# UNITED STATES DISTRICT COURT

## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE: TELEXFREE SECURITIES LITIGATION<br><br>**This Document Relates To:_____**<br><br>**ALL CASES** | **MDL No. 4:14-md-2566-TSH** |

| | |
|---|---|
| CELIO DA SILVA, RITA DOS SANTOS, PUTATIVE CLASS REPRESENTATIVES AND THOSE SIMILARLY SITUATED,<br><br>                     Plaintiffs,<br>       v.<br><br>TELEXELECTRIC, LLLP; TELEX MOBILE, HOLDINGS, INC.; JAMES M. MERRILL; CARLOS N. WANZELER; STEVEN M. LABRIOLA; JOSEPH H. CRAFT, a/k/a JOE H. CRAFT; CRAFT FINANCIAL SOLUTIONS, LLC; ANN GENET; CARLOS COSTA; KATIA WANZELER; SANDERLEY RODRIGUES DE VASCONCELOS; WWW GLOBAL BUSINESS, INC.; SANTIAGO DE LA ROSA; RANDY N. CROSBY; FAITH R. SLOAN; DANIIL SHOYFER; SCOTT MILLER; GERALD P. NEHRA, individually and doing business as LAW OFFICES OF NEHRA AND WAAK; GERALD P. NEHRA ATTORNEY AT LAW, PLLC; RICHARD W. WAAK, individually and doing business as LAW OFFICES OF NERHA AND WAAK; RICHARD W. WAAK, ATTORNEY AT LAW, PLLC; OPT3 SOLUTIONS, INC.; JASON A. BORROMEI; PRICEWATERHOUSECOOPERS, LLP; BANK OF AMERICA CORPORATION; BANK OF AMERICA, NA; TD BANK, NA; FIDELITY CO-OPERATIVE BANK, doing business as FIDELITY BANK; JOHN F. MERRILL; SYNOVUS FINANCIAL CORPORATION; SYNOVUS BANK; GLOBAL PAYROLL GATEWAY INC.; INTERNATIONAL PAYOUT SYSTEMS, INC.; PROPAY, INC., doing business as PROPAY.COM; BASE COMMERCE, LLC, doing business as PHOENIX PAYMENTS; JOHN HUGHES; VANTAGE PAYMENTS, LLC; DUSTIN SPARMAN; ALLIED WALLET, LTD; DOE INSIDE PROMOTERS; DOE PROFESSIONAL SERVICES PROVIDERS; DOE BANKS; DOE INVESTMENT SERVICES PROVIDERS; DOE | **CLASS ACTION**<br><br>**FIRST CONSOLIDATED AMENDED COMPLAINT**<br><br>**DEMAND FOR TRIAL BY JURY** |

| PAYMENT PROCESSORS; and PARALEGAL DOE, Defendants. | |

## TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................... i

I.   JURISDICTION AND VENUE ............................................................................. 10

II.  THE PARTIES ....................................................................................................... 11

    A.  PLAINTIFFS ................................................................................................... 11

    B.  DEFENDANTS ............................................................................................... 11

        1.  TELEXFREE DEFENDANTS ............................................................. 11

            a.  Third-Party TelexFree Bankrupt Entities ................................... 11

            b.  Electric and Mobile ........................................................................ 13

        2.  OTHER OPERATIONAL DEFENDANTS ........................................ 13

            a.  Founders and Principals, Executive Office, Top Level Promoters and Associated Individuals ................................................................ 13

            b.  Licensed Professionals including Attorneys and Other Professional Services Providers ....................................................... 15

            c.  The Accountant Defendants ........................................................... 17

        3.  FINANCIAL SERVICES PROVIDERS ............................................. 18

            a.  The Bank Defendants ..................................................................... 18

            b.  Payment Processing Service Companies ....................................... 19

III. FACTS AND ALLEGATIONS ............................................................................. 20

    A.  Chronological Overview ................................................................................ 21

    B.  TelexFree's History, Formation and its Brazilian Links ......................... 30

    C.  Ympactus, TelexFree's Brazilian-Based Operations ............................... 31

    D.  The Formation of the Bankrupt TelexFree Companies ........................... 34

    E.  TelexFree, Inc. ............................................................................................... 34

    F.  TelexFree, LLC ............................................................................................. 35

    G.  TelexFree Financial, Inc. ............................................................................. 36

H.  Relationship of the Bankrupt TelexFree Companies ............................................ 37

I.  Defendants Electric and Mobile ............................................................................ 37

J.  TelexFree's Founders and Principals, Executive Officers and Top Level Promoters ............................................................................................................... 39

K.  TelexFree's Unlawful, Unfair and Deceptive Pyramid Scheme ........................ 45

L.  Gallery of Rogues Assembled ............................................................................... 60

        i.  The Seasoned Scam Artists ............................................................ 60

        ii.  The Professional Legitimizers' Roles ........................................... 64

M.  TelexFree's Fraudulent and Deceptive Use of Best Western Hotel .................. 69

N.  Investigation of, and Injunctions against, Telexfree's Brazilian Operations in Brazil ..................................................................................................................... 70

O.  TelexFree's Continued United States' Operations ............................................. 73

P.  Collapse of TelexFree's United States Operations ............................................. 74

Q.  TelexFree's Belated Efforts to Legitimize Its Scheme ...................................... 75

R.  Events Since TelexFree's Bankruptcy Filing ..................................................... 76

S.  TelexFree's Principals, Founders and Executive Office Controlled TelexFree, Knowingly Perpetrated the Unlawful, Unfair, and Deceptive Pyramid Scheme, and Made False Representations about TelexFree ............................................. 78

T.  TelexFree's Top Level Promoters Played an Integral, Essential and Primary Role and also Aided and Abetted the Pyramid Scheme ..................................... 83

U.  TelexFree's Attorneys Played an Integral Role in and Aided and Abetted the Unlawful, Unfair, and Deceptive Pyramid Scheme .......................................... 84

V.  TelexFree's Accountants and Professional Services Providers Played an Integral Role in and Aided and Abetted the Unlawful, Unfair, and Deceptive Pyramid Scheme ................................................................................................... 93

W. The Financial Services Providers Were Required to Comply With Various Statutory and Regulatory Investigation and Monitoring Obligations .............. 98

X.  TelexFree's Suspicious, Tortious and Unlawful Operation Displayed Red Flags Detectable by the Defendant Financial Service Providers ............................... 115

Y.  The Bank Defendants ......................................................................................... 122

    1.  Defendant Bank of America ................................................................. 125

    2.  Defendant TD Bank ............................................................................. 131

3.  Fidelity Bank .............................................................................137

4.  Synovus ...................................................................................142

Z.  **Defendant Payment Processing Service Companies**.........................143

1.  Propay ....................................................................................146

2.  GPG ........................................................................................148

3.  Base Commerce ......................................................................151

4.  Vantage Payments...................................................................157

5.  Allied Wallet ...........................................................................161

6.  IPS ..........................................................................................163

IV. CLASS ACTION ALLEGATIONS ..........................................................167

V.  CLAIMS FOR RELIEF ..........................................................................170

**FIRST CLAIM FOR RELIEF**
**VIOLATIONS OF MASSACHUSETTS GENERAL LAWS, CHAPTER 93, SECTIONS
12 and 69**
**(Against All Operational Defendants)**……………………………………………..171

**SECOND CLAIM FOR RELIEF**
**VIOLATIONS OF MASSACHUSETTS GENERAL LAWS, CHAPTER 93A,
SECTIONS 2 AND 11**
**(Against All Operational Defendants)**…………………………………………….171

**THIRD CLAIM FOR RELIEF**
**AIDING AND ABETTING VIOLATIONS OF MASSACHUSETTS GENERAL LAWS,
CHAPTER 93, SECTIONS 12 and 69, AND MASSACHUSETTS GENERAL LAWS,
CHAPTER 93A, SECTIONS 2(a) or 11**
**(Against TelexFree And All Defendants)**……………………………………………173

**FOURTH CLAIM FOR RELIEF**
**UNJUST ENRICHMENT**
**(Against All Defendants)**…………………………………………………………..178

**FIFTH CLAIM FOR RELIEF**
**CIVIL CONSPIRACY**
**(Against TelexFree, All Operational Defendants, John Merrill, John Hughes, Dustin
Sparman, Fidelity Bank, Base Commerce, GPG, and IPS)**………………………179

**SIXTH CLAIM FOR RELIEF**
**PROFESSIONAL NEGLIGENCE**
**(Against All Licensed Professional Defendants)**………………………..……………..180

**SEVENTH CLAIM FOR RELIEF**
**NEGLIGENT MISREPRESENTATION**
**(Against Operational Defendants Except Katia Wanzeler)**……………………………..181

**EIGHTH CLAIM FOR RELIEF**
**VIOLATIONS OF MASSACHUSETTS GENERAL LAWS, CHAPTER 110a, SECTION**
**410(b)**
**(Against All Operational Defendants except for Mobile, Electric,**
**PricewaterhouseCoopers)**……………………………………………………………………….182

**NINTH CLAIM FOR RELIEF**
**FRAUD**
**(Against Operational Defendants)**……………………………………………………………….184

**TENTH CLAIM FOR RELIEF**
**TORTIOUS AIDING AND ABETTING**
**(Against All Defendants)**…………………………………………………………………………186

**VI. PRAYER FOR RELIEF** ............................................................................................... **188**

**VII.    DEMAND FOR JURY TRIAL**.................................................................................. **189**

Plaintiffs and Putative Class Representatives Celio Da Silva and Rita Dos Santos on behalf of themselves and all others similarly situated ("Plaintiffs") bring this action against the defendants named herein ("Defendants").  This complaint is based on information and belief, except those paragraphs that relate to Plaintiffs, which are based on personal knowledge. Plaintiffs allege as follows:

1.      TelexFree, Inc., TelexFree, LLC, and TelexFree Financial, Inc. (collectively, "TelexFree") and its related entities and individuals operated an illegal scheme whereby it sold "memberships," ostensibly paid its "promoters" ("Members" or "Promoters") for placing advertisements for a "voice over internet protocol" ("VoIP") product, and in reality paid them to recruit other investors whose new membership fees kept the scheme afloat (the "TelexFree Program").

2.      Until TelexFree, Inc. changed its compensation plan in March 2014, a month before it filed for bankruptcy, it did not require promoters to sell its VoIP product to be eligible for payments.

3.      TelexFree's business and operations constituted an illegal Pyramid Scheme (the "Pyramid Scheme").  A pyramid scheme is a form of a Ponzi scheme wherein a business enterprise persuades people to invest money into a seemingly legitimate business model and in exchange guarantees profits. The actual sales or services provided, if any, are insufficient to pay the promised returns to investors.  The operation of a pyramid scheme relies entirely on additional investment funding by new or existing investors. The actual sales or services provided, if any, are insufficient to pay the promised returns to investors.  Once the influx of new investments stops, the pyramid scheme collapses because there are no new funds with which to pay previous investors. Pyramid schemes are lucrative for those who occupy top-level or other

like positions and for those who service them.

4.    Massachusetts General Laws ("M.G.L.") c. 93, § 69 makes pyramid schemes, as well as many of their traditional features, unlawful.  M.G.L. c. 93, § 69(g) expressly declares that a violation of M.G.L. c. 93, § 69 is a per se violation of M.G.L. c. 93A, §2(a).  For this reason, in addition to others, TelexFree and certain other defendants otherwise violated M.G.L. c. 93A, §§2 and 11.

5.    TelexFree raised as much as $1 billion dollars over the course of eighteen months as follows:

| | |
|---|---|
| 2012 Income | $15,490,349.71 |
| 2013 Income | $865,893,524.99 |
| 2014 Income | $161,116,265.38* |

(*Law enforcement authorities shut down TelexFree on April 15, 2014.)

6.    The financial services providers ("Financial Services Providers" or "Financial Services Defendants") processed hundreds of thousands of related transactions involving hundreds of millions of dollars, and the substantial assistance they provided was essential to TelexFree.

7.    TelexFree's founders and principals, executive officers and top level promoters controlled the activities and operations of TelexFree and knowingly, maliciously, and willfully conspired to perpetrate, and did perpetrate, the TelexFree Pyramid Scheme with full awareness of its unfair, deceptive, and unlawful nature.  Licensed professionals and others were negligent or reckless in providing advice, directly participated in, or otherwise providing essential substantial assistance after knowing TelexFree business enterprise was unlawful.

8.    The Federal Financial Institutions Examination Council ("FFIEC" or "Council") regulates the TelexFree Financial Services Providers.  The Council is a formal interagency body

empowered to prescribe uniform principles, standards, and report forms for the federal examination of financial institutions by the Board of Governors of the Federal Reserve System ("FRB"), the Federal Deposit Insurance Corporation ("FDIC"), the National Credit Union Administration ("NCUA"), the Office of the Comptroller of the Currency ("OCC"), and the Consumer Financial Protection Bureau ("CFPB"), and to make recommendations to promote uniformity in the supervision of financial institutions.

9.      The Financial Services Defendants were required by federal law to, and did, maintain robust, sophisticated, and thorough due diligence systems at all times.

10.     The Financial Services Defendants are not just required to know their clients, they are required to obtain knowledge of and understand how their client's business operates, who is running it, and who is associated with it.  The Financial Services Defendants did not simply have to gather information; they needed to analyze it and understand their clients' business models and key personnel, and continue to monitor their customers on an ongoing basis.

11.     TelexFree was purportedly a contract-based business.  All TelexFree promoters, including Plaintiffs and members of the putative class were similarly obligated to enter into TelexFree's identical form contract ("TelexFree Pre-March 9 TelexFree Contract").  A true and correct copy of the Pre-March 9 TelexFree Contract is attached hereto as Exhibit 1

12.     At all times material herein, TelexFree was a "multi-level distribution company" as defined by M.G.L., Chapter 93, Section 69(a).

13.     M.G.L., Chapter 93, Section 69(d)(2) prohibits any multi-level distribution company from offering or paying any "finder's fee, bonus, refund, override, commission, cross-commission, dividend or other consideration" to any participant therein "solely for the solicitation or recruitment of other participants."

14.     The TelexFree Pre-March 9 Contract, on its face, contains numerous instances of promising payment merely for recruitment of new Participants[1] as defined by M.G.L., Chapter 93, Section 69, including, but not limited to, the following:

a.  Clause 5.7:  "A PROMOTER will achieve TEAM BUILDER status when he is active in an ADCentral FAMILY position (in the marketing network) that has 10 (ten) ADCentral FAMILIES on the incentive plan registered directly by him on his site."

b.  Clause 5.7.1:  "As long as he is fulfilling the qualification in clause 5.9.2[2] [sic], a TEAM BUILDER will earn a payment of 2% (two percent) of the company's net billing in the following month…the maximum amount for this earning, by contract, which is for one year, is up to US$ 39,600.00…" (emphasis added).

c.  Clause 5.8:  "THE PROMOTER shall receive as an incentive a bonus of US$ 20.00 (twenty U.S. dollars), for each VOIP ADCentral kit that his direct lower PARTNER acquires and a US$ 100.00 (one hundred U.S. dollars) bonus for each VOIP FAMILY kit that his direct lower PARTNER acquires."

d.  Clause 6.1:  "A PROMOTER who directly registers 2 (two) new promoters, with one on the left side and the other on the right side of his marketing network, qualifies for direct and indirect binary earnings, and for 2% (two percent) of the network from the first to the 6th level, assessed only on plans whose owners have at least one active VOIP client, that is, who have at least one active 99TELEXFREE plan."

e.  Clause 6.1.1:  Upon qualifying in the manner described in the clause above by selling 2 (two) new ADCENTRAL kits to people in his network, with 1 (one) on the left side and the other on the right side, he shall receive an additional gratuity of US$20 (twenty U.S. dollars), called the binary cycle, with the maximum daily earning in this status being US$ 440.00 (four hundred and forty U.S. dollars), for 22 (twenty-two) binary cycles."

f.  Clause 6.1.2:  If the sale is of 2 (two) VOIP ADCentral FAMILY kits, this cycle will yield an additional US$ 20.00 (twenty U.S. dollars), for the ADCentral principals, plus US$ 60 (sixty U.S. dollars), for 3 (three) of the 4 (four) ADCentral additional…"

g.  Clause 8.1:  "THE PROMOTER shall be entitled to a payment of 1% (one percent), in the form of ROYALTIES, from the company's net billing, if within 1

---

[1] For ease of reading, the terms "Member," "Promoter" or "Participant," regardless of capitalization, are at all times herein to be construed as "Participant" defined by M.G.L. Chapter 93, Section 69.

[2] The TelexFree Pre-March 9 Contract does not include a clause numbered 5.9.2.

4

(one) calendar month (from the 1ˢᵗ (first) day – to the last day of the month) the PROMOTER shall have closed 22 (twenty-two) cycles in 20 (twenty) days, which need not necessarily be consecutive days."

15.     The above provisions of the standard TelexFree Pre-March 9 Contract are clear and direct violations of M.G.L. c. 93, § 69(d), as they promise payments, including cash payments, "bonuses," "gratuities," "royalties," and dividends, merely for the recruitment of new TelexFree members/participants (i.e. through the sale of AdCentral membership accounts).

16.     Furthermore, M.G.L., Chapter 93, Section 69(d)(3)-(4) also prohibits any multi-level distribution company from offering or paying any "finder's fee, bonus, refund, override, commission, cross-commission, dividend or other consideration" to any participant therein:

  a.  "unless such participant performs a bona fide and essential supervisory, distributive, selling or soliciting function in the sale or delivery of such product or services," or,

  b.  "where no amount of judgment or skill exercised by the participant has any appreciable effect" upon such payment," or,

  c.  "where the participant is without that degree of control over the operation of such plan as to enable him substantially to affect the amount" of such payment."

17.     The TelexFree Pre-March 9 Contract, on its face, contains clear, obvious and direct violations of M.G.L. c. 93, § 69(d)(3)-(4), including:

  a.  Clause 5.4:  "ADCENTRAL PROMOTERS: After setting up his membership, a PARTNER may acquire an "ADCentral" kit consisting of 10 99TELEXFREE VOIP accounts, for which he must pay the equivalent of US$ 289.00 (two hundred and eighty-nine U.S. dollars)."

  b.  Clause 5.4.1:  "with this qualification, the PARTNER will become a TELEXFREE PROMOTER and, accordingly, shall have his own active ad central for 12 (twelve) months, counting from the date of his membership (and not from the date of the purchase of the kit)."

  c.  Clause 5.4.2:  "He must also post 1 (one) announcement (prepared by TELEXFREE) per day on internet announcement sites (whether free of charge or not), so that at the end of each cycle of 7 (seven) announcements for the week, the PROMOTER shall receive one 99TELEXFREE account."

    d.   Clause 5.5:  "ADCENTRAL FAMILY MEMBERSHIP – A PROMOTER wishing to attain the status of an "ADCentral FAMILY Member" must pay the equivalent of US$ 1,375.00 (one thousand three hundred and seventy-five U.S. dollars)."

    e.   Clause 5.5.1:  "With this membership, a PROMOTER shall have 5 (five) active announcement centrals for 12 (twelve) months, counting from the date of his activation."

    f.   Clause 5.5.2:  "He must, in turn, post 1 (one) announcement (prepared by TELEXFREE) per day at internet announcement sites (whether free of charge or not) on each one of the 5 (five) ADCentral sites. At the end of the 35 (thirty-five) announcements the PROMOTER shall receive 5 (five) 99TELEXFREE accounts as remuneration for these announcements."

18.    The above-cited language makes it clear to a sophisticated reader that TelexFree Members were not required to engage in any "bona fide and essential supervisory, distributive, selling or soliciting" nor exercise any "judgment," "skill," or "control over the operation."

19.    Rather, Members were only required to engage in the activity of cutting-and-pasting spam advertisements, which were "prepared by TELEXFREE," onto "internet announcement sites," and would receive "remuneration for these announcements."

20.    Furthermore, VoIP products distributed to Members as remuneration for this mindless spamming activity could be redeemed with TelexFree for cash, resulting in cash remuneration.

21.    M.G.L., Chapter 93, Section 69(b) requires that: "Every multi-level distribution company shall provide in its contract of participation that such contract may be cancelled for any reason at any time by a participant upon notification in writing to the company of his election to cancel. If the participant has purchased products while the contract of participation was in effect, all unencumbered products in a resaleable condition then in the possession of the participant shall be repurchased …"

22.    The TelexFree Pre-March 9 Contract, on its face, contains egregious, obvious

violations of M.G.L. c. 93, § 69(b), including:

    a.   Clause 10.1.2: "A PARTNER or PROMOTER can cancel his membership within 7 (seven) days of becoming a member, and receive a full refund of what he actually paid to TELEXFREE, including the membership fee and the price of the VOIP accounts he has not activated..."

    b.   Clause 10.1.4: "If a PARTNER or PROMOTER seeks cancellation of membership after the legal deadline, he is aware that he will not receive any reimbursement of any amount, since his position will continue to entail expenses for its maintenance."

23.     In addition to these clear violations of M.G.L. c. 93, § 69(b), the TelexFree Pre-March 9 Contract also sets forth the following draconian terms for cancellation of membership:

Clause 10.1.3: "To be disconnected from the TELEXFREE NETWORK Marketing System, a member must request cancellation of his participation on a specific form provided on his personal page, or in the event of absence or inability to use this resource, through a letter written and signed by him, with certified signature recognition, sent to the headquarters of the CONTRACTOR, correctly stating all of the information requested; if these data rigorously match the data reported when putting through the application, which is to be ascertained for reasons of security, the cancellation shall be approved in an irreversible manner."

24.     These terms of cancellation are clearly designed to entangle members in TelexFree's Scheme and prevent Members from withdrawing.

25.     Not only does the TelexFree Pre-March 9 Contract explicitly violate M.G.L. Chapter 93, Section 69 – it also lays bare several classic hallmarks of pyramid schemes, including paying participants solely for recruitment of new members, not requiring any meaningful sales or distributive activity by participants, and using coercive measures to prevent participant withdrawal from the scheme.

26.     The mechanics of the TelexFree Program (e.g. AdCentral, AdCentral Family) were described in the TelexFree Pre-March 9 Contract and on TelexFree's website and otherwise accessible to the Financial Services Defendants.  TelexFree's business model and operations were suspicious, tortious, or illegal to the sophisticated Financial Services Defendants, as

demonstrated by the following graphic taken from the public area of TelexFree's website,

www.TelexFree.com:



27.     Like the TelexFree Pre-March 9 Contract, TelexFree's own website set forth

numerous plain violations of M.G.L. c. 93, § 69. For example, several violations were included

in a key promotional video, entitled "Presentation," which was prominently featured on

www.TelexFree.com, and which included, without limitation, the following violations of M.G.L.

Chapter 93, Section 69:

    a.   promising that Members would "[e]arn US$20 for the direct registration of each
       new promoter," in violation of Section 69(d)(2);

    b.   promising that Members would "[e]arn US$20 per cycle each time you register 1
       ADCentral in your left and 1 in your right, doesn't matter if they are direct,
       indirect, or gotten by transfer," in violation of Section 69(d)(2);

    c.   promising that Members would "[r]eceive 2% over what your network, direct or indirect up to the 6th level, is receiving from Telexfree in money for the ads posting [sic]," in violation of Section 69(d)(2);

    d.   promising that "[e]veryone who reaches 22 [cycles] of ADCENTRAL for 20 days, within the same month. [sic] Individually or by group will receive 1% of the business volume of the company, as extra bonus, will be divided equally among everyone qualified," in violation of Section 69(d)(2);

    e.   promising that "Team Builders," i.e. Promoters who are able to register at "10 direct ADCentral FAMILY in a period of 60 days," "will receive the share of 2% of the revenue of the monthly net sales for the company, divided equally among all the TEAM BUILDERS until receiving the maximum bonus for the TEAM BUILDER which is of $39,600," in violation of Section 69(d)(2);

    f.   promising that Members would receive income for "[o]nly posting 5 DAILY ADS ON INTERNET! [sic]," in violation of Section 69(d)(3) & (4);

    g.   guaranteeing to Members returns of $49.90 weekly, $199.60 monthly, and $2594.80 annually in exchange for the purchase of one AdCentral package, in violation of Section 69(e);

    h.   guaranteeing to Members returns of $249.50 weekly, $998.00 monthly, and $12,974 annually, on one AdCentral Family package, in violation of Section 69(e); and

    i.   providing a simulation of guaranteed earnings based solely on adding new Members to one's network, in violation of Section 69(d)(2) & (e).

    28.   The above violations of M.G.L. Chapter 93, Section 69 were also plain evidence to the sophisticated Financial Services Defendants that TelexFree promised passive income to participants, that recruitment of new participants predominated over product sales in TelexFree's business model, and TelexFree was therefore a pyramid scheme.

    29.   The facts and circumstances set forth herein establish that the sophisticated notice, investigation and evaluation systems of the Financial Services Defendants were exposed to open and notorious facts that reasonably placed them on notice of TelexFree's suspicious, tortious, malicious, unfair, deceptive and/or unlawful acts, practices and business enterprise.

    30.   As a result of their compliance with federal law, each of the Financial Services

Defendants was actually aware of facts and evidence of suspicious, tortious, or illegal TelexFree activity ("Red Flags").

31.     When a bank finds out that a client is laundering money or running an unlawful enterprise, it must stop servicing or shut down the accounts, terminate the banking relationship, and file a Suspicious Action Report ("SAR") with the Financial Crimes Enforcement Network.

32.     During the class period, the Financial Services Providers unlawfully failed to timely or sufficiently meet these obligations.

33.     Each of the Financial Services Defendants was a substantial and integral cog in TelexFree's unlawful United States Pyramid Scheme, and, without that assistance, the Scheme would not have been able to get off the ground, develop, maintain or thrive.  Each Financial Services Defendant was motivated by substantial profits and other interests at the local and national level gained from its relationship with TelexFree and other Defendants, as well as a desire to maintain their personal and lucrative relationships with the multilevel marketing industry as a whole.

34.     Similarly situated Plaintiffs seek compensation for the ascertainable economic loss they were similarly caused to suffer as a result of Defendants' participation in, or aiding or abetting of, TelexFree's illegal Pyramid Scheme.  They also seek equitable relief.

## I.     JURISDICTION AND VENUE

35.     This Court has subject-matter jurisdiction over the instant matter pursuant to 28 U.S.C. § 1332(d) and the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §§ 1711, *et seq.*, which vest original jurisdiction in the district courts of the United States for any multi-state class action where the aggregate amount in controversy exceeds $5,000,000 and where the citizenship of any member of the class of plaintiffs is different from that of any defendant.  The

$5,000,000 amount-in-controversy and diverse citizenship requirements of CAFA are satisfied in this case.

36.     Venue is proper under 28 U.S.C. § 1391 since a substantial part of the acts, omissions and transactions giving rise to this action occurred in this district; certain Defendants reside in this district; and TelexFree, LLC, TelexFree, Inc. and TelexFree Financial, Inc. (related entities not named as Defendants) are currently debtors in Chapter 11 proceedings pending in this district.

## II.     THE PARTIES

### A. PLAINTIFFS

37.     Plaintiff Rita D. Dos Santos ("Dos Santos") is an individual who resides in Massachusetts.  Dos Santos, like many other victims of TelexFree's Pyramid Scheme, tendered funds for a TelexFree Membership and its promised pre-March 9, 2014 return on investment (the "Original Return on Investment").

38.     Plaintiff Celio Da Silva (" Da Silva") is an individual who resides in Massachusetts.  Da Silva, like many other victims of TelexFree's Pyramid Scheme, tendered funds for a TelexFree Membership and its promised Original Return on Investment.

### B. DEFENDANTS

#### 1.  TELEXFREE DEFENDANTS

##### a.  Third-Party TelexFree Bankrupt Entities

39.     TelexFree, Inc., TelexFree, LLC and TelexFree Financial, Inc. are not currently Defendants due to their Chapter 11 bankruptcy protections, but they are third-party participants in the unlawful activities described in this complaint.

40.     TelexFree, Inc. is a corporation duly organized and existing under the laws of the Commonwealth of Massachusetts, registered with the Corporations Division of the Secretary to

11

the Commonwealth of Massachusetts (Identification Number 000832397), having a last known

principal place of business at 225 Cedar Hill Street, Suite 200, in Marlborough, County of

Middlesex, Commonwealth of Massachusetts 01752 (the "TelexFree Marlborough Office").

41.     TelexFree, LLC is a limited liability company duly organized and existing under

the laws of Nevada, having a purported place of business at 4705 S. Durango Drive, #100-J51 (a

post office box), Las Vegas, Nevada 89147 (the "Nevada Post Office Box").  TelexFree, LLC

also maintained offices in the Commonwealth of Massachusetts at the TelexFree Marlborough

Office between 2012 and late April 2014.  At all material times, TelexFree, LLC was identified

as a limited liability company as registered with the Corporations Division of the Secretary to the

Commonwealth of Massachusetts (Identification Number 001105166).  TelexFree, LLC

registered with the Secretary of State for the Commonwealth of Massachusetts on April 18,

2013.

42.     The last unnamed TelexFree entity is TelexFree Financial, Inc. ("TelexFree

Financial").  TelexFree Financial, Inc. is a corporation duly organized and existing under the

laws of the State of Florida, having its last known principal place of business at 2321 NW

37th Avenue, in Coconut Creek, Florida 33063.  TelexFree Financial is a wholly-owned

subsidiary of TelexFree, LLC.

43.     Throughout this complaint, for ease of reference, the named and unnamed

TelexFree corporations as well as the Founders, Principals, Executive Office, Top Level

Promoters and Associated Individuals; and the Licensed Professionals including Attorneys,

Accountants, and Other Professional Services Providers (as defined herein) are alternatively

referred to for ease of reading as "Operational Defendants."  At times relevant to this complaint,

the Operational Defendants served as principals, agents, servants, authorized representatives, co-

conspirators or employees of TelexFree.

### b.  Electric and Mobile

44.     Defendant TelexElectric, LLLP ("Electric") is a limited liability limited partnership organized and under the laws of the State of Nevada.  Its registered agent is BWFC Processing Center, LLC, 3960 Howard Hughes Parkway, Suite 500, Las Vegas, Nevada 89169.

45.     Defendant Telex Mobile, Holdings, Inc. ("Mobile") is a corporation organized and existing under the laws of the State of Nevada, and having its registered agent as BWFC Processing Center, LLC, 3960 Howard Hughes Parkway, Suite 500, Las Vegas, Nevada 89169.

### 2.  OTHER OPERATIONAL DEFENDANTS

### a.  Founders and Principals, Executive Office, Top Level Promoters and Associated Individuals

46.     James M. Merrill ("Merrill") is an individual with a last known usual place of abode of 1 Coburn Drive in Ashland, County of Middlesex, Commonwealth of Massachusetts 01721.  Merrill is a Founder, Principal, and a member of TelexFree's Executive Office.

47.     Carlos N. Wanzeler ("Wanzeler") is an individual with a last known usual place of abode of 373 Howard Street, in Northborough, County of Worcester, Commonwealth of Massachusetts 01532.  Wanzeler is a Founder, Principal, and a member of TelexFree's Executive Office.

48.     Carlos Roberto Costa ("Costa") is an individual with a last known usual place of abode located at Rua Umbizeiro, 37, Bairro de Itapoa, Vila Velha, Espirito Santo, 29101-00 Brazil.  Costa is a Founder, Principal and a member of TelexFree's Executive Office.

49.     Merrill, Wanzeler and Costa are collectively referred to herein as "Founders."

50.     Steven M. Labriola is an individual with a last known usual place of abode of 21 Kiwanis Beach Road, in Upton, County of Worcester, Commonwealth of Massachusetts

01568.  Labriola is a Principal and a member of TelexFree's Executive Office.

51.     Joseph H. Craft, also known as Joe H. Craft ("Craft") is an individual with a last

known usual place of abode at 825 E. Main Street in Boonville, Indiana 47601-1885.  Craft is a

Principal and a member of TelexFree's Executive Office.

52.     Merrill, Wanzeler, Costa, Labriola and Craft are collectively referred to herein as

"Principals" or "Executive Office."

53.     Defendant Ann Genet ("Genet") served as TelexFree, LLC's Nevada agent,

servant or employee, was a resident of Las Vegas, Nevada who served TelexFree's Executive

Office and is an individual associated with Craft and Bridgeway Financial Corporation.  Her

address is unknown at this time.

54.     Katia Wanzeler is an individual with a last known usual place of abode of

373 Howard Street, in Northborough, County of Worcester, Commonwealth of Massachusetts

01532.  Katia Wanzeler served as an agent servant or authorized representative of TelexFree's

Executive Office and is otherwise an individual associated with TelexFree's Founders,

Principals, Executive Office, and Top Promoters.

55.     Genet and Katia Wanzeler are collectively referred to herein as "Associated

Individual" Defendants.

56.     Sanderley Rodrigues de Vasconcelos ("Rodrigues") has a last known usual place

of abode of 100 Stockton Street, Apt. 49, in Chelsea, County of Suffolk, Commonwealth of

Massachusetts 02150.  Rodrigues is a TelexFree Top Level Promoter

57.     Santiago de la Rosa ("De La Rosa") is an individual with a last known usual place

of abode of 189 Beacon Hill Avenue, Unit 2, in Lynn, County of Essex, Commonwealth of

Massachusetts 01902.  De La Rosa is a TelexFree Top Level Promoter.

58.     Randy N. Crosby ("Crosby") has a last known usual place of abode of 30 Club Court, in Alpharetta, Georgia 30005.  Crosby is a TelexFree Top Level Promoter.

59.     Scott Miller ("Miller") has a last known usual place of adobe of 973 Thornwood Drive, Greenwood, IN 46143.  Miller is a TelexFree Top Level Promoter.

60.     Faith R. Sloan ("Sloan") has a last known usual place of abode of 515 E. End Avenue, Unit 105, in Calumet City, Illinois 60409.  Sloan is a TelexFree Top Level Promoter.

61.     Daniil Shoyfer ("Shoyfer") has a last known usual place of abode of 123 Arbutus Avenue, in Staten Island, New York 10312.  Shoyfer is a TelexFree Top Level Promoter.

62.     Rodrigues, De La Rosa, Crosby, Sloan, Shoyfer, and Miller are collectively referred to herein as "Top Level Promoters."

63.     TelexFree's Founders, Principal, Executive Office, Top Level Promoter Defendants are collectively referred to as "TelexFree's Executives" or "Executives."

64.     By their acts and omissions, each above Founder, Principal, Executive Office, Top Level Promoter Defendant and Associated Individual Defendant transacted business in the Commonwealth of Massachusetts; contracted to supply services and things in the Commonwealth of Massachusetts; caused tortious injury to the putative class in the Commonwealth of Massachusetts; regularly solicited business and engaged in persistent courses of conduct in the Commonwealth of Massachusetts; made use of the laws, rights, and protections offered by the Commonwealth of Massachusetts; and derived substantial revenue from goods used or consumed or services rendered in the Commonwealth of Massachusetts.

**b.  Licensed Professionals including Attorneys and Other Professional Services Providers**

65.     Defendant Gerald P. Nehra, Esq. ("Nehra") is an individual who now resides or formerly resided at 1710 Beach Street, Muskegon, Michigan, 49441 and also maintains a second

residence at 2149 Tall Oak Court, Sarasota, Florida 34232.  Nehra is an attorney duly licensed to practice law in the State of Michigan.

66.    Defendant Gerald P. Nehra, Attorney at Law, PLLC ("Nehra Law Firm") is a professional limited-liability company engaged in the practice of law and duly organized and existing under the laws of Michigan, with offices located at 1710 Beach Street, Muskegon, Michigan, 49441.  Nehra is its sole member, manager, and registered agent.

67.    Defendant Richard W. Waak ("Waak") is an individual who now resides or formerly resided at 11300 East Shore Drive, Delton, Michigan, 49046.  Waak is an attorney duly licensed to practice law in the State of Michigan.

68.    Defendant Richard W. Waak, Attorney at Law, PLLC ("Waak Law Firm") is a professional limited-liability company engaged in the practice of law and duly organized and existing under the laws of Michigan, with offices located at 11300 East Shore Drive, Delton, Michigan, 49046.  Waak is its sole member, manager, and registered agent.

69.    Defendant Law Offices of Nehra and Waak ("Nehra and Waak Law Firm") is a general partnership formed between Defendants Nehra, Waak, Nehra Law Firm, and Waak Law Firm with primary offices located at 11300 East Shore Drive, Delton, Michigan, 49046, and a secondary office is located at 1710 Beach Street, Muskegon, Michigan.

70.    Nehra, Waak, Nehra Law Firm, Waak Law Firm, Nehra and Waak Law Firm, are collectively referred to herein as "Attorney Defendants."

71.    Defendant Opt3 Solutions, Inc. ("Opt3") is a corporation duly organized and existing under the laws of the State of California, having its principal place of business at 120 Vantis, Suite 300, Alison Viejo, California.

72.    Defendant Jason A. Borromei, also known as Jay Borromei ("Borromei"), is an

individual with a last known place of abode located at 23952 Catbird Court, Laguna Niguel,

California 92677.   At all material times, Borromei served as president and authorized

representative of Opt3.

73.     Boromei and Opt3 are collectively referred to herein as "Other Professional

Services Providers."

74.     By their acts and omissions, the Attorney Defendants and Other Professional

Services Providers have transacted business in the Commonwealth of Massachusetts; contracted

to supply services and things in the Commonwealth of Massachusetts; caused tortious injury to

the putative class in the Commonwealth of Massachusetts; regularly solicited business and

engaged in persistent courses of conduct in the Commonwealth of Massachusetts; made use of

the laws, rights, and protections offered by the Commonwealth of Massachusetts; and derived

substantial revenue from goods used or consumed or services rendered in the Commonwealth of

Massachusetts.

