# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

In re:                      )   Case No.  4:14-md-02566-TSH
                         )
TELEXFREE SECURITIES LITIGATION    )
                         )
This Document Relates To:         )
All Actions                   )
                         )

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO THE MOVING DEFENDANTS'
MOTIONS TO DISMISS:  SUBSTANTIVE ISSUES**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ vii

PRELIMINARY STATEMENT ............................................................................. 1

STATEMENT OF ALLEGED FACTS ................................................................... 6

ARGUMENT ...................................................................................................... 7

THE COMPLAINT MEETS THE RELEVANT PLEADINGS STANDARDS UNDER
THE FEDERAL RULES OF CIVIL PROCEDURE ................................................ 7

    A.    The Applicable Rule 12(b)(6) Standards .............................................. 7

    B.    The Applicability Of Rule 9(b) ........................................................... 8

    C.    The Pleading of Group Allegations Is Entirely Appropriate ............... 12

PART ONE:  TORTIOUS AIDING AND ABETTING ........................................... 13

    I.    THE INVESTOR VICTIMS HAVE ADEQUATELY PLED
        THE FINANCIAL SERVICES PROVIDERS' AIDING AND ABETTING
        OF THE TELEXFREE SCHEME ............................................................ 14

        A.    The SCAC Alleges The Commission Of A Primary Tort Or Violation ... 14

        B.    The SCAC Alleges That Defendants Had Actual Knowledge Of The
            Wrongful Nature Of The Illegal TelexFree Pyramid Scheme ................. 18

            1.    Legal Standard ........................................................... 18

            2.    Plaintiffs Adequately Pled Defendants' Actual Knowledge
                Of The Primary Wrong .............................................. 19

            3.    Plaintiffs Pled A Basis To Infer Defendants' Actual Knowledge
                ............................................................................... 20

                i.    TelexFree Displayed All The Familiar And Standard
                    Hallmarks of a Pyramid Scheme ............................. 21

                ii.    Defendants' Compliance With Banking Regulations
                    Gave Them Knowledge Of The Illegal Nature Of
                    TelexFree ............................................................... 26

4.      The SCAC Provides Allegations Detailing Each Financial Services Provider's Involvement In The TelexFree Scheme, All Of Which Support Their Actual Knowledge of Fraud ........... 30

5.      Financial Services Provider Defendants' Arguments Lack Merit........................................................................................ 40

      i.      Defendants' Strict Formulation Of The Applicable Legal Standard Should Be Rejected ................................ 40

      ii.     Defendants' Remaining Arguments Lack Merit............... 45

C.      The SCAC Alleges Moving Defendants Substantially Assisted The Commission Of The Wrongful Scheme.................................................... 49

1.      Legal Standard ........................................................................... 49

2.      Plaintiffs Pled Substantial Assistance........................................... 51

3.      The SCAC Alleges Each Financial Services Providers' Substantial Assistance Of The TelexFree Scheme ...................... 53

4.      Financial Services Provider Defendants' Arguments Lack Merit.................................................................................... 59

II.     THE INVESTOR VICTIMS HAVE ADEQUATELY PLED THE LICENSED PROFESSIONALS' TORTIOUS AIDING AND ABETTING OF THE TELEXFREE SCHEME ................................................................... 63

A.      The SCAC Sufficiently Pleads The Attorney Defendants' Aiding And Abetting Of The TelexFree Scheme ............................................... 67

1.      The SCAC Pleads Sufficient Particularized Facts That Meet The Standard For Pleading The Attorney Defendants' Actual Knowledge Of The TelexFree Scheme........................................ 67

2.      The SCAC Pleads Sufficient Particularized Facts That Meet The Standard For Pleading The Attorney Defendants' Substantial Assistance Of The TelexFree Scheme .......................................... 69

B.      The SCAC Sufficiently Pleads The Accountant Defendants' Aiding And Abetting Of The TelexFree Scheme .................................... 74

1.   The SCAC Pleads Sufficient Particularized Facts That Meet
     The Standard For Pleading The Accountant Defendants'
     Actual Knowledge Of The TelexFree Scheme ............................ 75

3.   The SCAC Pleads Sufficient Particularized Facts That Meet
     The Standard For Pleading The Accountant Defendants'
     SubstantialAssistance Of The TelexFree Scheme ....................... 77

PART TWO:  M.G.L. CHAPTERS 93 AND 93A – DIRECT VIOLATIONS AND
AIDING AND ABETTING .................................................................................. 78

I.     THE INVESTOR VICTIMS HAVE STATED A VALID CLAIM FOR
       VIOLATION OF M.G.L. CHAPTER 93 §§ 12 AND 69 AGAINST THE
       LICENSED PROFESSIONALS .............................................................. 78

II.    THE INVESTOR VICTIMS HAVE STATED A VALID CLAIM FOR
       VIOLATION OF M.G.L. CHAPTER 93A §§ 2 AND 11 AGAINST THE
       LICENSED PROFESSIONALS .............................................................. 80

       A.   Privity Is Not Required To Maintain A Chapter 93A Claim ................... 81

       B.   PwC's Conduct Rose To The Level Of Unfairness And Deceptiveness
            Required By Massachusetts Courts .......................................... 83

       C.   The Investor Victims Properly Pled Facts Demonstrating Causation
            And Damages ................................................................... 84

       D.   Defendant Attorneys Nehra And Waak May Incur Chapter 93A
            Liability To A Non-Client ..................................................... 85

III.   THE INVESTOR VICTIMS HAVE ADEQUATELY PLED THE MOVING
       DEFENDANTS' AIDING AND ABETTING OF THE VIOLATIONS OF
       MASSACHUSETTS STATUTORY LAW .............................................. 86

       A.   The SCAC Properly Asserts A Claim For Aiding and Abetting a
            Statutory Violation By The Moving Defendants ..................................... 86

       B.   The SCAC Properly Pleads A Claim For Aiding And Abetting
            Statutory Violation Against The Moving Defendants .............................. 89

PART THREE:  ADDITIONAL LICENSED PROFESSIONAL COUNTS ............................. 92

I.     THE INVESTOR VICTIMS HAVE SUFFICIENTLY PLED
       NEGLIGENCE CLAIMS AGAINST THE ATTORNEY DEFENDANTS ........ 92

       A.   The Investor Victims Plead Sufficient Facts To Support A Duty

|  | Based Upon An Implied Attorney-Client Relationship | 95 |
| B. | The Investor Victims Plead Sufficient Facts To Support A Duty Based Upon Foreseeable Reliance | 98 |

II. THE INVESTOR VICTIMS HAVE STATED A VALID CLAIM  FOR PROFESSIONAL NEGLIGENCE AND NEGLIGENT REPRESENTATION AGAINST THE MOVING ACCOUNTANT DEFENDANTS ....................................................................................... 106

A. The Investor Victims Have Stated A Claim For Professional Negligence Against The Moving Accountant Defendant ...................... 107

     1. The SCAC Sets Forth Sufficient Facts To Establish That PwC Had A Duty Of Care To Investors ............................. 108

     2. The SCAC Sets Forth Sufficient Facts To Establish That PwC Breached Its Duty To Investors ................................. 111

     3. The Investor Victims Have Alleged Sufficient Facts To Plead That PwC's Breach Caused Them Harm ......................... 115

         a. The SCAC Alleges That The Investor Victims Suffered Harm Caused By PwC's Advice And Guidance Which Resulted In The Issuance Of Unlawful Form 1099s .................................................... 115

         b. The Complaint Alleges That The Investor Victims Suffered Harm As A Result Of PwC's Actions During The SOC Investigation And Provision Of Other Services ........................................................................ 116

B. The Investor Victims Have Pled Sufficient Facts To Support Their Negligent Misrepresentation Claim ....................................................... 117

     1. The Investor Victims Have Pled Sufficient Facts That PwC Made The Requisite Representations or Statements .......... 117

     2. The Investor Victims Have Sufficiently Alleged That The Investor Victims Relied Upon PwC's Actions And Representations To The Detriment ........................................... 119

     3. Investor Victims Have Alleged Sufficient Facts To Support Duty And Breach Of Duty For Negligent Misrepresentation ..... 121

III. THE INVESTOR VICTIMS HAVE STATED A VALID CLAIM FOR VIOLATION OF M.G.L. CHAPTER 110, § 410(b) AGAINST THE

ATTORNEY DEFENDANTS.........................................................................121

    A.    General Standard Of Liability...............................................122

    B.    The Allegations Against Nehra And Waak Satisfy Multiple
          Categories Of Persons Liable Under § 410(b)........................124

IV.   THE INVESTOR VICTIMS HAVE STATED VALID FRAUD CLAIMS
     AGAINST THE LICENSED PROFESSIONALS ............................129

    A.    The SCAC Sets Forth The Licensed Professionals' False
          Representations Of Material Fact To The Investor Victims...................130

    B.    The SCAC Alleges That The Licensed Professionals Had Actual
          Knowledge That Their Representations Were False, And That Such
          Representations Were Made With The Intent to Deceive The Investor
          Victims And Induce Their Investments ................................132

    C.    The SCAC Alleges That The Investor Victims Materially Relied Upon
          The Licensed Professionals' False Representations And Suffered
          Harm As A Result...................................................................135

PART FOUR: REMAINING COMMON COUNTS ............................................136

I.    THE INVESTOR VICTIMS HAVE ADEQUATELY PLED UNJUST
     ENRICHMENT ............................................................................136

    A.    Unjust Enrichment Remedy Requires Disgorgement Of Benefit
          Conferred ...............................................................................136

    B.    Plaintiffs Have Alleged Sufficient Facts To Sustain An Unjust
          Enrichment Claim ...................................................................138

          1.    The SCAC Adequately Pleads That The Investor Victims
               Conferred A Benefit Upon The Moving Defendants.................139

          2.    The SCAC Adequately Pleads The Unjustified Nature Of
               Defendants' Retention Of The Benefits In Light Of Their
               Appreciation Of The Benefit ......................................142

          3.    The Fact That Defendants Rendered Services Does Not
               Vitiate Unjust Enrichment .........................................144

          4.    Unjust Enrichment May Be Pled With Other Causes Of
               Action........................................................................146

II. THE INVESTOR VICTIMS HAVE STATED A VALID CLAIM FOR
CONSPIRACY AGAINST CERTAIN FINANCIAL SERVICES
PROVIDERS AND THE LICENSED PROFESSIONALS ..............................147

    A. Plaintiffs Have Sufficiently Alleged That The Defendants' Engaged
In A "Common Plan" To Defraud TelexFree's Investors ......................150

    B. Plaintiffs Have Pled Facts Sufficient To Allege That the Conspiracy
Defendants Committed Acts in Furtherance Of The Scheme.................154

    C. Even if Rule 9(b) Applies, Plaintiffs Have Met the Heightened
Pleading Requirements Thereto ...............................................................157

PART FIVE: ASSOCIATED INDIVIDUAL DEFENDANT CLAIMS...................................159

I. THE ASSOCIATED INDIVIDUAL DEFENDANTS HAVE FAILED TO
TO IDENTIFY ANY SUBSTANTIVE GROUNDS THAT PERMIT THE
PRE-DISCOVERY DISMISSAL OF ANY CAUSE OF ACTION IN THE
SCAC .......................................................................................................159

II. WANZELER'S PURPORTED "JOINDER" IS IMPERMISSIBLE .................164

PART SIX: LEAVE TO REPLEAD IS THE PROPER ALTERNATIVE TO
DISMISSAL WITH PREJUDICE .........................................................................163

CONCLUSION....................................................................................................................170

CERTIFICATE OF SERVICE .............................................................................................172

## TABLE OF AUTHORITIES

*A.G. ex rel. Maddox v. Elsevier, Inc.*
732 F.3d 77 (1st Cir 2013)........................................................................................143

*Accousti v. Wolas*
No. 95-CV-5267 (JG), 1996 WL 1088218 (E.D.N.Y. Oct. 10, 1996).........................................17

*Advanced Micro Devices, Inc. v. Feldstein*
951 F. Supp. 2d 212  (D. Mass. 2013) .......................................................................7

*Aetna Cas. Sur. Co. v. P & B Autobody*
43 F.3d 1564 (1st Cir. 1994)....................................................................148, 154, 156

*Aetna Casualty and Surety Co. v. Leahey Constr. Co.*
219 F.3d 519 (6th Cir. 2000)   ........................................20, 25, 45, 49, 50, 60, 62, 66

*Akamai Techs., Inc. v. Deutsche Bank AG*
754 F. Supp. 2d 263 (D. Mass. 2011) .......................................................................122

*Alan Corp. v. International Surplus Lines, Inc. Co.*
823 F. Supp. 33 (D. Mass. 1993) ...............................................................................81

*Aldridge v. A.T. Cross Corp.*
284 F3d 72 (1st Cir. 2002)........................................................................................129

*American Bank of St. Paul v. TD Bank, N.A.*
713 F.3d 455 (8th Cir. 2013) .....................................................................................60

*Anderson v. Francis I. Dupont & Co.*
291 F. Supp. 705 (1968) ....................................................................................19, 41

*Applera Corp. v. Michigan Diagnostics, LLC*
594 F. Supp. 2d 150 (D. Mass. 2009) .......................................................................168

*Arreola v. Bank of Am. Nat'l Ass'n*
No. CV 11-06237 DDP(PLAx), 2012 WL 4757904
(D.C. Cal. Oct. 5, 2012)....................................................................................45, 46

*Ashcroft v. Iqbal*
556 U.S. 662 (2009) ..............................................................................8, 14, 130, 160

*Askenazy v. KPMG LLP*
988 N.E.2d 463 (Mass. App. Ct. 2013) ......................................................................63

*Austin v. Bradley, Barry & Tarlow, P.C.*
836 F. Supp. 36 (D. Mass. 1993) ......................................................................72, 99

*Balance Return Fund Ltd v. Royal Bank of Canada*
921 N.Y.S.2d 38 (N.Y. App. Div. 2011) ............................................................25, 40

*Bamberg v. SG Cowen*
236 F. Supp. 2d 79 (D. Mass. 2002) ...............................................9, 49, 66, 78, 119

*Bank of Am., N.A. v. Prestige Imports, Inc.*
84 Mass. App. Ct. 1106 (2013)........................................................................25, 27

*Bank of Montreal v. Avalon Cap. Group, Inc.*
Civil No. 10-591 (MJD/AJB), 2012 WL 1110691 (D.
Minn. Apr. 3, 2012) ..............................................................................................49

*Barrett v. H & R Block, Inc.*
652 F. Supp. 2d 104 (D. Mass. 2009) .....................................................................147

*Bartle v. Berry*
953 N.E.2d 243 (Mass. App. Ct. 2011) ...................................................................156

*Bell Atl. Corp. v. Twombly*
550 U.S. 544 (2007) ................................................7, 8, 14, 47, 84, 130, 160

*Benson v. JPMorgan Chase Bank, N.A.*
2010 WL 1526394 ...........................................................19, 20, 50, 51, 54, 59

*Berman v. Morgan Keegan & Co.*
455 Fed. App'x 92 (2d Cir. 2012)............................................................................42

*Bielski v. Cabletron Sys., Inc.*
311 F. 3d 11 (1st Cir. 2002)...................................................................................122

*Bingo Innovative Software, LLC v. Cahill*
No. SUCV2010-02743-A, 2011 WL 2652170 (Mass. Super. Ct.
June 9, 2011)...............................................................................151, 152, 154

*Blanco v. United Comb and Novelty Corp.*
No. 12-10829-TSH, 2013 WL 5755482 (D. Mass. Oct. 22, 2013 ...................21, 26, 87

*Blocker v. Wells Fargo Bank*
No. CV 08-1196-PK, 2010 WL 6403721 (D. Ore. Nov. 23, 2010 ...............................61

*Blu Homes, Inc. v. Kaufmann*
No. Civ. A. 10-11418-DJC, 2011 WL 3290362 (D. Mass. July 29, 2011) ..................169

*Bond Leather Co., Inc., v. G.T. Shoe Mfg. Co., Inc.*
764 F. 2d 928 (1st Cir. 1985) ................................................................34

*Bowers v. Baystate Techs., Inc.*
101 F. Supp. 2d 53 (D. Mass. 2000) ........................................................81

*Briggs v. Carol Cars, Inc.*
553 N.E.2d 930 (Mass. 1990) ................................................................83

*Brockton Sav. Bank v. Peat, Marwick, Mitchell & Co.*
577 F. Supp. 1281 (D. Mass. 1983) .......................................................119

*Brooks v. Bank of Boulder*
891 F. Supp. 1469 (D. Colo. 1995) ........................................................143

*Bruhl v. Price Waterhouse Coopers Int'l*, No. 03-23044-CIV,
2008 WL 899250 (S.D. Fla. Mar. 31, 2008) ............................................50

*Cahaly v. Benistar Prop. Exch. Trust Co., Inc.*
885 N.E.2d 800 (Mass. 2008) ..........................................................21, 40

*Cambridge Place Inv. Mgmt. v. Morgan Stanley & Co.*
Nos. 10-2741-BLS1, 11-4605-BLS1, 2012 WL 5351233 (Mass. Super. Ct.
Sept. 28, 2012) ................................................................................123

*Camp v. Dema*
948 F.2d 455 (8th Cir. 1991) ....................................................20, 21, 65

*Carpenters Health & Welfare Fund v. Coca-Cola Co.*
No. 1:00-cv-2338-WBH, 2008 WL 9358563 (N.D. Ga. Apr. 23, 2008) ..........49

*Casco Standards v. Verichem Labs, Inc.*
752 F. Supp. 66 (1989) ........................................................................48

*Cavadi v. DeYeso*
941 N.E.2d 23 (Mass. 2011) ..........................................................143, 144

*Chang v. Winklevoss*
No. 09-5397-BLS1, 2011 WL 1758963 (Mass.
Super. Ct. May 3, 2011) ......................................................................149

*Cheswell, Inc. v Westfield Const. Co., Inc.*
319 F. Supp. 2d 144 (D. Mass. 2004) ..............................................102, 103

*City of Worcester v. HCA Mgmt. Co., Inc.*
No. Civ. A. No.90-40012-GN, 1994 WL 123629
(D. Mass. Apr. 7, 1994) ........................................................................................................93, 106

*Clark v. Rowe*
701 N.E.2d 624 (Mass. 1998) ...........................................................................................107, 112

*Coggins v. Mooney*
No. CIV.A. 94-0844, 1998 WL 156998 (Mass. Super. Apr. 3, 1998).........................................85

*Collins v. Godfrey*
87 N.E.2d 838 (Mass. 1949) .....................................................................................................144

*Collins v. Rukin*
342 F. Supp. 1282 (D. Mass. 1972) .........................................................................................9, 10

*Com v. Reyes*
982 N.E. 2d 504 (Mass. 2013) .....................................................................................................79

*Commonwealth v. Adams*
624 N.E.2d 102 (1993)..................................................................................................................44

*Commonwealth v. Richards*
293 N.E.2d 854 (Mass. 1973) .......................................................................................................44

*Computer Sales Int'l, Inc. v. Lycos*
No. Civ. A.05-10017 RWZ, 2005 WL 3307507 (D. Mass. Dec. 6, 2005)..................................135

*Cooper v. Charter Communs. Entm'ts I, LLC*
760 F.3d 103 (1st Cir. 2014)......................................................................................................146

*Cordell Consultant, Inc. Money Purchase Plan & Trust v. Abbott*
561 F. App'x 882 (11th Cir. 2014) ................................................................................63, 68, 72

*County of San Bernardino v. Walsh*
158 Ca. App. 4th. 533, 69 Cal. Rptr. 3d 848 (Cal. Ct. App. 2nd Dist. Div. 6) ............................138

*Cox v. Cox*
780 N.E.2d 951 (Mass. App. Ct. 2002) .....................................................................................144

*Cromer Finance Ltd. v. Berger*
137 F. Supp. 2d 452 (S.D.N.Y. 2001) ....................................................................................13, 46

*DaRoza v. Arter*
377 N.E.2d 604 (Mass. 1993) ...............................................................................................98, 103

*Defonseca v. Sandler*
No. 020362, 2002 WL 1923885 (Mass. Super. Ct. June 25, 2002) ............................ 151, 152, 154

*DeVaux v. Am. Home Assur. Co.*
444 N.E.2d 355 (Mass. 1983) ................................................................................. 94, 95, 98

*DeVries Dairy, L.L.C. v. White Eagle Coop. Assn.*
974 N.E.2d 1194 (Ohio 2012) ......................................................................................... 45

*Diviacchi v. Affinion Grp., Inc.*
No. CIV.A. 14-10283-IT, 2015 WL 3631605 (D. Mass. Mar. 11, 2015) .................................... 146

*Doyle v. Hasbro, Inc.*
103 F.3d 186 (1st Cir. 1996) ........................................................................................... 129

*Dubai Islamic Bank v. Citibank, N.A.*
256 F. Supp. 2d 158, 157 (S.D.N.Y. 2003) ......................................................................... 19

*Eastside Carpet Mills, Inc. v. Dodd*
241 S.E.2d 466 (Ga. App. Ct. 1978) ................................................................................ 145

*Edwards & Assoc., Inc. v. Atlas-Telecom Servs-USA, Inc.*
C.A. No. 3:06-CV-0751-G, 2007 WL 30256 (N.D. Tex. Jan. 4, 2007) ............................... 67, 160

*El Camino Resources, Ltd. V. Huntington National Bank*
722 F. Supp. 2d 875 (W.D. Mich. 2010),
*aff'd* 712 F.3d 917 (6th Cir. 2013) ................................................................................. 143

*Energytec, Inc. v. Proctor*
No. CIV.A.3:06CV871-L, 2007 WL 1002138 (N.D. Tex. Mar. 31, 2007) .................................. 17

*Facciola v. Greenburg Taurig, LLP*
No. CV-10-1025-PHX-FJM, 2011 WL 2268950 (D. Ariz. June 9, 2011) ............................... 71,73

*Facciola v. Greenburg Taurig, LLP*
781 F.Supp.2d 913 (D. Ariz. 2011) ............................................................................... 40, 60

*Farrah ex rel Estate of Santana v. Gondella*
725 F. Supp. 2d 238 (D. Mass. 2010) ....................................................... 148, 150, 154, 155

*Federal Deposit Ins. Corp. v. First Interstate Bank of Des Moines, N.A.*
885 F.2d 423 (8th Cir. 1989) ......................................................................................... 20, 65

*Federal Home Loan Bank of Boston v. Ally Fin., Inc.*
Civ. Act. No. 11–10952–GAO, 2013 WL 5466631 (D. Mass. Sept. 30, 2013) ........................ 121

*Fidelity Nat'l Title Ins. Co. v. Intercounty Nat'l Title Ins. Co.*
412 F.3d 745 (7th Cir. 2005) ...................................................................................143

*First Nat'l Bank of Commerce v. Monco Agency, Inc.*
911 F.2d 1053 (5th Cir.1990) ..................................................................................108

*Fernandes v. Havkin*
731 F. Supp. 2d 103 (D. Mass. 2010) ...............................................................93, 106

*Foman v. Davis*
371 U.S. 178 (1692)...............................................................................167, 168, 169

*Frappier v. Countrywide Home Loans, Inc.*
645 F.3d 51 (1st Cir. 2011)......................................................................................144

*Freeman v. MetLife Grp., Inc.*
583 F. Supp. 2d 218 (D. Mass. 2008) ..............................................................106, 107

*Frontier Mgm. Co. v. Balboa Ins. Co.*
658 F. Supp. 987 (D. Mass. 1986) .............................................................................34

*Full Spectrum Software, Inc. v. Forte Automation Sys., Inc.*
No. 4:12-CV-40098-TSH, 2012 WL 5875601 (D. Mass. Nov. 19, 2012) ...................7

*Geverts v.TD Bank, N.A.,*
Case No. 1:14-cv-20744, 2014 WL 5493183 (S.D. Fla. Oct. 31, 2014) ....................29

*Glickman v. Brown*
486 N.E. 2d 737 (Mass. App. Ct. 1985) ...................................................................83

*Go-Best Assets, Ltd. v. Citizens Bank of Mass.*
972 N.E.2d 426 (Mass. 2012) ................................................40, 43, 59, 65, 148, 149

*Goldberg v. Unum Life Ins. Co. of Am.*
527 F. Supp. 2d 164 (D. Me. 2007) ..........................................................................48

*Gonzales v. Lloyds TSB Bank, PLC*
532 F. Supp. 2d. 1200 (C.D. Cal. 2006) ...................................................................19

*Gould v. American-Hawaiian S.S. Co.*
535 F.2d 761 (3d Cir. 1976)......................................................................................26

*Green v. Parts Distrib. Xpress, Inc.*
No. 10-11959-DJC, 2011 WL592858 (D. Mass. 2011).......................................48, 86

*Greycas, Inc. v. Proud*
826 F.2d 1560 (7th Cir. 1987) ................................................................................101

*Guerra v. Teradyne*
No. Civ.A. 01–11789–NG, 2004 WL 1467065 (D. Mass. Jan. 16, 2004) .................................. 168

*Hadley Pollett, LLC v. Yun Zhu*
No. CIV.A. 07-1488, 2009 WL 5909268 (Mass. Super. Dec. 10, 2009) .................................. 150

*Hanlon v. Rollins,*
190 N.E. 606 (Mass. 1934) ................................................................................................ 79

*Hayduk v. Lanna*
775 F.2d 441 (1st Cir. 1985) ............................................................................................ 158

*Heinrich v. Sweet*
49 F. Supp. 2d 27 (D. Mass. 1999) .................................................................................... 158

*In re Agape Litig. (Agape I)*
681 F. Supp. 2d 352 (E.D.N.Y. 2010) ................................................................................ 41

*In re Agape Litig. (Agape II)*
773 F. Supp. 2d 298 (E.D.N.Y. 2011) ................................................................... 25, 41, 42, 47

*In re Am. Cont'l Corp./Lincoln Sav. & Loan Sec. Litig.*
794 F. Supp. 1424 (D. Ariz. 1992) .................................................................................... 74

*In re Bayou Hedge Funds Inv. Litig.*
472 F. Supp. 2d 528 (S.D.N.Y. 2007) ................................................................................ 145

*In re Enron Corp. Sec., Derivative & "ERISA" Litig.*
511 F. Supp. 2d 742 (S.D. Tex. 2005) ..................................................................... 49, 55, 71

*In re First Alliance Mortgage Co. v. Lehman Commercial Paper, Inc.*
471 F.3d 977 (9th Cir. 2006) ................................................................................ 45, 50, 60

*In re Kappeler*
No. 11-18166-WCH, 2014 WL 347051 (Bankr. D. Mass. Jan. 30, 2014) .................................. 168

*In re Morgan Stanley & Van Kampen Mut. Fund Sec. Litig.*
03 Civ. 8208(RO), 2006 WL 1008138 (S.D.N.Y. Apr. 18, 2006) .............................................. 48

*In re National Century Fin Enters., Inc. Inv. Litig.*
580 F. Supp. 2d 630 (S.D. Ohio 2008) ..................................................................... 20, 49, 70

*In re Pharm. Indus. Average Wholesale Price Litig.*
478 F. Supp. 2d 164 (D. Mass. 2007) ................................................................................ 10

*In re Rough Rice Commodity Litig.*
Civ. No. 11 C 618, 2012 WL 473091 (N.D. Ill. Feb. 9, 2012) .......................................49

*In re Stone & Webster, Inc., Sec. Litig.*
414 F.3d 187 (1st Cir. 2005) .............................................................................9

*In re Storage Tech Corp. Sec. Litig.*
147 F.R.D. 232 (D. Colo. 1993) .........................................................................18

*In re WellNx Mktg. & Sales Practices Litig.*
673 F. Supp. 2d 43 (D. Mass.2009) .....................................................................9

*Ingram v. Krock*
No. 042468C, 2006 WL 416958 (Mass. Super. Ct. Jan. 26, 2006) ...................................150, 151

*Instant Image Print Shop, Inc., v. Lavigne*
1998 Mass. App. Div. 74 (1998)..........................................................................34

*International Strategies Grp. Ltd. v. Greenberg Traurig, LLP*
482 F.3d 1 (1st Cir. 2007) ......................................................................99, 103, 104, 105

*Invest Almaz v. Temple-Inland Forest Prods. Corp.*
243 F.3d 57 (1st Cir. 2001)...............................................................................43

*J.P. Morgan Chase Bank v. Winnick*
406 F. Supp. 2d 247 (S.D.N.Y. 2006) ...................................................................34

*Jackson v. Regions Bank*
No. 3:09-00908, 2010 WL 3069844 (M.D. Tenn. Aug. 4, 2010)........................................140

*Jurgens v. Abraham*
616 F. Supp. 1381 (D. Mass. 1985) ....................................................................102

*Keaton v. Hannum*
No. 1:12-CV-00641-SEB, 2013 WL 1800577 (S.D. Ind. Apr. 29, 2013) ...................................31

*Kennedy v. Josephthal & Co.*
No. 82-913-MA, 1983 WL 1314 (D. Mass. May 9, 1983)...............................................123, 124

*Kilmartin v. H.C. Wainwright & Co.*
580 F. Supp. 604 (D. Mass. 1984) ....................................................................11, 47

*Kinetic Concepts, Inc. v. Convatec Inc.*
No. 1:08CV00918, 2010 WL 1427592 (M.D.N.C. Apr. 8, 2010) ..........................................10

*Kirkland Constr. Co. v. James*
658 N.E.2d 699 (Mass. App. Ct. 1995) ............................................................ 85, 93, 94, 98-105

*Kitner v. CTW Transport*
762 N.E.2d 867 (Mass. App. Ct. 2002) ..........................................................................119

*Krause & Buffalo & Erie Cnty. Workforce Dev. Consortium, Inc.*
426 F. Supp. 2d 68 (W.D.N.Y. 2005) ............................................................................165

*Kurker v. Hill*
689 N.E.2d 833 (Mass. App. Ct. 1991) ..................................................................50, 148, 158

*Kurtenbach v. TeKippe*
260 N.W.2d 53 (Iowa 1977) .........................................................................................95

*Kyte v. Phillip Morris, Inc.*
556 N.E.2d 1025 (Mass. 1990) ................................................................................44, 45

*Landy v. D'Alessandro*
316 F. Supp. 2d 49 (D. Mass. 2004) ................................................................................7

*Landy v. Federal Deposit Insurance Corporation*
486 F.2d 139, (3d Cir. 1974)........................................................................................62

*Lass v. Bank of Am., N.A.*
695 F.3d 129 (1st Cir. 2012)........................................................................................146

*Lautenburg Found v. Madoff*
Civ. Act. No. 09-816, 2009 WL 2928913 (D.N.J. Sept. 9, 2009) ............................................60

*Lawyers Title Ins. Corp. v. United Am. Bank of Memphis*
21 F. Supp. 2d 785 (W.D. Tenn. 1998).............................................................................50

*Lerner v. Fleet Bank N.A.*
459 F.3d 273 (2d Cir. 2006)....................................................................................148, 149

*Lesti v. Wells Fargo Bank, N.A.*
960 F. Supp. 2d 1311 (M.D. Fla. 2013)............................................................................140

*Levings v. Forbes Wallace, Inc.*
396 N.E.2d 149 (Mass. App. Ct. 1979) ..............................................................................83

*Limone v. U.S.*
579 F.3d 79 (1st Cir. 2009)..........................................................................................147

*Logotheti v. Gordon*
607 N.E.2d 1015 (Mass. 1993) ........................................................................................102

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*
No. 12. Civ. 3723(RJS), 2013 WL 1294668 (S.D.N.Y. Mar. 28, 2013) ......................................48

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*
No. 13-1476-CV, 2015 WL 4492258 (2d Cir. July 24, 2015)......................................48

*Maldonado v. Dominguez*
137 F.3d 1 (1st Cir. 1998) ...................................................................................................9

*Lormand v. US Unwired, Inc.*
565 F.3d 228 (5th Cir. 2009) .............................................................................................7

*Martin v. Irwin Industrial Tool Co.*
842 F. Supp. 2d 37 (D. Mass. 2012) ..................................................................................87

*Maruho Co. v. Miles, Inc.*
13 F.3d 6 (1st Cir. 1993)...................................................................................................44

*Masingill v. EMC Corp.*
870 N.E.2d 81 (Mass. 2007) ............................................................................................129

*Mass. Eye & Ear Infirm. V. QLT Phototherapeutics, Inc.*
412 F.3d 215 (1st. Cir. 2005)...........................................................................................136

*Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.*
552 F.3d 47 (1st Cir. 2009)..............................................................................................136

*Massachusetts Laborers' Health & Welfare Fund v. Philip Morris, Inc.*
62 F. Supp. 2d 236 (D. Mass. 1999) ...............................................................................157

*Max-Planck-Gesellschaft Zur Foerderung der Wissenschaften E.V. v*
*Wolf Greenfield & Sacks, PC*
736 F. Supp. 2d 353 (D. Mass. 2010) ...............................................................................94

*McGinty v. Beranger Volkswagen, Inc.*
633 F.2d 226 (1st Cir. 1980) ..............................................................................................9

*McLane, Graf, Raulerson & Middleton, P.C. v. Grady*
Civ. Act. No. ESCV201301708A, 2014 WL 2504540 (Mass.
Super. Ct. Apr. 1, 2014)..................................................................................................146

*Mendelsohn v. Capital Underwriters, Inc.*
490 F. Supp. 1069, 1084 (N.D. Cal. 1979) ......................................................................62

*Metge v. Baehler*
762 F.2d 621 (8th Cir. 1985) ..................................................................26, 54, 62, 73

*Metro. Prop & Cas. Ins. Co. v. A.B. Physical Therapy, LLC*
Civ. Act. No. 12-11059-RGS, 2013 WL 396130 (D. Mass. Feb. 1, 2013) ...............158

*Metz v. Unizan Bank*
No. 5:05 CV 1510, 2008 WL 2017574 (N.D. Ohio May 7, 2008)........................45, 56

*Miller v. Mooney*
725 N.E. 2d 545 (Mass. 2000) .............................................................................85

*Miller v. Volk*
825 N.E.2d 579 (Mass. App. Ct. 2005) ........................................................107, 112

*Mississippi Pub. Emps. Ret. Sys. v. Boston Scientific Corp.*
523 F.3d 75 (1st Cir. 2008) ...................................................................................8

*Mongeau v. Boutelle*
407 N.E. 2d 352 (Mass. App. Ct. 1980) ................................................................81

*Morales v. Trans World Airlines, Inc.*
504 U.S. 374 (1992)...........................................................................................137

*Natale v. Espy Corp.*
2 F. Supp. 3d 93 (D. Mass. 2014) .......................................................................143

*In re National Century Fin. Enters., Inc.*
580 F. Supp. 2d 630 (6th Cir. 2012) ...............................................................20, 65

*Neilson v. Union Bank of Ca.*
290 F. Supp. 2d 1101 (C.D. Cal. 2003) ...........................................19, 26, 46, 49, 62, 70

*Nollet v. Justices of the Trial Court of Mass.*
83 F. Supp. 2d 204 (D. Mass. 2000), *aff'd*, 248 F.3d 1127 (1st Cir. 2000)..................31

*Norman v. Brown, Todd & Heyburn*
693 F. Supp. 1259 (D. Mass.1988) ...............................................................43, 66, 94

*North Am. Catholic Educ. Programming Found, Inc. v. Cardinale*
567 F.3d 8 (1st Cir. 2009) .........................................................................11, 12, 107

*North Am. Specialty Ins. Co. v. Lapalme*
258 F.3d 35 (1st Cir. 2001)................................................................................118

*Nova Assignments, Inc. v. Kunian*
928 N.E.2d 364 (Mass. App. Ct. 2010) ............................................................99, 100

*Nycal Corp. v. KPMG Peat Marwick LLP*
688 N.E.2d 1368 (Mass. 1998) ................................................. 108-110, 117, 118, 121

*Ocasio-Hernandez v. Fortuno-Burset*
640 F.3d 1 (1st Cir. 2011) ...............................................................................7, 8

*One National Bank v. Antonellis*
80 F.3d 606 (1st Cir. 1996) ........................................................................99, 105

*Operating Engs. Local 324 Health Care Plan v. G & W Constr. Co.*
783 F.2d 1045 (6th Cir. 2015) ....................................................................67, 160

*Oster v. Kirschner*
77 A.D.3d 51 (N.Y. 2010) .................................................................................72

*Page v. Frasier*
455 N.E.2d 148 (Mass. 1983) ...........................................................................99

*Pine Polly, Inc. v. Integrated Packaging Films IPF, Inc.*
Civ. Act. No. 13–11302–NMG, 2014 WL 1203106 (D. Mass. Mar. 19, 2014)..........................47

*PMP Associates, Inc. v.Globe Newspaper Co.*
321 N.E.2d 915(Mass. 1975).............................................................................83

*Perkumpulan Investor Crisis Center Dressel v. Regal Fin. Bancorp, Inc.*
781 F. Supp 1098 (W.D. Wash. 2011).....................................................................29

*Planned Parenthood League v. Blake*
631 N.E.2d 985 (Mass. 1993) ...........................................................................44

*Primavera Familienstiftung v. Askin*
173 F.R.D. 115 (S.D.N.Y. 1997) .......................................................................62

*RTR Techs., Inc. v. Helming*
815 F. Supp. 2d 411 (D. Mass. 2011) .................................................................111

*Refrigeration Discount Corp. v. Catino*
112 N.E.2d 790 (Mass. 1953) ...........................................................................34

*Reynolds v. City Express, Inc.*
No. SUCV201002655D, 2014 WL1758301 (Mass. Super. Ct. Jan. 8, 2014) ...............................88

*Richard P. Anderson, LLC v. US Bank Nat. Ass'n*
File No. 27-CV-12-14784, 2014 WL 502955 (Ct. App.
Minn. Feb. 10, 2014)......................................................................................19, 21, 41, 51, 55, 60

*Rivera v. Centro Medico de Turabo, Inc.*
575 F.3d 10 (1st Cir. 2009)...................................................................................................162

*Rogatkin v. Raleigh Am., Inc.*
69 F.Supp.3d 294 (D. Mass. 2014) .................................................................................117, 118

*Santagate v. Tower*
833 N.E.2d 171 (Mass. App. Ct. 2005) ...................................................................................136

*S.E.C. v. Berry*
580 F. Supp. 2d 911 (N.D. Cal. 2008) .....................................................................................18

*Seidel v. Public Serv. Co. of N.H.*
616 F. Supp. 1342 (D.N.H. 1985)...........................................................................................124

*Shaw v. Digital Equip. Corp.*
82 F.3d 1194 (1st Cir. 1996)....................................................................................................29

*Sheinkopf v. Stone*
927 F.2d 1259 (1st Cir. 1991)........................................................................................124, 129

*Sherter v. Ross Fialkow Capital Partners, LLP*
No. SUCV2010001888BLS1, 2013 WL 1324818 (Mass. Super.
Ct. Jan. 4, 2013) ...........................................................................................................123, 124

*Shirokov v. Dunlap, Grubb & Weaver, PLLC,*
No. CIV. A. 10-12043-GAO, 2012 WL 1065578 (D. Mass Mar. 27, 2012)...........................31, 42

*Smith v. First Union Nat'l Bank*
No. 00-4485-CIV, 2002 WL 31056104
(S.D. Fla. Aug. 23, 2002)...............................................................................21, 26, 44, 45, 65

*Soni v. Boston Med. Ctr. Corp.*
683 F. Supp. 2d 74 (D. Mass. 2009) .......................................................................................150

*Speedway Motorsports, Inc. vs. Pinnacle Bank*
727 S.E.2d 151 (Ga. App. Ct. 2012).......................................................................................145

*Spinnato v. Goldman*
No. CIV. 14-12443-PBS, 2014 WL 7236343 (D. Mass. Dec. 19, 2014) ...................................103

*Squeri v. McCarrick*
588 N.E.2d 22 (Mass. App. Ct. 1992)   ...................................................................83

*Standard Register Co. v. Bolton-Emerson, Inc.*
649 N.E.2d 791 (Mass. App. Ct. 1995)   ...............................................................81

*Stanley v. Carrier Mills-Stonefront Sch. Dist. No. 2*
459 F. Supp. 2d 766 (S.D. Ill. 2006)   ...........................................................67, 161

*Stock v. Fife*
430 N.E.2d 845 (Mass. App. Ct. 1982) ...............................................................157

*Sweeney v. DeLuca*
No. 042338, 2006 WL 936688 (Mass. Super. Ct. Mar. 16, 2006)..............................137

*Tamposi v. Denby*
74 F. Supp. 2d 51 (D. Mass. 2013) ........................................................................43

*Taylor v. Am. Chemistry Council*
576 F.3d 16 (1st Cir. 2009)..................................................................................136

*Taylor Woodrow Blitman Constr. Corp. v. Southfield Gardens Co.*
534 F. Supp. 340 (D. Mass. 1982) .................................................................44, 136

*Tingley Sys., Inc. v. CSC Consulting, Inc.*
152 F.Supp.2d 95 (D. Mass. 2001)   ...............................................................14, 63

*Townsends, Inc. v. Beaupre*
716 N.E.2d 160 (Mass. App. Ct. 1999) ..................................................................34

*U.S. Gypsum Co. v. National Gypsum Co.*
352 U.S. 457 (1957)...............................................................................................47

*United Air Lines, Inc. v. Gregory*
716 F. Supp. 2d 79 (D. Mass. 2010)   ................................................................9, 10

*United States v. Gelb*
783 F. Supp. 748  (E.D.N.Y. 1991)  ........................................................................9

*United States v. Pizarro-Berrios*
448 F.3d 1 (1st Cir. 2006)....................................................................................166

*Van Schaick v. Church of Scientology of Cal., Inc.*
535 F. Supp. 1125 (D. Mass. 1982) ..............................................................150, 157

*Vargas v. McNamara*
608 F.2d 15 (1st Cir. 1979)..................................................................................167

*Vieau v. AGFA Corp.*
No. CIV A 06-11320-RGS, 2007 WL 671086 (D. Mass. Mar. 1, 2007)....................................157

*Vieira v. First American Title Ins. Co.*
668 F.Supp.2d 282 (D. Mass. 2009) ........................................................................146

*Walck v. Am. Stock Exch., Inc.*
687 F.2d 778 (3d Cir. 1982).................................................................................26

*Wells Fargo Bank v. Arizona Laborers, Teamsters & Cement*
*Masons Local No. 395 Pension Trust Fund*
38 P.3d 12 (Ariz. 2002)...............................................................................41, 73

*Weinberg v. Mendelow*
113 A.D. 3d 485 (N.Y. App. Ct. 2014).......................................................................70

*Westlake v. Abrams*
565 F. Supp. 1330 (N.D. Ga. 1983) .........................................................................124

*Westlake v. Abrams*
504 F. Supp. 337 (N.D. Ga. 1980) .........................................................................124

*Williams v. Wells Fargo Bank, N.A.*
No. 11-21233-CIV, 2011 WL 4368980 (S.D. Fla. Sept. 19, 2011)............................................140

*Witzman v. Lehrman & Flom*
601 N.W.2d 179 (Minn. 1999).................................................................................71

*Woods v. Barnett Bank of Fort Lauderdale*
765 F.2d 1004  (11th Cir. 1985) .........................................................................21,65

*Woodward v. Metro Bank of Dallas*
522 F.2d 84 (5th Cir. 1975) ................................................................................41

*Yorke v. Taylor*
124 N.E.2d 912 (Mass. 1955) ................................................................................18

*Zayed v. Associated Bank, N.A.*
779 F.3d 727, 735 (8th Cir. 2015) ......................................................................19, 45

*Zereski v. American Postal Workers Union*
No. 97-1567, 1998 WL 1181769 (Mass. Super. Ct. Aug. 13, 1998)...........................................151

*Zond, Inc. v. Fujitsu Semiconductor Ltd.*
990 F. Supp. 2d 50 (D. Mass. 2014) ...................................................................................12, 13


Other Authorities

ABA Model Rules of Professional Conduct 4.1 ........................................................................72

Fed. R. Civ. P. 7 ......................................................................................................................165

Fed. R. Civ. P. 8 ..........................................................................................9, 13, 47, 107, 146, 147

Fed. R. Civ. P. 9 ................................. 8-12, 14, 17, 19, 29, 105, 107, 117, 121, 129, 157, 158, 160

Fed. R. Civ. P. 10 .................................................................................................................72, 165

Fed. R. Civ. P. 12 ...............................................1, 6, 7, 13, 14, 74, 85, 88, 94, 97, 105

Fed. R. Civ. P. 15 .............................................................................................................107, 167

M.G.L. Chapter. 93, § 12 ................................................................................................78, 79, 86

M.G.L. Chapter. 93, § 69 ...............................................................4, 24, 42, 64, 76, 78-80, 89-92

M.G.L. Chapter. 93A, § 2 ..................................................................................... 80-82, 84, 86, 89

M.G.L. Chapter. 93A, § 11 .................................................................................. 80-82, 84, 86, 89, 92

M.G.L. c. 110A, §410.......................................................................................................121, 122, 123

M.G.L. Chapter 151B ....................................................................................................................87

Massachusetts Uniform Commercial Code (G.L. c. 106, §§ 4A-202, 4A-212) ..........................61

2A Moore & Lucas, Moore's Federal Practice ¶ 12.14 at 12-99 (2d ed. 1989) .........................168

Mass. Prof. Con. Rule 4.1 ............................................................................................73, 100, 101

Restatement (Second) of Torts § 552...............................................................99, 100, 108, 109

Restatement (Second) of Torts § 876.........................................50, 71, 72, 87, 88, 149, 148, 156

Restatement (Third) Of Restitution & Unjust Enrichment (2011) .............................137, 138, 147

Restatement (Third) Of Restitution & Unjust Enrichment: Some Introductory

Suggestions, 68 Wash. & Lee L. Rev. 899, 901 (2011) ......................................................137, 147

S.J.C. Rule 3:07, Canon 7, DR 7-102 ...............................................................................100, 101

81 A.L.R.3d 1119................................................................................................................112

31 C.F.R. § 10.8 .................................................................................................................112

31 C.F.R. § 10.21 ...............................................................................................................112

31 C.F.R. § 10.22 ........................................................................................................112, 114

31 C.F.R. § 10.34 ........................................................................................................112-114

# PRELIMINARY STATEMENT

Putative Class Representatives Rita Dos Santos and Celio Da Silva[1] respectfully request that this Honorable Court deny the Moving Defendants'[2] Motions to Dismiss in their entirety on the grounds that the Second Consolidated and Amended Complaint ("SCAC" or "Complaint") satisfies each threshold requirement for adequate pleading at this early stage of the litigation. This is particularly true given the complexity and length of the pyramid scheme at issue, the number of parties involved, and the level of detail provided in the SCAC.

When considering the Moving Defendants' 12(b)(6) motions, this Court must presume that all the allegations of the Complaint are true and resolve all doubts or inferences in Plaintiffs' favor. The Court is also required to read the Complaint in the light most favorable to the Plaintiffs, and no material from outside the pleadings may be considered.[3] The SCAC[4] specifically sets forth each element of each cause of action and includes specific allegations relating to each Defendant's[5] actionable conduct. It also asserts Plaintiffs' economic loss in sufficient detail for this stage of the litigation. The Moving Defendants claim that the factual

---

[1] A motion to allow Celio Da Silva to withdraw from the action is pending before this Court.

[2] Nineteen Defendants named in this action have moved to have the claims against them summarily dismissed with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(6) (the "Moving Defendants"). The Moving Defendants are certain banks, payment processing companies and two of their officers (collectively, the "Financial Services Provider Defendants"), attorneys and an accounting firm (the "Licensed Professionals") and two individuals (the "Associated Individual Defendants"), all of who provided significant services and/or advice to TelexFree. *See* Attachment 1: Categorical Listing of Defendants including Moving Defendants.

[3] As otherwise set forth herein, Plaintiffs object to the Defendants' submission of outside materials and request that the Court strike them.

[4] The operative complaint is the Second Consolidated Amended Complaint in this action. *See* Doc. No. 141. Although that document is styled "Second Consolidated Amended Complaint," no court has previously carried out a Rule 12(b)(6) review of any of Plaintiffs' complaints or claims.

[5] *See* Attachment 2: Chart of Defenses and Citations to Factual Allegations in the SCAC.

detail in the SCAC is insufficient to place them on notice of the claims against them that the

content is so lacking in merit that no answer is necessary and that Plaintiffs should be forever

barred from pursuing them.  Reprieve is not to be so easily obtained.

Pyramid schemes are now at epidemic levels in the United States.[6]  SCAC ¶ 294.

TelexFree ranks among the largest and longest running pyramid schemes[7] in United States

history.[8]  It also ranks among the most notorious because it targeted the poor and other

vulnerable segments of the population, stripping them of their hard-earned dollars or life

savings.[9]  The TelexFree pyramid scheme (the "Pyramid Scheme" or "Scheme") was

extraordinary because its business model was objectively unlawful,[10] and it was operated by

known financial fraudsters,[11] yet millions of suspect transactions totaling nearly a billion dollars

were processed by the Defendant Financial Services Providers[12] who at all times maintained

robust, sophisticated and thorough due diligence systems designed to detect the suspect financial

---

[6] The Federal Trade Commission first began to take concerted action against pyramid schemes in the 1970's.  By the 1990's, the incidence of pyramid and Ponzi schemes had proliferated exponentially.

[7] Perpetrators of pyramid schemes endeavor to persuade victims to invest money into a seemingly legitimate business operation with guarantees of high returns for the investors.   The actual sales or services provided by the pyramid scheme's business, if any, are insufficient to pay the promised returns to investors.  To pay these promised returns, the structure of a pyramid scheme relies entirely on additional investment funding by new or existing investors.  Once the influx of new investments stops or slows, the pyramid scheme collapses, as there are no new funds with which to pay previous investors and support the scheme.   Pyramid schemes are extremely lucrative to those who occupy top-level positions and for those who service them.  SCAC ¶¶ 1-3, 330.

[8] SCAC ¶¶ 5, 6, 311, 330.

[9] SCAC ¶ 354.

[10] The express terms of TelexFree pre-March 9 2014 contract (the "Standard Contract") violated Massachusetts law.  SCAC ¶¶ 4, 12-18, 21-28, 119.

[11] SCAC ¶¶ 102, 111-12, 134, 139-45, 149, 373-92, 408-11.

[12] SCAC ¶ 5.

transactions at issue.[13]  The same Defendant Financial Services Providers who profited from this astonishing transactional volume strictly adhered to governmental regulations mandating the institution, maintenance, and constant monitoring of systems that detected and combated financial fraud, and otherwise had actual knowledge of the primary torts and violations.[14] TelexFree's unlawful enterprise also stands apart from other notorious and extraordinary financial frauds because it was launched in the United States only after a foreign government shut it down because it was a pyramid scheme, and enjoined it from conducting further business in Brazil.[15]

The SCAC asserts that TelexFree operated an illegal international Pyramid Scheme[16] from its Massachusetts headquarters for approximately four years.[17]  TelexFree's unlawful Pyramid Scheme was given a full-scale launch in the United States after Brazilian authorities shut down its Brazilian predecessor, Ympactus, which also openly operated under the "TelexFree" moniker.  SCAC ¶¶ 113, 141,149.  Notwithstanding the fact its predecessor Ympactus was shuttered and enjoined from conducting any further business in Brazil, TelexFree named Ympactus as a controlling party in its Standard Contract and also identified Ympactus as playing an important role in TelexFree's United States business operations.  SCAC ¶ 186.  The Defendant Financial Services Providers also knew that TelexFree and Ympactus shared the same

---

[13] Federal regulatory authorities mandated the Defendant Financial Services Providers to maintain these systems that detect the marketing strategies and other characteristics of pyramid schemes.  SCAC ¶¶ 8-10, 29-30, 284-26, 616-31, 647–48, 651-64, 667-88, 697, 720, 771, 1018-19.

[14] SCAC ¶¶8-10, 31, 609-10, 616, 618-25, 628-30, 636-39, 642-44, 651, 692,737-38, 765-66, 781-82, 800, 813, 821, 838, 853, 857, 858, 874, 887-88, 896-99, 905-06, 921, 923-25, 953-54, 961, 966, 969-70, 975, 984-85, 988-89, 1026.

[15] SCAC ¶¶ 101, 120-23, 134–36, 139-41, 691.

[16] *See, e.g.*, SCAC ¶¶ 1-3, 14-17, 22-23, 27, 119, 202, 232, 287, 311-12, 319, 323, 325, 353, 359.

[17] SCAC ¶¶ 12, 40-41, 64, 74, 79, 103-04, 118, 160, 176-77, 186, 306, 912, 1034.

unlawful business plan[18] and that TelexFree and Ympactus also shared the same executives, management, back office support, physical space and more.[19]   The SCAC also makes clear that following the Ympactus shutdown, TelexFree's illegal enterprise became an open secret among banks and payments processing companies in the United States, and the SCAC further details explicit communications among the Defendants wherein they admit the same.[20]

The SCAC advances abundant factual details that describe how the various TelexFree entities and related individuals and entities (collectively, "TelexFree"[21]) created, staffed, and operated their unlawful Pyramid Scheme in twenty-one states and internationally, and caused the substantially identical members of a putative class to similarly suffer ascertainable economic loss.   The heavily detailed factual allegations in the SCAC establish that while TelexFree held itself out as a "multi-level marketing" company in the business of selling telephone service plans that utilized "voice over internet" ("VOIP") technology, its operation was instead deliberately set up as an unlawful Pyramid Scheme.   It also describes the unlawful methods by which TelexFree's officers, insider promoters, and retained professionals persuaded class members to invest into the seemingly legitimate VOIP business.   The SCAC details why TelexFree's

---

[18] SCAC ¶¶ 107, 114, 190, 202.   In the course of their initial pre-account opening due diligence, each of the Financial Services Provider Defendants were provided with a copy of TelexFree's Standard Contract which noted TelexFree's relationship with Ympactus.   SCAC ¶ 188. Furthermore, the terms of this contract clearly and unambiguously violated the Massachusetts Anti-Pyramid Scheme Statute, Mass. Gen. Laws c. 93, § 69, in numerous instances.   SCAC ¶¶ 13-25.

[19] SCAC ¶¶ 189, 191, 195, 197-98, 200-01, 321-22, 328-29, 338, 459, 901.

[20] For example, in email communications, Defendants called TelexFree a "reputational risk," a "real hot-potato," and "an MLM with a huge amount of negative news and serious accusations," and worried "if, god forbid, TelexFree came under a publicized FTC investigation" and "no US Bank or Processor […] will accept your business" – all while continuing to service TelexFree's accounts and reaping healthy fees.   SCAC ¶¶ 602, 872, 907, 910, 915.

[21] To avoid needless duplicity, and for ease of reading, all TelexFree Defendants are jointly referred to herein as TelexFree except where a distinction is necessary.

remarkably rapid proliferation and extraordinary financial volume could not have occurred or been sustained without the substantial assistance of the other named Defendants, especially the banks and payment processors.  The SCAC also makes plain that the Licensed Professional Defendants and various individuals also directly participated in the Scheme, or were negligent in providing essential assistance that allowed the Scheme to evade regulators and lure in additional investments.

As this Court is aware, there is no question as to the commission of the primary tort or violation.  The TelexFree's bankruptcy trustee, Stephen B. Darr (the Trustee), has openly conceded that TelexFree was an unlawful pyramid scheme,[22] criminal actions have been lodged against TelexFree's principals, and there are pending investigations by, *inter alia*, the Federal Bureau of Investigation, the Department of Justice, the Massachusetts Division of Securities, the Department of Homeland Security, and the United States Attorney's Office.

Putative class representatives Rita Dos Santos and Celio Da Silva ("Plaintiffs," "Investor Victims" or "Investors") advance ten specific counts for relief in the SCAC, in whole or in part, against thirty eight (38) Defendants.  The plain language of the SCAC asserts that each of the Moving Defendants had actual knowledge[23] that TelexFree was an unlawful enterprise at the

---

[22] *See SEC v. TelexFree, Inc. et al.*, 1:14-cv-11858-NMG, Doc. No. 220 ("the Trustee admits that the individual defendants operated a Ponzi/pyramid scheme as evidenced by, among other things, the revenues from the retail sales of the VOIP were less than one (1%) percent of the amounts needed to satisfy the promises to the investors who had placed the Internet ads. Further, based upon the information available to the Trustee, it appears that the early investors were paid not from sales of the VoIP services but rather from the money received from the later investors, thus evidencing a classic Ponzi/pyramid scheme.").

[23] Actual knowledge is addressed in SCAC ¶¶ 30, 188, 196, 252, 280, 320, 328-29, 607, 615, 631-35, 640-41, 644, 694, 697, 699, 707-10, 722-25, 728, 731, 739-40, 743, 745–46, 751-53, 759, 761-62, 791-799, 801-02, 809-12, 814-15, 821-23, 832-33, 839, 841, 846, 848-49, 857, 871-73, 875-76, 882-83, 885, 887-89, 891-92, 895, 898-99, 902, 906-10, 921, 923–26, 929, 936, 957, 961, 966-70, 976-79, 985-86, 988-89, 1021, 1024-25, 1031-34, 1039-40, 1045-51, 1094-96.

time they offered it substantial assistance,[24] including essential services.  *See* Attachment 2:
Defenses and Citations to Factual Allegations in the SCAC.

Notwithstanding this thorough approach that provides each Defendant with reasonable
notice of the claims lodged against them, the Moving Defendants have requested to have those
claims summarily dismissed with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(6).
The gravamen of the Moving Defendants' requests is that Plaintiffs have failed to plead their
claims with requisite specificity and that damages were insufficiently pled.[25]  A reasonable
review of Plaintiffs' SCAC confirms that for purposes of the instant 12(b)(6) review, these
arguments are fruitless.

At issue is whether the Moving Defendants are entitled to summary dismissal prior to
Defendants producing a single shard of evidence regarding their role in sustaining and propelling
forward TelexFree's massive Pyramid Scheme.  Plaintiffs respectfully submit that they are not.
As detailed below, the allegations of Defendants' wrongdoing contained in the SCAC are solidly
rooted in the record that has so far come to light, and are thoroughly pled and well-detailed.  For
that reason, Defendants' motions should be denied.

## STATEMENT OF ALLEGED FACTS

Plaintiffs' opposition responds to thirteen Motions to Dismiss filed by nineteen
Defendants totaling almost 500 pages.  The SCAC under review was approximately 200 pages
long and consisted of approximately 1000 paragraphs.  In an effort to increase efficiencies and

---

[24] Substantial assistance is addressed in SCAC ¶¶ 33, 313, 704-06, 726, 729-31, 740-44, 754, 757-62, 779-80, 803-06, 828-30, 833-34, 840, 843-52, 859, 860, 866-69, 876-77, 879-80, 883- 84, 890, 903-04, 911-17, 921-22, 925-28, 931-35, 938-41, 943-49, 951- 52, 955, 959-60, 962-68, 971, 974-79, 981-83, 985-87, 989, 1026-34, 1036, 1046-49, 1074, 1094-96, 1098.

[25] As detailed herein, the Moving Defendants primarily support their requests by ignoring the plain language or content of the Complaint, misapplying the law or citing to incorrect standards of review or inapposite cases, and requesting this Court to accept as true contested facts.

reduce the burden on this Court, in lieu of a traditionally formatted Statement of Alleged Facts,

Plaintiffs submit a chart, attached herewith as Attachment 2, that sets out each defense raised for

failure to adequately plead as well as exemplar factual allegations asserted in the SCAC that

counter that defense.  This chart follows the order of the Claims for Relief set forth in the SCAC.

# ARGUMENT

## THE COMPLAINT MEETS THE RELEVANT PLEADING STANDARDS
## UNDER THE FEDERAL RULES OF CIVIL PROCEDURE

### A.    The Applicable Rule 12(b)(6) Standards

Motions to dismiss brought under Rule 12(b)(6) "are viewed with disfavor" by courts.

*Landy v. D'Alessandro*, 316 F. Supp. 2d 49, 75 (D. Mass. 2004); *see also Lormand v. US*

*Unwired, Inc.*, 565 F.3d 228, 232 (5th. Cir. 2009) (motions to dismiss disfavored and "rarely

granted"), *cert. denied,* 547 U.S. 1055 (2006).  "When deciding a motion to dismiss, the court is

obligated to accept all factual accounts contained within the complaint as true and draw

reasonable inferences in a plaintiff's favor."  *Full Spectrum Software, Inc. v. Forte Automation*

*Sys., Inc.*, No. 4:12-CV-40098-TSH, 2012 WL 5875601, at *1 (D. Mass. Nov. 19, 2012)

(Hillman, J.) (denying motion to dismiss); *see also Advanced Micro Devices, Inc. v. Feldstein*,

951 F. Supp. 2d 212, 215 (D. Mass. 2013) (Hillman, J.) (denying in part motion to dismiss).

Thus, "non-conclusory factual allegations in the complaint must then be treated as true, even if

seemingly incredible."  *Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 12 (1st Cir. 2011).

To state a claim, a complaint "does not need detailed factual allegations," but must

provide the plaintiff's grounds for entitlement to relief — including factual allegations that when

assumed to be true "raise a right to relief above the speculative level."  *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 555 (2007) (citation omitted).  As such, Federal Rule of Civil Procedure

12(b) bars the dismissal of a claim where plaintiffs have pled enough facts to state "a plausible

entitlement to relief." *Mississippi Pub. Emps. Ret. Sys. v. Boston Scientific Corp.*, 523 F.3d 75,

85 (1st Cir. 2008); *see also Twombly*, 550 U.S. at 570; *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009).  "Although evaluating the plausibility of a legal claim 'requires the reviewing court to

draw on its judicial experience and common sense,' *Iqbal,* 129 S. Ct. at 1950, the court may not

disregard properly pled factual allegations, 'even if it strikes a savvy judge that actual proof of

those facts is improbable.' *Twombly,* 550 U.S. at 556." *Ocasio-Hernandez*, 640 F.3d at 12.  "Nor

may a court attempt to forecast a plaintiff's likelihood of success on the merits; 'a well-pleaded

complaint may proceed even if . . . a recovery is very remote and unlikely.'" *Id.* at 12-13*,*

*quoting Twombly,* 550 U.S. at 556 (internal quotation marks omitted).  At the pleading stage,

"[a]sking for plausible grounds to infer the existence of a claim for relief . . . simply calls for

enough facts to raise a reasonable expectation that discovery will reveal evidence to prove that

claim." *Twombly*, 550 U.S. at 556.

 In their motions, the Moving Defendants argue that all of the Investor Victims' various

claims should be dismissed as inadequately pled.  They do so based upon a self-serving and

truncated interpretation of the plain language of the Complaint, which ignores or miscasts the

claims asserted or their supporting allegations, and fails to acknowledge the existence and scope

of the Pyramid Scheme of which they were a part.  When reasonably viewed in its entirety, the

Complaint pleads more than sufficient facts to state plausible claims for relief under the

*Iqbal/Twombly* standard.  Accordingly, the Moving Defendants' motions should be denied.

## B. The Applicability of Rule 9(b)

 Federal Rule of Civil Procedure Rule 9(b) requires particularity in pleading the

circumstances constituting fraud.  A claim of aiding and abetting fraud must meet Rule 9(b)'s

requirements.  *Bamberg v. SG Cowen*, 236 F. Supp. 2d 79, 91 (D. Mass. 2002).  These

requirements, however, are not as strict and onerous as Defendants advance.

Rule 9(b) should be applied with its purpose in mind.  That purpose "is to provide notice,

not to test the factual allegations of the claim."  *In re WellNx Mktg. & Sales Practices Litig.*, 673

F. Supp. 2d 43, 51 (D. Mass. 2009) (emphasizing "it is difficult to envision circumstances in

which a plaintiff could obtain information about the role a [certain] defendant . . . played in

aiding and abetting a false representation without discovery").  Accordingly, Rule 9(b) does not

completely displace the general principles of simplicity set forth in Rule 8.  *McGinty v. Beranger*

*Volkswagen, Inc.*, 633 F.2d 226, 228–29 (1st Cir. 1980), *superseded by statute on other*

*grounds,* Private Securities Litigation Reform Act of 1995, Pub. L. No. 104–67, 109 Stat. 737.

Thus, it is inappropriate to focus exclusively, as the Moving Defendants urge, on the fact that

Rule 9(b) requires particularity in pleading the circumstances of certain claims asserted in the

Complaint.  *See United States v. Gelb*, 783 F. Supp. 748, 757 (E.D.N.Y. 1991).

Rule 9(b) does not require absolute particularity or a recital of the evidence, especially

when some matters are beyond the knowledge of the pleader and can only be developed by

discovery.  *Maldonado v. Dominguez*, 137 F.3d 1, 9 (1st Cir. 1998); *see also United Air Lines,*

*Inc. v. Gregory*, 716 F. Supp. 2d 79, 85 (D. Mass. 2010) (although Rule 9(b) "mandates that the

plaintiff state the circumstances of the fraud with particularity, he need not plead all of the

evidence or facts supporting his claim"); *In re Stone & Webster, Inc., Sec. Litig.*, 414 F.3d 187,

199 (1st Cir. 2005) (plaintiff not required to "plead evidence").  Pleading the "circumstances" as

required by the Rule should not be treated as a requirement to plead facts; neither Rule 8 nor

Rule 9(b) requires fact pleading.  *See McGinty*, 633 F.2d at 228–29; *Collins v. Rukin*, 342 F.

Supp. 1282, 1292 (D. Mass. 1972); *Kinetic Concepts, Inc. v. Convatec Inc.*, No. 1:08CV00918, 2010 WL 1427592, at *10 (M.D.N.C. Apr. 8, 2010).

Moreover, strict application of the requirements of Rule 9(b) may be relaxed in some circumstances, including several present here that should be taken into account. Specifically, "an alleged scheme of fraud may involve numerous transactions that occur over a long period of time, and pleading the precise specifics with regard to every instance of fraudulent conduct may be impractical." *In re Pharm. Indus. Average Wholesale Price Litig.*, 478 F. Supp. 2d 164, 171–72 (D. Mass. 2007) (emphasizing "Rule 9(b) will be satisfied if the complaint alleges, as it does here, the basic framework, procedures, and the nature of fraudulent scheme"). As detailed herein, thirty-eight defendants so far have been implicated in a Pyramid Scheme operated for years in twenty-one states and internationally. Moreover, millions of transactions by hundreds of thousands of victims totaling an estimated billion dollars are in issue.

Strict application of the rule may also be relaxed as to matters peculiarly within the opposing party's knowledge[26] to which the pleader is not privy. *United Air Lines,* 716 F. Supp. 2d at 86 (quotation marks omitted) ("when the underlying facts are peculiarly within the defendants' control, less specificity may be required pending discovery"). Here, no discovery has taken place, and Defendants have even fought off the exchange of Initial Disclosures. Moreover, here Plaintiffs are acting in a fiduciary capacity on behalf of perhaps a million or so victims that have been duped into a fraudulent scheme. As with all pyramid schemes, success is dependent on the ability to hide the inner workings of that Scheme from its victims. The detailed

---

[26] The Moving Defendants have successfully fought hard to prevent Plaintiffs from receiving any discovery. While the SCAC contains a sufficiently adequate description, especially given the length and great many transactions of the TelexFree Pyramid Scheme, Defendants apparently demand more from Plaintiffs, including information that is on their secure servers or in other records within their exclusive possession and control.

business records of those inner workings were also seized by criminal prosecutors, and so now are generally not available to parties in civil litigation such as this proceeding.  The Investor Victims here, then, have at this early stage a very limited access to much of the factual details available as a matter of course to litigants in the more typical commercial litigation.

In addition, the heightened pleading standard does not apply to both prongs of the aiding and abetting claims equally.  With respect to the element of knowledge, the text of Rule 9(b) "provides that 'knowledge [of fraud] may be averred generally.'"  *Kilmartin v. H.C. Wainwright & Co.*, 580 F. Supp. 604, 608 (D. Mass. 1984) (quoting Fed. R. Civ. P. 9(b)) (brackets in original).  As fully described below, the Complaint directly alleges that each Moving Defendant had actual knowledge of the underlying Pyramid Scheme, which is sufficient.  Defendants ignore these allegations of actual knowledge and urge the Court to test the Complaint by other, parallel allegations of constructive knowledge, but this argument is without merit.  Where a complaint alleges actual knowledge, as the SCAC repeatedly does, "[t]he inclusion in the complaint of additional phrases such as 'should and could have known' does not render this otherwise adequate pleading insufficient."  *Id.*

Defendants do not dispute that the Investor Victims have pled the circumstances of the primary violation—the Pyramid Scheme—with particularity.  Plaintiffs have pled the Moving Defendants' actual knowledge adequately and substantial assistance with sufficient particularity under Rule 9(b), especially given the length of time the Pyramid Scheme operated, the complexity of the circumstances and the fact that the details of involvement still remain solely in the control of Defendants.  Should the Court disagree, leave to amend should be granted.  *See N. Am. Catholic Educ. Programming Found., Inc. v. Cardinale*, 567 F.3d 8, 16 (1st Cir. 2009) ("For

11

deficiencies under Rule 9(b), leave to amend is often given, at least for plausible claims."); *see also* PartVI, *infra*.

## C.     The Pleading Of Group Allegations Is Entirely Appropriate

Finally, many Moving Defendants attempt to avoid the bulk of the SCAC's allegations detailing their wrongful behavior by arguing that the common allegations pled against categorical defendants are somehow improper, and, in doing so, flout Rule 9(b)'s particularity requirements.[27]   Some Defendants fail to address those common facts at all, contending that only several paragraphs relate to them.[28]   Defendants' attempt to delegitimize or ignore the serious allegations, pled in common, of their group participation in the advancement of the Scheme should be of no avail.

Group allegations are entirely proper and sufficient to state a claim against defendants who committed acts in common.  *See Zond, Inc. v. Fujitsu Semiconductor Ltd.*, 990 F. Supp. 2d 50, 53 (D. Mass. 2014) ("At the motion to dismiss stage a complaint generally will only be dismissed where it is 'entirely implausible' or impossible for the grouped defendants to have

---

[27] Adopting the approach these Defendants demand, the SCAC would have been incredibly repetitious and easily exceeded 1000 pages, rather than slightly exceeding 200 pages.

[28] For example, Wells Fargo recites two paragraphs that name it and concludes that "[t]hese are the only facts Plaintiffs allege to support the claims" asserted against it.  *See* Doc. No. 172 (Wells Fargo Br.) at 1 (emphasis in original not included).  This calculated representation is misleading because it explicitly contradicts the SCAC.  The SCAC defines Wells Fargo as both a Financial Services Provider and a Banking Defendant.  It is included under the rubric on page 18, "3. FINANCIAL SERVICES PROVIDERS, a. The Banking Defendants."  SCAC ¶ 84.  While Wells Fargo was not specifically named in paragraph 99 as a "Financial Services Provider," the body of the SCAC plainly includes Wells Fargo within the penumbra of a Financial Services Provider.  The SCAC dedicates hundreds of paragraphs to uniform, regulated obligations and responsibilities and the other involvement of the Financial Services Providers in the TelexFree Pyramid Scheme.  SCAC ¶¶ 153, 284–571, 608, *et seq*.  Wells Fargo's casual attempt to exploit what is at best a typographical oversight in one paragraph contradicts the bulk of the SCAC.  Also, Wells Fargo's choice to limit its argument to a mere two paragraphs is telling, as is each other Moving Defendant's similar attempt to avoid the group allegations:  the depth of the conduct charged within them makes any argument that they are not on notice of the wrongful conduct they are alleged to have performed disingenuous.

acted as alleged.") (citation omitted); *Neilson v. Union Bank of Cal.*, 290 F. Supp. 2d 1101 (C.D.

Cal. 2003) (refusing to dismiss aiding and abetting allegations asserted against "Banks").

Indeed, the method adopted by the Putative Class best serves the purposes of Rule 8(a)'s plain

statement requirements, also ironically claimed as violated by some Moving Defendants.  The

SCAC's allegation of common facts against the Moving Defendants as Licensed Professionals,

Financial Services Providers and Associated Individuals has the effect that "each and every

allegation is made against each individual defendant."  *See Zond,* 990 F. Supp. 2d at 53-54.  The

fact that Defendants performing similar roles committed similar wrongful acts or were subject to

the same laws and regulations is neither surprising nor does it excuse their wrongful behavior.

Great thought was given to putting forth sufficient facts to place Defendants on notice

and to satisfy Rule 8 (a)'s plain statement requirement while not overburdening the Court with

an extremely lengthy and repetitious complaint.  The SCAC's combination of group allegations

and additional individualized allegations sufficiently detail each Moving Defendant's

participation and role in the Scheme by pleading with particularity each Defendant's wrongful

acts, knowledge and substantial assistance.  Read in conjunction, these allegations are neither

conclusory nor lack the requisite particularity to warrant pre-discovery dismissal.

## PART ONE:  TORTIOUS AIDING AND ABETTING
### (Tenth Count as against Financial Services Providers and Licensed Professionals)

Plaintiffs assert claims for tortious aiding and abetting and the aiding and abetting of

statutory violations against the Moving Defendants due to their knowing and substantial

assistance to the TelexFree Pyramid Scheme.  *See* Doc. No. 141 at 180, 194.  Defendants'[29] Rule

---

[29] Moving to dismiss Count Ten, Tortious Aiding and Abetting, are Bank of America, N.A. ("BANA"); Synovus Bank ("Synovus"); Fidelity Cooperative Bank ("Fidelity"); John F. Merrill

12(b)(6) and 9(b) motions should be denied since the SCAC's allegations satisfy the plausibility standard of *Twombly, Iqbal*, as well as Rule 9(b).

## I.

### THE INVESTOR VICTIMS HAVE ADEQUATELY PLED THE FINANCIAL SERVICES PROVIDERS' AIDING AND ABETTING OF THE TELEXFREE SCHEME

A claim for aiding and abetting is sufficiently pled where a plaintiff alleges (1) the commission of a primary tort or violation, (2) the defendant had actual knowledge of the primary wrong, and (3) the defendant substantially assisted the commission of the wrong.  *See Tingley Sys., Inc. v. CSC Consulting, Inc.*, 152 F. Supp. 2d 95, 113 (D. Mass. 2001).

A.    **The SCAC Alleges the Commission of a Primary Tort or Violation**

With respect to the first element, the SCAC's painstakingly detailed allegations establish the mechanics of the TelexFree Scheme.  *See* SCAC ¶¶ 1-3, 11- 27, 101-14, 131-32, 139-48, 153, 159-61 281-373, 393-401, 428-38, 467-78, 515-21.  In addition, this element is satisfied as to the Financial Services Providers since, other than TD Bank, none of the Financial Services Providers dispute the alleged commission of the primary tort or violation.

On the heels of the Brazilian government's shut down of its sister company, Ympactus, TelexFree ramped up its United States operation.[30]  TelexFree operated as a Pyramid Scheme in

_____

("Merrill"); Wells Fargo Bank, N.A. ("Wells Fargo"); TD Bank, N.A. ("TD Bank"); Propay, Inc. ("Propay"); International Payout Systems ("IPS"); Global Payroll Gateway, Inc. ("GPG"); Base Commerce, LLC ("Base Commerce"); John Hughes ("Hughes"); Gerald P. Nehra, Richard W. Waak, Gerald P. Nehra Attorney at Law PLLC, Richard W. Waak Attorney at Law PPLC, and Law Offices of Nehra and Waak (collectively, "Nehra and Waak"); and PricewaterhouseCoopers LLP ("PwC").  It is undecipherable if Individual Defendants Ann Genet ("Genet"); and Katia Wanzeler ("Wanzeler") move to dismiss this count.  *See* Part V, *infra*.

[30] SCAC ¶¶ 139, 396, 455.

the United States during the Class Period, 2012-2014.[31]  It purported to provide "voice-over-internet-protocol" ("VOIP") telephone services, selling a product that allowed for unlimited international calling at the flat rate of $49.90 per month.[32]  TelexFree promoters were required to pay an initial $50 membership fee.[33]  Then, the individual could purchase one of two "AdCentral" packages, priced at $289 and $1,375.[34]  The packages permitted the promoter/investor to sell VOIP products, for which the promoter earned a 90% commission.[35]  TelexFree recruited hundreds of thousands of "promoters" to sell the VOIP service by simply posting ads for the product on the Internet.[36]  By March 2014, TelexFree had attracted hundreds of thousands of promoters/investors. SCAC ¶¶ 311, 330, 689, 995.

The product was virtually unsalable.[37]  It was substandard and competed with equally available free services obtained over the internet.[38]  TelexFree would "buy back" any unsold products for $20 if the promoter posted one ad per day for seven consecutive days.  Therefore, with a $289 investment, a promoter could achieve a return of $1,040 per year ($20/week for 52 weeks) without even selling a single VOIP product.  The $1,375 investment was similarly structured, allowing a promoter a return of $5,200 per year without selling any VOIP products.[39]  The postings were meaningless, perfunctory and passive activities with no substantive value.

---

[31] SCAC ¶¶ 12, 40, 41, 64, 74, 79, 103-04, 119, 220-21, 229, 160, 176-77, 186, 202, 306, 312, 319, 912, 1034.

[32] SCAC ¶¶ 308-10.

[33] SCAC ¶ 334.

[34] SCAC ¶¶ 333, 340.

[35] SCAC ¶¶ 332-54.

[36] SCAC ¶¶ 311, 314, 316-17.

[37] SCAC ¶ 473.

[38] SCAC ¶¶ 110, 288, 308-10.

[39] SCAC ¶¶ 340-42.

Thousands of postings were repeatedly made throughout websites, and generated little activity.[40] TelexFree also compensated promoters for recruiting others promoters, thus forming a binary compensation structure.  For each $289 investment made by a new promoter, TelexFree paid the recruiting promoter $20, and for each $1,375 investment made by a new promoter, TelexFree paid the recruiting promoter $100.

During or before June 2013, TelexFree shifted its geographic target market to the United States because Brazilian authorities were prosecuting TelexFree's predecessor company Ympactus, and enjoined it from conducting its operations.[41]  Despite this shutdown, TelexFree continued to hold conferences and create YouTube videos to promote the company, with a greater emphasis in the United States.[42]  The Operational Defendants falsely represented that the VOIP was a successful and legitimate product.[43]  However, it was an open secret among the Defendants that nearly all incoming revenue was derived from new investments by members.[44] The manifold misrepresentations regarding both VOIP and the TelexFree business model duped hundreds of thousands of unsuspecting victims, who relied upon these lies in hope for a better future and more comfortable lifestyle.  These unsuspecting victims elevated the TelexFree Principals to a demigod status, and invested over one billion dollars in pursuit of an illusory promise..[45]  Virtually all of the revenue came from investment by new promoters, as sales of the VOIP service were virtually nonexistent.[46]  With this unsustainable structure, TelexFree could

---

[40] SCAC ¶¶ 18-19, 319-20, 349, 351.

[41] SCAC ¶¶ 134-35,450.

[42] SCAC ¶¶ 133,141-46, 150, 155, 159, 256, 264-65, 291, 293, 379, 391, 393, 493, 528, 650.

[43] SCAC ¶¶ 109-10, 114, 288, 309-10, 323-24, 352-55, 357-58, 393, 495-96, 695.

[44] SCAC ¶¶ 108, 155, 263, 287, 292, 305, 314, 329, 331, 350, 353-54, 746-50, 791-99.

[45] SCAC ¶¶ 5, 327, 360.

[46] SCAC ¶¶ 362-71, 746-50, 791-99.

not meet its payment obligations to existing promoters without equally large infusions of cash from new promoters.[47]  Ultimately, TelexFree collapsed, taking with it millions of dollars swindled from hundreds of thousands of victims.[48]

The allegations in the SCAC are consistent with the conclusion reached by the bankruptcy Trustee, who declared TelexFree to be an unlawful Pyramid Scheme.  *See, e.g., SEC v TelexFree, et. al.*, Case 1:14-cv-11858-NMG, Doc. No 220, filed 07/16/14 at p. 2.

Only TD Bank contends that the SCAC fails to allege  the commission of a primary tort or violation that was aided and abetted.  *See* Doc. No. 168 (TD Bank Br.) at 14-15.[49]  TD Bank criticizes the SCAC for not pleading the exact dates of the named Plaintiffs' purchases, each and every misrepresentation made to them and the Class, and by whom.  TD Banks' challenge is without merit.  The granular level of detail that TD Bank claims is required to plead a primary tort or violation is contrary to the established legal authority.  *See Accousti v. Wolas*, No. 95-CV-5267 (JG), 1996 WL 1088218, at *2 (E.D.N.Y. Oct. 10, 1996) (rejecting bank's Rule 9(b) objection that Ponzi-victim plaintiffs failed to identify specifics regarding checks and misrepresentations and stating such information could be gained through interrogatories); *cf. Energytec, Inc. v. Proctor*, No. CIV.A.3:06CV871-L, 2007 WL 1002138, at *9 (N.D. Tex. Mar. 31, 2007) (refusing to dismiss complaint even where "close call" on particularity of fraud allegations).  Plaintiffs allege that the Investor Victims were net losers who relied upon the false misrepresentations made by TelexFree and the various other Defendants regarding the Pyramid Scheme.  *See* SCAC ¶¶ 993-96, 1063, 1091.  The SCAC also alleges exemplar representations

---

[47] SCAC ¶¶ 359-72.

[48] SCAC ¶¶ 460-78.

[49] Page citations to briefs correspond to the document's original pagination, not the docketed pagination.

and dates of various misrepresentations made by its Founders, Officers, Top Level Promoters, attorneys and accountants and others.  *See* Part III, Section IV (fraud argument), *infra*.  This is adequate.

Defendant BANA relies upon *Yorke v. Taylor*, 124 N.E.2d 912, 916 (Mass. 1955) in support of its argument that the "too good to be true" nature of the AdCentral packages relieves it of liability.  Doc. No. 184 at 14.  This reliance, however, is misplaced.  In fact, the Court in *Yorke* stated that even in the face of a "representation that was either preposterous or palpably false," "[n]o rogue should enjoy his ill-gotten plunder."  124 N.E.2d at 914.  Of course, every pyramid scheme appears to the victims, in hindsight, to have been something that should have been detected earlier.  BANA further fails to account for the fact that TelexFree specifically targeted unsuspecting, unsophisticated members of immigrant communities, who were more vulnerable and unable to discern the legitimacy of the scheme, particularly in light the assurances proffered by TelexFree and its licensed professionals.  SCAC ¶¶ 324, 354, 536.

**B.    The SCAC Alleges That Defendants Had Actual Knowledge Of The Wrongful Nature Of The Illegal TelexFree Pyramid Scheme**

**1.    Legal Standard**

Under Federal Rule of Civil Procedure 9(b), even though circumstances of fraud must be pled with particularity, "knowledge [of fraud] . . . may be averred generally."  Fed. R. Civ. P. 9(b); *see* Argument, Section A-B, *supra*.

To state an aiding and abetting claim under this standard, it is sufficient to plead the assisting tortfeasor's knowledge generally and to make specific allegations regarding the circumstances concerning the primary violation, namely the TelexFree Scheme here.  *See, e.g., S.E.C. v. Berry*, 580 F. Supp. 2d 911, 920 (N.D. Cal. 2008); *In re Storage Tech Corp.  Sec. Litig.*, 147 F.R.D. 232, 235 (D. Colo. 1993).  In practice, "courts have found pleadings sufficient if they

allege generally that defendants had actual knowledge of a specific primary violation." *See*

*Neilson v. Union Bank of Cal.*, 290 F. Supp. 2d 1101, 1120 (C.D. Cal. 2003) (banks' actual

knowledge of Ponzi scheme adequately alleged even though complaint did not directly state that

primary violator was running Ponzi scheme), *citing Dubai Islamic Bank v. Citibank, N.A.*, 256 F.

Supp. 2d 158, 157 (S.D.N.Y. 2003) (holding that pleading alleging "'Citibank, through its

officers and employees, . . . actually knew of and participated in the unlawful scheme to steal

from DIB and launder the money stolen from DIB' . . . sufficiently allege[d] that Citibank had

actual knowledge").

Courts have held that general allegations asserting that a financial institution understood

the criteria of a Ponzi or pyramid scheme, and that such financial institution's particular

customer was operating such a scheme, are sufficient to plead actual knowledge if such

assertions are supported by detailed factual allegations regarding that scheme's operation and

additional allegations describing the services provided by the defendant. *See, e.g., Benson v.*

*JPMorgan Chase Bank, N.A.*, Nos. C-09-5272 EMC, C-09-5560-EMC, 2010 WL 1526394, at

*3-4 (N.D. Cal. Apr. 15, 2004); *Gonzales v. Lloyds TSB Bank, PLC*, 532 F. Supp. 2d. 1200 (C.D.

Cal. 2006) (allegation the bank knew hallmarks of Ponzi scheme and identified them in customer

account sufficient to satisfy Rule 9(b) pleading); *Richard P. Anderson, LLC v. U.S. Bank Nat'l*

*Assoc.*, File No. 27-CV-12-14784, 2014 WL 502955, at *7 (Ct. App. Minn. Feb. 10, 2014);

*Neilson v. Union Bank of Cal.*, 290 F. Supp. 2d 1101, 1120-21 (C.D. Cal. 2003); *Zayed v.*

*Associated Bank, N.A.*, 779 F.3d 727, 735 (8th Cir. 2015).

## 2. Plaintiffs Adequately Pled Defendants' Actual Knowledge Of The Primary Wrong

The SCAC expressly alleges that each Moving "Defendant knew TelexFree was an

unlawful Pyramid Scheme, but continued to participate in or aid, abet and further such illegal

19

activities."  SCAC ¶ 459.  Moving Defendants "knew that TelexFree was a Pyramid Scheme and yet actively assisted and profited thereby."  SCAC ¶¶ 301-03.  Additional allegations of the Financial Services Providers' actual knowledge appear throughout the SCAC.[50]

### 3.    Plaintiffs Pled A Basis To Infer Defendants' Actual Knowledge

In addition to the direct allegations, the SCAC also pleads sufficient facts from which the sophisticated financial service providers' actual knowledge of the TelexFree scheme reasonably can be inferred.  *See Benson*, 2010 WL 1526394, at *3-4 (actual knowledge of Ponzi scheme reasonably inferred by facts pled about financial relationship).

Circumstantial evidence that a defendant knew that the primary violator was engaging in wrongful conduct is sufficient to establish actual knowledge.[51]  *See Aetna Cas. and Surety Co. v. Leahey Constr. Co.*, 219 F.3d 519, 535 (6th Cir. 2000); *In re National Century Fin. Enters., Inc., Inv. Litig.*, 580 F. Supp. 2d 630, 634 (S.D. Ohio 2008).  The knowledge element may be satisfied even where the defendant "may not have known of all the details of the primary party's scheme." *Aetna*, 219 F.3d at 536; *see also National Fin. Enters.*, 580 F. Supp. 2d at 654.  As such, an aider and abettor's "general awareness" of a fraudulent scheme, which may be established through circumstantial evidence, is enough to plead actual knowledge.  *Federal Deposit Ins. Corp. v. First Interstate Bank of Des Moines, N.A.*, 885 F.2d 423, 430-31 (8th Cir. 1989) (bank's general awareness of its overall role in customer's scheme established through circumstantial evidence was sufficient ); *National Fin. Enters.*, 580 F. Supp. 2d at 654, *citing Camp v. Dema*, 948 F.2d

---

[50] Actual knowledge is addressed in SCAC ¶¶ 30, 159-60, 188, 196, 204, 243, 249, 252, 259-60, 277-80, 320, 328-29, 607, 615, 631-35, 640-41, 644, 694, 697, 699, 707-10, 722- 25, 728, 731, 739-40, 743, 745-46, 750-53, 759, 761-62, 791-99, 801- 02, 809-12, 814-15, 821- 23, 832- 33, 839, 841, 846, 848- 49, 857, 871-73, 875-76, 882- 83, 885, 887-89, 891-92, 895, 898-99, 902, 906-10, 921, 923-26, 929, 936, 957, 961, 966-70, 976-78, 979, 985-986, 988-89, 1021, 1024-25, 1031-34, 1039-40, 1045-51, 1094-96.

[51] *See* Attachment 3 – Listing of Red Flags.

455, 460 (8th Cir. 1991); *Smith v. First Union Nat'l Bank*, No. 00-4485-CIV, 2002 WL

31056104, at *3 (S.D. Fla. Aug. 23, 2002), *quoting Woods v. Barnett Bank of Fort Lauderdale*,

765 F.2d 1004, 1009 (11th Cir. 1985).

Courts have noted that rarely will there be direct evidence of a defendant's actual

knowledge of a pyramid or Ponzi scheme.  *See, e.g., Smith,* 2002 WL 31056104, at *3

("existence of a violation must usually be inferred") (citation omitted); *Richard P.*

*Anderson, LLC v. U.S. Bank Nat'l Assoc.*, File No. 27-CV-12-14784, 2014 WL 502955 (Ct.

App. Minn. Feb. 10, 2014) ("Given [the bank's] vigorous denials of having known of the

Ponzi scheme, it is hard to envision how knowledge might be pleaded with more

particularity than [the investors] have pleaded it."); *see also Woods v. Barnett Bank of Fort*

*Lauderdale*, 765 F.2d 1004, 1009 (11th Cir. 1985) (non-Ponzi setting).  This is particularly

true on a pre-discovery motion to dismiss.  *See Blanco v. United Comb and Novelty Corp.*,

Civ. Act. No. 13-10829-TSH, 2013 WL 5755482, at *1 (D. Mass. Oct. 22, 2013) (non-

pyramid case refusing to dismiss aiding and abetting fraud claim against company and

allowing discovery on role of corporation owner); *cf. Cahaly v. Benistar Prop. Exch. Trust*

*Co., Inc.*, 885 N.E.2d 800 (Mass. 2008) (granting investor new aiding and abetting trial

after dismissing verdict finding liability where new evidence produced to plaintiff after

start of trial revealed that investment firm's denials of knowledge were false).

### i.   TelexFree Displayed All The Familiar And Standard
### Hallmarks Of A Pyramid Scheme

TelexFree bore the "classic hallmarks of pyramid schemes, including paying participants

solely for recruitment of new members, not requiring any meaningful sales or distributive

activity by participants, and using coercive measures to prevent participant withdrawal from the

21

scheme." SCAC ¶ 25.  The SCAC alleges that TelexFree followed the typical pyramid scheme

pattern:

(1)     **the "hook"** – the above average rate of return (over 200% in the TelexFree
        postings) and purported access to inside information on a product (the VOIP
        technology), SCAC ¶¶ 287-88;

(2)      **the "credibility" factors** – the description of how the investment will earn its
        high rate of return and association with respected individuals or institutions (the
        false credentials of TelexFree's founders and principals and the vouching by the
        Licensed Professionals), SCAC ¶¶ 289-91; and the payment of initial investors,
        SCAC ¶ 292; and

(3)     **the "communicated successes"** – the regular dissemination and promotion of
        success stories (the success stories posted and extravaganzas held and publicized
        by TelexFree), SCAC ¶ 293.

As such, TelexFree displayed classic indicia of a pyramid scheme.  *See* SCAC ¶¶ 19, 25,

28, 281-93, 331-72.  The TelexFree Standard Contract, which was reiterated through TelexFree's

website, "promise[d] payments, including cash payments, 'bonuses,' 'gratuities,' 'royalties,' and

dividends, merely for the recruitment of new TelexFree members/participants."  SCAC ¶ 15.

The SCAC also describes the exponential expansion of the Scheme, another well-known

hallmark of a pyramid scheme that is impossible not to detect.  SCAC ¶ 5.

At least six banks, not named here as defendants, "turned TelexFree away before opening

an account" due to "suspicious activity and other numerous 'Red Flags' alerting them of fraud

during the same time period that the Defendant Banks transacted millions of dollars in business

with TelexFree."  SCAC ¶¶ 611-12.  Three other banks, not defendants here, terminated their

relationships with TelexFree when "its illegal and tortious operations became apparent."  SCAC

¶¶ 463, 613.  One United Kingdom-based payment processor was twice approached to perform

processing services for TelexFree, but declined to become involved "in light of the accusations

of fraud and illegality" surrounding the Scheme.  SCAC ¶¶ 932, 941-42.  This same suspicious

activity was equally evident to the Financial Services Providers named as Defendants in this lawsuit.  They, however, chose to embrace TelexFree.

Defendants' "actual knowledge of TelexFree's unlawful operation was based in part on the . . . fact that the related accounts and transactions bore the classic hallmarks of a Pyramid Scheme."  SCAC ¶ 641.

*First*, the SCAC alleges that "[p]yramid schemes follow a pattern that is well known to the sophisticated personnel and systems that support financial services providers, including the Defendant Financial Services Providers." SCAC ¶ 285.  The SCAC alleges that knowledge was further gained by the "large magnitude and long duration of the Scheme; nature and volume of the deposits; open association with others known to have been closely tied to past high profile Ponzi and pyramid schemes; [and] extensive negative news reports."  *Id.*  The SAC alleges that the TelexFree Scheme is "one of the largest, if not the largest, pyramid scheme(s) in history by number of members."  SCAC ¶ 330.

*Second*, the SCAC alleges that each of the Financial Services Providers possessed highly sophisticated personnel, devoted entire departments to detecting fraud and monitoring customer activities, and used sophisticated software with which to detect and monitor pyramid schemes. *See, e.g.,* SCAC ¶¶ 294, 328, 531, 609, 620-23, 625, 652-62, 683.  The sophisticated Financial Services Providers, keenly aware of the mechanics of pyramid schemes, identified TelexFree as an unlawful enterprise. SCAC ¶ 285.

*Third*, the SCAC alleges that TelexFree revealed enough about itself publicly to expose its illegal nature.  Its website illustrated its pyramid-like business model and the commission-based structure of the Scheme for recruitment alone.  SCAC ¶¶ 26-27.  Other Internet postings with hallmark pyramid scheme claims of easily acquired excessive wealth are identified in the

SCAC, including postings by the principals and top marketers of TelexFree (SCAC ¶¶133, 147, 150, 155), videos of extravaganzas and super weekend events (SCAC ¶¶ 141-46), and transparently false assurances about legal troubles (SCAC ¶¶ 136-38).  Financial Services Provider Defendants knew this content violated M.G.L. c. 93, § 69.  Specifically, TelexFree program details on its website were "plain evidence to the sophisticated Financial Services Defendants that TelexFree promised passive income to participants, that recruitment of new participants predominated over product sales in TelexFree's business model, and TelexFree was therefore a pyramid scheme."  SCAC ¶  28.

*Fourth*, a billion dollar enterprise was shut down in Brazil for being a pyramid scheme and immediately reopened in the United States under the same name.  The SCAC alleges that the Moving Defendants knew of the Brazilian roots of the TelexFree program and knew about the nature of the Brazilian enforcement action.  SCAC ¶¶ 120-23, 134-35; 395-96, 459.

*Fifth*, the SCAC also provides an exemplar listing of the negative press evident to  the Financial Services Providers that existed upon TelexFree's entry into the United States' market.  SCAC ¶ 116-17, 648-49.

*Sixth*, the TelexFree Standard Contract, which governed individual members' relationship with TelexFree, on its face violated multiple provisions of the Massachusetts Anti-Pyramid Scheme Statute, M.G.L. c. 93, § 69, and includes classic hallmarks of a pyramid scheme.  SCAC ¶¶ 12-24.  This Contract was made available to TelexFree's Financial Services Providers at or prior to the time each became involved with TelexFree.  SCAC ¶¶ 26, 187.

*Seventh,* even after Brazilian authorities shut it down because it was a Pyramid Scheme, Ympactus was specifically listed in TelexFree's Standard Contract as a controlling business partner.  SCAC ¶¶ 186-88.

The Financial Services Providers' actual knowledge can be inferred from all the above allegations.  *See Aetna*, 219 F.3d at 535 ("[f]or the purposes of establishing aiding and abetting liability, '[t]he requisite intent and knowledge may be shown by circumstantial evidence'") (citations omitted); *Balance Return Fund Ltd. v. Royal Bank of Canada,* 921 N.Y.S.2d 38 (N.Y. App. Div. 2011) (refusing to dismiss because knowledge could be inferred from circumstantial evidence).

Moreover, actual knowledge is imputed to the Moving Defendants to the extent they turned a blind eye to the TelexFree Scheme. SCAC ¶¶ 700, 725, 761, 802, 832, 858, 891, 924, 954, 969, 988.  Conscious avoidance is sufficient to meet the actual knowledge element of aiding and abetting.  Conscious avoidance "occurs when it can almost be said that a defendant actually knew because he or she suspected a fact and realized its probability, but refrained from confirming it in order later to be able to deny knowledge." *In re Agape Litig.* 773 F.Supp.2d 298 (E.D.N.Y. 2011), *see also Bank of Am., N.A. v. Prestige Imports, Inc.*, 84 Mass. App. Ct. 1106 (2013) (bank's deliberate closing of eyes to irregularities supports inference that bank knew of fraud).

Finally, the SCAC alleges that Moving Defendants knew that TelexFree was operating an illegal Pyramid Scheme and continued to provide substantial assistance[52] because they were motivated by substantial profits from compensation and various fees and interest, and other non-monetary benefits arising from their relationships with the MLM industry.  *See, e.g.,* SCAC ¶¶ 12, 33, 703, 719 (list of earned fees by Defendant Banks), 904 (list of the substantial assistance provided by Base Commerce reflecting total deductions made from the TelexFree

---

[52] Substantial assistance is addressed in SCAC ¶¶ 33, 313, 704-06, 726, 729-31, 740-44, 754, 757-62, 779-80, 80306, 828-30, 833-34, 840, 843-47, 848-52, 859-60, 866-69, 876-77, 879 -80, 883-84, 890, 903-04, 911-17, 921-22, 925-27, 928, 931-35, 938-41, 943-49, 951-52, 955, 959-60, 962-68, 971, 974-79, 981-83, 985-87, 989, 1026-34, 1036, 1046-49, 1074, 1094-96, 1098,

account for the months of June 2013 through January 2014).   A profit motive is not a requirement of an aiding-and-abetting claim.  *Metge v. Baehler*, 762 F.2d 621, 630 (8th Cir. 1985); *Neilson v. Union Bank of Cal., NA*, 290 F. Supp. 2d 1101, 1129 (C.D. Cal. 2003).  *Cf. Walck v. Am. Stock Exch., Inc.*, 687 F.2d 778, 791 n.18 (3d Cir. 1982).  However, "[t]he requirement of knowledge may be less strict where the alleged aider and abettor derives benefits from the wrongdoing."  *Gould v. American-Hawaiian S.S. Co.*, 535 F.2d 761, 780 (3d Cir. 1976).

### ii.   Defendants' Compliance With Banking Regulations Gave Them Knowledge Of The Illegal Nature Of TelexFree

As noted above, Moving Defendants employed sophisticated measures to monitor their customers, as they were required to act in accordance with a myriad of federal regulations.  The SCAC alleges that each of the Financial Services Providers acted as mandated, and by doing so gained actual knowledge of the unlawful Pyramid Scheme to which they provided services and substantial assistance.  *See, e.g.*, SCAC ¶¶ 328-29, 609, 620, 623, 638-39, 652-62, 683, 688.  In particular, the Financial Services Providers ("FSP") used federally-mandated sophisticated notice, investigation and evaluation procedures designed to recognize textbook fraud, which, during those processes, easily uncovered TelexFree's Pyramid Scheme.  SCAC ¶¶ 9, 29, 285, 329, 420, 616-18, 642, 647, 692.

Since those engaged in business are charged with knowledge of the laws regulating that business it is presumed that the FSPs understood and complied with their legal obligations (SCAC ¶ 634), and thus possessed all the fruits of the required investigations.  *See Blanco v. United Comb and Novelty Corp.*, Civ. Act. No. 13-10829-TSH, 2013 WL 5755482, at *6 (D. Mass. Oct. 22, 2013) (stating that inference can be made that defendants would have known of statutes regulating their business conduct); *Smith*, 2002 WL 31056104, at *3 (plaintiff's allegations of atypical activities that would have been known by bank employee as relationship

26

manager which were enumerated by expert permitted inference of knowledge even though

declaration struck as untimely); *cf. Bank of Am., N.A. v. Prestige Imports, Inc.*, 84 Mass. App. Ct.

1106 (2013) (testimony from bank manager that transaction should have been questioned or

rejected was proper basis for jury to infer knowledge by circumstantial evidence).  Financial

institutions must perform their compliance obligations; failure to do so violates federal law.

SCAC ¶¶ 608-10, 615-25, 628-31, 636, 639, 643, 651-64, 667-90, 696, 698-99, 720.[53]

Each Financial Services Provider is required to implement into its business operations

proven solutions to assure compliance with key anti-bribery and corruption regulations,

including the Bank Secrecy Act ("BSA"), Foreign Corrupt Practices Act ("FCPA"), and critical

anti-money laundering ("AML") mandates such as Know Your Customer ("KYC") and the

Customer Information Program ("CIP").  The SCAC alleges the FSPs undertook specific actions

as part of their compliance efforts, including:

- The FSPs "maintain[ed] robust, sophisticated and effective due diligence systems" for purposes of BSA and AML compliance, which included "use of highly sophisticated software programs that provided them with background information and financial details about prospective customers that are not available to the general public."  SCAC ¶¶ 616-17, 642, 692.

- As part of their KYC obligations, the FSP collected and analyzed basic identity information (referred to in U.S. regulations and practice as "Customer Identification Program" or CIP); name-matched against lists of known parties; determined their customers' risk in terms of propensity to commit money laundering, terrorist finance, or identity theft; created an expectation of a customer's transactional behavior; monitored customers' transactions against expected behavior and recorded profile and against that of the customers' peers. SCAC ¶ 623.

- Each FSP had a written CIP that was approved by its board of directors which allowed it to form a reasonable belief that it knew the true identity of each customer and described circumstances when it should not open an account, should

---

[53] Should a Financial Services Provider argue that it failed to follow mandatory regulatory law, the Investor Victims are entitled to discovery to investigate such claims.

close an account after attempts to verify a customer's identity have failed, and should file a SAR.  SCAC ¶¶ 653-55.

- Each FSP's board of directors approved a written BSA/AML compliance program for the institution.  SCAC ¶ 658.

- The FSPs investigated the top managers, directors, and principal owners of TelexFree.  SCAC ¶ 643.

- Each FSP performed a risk assessment of TelexFree upon its account openings and determined it was a high-risk customer, which invoked additional investigatory obligations.  .SCAC ¶¶ 660, 663-64, 666

- The FSPs also obtained information that TelexFree was associated with multiple individuals implicated in other pyramid or Ponzi schemes.  SCAC ¶ 403.

- During its high-risk assessment, the FSPs obtained extensive information on TelexFree, including the true identity of its management; and the true nature of its business activities, its customer base, the fact it was an MLM which triggers additional review and its product offerings.  SCAC ¶¶ 621, 633-34, 678.

- In addition, subsequent to opening the TelexFree accounts, the FSPs monitored those accounts through regular suspicious activity monitoring and enhanced customer due diligence processes and periodic risk-based monitoring of the customer relationship and had knowledge of factors characterized as red flags by the FFIEC Manual.  SCAC ¶¶ 682-84, 686-88, 697.

The SCAC also alleges that each FSP possessed a Regulatory Account Monitoring Department that was charged with researching and obtaining information on prospective and current customers.  SCAC ¶ 637.

The SCAC provides a sampling of twenty-seven  facts evidencing  TelexFree's unlawful enterprise obtained by the FSPs through their mandatory compliance.  SCAC ¶ 697.  The SCAC specifically alleges that the FSPs each possessed knowledge of these facts.  SCAC ¶¶ 634, 697.  The SCAC further alleges that the Scheme's standard operating procedures raised a numerous red flags under these banking regulations.  *See* SCAC ¶¶ 608-10, 615-16, 618-25, 628-30, 635-39, 643, 648, 651-62, 667-88, 690, 696, 698, 736.

The SCAC also details the ready availability of information on the Internet that revealed TelexFree as a Pyramid Scheme, including:

- eleven major news and watchdog websites covering the MLM industry, Ponzi schemes, and online scams [that] analyzed TelexFree in 2012, 2013 and 2014 (SCAC ¶ 645),

- five websites specifically dedicated to pyramid and Ponzi schemes and other online scams [that] conducted analysis and exposés on TelexFree in 2012, 2013, and 2014 (SCAC ¶ 646),

- TelexFree's own website, which posted information revealing hallmark pyramid scheme traits (SCAC ¶ 647), and

- basic Google searches yielding postings typical of pyramid schemes (SCAC ¶ 649).

The SCAC further alleges that the FSPs reviewed those sites in the course of performing their due diligence obligations.  SCAC ¶ 648; *see Perkumpulan Investor Crisis Center Dressel v. Regal Fin. Bancorp, Inc.*. 781 F. Supp. 1098 (W.D. Wash. 2011) (stating aiding and abetting fraud claim against bank CEO).

The SCAC alleges that the FSPs performed these actions, thereby imputing knowledge of TelexFree's Pyramid Scheme.  *See Geverts v. TD Bank, N.A.*, Case No. 1:14-cv-20744, 2014 WL 5493183, at *5 (S.D. Fla. Oct. 31, 2014) (finding plaintiff adequately pled TD Bank's actual knowledge by citing state law requiring TD Bank to report overdrafts by attorneys and alleging that TD Bank had systems in place to detect such overdrafts).  The specific actions taken by the FSPs when accepting TelexFree as a customer and during the maintenance of those accounts, and the facts uncovered thereby, establish actual knowledge under Rule 9(b).  *See Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1224 (1st Cir. 1996) (complaint "cannot be fairly characterized as resting on conclusory allegations of the defendants' knowledge [because] [t]he plaintiffs provide a series of factual allegations relating to a combination of developments known

to the company.  These factual allegations, together with other aspects of the complaint . . .

provide a basis for a reasonable inference" of knowledge).

> ### 4. The SCAC Provides Allegations Detailing Each Financial Services Provider's Involvement In The TelexFree Scheme, All Of Which Support Their Actual Knowledge Of Fraud

**BANA**

Bank of America first opened accounts in TelexFree's name in February 2012.  SCAC

¶ 734.  In its own North American Account Opening Guide, BANA specifically acknowledges

its knowledge of due diligence regulations, which require it "to be entirely satisfied with our

understanding of our clients' identities, beneficial ownership, management structures and usual

transaction flows."  SCAC ¶¶ 735-36.  BANA performed the required investigations and

complied with due diligence obligations when accepting and servicing TelexFree as a customer.

SCAC ¶¶ 737-38.

BANA and its Regulatory Account Monitoring Department knew that virtually all the

deposits into BANA accounts were for AdCentral packages (whole dollar amounts) and not sales

of VOIP products, because the amounts corresponded to the plainly stated prices of packages as

plainly stated on TelexFree's website.  SCAC ¶¶ 746-50.

BANA gave notice that it would terminate TelexFree's account based upon its illegal

activities on April 24, 2013.  Despite this notice, which clearly evidences BANA's actual

knowledge of the fraud, BANA continued to provide services until at least December 31, 2013

(SCAC ¶¶ 754-58) as evidenced by a November 2013 email and wire instructions, which are

attached to the SCAC.  SCAC ¶ 756 and Ex. 8.

BANA's contention that "no deposits to a TelexFree account at BANA are alleged *after*

May 2013" (Doc. No.184 at 1) contradicts the SCAC, which alleges that BANA "continued to

perform [banking services] until at least December 31, 2013."  *See* SCAC ¶ 739.  The SCAC

also alleges that TelexFree's wiring instructions, dated November 11, 2013, for payments from

Allied Wallet routed all deposits to a BANA account.  SCAC ¶ 756.  A document dated

November 11, 2013, establishes that Defendant Merrill, on behalf of TelexFree, directed Allied

Wallet, a Defendant payment processor, to transfer funds via international wire transfer to a

TelexFree account with Bank of America.  SCAC ¶ 755.  BANA has only raised a factual

question that cannot be resolved on a Rule 12(b)(6) motion.

Furthermore, BANA's references to extraneous evidence and reliance upon selected

documents provided with a self-serving affidavit is inappropriate at the motion to dismiss phase

and should not be considered.  *See Shirokov v. Dunlap, Grubb & Weaver, PLLC*, No. CIV.A. 10-

12043-GAO, 2012 WL 1065578, at *8 (D. Mass. Mar. 27, 2012) (cited by BANA, Doc. No. 184

at 8) ("the Court may not consider documents outside of the complaint in connection with a

motion to dismiss under Rule 12(b)(6)"), *citing Nollet v. Justices of the Trial Court of Mass.,* 83

F. Supp. 2d 204, 208 (D. Mass.2000) (Harrington, J.), *aff'd,* 248 F.3d 1127 (1st Cir. 2000).[54]

## TD Bank

TD Bank first opened accounts in TelexFree's name in September 2012, and maintained

three of its depository accounts.  SCAC ¶¶ 780, 785.  TD Bank performed the required

investigations and complied with its mandated due diligence obligations.  SCAC ¶¶ 781-82.  TD

Bank and its Regulatory Account Monitoring Department knew that virtually all the deposits in

TD Bank accounts were for AdCentral packages and not sales of VOIP products since the

---

[54] Plaintiffs object to all documents outside of the SCAC that Defendants attempt to place into the record without authority.  Plaintiffs move to strike them based upon the law cited herein. *Weiland v. AssureCare, Inc.,* No.12 C 01947, 2013 WL 4840460, at*1 (N.D. Ill. Sept 10, 2013) (where the court granted a motion to strike documents attached to a defendant's motion to dismiss, and ultimately denied the motion to dismiss); *Keaton v. Hannum,* No. 1:12-CV-00641-SEB, 2013 WL 1800577, at *1 (S.D. Ind. Apr. 29, 2013).  Should this Honorable Court wish to have related briefing and oral argument, Plaintiffs request it.

amounts corresponded with the prices of packages as plainly stated on TelexFree's website. SCAC ¶¶ 791-99.  Despite these indicia of a pyramid scheme, TD Bank failed to terminate TelexFree's accounts until at least January 2014.  SCAC ¶ 784.

TD Bank is especially attuned to illegal schemes because of its notorious historic involvement with other Ponzi schemes.  As detailed in the SCAC, TD Bank was directly involved in the Scott Rothstein Ponzi Scheme, of which it had knowledge and assisted, violated the BSA requirements for failure to file SAR's, had employees and officers who aided and abetted the Rothstein scheme, incurred civil liability for its role in the Rothstein scheme, and was investigated by the OCC for failure to follow the BSA requirements.  SCAC ¶¶ 764-78.  The SCAC's allegations that TD Bank investigated and monitored TelexFree are supported by the evidence in the Rothstein lawsuit that established that TD Bank N.A. had in place standard protocols to detect suspicious and/or illegal banking activities.  SCAC ¶¶ 771-72.

**Fidelity Bank**

Fidelity Bank opened three accounts for TelexFree, two on August 8, 2013 with initial deposits totaling $7,123,784.58 and one on September 12, 2013 with deposits of $2,951,337.12. SCAC ¶ 804.  Fidelity Bank performed the required investigations and complied with its due diligence obligations when accepting and servicing TelexFree as a customer.  SCAC ¶¶ 813-15. Fidelity serviced TelexFree's accounts for nearly five months, maintained deposit accounts in TelexFree's name holding over $10 million, and even accommodated TelexFree by providing remote deposit capture systems to make obtaining the Investor Victims' funds more convenient. SCAC ¶¶ 16-20; Ex. 10, p. 4.  Fidelity gave notice that it would terminate TelexFree's account based upon its illegal activities on December 3, 2013, but despite its actual knowledge of the

32

fraud, Fidelity continued to service TelexFree and receive the Investor Victims' funds until at least December 31, 2013.  SCAC ¶¶ 825-26.

Allegations of actual knowledge are also supported by the Secretary of the Commonwealth of Massachusetts, Securities Division ("SOC") consent decree (the "Consent Decree").  The SOC initiated an investigation of Fidelity Bank on April 30, 2014, concerning its banking relationship with TelexFree.  SCAC ¶ 816.  The SOC alleged, *inter alia*, that Fidelity Bank's account opening process in 2013 was inadequate and insufficient to handle the voluminous TelexFree deposit accounts.  SCAC ¶ 818.  The investigation resulted in the entry into the Consent Decree, dated September 22, 2014, whereby Fidelity Bank agreed to establish an escrow fund of $3.5 million for victims of the Scheme.  SCAC ¶ 817.  This Consent Decree evidences that Fidelity had due diligence systems in place.  SCAC ¶¶ 816-23, 831-32, s*ee* Exhibit 10.  It also suggests that certain employees or officers of Fidelity Bank, such as its president John Merrill, were complicit in concealing the Scheme.  SCAC ¶¶ 810-15, 821, 826-30, 832-33; *see also* SCAC ¶¶ 252, 280, 808, 834, 1045.  Indeed, a particular employee, Fidelity's compliance and BSA officer, discovered red flags and other evidence of pyramid scheme characteristics in TelexFree on November 23, 2013, of which he notified John Merrill and an outside consultant.  SCAC ¶¶ 821-23.

## John Merrill

Fidelity's president and chief operating officer, Defendant John Merrill, is the brother of one of the Founders of the TelexFree Pyramid Scheme, Defendant James Merrill.  This close familial relationship supports allegations of actual knowledge concerning both Merrill and Fidelity.  SCAC ¶¶ 807, 809.  Fidelity President John Merrill was intimately familiar with his

brother and TelexFree Co-Founder James Merrill's education, experience, prior business activities, and the Brazilian prosecution of TelexFree.  SCAC ¶¶ 252, 807, 809-10, 832.

A corporate officer is personally liable for any tortious activity in which they participate. *Instant Image Print Shop, Inc., v. Lavigne,* 1998 Mass. App. Div. 74, 76 (1998), *citing Frontier Mgt. Co. v. Balboa Ins. Co.,* 658 F. Supp. 987, 991-93 *(*D. Mass.1986).  This is true even if the tortious activity is performed while acting in a corporate capacity.  *Id.*  Personal liability attaches when a corporate officer participates in the tort by directing, controlling, approving, or ratifying the act that injured the aggrieved party.  *Townsends, Inc v. Beaupre,* 716 N.E.2d. 160 (Mass. App. Ct. 1999) *citing Refrigeration Discount Corp. v. Catino,* 112 N.E.2d. 790 (Mass. 1953). The SCAC alleges that John Merrill participated directly in this fraudulent Scheme.  SCAC ¶¶ 252, 280, 808, 810-11, 819, 822, 828-29, 833-34.  No corporate veil shields him from liability. *See Bond Leather Co., Inc., v. G.T. Shoe Mfg. Co., Inc.,* 764 F. 2d 928 (1st Cir. 1985).

Fidelity's motion seeks to introduce factual questions as to how much the brothers knew about each other's affairs and invites speculation as to whether the allegations in the SCAC or the facts set forth by Fidelity are "more likely."  Doc. No. 182 at 10.  This cannot negate inferences of actual knowledge, and only serves to create issues of fact that cannot be resolved on a Rule 12(b)(6) motion.  For example, it is not inconsistent for an employee to be complicit in a massive fraudulent scheme while at the same time expressing concern about transactions and ordering an investigation.  *See J.P. Morgan Chase Bank v. Winnick*, 406 F. Supp. 2d 247, 255-56 (S.D.N.Y. 2006).

**Synovus**

Synovus was a sponsor bank of the Defendant Payment Processing Services.  It agreed to accept TelexFree as a customer and began to act as a conduit through which to funnel money in

April 2013.  SCAC ¶¶ 835, 840.  Synovus performed the required investigations and complied

with its due diligence obligations in accepting TelexFree as a customer and servicing its

accounts.  SCAC ¶ 838.  "Due to concerns regarding public accusations that TelexFree was

running a Pyramid Scheme, and the possibility of an investigation by the Federal Trade

Commission or other federal agencies," Synovus determined in August 2013 that it would no

longer hold funds for TelexFree and instructed PPS Defendants Base and GPG to cease doing

business with TelexFree.  SCAC ¶ 842.  Nevertheless, despite the actual knowledge Synovus

possessed of the fraud, Synovus continued to process payments and make transfers for the

benefit of TelexFree until January 16, 2014.  SCAC ¶¶ 843-45.

**Wells Fargo**

Wells Fargo maintained accounts for TelexFree starting in 2013 and has since processed

transactions amounting to tens of millions of dollars.  SCAC ¶ 713.  Wells Fargo also performed

the required investigations and complied with its mandated due diligence prior to servicing

TelexFree.  SCAC ¶¶ 10, 113, 188, 328-29, 380, 609-10, 615-25, 631, 637-39, 692, 1018.

Through its mandated investigation, Wells Fargo know that TelexFree was a fraudulent

enterprise, but chose notwithstanding to provide necessary financial services which aided,

abetted and otherwise furthered TelexFree in the commission of its Pyramid Scheme.  SCAC

¶¶ 632-35, 640, 697, 701-02, 707.  Wells Fargo was an integral part of TelexFree's illegal

enterprise and in converting funds from the class members.  SCAC ¶¶ 704-06.  Wells Fargo

further received substantial compensation for servicing TelexFree in the commission of its illegal

enterprise.  SCAC ¶ 703.

**Base Commerce and John Hughes**

In April 2013, Defendants James Merrill and Carlos Wanzeler submitted an application for payment processing services to Base Commerce. SCAC ¶ 894. In the course of processing the application, Base Commerce ran a "FraudDefender" electronic search on both Merrill and Wanzeler, which revealed that Merrill and Wanzeler were moderate and moderate-high risk clients, respectively. SCAC ¶¶ 897-98. On May 22, 2013, Defendant John Hughes, President of Base Commerce, wrote that TelexFree's predecessor entity, Common Cents Communications, had "paid people residual commissions for placing ads online and the network marketing commentators accused them of being a Ponzi scheme as the commission advertised appeared unrealistically high and therefore fictitious." SCAC ¶ 899. This, of course, continued to be TelexFree's business model. SCAC ¶ 900. In the same letter, Hughes noted that TelexFree's "current primary market" was Brazil, and that they had a relationship with Ympactus, Ltd. SCAC ¶ 901. Despite this knowledge, Base Commerce took on TelexFree as a client and began processing payments, as well as performing a myriad of other services. SCAC ¶¶ 902, 910-13, 915-16, 919-22.

Following the Brazilian shutdown of TelexFree Brazil in June 2013 and mounting negative attention on TelexFree, in August 2013 Base Commerce was instructed by its sponsor bank, Synovus, to cease performing services for TelexFree by August 31, 2013. SCAC ¶ 905. In an August 28, 2013 letter to Merrill, Wanzeler, Craft, and GPG, Hughes openly acknowledged that TelexFree had been legally exposed, stating "[we] have an MLM with a huge amount of negative news and serious accusations. Hence, banks and processors are running away based on what the FTC, Treasury Dept., FDIC and Justice Dept. has done to them lately to include suing them,,[sic] fining them and freezing their settlement funds." SCAC ¶ 907. Hughes went on to

state "[n]o US Bank or Processor . . . will accept your business… you are a real hot-potato as they say."  SCAC ¶ 465.  On September 26, 2013, and again on October 10, 2013, Hughes reiterated to Merrill his concern over a possible Federal Trade Commission investigation.  SCAC ¶¶ 915, 918.  Possessing this knowledge, Base Commerce continued to provide services to TelexFree into at least January 2014.  SCAC ¶ 919.  These services even included, processing transactions despite Synovus' instructions to the contrary (SCAC ¶ 915) and helping to establish TelexFree's business off-shore (SCAC ¶¶ 910, 912).

Defendant John Hughes is liable for his personal participation in the fraud both individually and as President of Base Commerce for the same reasons, discussed above, that John Merrill is liable individually and as President of TD Bank.

**GPG**

Prior to accepting TelexFree as a customer, GPG performed its required due diligence, which revealed the illegal nature of TelexFree's enterprise.  SCAC ¶¶ 640-50, 887.  Nevertheless, on April 17, 2013, GPG entered into a payment processing services agreement with TelexFree.  SCAC ¶ 879.  In August 2013, "[d]ue to concerns regarding public accusations that TelexFree was running a Pyramid Scheme, and the possibility of an investigation by the Federal Trade Commission or other federal agencies,"  GPG was instructed to cease performing services for TelexFree by August 31, 2013.  SCAC ¶ 842.  On August 28, 2013, GPG received a follow-up email from its payment-processing partner, Base Commerce, characterizing TelexFree as an extremely high-risk client and indicating that no United States bank or processor would be willing to take on TelexFree as a client given this risk.  SCAC ¶ 882.  Furthermore, in an email of September 27, 2013 to Defendant Jay Borromie, Jayme Amirie, President of GPG, implicitly acknowledged TelexFree's illegality, stating that, although doing business with TelexFree

represented a "reputational risk" for GPG, GPG would continue to allow TelexFree to use GPG's electronic gateway to transfer electronic data to Defendant Allied Wallet for processing members' credit card payments.  SCAC ¶ 602.  Despite GPG's evident knowledge of TelexFree's illegality and Synovus' instructions to cease performing services, GPG continued to process transactions for TelexFree until at least January 2014.  SCAC ¶ 884.  This even included "sneaking" payments out of the Synovus account for TelexFree.  SCAC ¶ 885.

**Propay**

Propay accepted TelexFree as a customer and began performing processing services in or about October, 2012.  SCAC ¶ 861.  This was only after performing the required KYC investigation of TelexFree and its principals, which revealed serious red flags concerning the company.  SCAC ¶ 875.  Propay continued servicing TelexFree until at least January 16, 2014. SCAC ¶ 862.  During this time, Propay performed continued monitoring of TelexFree's account, which revealed further indicia of fraud, such as the Brazilian shut-down.  SCAC ¶ 875.  Indeed, at least as early as August 2013, Propay was communicating with Base Commerce and GPG, TelexFree's other payment processors, regarding the high risk posed by associating with TelexFree.  SCAC ¶ 871.  By Propay's own assessment, the risk posed by TelexFree was such that no other U.S.-based bank or processor would be willing to take on the company.  SCAC ¶ 871.  Nevertheless, Propay continued to process millions of dollars in transactions for TelexFree into 2014.  SCAC ¶¶ 863-69.

**IPS**

International Payment Systems, or "IPS," is well-versed in servicing Ponzi schemes and financial scams—it has been associated with such known Ponzi schemes as "Spinding," "Wealth4AllTeam," "Primus Hub," "Funky Shark," "Team Vinh International,"

"MyAdvertisingPays" (a 120% return-on-investment advertising-based Ponzi scheme, similar to TelexFree), "Diamond Banners," "Argent Network" (which was advertised as "a mixture of Zeek Rewards and TelexFree"), and "1BuckAdSharehas."  SCAC ¶ 978.  IPS was brought in as a processor for TelexFree after Base Commerce lobbied on TelexFree's behalf for IPS to become involved.  SCAC ¶ 916.  By at least January 2014, IPS was forced to compete with Vantage Payments for TelexFree's payment processing business; on January 15, Merrill issued the challenge:  "whomever [sic] treats us best will get most of the business."  SCAC ¶ 950.  IPS was also responsible for processing foreign transactions for TelexFree, which were conducted through TelexFree's UK-based shell company.  SCAC ¶ 973.

Prior to performing these services for TelexFree, IPS performed its required due diligence on the company and its principals.  SCAC ¶ 975.  IPS explicitly confirmed this in an October 2013 public statement to the news website BehindMLM.com, in which they stated that they had "done a complete due diligence on TelexFree."  SCAC ¶ 979.  On February 12, 2014, IPS went a step further and announced that they were partnering with MLM attorney Kevin Thompson of Thompson Burton, PLLC, to "provide up-to-date compliance guidance to their new and existing clients in the Direct Selling and Multi-Level Marketing industry."  SCAC ¶ 980.  Despite this legal counsel, IPS did not terminate its relationship with TelexFree until April 17, 2014—four days *after* TelexFree's bankruptcy filing.  ¶ 983.  IPS then posted a notice online stating that they had terminated their relationship with TelexFree for reasons including TelexFree having "violated Anti-Money Laundering policies."  SCAC ¶ 979.

IPS asserts that it is not subject to the federal laws imposing due diligence obligations when accepting a customer's business.  *See* Doc. No. 173 at 7-8.  This assertion contradicts the SCAC and presents an issue of fact, precluding dismissal under Rule 12(b)(6).  It is also factually

incorrect.  31 U.S.C. ¶ 5312(a)(2)(R) includes "any other person who engages as a business in the transmission of funds" within the definition of a "financial institution."  In addition, IPS's assertion is contradicted by its own website, which indicates that it conducts the activities required under the BSA.[55]  Furthermore, IPS (as did Allied Wallet) registered its businesses with FinCen as a Money Services Business pursuant to the BSA.  FinCen is the financial crimes enforcement network and operates under the authority of the BSA.  A money service business ("MSB") is obligated to register with FinCen or face civil and criminal penalties.  *See* Enforcement Actions for Failure to register as a Money Services Business *available at* (http://www.fincen.gov/news_room/ea/ea.msb.html).  Filing with FinCen and self-identifying as an MSB supports the allegations that IPS is subject to the BSA and Patriot Act.

### 5.     Financial Services Provider Defendants' Arguments Lack Merit

#### i.     Defendants' Strict Formulation Of The Applicable Legal Standard Should Be Rejected

The Financial Services Providers rely heavily on decisions from the Second Circuit and its district courts that essentially require the identification of a specific rogue employee who was extensively complicit in the fraudulent scheme to plead facts supporting actual knowledge. These out-of-circuit authorities conflict with Massachusetts law, which allows for "a reasonable inference" to establish actual knowledge, and which does not require direct evidence.  *Go-Best Assets, Ltd. v. Citizens Bank of Massachusetts*, 972 N.E.2d 426 (Mass. 2012).  Under Massachusetts law, "plaintiffs are not required to produce a 'smoking gun'" particularly at the

---

[55] *See* IPS Press Release, March 11, 2014, available at https://www.i-payout.com/PressRelease.aspx?id=12 (stating IPS is "compliant to the Currency and Foreign Transactions Reporting Act known as The Bank Secrecy Act [BSA]"); *see also* IPS Website, available at https://www.i-payout.com/Features.aspx ("i-payout's software is updated regularly with all the latest information to ensure full KYC, OFAC, Anti-Terror, and Anti-Money Laundering verification and compliance").

pleading stage, to satisfy actual knowledge.  *See Cahaly*, 885 N.E.2d at 810 (citation omitted).

Other courts are in accordance with this better approach.  *See, e.g., Facciola v. Greenberg*

*Traurig, LLC*, 781 F. Supp. 913, 925 (D. Ariz. 2011); *Balance Return Fund Ltd*, 921 N.Y.S.2d

38 (N.Y. App. Div. 2011); *Wells Fargo Bank v. Ariz. Laborers, Teamsters and Cement Masons*

*Local 395 Pension Trust Fund*, 201 Ariz. 474 (2002); *Aetna Cas. And Sur. Co. v. Leahey Constr.*

*Co,* 219 F.3d.519 (2000); *Woodward v. Metro Bank of Dallas,* 522 F.2d 84, 97 (5th Cir.1975);

*Anderson v. Francis I. DuPont & Co.,* 291 F. Supp 705 (1968).

Specifically, certain Defendants rely extensively upon two decisions from the Eastern

District of New York, *In re Agape Litigation*—681 F. Supp. 2d 352 (E.D.N.Y. 2010) (*Agape I*)

and 773 F. Supp. 2d 298 (E.D.N.Y. 2011) (*Agape II*), to attack the Investor Victims' due

diligence and monitoring allegations.  *See* Doc. No. 168 (TD Bank Br.) at 7-9; Doc. No. 184

(BANA Br.) at 8-9; Doc. No. 172 (Wells Fargo Br.) at 5 n.1; Doc. No. 179 (Synovus Br.) at 15;

Doc. No. 182 (Fidelity Br.) at 9; Doc. No. 173 (IPS Br.) at 9; Doc. No. 176 (Propay Br.) at 13.

Those out-of-circuit decisions are inapposite.  There, investors in a Ponzi scheme brought suit

against the scheme's mastermind and BANA, which had provided banking services, including

the installation of a one-person bank office at the violator's office.  The plaintiffs alleged that

BANA had aided and abetted the scheme and cited to the bank's various due diligence activities

performed pursuant to the KYC regulations and the factors triggering Enhanced Due Diligence

obligations in accordance with the bank's CIP program.  The court found it determinative that

the plaintiffs had failed "to identify any specific books, records or other information outside of

the Agape account activity" that would have provided BANA with actual knowledge.  *Agape II*,

773 F. Supp. 2d at 311.  At bar, the Investor Victims identify specific non-account related

documents and information that the FSP possessed in addition to their internal records,

including: numerous websites identifying TelexFree as a pyramid scheme; news reports detailing the shutdown of TelexFree's Brazilian operation; TelexFree's own website which described in detail the mechanics of the scheme (and included photographs showing Promoters at events showering money on crowds); TelexFree's membership contract, which set forth the mechanics of the scheme and plainly violated Mass. Gen. Laws c. 93, § 69; online videos posted by TelexFree Founders and Promoters discussing the mechanics of the Scheme; and online videos posted by TelexFree Promoters, as well as Defendant Costa, discussing the Brazilian shutdown. Another significant distinguishing factor is that the *Agape II* court had given the plaintiffs an opportunity to conduct discovery, through which they obtained thousands of pages of BANA's documents, and to amend their complaint subsequent to the *Agape I* decision.  Also, the *Agape II* court noted that cases in its circuit were "less willing to infer actual knowledge" in certain situations than other circuits.  773 F. Supp. 2d at 313, 315.[56]  Finally, the hallmarks of a Ponzi scheme are far more subtle than the hallmarks of a pyramid scheme.  Ponzi investments can be sporadic, irregular, and in varying amounts.  Basically, a Ponzi victim puts in and withdraws whatever she sees fit, whenever it suits her, like anyone playing the stock market.  In contrast, a pyramid scheme is recognizable by regular deposits and withdrawals of uniform amounts—the

---

[56] BANA also relies upon another Second Circuit case, *Berman v. Morgan Keegan & Co.*, 455 Fed. App'x 92 (2d Cir. 2012) as barring consideration of KYC and BSA obligations.  That reliance is misplaced.  In *Berman*, the plaintiff investors failed to identify any particular monitoring obligation on the part of a brokerage firm, unlike in the TelexFree which lists specific federal laws and regulations (SCAC¶¶ 609, 620-23, 652-62, 683, 688).  The court then stated in dicta that those laws could only establish what a bank should have known, expressing its desire to protect brokerage firms from liability "every time" their accounts were used for fraud.  *Id.* at 95.  The court emphasized that the laws "standing alone" are not sufficient, which is not the case here.  *Id.* at 95.  Finally, the plaintiffs there had already obtained documents from the defendant's files, unlike the absence discovery here.  *Id.*  BANA's other case, *Shirokov v. Dunlap, Grubb & Weaver, PLLC*, No. 10-12043-GAO, 2012 WL 1065578, at *27 (D. Mass. Mar. 27, 2012), is similarly inapposite.  That case merely states that the S.E.C. had issued alerts warning banks generally about schemes like the one at issue there.  There were no allegations, as there are here, that the bank had performed any due diligence or discovered hallmark facts.

membership fee—and no or virtually no transactions involving the purchase price of the bogus product.  SCAC ¶¶ 281–93.

The in-circuit authorities cited by Defendants fare no better.  Certain of the Moving Defendants rely heavily upon *Go-Best Assets, Ltd. v. Citizens Bank of Massachusetts*, 972 N.E.2d 426 (Mass. 2012), a non-pyramid scheme case.  *See* Doc. No. 184 (BANA Br.) at 10; Doc. No. 164-1 (Base Commerce Br.) at 19; Doc. No. 182 (Fidelity Br.) at 5; Doc. No. 167-1 (GPG Br.) at 15; Doc. No. 173 (IPS Br.) at 12; Doc. No. 188 (Nehra and Waak Br.) at 28; Doc. No. 170-1 (PwC Br.) at 12; Doc. No. 176 (Propay Br.) at 11; Doc. No. 179 (Synovus Br.) at 13; Doc. No. 168 (TD Bank Br.) at 7; Doc. No. 172 (Wells Fargo Br.) at 4.  In *Go-Best*, the Court granted summary judgment dismissing claims asserted against Citizens Bank for aiding and abetting the fraud of an attorney who had used it as a depository for a purported client escrow fund, finding a lack of knowledge and substantial assistance.  There are several critical differences from the present case.  *Go-Best* involved a limited transaction between one attorney and one client as opposed to a massive pyramid fraud scheme involving hundreds of individuals and several corporate and individual actors.  *Go-Best* applied a summary judgment standard and thus its decision was based upon the lack of evidence, not pleading defects.  *Id.* at 432.  Finally, in *Go-Best* the plaintiff claimed only that the bank "should have recognized" that the lawyer was misappropriating funds.  *Id.* at 431.

Certain of the Moving Defendants argue that the Complaint should be dismissed because there are no allegations that they possessed a specific unlawful intent to further the Scheme.  *See, e.g.*, Doc. No. 179 (Synovus Br.) at 14, Doc. No. 184 (BANA Br.) at 7, Doc. No. 173 (IPS Br.) at 10-11.  Plaintiffs need not plead such intent, since this is neither an additional element of aiding and abetting nor is it part of the actual knowledge element.  *See Invest Almaz v. Temple-Inland*

43

*Forest Prods. Corp.*, 243 F.3d 57, 82-83 (1st Cir. 2001); *Tamposi v. Denby*, 974 F. Supp. 2d 51

(D. Mass. 2013); *Norman v. Brown, Todd & Heyburn*, 693 F. Supp. 1259, 1264 (D. Mass. 1988);

*F.D.I.C.*, 885 F.2d at 430.  The only intent necessary here is, as BANA concedes, "the intent to

assist [the primary violators'] actions."  (Doc. No. 184 (BANA Br.) at 7), which the SCAC

alleges.  *See, e.g.*, SCAC ¶ 1094.  In instances where a defendant has no duty to disclose the

fraud, and liability is premised on a mere failure to act, "conscious intent' to aid the fraud" must

be pled, *Smith*, 2002 WL 31056104, at *3.  However, this principle is not applicable at bar since

the Investor Victims have asserted that FSPs affirmatively acted to assist TelexFree, and did so

despite their obligations to investigate and report under federal law.  Nor must Plaintiffs plead

that the Defendants "share the mental state of the principal violator," as suggested by Synovus

and IPS.  Said Defendants rest this argument on a footnote set forth in a conspiracy case, *Taylor*

*v. Am. Chemistry Council*, 576 F.3d 16, 36 (1st Cir. 2009), discussing another case, *Planned*

*Parenthood*, dealing with an "aiding and abetting" clause contained in a court injunction, and

analogizing not civil aiding and abetting liability, but the criminal version.[57]  Outside of this

dictum in *Taylor*, no Massachusetts court has ever required a "shared mental state" as an element

of civil aiding and abetting liability.

Similarly, nothing in *Maruho Co. v. Miles, Inc.*, 13 F.3d 6 (1st Cir. 1993) supports the

idea that BANA (or other Defendants) must have known of the detailed particulars of the

Scheme to possess actual knowledge.  *See* Doc. No. 184 (BANA Br. at 7).  *Maruho* specifically

addressed the adequacy of "should-have-known" allegations, while here the SCAC alleges that

each Moving Defendant had actual knowledge, and provides substantial specific allegations to

---

[57] *See Planned Parenthood League v. Blake*, 631 N.E.2d 985, 993 (1993), citing *Commonwealth v. Richards*, 363 Mass. 299, 307-308, 293 N.E.2d 854 (1973) (criminal case) and *Commonwealth v. Adams*, 416 Mass. 558, 565, 624 N.E.2d 102 (1993) (criminal case).

support this conclusion.  Nor does *Kyte v. Phillip Morris, Inc.*, 556 N.E.2d 1025 (Mass. 1990) stand for the proposition that actual knowledge here requires detailed knowledge of the inner workings of the TelexFree Scheme. *See*  Doc. No. 179 (Synovus Br.) at 14.  In *Kyte*, plaintiffs sought to hold a cigarette manufacturer liable for sales to minors made by a particular convenience store.  The court sensibly held that Philip Morris's "general awareness" that minors purchased cigarettes, absent "specific knowledge" that the convenience store in question sold its cigarettes to minors, and absent any direct relationship between the maker and the store, did not give rise to civil liability for conspiracy.  *Kyte* is inapposite.

### ii.       Defendants' Remaining Arguments Lack Merit

Moving Defendants' request that the Court focus on isolated indications of actual knowledge (Red Flags, suspicious activities, etc.), rather than the totality of the allegations, is inappropriate.  *See Zayed*, 779 F.3d at 733 (isolation approach to complaint allegations rejected and actual knowledge pled by allegations as a whole); *see also Aetna*, 219 F.3d at 536 (individual allegations taken together and put in context to evaluate actual knowledge).  Even so, allegations of knowledge of atypical banking procedures are sufficient, standing alone, to meet the pleading requirement of actual knowledge of wrongdoing.  *See, e.g., In re First Alliance Mortgage Co.*, 471 F.3d 977 (9th Cir. 2006); *Neilson v. Union Bank of Cal.*, 290 F. Supp. 2d 1101, 1120-21 (C.D. Cal. 2003); *Aetna*, 219 F.3d at 536; *Metz v. Unizan Bank*, No. 5:05 CV 1510, 2008 WL 2017574, at *18-20 (N.D. Ohio May 7, 2008), *aff'd*, 549 F.3d 492 (6th Cir. 2011).[58]  Allegations of red flags are a critical factor supporting a reasonable inference of actual

---

[58] The Supreme Court of Ohio has ruled subsequent to these cases that no claim for aiding and abetting fraud exists under Ohio law.  *See DeVries Dairy, L.L.C. v. White Eagle Coop. Assn., Inc.*, 974 N.E.2d 1194 (Ohio 2012).  This has no bearing on its analysis on what constitutes actual knowledge.  *See Smith*, 202 WL 31056104, at *2, n.2 (Supreme Court's "rejection of

knowledge.  *See Zayed*, 779 F.3d at 734-35 (where red flags and details of Ponzi transactions

alleged, circumstances strongly indicating knowledge were pled particularly); *Arreola v. Bank of*

*Am. Nat'l Ass'n*, No. CV 11-06237 DDP (PLAx), 2012 WL 4757904, at \*2-3 (C.D. Cal. Oct. 5,

2012) (red flags such as transfer of funds to Mexico coupled with bank manager's knowledge of

false deposit forms used for fraudulent mortgage applications, taken together, pled actual

knowledge).  Where, as here, a complaint pleads both red flags and additional facts detailing the

particulars of a Ponzi or pyramid scheme, an adequate claim is pled.  *See id.* ("[a] common sense

reading of these allegations, taken together, sufficiently establish, at this [motion to dismiss]

stage, that the bank had actual knowledge").  Similarly, allegations regarding Internet postings

and news reports should not be considered in isolation, as Defendants urge (*see, e.g.*, Doc. No.

168 (TD Bank Br. at 11)), but with other factors, which combined support an inference of actual

knowledge.  *See Neilson v. Union Bank of Ca.*, 290 F. Supp. 2d 1101 (C.D. Cal. 2003); *Cromer*

*Finance Ltd. v. Berger,* 137 F. Supp. 2d 452, 494 (S.D.N.Y. 2001) (a plaintiff satisfies the . . .

pleading requirement where it identifies 'circumstances indicating conscious behavior by the

defendant').  Defendants criticize Plaintiffs for not alleging that Defendants "had copies" of

reports and posts, but the SCAC alleges that each Financial Services Provider had Regulatory

Compliance Departments whose responsibility was to obtain just such information.  SCAC ¶¶

609-10, 616-25; *see also* SCAC ¶¶ 9, 647-90 (alleging sophisticated computer systems and

detection software); SCAC ¶¶ 113, 691-709 (articles and postings easily discovered by

sophisticated dedicated internal systems); SCAC ¶¶ 285-93 (pyramid schemes follow a specific

pattern well known and easily detectable).

---

liability under [a] statute does not effect precedent articulating the elements of the cause of
action.").

Moving Defendants seek to recast the SCAC as alleging only that Defendants "should have known" of TelexFree's Scheme, but this mischaracterizes the SCAC.  *See, e.g.,* SCAC ¶ 1094 (alleging each Defendant rendered substantial assistance "with unlawful intent and knowledge that such parties were perpetuating an illegal Pyramid Scheme").  Thus, arguments that the SCAC inadequately alleged only "constructive knowledge" are unsupported.  *See, e.g.,* Doc. No. 184 (BANA Br.) at 6.  Any "should-have-known" allegations in the SCAC do not negate the pleading of actual knowledge elsewhere.  *See Kilmartin v. H.C. Wainwright & Co.,* 580 F. Supp. 604, 608 (D. Mass. 1984)  (where complaint alleges actual knowledge, "[t]he inclusion in the complaint of additional phrases such as 'should and could have known' does not render this otherwise adequate pleading insufficient").

Moving Defendants resort to contradicting allegations in the SCAC, which cannot justify dismissal.  For example, as noted above, Fidelity speculates that it is "more likely" that John Merrill was engaged in lawful behavior.  Doc. No. 182 (Fidelity Br.) at 10; *see also* Doc. No. 184 (BANA Br.) at 4 (Plaintiffs are "incorrect"); Doc. No. 168 (TD Br.) at 18 (assistance was "routine," not substantial).  The SCAC's allegations are to be taken as true on a motion to dismiss.  A defendant's offering of alternative explanations or explanatory facts is improper and to be disregarded. *Twombly,* 550 U.S. 544 (2007).

Defendants criticize Plaintiffs for pleading constructive knowledge alongside actual knowledge, and urge the Court to consider only the floor and not the ceiling.  The SCAC asserts alternative theories and allegations.  Alternative pleading is entirely proper and routinely employed to deal with the common difficulty presented by pre-discovery motions. *Pine Polly, Inc. v. Integrated Packaging Films IPF, Inc.,* Civ. Act. No. 13–11302–NMG, 2014 WL 1203106 (D. Mass. Mar. 19, 2014); *U.S. Gypsum Co. v. National Gypsum Co.* 352 U.S. 457 (1957); *Casco*

*Standards v. Verichem Labs., Inc.* 725 F. Supp. 66 (D. Me. 1989); s*ee* Fed.R.Civ.P.8.  Moreover, the fact that Financial Services Providers turned a blind eye to the facts it had in its possession (SCAC ¶¶ 700, 725, 761, 802, 832, 858, 891, 924, 954, 969, 988) is sufficient to constitute actual knowledge, not constructive knowledge.  *In re Agape Litig.,* 773 F.Supp.2d 298 at 308.

Moving Defendants seek to downplay the importance of federal laws and regulations cited in the SCAC which mandate that financial institutions investigate and monitor their customers, arguing that these laws do not create a private right of action.  Doc. No. 168 (TD Bank Br.) at 10; Synovus Br. at 15; Doc. No. 176 (IPS Br.) at 9.  This argument mischaracterizes the nature of the Plaintiffs' claims.  Indeed, Plaintiffs assert claims of aiding and abetting common law fraud and violations of Mass. Gen. Laws c. 193, § 69, for which the financial laws and regulations help satisfy the element of actual knowledge.  Plaintiffs do not assert claims under those federal financial institution laws.  *See Green v. Parts Distrib. Xpress, Inc.*, Civ. Act. No. 10-11959-DJC, 2011 WL 5928580, at *3 (D. Mass. Nov. 29, 2011) (making distinction that plaintiff relying upon common law aiding and abetting and not statutes whose violation were alleged).

Fidelity's argument that regulatory settlements such as the Consent Decree may not be incorporated into a pleading is frivolous.  On the contrary, regulatory settlements may be incorporated into a subsequent civil complaint.  *See Goldberg v. Unum Life Ins. Co. of Am.*, 527 F. Supp. 2d 164, 167 (D. Me. 2007).  Fidelity's reliance upon *Loreley Fin. (Jersey) No.3 Ltd. v. Wells Fargo Sec., LLC*, No. 12. Civ. 3723(RJS), 2013 WL 1294668 (S.D.N.Y. Mar. 28, 2013) is misplaced.  This decision was recently overturned by the Second Circuit (Calabresi, J.), wherein that Court held that regulatory settlements, when offered in combination with additional allegations, may indeed be relied upon for purposes of overcoming a motion to dismiss.  *Loreley*

*Fin. (Jersey) No.3 Ltd. v. Wells Fargo Sec., LLC*, No. 13-1476-CV, 2015 WL 4492258 (2d Cir. July 24, 2015).  Fidelity's reliance on *In re Morgan Stanley & Van Kampen Mut. Fund Sec. Litig.,* 03 Civ. 8208(RO), 2006 WL 1008138, at *5 (S.D.N.Y. Apr. 18, 2006), is also misplaced. There, plaintiffs cited settlement agreements in their amended complaint "as though they were legal precedents," which the SCAC does not.  *In re Rough Rice Commodity Litig.*, Civ. No. 11 C 618, 2012 WL 473091, at *4 (N.D. Ill. Feb. 9, 2012), also cited by Fidelity, is also inapposite since at bar the SCAC does not rely exclusively on language from a consent decree to establish tortious conduct.  Finally, Fidelity's novel policy argument that allowing Plaintiffs to rely on the Consent Decree would chill regulatory settlements should be rejected.  *See* Doc. No. 182 at 7 n.3., *citing Carpenters Health & Welfare Fund v. Coca-Cola Co.,* No. 1:00-cv-2338-WBH, 2008 WL 9358563, at *3, *6 (N.D. Ga. Apr. 23, 2008).  Private and public enforcement actions are complementary, not alternative or exclusive.

**C.**     **The SCAC Alleges Moving Defendants Substantially Assisted the Commission of the Wrongful Scheme**

**1.  Legal Standard**

To plead substantial assistance, allegations of actions by a defendant that were "a substantial factor in causing the tort" or violation will suffice.  *See Aetna*, 219 F.3d at 537 (6th Cir. 2000); *see also In re Nat'l Century Fin. Enters.*, 580 F. Supp. 2d 630, 655 (6th Cir. 2012). Rule 9(b) is satisfied where a complaint "inform[s the] defendant . . . what he did that constituted . . . 'substantial assistance.'"  *Neilson*, 290 F. Supp. 2d at 1131 (citation omitted).   Indeed, Massachusetts cases have stated that a plaintiff need only "demonstrate some measure of 'active participation.'" *See Bamberg v. Sg Cowen*, 236 F. Supp. 2d 79 (D. Mass. 2002) (citation omitted).

49

Substantial assistance is to be evaluated "in tandem" with the knowledge element. *Anderson*, 2014 WL 502955, at *6-7; *see also In re Enron Corp. Secs., Deriv. and ERISA Litig.*, 511 F. Supp. 2d 742, 803 (S.D. Tex. 2005); *Bank of Montreal v. Avalon Cap. Group, Inc.*, Civil No. 10–591 (MJD/AJB), 2012 WL 1110691, at *8 (D. Minn. Apr. 3, 2012). As a result, "[o]rdinary business transactions a bank performs for a customer can satisfy the substantial assistance element of an aiding and abetting claim if the bank actually knew those transactions were assisting the customer in committing a specific tort." *In re First Alliance Mortgage*, 471 F.3d 977, 995 (9th Cir. 2006); *see also Benson v. JPMorgan Chase Bank, N.A.*, 2010 WL 1526394, at *4 (finding plaintiffs adequately pled substantial assistance by ordinary banking transactions); *In re Nat'l Century*, 580 F. Supp. 2d at 655 (credit rating agency's "contention that the element of substantial assistance can never be satisfied by an ordinary act or transaction must be rejected."); *Lawyers Title Ins. Corp. v. United Am. Bank of Memphis*, 21 F. Supp. 2d 785, 798-800 (W.D. Tenn. 1998) (bank lent money and extended credit for overdrafts was substantial assistance). Thus, as long as a financial institution has knowledge of an underlying scheme or fraud, even ordinary financial services can be substantial assistance. *In re First Alliance*, 471 F.3d at 995; *Kurker v. Hill*, 44 Mass. App. Ct. 184, 189 (1998) (holding that "[k]ey to [claim under Restatement (Second) of Torts § 876(b) aiding and abetting section] is a defendant's substantial assistance, with the knowledge that such assistance is contributing to a common tortious plan."). The appearance of propriety created by the association of a defendant with certain activities performed in the course of a fraud has also been held to substantially assist that fraud. *See Bruhl v. Price WaterhouseCoopers Int'l*, No. 03-23044-CIV, 2008 WL 899250, at *4 (S.D. Fla. Mar. 31, 2008); *Neilson* (substantial assistance sufficiently alleged where banks gave fraudulent investment advisor an "aura of legitimacy"); *In re Nat'l Century*, 580 F. Supp. 2d at

655.  The determinative factor is "the foreseeability of the result of the conduct or transaction" or

if the act made the scheme "easier."  *Id.*; *see also Aetna*, 219 F.3d at 537 (while routine extension

of a loan may not ordinarily constitute "substantial assistance" but its important role in fraud

made it sufficient).

Notably, where the details of a Ponzi scheme and the acts taken by a financial institution

to assist the scheme are stated, courts have found the substantial assistance element to have been

met.  *See, e.g., Benson v. JPMorgan Chase Bank, N.A.*, 2010 WL 1526394, at *4 (bank allowed

schemers to deposit investor money, commingle funds within entity's accounts, transferring

large amounts of investment deposits to offshore bank accounts, use of investor funds for

schemer's expenses and establishment of remote banking platforms); *Anderson v. US Bank Nat.*

*Ass'n* 2014 WL 502955 at *7-8 (aiding and abetting pleading sufficient where unusual, whole

dollar wire transfers, large withdrawals of cash, and facilitation of transfers from business

account to personal accounts were alleged).

## 2.     Plaintiffs Pled Substantial Assistance

The very core of the TelexFree Scheme was the deposit of the Investor Victims' funds in

various bank accounts.  The Financial Services Providers enabled TelexFree to receive and

process funds from the Investor Victims, transfer funds within the TelexFree entities, transfer

funds between TelexFree entities, and move money to the Founders and Top Level Promoters.

The Financial Services Providers "processed hundreds of thousands of related

transactions involving hundreds of millions of dollars, and the substantial assistance they

provided was essential to TelexFree."  SCAC ¶ 6.  TelexFree processed through the Defendant

Financial Services Providers over 783,771 investments of either $289 or $1,375 (including

combinations thereof) totaling over $880,189,455.32.  SCAC ¶ 717.  As a specific example of a

51

transfer in furtherance of the Scheme, the SCAC alleges that "[b]etween mid-November 2013 and March 2014, TelexFree transferred approximately $30 million from its operating accounts to its Principals and officers and to affiliate companies with the necessary assistance of the Financial Services Provider Defendants."  SCAC ¶ 153.

The SCAC also alleges:

- TelexFree would not have been able to get off the ground, develop, maintain or grow its Pyramid Scheme without the substantial assistance of the Financial Services Providers.  SCAC ¶¶ 33, 704.

- The Financial Services Providers were also an integral cog in the siphoning off of funds by the Operational Defendants.  SCAC ¶¶ 33, 705.

- The Operational Defendants would not have been able to wrongfully convert the class members' funds to their own personal possession and use without the substantial assistance of the Financial Services Providers.  SCAC ¶ 706.

- The Financial Services Providers "knew that TelexFree was a Pyramid Scheme and yet actively assisted" it.  SCAC ¶¶ 301-03.

- "TelexFree, with the integral assistance of numerous banks, payment processors, professionals and other third parties, operated an unlawful Pyramid Scheme of nationwide and international scope."  ¶ 306.

- TelexFree could not have successfully carried out its unlawful enterprise, nor launder or shelter its ill-gotten funds, without the integral assistance of the other Defendants, including the cooperating Defendant financial institutions, payment processing service companies and Operational Defendants.  SCAC ¶ 313.

Defendant Banks in particular (as opposed to the Payment Processors), ensured that "TelexFree was given access to banking services and those banking services were used to further TelexFree's unlawful business."  SCAC ¶ 727.  The Bank Defendants accepted, processed and maintained deposit accounts on behalf of TelexFree, accepted payment of AdCentral package membership fees from the Promoters on behalf of TelexFree and made transfers of the payments derived from the Scheme.  SCAC ¶ 707.  The Defendant Banks received significant funds from TelexFree and other Defendants and provided banking services, maintained accounts, and

received and executed transfers of funds from or for the benefit of TelexFree.  SCAC ¶ 711.

Each Defendant Bank engaged in the following activities, as alleged in SCAC ¶ 732:

- processing and opening of depository accounts;

- receiving payments made by Promoters to TelexFree to become Members of the TelexFree Program;

- maintaining depository accounts containing funds paid by Promoters to TelexFree for AdCentral Package membership fees;

- making payments to certain Promoters as part of TelexFree's purported return on investment;

- transferring funds paid by Promoters to TelexFree among TelexFree entities, Defendant Founders' personal accounts, foreign companies and shell companies;

- providing financial services that were indispensible; and

- allowing TelexFree to use the bank's name in its promotional materials thereby lending TelexFree the use of the bank's reputation as a large, nationwide banking institution and credibility.

Each Payment Processing Services Company Defendant (as opposed to the Banks) processed payments between TelexFree and its Members, provided the electronic gateway used to send and receive such payments, and provided the electronic interface services used by both TelexFree and its Members.  SCAC ¶ 850.  Certain Payment Processing Companies went far beyond this role and became active direct participants in TelexFree's unlawful business enterprise by providing specialized advice and allowing it to skirt the law.  SCAC ¶ 851.  The services of the Payment Processing Services Company Defendants, including the capturing, maintenance and transferring of Promoters' funds, was essential and without their integral assistance TelexFree's Pyramid Scheme could not have operated.  SCAC ¶ 852.  The SCAC alleges that "[n]otwithstanding knowledge of suspicious, tortious or illegal activity, the Payment Processing Services Company Defendants processed payments between TelexFree, the Operational Defendants, and its Promoters, . . . provided the electronic gateway used to send and

receive such payments, and provided the electronic interface services used by both TelexFree and its Promoters." SCAC ¶¶ 708-09.

The cumulative nature of all the foregoing allegations regarding the details of the TelexFree Scheme, the Moving Defendants' actual knowledge of the Scheme, and their substantial assistance, sufficiently state a claim. *See Benson,* 2010 WL 1526394, at *5; s*ee also Metge v. Baehler*, 762 F.2d 621, 630 (8th Cir. 1985) ("Although the facts we have recounted here at length are unremarkable taken in isolation, we find that taken together, they present what should have been a jury issue on the question of aiding-and-abetting liability.").

### 3. The SCAC Alleges Each Financial Services Provider's Substantial Assistance Of The TelexFree Scheme

**BANA**

BANA accepted TelexFree as a customer and opened and maintained TelexFree accounts. SCAC ¶ 739. The SCAC identifies the specific accounts opened and maintained. ¶¶ 746-49, Ex. 8, Ex. 3 Att. 37. Certain specific deposits are identified. SCAC ¶¶ 747-49. The approximate dates that BANA provided services are alleged. SCAC ¶¶ 734, 761. BANA received payment of Membership fees from the victims of the TelexFree program. SCAC ¶¶ 740-42, 746-49. BANA provided credit accounts in the form of credit cards. SCAC ¶ 744. BANA also assisted the Scheme because it permitted TelexFree to name it in TelexFree's promotional sign-up procedures, and the Investor Victims were encouraged to make walk-in deposits. SCAC ¶¶ 740-41. Bank of America also knowingly permitted TelexFree to identify it in promotional materials as the holder of its accounts. SCAC ¶ 743. The use of BANA's name lent credibility to the scheme, and supports allegations of substantial assistance. *See Bruhl*, 2008 WL 899250, at *4; *Neilson v. Union Bank of California*, N.A., 290 F. Supp. 2d 1101 (C.D. Cal. 2003).

54

**TD Bank**

TD Bank accepted TelexFree as a customer and opened and maintained TelexFree accounts.  SCAC ¶ 783.  The SCAC identifies the specific accounts.  ¶¶ 792-99, Ex. 3 Att. 37.  Certain specific deposits are identified.  SCAC ¶¶ 792-99.  The approximate dates that TD Bank provided services are alleged.  SCAC ¶¶ 780, 802.  TD Bank received payment of Membership fees from the victims of the TelexFree program.  SCAC ¶¶ 786-87, 789, 791-99.

TD Bank additionally assisted the Scheme because it permitted TelexFree to name it in TelexFree's promotional sign-up procedures, and the Investor Victims were encouraged to make direct deposits into TD Bank's accounts. SCAC ¶¶ 786-90.   As with BANA, this lent credibility to TelexFree's illegal enterprise.  TD Bank incorrectly contends that the SCAC does not allege that "anyone from TD knew" that TelexFree named TD Bank in TelexFree's materials.  In fact, the SCAC alleges that "TD Bank knowingly permitted TelexFree to identify it as the holder of its accounts."  SCAC ¶ 788.

**Fidelity Bank**

Fidelity Bank accepted TelexFree as a customer and opened and maintained TelexFree accounts.  SCAC ¶ 804.  The SCAC identifies the specific accounts.  ¶ 729 n. 72.  Certain specific deposits are identified.  SCAC ¶¶ 729 n. 72.  The approximate dates that Fidelity Bank provided services are alleged.  SCAC ¶¶ 804, 806, 826.  The SCAC alleges that $3.5 million was transferred from TelexFree's accounts by Fidelity Bank to an outside account in Singapore.  SCAC ¶ 830.

Even after Fidelity determined to stop servicing TelexFree's accounts, at which time it indisputably had knowledge that it should not continue its services, it continued to accept Investor Victims' funds, and transfer funds out of TelexFree's accounts into offshore and

personal accounts. SCAC ¶ 826.  This alone satisfies the pleading requirement here.  *See Anderson*, 2014 WL 502955, at *7; *In re Enron Corp. Secs., Deriv. and ERISA Litig.*, 511 F. Supp. 2d 742, 803 (S.D. Tex. 2005).

## John Merrill

Defendant John Merrill (brother of TelexFree Founder James Merrill) "used his position and influence with Fidelity Bank to procure the described banking services from Fidelity Bank for TelexFree and others including the Defendant Founders."  SCAC ¶ 811.  From his privileged position with the bank, John Merrill was able to "obtain the account services for his brother James Merrill, the other TelexFree Founders and TelexFree itself."  SCAC ¶ 819. The familial relationship facilitated the "business" relationship between TelexFree and Fidelity Bank and is a significant factor in pleading substantial assistance.  *See Metz v. Unizan Bank*, No. 5:05 CV 1510, 2008 WL 2017574 (N.D. Ohio May 7, 2008) (father-daughter relationship between schemer and bank employee).

## Synovus

Synovus accepted TelexFree as a customer and opened and maintained TelexFree accounts beginning in April 2013.  SCAC ¶ 840.  Synovus served as the "sponsor bank" of GPG and Base Commerce, providing depository account and fund transfer services in connection with GPG and Base Commerce's processing services.  SCAC ¶ 834.  Synovus continued to act in this capacity until at least January 16, 2014.  SCAC ¶¶ 840, 845.  This continued even after Synovus had made the decision to sever its relationship with TelexFree.  SCAC ¶¶ 843-44.  Synovus received payment of Membership fees from the victims of the TelexFree program.  SCAC ¶¶ 843, 845, 903.

## Wells Fargo

Wells Fargo accepted TelexFree as a customer and opened and maintained TelexFree accounts.  SCAC ¶ 713.  The approximate dates that Wells Fargo provided services are alleged, through which it processed tens of millions of dollars investor funds.  SCAC ¶ 713. Wells Fargo was an integral part of TelexFree's illegal enterprise and in converting funds from the class members.  SCAC ¶¶ 704-06).

**Base Commerce and John Hughes**

Base Commerce processed payments for TelexFree from approximately June 2013 through at least January, 2014.  SCAC ¶¶ 894-902.  This is despite acknowledging in a May 22, 2013 email that TelexFree's predecessor entity, Common Cents Communications, Inc., "paid people residual commissions for placing ads online and the network marketing commentators accused them of being a Ponzi scheme as the commission advertised appeared unrealistically high and therefore fictitious."  SCAC ¶ 899.  In August 2013, Base Commerce was instructed by Synovus, its sponsor bank, to cease to doing business with TelexFree by August 31, 2013.  SCAC ¶ 905-906.  John Hughes, president of Base Commerce, even openly acknowledged the accusations and investigations surrounding TelexFree in an August 28, 2013 email.  SCAC ¶ 907.  Nonetheless, Base Commerce became even more involved, applying to offshore banks on TelexFree's behalf.  SCAC ¶ 910.  Ultimately, Base Commerce was responsible for getting Vantage Payments and IPS involved in the scheme.  SCAC ¶¶ 913-14, 916.  Hughes, on behalf of Base Commerce, also offered TelexFree operational advice regarding payment methods.  SCAC ¶ 911.  In September 2013, against Synovus' instructions, Base Commerce authorized approximately $5 million in transfers for TelexFree.  SCAC ¶ 915.  And in January 2014, Base Commerce interceded in a dispute between TelexFree and GPG, in order to keep TelexFree's cash flow high.  SCAC ¶¶ 919-20.

**GPG**

GPG began processing payments for TelexFree in April 2013.  SCAC ¶ 879.  GPG's processing system was made available to TelexFree not only for its own use, but also for use as a promotional tool to encourage further investments.  SCAC ¶¶ 880-81.  After being instructed by Synovus to cease doing business with TelexFree by August 31, 2013, GPG "sneaked" payments of investor funds out of the Synovus account to TelexFree.  ¶ 885.  GPG also provided TelexFree with continued access to its electronic processing system at least into January 2014, in violation of Synovus' instructions and even after acknowledging the "reputation risk" posed by doing business with TelexFree.  SCAC ¶ 602.

**Propay**

Propay continued processing payments for TelexFree at least into January 2014, despite acknowledging the high risk posed by TelexFree in an August 28, 2013 email.  SCAC ¶¶ 862, 871, 873.  The volume of transfers processed by Propay numbered in the millions, with over 1.5 million transfers processed between October and December 2012 alone.  SCAC ¶ 865.  This payment processing continued at a high volume, with Propay holding over $4.5 million in its TelexFree accounts as of December 31, 2013.  SCAC ¶¶ 868-69.  It appears that Propay actually ramped-up its processing for TelexFree over time, as the total amount held by Propay in its TelexFree accounts as of December 31, 2013 was over five times the amount held as of December 31, 2012.  *See* SCAC ¶¶ 863-64, 868-69.

**IPS**

IPS processed payments for TelexFree – specifically handling TelexFree's ACH payment processing load – in September 2013.  SCAC ¶¶ 971-72.  As of December 31, 2013, IPS held over $31.6 million in funds on behalf of TelexFree.  SCAC ¶ 982.  IPS also held a processing

account for TelexFree under the name of TelexFree's U.K.-based sham corporation, "TelexFree, Ltd."  SCAC ¶ 973.  IPS further expanded is processing volume for TelexFree, when it began providing TelexFree with "e-Wallet" services in January 2014.  SCAC ¶ 974.  In an extremely unusual step for a payment processor, in October 2013 IPS spoke publicly  on TelexFree's behalf, telling BehindMLM.com that it had "done a complete due diligence on TelexFree" and "confirmed the product as compliant with all US laws."  SCAC ¶ 974.  IPS also provided TelexFree with legal services by lending TelexFree its own MLM specialist attorney.  SCAC ¶ 980-81.  IPS finally ceased assisting TelexFree on April 17, 2014, with an announcement on its electronic portal that TelexFree may have "violated Anti-Money Laundering policies."  SCAC ¶¶ 983-84.

### 4.    Financial Services Provider Defendants' Arguments Lack Merit

Moving Defendants' reliance on the *Go-Best* decision in support of their argument that their  assistance to TelexFree constitutes mere "routine" banking, financial and legal services, and does not rise to the level of "substantial assistance", is misplaced.  In *Go-Best*, the Massachusetts Supreme Judicial Court stated, "[t]he issue presented in this case is whether Citizens Bank may be found liable on these claims where it had no knowledge of [its customer's] scheme to defraud . . ."  972 N.E.2d at 429.  At bar, the SCAC alleges performance of actions, coupled with knowledge.  In addition, as noted above, the *Go-Best* Court treated the motion as one for summary judgment, so it should not be used as a guide for a Rule 12(b)(6) motion.

Moving Defendants' routine-services exception essentially posits that any services provided to TelexFree were inconsequential since any of countless other financial and professional service providers or individuals could have, or in some cases did, perform them.  In the same vein, BANA argues that its assistance could not have been substantial since the Scheme

continued to operate after its servicing ceased.  Doc. No. 184 (BANA Br.) at 4.  These arguments

are unavailing.  First, the SCAC alleges that other financial institutions **refused** the TelexFree

business.  *See Benson*, 2010 WL 1526394, at *5 (fact that three banks declined business due to

suspicious nature supported critical role of serving defendants in Ponzi scheme).  Second, this

argument confuses substantial assistance with necessary assistance, which is not required.

*Aetna,* 219 F.3d at 537 (rejecting bank's argument that loan it extended did not substantially

assist a fraud because it was not necessary).

Moving Defendants' argument that they merely assisted with TelexFree's business, not

its fraud, is of no moment.  TelexFree was an entirely fraudulent enterprise and so assistance

provided assisted its wrongful activities.  *See In re First Alliance Mortgage*, 471 F.3d at 995 ("In

a situation where a company's whole business is built like a house of cards on a fraudulent

enterprise, this is distinction without a difference.").

Certain Moving Defendants argue that the SCAC improperly asserts claims based on

Defendants' inaction, rather than action.  First, certain allegations of Defendants' failures do not

amount to allegations of inaction.  *See Lautenburg Found. v. Madoff*, No. 09-816, 2009 WL

2928913, *14 (D.N.J. Sept. 9., 2009) (rejecting defendant's argument that complaint pled only

inaction where allegations that defendant failed to institute sufficient internal controls); *Facciola*

*v. Greenburg Taurig, LLP*, •781 F.Supp.2d 913 (D. Ariz. 2011) (denying motion to dismiss as

lawyer's omission in POM was substantial assistance).  Second, the SCAC is replete with

allegations of the substantial assistance proffered by each Defendant.  *See* Part I, Section I.C.2-3,

*supra*; *see also* SCAC ¶ 732 (list of active steps taken that provided substantial assistance).

These activities stand in stark contrast to the allegations that set forth the appropriate actions

which the Defendants should have, and were obligated, to have taken.  *See Am. Bank of St. Paul*

60

*v. TD Bank, N.A.*, 713 F.3d 455 (8th Cir. 2013).  It is semantics to argue that wrongful actions

taken should only be viewed as wrongful failure to refrain from taking such actions.

Fidelity also argues the converse -- that it was powerless to prevent the transfers of

millions of dollars that it made for TelexFree.  This argument goes beyond the four corners of the

SCAC and thus cannot justify dismissal.  Not only had Fidelity no obligation to accept TelexFree

as a customer (as six other banks refused to do, *see* SCAC 461), it also had the power to shut

down TelexFree's account at any time and cease processing transactions.   The SCAC alleges

that Defendants' statutory and regulatory investigation and monitoring obligations provided that

"[w]hen a bank finds out that a client is laundering money or running an unlawful enterprise it

should terminate the banking relationship, shut down the accounts and file a SAR."  SCAC

¶ 690.  In addition, it is standard for banks to include in their customer contracts the express right

to freeze an account for suspected fraud.  *See, e.g., Blocker v. Wells Fargo Bank*, No. CV 08–

1196–PK, 2010 WL 6403721, at * 2 (D. Ore. Nov. 23, 2010) (Wells Fargo customer account

contained following provision:  "[a]s part of the Bank's loss prevention program, when the Bank

suspects that irregular, unauthorized, or unlawful activities may be involved with [Blocker's]

Account, the Bank may 'freeze' (or place a hold on) the balance in [the] Account ... pending an

investigation of such suspected activities").  Despite Fidelity's argument that it was precluded

from freezing its accounts based upon the Massachusetts Uniform Commercial Code (G.L. c.

106, §§ 4A-202, 4A-212), Section 4A-501 provides that "the rights and obligations of a party to

a funds transfer may be varied by agreement of the affected party."

Finally, certain Moving Defendants argue that the aiding and abetting claim must be

dismissed for failure to plead causation.  For example, BANA states that proximate cause is "a

necessary component" of an aiding and abetting claim and that a plaintiff must pled that their

investments in TelexFree and resultant damages were a "direct or reasonably foreseeable result" of BANA's services.  Doc. No. 184 (BANA Br.) at 15.  Those arguments overlook that causation is part-and-parcel of substantial assistance—the swindle was accomplished with the help of the assistance provided by Moving Defendants.  *See Aetna*, 219 F.3d at 537 (a plaintiff must show "that the secondary party proximately caused the violation, or in other words, that the encouragement or assistance was a substantial factor in causing the tort") (citation omitted); *Primavera Familienstiftung v. Askin*, 173 F.R.D. 115, 126 (S.D.N.Y. 1997) ("[t]he substantial assistance element has been construed as a causation concept"); *Neilson v. Union Bank of California, N.A.*, 290 F. Supp. 2d 1101, 1135 (C.D. Cal. 2003) ("causation is an essential element of an aiding and abetting claim, i.e., plaintiff must show that the aider and abettor provided assistance that was a substantial factor in causing the harm suffered"); *see also Metge v. Baehler*, 762 F.2d 621, 624 (8th Cir. 1985) (proximate cause is satisfied by either "a showing of substantial causal connection between the culpable conduct of the alleged aider and abettor and the harm to the plaintiff[,]" *Mendelsohn v. Capital Underwriters, Inc.,* 490 F. Supp. 1069, 1084 (N.D.Cal.1979), or a showing that "the encouragement or assistance is a substantial factor in causing the resulting tort[.]" *Landy v. Federal Deposit Insurance Corporation,* 486 F.2d 139, 163 (3d Cir.1974), *cert. denied,* 416 U.S. 960, 94 S. Ct. 1979, 40 L.Ed.2d 312 (1975) (quoting Restatement of Torts § 436.)").

## II.

### THE INVESTOR VICTIMS HAVE ADEQUATELY PLED
### THE LICENSED PROFESSIONALS' TORTIOUS AIDING AND ABETTING
### OF THE TELEXFREE SCHEME

The SCAC's Tenth Claim for Relief carefully sets forth the required elements of a

tortious aiding and abetting claim against all Defendants, including Attorney Defendants Nehra

and Waak[59] and Accountant Defendant PricewaterhouseCoopers LLP ("PwC") (collectively, the

"Licensed Professionals"). SCAC ¶¶ 1093-98 (Count 10).  Specifically, the Investor Victims

assert (i) that TelexFree committed a tort or primary violation, and (ii) that the Licensed

Professionals had actual knowledge of TelexFree's unlawful enterprise, provided substantial

essential services in furtherance of this unlawful enterprise, and otherwise played an integral role

in TelexFree's Pyramid Scheme. Notwithstanding thorough pleading, the Licensed Professionals

have moved to dismiss this claim as against them with prejudice, premised upon the unfounded

and erroneous contention that the SCAC fails to adequately plead the requisite elements to

sustain a claim for tortious aiding and abetting.

An aiding and abetting claim is sufficiently alleged where a plaintiff pleads (1) the

commission of a primary tort or violation, (2) that the defendant had actual knowledge of the

primary wrong, and (3) that the defendant substantially assisted the commission of the wrong.

*See Tingley Sys., Inc. v. CSC Consulting, Inc.*, 152 F. Supp. 2d 95, 113 (D. Mass. 2001).  The

contours of those elements and the applicable legal standards are discussed at length in previous

sections.  *See* Part I, Section I, *supra*.  Accordingly, they are incorporated herein and thus

addressed only briefly here.  *See, e.g.*, *Cordell Consultant, Inc. Money Purchase Plan & Trust v.*

---

[59] Gerald P. Nehra, Richard W. Waak, Gerald P. Nehra Attorney at Law, Richard W. Waak
Attorney at Law, and the Law Offices of Nehra and Waak are referred to within this section as
the "Attorney Defendants" or "Nehra and Waak".

*Abbott*, 561 F. App'x 882, 885 (11th Cir. 2014) (holding attorneys liable for aiding and abetting client fraud); *Askenazy v. KPMG LLP*, 988 N.E.2d 463 (Mass. App. Ct. 2013) (refusing to dismiss aiding and abetting claim against auditor and tax advisor of Madoff "feeder" fund).

With respect to the first element, the SCAC's painstakingly detailed allegations establishing the TelexFree Scheme are set forth in Section I, *supra*. In addition, this element is satisfied as to the Licensed Professionals because the moving papers of the Attorney Defendants and PwC[60] did not dispute the alleged commission of the primary tort or violation.

The second element of tortious aiding and abetting, actual knowledge of the primary wrong, is also sufficiently pled. *See, e.g.,* SCAC ¶¶ 302, 396, 405-15, 459, 534, 537, 547-60, 557-58, 561, 563-64, 585, 587-89, 591, 593, 1095-96, *inter alia.* Like the first element, the Attorney Defendants did not expressly challenge the SCAC's pleading of the actual knowledge element of aiding and abetting. *See* Doc. No. 188 at 28-30. Even so, as shown in greater detail below, the SCAC is replete with allegations and supporting details establishing that the Attorney Defendants had actual knowledge of the wrongfulness of the TelexFree program, including, among other things, the fact that they held themselves out as seasoned MLM experts,[61] and that they examined the program closely and passed on its legality.[62] Plaintiffs assert that as lawyers and as MLM experts who had vetted the business, they had actual knowledge that the TelexFree Standard Membership Contract on its face violated the Massachusetts Anti-Pyramid Scheme statute, M.G.L c. 93, § 69[63] and that TelexFree's VOIP sales generated less than 3% of

---

[60] *See* Doc. No. 174 (PwC Br.); Doc. No. 188 (Nehra and Waak Br.).

[61] SCAC ¶¶ 406-07, 412, 414, 537-38, 540, 549, 564.

[62] SCAC ¶¶ 416, 421, 423, 549-50, 556, 566.

[63] SCAC ¶¶ 13-25, 430-31, 550, 562.

TelexFree's income and could not sustain the promised payouts.[64]   Moreover, although Plaintiffs are "Investors" under Massachusetts law, Nehra and Waak unfairly and deceptively advised TelexFree and others to refer to members of the putative class as "Associates," "Members" and "Promoters" in an attempt to circumvent liability under state securities law.  SCAC ¶¶ 428-31, 550.  Nehra spoke at length at TelexFree's "Super Weekend" on behalf of Nehra and Waak collectively, while representing TelexFree.[65]   While there, Nehra emphasized that the TelexFree operations had been "vetted by the Nehra and Waak law firm." SCAC ¶ 423.  Nehra and Waak even attended meetings at the TelexFree Massachusetts headquarters to discuss TelexFree's product, business model and operations.  SCAC ¶ 546.  All these actions underscore the allegations of actual knowledge of the fraudulent conduct engaged in by TelexFree.

Regarding PwC, the SCAC plainly alleges that PwC had actual knowledge of TelexFree's unlawful Scheme and further provides details of its involvement.  SCAC ¶¶ 585, 587, 589-91, 593.  The allegations as pled in the SCAC exceed the minimal standard prescribed under Massachusetts law, which is that a reasonable inference of a party's actual knowledge of a scheme suffices to state a claim.  *See Go-Best Assets, Ltd. v. Citizens Bank of Mass.*, 972 N.E.2d 426 (Mass. 2012).[66]

---

[64] SCAC ¶¶ 327, 331, 562, 566; *see also* SCAC ¶ 447 (Brazilian Ministry of Finance publicly declared TelexFree an unsustainable Ponzi scheme on March 9, 2013).

[65] SCAC ¶¶ 393, 422-23.  Notably, Nehra did take the opportunity at this event to falsely assure attendees that the events surrounding TelexFree in Brazil would not affect their investments.  SCAC ¶ 422.  These types of TelexFree "extravaganza" events were intended to recruit new victims, and would feature leading Promoters rewarded by "showering" them with cash on stage.  SCAC ¶ 646.  This particular event in July 2013 was organized by Thomas More, former high-profile pitch-man for defunct pyramid scheme Zeek Rewards.  SCAC ¶¶ 141-44.  Nehra had also been active in Zeek Rewards, serving as its legal counsel until its eventual shutdown in August 2012.  SCAC ¶¶ 408-411, 537.

[66] In pleading the actual knowledge element , it is well-accepted that "general awareness" of a fraudulent scheme by an aider or abettor is sufficient and that such awareness may be established through circumstantial evidence.  *Federal Deposit Ins. Corp. v. First Interstate Bank of Des*

With respect to the third and last element for tortious aiding and abetting, substantial assistance, the SCAC abundantly alleges that the Defendant Licensed Professionals offered substantial assistance and provides sufficient supporting detail for purposes of the instant review. *See, e.g.,* SCAC ¶¶ 405-33, 533-71 (Attorney Defendants); 577-80, 582-91, 593 (PwC). Substantial assistance has been found to exist in Massachusetts where a plaintiff demonstrates "some measure of 'active participation'" in a primary tort by the defendant. *See Bamberg v. Sg Cowen*, 236 F. Supp.2d 79 (D. Mass. 2002) (citation omitted). The substantial assistance prong is also satisfied where the conduct alleged was "a substantial factor in causing the tort" or violation. *See Aetna Cas. and Surety Co.*, 219 F.3d at 537; *see also Norman v. Brown, Todd & Heyburn*, 693 F. Supp. 1259, 1264 (D. Mass. 1988) (reversing motion to dismiss in favor of law firm and finding substantial assistance by firm of client's fraud).

The SCAC sets forth the active participation of the Defendant Licensed Professionals and makes clear Nehra and Waak's and PwC's conduct was "a substantial factor in causing the tort" or violation because, among other things, the assistance they provided was substantial and essential to the survival and perpetuation of the Scheme. *See e.g.* SCAC ¶¶ 146, 393, 421-23, 429, 537, 545, 547-50, 552, 554, 556-57, 559-60, 562, 566 (Nehra and Waak); 578-79, 588-89, 591, 593 (PwC).

While an objective review of the content of the pleadings set forth herein is sufficient to defeat the Licensed Professionals' Rule 12 (b)(6) requests, in further support of their opposition Plaintiffs rely on the arguments set forth below and the content of Attachment 2. The SCAC

---

*Moines, N.A.*, 885 F.2d 423, 430-31 (8th Cir. 1989) (bank's general awareness of its overall role in customer's scheme established through circumstantial evidence was sufficient ); *National Fin. Enters.*, 580 F. Supp. 2d at 654., *citing Camp v. Dema*, 948 F.2d 455, 460 (8th Cir. 1991); *Smith v. First Union Nat'l Bank*, No. 00-4485-CIV, 2002 WL 31056104, at *3 (S.D. Fla. Aug. 23, 2002), *quoting Woods v. Barnett Bank of Fort Lauderdale*, 765 F.2d 1004, 1009 (11th Cir. 1985).

adequately alleges each element of tortious aiding and abetting asserted against Nehra & Waak and PwC with accompanying factual references sufficient to place those Defendants on notice of the claims against them.  As such, the Defendant Licensed Professionals' request for pre-discovery, summary dismissal with prejudice must be denied.

## A.      The SCAC Sufficiently Pleads The Attorney Defendants' Aiding And Abetting Of The TelexFree Scheme

In response to the thorough and detailed allegations asserted against them, the Attorney Defendants devote a mere two pages to their argument that the SCAC fails to state a claim for aiding and abetting against them.  In those two pages they do not address a single factual allegation of the SCAC.  *See* Doc. No. 188 at 28-29.  The Attorney Defendants' abbreviated and unsupported attack does not counter the extensive allegations in the SCAC.  Plaintiffs' averments must be accepted as true, and, given the level of detail referencing how Nehra and Waak aided and abetted the TelexFree Scheme, the claim is sufficiently pled and the Attorney Defendants' Motion must be denied.

### 1.      The SCAC Pleads Sufficient Particularized Facts That Meet The Standard For Pleading The Attorney Defendants' Actual Knowledge Of The TelexFree Scheme

The second element of tortious aiding and abetting is satisfied for purposes of the instant review because although the Attorney Defendants suggest throughout their brief that they did not have intimate knowledge of the Scheme, they failed to contest the aiding and abetting counts with fact,[67] law[68] or argument.[69]  The plain language of the SCAC specifically and repeatedly

---

[67] *See Stanley v. Carrier Mills-Stonefront Sch. Dist. No. 2*, 459 F. Supp. 2d 766, 779 (S.D. Ill. 2006) (denying motion to dismiss where defendant had provided general citations to the legal standard but failed to offer anything "but facile assertions unsupported by citation to analogous case law").

[68] It is not [the court's] function to craft such arguments on behalf of the Defendants.  *Edwards & Assoc., Inc. v. Atlas-Telecom Servs-USA, Inc.*, C.A. No. 3:06-CV-0751-G, 2007 WL 30256,

alleges with supporting facts that Nehra and Waak had actual knowledge of the TelexFree Scheme.  For example, the SCAC alleges that the Attorney Defendants held themselves out as experts claiming that they possessed special expertise and great experience as MLM specialists (SCAC ¶¶ 144, 146, 287, 396-97, 403-08, 412, 414, 537-38, 540, 549, 564), that they possessed intimate knowledge of TelexFree's business model (SCAC ¶ 320, 384, 414-15, 531, 536, 562), that they had involvement with past unlawful pyramid schemes (SCAC ¶¶ 394, 399-402, 408-13), and that they knew that the TelexFree model was an unlawful Scheme (SCAC ¶¶ 403, 415, 418, 429, 534-36).[70]  In addition, Nehra and Waak knew that the same principals of Ympactus created TelexFree. SCAC ¶¶ 112, 182-184, 198-200, 210, 215, 217-18, 225, 227, 230, 235, 240, 242, 245, 251, 253-255. Nehra and Waak also knew TelexFree was merely a purported new entity intended to transition their Pyramid Scheme enterprise from Brazil to the United States and to engage in the same deceptive and unlawful activities as Ympactus.  SCAC ¶¶ 107-110, 122, 182, 396, 399-405.  Further, at the time of many of their affirmative acts and representations, they knew that Ympactus had come under legal scrutiny with Brazilian authorities and that an injunction had issued which shuttered TelexFree's Brazilian operations. SCAC ¶¶ 120-23, 134-35, 141, 395-396, 410-15, 422-23.

These allegations are more than sufficient to satisfy the knowledge element of the Investor Victims' claim.  *See Cordell Consultant, Inc. Money Purchase Plan & Trust v. Abbott*,

---

*2-3, 8 (N.D. Tex. Jan. 4, 2007) (on motion to dismiss defense counsel improperly failed to address the requisite elements of causes of action or direct court to legal authority for them).

[69] *See Operating Engs. Local 324 Health Care Plan v. G &W Constr. Co.*, 783 F.3d 1045 (6th Cir. 2015) (declining to address argument where party had "not offered any 'developed argumentation' on a defense) [citation omitted].

[70] *See also* SCAC ¶¶ 13-28 (discussing clear and unambiguous illegality of TelexFree business model and compensation system as set forth in Standard Membership Contract and TelexFree.com website).

561 F. App'x 882, 885 (11th Cir. 2014) (reversing lower court and holding plaintiff's allegations (i) that attorneys knew that financial statements filed on the behalf of Ponzi client were false, (ii) that Ponzi's principal was withdrawing funds from intermediaries and using them to purchase property in the client's own name, and (iii) that financial statements used in securing fraudulent loan vastly understated the client's liabilities was sufficient to plead actual knowledge for purposes of aiding and abetting claim).

2.    **The SCAC Pleads Sufficient Particularized Facts That Meet The Standard For Pleading The Attorney Defendants' Substantial Assistance Of The TelexFree Scheme**

The allegations in the SCAC reasonably satisfy the third element of the Investor Victims' claim for tortious aiding and abetting against the Attorney Defendants for purposes of the instant review since they unequivocally assert that the Attorney Defendants provided substantial assistance essential to the unlawful Pyramid Scheme.  To the extent that more is required, the SCAC also sets forth sufficient supporting detail.[71]  For example, the Investor Victims assert that, with full actual knowledge of the illegal nature of the TelexFree Scheme, the Nehra and Waak legal team advised TelexFree, instructed it in the wording of its unlawful contracts,[72] and counseled it in methods to avoid compliance with securities regulations and the scrutiny of

---

[71] Plaintiffs do not allege that Nehra and Waak had the misfortune of offering their legal services to a client who unbeknownst to them used such services to further a fraudulent scheme.  Rather Plaintiffs allege they were in lock step with the other conspirators and knowingly acted to sustain and propagate the unlawful Pyramid Scheme.

[72] SCAC ¶ 413 ("The Attorney Defendants were used in an attempt to hide TelexFree's Pyramid Scheme activity with obfuscating phraseology."); *see also* SCAC ¶¶ 428-31 (Nehra and Waak specifically advised TelexFree to refer to Members of the putative class as "Associates," "Members," and "Promoters," but never as "investors," in order to avoid the strictures of applicable securities regulations – advice which TelexFree followed).

government regulators.[73]  SCAC ¶¶ 413, 428-32, 547, 550 (discussing Attorney Defendants' use of deceptive language to evade law enforcement).

While the legal advice provided alone is sufficient to sustain Plaintiffs' burden in pleading substantial assistance, the Attorney Defendants also went well beyond the role of legal advisors and acted as shills in TelexFree's marketing program.[74]  Nehra stepped into the forefront of the Scheme's marketing campaign when he inserted himself in the indispensable role of a party assigned to "shower TelexFree with credibility,"[75] by identifying himself as a specialized MLM attorney[76] and by falsely representing to the Investor Victims that TelexFree was lawful,[77] in direct response to their concerns and with full knowledge that his comments would become part of the marketing campaign used to spur sales.  *See also* Part III, Section IV, *infra* (Ninth Cause of Action -Fraud), for a fuller discussion.

Plaintiffs allege that Nehra knew that TelexFree was using his representations that TelexFree was legitimate, lawful and worthy of investment to sustain and promote the Pyramid Scheme.  SCAC ¶¶ 289, 419-21, 554-60; *see also Neilson,* 290 F. Supp. 2d at 1131 (imparting "aura of legitimacy" sufficiently alleges substantial assistance); *In re Nat'l Century*, 580 F. Supp. 2d at 655; *Weinberg v. Mendelow*, 113 A.D.3d 485, 488 (N.Y. App. Ct. 2014) (plaintiff's reliance upon law firm's representation of qualifications of advisor on firm's website could constitute substantial assistance).  In fact, the SCAC specifically alleges that Defendant

---

[73] *See Id.*

[74] *See* Part II, Sections I and II; Part III, Sections III and IV, *infra*, for a more detailed description.

[75] SCAC ¶ 289-90.

[76] SCAC ¶¶ 405-12, 414, 545, 549, 554.

[77] *See, e.g.,* SCAC ¶¶ 422-23, 555-56 ("the special ingredient is that you have a real product"), 557-67.

Attorneys' representations furthered and propelled the unlawful Scheme (SCAC ¶ 432), and that

Nehra and Waak encouraged and advised the Investor Victims to become and remain Members

to their detriment, despite knowledge of the illegality of TelexFree's operations.  SCAC ¶¶ 562-

65. The Defendant Attorney acts were done for the specific purpose of offering substantial

assistance that was of essential benefit to TelexFree.  SCAC ¶¶ 568-70.

    None of the Attorney Defendants' defective legal arguments merit dismissal of the

Investor Victims' well-pled claim of tortious aiding and abetting.  Although it is inapplicable to

the allegations in the SCAC, Nehra and Waak recite the legal principle that an attorney's silence

when he or she knows his or her client is committing tortious conduct does not give rise to

liability when there is no separate duty to the plaintiffs.  *See* Doc. No. 188 at 29.  The Attorney

Defendants assert a second inapplicable legal principle, arguing that their failure to warn the

Investor Victims cannot constitute substantial assistance because they owed no duty to do so.  *Id.*

at 29-30.  The Attorney Defendants' curious defense does little more than conflate a failure-to-

act type claim with Plaintiffs' allegations that Nehra and Waak affirmatively fully participated

and acted to provide substantial and essential services.  Moreover, the existence of a duty is not a

prerequisite to an aiding and abetting claim, including its substantial assistance element.  *See In*

*re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 511 F. Supp. 2d 742, 802 (S.D. Tex. 2005),

*quoting Witzman v. Lehrman & Flom,* 601 N.W.2d 179, 186 (Minn. 1999), *citing* Restatement

(Second) of Torts § 876 ("[w]ith respect to attorneys, '[u]nlike negligence claims, aiding and

abetting liability does not require the existence of, nor does it create, a pre-existing duty of care

to a third party nonclient . . . [r]ather aiding and abetting liability is based on proof of scienter—

the defendants must *know* that the conduct they are aiding and abetting is a tort.'"); *Facciola v.*

*Greenburg Taurig, LLP*, No. CV-10-1025-PHX-FJM, 2011 WL 2268950 (D. Ariz. June 9, 2011)

(denying motion to dismiss as lawyer's omission in preparing private offering memoranda was substantial assistance).

Even assuming, *arguendo,* that a duty to speak was required,[78] the SCAC makes plain that, with regard to certain false statements, the Attorney Defendants did owe Plaintiffs a duty as a result of Nehra's voluntarily assumption of a public role in the TelexFree Scheme and the unfair, deceptive and untrue representations he specifically directed to the Investor Victims as part of TelexFree's marketing of their Pyramid Scheme.  The Attorney Defendants were not silent at all.  They provided affirmative, targeted advice and assistance that perpetuated and strengthened the Scheme.[79]

Nehra and Waak's other argument that "routine professional services" cannot form the basis of substantial assistance is erroneous for the same reasons that a financial institution may be held liable for such actions.  *See* Part I, Section I.C.4, *supra*; *see also Cordell Consultant*, 561 F. App'x at 885 (reversing dismissal of second amended complaint against lawyers who prepared loan documents and provided them to plaintiffs knowing they would rely on them)[80]; *Oster v.*

---

[78] *See* Part III, Section I, *infra.*

[79] For this reason, the Attorney Defendants' reliance upon *Austin v. Bradley Barry & Tarlow, P.C.*, 836 F. Supp. 36 (D. Mass. 1993), is unavailing.  As the *Austin* court succinctly stated, "[t]he plaintiffs [t]here d[id] not contend that BBT's duty to disclose arose from any prior affirmative misrepresentations."  In stark contrast, the TelexFree Complaint under review explicitly alleges affirmative misrepresentations made by Nehra and Waak to the Investor Victims.  Further distinguishing the *Austin* case is the fact it was brought under Rule 10b(5) of the Securities Exchange Act of 1934.

[80] In *Cordell*, the plaintiff brought a claim against lawyers alleging that they aided and abetted a Ponzi scheme.  The lawyers allegedly aided and abetted the scheme by helping the principal borrow seven million dollars that sustained the scheme. The lower court's dismissal was reversed on the basis that plaintiff had sufficiently pled all elements of the claim.  With regard to the substantial assistance element, the court held that the plaintiff's allegations that transactional lawyers had prepared the loan documents and closed the loan were sufficient to support a claim of substantial assistance.  The court also held that plaintiff's allegations that litigation lawyers who had supervised the transactional lawyers and advised the Ponzi's principle to take a loan in the first place were sufficient to support a claim of aiding and abetting.

*Kirschner*, 77 A.D.3d 51 (N.Y. 2010).  The Attorney Defendants knowingly providing false

advice intentionally designed to sway Investor Victims toward investing in a Pyramid Scheme is

not routine legal services.  Legal professionals are not allowed to falsely advise investors that an

investment is legitimate[81] when they are aware it is an unlawful Pyramid Scheme.[82]

Finally, Nehra and Waak attempt to immunize their substantial role in furthering the

TelexFree Scheme by claiming they were paid legal fees.[83]  They argue that substantial

assistance does not exist because their receipt of fees is not sufficient evidence of a motive to

provide knowing assistance to the Scheme through silence.  Once again, the Attorney

Defendants' argument misses the mark.  As addressed herein, the claims against the Attorney

Defendants are not solely based upon a failure to warn the Investors.  Rather the claims are

driven by the Attorney Defendants' significant, affirmative misrepresentations and their

substantial provision of essential services.  *See Facciola v. Greenberg Traurig LLP*, No. CV-10-

1025-PHX-FJM, 2011 WL 2268950, at *9 (D. Ariz. June 9, 2011) (rejecting motion to dismiss

that wrongly characterized lawyer's actions as inaction).  In addition, there is no exception to the

substantial assistance element for parties who also receive legal fees.  *See, e.g., id.* (finding

pleading of sufficient facts to infer that attorney substantially assisted tort).  In any event, the

lack of a profit does not negate the existence of substantial assistance.  *See, e.g., Metge v.*

*Baehler*, 762 F.2d 621, 630 (8th Cir. 1985) (substantial assistance is issue for jury even where

---

[81] *See* ABA Model Rules of Professional Conduct 4.1; Mass. R. Prof. Cond. 4.1.

[82] *Sgarzi v. Sharkansky, LLP*, No. 13-03951, 2014 WL 2504537 (Mass. Super. Ct. Feb. 11, 2014), relied upon by Nehra & Waak, does not dictate a different result.  *See* Doc. No. 188 at 29. There, the complaint did not allege that the law firm engaged in fraudulent conduct, such as incorrectly advising the plaintiff that its client's offerings were lawful.  Rather, it alleged that the attorneys gave correct and lawful advice regarding financial statements and their filing requirements but that its clients failed to follow that advice.

[83] *See* Doc. No. 188 at 29.

bank aider and abettor made no profit on loans); *Wells Fargo Bank v. Arizona Laborers, Teamsters & Cement Masons Local No. 395 Pension Trust Fund*, 38 P.3d 12, 23 (Ariz. 2002), as corrected (Apr. 9, 2002) ("[e]vidence of business strategies undertaken by [defendant] to prolong [the primary actors'] financial life," raised an inference that defendant Bank "knew of, and gave substantial assistance" to the primary violation).

The Attorney Defendants provided substantial assistance or encouragement to TelexFree, and the SCAC is sufficiently particularized in this regard to provide them with notice of the claims against them. The Attorney Defendants drafted legal documents that allowed TelexFree's fraudulent enterprise to skirt regulatory authorities. Their marketing-related activities or legal opinions that assured investors that TelexFree was a legal business operation in the United States were widely circulated and heavily promoted and were essential cogs in TelexFree's operations. This was an essential element in the launching, sustainability and proliferation of the TelexFree program. This substantial assistance was intended to and did counter the concerns of the Investor Victims when TelexFree faced scrutiny by international authorities. Substantial assistance was sufficiently pled.

**B.      The SCAC Sufficiently Pleads The Accountant Defendants' Aiding And Abetting Of The TelexFree Scheme**

Auditors are not immune from aiding and abetting claims with respect to their clients' wrongdoing. *See, e.g., In re Am. Cont'l Corp./Lincoln Sav. & Loan Sec. Litig.*, 794 F. Supp. 1424, 1442 (D. Ariz. 1992) ("an independent public accountant who knows of or recklessly disregards a client's fraud, may be held liable for aiding and abetting that fraud where the auditor provides services which constitute substantial assistance"). Here, as alleged in sufficient detail for this review, PwC was integrally involved in TelexFree's operation long after any competent review of its books revealed that it was an unlawful Pyramid Scheme. To assist TelexFree in its

74

response to the Massachusetts SOC Securities Division's formal investigation, PwC was given unfettered access to its records. For purposes of this Rule 12(b)(6) review, its subsequent knowing role in TelexFree's unlawful Pyramid Scheme renders it subject to a claim of tortious aiding and abetting.

1. **The SCAC Pleads Sufficient Particularized Facts That Meet The Standard For Pleading The Accountant Defendants' Actual Knowledge Of The TelexFree Scheme**

The SCAC alleges facts that support the Investor Victims' allegations that PwC, a sophisticated international financial advisor, had actual knowledge of the TelexFree Scheme. The SCAC alleges that PwC possessed intimate knowledge of TelexFree and its illegal operation by virtue of its financial and tax consultation and advice since at least January 2014. PwC's role was multifarious, and included providing tax and financial consultation, assisting with the development of international tax structures, preparing financial documents for affiliated TelexFree entities, assisting with the preparation and issuance of 1099 Forms, and assisting with TelexFree's response to the Massachusetts SOC Securities Division information requests in February 2014. SCAC ¶¶ 577-80, 583-84.

The Investor Victims further support their claim of actual knowledge by specifically alleging that PwC had access to internal financial documents that demonstrated that TelexFree received virtually no income from the sale of its VOIP product and was, in fact, an illegal Pyramid Scheme. SCAC ¶¶ 585, 587. As noted above, by the time PwC began aiding TelexFree, its Brazilian operations had been declared a likely pyramid scheme, its Brazilian entity was enjoined from any further operation, and criminal investigations of the principals were underway by Brazilian authorities. The Investor Victims specifically allege that PwC knew that TelexFree's Brazilian operation, Ympactus, had been declared fraudulent and enjoined by the Brazilian courts. SCAC ¶ 590. Following the Brazilian shutdown, PwC also knew that

TelexFree was simply a new shell entity for the same pyramid scheme operated from the same offices, by the same principals.  SCAC ¶ 396.

Significantly, PwC advised and participated with TelexFree in the issuance of fraudulent IRS Form 1099s [Miscellaneous Income], and given that the very purpose of these Forms is to report investor income, PwC necessarily studied and understood the structure and operations of TelexFree.  Furthermore, the Investor Victims specifically allege that:

- TelexFree's operation had many signs of unlawful, unfair and deceptive wrongdoing that were highly suspicious and constituted Red Flags recognized by the Federal Financial Institution Examinations' Counsel.  SCAC ¶¶ 394-402; *see also* SCAC ¶¶ 652-83 (discussing FFIEC investigation and monitoring requirements and Red Flags).

- TelexFree's Standard Membership Contract and website revealed numerous clear and unambiguous violations of the Massachusetts Anti-Pyramid Scheme Statute, M.G.L. c. 93, § 69.  SCAC ¶¶ 13-28.

- PwC knew that TelexFree was nothing more than a revised entity created by the same principals to engage in the same unlawful enterprise.  SCAC ¶ 396.

- PwC knew that TelexFree was an unlawful Pyramid Scheme but continued to participate in, aid, abet and further such illegal activities and knew that Telex Free was shuttered in Brazil but continued to substantially aid and abet and act to further its unlawful operations and activities in the United States.  SCAC ¶ 459.

- PwC knew that the requirement that Telex Free members merely place online advertisements was economically worthless and yet purported to be an integral part of the Telex Free enterprise.  SCAC ¶ 320.

- TelexFree did not make use of usual and accepted MLM accounting practices.  SCAC ¶ 516.

- The SOC investigation, with which PwC assisted, confirmed the existence of duplicative accounting records containing egregious discrepancies and failure to comply with GAAP standards.  SCAC ¶¶ 517-21.

- TelexFree's illegal operations were widely reported online by English media in January 2013, and in February 2013 BehindMLM.com reported that TelexFree was under criminal investigation in Brazil and the results of the Brazilian investigation were widely reported.  SCAC ¶¶ 444-53.

- PwC knew that providing their services to TelexFree would give substantial assistance or encouragement to TelexFree to continue its unlawful business model and further the illegal Scheme.  SCAC ¶ 590.

Despite the above allegations, PwC argues that the Investor Victims' allegations are simply "conclusory terms" and that the Investors cite only two facts in support of their allegations of knowledge.[84]  PwC completely ignores all but two of the above allegations as a way to gloss over the abundance of facts alleged that support PwC's obvious knowledge of the Pyramid Scheme.  PwC's incomplete and inaccurate arguments are insufficient to negate actual knowledge.

## 2.    The SCAC Pleads Sufficient Particularized Facts That Meet The Standard For Pleading The Accountant Defendants' Substantial Assistance Of The TelexFree Scheme

The Investor Victims specifically allege that PwC knew that their role would give substantial assistance and encouragement to TelexFree to continue its illegal Scheme.  SCAC ¶ 588.  The Investor Victims allege that PwC provided its services, advice and assistance to TelexFree with full knowledge of the illegal nature of TelexFree, with full knowledge that Investor Victims would rely on the advice provided and with full knowledge that its assistance would sustain the Pyramid Scheme.  SCAC ¶¶ 396, 577-80, 584-85, 590.  In fact, PwC provided bad advice that distorted, furthered and perpetuated the unlawful, unfair and deceptive Pyramid Scheme.  SCAC ¶ 432.

PwC's assistance to TelexFree includes advising TelexFree to send unfair, deceptive and unsupportable Form 1099s; providing tax and financial consultation and assistance with the development of international tax structures; and responding to SOC information requests cognizant that this advice would sustain, rather than put a stop to, TelexFree's unlawful

---

[84] *See* Doc. No. 174 at 11.

operation and would help maintain the false illusion that TelexFree was a legitimate company.

All this allowed TelexFree to further advance its business operations and illegal enterprise.

SCAC ¶¶ 580, 589-90.  These are affirmative acts that substantially assisted TelexFree.  PwC

undertook these efforts with full knowledge of the illegal nature of TelexFree.  These facts

demonstrate "active participation" and knowing provision of substantial assistance and thus are

sufficiently pled to meet the substantial assistance element.  *See Bamberg v. SG Cowen*, 236 F.

Supp. 2d 79, 90-91 (D. Mass. 2002).[85]

Accordingly, at this juncture the SCAC pleads sufficient facts that demonstrate PwC's

substantial assistance in the TelexFree Scheme to withstand a Rule 12(b)(6) pre-discovery

dismissal of its aiding and abetting claims.


## PART TWO:  M.G.L. CHAPTERS 93 AND 93A
## DIRECT VIOLATIONS AND AIDING AND ABETTING
### (First and Second Counts as against Licensed Professionals;
### Third Count as against Financial Services Providers
### and Licensed Professionals)

### I.

### THE INVESTOR VICTIMS HAVE STATED A VALID CLAIM FOR VIOLATION OF
### M.G.L. CHAPTER 93, §§ 12 AND 69 AGAINST THE LICENSED PROFESSIONALS

Defendant PricewaterhouseCoopers, LLP ("PwC") moves to dismiss Plaintiffs' claim

alleging violations of Massachusetts General Laws ("M.G.L.") Chapter 93, §§ 12 and 69 against

it (First Claim for Relief), arguing that PwC is not a multi-level distribution company or

participant and did not engage in any of the conduct set forth in Section 69.  *See* Doc. No. 170

---

[85] In *Bamberg*, the court found that the accountant did not provide substantial assistance in
providing information for an audit report that was ultimately finalized and presented by another
company on the basis that accountant expressed reservations with the information provided.
Here, there are not facts alleged as to any reservations expressed.  To the contrary, the facts
allege that PwC affirmatively gave advice to issue the Form 1099s.

(PwC Br.) at 4.  PwC also argues that Plaintiffs' Section 69 claim fails to identify any conduct by

it that violated the statute.  *See id.* at 4-5.  Defendants Gerald P. Nehra, Richard W. Waak,

Gerald P. Nehra Attorney at Law, Richard W. Waak Attorney at Law, and the Law Offices of

Nehra and Waak (collectively, "Nehra and Waak") similarly move to dismiss Plaintiffs' claims

asserting virtually identical arguments.  *See* Doc. No. 188 ("Nehra and Waak Br.) at 19-20.

Contrary to PwC and Nehra and Waak's assertions, both acted as a "participant" in TelexFree as

detailed in Plaintiffs' SCAC.

> M.G.L. Chapter 93, § 69(d)(1) provides that

> [n]o multi-level distribution company or participant in its marketing program shall:
> (1) operate or, directly or indirectly, participate in the operation of any multi-level
> marketing program wherein the financial gains to the participants are primarily
> dependent upon the continued, successive recruitment of other participants and
> where retail sales are not required as a condition precedent to realization of such
> financial gains[.]

While "multi-level distribution company" is expressly defined under Section 69, "participant" is

not.  *See* M.G.L. c. 93, § 69(a).  In the absence of a statutory definition, the meaning of

"participant" should be ascertained from the statute's words construed by the "ordinary and

approved usage of the language, considered in connection with the cause of its enactment, the

mischief or imperfection to be remedied and the main object to be accomplished, to the end that

the purpose of its framers may be effectuated."  *See Hanlon v. Rollins*, 190 N.E. 606 (Mass.

1934); *see also Com. v. Reyes*, 982 N.E.2d 504, 509 (Mass. 2013).  Here, the most useful

guidance to defining "participant" can be found in Section 69(a) which describes a number of

activities that "participants" may perform, such as participating in the distribution chain for

goods or services offered by the company; recruiting new participants; paying or receiving

commissions, bonuses, or finders' fees as a result of the sale of such goods or the recruitment of

additional participants.  *See* M.G.L. c. 93, § 69(a).

79

Pursuant to the foregoing guidance, the SCAC alleges actions by PwC and Nehra and Waak, including recruiting new participants and receiving financial compensation based on the recruitment of additional participants, making PwC and Nehra and Waak "participants" under M.G.L. c. 93, § 69(d)(1).  Particularly, Plaintiffs' SCAC includes allegations that Nehra and Waak made public statements at TelexFree conferences and in communications with the press regarding the legality and viability of TelexFree in an obvious effort to recruit and maintain investor Members.  SCAC ¶ 393.  Plaintiffs also allege that Nehra and Waak drew direct financial benefit from assisting TelexFree to perpetuate and further the Pyramid Scheme.  SCAC ¶ 427.  PwC acted as an indirect "participant" by advising and approving TelexFree to mail fraudulent and inaccurate IRS Form 1099s in an attempt to maintain the illusion that investor Members were receiving commissions or bonuses.  SCAC ¶ 580.

These alleged acts of PwC and Nehra and Waak are the same acts "participants" perform under Chapter 93.  *See* M.G.L. c. 93 § 69(a).  Moreover, PwC and Nehra and Waak's actions are undoubtedly the type of mischief and harm anticipated by Chapter 93.  PwC and Nehra and Waak's contentions that they are not "participants" or that Plaintiffs failed to plead requisite acts or conduct violative of Section 69 is not persuasive.  Thus, their motions to dismiss should be denied.

## II.

## THE INVESTOR VICTIMS HAVE STATED A VALID CLAIM FOR VIOLATION OF M.G.L. CHAPTER 93A, §§ 2 AND 11 AGAINST THE LICENSED PROFESSIONALS

PwC's argument that Plaintiffs have failed to allege the requisite elements to establish a claim under M.G.L. Chapter 93A, §§ 2 and 11 (Second Claim for Relief) is equally without merit.  *See* Doc. No. 170 at 5.  Specifically, PwC errantly alleges that the Investor Victims have failed to plead facts establishing that PwC and Plaintiffs had a business relationship, that PwC's

tax advice to TelexFree was unfair or deceptive and that PwC's tax advice caused an actual loss to Plaintiffs. *See id.* Similarly, Nehra and Waak's argument that Plaintiffs' Second Claim for Relief must fail since they owed no duty of care to Plaintiffs pursuant to an attorney-client relationship is also unpersuasive. Doc. No. 188 at 12. Contrary to PwC and Nehra and Waak's assertions, the SCAC complies with the federal pleading standards and sets forth sufficient facts to demonstrate the necessary elements for a claim for violations of M.G.L. Chapter 93A, §§ 2 and 11.

Specifically, M.G.L. Chapter 93A declares "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce" to be unlawful. *See* M.G.L. c. 93A, § 2(a). The statute expressly provides a private right of action to non-consumer claimants injured by violations of its terms. *See* M.G.L. c. 93A, § 11. To prevail in a Section 11 action, a claimant must prove that a person who is engaged in trade or business committed an unfair or deceptive trade practice and that the claimant suffered a loss of money or property as a result. *See Bowers v. Baystate Techs., Inc.*, 101 F. Supp. 2d 53, 54-55 (D. Mass. 2000); *Alan Corp. v. Int'l Surplus Lines Ins. Co.,* 823 F. Supp. 33, 43 (D. Mass.1993).

## A.     Privity is Not Required To Maintain A Chapter 93A Claim

Contrary to PwC's assertion, Massachusetts' courts do not require privity to maintain a non-warranty-based action under Chapter 93A so long as the parties engaged in more than a minor or insignificant business relationship. *See Standard Register Co. v. Bolton-Emerson, Inc.*, 649 N.E.2d 791, 795-796 (Mass. App. Ct. 1995) (finding that officers could be liable for their misrepresentations made to plaintiff in violation of Chapter 93A, § 11, despite not being a party to an agreement with plaintiff); *Mongeau v. Boutelle*, 407 N.E.2d 352 (Mass. App. Ct. 1980) (finding allegations sufficient by a buyer of land who brought M.G.L. c. 93A action against real

81

estate broker that broker had misinformed plaintiff of the size of the lot and failed to disclose that property was encumbered by right of way).

At bar, PwC took an active role in the business relationship between TelexFree and its Members when it originated and orchestrated the dissemination of false IRS Form1099s from TelexFree to its investor Members.  SCAC ¶¶ 579-80.  By impacting the business relationship of TelexFree and Plaintiffs, PwC, like the realtor in *Mongeau*, eliminated the need for privity under Chapter 93A based on its misrepresentations and the fraud perpetuated against Plaintiffs.

Moreover, if the legislature had intended to place such a restriction on Chapter 93A actions, it could easily have done so by simply incorporating this directly into the statute. Conspicuously absent from the term "person" as defined in section 1(a), or any other provision of Chapter 93A, is any intention by the legislature to restrict its application only to deceptive trade practices committed by persons who furnish the goods or services on which the complaint is based.  Chapter 93A also lacks any indication that the legislature required privity as a condition of Chapter 93A actions.  *See generally* M.G.L. c. 93A.

Rather, Section 11 of Chapter 93A expressly provides a right of action by anyone adversely affected by "the use or employment by another person . . . of an unfair or deceptive act or practice declared unlawful by section two or by any rule or regulation issued under paragraph."  *See* M.G.L. c. 93A, § 11.  Deceptive acts, such as PwC's advice to TelexFree to issue false IRS Form1099s, are expressly declared unlawful under Section 2 of Chapter 93A. PwC is a "person" as defined under Chapter 93A.  *See* M.G.L. c. 93A, § 2(a).  As the terms of Chapter 93A do not restrict the Investor Victims from bringing this action against PwC, and in the interest of protection to consumers, PwC's motion should be denied.

82

**B.      PwC's Conduct Rose To The Level Of Unfairness And Deceptiveness Required By Massachusetts Courts**

PwC's argument that Plaintiffs' Chapter 93A claims must fail since assertions of negligence do not rise to the level of "unfair" and "deceptive" conduct is without merit.  It is axiomatic that conduct undertaken in a business context can be considered unfair or deceptive if the "actions lack any foundation at all, and go well beyond the rough and tumble of ordinary business transactions."  *Bellerman v. Fitchburg Gas & Elec. Light Co.,* No. WOCV200900023B, 2013 WL 518526, at *8 (Mass. Super. Jan. 7, 2013); *see also Levings v. Forbes & Wallace, Inc.*, 396 N.E.2d 149, 153 (Mass. App. Ct. 1979), *abrogated in part by Mass. Emp'rs Ins. Exch. v. Propac–Mass, Inc.*, 648 N.E.2d 435, 438 (Mass. 1995) (rejecting "level of rascality" test).  An act is unfair or deceptive if it is "'within any recognized conception of unfairness' or is 'immoral, unethical, oppressive or unscrupulous' or 'causes substantial injury to consumers (or competitors or other businessmen).'"  *See Glickman v. Brown*, 486 N.E.2d 737 (Mass. App. Ct. 1985), *abrogated on other grounds by Cigal v. Leader*, 557 N.E.2d 1119, 1121 n.8 (Mass. 1990), *quoting PMP Assocs., Inc. v. Globe Newspaper Co.*, 321 N.E.2d 915 (Mass. 1975).  Negligence can provide the basis for Chapter 93A liability, so long as it is paired with an unfair or deceptive act or practice.  *See Squeri v. McCarrick*, 588 N.E.2d 22, 24 (Mass. App. Ct. 1992); *Glickman* 486 N.E.2d at 741 (1985); *see, also, Briggs v. Carol Cars, Inc.,* 553 N.E.2d 930 (Mass. 1990).

The Investor Victims plainly allege that PwC violated Chapter 93A by negligently advising TelexFree to prepare and disseminate unfair, deceptive, and unsupportable IRS Form1099s.  SCAC ¶¶ 579-80.  Plaintiffs further allege that PwC negligently assisted TelexFree in providing its responses to the Massachusetts SOC Securities Division's information requests.  SCAC ¶ 584.  In their response, TelexFree offered conflicting financial records.  SCAC ¶¶ 515, 517-21.  PwC's negligent actions also rise to the level of rascality such as to be "unfair,"

"immoral" or "unscrupulous" as they knowingly aided TelexFree in attempting to *deceive* its investor Members and taxing authorities by advising TelexFree to disseminate fraudulent IRS Form 1099. PwC's advice to issue false and deceptive IRS Form 1099s caused substantial harm to the Members by causing them to incur tax liabilities on non-existent income reported on the IRS 1099 Forms and to carry the expense of dealing with the related income reporting obligations. PwC's acts unquestionably rise to a level of "unfair" and "deceptive" under Massachusetts law. The acts of PwC had no legitimate business purpose, but instead were engineered to assist TelexFree to continue to operate while harming its investor Members. Accordingly, Plaintiffs should be entitled to adjudicate their claims for violation of Chapter 93A, and PwC's motion should be denied.

**C.     The Investor Victims Properly Pled Facts Demonstrating Causation And Damages**

PwC next contends that Plaintiffs failed to properly allege facts demonstrating causation and damages to support their Chapter 93A claim. In doing so, PwC confuses the standard required at this pleading stage verses that required at trial. At this stage, Plaintiffs need only demonstrate a plausible claim to relief. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-558 (2007). Plaintiffs have satisfied their pleading obligation.

Specifically, Plaintiffs' SCAC alleges that as result of Defendants' (including PwC's) "violative acts, and unfair methods of competition or unfair or deceptive acts or practices, Plaintiffs and the putative class have been similarly caused to suffer ascertainable economic loss." SCAC ¶ 1016. While this allegation of causation and damages was reinforced further in the SCAC (*see*, *e.g.,* SCAC ¶¶ 577-82.), no further specificity regarding causation or Plaintiffs' economic damages is required to satisfy the federal notice pleading standard. *See* Fed. R. Civ. P. 8. Accordingly, Plaintiffs' Chapter 93A §§ 2 and 11 violation claim was adequately pled under Fed. R. Civ. P. 8, and PwC's motion should be denied.

**D.    Defendant Attorneys Nehra and Waak May Incur Chapter 93A Liability To A Non-Client**

Attorney Defendants Nehra and Waak mistakenly argue that Plaintiffs' Chapter 93A claim against them must fail since this claim is only available when an attorney-client relationship between a non-client plaintiff and defendant attorney exists.  It is well-settled that an attorney or law firm may incur Chapter 93A liability to a non-client or to an adversary of its client (1) if it joins its client in marketplace communications to the adversary rather than merely relays its client's positions and (2) if those marketplace communications knowingly or carelessly are false, misleading and harmful.  *See Coggins v. Mooney*, No. CIV.A. 94-0844, 1998 WL 156998, at *5 (Mass. Super. Apr. 3, 1998), *aff'd sub nom. Miller v. Mooney*, 725 N.E.2d 545 (Mass. 2000); *Kirkland Constr. Co. v. James,* 658 N.E.2d 699 (Mass. App. Ct. 1995) (reversing 12(b)(6) dismissal of a Chapter 93A claim against lawyer and firm).  In such situations, the attorney has arguably crossed from traditional representation into active participation in trade and commerce.

At bar, Plaintiffs alleged that Nehra and Waak crossed from traditional representation into active participation in trade and commerce on several occasions.  Specifically, Defendant attorney Nehra publicly appeared at TelexFree conferences and "Super Weekend" events, as well as in communications with the press, and publicly opined that he had examined TelexFree's business model and determined it to be legal, and that TelexFree "pays ONLY on the sale of its VOIP long distance product."  *See, e.g.*, SCAC ¶¶ 146, 393, 416, 423.  Defendant Nehra spoke at great length during the July 2013 TelexFree Super Weekend and reassured attendees of the legality and legitimacy of TelexFree's operation and stated that TelexFree's operation had been "vetted by the Nehra and Waak law firm."  SCAC ¶ 423.  These communications and published statements by Nehra and Waak to attendees and the press were knowingly false and made in an

attempt to mislead new or potential investor members as to the legality of TelexFree's business model.  SCAC ¶ 426.

Nehra and Waak's public statements to Plaintiffs and the press demonstrate that Nehra and Waak exceeded traditional representation and joined TelexFree in marketplace communications to Plaintiffs as required for an attorney or law firm to incur Chapter 93A liability to a non-client.  Moreover, Nehra and Waak's marketplace statements as to the legality and legitimacy of TelexFree were knowingly or carelessly false, misleading and harmful as alleged in the SCAC.  *See, e.g.,* SCAC ¶¶ 146, 393, 423.  Nehra and Waak's falsehoods included statements that "TelexFree 'pays ONLY on the sale of its VOIP long distance product'" and that TelexFree was "legally designed…you are on very solid legal ground."  *See* SCAC ¶¶ 393,423. Nehra and Waak's false marketplace communications demonstrate any argument as to a lack of liability under Chapter 93A is without merit, and their motion should be denied.

### III.

### THE INVESTOR VICTIMS HAVE ADEQUATELY PLED THE MOVING DEFENDANTS' AIDING AND ABETTING OF THE VIOLATIONS OF MASSACHUSETTS STATUTORY LAW

The Moving Defendants seek to avoid the Investor Victims' claims that they aided and abetted the various violations of Massachusetts General Laws ("M.G.L."), Chapter 93, §§ 12 and 69, and Chapter 93A, §§ 2 and 11, asserting first that no such cause of action exists and thereafter that the SCAC does not adequately allege that claim.  *See* Doc. No. 141, ¶¶ 1017-36 (Third Cause of Action).  Neither argument is valid.

**A.     The SCAC Properly Asserts A Claim For Aiding and Abetting A Statutory Violation By The Moving Defendants**

The Moving Defendants' contention that claims for aiding and abetting do not apply to M.G.L. Chapter 93 and Chapter 93A violations unless expressly provided in the statute is

misplaced.  Indeed, there is a plethora of support for the proposition that aiding and abetting

claims exist for statutory violations regardless of whether the statute specifically allows.

Analyzing this issue in light of common law, this Court, in *Green v. Parts Distrib. Xpress, Inc.,*

No. 10-11959-DJC, 2011 WL592858, *3 (D. Mass. 2011), denied the defendant's motion to

dismiss a claim of aiding and abetting a violation of the Massachusetts Independent Contractor

statute, finding:

> Although [the defendant] is correct that the statutory language in question is silent as
> to aiding and abetting liability, Massachusetts has long recognized the principle that a
> party may be liable under the common law if it 'knows that the other's conduct
> constitutes a breach of duty and gives substantial assistance or encouragement to the
> other so to conduct himself'…the issue is not whether the statutes underlying Count
> II expressly allow aiding and abetting liability, but whether those statutes either
> expressly prohibit such liability or otherwise dislodge Massachusetts' well-
> established common law regarding aiding and abetting.  [The defendant] has not
> pointed to, nor has this Court found, any statutory language or case law suggesting
> that any of the statutes underlying Count II preclude aiding and abetting liability.
> Thus, at this stage of the litigation, it would be inappropriate to dismiss Count II with
> regard to CMS.

Similarly, in *Blanco v. United Comb and Novelty Corp.,* No. 12-10829-TSH, 2013 WL

5755482, *6-7 (D. Mass. Oct. 22, 2013), this Court denied the defendant's motion to dismiss a

claim of aiding and abetting a violation of federal wage and hour statutes.  In *Blanco*, Judge

Hillman reasoned that an aiding and abetting claim is allowed, even where not specifically

provided for by a statute, as long as such cause of action would not be inconsistent with the

statute itself.  *Id.*  This Court also quoted Restatement (2d) of Torts § 876(b) which establishes

liability for aiding and abetting if a party "knows that the other's conduct constitutes a breach of

duty and gives substantial assistance or encouragement to the other so to conduct himself.".  *Id.*

at *6 (citation omitted).

The Moving Defendants' reliance on *Martin v. Irwin Indus. Tool Co.,* 852 F. Supp. 2d 37,

39 (D. Mass. 2012) is equally misplaced.  In *Martin,* this Court denied the defendant's motion to

dismiss against a co-employee for violations of M.G.L. Chapter 151B, reasoning, "nothing on the face of the statute limits the categories of the persons who may be liable." *Id*. Similarly, nothing on the face of either M.G.L. Chapter 93 or Chapter 93A limits aiding and abetting claims.

Desperate for support, the Moving Defendants look to the Suffolk Superior Court decision of *Reynolds v. City Express, Inc.,* No. SUCV201002655D, 2014 WL1758301 (Mass. Super. Ct. Jan. 8, 2014), again to no avail. Opinions of the Suffolk Superior Court do not constitute authority that binds this Court, or that this Court must consider sufficient to reverse its prior well-considered reasoning. *Reynolds* is otherwise easily distinguished. First, the *Reynolds* court reasoned "the plaintiffs do not have a claim under common-law aiding and abetting against [the defendants] because the plaintiffs do not allege, and the summary judgment record does not contain any evidence to suggest, that [the other defendants] committed an underlying tort." *Id*. at *8. Thus, the *Reynolds* opinion does not stand for the proposition that statutory aiding and abetting claims are not viable, but rather that it was not pled or proven in that case. Second, the SCAC here is overflowing with allegations and objective proof that establishes the other Defendants committed the alleged underlying claims. Third, *Reynolds* was a ruling on a motion for summary judgment. The Reynolds court applied a standard of review that is entirely different from the F.R.C.P 12(b)(6) failure to adequately plead review this Court will carry out. The *Reynolds* opinion was written after the plaintiff was afforded an opportunity to conduct full discovery, was judged against a fully developed record and was made at a procedural point where the plaintiff was deprived of the presumption of the truth of the complaint's allegations. Here, Plaintiffs have been afforded no discovery whatsoever and are entitled to the presumption of the truth of the SCAC's allegations

Indeed, Massachusetts' public policy considerations mandate that aiding and abetting claims for Chapter 93 and Chapter 93A violations exist. So compelling is the Massachusetts public policy that drives Chapter 93A, that § 3 specifically provides that "[f]or the purpose of this section, the burden of proving exemptions from the provisions of this chapter shall be upon the person claiming the exemptions." The Moving Defendants have offered nothing to establish that they are exempt from aiding and abetting claims in connection with that chapter, and their motion to dismiss this count as barred by law must be denied.

**B.   The SCAC Properly Pleads A Claim For Aiding And Abetting Statutory Violation Against The Moving Defendants**

The Investor Victims assert a claim for aiding and abetting violations of M.G.L. Chapter 93, § 69 ("Section 69") and M.G.L. Chapter 93A, § 11 ("Section 11") (SCAC Third Cause of Action) against the Moving Defendants. The SCAC sufficiently sets forth claims against the Moving Defendants for aiding and abetting TelexFree and the Operational Defendants'[86] violations of Section 69 and Section 11. More particularly, the SCAC sufficiently alleges that TelexFree and the Operational Defendants committed numerous primary violations of Section 69 and Section 11,[87] that the Moving Defendants had actual knowledge of these violations, and that they nonetheless provided substantially essential assistance in furthering these violations.

With respect to TelexFree and the Operational Defendants' primary violations of Section 69 and Section 11, the SCAC is replete with detailed allegations setting forth numerous instances

---

[86] The SCAC alleges that primary violations of M.G.L. Chapter 93, §§ 12 and 69 and M.G.L. Chapter 93A, §§ 2 and 11 were committed by the non-Defendant entities TelexFree, Inc., TelexFree, LLC, and TelexFree Financial Inc., and by Defendants Electric, Mobile, James M. Merrill, Carlos N. Wanzeler, Costa, Labriola, Craft, Craft Financial, Genet, Katia Wanzeler, Rodrigues, De La Rosa, Crosby, Miller, Sloan, Shoyfer, Nehra, Waak, Opt3, Borromei, PwC (collectively, the "Operational Defendants").

[87] Pursuant to M.G.L. c. 93, § 69(g), any violation of M.G.L. c. 93, § 69 also constitutes "an unlawful method, act or practice" within the meaning of M.G.L. c. 93a, § 2.

by which TelexFree's business model violated the operative statutes.  *See* Part I, Section I.A. and Part II, Sections I- II, *supra* (discussing illegal nature of TelexFree Scheme).  More particularly, TelexFree's pre-March 9, 2014 standard membership contract (the "Standard Contract") contained, on its face, numerous instances of Section 69 violations.  SCAC ¶¶ 13-25.  These facial violations include, among others: promising to pay "finder's fee[s], bonus[es], refund[s], override[s], commission[s], cross-commission[s], dividend[s], or other consideration" to Members solely for the solicitation or recruitment of new Members (SCAC ¶¶ 13-15); and, promising to pay "finder's fee[s], bonus[es], refund[s], override[s], commission[s], cross-commission[s], dividend[s], or other consideration" to Members although Members were not required to engage in any "bona fide and essential supervisory, distributive, selling or soliciting" nor exercise any "judgment," "skill" or "control over the operation" (SCAC ¶¶ 16-20).  The Contract further prohibits Members from canceling their individual Contracts "for any reason at any time […] upon notification in writing to the company" with full repurchase by the company of any unsold products, in clear violation of Section 69.  SCAC ¶¶ 21-24.  In addition to these facial violations of Section 69, the Pre-March 9 Contract also displays several classic hallmarks of pyramid schemes, such as "paying participants solely for recruitment of new members, not requiring any meaningful sales or distributive activity by participants, and using coercive measures to prevent participant withdrawal from the scheme" that were detected by the sophisticated systems of the Chapter 93A Aiding and Abetting Defendants. SCAC ¶ 25 (describing hallmarks). As previously detailed, the contract unjustifiably directly tied TelexFree's operations to the unlawful operations of Ympactus. SCAC ¶ 186.

Furthermore, TelexFree's own website laid bare to a sophisticated eye the illegal nature of its business model.  SCAC ¶¶ 26-27.  For example, the website promised that Members would

be paid for each new recruit they brought into the Scheme (SCAC ¶ 27(a)); it promised

additional bonuses and incentives simply for building a "network" of recruits, regardless of

product sales (SCAC ¶¶ 27(b)-(e)); it promised additional income for the unskilled cutting-and-

pasting of spam advertisements online on pre-selected websites (SCAC ¶ 27(f)); and, it

guaranteed income to Members (SCAC ¶¶ 27(g)-(i)).  Once again, these all constitute

unambiguous violations of Section 69.  *See* SCAC ¶¶ 27-28.  However, the violations of Section

69 were not limited to TelexFree, its Principals, Founders, and Executive Office; for a discussion

of Defendants PwC and Nehra and Waak's violations of Section 69, *see* Part II, Section I, *supra*.

Pursuant to M.G.L. Chapter 93, § 69(g), each of these violations of Section 69 also constitutes a

*per se* violation of Section 11.

With respect to the Moving Defendants' knowledge of the violations of Section 69, the

SCAC includes voluminous allegations establishing such Defendants' actual knowledge of the

Scheme's mechanics and marketing practices.  *See* Part I, Sections I.B, II.A.1 and II.B.1, *infra*

(discussing Moving Defendants' knowledge of mechanics of Scheme); *see also* SCAC ¶¶ 26,

116, 187-88, 303-05, 546, 566, 647-48, 693-94.  More particularly, and among other allegations,

the SCAC avers that the Financial Services Providers each reviewed TelexFree's standard

membership contract (to wit: the Pre-March 9 Contract) as a part of their required due diligence

before accepting TelexFree as a customer (SCAC ¶¶ 187-88), and that each of the Financial

Services Providers also reviewed TelexFree's website as part of their due diligence procedures.

SCAC ¶¶ 26, 647-48, 693-94.  Given the clear and unambiguous violations of Section 69 set

forth in TelexFree's membership contract and website, these allegations alone are sufficient to

establish that the Financial Services Providers were aware of TelexFree's statutory violations.

For further discussion of the Financial Services Providers' knowledge of the mechanics of TelexFree's Scheme, *see* Part I, Section I.B.2-4, *supra*.

The SCAC also leaves no question that the Attorney Defendants were aware of these statutory violations.  Indeed, among other allegations, the SCAC specifically states that the Attorney Defendants were active in *creating* the Standard Contract.  *See* SCAC ¶¶ 550, 566.  The Attorney Defendants also promoted themselves as "MLM Specialists" with extensive experience advising MLM and direct-selling companies, and therefore had sophisticated knowledge regarding the legalities surrounding the MLM industry, including Section 69.  *See* SCAC ¶¶ 290, 405-07, 414, 416, 457, 540, 564.

Finally, with respect to Defendant PwC, the SCAC makes clear that they were retained by TelexFree months after TelexFree Brazil had been publicly shut down (SCAC ¶ 578); it alleges that PwC advised TelexFree in responding to the inquiries of Massachusetts Corporations Division (SCAC[88] ¶ 584); it participated in creating deceptive IRS Form 1099s (SCAC ¶ 580); and, as TelexFree's accountant, it had full access to TelexFree's financial documents which clearly revealed that TelexFree was nothing more than a pyramid scheme (SCAC ¶ 585).  Therefore, PwC, too, cannot credibly claim ignorance of TelexFree's violations of Section 69, which SCAC makes the clear.

The SCAC describes, in painstaking detail, the assistance provided by each of the Moving Defendants to the TelexFree Scheme.  This is discussed with specificity at Part I. Sections I.C.2-3, II.A.2 and II.B.2, *supra*.  Given all of the foregoing, the Investor Victims' claim for aiding and abetting violations of M.G.L. Chapter 93A, § 11 and M.G.L. Chapter 93, §

---

[88] In advising TelexFree how to respond to the SOC investigation, PwC took advantage of its unfettered access to the business model, contracts and accounting records of TelexFree and gained actual knowledge that the sales of VoIP did not generate funding and that TelexFree's accounting records nonetheless further exposed wrongful conduct.

69 are recognized claims within Massachusetts law, and the SCAC has adequately pled these claims with respect to each Moving Defendant.

## PART THREE:  ADDITIONAL LICENSED PROFESSIONAL COUNTS
### (Sixth, Seventh, Eighth and Ninth Counts as against Licensed Professionals)

### I.

### THE INVESTOR VICTIMS HAVE SUFFICIENTLY PLED
### NEGLIGENCE CLAIMS AGAINST THE ATTORNEY DEFENDANTS

The SCAC asserts claims for professional negligence (Sixth Cause of Action) and negligent misrepresentation (Seventh Cause of Action) against Defendants Nehra, Nehra Law Firm, Waak, Waak Law Firm, Nehra and Waak Law Firm (the "Attorney Defendants" or "Nehra and Waak").  The Attorney Defendants challenge those claims on the sole ground that neither Nehra nor Waak owed a duty of care to the putative class because they are non-clients.  Doc. No. 188 at 4 (Nehra and Waak Br.).  No other element of either claim is challenged.  Claims for professional negligence and negligent misrepresentation are generally subject to pleading pursuant to Fed. R. Civ. P. 8.  *Fernandes v. Havkin*, 731 F. Supp. 2d 103, 120 n.12 (D. Mass. 2010), (denying motion to dismiss because negligent misrepresentation count "is not subject to the particularity requirement of Fed. R. Civ. P. 9(b)") *citing City of Worcester v. HCA Mgmt. Co., Inc.,* Civ. A. No. 90-40012-GN, 1994 WL 123629, at *1 (D. Mass. Apr. 7, 1994). *Compare favorably, Kirkland Constr. Co. v. James,* 658 N.E.2d 699, 700 (Mass. App. Ct. 1995) (applying Massachusetts law and holding that pursuant to the lenient standard on a motion to dismiss allegations are taken as true, doubts are resolved in favor of the complainant, and the motion must be denied unless no set of provable facts could entitle the plaintiff to relief).  Even if the particularity standards of Rule 9(b) somehow apply, Nehra and Waak's motion to dismiss must

be denied because the facts alleged fully support the claim that Attorney Defendants owed a duty to the Investor Victims and the putative class.

To support their lack of duty defense, the Attorney Defendants ignore case law directly on point, utilize inapposite case law and misconstrue and overlook allegations in the SCAC. Significantly, the Attorney Defendants cite only one case that was decided on a Rule 12(b)(6) challenge, while all other cases cited were decided either on summary judgment or after trial. Moreover, the cases relied upon by the Attorney Defendants are easily distinguishable.  Perhaps most important, Attorney Defendants fail to cite or acknowledge a Massachusetts case directly on point which was decided on a Rule 12(b)(6) basis in the defendant's favor.  As such, the Attorney Defendants' motion must be denied.

In general, a duty of care which arises from an attorney-client relationship is a required element to state a legal malpractice claim.  *Max-Planck-Gesellschaft Zur Foerderung der Wissenschaften E.V. v. Wolf Greenfield & Sacks, PC,* 736 F. Supp. 2d 353, 359 (D. Mass. 2010); *Norman v. Brown, Todd & Heyburn,* 693 F. Supp. 1259, 1265 (D. Mass.1988); *DeVaux v. Am. Home Assur. Co.*, 444 N.E.2d 355, 357 (Mass. 1983); *Kirkland,* 658 N.E.2d at 700.  There are two caveats to this general rule in Massachusetts.  First, an attorney may owe a duty to a plaintiff based upon an implied attorney-client relationship as opposed to a direct attorney-client relationship. *Max-Planck.,* 736 F. Supp. 2d at 359; *DeVaux*, 444 N.E.2d at 357.  Second, pursuant to the foreseeable reliance exception, an attorney owes a duty to a plaintiff even if there is no attorney-client relationship when the attorney knows or can reasonably foresee that the non-client will rely on the attorney services rendered.  *Kirkland*, 658 N.E.2d at 701.  The Investor Victims' SCAC states a claim under both theories.

**A.      The Investor Victims Plead Sufficient Facts To Support A Duty Based Upon An Implied Attorney-Client Relationship**

An attorney-client relationship may be implied when (1) a person seeks advice or assistance from an attorney, (2) the advice or assistance sought pertains to matters within the attorney's professional competence, and (3) the attorney expressly or impliedly agrees to give or actually gives the desired advice or assistance. *Max-Planck,* 736 F. Supp. 2d at 359 (holding that a material issue of fact existed as to implied attorney client relationship), (*citing DeVaux*, 444 N.E.2d at 357-58 (*quoting Kurtenbach v. TeKippe*, 260 N.W.2d 53, 56 (Iowa 1977))).  The third prong may be established "by proof of detrimental reliance, when the persons seeking legal services reasonably relies on the attorney to provide them, and the attorney, aware of such reliance, does nothing to negate it." *Id*.  Where reasonable persons could differ as to the existence of an attorney-client relationship, the trier of fact must resolve this issue. *Id*.

The SCAC meets each of the required elements for an implied attorney-client relationship.  First, the Investor Victims' allegations taken as a whole sufficiently allege that they sought advice from the Attorney Defendants.  The Attorney Defendants addressed the Investor Victims and provided legal advice through different channels that they knew were intended and accessible to Investor Victims such as the heavily promoted Super Weekend[89], videos, websites and other communications. *See* SCAC ¶¶ 416, 555-60, 566.  For example, Investor Victims allege that the Attorney Defendants:

- gave speeches to the putative class at TelexFree's recruiting and retention extravaganzas, super weekends, and other events proclaiming with an air of authority that TelexFree's product and model were legitimate and lawful; and

- informed the putative class that TelexFree "is legally designed…you are on very solid legal ground" and that TelexFree's operation had been "vetted" and "bless[ed]."

---

[89] The video was continuously used as promotional material.

*See* SCAC ¶ 566.  Further, Nehra directly advised the Investor Victims to avoid using the term "investment" to conceal and encourage others to conceal TelexFree's sale of securities and to refer to themselves as associates, members and promoters as opposed to investors.  SCAC ¶¶ 429-31, 550.  Through these communications, Attorney Defendants provided individualized advice specifically for the Investor Victims' use in seeking advice and information about TelexFree. Significantly, Investor Victims asked legal questions and were provided advice by Nehra at the Super Weekend.  *See* SCAC, Ex. 4 (Dec. of Carol Harris), Ex. 14.  Taken together, the facts support the reasonable inference that Investor Victims were the target audience and Investor Victims accessed and sought legal information via the various channels of communication provided.

Second, the advice sought by the Investor Victims through these communications pertained specifically to matters within the Attorney Defendants' professional competence.  As touted on their website, they are multilevel marketing ("MLM") experts.  Both Nehra and Waak held themselves out publicly and specifically to the Investor Victims as attorneys with extensive specialized skill and experience in MLMs.  SCAC ¶¶ 146, 403-08.

Third, the Attorney Defendants actually gave the desired advice and guidance to the Investor Victims on several occasions.  Nehra assured Promoters through internet postings, in writing and in person, that in his professional opinion, the TelexFree business model was legitimate.  SCAC ¶¶ 557-60.  Moreover, in their capacity as attorneys, the Attorney Defendants provided false and deceptive assurances directly to the Investor Victims via video on August 2, 2013 that TelexFree was not an unlawful enterprise because "the special ingredient is that you have a real product."  *See* SCAC ¶¶ 555-56.  Nehra otherwise assured Promoters through internet postings, in writing and in person, that in his professional opinion, the TelexFree business model

was legitimate.  SCAC ¶¶ 557-60.  At the Super Weekend, Nehra also represented that he had

vetted and blessed the TelexFree business model and operation.  SCAC ¶ 416.  In addition to at

the Super Weekend, Nehra represented to the Investor Victims in the press that he examined the

TelexFree business model and determined it to be legal and that TelexFree "pays ONLY on the

sale of its VOIP long distance product."  SCAC ¶ 393.  Nehra reassured the Investor Victims that

TelexFree was legal and legitimate and that the shutdown in Brazil would not affect TelexFree's

operations in the United States.  SCAC ¶¶ 422-23.  In guaranteeing that TelexFree was a

legitimate business enterprise, Nehra and Waak provided legal advice to the Investor Victims

that they knew to be false, thus cementing their role in the credibility portion of the Telex

Pyramid Scheme.  SCAC ¶ 286.

Further, Plaintiffs allege more than just general assurances of legality but go beyond and

allege that Nehra and Waak provided other specific advice to Plaintiffs intended to be relied

upon by them.  *See* SCAC Ex. 4, Decl. of Carol Harris, Ex. 14.  Nehra directly advised the

Investor Victims to avoid using the term "investment" to conceal and encourage others to

conceal TelexFree's sale of securities.  SCAC ¶ 550.  Nehra and Waak also provided advice to

the Investor Victims to refer to themselves as associates, members and promoters as opposed to

investors.  SCAC ¶¶ 429-431.

The cases relied upon by the Attorney Defendants are easily distinguishable both

procedurally and substantively.  First, none of the cases cited for the proposition that there was

no implied attorney client relationship were decided on a Rule 12(b)(6) challenge and thus were

subject to the less permissive summary judgment standard after discovery as opposed to the more

permissive pleading standard and the benefit of discovery.  *See* Doc. No. 188 at 4-11. Second,

the cited cases do not address circumstances, as at bar, where there is a reasonable inference that

the Investor Victims sought out advice from the Attorney Defendants.

For example, the Attorney Defendants rely on *DaRoza v. Arter*, which was decided on a

motion for summary judgment, for the proposition that Plaintiffs have failed to allege sufficient

facts to satisfy the first *Devaux* element that they sought advice from the attorney-defendant.[90]

622 N.E.2d 604, 607 (Mass. 1993) (holding that there is nothing to show that the plaintiff sought

any advice or assistance from any of the defendant attorneys).  The facts of *DaRoza* are readily

distinguishable.  In *DaRoza,* the non-client in question was a witness in litigation handled by the

attorney and, although he followed instructions, he did not seek advice from the attorney.  By

contrast, the facts alleged at bar support a reasonable inference that the Investor Victims sought

out the individual advice of the Attorney Defendants through the websites, the Super Weekend

and other communications as set forth above including directly asking questions.  *See* SCAC, Ex.

4 (Dec. of Carol Harris), Ex. 14.  At a minimum, based upon the facts alleged, reasonable

persons could differ as to the existence of an implied attorney-client relationship, and, thus, this

issue survives a motion to dismiss and must be resolved by the trier of fact.

**B.     The Investor Victims Plead Sufficient Facts To Support A Duty Based Upon
Foreseeable Reliance**

Attorneys owe a duty of reasonable care to a non-client whom he or she knows will, or

could reasonably foresee would, rely on the services rendered.  *Kirkland*, 658 N.E.2d at 701;

*Norman*, 693 F. Supp. at 1265 (holding plaintiff/investor allegations sufficient to support a

finding that they relied upon tax opinion letter included in offering circular and that attorney

---

[90] *DaRoza* does not hold that whether or not a plaintiff pled sufficient facts to establish a duty of care is a matter of law.  Rather, in deciding the summary judgment motion, the court indicated that whether there is a duty of care is a question of law.  *DaRoza*, 622 N.E.2d at 608.

knew or reasonably could foresee that the circular would be used by plaintiffs thus satisfying the foreseeable reliance standard).

The standard for a claim based upon foreseeable reliance is similar to, but less demanding than, the standard for a claim made under Restatement (Second) of Torts § 552(2)(b).  *See Kirkland*, 658 N.E.2d at 701 n.6 (holding that the standard for liability is the less demanding, reasonably foreseeable reliance).  Defendants cite *Page* and *Austin* for the contrary position, i.e., that plaintiffs must allege actual knowledge for the foreseeable reliance exception to apply.  *See* Doc. No. 188 at 5, (*citing Page v. Frasier*, 455 N.E.2d 148 (Mass. 1983)); *Austin v. Bradley, Barry & Tarlow, P.C.*, 836 F. Supp. 36, 38, 40-41 (D. Mass. 1993).  Significantly, both cases were decided prior to *Kirkland,* and cases decided since have found that reasonably foreseeable reliance is the correct standard to apply.  *See, e.g.*, *One Nat'l Bank v. Antonellis*, 80 F.3d 606 (1st Cir. 1996); *International Strategies Grp., Ltd v. Greenberg Traurig, LLP*, 482 F.3d 1 (1st Cir. 2007).  The Investor Victims' allegations are sufficient to meet the pleading standards for both actual knowledge and reasonable foreseeable reliance.

The Attorney Defendants argue that no duty to the Investor Victims could exist because it would create a conflict of interest in connection with its relationship with its client, TelexFree.  Doc. No. 188 at 7, 11.  However, the Attorney Defendants may not hide behind their attorney-client relationship with TelexFree to protect the intentionally false and misleading representations made, and advice given, to the Investor Victims at bar.  Although a court is less likely to impose a duty of reasonable care to a non-client where the duty will potentially conflict with the duty the attorney owes to his or her client, a duty of confidentiality does not protect an attorney who makes knowing misrepresentations to a non-client.  *Kirkland,* 658 N.E.2d at 701; *Nova Assignments, Inc. v. Kunian,* 928 N.E.2d 364, 368-69 (Mass. App. Ct. 2010).  In *Kirkland*,

the Court held that an attorney has a duty to a non-client ***"to refrain from relaying information that the lawyer knows or should know is untrue or misleading"*** and to act within the boundaries of S.J.C. Rule 3:07, Canon 7, DR 7-102 as appearing in 382 Mass. 785 (1981). *Kirkland,* 658 N.E.2d at 700 (emphasis added) (presently embodied in Mass. Prof. Con. Rule 4.1).

Claims against lawyers based upon a non-client's detrimental reliance on false statements are fully recognized under Massachusetts law and are distinguished from the types of claims that are negated due to concerns of conflict. *See, e.g., Nova Assignments,* 928 N.E.2d at 368-69.  In *Nova*, the Court explained that claims by a non-client against an attorney for detrimental reliance on a false representation do not implicate the conflict issue raised in *Basbanes*, i.e. that the law should not imply a duty of care toward an adversary. *Id.*  The court determined that "[b]ar membership provides no cloak of immunity for an attorney's false representations.  Rather it imposes a high duty of ethical conduct in the practice of our shared profession." *Id.* at 369.

The Attorney Defendants fail to cite to *Kirkland Constr. Co. v. James,* a case both constructive and directly on point.  658 N.E.2d 699, 701 (Mass. App. Ct. 1995).  The attorney in *Kirkland* represented Write Now, Inc., an office supply firm.  Kirkland, a construction company, was engaged by Write Now to renovate a building and wanted assurances that Write Now could pay for the job.  Write Now's lawyer, Choate, Hall ("Choate"), provided the assurances in the form of a letter to Kirkland.  Ultimately, Write Now failed to pay and Kirkland brought suit against the lawyer.  The lawyer sought to dismiss the complaint for failure to state a claim arguing that they had no duty to Kirkland.  The superior court granted the motion and the appeals court reversed, explaining that the allegations in the complaint addressed each of the required elements for a foreseeable reliance complaint:

First, Kirkland does not allege that it sought legal advice from Choate Hall; it sought assuring information from the lawyers about their client.  Contrast *DaRoza v. Arter,* 416 Mass. 377, 381, 622 N.E.2d 604 (1993).  Second, the complaint may be read to allege that Choate Hall made factual representations about arrangements its client "had made to ensure payment to Kirkland."[5]  Choate Hall's objective was to induce Kirkland to enter into a contract for the benefit of its client, itself, and, incidentally, Kirkland.  That combination, if Kirkland can prove it, may well be significant.  *See Greycas, Inc. v. Proud,* 826 F.2d 1560, 1563, 1565 (7th Cir.1987) (lawyer liable to nonclient lender for inducing loan to client by negligent misrepresentation).  Third, Kirkland alleges that Choate Hall knew and intended that Kirkland would rely on the representations in its letters, and Kirkland reasonably so relied.[6]  And fourth, the representations were allegedly false, careless, and harmful.  Those allegations, if they are proven, are the stuff of liability.

*Id.* at 701.  The *Kirkland* court did not identify any conflict between the interests of the client and non-client that would negate the attorney's duty to Kirkland.  The court also noted the trial court's earlier holding that, as counsel for Write Now, Choate owed Kirkland no duty except ***"to refrain from relaying information that the lawyer knows or should know is untrue or misleading"*** and to act within the boundaries of S.J.C. Rule 3:07, Canon 7, DR 7-102 as appearing in 382 Mass. 785 (1981).  *Id.* at 700 (emphasis added) (presently Mass. Rule Prof. Con. 4.1).

Plaintiffs make abundant allegations to meet each requirement for a claim based upon the foreseeable reliance exception.  Specifically, the Investor Victims have alleged facts that Nehra and Waak knew and/or could reasonably foresee not only that the Investors would rely on their representations and assurances but also that Nehra and Waak intended that they do so.  As detailed above, the Attorney Defendants touted to the Investor Victims and generally that they are MLM experts, thereby inducing reliance upon their representations and advice.  As also detailed above, the Attorney Defendants in fact made multiple assurances and representations to the Investor Victims about the legitimacy of TelexFree and provided advice on how to approach their interests to avoid regulatory scrutiny.

101

The Investor Victims further allege that Defendants made their representations and assurances to Plaintiffs knowing that they were false and intending that Plaintiffs rely upon them to perpetuate the TelexFree Scheme.  For example, Nehra assured Promoters through internet postings, in writing and in person that, in his professional opinion, the TelexFree business model was legitimate, despite having actual knowledge that it was unlawful and knowing his representations would be used as a marketing tool by TelexFree to reassure Promoters that TelexFree was lawful and worthy of investment and to perpetuate and advance its on-going fraud.  SCAC ¶¶ 57-60, 419-21.  Nehra and Waak's representations encouraged and advised Plaintiffs to become and remain Promoters to their detriment, despite knowledge of the illegality of TelexFree's operations.

The circumstances here do not implicate concerns about conflict of interest.  Here, in the context provided, the legal advice was represented as beneficial to the victims.  An independent duty to a non-client will be more readily found where the service rendered is intended to benefit both the client and the non-client.  *See Kirkland*, 658 N.E.2d at 701 (*citing Logotheti v. Gordon*, 607 N.E.2d 1015 (Mass. 1993))*; see also Cheswell, Inc.,v. Wesfield Const. Co., Inc.,* 319 F. Supp. 2d 144, 151 (D. Mass. 2004) (noting that Massachusetts courts have been willing to impose a duty of reasonable care when an attorney is acting for the benefit of both the client and the non-client); *Jurgens v. Abraham,* 616 F. Supp. 1381, 1386 (D. Mass.1985) (holding that non-client stated a claim where attorney told him he attached a sum of money for non-client's benefit.).

In addition, the Attorney Defendants provided their advice in a non-adversarial setting, where a court is more likely to allow liability to a non-client.  *Kirkland,* 658 N.E.2d at 701.  The reasoning is that in an adversarial setting, 1) it would not be reasonable for the non-client to rely

on the attorney statements and 2) there is a greater chance that a conflict will arise.  *See Cheswell*, 319 F. Supp. 2d at 151 (lawyer failed to demonstrate that the recording of the mortgage for non-client was so adversarial in nature as to render unreasonable any reliance by non-client).  Unlike here, in most cases where the court found that a conflict of interest negated the duty to a non-client, the client and non-client had adverse interests in the transaction at hand. *See, e.g., DaRoza,* 622 N.E.2d at 608 (employee's interest in worker's compensation suit could have differed from client insurer's); *Spinnato v. Goldman*, No. CIV. 14-12443-PBS, 2014 WL 7236343, at *4 (D. Mass. Dec. 19, 2014) (testator and beneficiary had conflicting interests where attorney convinced different heir to bring claim of undue influence against beneficiary); *International Strategies Grp. Ltd. v. Greenberg Traurig LLP*, 482 F.3d 1 (1st Cir. 2007) (holding that conflict exists and thus no duty where non-client agrees to hold off on lawsuit against adversary based upon representations of adversary's attorney).  What binds these cases in a common theme is that the attorney was freed of liability because an actively adversarial relationship between the attorney and the person relying on the advice existed.  The same logic that binds them together differentiates these cases from *Kirkland* and TelexFree, where there was no adversarial relationship at the time the attorneys made representations designed to induce reliance in the victim which they knew or should have known were untrue or misleading.

Given the content of their representations and their expert status, Nehra and Waak knew and/or could reasonably foresee that the Investor Victims would rely on their false representations and assurances.  *See* SCAC ¶¶ 562-63.  Like the plaintiffs in *Kirkland*, the Investor Victims have alleged facts to fully support a claim of foreseeable reliance, and, like the situation in *Kirkland*, there is no conflict with Nehra and Waak's duty "to refrain from relaying

information that the lawyer knows or should know is untrue or misleading." *Kirkland,* 658

N.E.2d at 700.

Defendants ignore *Kirkland* entirely and rely instead upon *International Strategies Group*

*v. Greenberg Traurig LLP*, 482 F.3d 1 (1st Cir. 2007) which is inapposite.  There, the plaintiff

was a Hong Kong-based company ("ISG") that had invested $4 million in a Boston-based

investment firm, Corporation of the BankHouse ("COB"), which turned out to be engaged in a

Ponzi scheme.  At some point, ISG became concerned about its funds, began an investigation

and realized that the funds had been depleted.  In a meeting with counsel for COB, ISG's counsel

was told that COB was also a victim and they were taking steps to recover funds and that

independent action by ISG may inhibit recovery which was in the process of negotiation.

Ultimately, ISG did not receive any recovery.

ISG brought numerous claims against Counsel for COB, including legal malpractice and

misrepresentation.  The court undertook an analysis as to whether counsel for COB owed a duty

to ISG.  The court held that the reasonable reliance exception did not apply because the

relationship between the parties was potentially adverse.  *Id.* at 13.  However, the court did not

reach this finding simply because ISG was an investor in COB.  Rather, the court discussed

extensively that ISG was aware of the actual conflict with COB even prior to the time of

discussions with counsel for COB to the point that they investigated and actually threatened to

pursue legal action against COB.  In addition, in the context of its discussion of an implied

attorney client relationship, the court set out a number of instances where counsel for COB and

ISG made it clear that COB's counsel represented only COB and that ISG should seek

independent counsel.

The situation here is easily distinguishable.  First, *International Strategies Group* was determined at the summary judgment stage, not on a 12(b)(6) motion.  Second, the Investor Victims were not sophisticated investors represented by counsel like the Hong Kong-based firm in *International Strategies Group*.  Third, at bar, counsel made affirmative, representations that they knew or should have known were untrue or misleading at the time they were made.  Unlike the instant situation, counsel for COB did not violate his duty to refrain from relaying information that he knew or should have known was untrue or misleading.

Defendants also rely on *One National Bank v. Antonellis*, 80 F.3d 606, 610-11 (1st Cir. 1996), which is distinguishable for the same reasons.  In *One National Bank*, the court declined to find a duty on summary judgment because of the potential for a conflict of interest.  There, the court was concerned about the lawyer having a conflict because he would have to correct an error that he made in certifying a title due to a representation made to him by his client.  The court held that finding a duty to the non-client under these circumstances would result in the lawyer having to breach his duty of confidentiality and reveal the error to the non-client.  In the instance case, Attorney Defendants were not in the position to correct information that came from their client but rather they set forth their own independent opinions that they knew or should have known were misleading at the time.

Unlike the Defendants' cited cases, the TelexFree Victims are most similarly situated to the victims in *Kirkland*.  The *Kirkland* court examined how the attorney had made false factual representations to induce an action that would be beneficial to the defendant, and incidentally the victim.  *Kirkland,* 658 N.E.2d at 701.  Similarly, Nehra's statements were made in order to induce Investors to the benefit of TelexFree, and, in theory, to the benefit of the Victims.  Just as

the *Kirkland* court determined that liability could be found on the basis of the attorney's statements, so too must the court find a basis for liability on the behalf of Nehra and Waak.

Based upon all of the above, the Investor Victims have sufficiently pled facts to support a duty owed to them by the Attorney Defendants, and thereby to support their claims for negligence and negligent misrepresentation against those Defendants. As such, Defendants have failed to meet their burden, and their motion to dismiss must be denied.

## II.

**THE INVESTOR VICTIMS HAVE STATED A VALID CLAIM FOR PROFESSIONAL NEGLIGENCE AND NEGLIGENT MISREPRESENTATION AGAINST THE MOVING ACCOUNTANT DEFENDANT**

The Accountant Defendant PricewaterhouseCoopers LLP ("PwC" or "Accountant Defendant") seeks to dismiss Counts VI and VII of the SCAC, which allege claims for professional negligence and negligent misrepresentation. PwC challenges the SCAC on every element stating that "Plaintiffs plead no facts" supporting any of these essential elements of these claims. *See* Doc. No. 170-1 at 18, 23. This argument ignores the abundance of well-pled facts that address and meet every element of both claims.

As detailed in the previous section, claims for professional negligence and negligent misrepresentation are generally subject to the standard pleading requirements of Fed. R. Civ. P. 8, as opposed to the heightened requirements of Fed. R. Civ. P. 9(b). *See Fernandes v. Havkin*, 731 F. Supp. 2d 103, 121 (D. Mass. 2010) (denying motion to dismiss because negligent misrepresentation count "is not subject to the particularity requirement of Fed. R. Civ. P. 9(b)")(*citing City of Worcester v. HCA Mgmt. Co., Inc.,* No. Civ. A. No. 90–40012–GN, 1994 WL 123629, at *1 (D. Mass. Apr. 7, 1994)). PwC cites *Freeman v. MetLife Grp., Inc*., 583 F. Supp. 2d 218, 223 (D. Mass. 2008) for the

proposition that the Rule 9(b) standard should be applied.  *See* Doc. No. 170-1 (PwC Br.) at

18.  The *Freeman*, court applied the 9(b) standard because, unlike here, the plaintiff did not

differentiate its claims for fraud from its claim for negligent misrepresentation.  *See*

*Freeman*, 583 F. Supp. 2d at 223.  Likewise, *North American Catholic Educational*

*Programming Foundation Inc v. Cardinale,* also cited by PwC, is inapposite.  567 F.3d 8

(1st Cir. 2009); *see* Doc. No. 170-1 at 18.  There, after straining to identify potential claims

from the jumbled pleading, including claims for fraud and negligent misrepresentation, the

court ruled that the 9(b) standard applied because all the claims arose out of a core

allegation of fraud.  *Cardinale*, 567 F.3d at 15.   At bar, the Investor Victims have

separated and distinguished their claims against PwC for fraud (Count IX) and negligence

(Counts VI and VII) and separate allegations apply to each.  In any event, the SCAC

alleges sufficient facts to meet either pleading standard.[91]

A.      **The Investor Victims Have Stated A Claim For Professional Negligence Against
        The Moving Accountant Defendant.**

In Count VI of the SCAC, the Investor Victims allege that PwC was negligent in

providing professional services to TelexFree and is therefore liable to the Members of TelexFree

who were affected by the services.  *See* SCAC ¶¶ 1053-59.  Under Massachusetts law, the

elements of a professional negligence claim against an accountant are generally the same as

those for traditional negligence claims, i.e., duty, breach of duty, causation and damage.  *See*

*Clark v. Rowe,* 701 N.E.2d 624, 626 (Mass. 1998); *see also Miller v. Volk,* 825 N.E.2d 579, 582

(Mass. App. Ct. 2005) (applying traditional negligence standard in malpractice case against

accountant for provision of negligent tax advice).  The allegations in the SCAC satisfy each of

---

[91] Note also that the *Freeman* Court permitted the plaintiff to amend the complaint pursuant to
Fed. R. Civ. P. 15(a)(2), to bring those counts into compliance with Rule 9(b).  *Id.* at 223.

those elements.  As more fully detailed below, the SCAC alleges (i) duty[92], (ii) breach[93], (iii)

causation[94], and (iv) damage.[95]  Whereas the Investor Victims' allegations in the SCAC clearly

satisfy the Rule 8 standard[96] PwC's motion must be denied.

### 1.  The SCAC Sets Forth Sufficient Facts To Establish That PwC Had A Duty Of Care To Investors

PwC attacks the Investor Victims' professional negligence claim upon the supposed

grounds that it owed them no duty of care because the Investors were not in privity with PwC.

*See* Doc. No. 170-1 (PwC Br.) at 23.  PwC's position is incorrect.  In the leading Massachusetts

case on the question of an accountant's duty to third parties, *Nycal Corp. v. KPMG Peat

Marwick LLP*, the Massachusetts Supreme Judicial Court adopted the rule of the Restatement

(Second) of Torts, holding that liability applies where non-contractual third parties can

demonstrate:

> actual knowledge on the part of the accountants of the limited-though unnamed-
> group of potential [third parties] that will rely upon the [report], as well as actual
> knowledge of the particular financial transaction that such information is designed
> to influence.

688 N.E.2d 1368, 1372 (Mass. 1998), (*citing First Nat'l Bank of Commerce v. Monco Agency

Inc.,* 911 F.2d 1053, 1062 (5th Cir.1990)); Restatement (Second) of Torts § 552 (1977).  In so

holding, the Court explicitly rejected any privity requirement, and also rejected the so-called

"near-privity" test which would have required a direct linkage between the accountant and the

aggrieved third party.  *Nycal*, 688 N.E.2d at1372.   The Court also emphasized that "the

---

[92] SCAC ¶ 582.

[93] SCAC ¶ 569-77.

[94] SCAC ¶ 579, 583.

[95]SCAC ¶ 572.

[96] Without waiving their objection that it would be error to apply a Rule 9 review, Plaintiffs point
out that the averments in the SCAC would also satisfy that standard.

[adopted] Restatement standard will not excuse an accountant's 'willful ignorance' of information of which the accountant would have been aware had the accountant not consciously disregarded that information." *Id.* at 1373.

Despite the inability to engage in any significant formal or informal discovery, the Investor Victims have pled adequate facts to exceed the *Nycal* standards based on what they know now.  First, the SCAC plainly identifies the Investor Victims as the limited- though- unnamed potential group of [third parties] that will rely on the financial consultation, services and advice that PwC provided to TelexFree including but not limited to the issuance of the1099's in issue. SCAC ¶¶ 37-38, 475-76, 479-582, 589-92, 977, 993.  PwC's actions and representations in providing those financial services qualify as a *Nycal*-based duty.

PwC began to provide accounting and consulting services to TelexFree in January 2014. PwC's services included tax and financial consultation, assistance with the development of international tax structures, financial statement crafting, and advice that led to TelexFree issuing unfair, deceptive, and unsupportable IRS Form 1099s and for other purposes that allowed TelexFree to remain in business and perpetuate the illusion that its business operations were legitimate between January 2014 and April 2014. SCAC ¶¶ 577-80, 590.  While PwC had actual knowledge that all of these services were intended to be relied upon by the Investor Victims, this reality is particularly incontrovertible with regard to the IRS Form1099s because by their very nature, they are to be provided to a limited group of third parties who have no choice but to rely on them.  SCAC ¶¶ 37-38, 993. Moreover, at all times material herein, PwC had actual knowledge of the particular financial transaction its financial consultation, services and advice provided to TelexFree was designed to influence; the issuance of the IRS Form 1099s to the Investor Victims by TelexFree who followed PwC's specific advice and the financial

transactions triggered by the Investor Victims formal tax reporting obligations. *See* SCAC ¶¶ 579-80, 591. The taxing authorities' receipt of the Form 1099s is yet another financial transaction that PwC had actual knowledge of.

IRS Form 1099 is a formal legal instrument having operation under federal law, and failure to report income represented on an official IRS tax form is actionable. Any argument to the effect that the Investor Victims could have simply ignored the IRS Form 1099 is meritless. IRS Form 1099s are provided to two sets of recipients. The first are the earners who have related tax obligations, such as the Investor Victims. The second is the governmental tax authorities, including the United States and the local state governments, all of whom treat Form 1099s as formal legal statements of earners' income. PwC knew that the Investor Victims must rely on, and could not ignore the TelexFree IRS Form 1099s for many reasons, including the fact that TelexFree would report the issuance of the IRS Form 1099s to governmental tax authorities, and the fact that persons who fail to report IRS Form 1099 miscellaneous income are subject to fines and penalties. PwC knew that its advice and analysis with regard to the IRS Form 1099s would be directly passed on to this limited group of Investors Victims for their review and for mandatory reliance with regard to their tax liability for the years indicated.

The *Nycal* standard is also met by the Investor Victims' allegations regarding PwC's other services to TelexFree, including its involvement in the investigation of TelexFree by the SOC. After TelexFree's Brazilian operation had been shut down and criminal investigations of the principals were occurring in Brazil, the SOC began an investigation. *See* SCAC ¶¶ 396, 590. In January and February 2014, the SOC issued subpoenas for certain documents and, in this context, PwC advised and assisted TelexFree in responding to those subpoenas. SCAC ¶¶ 156, 584. However, the information produced by TelexFree, with PwC's assistance, showed massive

discrepancies when compared to data provided to the SOC by TelexFree in 2013.  SCAC ¶¶ 515-18.  For example, in its February 2014 responses to the SOC, TelexFree's total income for the year 2012 was listed as $2,834,835.70, whereas in it had listed its 2012 income as $1,864,939.70.  SCAC ¶ 519.  These discrepancies indicate that either or both sets of books provided to the SOC were at least negligently maintained, and perhaps intentionally falsified.  SCAC ¶ 521.  PwC was clearly aware that these negligently prepared records would be relied upon by the SOC in assessing TelexFree's operation, and that they would ultimately impact TelexFree's continued offering of AdCentral packages to Members. The Investor Victims relied on TelexFree's continued operation and PwC's representation of TelexFree's and its continued operation and in the face of a formal SOC investigation.

PwC argues that the Investor Victims could not have relied upon the IRS Form 1099s because they were issued in mid-April after the Investor Victims had already made their investments in TelexFree.  *See* Doc. No. 170-1 at 19.  However, this argument misses the point. These fraudulent IRS Form 1099s imposed tax liability on the Investor Victims and obligated the Investor Victims to report this income on their own tax returns, incur the expense of challenging the taxes reported, and face additional liability and risk.  PwC knew the IRS Form 1099s it advised TelexFree to produce would be furnished to Members and Promoters, and it had actual knowledge of the discrete group of third parties would be affected by those statements.

**2.     The SCAC Sets Forth Sufficient Facts To Establish That PwC Breached Its Duty To Investors**

The second element of a professional malpractice claim, breach of a duty, is also adequately pled in the SCAC.  With respect to the standard of care required of accountants, courts apply a traditional negligence standard, i.e., whether the defendant "failed to exercise reasonable care and skill in handling the client's matter."  *See RTR Techs., Inc. v. Helming,* 815

F. Supp. 2d 411, 424 (D. Mass. 2011), *aff'd on other grounds,* 707 F.3d 84 (1st Cir. 2013) (citing *Clark v. Rowe,* 701 N.E.2d 624, 626 (Mass. 1998)). "Accountants are subject generally to the same rules of liability for negligence in the preparation of tax returns for others as members of other skilled professions are in the practice of their professions." 81 A.L.R.3d 1119; *see also Miller v. Volk,* 825 N.E.2d 579, 582 (Mass. App. Ct. 2005) (applying traditional negligence standard in malpractice case against accountant for provision of negligent tax advice).

Accountants also must comply with various federal regulations related to practice before the IRS. These regulations impose a duty of due diligence upon accountants who prepare or assist in the preparation of documents relating to IRS matters. *See* 31 C.F.R. § 10.8(a)(c); 31 C.F.R. § 10.22(a). That duty of due diligence also requires an accountant to determine that representations made by it to the IRS and to the clients are correct. 31 C.F.R. § 10.22(a).

Furthermore, accountants must exercise due diligence when relying on information furnished by a client. Pursuant to 31 C.F.R. § 10.34(d), "[a] practitioner advising a client to take a position on a tax return, document, affidavit or other paper submitted to the Internal Revenue Service, or preparing or signing a tax return as a preparer, generally may rely in good faith without verification upon information furnished by the client. *The practitioner may not, however, ignore the implications of information furnished to, or actually known by, the practitioner, and must make reasonable inquiries if the information as furnished appears to be incorrect, inconsistent with an important fact or another factual assumption, or incomplete."* 31 C.F.R. § 10.34(d) (emphasis added).[97] Consistent with these standards, an accountant may not advise a client to take a frivolous position on or submit a frivolous document to the IRS or

---

[97] Accountants are also required to inform clients of lack of compliance, errors or omissions and likely penalties. *See* 31 C.F.R. §§ 10.21, 10.34(d).

submit a document to delay or impede federal tax laws or submit a document that contains or omits information that intentionally disregards the law with no good faith basis. *Id.*

Based upon the aforementioned regulations and traditional tort law principles, PwC was required to perform due diligence, not only in the provision of advice and services to TelexFree, but also in its own internal fact-checking and determination that the advice it provided was based on correct information. As articulated throughout this brief and Attachment 2, the SCAC is replete with facts that establish PwC detected TelexFree's Pyramid scheme. As stated above, in January and February 2014, PwC advised and assisted TelexFree in responding to subpoenas from the SOC. SCAC ¶¶ 156, 584. In connection with these services, PwC was given unfettered access to TelexFree's books and records. SCAC ¶ 585. A simple review of these books and records reveals, in addition to indicia of a pyramid scheme, massive accounting irregularities that should have compelled PwC to take remedial action. SCAC ¶¶ 515-21. PwC also had the obligation to verify any financial or other information provided by TelexFree, particularly when this information was to be used to keep the TelexFree Pyramid scheme operating and when it was passed on to Investor Victims (as in the IRS Form 1099s or in Investor reports, meetings, news casts etc.) or the SOC. The fact that PwC advised TelexFree to issue the IRS Form 1099s means it was negligent in providing advice or aided and abetted TelexFree as asserted elsewhere or both.

There is no doubt that Plaintiffs clearly asserted that in its role as a general financial advisor to TelexFree, PwC accessed internal financial documents that showed that there was virtually no income from the VOIP product. SCAC ¶¶ 585, 587. PwC was no "outsider" to the TelexFree Scheme, but rather had an intimate and influential role in the operation after it became involved, providing financial and tax advice and development of international tax structures, in

addition to dealing with the SOC's inquiries.  SCAC ¶ 578.  That required PwC's unfettered access to TelexFree's records, internal structure and standard membership contract, and that access revealed that TelexFree was a Pyramid Scheme.  *See, e.g.,* SCAC ¶¶ 14-25 (TelexFree member contract was clearly illegal); 27-29 (TelexFree's payment structure was typical of a pyramid scheme); 747-50, 791-99 (virtually all incoming payments were for AdCentral packages, not VOIP product).  Finally, PwC was in possession of widely available public information regarding the shutdown of TelexFree's Brazilian operation, particularly as this shutdown initiated the SOC's investigation, with which PwC was heavily involved.  SCAC ¶¶ 151, 156, 584.  To the extent PwC claims that it was unaware of the fraudulent nature of the Scheme – however implausible that claim may be – it certainly failed to exercise reasonable diligence under 31 C.F.R § 10.34(d), and common law. At best this is a question of fact and a highly relevant subject of discovery.

PwC specifically breached its duty by advising TelexFree to issue IRS Form 1099s to the Investor Victims that it knew or was negligent in not knowing were unsupportable and illegal based upon its independent access to the financial documents and inner workings of TelexFree. As discussed above, any claim that PwC was entitled to claim that it was compelled to believed TelexFree's false representations conflicts with their express ethical and professional licensure obligations. Such a claim in any event would mean that PwC also breached its duty of care by failing to ensure that the financial and other information that TelexFree provided, which it used, was in fact accurate.  *See* 31 CFR § 10.22(a).  PwC also breached its duty to the Investor Victims by failing to take appropriate and reasonable remedial measures – for example, withdrawing as accountant and filing a report – upon learning that TelexFree's operation received no outside income and was sustained entirely by membership fees.  Instead, its advice and services resulted

in TelexFree's continued operation between January and April 2014, thus directly and proximately causing the Plaintiffs to suffer ascertainable economic loss as further detailed below.

### 3.     The Investor Victims Have Alleged Sufficient Facts To Plead That PwC's Breach Caused Them Harm

With respect to the causation and harm elements, the Investor Victims directly allege that PwC's negligence caused them ascertainable economic harm.  *See* SCAC ¶ 1054 (alleging that the negligence of Licensed Professional Defendants "caused the Putative Class to suffer ascertainable economic loss"); SCAC ¶ 1059 ("the Putative Class have been caused to suffer and sustain damages and losses and demand they be made whole"); SCAC ¶ 1066 ("Putative Class have suffered great financial losses, have also incurred considerable expenses and loss of income and have otherwise been greatly damaged").  These allegations alone are sufficient to withstand dismissal under the Rule 12(b)(6) pleading standard at this stage of litigation.

Nevertheless, PwC argues that the Investor Victims did not allege that they were harmed by PwC's negligence because any harm from the issuance of unfair, deceptive and unsupportable IRS Form 1099s is speculative.  *See* Doc. No. 170-1 at 20, 24.  PwC is not only incorrect on this point but also fails to even address the damage the Investor Victims suffered as a result of the other negligent services and representations provided by PwC.  PwC's self serving bare conclusion that Plaintiffs' damages are speculative is at best, a question of fact.

### a.     The SCAC Alleges That The Investor Victims Suffered Harm Caused By PwC's Advice and Guidance Which Resulted in The Issuance Of Unlawful Form 1099s

The Investor Victims allege both that PwC provided advice and guidance to TelexFree to prepare the deceptive, unsupportable, and unlawful IRS Form 1099s and that the Forms were actually issued to them to sustain the false illusion that TelexFree made payments to Members. *See* SCAC ¶¶ 577-80, 590; 37-38.  These illegal Forms imposed an undue burden and hardship

on Promoters who may now be liable to pay taxes on income they never received.  SCAC

¶¶ 579-82.  As such, the Investor Victims will either be required to pay taxes they do not owe or

will incur the time and expense to correct the improper tax forms.[98]  Either way, the Investor

Victims have reasonably alleged ascertainable economic harm.

> **b.** **The Complaint Alleges That The Investor Victims Suffered Harm As A Result Of PwC's Actions During The SOC Investigation And Provision Of Other Services**

PwC's advice and work relative to the SOC investigation was performed in January and

February 2014.  The Investor Victims also allege that in January 2014 PwC began to provide tax

and financial consultation, including assisting with the development of international tax

structures and crafting financial documents and tax returns for affiliated TelexFree entities, and,

in doing so, provided substantial assistance or encouragement to continue TelexFree's illegal

Pyramid Scheme.  *See* SCAC ¶¶ 578, 583, 588.  In the aggregate, these services were integral to

the scheme and permitted it to continue functioning in the U.S. even after being exposed as a

pyramid scheme and shutdown in other countries.  *See* SCAC ¶¶ 313, 586.  *Ipso facto*, any

Investor losses incurred at or after the time that PwC became involved were caused, at least in

part, by PwC's advice and assistance of the Scheme.  This is sufficient for the Investor Victims'

claims to survive PwC's Motion to Dismiss, and the degree of damages attributable to PwC's

conduct is ultimately a question of fact.

Taking the SCAC's allegations as a whole, the Investor Victims have sufficiently pled

facts to support their claim for negligence against PwC.  This is particularly true at this stage of

---

[98] Without factual or legal support, PwC offers its conclusion that the Investor Victims somehow must plead facts that the tax authorities would actually credit the IRS Form 1099s under the circumstances.  *See* Doc. No. 170-1 at 20, n.8.  PwC completely disregards the standard of review for pleading and engages in pure speculation that the IRS might *sua sponte* choose to ignore a filed tax document.  At best, this simply raises an issue of fact to be addressed after discovery.

the litigation, and in light of the deferential standard of review that must be applied to Plaintiffs'

claims.  Even under the heightened pleading standards of Rule 9(b), at this stage and under the

circumstances herein, the allegations are sufficient to defeat PwC's Motion to Dismiss.[99]  PwC

prematurely focuses on factual disputes that are more appropriately resolved after discovery on a

motion for summary judgment.  As such, PwC's Motion to Dismiss must be denied.

**B.      The Investor Victims Have Pled Sufficient Facts To Support Their Negligent Misrepresentation Claim**

PwC's attack upon the Investor Victims' negligent misrepresentation claim (Count VII)

is similarly untenable.  In general, a claim for negligent misrepresentation exists where a

defendant negligently made "a false statement of material fact made to induce the plaintiff to act,

together with reliance on the false statement by the plaintiff to the plaintiff's detriment."

*Rogatkin v. Raleigh Am., Inc.*, 69 F. Supp. 3d 294, 300-01 (D. Mass. 2014).  As is evident, there

is significant overlap between the elements for third-party claims of professional negligence and

claims of negligent misrepresentation by a person not in privity with an accountant.  The Investor

Victims have similarly adequately pled those elements.

**1.      The Investor Victims Have Pled Sufficient Facts That PwC Made The Requisite Representations Or Statements**

With respect to the requisite false statement of material fact, in cases against accountants

by parties not in privity with them, the "statement" at issue is defined as "information provided

for the guidance of others in their business transactions."  *Nycal,* 688 N.E.2d at 1371-72.  PwC

sets forth a cursory argument that Plaintiffs' claim for negligent misrepresentation must fail

because they do not identify any "statement" made by PwC.  Doc. No. 170-1 at 18.  PwC again

---

[99] In addition, even if the allegations were not sufficient, based on the facts alleged in the SCAC, it would be premature for this Court to dismiss the claims outright.  Plaintiffs have established a prima facie case for professional negligence on the part of PwC, and Plaintiffs are entitled to obtain documents and other evidence relevant to these allegations through discovery.

misconstrues the relevant law and ignores well-pled facts.  The representation or statement

identified in *Nycal* is supplying information for guidance of others in business transactions.

*Nycal,* 426 Mass. at 498.[100]   The Investor Victims allege that PwC supplied information for the

guidance of others by advising TelexFree to issue unsupportable Form 1099s, which it knew

would be passed on to the Investors and the tax authorities. This advice and assistance in

preparing and issuing the IRS Form 1099s, as well as the issued IRS Form 1099s themselves, are

″information provided for the guidance of others," and thus statements under *Nycal*.  The

Investor Victims also allege that PwC provided information to TelexFree and to the SOC

knowing that its advice or work product would be used by TelexFree to sustain or further

advance its business model and unfair, deceptive or otherwise unlawful activities.  SCAC ¶¶ 583,

588-90.  As set forth above, these actions are representations and the Form 1099 representations

are false statements of material fact made to induce the plaintiff class to act. As otherwise set

forth herein, the members of the putative class relied on the false statement to their detriment.

There is more than a reasonable inference from the facts alleged that PwC provided advice and

services that clearly qualify as "information" pursuant to the *Nycal* standard.

Although supported by facts alleged here, actual knowledge of falsity by a defendant is

not necessary "if the truth is reasonably susceptible of actual knowledge, or otherwise expressed,

if, through a modicum of diligence, accurate facts are available to the speaker." *Rogatkin* , 69 F.

Supp. 3d at 300-01.  Thus, establishing liability for misrepresentation does not require a showing

that PwC even knew that the statements made were false or that it actually intended to deceive

---

[100] Other courts interpreting *Nycal* have referenced "work product" of the accountants. *N. Am. Specialty Ins. Co. v. Lapalme*, 258 F.3d 35, 39 (1st Cir. 2001).

Plaintiffs.[101]   *See Bamberg v. SG Cowen,* 236 F. Supp. 2d 79, 92 (D. Mass. 2002) (*citing Kitner v. CTW Transport,* 762 N.E.2d 867, 873 (Mass. App. Ct. 2002)).  The plain language of the SCAC asserts that PwC had actual knowledge.  If not, the multitude of allegations setting forth red flags make clear the truth about TelexFree was "reasonably susceptible of actual knowledge, or otherwise expressed, if, through a modicum of diligence, accurate facts" were available to the PwC.  SCAC ¶¶ 30, 328, 644, 157-58, 395-96, 398-400, 402-03, 441-47, 450, 515-21, 645-50, 855.  Plaintiffs satisfied all related pleading requirements.

> **2.**      **The Investor Victims Have Sufficiently Alleged That The Investor Victims Relied Upon PwC's Actions And Representations To Their Detriment**

PwC next argues that Investor Victims did not show that they made any decisions or otherwise acted to their detriment based on PwC's statements.  PwC is incorrect.  Applying *Nycal* as discussed above, this element is met if Investor Victims allege facts that they relied upon information PwC supplied for the guidance of others to their detriment.  Reliance may be direct or indirect.  Indirect reliance is found where the plaintiff sets forth facts that the misrepresentation or statement was communicated to the plaintiff and that he relied upon it. *Brockton Sav. Bank v. Peat, Marwick, Mitchell & Co.,* 577 F. Supp. 1281, 1287 (D. Mass. 1983)[102] Investor Victims have set forth sufficient facts that they relied both upon advice and guidance PwC provided to TelexFree relative to issuing of unfair, deceptive and unsupportable IRS Form 1099s and with regard to other financial advice provided to TelexFree.

---

[101] In addition, PwC makes a one-paragraph argument that Plaintiffs have not alleged that PwC acted negligently. *See* Doc. No. 170-1 at 19.  As detailed in Part III, Section II.A.1-2, *supra*, Plaintiffs have sufficiently alleged that PwC failed to exercise reasonable care or competence.

[102] PwC cites *Brockton Savings Bank* in support of its argument that Plaintiffs did not allege reliance.  However, *Brockton Savings Bank* provides no such support because there, as distinguished from here, the plaintiff set forth no allegations that the advice provided to a third party was ever communicated to plaintiff. *Id.*

At the outset, Investor Victims directly allege that they relied upon PwC's expertise and/or performance of its duties, as well as its representations, statements and omissions, that they reposed faith and confidence in PwC's representations and advice, and that they suffered damages as a result of same.  SCAC ¶¶ 1057-66.   More specifically, with regard to the IRS Form 1099s, the Investor Victims alleged that upon PwC's advice TelexFree prepared and issued the Forms and provided the same to Investor Victims.   Having received these official tax documents, there is a reasonable inference, the only reasonable inference, that Investor Victims and the taxing authorities relied upon them as imposing a tax burden upon the Investor Victims.

In addition, the Investor Victims allege that PwC provided tax guidance and information to TelexFree and to the SOC knowing that its advice or work product would be used by TelexFree as a marketing tool to further advance its business model and unfair, deceptive and unlawful activities to the detriment of the plaintiffs.  SCAC ¶¶ 583, 588-90, 593.   There are abundant allegations that TelexFree communicated with investors to market the illegal business, and in fact a major marketing push was made before and after the March 9, 2014 contract change.  Given these combined allegations, there is a reasonable inference that information provided for the guidance of TelexFree in their business transactions was communicated to Investor Victims through TelexFree's continued marketing efforts.  Investors Victims continued to suffer damages as TelexFree's scheme was advanced and they continued to invest in TelexFree and in responding to the Form 1099s.[103]

The allegations in the SCAC taken as a whole are sufficient to allege both that Investors relied on information provided to TelexFree by PwC and that they were harmed by same.

---

[103] The damages and harm were addressed previously in Part III, Section II.A.3, *supra,* which is incorporated herein.

### 3. Investor Victims Have Alleged Sufficient Fact To Support Duty And Breach Of Duty For Negligent Misrepresentation

As detailed above, the SCAC alleges facts that establish a duty on PwC's behalf to Plaintiffs. *See* Part III, Section II.A.1. *See also Fed. Home Loan Bank of Boston v. Ally Fin., Inc.*, Civil Action No. 11-10952-GOA, 2013 WL 5466631, at *6 (D. Mass. Sept. 30, 2013); *Nycal,* 688 N.E.2d at 1371–72 .[104] Likewise, the SCAC alleges facts that establish that PwC breached that duty.[105] Accordingly, Investor Victims need not re-argue those points here and incorporates those arguments by reference.

## III.

## THE INVESTOR VICTIMS HAVE STATED A VALID CLAIM FOR VIOLATION OF M.G.L. CHAPTER 110, § 410(b) AGAINST THE ATTORNEY DEFENDANTS

Plaintiffs assert claims against Defendants Nehra and Waak[106] for violation of the Massachusetts Uniform Securities Act ("MUSA"), M.G.L. c. 110A, § 410(b). Section 410(b) imposes liability on certain classes of persons who aid and abet, or otherwise play a role, in the sale of fraudulent or unregistered securities. In seeking summary dismissal, Nehra and Waak falsely assert that they acted as "merely outside counsel" on "limited issue[s]" relating to regulatory compliance and therefore are not subject to that Section. *See* Doc. No. 188 at 12. This vastly understates the depth and scope of Nehra and Waak's role in the TelexFree Scheme.

---

[104] The court in *Bank of Boston* also determined that the heightened pleading standards of Rule 9(b) did not apply to the negligent misrepresentation claim.

[105] The breach of duty principles and arguments set forth above in Part III, Section II.A.2 are incorporated here by reference.

[106] Defendants Gerald P. Nehra, Gerald P. Nehra Attorney At Law, PLLC, Richard W. Waak, Richard Waak Attorney At Law, PLLC, and Law Offices of Nehra And Waak are herein collectively referred to as "Nehra and Waak" or "Attorney Defendants." Their relationship is well-detailed in the SCAC. *See* SCAC ¶¶ 69, 290, 403-04, 423, 538, 541-44, 563.

The SCAC makes plain that Gerald Nehra was highly active in both the operational and marketing aspects of TelexFree, served as an integral public face and mouthpiece for the company,[107] and helped to design the company's business model so as best to evade the notice of law enforcement.[108]  Under Massachusetts law, whether a defendant is sufficiently embroiled with a seller of securities so as to fall within the scope of MUSA § 410(b) is a question of fact that should not be resolved at the pleading stage.  *Akamai Techs., Inc. v. Deutsche Bank AG*, 764 F. Supp. 2d 263, 269 (D. Mass. 2011) ("control is 'a question of fact that' will not ordinarily be resolved summarily at the pleading stage'"), *citing Bielski v. Cabletron Sys., Inc.*, 311 F.3d 11, 41 (1st Cir. 2002).  As such and as shown below, Nehra and Waak's attempt to secure pre-discovery dismissal must fail.

## A.   General Standard Of Liability[109]

MUSA, M.G.L. c. 110A, provides for private civil actions in connection with the fraudulent offer and sale of securities.  Section 410(a) imposes liability on those who themselves offer or sell the security – the "seller."  Section 410(b) imposes liability on certain categories of persons otherwise involved with the fraudulent offer or sale.[110]

Liability extends to the following classes of persons:

- Those who "directly or indirectly control" a seller;

---

[107] *See* SCAC ¶¶ 303, 412-13, 537, 548-50, 554, 566.

[108] See SCAC ¶ 413, 429, 537, 547-50.

[109] The Moving Defendants did not challenge the Investor Victims' claim that TelexFree AdCentral packages were "securities" within the meaning of M.G.L. c. 110A, or whether an "offer or sale" took place within the meaning of the statute.  Those elements thus are not in issue.

[110] That section provides in relevant part that "[e]very person who directly or indirectly controls a seller liable under subsection (a), every partner, officer, or director of such a seller, every person occupying a similar status or performing similar functions, every employee of such a seller who materially aids in the sale, and every broker-dealer or agent who materially aids in the sale are also liable jointly and severally with and to the same extent as the seller."  M.G.L. c. 110A § 410(b).

- Partners, officers, and directors of a seller;

- Those "occupying a similar status or performing similar functions" to partners, officers, and directors of a seller;

- Employees who materially aid in the sale; and

- Broker-dealers and agents who materially aid in the sale.

*Id.*  Thus, liability under Section 410(b) does not require that the defendant have offered or sold the security in issue.  *See, e.g., Cambridge Place Inv. Mgmt. v. Morgan Stanley & Co.*, Nos. 10-2741-BLS1, 11-4605-BLS1, 2012 WL 5351233, at *24 (Mass. Super. Ct. Sept. 28, 2012) (holding lead underwriter of security may be liable under § 410(b) although underwriter did not act as seller).  With respect to the individuals subject to § 410(b), Massachusetts' courts have emphasized its breadth, stating that "the sweep of § 410(b), interpreted in light of its federal analog, is broad; it imposes potential liability on five classes of persons including…agents of the seller."  *See Sherter v. Ross Fialkow Capital Partners, LLP*, No. SUCV2010001888BLS1, 2013 WL 1324818, at *12 (Mass. Super. Ct. Jan 4, 2013); *Kennedy v. Josephthal & Co.*, No. 82-913-MA, 1983 WL 1314, at *6 (D. Mass. May 9, 1983)

MUSA Section 401(b) defines "agent" as "any individual other than a broker-dealer who represents a broker-dealer or issuer in effecting or attempting to effect purchases or sales of securities."  *See* M.G.L. c. 110A, § 401(b); *see also* SCAC ¶ 1073-76 (alleging Licensed Professionals were agents materially aiding sale of securities within meaning of MUSA).  The term "agent" can apply to a very wide range of persons, as long as they "materially aid" in the sale.  *See Kennedy,* 1983 WL 1314, at *6.  As the *Kennedy* court noted, "[t]he full and proper scope of 'non-sellers' intended by the legislature to be included within this section has yet to be articulated by the state courts of Massachusetts, however, it is apparent from the statutory language that the general purpose of section 410(b) is to subject all those who 'materially aid' in

123

the sale of a security, whether 'directly or indirectly,' to liability for securities fraud." *Id.* at *6. Furthermore, the meaning of "materially aid" does not require that the defendant's actions be essential to the seller's sale of the subject securities, but rather that the defendant's contribution be merely "significant" in making the sale possible. *See Sherter*, 2013 WL 1324818, at *12. As discussed below, the plain language of the SCAC describes the significant contributions to sales made by Defendants Nehra and Waak. *See, e.g.,* SCAC ¶¶ 146, 393, 421, 556, 559-60.

## B.    The Allegations Against Nehra And Waak Satisfy Multiple Categories Of Persons Liable Under § 410(b)

To defeat the Section 410(b) claim (*see* SCAC ¶¶ 1067-79), Nehra and Waak offer up the unsupportable and meritless conclusion that Nehra was "merely outside counsel" on "limited issue[s]" relating to compliance. *See* Doc. No. 188 at 12.  In furtherance of this fallacy, they further offer up the futile argument that TelexFree retained Nehra and Waak only "as outside counsel to provide legal advice and articulate a legal opinion on the limited question of whether its business model complied" with applicable laws and regulations. *See id.* at 17.  To the extent that Nehra and Waak are implying that their role as attorneys for TelexFree puts them outside the scope of liability under § 410(b), they are mistaken.  It is well-established in securities fraud cases that attorneys fall within the scope of "controlling person" liability "when they are in some sense culpable participants in the acts perpetrated by the controlled person." *Seidel v. Public Serv. Co. of N.H.*, 616 F. Supp. 1342, 1362 (D.N.H. 1985), *citing Westlake v. Abrams,* 565 F. Supp. 1330, 1350 (N.D. Ga. 1983); *Westlake v. Abrams*, 504 F. Supp. 337, 349 (N.D. Ga. 1980). *Cf. Sheinkopf v. Stone*, 927 F.2d 1259, 1270 (1st Cir. 1991) (noting attorneys may be held liable under § 410(b)).  Here, as active co- conspirators they are in every sense culpable participants in TelexFree's unlawful enterprise.

Notably, Nehra and Waak's motion ignores substantial sections of the Complaint.  For example, the SCAC alleges that Nehra travelled to Newport Beach for the July 2013 TelexFree "Super Weekend" event, and that his focus at it was to communicate the purported legitimacy of the TelexFree Pyramid Scheme to Promoters from the willfully and knowingly crafted role of a legal advisor, specialized in multi-level marketing.  *See* SCAC ¶¶ 146, 393, 421, 423, 566.  In promoting legitimacy from the position of a trustworthy expert, Nehra filled one of the roles essential to marketing a successful pyramid scheme.  *See* SCAC ¶¶ 303, 412-13, 537, 548-50, 554, 566 (discussing role and importance of attorneys in pyramid scheme).  Nehra not only reassured Promoters and potential new promoters – he lured them in.  Nehra and Waak's seal of approval and legal opinion that TelexFree's United States operations were "legitimate, lawful and worthy of investment" was an essential component of the unlawful enterprise.  *See* SCAC ¶ 421.

Another glaring example alleged in the SCAC of Nehra and Waak's extensive role that took place at the Super Weekend event was that Nehra explicitly joined himself with TelexFree's management, stating

> Now, can end-users be you guys?  Can end-users be reps?  Yes they can.  Of course, **we** want you to be users of the product.  **We** don't want you to be 100% users of the product, **we** also want to have outside customers, that's very, very important.

*Id.* at 80 (emphasis added).  Nehra also represented

> When I started with Jim [Merrill] and with Mike and Carl [Wanzeler] I realized your magic ingredient.  The magic ingredient that separates you from some other companies that have been indirectly referred to that have gone and been in a lot of trouble.  That special ingredient is that you have a real product. You have a real product slash service.

125

*Id.* at 81 (emphasis added).  Far from the claimed level of participation of a "mere outside counsel" on "limited issue[s]" relating to regulatory compliance, these remarks constitute a fine example of "snake oil salesmanship."

Nehra also knowingly provided extensive sales commentary and advice that appeared on the TelexFree website.  His "pep talk" instructed TelexFree's Members on their sales and was intended to direct and move the Investor Victims' activities.  For example, Nehra's cheerleading included the following:

> You guys can control the future of this company.  You gotta play it by the book, you gotta follow the instructions of the corporate leadership and your upline leadership.  You've gotta say the right things, do the right things and most importantly, keep the focus on customer activity.

SCAC, Ex. 4, #14 p. 79.

Perhaps most egregious, the SCAC alleges that Nehra willfully advised Promoters to act in a way that furthered the fraud.  Nehra unfairly and deceptively advised Promoters to avoid the specter of regulatory authorities and the hassle presented by regulations through the carefully selected use of language, telling them that

> The question is the word 'investment'.  Take it out of your vocabulary!  The word investment has a special meaning to the Securities and Exchange Commission.  It is a highly sensitive, regulated word.  We are not offering anybody in this country or in any country an investment . . ..  You are not offering anybody an investment and we don't want the word anywhere in our literature and we don't want to use the word verbally in any of our meetings.

*Id.* at 82.  The offering of this advice and representation was intended to further the fraud, to keep regulatory authorities away[111] and to assist with sales by underscoring the TelexFree mantra

---

[111] This advice and representation furthered the fraud and was intended to keep out of the Federal Trade Commission's watchful eye, to make inapplicable legal protections and to conceal the fraudulent business model.

that anyone can make money in a hassle-free way by simply placing ads and following TelexFree's protocols.

These communications and acts, alleged in the SCAC, exceed those of an outside counsel providing TelexFree's management with advice on regulatory issues. They are well beyond the narrow and confined thimble of involvement spuriously claimed by the Defendants in support of their request to dismiss.

The SCAC alleges marketing and promotional activities by Nehra that went beyond appearing at events. With his knowledge and approval, his July 2013 "Super Weekend" promotional speech was posted on TelexFree's website as part of their marketing efforts. *See* SCAC ¶ 556. In a statement to the press Nehra and Waak intended to be widely disseminated, Nehra falsely represented on TelexFree's behalf that it "pays ONLY on the sale of its VOIP long distance product." SCAC ¶ 393 (emphasis in Nehra's statement). This advice to Promoters was beyond the role of an "outside legal consultant." It was instead a substantial and integral component of the TelexFree marketing campaign, intended to further the fraudulent Pyramid Scheme. Also contradicting the claim that they were merely "outside counsel" for "limited issues" relating to compliance, Nehra was listed on TelexFree's website as TelexFree's actual "Legal Department." SCAC, Ex. 14, p. 82. Throughout his involvement with the enterprise, Nehra "knew that TelexFree intended to use his advice and likeness prominently as a marketing tool on both their localized Brazilian (Portuguese) and Spanish (Spanish) website portals, in an effort to make TelexFree's business appear legitimate." SCAC ¶ 559; *see also* SCAC ¶ 560.

In addition to being designated as its legal department, the SCAC makes clear that Nehra had significant operational involvement and influence within the enterprise. He "attended meetings at TelexFree's headquarters in Massachusetts to discuss TelexFree's product, business

model, and operations, participated in teleconferences with Defendant Founders, Principals, Executive Office, and Top Level Promoters to discuss TelexFree's product, business model, and operations and had access to and input into TelexFree's documents, including the contracts entered into between TelexFree and the putative class." SCAC ¶ 546. As stated above, he also personally instructed Promoters on how to sell, with whom to sell, and what terminology to use. *See* SCAC, Ex. 14, pp. 79-81.

Taken as a whole, Nehra's involvement, which reaches his general partner and co-conspirator Waak,[112] is clearly within the ambit of MUSA § 410(b) and went well beyond that of "outside counsel." As described above, Nehra's major role in the enterprise was more promotional than legal, as he personally travelled the country promoting TelexFree to crowds of potential Members, appeared in online promotional videos, allowed his and his firm's name to be used ubiquitously in materials promoting TelexFree, and released statements – including unambiguous falsehoods – to the press on TelexFree's behalf. Simply put, Nehra was hired by TelexFree to serve as one of the "faces" of the enterprise and generate sales. The Complaint's allegations also establish that Nehra had a major operational role with the enterprise, on par with that of the Operational Defendants. Those allegations must be taken as true on this motion to dismiss.

By performing the foregoing substantial promotional services, each of which is consistent with and stereotypical of, pyramid scheme marketing, Nehra "materially aided" in the sales of AdCentral packages. He therefore qualifies as an "agent[] who materially aid[s]" in the sale of securities under § 410(b) of MUSA. Furthermore, given his combined promotional, legal and operational role within the enterprise, including serving as the enterprise's "Legal Department,"

---

[112] *See* Part I, Section II.A; Part II; Part III, Sections I-IV , *supra* for a discussion of the liability of the Attorney Defendants.

Nehra qualifies as a person "occupying a similar status or performing similar functions" to officers and directors of the company under the statute.  Finally, as Nehra and Waak's activities extended into operational aspects of the enterprise and included personally issuing directives to Promoters at TelexFree events, he did exercise "power to direct the management, policies and operations" of the enterprise,"  *Sheinkopf*, 927 F.2d at 1270; *see also Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 85 (1st Cir. 2002), and therefore also qualifies as a "control person" under the statute.  As such, the SCAC has abundantly pled the Attorney Defendants' joint liability under multiple classes of persons covered by MUSA § 410(b) and that claim is proper.

## IV.

### THE INVESTOR VICTIMS HAVE STATED
### VALID FRAUD CLAIMS AGAINST THE LICENSED PROFESSIONALS

The SCAC advances fraud claims against the Defendant Licensed Professionals.  *See* Doc. No. 141 at 186 (Ninth Cause of Action).  In their motions, Defendants erroneously contend that Plaintiffs have failed to state adequately those claims.  Such contention is meritless.  The SCAC meets each element required to support a fraud claim and pleads accompanying facts with sufficient particularity to place the Licensed Professionals on notice of the claims against them by establishing their fraudulent conduct.

Under Massachusetts law, a claim for fraud is sufficiently pled where a plaintiff alleges that (1) the defendant made a false representation of material fact; (2) the defendant had actual knowledge that the misrepresentation was false; (3) the defendant made the false representation with the intent to deceive the plaintiff and induce him or her to act thereon; (4) the plaintiff reasonably relied on the false representation; and (5) the plaintiff suffered harm as a result of his or her reliance.  *Masingill v. EMC Corp.*, 870 N.E.2d 81 (Mass. 2007); *Doyle v. Hasbro, Inc.*, 103 F.3d 186, 193 (1st Cir. 1996).  As referenced below, the SCAC sets forth facts and details

that more than satisfy the plausibility standard of *Twombly* and *Iqbal* as well as Rule 9(b),

thereby warranting a denial of the Licensed Professionals' motions to dismiss.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("[t]he plausibility standard is not akin to a 'probability

requirement,' but it asks for more than a sheer possibility that a defendant has acted

unlawfully"); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007).

**A.      The SCAC Sets Forth The Licensed Professionals' False Representations Of Material Fact To The Investor Victims**

The SCAC is replete with allegations of material false representations made by the

Licensed Professional Defendants.  With respect to Nehra and Waak,[113] there are ample specific

allegations of material false representations made by them and their firm regarding the

legitimacy of the TelexFree program.  For example, the SCAC alleges that:

- During the July 2013 TelexFree "Super Weekend" recruitment event, Nehra publicly gave his "legal blessing" to TelexFree, guaranteeing to crowds of recruits that TelexFree was a lawful enterprise, SCAC ¶ 146, *see also* SCAC, Ex. 4, Exhibit 14;

- At this same event, Nehra told a crowd of recruits that TelexFree was "legally designed…you are on very solid legal ground," and that TelexFree's operations had been "vetted by the Nehra and Waak law firm," SCAC ¶ 423;

---

[113] The legal relationship of Nehra, Waak and their various business operations are set forth in the Complaint.  *See* SCAC ¶¶ 541, 543, 544.  The SCAC identifies the legal and marketing services performed for TelexFree by their firm as the concerted efforts of both Nehra and Waak in combination – or, as stated by Nehra, of the "Nehra and Waak Law Firm."  SCAC ¶ 423.  It sets forth that The Law Offices of Nehra and Waak provided legal counsel to TelexFree and that Waak, as the principal attorney, oversaw the firm's activities.  SCAC ¶ 541.  It alleges "Attorney Waak, as general partner and principal attorney of the Law Offices of Nehra and Waak, and the other Attorney Defendants knew of, oversaw, and participated in Attorney Nehra's tortious and illegal conduct regarding the TelexFree Pyramid Scheme."  SCAC ¶ 563.  It also alleges that "(a)mong the Attorney Defendants, and throughout TelexFree's Scheme, there was no clear distinction among the services provided to TelexFree by the Law Offices of Nehra and Waak, the individual Attorney Defendants, and their respective professional limited liability companies."  SCAC ¶ 543.  Importantly, it also alleges that "(a)s general partners of the Law Offices of Nehra and Waak, Attorney Nehra and Attorney Waak are jointly and severally liable for torts and obligations of the firm."  SCAC ¶ 544.  Nehra and Waak have not challenged joint liability in their Motion to Dismiss or supporting Memorandum.  *See* Docs. No. 187, 188.

130

- Nehra made unambiguously false public statements, including a written press release regarding that company, that TelexFree "pays ONLY on the sale of its VOIP long distance product," SCAC ¶ 393;

- Shortly after signing on as TelexFree's resident MLM expert and legal counsel,[114] Nehra began falsely reassuring Members that TelexFree's program complied with all federal and state laws, *see, e.g.,* SCAC ¶ 554, when in fact the terms of the standard TelexFree contract unambiguously violated the Massachusetts anti-pyramid scheme law, General Laws Chapter 93, Section 69. *See, e.g.,.* SCAC ¶¶ 14-25;

- Nehra advised Members that the shutdown of TelexFree Brazil would have no effect on TelexFree's U.S.-based operation, SCAC ¶ 422; and,

- In an internet video posted on August 2, 2013, Attorney Nehra falsely stated to Members and potential recruits that "[t]he special ingredient is that you have a real product," SCAC ¶ 556.

*See also* SCAC ¶¶ 552, 562. During the course of his involvement with TelexFree, Nehra was aware of, and consented to, TelexFree's use of his advice, statements and likeness as a marketing tool to lure in new recruits and keep existing recruits. SCAC ¶¶ 554, 557, 559-60.

Furthermore, another of Nehra's major services to TelexFree was to design TelexFree's operating terminology to deliberately disguise its illegal nature and evade regulators – for example, he instructed TelexFree and its Promoters to specifically avoid the use of the terms "investor" and "investment" to evade securities regulations. SCAC ¶¶ 413, 429, 537, 547-50. Also, throughout all of his services to TelexFree, in all of his marketing videos and public statements on behalf of the company, and even after the shutdown of TelexFree Brazil, Attorney Nehra never once advised prospective TelexFree members that their participation in TelexFree presented a financial risk or that TelexFree might be illegal. SCAC ¶ 551. On the contrary, following the Brazilian shutdown, Nehra continued to hold himself out to TelexFree's Members

---

[114] Attorney Nehra's actions exceeded the scope of zealous representation of TelexFree. Although he was licensed to practice law and purported to offer legal opinions, active and integral participation in a Pyramid Scheme does not fall within the parameters of the profession in which he was licensed to practice. *See* SCAC ¶ 553.

131

and recruits as an "MLM Specialist," and continued to assure these people that TelexFree was a perfectly safe and legal income opportunity.  SCAC ¶¶ 146, 393, 405, 407, 417, 422-23, 552, 554, 556, 562.

With respect to Defendant PwC, the SCAC alleges that it collaborated with TelexFree in preparing and disseminating fraudulent IRS Form 1099s, which intentionally misrepresented investor earnings.  SCAC ¶¶ 579-80.  The purpose of these Form 1099s was to create the illusion that TelexFree had made payments to Investors, when, in fact, such payments had never been made.  SCAC ¶ 580.  As stated in the SCAC, PwC's services for TelexFree were "designed to misrepresent and hide the true nature of TelexFree's product, business model, and operations." SCAC ¶ 590.  This constitutes a significant fraudulent misrepresentation, in which PwC participated.  Indeed, these fraudulent 1099s were prepared on PwC's advice, SCAC ¶¶ 579-80, and PwC is therefore directly responsible for this deception.

As the foregoing demonstrates, Defendants' allegation that a material misrepresentation has not been pled in the SCAC is inaccurate

**B.     The SCAC Alleges That The Licensed Professionals Had Actual Knowledge That Their Representations Were False, And That Such Representations Were Made With The Intent To Deceive The Investor Victims And Induce Their Investments**

The Licensed Professionals contend that the SCAC fails to adequately plead the second and third fraud elements that require actual knowledge of the representations' falsity and the intent to deceive and induce reliance.  *See* Doc. No. 170-1 (PwC Br.) at 25-26; Doc. No. 188 (Nehra and Waak Br.) at 26-28.  However, even a cursory review of the SCAC reveals the fallacy of that position.

Allegations of the Licensed Professionals' knowledge are set forth throughout the Complaint.  *See* SCAC ¶¶ 534-35, 537, 547-48, 557, 559-60, 564-65, 566, 568-71 (Nehra and Waak); 588, 589, 591, 593 (PwC); *see also supra,* Part I, Sections II.A.1 and II.B.1.  The SCAC

includes numerous specific allegations that demonstrate such knowledge.  For example, with

respect to Defendant Nehra, the SCAC alleges that:

- At all material times, Nehra was a self-proclaimed "MLM and direct-marketing specialist" attorney with extensive experience serving MLM businesses, SCAC ¶ 405-07, 540, 564;

- Prior to joining with TelexFree, Nehra had extensive experience in the MLM industry, and had previously been involved with AdSurfDaily and ZeekRewards, both major pyramid schemes which subsequently collapsed during the course of Nehra's involvement, SCAC ¶¶ 408-11, 537;

- Nehra's extensive experience with MLM and direct-sales ventures, including his involvement with the AdSurfDaily and Zeek Rewards ventures, provided him with extensive knowledge of what constitutes violations of United States securities laws, SCAC ¶ 412;

- Nehra's involvement with TelexFree provided him with intimate knowledge of TelexFree's business, SCAC ¶ 415 – indeed, Nehra was even held out to the public as TelexFree's "Legal Department," SCAC Ex. 4, Exhibit 4, p. 6;

- As TelexFree's legal counsel, Nehra had actual personal knowledge of TelexFree's business model,  SCAC ¶ 415, and assisted in designing certain elements of that business model, SCAC ¶¶ 429, 431;

- This business model, on its face, clearly and unambiguously violated the Massachusetts anti-pyramid scheme law, General Laws Chapter 93, Section 69, SCAC ¶¶ 14-28;

- From the inception of the investigation and eventual shutdown of TelexFree's Brazilian operation, Nehra was well aware of the proceedings, SCAC ¶¶ 557-58, 564;

- However, when asked by a concerned TelexFree member in July 2013 about the Brazilian shutdown, Nehra refused to answer, responding only that he had to "duck the question," SCAC Ex.4, Exhibit 4, p. 6;

- Nonetheless, he went on to represent to investors that the shutdown of TelexFree Brazil would have no effect on TelexFree's U.S.-based operation, SCAC ¶ 422; and

- He was patently aware of the fact that TelexFree was using his name, likeness, and statements as marketing tools to recruit new members, SCAC ¶¶ 559-60.

Defendant Waak also possessed knowledge that TelexFree's operation was fraudulent

throughout Nehra and Waak's involvement with TelexFree.  SCAC ¶ 564.  Waak, like Nehra,

boasted of extensive legal experience in the MLM industry, including "over thirty years advising MLM and direct-selling enterprises" and "manag[ing] the legal defense of multiple class action lawsuits involving claims for 'pyramiding, securities fraud, false advertising and civil RICO.'" SCAC ¶ 414.  During the course of the firm's involvement with TelexFree, Waak oversaw Nehra's activities for the company.  SCAC ¶ 563.  Furthermore, throughout the course of their involvement with TelexFree, Nehra and Waak's respective services and involvement with the operation were largely indistinguishable, SCAC ¶ 543, with Nehra telling investors and potential investors at a TelexFree "Super Weekend" recruitment event that TelexFree had been "vetted by the Nehra and Waak law firm."  SCAC ¶ 423.

The SCAC is also abundantly clear that Nehra and Waak's numerous misrepresentations were made with intent to deceive the Investor Victims.  *See, e.g.,* SCAC ¶¶ 537, 549-50, 556-59.  As stated above, Nehra's advice, statements and likeness were intended as a marketing tool to induce continued investments.  SCAC ¶¶ 554, 557, 559-60.  Just as egregious, Nehra's misrepresentations and services were also knowingly intended by him to disguise TelexFree's illegal nature and allow the operation to evade detection by regulators.  SCAC ¶¶ 413, 429, 537, 547-50.  Under no full view of the facts set forth in the SCAC could Nehra and Waak's involvement with TelexFree be regarded as innocent or lacking in deceptive intent.

The SCAC also adequately alleges that PwC was aware of TelexFree's fraudulent nature when it collaborated with TelexFree in preparing the fraudulent 1099s.  SCAC ¶¶ 588-89, 591, 593.  PwC was retained by TelexFree in January 2014, well after news of the TelexFree Brazil shutdown had broken.  SCAC ¶ 578.  As TelexFree's accountants, PwC then had "access to TelexFree's internal financial documents that demonstrated that TelexFree received virtually no income from the sale of its VOIP product and was, in fact, an illegal Pyramid Scheme."  SCAC

¶ 585.  PwC also specifically "received information reflecting the facts regarding TelexFree's business practices and exercised control over the materially misleading misstatements."  SCAC ¶ 1087.  Furthermore, fraudulent intent is adequately pled, as the SCAC alleges that these 1099s were prepared for the specific purpose of "maintain[ing] the illusion that [TelexFree] had made payments to its members."  SCAC ¶ 580.

C.      **The SCAC Alleges That The Investor Victims Materially Relied Upon The Licensed Professionals' False Representations And Suffered Harm As A Result**

Finally, the SCAC sufficiently alleges the fourth and fifth elements of fraud, namely that the Investor Victims materially relied upon the misrepresentations of Nehra and Waak and PwC, and were harmed as a result.  The SCAC sets forth that the Defendant Licensed Professionals' misrepresentations were relied upon by the Investor Victims who were induced to furnish money to TelexFree and to recruit additional members.  SCAC ¶ 1090.[115]  These allegations are sufficient to withstand a motion to dismiss under Rule 12(b)(6).  *See Computer Sales Int'l, Inc. v. Lycos*, No. Civ.A.05-10017 RWZ, 2005 WL 3307507, at *5 (D. Mass. Dec. 6, 2005) (denying motion to dismiss on reliance grounds, holding "whether the plaintiff exercised due diligence and was justified in placing confidence in the defendant is question of fact").

---

[115] More particularly, the prospective class members are those Investor Victims who suffered a "net loss" as a result of their investing in the TelexFree Scheme.  *See* SCAC ¶ 993.

## PART FOUR:  REMAINING COMMON COUNTS
### (Fourth and Fifth Counts as against the Financial Services Providers and the Licensed Professionals)

### I.

### THE INVESTOR VICTIMS HAVE ADEQUATELY PLED UNJUST ENRICHMENT

Plaintiffs assert a claim for unjust enrichment against the Moving Defendants seeking to recoup the ascertainable benefits they wrongfully received as a result of their knowing, substantial and indispensable participation in the TelexFree Pyramid Scheme.  *See* Doc No. 141 at 185 (Fourth Cause of Action- Unjust Enrichment).  The Moving Defendants[116] seek to dismiss the claim, asserting various alleged legal and factual deficiencies.  However, as established below, not a single argument they advance withstands scrutiny.

### A.      Unjust Enrichment Remedy Requires Disgorgement Of Benefit Conferred

Unjust enrichment is an equitable remedy where there is "unjust enrichment of one party and unjust detriment to another party."  *Mass. Eye & Ear Infirm. v. QLT Phototherapeutics, Inc.*, 412 F.3d 215, 234 n.7 (1st. Cir. 2005).  Unjust enrichment has been defined broadly as "retention of money or property of another against the fundamental principles of justice or equity and good conscience."  *Massachusetts Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.*, 552 F.3d 47, 57 (1st Cir. 2009), *decision clarified on denial of reh'g,* 559 F.3d 1 (1st Cir. 2009), *citing Santagate v. Tower,* 833 N.E.2d 171 (Mass. App. Ct. 2005), *quoting Taylor Woodrow Blitman Constr. Corp. v. Southfield Gardens Co.*, 534 F. Supp. 340, 347 (D. Mass. 1982).

---

[116] Moving to dismiss Plaintiffs' unjust enrichment count are BANA, TD Bank, Fidelity, John Merrill, Synovus Bank, Wells Fargo, Propay, GPG, Base Commerce, Hughes, IPS, PwC, and Gerald P. Nehra, Gerald P. Nehra Attorney At Law, PLLC, Richard W. Waak, Richard Waak Attorney At Law, PLLC, and Law Offices of Nehra And Waak (collectively, "Nehra and Waak").

136

"Massachusetts courts emphasize the primacy of equitable concerns in a finding of unjust enrichment."  *Id.*

While it is often assumed by practitioners and courts that the claim is intended to "fill in remedial gaps" when no adequate remedy at law is present (*see Sweeney v. DeLuca*, No. 042338, 2006 WL 936688, at *8 (Mass. Super. Ct. Mar. 16, 2006), *citing Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992)), the Restatement makes clear that restitution may be legal or equitable or both.[117]  According to the principles laid out in the Restatement, "[a] claimant entitled to a remedy for unjust enrichment need not demonstrate the inadequacy of available remedies at law."[118]  "The term 'restitution' connotes both liabilities and remedies for unjust enrichment."[119]

Unjust enrichment has traditionally been described as consisting of three elements:

(1) a benefit conferred upon the defendant by the plaintiff;

(2) an appreciation or knowledge by the defendant of the benefit; and

(3) acceptance or retention by the defendant of the benefit under circumstances that make it inequitable for the defendant to retain the benefit without payment of its value.

*QLT Phototherapeutics*, 552 F.3d at 57.

The first and central principle of unjust enrichment is that "[a] person who is unjustly enriched at the expense of another is subject to liability in restitution."  Restatement (Third) Of

---

[117] Michael Traynor, *The Restatement (Third) Of Restitution & Unjust Enrichment: Some Introductory Suggestions*, 68 Wash. & Lee L. Rev. 899, 901 (2011).

[118] *Id.*, *citing* Restatement (Third) Of Restitution & Unjust Enrichment § 4(2) (2011) ("A claimant otherwise entitled to a remedy for unjust enrichment including a remedy originating in equity, need not demonstrate the inadequacy of available remedies at law.").

[119] *Id.*, *citing* Restatement (Third) Of Restitution & Unjust Enrichment § 1 (2011), Reporter's Note e ("The confused view that 'restitution' is merely a remedy appears to result from a historical accident in the American law school curriculum.").

Restitution & Unjust Enrichment § 1 (2011).[120]  Restitution can be: "loss"-based, i.e. what did

the plaintiff lose (restitution of property or money given); "gain"-based, i.e. what was the

wrongdoer's gain (disgorgement of ill gotten gains or profit); or a combination of the two.[121]

Regardless of whether the remedy is styled as classic restitution or a form of restitutionary

disgorgement, the "appropriate measure of damages should be an approximation of the value of

the benefit . . . conferred."  *QLT Phototherapeutics*, 552 F.3d at 66.  The "determination of the

value of the benefit conferred on the defendant is a question of fact."  *Id.*  "Massachusetts has

made clear that a jury's unjust enrichment award need not be susceptible of calculation with

mathematical exactness, provided there is a sufficient foundation for a rational conclusion."  *Id.*

**B.      Plaintiffs Have Alleged Sufficient Facts To Sustain An Unjust Enrichment Claim**

The Moving Defendants' contention that insufficient facts have been pled to support an

unjust enrichment cause of action fails because the SCAC sets forth abundant facts and details

that satisfy the pleading requirements of unjust enrichment.  Likewise, the Moving Defendants

contentions that the Investor Victims did not confer a direct benefit upon them, that they had no

knowledge of TelexFree's fraud, and that the Investor Victims are precluded from asserting their

---

[120] "A corollary principle" applies that "[a] person is not permitted to profit by his own wrong." Traynor, 68 Wash. & Lee L. Rev. at 901, *citing* Restatement (Third) Of Restitution & Unjust Enrichment § 3 (2011).

[121] *See QLT Phototherapeutics*, 552 F.3d at 66-67 (damages can take into account the loss or the extent to which the wrongdoer has been enriched or profited); *see also County of San Bernardino v. Walsh*, 158 Cal. App. 4th. 533, 542-543, 69 Cal. Rptr. 3d 848, 855-856 (Cal. Ct. App. 2nd Dist. Div. 6 ) (citing the Restatement (3d) Restitution and Unjust Enrichment:  "Where 'a benefit has been received by the defendant but the plaintiff has not suffered a corresponding loss or, in some cases, any loss, but nevertheless the enrichment of the defendant would be unjust … [t]he defendant may be under a duty to give to the plaintiff the amount by which [the defendant] has been enriched.' … It is not essential that money be paid directly to the recipient by the party seeking restitution. … The emphasis is on the wrongdoer's enrichment, not the victim's loss … Disgorgement may include a restitutionary element, but it may compel a defendant to surrender all money obtained through an unfair business practice … regardless of whether those profits represent money taken directly from persons who were victims of the unfair practice").

claim for unjust enrichment because they have pled parallel causes of action are equally defective because the SCAC sets forth sufficient facts and details to defeat these challenges and satisfy each element of an unjust enrichment claim.

### 1.  The SCAC Adequately Pleads That The Investor Victims Conferred A Benefit Upon The Moving Defendants

As to the element of whether a "benefit" was conferred on Defendants,[122] the SCAC contains multiple allegations detailing the Moving Defendants benefited from and were enriched by the Investor Victims' investments and payments into TelexFree.  The plain language of the SCAC alleges that Defendants received significant transactional processing fees, ACH processing charges, return deposit item fees, chargeback fees, interest on funds held in TelexFree accounts, miscellaneous fees, and/or fees for legal services.  *See* SCAC ¶¶ 33, (Financial Services Providers); 326 (all Defendants); 562 (Nehra); 703 (Financial Services Providers); 719 (Defendant Banks); 903-04 (Base Commerce); 1038 (all Defendants).  With respect to the Defendant Banks, the SCAC also sets forth that such Defendants profited by lending out Investor funds on the interbank lending market – thereby directly profiting off investor losses.  *See* SCAC ¶ 719.  The SCAC also alleges that the Defendant Banks and Payment Processors sought to benefit from the Scheme because their services to TelexFree helped to build, maintain and further their lucrative relationships with members of the MLM community as a whole, enhancing the reach of TelexFree Promoters, and others.  *See* SCAC ¶ 33.  This litany of benefits is appreciable.

---

[122] Although the Moving Defendants are not uniformly clear as to which element of the Plaintiffs' claims for unjust enrichment they are challenging, it appears that the first element of the claim, requiring a benefit conferred, is being challenged by BANA, TD Bank, Synovus, Wells Fargo, Propay, GPG, Base Commerce, Hughes, IPS, PwC, and Nehra and Waak.

The Moving Defendants next attempt to insert a legal obstacle, claiming that the benefits alleged are insufficient because they were not the result of "direct" transactions with them.  No such hurdle exists.  A claim of unjust enrichment does not require a direct transaction, or benefit, between a plaintiff and a defendant to survive.  *See Lesti v. Wells Fargo Bank, N.A.*, 960 F. Supp.2d 1311, 1327 (M.D. Fla. 2013); *Jackson v. Regions Bank*, No. 3:09-00908, 2010 WL 3069844, at *10-11 (M.D. Tenn. Aug. 4, 2010) (holding absence of a direct transfer of funds from a plaintiff to the defendant is insufficient to defeat an unjust enrichment claim).

In *Lesti*, defendant Wells Fargo similarly argued that the plaintiffs' unjust enrichment count should be dismissed as it did not allege that plaintiffs "have directly conferred a benefit on defendant."  *See Lesti*, 960 F. Supp.2d at 1327.  The court denied the motion, stating

> plaintiffs allege: (1) [the primary violator] conferred a benefit upon Wells Fargo by making wire transfers into and out of the Wells Fargo Accounts, thereby accruing significant transaction/service fees; (2) [the primary violator] paid the fees with investor funds; (3) Wells Fargo knowingly accepted and retained the benefits; and (4) the circumstances are such that it would be inequitable for Wells Fargo to retain the benefits…At this stage in the litigation, the Court finds that plaintiffs have adequately pled a plausible cause of action for unjust enrichment.

*Id.*

Similarly, In *Williams v. Wells Fargo Bank, N.A.*, No. 11-21233-CIV, 2011 WL 4368980 at 9 (S.D. Fla. Sept. 19, 2011), the court denied Wells Fargo's motion to dismiss, explaining that

> just because the benefit conferred by Plaintiffs on Defendants did not pass directly from Plaintiffs to Defendants — but instead passed through a third party — does not preclude an unjust-enrichment claim. . . . [i]ndeed to hold otherwise would be to undermine the equitable purpose of unjust enrichment claims.

*Id.* at *9.  Thus, for unjust enrichment to survive, it is sufficient that the primary violator(s) – in this case, TelexFree and its principals – pay fees to the financial institution or legal services provider using investor funds.  *See id; see also Jackson,* at *10-11.  As such, the SCAC's allegations that the Moving Defendants were enriched at the expense of the Investor Victims are

sufficient, regardless of whether the funds Defendants received came directly from the Investor

Victims or indirectly through TelexFree - all such funds having originated from the Investor

Victims.

In addition, even assuming, *arguendo*, that a direct transfer from the Investor Victims to

the Moving Defendants were necessary, the SCAC sets forth that those Defendants were directly

enriched by Investor funds.  In particular, the funds received by the Moving Defendants were

paid or deducted directly from the TelexFree accounts containing the Investor Victims' funds.

For example, with respect to the Payment Processor Defendants, the SCAC alleges that their fees

were deducted directly from the accounts used for processing payments, although the precise

amounts of most of these deductions have not yet been disclosed.[123]  *See* SCAC ¶¶ 863-69

(Propay holdings of TelexFree Investor funds); 904 (Base Commerce fee deductions); 959-65

(Allied Wallet processing account and transfers); 982 (IPS holdings of TelexFree Investor

funds); *but see* SCAC ¶ 904 (specifically setting forth amounts of Base Commerce's fees, which

were deducted directly out of Investor funds obtained in the Scheme via the accounts used to

process payments).  The SCAC also sets forth that the Defendant Banks profited by lending out

funds received from the Investor Victims on the interbank lending market.  SCAC ¶ 719.  Thus,

the facts alleged sufficiently set forth a "direct" benefit conferred upon the Defendant Financial

Services Providers.

---

[123] Discovery will bear out the millions of bits of granular data including the exact amounts and
dates that these payments were made.  However, at this pre-discovery stage, the income received
by these Payment Processors appears to have been substantial.  For example, in approximately
eight months, Defendant Base Commerce deducted over $2.5 million in fees from its TelexFree
processing account. SCAC ¶ 904.  The amounts processed by the other Payment Processor
Defendants on behalf of TelexFree were similarly known to have been massive.  For example, as
late as December 31, 2013, Defendant Propay held over $4.5 million in its TelexFree account
simply awaiting distribution to TelexFree. SCAC ¶¶ 868-69.  This high volume of payment
processing suggests that earned fees were extremely high.

### 2.     The SCAC Adequately Pleads The Unjustified Nature Of Defendants' Retention Of The Benefits In Light Of Their Appreciation Of The Benefit

With respect to the second and third elements of unjust enrichment, the Moving Defendants' acceptance and retention of funds swindled from the Scheme's Victims is plainly inequitable.[124]  The SCAC makes clear that the TelexFree Pyramid Scheme was detected by the sophisticated systems of the Moving Defendants.  Some Defendants even went so far as to describe TelexFree as a "hot potato" which no bank would touch.  SCAC ¶ 872 (discussing Hughes' and Base Commerce's correspondence of August 28, 2013); *see also* SCAC ¶ 909; SCAC, Ex. 12.  The Defendants' unjust profits were entirely the result of the knowing involvement and substantial assistance they provided to the TelexFree Pyramid Scheme, all at the expense of the Investor Victims.  The Investor Victims have explicitly alleged the injustice of Defendants' enrichment.  SCAC ¶¶ 303 (Financial Services Providers), 325 (all Defendants), 716 (Defendant Banks), 1041-43 (all Defendants).  The injustice is particularly apparent where, as here, the Moving Defendants were aware of the fraud and yet continued to provide the Scheme with valuable services.  *See* Part I, Sections I.B-C and II, *supra*.  Moreover, and as discussed below, the Financial Services Providers profited *directly* from funds swindled from the Investor Victims, via deducted fees and interest on interbank lending of these funds.  *See* SCAC ¶¶ 863-69 (discussing Propay holdings of TelexFree Investor funds); 904 (discussing Base Commerce fee deductions); 959-65 (discussing Allied Wallet processing account and transfers); 982 (discussing IPS holdings of TelexFree Investor funds); 719 (discussing income received by Defendant Banks, including interest on interbank lending of Investor funds).  In any event, whether it would be inequitable for the Moving Defendants to retain their profits is a question of

---

[124] The Moving Defendants do not appear to contest the second element.  The SCAC adequately sets forth that the Defendants had an "appreciation or knowledge" of the benefits received. SCAC ¶¶ 1039-40.

fact that should not be resolved at this pre-discovery stage of litigation.  *See Natale v. Espy Corp.*, 2 F. Supp. 3d 93, 105 (D. Mass. 2014) (holding unconscionability of retention of benefit is issue of fact not resolvable on motion to dismiss).

The Moving Defendants also claim ignorance of the Scheme in an effort to justify the retention of their fees.  This argument is legally, as well as factually, deficient.  First, Plaintiffs have pled otherwise, and the allegations in the Complaint must be taken as true.  *See A.G. ex rel. Maddox v. Elsevier, Inc.*, 732 F.3d 77, 80 (1st Cir 2013).  Apart from this creation of a question of fact, specifically, a financial institution's lack of such knowledge will not automatically defeat a claim for unjust enrichment.  In *El Camino Resources, Ltd. v. Huntington National Bank*, 722 F. Supp. 2d 875, 930-932 (W.D. Mich. 2010), *aff'd*, 712 F.3d 917 (6th Cir. 2013), the plaintiff alleged that the defendant bank was unjustly enriched when the primary violator used funds obtained from the plaintiff to pay down a line of credit with the defendant bank.  Rejecting the bank's innocence defense, the court refused to dismiss the unjust enrichment claim, holding that knowledge of improper conduct is not necessary for a party to be unjustly enriched.  *See id.* Similarly, in *Brooks v. Bank of Boulder*, 891 F. Supp. 1469, 1480 (D. Colo. 1995), the plaintiffs' funds had been placed in the primary violator's account with the defendant bank and were available to offset the primary violator's debts to that bank.  *See id.*  The plaintiffs alleged that in making their investment they conferred a benefit on the bank, as the bank could use such funds to offset the debt of the primary violator.  The court refused to dismiss the plaintiffs' unjust enrichment claim, even though it found the plaintiffs' allegations insufficient to establish that the bank had knowledge of the primary violator's Ponzi scheme.  *Id.; s*ee *also Fidelity Nat'l Title Ins. Co. v. Intercounty Nat'l Title Ins. Co.*, 412 F.3d 745, 748 (7th Cir. 2005) (noting that the defendant need not be party to a fraud to be liable for unjust enrichment).  *Cf. Cavadi v. DeYeso*,

941 N.E.2d 23 (Mass. 2011) (noting unjust enrichment remedy of constructive trust "may be imposed, generally as between transferor and transferee, without proof of fraudulent intent").[125] Even assuming, *arguendo,* that actual knowledge were a legal element of an unjust enrichment claim, as detailed extensively above, the SCAC sufficiently alleges knowledge on the part of the Moving Defendants.  *See* Part I, Sections I.B., II.A.1 and II.B.1, *supra.*  Thus, the Moving Defendants' knowledge-based arguments should be rejected.

### 3. The Fact That Defendants Rendered Services Does Not Vitiate Unjust Enrichment

Further endeavoring to circumvent liability for their inequitable enrichment, Moving Defendants TD Bank, Synovus Bank, and PwC argue that a claim for unjust enrichment cannot be premised on their receipt of fees for services actually rendered.[126]  This argument is also misplaced since it is well-established that the receipt or retention of a fee for services may constitute unjust enrichment when the particular circumstances render it unjust.  *See Frappier v. Countrywide Home Loans, Inc.*, 645 F.3d 51, 58 (1st Cir. 2011) (payments of interest on loan); *Cox v. Cox*, 780 N.E.2d 951 (Mass. App. Ct. 2002) (fees for legal services).[127]  Furthermore,

---

[125] *QLT Phototherapeutics*, 552 F.3d at 57 (noting that under Massachusetts law a constructive trust is imposed to avoid unjust enrichment resulting from the misuse of confidential information).

[126] *See* Doc. No. 168 (TD Bank Br.) at 18-19; Doc. No. 179 (Synovus Br.) at 18; Doc. No. 174 (PwC Br.) at 15.

[127] *See* The Restatement of Restitution (Third) (draft) §44 Interference With Other Protected Interests ("a person who obtains a benefit by conscious interference with another's legally protected interests is accountable to the other for the benefit so obtained unless competing legal objectives make such liability inappropriate"); *see also Collins v. Godfrey*, 87 N.E.2d 838 (Mass. 1949) (attorney who rendered legal services regarding a criminal matter while acting as a "special justice" in clear violation of an SJC rule prohibiting such justices from "be[ing] retained or employed or . . . practic[ing] as an attorney on the criminal side of any court" which was promulgated in order to maintain "public confidence" in the judiciary was denied his right to recover for such services (otherwise rendered properly) because: "since the rule is valid and prohibited the rendering of the services by the plaintiff, he cannot recover for rendering them").

with respect to the Defendant Banks, the SCAC alleges that such Defendants not only profited from payment of fees, but also from lending out Investor Funds at interest on the overnight lending market, thus profiting directly from their own use of funds swindled from investors.  *See* SCAC ¶ 719.

Notably, the cases cited by those Defendants to support their contention that fees earned fails to constitute unjust enrichment are inapposite.  More particularly, Synovus Bank cites three cases in which there is no alleged wrongdoing by the recipient of the funds or any involvement by the recipient in the primary tortfeasor's scheme.[128]  *See Speedway Motorsports, Inc. v. Pinnacle Bank*, 727 S.E.2d 151, 153-54 (Ga. App. Ct. 2012) (use of swindled funds to pay interest on separate and unrelated mortgage); *Eastside Carpet Mills, Inc. v. Dodd*, 241 S.E.2d 466, 467 (Ga. App. Ct. 1978) (funds used to repay bank loan where loan taken out to purchase vehicle later discovered to be stolen); *In re Bayou Hedge Funds Inv. Litig.*, 472 F. Supp. 2d 528, 532 (S.D.N.Y. 2007) (payment of fees for general legal services, but not allegations of involvement in scam).  The principal embodied in these cases is quite unremarkable – naturally, a plaintiff should not be allowed to seek recovery from every person with whom the primary tortfeasor has ever done business.  However, that proposition is entirely inapplicable to the matter at bar.  The Investor Victims have alleged that the Moving Defendants were knowingly and directly involved in the TelexFree Scheme and culpable in their own right.  Indeed, it was the Moving Defendants' very involvement in the Scheme that enriched them.  Furthermore, in

---

[128]*See* Doc. No. 179 at 17, *citing Speedway Motorsports, Inc. v. Pinnacle Bank*, 727 S.E.2d 151, 153-54 (Ga. App. Ct. 2012) (use of swindled funds to pay interest on separate and unrelated mortgage); *Eastside Carpet Mills, Inc. v. Dodd*, 241 S.E.2d 466, 467 (Ga. App. Ct. 1978) (funds used to repay bank loan where loan taken out to purchase vehicle later discovered to be stolen); *In re Bayou Hedge Funds Inv. Litig.*, 472 F. Supp. 2d 528, 532 (S.D.N.Y. 2007) (payment of fees for general legal services, but not allegations of involvement in scam).

*McClane*,[129] the parties had a written contract, and the defendant's counterclaim for unjust enrichment only asserted that the fees set forth in the contract had been too high. *McLane, Graf, Raulerson & Middleton, P.C. v. Grady*, No. ESCV201301708A, 2014 WL 2504540, at *3-4 (Mass. Super. Ct. Apr. 1, 2014). The court dismissed the count for unjust enrichment because the defendant's claim was "a matter to be litigated in the breach of contract claims." *Id.* at *4. This is plainly distinct from the matter at bar, as the SCAC does not allege the existence of a contract between the Investor Victims and Moving Defendants.

### 4.    Unjust Enrichment May Be Pled With Other Causes Of Action

Finally, Moving Defendants Propay and IPS also errantly suggest that the Investor Victims' pleading of other causes of action precludes their claims for unjust enrichment. This argument is not merely inaccurate, but premature. Considering this exact contention, the District of Massachusetts recently denied a defendant's motion to dismiss referring to the express language of the Federal Rules of Civil Procedure. *See Diviacchi v. Affinion Grp., Inc.,* No. CIV.A. 14-10283-IT, 2015 WL 3631605, at *17 (D. Mass. Mar. 11, 2015), *report and recommendation adopted*, No. 14-CV-10283-IT, 2015 WL 3633522 (D. Mass. June 4, 2015), *citing Vieira v. First American Title Ins. Co.*, 668 F.Supp.2d 282, 295 (D. Mass. 2009) ("[a]t the pleading stage . . . Fed. R. Civ. P. 8(d) allows 'plaintiffs to plead alternative and even inconsistent theories.'"). That court also defined pleading in the alternative as an "accepted practice to pursue both theories [unjust enrichment and breach of contract] at the pleading stage." *See id.*, *citing Lass v. Bank of Am., N.A.*, 695 F.3d 129, 140 (1st Cir. 2012); s*ee also Cooper v. Charter Communs. Entm'ts I, LLC*, 760 F.3d 103, 112-13 (1st Cir. 2014) (overturning dismissal of unjust enrichment claim, despite pleading of adequate remedy at law, reasoning inconsistent

---

[129] *See* Doc. No. 174 at 15.

pleading is permitted); *Limone v. U.S.*, 579 F.3d 79, 93 (1st Cir. 2009) ('plaintiffs had the right to plead alternative theories of liability, *see* Fed. R. Civ. P. 8(d), and their exercise of that right did not debar them from an independent review of each set of claims'); *Barrett v. H & R Block, Inc.*, 652 F. Supp. 2d 104, 112 (D. Mass. 2009) (denying motion to dismiss because "Rule 8 permits plaintiffs to plead alternative theories of liability"). This authority is also consistent with the principles laid out in the Restatement that an unjust enrichment claim is <u>*not*</u> restricted to those instances where there is no other adequate remedy at law.[130] Thus, the Investor Victims' simultaneous pleading as parallel claims is entirely proper at this stage of the litigation.

Each of the Moving Defendants' arguments in support of their motions to dismiss the unjust enrichment count are, therefore, without basis. As such, they have not demonstrated their entitlement to dismissal, the cause of action is adequately pled and their motions should be denied.

## II.

### THE INVESTOR VICTIMS HAVE STATED A VALID CLAIM FOR CONSPIRACY AGAINST CERTAIN FINANCIAL SERVICES PROVIDERS AND THE LICENSED PROFESSIONALS

The Investor Victims assert a claim for civil conspiracy (SCAC Fifth Cause of Action) against certain of the Financial Services Providers[131] as well as the Licensed Professionals[132] (collectively, the "Conspiracy Defendants") based on their actual knowledge that TelexFree was

---

[130] Traynor, 68 Wash. & Lee L. Rev. at 901, "The Restatement (Third) Of Restitution & Unjust Enrichment: Some Introductory Suggestions," *citing* Restatement (Third) Of Restitution & Unjust Enrichment § 4(2) (2011) ("A claimant otherwise entitled to a remedy for unjust enrichment including a remedy originating in equity, need not demonstrate the inadequacy of available remedies at law.").

[131] The Financial Services Providers against which civil conspiracy is alleged are Defendants Fidelity Bank and John Merrill, Base Commerce and John Hughes, GPG and IPS.

[132] The relevant Licensed Professionals against which civil conspiracy is alleged are Defendants Nehra, Waak, Nehra Law Firm, Waak Law Firm, Nehra and Waak Law Firm and PwC.

an unlawful enterprise and their wrongful, substantial, and essential participation in the Pyramid

Scheme.  To obtain dismissal, those Defendants make largely overlapping arguments that the

SCAC contains insufficient factual allegations to support a claim for civil conspiracy.  Those

arguments are baseless.  As set forth below, a straightforward review of the SCAC establishes

that the plain language set forth in the Complaint satisfies each relevant pleading standard.

Under Massachusetts law, a claim of civil conspiracy "requires proof of a common plan

to commit a tortious act."  *Farrah ex rel. Estate of Santana v. Gondella*, 725 F. Supp. 2d 238,

248 (D. Mass. 2010).  A conspiracy claim is properly pled where a plaintiff alleges "first, a

common design or an agreement, although not necessarily express, between two or more persons

to do a wrongful act and, second, proof of some tortious act in furtherance of the agreement."  *Id.*

(quoting *Aetna Cas. Sur. Co. v. P & B Autobody*, 43 F.3d 1546, 1564 (1st Cir.1994)) (internal

citations omitted).  A showing that the defendant had "actual knowledge" of the underlying

scheme and "substantially assisted" the offense is also required.  *See Kurker v. Hill*, 689 N.E.2d

833, 837 (Mass. App. Ct. 1998) (citing Restatement (Second) of Torts § 876 ("For harm

resulting to a third person from the tortious conduct of another, one is subject to liability if he (a)

does a tortious act in concert with the other or pursuant to a common design with him or (b)

knows that the other's conduct constitutes a breach of duty and gives substantial assistance or

encouragement to the other so to conduct himself")).

The Conspiracy Defendants have emphasized the observation in *Lerner v. Fleet Bank*

*N.A.*, 459 F.3d 273, 294 (2d Cir. 2006) ("*Lerner*") that "red flags … do not create a strong

inference of actual knowledge of [misappropriation.]"  *See also Go-Best Assets Ltd. v. Citizens*

*Bank of Mass.*, 972 N.E.2d 426 (Mass. 2012) (affirming dismissal of aiding and abetting claims

against defendant Bank relying upon the *Lerner* rationale) ("*Go-Best*").  Such reliance is

misplaced because those cases involved intermittent accounting irregularities in the course of otherwise lawful business enterprises, and the red flags identified therein were innocent and explainable. *See Go Best*, 972 N.E.2d at 431. Unlike the apparently lawful businesses at issue in *Lerner* and *Go-Best*, the red flags associated with the TelexFree scheme went to its core legitimacy and established it as an unlawful Pyramid Scheme. The Conspiracy Defendants suggest that discovering that TelexFree could only meet its current contractual obligations at any moment by continuously enrolling more subscribers, i.e. its fundamental nature as a pyramid scheme, is like a lawyer-client with overdrafts. The facts and circumstances surrounding TelexFree are so outrageous that a comparison to facilitating the acceptance and transfer of client funds after learning that one's lawyer-client is unlicensed is the more reasonable analogy.[133]

The allegations in the SCAC reasonably satisfy each element of the claim of civil conspiracy. As more fully detailed herein, the SCAC alleges that (i) the Conspiracy Defendants engaged in a "common plan" to defraud TelexFree's Investors,[134] (ii) each acted in furtherance of the Scheme,[135] (iii) each had actual knowledge of the underlying Scheme,[136] and (iv) each

---

[133] These actual knowledge and substantial assistance elements of a conspiracy claim overlap with the elements of an aiding and abetting claim. *See Chang v. Winklevoss*, No. 09-5397-BLS1, 2011 WL 1758963, at *5 n.9 (Mass. Super. Ct. May 3, 2011) (simultaneously analyzing whether a complaint contained allegations of actual knowledge and substantial assistance sufficient to support claims for both aiding and abetting and civil conspiracy) (citing *Kurker v. Hill*, 689 N.E.2d at 837). As such, the Investor Victims do not in this section, repeat their discussion of the Conspiracy Defendants' respective knowledge of and substantial assistance with the TelexFree Scheme, but refer the reader to Part I, Sections I and II, *supra*. In addition, with respect to the "actual knowledge" prong, the Investor Victims note that they are not, at the pleading stage, obligated to prove any allegation, but only to plead a case of knowledgeable fraud sufficient to proceed to discovery. *See* Argument, Section A, *supra* ("The Applicable Rule 12(b)(6) Standards").

[134] SCAC ¶¶ 278, 405-33, 533-71, 577, 804-34, 842, 844, 878-927, 971-92, 1045-52.

[135] SCAC ¶¶ 405-33, 533-71, 577, 804-34, 878-927.

[136] SCAC ¶¶ 405-33; 415, 533-71, 577-80, 585, 807-10, 812-15, 820-21, 832; *see also* Part I, Sections I.B, II.A.1 and II.B.1, *supra*.

"substantially assisted" in perpetuating the Scheme.[137]   Contrary to the Conspiracy Defendants'

claims, for purposes of the instant review, the Investor Victims have pleaded fraudulent

conspiracy "with enough specificity to inform [the Conspiracy Defendants] of facts forming the

basis of the conspiracy charge."  *See Van Schaick v. Church of Scientology of Cal., Inc.*, 535 F.

Supp. 1125, 1141 (D. Mass. 1982).

## A.   Plaintiffs Have Sufficiently Alleged That The Defendants Engaged In A "Common Plan" To Defraud TelexFree's Investors

Where a complaint provides "sufficient foundation for the inference," *Hadley Pollett,*

*LLC v. Yun Zhu*, No. CIV.A. 07-1488, 2009 WL 5909268, at *3 (Mass. Super. Dec. 10, 2009),

that defendants "had an agreement or engaged in a common plan," *Soni v. Boston Med. Ctr.*

*Corp.*, 683 F. Supp. 2d 74, 100 (D. Mass. 2009), to commit a tortious act, dismissal is

inappropriate.[138]   In turn, a "common plan," is a "design or an agreement, although not

necessarily express, between two or more persons to do a wrongful act."  *Farrah*, 725 F. Supp.

2d at 248.  As clearly alleged here, persons or entities engage in a "common plan" by

"combining together and confederating to accomplish unlawful purposes."  *Ingram v. Krock*, No.

042468C, 2006 WL 416958, at *4 (Mass. Super. Jan. 26, 2006).

Generally, a complaint's allegation of a "common plan" among defendants will be

deemed adequate for a civil conspiracy claim to survive a motion to dismiss where the complaint

alleges how the defendants combined to injure defendants, and to what purpose.  *See, e.g.,*

---

[137]SCAC ¶¶ 146, 393, 423, 429, 707, 711, 719, 804-09, 811-12, 814, 818, 820, 825-31, 850-52, 879-81, 884-85, 894, 903, 909-11, 915-16, 920, 926, 971, 973-74, 979, 982, 986; *see also* Part I, Sections I.C, II.A.2 and II.B.2, *supra*.

[138] Defendants Base Commerce/Hughes, GPG, IPS, PwC, and the "Nehra and Waak Defendants" seek dismissal of Count Five on the grounds that it does not provide sufficient foundation for such an inference.  As described above, the Nehra & Waak Defendants are, collectively, Nehra, Waak, the Nehra Law Firm, the Waak Law Firm, and the Nehra and Waak Law Firm, each as defined in the SCAC.  The Nehra & Waak Defendants are also collectively referred to in the SCAC as the "Attorney Defendants."

*Defonseca v. Sandler*, No. 020362, 2002 WL 1923885, at *3 (Mass. Super. Ct. June 25, 2002) (where author of an autobiography sued publisher, publisher's president, and the relations professional retained by the publisher, for, among other things, engaging in a conspiracy to create the appearance that author had breached the publishing agreement among the parties, complaint sufficiently alleged that the defendants engaged in a common plan to do so by alleging that at president's request, public relations professional "intentionally scheduled engagements when she knew [author] was unavailable, gave short notice of scheduled engagements, refused to answer questions regarding the content and format of the interviews, and scheduled [author] for hostile and inappropriate interviews"); *Bingo Innovative Software, LLC v. Cahill*, No. SUCV2010-02743-A, 2011 WL 2652170, at *6 (Mass. Super. Ct. June 9, 2011) (where plaintiff Bingo Innovative Software, LLC (BIS) sued Massachusetts State Lottery Commission employees alleging conspiracy with respect to the granting of lottery contracts and sufficiently pleaded civil conspiracy claim to survive dismissal where the complaint, "generously read" alleged that "[defendants] combined with others at the Lottery to interfere with the pilot agreement and hinder implementation of the Bingo game for the purpose of harming BIS and rewarding [a third party] for campaign fundraising for [defendant]."")[139]

---

[139] Even under the more stringent standards applied to summary judgment motions, allegations that generally support an inference that the defendants worked together to injure plaintiffs have been found to pass muster. *See Ingram v. Krock*, No. 04-2468-C, 2006 WL 416958, at *5 (Mass. Super. Ct. Jan. 25, 2006) (denying motion for summary judgment on a civil conspiracy claim based on allegations that one of the two defendants "was aware of [the other defendant's] tortious actions and agreed with, assisted, and encouraged them."); *Zereski v. American Postal Workers Union*, No. 97-1567, 1998 WL 1181769, at *10 (Mass. Super. Ct. Aug. 13, 1998) (where plaintiff employee sued defendants, union, president, and treasurer, alleging various tort and contract claims arising out of the publication of allegedly defamatory material printed in a union newsletter, court refused to grant summary judgment on the plaintiff's civil conspiracy where the complaint alleged merely that "several of the defendants discussed whether to include her name prior to publication").

At bar, as in *Defonseca* and *Bingo Innovative Software*, the SCAC alleges that the relevant Moving Defendants combined, or together designed, to commit a wrongful act (*i.e.*, to maintain the unlawful Scheme).  *See, e.g.,* SCAC ¶¶ 1045-46 (alleging that the relevant Moving Defendants "combined by common design to enter into a civil conspiracy" to maintain a pyramid scheme).  And the SCAC makes detailed factual allegations in support of that contention.

With respect to Moving Defendants Base Commerce, Hughes and GPG, the SCAC alleges, among other things, that Base Commerce and GPG shared a close business relationship, and that Hughes (as president of Base Commerce), Base Commerce, and GPG colluded to provide services to TelexFree, including the services necessary to further and complete the Scheme, and provided those services during the same time period, and towards the same purpose, as the other Conspiracy Defendants. SCAC ¶¶ 278, 804-34, 842, 878-92.  The SCAC alleges that after GPG and Base Commerce were informed to cease providing services to TelexFree by their sponsor bank, GPG "sneaked" payouts from the bank for the benefit of TelexFree. SCAC ¶ 844.  In particular, the SCAC alleges that Hughes and Base Commerce authorized a transfer of $5 million for the benefit of TelexFree in September of 2013, notwithstanding that services were have supposed to ceased by that time. SCAC ¶ 885.  The SCAC alleges that Defendant Hughes communicated with Defendant GPG, as well as the TelexFree Founders, regarding his concern that Federal agencies would intervene with TelexFree (SCAC ¶ 907), and that Defendant Base Commerce successfully applied to Moving Defendant IPS, on TelexFree's behalf, to obtain for TelexFree additional ACH processing services, (SCAC ¶ 916).  On those grounds, the SCAC also alleges that IPS provided payment processing services to TelexFree that were integral to the furtherance of the Scheme during the same time as the other Moving Defendants. SCAC ¶ 971-72.

With respect to the Nehra and Waak Defendants, the SCAC alleges, among other things, that Attorney Nehra, in concert with TelexFree, procured TelexFree's own violations of law regarding the proper segregation and maintenance of customer funds (SCAC ¶ 561), and that the Nehra and Waak Defendants collectively, knowingly and deliberately advised TelexFree how to evade United States securities laws (laws intended to offer, in part, protection from pyramid and Ponzi schemes) and advised TelexFree Promoters (excluding Top Level Promoters) to unknowingly participate in those evasions (SCAC ¶¶ 546-70).  The SCAC also flatly alleges that (i) the Nehra and Waak Defendants committed those acts and omissions with the specific knowledge and purpose of assisting and benefiting TelexFree and themselves, to the detriment and loss of the putative class (SCAC ¶ 568), and (ii) the Nehra and Waak Defendants knew their representations and statements would be and were used by TelexFree as a marketing tool to further advance its business model and illegal activities (SCAC ¶ 569).

The SCAC's allegations of Defendant PricewaterhouseCoopers' participation in the common plan are equally strong.  The SCAC alleges that PwC, with full knowledge of the TelexFree Scheme[140] and of the fact that it was an illegal pyramid scheme, continued to (i) provide TelexFree with accounting and consulting services, including advice leading to the issuance of fraudulent 1099's, (ii) craft financial statements and make other representations designed to misrepresent and hide the true nature of TelexFree's product and business model, and (iii) allow TelexFree to use those statements as propaganda to recruit additional victims into the Scheme. SCAC ¶¶ 577-91.

---

[140] PwC was retained by TelexFree to assist in its response to the SOC investigation. PwC is one of the world's preeminent accounting and auditing firm with offices throughout the world, including Brazil.  In providing assistance, PwC was given access to TelexFree's business model and accounting records.

In short, the SCAC specifically alleges that the Conspiracy Defendants each "combined with others . . . for the purpose of harming" the Investor Victims. SCAC ¶¶ 278, 577, 405-33, 533-71, 804-34, 842, 844, 878-927, 971-92, 1045-52.  These allegations, taken together as true, more than meet the standards articulated in *Defonseca* and *Bingo Innovative Software* for pleading that these Defendants engaged in a "common plan" to defraud TelexFree's investors. The Conspiracy Defendants' argument that the allegations in the SCAC do not support an inference that those Defendants engaged in a common plan to defraud TelexFree's investors is baseless, and dismissal of the Investor Victims' claim on the grounds that the SCAC does not meet the applicable pleading standard is thus patently unwarranted.

**B.      Plaintiffs Have Pled Facts Sufficient To Allege That The
         Conspiracy Defendants Committed Acts In Furtherance Of The Scheme**

To state a claim for civil conspiracy, a complaint must also allege that the defendants acted in concert to further an underlying tortious design.  *See Aetna*, 43 F.3d at 1564. Allegations that defendants cooperated to further fraud or deceit that caused damage to the plaintiff have been found to meet that standard.  *See id*; *see also Defonseca,* 2002 WL 1923885 at *3 (allegations that plaintiff suffered monetary damage as a result of defendants' conspiratorial conduct deemed sufficient).

At bar, the SCAC meets the pleading standard set forth in *Farrah* and elsewhere by alleging that the Conspiracy Defendants worked in concert with others, including TelexFree, to commit a specific tortious act -- defrauding the Investor Victims as part of the TelexFree Scheme.[141]  As but one example, the SCAC alleges that Conspiracy Defendant Fidelity Bank wrongfully continued to receive Victims' funds even after it notified TelexFree of the closing of

_____

[141] Arguing that the SCAC does not meet the standard established by the Court in *Farrah* are Conspiracy Defendants Fidelity Bank/Merrill, Base Commerce/Hughes, GPG, PricewaterhouseCoopers, and the Nehra and Waak Defendants.

its accounts (SCAC ¶ 826), and in fact transferred over $10 million out of TelexFree's and

Defendant Founders' accounts into the personal accounts of Defendants Merrill and Wanzeler

(SCAC ¶ 829).  With respect to Defendants Base Commerce and Hughes, the SCAC likewise

alleges that notwithstanding their knowledge of the illegality of TelexFree's Scheme, those

Defendants wrongfully continued to provide TelexFree with payment processing services

integral to the Scheme. SCAC ¶¶ 893-927.  Defendant GPG, the SCAC alleges, willfully acted in

concert with TelexFree to siphon and convert class member funds, as well as to provide other

services integral to the Scheme. SCAC ¶¶ 878-92.  Defendant PwC's alleged acts in furtherance

of the unlawful Scheme include its continued provision of accounting and consulting services to

TelexFree -- services which, again, were integral to the Scheme -- notwithstanding its knowledge

that TelexFree was running an illegal Pyramid Scheme. SCAC ¶ 577.  Finally, the SCAC alleges

that the Nehra and Waak Defendants, among other things, drew upon their extensive expertise

and experience advising Multi Level Marketing pyramid schemes to advise TelexFree on how to

best dodge securities laws and defraud investors, in each case for their own personal financial

gain. SCAC ¶¶ 405-33, 533-71; *see also generally* SCAC ¶ 1047-49 (alleging that Conspiracy

Defendants worked in concert to further the activities of the Pyramid Scheme, including by

conspiring to use confidential information to obtain and misappropriate funds through the

Scheme).  The Nehra and Waak Defendants also engaged in marketing activities that were

knowingly intended to provide an essential component in the Pyramid Scheme, promote sales,

and propel the Scheme forward. SCAC ¶¶ 146, 393, 421, 546, 556, 559-60, and SCAC, Ex. 4,

#14 p. 79-82; *see also* SCAC ¶¶ 303, 412-13, 537, 548-50, 554, 566 (discussing role and

importance of attorneys in pyramid/Ponzi scheme).   The SCAC thus plainly alleges that the

Conspiracy Defendants acted in concert to further the unlawful TelexFree Scheme.

Those allegations notwithstanding, Conspiracy Defendants GPG and Base Commerce/Hughes, citing a comment to Section 876(a) of the Restatement (Second) of Torts (and no other authority), claim that because the payment processing services they provided to TelexFree were not in and of themselves tortious, the Investor Victims' civil conspiracy claim cannot lie against them. Their contention purposefully ignores the immediately following section of the Restatement, which states that an entity may be liable if it "knows that the . . . conduct [of another] constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself," and includes no requirement that the acts that constitute "substantial assistance" themselves be tortious. *See* Restatement (Second) of Torts § 876(b). As the First Circuit has recognized, Section 876(b) "is invoked to support liability of one person for a tort *committed by another.*" *Aetna*, 43 F.3d at 1564 (emphasis supplied). Accordingly, while "plaintiffs must show an *underlying* tortious act in which two or more persons acted in concert and in furtherance of a common design or agreement," *Bartle v. Berry*, 953 N.E.2d 243, 253 (Mass. App. Ct. 2011) (emphasis added) (here, among other things professional negligence, negligent misrepresentation, fraud, and violations of M.G.L. Chapter 93A), Massachusetts courts have not required plaintiffs claiming a civil conspiracy to allege that each participant therein has committed acts that are in and of themselves tortious. Rather, "the doctrine [imposing liability under § 876(b)] appears to be reserved for application to facts which manifest a common plan to commit a tortious act where the participants [(i)]know of the plan and its purpose and [(ii)] take affirmative steps to encourage the achievement of the result." *Stock v. Fife*, 430 N.E.2d 845, 849 (Mass. App. Ct. 1982); *see also Massachusetts Laborers' Health & Welfare Fund v. Philip Morris, Inc.*, 62 F. Supp. 2d 236, 244 (D. Mass. 1999) (noting that "the 'concerted action' version [of civil conspiracy] extends liability to those who *assist or encourage*

156

*others to commit torts* without necessarily any proof . . . of an explicit agreement among the defendants") (emphasis added).  As set forth in Part I, Sections I.B.2-4 and I.C.2-3, *supra*, both GPG and Base Commerce/Hughes knew of the TelexFree Scheme and took affirmative steps to encourage the achievement of the result -- the wrongful acquisition of TelexFree's investors' funds.

Accordingly, because the SCAC alleges that the Conspiracy Defendants had actual knowledge that TelexFree was an unlawful enterprise yet acted in concert by providing services that were substantial and essential to further[142] the unlawful TelexFree Scheme, dismissal of the Investor Victims' civil conspiracy claim on the grounds that it does not is inappropriate.

## C.     Even If Rule 9(b) Applies, Plaintiffs Have Met
## The Heightened Pleading Requirements Thereof

Finally, the Nehra and Waak Defendants contend that the SCAC does not meet the standards of Rule 9(b); *i.e.*, that the SCAC does not plead fraudulent conspiracy "with enough specificity to inform [the Conspiracy Defendants] of facts forming the basis of the conspiracy charge." *Van Schaick*, 535 F. Supp. at 1141.[143]  As an initial matter, there is ample authority supporting the proposition that Rule 9(b)'s pleading requirements are inapplicable to a claim of civil conspiracy.  *See, e.g.*, *Vieau v. AGFA Corp.*, No. CIV A 06-11320-RGS, 2007 WL 671086, at *1 n.3 (D. Mass. Mar. 1, 2007) (noting that it is "not clear that Massachusetts in fact requires that civil conspiracy . . . be plead with Rule 9(b) particularity")  (citing *Kurker v. Hill*, 689 N.E.2d at 836 n.3 ("[D]efendants cite no authority applying the pleading standard of Mass. R. Civ. P. 9(b) . . . to civil conspiracy claims generally.")); *but see Hayduk v. Lanna*, 775 F.2d 441, 443 (1st Cir.1985) (holding that a civil conspiracy claim was subject to Rule 9(b) requirements).

---

[142] In fact, without the services provided, TelexFree could not have operated, much less exponentially grow.

[143] No other Conspiracy Defendant argues that Count Five fails to meet this standard.

The Nehra and Waak Defendants' attempt to obtain dismissal of Count Five due to an alleged

violation of that Rule thus rests on shaky legal ground.

Even assuming, *arguendo*, that Rule 9(b) applies to the Investor Victims' civil conspiracy

claim, the SCAC easily satisfies its pleading requirements with respect to the Nehra and Waak

Defendants by alleging in rich detail that they knowingly, purposefully and affirmatively

participated in a common agreement or design to engage in the TelexFree fraud. SCAC ¶¶ 146,

303, 393, 405-33, 533-71 and SCAC, Ex. 4, #14 pp. 79-82; *see also Heinrich v. Sweet*, 49 F.

Supp. 2d 27, 44-45 (D. Mass. 1999) (finding that plaintiffs had adequately pled conspiracy claim

in alleging the existence of a concerted effort and affirmative conduct on the part of each

defendant, as well as alleging that the scheme was perpetrated knowingly and purposefully by

each defendant, and noting that "[s]o long as defendants receive specification of the time, place,

and content of the alleged conspiracy, the purposes of Rule 9(b) are met"); *Metro. Prop. & Cas.*

*Ins. Co. v. A.B. Physical Therapy, LLC*, Civil Action No. 12-11059-RGS, 2013 WL 396130, at

*2 (D. Mass. Feb. 1, 2013) (finding that plaintiff had pleaded conspiracy claim with sufficient

detail where plaintiff identified the patients whose treatments regimens were suspect by name

(the "who"), the times and durations of their treatments (the "when and where"), and alleged that

the patients were systematically overbilled (the "what")).  In addition to demonstrating the Nehra

and Waak Defendants' actual knowledge of the Scheme, as set forth in Part I, Section II.A.1,

*supra*, the SCAC alleges that those Defendants purposefully and affirmatively participated in the

TelexFree Scheme and provided substantial and integral assistance thereto. SCAC ¶¶ 405-33,

533-71 (discussing Nehra and Waak Defendants' knowing, active participation in the Scheme).

In the face of the many direct allegations in the SCAC, the Nehra and Waak Defendants

cannot claim to be unaware of the nature of the Investor Victims' claims against them.

Moreover, given the several paragraphs of argument those Defendants engage in as to why the

Investor Victims' civil conspiracy claim must be dismissed, their claim of ignorance simply

defies belief, and must be rejected.

For these reasons, the Investor Victims' civil conspiracy claim against the Conspiracy

Defendants must survive those Defendants' baseless attempts to dismiss it at the pleading stage.


# PART FIVE:  ASSOCIATED INDIVIDUAL DEFENDANT CLAIMS

## I.

### THE ASSOCIATED INDIVIDUAL DEFENDANTS HAVE FAILED TO IDENTIFY ANY SUBSTANTIVE GROUNDS THAT PERMIT THE PRE-DISCOVERY DISMISSAL OF ANY CAUSE OF ACTION IN THE SCAC

Associated Individual Defendants Katia Wanzeler and Ann Genet have each filed

motions to dismiss the SCAC.  *See* Doc. No. 194 (Katia Wanzeler Br.); Doc. No. 210 (Genet

Br.).  Both motions, however, are so procedurally and substantively deficient that it is impossible

for the Investor Victims to frame a meaningful response.  Based upon those fatal defects, their

motions should be denied outright.

First, Defendants Katia Wanzeler and Genet suggest in their respective motions that the

SCAC fails to state a claim against them.  *See* Doc. No. 194 at 5-7; Doc. No. 210 at 3.  Beyond

this general argument, which is seemingly alleged as a matter of course in every motion brought

pursuant to Federal Rule of Civil Procedure 12(b)(6) regardless of the facts of the particular case,

there is nothing to be gleaned from their briefs.  In their filings, both Defendants fail to identify

which claim(s), or which elements of the many causes of action asserted against them, have not

been so stated.

For instance, rather than discuss any specific claim, Defendant Katia Wanzeler appears to seek dismissal on the grounds that she has not been personally named enough in the SCAC, and that the allegations against her simply amount to "guilt by association."  Indeed, it is precisely her association with the unlawful TelexFree Scheme and the monetary benefits she knowingly received and hoped to receive that render her liable.  In seeking absolution, Katia Wanzeler fails even to identify the individual causes of action asserted against her that she seeks to dismiss. She similarly fails to identify a single legal element of any of those claims that she believes has not been met, choosing rather to state generally that the SCAC does not "show that [she] took some actions, that she is culpable, and that Plaintiffs are entitled to relief."  *See* Doc. No. 194 at 8. Although Defendant Katia Wanzeler generally refers to the principals established in *Iqbal,* and *Twombly,* and the requirements of Federal Rule of Civil Procedure 8(a), she offers no explanation and ultimately leaves it to this Court and the Investor Victims to discern to which causes of action and which elements she claims those principles apply.  Defendant Genet provides even less explanation, committing a single paragraph to ordinary pleading principles prescribed by *Twombly* and *Iqbal.*

It is neither this Court's nor the Investor Victims' responsibility to develop the Defendants' arguments.  *See Operating Engs. Local 324 Health Care Plan v. G &W Constr. Co.*, 783 F.3d 1045, 1057 (6th Cir. 2015) (declining to address argument where party had "not offered any 'developed argumentation' on  the waiver defense.  [citation omitted].  Because it is not [the court's] function to craft such arguments."); *Edwards & Assoc., Inc. v. Atlas-Telecom Servs-USA, Inc.*,  No. CIVA 3:06CV0751 G, 2007 WL 30256 (N.D. Tex. Jan. 4, 2007) (on motion to dismiss, defense counsel improperly failed to allege the requisite elements of causes of action or

direct court to legal authority for them).   Accordingly, their motions to dismiss are fatally deficient.

Second, although Defendants Katia Wanzeler and Genet suggest that certain apparently fraud-based allegations in the SCAC were not plead with the particularity required by Rule 9(b),[144] neither relates those allegations to any specific cause of action.   *See* Doc. No. 194 at 8-10; Doc. No. 210 at 1-2.   In addition to failing to identify which claim(s) they challenge, they provide no legal authority setting forth the elements of the claim whose particularity they challenge.   They also fail to provide any factual application to the relevant elements and the case law.   *See Stanley v. Carrier Mills-Stonefront Sch. Dist. No. 2*, 459 F. Supp. 2d 766, 779 (S.D. Ill. 2006) (denying motion to dismiss where defendant had provided general citations to the legal standard but failed to offer anything "but facile assertions unsupported by citation to analogous case law").

Third, Defendants Katia Wanzeler and Genet both improperly make factual allegations that are outside the substance of the pleadings, in an attempt to minimize the nature of their wrongful activities in the TelexFree Scheme.[145]   *See, e.g.,* Doc. No. 210 at 2 (describing her purported acts as registered agent for TelexFree).   For example, in her most substantive discussion of the SCAC, Defendant Katia Wanzeler seeks to distance herself from her husband, an indisputable Scheme mastermind, by characterizing the SCAC's allegations towards her as merely "guilt by association."   To do so, Ms. Wanzeler attempts to explain away the SCAC's

---

[144] In her patently deficient brief, Wanzeler fails to even mention Rule 9(b), stating only that the SCAC does not establish the "*what, where, when, or how*" of her participation in the TelexFree Scheme.   *See* Doc. No. 194 at 9.   Genet recites Rule 9(b) and the particularity requirement but only proceeds to list various paragraphs that are not necessarily an element of any fraud-based claim followed by a question.   *See* Doc. No. 210 at 1-2 (stating, for example, "Paragraph 53. How did Genet serve as TelexFree, LLC's agent or Executive Office?").

[145] Plaintiffs have previously moved to strike extraneous filings and again move so here. In the alternative, Plaintiffs request this Court set a related briefing schedule.

allegation that she "was apprehended as she attempted to board a flight to Brazil [where her husband is believed to have fled], on which she had a one-way ticket, cash and seventy pounds of luggage," SCAC ¶ 485, by claiming that she was stopped as a result of a grand jury subpoena, of which "she was not aware."[146]  *See* Doc. No. 194 at 10.  Outside factual assertions such as those violate basic Rule 12(b)(6) principles and should, therefore, be discarded.[147]  *See Rivera v. Centro Medico de Turabo, Inc.*, 575 F.3d 10, 15 (1st Cir. 2009).

Fourth, although Plaintiffs are unable to defend any specific causes of action because Defendants Katia Wanzeler and Genet have failed to identify any they challenge, it is notable that even their general position that the SCAC contains only minimal allegations against them is flatly wrong.  The SCAC, in fact, contains abundant allegations against both Defendants.

According to the SCAC, Katia Wanzeler served as an agent and representative of TelexFree's Executive Office and was closely associated with its management and top-level Promoters.  *See, e.g.,* SCAC ¶ 54.  She was, in addition to being the spouse of principal violator Carlos Wanzeler, his co-conspirator in the TelexFree enterprise.  *See, e.g.,* SCAC ¶ 259. Defendant Katia Wanzeler actively assisted her husband in stealing and laundering funds, SCAC ¶ 261, and "personally performed integral services and provided essential advice and assistance

---

[146] Katia Wanzeler's self-serving denial of this allegation, for which Plaintiffs have compelling evidence to the contrary, as well as her statements that she has not been charged (even though the DOJ has informed this Court that more indictments are to be forthcoming) are irrelevant.

[147] The SCAC places the allegation concerning Ms. Wanzeler's arrest in the sequence of events as occurring after the April 15, 2014 raid of TelexFree's offices and before the Montana Security Commissioner's May 1, 2014 cease and desist order against TelexFree. SCAC ¶¶ 482-86.  To the extent necessary, this particular allegation alone is sufficient circumstantial evidence from which to reasonably infer her motive, culpability and knowledge of and participation in the TelexFree Scheme.  As her brief acknowledges (Doc. No. 194 at 4), the SCAC alleges that "TelexFree could not have successfully carried out its unlawful enterprise, nor launder or shelter its ill-gotten funds, without the integral assistance of the . . . Operational Defendants." SCAC ¶ 313.  Also, as detailed in depth above, the SCAC provides voluminous facts regarding that Scheme.

that was used to further TelexFree's unlawful business and fully and knowingly furthered

TelexFree's unlawful Pyramid Scheme."  SCAC ¶ 280.

Defendant Katia Wanzeler was also involved in TelexFree's methodical release of

deceptive information designed to promote TelexFree's U.S. and Brazil-based operations during

and after the Brazilian shutdown.  SCAC ¶ 113.  The Complaint specifically alleges that Katia

Wanzeler "prepared and provided information on, and endorsed and actively promoted the

opportunity regarding the securities on websites and at TelexFree events and extravaganzas."

SCAC ¶ 1075.  She further "provided print materials, electronic materials, and made oral

representations to the Putative Class."  SCAC ¶ 1075, and was directly involved in the violation

of Massachusetts' anti-pyramid scheme law, M.G.L. c. 93, § 69.  SCAC ¶ 1005.   In return for

her assistance, Defendant Katia Wanzeler profited from the Scheme.  SCAC ¶ 301.  Defendant

Katia Wanzeler was, in sum, deeply involved in the TelexFree Scheme and materially

contributed to the sales operations of the enterprise and sale of AdCentral Packages.

These allegations regarding Defendant Katia Wanzeler's nefarious involvement with

TelexFree are well documented. As noted above, after her husband fled to Brazil to escape

justice, Katia Wanzeler was arrested at JFK International Airport attempting to join her husband.

At the time of the arrest, Katie Wanzeler was attempting "to board a flight to Brazil, on which

she had a one-way ticket, cash and seventy pounds of luggage." SCAC ¶ 485.

The SCAC also contains sufficient allegations that establish Defendant Genet as a

similarly integral member of the Scheme.  Genet "served TelexFree's Executive Office and is an

individual associated with Craft and Bridgeway Financial Corporation."  SCAC ¶ 53.  More

particularly, she "served as TelexFree's advisor and person on the ground in Nevada."  SCAC

¶ 204.  She also "served as Mobile's, Electric's and all TelexFree entities' advisor and person on

the ground." SCAC ¶ 243.  Defendant Genet provided essential services and integral advice,

which [Telex] Electric and the other TelexFree Defendants used to further and operate the

Pyramid Scheme."  *Id*.  Genet "personally performed integral services and provided essential

advice and assistance that was used to further TelexFree's unlawful business."  SCAC ¶ 280.

Much like Katia Wanzeler, Genet "prepared and provided information on, and endorsed and

actively promoted the opportunity regarding the securities on websites and at TelexFree events

and extravaganzas."  SCAC ¶ 1075.  She further "provided print materials, electronic materials,

and made oral representations to the Putative Class."  SCAC ¶ 1075.  The Complaint contains

sufficient and particular allegations against the Associated Individual Defendants to withstand

dismissal on a motion to dismiss.

Regardless of these numerous supporting allegations, Plaintiffs object to the deficient and

improper submissions of Defendants Genet and Katia Wanzeler.  For the foregoing reasons, their

motions to dismiss should be denied.

## II.

## WANZELER'S PURPORTED "JOINDER" IS IMPERMISSIBLE

Associated Individual Katia Wanzeler attempts to find another way around filing a brief

with proper analysis, support and citations.  Ms. Wanzeler purports to "join[] in the arguments

presented in the motions to dismiss submitted by the Defendants who raise issues that are equally

applicable to Ms. Wanzeler and the nature and posture of the allegations and claims against her."

*See* Doc. No. 194 at 10.  There is no basis in law that allows for that shortcut.[148]  Federal Rule of

---

[148] Katia Wanzeler's failure to adequately review the SCAC and prepare an appropriate motion is
evidenced in her claim that "it is not entirely clear on the face of the SCAC" if she is defined as
an Operational Defendant.  *See* Doc. No. 194 at 3.  A simple review of the SCAC reveals the
error of this assertion.  Katia Wanzeler concedes that the SCAC plainly identifies her as an
"Associated Individual."  *See id.* at 3; SCAC ¶ 55.  Paragraph 55 falls under the following

Civil Procedure 10(c) does not permit adoption of arguments proffered in motions; it only permits adoption of statements made in pleadings. *See* Fed. R. Civ. P. 10; *Krause v. Buffalo & Erie Cnty. Workforce Dev. Consortium, Inc.*, 426 F. Supp. 2d 68, 77-78 (W.D.N.Y. 2005), *aff'd*, 425 F. Supp. 2d 352 (W.D.N.Y. 2006) (Fed. R. Civ. P. 10(c) "provides no authority for one party to adopt by reference the arguments advanced by another party in a motion [to dismiss] in which the first party seeks to join"). The other Moving Defendants' motions to dismiss are not pleadings under Federal Rule of Civil Procedure 7(a) and thus cannot be adopted by reference. *See* Fed. R. Civ. P. 7.

The only proper procedure for joining in another party's motion is through the presentation of a motion to join, which has not been requested here. *See Krause*, 426 F. Supp. 2d at 77-78 (granting motion to join but clarifying that attempt to adopt other motion to dismiss by reference included another motion to dismiss was impermissible). In any event, such a request would be futile. The Investor Victims vigorously oppose any such request and note that it is indecipherable in which defenses and arguments she seeks to join, as Katia Wanzeler, a primary operational actor in the TelexFree Scheme, does not share in any of the other Moving Defendants' categorical groups except Genet, whose brief is similarly abbreviated and deficient. The prejudice to the Investor Victims in responding to this request would be insurmountable.

\* \* \*

---

heading: 2. Other Operational Defendants; a. Founders and Principals, Executive Office, Top Level Promoters and Associated Individuals." SCAC at 13-14. If that was not sufficient, the SCAC also explicitly states "[t]hroughout this complaint, for ease of reference, the . . . *Associated Individuals* . . . (as defined herein) are alternatively referred to for ease of reading as "Operational Defendants." SCAC ¶ 43 (emphasis added). This definition could hardly be made clearer. Katia Wanzeler's cavalier approach to obligations dictated by the Federal Rules of Civil Procedure should not be rewarded and her motion should be discarded as noncompliant.

The Complaint has put Defendants Katia Wanzeler and Genet on reasonably sufficient notice of the claims against them. Simply put, Katia Wanzeler and Genet seek the pre-discovery dismissal, with prejudice, of the serious claims brought against them based upon briefs that are deficient in legal research, legal analysis and legal reasoning.  However, the unlawful, unfair, deceptive or fraudulent Scheme at issue, in which the SCAC alleges Wanzeler and Genet took a knowing and active part, and the massive losses the Investor Victims have endured as a result, are grave.  Although the SCAC may be voluminous and its causes of action extensive, this does not excuse Wanzeler or Genet from their obligation to present their defenses with a reasonable modicum of specificity so that an appropriate response may be framed. Because Defendants Katia Wanzeler and Genet have failed to do so, their submissions should therefore be stricken or their requests otherwise denied.

Notably, both Katia Wanzeler and Genet are now precluded from asserting any additional arguments that they did not raise in their initial briefs.  *See United States v. Pizarro-Berrios*, 448 F.3d 1, 5-6 (1st Cir. 2006).  To hold otherwise would overturn the Federal Rules of Civil Procedure's well-defined motion practice, allowing the Defendants to assert virtually no arguments in their moving brief, make them in their responding briefs and thereby possibly strip the Plaintiff Investor Victims of any opportunity to respond.[149] It would also impose on the Plaintiffs further delay and expense and add a needless layer of complexity to this proceeding.

---

[149] The Investor Victims request the right to respond and for costs should the Court entertain any additional arguments by those Defendants.

# PART SIX

## LEAVE TO REPLEAD IS
## THE PROPER ALTERNATIVE TO DISMISSAL WITH PREJUDICE

In drafting the SCAC, Plaintiffs acted to balance the need to satisfy Federal Rules of Civil Procedure 8,9 and 12(b)(6) and reasonably place Defendants on notice of the claims against them while not overburdening the Court.  The SCAC asserts ten causes of action against thirty-eight Defendants for claims arising out of an approximate four-year long interstate and international Pyramid Scheme that raised an estimated billion dollars through millions of transactions made by hundreds of thousands of Investor Victims through multiple Financial Service Providers.  As detailed herein, and easily grasped through a fair reading, the SCAC precisely tracks the elements of each claim raised and consists of slightly over 200 pages of well-plead, highly detailed, and factually supported causes of action.  At this point in the proceedings and for purposes of the instant Rule 12(b)(6) review, the SCAC adequately alleges each of those causes of action.  However, in the event that this Court deems any of those claims to be insufficient, the appropriate remedy is to allow Plaintiffs the opportunity to amend.  At this early stage of litigation and with no discovery having been permitted to date, at the insistence of the Moving Defendants, leave to amend is particularly fitting.[150]

"[A] party may amend its pleading . . . with . . . the court's leave," and leave to amend "shall be given freely when justice so requires."  Fed. R. Civ. P. 15(a); s*ee also Foman v. Davis,* 371 U.S. 178, 182 *(1962)* (holding that because "leave to amend 'shall be freely given when justice so requires,'" lower court's dismissal with prejudice must be reversed); *Vargas v.*

---

[150] Upon the request of the Moving Defendants' even initial disclosures were stayed, and the production of documents to the Chapter 11 Bankruptcy Trustee are subject to Confidentiality Agreements.  The Department of Justice also weighed in, advocating against the production of discovery at that time.

*McNamara*, 608 F.2d 15, 18 (1st Cir. 1979) (holding that a judge "should freely give leave [to

replead] when justice so requires"), *In re Kappeler,* No. 11-18166-WCH, 2014 WL 347051, at

*4 (Bankr. D. Mass. Jan. 30, 2014) (granting a motion to amend complaint in light of Rule 15

standard).  *See also* 2A Moore & Lucas, Moore's Federal Practice ¶ 12.14 at 12–99 (2d ed. 1989)

(when a motion to dismiss is granted, "the usual practice is to grant leave to amend the

complaint").  Although the decision whether to grant leave to amend is within the district court's

discretion, refusal to grant leave must be based on a valid ground, and the "outright refusal to

grant the leave without any justifying reason appearing for the denial is not an exercise of

discretion."  *Foman,* 371 U.S. at 182 (reversing lower court's dismissal with prejudice).

"Grounds for denial generally involve undue delay, bad faith, dilatory motive of the requesting

party, repeated failure to cure deficiencies, and futility of amendment."  *Applera Corp. v.*

*Michigan Diagnostics, LLC*, 594 F. Supp. 2d 150, 154 (D. Mass. 2009) (citation omitted).

"[T]he liberal amendment policy of Rule 15(a) is a mandate to be heeded," and the

burden is on the defendant to declare a reason why the dismissal should be prejudicial.  *See*

*Foman,* 371 U.S. at 182.  This mandate is particularly exacting early on in litigation and, like

here, where the court has yet to review the complaint.  *See, e.g.*, *Guerra v. Teradyne*, No. Civ.A.

01–11789–NG, 2004 WL 1467065, at *28 (D. Mass. Jan. 16, 2004) (allowing leave to amend

where it "was the first time a complaint has been substantially reviewed by the court in th[e]

case"), *Applera,* 594 F. Supp. 2d at 154 (granting motion for leave to file second amended

complaint even after discovery in process and holding that amendment of the complaint was not

futile despite defendant's argument plaintiff failed to put forth facts to support requested

amendment),[151] *Blu Homes, Inc. v. Kaufmann,* No. Civ. A. 10-11418-DJC, 2011 WL 3290362, at *11 (D. Mass. July 29, 2011) (holding no undue delay or prejudice to defendants in granting leave to amend and reasoning that no discovery or trial date had yet been set, and defendants would have ample time to adapt to a new complaint).

Here, the Moving Defendants offer no reasonable basis for the requested dismissal with prejudice or against allowing Plaintiffs leave to amend, if necessary at this early stage. Even assuming, *arguendo*, that Defendants raised factual support for their request, the record here clearly tips in favor of Plaintiffs. Because we stand at an early phase of litigation, and there can be no showing by the Moving Defendants of any of the *Foman* criteria creating a reason for prejudicial dismissal, leave to amend is the appropriate remedy should this Court find any of the Investor Victims' claims insufficiently pled.

---

[151] The court reasoned that requiring proof of a claim's veracity at this early would be "putting the cart before the horse" and declined to make dismissal prejudicial. *See id.*

# CONCLUSION

Plaintiffs respectfully request that this Court deny the Moving Defendants motions to dismiss in their entirety, or, in the alternative, grant Plaintiffs leave to file an amended Complaint.

Dated: September 1, 2015
        Boston, Massachusetts

*/s/ Robert J. Bonsignore*
Robert J. Bonsignore, Esq.
(NH Bar No 21241)
Bonsignore Trial Lawyers, PLLC
3771 Meadowcrest Drive
Las Vegas, NV  89121
Telephone:  781-856-7650
rbonsignore@classactions.us

***Plaintiffs' Interim Lead Counsel***

Ronald A. Dardeno, Esq.
(BBO No. 548278)
Alexander D. Wall, Esq.
(BBO No. 688881)
Law Offices of Frank N. Dardeno
424 Broadway
Somerville, MA  02145
Telephone:  617-666-2600
Email: rdardeno@dardeno.com

R. Alexander Saveri, Esq.
(CA Bar No. 173102)
Carl N. Hammarskjold, Esq.
(CA Bar No. 280961)
Saveri & Saveri, Inc.
706 Sansome Street
San Francisco, CA  94111
Telephone:  415-217-6810
Email: rick@saveri.com
Email: carl@saveri.com

170

William Coulthard, Esq.
Kemp, Jones & Coulthard, LLP
Wells Fargo Tower
3800 Howard Hughes Parkway, 17th Floor
Las Vegas, NV  89169
Telephone:  702-385-6000
Email:  w.coulthard@kempjones.com


D. Michael Noonan, Esq.
(NH Bar No. 8214)
(MA Bar No. 558247)
(VT Bar No. 4050)
(ME Bar No. 7240)
Shaheen and Gordon
140 Washington Street
P.O. Box 977
Dover, NH  03821
Telephone:  603-871-4144
Email: mnoonan@shaheengordon.com


William R. Baldiga, Esq.
(MA Bar No. 542125)
(NY Bar No. 4813846)
Kiersten Taylor, Esq.
(MA Bar No. 681906)
Brown Rudnick LLP
One Financial Center
Boston, MA  02110
Telephone:  617-856-8586
Email:  wbaldiga@brownrudnick.com
Email:  ktaylor@brownrudnick.com

Plaintiffs Interim Executive Committee

171

**CERTIFICATE OF SERVICE**

I, Robert J. Bonsignore, hereby certify that on this 1st day of September 2015, I caused the foregoing to be electronically filed with the Clerk of the Court by using the Case Management/Electronic Case Filing (CM/ECF) system, which will send a notice of electronic filing to all parties registered with the CM/ECF system in the above-captioned matter. A copy will be forwarded via first class mail, postage prepaid, to those parties not electronically registered.

/s/ Robert J. Bonsignore
Robert J. Bonsignore