### c.  The Accountant Defendants

75.     Defendant Craft is a certified public accountant who privately provided

accounting services and financial advice to TelexFree and others before he served as the chief

financial officer of TelexFree, Inc. and TelexFree, LLC.

76.     Defendant Craft Financial Solutions, LLC ("Craft Financial") is a limited-liability

company duly organized and existing under the laws of the State of Indiana with a principal

place of business located at 825 E. Main Street, Boonville, Indiana, 47601-1885.  Craft Financial

provided accounting services and financial advice to TelexFree and others.  Craft is also the sole

member and manager of Craft Financial.

77.     PricewaterhouseCoopers, LLP ("PricewaterhouseCoopers") is a Registered

foreign limited liability partnership, organized and existing under the laws of the State of

Delaware, having a principal place of business in New York, New York, and having a place of

business at 125 High Street, in Boston, County of Suffolk, Commonwealth of Massachusetts

02110.  At times material herein, PricewaterhouseCoopers provided accounting services and

other professional services to TelexFree.

78.     Craft, Craft Financial and PricewaterhouseCoopers are collectively referred to

herein as "Accountant Defendants."

79.     By their acts and omissions, the Accountant Defendants have transacted business

in the Commonwealth of Massachusetts; contracted to supply services and things in the

Commonwealth of Massachusetts; caused tortious injury to the putative class in the

Commonwealth of Massachusetts; regularly solicited business and engaged in persistent courses

of conduct in the Commonwealth of Massachusetts; made use of the laws, rights, and protections

offered by the Commonwealth of Massachusetts; and derived substantial revenue from goods

used or consumed or services rendered in the Commonwealth of Massachusetts.

80.     The Attorney Defendants, Accountant Defendants and the foregoing Other

Professional Services Providers are collectively referred to herein as "Licensed Professionals."

### 3.  FINANCIAL SERVICES PROVIDERS

#### a.  The Bank Defendants

81.     TD Bank, N.A. ("TD Bank") is a national banking institution in the United States

chartered and supervised by the federal Office of the Comptroller of the Currency (the "OCC")

with its principal place of business at 15 Broad Street in Boston, County of Suffolk,

Commonwealth of Massachusetts 02109.

82.     Bank of America, N.A. ("Bank of America") is a national banking institution in

the United States chartered and supervised by the OCC with a principal place of business in

Charlotte, North Carolina.  Bank of America, N.A. is a subsidiary of Bank of America, and

conducts business in the Commonwealth of Massachusetts at, *inter alia*, 100 Federal Street, in

Boston, County of Suffolk, Commonwealth of Massachusetts 02110.

83.     Fidelity Co-operative Bank, doing business as Fidelity Bank, ("Fidelity Bank") is

a Massachusetts Chartered Banking Institution, having its principal offices at 675 Main Street, in

Fitchburg, County of Worcester, Commonwealth of Massachusetts 01420.

84.     John F. Merrill is an individual with a last known usual place of abode of 7

Kinnicutt Road, in Worcester, Massachusetts 01602.

85.     At all material times herein, John F. Merrill served as president and chief

operating officer of Fidelity Bank.

86.     Synovus Bank ("Synovus") is a Georgia Chartered Banking Institution, having its

principal offices at 1148 Broadway, in Columbus, County of Muscogee, Georgia 31901.

87.     TD Bank, Bank of America, Fidelity Bank, John F. Merrill, and Synovus are

collectively referred to herein as the "Defendant Banks."

### b.  Payment Processing Service Companies

88.     Global Payroll Gateway, Inc. ("GPG") is a corporation duly organized and

existing under the laws of the State of California, having its principal offices at 18662

MacArthur Boulevard, Suite 200, in Irvine, California 92612.

89.     International Payout Systems, Inc. ("IPS") also doing business as i-Payout, is a

corporation duly organized and existing under the laws of the State of Florida, having its

principal offices at 2500 East Hallandale Beach Boulevard, Suite 800, Hallandale Beach, Florida

33009.

90.     Propay, Inc. ("ProPay") is a corporation duly organized and existing under the

laws of the State of Utah with its principal offices at 3400 North Ashton Boulevard, Lehi, Utah

84043 and also does business as PROPAY.COM.

91.     Base Commerce, LLC ("Base Commerce") formerly known as Phoenix Payment, LLC, is a limited liability company duly organized and existing under the laws of the State of Arizona with its principal offices at 7910 S. Kyrene Road, Suite 106, Tempe, Arizona 85284, and also does business as Phoenix Payments.

92.     John Hughes ("Hughes") is an individual with a last known usual place of abode of 6455 E. Rustic Drive, Mesa, Arizona 85215.

93.     Vantage Payments, LLC ("Vantage Payments") is a limited liability company duly organized and existing under the laws of the State of Arizona, having its principal offices at 8300 N. Hayden Road #A207, Scottsdale, Arizona 85251.

94.     Dustin Sparman ("Sparman") is an individual with a last known usual place of abode of 8702 E. Plaza Avenue 85610, Scottsdale, Arizona 85250.

95.     Allied Wallet, Ltd. ("Allied Wallet") is a limited company having its central office in the United Kingdom, and having its United States office at 900 Sunset Boulevard, Suite 820, West Hollywood, California 90069.

96.     GPG, IPS, ProPay, Base Commerce, Vantage Payments, Hughes, Sparman and Allied Wallet are collectively referred to herein as the "Payment Processing Service Companies."

97.     Defendants Bank of America, TD Bank, Fidelity Bank, Synovus, GPG, IPS, ProPay, Base Commerce, Vantage Payments, Allied Wallet, John F. Merrill, Hughes, Sparman and the Doe Banks and Doe Payment Processors are referred to herein collectively as the "Financial Services Providers".

## III.     FACTS AND ALLEGATIONS

### A. Chronological Overview

98.     The template for TelexFree's Pyramid Scheme was developed and refined in the

years immediately prior to the takeoff of its United States enterprise.

99.     In 2010, TelexFree Founders and Principals Wanzeler, Merrill and Costa first

formed and registered Ympactus Comercial Ltda ("Ympactus") under the laws of Brazil.

100.     Ympactus operated out of offices in Marlborough, Massachusetts and Brazil.

101.     TelexFree's United States Pyramid Scheme operated out of the same location. [3]

102.      Ympactus was registered as a company that would market cosmetics, perfumery

and toilet products.

103.     Later, in Brazil, Ympactus purported to sell internet telephone services, but in

reality sold Pyramid Scheme "memberships" to investors.

104.     TelexFree's United States business model and operations were essentially

identical to Ympactus' business model and operations in Brazil.[4]

105.     Ympactus and TelexFree's U.S. memberships offered investors (the "Members"

or "Promoters") guaranteed high returns in exchange for promoting the company online and

recruiting new investors.

106.     Ympactus and TelexFree falsely advertised themselves as a "multi-level

marketing" company selling local and international telephone service plans that used unique

groundbreaking "voice over internet protocol" ("VoIP") technology.

---

[3] There was considerable overlap between Ympactus, which also operated as TelexFree, and TelexFree's United States companies and operations.  To assist the reader, TelexFree's Brazilian Pyramid Scheme will be referred to as "TelexFree Brazil" or "Ympactus."  "TelexFree" means the various United States-based TelexFree entities, as well as the Operational Defendants as defined herein.

[4] As in Brazil, TelexFree's business model has it accept $299 deposits from Members on the promise of a $20 a week rate of interest for 52 weeks.  The company also pays Members directly based on how many deposits recruited down line affiliates make via a matrix.

107.    The VoIP technology used by Ympactus and TelexFree was not unique or groundbreaking.  In fact, it was substandard and offered nothing more than the free Google Voice and Skype.

108.    In February 2012, Wanzeler and Merrill formed TelexFree, Inc. in the Commonwealth of Massachusetts.

109.    Wanzeler and Merrill formed TelexFree, Inc. with the intent to use the same unlawful Ympactus business model in the United States.

110.    After they opened TelexFree in the United States, the Operational Defendants methodically released false or misleading information that was intended to, and did, separate publicly TelexFree and TelexFree Brazil or Ympactus and otherwise shower their Scheme with credibility.[5]  While these calculated information releases were sufficient to mislead members of the class, they were detectable by the robust and sophisticated Financial Services Providers' Know Your Client investigations and evaluations.

111.    In March 2012, Founders and Principals Costa, Merrill and Wanzeler repurposed Ympactus to front the TelexFree Brazil's VoIP pyramid scheme.

112.    In April 2012, Craft was retained to serve as TelexFree's accountant and prepared its financial statements and taxes.[6]

113.    As early as July 27, 2012, the multilevel marketing news site BehindMLM.com published a detailed analysis of TelexFree's business operation, concluding that:

> The corporate structure of TelexFree and the obvious business relationship between the company and Disk a Vontade and complete lack of disclosure on either company's website is cause for concern…

---

[5] *See, e.g.,* ¶¶123, 124, 126, 130, 131, 140, 145, 149, 153, 162. 519. *infra*; *see also* http://behindmlm.com/companies/telexfree/gerry-nehra-gives-legal-blessing-to-telexfree/.

[6] *See* Omnibus Decl. of William H. Runge, Case 14-1552-abl, Doc. 13, ¶ 31.  A true and correct copy of this Declaration is attached hereto as Exhibit 2.

> Personally I believe the ridiculously high membership fee charged by
> TelexFree (a $299 fee to publish ads for the company?) and the fact that
> individual members are able to purchase up to five membership positions
> strongly indicates a lack of external revenue here.[7]

114.    Over the ensuing months, the number of online articles and websites

characterizing TelexFree as a Pyramid Scheme increased.

115.    During or about November 2012, TelexFree increased its focus on United States-

based operations including the development of special relationships with United States-based

banks, especially those located in the Commonwealth of Massachusetts.

116.    TelexFree's business plan and operations were an unlawful Pyramid Scheme and

not a lawful multi-level marketing ("MLM") enterprise.  At all times relevant to this complaint,

TelexFree violated the express terms of M.G.L. c. 93, § 69.

117.    In January 2013, Ympactus/TelexFree Brazil came under legal scrutiny in Brazil

by the Brazilian Bureau of Consumer Protection (known as Procon).

118.    Procon was suspicious of the company's rapid recruitment of new investors and

lack of substantial sales, and Brazilian authorities opened an investigation against Ympactus.

119.    Prior to and at the time Brazilian authorities shut them down for running a

Pyramid Scheme, Ympactus also operated under the name TelexFree.

120.    In a January 11, 2013 press release, the Brazilian Bureau of Consumer Protection

indicated that its investigation of TelexFree had *"detected evidence of crimes."*

121.    During early 2013, "TelexFree affiliates were urging recruits to make walk-in

deposits at a Bank of America branch located at 188 Boston Turnpike, Shrewsbury,

Massachusetts 01545.[8]

---

[7] *See* Exhibit 3, Decl. of Gray Echavarria at Attachment 5.

[8] *See* Exhibit 3, Decl.of Gray Echavarria, Attachment 35 - Facebook Page with Instructions to
Deposit at Bank of America, Shrewsbury, Massachusetts; *see also* Exhibit 3, Decl. of Gray

122.    In early 2013, TelexFree also preferred to use TD Bank.[9]

123.    In a March 1, 2013 press release, Merrill admitted "[w]e [TelexFree] pay our representatives weekly if they follow our system and advertise our service on the Internet."  This payment condition required no actual sales of the VoIP product.

124.    On March 7, 2013, a TelexFree blog falsely claimed that the TelexFree "program" had "SEC approval from the USA."

125.    During spring 2013, Labriola, director of marketing for TelexFree, Boston, announced via a TelexFree-approved email that TelexFree was "pulling out of Bank of America."

126.    TelexFree's threatened pull out followed Bank of America's questioning of TelexFree's suspicious, tortious or illegal activity.

127.    During spring 2013, Bank of America had exchanges with TelexFree about terminating their relationship and discontinuing the service of their accounts, but never did.

128.    In an April 2013, TelexFree-approved internet video, Defendant Crosby stated "[t]his company has a joint venture with Best Western."  TelexFree did not have the above-described business relationship with Best Western.

129.    During spring 2013, the TelexFree website and its president and principal Merrill also falsely promoted the Best Western offer.

130.    In or about May 2013, Defendant Miller appeared in an internet video deceptively touting TelexFree as an opportunity to earn "not just wealth, but generational wealth," which was posted on YouTube and widely distributed via social media, and in which he maliciously boasted

---

Echavarria, Attachment 22.

[9] *Id.*

of his earnings through TelexFree and encouraged others to join the scheme. [10]

131.    As part of the June 13, 2013 Court in Acre's Public Prosecutor's injunction, TelexFree Brazil faced fines of R$100,000 a day ($42,500 USD) if they signed up any more Brazilian affiliate investors or paid out any existing ones.

132.    On June 19, 2013, the Brazilian Court in Acre issued an injunction putting "a stop to TelexFree Brazil's business operations, including the registration of new affiliate investors, acceptance of new investments and paying any returns owed on existing affiliate investments."[11]

133.    On or about June 20, 2013, after the Court in Acre suspended TelexFree Brazil's activities, TelexFree Principals Merrill and Wanzeler and TelexFree Executive Office employee Labriola all maliciously made false, deceptive and misleading statements in a TelexFree-approved video intended to reassure United States Promoters.  For example, Merrill stated that "[i]nquiries like this are very common in network marketing . . . . We have such unbelievable growth that we're going to draw attention."

134.    Labriola stated that "[t]hese things happen to network marketing companies over and over again… Let's not worry about it."

135.    Wanzeler added that "[w]e're still here.  We're going to stay here for a long time."

136.    The TelexFree website

137.    During or before June 2013 (and within weeks of having their Brazilian operation shuttered), Wanzeler, Merrill, Labriola and Costa, with the participation and assistance of others including the Defendants named in this complaint, placed an increased focus on and rapidly

---

[10] *See* Administrative Complaint of instituted by the SOC, Dkt. No. 2014-0004, page 39, attached as Attachment 36 to Exhibit 3, Decl. of Gray Echavarria.

[11] *Id.*

expanded their fraud in the United States under the name TelexFree.

138.    During or before June 2013, and after shifting its geographic target market to the United States, several TelexFree Top Level Promoters were recruited by Wanzeler, Costa, Merrill, and Labriola and began to target the Brazilian-American and Dominican-American communities in the United States.

139.    In July 2013, Newport Beach, California became the staging ground for TelexFree's first United States-based  "Extravaganza."  This was approximately one month after the Brazilian Court in Acre had frozen TelexFree's Brazilian assets and enjoined TelexFree from any further membership or registration related efforts in Brazil,

140.    The July 2013 TelexFree "Super Weekend" was organized by Zeek Rewards' high-profile pitchman Thomas More.[12]

141.    Thomas More was a key spokesperson and authorized representative for Zeek Rewards.  More held out that he had acquired over a million Zeek Rewards VIP points and, otherwise greatly profited (from the fraud) while it lasted.

142.    At the time More organized TelexFree's Newport Beach "Super Weekend" extravaganza, he was a named defendant in a Zeek Rewards Ponzi scheme-related lawsuit.[13]

143.    During the July 2013 "Super Weekend," Defendant Miller took the stage, and falsely promoted a connection and promotion with Best Western Hotel.

144.    During the July 2013 TelexFree "Super Weekend," Attorney Defendant Nehra gave his "blessing" to TelexFree, representing not only that it was a lawful enterprise and why, but also that he was a duly licensed attorney with extensive specialized skill and experience in

---

[12] In a widely viewed internet video of the event titled "TelexFree Corporate Speakers at Newport Beach Extravaganza," Merrill specifically thanked Tom More for putting it together.

[13] *See* Exhibit 4, Decl. Carol L. Harris, Exhibit 14.

MLM.[14]

145.    During or about August 2013, Attorney Jeffery Babener, of the Law Firm Babener & Associates advised TelexFree Principals, Executive Office, Licensed Professionals and others that TelexFree's business model, operations and payout scheme were an unlawful MLM and must be changed.

146.    During or about August 2013, Attorney Babener advised TelexFree Principals, Executive Office, Licensed Professionals and others that the TelexFree MLM violated M.G.L. c. 93, §69 and, thus, M.G.L. c. 93A.

147.    In or about August 2013, Brazilian Judge Braz Aristóteles dos Reis found that in the public eye, TelexFree (Brazil) and Ympactus are one and the same company.

148.    On August 19, 2013, the TelexFree FaceBook page falsely posted the following: "The President of Google involved with Telexfree!!  Google's President will be speaking at our next Telexfree event in Brazil….11 year contract with Best Western 23 Millionaires in 1 year and now Google's President at our Next event.  Hmmmm is he coming to your's?.  Didn't think so....  It's time to get educated.  You get what you pay for!"

149.    In fall 2013, the Secretary of the Commonwealth of Massachusetts, Securities Division ("SOC") raised questions concerning TelexFree's business model.

150.    In late 2013, Costa withdrew his ownership in Ympactus.

151.    Between mid-November 2013 and March 2014, TelexFree transferred approximately $30 million from its operating accounts to its Principals and officers and to affiliate companies with the necessary assistance of the Financial Service Provider Defendants.

152.    On or before December 2013, Craft was hired to serve and did thereafter serve as

---

[14] *Id.*

TelexFree, LLC's chief financial officer.

153.    In a January 2014 TelexFree promotional video, Labriola misled potential Promoters with the intent that they invest in TelexFree by stating that "[t]here are some people that are making incredible money in this."

154.    In January and February 2014, the SOC issued subpoenas.

155.    On February 19, 2014, the National Bank of Rwanda, in conjunction with the Ministry of Trade and Industry of Rwanda, issued a report concluding that TelexFree's Rwanda-based affiliate, P.L.I. TelexFree Rwanda, Ltd., was a pyramid scheme and could facilitate money laundering, and that the Ministry of Trade and Industry subsequently banned any further operations in the country by TelexFree.

156.    On February 20, 2014, United Kingdom authorities issued a public warning that TelexFree UK was a Ponzi scheme and that its Brazilian operation had been shut down.

157.    During late February 2014 through early March 2014, TelexFree Principals, Executive Office, Licensed Professionals and Top Level Promoters developed during teleconferences strategies to siphon off funds and maximize the exploitation of the rank and file TelexFree Promoters.

158.    During or about late February 2014 through early March 2014, TelexFree Principals, Executive Office, Licensed Professionals and Top Level Promoters held an invitation-only meeting at TelexFree's Marlborough, Massachusetts headquarters with the intent of siphoning off funds and maximizing the exploitation of the rank and file TelexFree Promoters.

159.    On March 9, 2014, TelexFree unilaterally changed its compensation plan, for the first time requiring existing Promoters to actually sell its VoIP product to qualify for the payments that TelexFree had previously promised to pay them.  Before making the change, TelexFree

informed its highest grossing Top Level Promoters of the impending change in compensation and held a strategy meeting during which they discussed unfair, deceptive and unlawful ways to further fleece the rank and file TelexFree members and ways to continue to profit from the unlawful business.

160.    The March 9, 2014 TelexFree compensation plan change generated a storm of protests from Promoters who were unable to recover their money.

161.    On March 9, 2014, Steven Labriola and others traveled to Haiti and made public that they arrived via private jet, and once on the ground, proclaimed "we got in the Prime Minister of Haiti's motorcade."

162.    On April 1, 2014, dozens of Promoters descended upon TelexFree's Marlborough Office to protest the March 9 change and attempt to reclaim their money.  They left empty-handed.

163.    On or about April 15, 2014, the United States Deparment of Homeland Security, the Federal Bureau of Investigation (the "FBI") and others raided the offices of TelexFree, shutting down its operation, seizing records and other evidentiary items.

164.    On April 14, 2014, TelexFree, Inc. along with two affiliated companies, TelexFree, LLC and TelexFree Financial, Inc. (together, the "Bankrupt Companies"), filed for Chapter 11 bankruptcy protection in Nevada claiming that TelexFree revenues were insufficient to meet its obligations.

165.    On May 9, 2014, the United States Department of Homeland Security filed criminal proceedings against two of TelexFree's Founders, Wanzeler and Merrill, for conspiracy to commit wire fraud.

166.    Thereafter, the United States Department of Justice (the "DOJ") brought charges

of wire fraud and conspiracy to commit wire fraud against TelexFree's owners Wanzeler and

Merrill, and the same were indicted by grand jury on July 23, 2014.

167.    TelexFree's other Principals and Operational Defendants are currently under state

and federal investigation, and some are the subjects of lawsuits by the Securities and Exchange

Commission ("SEC") and the SOC for operating a Pyramid Scheme as detailed herein.

168.    The DOJ announced at the March 3, 2015 status hearing in the above-captioned

MDL 2566 that undisclosed Financial Service Providers are also the subjects of its ongoing

investigations.

### B.  TelexFree's History, Formation and its Brazilian Links

169.    In or about 2007, Wanzeler, Merrill, Costa and other Defendants began operating

or assisting in the operation of purported telecommunications businesses in the United States and

Brazil, under the names "Brazilian Help" and "Disk A Vontade Telefonia," respectively,

charging $49.90 monthly for VoIP service.

170.    Disk A Vontade Telefonia, Ltd., also known as Diskavontade, also known as Disk

("Disk A Vontade"), is a Brazilian limited liability company, now or formerly having its

principal offices as Rua Jose Luiz Gabeira, NRO 170, APTO 103 Barro Vermelho.

171.    Defendant Wanzeler is the chief executive officer of Disk A Vontade.

172.    Defendant Merrill is vice president and a signatory of Disk A Vontade.

173.    Disk A Vontade's domain ("discavontade.com") is registered to Defendant

Wanzeler.

174.    Brazilian Help, Inc. ("Brazilian Help") is a domestic profit corporation, organized

and existing under the laws of the Commonwealth of Massachusetts, now or formerly having a

principal place of business at 225 Cedar Hill Street, Suite 118, in Marlborough, Massachusetts

01752.

175.   Brazilian Help's Massachusetts office is in the same building in Marlborough, Massachusetts as the Bankrupt TelexFree Companies.

176.   Defendant Wanzeler is the president, secretary, treasurer, and registered agent of Brazilian Help.

177.   Brazilian Help and Disk A Vontade were the American and Brazilian branches, respectively, of the same enterprise.

178.   Costa, a longtime friend of Wanzeler, was employed by Disk A Vontade and was Wanzeler's top sales agent in Brazil.

### C. Ympactus, TelexFree's Brazilian-Based Operations

179.   Ympactus is a Brazilian limited liability company, which served as TelexFree's Brazilian branch.

180.   Wanzeler, Costa, and Merrill have jointly controlled Ympactus.

181.   The records of the SOC demonstrate no meaningful distinction between U.S. TelexFree operations and Brazilian operations.

182.   As described by TelexFree management, the ownership interests in TelexFree, Inc. (Massachusetts-based), TelexFree LLC (Nevada-based) and Ympactus (Brazilian-based) overlap.

183.   At all times there has been a high degree of operational interdependence among Ympactus and the TelexFree entities and in many ways, the operations of these entities are indistinguishable.

184.   Paragraph 2.1.2 of the standard TelexFree Pre-March 9 Contract with its Members states "TELEXFREE INC, from its headquarters in, Marlboro [sic], Massachusetts (U.S.), on the basis of an operating contract between the latter and the CONTRACTOR (YMPACTUS), has as its primary activity VOIP telephony, using its equipment installed at its

headquarters in Massachusetts, where it makes the necessary connections for these calls; it also

provides virtual media, through the website www.telexfree.com to associates and to the

Promoters that YMPACTUS/TELEXFREE coordinates and controls, including the respective

publicity channels."[15]

185.    This contract was made available to each Defendant at or prior to the time they

became involved with TelexFree.

186.    Each of the Financial Services Defendants was obligated to, and did review the

TelexFree contract during its Know Your Client investigation, analysis and monitoring.

187.    The TelexFree entities used the same executives, management, employees, back

office support, physical address and offices, merely providing identical information in multiple

languages and under a different name in part after Ympactus was shut down and had its assets

seized.

188.    At times relevant to this complaint, TelexFree used essentially identical

fraudulent income generation methods as Ympactus.

189.    At times relevant to this complaint, TelexFree used essentially identical

promotional materials and marketing techniques as Ympactus.

190.    In January 2013, Ympactus came under legal scrutiny in Brazil by the Brazilian

Bureau of Consumer Protection (known as Procon).  Suspicious of the company's rapid

recruitment of new investors and lack of substantial sales, Brazilian authorities opened an

investigation against Ympactus.

191.    In late 2013, Costa withdrew his ownership in Ympactus for what Merrill

_____

[15] *See* TelexFree Pre-March 9 Contract, attached herewith as Exhibit 1.

characterized as "legal reasons."[16]

192.    Both Merrill and Wanzeler provided testimony to the SEC stating that they

transferred at least $3 million to Costa long after Brazilian authorities shut down Ympactus

operations.[17] This was accomplished only with the necessary assistance of the Financial Services

Defendants.

193.    The TelexFree entities use the same website and back office support as Ympactus,

providing identical information in multiple languages.

194.    Since at least February 15, 2012, there has been a high degree of operational

interdependence among TelexFree entities and Ympactus, and, to sophisticated banks and

payment processors, the operations of these entities were related.

195.    The TelexFree entities and Ympactus shared common management and

ownership.

196.    For example, both Merrill and Wanzeler, self-proclaimed Founders of TelexFree,

hold 50% ownership interest in the United States entities and 20% and 40% interests respectively

in the Brazilian entity.

197.    At times relevant to this complaint, Costa, head of Brazilian operations and

longtime friend of Wanzeler, was an owner of TelexFree, LLC.

198.    More particularly, and at least since February 15, 2012, Defendants Merrill,

Wanzeler, Labriola, Craft and Costa have together owned, managed and/or operated the

TelexFree entities and Ympactus with no distinction among these entities other than Ympactus'

Brazilian operations being shut down by Brazilian authorities.

---

[16] *See* Administrative Complaint of instituted by the SOC, Dkt. No. 2014-0004, page 7, attached
as Attachment 36 to Exhibit 3, Decl. of Gray Echavarria.

[17] *Id.*

199.    The TelexFree entities and Ympactus have also shared common financial, strategic, legal, and human resources.

200.    TelexFree entities and Ympactus were both wrongfully, fraudulently, unfairly or deceptively organized from the start to unlawfully convert, divert, launder or shelter funds rightfully belonging to Plaintiffs and the putative class.

### D.  The Formation of the Bankrupt TelexFree Companies

201.    Between mid-November 2013 and April 17, 2014, TelexFree, Inc. and TelexFree, LLC transferred approximately $30 million from their operating accounts to accounts owned and controlled by TelexFree, its affiliated companies or the individual Defendants.

202.    Defendant Ann Genet served as TelexFree's advisor and person on the ground in Nevada.

203.    The investment funds of the putative class inflated TelexFree accounts by hundreds of millions of additional dollars.

204.    The funds of the putative class remain unaccounted for to date.

### E.  TelexFree, Inc.

205.    Common Cents Communications, Inc. was formed by Merrill, Wanzeler and Labriola in December 2002.

206.    Common Cents Communications, Inc. was a predecessor enterprise to TelexFree, Inc.

207.    In 2012, Costa suggested to Wanzeler that they begin soliciting customers in the United States through online advertisements.

208.    Acting on Costa's proposal, Wanzeler and Merrill changed the name of Common Cents Communications, Inc. to TelexFree, Inc. on February 15, 2012.

209.    Wanzeler and Costa also caused the website, "www.telexfree.com" to be created.

210.    Disk A Vontade was the registered owner of the telexfree.com domain name.

211.    By February 15, 2012 and until approximately April 15, 2014, TelexFree, Inc. maintained a principal office at TelexFree's Marlborough Office.

212.    Co-Defendants Merrill and Wanzeler are officers and directors of TelexFree, Inc., a domestic profit corporation.

213.    Beginning on March 15, 2005, Merrill served as registered agent of Common Cents Communications, Inc., and continued as registered agent thereof after the change of name to TelexFree, Inc.

214.    Since February 15, 2012, Merrill has maintained a registered address for service of process at TelexFree's Marlborough Office.

215.    Merrill, Wanzeler, Labriola, Craft and Costa conducted the business of TelexFree, Inc. in TelexFree's Marlborough Office.

### F.  TelexFree, LLC

216.    In July 2012, Wanzeler, Merrill and Costa together formed TelexFree, LLC.

217.    Telex Free, LLC was organized under the laws of the State of Nevada on July 19, 2012.

218.    TelexFree, LLC was wrongfully, fraudulently, unfairly or deceptively organized from the start to unlawfully convert, divert, launder or shelter funds rightfully belonging to Plaintiffs and the putative class.

219.    There is no distinction between the business operations of TelexFree, LLC and TelexFree, Inc.

220.    At all material times, TelexFree LLC was identified as a limited liability company as registered with the Corporations Division of the Secretary to the Commonwealth of Massachusetts (Identification Number 001105166).  TelexFree, LLC registered with the

Secretary of State for the Commonwealth of Massachusetts on April 18, 2013.

221.     TelexFree, LLC maintained an address at the Nevada Post Office Box.

222.     At least between February 15, 2012 and approximately April 15, 2014, TelexFree, LLC operated a Massachusetts office at TelexFree's Marlborough Office.

223.     At all material times, Co-Defendants Costa, Merrill and Wanzeler were the managers of TelexFree, LLC.

224.     At least between February 15, 2012 and approximately April 15, 2014, Merrill was TelexFree, LLC's registered agent for the Commonwealth of Massachusetts whose address is identified as TelexFree's Marlborough Office.

225.     At least between February 15, 2012 and approximately April 15, 2014, Merrill, Wanzeler, Labriola, Craft and Costa conducted the business of TelexFree, LLC in TelexFree's Marlborough Office.

### G. TelexFree Financial, Inc.

226.     Defendant Craft incorporated TelexFree Financial on December 26, 2013.

227.     TelexFree Financial was wrongfully, fraudulently, unfairly or deceptively organized from the start to unlawfully convert, divert, launder or shelter funds rightfully belonging to Plaintiffs and the putative class.

228.     At all material times, Co-Defendants Merrill and Wanzeler were officers and directors of TelexFree Financial, and Co-Defendant Wanzeler is its registered agent.

229.     On December 30 and December 31, 2013, TelexFree Financial received wire transfers totaling $4,105,000 from TelexFree, Inc. and TelexFree, LLC.

230.     On April 14, 2014, Defendants TelexFree, Inc., TelexFree, LLC and TelexFree Financial abruptly sought bankruptcy protection in Nevada under the United States Bankruptcy Code, Chapter 11, admitting that they could not meet their obligations from VoIP revenues and

seeking authority to reject all their current obligations to Promoters.

### H. Relationship of the Bankrupt TelexFree Companies

231.    Since at least February 15, 2012, there has been a high degree of operational interdependence among TelexFree, LLC, TelexFree, Inc., and TelexFree Financial, and the operations of these entities are indistinguishable.

232.    TelexFree, LLC, TelexFree, Inc. and TelexFree Financial shared common management and ownership.

233.    More particularly, and at least since February 15, 2012, Defendants Merrill, Wanzeler, Labriola, Craft and Costa have together owned, managed and/or operated TelexFree, LLC, TelexFree, Inc., and TelexFree Financial with no distinction among these entities.

234.    At least between February 15, 2012 and approximately April 15, 2014, funds were freely transferred between and among TelexFree, LLC, TelexFree, Inc., and TelexFree Financial with no distinction among these entities.

235.    TelexFree, LLC, TelexFree, Inc., and TelexFree Financial have also shared common financial, strategic, legal, and human resources.

236.    TelexFree, LLC, TelexFree, Inc., and TelexFree Financial are alter ego entities that combine to form a single enterprise.

### I. Defendants Electric and Mobile

237.    Mobile is a Nevada corporation formed on November 26, 2013.

238.    According to its filings with the State of Nevada Secretary of State Office, Mobile identifies its officers and directors as follows:

- Defendant Merrill is president, secretary and director, having an address at the Nevada Post Office Box;

- Defendant Wanzeler is treasurer and director, having an address at the Nevada Post Office Box;

- Defendant Ann Genet served as their advisor and person on the ground; and

- Defendant Craft provided essential services and integral advice, without which Mobile would not have been able to operate.

239. TelexFree, Inc. and TelexFree, LLC made a $500,870 "loan" to Mobile during the class period, as indicated by financial statements prepared by Craft. The loan was a sham.

240. Wanzeler and Merrill formed Electric in December 2013 as a Nevada limited liability partnership.

241. Defendant Ann Genet served as Mobile's, Electric's and all TelexFree entities' advisor and person on the ground. Defendant Genet provided essential services and integral advice, which Electric and the other TelexFree Defendants used to further and operate the Pyramid Scheme.

242. Defendant Craft provided essential services and integral advice, without which Electric would not have been able to operate.

243. According to its filings with the State of Nevada Secretary of State Office, Co-Defendants Merrill and Wanzeler are Electric's general partners.

244. Merrill and Wanzeler further list their addresses as the Nevada Post Office Box.

245. Electric also lists its address as the Nevada Post Office Box.

246. TelexFree, Inc. and TelexFree, LLC made a $2,022,329 "loan" to Electric during the class period, as indicated by financial statements prepared by Craft.[18] The loan was a sham.

247. The loan was a sham carried out by Craft to wrongfully, fraudulently, unfairly or deceptively convert, divert, launder or shelter funds invested by Plaintiffs and the putative class.

248. Electric and Mobile possess funds rightfully belonging to the putative class.

---

[18] *See* TelexFree, LLC Balance Sheet as of December 31, 2013, a true and correct copy of which is attached hereto as Exhibit 5.

**J.   TelexFree's Founders and Principals, Executive Officers and Top Level Promoters**

249.   At all material times Merrill was:

- President, secretary and director of Defendant Mobile and a general partner of Defendant Electric;

- Founder, president, secretary, and director of third-party TelexFree, Inc.;

- Founder and manager of third-party TelexFree, LLC, and was listed with the Massachusetts Secretary of State Corporations Division as an authorized person to execute, acknowledge, deliver, and record any recordable instrument purporting to affect an interest in real property; and

- Founder, president, secretary, and director of third-party TelexFree Financial.

250.   Merrill regularly discussed TelexFree's suspicious, tortious or unlawful business operations with his brother Defendant John Merrill who provided him with advice, services and access to banking.

251.   At all material times, Wanzeler was:

- Founder and general partner of Defendant Electric and Founder, treasurer and director of Defendant Mobile;

- Founder, treasurer and director of third-party TelexFree, Inc.;

- Founder and manager of third-party TelexFree, LLC; and

- Founder, vice-president, treasurer, and director of third-party TelexFree Financial and was listed with the Massachusetts Secretary of State Corporations Division as an authorized person to execute, acknowledge, deliver, and record any recordable instrument purporting to affect an interest in real property.

252.   At all times relevant to this complaint Labriola was:

- Director of Common Cents Communications, Inc., the predecessor of TelexFree, Inc., in its filed Articles of Incorporations with the Massachusetts Secretary of State Office.

- TelexFree's international sales director;

- TelexFree's frequent authorized spokes-person; and

- a member of TelexFree's Executive Office.

253.   At all material times Costa:

- was a Founder, Principal, and a member of TelexFree's Executive Office;

- was a Founder of TelexFree, LLC;

- was a manager of TelexFree, LLC with the Massachusetts Secretary of State Corporations Division;

- made use of the laws, rights and protections of the Commonwealth of Massachusetts; and

- attended meetings at TelexFree's Marlborough Office.

254.   While at TelexFree's Marlborough Office headquarters, on phone conferences and while located elsewhere, Costa unfairly and deceptively conspired with other Defendants to carry on TelexFree's unlawful enterprises.

255.   At times relevant to this complaint, Costa and Craft:

- directly made unfair and deceptive misrepresentations to the putative class;

- transacted business in the Commonwealth;

- contracted to supply services or things in this Commonwealth;

- advanced TelexFree's unlawful enterprise;

- caused tortious injury by an act or omission in this Commonwealth;

- advanced TelexFree's unlawful enterprise;

- otherwise regularly did or solicited business, and engaged in persistent courses of conduct in the Commonwealth of Massachusetts; and

- otherwise derived substantial revenue from TelexFree's and other goods used or consumed or services rendered in this Commonwealth.

256.   At times relevant to this complaint, Craft:

- was a certified public accountant who maintained offices in Indiana and in Kentucky under the name Joe H. Craft, CPA/PFS, CFP;

- served as the chief financial officer of third parties TelexFree, Inc. and TelexFree, LLC;

- prepared and approved the financial statements for third parties TelexFree, Inc. and TelexFree, LLC; and

- was a member of TelexFree's Executive Office.

257.    Katia Wanzeler was at all times relevant to this complaint Wanzeler's partner and co-conspirator in TelexFree's unlawful enterprise.

258.    Katia Wanzeler actively assisted her husband, Carlos Wanzeler, in fraudulently stealing and laundering funds that were derived from the TelexFree Pyramid Scheme, and in converting said funds to their private use.

259.    At all times relevant to this complaint, Rodrigues was a TelexFree Top Level Promoter.

260.    At all times relevant to this complaint, De La Rosa was one of TelexFree's Top Level Promoters.  De La Rosa appears in internet videos promoting the TelexFree Program and is one of its most successful Promoters, having recruited numerous other Promoters within the Dominican community in Massachusetts and elsewhere.

261.    At all times relevant to this complaint, Crosby was a TelexFree Top Level Promoter.  Crosby appears in internet videos promoting the TelexFree Program and is one of its most successful Promoters, having recruited numerous other Promoters, primarily through a website known as "everybodygetspaidweekly.biz," in Massachusetts and elsewhere.

262.    At all times relevant to this complaint, Defendant Miller was a TelexFree Top Level Promoter.  Miller appeared in internet videos promoting the TelexFree program, giving numerous "tutorials," and was one of its most successful at doing so, having recruited numerous

other Promoters, primarily through his personal YouTube page at

"https://www.youtube.com/user/TelexFreeTrainer" in Massachusetts and elsewhere.

263.    At all times relevant to this complaint, Defendant Miller is a career MLM

promoter, doing business primarily through his YouTube page at

"https://www.youtube.com/user/TelexFreeTrainer" and "www.join-getpaid-period.com," using

many of the same graphics and techniques he used as a TelexFree Promoter.

264.    At all times relevant to this complaint, Sloan was a TelexFree Top Level

Promoter.  Sloan appears in internet videos promoting the TelexFree Program, and is one of its

most successful Promoters, having recruited numerous Promoters.  Sloan promoted TelexFree

through a website known as "telexfreepower.com."

265.    At all times relevant to this complaint, Shoyfer was one of TelexFree's Top Level

Promoters, managing a large network of TelexFree Members in New York City.  Shoyfer

recruited many Promoters through public meetings that he arranged and held in New York City.

Shoyfer's TelexFree network had Members in other states as well, including Massachusetts.

TelexFree changed its compensation plan on or about March 9, 2014, much to the fury of

affiliates, noted below.  Shoyfer, however, continued to promote it unremittingly, sending group

text messages to his network with such as the following:

> *Hey..my team Telexfree! ! And here we go again..Come to check out and learn*
> *about new compensation plan TF 2.0.. and how to grow it even faster and*
> *MUCH more aggressively and efficiently than the one we had before....Here*
> *is this week's schedule. . Monday 03/24 at Salon Delacqua (2027 86 str)*
> *at 8.00 pm (in English) ..Wednesday 03/26 at SOHO launch(2213 65th street)*
> *at 7.45 pm ( in Russian) and Thursday 03/27 at 7.30 pm at 63-112 Woodhaven*
> *Blvd in a real estate office. In my case, since I have started from absolute zero*
> *during this passed week Mon 03/17- Sun 03/23/14 I booked 11,500 from new*
> *one and 21,600 still coming from old plan..A total of 31,100 in 7 short days…*
> *Go Telex!!!"*

266.    After the institution of the new TelexFree compensation plan in March 2014,

Shoyfer took part in a closed meeting with TelexFree's directors and owners in Marlborough,

Massachusetts, at which Shoyfer was instructed not to discuss the new TelexFree compensation

plan with other, non-insiders, as the new compensation plan was detrimental to Promoters and

was adopted to forestall filing bankruptcy."

267.    Shoyfer worked in concert with TelexFree management to dupe people into

enrolling right up until the time of TelexFree's bankruptcy filing.

268.    Filings in the TelexFree bankruptcy case suggest that Shoyfer received nearly

$88,000 from TelexFree in two separate payments just prior to the April 13 bankruptcy filing.

The first, for $9,902.37, occurred on March 21, and the second, for $78,037.33, occurred on

March 28.

269.    Opt3 and Borromei have a history of providing technical services within the

multilevel marketing industry and hold themselves out as having related specialized knowledge.

For example, Borromei previously served as chief information officer of Joystar, Inc., later

renamed Travelstar, a multilevel marketing company that collapsed in approximately late 2008,

and subsequently entered involuntary chapter 7 bankruptcy.

270.    Opt3 and Borromei intentionally, knowingly, unfairly, deceptively set up

TelexFree's United States based servers in Brazil with the intent of directly furthering, aid or

abetting their unlawful and fraudulent operation including facilitating the placement of

evidence of the Pyramid scheme beyond the jurisdiction of the United States courts.

271.    Opt3 and Borromei otherwise intentionally, knowingly, unfairly, deceptively set

up TelexFree's United States based servers and electronic data systems with the intent of directly

furthering, aid or abetting their unlawful and fraudulent operation.

272.    Opt3 presently holds itself out as providing substantial technical services to multilevel marketing companies Healthient, Inc. and Travelstar, Inc.  Borromei serves as chief information officer of Healthient, Inc.

273.    At times relevant to this complaint, Opt3 and Borromei:

- directly made unfair and deceptive misrepresentations to the putative class;

- transacted business in the Commonwealth;

- contracted to supply services or things in this Commonwealth;

- advanced TelexFree's unlawful enterprise;

- caused tortious injury by an act or omission in this Commonwealth;

- advanced TelexFree's unlawful enterprise;

- otherwise regularly did or solicited business, and engaged in persistent courses of conduct in the Commonwealth of Massachusetts; and

- otherwise derived substantial revenue from TelexFree's and other goods used or consumed or services rendered in this Commonwealth

274.    John F. Merrill is the brother of TelexFree Founder and Principal, Defendant James M. Merrill.  At material times herein, John F. Merrill:

- served as president and chief operating officer of Fidelity Bank;

- personally performed integral services and provided essential advice and assistance, and access to banking services that was used to further TelexFree's unlawful business; and

- personally ensured TelexFree was given access to Fidelity Bank's banking services as well as the national banking system, and those banking services were used to further TelexFree's unlawful business.

275.    Defendant Hughes served as manager and president of Base Commerce, LLC and personally handled TelexFree's account while providing numerous additional services to TelexFree.  At times relevant to this complaint, Hughes:

- personally performed integral services and provided essential assistance that was used to further TelexFree's unlawful business;

- personally ensured TelexFree was given access to payment-processing and banking services and those services were used to further TelexFree's unlawful business; and

- personally ensured banking services that were used to further TelexFree's unlawful business, as well as access to the national banking system, were made available to TelexFree.

276.   Sparman served as managing partner and founder of Vantage Payments, LLC and personally handled TelexFree's account while providing numerous additional services to TelexFree.  At all material times herein, Sparman:

- personally handled TelexFree's account with Vantage Payments;

- performed integral services and provided essential advice and assistance that was used to further TelexFree's unlawful business;

- personally ensured TelexFree was given access to payment-processing and banking services, as well as the national banking system, and those services were used to further TelexFree's unlawful business; and

- solicited services and negotiated with payment processors on TelexFree's behalf.

277.   Despite having knowledge that TelexFree was an enterprise carrying out unlawful, unfair, or deceptive acts or practices, James Merrill, Carlos Wanzeler, Steven Labriola, Carlos Costa, Joseph Craft, Ann Genet, Opt 3 Solutions Inc., Jason Borromei, Katia Wanzeler, Sanderley Rodrigues de Vasconcelos, Santiago de la Rosa, Randy Crosby, Faith Sloan, Daniil Shoyfer, Scott Miller, John Merrill, John Hughes, and Dustin Sparman all personally performed integral services and provided essential advice and assistance that was used to further TelexFree's unlawful business and fully and knowingly furthered TelexFree's unlawful Pyramid Scheme.

### K.  TelexFree's Unlawful, Unfair and Deceptive Pyramid Scheme

278.   A pyramid scheme is a fraudulent business operation whereby an individual or organization guarantees and sometimes pays returns to its investors from new money paid into the operation by new victims, rather than from profit earned by the operator.

279.   Typically, operators of pyramid schemes entice new victims by promising guaranteed returns that are short-term return, abnormally high or unusually consistent.

280.   Pyramid Schemes inevitably fail when new investors are not recruited quickly enough to pay the promised returns to the earlier investors.  Typically, this is when the investment is revealed to be an illegal scam.

281.   Financial services providers, including banks and payment processing companies, are required to be on alert for pyramid-type Ponzi schemes because they are one of the most common schemes presently being used by international thieves, and recently, by organized crime.

282.   Pyramid schemes follow a pattern that is well known to the sophisticated personnel and systems that support financial services providers, including the Defendant Financial Services Providers.

283.   As refereneced herein, during the putative class period, the TelexFree Pyramid Scheme made use of pyramid-scheme techniques recognizable or known to the Financial Services Provider Defendants. They include but are not limited to the following:

284.   **The Hook**: In a pyramid scheme, potential investors are promised that an investment opportunity will achieve an above normal rate of return on investment that is often specified, or very easy to figure out.  The promised interest rate or return on investment in successful pyramid schemes will be an amount high enough to be worthwhile to the investor but not so high as to be unbelievable.  This is called an "above normal rate of return on investment."

In violation of M.G.L. c. 93, § 69, TelexFree promised, and purported to deliver to hard-working promoters, a return rate of over 200% per year for placing ads and performing the other tasks included in its uniform contract and marketing materials.  This was a false promise, as TelexFree's ability to pay any returns whatsoever was contingent on its bilking new victims.

285.   In a pyramid scheme, in addition to lending credibility to the scam, the high rate of return serves as the goal for others to reach and an encouragement to borrow money or drain one's life savings.  Other frequent reasons used to support the specified "above normal rate of return" include "inside information" or "access to an investment opportunity not available to the general public."  Here, TelexFree falsely promoted its VoIP technology as cutting edge and proprietary.  It was not.  The TelexFree product was a grade below what was available for free via Google Voice or Skype.

286.   **The Scheme is Showered with Credibility**: The victims of pyramid schemes are always given a believable explanation of how their investment will earn the "above normal rate of return on investment."  The explanation must be good enough to convince people to invest and reinvest their money and importantly, to recruit others.  Many times the founders or those running the company operating the pyramid scheme are described as being highly successful, skilled, trained or educated.  For example here, TelexFree falsely represented on its web site that the Founder and Principal Merrill was a college graduate with specialty degrees in a field related to the product they touted as driving the profit.  TelexFree also deceptively touted its Principals long-term experience and involvement in telecommunications.  Most often, perpetraors of pyramid schemes will hire lawyers, certified public accountants ("CPAs"), or other credible professionals to bless the scam as a legal and sound business opportunity.  The lawyers, CPAs and other professionals vouch for the scam in exchange for payoffs.  They will also often have

47

other seemingly credible persons serve as shills by touting the investment as an incredibly great opportunity that worked for them. Shills include so-called rock stars and so-called regular people all of whom have "gotten rich quick" through the pyramid scheme.

287.    As referenced herein, TelexFree made use of virtually all of the pyramid-scheme techniques recognizable or known to the Financial Services Provider Defendants.  For example, TelexFree first had Defendant Nehra, an attorney who also heavily promoted himself as having specialized MLM experience, guarantee that TelexFree was a legitimate business enterprise.  It also promoted Nehra's partnership with another leading MLM attorney, Defendant Waak.  TelexFree also hired CPA Craft to serve as its chief financial officer.  TelexFree was also publicly tied to Bank of America and TD Bank.  At all times, well-known MLM "professionals" with great experience or success were hired to state on TelexFree's behalf that the Pyramid Scheme was legal and a good investment.  TelexFree made such use of Rodrigues, De La Rosa, Crosby, Sloan, Shoyfer, Smith and others.

288.    TelexFree, like other major pyramid shemes before it, also held extravagant conferences at hotels that were beyond the means of its victims and hyped the success of individuals who had supposedly "gotten rich quick" through the scheme.  The owners and a select few top promoters surrounded themselves with rich and lavish settings and publicly boasted of their supposed massive earnings and "rags to riches" stories.

289.    **Initial Investors Paid Off**:  In most pyramid schemes, some initial investors will receive the promised return.  This trick is used to convince victims that the investment is not risky and that a return will be received.  The scammers use smaller payouts to bring in bigger ones.  Payouts are also used to prompt victims to bring in the investment cash of their family, friends, co-workers and others.  It is also used to turn the $100 dollar investor into a $1,000 or

$10,000 investor.  Pyramid schemes succeed because the majority of victims invest over and over with larger amounts of cash.  They also unwittingly recommend the scheme to their family, friends, and business associates, as the scam appears to provide them with benefits early on.  This is all part of the scammers' deliberate plan.  Scam artists will pay the initial investment money to the investors, plus the specified interest rate or return, to lure in more and greater investments.  Many of TelexFree's Promoters initially invested small sums and then after receiving the above normal rate of return on investment invested a great deal more.  Many convinced their family and friends to invest.  Some Promoters took out loans and others emptied their savings accounts.

290.  **Communicated Successes**:  Pyramid scheme principals and others at the top levels will uniformly and heavily promote success stories and build in a system that communicates motivating success stories.  The historical success of the investment opportunity is another ploy intended to deceptively lend credibility to the pyramid scheme.  Historically, the most damaging pyramid schemes put victims in a position where they believed convincing others close to them to invest money into the scam was doing them a great favor.  TelexFree showered its investors and potential investors with stories and visuals evidencing big payoffs.  TelexFree positioned its owners and Top Level Promoters as "Rock Stars" and they promoted the above normal rate of return on investment, often with great deal of flourish.  Large-scale pyramid schemes also typically sponsor conferences and events at hotels or exotic locations, as did TelexFree.  Large-scale pyramid schemes also commonly promote success stories involving tales of great income, early retirement or other dreams come true.  TelexFree played each of those angles heavily.  TelexFree spokespersons often sported expensive attire, and promoted the fact they owned luxury cars and boats, lived in enormous homes, and made their dreams come true.

291.    According to the Federal Trade Commission, TelexFree utilized a pyramid scheme structure offering straight recruitment commissions and binary recruitment commissions. These commissions directly compensate existing affiliates upon the recruitment of new affiliates into the Scheme.

292.    At times relevant to this complaint, the Defendant Founders, Principals, Executive Office, Top Level Promoters and Associated Individual Defendants knew that TelexFree was a Pyramid Scheme and yet actively assisted and profited thereby.

293.    At times relevant to this complaint, the Defendant Attorneys, Defendant Accountants, other Professional Service Providers, and Persons Associated with them knew that TelexFree was a Pyramid Scheme and yet unfairly or deceptively actively assisted, aided and abetted and profited thereby.

294.    At times relevant to this complaint, the Defendant Financial Services Providers knew that TelexFree was a Pyramid Scheme and yet unfairly and deceptively actively assisted, aided and abetted and profited thereby and were unjustly enriched.

295.    TelexFree presented itself to the putative class as a marketer of telecommunications.

296.    The records and the TelexFree Pre-March 9 Contract, however, establish that TelexFree did not compensate its "Promoters" primarily for sales of the VoIP product, nor for carrying out legitimate advertising.

297.    TelexFree, with the integral assistance of numerous banks, payment processors, professionals and other third parties, operated an unlawful Pyramid Scheme of nationwide and international scope.

298.    As referenced herein, TelexFree was nothing more than a retooling of its illegal

operation in Brazil.

299.    Using run-of-the-mill and essentially borrowed technology, TelexFree rebranded Disc A Vontade's VoIP program, offering it for a flat monthly fee of $49.90.

300.    TelexFree deceptively promoted its unlawful enterprise as offering a cutting edge VoIP service program called "99TelexFree."

301.    Because it featured an inferior product that offered no improvement over what others Google Voice, Skype, or others made available elsewhere for free, Wanzeler, Merrill and Costa's Disk A Vontade's phone service had been unprofitable.  Departing from the unsuccessful Disk A Vontade business model, TelexFree coupled the VoIP program with a purportedly lucrative and fraudulent scheme.  The VoIP program served purely as a façade.

302.    TelexFree, Inc., TelexFree, LLC and TelexFree Financial, Inc. operated a Pyramid Scheme that defrauded hundreds of thousands of individuals out of hundreds of millions of dollars.

303.    TelexFree was willfully and knowingly, wrongfully and maliciously, unfairly and deceptively organized and maintained.  From the start it was intended to, and did, unlawfully convert, divert, launder and shelter funds invested by Plaintiffs and the putative class.

304.    TelexFree could not have successfully carried out its unlawful enterprise, nor launder or shelter its ill-gotten funds, without the integral assistance of the other Defendants, including the cooperating Defendant financial institutions, payment processors and Operational Defendants.

305.    Although TelexFree purported to sell internet telephone services but in actuality, generated its income almost exclusively through its recruitment of "Members" (also referred to interchangeably herein as "Promoters").

306.    TelexFree promised its Promoters a guaranteed return on investment in excess of 200% annually, purportedly in exchange for promoting TelexFree's business.

307.    TelexFree created memberships, known as "AdCentral" packages, which entitled Promoters to be paid for cutting-and-pasting spam advertisements on the Internet, creating the illusion that they were performing valuable services in exchange for compensation.

308.    TelexFree promised its Promoters a guaranteed financial return in exchange for their participation in a passive income scheme.

309.    Promoters were financially motivated to recruit and "build" their own network of new Members because they were promised additional compensation when they did.  TelexFree did not monitor the futile make-work activity of cutting-and-pasting of spam advertisements by its Promoters.

310.    At all times relevant to this complaint, TelexFree and each of Executives, knew that the purported requirement made upon TelexFree Members to place ads was a sham, yet an integral part of the unfair and deceptive acts and practices necessary to carry out and further their unlawful business enterprise.

311.    At times relevant to this complaint, TelexFree and each of its Licensed Professionals, and Financial Services Providers also knew that the purported requirement made upon TelexFree Members to place ads was economically worthless, yet an integral part of TelexFree's business enterprise.

312.    Though TelexFree was purportedly a separate and distinct legal entity from Ympactus, Wanzeler, Labriola, Merrill and Costa intermingled the resources and assets of the two businesses including the labor and representation of employees and executives, telephones, addresses, office furniture and space, bank and other financial accounts, finances, computer

network systems, and postage.

313.    Wanzeler, Labriola, Merrill and Costa used the TelexFree entity as a convenient vehicle to re-create in the United States the same massive Pyramid Scheme that they had earlier conducted in Brazil, even to the extent, for example, that both companies also provided the same information on their websites.

314.    Contrary to the malicious, false, unfair, and deceptive representations made by TelexFree, the TelexFree VoIP service was not groundbreaking, and offered nothing more than what was and is otherwise available for free.  In fact, the TelexFree VoIP technology was not patented or proprietary.

315.    Wanzeler, Merrill, Labriola and Costa, and those working with them, specifically targeted unwitting purchasers (the Members/Promoters) for memberships that promised annualized returns of over 200% in exchange for placing duplicative advertisements on social media.  The bait for TelexFree's scheme was the right to promote and profit from its VoIP product - an illusory menial task willfully designed to convince purchasers of the legitimacy of the business model.

316.    TelexFree similarly used its membership fees ploy to further grow its unlawful and fraudulent enterprise as well as to unjustly and unfairly line the pockets of the Defendants with profits earned through the victimization of the putative class representatives and the other members of the putative class they seek to represent.

317.    Notwithstanding the earlier shutdown of TelexFree's essentially identical operation, Ympactus, and many other indicators of unlawful business operations, each of the Defendants chose to earn handsome fees for providing services to TelexFree's suspicious and unlawful enterprise.

318.    Over time, TelexFree's revenue from sales of its VoIP service plans only accounted for only approximately $1.3 million (or approximately 0.1%) of the nearly $1.1 billion needed to honor its promises to Promoters.  This was because TelexFree had virtually no legitimate business, and almost all of its receipts were simply new investments of more people duped into expecting sizeable returns.

319.    Financial Services Providers who performed the Know Your Client investigations and analysis were aware of this because the Red Flags directed them to the suspicious, tortious and unlawful activity referenced herein.

320.    The Financial Services Providers who performed the Know Your Client investigations and analysis were able to recognize that TelexFree's actual business was the unlawful recruitment of new Promoters with the help of their robust or sophisticated systems or personnel.

321.    With hundreds of thousands of victims, TelexFree appears to be one of the largest, if not the largest, pyramid schemes in history by number of members.

322.    New Promoters generated no income by placing advertisements on the Internet. New Promoters did, however, generate income for TelexFree through the recruitment of more new Promoters who paid its membership fees. TelexFree's operations were unsustainable without a continuous influx of new capital coming from the recruitment of additional participants.

323.    The income-generating activity that drove TelexFree's unlawful passive income scheme was the payment of a fee in the amount of either $289 or $1,375 to become a Promoter. TelexFree offered options that provided for a tiered return.

324.    The first option was known as the "AdCentral" program.  Participation in

AdCentral cost $289 plus a $50 membership fee for a one-year contract.

325.    The $50 membership fee purchased a purported license to sell the product and entitlement to otherwise profit from various bonus structures and recruitment commissions, including the sale of additional memberships.

326.    Promoters participating in TelexFree through the AdCentral program received ten one-month packages of the VoIP service and in return were instructed to place one internet advertisement a day.

327.    For every week a Promoter placed advertisements, they received one additional VoIP package and were guaranteed a weekly payment of $20 ($1,040 for the entire year).

328.    Each of the Financial Services Provider Defendants was given access to TelexFree's Promotional Advertisements at the commencement of or during its relationship with TelexFree.[19]

329.    Each of the Financial Services Provider Defendants reviewed TelexFree's Promotional Advertisements at the commencement of or during its relationship with TelexFree.[20]

330.    The AdCentral program offered a 207% return on the original amount paid.[21]

331.    The second option, known as the "AdCentral Family" program, cost $1,375 plus the $50 membership fee for a one-year contract, a purported license to sell the product.[22]

332.    Promoters in the AdCentral Family program received fifty one-month VoIP packages and had to post five advertisements on the Internet daily.[23]

333.    Those who posted the required advertisements received five additional VoIP

---

[19] *See* TelexFree Promotional Advertisements, attached herewith as Exhibit 6.

[20] *Id.*

[21] *Id.*

[22] *Id.*

[23] *Id.*

packages and were guaranteed a weekly payment of $100 if they did ($5,200 over the year).

334.  The AdCentral Family program offered an annual return of 265%.[24]

335.  The TelexFree advertisement kit enabled participants to be paid for posting pre-written advertisements, to pre-determined websites, through an automated TelexFree system.  A participant's daily posting of advertisements generated payments regardless of whether or not Promoters sold any VoIP Programs.

336.  TelexFree's promotional material stated "(y)ou just place your Ad and get paid weekly regardless of if anyone buys what you are selling or regardless of if you ever recruit a single person into this opportunity or not. . . . Sounds good doesn't it?"[25]

337.  Posting advertisements was an effortless process that took, at maximum, a minute per advertisement.  In fact, TelexFree touted, "We will take care of your add (sic) posting and teach you the trick to submit your five ad (sic) in one click"[26]

338.  Members were not required or expected to close any internet phone sales.

339.  Members were compensated solely for recruiting new Members and for performing the menial, pretextual activity of cutting-and-pasting advertisements.  The posting of these supposed advertisements was meaningless.

340.  Promoters were posting a massive volume of nearly identical ads on the same websites in an already saturated market.  Members were not paid according to how many viewers clicked the ads.

341.  The marketing strategy of TelexFree was to recruit more Promoters, not to sell its VoIP programs.

---

[24] *Id.*

[25] *Id.*

[26] *Id.*

342.    For example, in early April 2014, Adpost.com had in excess of 33,000 TelexFree ads, and ClassifiedsGiant.com had in excess of 25,000 ads posted since February 1, 2014.

343.    Promoters also had other income options. For example, he or she could sell the additional VoIP Programs they "earned" back to TelexFree for $20.

344.    The TelexFree passive income scheme generated even further returns for participants through various bonus structures and recruitment commissions.  TelexFree and the Defendant Founders deceptively tailored additional income streams to incentivize recruitment. For example, TelexFree provided marketing materials on its website that current Promoters could download and use to recruit new members;[27] new Promoters were promised a one-time bonus of $20 for each recruited AdCentral member and $100 for each recruited AdCentral Family member; and Promoters who recruited two additional Promoters were promised a bonus of $20 for each direct and indirect participant in their "network," up to a maximum of $440.  All these options were maliciously, willfully and knowingly reverse-engineered to unfairly and deceptively drive membership-related income into TelexFree's coffers and did not drive sales of its VoIP product.

345.    TelexFree's unlawful enterprise was particularly reprehensible because it encouraged its Promoters to unwittingly turn their family, friends and close associates into victims.  TelexFree and the Defendant Founders deceptively tailored income streams to capitalize on the tight social and familial immigrant communities they targeted.  Under a "Team Builder Plan," AdCentral Family Promoters who recruited ten other AdCentral Family members, each of whom sold five VoIP packages (to themselves or others), were promised 2% of TelexFree's net billing in the following month, up to $39,600.  Promoters were promised

---

[27] *Id.*

commissions based on sales of the VoIP service:  90% for the initial VoIP package sold to a customer he/she recruited, 10% monthly for direct participants who renewed the service, and 2% monthly for each indirect participant who renewed their service down to the sixth level of the Promoter's network.

346.    As represented in the TelexFree website and promotional materials mailed out and handed to participants at TelexFree's "Extravaganzas" by Defendant Principals, Executive Office and Top Level Promoters, a Promoter was allowed to invest in more than one advertisement kit and purchase the VoIP Program to earn bonuses.

347.    A feature of TelexFree's bonus structure and recruitment commissions is the fact that TelexFree participants could self-qualify for sales and commissions.

348.    A Promoter was allowed to purchase a VoIP program, never use the program, and still qualify for additional income.

349.    Therefore, without selling any VoIP programs, the Promoter could receive, or expect to receive, a return far over the 200-250% guaranteed return.[28]

350.    TelexFree's revenue from sales of VoIP programs alone was entirely inadequate to satisfy the payments it promised to Promoters.

351.    According to an investigation conducted by the SEC, between August 2012 and March 2014, TelexFree received slightly more than $1.3 million from the sale of approximately 26,300 VoIP programs, while receiving more than $302 million in investments by Promoters, less than one-half of one percent of total revenue during this period from sales of its purported product.

352.    During this period, TelexFree, the Defendant Founders and Inside Promoters

---

[28] *Id.*

promised to pay Promoters over $1.1 billion.

353.    TelexFree did not produce anywhere near $1.1 billion dollars in VoIP revenue.

354.    According to an investigation by the SOC, in 2012 and 2013 TelexFree identified 4,845,576 VoIP program transactions totaling $238,395,353.80.

355.    Net revenue received by TelexFree from VoIP program sales was inhibited by substantial commission payments.

356.    In other words, only a trivial number, if any, of non-Promoters purchased the VoIP product.  In his statement to the Massachusetts SOC, TelexFree Founder Wanzeler could not identify the number of individuals who purchased only a VoIP program without also becoming a participant, and provided wildly varied estimates when challenged to identify the number of VoIP programs sold to non-participants.

357.    Over the same period, TelexFree received 783,771 package purchases of either $289 or $1,375 totaling $880,189,455.32.

358.    Under this compensation plan, if each of the 783,771 Promoters invested in only one AdCentral package at $289 and only posted one advertisement per day, TelexFree would have owed Promoters $799,446,420.

359.    Under this compensation plan, if each of the 783,771 Promoters invested in the AdCentral Family package at $1,375 and only posted five advertisements per day, TelexFree would have owed $3,997,232,100 to Promoters.

360.    According to data provided by TelexFree, the $1,375 AdCentral Family memberships accounted for 88% of the transactions by Massachusetts-based participants.

361.    Even assuming that only 50% of all participant memberships were at the AdCentral Family level, TelexFree would still have owed $2,398,897,200 a number that far

exceeded TelexFree's reported total revenues over the same period.

362.     This figure of almost $2.4 billion omits further bonuses, recruitment commissions, and revenue sharing; including these additional payments would create an even greater disparity between the VoIP program revenue and the guaranteed money paid out of the passive income scheme to Promoters.

363.     At no time during the class period did TelexFree generate sufficient funds from sales of their phone service to make the payments they had contracted to pay to existing Promoters.  Those funds came from the registration fees of subsequent TelexFree Promoters.

### L.  Gallery of Rogues Assembled

#### i.   The Seasoned Scam Artists

364.     TelexFree, Wanzeler, Merrill, Costa, Labriola and others enlisted the involvement of persons and entities that operated or otherwise had highly publicized involvement in business models that were later found to be fraudulent and unlawful Ponzi Schemes.

365.     For example, prior to his involvement with TelexFree, Rodrigues was charged by the SEC with operating a fraudulent pyramid scheme under the name of Universo FoneClub Corporation, another Massachusetts corporation formed by Rodrigues, in which he acted as officer and director.

366.     Rodrigues settled these charges in 2007.  As a condition of his settlement Rodrigues was permanently enjoined from violating Section 10(b) of the Exchange Act and Rule 10b-5, and Sections 5(a), 5(c) and 17(a) of the Securities Act.

367.     As a condition of his settlement, Rodrigues was further ordered disgorged of approximately $1.8 million of related ill-gotten gains.

368.     Rodrigues formed and organized WWW Global Business, Inc. ("WWW Global Business") on or about February 7, 2013, to market and sell TelexFree Memberships.  WWW

Global Business was and is a "shell" corporation holding no, or virtually no, assets and having no employees beyond its principal, Defendant Rodrigues, who served as its sole director, officer, and agent for service.  WWW Global Business was organized for the sole purpose of marketing and selling TelexFree Memberships, *i.e.* AdCentral packages, and did not engage in the sale of TelexFree's purported VoIP product.

369.    At all times material herein, WWW Global Business was effectively an alter ego of Defendant Rodrigues, and furthermore, had no legitimate business purpose, failed to maintain corporate formalities, had no independent board of directors and otherwise served as a "façade" for the sole benefit of Defendant Rodrigues.

370.    Rodrigues attended meetings at TelexFree's Marlborough Office headquarters. While at TelexFree's headquarters, on phone conferences and while located elsewhere, he unfairly and deceptively conspired with other Defendants to carry on TelexFree's unlawful enterprises.  Despite having knowledge that TelexFree was an enterprise carrying out unlawful, unfair, or deceptive acts or practices, Rodrigues personally performed integral services and provided substantial and essential advice and assistance that were used to further TelexFree's unlawful business.

371.    Rodrigues's SEC and criminal related history was available to the Financial Services Provider Defendants while they were carrying out Know Your Client due diligence investigations.

372.    TelexFree and the Defendant Founders and Principals willfully and knowingly utilized Rodrigues.  Rodrigues was allowed to join and market the program despite his previous criminal convictions.  In fact, Rodriques was selected for a prominent role in TelexFree because he had experience running a related scam.

373.     Another example is Brandon Bradshaw, who had formerly served as vice president and

sales director of AddWallet, a now-defunct Pyramid Scheme, through March 29, 2013.

AddWallet was a successor to Zeek Rewards, an infamous Ponzi scheme.  Zeek Rewards ran

from January 2011 into August 2012 when the SEC shut it down.  The Zeek Rewards Ponzi

scheme bilked investors out of a purported $850 million dollars.  Prior to being shut down, Zeek

Rewards was alleged to have paid out $350 million dollars to early investors.

374.     Under the guise of a penny auction, Zeek Rewards let its members invest in the

company and paid out a daily rate of investment that guaranteed affiliates (investors) that over 90

days, they would receive more than 100% of their investment back.  At the time the SEC shut

them down, they only had enough capital to keep the business afloat for 90 days.  AddWallet's

business structure was based on Zeek Rewards, and was intended to lure in former Zeek Rewards

members, many of whom had already lost funds in Zeek Reward's collapse.

375.     In March 2013, AddWallet held a conference call intended to assure investors.

During the call, AddWallet representatives assured investors that it was an offshore company and

immune from the SEC.

376.     Bradshaw answered most of the questions on the call.  He started by lamenting

the loss of Zeek Rewards and highlighting the intentional similarities that exist between it and

AddWallet.  He stated that:

- [4:52] "After the fall of the major player Zeek (Rewards), we. . . saw a lot of things there."

- [13:34] "It's unfortunate what happened, a lot of good people got hurt.  I thought Zeek was doing a fantastic job."

- [5:26] "We put a base operating system down.  Yes, it's very much like Zeek when you go into the retail profit pool earnings, you see something that you've seen before."

377.     In August 2013, as the AddWallet scheme dwindled, Bradshaw abruptly left his

position with AddWallet, without providing any reason to members.  Almost immediately,

Bradshaw was a TelexFree spokesperson.

378.    Bradshaw spoke during a September 6, 2013 TelexFree conference call hosted by

Labriola, during which Bradshaw promoted sales of TelexFree memberships and instructed and

otherwise provided advice to Promoters and potential Promoters on behalf of TelexFree that

furthered its unlawful enterprise.

379.    During the September 6, 2013 TelexFree conference call, Bradshaw advised those

on the call of the fastest way to transfer payments of membership fees to TelexFree.  Bradshaw

directly made other unfair and deceptive misrepresentations to the putative class that furthered

TelexFree's unlawful enterprise.

380.    In 2014, Bradshaw became a co-founder of another pyramid scheme, Genesis

Global Network, which was characterized in online promotional materials as "operat[ing] just

like Zeek and Add Wallet.  The early members in Zeek earned over $1 Million and this one is

better and completely offshore."[29]

381.    Another example is Defendant Miller, another big player in the infamous $850

million Zeek Rewards Ponzi scheme, which had a component similar to TelexFree's AdCentral.

Like TelexFree Members, Zeek members were told they got paid for posting ads about the

company online.  Zeek Rewards told its "Affiliates" that in order to "earn" their points, they

were required to place a short, free digital ad each day on one of the many free classified

websites available on the Internet.  According to Zeek receiver Kenneth D. Bell, "[i]n reality the

ads were just an attempt to manufacture a cover for what was nothing more than the investment

of money by Affiliates with the expectation of receiving daily 'profit' distributions."  Bell

---

[29] *See* https://www.facebook.com/mlmsuccessgroup/posts/772337832778294; *see also* Exhibit 3,
Decl. of Gray Echavarria, Attachment 25.

targeted Miller in his prosecution of Zeek's massive Ponzi scheme.  Miller spoke on behalf of

TelexFree at TelexFree events and was one of its key pitchmen.

382.    According to a video playing on YouTube, Miller was one of the featured

TelexFree speakers at the Newport Beach event.  Members of his group claim in videos that, if

one sends $15,125 to TelexFree to purchase a "contract," one will emerge with guaranteed

earnings of at least $1,100 a week for a year.  The math of the claim is basically this:  $1,100 a

week for 52 weeks equals $57,200.  Subtract the original outlay of $15,125, and emerge with

$42,075 on the plus side.

383.    Indeed, TelexFree was at all times relevant to the complaint staffed by what

amounted to an "all-star team" of online network marketing scam artists.

### ii.  The Professional Legitimizers' Roles

384.    TelexFree, Wanzeler, Merrill, and Costa also enlisted the involvement of persons

and entities who provided advice and blessed, or provided opinions that purported to legitimize,

business models that were later found to be fraudulent and unlawful pyramid schemes.  For

example, Defendant Attorney Nehra publicly opined, during TelexFree conferences and "Super

Weekend" events,[30] as well as in communications with the press,[31] that he had examined

TelexFree's business model and determined it to be legal, and that TelexFree "pays ONLY on

the sale of its VOIP long distance product."

385.    TelexFree's operations had many signs of unlawful, unfair and deceptive

wrongdoing that were highly suspicious and in fact constituted Red Flags recognized by the

Federal Financial Institutions Examinations Counsel ("FFIEC").

---

[30] *See* Exhibit 4, Decl. of Carol L. Harris, Exhibit 14.

[31] *Id.*

386.     Moreover, each Defendant had knowledge of the Brazilian authorities' seizure of Ympactus' assets that were directly connected to Wanzeler, Merrill and Costa.

387.     After authorities shut down TelexFree's Brazilian unlawful predecessor, Ympactus, the Licensed Professionals and Financial Services Providers knew that TelexFree was nothing other than a new entity created by the same principals to engage in the same unlawful enterprise yet did business with it.

388.     At times relevant to this complaint, TelexFree had a website that was managed by its Executives and designed and maintained by Opt3 Solutions Inc. and Defendant Borromei.

389.     The promotional materials posted online by TelexFree and its Executives specifically referred to income received by Promoters for placing ads as part of the AdCentral Packages as "passive income"[32] in violation of Massachusetts black letter law.

390.     In addition to the March 1, 2013 press release, where Merrill admitted TelexFree did not condition payment actual sales of its VoIP product, the multitude of marketing materials provided on the TelexFree website only contained *a single slide* mentioning the VoIP service.

391.     The great bulk of the content centered on the payment for posting of ads, such as "Work over the Internet Posting ads daily," and the membership commission structure.

392.     The website emphasized the simplicity of its advertising system, stating "TelexFree turnkey marketing system makes internet advertising simply & duplicatelable [sic]," and "[w]e have it all computerized [sic], with only 3 steps, in your virtual office."

393.     All of this served as "Red Flags" to the sophisticated Financial Services Defendants and Licensed Professionals Defendants who had sophisticated know your client protocols and systems as well as expertise in multi-level marketing.

---

[32] *See* TelexFree Promotional Advertisements, attached herewith as Exhibit 6.

394.    Nehra and Waak Law Firm, Nehra and Waak were also persons who the Financial Services Providers knew had prior involvement in pyramid or unlawful MLM schemes.

395.    Defendants Nehra, Waak, Nehra Law Firm, Waak Law Firm, and Nehra and Waak Law Firm each provided legal services to TelexFree.  There was no clear distinction between Nehra, Waak, Nehra Law Firm, Waak Law Firm, and Nehra and Waak Law Firm with regard to the legal services that they provided to TelexFree.

396.    The Attorney Defendants each are self-proclaimed MLM and direct marketing specialist attorneys.[33]

397.    The Attorney Defendants each boast on their respective websites that they have vast knowledge and experience representing MLM and direct-sales clients.[34]

398.    The Attorney Defendants each boast on their respective websites that they have specialized knowledge and experience and can discern between legitimate and lawful MLM and direct-sales ventures and illegitimate and unlawful pyramid or Ponzi scheme ventures.[35]

399.    Nehra represented or advised ventures that had been shuttered by state or federal authorities as fraudulent pyramid or Ponzi schemes, including Zeek Rewards and AdSurfDaily, both before and concurrent with Nehra's provision of services to Telexfree.

400.    During the investigation of the AdSurfDaily scheme, Attorney Nehra filed an affidavit in court representing that AdSurfDaily was "not a Ponzi Scheme."

401.    AdSurfDaily's operations were shut down as a Ponzi scheme in 2010.

402.    Zeek Rewards' operations were shut down as an unlawful pyramid and Ponzi scheme in August 2012.

---

[33] *See* Exhibit 4, Decl. of Carol L. Harris, ¶¶ 6-49, Exhibits 1-14.

[34] *See id.*

[35] *See id.*

403.     Nehra's extensive experience with MLM and direct-sales ventures, particularly his involvement with the unlawful AdSurfDaily and Zeek Rewards ventures, armed him with the knowledge of what constitutes violations of United States securities law.

404.     The Attorney Defendants were used in an attempt to hide TelexFree's Pyramid Scheme activity with obfuscating phraseology.

405.     Similar to Nehra, Waak claims to have over thirty years advising MLM and direct-selling enterprises.  Waak claims to have managed the legal defense of multiple class action lawsuits involving claims for "pyramiding, securities fraud, false advertising and civil RICO."

406.     As counsel for TelexFree, the Attorney Defendants had actual personal knowledge of TelexFree's product and business model.

407.     Nehra, negligently or recklessly gave his professional opinion as a duly licensed attorney who specialized in MLM for decades.  He informed the putative Class in July 2013 that he had "vetted" and "bless[ed]" TelexFree's business model and operation.[36]

408.     The Attorney Defendants negligently or recklessly drew upon their prior experience to substantially aid, abet, and play an integral role in TelexFree's unlawful, unfair, and deceptive acts and practices during the times relevant to this complaint.

409.     Despite their actual knowledge, rather than decline or cease rendering services to TelexFree, the Attorney Defendants failed to adequately provide even minimally acceptable legal counsel.

410.     In spring 2013, TelexFree was forced to focus on new markets, including the United States and Canada, because its Brazilian operations had been shut down and all of its

---

[36] See Exhibit 4, Decl. of Carol L. Harris, ¶ 19, Exhibit 14.

Brazilian assets frozen.  TelexFree used the presence, representations and statements of the

Attorney Defendants to perpetuate and advance the Pyramid Scheme in those new markets.

411.     Nehra's representations and statements that Telexfree's operations in the United

States were legitimate and lawful were part of its total "post Brazilian shut down package."

412.     Nehra was aware of how his representations and statements were being used by

TelexFree, yet willingly spoke on behalf of TelexFree at an event dubbed a "Super Weekend" in

Newport Beach, California on July 26 and 27, 2013.  His focus at the "Super Weekend" event

was to reassure Promoters that TelexFree's United States operations were legitimate, lawful, and

worthy of investment.

413.     Although at the time of the "Super Weekend," TelexFree's Brazilian bank

accounts had been frozen and all of TelexFree's Brazilian recruiting and payments had been

suspended by court order in its largest affiliate market, Nehra advised attendees that the

shutdown in Brazil would not affect TelexFree's operations in the United States.

414.     Nehra spoke at length during that "Super Weekend" and reassured the attendees

of the legality and legitimacy of TelexFree's operations in the United States, stating "It is legally

designed . . . you are on very solid legal ground," and that TelexFree's operations had been

"vetted by the Nehra and Waak law firm."

415.     Nehra's statements and opinions provided legal representations. Nehra's

statements and opinions constituted legal advise.   Nehra knew that TelexFree's conduct

constituted a breach of duty to its Promoters.

416.     In addition, at all relevant times, the Attorney Defendants consented to be and

acted as agents of Telex Free and had authority to represent and bind TelexFree.

417.     As agents of TelexFree, the Attorney Defendants owed a duty to the putative class

not to make negligently or recklessly make statements or misrepresentations, or offer incorrect opinions that would support the TelexFree business model or smooth the way for the additional influx of membership driven funding.

418.    The Attorney Defendants drew direct financial benefit from assisting TelexFree to perpetuate and further the Pyramid Scheme to the detriment and loss of the putative class.

419.    Plaintiffs and all other members of the putative class are "Investors" under Massachusetts state securities law.

420.    However, upon the advice of the Nehra and Waak attorneys, TelexFree referred to the members of the putative class as "Associates," "Members," and "Promoters."

421.    The TelexFree Pre-March 9 Contract at Section 2.6.5 (m) mandates that Promoters are not to use the term "investment" regarding the registration costs.

422.    Specifically, the TelexFree Pre-March 9 Contract at Section 2.6.5 (m) provides that the Promoter must not "use terms that distort the real meaning of products or the mechanism and functioning of multilevel marketing, including, without limitation, expressions that convey the idea of instant wealth for nothing in exchange, as well as speaking of registration costs as a 'financial investment.'  Similarly, it is expressly prohibited to use the term 'INVESTMENT' at meetings and in promotional materials in general, orally or in writing."

423.    TelexFree, the Operational Defendants and the Licensed Professional Defendants including the CPA and Attorney Defendants, provided the bad advice that distorted, furthered and perpetuated the unlawful, unfair, and deceptive Pyramid Scheme.

424.    These same promotional materials also falsely represented that TelexFree was a "*clean & scam free business.*"  (Emphasis in original).

### M. TelexFree's Fraudulent and Deceptive Use of Best Western Hotel

425.    In addition to the passive income scheme described above, and as part of its

TelexFree maliciously, falsely and deceptively represented that it had a connection with Best Western Hotel in South America that it could offer to its Promoters. TelexFree represented that they had an interest in a Best Western but did not.

426.    TelexFree's president Merrill falsely described the Best Western Hotel offer.  His promotion of this false opportunity was an important marketing tool intended to bolster TelexFree credibility.

427.    TelexFree's management maliciously, willfully, knowingly and deceptively featured the offer of the "Hotel Best Western Opportunity" on the front page of the TelexFree website with an accompanying banner and video.

428.    TelexFree presented this Best Western Hotel opportunity as having a guaranteed yearly return of over 8%.

429.    There was no business relationship between TelexFree and Best Western. TelexFree, Opt 3 and Borromei willfully and knowingly kept the Best Western Hotel opportunity video deceptively remained on the United States-based TelexFree website for months, being visible for months after the president of Best Western became aware of the video and requested TelexFree's website staff to remove it as part of its"post Brazilian shut down package." Defendant Opt 3 lists Best Western Hotel as a client although Best Western International Inc has never actually retained it.

430.    Defendants Opt 3 and Defendant Borromei had actual knowledge of and involvement in TelexFree's false representation concerning the Best Western investment.

**N. Investigation of, and Injunctions against, Telexfree's Brazilian Operations in Brazil**

431.    The following activities were taking place as TelexFree was carrying out approximately $865,893,524.99 in transactions with the Defendant Financial Services Providers.

432.     In or about January 2013, the Brazilian Bureau of Consumer Protection (known as Procon) began to investigate TelexFree.

433.     In its January 11, 2013 press release, Procon indicated that it had *"detected evidence of crimes"*:

> The investigation initiated by civil prosecution of Consumer Protection (no. 01/2013) shows several controversial issues and possible crimes that put consumers at risk in time to accept that kind of deal.
>
> Among the possibilities, there is a breach in the Federal Law No. 1.521/51, art. 2, according to which it is a crime:
>
> Obtaining or attempting to obtain illicit gains at the expense of the people or of undetermined number of people through speculation or processes fraudulent ('snowball', 'chains', 'pichardismo' and any other equivalent) including Ponzi pyramid.
>
> There is also the possible violation of the Code of Consumer Protection (CDC), with false advertising, failure of product information and company, abuse of weakness or ignorance of consumers and conditions unreasonable disadvantage, among others.[37]

434.     Procon subsequently initiated an official complaint and notified the "State Prosecutors Office, the Minister of Finance and the Federal Police."[38]

435.     Shortly after January 11, 2013, Procon's investigation of TelexFree was widely reported online by English-language media.

436.     On February 15, 2013, the MLM news site BehindMLM.com reported that TelexFree was under criminal investigation in Brazil for having operated an illegal Ponzi scheme.[39]

437.     On February 17, 2013, A (MLM) Skeptic, an MLM blog, reported that Brazil's Bureau of Consumer Protection had investigated TelexFree upon suspicion of operating a Ponzi

---

[37] *See* Exhibit 3, Decl. of Gray Echavarria, Attachment 6.

[38] *See*, Exhibit 3, Decl. of Gray Echavarria, Attachment 38.

[39] *See* Exhibit 3, Decl. of Gray Echavarria, Attachment 6.

scheme, and had subsequently forwarded the case to the State Prosecutor's office for filing of

formal charges.[40]

438.     On March 9, 2013, the Ministry of Finance, after its investigation, declared that:

> The TelexFree business of selling packages of internet telephony (VoIP,
> its acronym in English), is not sustainable and suggests a Ponzi scheme,
> which is a crime against the popular economy.

> That is the conclusion of the Secretariat for Economic Monitoring of the
> Ministry of Finance (Seae / MF) in a statement on Thursday (14).[41]

439.     As the matter progressed through the Brazilian court system, the Ministry of

Finance was ordered not to issue further statements about the matter.

440.     TelexFree and the Defendant Founders seized upon that fact and circulated

through its affiliates the following misleading misrepresentation of the order:

> It's official!  The investigation on TelexFree has been absolved of what
> Behind MLM has researched and posted.[42]

441.     On June 19, 2013, the Brazilian Court in Acre issued an injunction putting "a stop

to TelexFree's business operations, including the registration of new affiliate investors,

acceptance of new investments and paying any returns owed on existing affiliate investments."[43]

442.     In addition, following a court order in Brazil by Judge Borges for TelexFree to

turn over "data relating to the registration and operation of the accounts of each of the affiliates,

including twelve months of retroactive data," TelexFree claimed it had no access to registrations

and transfer accounts of the company's Promoters.

443.     This claim directly contradicts the internet video in which Costa is surrounded by

---

[40] *See,* Exhibit 3, Decl. of Gray Echavarria, Attachment 27.

[41] *Id.*

[42] *See,* Exhibit 3, Decl. of Gray Echavarria, Attachment 7.

[43] *Id.*

stacks of books he falsely claims holds the requested affiliate data.[44]

444.    At no point did TelexFree sell VoIP products legally in Brazil.

445.    On January 26, 2015, the Brazilian government filed a criminal complaint seeking fines and jail time against Defendant Founders Wanzeler and Costa for their failure to register their offering of VoIP products with the Brazilian National Telecommunications Agency.

## O.  TelexFree's Continued United States' Operations

446.    After the Brazilian government's seizure of Ympactus in June 2013, TelexFree continued to operate its Pyramid Scheme in the United States.

447.    In late summer or fall of 2013, TelexFree retained a consulting group, The Sheffield Group, which also markets itself as having extensive MLM expertise and experience, to review its business plan.  At this time, the advice provided by Sheffield Group and whether it was followed is unknown.

448.    Jeffrey Babener of Babener & Associates advised TelexFree that its business plan was unlawful and needed to be redesigned in 2013. Jeffrey Babener of Babener & Associates markets himself as having specialized MLM expertise and experience.

449.    Despite being advised of the illegality of the TelexFree program by Babener & Associates, TelexFree and its Defendant Founders continued operations without modification until March 2014.

450.    Each Defendant knew TelexFree was an unalwful Pyramid Scheme, but continued to participate in or aid, abet and further such illegal activities. Each Defendant knew that TelexFree was shut down in Brazil, but continued to participate, substantiall aid, and abet and act to further its unlawful operations and activities in the United States.

---

[44] *See* Exhibit 3, Decl. of Gray Echavarria, Attachment 24.  "*TelexFree claim no affiliate data, fined again,*" Behind MLM (Jan. 1, 2014) (explaining Judge Borges' request and TelexFree's contentious response).

**P.  Collapse of TelexFree's United States Operations**

451.    On or about February 5, 2014, the SOC, in connection with an investigation of TelexFree's operations, served TelexFree with subpoenas.

452.    At least six banks, not named here as Defendants, rejected TelexFree's business.

453.    However over several years of operations, TelexFree did employ financial accounts, including domestic and international bank accounts and various online payment processors to carry out and facilitate its fraudulent and deceptive scheme in the Commonwealth of Massachusetts including a nearly continuous banking relationship with Bank of America and TD Bank.

454.    At least three banks, not named here as Defendants, terminated their relationship with TelexFree as its illegal and tortious operations became apparent.

455.    Emails between TelexFree management and financial institutions painted a bleak picture of TelexFree's continuing financial operations.

456.    In an August 28, 2013 email to Defendants Merrill, Craft and Wanzeler, Defendant Hughes, President of Base Commerce, a payment processing company serving TelexFree, clearly stated "[n]o US Bank or Processor . . . will accept your [TelexFree] business given that you are on month five of the Visa Chargeback monitoring program.  You are one of only three merchants in the USA on month five so you are a real hot-potato as they say."[45]

457.    Financial institutions were an essential part of the TelexFree Pyramid Scheme and provided substantial assistance or encouragement, without which payments from Promoters could not be obtained or funneled through various shell companies and personal accounts. Without the substantial services of the Financial Service Defendants TelexFree would not have

---

[45] *Id.*

74

been able to grow, be maintained, or flourish as it did.

## Q. TelexFree's Belated Efforts to Legitimize Its Scheme

458.    On March 9, 2014, TelexFree abruptly changed its compensation plan, requiring Promoters to sell its VoIP product to qualify for the payments that TelexFree had previously promised to pay them.  A central component of the new change affected the ease of participant withdrawals.  TelexFree Participants could no longer withdraw money, even money already "earned," without making a specified number of retail sales and recruiting several new investors.

459.    These changes were put in place in an attempt to forestall the impending collapse of the scheme.

460.    Following these changes, numerous TelexFree Participants frantically contacted the Office of the Secretary of the Commonwealth, correctly suspecting the harbinger of TelexFree's collapse.  The changes also generated a storm of protests from Promoters who could not recover their money.

461.    As it became more difficult to withdraw money from TelexFree, TelexFree switched its compensation plan from one that paid participants in United States currency to one that operated on TelexFree "credits," which were essentially worthless.

462.    The switch from payment in United States currency to payment in "credits" was made without any announcement or forewarning to TelexFree's Members, and was designed merely to forestall the impending collapse of the scheme.

463.    Furthermore, the value of the "credits" issued by TelexFree was not fixed in relation to any currency, thus giving TelexFree and its Executives the power to alter the value of the "credits" to suit their own interests and avoid compensating TelexFree's Members.

464.    On April 1, 2014, dozens of Promoters descended upon TelexFree's Marlborough Office to protest the changes and to attempt to regain access to their money.  Local media

covering the chaos interviewed one Promoter who admitted that the VoIP service is "almost impossible to sell."[46]

465.    On April 14, 2014, TelexFree, Inc., TelexFree, LLC and TelexFree Financial abruptly sought bankruptcy protection in Nevada under Chapter 11, admitting that they could not meet their obligations from VoIP revenues and seeking authority to reject all its current obligations to Promoters.

466.    In furtherance of the enterprise, TelexFree mailed fraudulent and inaccurate 1099 (Miscellaneous Income) forms to Promoters in or about mid-April 2014, an attempt to create the illusion that TelexFree had made payments to Promoters when no such payments were made.

467.    The 1099 forms were provided long after the mandated January 31, 2014 deadline, and some after the April 15, 2014 filing deadline.

468.    TelexFree falsely represented that Promoters had received income that they in fact had not received.

469.    TelexFree's former officers or employees stated to the TelexFree bankruptcy transition team that under the TelexFree Pre-March 9 Contract, TelexFree owed its Promoters over $5 billion dollars.

### R.  Events Since TelexFree's Bankruptcy Filing

470.    On April 15, 2014, the SOC filed an Administrative Complaint against TelexFree, Inc. and TelexFree, LLC, alleging violations of the Massachusetts Uniform Securities Act, MASS. GEN. LAWS, c. 110A.

471.    The SOC sought injunctions and orders requiring TelexFree, Inc. and TelexFree,

---

[46] *See* Exhibit 3, Decl. of Gray Echavarria, Attachment 33.  Scott O'Connell, *"Upset customers look for answers at TelexFREE offices,"* Wicked Local-Dennis (April 1, 2014 (updated April 17, 2014)), http://dennis.wickedlocal.com/article/20140401/NEWS/140409503?sect=More&map=0.

LLC to cease and desist from further conduct violating Massachusetts securities laws and regulations, to provide an accounting of all proceeds received because of TelexFree's fraud, to provide restitution to Promoters for losses attributable to the fraud operations, and to disgorge all profits.

472.     Also on April 15, 2014, the SEC filed a civil Complaint and Jury Demand against TelexFree, Inc. and TelexFree, LLC as well as Defendants Merrill, Wanzeler, Labriola, Craft, Rodrigues, De La Rosa, Crosby, and Sloan, alleging violations of the Securities Act of 1933, the Securities Exchange Act of 1934, and SEC Regulations.  The SEC requested and was granted a preliminary injunction and an order freezing the assets of TelexFree.  The SEC is also seeking disgorgement of profits and additional civil penalties.

473.     Additionally on April 15, 2014, the FBI and the U.S. Department of Homeland Security (the "DHS") conducted a raid of TelexFree's Marlborough Office.

474.     During this raid by the FBI and DHS, federal agents apprehended Defendant Craft as he attempted to leave the building with a laptop and approximately $38 million in cashier's checks in a bag.  He also tried to leave with TelexFree computer equipment containing incriminating data.

475.     When questioned, Craft stated to the federal agents he was merely a "consultant," and claimed that the checks and computer were "personal."

476.     Defendant Katia Wanzeler was apprehended as she attempted to board a flight to Brazil, on which she had a one-way ticket, cash and seventy pounds of luggage.

477.     On or about May 1, 2014, the Montana Securities Commissioner filed a cease and desist order against TelexFree.

478.     The following day, the United States Bankruptcy Court for the District of Nevada,

on motion by the SEC, transferred the matter to the federal district court in Massachusetts,

central division.

479.    During hearings conducted on May 2, 2014, William H. Runge, III, former Chief

Restructuring Officer of TelexFree, estimated that as of TelexFree's bankruptcy filing TelexFree

had assets of $31 million in its bank accounts, $28 million in brokerage accounts, and nearly $30

million held by payment processing companies.

480.    The location of hundreds of millions of dollars received by TelexFree from

Promoters remains unknown.

**S.   TelexFree's Principals, Founders and Executive Office Controlled TelexFree, Knowingly Perpetrated the Unlawful, Unfair, and Deceptive Pyramid Scheme, and Made False Representations about TelexFree**

481.    Defendants Merrill, Wanzeler, Labriola, Craft and Costa were responsible for the

control and operation of TelexFree**.**

482.    These Defendants, TelexFree's Founders and Principals, Executive Office and

Top Level Promoters knowingly and willfully conspired to perpetrate, and did perpetrate, the

TelexFree Pyramid Scheme with full awareness of its unfair, deceptive, and unlawful nature.

483.    Defendant Merrill served as the president, secretary, and director of TelexFree,

Inc.; a manager of TelexFree, LLC; president, secretary and director of TelexFree Financial;

general partner of Defendant Electric, and president, secretary and director of Defendant Mobile,

and in those capacities, exercised significant control over TelexFree's business operations.

Merrill exercised significant control over the TelexFree Pyramid Scheme.  Merrill has

appeared in videos posted to the internet – including, among numerous others, a November 3,

2012 YouTube video entitled "TelexFree James Merrill Brasil,"[47] a June 20, 2013 YouTube

---

[47] Available at https://www.youtube.com/watch?v=8hYuvWNIL2M.

video entitled "James Merrill Speaks About TelexFREE BR Investigation,"[48] and the highly

promoted "TelexFree 1st Extravaganza" video made available on www.TelexFree.comin which

he can be seen promoting TelexFree as a revenue opportunity for Promoters.

484.    Merrill also otherwise made numerous false representations in furtherance of the

Pyramid Scheme.

485.    In a March 21, 2014 press release, Merrill misrepresented that TelexFree had been

"in the VoIP business for more than a decade."

486.    Through to at least March 28, 2014, the TelexFree website included a biography

of Merrill, which falsely stated that Merrill was a 1985 graduate of Westfield State University in

economics, and that he is "well versed in one of the new technologies of the era (VoIP)."

487.    According to testimony obtained by the SOC, Merrill attended Westfield State

University for a mere two years, without either receiving a degree or declaring a major.

488.    In further direct contravention to the representations made on the TelexFree

websites, Merrill also testified to the SOC on March 25, 2014 that he had only a basic

understanding of VoIP technology.

489.    Defendant Merrill received $3,136,200 on December 26 and 27, 2013 from one of

the named Financial Service Provider Defendants.

490.    Defendant Wanzeler served as treasurer and a director of TelexFree, Inc.; a

manager of TelexFree, LLC; vice president, treasurer, and a director of TelexFree Financial;

general partner of Defendant Electric and treasurer and director of Defendant Mobile, and,

according to corporate filings on record with SOC, as the chief executive officer of TelexFree,

Inc.

---

[48] Available at https://www.youtube.com/watch?v=zO4xe-0tE-4.

491.    In those capacities, Wanzeler exercised significant control over TelexFree's business operations.

492.    Wanzeler exercised significant control over the TelexFree Pyramid Scheme and participated in marketing TelexFree to potential investors.

493.    Wanzeler appeared in TelexFree videos posted to the Internet in which he willfully, maliciously, unfairly, deceptively:

- promoted TelexFree as a revenue opportunity for Promoters;

- detailed the, unlawful and fraudulent TelexFree Program; and

- made false representations regarding returns.

494.    Wanzeler received $4,317,800 on December 26 and 27, 2013, and wired $3.5 million to the Oversea-Chinese Banking Corporation in Singapore on January 2, 2014.

495.    Defendant Labriola served as the international marketing director for TelexFree, Inc.

496.    Labriola was one of the original directors and founders of Common Cents Communications, Inc.

497.    At all material times, Labriola exercised significant control over TelexFree's business operations and the operations of its interrelated companies.

498.    Labriola also appeared in several videos posted on the Internet promoting TelexFree as a revenue opportunity for Promoters, detailing the fraudulent TelexFree program and making false representations regarding returns.

499.    Labriola has acted as TelexFree's spokesman to Promoters during post-bankruptcy petition conference calls.

500.    As a director of TelexFree, Inc., Labriola exercised significant control over the TelexFree Pyramid Scheme.

501.    As international marketing director for TelexFree, Inc., Labriola maliciously and knowingly perpetrated the TelexFree fraud through the dissemination of false and misleading advertising and marketing communications.

502.    Nevertheless, those Defendants have admitted in their April 14, 2014 bankruptcy filings that they began to plan their restructuring after Ympactus' enforcement action.

503.    Defendant Craft is a CPA and served as the chief financial officer ("CFO") of Telex Free, Inc. and TelexFree, LLC.

504.    In his capacity as CFO of TelexFree, Craft was responsible for preparing or approving TelexFree's financial statements, overseeing TelexFree's accounting methods and records, and otherwise exercising significant supervision and control over TelexFree.

505.    According to the SEC, two companies controlled by Craft received more than $2 million from TelexFree between November 19, 2013 and March 14, 2014.

506.    On April 23, 2013, in response to a request for a profit-and-loss statement issued by the SOC, TelexFree produced a document purporting to be TelexFree's 2012 profit-and-loss statement.[49]

507.    TelexFree did not make use of usual and accepted MLM accounting practices. For example, they did not separate out income generated by sales of VoIP from income generated by other means.

508.    On February 5, 2014, the SOC requested a second profit-and-loss statement from TelexFree for 2012, which TelexFree produced on February 26, 2014.[50]

509.    A comparison of these two profit-and-loss statements – each purporting to be

---

[49] *See* Administrative Complaint of instituted by the SOC, Dkt. No. 2014-0004, page 39, attached as Attachment 36 to Exhibit 3, Decl. of Gray Echavarria.
[50] *Id.*

TelexFree's profit-and-loss statement for 2012 – reveals massive discrepancies (and "conflicting statements").

510.    The first statement provided by TelexFree lists total income for 2012 at $1,864,939.70, while the second lists total income for 2012 at $2,834,835.70.[51]

511.    As further examples, agent commission is listed at $520,582.95 in the first, versus $2,105,925.61 in the second; total expenses are listed as $784,899.22 in the first, versus $2,333,893.09 in the second; net operating income is listed as $1,080,040.48 in the first, versus $478,251.56 in the second; and net income is listed as $1,066,313.39 in the first, versus $477,652.23 in the second.[52]

512.    The existence of duplicative accounting records containing egregious discrepancies indicates TelexFree's falsification of accounting records and negligent failure to adhere to Generally Accepted Accounting Principles ("GAAP").

513.    As CFO for TelexFree, Inc. and TelexFree, LLC, and a certified public accountant, Defendant Craft negligently or recklessly perpetuated the TelexFree unlawful enterprise by:

- overseeing TelexFree's creation of accounting records;

- failing to ensure that GAAP accounting methods were adopted and adhered to;

- certifying TelexFree's business operations and accounting practices as good and lawful;

- concealing that the AdCentral packages purveyed by TelexFree were securities.

514.    Defendant Costa was listed as manager of TelexFree, LLC with the Massachusetts

---

[51] *Id.*

[52] *Id.*

Secretary of State Corporations Division.

515.    Costa is one of the original founders of TelexFree, and was involved in the day-to-day management and oversight of TelexFree and was actively involved in and managed its Brazilian operations.

516.    Costa has appeared on numerous websites and videos posted on the Internet promoting TelexFree as a revenue opportunity for Promoters, detailing the fraudulent TelexFree Program and touting its huge financial return.

517.    In an August 15, 2013 video, Costa fraudulently claims that TelexFree "never was, never will be" an illegal pyramid scheme because of its VoIP sales.  He further misrepresented that "[w]e do not depend on everyone coming in in order to pay the people who are already in."

518.    Costa was an outspoken advocate against the Brazilian Court's decision to enjoin TelexFree's Brazilian activities, and publicly supported TelexFree's illegal and corrupt activities.

519.    On June 25, 2013, in an outright misrepresentation, Costa is videoed displaying an insurance notification representing that it was proof of coverage for Promoters' payments; however, in actuality, the document was a notification denying coverage.[53]

**T.** **TelexFree's Top Level Promoters Played an Integral, Essential and Primary Role and also Aided and Abetted the Pyramid Scheme**

520.    TelexFree conducted its Pyramid Scheme through the use and with the participation of several high profile Promoters referred to herein as "Top Level Promoters," including Defendants Rodrigues, De La Rosa, Crosby, Miller, Sloan, Shoyfer and others.

521.    TelexFree's Top Level Promoters played a primary role in the Pyramid Scheme and were integral and essential co-conspirators who at all times knew that they were involved in

_____

[53] *See* http://www.youtube.com/watch?v=q2A2IsAPd0I.

unlawful activities designed to wrongfully take the funds invested by the class.  In fact, that is why the Founders, Principals, and Executive Office recruited many of them for involvement in TelexFree.

522.    The presence of the Top Level Promoters as well as their suspicious, tortious or unlawful activities were Red Flags for the Financial Services Defendants as identified by the FFIEC.

523.    Each Top Level Promoter promoted deceptively, fraudulently and misleadingly promoted and furthered the Pyramid Scheme with knowledge of its illegality.

**U. TelexFree's Attorneys Played an Integral Role in and Aided and Abetted the Unlawful, Unfair, and Deceptive Pyramid Scheme**

524.    TelexFree's Attorney Defendants were a critical component of the TelexFree Pyramid Scheme as their representation of TelexFree went beyond the ordinary attorney-client relationship of delivering legal advice.

525.    At times relevant to this complaint, the Attorney Defendants had actual knowledge that the TelexFree business model was a fraudulent Pyramid Scheme.

526.    The Attorney Defendants were obligated to advise their clients on how to comply with the law, yet TelexFree's Attorney Defendants negligently, recklessly, willfully, knowingly, unfaitrly and deceptively advised their clients how to avoid detection, maintain the appearance of legality, and to maintain and build the Pyramid Scheme. They knowingly extended their roles to become supporters of the Pyramid Scheme by lending legitimacy to its operation. Throughout TelexFree's profitable Pyramid Scheme, the Attorney Defendants acted as legal counsel to TelexFree, and used their positions of authority, education and respect of the profession of law within the targeted immigrant and other communities as an integral part of the Pyramid Scheme" and its post Brazilian shut down package."

527.    Beyond his licensure, Attorney Nehra's extensive experience in MLM, and particularly his involvement with the Ponzi Schemes involving AdSurfDaily and Zeek Rewards, armed him with the knowledge of what constitutes violations of United States securities law, which he used in an attempt to hide TelexFree's Pyramid Scheme activity with obfuscating phraseology.

528.    Similar to Attorney Nehra, Attorney Waak also claimed to have over thirty years of experience in counseling MLM and direct-selling enterprises.[54]

529.    On the website of the Law Offices of Nehra and Waak, the Defendant Attorneys boasted that "[n]o Company that retained this firm BEFORE LAUNCH has been shut down by a regulator."[55]  (emphasis in original).

530.    On their website, Attorney Nehra and Attorney Waak claim to specialize in counseling "domestic and foreign companies operating MLM (multi-level marketing) businesses in the United States."[56]

531.    The Law Offices of Nehra and Waak provided legal counsel to TelexFree, Attorney Waak was principal attorney of the law firm and was charged with oversight of the firm's daily activities.

532.    Attorneys Nehra and Waak also maintained the Defendant professional limited liability companies Gerald P. Nehra, Attorney at Law, PLLC and Richard W. Waak, Attorney at Law, PLLC, which also provided legal and counseling services to TelexFree.

533.    Among the Attorney Defendants, and throughout TelexFree's Scheme, there was no clear distinction among the services provided to TelexFree by the Law Offices of Nehra and

---

[54] *See* Exhibit 4, Decl. of Carol L. Harris, Exhibit 2.  http://www.mlmatty.com/meet-mlm-attorneys/.

[55] *Id.*

[56] *Id.*

Waak, the individual Attorney Defendants, and their respective professional limited liability companies.

534.    As general partners of the Law Offices of Nehra and Waak, Attorney Nehra and Attorney Waak are jointly and severally liable for torts and obligations of the firm.

535.    Seeking to profit from TelexFree's exploitation of the members of the putative class, Defendant Nehra drew upon his prior experience to aid, abet and play a substantial and integral part in TelexFree's unlawful, unfair and deceptive acts and practices during times relevant to this complaint.

536.    The Attorney Defendants attended meetings at TelexFree's headquarters in Massachusetts to discuss TelexFree's product, business model, and operations participated in teleconferences with Defendant Founders, Principals, Executive Office, and Top Level Promoters to discuss TelexFree's product, business model, and operations and had access to and input into TelexFree's documents, including the contracts entered into between TelexFree and the putative class.

537.    Attorney Nehra negligently, recklessly, willfilly, knowingly, unfairly or deceptively counseled TelexFree on actions that would serve to evade United States securities laws that were intended to offer, in part, to provide the members of the Putative Class with protection from pyramid schemes, and advised TelexFree Promoters (excluding Top Level Promoters) to unknowingly participate in the evasion of federal and state securities laws, to enrich himself financially and serve his own selfish interests.

538.    Attorney Nehra otherwise negligently, recklessly, willfilly, knowingly, unfairly or deceptively counseled and advised TelexFree Promoters (except the Top Level Promoters) to unknowingly participate in the evasion of federal and state securities laws.

539.    Defendant Nehra accomplished this through his reputation as a licensed attorney, his purported experience as an MLM expert, and his purported research of TelexFree's business model, which allowed him to hold out TelexFree as a legal business.

540.    Defendant Nehra did this in a variety of ways, including his instruction to Investors to avoid using the terms "investment" regarding AdCentral Packages (*See* TelexFree Pre-March 9 Contract, Paragraph 2.6.5(m)), which was an attempt to conceal, and encouraged others to conceal TelexFree's sale of securities, in an attempt to strip Promoters of the rights afforded them by federal and state securities laws.

541.    In company videos, Attorney Nehra failed, refused and neglected to advise prospective TelexFree Promoters, the putative class members, that their participation in TelexFree presented a risk, including the risk of participating in an unlawful scheme, or that his advice was, in fact, against their own interests.

542.    Attorney Nehra perpetuated and enhanced the Scheme by not advising the putative class member TelexFree Investors that his web-published purported professional advice was intended to serve the interests of TelexFree and himself.

543.    Attorney Nehra's actions exceeded the scope of zealous representation of TelexFree.  Although he was licensed to practice law and purported to offer legal opinions, active and integral participation in a Pyramid Scheme does not fall within the parameters of the profession in which he was licensed to practice.

544.    Nehra negligently told Promoters and prospective members that TelexFree's actions were within the purview of federal and state law.  As described above, the Defendant Founders, Principals, Executive Office and Top Level Promoters knowingly used Attorney Nehra's false legal opinions and misrepresentations as a marketing tool to unfairly and

deceptively further the illegal Pyramid Scheme.

545.    Attorney Nehra's opinions, and the opinions of other Attorney Defendants, were

packaged and promoted as part of TelexFree's total "post Brazilian shut down package" to the

members of the putative class.[57]

546.    On an internet video posted on August 2, 2013, Attorney Nehra provided false

and deceptive assurances to Promoters and potential Promoters, stating that "[t]he special

ingredient is that you have a real product."

547.    Attorney Nehra assured Promoters on internet postings, in writing, and in person

at marketing promotions that, in his professional opinion, the TelexFree business model was

legitimate despite having actual knowledge that TelexFree MLM Network "*Partnerships*"[58]

involving TelexFree's AdCentral marketing packages were unlawful, as he had actual knowledge

of the ruling of the Brazilian Court, knowledge of and access to TelexFree's United States

operations and its composition, and knowledge of United States law.

548.    More particularly, when he advised potential participants of the soundness of the

venture, Attorney Nehra knew that a Brazilian court had determined that TelexFree's activity

was fraudulent, and that its Brazilian attorneys essentially admitted it was a pyramid scheme.

549.    Defendant Nehra's own comments suggest that when providing legal opinions at

the request of TelexFree and Defendant Founders, he knew that TelexFree intended to use his

advice and likeness prominently as a marketing tool on both their localized Brazilian

(Portuguese) and Spanish (Spanish) website portals, in an effort to make TelexFree's business

appear legitimate thereby continuing and perpetuating the ongoing fraud.

---

[58] *See* Exhibit 1 - Standard TelexFree Contract at ¶2.2.1 ¶

550.    Defendant Nehra knew TelexFree used his legal opinions as a marketing tool to promote its suspicious, tortious or unlawful Pyramid Scheme on Brazilian (Portuguese) and Spanish/Dominican (Spanish) website portals.

551.    Attorney Nehra aided, abetted, counseled, induced, and/or procured TelexFree's violations of law regarding the proper segregation and maintenance of customer funds, and acted in concert and combination with TelexFree in such violations.

552.    Defendant Nehra gave substantial assistance to TelexFree and Defendant Founders in accomplishing a tortious and illegal result, and Nehra's own conduct, separately considered, constitutes a breach of duty to Promoters since he:

- negligently misrepresented the legality and sustainability of TelexFree's operations to the detriment of Promoters, and received fees from TelexFree;

- negligently obscured and obfuscated the illegal nature of TelexFree's Scheme by the manipulative use of language, including, e.g., advising TelexFree that using the term "investment" must be avoided;

- breached his duty of professional care to Promoters by failing to exercise proper due diligence in investigating the legality of TelexFree's operations;

- breached his duty of care by encouraging and advising individuals to become and remain Promoters to their detriment, despite his knowledge of the illegality of TelexFree's operations; and

- engaged in a civil conspiracy to defraud TelexFree's Promoters with a Pyramid Scheme, and took a leading role in the Scheme.[59]

553.    Attorney Waak, as general partner and principal attorney of the Law Offices of Nehra and Waak, and the other Attorney Defendants knew of, oversaw, and participated in

---

[59] As stated by Justice William O. Douglas, "just as a fine natural football player needs coaching in the wiles of the sport, so, too, it takes a corporation lawyers with a heart for the game to organize a great stock swindle or income tax dodge and drill the financiers in all the precise details of their play."  William O. Douglas, *Directors Who Do Not Direct,* 47 Harv.L.Rev. 1305, 1329 (1934).

Attorney Nehra's tortious and illegal conduct regarding the TelexFree Pyramid Scheme.

554.     With their specialized knowledge of the laws governing MLM and direct-sales ventures and their personal knowledge of TelexFree's product, business model, and operations which were identical to its Brazilian product, business model, and operations, the following publicly available information caused or should have caused the Attorney Defendants to recognize that TelexFree was an unlawful pyramid or Ponzi scheme and decline or cease providing services to it or provide advice to change the program and make sure it was promptly changed:

- a Brazilian court found TelexFree's Brazilian operations to be fraudulent;

- a Brazilian court described TelexFree's operations in terms of the quintessential pyramid scheme after TelexFree's own Brazilian lawyers unwittingly admitted as much;

- TelexFree's Brazilian lawyer Djacir Falcão ("Falcão") advised the Brazilian court that an injunction would cause the company to enter bankruptcy:  "Running the company really becomes difficult because of the court decision, so we will appeal";

- Falcão informed the Brazilian court that "should the company spend a few more days being prohibited from signing up new investors, they would have no money to pay the old ones";

- all of TelexFree's appeals in the Brazilian courts were denied;

- a Brazilian court remarked that the problem is that the earnings will be exhausted when the main source of revenue—new member registrations— stops;

- a Brazilian court remarked that adding new Members was more important to TelexFree than trying to sell its VoIP product;

- a Brazilian court remarked that it is detrimental that many affiliates do not even have the opportunity to recover their initial payment to Telexfree; and

- a Brazilian court entered an order freezing TelexFree's funds in Brazil, blocking future payments to TelexFree in Brazil, and enjoining TelexFree from signing on new members in Brazil.

555.    Despite having knowledge that TelexFree was an enterprise carrying out unlawful, unfair, or deceptive acts or practices, Nehra and Defendant Nehra Law Firm performed integral services and provided essential advice and substantial assistance that was used to further TelexFree's unlawful business.

556.    The Attorney Defendants used their knowledge and experience with MLM and direct-sales ventures, the laws applicable to those types of ventures, and their personal knowledge of TelexFree's product, business model, and operations to assist TelexFree in perpetrating the Pyramid Scheme.  More specifically the Attorney Defendants:

- belatedly advised TelexFree that its compensation plan required amendment;

- advised TelexFree on how to avoid detection from state and federal agencies;

- advised TelexFree on how to maintain the appearance of legality, including to avoid using the term "investment" regarding the AdCentral Packages (TelexFree Pre-March 9 Contract, Paragraph 2.6.5(m)), which was an attempt to conceal, and encourage others to conceal, TelexFree's sale of securities in an attempt to strip Promoters of the rights afforded them by federal and state securities laws;

- advised TelexFree on how to maintain and advance TelexFree;

- advised TelexFree on how to avoid United States securities laws intended to offer, in part, protection from pyramid and Ponzi schemes;

- advised TelexFree Promoters (excluding Top Level Promoters) to unknowingly participate in the evasion of federal and state securities laws;

- advised TelexFree on laws concerning the proper segregation and maintenance of consumer funds;

- failed to inform the putative class that the Attorney Defendants' web-published professional "advice" was intended to serve the interests of TelexFree and the Attorney Defendants;

- failed to inform the putative class that participation in TelexFree presented a risk, including the risk of participating in an unlawful scheme, or that their advice was against the putative class's interests;

- advised Promoters and represented to the putative class that TelexFree was a lawful, legitimate, and sustainable venture under state and federal laws, which TelexFree then used as a potent marketing tool to recruit new members;

- provided legal representations and statements to Defendant Founders, Principals, Executive Office, and Top Level Promoters that Attorney Defendants knew would be used by TelexFree in its efforts to recruit and retain members;

- allowed their names, experience, and likenesses to be used by TelexFree in propaganda aimed at retaining and obtaining members to the Pyramid Scheme like online postings, in-person meetings, company "super weekends" and "extravaganzas," brochures, and videos;

- gave speeches to the putative class at TelexFree's recruiting and retention "extravaganzas," "super weekends," and other events proclaiming with an air of authority that TelexFree's product and model was legitimate and lawful;

- informed the putative class that the Brazilian government's shutdown of TelexFree's activities in Brazil would not affect TelexFree's operations in the United States;

- refused to address questions asked by the putative class regarding implications of the injunction granted against TelexFree's operations in Brazil;

- informed the putative class that TelexFree "is legally designed . . . you are on very solid legal ground," and that TelexFree's operation had been "vetted" and "bless[ed]" by the Attorney Defendants;

- Encouraged the putative class to become or remain Promoters; and

- Provided assurances to Promoters and the putative class on website postings and other writings, and in person that TelexFree was legitimate and lawful, including assurances that "[t]he special ingredient is that you have a real product."

557.   The acts and omissions of the Attorney Defendants were integral for TelexFree to perpetuate and further the Pyramid Scheme and constitute substantial assistance in that Scheme by the Attorney Defendants.

558.   The Attorney Defendants committed their respective acts and omissions with the

knowledge, and purpose of assisting and benefiting of TelexFree and themselves and to the detriment and loss of the putative class.

559.    The Attorney Defendants knew their representations and statements would be and were used by TelexFree as a marketing tool to further advance its business model and illegal activities.

560.    The Attorney Defendants knowingly allowed TelexFree to utilize their statements and representations regarding the legality of TelexFree as propaganda to retain and maintain members in the Pyramid Scheme.

561.    The Attorney Defendants negligently, recklessly, willfilly, knowingly, unfairly or deceptively failed to exercise proper diligence in investigating the legality, legitimacy, and sustainability of TelexFree's product, business model, and operations or otherwise offered bad advise.

### V. TelexFree's Accountants and Professional Services Providers Played an Integral Role in and Aided and Abetted the Unlawful, Unfair, and Deceptive Pyramid Scheme

562.    Defendants Craft and Craft Financial participated in and perpetuated TelexFree's unlawful business operation.

563.    In his dual capacity as CFO and CPA for TelexFree, Craft and Craft Financial were responsible for preparing or approving TelexFree's financial statements, overseeing TelexFree's accounting methods and records, and otherwise exercised significant supervision and control over TelexFree.

564.    In exercising their duties, Craft Financial and Craft negligently participated in, supervised, and controlled conflicting financial statements for TelexFree that reveal massive discrepancies.

565.    As the CFO and CPA for TelexFree, Inc. and TelexFree, LLC, Craft and Craft

Financial negligently assisted in perpetuating TelexFree's fraudulent Pyramid Scheme by:

- directing or overseeing TelexFree's creation of inaccurate, false or falsified accounting records;

- failing to ensure that GAAP was adopted and adhered to by TelexFree;

- certifying TelexFree's business operations and accounting practices as good and lawful;

- preparing inaccurate financial documents for the affiliated TelexFree entities;

- preparing inaccurate tax returns for the affiliated TelexFree entities;

- knowingly disseminating or allowing to be disseminated inaccurate financial information among and between Promoters; and

- conspiring with TelexFree's Officers to structure and perpetuate the TelexFree business model while enriching TelexFree, Craft Financial, and Craft.

566.     Defendants Craft and Craft Financial knew when providing their financial assistance that their roles would give substantial assistance or encouragement to the Pyramid Scheme.

567.     Defendant PricewaterhouseCoopers ("PwC") also negligently provided accounting and consulting services to TelexFree during the Pyramid Scheme.

568.     More particularly, TelexFree retained PwC in January 2014, several months after TelexFree had been shuttered by government authorities in Brazil, to provide tax and financial consultation, including assistance with the development of international tax structures.

569.     PwC negligently advised TelexFree to prepare and issue unfair, deceptive, inaccurate, suspicious, and unlawful 1099 (Miscellaneous Income) forms.

570.     In an effort to maintain the illusion that it had made payments to its members and on the negligent advice of PwC, TelexFree mailed fraudulent and inaccurate 1099 (Miscellaneous Income) forms to its members as described above.

571.   Craft Financial and Craft also negligently assisted in preparing and sending the inaccurate 1099 forms to TelexFree's members.

572.   Those inaccurate 1099 forms were filed with the Internal Revenue Service and State Revenue Offices and will impose an undue burden and hardship on Promoters who may now be liable to pay taxes on income they never received.

573.   The CPA Defendants also negligently prepared financial documents for affiliated TelexFree entities and prepared tax returns for the affiliated TelexFree entities.

574.   PwC also negligently assisted TelexFree in responding to the Massachusetts SOC Securities Division's information requests.

575.   PwC negligently provided TelexFree with its services despite having access to TelexFree's internal financial documents that demonstrated that TelexFree received virtually no income from the sale of its VoIP product and was, in fact, an illegal Pyramid Scheme.

576.   Craft Financial, Craft, and PwC negligently performed services and provided assistance and advice that was integral and essential to TelexFree and used to further TelexFree's unlawful business.

577.   Craft Financial, Craft, and PwC negligently provided TelexFree with these professional services despite having access to TelexFree's internal financial documents, which demonstrated that TelexFree received virtually no income from the sale of its VoIP product and was, in fact, an illegal Pyramid Scheme.

578.   Craft Financial, Craft, and PwC knew when providing their professional services to TelexFree that their role would give substantial assistance or encouragement to TelexFree to continue its unlawful business model and would further the illegal Scheme.

579.   Craft Financial, Craft, and PwC knew their representations and statements were

false and misleading and that they would be and were used by TelexFree as a marketing tool to further advance its business model and illegal activities.

580.    At all times relevant to this complaint, Craft Financial, Craft, and PwC acted subject to pervasive control of TelexFree and were subject to TelexFree's will.  Despite having actual knowledge that TelexFree's Brazilian operations had been found fraudulent and enjoined by Brazilian courts, Craft Financial, Craft, and PwC, at the direction of and with information provided by TelexFree, negligently crafted financial statements and negligently made representations designed to misrepresent and hide the true nature of TelexFree's product, business model, and operations in the United States and the effect of the Brazilian courts' findings and orders.

581.    At all times relevant to this complaint, Craft Financial, Craft, and PwC consented to be agents of TelexFree.  Craft Financial, Craft, and PwC knowingly allowed TelexFree to utilize their deceptive and misleading financial statements and representations regarding TelexFree as propaganda to retain and maintain members in the Pyramid Scheme.

582.    As agents of TelexFree, Craft Financial, Craft, and PwC owed a duty to the putative class not to make deceptive statements or misrepresentations in order to induce the putative class to buy into TelexFree's Pyramid Scheme.

583.    Craft Financial, Craft, and PwC committed their respective acts and omissions with the knowledge of assisting TelexFree to perpetuate and advance the Pyramid Scheme to the benefit of TelexFree and Craft Financial, Craft, and PwC, but to the detriment and loss of the putative class.

584.    At all material times, Defendant Borromei served as the direct contact and liaison between Defendant Opt3 and TelexFree.

585.    At all material times, Borromei had actual knowledge that TelexFree was an

unlawful Pyramid Scheme.

586.    In addition to providing technical support and assistance with payment

processing, Opt3 and Borromei managed and oversaw the technological aspects of TelexFree's

fraudulent and illegal activities.

587.    In or around 2012, Opt3 and Borromei were contracted by TelexFree to provide

internet technology ("IT") services, to establish TelexFree's electronic database in Brazil, to

maintain and service TelexFree's computers and electronic database, to provide assistance with

processing payments and financial transactions, and to provide other technical support.

588.    Opt3 and Borromei set up and maintained TelexFree's electronic database.

Together with TelexFree, Opt3 and Borromei conspired to set up TelexFree's servers in Brazil

with the goal of evading U.S. regulators and hindering investigation of TelexFree in the event

that TelexFree's Scheme should collapse or be shut down.

589.    On August 13, 2013, Defendant Borromei co-hosted an open webinar with

Defendant Labriola, which promoted TelexFree's payment system, which had been established

by Opt3 and which utilized Defendant GPG's electronic payment gateway, to TelexFree

Investors and potential investors and encouraged them to make further investments using this

system.

590.    On August 16, 2013, Borromei hosted an additional open webinar, in which he

further promoted the payment system, including Defendant GPG's electronic payment gateway,

and encouraged further investments in TelexFree using this system.

591.    By email dated September 27, 2013, Borromei petitioned GPG to allow TelexFree

continued use of its electronic gateway for transmitting Member credit card data.

592.    By email dated September 27, 2013, in response to Borromei's email earlier that

same day, Jayme Amirie, President of GPG, indicated to Borromei that, although TelexFree

represented a "reputational risk" for GPG, GPG would continue to allow TelexFree to use GPG's

electronic gateway to transfer electronic data to Defendant Allied Wallet for processing

Members' credit card payments.

593.    Borromei also worked with Defendants Sparman and Vantage Payments to

establish TelexFree's payment processing through Allied Wallet.

594.    Opt3 and Borromei continued to provide services to TelexFree until the time of

TelexFree's bankruptcy petition.

595.    Opt3 is listed as a trade creditor in TelexFree's initial bankruptcy filings.

596.    Barromei was also copied on numerous emails between and among TelexFree,

Defendant Base Commerce's John Hughes, and GPG's Jayme Amirie, discussing the transition

of TelexFree's payment processing to Allied Wallet and transfers of funds.

597.    Through their close relationship with co-Defendants Merrill, Wanzeler and Craft,

and through their providing TelexFree with technological oversight and support, Barromei and

Opt3 had actual knowledge of TelexFree's illegal and fraudulent activities yet continued to

provide substantial assistance in the furtherance thereof.

**W.  The Financial Services Providers Were Required to Comply With Various Statutory and Regulatory Investigation and Monitoring Obligations**

598.    Each of the Financial Services Provider Defendants is a "financial institution"

under the terms of the Bank Secrecy Act, 31 U.S.C. § 5312.

599.    Each of the Financial Services Provider Defendants is required to implement in

their business operations proven solutions to assure compliance with key anti-bribery and

corruption regulations, including the Bank Secrecy Act ("BSA"), Foreign Corrupt Practices Act

("FCPA"), and critical anti-money laundering ("AML") mandates such as Know Your Customer

("KYC") and the Customer Information Program ("CIP").

600.     Each of the Financial Services Provider Defendants is required by key anti-

bribery and corruption regulations to possess AML expertise.

601.     At least six financial institutions not named in this action turned TelexFree away

before opening an account.

602.     At least six financial institutions not named in this action turned TelexFree away

because of suspicious activity and other numerous "Red Flags" alerting them of fraud during the

same time period the Defendant Banks transacted millions of dollars in business with TelexFree.

603.     Other banks not named in this action discharged TelexFree within weeks of

opening a financial service relationship with them.

604.     Each Financial Services Provider profited from its relationship with TelexFree

and the other Defendants.

605.     Given TelexFree's unlawful business operation and the "Know Your Client" and

AML regulations, each Financial Services Provider was obligated to refuse to open any accounts

or process any transactions for the benefit of TelexFree.

606.     Each of the Defendant Financial Services Providers was required to maintain

robust, sophisticated and effective due diligence systems for purposes of BSA and AML

compliance.

607.     During times relevant to the complaint, each of the Defendant Financial Services

Providers did maintain robust, sophisticated and effective due diligence systems for purposes of

BSA and AML compliance.

608.     When a Financial Service Provider finds out that a client is laundering money or

running an unlawful enterprise it should:

- terminate the banking relationship;

- shut down the accounts; and

- file a Suspicious Action Report ("SAR").

609.    Each of the Financial Services Provider Defendants are required to take

precautions against violations of the BSA and AML laws by clearly understanding the risk in

their customer base and conducting comprehensive enhanced due diligence that prioritizes those

risks.

610.    At all times relevant to this complaint, each of the Financial Services Provider

Defendants was subject to federal regulatory law obligations that required them to:

- obtain and possess knowledge of and understand[60] their clients' business operations;

- obtain and possess knowledge of and understand their clients' relationships and activities;

- continue to monitor such information throughout the term of their relationship; and

- take certain and defined steps once indicators of suspicious, tortious or illegal activity existed.

611.    In particular, each of the Financial Services Provider Defendants was obligated

by, without limitation, the BSA, the USA Patriot Act of 2001 (the "Patriot Act"), and federal

regulations including 31 C.F.R. § 103.121 and amended 31 C.F.R. § 1020, et seq. (the "Federal

Regulations") to perform a reasonable investigation of TelexFree to determine and understand:

- the true identity of its management;

- the true nature of its business activities;

---

[60] In other words, the Financial Services Defendants did not simply have to gather information; they needed to analyze it and understand their clients' business models and key personnel.

- the true nature of its customer base;

- the true nature of its product offerings; and

- prior to agreeing to provide any financial services or access to the federally regulated banking system.[61]

612.   Specifically, pursuant to the KYC analysis mandated by 31 C.F.R. § 103.121 and amended 31 C.F.R. § 1020, et seq. (the "Know-Your-Customer Regulations"), each of the Financial Services Providers Defendants was required to collect information sufficient to determine whether TelexFree, or any other customer of the Defendant involved with TelexFree, posed a threat of criminal or other improper conduct.

613.   KYC controls typically include the following:

- collection and analysis of basic identity information (referred to in U.S. regulations and practice as "Customer Identification Program" or CIP);

- name matching against lists of known parties;

- determination of the customer's risk in terms of propensity to commit money laundering, terrorist finance, or identity theft;

- creation of an expectation of a customer's transactional behavior;

- monitoring of a customer's transactions against their expected behavior and recorded profile; and

- monitoring of a customer's transactions against that of the customer's peers.

614.   In addition, at all times relevant to this complaint, the Defendant Financial Services Providers were mandated to conduct due diligence prior to opening an account pursuant to 31 C.F.R. 1010.620.

615.   At all times relevant to this complaint, the Defendant Financial Services Providers were also mandated without limitation by the BSA, the Money Laundering Control Act of 1986

---

[61] *See also* Federal Financial Institution Examination Council, BANK SECRECY ACT ANTI-MONEY LAUNDERING EXAMINATION MANUAL (June 2005).

(the "Money Laundering Control Act"), the Patriot Act, and the Know-Your-Customer Regulations *to continue* to actively monitor TelexFree's business activities, customer base, *and product offerings* once it became a customer.

616.    Each of the Financial Services Provider Defendants processed transactions in excess of $25,000 in the aggregate on behalf of TelexFree.

617.    Processed transactions in excess of $25,000 in the aggregate on behalf of TelexFree were suspicious and triggered the SAR requirements set forth in the BSA and the Patriot Act.

618.    A transaction is "suspicious" if the transaction:  (1) involves funds derived from illegal activities, or is conducted to disguise funds derived from illegal activities; (2) is designed to evade the reporting or recordkeeping requirements of the BSA or regulations under the Act; or (3) has no business or apparent lawful purpose or is not the sort in which the customer would normally be expected to engage, and the bank knows of no reasonable explanation for the transaction after examining the available facts, including the background and possible purpose of the transaction.  31 C.F.R. § 1020.320(a)(2)(i) - (iii).

619.    As a result of their obligation to file SARs with the Financial Crimes Enforcement Network of the U.S. Department of the Treasury and other appropriate federal law enforcement agencies, as required by the BSA and accompanying Federal Regulations, 31 U.S.C. § 5312 et seq. and 12 CFR § 21.11 (the "Obligation"), each of the Financial Services Providers Defendants was obligated to determine the nature of TelexFree's normal business activities at the beginning of their relationship with TelexFree.

620.    The Obligation to file a SAR with the Financial Crimes Enforcement Network of the U.S. Department of the Treasury and other appropriate federal law enforcement agencies was

required on an ongoing basis during the course of each Defendant Financial Services Provider's

relationship with TelexFree.

621.    Each of the Defendant Financial Services Providers performed the above SAR-

related investigations at times relevant to this complaint.

622.    During times relevant to this complaint, TelexFree's Financial Services Providers

knowingly participated in and aided and abetted TelexFree's Pyramid Scheme by, *inter alia*,

enabling the TelexFree Pyramid Scheme to operate, expand and continue by providing necessary

financial services to TelexFree, the Operational Defendants, and each other, despite actual

knowledge that they were engaged in suspicious, tortious or illegal activity.

623.    Each of the Defendant Financial Services Providers understood, at a minimum,

TelexFree's business models and key personnel prior to opening accounts.

624.    Each of the Defendant Financial Services Providers performed the above

investigations and understood, at a minimum, TelexFree's business models and key personnel at

all times after they opened them and while they were servicing TelexFree's accounts.

625.    At times relevant to this complaint, each of the Financial Services Providers

Defendants willfully and knowingly acted unfairly, deceptively and in bad faith by failing to

timely or properly act on their knowledge of TelexFree's suspicious, tortious or illegal business

operation, and to otherwise fulfill their obligations under the BSA, 31 U.S.C. § 5311 et seq.; the

Patriot Act, § 326, 31 U.S.C. § 5318; and 31 C.F.R. § 1020 *et seq.*, or, in the alternative, by

failing to disclose or report the nature of TelexFree's business operations.

626.    At all times material herein, the Financial Services Providers maintained

departments responsible for ensuring compliance with the investigation, reporting, and

procedural requirements contained in, *inter alia*, the Know-Your-Customer Regulations, 31

U.S.C. § 5312 *et seq.*, 31 U.S.C. § 5311 *et seq.*, the Patriot Act, § 326, and 12 CFR § 21.11

(hereinafter, "Regulatory Account Monitoring Department").

627.    Each of the Financial Services Providers maintained a Regulatory Account

Monitoring Department.

628.    Each of the Financial Services Providers performed the initial investigations

required by the foregoing laws.

629.    Each of the Financial Services Providers performed the continual monitoring

required by the foregoing laws.

630.    At all times relevant to this complaint, in the course of complying with their

regulatory duties and obligations, the Financial Services Providers and their employees and

officers obtained actual knowledge that TelexFree, its Defendant Executive Officers and Top

Level Promoters were engaged in suspicious, tortious or illegal activity.

631.    In addition to what has already been set forth, actual knowledge of TelexFree's

unlawful operation was based in part on the:

- large magnitude and long duration of the Scheme;

- nature and volume of the deposits;

- open association with others known to have been closely tied to past high
profile Ponzi and pyramid schemes;

- extensive negative news reports; and

- the fact that the related accounts and transactions bore the classic
hallmarks of a Pyramid Scheme.

632.    Each of the Financial Servce Provider Defendants possess and made use of highly

sophisticated software programs that provided them with background information and financial

details about prospective customers that are not available to the general public.

633.    Under the federal AML laws, the Defendant Financial Service Providers must

investigate the top managers, directors, and principal owners of their clients.

634. The Defendant Financial Service Providers also were aware of many Red Flags of suspicious, tortious, and criminal misconduct by TelexFree.

635. At least eleven major news and watchdog websites covering the MLM industry, Ponzi schemes, and online scams analyzed TelexFree in 2012, 2013 and 2014, including, but not limited to:

- BehindMLM.com, an internet watchdog and journalism site dedicated to the MLM industry;

- PatrickPretty.com, an internet watchdog and journalism site covering Ponzi schemes and internet crime;

- Skeptic.blogspot.com, an internet watchdog and blog covering the MLM industry and online scams;

- ASDUpdates.com, an online journal covering internet scams;

- BusinessForHome.org, an internet news site analyzing direct-selling and MLM opportunities;

- CitizenCorps.com, an internet news site analyzing work-from-home and online income opportunities;

- EthanVanderbuilt.com, an internet watchdog and news site covering online scams;

- MLMHelpDesk.com, a blog and news site dedicated to the MLM industry;

- PonziTracker.com, an internet watchdog and news site covering and analyzing Ponzi schemes;

- Scam.com, a community-operated massage board analyzing and discussing internet scams; and

- ScamXPoser.com, an internet watchdog site analyzing online income opportunities.

636. In addition to the above-listed websites dedicated to the MLM industry, the following websites specifically dedicated to Ponzi schemes and other online scams conducted

analysis and exposés on TelexFree in 2012, 2013, and 2014, including, but not limited to:

- http://www.dailymotion.com/video/xwbhex_telexfree-has-launched-in-usa-english-presentation_news, -  video posted on December 30, 2012 by TelexFree Promoter Kelly Isom Tolar, which shows TelexFree Promoters "showering" cash on each other while on stage at a promotional event, and states that TelexFree began in Brazil in January 2012, that it promises "up to $15,360" in income per day, that income is guaranteed without any sales of VoIP, and that TelexFree and Best Western Hotels had partnered to build 500 hotels in Brazil;

- http://www.slideshare.net/growrichteam/telexfree-marketing-plan-english - slide presentation posted on January 18, 2013, which discusses the pyramid structure of TelexFree's operation and states that TelexFree promises payment for posting of ads only, with no sales required;

- http://mmoljbp.blogspot.com/p/telexfree.html - blog posted on January 24, 2013, which repeatedly characterizes TelexFree as a "passive income opportunity," with the opportunity for "six generations of passive income," and discusses the pyramid structure of the operation;

- http://www.getresponse.com/archive/interestedpeople/Interested-People-TelexFree-Earn-20-a-week-for-a-year-no-recruiting-at-all-10992068.html - blog posted by a TelexFree Promoter named "Suzanna" on April 27, 2013, which states that TelexFree had been "sued by the Brazilian SEC"; and

- http://www.realscam.com/f9/telexfree-scam-not-2366/ - inquiry posted on a user-operated message board of the MLM community on May 30, 2013, stating "It looks like a Ponzy [sic] for me," and requesting feedback, which included a link to BehindMLM.com's exposé of July 27, 2012.

637.    TelexFree's *own website* admitted TelexFree's connection to Brazil, legal problems, and lack of legitimate income in a way intended to deceive its Promoters, but not in a way that would avoid detection by the robust and sophsticated systems and personnel of the Financial Services Defendants. For example:

- As of February 25, 2012, the front page of www.TelexFree.com stated "99 TelexFree grows everyday in Brazil" and also included a slideshow presentation "by our President Mr. Jim Merrill" discussing the pyramid structure of the operation;

- As of January 19, 2013, the front page of www.TelexFree.com included a pop-up which stated as follows:  "During this week we have been in

contact with several government agencies which was extremely useful to clarify the operation of TelexFree…some [Promoters] are making practices [sic] that go against the law of Brazil…"

- During 2013, www.TelexFree.com included photographs of Defendants Merrill, Wanzeler, Costa and numerous Promoters together on stage at the "1°Extravaganza" event, at which "jumbo" checks were distributed, and Members were encouraged to become "TelexFree millionaires" through increased promotion;

- During the entirety of 2013 until approximately November 6, 2013, the front page of www.TelexFree.com included a certificate stating that, according to data analyst Alexa Internet, Inc., "we are among the most visited sites in Brazil."  (Importantly, No similar certification with respect to any other country was included.); and

- From approximately June 2012 through approximately May 25, 2013, the tab header for www.TelexFree.com announced, "Make money by posting ads."

638.    Moreover, setting aside the highly advanced BSA and AML due diligence programs utilized by the Financial Services Provider Defendants, even the most basic internet investigation of TelexFree's clients or its business model or principals would have revealed to these sophisticated corporate entities with experience in identifying illegal and suspicious operations that TelexFree was running an unlawful Pyramid Scheme in the United States that was essentially identical to its shuttered and enjoined Brazilian operation and was otherwise suspicious, tortious or illegal.

639.    At a minimum, the following high-profile English-language Google search results generated simply by entering the search term "telexfree" required the Defendant Financial Services Providers to carry out closer-than-standard inquiry and monitoring:[62]

- January 1, 2013.  The first page of Google search results includes a video posted by promoter Kelly Isom Tolar to dailymotion.com that clearly sets forth the payment structure of company, as well as the Best Western investment opportunity

---

[62] *See also* search engine trends for TelexFree (provided by MLMRankings.com): http://www.mlmrankings.com/telexfree/trend.htm.

(http://www.dailymotion.com/video/xwbhex_telexfree-has-launched-in-usa-english-presentation_news).  The visible video description by Kelly Isom Tolar states the following: *http://telexfreeusateam.com* "TelexFree has taken over Brazil since January 2012. Now the USA has the green light to open their doors as of November 2012.  In just 11 months, Brazil has created 8 millionaires with 380,000+ reps company wide.  Here comes the USA and our opportunity with TelexFREE.  I look forward to a lurcative business partnership with you."

• January 24, 2013.  A prominent Google result is a Blogspot webpage discussing the income scheme – including references to "6 Generations of Passive Income" – that unambiguously describes a pyramid scheme, and also discusses the hotel opportunity (http://mmoljbp.blogspot.com/p/telexfree.html) .

• March 1, 2013.  A first-page Google result is a video entitled "TelexFree Marketing Plan," with transcript, posted to slideshare.net (http://www.slideshare.net/growrichteam/telexfree-marketing-plan-english) that sets forth the structure of TelexFree, clearly describing a pyramid scheme.

• April 27, 2013.  A posting by promoter "Suzanna" on getresponse.com, an online marketing community site, discloses that TelexFree is a "company that originated in Brazil and has even been examined and sued by the Brazilian SEC."  She also describes TelexFree as a passive income opportunity. (http://www.getresponse.com/archive/interestedpeople/Interested-People-TelexFree-Earn-20-a-week-for-a-year-no-recruiting-at-all-10992068.html).

640.    There were also many other videos posted to YouTube and other sites that constituted Red Flags to the Financial Services Provider Defendants.

641.    The already sophisticated eye of the Financial Service Providers in AML monitoring is buttressed by the requirements imposed on them by federal banking regulators under the auspices of the FFEIC.

642.    FFIEC's Bank Secrecy Act and Anti-Money Laundering Examination Manual (the "FFIEC Examination Manual") requires Financial Services Providers operating in the United States to establish mandatory Anti-Money Laundering Programs and Guidelines.

643.    According to the FFIEC Examination Manual, every Financial Services Provider

must have a written Customer Identification Program ("CIP") that has been approved by the

bank's board of directors.

644.    The purpose of the CIP is to enable the Financial Services Provider to form a

reasonable belief that it knows the true identity of each customer.

645.    The CIP should describe, among other things:

- circumstances in which the Financial Services Providers should not open an account;

- when the Financial Services Providers should close an account after attempts to verify a customer's identity have failed; and

- when the Financial Services Providers should file a SAR.

646.    The CIP must include procedures for determining whether the customer appears

on any federal government list of known or suspected terrorists or terrorist organizations, Office

of Foreign Assets Control lists, and lists compiled under 31 CFR 1010.520 (Section 314(a)

requests).[63]

647.    Most major Financial Services Providers use specialized software programs to run

these database checks.

648.    According to the FFIEC manual, the Financial Services Provider's board of

directors must also approve a written BSA/AML compliance program for the institution.

649.    The Financial Services Provider's board of directors must also evaluate the

Financial Services Provider's audit and training programs to ensure that the CIP is adequately

incorporated.

650.    The Financial Services Provider's account opening procedures must mandate that

---

[63] The Patriot Act Section 314(b) permits financial institutions, upon providing notice to the United States Department of the Treasury, to share information with one another to identify and report to the federal government activities that may involve money laundering or terrorist activity.  Financial institutions wanting to do so may notify the Treasury Department by clicking on the Section 314(b) Certification link and supplying the required information.

the Provider conduct a risk assessment of prospective customers and classify them as low-risk, medium-risk or higher-risk.

651.     This risk assessment classification will affect how intensive the Financial Services Provider's BSA and AML due diligence process must be.

652.     The FFIEC Examination Manual states "the bank may determine that a customer poses a higher risk because of the customer's business activity, ownership structure, anticipated or actual volume and types of transactions, including those transactions involving higher-risk jurisdictions."  If so, the bank should consider obtaining, both at account opening and throughout the relationship, the following information on the customer:

- purpose of the account;

- source of funds and wealth;

- individuals with ownership or control over the account, such as beneficial owners, signatories, or guarantors.  *Guidance on Obtaining and Retaining Beneficial Ownership Information*, was issued by FinCEN, Board of Governors of the Federal Reserve System, Federal Deposit Insurance Corporation, National Credit Union Administration, Office of the Comptroller of the Currency, Office of Thrift Supervision, and Securities and Exchange Commission, in consultation with the U.S. Commodity Futures Trading Commission, in May 2010.  The guidance consolidates existing regulatory expectations for obtaining beneficial ownership information for certain accounts and customer relationships;

- occupation or type of business (of customer or other individuals with ownership or control over the account);

- financial statements;

- banking references;

- domicile (where the business is organized);

- proximity of the customer's residence, place of employment, or place of business to the bank;

- description of the customer's primary trade area and whether international transactions are expected to be routine;

- description of the business operations, the anticipated volume of currency and total sales, and a list of major customers and suppliers; and

- explanations for changes in account activity.

653.    AML experts consider MLM companies such as TelexFree to be higher-risk customers for BSA and AML purposes, partly because they pose the risk of Ponzi schemes and violations of the Securities Act of 1933.

654.    AML experts also regard MLMs as higher-risk because those companies have high volumes of sales, high customer dissatisfaction rates, and guaranteed money-back policies.

655.    In 2013, the Financial Crimes Enforcement Network ("FinCen") instituted a BSA proceeding against TD Bank, N.A., which assessed a $37.5 million civil money penalty against that bank for failing to detect and report another Ponzi scheme and was predicated on the theory that Financial Services Providers should treat MLMs as higher-risk for purposes of BSA and AML due diligence.[64]

656.    FinCen's action supports the conclusion that MLM companies should be treated as higher-risk for purposes of BSA and AML compliance.

657.    To comply with the requirements in FFIEC Examination Manual, the Defendant Financial Services Providers must also inquire into and consider:

- the customer's source of funds and particularly high volumes of cash transactions;

- the anticipated destination of those funds; and

- the countries and clients with which the customer is doing business.

658.    The Defendant Financial Services Providers must ascertain and form a reasonable belief as to the true identity of a customer, including any higher-risk customers.

---

[64] Concurrently, the Office of the Comptroller of the Currency assessed a second $37.5 million penalty against TD Bank, N.A., for related violations and the SEC imposed a $15 million penalty on that bank for related securities violations.

659.    In addition to what was set forth above, to comply with the requirements in FFIEC's Examination Manual, Financial Services Providers must ascertain the customer's true identity by at a minimum, obtaining the customer's name, date of birth (for individuals), address, and identification number.

660.    In addition, for customers that are business entities, the Defendant Financial Services Providers must obtain documents showing the legal existence of the entity (such as certified articles of incorporation, an unexpired government-issued business license, a partnership agreement, or a trust instrument).

661.    The Defendant Financial Services Providers may require added identifying information for higher-risk customers.

662.    Specifically, where, based on their risk assessment of a new account opened by a customer that is not an individual, the Defendant Financial Services Providers should obtain information about individuals with authority or control over such accounts including signatories, to verify the customer's identity.

663.    This verification method applies when the Defendant Financial Services Providers cannot verify the customer's true identity using documentary or non-documentary methods.

664.    For example, a Financial Services Provider may need to obtain information about and verify the identity of a sole proprietor or the principals in a partnership when the bank cannot otherwise satisfactorily identify the sole proprietorship or the partnership.

665.    The Defendant Financial Services Providers must also verify the customer's identity within a reasonable period of time after opening the account.

666.    The Defendant Financial Services Providers must report any suspicious activity by completing a Suspicious Activity Elevation Form and submitting it to the appropriate federal

regulator.

667.    The FFIEC Examination Manual also requires Financial Services Providers to conduct "Customer Due Diligence" or "CDD."

668.    The FFIEC Examination Manual states, "the bank should obtain information at account opening sufficient to develop an understanding of normal and expected activity for the customer's occupation or business operations."

669.    According to FFIEC, "much of the CDD information can be confirmed through an information-reporting agency, banking references (for larger accounts), correspondence and telephone conversations with the customer, and visits to the customer's place of business. Additional steps may include obtaining third-party references or researching public information (e.g., on the Internet or commercial databases)."

670.    In addition to ascertaining the customer's identity, the Defendant Financial Services Providers must be entirely satisfied with their understanding of the customer's beneficial ownership, management structures, and usual transaction flows.

671.    In that regard, the Defendant Financial Services Providers must verify the personal identity of the customer's major shareholders and top managers (especially authorized signatories).

672.    During CDD, the Defendant Financial Services Providers should also pay attention to any Red Flags.

673.    FFIEC has identified a long list of BSA and AML Red Flags, including, but not limited to:

- "A customer makes frequent or large transactions and has no record of past or present employment experience."

- "Many funds transfers are sent in large, round dollar, hundred dollar, or thousand dollar amounts."

- "Funds transfer activity occurs . . . when the activity is inconsistent with the customer's business or history."

- "Many small, incoming transfers of funds are received."

- "Funds transfer activity is unexplained, repetitive, or shows unusual patterns."

- "Payments or receipts with no apparent links to legitimate contracts, goods, or services are received."

- "A large volume of cashier's checks, money orders, or funds transfers is deposited into, or purchased through, an account when the nature of the accountholder's business would not appear to justify such activity."

- "Unusual transfers of funds occur among related accounts or among accounts that involve the same or related principals."

- "Goods or services purchased by the business do not match the customer's stated line of business."

- "Payments to or from the company have no stated purpose, do not reference goods or services, or identify only a contract or invoice number."

- "Customer receives large and frequent deposits from online payments systems yet has no apparent online or auction business."

- "A large number of incoming or outgoing funds transfers take place through a business account, and there appears to be no logical business or other economic purpose for the transfers, particularly when this activity involves higher-risk locations."

674.    Subsequent to an account opening, the Defendant Financial Services Providers must monitor the account and the customer.

675.    Specifically, to comply with FFIEC's Examination Manual, it is not enough to only conduct CDD at account opening.

676.    In addition, according to FFIEC, "banks should monitor their lower-risk customers through regular suspicious activity monitoring and customer due diligence processes.

If there is indication of a potential change in the customer's risk profile (e.g., expected account activity, change in employment or business operations), management should reassess the customer risk rating and follow established bank policies and procedures for maintaining or changing customer risk ratings."

677.    The FFIEC goes on to state that the Defendant Financial Services Provider's CDD processes "should include periodic risk-based monitoring of the customer relationship to determine whether there are substantive changes to the original [CDD] information (e.g., change in employment or business operations)."

678.    Furthermore, the FFIEC clearly mandates that higher-risk customers must undergo enhanced due diligence ("EDD") and that higher-risk customers should be reviewed more frequently and intensively than lower-risk customers and particularly if new Red Flags appear.

679.    It is generally accepted industry opinion in the financial services industry that customers who have the same amount coming in from hundreds of thousands of people with different last names require closer inquiry and monitoring.

680.    When a bank finds out that a client is laundering money or running an unlawful enterprise it should terminate the banking relationship, shut down the accounts and file a SAR.

**X.  TelexFree's Suspicious, Tortious and Unlawful Operation Displayed Red Flags Detectable by the Defendant Financial Service Providers**

681.    After authorities began to shut down TelexFree, Wanzeler, Merrill and Costa's unlawful Pyramid Scheme in Brazil in June of 2013, they simply switched their geographic target market to the United States.

682.    During the putative class period, the Financial Services Defendants maintained robust, sophisticated, and effective due diligence systems that detected TelexFree's Red Flags

because the components of TelexFree's switch from its Brazil targeted Pyramid Scheme to its

United States targeted Pyramid Scheme would have been included within their search

parameters, including, but not limited to, the following:

- use of the identical business name;

- use of the identical business model;

- use of the same product;

- specifically naming their unlawful business operation in Brazil –Ympactus – in their standard contract as owning the product and as a party to the contract;

- use of the same people to serve as officers, executives and management;

- use of the same address, office space and office equipment;

- use of the same back office support;

- changing its public name to TelexFree;

- indiscriminately transferring money from account to account including business to personal;

- obtaining cashiers checks for millions of dollars from business accounts after changing its compensation and business plan; and

- obtaining cashiers checks for millions of dollars from business accounts after filing for bankruptcy.

683.   The following graphics taken from the public areas of both the English and

Spanish TelexFree websites, as well as numerous Promoters' websites and video "tutorials,"

made no secret of the pyramid structure of the business:











684.    Sophisticated parties such as the Defendant Financial Services Providers could not have been fooled by the public announcements and key marketing representations advanced by TelexFree, its Principals, Executive Officers and the Operating Defendants.

685.    For example, as noted above, in promoting TelexFree and himself, Merrill held himself out, including through direct references on the TelexFree website, as having experience in VoIP and internet phone service and having a college degree.  Neither claim was true.[65]

686.    In carrying out their FFIEC due diligence, the Financial Service Provider Defendants were required under the circumstances to investigate and uncover false facts such as the false past experience and education of a corporate principal.

687.    As a result of their compliance with the foregoing laws, each of the Financial Services Providers was actually aware of the facts and evidence of suspicious, tortious, or illegal activity, or Red Flags as follows, as well as those offered elsewhere in the complaint:

- the TelexFree Program violated the express terms of M.G.L. c. 93, § 69 governing multi-level distribution companies (i.e., MLMs), and thereby M.G.L. c. 93A prohibiting unfair or deceptive acts or practices;

- the TelexFree business operations in Brazil were shuttered by Brazilian authorities and TelexFree and its Principals and Executive Office were enjoined from doing further business;

- the TelexFree program was the subject of extensive MLM coverage warning that it was an unlawful, tortious and suspicious Pyramid Scheme;

- the TelexFree business model expressly sold memberships that enabled Promoters to be paid without the sales of any actual product;

- less than 0.5% of TelexFree's total revenue was derived from sales of its VoIP product, with the remainder deriving from membership fees;

- promoters were expressly paid for merely placing spam advertisements on the internet or recruiting additional promoters and product sales were expressly unrelated to a *guaranteed* return on investment ("ROI");

---

[65] In sworn testimony given to the SOC on March 25, 2014, Merrill testified to having limited knowledge of VoIP services and never working in the telecom business.

- the guaranteed ROI promised to Promoters was exceedingly high with no apparent risk;

- the memberships were not registered with any governmental agency but were nevertheless marketed and sold to members of the general public via public solicitation over the Internet and otherwise;

- the vast majority of Investors were of Brazilian/Dominican-American ethnicity as evidenced by their sur-names;

- videos by Defendant Founders and Inside Promoters;

- the advertisements posted by Promoters were merely spam ads;

- various Defendant Founders, Principals, and Top Level Promoters were associated with other unlawful and previously exposed Pyramid Schemes;

- an extremely large number of account transactions occurred and that number increased rapidly over time;

- many funds transfers and deposits were received in the exact same dollar amounts and with no apparent links to legitimate contracts, goods, or services.  This latter factor and the high volume of small incoming transactions are considered by the FFIEC as a red flag in its examination handbook;

- credit card payments involving TelexFree were subject to an exceptionally high rate of credit card fraud and chargebacks;

- as a MLM company, TelexFree was regarded as a high-risk customer by banks and payment processing companies;

- funds were commingled between TelexFree entities;

- TelexFree failed to keep financial records in accordance with GAAP standards;

- huge wire transfers of funds were made to personal accounts of certain Defendant Founders and shell corporations;

- wire transfers of large sums to foreign entities occurred;

- TelexFree was widely regarded as a fraudulent scheme by the online MLM community;

- TelexFree maintained a Brazilian affiliate, also operating under the name TelexFree, which was under investigation by the Brazilian government as of February 2013 under suspicion of operating an illegal Ponzi scheme;

- in a March 1, 2013 press release available online, Defendant Merrill, president of TelexFree, admitted that "the real 'secret sauce' of our [TelexFree's] success is our compensation plan…We [TelexFree] pay our representatives weekly if they follow our system and advertise our service on the Internet," while making no mention of any product or service;

- in June 2013, TelexFree's Brazilian affiliate had publicly falsely claimed that MAPFRE, an international insurance company, served as insurer to TelexFree, prompting MAPFRE to release a public statement online denying any relationship with TelexFree and threatening legal action against TelexFree for making this false statement;

- in June 2013, TelexFree's Brazilian affiliate Ympactus, also operating under the name TelexFree, was shut down and enjoined from doing further business by the Brazilian government for operating an illegal Ponzi scheme.  This event was promptly reported online in English language news sources as was follow up news; and

688.    Pursuant to FFEIC guidelines, the payments being deposited into the accounts maintained at the Bank Defendants or processed by the Defendant Payment Processing Service Companies originated in the majority of instances from individuals bearing foreign surnames, raising actionable concerns regarding potential violations of the Patriot Act and other federal banking laws and regulations regarding issues of potential money laundering, terrorism, drug trafficking, and Ponzi schemes.

689.    The overwhelming number of Red Flags referenced throughout this complaint was sufficient to have compelled a reasonable Financial Services Provider to make further inquiries and/or decline to provide financial services (as some banks did).  Other information about TelexFree that was available to the Financial Services Providers went beyond raising the specter of suspicious activity and constituted reasonable evidence of tortious or unlawful conduct, of which the Financial Services Providers had actual knowledge.

690.    To the extent that any of the Financial Services Providers did not comply with its

regulatory duties and/or knowingly failed and/or refused to report the results of such Financial

Services Provider's own investigation of TelexFree to the proper authorities despite the improper

activity revealed by such investigation, it turned a blind eye to the tortious conduct it knew was

occurring.

691.   TelexFree's Financial Services Providers had sufficient notice of wrongdoing in

this case to give rise to a duty on their part to undertake heightened scrutiny of the TelexFree

accounts, inquire further and to take reasonable steps to prevent a diversion of funds.

692.   Upon their knowledge of suspicious, tortious or unlawful conduct, TelexFree's

Financial Services Providers were required to refuse to do business with TelexFree initially,

freeze TelexFree's existing accounts, stop doing new business with TelexFree, and to report the

activities to Federal authorities.

693.   TelexFree's Financial Services Providers received substantial compensation in

exchange for the services they provided to TelexFree and the other TelexFree Pyramid Scheme

participant Defendants.

694.   Each of the Financial Services Providers was an integral cog in the TelexFree

Scheme and without them, TelexFree would not have been able to get off the ground, develop,

maintain or grow its Pyramid Scheme.

695.   The Financial Services Providers were also an integral cog in the siphoning off of

funds by the Operational Defendants.

696.    Without the active assistance and cooperation of the Financial Services Providers,

the Operational Defendants would not have been able to wrongfully convert the class members'

funds to their own personal possession and use.

697.   Notwithstanding knowledge of suspicious, tortious or illegal activity, the Bank

Defendants accepted, processed and maintained deposit accounts on behalf of TelexFree,

accepted payment of AdCentral package membership fees from the Promoters on behalf of

TelexFree and made transfers of the payments derived from the Scheme.

698.   Notwithstanding knowledge of suspicious, tortious or illegal activity, the Payment

Processing Services Company Defendants processed payments between TelexFree, the

Operational Defendants, and its Promoters.

699.   Notwithstanding knowledge of suspicious, tortious or illegal activity the Payment

Processing Services Company Defendants provided the electronic gateway used to send and

receive such payments, and provided the electronic interface services used by both TelexFree

and its Promoters and were thereby enriched.

### Y.  The Bank Defendants

700.   During the time they did business with TelexFree, the Defendant Banks possessed

actual knowledge of the fraudulent nature of TelexFree's business operation and substantially

assisted the tortious conduct.

701.   As detailed herein, at times material to this complaint, the Defendant Banks

received significant funds from TelexFree and other Defendants and provided banking services,

maintained accounts, and received and executed transfers of funds from or for the benefit of

TelexFree.

702.   Activity undertaken on behalf of TelexFree or the other Operational Defendants

generated income to the Financial Services Defendants.

703.   At times material herein, the Defendant Banks received investment funds of

Plaintiffs.

704.   At times material herein, the Defendant Banks profited from their relationship

with TelexFree and other Defendants and were unjustly enriched.

705.    At diverse times TelexFree processed through the Defendant Financial Services

Providers over 783,771 investments of either $289 or $1,375 (including combinations thereof)

totaling over $880,189,455.32.

706.    The Financial Service Providers derived substantial income from their services to

TelexFree.

707.    More particularly, the Defendant Banks earned fees from their participation in the

TelexFree Scheme on several levels:

- interest on amounts held on behalf of TelexFree, at or above the Federal Funds Rate, currently set at .25%;

- processing fees for each transaction, typically in an amount of 1-4% of the amount transferred per transaction, or, in some cases, $40.00 per transaction;

- annual ACH processing charges;

- return deposit item fees;

- chargeback fees; and

- miscellaneous fees and servicing charges.

708.    In general, the Defendant Banks possessed a federal regulatory duty to look for

certain types of facts or lack thereof, including the identity and purpose of the individuals

opening and making payments into their accounts.

709.    Even a perfunctory investigation of TelexFree in accordance with their regulatory

duties would have revealed the existence of the tortious Pyramid Scheme.

710.    Each of the Defendant Banks became aware of the Red Flags surrounding

TelexFree and its conduct pursuant to their regulatory duties.

711.    Each of the Defendant Banks also became aware of strong evidence of suspicious,

tortious or illegal activity including the outright fraud pled with excruciating particularity herein

on the part of TelexFree, its Founders and Principals.

712.    The overwhelming number of Red Flags and other indicia of fraud established the existence of TelexFree's tortious conduct and the Pyramid Scheme and the Defendant Banks thereby gained actual knowledge of its tortious conduct.

713.    In the alternative, if any Defendant Banks failed to perform any of the required investigations and account monitoring, it turned a blind eye to the tortious conduct it actually knew underlied TelexFree's activities despite its general awareness of the unlawful nature of the Scheme.

714.    At times material herein, despite having knowledge that TelexFree was an enterprise carrying out suspicious, tortious, or unlawful, unfair, or deceptive acts or practices, the Defendant Banks performed integral services and provided essential assistance that was used to further TelexFree's unlawful business.

715.    At times material herein, despite having knowledge that TelexFree was an enterprise carrying suspicious, tortious, or unlawful, unfair, or deceptive acts or practices, the Defendant Banks ensured TelexFree was given access to banking services and those banking services were used to further TelexFree's unlawful business.

716.    Despite actual knowledge of the fraudulent nature of TelexFree's business operations, the Defendant Banks continued to provide TelexFree with banking services and substantially assisted its tortious conduct.

717.    As an integral part of the Pyramid Scheme, the Defendant Banks received funds from Promoters, which funds were then held for the benefit of or transferred from or to TelexFree, its affiliated entities, and its Defendant Founders and Principals, Executive Office,

Top Level Promoters and Licensed Professionals.[66]

718.    Obtaining, maintaining and transferring Promoters' funds was the essence of the TelexFree Pyramid Scheme and without the services of the Defendant Banks, the TelexFree United States Pyramid Scheme could not have been opened, been maintained, thrived and been exploited through to the end where Principals and other Defendants were issued cashiers checks and either successfully absconded with significant funds or were caught while in the act of doing so.

719.    Despite their actual knowledge, the Defendant Banks agreed and undertook to provide banking services that were essential to the operation of the Pyramid Scheme.

720.    The services provided by each Defendant Bank included, *inter alia*, the following:

- processing and opening of depository accounts;

- receiving payments made by Promoters to TelexFree to become Members of the TelexFree Program;

- maintaining depository accounts containing funds paid by Promoters to TelexFree for AdCentral Package membership fees;

- making payments to certain Promoters as part of TelexFree's purported return on investment;

- transferring funds paid by Promoters to TelexFree among TelexFree entities, Defendant Founders' personal accounts, foreign companies and shell companies; and

- allowing TelexFree to use the bank's name in its promotional materials thereby lending TelexFree the use of the bank's reputation as a large, nationwide banking institution and credibility.

721.    Additional facts specific to each Defendant Bank provide additional particulars of its further involvement, participation and aiding and abetting of the TelexFree Pyramid Scheme.

### 1.  Defendant Bank of America

---

[66] *See, e.g.,* check deposited by TelexFree into its account with Fidelity Bank, to wit, account number 211370707, attached as Exhibit 7.

722.    As documented in the criminal complaint filed by the DHS dated May 9, 2014, against Defendants Wanzeler and Merrill (¶ 61), Bank of America first opened accounts in TelexFree's name in February 2012.

723.    Bank of America's North American Account Opening Guide (the "Guide") specifically provides that the opening of accounts is "subject to significant scrutiny by regulators and the bank."

724.    Citing the Know-Your-Customer Requirements, the Guide also states that "[r]egulators require us to be entirely satisfied with our understanding of our clients' identities, beneficial ownership, management structures and usual transaction flows."

725.    Bank of America performed an investigation of TelexFree prior to agreeing to accept it as a customer and did further comply with its own requirements.

726.    At times relevant to this complaint, Bank of America complied with due diligence requirements when opening TelexFree's accounts, including the Know Your Customer Requirements and it was aware of the Pyramid Scheme nature of TelexFree's business plan.

727.    Despite Bank of America's knowledge of the illegal nature of TelexFree's business activities, including the fact it obviously violated M.G.L. c. 93, § 69, Bank of America agreed to accept TelexFree as a customer and began to perform banking services for TelexFree, which it continued to perform until at least December 31, 2013.

728.    In addition to opening and maintaining accounts for TelexFree, Bank of America was specifically named in TelexFree's "signup procedures" document which was available online as an entity holding TelexFree accounts into which transfers of membership funds could be made by Members.[67]

---

[67] *See* "*Signup procedures for TelexFREE,*" attached to Exhibit 3, Decl. of Gray Echavarria, Attachment 37, http://PatrickPretty.com, "*TelexFree Affiliates Gave AdSurfDaily-Like Coaching*

729.   As described above, during 2013, TelexFree affiliates were urging recruits to make walk-in deposits at a Bank of America branch in Massachusetts and the instructions given strongly resembled instructions given to recruits in 2008 by another infamous Ponzi scheme, AdSurfDaily.

730.   More specifically, Members were directed to transfer their membership fees to a "corporate" account at Bank of America under the name "TelexFREE LLC," were provided with the applicable account and routing numbers, and were provided with the Bank of America branch address, "188 Bosyon [sic] Tpke Shrewsbury Ma 01545."[68]

731.   Bank of America knowingly permitted TelexFree to identify it in promotional materials as the holder of its accounts and thereby lent an aura of legitimacy and credibility to TelexFree's business operations through TelexFree's connection with a large and well-established financial institution.

732.   In addition to maintaining and servicing depository accounts, Bank of America also provided credit to TelexFree, via at least two credit cards, which are identified in TelexFree's 2013 balance sheet as "Bank of America Braz Help 0033" and "Bank of America Telexfree 2658."

733.   Pursuant to its obligations to perform ongoing customer monitoring of TelexFree, Bank of America's Regulatory Account Monitoring Office, employees and officers discovered the Red Flags and evidence of the suspicious, tortious or unlawful activities described herein and deliberately ignored them.

---

*Tips, Instructed Prospects to Make Deposits at Bank of America[...]TelexFree Also May Have TD Bank Account,"* http://patrickpretty.com/2013/07/08/telexfree-affiliates-gave-adsurfdaily-like-coaching-tips-instructed-prospects-to-make-deposits-at-bank-of-america-and-to-copy-slips-to-team-leaders-gmail-address-for-expedited-service-t/ (July 8, 2013) (including screen shot of TelexFree bank transfer instructions).

[68] *See id*; *see also* TelexFree Recruitment Presentation, available at http://webopportunities.weebly.com/uploads/1/5/8/5/15857054/telex.pp.2.13.pdf.

734.    In addition, the fact that virtually all deposits into Bank of America's account xxxxxxxx7408 were made for the purchase of an AdCentral package, and not TelexFree's purported VoIP product, was known to Bank of America's Regulatory Account Monitoring Office, employees and officers and was an additional indication that TelexFree was operating an illegal Pyramid Scheme.

735.    Specifically, between June 2012 and May 2013, Bank of America account xxxxxxxx7408, held in the name of TelexFree, Inc., received 1,133 deposits, totaling $12,203,496.48.

736.    Furthermore, between September 2012 and May 2013 there were 813 deposits into account xxxxxxxx7408 in the exact amount of the fee for an AdCentral Family package ($1,425 or $1,375), totaling $1,142,625.

737.    During this same period, there were only nine deposits in the amount of $49.90 – the VOIP purchase price – into account xxxxxxxx7408.

738.    Notably, TelexFree's marketing materials that were available online made clear to what these sums corresponded.

739.    Bank of America, while examining TelexFree during the initial account opening process and later while conducting ongoing monitoring of TelexFree following account opening, investigated TelexFree's management, business activities, customer base, and product offerings and discovered the Red Flags and evidence of suspicious, tortious or unlawful activities.

740.    As a result of Bank of America's required initial investigation and ongoing monitoring of TelexFree, Bank of America possessed actual knowledge that TelexFree was engaged in an illegal Pyramid Scheme.

741.    On or about April 24, 2013, Bank of America informed TelexFree that it would

cease doing business with TelexFree due to concern over TelexFree's illegal business activities.[69]   Additionally, on or about April 24, 2013, Defendant Labriola announced, in a mass email to TelexFree Members that TelexFree would be "pulling out" of Bank of America.[70]

742.   Despite the foregoing representation that Bank of America would cease doing business with TelexFree, Bank of America continued to perform banking services for TelexFree and its Defendant Founders for at least another eight months, until about December 2014.

743.   As an example of services continued, on August 30, 2013, Defendant Labriola announced during a public conference call with TelexFree Members that payments due-and-owing from Bank of America to members as of July 30, 2013 required manual sorting, since "Bank of America didn't give them a sorted list" as to which of the payments had already been made by Bank of America.[71]

744.   As another example, a document dated November 11, 2013, establishes that Defendant Merrill, on behalf of TelexFree, directed Allied Wallet, a Defendant payment processor, to transfer funds via international wire transfer to a TelexFree account with Bank of

---

[69] *See* Exhibit 3, Decl. of Gray Echavarria, Attachment 22, http://patrickpretty.com/2013/07/08/telexfree-affiliates-gave-adsurfdaily-like-coaching-tips-instructed-prospects-to-make-deposits-at-bank-of-america-and-to-copy-slips-to-team-leaders-gmail-address-for-expedited-service-t/ ("Steve Labriola, Director of Marketing for Telex FREE, Boston, announced via email earlier today that they are 'pulling out of Bank of America.' These appear to be dated April 24, 2013. The claims appear on sites slugged telexfreeunitedkingdon.weebly.com and mytelexfree4u.blogspot.com and telexfreeunitedstates.com. So, this leads to questions about whether TelexFree had the 'Zeek problem' — i.e., whether the banks pulled the plug on TelexFree. The sites also make this claim: ' . . . For now, and those on the East Coast, please use TD Bank for your walk-in deposits.'").

[70] *See* http://telexfreeunitedkingdon.weebly.com/telexfree-updates.html (recruitment website of TelexFree 'Team Builder' Leonardo de Souza] and http://mytelexfree4u.blogspot.com/ (website of TelexFree Promoter).

[71] *See* http://teamstelexfree.blogspot.com/p/blog-page_7.html (recruitment website of TelexFree Promoter)

America.[72]

745.     Furthermore, Bank of America continued to provide credit, via at least two credit cards, at least through December 31, 2013, as indicated on TelexFree's 2013 balance sheet.

746.     Bank of America continued to provide credit to TelexFree despite its knowledge of the suspicious, tortious or illegal nature of TelexFree's conduct, also lending an aura of legitimacy and credibility to TelexFree's business operations through TelexFree's connection with a large and well-established financial institution.

747.     Although Bank of America possessed knowledge of the tortious nature of TelexFree's business activities from the time of its initial investigation and during its monitoring of TelexFree, it continued to provide TelexFree with credit and depository services integral to the TelexFree Scheme.

748.     Through its actions, Bank of America substantially assisted in the perpetration of, and otherwise became an integral part of, TelexFree's fraudulent Scheme.

749.     At a minimum, Bank of America's initial investigation and ongoing monitoring of TelexFree, made it aware that TelexFree was engaged in suspicious, tortious or unlawful conduct, but it willfully turned a blind eye to the results of its investigation and monitoring because it refused to suspend service or terminate its banking relationship with them or Operational Defendants and it continued to provide TelexFree with credit and depository services integral to the TelexFree Scheme until at least December 2013.

750.     Through its actions, Bank of America knew TelexFree's conduct constituted a breach of duty and violated M.G.L. c. 93, § 69 and M.G.L. c. 93A, and it gave substantial assistance and encouragement to the perpetuation of, and otherwise became an integral part of,

---

[72] *See,* Allied Wallet Bank Information Form for Bank of America, attached herewith as Exhibit 8.

TelexFree's unlawful Scheme.

## 2. Defendant TD Bank

751.    Defendant TD Bank, N.A., has over 1,300 domestic locations in 16 states and one

foreign branch without a physical location.  TD Bank is a large national bank with approximately

$212 billion in assets and approximately 25,000 employees.  TD Bank is a member of TD Bank

Group and a subsidiary of The Toronto-Dominion Bank of Toronto, Canada.  The Toronto-

Dominion Bank trades on the NYSE Euronext under the ticker symbol "TD."

752.    TD Bank has previously settled accusations that it provided active assistance to

large Ponzi schemes in violation of the BSA and other laws, including Scott Rothstein's $1.2

billion Florida-based Ponzi scheme, for which it was civilly prosecuted and fined.

753.    The Office of the Comptroller of the Currency ("OCC") is TD Bank's Federal

functional regulator.  In September 2013, the OCC determined that TD Bank violated the BSA

from April 2008 through September 2009, by failing to file SARs in a timely manner, in

violation of 31 C.F.R. § 1020.320 and 31 U.S.C. § 5318(g).  TD Bank agreed to a $37.5 million

civil money penalty assessed by the OCC.[73]

754.    The September 22, 2013 consent decree followed several years of active

investigation and negotiations.  At all times in 2012, 2013, and 2014 that TD Bank was servicing

TelexFree, it was under investigation by the OCC because it "willfully violated the Bank Secrecy

Act's reporting requirements by failing to detect and adequately report suspicious activities in a

timely manner in violation of 31 U.S.C. § 5318(g) and 31 C.F.R. § 1020.320."[74]

755.    TD Bank violated BSA suspicious activity reporting requirements by failing to

detect and report suspicious activity and by filing late SARs in relation to the so-called Rothstein

---

[73] *See* Exhibit 9 – September 20, 2013 OCCurrency Consent Decree.

[74] *Id.* at 2.

Ponzi scheme.  TD Bank failed to properly identify, monitor, and report suspicious activity in Rothstein's accounts.  A lack of adequate training for both the business and BSA/AML staff also contributed to TD Banks' failure to recognize this suspicious activity.

756.    In May 2010, Coquina Investments filed a lawsuit alleging that TD Bank aided and abetted the Rothstein Ponzi scheme, made fraudulent misrepresentations and engaged in a pattern of racketeering in violation of RICO.

757.    In January 2012, a jury returned a verdict against TD on both aiding and abetting and fraudulent misrepresentation, awarding $32,000,000 in compensatory damages and $35,000,000 in punitive damages.

758.    Evidence showed that TD Bank, through its then-regional vice president, Frank Spinosa, and other employees, aided and abetted the scheme and made fraudulent misrepresentations.

759.    Evidence established TD Bank N.A. had in place standard protocols to detect suspicious and/or illegal banking activities.  The evidence also established that to facilitate the Ponzi Scheme TD Bank N.A. ignored alerts generated by its standard protocols for years.  These protocols included its AML system that would alert it to suspicious activity and a related "Standard Investigative Protocol," which provided guidance concerning reportable or non-reportable suspicious activity and provided procedures that TD Bank employees were to follow without exception.

760.    TD Bank N.A. ignored 17 months of alerts on the AML system.  The amount of money moving through the accounts and the speed with which it moved was also a focus of the OCC.  TD Bank N.A. also ignored numerous concerns raised by multiple TD Bank, N.A. executives relative to the selling of settlements, the limited banking relationship with various

parties seeking to open accounts with significant balance changes, and the large value of wires being received.

761.     TD Bank N.A.'s awareness of the Ponzi scheme and the Red Flags associated with Ponzi schemes generally was highlighted not only through the *Coquina* verdict and the evidence supporting it.

762.     TD Bank's awareness of the Ponzi scheme and the Red Flags associated with Ponzi schemes generally was also highlighted through TD Bank's actions through counsel and its witnesses because during the course of the litigation TD Bank willfully withheld evidence of Red Flags showing illegal activity.

763.     During discovery, Coquina requested documents evidencing potential illegal activity, including documents related to the standard protocols.  In response, TD Bank willfully provided only limited documents despite the requirements imposed upon it by the Federal Rules of Civil Procedure.

764.     The Coquina plaintiffs filed five motions for sanctions, three before or during trial and two after trial, alleging serious discovery violations willfully carried out by TD Bank and/or its counsel.

765.     These motions unveiled the following among other things:

- Just before the close of discovery and subsequent to the deposition of the 30(b)(6) corporate representative, Vincent Auletta (vice president of global due diligence), wherein he testified that there were no Rothstein alerts before September 2009 and no more than 5 alerts after, the bank produced 150 pages of AML alerts from September 2009 –November 2009.

- On the eve of trial, TD Bank, N.A. produced 17 months' worth of AML alerts generated by the Searchspace system for Rothstein accounts which had not been previously disclosed and which were separate and distinct from normal fraud alerts, in addition to numerous communications

indicating that TD Bank executives were aware of the investment schemes.

- After the trial had concluded, during the course of different litigation against TD Bank, Coquina learned that TD Bank did in fact have a document called "Standard Investigative Protocol," which it had repeatedly denied having during discovery and trial and that a document they had received, the CDD (Customer Due Diligence) form generated by the Cash Management Department of TD Bank, was not produced in color, which resulted in the absence of important and relevant information including the presence of a red banner at the top proclaiming that the account was "HIGH RISK."

766.    The district court sanctioned TD Bank for willful misconduct in failing to provide the color copy of the CDD and other relevant documents.

767.    At all times relevant to the complaint, Defendant TD Bank maintained multiple accounts on behalf of TelexFree, another Ponzi scheme.

768.    TD Bank first opened accounts in TelexFree's name in September 2012.[75]

769.    TD Bank performed its KYC investigation of TelexFree prior to agreeing to accept TelexFree as a customer and otherwise complied with all banking regulations when opening TelexFree's accounts.

770.    TD Bank continually performed its KYC investigations of TelexFree and otherwise complied with all banking regulations at all times it continued to service TelexFree during the 2012-2014 class period.

771.    Yet, despite the obvious illegal nature of TelexFree's business activities, TD Bank agreed to accept TelexFree as a customer and began to perform banking services for it.

772.    Despite the obvious illegal nature of TelexFree's business activities, TD Bank did not suspend servicing or terminate its relationship with TelexFree or any of the Operational Defendants until at least January 2014.

---

[75] *See* DHS Criminal Complaint dated May 9, 2014 against Wanzeler and Merrill at ¶ 62(b).

773.    TelexFree continued to maintain three depository accounts with TD Bank as of December 31, 2013.[76]

774.    In addition to opening and maintaining accounts for TelexFree, TD Bank was specifically named in TelexFree's "signup procedures" document which was available online as an entity holding TelexFree accounts into which transfers of membership funds could be made by Members.[77]

775.    Specifically, TelexFree Promoters were directed to transfer their membership fees to a "corporate" account at TD Bank under the name "TelexFREE LLC," and were provided with the applicable account and routing numbers.[78]

776.    TD Bank knowingly permitted TelexFree to identify it as the holder of its accounts and thereby lent an aura of legitimacy and credibility to TelexFree's business operations through TelexFree's connection with a large and well-established financial institution.

777.    On or about September 6, 2013, TelexFree leadership instructed its members via a public conference call that the fastest way to send money to TelexFree was by direct deposit to TelexFree's accounts with TD Bank.[79]

778.    The person speaking on behalf of TelexFree during this conference call was Bradshaw, the above-described high profile pyramid scheme regular formerly active with the now-defunct pyramid schemes Zeek Rewards and AddWallet.

779.    The fact that well over ninety percent (90%) of deposits into TD Bank's accounts

---

[76] *See* TelexFree's December 31, 2013 Balance Sheet, attached hereto as Exhibit 5.

[77] *See* "*Signup procedures for TelexFREE*," Exhibit 3, Decl. of Gray Echavarria, Attachment 37; *. see also n.* 71.

[78] *Id.*

[79] *See* Exhibit 3, Decl. of Gray Echavarria, Attachment 34, BehindMLM.com, "*TelexFree US business plagued with 'rampant fraud'*", Sept. 7, 2013, http://behindmlm.com/companies/telexfree/telexfree-us-business-plagued-with-rampant-fraud/.

held in the name of TelexFree, LLC were made for the purchase of an AdCentral package, and not TelexFree's purported VoIP product, was known to TD Bank's Regulatory Compliance Office, employees and officers and was an additional indication that TelexFree was operating an illegal Pyramid Scheme.

780.    Specifically, between October 9, 2013, and January 17, 2014, TD Bank account xxxxxx8409 held in the name of TelexFree, LLC received 478 incoming wire transfers ranging from $309 to $142,500, totaling $2,638,712.

781.    Of these deposits into account xxxxxx8409, 2,474 were in the amount of $1,425 – the AdCentral Family package purchase price – totaling $3,525,450.

782.    During this same period, there was only one deposit into account xxxxxx8409 in the amount of $49.90 – the VoIP purchase price.

783.    Notably, TelexFree's marketing materials that were available online made clear to what these sums corresponded.

784.    Between September 2012 and July 2013, there were 1,550 deposits by cash, check, money order or wire transfer into TD Bank account xxxxxx2808, held in the name of TelexFree, LLC, in the exact amount of $1,425, the AdCentral Family package purchase price.

785.    During this same period, there was only one deposit into account xxxxxx2808 in the amount of $49.90 – the VOIP purchase price.

786.    Between June 2013 and October 2013, there were 1,800 deposits into TD Bank account TD Bank account xxxxxxx334, held in the name of TelexFree, LLC, in the exact amount of $1,425, the AdCentral Family package purchase price.

787.    During this same period, there was only one deposit into account xxxxxxx334 in the amount of $49.90 – the VOIP purchase price.

788.     While examining TelexFree during the initial account opening process and later while conducting ongoing customer monitoring of TelexFree, TD Bank investigated TelexFree's management, business activities, customer base, and product offerings.

789.     While examining TelexFree during the initial account opening process and later during its ongoing customer monitoring of TelexFree, TD Bank's Regulatory Account Compliance Office, other employees or officers discovered the Red Flags and other evidence described throughout this complaint, indicating that TelexFree was engaging in suspicious, tortious or unlawful conduct.

790.     At a minimum, TD Bank's initial investigation and ongoing monitoring of TelexFree, made it aware that TelexFree was engaged in suspicious, tortious or unlawful conduct, but it willfully turned a blind eye to the results of its investigation and monitoring because it refused to suspend service or terminate its banking relationship with them or operational defendants and it continued to provide TelexFree with credit and depository services integral to the TelexFree Scheme until at least January 2014.

791.     Through its actions, TD Bank knew TelexFree's conduct constituted a breach of duty and violated M.G.L. c. 93, § 69 and M.G.L. c. 93A and gave substantial assistance and encouragement to the perpetuation of, and otherwise became an integral part of, TelexFree's unlawful Scheme.

### 3.  Fidelity Bank

792.     Fidelity Bank opened three accounts for TelexFree, two on August 8, 2013 with initial deposits of $7,123,784.58 and one on September 12, 2013 with deposits of $2,951,337.12.

793.     Fidelity Bank helped TelexFree to conduct its business more easily by using remote deposit capture.

794.     Fidelity Bank continued to accept deposits from TelexFree until at least

December 26, 2013.

795.    Notably, the president and chief operating officer of Fidelity Bank, Defendant John Merrill is the brother of Defendant James Merrill, one of the Founders of the TelexFree Pyramid Scheme.

796.    John Merrill's knowledge is imputed to Fidelity Bank because at all times material he was its president and chief operating officer.

797.    This familial relationship facilitated the relationship between TelexFree and Fidelity Bank and made Fidelity Bank privy to information regarding TelexFree and its suspicious, tortious or unlawful conduct.

798.    At all material times, through his personal relationship with his brother, Defendant John F. Merrill was fully aware of the fact that TelexFree's business operation was nothing more than a Pyramid Scheme, and that TelexFree's other banking relationships were souring.

799.    Despite this knowledge, Defendant John F. Merrill used his position and influence with Fidelity Bank to procure the described banking services from Fidelity Bank for TelexFree and others including the Defendant Founders.

800.    Despite Fidelity Bank's actual knowledge of the suspicious, tortious or unlawful nature of TelexFree's business activities, Fidelity Bank agreed to accept TelexFree as a customer and acted as a creditor and depository bank for TelexFree until at least December 31, 2013.

801.    Fidelity Bank's Regulatory Account Compliance Office did in fact perform an investigation of TelexFree prior to agreeing to accept TelexFree as a customer in or about August 2013.

802.    Although Fidelity Bank possessed knowledge of the suspicious, tortious or

unlawful nature of TelexFree's business activities from the time of its initial investigation of TelexFree, it continued to provide TelexFree with credit and depository services.

803.    Either through Fidelity Bank's attempts to comply with all banking regulations when opening and maintained its accounts, including the Know-Your-Customer Regulations, or because of the familial relationship between its President and one of TelexFree's masterminds, Fidelity should have been aware of the Pyramid Scheme characteristics and of TelexFree's unlawful business operation and stopped servicing, terminated its relationship and filed SAR reports but it did not.

804.    An investigation was initiated by the SOC against Fidelity Bank on April 30, 2014, concerning Fidelity's banking relationship with TelexFree.

805.    That investigation resulted in the entry into a Consent Decree, dated September 22, 2014, whereby Fidelity Bank agreed to establish an escrow fund of $3.5 million for victims of the Scheme.[80]

806.    The SOC alleged, *inter alia*, that Fidelity Bank's account opening process in 2013 was inadequate and insufficient to handle the voluminous TelexFree deposit accounts. [81]

807.    These failures to comply even minimally with mandatory banking regulations allowed the bank's president John F. Merrill to obtain the account services for his brother James Merrill, the other TelexFree Founders and TelexFree itself.

808.    The Consent Decree establishes that Fidelity Bank wrongfully permitted TelexFree to deposit funds received from victims of its illegal Pyramid Scheme in Fidelity Bank's accounts between August 8 and December 26, 2013.[82]

---

[80] *Id.*

[81] *Id.*

[82] SOC Consent Order E 2014-0073 is herewith attached and marked as Exhibit 10.

809.    On or about November 23, 2013, pursuant to Fidelity Bank's obligations to perform ongoing customer monitoring of TelexFree, Fidelity Bank's compliance and BSA officer discovered Red Flags, other evidence of suspicious, tortious or unlawful conduct.

810.    That officer also discovered further indicators of fraud in the TelexFree business model, and he notified president Merrill and an outside compliance consultant utilized by Fidelity Bank.

811.    The outside consultant advised Fidelity Bank of his conclusions that TelexFree was a high-risk customer based upon its account balance and extensive wire transfers and that TelexFree's accounts would "require the appropriate monitoring level for a high risk customer."

812.    Less than two weeks after this initial investigation, Fidelity Bank made a determination it should close TelexFree's accounts.

813.    Fidelity Bank notified TelexFree of its determination to close its accounts on December 3, 2013.

814.    Despite that determination Fidelity Bank continued to receive the victims' funds obtained by TelexFree until December 27, 2013 and, to perform other banking services until December 31, 2013.

815.    Fidelity Bank did not terminate its relationship with TelexFree, refuse to accept victims' funds, or stop servicing accounts and report suspicious activity, after its internal review revealed the suspicious, tortious or unlawful conduct.

816.    As a result of the direct influence and unfair, deceptive and unlawful involvement of Fidelity Bank president and chief operating officer, Defendant John F. Merrill, Fidelity Bank opened personal accounts for TelexFree Founders and Principals, including Defendant James Merrill (president Merrill's brother) and Wanzeler after Fidelity's internal review revealed the

tortious conduct.

817.    After its November 27, 2013 receipt of the outside consultant's report, Fidelity Bank unfairly, deceptively and unlawfully transferred over $10 million dollars out of TelexFree's and Defendant Founders' accounts and into the personal accounts of Defendants James Merrill and Wanzeler.

818.    This wrongful transfer included a $3.5 million transfer by Wanzeler to a Singapore account on December 30, 2013.

819.    The SOC concluded that the use of Fidelity Bank's corporate and personal accounts caused harm to the victims of the TelexFree fraud.

820.    At a minimum, as a result of Fidelity Bank's initial investigation and ongoing monitoring, the relationship between the Merrill brothers, and its investigation and ongoing monitoring of TelexFree, Fidelity Bank was aware that TelexFree was engaged in tortious conduct, but it deliberately and willfully turned a blind eye to its knowledge and the results of its investigation and monitoring and continued to act as its banking institution, causing the members of the putative class to suffer ascertainable economic harm.

821.    Although Defendant Fidelity Bank and Defendant John F. Merrill possessed actual knowledge of the suspicious, tortious or illegal nature of TelexFree's business activities at all times it received or held TelexFree funds, they willfully acted in concert with them to until at least December 31, 2013 to:

- further the unlawful Pyramid Scheme;

- unfairly, deceptively and unlawfully siphon class member funds;

- unfairly, deceptively and unlawfully convert class member funds;

- continue to provide TelexFree and James Merrill and Carlos Wanzeler services integral to the TelexFree Scheme; and

- continue to provide TelexFree and James Merrill and Carlos Wanzeler with substantial assistance and encouragement essential to their unlawful plan.

822.    Through its actions, Fidelity Bank and John Merrill provided substantial assistance and encouragement and otherwise became an integral part of TelexFree's fraudulent Scheme.  Fidelity Bank and John Merrill also assisted TelexFree and its Principals to further achieve their unfair, deceptive and unlawful Scheme that was at a minimum violative of M.G.L. c. 93, § 69.

### 4.  Synovus

823.    At all material times, Defendant Synovus served as the "sponsor" bank of Defendants Base Commerce and GPG, and provided depository account and funds transfer services in connection with Base Commerce's and GPG's payment processing services.

824.    At all material times, Defendants Synovus, Base Commerce, and GPG shared a close business relationship, which included serving common clients, including TelexFree, and sharing information regarding said clients.

825.    At all material times, Base Commerce served as an agent of Synovus with respect to Synovus' relationship with TelexFree, which began in April 2013.

826.    Synovus performed an investigation of TelexFree prior to agreeing to accept TelexFree as a customer and its initial investigation and ongoing monitoring of TelexFree revealed indicia of suspicious, tortious and unlawful activities.

827.    Given Synovus' knowledge of the illegal nature of TelexFree's business operations, Synovus was obligated to refuse to open any accounts, process any transactions, or serve as a conduit for payments for the benefit of TelexFree.

828.    Synovus agreed to accept TelexFree as a customer and began to act as a conduit for TelexFree in April 2013, which services it continued to perform until at least January 16,

2014.

829.    In August 2013, due to concerns regarding public accusations that TelexFree was running a Pyramid Scheme, and the possibility of an investigation by the Federal Trade Commission or other federal agencies, Defendant Synovus indicated that it would no longer hold funds on TelexFree's behalf.

830.    More particularly, Synovus instructed Base Commerce and GPG to cease performing payment-processing services for TelexFree by August 31, 2013.

831.    Nevertheless, Synovus continued to act as the sponsor bank for GPG and Base Commerce thereafter and continued to process payments and make transfers for the benefit of TelexFree.

832.    For example, Synovus acted as the sponsor bank for Base Commerce's $5 million transfer on or about September 26, 2013 authorized by Base Commerce's Hughes for the benefit of TelexFree.

833.    Synovus continued to act as GPG's sponsor bank for its electronic payments transmitting credit card processing data to Defendant Allied Wallet until at least January 16, 2014, for the benefit of TelexFree.

834.    At a minimum, Synovus' initial investigation and ongoing monitoring of TelexFree made it aware that TelexFree was engaged in suspicious, tortious or unlawful conduct and was at a minimum violative of M.G.L. c. 93, § 69, but it continued to provide TelexFree with payment processing services, integral to the TelexFree Scheme until at least January 16, 2014.

835.    Through its actions, Synovus provided substantial assistance and encouragement to TelexFree.  Synovus also assisted TelexFree and its Principals to further achieve their unfair, deceptive and unlawful Scheme that was at a minimum violative of M.G.L. c. 93, § 69.

   **Z.  Defendant Payment Processing Service Companies**

836.    Defendants GPG, IPS, Propay, Base Commerce, Vantage Payments, Allied Wallet, and the Doe Payment Processors possessed actual knowledge of the suspicious, tortious and unlawful nature of TelexFree's business operations, yet substantially assisted and encouraged them by providing essential payment processing services as early as October, 2012.[83]

837.    Despite actual knowledge of the suspicious, tortious, or unlawful nature of TelexFree's business operations, the Payment Processing Service Company Defendants continued to encourage and provide TelexFree with payment processing services and substantially assisted and encouraged its suspicious, tortious or unlawful conduct.

838.    As an integral part of the Pyramid Scheme, the Payment Processing Service Company Defendants processed payments between TelexFree and its Members, provided the electronic gateway used to send and receive such payments, and provided the electronic interface services used by both TelexFree and its Members.

839.    As set forth below, certain Payment Processing Companies went far beyond this role and became active direct participants in TelexFree's unlawful business enterprise by providing specialized advice and assisting them to skirt the law.

840.    The services of the Payment Processing Service Company Defendants, including the capturing, maintenance and transferring of Promoters' funds, was essential and without their integral assistance TelexFree's Pyramid Scheme could not have operated.

841.    Each Payment Processing Service Company Defendant possessed a regulatory duty to look for certain types of facts or lack thereof, including the identity and purpose of the individuals opening and making payments into their accounts.

842.    In 2012, TelexFree underwent a "several day" period during which they double-

---

[83] *See also* Omnibus Decl. of William H. Runge, Case No. 14-125234-ABL, Doc. 13, ¶61, attached herewith as Exhibit 2.

billed customers, resulting in a temporary spike in the rate of customer chargebacks, according to an interoffice email of Defendant Base Commerce, dated May 22, 2013.[84]

843.     As a result of this period of especially heavy chargebacks, TelexFree was added to MasterCard's MATCH database in 2012, indicating that TelexFree was no longer to receive any credit card processing services due to exceptionally high risk.

844.     In addition to the alert from Mastercard's MATCH database in 2012, each of the Payment Processing Service Company Defendants became aware of other Red Flags and evidence of suspicious, tortious or unlawful activities surrounding TelexFree and pursuant to their regulatory duties they carried out further investigation.

845.     Each Payment Processing Service Company Defendant discovered the news reports and other evidence detailed in this complaint that reasonably evidenced TelexFree's unlawful conduct during the time they serviced them.

846.     Each Payment Processing Service Company Defendants performed all of the investigations and monitoring required of them by the federal government yet they:

- failed to act as required;

- failed to monitor the suspicious, tortious or unlawful conduct they identified;

- turned a blind eye to suspicious, tortious or unlawful conduct; and

- failed to detect or report suspicious, tortious or unlawful conduct.

847.     The services provided by each Payment Processing Service Company Defendant included, *inter alia*, the following:

- processing and opening of TelexFree payment processing accounts;

---

[84] *See* email from John Hughes, dated May 22, 2013, attached herewith as Exhibit 11.

- receiving payments made by Promoters to TelexFree to become members of the TelexFree Program;

- processing payments by Promoters to TelexFree in the course of TelexFree's fraudulent business operations, which funds were then held for the benefit of TelexFree, its affiliated entities and its Defendant Founders;

- maintaining accounts containing funds paid by Promoters to TelexFree for AdCentral Package membership fees;

- making payments to certain Promoters as part of TelexFree's purported return on investment; and

- transferring funds paid by Promoters to TelexFree between TelexFree entities, Defendant Founders' personal accounts, foreign companies and shell companies.

### 1. Propay

848.　Defendant ProPay processed electronic transfers of funds on behalf of TelexFree.

849.　ProPay agreed to accept TelexFree as a customer and began processing transactions for the benefit of TelexFree in or about October 2012.

850.　ProPay continued to process transactions for the benefit of TelexFree until at least January 16, 2014.

851.　According to TelexFree's December 2012 Balance Sheet, as of December 31, 2012, ProPay held a total of $546,947.23 in two accounts for the benefit of TelexFree.

852.　Furthermore, as of December 31, 2012, ProPay held an additional amount of $279,209.46, which is listed as "on hold" by TelexFree's 2012 Balance Sheet.

853.　Between October 2012 and December 2012, ProPay processed a total of $1,506,856.60 in incoming transfers of membership fees for the benefit of TelexFree.

854.　According to TelexFree's July 2013 Balance Sheet, as of July 31, 2013, Propay held a total of $3,743,049.03 in funds for the benefit of TelexFree.

855.　Furthermore, as of July 31, 2013, ProPay held an additional amount of

$4,698,867.83, which is listed as "on hold" by TelexFree's July 2013 Balance Sheet.

856.    According to TelexFree's December 2013 Balance Sheet, as of December 31, 2013, ProPay continued to hold funds in the amount of $98,463.24 for the benefit of TelexFree.

857.    In addition to this amount, as of December 31, 2013, ProPay continued to hold funds in the amount $4,468,411.11 in a "reserve" account for the benefit of TelexFree.

858.    In the course of providing services to TelexFree, ProPay directly communicated with fellow Defendant Payment Processing Service Companies Base Commerce and GPG regarding the inherent risks and concerns with TelexFree.

859.    More particularly, in an email to Defendant Hughes, president of Base Commerce, a Payment Processing Company serving TelexFree, ProPay characterized TelexFree as an extremely high-risk client and indicated that no United States bank or processor would be willing to take on TelexFree as a client given this risk.  This email was referenced in a subsequent email from Hughes to Defendants Merrill, Wanzeler, and Craft, as well as Defendant GPG, dated August 28, 2013.

860.    Hughes, as President of Base Commerce, stated in that August 28, 2013 email to Defendants Merrill, Craft, and Wanzeler, "[n]o US Bank or Processor . . . will accept your [TelexFree] business given that you are on month five of the Visa Chargeback monitoring program.  You are one of only three merchants in the USA on month five so you are a real hot-potato as they say."[85]

861.    Despite ProPay's knowledge of TelexFree's legal issues and the risk surrounding TelexFree, and despite ProPay's own warnings to Base Commerce regarding these issues, ProPay continued to provide payment processing services to TelexFree into January 2014.

---

[85] *See* email from Hughes to Merrill, dated August 28, 2013, attached hereto as Exhibit 12.

862.    ProPay continued to provide payment-processing services to TelexFree until at least January 16, 2014 and during that time ProPay conducted its continued monitoring obligations under the law.

863.    Pursuant to its obligations to perform ongoing customer monitoring of TelexFree, ProPay's Regulatory Monitoring Office, employees and officers discovered the Red Flags and evidence of suspicious, tortious or unlawful conduct described above.

864.    At a minimum, ProPay's initial investigation and ongoing monitoring of TelexFree made it aware that TelexFree was engaged in suspicious, tortious or unlawful conduct that was at a minimum violative of M.G.L. c. 93, § 69, but it continued to provide TelexFree with payment processing services, integral to the TelexFree Scheme until at least January 16, 2014.

865.    Through its actions, ProPay provided substantial assistance and encouragement to TelexFree.  ProPay also assisted TelexFree and its Principals to further achieve their unfair, deceptive and unlawful Scheme that was violative of M.G.L. c. 93, § 69.

## 2.  GPG

866.    Defendant GPG is a Payment Processing Service Provider that specializes in making outgoing payroll and commission payments for clients as well as processing credit card transactions for incoming payment.

867.    On April 17, 2013, GPG and TelexFree entered into a Corporate Client Payroll & Commission Processing and Payment Services Agreement, and it continued to render TelexFree substantial assistance that was necessary for TelexFree's operation to continue until at least January 16, 2014.

868.    In the course of providing services to TelexFree, on August 13, 2013, Defendant Borromei, a representative of GPG, co-hosted an open webinar with Defendant Labriola, which

promoted GPG's payment system to TelexFree Investors and potential investors and encouraged them to make further investments in TelexFree using GPG's system.

869.     On August 16, 2013, Borromei hosted an additional open webinar, in which he further promoted the payment system that GPG was providing to TelexFree, and encouraged further investments in TelexFree using GPG's payment system.

870.     On August 28, 2013, GPG received an email from Defendant Hughes, resident of Base Commerce, that included prior statements by ProPay characterizing TelexFree as an extremely high-risk client and indicating that no United States bank or processor would be willing to take on TelexFree as a client given this risk.

871.     Despite previous correspondence indicating that it would cease doing business with TelexFree by August 31, 2013, and the explicit instructions from its "sponsor bank," Defendant Synovus, to cease performing any services for TelexFree by August 31, 2013, GPG continued to provide services to TelexFree well after this date.

872.     These services included permitting TelexFree GPG's electronic payment conduit, or "GPG Gateway," to transmit credit card processing data to Allied Wallet until at least January 16, 2014.

873.     More particularly, in an email from GPG to Defendants Merrill, Wanzeler, and Labriola, as well as Base Commerce, dated September 3, 2013, GPG's Jayme Amirie indicated that, against the specific instructions of its sponsor bank, which had instructed it to cease all services for TelexFree, GPG "sneaked" payouts from the bank on TelexFree's behalf.[86]

874.     In his email of September 27, 2013 to Defendant Borromei and copied to Merrill, GPG's Jayme Amirie acknowledged that "TelexFree can continue to use the GPG gateway to

---

[86] *See* email from Jayme Amirie to James Merrill dated September 3, 2013, attached hereto and marked as Exhibit 13.

transmit electronic data to Allied Wallet."[87]

875.   Pursuant to its obligations to perform initial and ongoing customer monitoring of TelexFree, GPG's Regulatory Monitoring Office, employees and officers discovered the Red Flags and evidence indicating that TelexFree was engaging in suspicious, tortious or unlawful conduct.

876.   As a result of GPG's required initial investigation and ongoing monitoring of TelexFree, ProPay possessed actual knowledge that TelexFree was engaged in an illegal Pyramid Scheme, yet they willfully chose to offer substantial assistance and encouragement and directly became involved as described herein.

877.   Although Defendant GPG and Borremei possessed knowledge of the suspicious, tortious or illegal nature of TelexFree's business activities, at all times it received or held TelexFree funds, it willfully acted in concert with them to:

- further the unlawful Pyramid Scheme;

- unfairly, deceptively and unlawfully siphon class member funds;

- unfairly, deceptively and unlawfully convert class member funds;

- continue to provide services integral to the TelexFree Scheme; and

- continue to provide TelexFree with substantial assistance and encouragement essential to their unlawful plan.

878.   Through its actions, GPG provided substantial assistance and encouragement to TelexFree and otherwise became an integral part of TelexFree's fraudulent Scheme.  GPG also assisted TelexFree and its Principals to further achieve their unfair, deceptive and unlawful Scheme that was at a minimum violative of M.G.L. c. 93, § 69.

879.   At a minimum, GPG's initial investigation and ongoing monitoring of TelexFree,

---

[87] *See* email from Jayme Amirie to Jay Borromei dated September 27, 2013, attached hereto and marked as Exhibit 14.

made it generally aware that TelexFree was engaged in tortious conduct, but it deliberately and willfully turned a blind eye to the results of its investigation and monitoring.

880.     Although GPG possessed knowledge of the tortious nature of TelexFree's business activities from the time of its initial investigation of TelexFree and during its monitoring of TelexFree, it continued to promote and to provide TelexFree with payment processing services integral to the TelexFree Scheme until at least January 16, 2014.

### 3.  Base Commerce

881.     At all times material times, Defendants GPG, Base Commerce and Synovus shared a close business relationship, acting as payment processing partners and sharing information regarding customers, including TelexFree.

882.     In April 2013, Defendants Merrill and Wanzeler, on behalf of TelexFree, submitted an application for payment processing services to Base Commerce, which also does business as Phoenix Payments, GPG's credit card processing partner.

883.     Despite Base Commerce's knowledge of the suspicious, tortious or unlawful nature of TelexFree's business activities, Base Commerce agreed to accept TelexFree as a customer and began to perform payment processing services for TelexFree, which services it continued to perform until at least December 31, 2013.

884.     Although TelexFree's application to Base Commerce for payment processing services requested the Social Security number and date of birth of Wanzeler and Merrill as co-owners of TelexFree, Wanzeler refused to provide his Social Security number and date of birth, which was a Red Flag that prompted Base Commerce to perform additional credit checks, or "pull credit," on both Merrill and Wanzeler.

885.     Base Commerce's additional credit check involved running a "FraudDefender" search on TelexFree, which resulted in a score of 30/50 for TelexFree, indicating moderate risk,

and score of 20/50 for Wanzeler, indicating moderately high risk.

886.    The results of this "FraudDefender" search were an additional "red flag" to Base

Commerce and indicate its actual knowledge of TelexFree's tortious conduct.

887.    In an interoffice letter dated May 22, 2013, Defendant Hughes, president of Base

Commerce, noted that TelexFree was formerly known as Common Cents Communications,

stating:

> [t]hat program paid people residual commissions for placing ads online
> and the network marketing commentators accused them of being a Ponzi
> scheme as the commission advertised appeared unrealistically high and
> therefore fictitious.

888.    At that time, TelexFree was widely and prominently marketed and advertised as a

similar passive income scheme in which Members would be paid commissions for placement of

online advertisements.

889.    In the same interoffice letter dated May 22, 2013, Hughes indicated that

TelexFree's "current primary market" was Brazil, and that TelexFree would receive a $19

million annual receivable from Ympactus Comercial, Ltda, "a Brazilian Company to whom they

license their IOP System."

890.    Despite Base Commerce's actual knowledge of TelexFree's negative press, its

Brazilian investigation and the accusations of operating a Pyramid Scheme, it ultimately

accepted TelexFree's application.

891.    Beginning in June 2013, Base Commerce provided TelexFree with payment

processing services via an account held by Base Commerce's "sponsor bank," Defendant

Synovus, from which Base Commerce deducted its monthly processing, chargeback, and other

service fees.

892.    The assistance that Base Commerce provided to TelexFree was substantial.  For

example, Base Commerce's total deductions from the TelexFree account for the months of June

2013 through January 2014, were as follows:

| | |
|---|---|
| June 2013 | $340,106.76 |
| July 2013 | $565,582.16 |
| August 2013 | $1,164,038.56 |
| September 2013 | $113,672.76 |
| October 2013 | $99,326.90 |
| November 2013 | $61,438.21 |
| December 2013 | $108,181.78 |
| January 2014 | $98,903.07 |

893.    Base Commerce received instruction from its sponsor bank Defendant Synovus to

cease performing payment-processing services for TelexFree by August 31, 2013.

894.    Only due to this pressure from Synovus, Hughes forwarded a letter to Merrill on

August 20, 2013, advising him that Base Commerce would terminate its services with TelexFree

"as of 5:00 PM Pacific Standard Time on August 31, 2013."[88]

895.    In a subsequent email from Hughes to Defendants Merrill, Wanzeler, and Craft,

as well as GPG, dated August 28, 2013, Hughes stated, regarding TelexFree

> [we] have an MLM with a huge amount of negative news and serious
> accusations.  Hence, banks and processors are running away based on
> what the FTC, Treasury Dept., FDIC and Justice Dept. has done to them
> lately to include suing them,,[sic] fining them and freezing their settlement
> funds.[89]

896.    Hughes characterized TelexFree as an extremely high-risk client and indicated

that no United States bank or processor would be willing to take on TelexFree as a client given

---

[88] *See* Letter from John Hughes to James Merrill, dated August 20, 2013, attached herewith as
Exhibit 15.
[89] *See* Exhibit 12, email from John Hughes to James Merrill, dated August 28, 2013.

this risk.[90]

897.    In the same email, in which Hughes also characterized TelexFree as "a real hot-potato as they say," Hughes indicated that Base Commerce had worked, and was continuing to work, to find a replacement processor for TelexFree "such that [TelexFree's] business was not interrupted" and that he had arranged, via Defendant Vantage Payments, for Defendant Allied Wallet, a United Kingdom-based payment processor, to take over payment processing services for TelexFree.

898.    Hughes also indicated that Base Commerce was actively applying to off-shore banks on TelexFree's behalf, noting "no US Bank or Processor, as evidenced by the email from PROPAY [sic], will accept your business. . . ."[91]

899.    Hughes also offered Merrill business planning advice, which included advising that TelexFree charge members for its $1,425 AdCentral membership packages by ACH instead of credit card.

900.    In another email from Defendant Merrill to Hughes, also dated August 28, 2013, Merrill indicated that he believed that Base Commerce's activity in soliciting off-shore banking services on TelexFree's behalf was connected with TelexFree's desire to separate its international, U.S.-based, and Brazil-based business among different banks and processors.

901.    In approximately August 2013, Defendant Sparman, managing partner of Vantage Payments, was contacted by Hughes regarding TelexFree.

902.    More particularly, Hughes asked Vantage Payments to act as a broker on TelexFree's behalf, and to contact banks and processors with whom it had a business relationship to secure payment-processing services for TelexFree, which services Vantage Payments agreed

---

[90] *See id.*

[91] *See* Exhibit 12 email from John Hughes to James Merrill, dated August 28, 2013.

to perform.

903.   In an email from Hughes to Defendants Merrill and Wanzeler, dated September

27, 2013, Hughes indicated that, against the instructions of Synovus, he had authorized

approximately $5 million in transfers on September 26, 2013, stating:

> "The bank is clearly not happy with me but we are still trying to do the
> best job we can for you.  Their concerns are that if, god forbid, TelexFree
> came under a publicized FTC investigation, there could be an
> indeterminate wave of chargeback's. . . ."[92]

904.   In September 2013, Base Commerce successfully applied to IPS, on TelexFree's

behalf, for TelexFree to receive its ACH processing services through IPS.  This went well

beyond its role as a Financial Services Provider.  By working in concert with them to skirt the

law, Base Commerce and Hughes became active participants in TelexFree's unlawful operation.

905.   Thereafter, TelexFree's ACH processing was conducted by IPS, also doing

business as e-Wallet.

906.   On or about October 10, 2013, Hughes reiterated to Merrill his concern over the

possibility of a FTC investigation.

907.   In an email from Defendant Merrill to Hughes, dated January 16, 2014, Merrill

indicated that TelexFree, which was continuing to do business with GPG, was having "a great

deal of issues with GPG," specifically, regarding TelexFree's reserve balance and cash flow in

and out of GPG.

908.   Hughes, on behalf of Base Commerce, responded that Base Commerce was

"happy to help" regarding TelexFree's issue with GPG.

909.   Despite the numerous Red Flags and evidence of suspicious, tortious or unlawful

activity that Base Commerce was aware of, and despite being instructed by its sponsor bank to

---

[92] *See* email from Hughes to Merrill, dated September 27, 2013, attached herewith as Exhibit 16.

cease providing services by August 31, 2013, Base Commerce continued to provide services to TelexFree.

910.    These services included: processing transactions for TelexFree until at least January 2014, connecting TelexFree with off-shore processors, applying for accounts at off-shore banks on TelexFree's behalf and proving advice and guidance regarding TelexFree's business operations.  By working so in concert with them to skirt the law, Base Commerce and Hughes became active participants in TelexFree's unlawful operation.

911.    As a result of Base Commerce's required initial investigation and ongoing monitoring of TelexFree, Base Commerce and Hughes possessed actual knowledge that TelexFree was engaged in an illegal Pyramid Scheme.

912.    At a minimum, Base Commerce's initial investigation and ongoing monitoring of TelexFree, made it generally aware that TelexFree was engaged in tortious conduct, but it deliberately and willfully turned a blind eye to the results of its investigation and monitoring.

913.    Although Base Commerce and Hughes possessed knowledge of the tortious nature of TelexFree's business activities from the time of its initial investigation of TelexFree and during its monitoring of TelexFree, it continued to promote and to provide TelexFree with payment processing services integral to the TelexFree Scheme.

914.    Although Defendant Base Commerce and Hughes possessed knowledge of the suspicious, tortious or illegal nature of TelexFree's business activities at all times it received or held TelexFree funds, they willfully acted in concert with them to:

- further the unlawful Pyramid Scheme;

- unfairly, deceptively and unlawfully convert class member funds;

- continue to provide services integral to the TelexFree Pyramid Scheme; and

- continue to provide TelexFree with substantial assistance and encouragement essential to their unlawful business enterprise.

915.    Through its actions, Base Commerce and Hughes provided substantial assistance and encouragement to TelexFree and otherwise became an integral part of TelexFree's Pyramid Scheme.  Base Commerce and Hughes also assisted TelexFree and its Principals to further achieve their unfair, deceptive and unlawful Scheme that was at a minimum violative of M.G.L. c. 93, § 69.

### 4.  Vantage Payments

916.    Defendant Vantage Payments, which characterizes itself as an "Independent Sales Agent," served as a broker between TelexFree and other banks and processors for purposes of securing payment-processing services.

917.    Despite Vantage Payments' knowledge of the suspicious, tortious or unlawful nature of TelexFree's business activities and operation, Vantage Payments agreed to accept TelexFree as a customer in August 2013 and began to solicit payment processing services on behalf of TelexFree, which services it continued to perform up to the time that TelexFree, LLC, TelexFree, Inc., and TelexFree Financial, Inc. declared bankruptcy in April 2014.

918.    In approximately August 2013, Defendant Sparman, managing partner of Vantage Payments, was contacted by Defendant Hughes of Base Commerce regarding TelexFree, asking it to act as a broker on TelexFree's behalf and to contact banks and processors with whom it had a business relationship to secure payment processing services for TelexFree, which services Vantage Payments agreed to perform.

919.    Thereafter, Vantage Payments contacted Defendant Allied Wallet, and applied on TelexFree's behalf for Allied Wallet to provide payment-processing services to TelexFree.

920.    Vantage Payments also contacted an additional payment processor based in the

United Kingdom, who, at that time, refused to provide services to TelexFree due to known accusations of fraud regarding TelexFree's operations.

921.    Vantage Payments was able to secure Allied Wallet's agreement to provide payment processing services to TelexFree, pursuant to which agreement Allied Wallet would provide a "processing account" and process both incoming and outgoing payments for the benefit of TelexFree, among other services.[93]

922.    In connection with TelexFree's agreement with Allied Wallet, Defendant Merrill instructed Allied Wallet to transfer funds from TelexFree's processing account with Allied Wallet to accounts with Fidelity Bank.

923.    Vantage Payments, on behalf of TelexFree, also registered an entity in the United Kingdom, known as "TelexFree, LTD," to serve as TelexFree's EU-based operation.

924.    In fact, as Vantage Payments was aware, "TelexFree, LTD" was a shell company with no physical presence beyond a mere address.

925.    On or about October 10, 2013, Allied Wallet informed TelexFree that, due to an increase in both payment volume and chargebacks, it would be increasing the rolling reserve on TelexFree's processing account to 20%.

926.    Thereafter, Vantage Payments negotiated extensively with Allied Wallet on TelexFree's behalf, to have this rolling reserve reduced.

927.    These negotiations entailed, *inter alia*, Sparman meeting personally with the CEO of Allied Wallet in Los Angeles, California on TelexFree's behalf.

928.    Ultimately, after extensive lobbying by Vantage Payments on TelexFree's behalf, Allied Wallet agreed to reduce its rolling reserve on the TelexFree processing account to 10%,

---

[93] *See* Allied Wallet Card Payment Processing Agreement, dated August 26, 2013, attached herewith and marked as Exhibit 17.

and also agreed to increase the maximum processing volume on the account

929.    On or about November 13, 2013, Sparman, on behalf of Vantage Payments, and acting on behalf of TelexFree, once again contacted another United Kingdom-based payment processor in hopes of securing TelexFree additional payment processing volume.[94]

930.    This effort was ultimately unsuccessful, as this additional United Kingdom-based payment processor declined to perform services for TelexFree in light of the accusations of fraud and illegality surrounding TelexFree.

931.    The foregoing activities were beyond the scope of Vantage Payments' role as a Financial Services Provider.  By working so in concert with the indicted parties to skirt the law, Vantage Payments and Sparman were active participants in TelexFree's unlawful operation.

932.    By agreement with TelexFree, Vantage Payments also provided TelexFree with access to its Customer Dispute Resolution Network ("CDRN") Portal to Verifi by Visa's CDRN, the purpose of which was to provide TelexFree with the capability to address issues relating to customer payment disputes.[95]

933.    TelexFree executed a CDRN Portal Agreement with Vantage Payments on December 5, 2013.

934.    This authorized TelexFree to make use of Vantage Payments' online CDRN portal for processing of ACH and credit card transactions.

935.    In return for these services, Vantage Payments charged TelexFree a flat rate of $40 per transaction.

936.    In connection with this Agreement, Merrill authorized Vantage Payments to

---

[94] *See* email from Dustin Sparman to James Merrill, dated November 13, 2013, attached hereto and marked as Exhibit 18.

[95] *See* Vantage Payments CDRN Portal Agreement, attached hereto and marked as Exhibit 19.

transmit all incoming payments to the account of TelexFree, Inc. at Fidelity Bank.

937.    Vantage Payments continued to provide TelexFree with these portal access services until at least March 13, 2014.

938.    In an email from Defendant Merrill to Sparman, dated January 15, 2014, Merrill stated, regarding dividing TelexFree's payment processing between Vantage Payments and IPS, "[T]here will be plenty of business to go around.  You deserve your share for getting us started…Whomever treats us best will get most of the business."[96]

939.    Despite having direct knowledge of the shutdown of TelexFree in Brazil and Rwanda, the United Kingdom scam warning against TelexFree, well-publicized accusations of fraud and illegality on the part of TelexFree, and an enormous number of Red Flags and indicia of the suspicious, tortious or unlawful nature of TelexFree's business operations, Vantage Payments continued to provide processing and processing-related services to TelexFree up to the time that TelexFree, LLC, TelexFree, Inc., and TelexFree Financial, Inc. declared bankruptcy in April 2014.

940.    Although Defendant Vantage Payments possessed knowledge of the suspicious, tortious or illegal nature of TelexFree's business activities at all times it received or held TelexFree funds, they willfully acted in concert with them to:

- further the unlawful Pyramid Scheme;

- unfairly, deceptively and unlawfully convert class member funds;

- continue to provide services integral to the TelexFree Pyramid Scheme; and

- continue to provide TelexFree with substantial assistance and encouragement essential to their unlawful business enterprise.

---

[96] *See* email from James Merrill to Dustin Sparman, dated January 15, 2014, attached hereto and marked as Exhibit 20.

941.    Through its actions, Vantage Payments provided substantial assistance and encouragement to TelexFree and otherwise became an integral part of TelexFree's Pyramid Scheme.  Vantage Payments also assisted TelexFree and its Principals to further achieve their unfair, deceptive and unlawful Scheme that was at a minimum violative of M.G.L. c. 93, § 69.

942.    At a minimum, Vantage Payments's initial investigation and ongoing monitoring of TelexFree, made it generally aware that TelexFree was engaged in suspicious, tortious or unlawful conduct, but it deliberately and willfully turned a blind eye to the results of its investigation and monitoring.

943.    Although Vantage Payments possessed knowledge of the tortious nature of TelexFree's business activities from the time of its initial investigation of TelexFree and during its monitoring of TelexFree, it continued to promote and to provide TelexFree with payment processing services integral to the TelexFree Scheme until at least April 2014.

### 5. Allied Wallet

944.    Defendant Allied Wallet shared a close business relationship with Defendants Vantage Payments and Sparman, and was kept informed by Sparman of information regarding TelexFree, including public accusations of operating a Pyramid Scheme and the investigation and shutdown of TelexFree's operations in Brazil.

945.    Despite Allied Wallet's knowledge of the suspicious, tortious, or unlawful nature of TelexFree's business activities and operation, Allied Wallet agreed to accept TelexFree as a customer and began in late August 2013 to perform payment processing services for TelexFree.

946.    Allied Wallet had extensive connections with Vantage Payments in facilitating the Scheme.

947.    Upon Vantage Payments' application on behalf of TelexFree, Allied Wallet agreed to provide payment-processing services to TelexFree, pursuant to which agreement Allied

Wallet would provide a "processing account" and process both incoming and outgoing payments for the benefit of TelexFree, among other services.[97]

948.    In connection with TelexFree's agreement with Allied Wallet, Defendant Merrill instructed Allied Wallet to transfer funds from TelexFree's processing account with Allied Wallet to accounts with Fidelity Bank.

949.    On or about October 10, 2013, Allied Wallet informed TelexFree that, due to an increase in both payment volume and chargebacks, it would be increasing the rolling reserve on TelexFree's processing account to 20%.

950.    Thereafter, Vantage Payments negotiated extensively with Allied Wallet on TelexFree's behalf, to have this rolling reserve reduced.

951.    These negotiations entailed, *inter alia*, Sparman meeting personally with the CEO of Allied Wallet in Los Angeles, California on TelexFree's behalf.

952.    Ultimately, after extensive lobbying by Vantage Payments on TelexFree's behalf, Allied Wallet agreed to reduce its rolling reserve on the TelexFree processing account to 10%, and also agreed to increase the maximum processing volume on the account.

953.    Allied Wallet also made transfers from TelexFree's corporate accounts to private accounts held in the names of Defendant Founders, despite knowledge of the suspicious, tortious or unlawful nature of TelexFree's business enterprise and operations.

954.    Despite having direct knowledge of the shutdown of TelexFree in Brazil and Rwanda, the United Kingdom scam warning against TelexFree, well-publicized accusations of fraud and illegality on the part of TelexFree, and an enormous number of Red Flags and indicia indicating the suspicious, tortious or unlawful nature of TelexFree's operations, Allied Wallet

---

[97] *See* Allied Wallet Card Payment Processing Agreement, dated August 26, 2013, attached herewith and marked as Exhibit 17.

continued to provide processing and processing-related services to TelexFree up to the time that

TelexFree, LLC, TelexFree, Inc., and TelexFree Financial, Inc. declared bankruptcy in April

2014.

955.    Although Defendant Allied Wallet possessed knowledge of the suspicious,

tortious or illegal nature of TelexFree's business activities at all times it received or held

TelexFree funds, it willfully acted in concert with TelexFree to:

- further the unlawful Pyramid Scheme;

-  unfairly, deceptively and unlawfully convert class member funds;

- continue to provide services integral to the TelexFree Pyramid Scheme; and

- continue to provide TelexFree with substantial assistance and encouragement essential to their unlawful business enterprise.

956.    Through its actions, Allied Wallet provided substantial assistance and

encouragement and otherwise became an integral part of TelexFree's Pyramid Scheme.  Allied

Wallet also assisted TelexFree and its Principals to further achieve their unfair, deceptive and

unlawful Scheme that was at a minimum violative of M.G.L. c. 93, § 69.

957.    At a minimum, Allied Wallet's initial investigation and ongoing monitoring of

TelexFree, made it generally aware that TelexFree was engaged in suspicious, tortious or

unlawful conduct, but it deliberately and willfully turned a blind eye to the results of its

investigation and monitoring.

958.    Although Allied Wallet possessed knowledge of the tortious nature of TelexFree's

business activities from the time of its initial investigation of TelexFree and during its

monitoring of TelexFree, it continued to promote and to provide TelexFree with payment

processing services integral to the TelexFree Scheme until at least April 2014.

**6.  IPS**

959.     In September 2013, Defendant Base Commerce successfully applied to IPS, on
TelexFree's behalf, for TelexFree to receive its ACH processing services through IPS.

960.     Thereafter, TelexFree's ACH processing was conducted by IPS, also doing
business as e-Wallet.

961.     In approximately December 2013, TelexFree entered into a further agreement
with IPS for additional payment processing services, under the name and address of "TelexFree,
LTD," the shell company established by Vantage Payments.[98]

962.     Thereafter, beginning in approximately January 2014, IPS provided TelexFree
with a service titled "e-Wallet," which was used by TelexFree for additional processing of funds
transferred by Promoters to TelexFree.

963.     IPS performed an investigation of TelexFree prior to agreeing to accept TelexFree
as a customer and its initial investigation and ongoing monitoring of TelexFree revealed indicia
of fraud and illegality, or Red Flags, and other evidence of fraud cited above.

964.     Given IPS's knowledge of the illegal nature of TelexFree's business operations,
IPS was obligated to refuse to open any accounts or process any transactions for the benefit of
TelexFree.

965.     Despite IPS's knowledge of the illegal nature of TelexFree's business activities,
IPS agreed to accept TelexFree as a customer and began to perform payment processing services
for TelexFree in September 2013.

966.     IPS has a history of representing Ponzi schemes.  Prior clients include the well-
publicized Ponzi schemes Spinding, Wealth4AllTeam, Primus Hub, (an attempted reboot of
Wealth4AllTeam following Wealth4AllTeam's collapse), Funky Shark (a planned Ponzi scheme

---

[98] *See* email from Sparman to Merrill, dated December 27, 2013, attached herewith as Exhibit
21.

that shut down prior to launch after receiving legal advice and a $40,000 fine), Team Vinh

International, MyAdvertisingPays (a 120% return-on-investment advertising-based Ponzi

scheme, similar to TelexFree), Diamond Banners, Argent Network (which was advertised as

advertised as "a mixture of Zeek Rewards and TelexFree"), and 1BuckAdShare.

967.    Despite the overwhelming evidence of TelexFree's fraudulent activities, in an

October 2013 public statement to the news website *BehindMLM.com*, IPS audaciously stated that

they had "done a complete due diligence on TelexFree" and "confirmed the product as

compliance with all US laws."  This activity was beyond the scope of its role as a Financial

Services Provider.  By publicly endorsing their business model, IPS became an active participant

in TelexFree's unlawful operation.

968.    On or about February 12, 2014, IPS announced that they were partnering with

MLM attorney Kevin Thompson of Thompson Burton, PLLC, to "provide up-to-date compliance

guidance to their new and existing clients in the Direct Selling and Multi-Level Marketing

industry."

969.    TelexFree was a recipient of such "compliance guidance" services.

970.    According to a TelexFree balance sheet, dated December 31, 2013, posted by the

Washington State Utilities and Transportation Commission, as of December 31, 2013, TelexFree

claimed $31,640,192.30 in assets then held by IPS (under the name "e-Wallet") on behalf of

TelexFree.[99]  The assistance that IPS offered TelexFree was substantial.

971.    IPS continued to provide payment-processing services to TelexFree until April

17, 2014, at which time IPS finally disabled its electronic services.

972.    Thereafter, in place of the previous e-Wallet online interface, IPS posted a

---

[99] *See* TelexFree, LLC Balance Sheet as of December 31, 2013, marked as Exhibit 5.

message online stating that TelexFree's payment processing services had been disabled, and suggested that this could be due to TelexFree having "violated Anti-Money Laundering policies."

973.    Despite having direct knowledge of the shutdown of TelexFree in Brazil and Rwanda, the United Kingdom scam warning against TelexFree, well-publicized accusations of fraud and illegality on the part of TelexFree, and an enormous number of Red Flags and indicia of fraud indicating the fraudulent and illegal nature of TelexFree's operations, IPS continued to provide processing and processing-related services to TelexFree up to the time that TelexFree, LLC, TelexFree, Inc., and TelexFree Financial, Inc. declared bankruptcy in April 2014.

974.    Although Defendant IPS possessed knowledge of the suspicious, tortious or illegal nature of TelexFree's business activities at all times it received or held TelexFree funds, it willfully acted in concert with TelexFree to:

- further the unlawful Pyramid Scheme;

-  unfairly, deceptively and unlawfully convert class member funds;

- continue to provide services integral to the TelexFree Pyramid Scheme; and

- continue to provide TelexFree with substantial assistance and encouragement essential to their unlawful business enterprise.

975.    Through its actions, IPS provided substantial assistance and encouragement and otherwise became an integral part of TelexFree's Pyramid Scheme.  IPS also assisted TelexFree and its Principals to further achieve their unfair, deceptive and unlawful Scheme that was at a minimum violative of M.G.L. c. 93, § 69.

976.    At a minimum, IPS's initial investigation and ongoing monitoring of TelexFree, made it generally aware that TelexFree was engaged in suspicious, tortious or unlawful conduct, but it deliberately and willfully turned a blind eye to the results of its investigation and

monitoring.

977.    Although IPS possessed knowledge of the suspicious, tortious or unlawful nature of TelexFree's business activities from the time of its initial investigation of TelexFree and during its monitoring of TelexFree, it continued to promote and to provide TelexFree with payment processing services integral to the TelexFree Scheme until April 17, 2014.

978.    Each of the Financial Services Providers failed to timely or adequately respond to information relating to TelexFree, or persons or entities it was related to, and as a direct and proximate result caused each member of the putative class to similarly suffer ascertainable economic harm.

979.    Various persons or entities that are not named as Defendants herein have participated as co-conspirators or aiders and abettors in the violations and other claims alleged herein and have performed acts and made statements in furtherance thereof. These persons or entities have directly participated because they have facilitated, adhered to, and/or communicated with others regarding the Pyramid SchemeScheme or offered substantial assistance or encouragement. Plaintiffs reserve the right to name some or all of these persons as Defendants at a later date.

980.    Plaintiffs and the putative class representatives seek to obtain damages, restitution and injunctive relief for the Class, as defined, below, from Defendants.

## IV.    CLASS ACTION ALLEGATIONS

981.    Under Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs sue on their own behalf, and on behalf of all other persons similarly situated ("the Class").  The Class that Plaintiffs seek to represent is:

> All persons residing in the United States who purchased TelexFree AdCentral or

AdCentral Family packages and suffered a Net Loss[100] during the period from January 1, 2012 to April 16, 2014 (the "Class Period")

982.    Excluded from the Class are Defendants and their officers, directors, and employees; any entity in which any Defendant has a controlling interest; the co-conspirators, the so-called Top Level Promoters, legal representatives, attorneys, heirs, and assigns of Defendants.

983.    Plaintiffs meet the requirements of Federal Rules of Civil Procedure 23(a) because the members of the Class are so numerous that the joiner of all members is impractical. While the exact number of Class members is unknown to Plaintiffs, it is in the hundreds of thousands.

984.    Plaintiffs meet the requirements of Federal Rules of Civil Procedure 23(a) because there is a well-defined community of interest among the members of the Class, common questions of law and fact predominate, Plaintiffs' claims are typical of the members of the Class, and Plaintiffs can fairly and adequately represent the interests of the Class.

985.    This action satisfies the requirements of Federal Rule of Civil Procedure 23(b)(3) because it involves questions of law and fact common to the member of the Class that predominate or questions affecting only individual members, including, but not limited to:

- whether the contract under which TelexFree claims to invoke the application of Nevada law is illegal and unenforceable as a matter of law;

- whether TelexFree claim to invoke the application of Nevada law is enforceable;

- whether TelexFree ran an unlawful Pyramid Scheme or a legitimate business;

- whether TelexFree ran a lawful MLM program or an unlawful pyramid scheme;

---

[100] "Net Loss" is defined as the class member having invested more funds than they withdrew.

- whether each Defendant knew that TelexFree was an illegal Pyramid Scheme, yet continued to aid, abet and further such illegal activities or are otherwise liable for the economic loss suffered by the Putative Class;

- whether the aid that each Defendant provided wasa substantial in the context of aiding and abetting;

- was TelexFree a "multi-level distribution company" as defined by Massachusetts General Laws Chapter 93, Section 69(a);

- did the standard TelexFree Pre-March 9 Contract contain promises to pay merely for the recruitment of new members in violation of Massachusetts General Laws Chapter 93, Section 69(a);

- did the standard TelexFree Pre-March 9 Contract contain offers to pay a "finder's fee, bonus, refund, override, commission, cross-commission, dividend or other consideration" to Participants in the TelexFree Program in violation of Massachusetts General Laws Chapter 93, Section 69(a);

- did the TelexFree Program offer its Members payment without requiring them to engage in any "bona fide and essential supervisory, distributive, selling or soliciting" nor exercise any "judgment," "skill," or "control over the operation in violation of Massachusetts General Laws Chapter 93, Section 69(a);

- did each of the Financial Services Defendants have actual knowledge of TelexFree's suspicious, tortious or unlawful activities;

- when did each of the Financial Services Defendants have actual knowledge of TelexFree's suspicious, tortious or unlawful activities;

- whether TelexFree's Financial Services Providers, including the aforesaid banking institutions and payment processing services providers aided and abetted TelexFree's Pyramid Scheme;

- whether TelexFree violated M.G.L. c. 93A;

- whether Massachusetts' Blue Sky Laws will apply to the claims of the Putative Class;

- whether TelexFree violated M.G.L. c. 110A, § 410 - Massachusetts' Blue Sky Laws;

- whether certain Defendants used and employed manipulative and deceptive devices and contrivances in violation of M.G.L. c. 110A, § 410; used means and instrumentalities, directly and indirectly, for the purchase and sale of unregistered securities; and used and employed manipulative

and deceptive devices and contrivances in violation of the Massachusetts Uniform Securities Act, M.G.L. c. 110A, § 410(b) and M.G.L. c. 93A;

- whether TelexFree mailed fraudulent and inaccurate 1099 (Miscellaneous Income) forms to investors;

- whether the 1099 (Miscellaneous Income) forms should be declared void as a matter of law;

- whether Defendants' conduct violated any of the articulated Massachusetts state common laws; and

- whether Plaintiff and the Class are entitled to damages, civil penalties, punitive damages, and/or injunctive relief.

986.    Plaintiffs' claims are typical of those of other Class members because Plaintiffs were defrauded by Defendants' common Scheme.

987.    Plaintiffs will fairly and accurately represent the interests of the Class.

988.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications regarding individual members of the Class, which would establish incompatible standards of conduct for Defendants and would lead to repetitive adjudication of common questions of law and fact.

989.    Class treatment is superior to any other method for adjudicating the controversy. Plaintiffs know of no difficulty likely to be encountered in the management of this litigation that would preclude its maintenance as a class action under Rule 23(b)(3).

990.    Damages for any individual class member likely cannot justify the cost of individual litigation, so that absent class treatment, the Defendants' violations of law inflicting substantial damages in the aggregate would go un-remedied without certification of the Class.

991.    Defendants have acted or refused to act on grounds that apply to the Class, as alleged above, and certification is proper under Rule 23(b)(2).

## V.    CLAIMS FOR RELIEF

**FIRST CLAIM FOR RELIEF**
**VIOLATIONS OF MASSACHUSETTS GENERAL LAWS,**
**CHAPTER 93, SECTIONS 12 and 69**
**(Against All Operational Defendants)**

992.    Plaintiffs incorporate by reference all allegations in all previous paragraphs, as though fully set forth here.

993.    The Operational Defendants were engaged in acts in violation of Massachusetts General Laws Chapter 93, Section 69.

994.    Massachusetts General Laws Chapter 93, Section 12 provides for a private right of action for violations of Chapter 93, Section 69.

995.    In consequence of said Defendants' violative conduct, Plaintiffs and the Putative Class have suffered great financial losses, and have also incurred considerable expenses and loss of income, and have otherwise been greatly damaged.

996.    In consequence of said Defendants' violative conduct or other unfair and deceptive acts and practices, Plaintiffs and the Putative Class have been similarly caused to suffer ascertainable economic loss, have incurred expense and have otherwise been similarly damaged.  Because the Operational Defendants' violations of Massachusetts General Laws Chapter 93, Section 69 were engaged in with malicious intent to injure the members of the Putative Class, the Class is entitled to (up to) three times the amount of actual damages sustained, together with the costs of suit, including reasonable attorneys' fees.

**SECOND CLAIM FOR RELIEF**
**VIOLATIONS OF MASSACHUSETTS GENERAL LAWS,**
**CHAPTER 93A, SECTIONS 2 AND 11**
**(Against All Operational Defendants)**

997.    Plaintiffs incorporate by reference all allegations in all previous paragraphs, as

though fully set forth here.

998.   All Operational Defendants were engaged in "trade" and "commerce" as defined by Massachusetts General Laws Chapter 93A, Section 1.

999.   Plaintiffs and the Putative Class were engaged in "trade" and "commerce" as defined by Massachusetts General Laws Chapter 93A, Section 1.

1000.   The transactions, actions or inaction of the Operational Defendants constitute unfair and deceptive acts and practices as defined by, and in violation of, Massachusetts General Laws, Chapter 93A, Sections 2 and 11.

1001.   In addition, said Defendants engaged in acts in violation of Massachusetts General Laws Chapter 93, Section 69.  Pursuant to Chapter 93, Section 69(g) any violation of the provisions of M.G.L. c. 93, section 69 shall constitute an unlawful method, act or practice within the meaning of clause (a) of section two of chapter ninety-three A.

1002.   As a result, the foregoing transactions, actions and inactions of said Defendants thereby constitute per se an unlawful method, act or practice within the meaning of Massachusetts General Laws, Chapter 93A, Section 2(a) by operation of Massachusetts General Laws, Chapter 93, Section 69(g).

1003.   The foregoing transactions, actions and inactions of said Defendants thereby constitute per se unfair and deceptive acts and practices as defined by, and in violation of, Massachusetts General Laws, Chapter 93A, §§ 2 and 11.

1004.   In consequence of said Defendants' violative acts, and unfair methods of competition or unfair or deceptive acts or practices, Plaintiffs and the Putative Class have been similarly caused to suffer ascertainable economic loss, have incurred expense and have otherwise been similarly damaged.  The Operational Defendants' violations of Massachusetts General

Laws Chapter 93A, Section 69 were willful or knowing, and the Class is otherwise entitled to (up

to) three times the amount of actual damages sustained, together with the costs of suit, including

reasonable attorneys' fees.

## THIRD CLAIM FOR RELIEF
### AIDING AND ABETTING VIOLATIONS OF MASSACHUSETTS GENERAL LAWS, CHAPTER 93, SECTIONS 12 and 69, AND MASSACHUSETTS GENERAL LAWS, CHAPTER 93A, SECTIONS 2(a) or 11
#### (Against TelexFree And All Defendants)

1005.   Plaintiffs incorporate by reference all allegations in all previous paragraphs, as

though fully set forth here.

1006.   As described above, to comply with federal anti-money laundering and other

banking laws, Defendants Bank of America, N.A., TD Bank, Fidelity Bank, Synovus, GPG, IPS,

ProPay, Base Commerce, Vantage Payments, Allied Wallet (collectively, the "Financial Services

Providers") must understand their customers' business model and must know their clients.

1007.   Under the attendant facts, any application of the mandated Know-Your-Customer

Regulations by each of the Financial Services Providers obviously included evaluating whether

TelexFree's business model and operations violated Massachusetts General Laws Chapter 93,

Section 69.

1008.   Violations of Massachusetts General Laws c. 93, § 69 are per se violations of

Massachusetts General Laws Chapter 93, Section 2(a).

1009.   Under the attendant facts, that TelexFree violated Massachusetts General Laws

Chapter 93, Section 69 during 2013 and 2014 was obvious or at a minimum apparent, to the

sophisticated eye, as focused by the FFIEC, of the Financial Services Providers.

1010.   As described herein, TelexFree and the Operational Defendants, except for Katia

Wanzeler, otherwise violated MGL c. 93A.

1011.   Massachusetts General Laws Chapter 93, Sections 12 and Section 69 created a duty carried by TelexFree and each of the Operational Defendants that inured to the benefit of the putative class.

1012.   The Operational Defendants and the Financial Services Providers knew that TelexFree's conduct was suspicious, tortious, unlawful, and constituted a breach of duty owed to each member of the putative class.

1013.   The Operational Defendants and the Financial Services Providers knew that TelexFree Program violated Massachusetts General Laws Chapter 93, Sections 12 and 69 and that TelexFree's conduct was unfair, deceptive, suspicious, tortious, and unlawful constituted a breach of duty owed to each member of the putative Class.

1014.   During the TelexFree Pyramid Scheme, the Financial Services Providerts provided essential financial services to TelexFree, the Operational Defendants, and each other, which substantially assisted and enabled them to carry on their unlawful, unfair, and deceptive Pyramid Scheme notwithstanding the presence of suspicious, tortious or illegal activity on TelexFree's part.

1015.   As described herein, the assistance and encouragement given to TelexFree by the Financial Services Providers to conduct its business operations was essential because TelexFree's business operations were entirely dependent on them.

1016.   For example, without the indispensible services provided by the Financial Services Providers, TelexFree would not have been able to accept, process or misappropriate the funds invested by the putative class.

1017.   Without the indispensible services provided by the Financial Services Providers, TelexFree would not have been able to otherwise open shop in the United States , develop and

maintain its unlawful business operations.

1018.   As described herein, the assistance and encouragement given to TelexFree by the Financial Services Providers to conduct its business operations was substantial.  According to an investigation by the SOC, in 2012 and 2013 TelexFree identified 4,845,576 VoIP Program transactions totaling $238,395,353.80.  Over the same period, TelexFree received 783,771 package purchases of either $289 or $1,375 totaling $880,189,455.32.

1019.   Each Defendant, while knowing that the other's conduct provided essential and substantial encouragement to TelexFree, the Operational Defendants, and each other, substantially assisted and enabled them to carry on their unlawful, unfair, and deceptive Pyramid Scheme notwithstanding the presence of suspicious, tortious or illegal activity on TelexFree's part.

1020.   Each Defendant provided substantial assistance and/or encouragement to the other Defendants in committing the violations of M.G.L. c. 93, § 69 and M.G.L. c. 93A alleged herein, and did so with unlawful intent and knowledge that such parties were perpetuating a fraudulent and illegal Pyramid Scheme, and yet continued to substantially assist or encourage said Scheme.

1021.   Each Defendants rendered this substantial assistance despite their knowledge that TelexFree's operations constituted an unlawful, unfair, deceptive and unsustainable Pyramid Scheme and violated M.G.L. c. 93 § 69 and M.G.L. c. 93A.

1022.   Such substantial assistance was rendered by Defendants despite their knowledge of the illegal nature of TelexFree's operations, is detailed within this complaint and includes, but is not limited to:

a.   managing and controlling TelexFree and its affiliated entities;

b.   providing accounting services to TelexFree;

c.  providing legal services to TelexFree;

d.  publicly certifying that TelexFree's business model and operations were legal, proper, and economically viable and sustainable;

e.  providing banking, investment and asset management services for TelexFree and its management;

f.  promoting TelexFree AdCentral packages;

g.  continuing to provide financial services following the Brazilian Court's injunction to stop TelexFree's business in Brazil;

h.  processing payments to, from, and on behalf of TelexFree and its affiliated entities; and

i.  processing payments for transfers of funds which deepened TelexFree's insolvency;

j.  making transfers from TelexFree's corporate accounts to private accounts held in the names of Defendant Founders, despite knowledge of the fraudulent nature of TelexFree's business enterprise;

k.  investing ill-gotten funds for the benefit of TelexFree's Founders, despite knowledge of the suspicious, tortious or illegal nature of TelexFree's business enterprise;

l.  providing TelexFree's Founders with cashier's checks in amounts totaling millions of dollars and purchased using funds in TelexFree's corporate accounts;

m.  providing credit to TelexFree;

n.  participating in a cover-up by knowingly failing and/or refusing to report

the results of such financial services provider's own investigation of

TelexFree to the proper authorities, despite the suspicious, tortious or

illegal activity revealed by such investigation;

o.    soliciting financial services for the benefit of TelexFree;

p.    negotiating with financial services providers on TelexFree's behalf;

q.    incorporating foreign "shell corporations" on TelexFree's behalf in order

to expand TelexFree's suspicious, tortious or illegal  business

internationally;

r.    providing financial advice to TelexFree designed to keep the violations

of MGL 93 § 69 and MGL 93A and the unlawful MLM Pyramid

Scheme alive and avoid detection by regulators;

s.    "sneaking" payments out of bank accounts to TelexFree in order to

avoid detection;

t.    appearing in online videos with TelexFree Founders promoting

TelexFree to the public;

u.    publicly falsely stating that TelexFree's business operations had been

assessed by the financial services provider and determined to be legal; or

v.    otherwise becoming an integral part of TelexFree's Pyramid Scheme by,

*inter alia*, enabling the TelexFree Pyramid Scheme to expand and

continue by providing necessary financial services to TelexFree, despite

actual knowledge of violations of MGL 93 § 69 and MGL 93A  by

TelexFree and other suspicious, tortious or illegal activities.

1023.   By each Defendant's actions participating in the Pyramid Scheme as described

herein, as alleged above, each Defendant aided and abetted the commission of the causes of

action alleged herein.

1024.   As a direct and proximate result of TelexFree's illegal Pyramid Scheme and all

the activities performed in connection therewith, to which said Defendants provided substantial

assistance, Plaintiffs and the Putative Class sustained ascertainable damages and losses and

demand they be made whole.

**FOURTH CLAIM FOR RELIEF**
**UNJUST ENRICHMENT**
**(Against All Defendants)**

1025.   Plaintiffs incorporate by reference all allegations in all previous paragraphs, as

though fully set forth here.

1026.   Plaintiffs and the Putative Class conferred a benefit upon the Defendants by

furnishing funds, directly or indirectly, to Defendants, who accepted them without protest or

defect and retained and benefitted from them.

1027.   Defendants had an appreciation or knowledge of the benefit.

1028.   Defendants knew of such funds received by them.

1029.   Defendants have unlawfully and in bad faith denied Plaintiffs and the putative

Class access to such funds, and have instead knowingly retained the benefit of such funds for

themselves.

1030.   Acceptance or retention by Defendants of the benefit under the circumstances set

forth herein would otherwise be inequitable without payment for its value.

1031.   As a direct and proximate result of Defendants' actions, as hereinabove set forth,

Defendants are, and continue to be, unjustly enriched and Plaintiffs demand they and the

Putative Class be made whole.

## FIFTH CLAIM FOR RELIEF
### CIVIL CONSPIRACY
**(Against TelexFree, All Operational Defendants, John Merrill, John Hughes, Dustin Sparman, Fidelity Bank, Base Commerce, GPG, and IPS)**

1032.   Plaintiffs incorporate by reference all allegations in all previous paragraphs, as though fully set forth here.

1033.   TelexFree, the Operational Defendants, Katia Wanzeler, John Merrill, John Hughes, Dustin Sparman, Fidelity Bank, Base Commerce, GPG and IPS have combined by common design to enter into a civil conspiracy.

1034.   Said Defendants conspired with each other to operate and maintain in operation a Pyramid Scheme in violation of Massachusetts General Laws Chapter 93, Section 69 and Chapter 93A.

1035.   Said Defendants, by agreement or common design, engaged directly in the operation of, or otherwise worked in concert to further the activities of, the unlawful Pyramid Scheme.

1036.   As detailed above, each of said Defendants engaged in a tortious act in furtherance of the agreement or common design to engage in the lawful Pyramid Scheme.

1037.    Said Defendants conspired with each other, making use of confidential information, and used this confidential information to misappropriate the funds of the Putative Class through the operation and maintenance of unlawful Pyramid Scheme.

1038.   Said Defendants, for an unlawful purpose and using unlawful means, with the intent of so combining, unlawfully defrauded Plaintiffs and the Putative Class out of funds.

1039.   Said Defendants' conduct constitutes a conspiracy to operate an unlawful enterprise, rendering all Defendants jointly and severally liable for the breaches of each other's obligations.

1040.   As a direct and proximate cause of said Defendants' conspiracy, the Putative

Class has and will continue to suffer substantial direct and consequential damages and Plaintiffs

demand they and the Putative Class be made whole.

**SIXTH CLAIM FOR RELIEF**
**PROFESSIONAL NEGLIGENCE**
**(Against All Licensed Professional Defendants)**

1041.   Plaintiffs incorporate by reference all allegations in all previous paragraphs, as

though fully set forth here.

1042.   Craft, Craft Financial, Ann Genet, Nehra, Nera Law Firm, Waak, Waak Law

Firm, Nehra and Waak Law Firm, Opt3 Solutions, Inc., PricewaterHouseCoopers, Jason A.

Borromei and each of the Licensed Professional Defendants owed a duty to Plaintiffs and the

Putative Class to act with reasonable care to avoid negligently misstating, misrepresenting or

being misleading about the true nature of TelexFree's operation and its financial information or

its returns, and to comply with all laws. Each and everyone failed and similarly caused the

Putative class to suffer ascertainable economic loss.

1043.   By negligently misstating and omitting relevant information, including the source

of and sufficiency of funds for payments to Promoters, said Defendants breached the duty of care

they owed to Plaintiffs and the Putative Class.

1044.   Each of the Licensed Service Provider Defendants owed Plaintiffs and the

Putative Class a duty to act with reasonable care and to exercise the ordinary skill and ability

commonly exercised by such professionals.

1045.   Plaintiffs and the Putative Class relied upon said Defendants' expertise and/or

performance of their duties or was similarly affected and similarly caused to incur ascertainable

economic loss.

1046.   Plaintiffs and the Putative Class reposed faith, confidence and trust in said

Defendants' representations and advice.

1047.   As a direct and proximate result of said Defendants' negligence and carelessness,

Plaintiffs and the Putative Class have been caused to suffer and sustain damages and losses and

demand they be made whole.

## SEVENTH CLAIM FOR RELIEF
## NEGLIGENT MISREPRESENTATION
### (Against Operational Defendants Except Katia Wanzeler)

1048.   Plaintiffs incorporate by reference all allegations in all previous paragraphs, as

though fully set forth here.

1049.   The Operational Defendants, except Katia Wanzeler, directly, and through their

agents, servants, employees and/or representatives, negligently made false misrepresentations of

material fact and omissions to Plaintiffs and the Putative Class in the course of their businesses

for the purpose of obtaining and/or wrongfully appropriating and converting money from

Plaintiffs and the Putative Class.

1050.   The said Operational Defendants made negligent misrepresentations and

omissions although said Defendants knew, or should have known, that such representations were

false.

1051.   Said representations and statements were material and were relied upon by

Plaintiffs and the Putative Class, inducing them to furnish money to Defendants.

1052.   Further, the Licensed Service Provider Defendants failed to exercise proper due

diligence in the discharge of their investigatory duties as certified public accountants and

attorneys of TelexFree, and knew or should have known Plaintiffs and the Putative Class would

have relied upon their expertise and misrepresentations.

1053.   Plaintiffs and the Putative Class reposed faith, confidence and trust in said

Operational Defendants' representations and advice.

1054.   In consequence of the reliance on the negligent misrepresentations of said

Defendants, Plaintiffs and the Putative Class have suffered great financial losses, have also

incurred considerable expenses and loss of income, and have otherwise been greatly damaged

and demand they be made whole.


### EIGHTH CLAIM FOR RELIEF
### VIOLATIONS OF MASSACHUSETTS GENERAL LAWS,
### CHAPTER 110a, SECTION 410(b)
### (Against All Operational Defendants except for Mobile, Electric, PricewaterhouseCoopers)

1055.   Plaintiffs incorporate by reference all allegations in all previous paragraphs, as

though fully set forth here.

1056.   For the purposes of this cause of action alone, Defendants Mobile and Electric,

PricewaterhouseCoopers is not included within the definition of Retained Licensed

Professionals.

1057.   At the time of the wrongs alleged, the Defendant Founders, Top Level Promoters

and Retained Licensed Professionals were each a controlling person, partner, officer, director,

person occupying a similar status, agent or employee materially aiding in the sale of securities,

of TelexFree within the meaning of Section 410(b) of the Massachusetts Uniform Securities Act,

Massachusetts General Laws Chapter 110A.

1058.   By their respective positions of authority, the Defendant Founders and Principals,

Executive Office and Licensed Professional had the power and authority, to influence and

control, and influenced and controlled, the decision-making and activities of TelexFree and the

affiliated TelexFree entities and caused them to engage in the wrongful conduct described and in

violations of Section 410(a) of the Massachusetts Uniform Securities Act, M.G.L. c. 110A.

1059.   The Defendant Founders and Principals, Executive Office and Licensed Professional actively participated in the leadership and decision-making process of the selling entity causing the dissemination of false and misleading statements and omissions of material facts.

1060.   By their positions as controlling persons, partners and officers and directors of TelexFree, and because of the aforementioned conduct, said Defendants are liable under Section 410(b) of the Massachusetts Uniform Securities Act, Massachusetts General Laws Chapter 110A..

1061.   In addition, the Defendant Top Level Promoters and Licensed Professionals were agents who materially aided in the sales of the fraudulent securities in violation of Sections 410 (b) of the Massachusetts Uniform Securities Act, Massachusetts General Laws Chapter 110A.

1062.   Said Defendants made significant contributions toward making the sales to Plaintiffs and the Putative Class possible through their actions detailed above.

1063.   Said Defendants prepared and provided information on, and endorsed and actively promoted the opportunity regarding the securities on websites and at TelexFree events and extravaganzas.  Each of the said Defendants provided print materials, electronic materials, and made oral representations to the Putative Class

1064.   The stated Defendants are liable under 410(b) as a primary violation by TelexFree was under 410(a) because Defendants materially aided in the sale of unregistered securities, and knew, or by reasonable diligence should have known, of the primary violation.

1065.   Said Defendants are jointly and severally liable for the primary violations under Section 410(a)(2) detailed above.

1066.   Plaintiffs and the Putative Class seek the award of actual damages on behalf of the

Class.

1067.   The Putative Class has and will continue to suffer irreparable harm as a result of the Defendants' conduct that cannot adequately be redressed at law.

1068.   Unless this Court grants injunctive relief, the Putative Class will be irreparably harmed in a manner not fully compensable by money damages.

### NINTH CLAIM FOR RELIEF
### FRAUD
### (Against Operational Defendants)

1069.   Plaintiffs incorporate by reference all allegations in all previous paragraphs, as though fully set forth here.

1070.   The Operational Defendants directly, and through their agents, servants, employees and/or representatives, did intentionally or recklessly make false representations and omissions of material fact to Plaintiffs and the Putative Class with these misrepresentations being made to obtain and/or wrongfully appropriate and convert money from Plaintiffs and the Putative Class.

1071.   Said Defendants' fraudulent or reckless misrepresentations and omissions are detailed above and include, but are not limited to:

      a.    providing false and misleading information on the nature of TelexFree's business operation;

      b.    misrepresenting the financial statements;

      c.    providing false and misleading information on the value of the AdCentral package;

      d.    providing false and misleading information on the method and source from which income was derived;

e.      providing false and misleading information on the legality of TelexFree's business model;

f.      providing false and misleading information on the sustainability of the returns to Promoter;

g.      providing false and misleading information regarding the investigation in Brazil and subsequent closure of TelexFree's Brazilian operations;

h.      knowingly participating in false and deceptive information televised over the internet and other media;

i.      failing to comply with federal and state laws;

j.      employing legal and accountant counsel to mask their illegal and fraudulent activities to further and perpetuate such illegal fraudulent activities; and

k.      setting up TelexFree's computer servers in a foreign country with the intent to avoid prosecution, legal service on the benefits of United States legal process and otherwise with knowledge that TelexFree was an unlawful Pyramid Scheme.

1072.   Said Defendants knew of the fraudulent or reckless deceptive misrepresentations and omissions of material facts set forth.

1073.   Said Defendants made these intentional or reckless misrepresentations although Defendants knew that such representations were false for the purpose of inducing Plaintiffs and the Putative Class to purchase initially and to continue to purchase memberships and to recruit new members.

1074.   Such misrepresentations and omissions were done knowingly or recklessly for the additional purpose and effect of concealing the true information about the TelexFree Program, including its financial condition and operations.

1075.   Said Defendants received information reflecting the facts regarding TelexFree's business practices and exercised control over the materially misleading misstatements.

1076.   Because of their control over and/or association with the TelexFree Program, said Defendants were active and culpable participants in the fraudulent Scheme.

1077.   Said Defendants knew and recklessly disregarded the false and misleading nature of the information they caused to be disseminated to Promoters and potential Promoters.

1078.   The ongoing fraudulent Pyramid Scheme could not have been perpetrated over a substantial period without the knowledge and complicity of said Defendants.

1079.   These misrepresentations and statements were material and were relied upon by Plaintiffs as true, inducing them to furnish money, directly or indirectly, to said Defendants and recruit new members.

1080.   In consequence of the reliance on the negligent, intentional or reckless misrepresentations, Plaintiffs and the Putative Class have paid artificially inflated prices for worthless membership interests, suffered great financial losses, and have also incurred considerable expenses and loss of income, and have otherwise been greatly damaged during the Class Period and demand to be made whole.

## TENTH CLAIM FOR RELIEF
### TORTIOUS AIDING AND ABETTING
### (Against All Defendants)

1081.   Plaintiffs incorporate by reference all allegations in all previous paragraphs, as though fully set forth here.

1082.   Each Defendant provided substantial assistance or encouragement to the other

Defendants in committing the primary causes of action alleged herein, and did so with unlawful intent and knowledge that such parties were perpetuating an illegal Pyramid Scheme yet continuing to substantially assist or encourage.

1083.   Defendants rendered this substantial assistance despite their knowledge that TelexFree's operations constituted an unlawful, unfair, deceptive and unsustainable Pyramid Scheme and financial fraud.

1084.   Such substantial assistance rendered by Defendants despite their knowledge of, or with reasonable diligence they should have known of, the illegal nature of TelexFree's operations, is detailed above and includes, but is not limited to:

a.      managing and controlling TelexFree and its affiliated entities;

b.      providing accounting services to TelexFree;

c.      providing legal services to TelexFree;

d.      publicly certifying that TelexFree's business model and operations were legal, proper, and economically viable and sustainable;

e.      providing banking, investment and asset management services for TelexFree and its management;

f.      promoting TelexFree AdCentral packages;

g.      continuing to provide financial services following the Brazilian Court's injunction to stop TelexFree's business in Brazil;

h.      processing payments to, from, and on behalf of TelexFree and its affiliated entities;

i.      processing payments for transfers of funds which deepened TelexFree's insolvency; and

     j.       setting up TelexFree's computer servers in a foreign country with the intent to avoid prosecution, legal service on the benefits of United States legal process and otherwise with knowledge that TelexFree was an unlawful Pyramid Scheme.

1085.   By each Defendant's actions participating in the Pyramid Scheme, as alleged above, each said Defendant aided and abetted the commission of the causes of action alleged herein.

1086.   As a direct and proximate result of TelexFree's illegal Pyramid Scheme and all the activities performed in connection therewith, to which Defendants provided substantial assistance, Plaintiffs and the Putative Class sustained damages and losses and demand to be made whole.

## VI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, pray for judgment against Defendants as follows:

1.      The Court determine that this action be maintained as a class action under Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiffs as Class Representatives and their counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class;

2.      The unlawful conduct alleged herein be adjudged and decreed an unlawful Pyramid Scheme in violation of Massachusetts General Laws Chapter 93, § 69 and Chapter 93A, §§ 2 and 11;

3.      Plaintiffs and the members of the Class recover damages, as provided by law, to the maximum extent allowed under the law, including, without limitations, multiple damages,

against the Defendants;

4.      Plaintiffs and the members of the Class recover their costs of suit, including

reasonable attorneys' fees, as provided by law;

5.      Defendants, their affiliates, successors, transferees, assignees and other officers,

directors, partners, agents and employees thereof, and all other persons acting or claiming to act

on their behalf or in concert with them, be permanently enjoined and restrained from in any

manner continuing, maintaining, or renewing the conduct alleged herein, or from entering into,

adopting, or following any practice, plan, program, or device having a similar purpose or effect;

6.      Plaintiffs and the members of the Class be awarded pre- and post-judgment

interest as provided by law, and that such interest be awarded at the highest legal rate from and

after the date of service of this Complaint;

8.      Plaintiffs and the members of the Class be granted such other and further relief as

the case may require and the Court may deem just and proper.

## VII.    DEMAND FOR JURY TRIAL

Plaintiffs and the Putative Class demand a jury trial of their claims to the extent

authorized by law.

Respectfully submitted,

Dated this 31st day of March, 2015

*/s/ Robert J. Bonsignore*
Robert J. Bonsignore, Esq.
(NH Bar #21241)
BONSIGNORE TRIAL LAWYERS, PLLC
2513 Morocco Avenue
North Las Vegas, NV 89031
Telephone:  781-856-7650
Email:  rbonsignore@classactions.us

Ronald A. Dardeno, Esq.
(BBO No. 548278)
Alexander D. Wall, Esq.
(BBO No. 688881)
Law Offices of Frank N. Dardeno
424 Broadway
Somerville, MA  02145
Telephone:  617-666-2600
Email: rdardeno@dardeno.com

William R. Baldiga, Esq.
(MA Bar No. 542125)
(NY Bar No. 4813846)
Kiersten Taylor, Esq.
(MA Bar No. 681906)
BrownRudnick LLP
One Financial Center
Boston, MA  02110
Telephone:  617-856-8586
Email:  wbaldiga@brownrudnick.com
Email:  ktaylor@brownrudnick.com

Evans J. Carter, Esq.
(MA Bar No. 076560)
Evans J. Carter, P.C.
860 Worcester Road, 2nd Floor
P.O. Box 812
Framingham, MA  01701
Telephone:  508-875-1669
Email:  ejcatty1@verizon.net

D. Michael Noonan, Esq.
 (MA Bar No. 558247)
(NH Bar No. 8214)
(VT Bar No. 4050)
(ME Bar No. 7240)
Christine M. Craig, Esq.
(MA Bar No. 631211)
(NH Bar No. 12842)
(ME Bar No. 8954)
Courtney Hart, Esq.
(ME Bar No. 4127)
Shaheen and Gordon
140 Washington Street
P.O. Box 977
Dover, NH  03821
Telephone:  603-871-4144
Email: mnoonan@shaheengordon.com
Email: ccraig@shaheengordon.com
Email:  cmhart@shaheengordon.com

R. Alexander Saveri, Esq.
(CA Bar No. 173102)
Cadio Zirpoli, Esq.
(CA Bar No. 179108)
Carl N. Hammarskjold, Esq.
(CA Bar No. 280961)
Saveri & Saveri, Inc.
706 Sansome Street
San Francisco, CA  94111
Telephone:  415-217-6810
Email:  rick@saveri.com
Email:  cadio@saveri.com
Email:  carl@saveri.com
Ronald P. Passatempo, Esq.
(MA Bar No. 632508)
Ronald P. Passatempo Law Offices
200 Broadway
Lynnfield, MA  01940
Telephone: 781-596-3100
Email: passatempolaw@comcast.net

D. Scott Dulea, Esq.
(MA Bar No. 670416)
Goldberg & Dullea
5 Briscoe Street
Beverly, MA  01915
Telephone:  978-922-4025
Email:  scott@goldberganddulles.com

Jan R. Schlichtmann, Esq.
(MA Bar No. 445900)
Jan R. Schlichtmann, Attorney at Law, PC
P.O. Box 233
Prides Crossing, MA  01965
Telephone:  978-927-1037
Email:  jan@schlichtmannlaw.com

Randall Renick, Esq.
Hadsell Stormer Richardson & Renick, LLP
128 N. Fair Oaks Avenue, Suite 204
Pasadena, CA  91103
Telephone:  626-381-9261
Email:  rrr@hadsellstormer.com

Adriana Contartese, Esq.
(FL Bar No. 89634)
Law Offices of Adriana Contartese
OCN Document Prep Suite 926
19W Flagler Street
Miami, FL  33130
Telephone: 617-268-3557
Email: adriana911@juno.com

Ihuoma Igboanugo, Esq.
(NC Bar No. 46618)
The Crescent Law Practice
183 Wind Chime Court, Suite 100
Raleigh, NC  27615
Telephone: 919-341-9707
Email: ihuoma2007@yahoo.com

Ryan Fowler, Esq.
(TX Bar No. 24058357)
2 Flat Creek Place
Spring, Texas 77381
Telephone: 903-738-8100
Email:  Jamesryanfowler@gmail.com

Mark A. Tate, Esq.
(GA Bar No. 698820)
Tate Law Group, LLC
2 East Bryan Street, Suite 600
P.O. Box 9060
Savannah, GA  31412
Telephone:  912-234-3030
Email: marktate@tatelawgroup.com

Stephen M. Smith, Esq.
(NY Bar No. 277784)
(VA Bar No. 14362)
(NY Bar No. 277784)
(DC Bar No. 230995)
Brain Injury Law Center
2100 Kecoughtan Road
Hampton, VA  23661
Telephone:  877-840-3431
Email:  ssmith@braininjurylawcenter.com

Lisa Sleboda, Esq.
(PA No. 71580)
Ernesto Ganaden
(HI Bar No. 8948)
Bonsignore Trial Lawyers, PLLC
193 Plummer Hill Road
Belmont, NH  03220
Telephone:  781-856-7650
Email:  lsleboda@class-actions.us
Email:  sganadan@class-actions.us

Kevin Barry, Esq.
(BBO #690595)
Bonsignore Trial Lawyers, PLLC
23 Forest Street
Medford, MA  02155
Telephone:  781-350-0000
Email:  kbarry@class-actions.us