# UNITED STATES DISTRICT COURT

## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE: TELEXFREE SECURITIES LITIGATION<br><br>**This Document Relates To:**<br><br>    **All Cases** | **MDL No. 4:14-md-2566-TSH** |
| CELIO DA SILVA, RITA DOS SANTOS, PUTATIVE CLASS REPRESENTATIVES AND THOSE SIMILARLY SITUATED,<br><br>                Plaintiffs,<br>      v.<br><br>TELEXELECTRIC, LLLP; *et al.*,<br><br>          Defendants. | CLASS ACTION<br><br><br>FIFTH CONSOLIDATED<br>  AMENDED COMPLAINT<br><br><br>DEMAND FOR TRIAL BY JURY |

**TABLE OF CONTENTS**

TABLE OF CONTENTS ............................................................................................ i

I.   JURISDICTION AND VENUE ................................................................. 11

II.  THE PARTIES ........................................................................................ 12

   A.            PLAINTIFFS ................................................................... 12

   B.            DEFENDANTS ................................................................ 13

          1.  TELEXFREE DEFENDANTS ................................................ 13

              a.  Third-Party TelexFree Bankrupt Entities ................ 13

              b.  Electric and Mobile ............................................... 14

          2.  OTHER OPERATIONAL DEFENDANTS ................................ 15

              a.  Founders and Principals, Executive Office, Top Level Promoters and Associated Individuals ... 15

              b.  Licensed Professionals including Attorneys and Other Professional Services Providers ................ 18

              c.  The Accountant Defendants .................................. 21

          3.  FINANCIAL SERVICES PROVIDERS ................................... 23

              a.  The Bank Defendants ........................................... 23

              b.  Payment Processing Service Companies ................ 24

          4.  INVESTMENT SERVICES PROVIDERS ................................ 28

III. FACTS AND ALLEGATIONS ................................................................. 28

   A.            Chronological Overview .................................................. 28

   B.            TelexFree's History, Formation and its Brazilian Links ... 38

   C.            Ympactus, TelexFree's Brazilian-Based Operations ....... 39

   D.            The Bankrupt TelexFree Companies ............................... 41

   E.            TelexFree, Inc. ............................................................... 42

   F.            TelexFree, LLC .............................................................. 43

G.  TelexFree Financial, Inc..................................................................... 44

H.  Relationship of the Bankrupt TelexFree Companies ........................... 44

I.  Defendants Electric and Mobile .......................................................... 45

J.  TelexFree's Founders and Principals, Executive Officers and Top Level Promoters ........................................................................ 46

K.  TelexFree's Unlawful, Unfair and Deceptive Pyramid Scheme ......... 53

L.  Gallery of Rogues Assembled ............................................................. 69

   1.  The Seasoned Scam Artists ......................................................... 69

   2.  The Professional Legitimizers' Roles .......................................... 73

M.  TelexFree's Fraudulent and Deceptive Use of Best Western Hotel ... 79

N.  Investigation of, and Injunctions against, TelexFree's Brazilian Operations in Brazil ......................................................... 79

O.  TelexFree's Continued United States' Operations .............................. 82

P.  Collapse of TelexFree's United States Operations ............................. 83

Q.  TelexFree's Belated Efforts to Legitimize Its Scheme ...................... 84

R.  Events Since TelexFree's Bankruptcy Filing ..................................... 86

S.  TelexFree's Principals, Founders and Executive Office Controlled TelexFree, Knowingly Perpetrated the Unlawful, Unfair, and Deceptive Pyramid Scheme and Made False Representations about TelexFree ........................................................................ 87

T.  TelexFree's Top Level Promoters Played an Integral, Essential and Primary Role and also Aided and Abetted the Pyramid Scheme .............. 94

U.  TelexFree's Attorneys Played an Integral Role in and Aided and Abetted the Unlawful, Unfair, and Deceptive Pyramid Scheme ....................... 95

V.  Attorney Babener Assembled A Team of Legal and Business Professionals Who All Agreed to Assist TelexFree and its Founders Merrill and Wanzeler To Continue to Operate the Unlawful Scheme After the Brazilian Shutdown In Summer 2013. ................................. 103

   1.  The MLM A Team Defendants knew that TelexFree was operating a pyramid/Ponzi scheme prior to providing services or upon otherwise working on TelexFree-related tasks yet joined the TelexFree team. ..................................................... 117

   2.  Despite knowing that TelexFree was continually operating as an illegal Scheme, the MLM A Team provided essential services that enabled TelexFree to continue and expand its daily operations and

to remove its ill-gotten funds from the reach of its victims and
U.S. authorities until the Scheme's collapse.................................................. 127

a.   The MLM A Team substantially assisted TelexFree's
business operations' continuation and expansion in the
United States after August 2013........................................................127

i.   The MLM A Team secured banking and payment processing
outlets to continue and expand TelexFree's illegal operations
after August 2013.....................................................................................129

ii.   Babener and Garvey Schubert assisted TelexFree to keep banked
$20 million from its TD Bank account upon its closure for fraud issues. ...... 135

iii.   The MLM A Team provided legal and business services and
consulting that kept TelexFree's operations running. ................................... 137

iv.   PwC assisted TelexFree in issuing false tax forms. ........................................ 143

b.   The MLM A Team devised and implemented a plan for TelexFree
to use international outlets through which to operate the Scheme
and through which TelexFree safeguarded its cache of victims'
funds. .................................................................................................................. 143

c.   The MLM A Team Substantially Assisted TelexFree and
Its Founders In Hiding The Illegality Of TelexFree's Operations
From Authorities. ................................................................................................ 155

3.        The MLM A Team Massively Profited From Their Services That
Enabled TelexFree's Continued Operation As A Pyramid Scheme
And Safeguarded Wrongfully Obtained Funds From Victims. ...................... 158

a.   The Babener Defendants Billed Hundreds of Thousands Of Dollars
In Fees For Their Substantial Assistance Of The TelexFree Scheme ............ 158

b.        The Sheffield Group Received Over $100,000 In Fees
For Their Substantial Assistance Of The TelexFree Scheme ........................... 160

c.        The Garvey Schubert Defendants Received Over $600,000
In Fees For Their Substantial Assistance Of The TelexFree............................ 161

d.   The PwC Defendants Received $65,000 In Fees For Their
Substantial Assistance Of The TelexFree Scheme............................................ 162

W.        TelexFree's Accountants and Professional Services Providers
Played an Integral Role in and Aided and Abetted the Unlawful,
Unfair, and Deceptive Pyramid Scheme ................................................................. 163

X.        The Financial Services Providers Were Required to Comply
With Various Statutory and Regulatory Investigation and Monitoring
Obligations ................................................................................................................ 177

Y.        TelexFree's Suspicious, Tortious and Unlawful Operation
Displayed Red Flags Detectable by the Defendant Financial

iii

Service Providers ................................................................................ 194

Z.    The Defendant Banks ................................................................ 201

    1. Defendant Bank of America ................................................ 214

    2. Defendant TD Bank ........................................................... 235

    3. Fidelity Bank .................................................................... 265

    4. Synovus ........................................................................... 269

    5. PNC Bank ......................................................................... 271

    6. Wells Fargo Bank ............................................................. 280

    i. Background Allegations ...................................................... 280

    ii. Wells Fargo Bank Acted as an Acquiring Bank for TelexFree's
       Credit Card Processors After It Had Documentation about TelexFree's
       Fraudulent Scheme. ............................................................ 292

    iii. Wells Fargo Acted as Depository and Acquiring Bank After
       It Had a Substantial Amount of Information about TelexFree's
       Scheme.  Further, It Kept TelexFree's Accounts Open and Active
       for Far Too Long .............................................................. 294

    iv. Wells Fargo Bank – at times at the Instruction of Cardenas and
       Assisted in Money Transfers from TelexFree Accounts Long After
       it Knew of TelexFree's Activities. .................................... 305

AA.    Defendant Payment Processing Service Companies ........................ 308

    1. ProPay ............................................................................. 321

    2. GPG ................................................................................
       324

    3. Base Commerce ................................................................ 337

    4. Vantage Payments ............................................................. 344

    5. Allied Wallet ..................................................................... 348

    6. IPS .................................................................................. 359

    7. Priority Payout .................................................................. 362

    8. Bank Card Consultants ....................................................... 372

BB.    Investment Services Providers .................................................. 383

    1. Mauricio Cardenas ............................................................ 383

    2. Wells Fargo Advisors ................................................................385

IV. CLASS ACTION ALLEGATIONS.......................................................391

V. FRAUDULENT CONCEALMENT ......................................................394

VI. CLAIMS FOR RELIEF........................................................................394

FIRST CLAIM FOR RELIEF VIOLATIONS OF MASSACHUSETTS GENERAL
    LAWS, CHAPTER 93, SECTIONS 12 AND 69
    (Against All Operational Defendants) ................................................394

SECOND CLAIM FOR RELIEF VIOLATIONS OF MASSACHUSETTS GENERAL
    LAWS, CHAPTER 93A, SECTIONS 2 AND 11
    (Against All Operational Defendants) ................................................395

THIRD CLAIM FOR RELIEF AIDING AND ABETTING VIOLATIONS OF
    MASSACHUSETTS GENERAL LAWS, CHAPTER 93, SECTIONS 12 and 69,
    AND MASSACHUSETTS GENERAL LAWS, CHAPTER 93A,
    SECTIONS 2(a) or 11
    (Against TelexFree And All Defendants) ...........................................396

FOURTH CLAIM FOR RELIEF UNJUST ENRICHMENT
    (Against All Defendants).....................................................................402

FIFTH CLAIM FOR RELIEF CIVIL CONSPIRACY
    (Against TelexFree, All Operational Defendants, John Merrill, John Hughes,
    Alexander Sidel, Jason Doolittle, John Kirchhefer, Brian Bonfiglio,
    Dustin Sparman, Fidelity Bank, Base Commerce, GPG, and IPS) ...............403

SIXTH CLAIM FOR RELIEF PROFESSIONAL NEGLIGENCE
    (Against All Licensed Professional Defendants).................................404

SEVENTH CLAIM FOR RELIEF NEGLIGENT MISREPRESENTATION
    (Against Operational Defendants Except Katia Wanzeler) .................405

EIGHTH CLAIM FOR RELIEF VIOLATIONS OF MASSACHUSETTS
    GENERAL LAWS, CHAPTER 110a, SECTION 410(b)
    (Against All Operational Defendants except for PricewaterhouseCoopers) ...............406

NINTH CLAIM FOR RELIEF FRAUD
    (Against Operational Defendants) .....................................................408

TENTH CLAIM FOR RELIEF TORTIOUS AIDING AND ABETTING
    (Against All Defendants).....................................................................411

ELEVENTH CLAIM FOR RELIEF TORTIOUS AIDING AND ABETTING
    (Against Defendants Wells Fargo Advisors and Cardenas) ................413

VII. PRAYER FOR RELIEF.......................................................................414

VIII. DEMAND FOR JURY TRIAL ..........................................................415

Plaintiffs and Putative Class Representative Rita Dos Santos on behalf of herself and all others similarly situated ("Plaintiffs") bring this action against the defendants named herein ("Defendants").  This complaint is based on information and belief, except those paragraphs that relate to Plaintiffs, which are based on personal knowledge.  Plaintiffs allege as follows:

1.      TelexFree, Inc., TelexFree, LLC, and TelexFree Financial, Inc. and its related entities (including, but not limited to, TelexFree International, Ltd and TelexFree International LLC) and individuals (collectively, "TelexFree")operated an illegal scheme whereby it sold "memberships," ostensibly paid its "promoters" ("Members" or "Promoters") for placing advertisements for a "voice over internet protocol" ("VoIP") product, and in reality paid them to recruit other investors whose new membership fees kept the scheme afloat (the "TelexFree Program").

2.      Until TelexFree, Inc. changed its compensation plan in March 2014, a month before it filed for bankruptcy, it did not require promoters to sell its VoIP product to be eligible for payments.

3.      TelexFree's business and operations constituted an illegal Pyramid Scheme (the "Pyramid Scheme" or the "Scheme").  A pyramid scheme is a form of a Ponzi scheme wherein a business enterprise persuades people to invest money into a seemingly legitimate business model and in exchange guarantees profits.  The actual sales or services provided, if any, are insufficient to pay the promised returns to investors.  The operation of a pyramid scheme relies entirely on additional investment funding by new or existing investors.  Once the influx of new investments stops, the pyramid scheme collapses because there are no new funds with which to pay previous investors.  Pyramid schemes are lucrative for those who occupy top-level or other like positions and for those who service them.

4.       Massachusetts General Laws ("M.G.L.") c. 93, § 69 makes pyramid schemes, as well as many of their traditional features, unlawful.  M.G.L. c. 93, § 69(g) expressly declares that a violation of M.G.L. c. 93, § 69 is a per se violation of M.G.L. c. 93A, §2(a).  For this reason, in addition to others, TelexFree and certain defendants otherwise violated M.G.L. c. 93A, §§ 2 and 11.

5.       TelexFree raised as much as $1 billion dollars over the course of eighteen months as follows:

| | |
|---|---|
| 2012 Income | $15,490,349.71 |
| 2013 Income | $865,893,524.99 |
| 2014 Income | $161,116,265.38* |

(*Law enforcement authorities shut down TelexFree on April 15, 2014.)

6.       The financial services providers ("Financial Services Providers" or "Financial Services Defendants") processed hundreds of thousands of related transactions involving hundreds of millions of dollars, and the substantial assistance they provided was essential to TelexFree.

7.       TelexFree's founders and principals, executive officers, executive office employees and agents and top level promoters controlled the activities and operations of TelexFree and knowingly, maliciously and willfully conspired to perpetrate, and did perpetrate, the TelexFree Pyramid Scheme with full awareness of its unfair, deceptive, and unlawful nature. Licensed professionals, investment services providers and others were negligent or reckless in providing advice, directly participated in, or otherwise provided essential substantial assistance after knowing the TelexFree business enterprise was unlawful.

8.       The Federal Financial Institutions Examination Council ("FFIEC" or "Council") regulates the TelexFree Financial Services Providers and Investment Services Providers (as

defined herein).  The Council is a formal interagency body empowered to prescribe uniform principles, standards, and report forms for the federal examination of financial institutions by the Board of Governors of the Federal Reserve System ("FRB"), the Federal Deposit Insurance Corporation ("FDIC"), the National Credit Union Administration ("NCUA"), the Office of the Comptroller of the Currency ("OCC"), and the Consumer Financial Protection Bureau ("CFPB"), and to make recommendations to promote uniformity in the supervision of financial institutions.

9.     The Financial Services Defendants were required by federal law to, and did, maintain robust, sophisticated and thorough due diligence systems at all times.

10.     The Financial Services Defendants are not just required to know their clients, they are required to obtain knowledge of and understand how each client's business operates, who is running it, and who is associated with it.  The Financial Services Defendants did not simply have to gather information; they needed to analyze it and understand their clients' business models and key personnel, and continue to monitor their customers on an ongoing basis.

11.     Investment Services Provider Defendant Wells Fargo Advisors LLC was subject to the same laws and regulations regarding client accounts as the Financial Services Provider Defendants.

12.     TelexFree was purportedly a contract-based business.  All TelexFree Promoters, including Plaintiffs and members of the putative class, were similarly obligated to enter into TelexFree's identical form contract ("TelexFree Pre-March 9 Contract").  A true and correct copy of the Pre-March 9 TelexFree Contract is attached hereto as Exhibit 1.

13.     At all times material herein, TelexFree was a "multi-level distribution company" as defined by M.G.L., Chapter 93, Section 69(a).

14.     M.G.L., Chapter 93, Section 69(d)(2) prohibits any multi-level distribution company from offering or paying any "finder's fee, bonus, refund, override, commission, cross-commission, dividend or other consideration" to any participant therein "solely for the solicitation or recruitment of other participants."

15.     The TelexFree Pre-March 9 Contract, on its face, contains numerous instances of promising payment merely for recruitment of new Participants[1] as defined by M.G.L., Chapter 93, Section 69, including, but not limited to, the following:

   a. Clause 5.7:  "A PROMOTER will achieve TEAM BUILDER status when he is active in an ADCentral FAMILY position (in the marketing network) that has 10 (ten) ADCentral FAMILIES on the incentive plan registered directly by him on his site."

   b. Clause 5.7.1:  "As long as he is fulfilling the qualification in clause 5.9.2[2] [sic], a TEAM BUILDER will earn a payment of 2% (two percent) of the company's net billing in the following month…the maximum amount for this earning, by contract, which is for one year, is up to US$ 39,600.00…" (emphasis added).

   c. Clause 5.8:  "THE PROMOTER shall receive as an incentive a bonus of US$ 20.00 (twenty U.S. dollars), for each VOIP ADCentral kit that his direct lower PARTNER acquires and a US$ 100.00 (one hundred U.S. dollars) bonus for each VOIP FAMILY kit that his direct lower PARTNER acquires."

   d. Clause 6.1:  "A PROMOTER who directly registers 2 (two) new promoters, with one on the left side and the other on the right side of his marketing network, qualifies for direct and indirect binary earnings, and for 2% (two percent) of the network from the first to the 6th level, assessed only on plans whose owners have at least one active VOIP client, that is, who have at least one active 99TELEXFREE plan."

   e. Clause 6.1.1:  Upon qualifying in the manner described in the clause above by selling 2 (two) new ADCENTRAL kits to people in his network, with 1 (one) on the left side and the other on the right side, he shall receive an additional gratuity of US$20 (twenty U.S. dollars), called the binary cycle, with the maximum daily

---

[1] For ease of reading, the terms "Member," "Promoter" or "Participant," regardless of capitalization, are at all times herein to be construed as "Participant" defined by M.G.L. Chapter 93, Section 69.

[2] The TelexFree Pre-March 9 Contract does not include a clause numbered 5.9.2.

earning in this status being US$ 440.00 (four hundred and forty U.S. dollars), for 22 (twenty-two) binary cycles."

    f.   Clause 6.1.2:  If the sale is of 2 (two) VOIP ADCentral FAMILY kits, this cycle will yield an additional US$ 20.00 (twenty U.S. dollars), for the ADCentral principals, plus US$ 60 (sixty U.S. dollars), for 3 (three) of the 4 (four) ADCentral additional…"

    g.   Clause 8.1:  "THE PROMOTER shall be entitled to a payment of 1% (one percent), in the form of ROYALTIES, from the company's net billing, if within 1 (one) calendar month (from the 1st (first) day – to the last day of the month) the PROMOTER shall have closed 22 (twenty-two) cycles in 20 (twenty) days, which need not necessarily be consecutive days."

16.    The above provisions of the standard TelexFree Pre-March 9 Contract are clear and direct violations of M.G.L. c. 93, § 69(d), as they promise payments, including cash payments, "bonuses," "gratuities," "royalties," and dividends, merely for the recruitment of new TelexFree members/participants (i.e. through the sale of AdCentral membership accounts).

17.    Furthermore, M.G.L. Chapter 93, Section 69(d)(3)-(4) also prohibits any multi-level distribution company from offering or paying any "finder's fee, bonus, refund, override, commission, cross-commission, dividend or other consideration" to any participant therein:

    a.   "unless such participant performs a bona fide and essential supervisory, distributive, selling or soliciting function in the sale or delivery of such product or services,"

    b.   "where no amount of judgment or skill exercised by the participant has any appreciable effect" upon such payment," or

    c.   "where the participant is without that degree of control over the operation of such plan as to enable him substantially to affect the amount" of such payment.

18.    The TelexFree Pre-March 9 Contract, on its face, contains clear, obvious and direct violations of M.G.L. c. 93, § 69(d)(3)-(4), including:

    a.   Clause 5.4:  "ADCENTRAL PROMOTERS: After setting up his membership, a PARTNER may acquire an "ADCentral" kit consisting of 10 99TELEXFREE VOIP accounts, for which he must pay the equivalent of US$ 289.00 (two hundred and eighty-nine U.S. dollars)."

    b. Clause 5.4.1: "with this qualification, the PARTNER will become a TELEXFREE PROMOTER and, accordingly, shall have his own active ad central for 12 (twelve) months, counting from the date of his membership (and not from the date of the purchase of the kit)."

    c. Clause 5.4.2: "He must also post 1 (one) announcement (prepared by TELEXFREE) per day on internet announcement sites (whether free of charge or not), so that at the end of each cycle of 7 (seven) announcements for the week, the PROMOTER shall receive one 99TELEXFREE account."

    d. Clause 5.5: "ADCENTRAL FAMILY MEMBERSHIP – A PROMOTER wishing to attain the status of an "ADCentral FAMILY Member" must pay the equivalent of US$ 1,375.00 (one thousand three hundred and seventy-five U.S. dollars)."

    e. Clause 5.5.1: "With this membership, a PROMOTER shall have 5 (five) active announcement centrals for 12 (twelve) months, counting from the date of his activation."

    f. Clause 5.5.2: "He must, in turn, post 1 (one) announcement (prepared by TELEXFREE) per day at internet announcement sites (whether free of charge or not) on each one of the 5 (five) ADCentral sites. At the end of the 35 (thirty-five) announcements the PROMOTER shall receive 5 (five) 99TELEXFREE accounts as remuneration for these announcements."

19.    The above-cited language makes it clear to a sophisticated reader that TelexFree Members were not required to engage in any "bona fide and essential supervisory, distributive, selling or soliciting" nor exercise any "judgment," "skill" or "control over the operation."

20.    Rather, Members were only required to engage in the activity of cutting-and-pasting spam advertisements, which were "prepared by TELEXFREE," onto "internet announcement sites," and would receive "remuneration for these announcements."

21.    Furthermore, VoIP products distributed to Members as remuneration for this mindless spamming activity could be redeemed with TelexFree for cash, resulting in cash remuneration.

22.    M.G.L. Chapter 93, Section 69(b) requires as follows:  "Every multi-level distribution company shall provide in its contract of participation that such contract may be

cancelled for any reason at any time by a participant upon notification in writing to the company

of his election to cancel.  If the participant has purchased products while the contract of

participation was in effect, all unencumbered products in a resaleable condition then in the

possession of the participant shall be repurchased …"

      23.     The TelexFree Pre-March 9 Contract, on its face, contains egregious, obvious

violations of M.G.L. c. 93, § 69(b), including:

     a.   Clause 10.1.2:  "A PARTNER or PROMOTER can cancel his membership within 7 (seven) days of becoming a member, and receive a full refund of what he actually paid to TELEXFREE, including the membership fee and the price of the VOIP accounts he has not activated..."

     b.   Clause 10.1.4:  "If a PARTNER or PROMOTER seeks cancellation of membership after the legal deadline, he is aware that he will not receive any reimbursement of any amount, since his position will continue to entail expenses for its maintenance."

      24.     In addition to these clear violations of M.G.L. c. 93, § 69(b), the TelexFree Pre-

March 9 Contract also sets forth the following draconian terms for cancellation of membership:

Clause 10.1.3:  "To be disconnected from the TELEXFREE NETWORK Marketing System, a member must request cancellation of his participation on a specific form provided on his personal page, or in the event of absence or inability to use this resource, through a letter written and signed by him, with certified signature recognition, sent to the headquarters of the CONTRACTOR, correctly stating all of the information requested; if these data rigorously match the data reported when putting through the application, which is to be ascertained for reasons of security, the cancellation shall be approved in an irreversible manner."

      25.     These terms of cancellation are clearly designed to entangle members in

TelexFree's Scheme and prevent Members from withdrawing.

      26.     Not only does the TelexFree Pre-March 9 Contract explicitly violate M.G.L.

Chapter 93, Section 69 – it also lays bare several classic hallmarks of pyramid schemes,

including paying participants solely for recruitment of new members, not requiring any

meaningful sales or distributive activity by participants, and using coercive measures to prevent

participant withdrawal from the scheme.

27.    The mechanics of the TelexFree Program (e.g. AdCentral, AdCentral Family)
were described in the TelexFree Pre-March 9 Contract and on TelexFree's website and otherwise
accessible to the Financial Services Defendants.  TelexFree's business model and operations
were suspicious, tortious, or illegal to the sophisticated Financial Services Defendants, as
demonstrated by the following graphic taken from the public area of TelexFree's website,
www.TelexFree.com:



28.    Like the TelexFree Pre-March 9 Contract, TelexFree's own website set forth
numerous plain violations of M.G.L. c. 93, § 69.  For example, several violations were included
in a key promotional video, entitled "Presentation," which was prominently featured on

www.TelexFree.com, and which included, without limitation, the following violations of M.G.L.

Chapter 93, Section 69:

    a.   promising that Members would "[e]arn US$20 for the direct registration of each new promoter," in violation of Section 69(d)(2);

    b.   promising that Members would "[e]arn US$20 per cycle each time you register 1 ADCentral in your left and 1 in your right, doesn't matter if they are direct, indirect, or gotten by transfer," in violation of Section 69(d)(2);

    c.   promising that Members would "[r]eceive 2% over what your network, direct or indirect up to the 6th level, is receiving from Telexfree in money for the ads posting [sic]," in violation of Section 69(d)(2);

    d.   promising that "[e]veryone who reaches 22 [cycles] of ADCENTRAL for 20 days, within the same month. [sic] Individually or by group will receive 1% of the business volume of the company, as extra bonus, will be divided equally among everyone qualified," in violation of Section 69(d)(2);

    e.   promising that "Team Builders," i.e. Promoters who are able to register at "10 direct ADCentral FAMILY in a period of 60 days," "will receive the share of 2% of the revenue of the monthly net sales for the company, divided equally among all the TEAM BUILDERS until receiving the maximum bonus for the TEAM BUILDER which is of $39,600," in violation of Section 69(d)(2);

    f.   promising that Members would receive income for "[o]nly posting 5 DAILY ADS ON INTERNET! [sic]," in violation of Section 69(d)(3) & (4);

    g.   guaranteeing to Members returns of $49.90 weekly, $199.60 monthly, and $2594.80 annually in exchange for the purchase of one AdCentral package, in violation of Section 69(e);

    h.   guaranteeing to Members returns of $249.50 weekly, $998.00 monthly, and $12,974 annually, on one AdCentral Family package, in violation of Section 69(e); and

    i.   providing a simulation of guaranteed earnings based solely on adding new Members to one's network, in violation of Section 69(d)(2) & (e).

29.    The above violations of M.G.L. Chapter 93, Section 69 were also plain evidence to the sophisticated Financial Services Defendants that TelexFree promised passive income to participants, that recruitment of new participants predominated over product sales in TelexFree's business model, and TelexFree was therefore a pyramid scheme.

30.     The facts and circumstances set forth herein establish that the sophisticated notice, investigation and evaluation systems of the Financial Services Defendants were exposed to open and notorious facts that reasonably placed them on notice of TelexFree's suspicious, tortious, malicious, unfair, deceptive and/or unlawful acts, practices and business enterprise.

31.     As a result of their compliance with federal law, each of the Financial Services Defendants was actually aware of facts and evidence of suspicious, tortious or illegal TelexFree activity ("Red Flags").

32.     When a bank finds out that a client is laundering money or running an unlawful enterprise, it must stop servicing or shut down the accounts, terminate the banking relationship, and file a Suspicious Action Report ("SAR") with the Financial Crimes Enforcement Network.

33.     During the class period, the Financial Services Providers unlawfully failed to timely or sufficiently meet these obligations.

34.     Each of the Financial Services Defendants was a substantial and integral cog in TelexFree's unlawful United States Pyramid Scheme, and, without that assistance, the Scheme would not have been able to get off the ground, develop, maintain or thrive.  Each Financial Services Defendant was motivated by substantial profits and other interests at the local and national level gained from its relationship with TelexFree and other Defendants, as well as a desire to maintain their personal and lucrative relationships with the multilevel marketing industry as a whole.

35.     In addition, Defendant Investment Services Provider Wells Fargo Advisors LLC obtained and possessed the same information and knowledge as the Financial Services Defendants, including the Red Flags; yet it nevertheless provided Defendant Founder Wanzeler with investment services and invested funds raised through TelexFree's illegal activities.  In

doing so, Wells Fargo Advisors, LLC performed integral services and provided substantial assistance that was used to further TelexFree's unlawful business and to enable Defendant Wanzeler to hide and invest assets and launder illicit monies derived from TelexFree's illegal activities.

36.     Similarly situated Plaintiffs seek compensation for the ascertainable economic loss they were similarly caused to suffer as a result of Defendants' participation in, or aiding or abetting of, TelexFree's illegal Pyramid Scheme.[3]  They also seek equitable relief.

## I.     JURISDICTION AND VENUE

37.     This Court has subject-matter jurisdiction over the instant matter pursuant to 28 U.S.C. § 1332(d) and the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §§ 1711, *et seq*., which vest original jurisdiction in the district courts of the United States for any multi-state class action where the aggregate amount in controversy exceeds $5,000,000 and where the citizenship of any member of the class of plaintiffs is different from that of any defendant.  The $5,000,000 amount-in-controversy and diverse citizenship requirements of CAFA are satisfied in this case.

38.     Venue is proper under 28 U.S.C. § 1391 since a substantial part of the acts, omissions and transactions giving rise to this action occurred in this district; certain Defendants reside in this district; and TelexFree, LLC, TelexFree, Inc. and TelexFree Financial, Inc. (related entities not named as Defendants) are currently debtors in Chapter 11 proceedings pending in this district.

---

[3] As used herein, the "Pyramid Scheme" or "Scheme" refers to all aspects of the scheme, including, but not limited to, all of TelexFree's ongoing operations, money laundering, movement of funds offshore and beyond the reach of the United States' justice system and the concealment of suspicious financial activity.

## II.   THE PARTIES

### A. PLAINTIFFS

39.     Plaintiff Rita Dos Santos ("Dos Santos" or "Rita") is an individual who currently resides in Tewksbury, MA 01876.  Rita was a house cleaner of minimal means and limited education at the time the fraud was committed on her.  Rita was fortunate and won $1 million in the Massachusetts State Lottery and opted to make a lump sum payout.  She received her lump sum and the Promoters from TelexFree were on her like a seagull after a French fry at the beach. They duped Rita into believing that if she "invested" $325,000 into TelexFree that she would have a payout of several million dollars in a short time.  Her investment was made in sometime in 2012-2013.  Rita has since become depressed and has moved several times because of her financial woes.

40.     Plaintiff Igor Shikhman ("Shikhman" or "Igor" or "Joseph"), is an individual who resides in New York, NY.  Shikhman, like many other victims of TelexFree's Pyramid/Ponzi Scheme, tendered cash in exchange for a membership in TelexFree (a "TelexFree Membership") and its promised pre-March 9, 2014 return in investment (the Pre-March 9, 2014 Return on Investment").

41.     Plaintiff Edivaldo A. Reis ("Edivaldo" or "Reis") is an individual who currently resides in Cinnaminson, NJ  08077.  Edivaldo is a business owner of United Service Group and Expert Lux Inc.  Edivaldo was physically shown payouts to what he was led to believe were investors who had put money into TelexFree and were "earning" benefits as the company was growing.  As a business man, he had questions, but the TelexFree Promoters were so experienced that they had documents to show Edivaldo that the business of TelexFree was more than legitimate.  Edivaldo believed in the fraudulent representations and refinanced two properties

and took in excess of $300,000 in his property's equity and "invested" the money in TelexFree. Edivaldo's investment was made in approximately March 2014.

42.     Plaintiff Anthony Cellucci ("Cellucci"), is an individual who resides in Massachusetts.  Cellucci, like many other victims of TelexFree's Pyramid/Ponzi Scheme, tendered cash in exchange for a TelexFree Membership and its promised Pre-March 9, 2014 Return on Investment.

43.     Plaintiff Jamilly Lake ("Lake") is an individual who resides in Massachusetts. Lake, like many other victims of TelexFree's Pyramid/Ponzi Scheme, tendered cash in exchange for a TelexFree Membership and its promised Pre-March 9, 2014 Return on Investment.

44.     Plaintiff Gerivaldo Pacheco ("Pacheco") is an individual who resides in Massachusetts.  Pacheco, like many other victims of TelexFree's Pyramid/Ponzi Scheme, tendered cash in exchange for a TelexFree Membership and its promised Pre-March 9, 2014 - Return in Investment.

   **B.**  DEFENDANTS

      1.  TELEXFREE DEFENDANTS

         a.  Third-Party TelexFree Bankrupt Entities

45.     TelexFree, Inc., TelexFree, LLC and TelexFree Financial, Inc. are not currently Defendants due to their Chapter 11 bankruptcy protections, but they are third-party participants in the unlawful activities described in this complaint.

46.     TelexFree, Inc. is a corporation duly organized and existing under the laws of the Commonwealth of Massachusetts, registered with the Corporations Division of the Secretary to the Commonwealth of Massachusetts (Identification Number 000832397), having a last known principal place of business at 225 Cedar Hill Street, Suite 200, in Marlborough, County of Middlesex, Commonwealth of Massachusetts 01752 (the "TelexFree Marlborough Office").

47.     TelexFree, LLC is a limited liability company duly organized and existing under the laws of Nevada, having a purported place of business at 4705 S. Durango Drive, #100-J51 (a post office box), Las Vegas, Nevada 89147 (the "Nevada Post Office Box").  TelexFree, LLC also maintained offices in the Commonwealth of Massachusetts at the TelexFree Marlborough Office between 2012 and late April 2014.  At all material times, TelexFree, LLC was identified as a limited liability company as registered with the Corporations Division of the Secretary to the Commonwealth of Massachusetts (Identification Number 001105166).  TelexFree, LLC registered with the Secretary of State for the Commonwealth of Massachusetts on April 18, 2013.

48.     The last unnamed TelexFree entity is TelexFree Financial, Inc. ("TelexFree Financial").  TelexFree Financial, Inc. is a corporation duly organized and existing under the laws of the State of Florida, having its last known principal place of business at 2321 NW 37th Avenue, in Coconut Creek, Florida 33063.  TelexFree Financial is a wholly-owned subsidiary of TelexFree, LLC.

49.     Throughout this complaint, for ease of reference, the named and unnamed TelexFree corporations as well as the Founders, Principals, Executive Office, Top Level Promoters and Associated Individuals; and the Licensed Professionals including Attorneys, Accountants, and Other Professional Services Providers (as defined herein) are alternatively referred to for ease of reading as "Operational Defendants."  At times relevant to this complaint, the Operational Defendants served as principals, agents, servants, authorized representatives, co-conspirators or employees of TelexFree.

b.  Electric and Mobile

50.     Defendant TelexElectric, LLLP ("Electric") is a limited liability limited partnership organized and under the laws of the State of Nevada.  Its registered agent is BWFC

Processing Center, LLC, 3960 Howard Hughes Parkway, Suite 500, Las Vegas, Nevada 89169.

51.     Defendant Telex Mobile, Holdings, Inc. ("Mobile") is a corporation organized

and existing under the laws of the State of Nevada, and having its registered agent as BWFC

Processing Center, LLC, 3960 Howard Hughes Parkway, Suite 500, Las Vegas, Nevada 89169.

2.  OTHER OPERATIONAL DEFENDANTS

a.  Founders and Principals, Executive Office, Top Level Promoters and
Associated Individuals

52.     James M. Merrill ("Merrill") is an individual with a last known usual place of

abode of 1 Coburn Drive in Ashland, County of Middlesex, Commonwealth of Massachusetts

01721.  Merrill is a Founder, Principal, and a member of TelexFree's Executive Office.

53.     Carlos N. Wanzeler ("Wanzeler") is an individual with a last known usual place

of abode of 373 Howard Street, in Northborough, County of Worcester, Commonwealth of

Massachusetts 01532.  Wanzeler is a Founder, Principal, and a member of TelexFree's Executive

Office.

54.     Carlos Roberto Costa ("Costa") is an individual with a last known usual place of

abode located at Rua Umbizeiro, 37, Bairro de Itapoa, Vila Velha, Espirito Santo, 29101-00

Brazil.  Costa is a Founder, Principal and a member of TelexFree's Executive Office.

55.     Merrill, Wanzeler and Costa are collectively referred to herein as "Founders."

56.     Steven M. Labriola is an individual with a last known usual place of abode of

21 Kiwanis Beach Road, in Upton, County of Worcester, Commonwealth of Massachusetts

01568.  Labriola is a Principal and a member of TelexFree's Executive Office.

57.     Joseph H. Craft, also known as Joe H. Craft ("Craft") is an individual with a last

known usual place of abode at 825 E. Main Street in Boonville, Indiana 47601-1885.  Craft is a

Principal and a member of TelexFree's Executive Office.

58.     Merrill, Wanzeler, Costa, Labriola and Craft are collectively referred to herein as "Principals" or "Executive Office."

59.     Ana Paula Oliveira ("Oliveira"), is an individual having a last known usual place of abode of 19 Cook Lane, Apt. D, Marlborough, Massachusetts 01752.

60.     Andreia B. Moreira, also known as Andreia Moreira Biachi, also known as Andreia Pinto ("Moreira"), is an individual having a last known usual place of abode of 216 W. Union Street, Ashland, Massachusetts 01721.

61.     Oliveira and Moreira are also included and referred to herein as "Executive Office."

62.     Defendant Ann Genet ("Genet") served as TelexFree, LLC's Nevada agent, servant or employee, was a resident of Las Vegas, Nevada who served TelexFree's Executive Office and is an individual associated with Craft and Bridgeway Financial Corporation.  Her address is unknown at this time.

63.     Katia Wanzeler is an individual with a last known usual place of abode of 373 Howard Street, in Northborough, County of Worcester, Commonwealth of Massachusetts 01532.  Katia Wanzeler served as an agent servant or authorized representative of TelexFree's Executive Office and is otherwise an individual associated with TelexFree's Founders, Principals, Executive Office, and Top Promoters.

64.     Genet and Katia Wanzeler are collectively referred to herein as "Associated Individual" Defendants.

65.     Sanderley Rodrigues de Vasconcelos ("Rodrigues") has a last known usual place of abode of 100 Stockton Street, Apt. 49, in Chelsea, County of Suffolk, Commonwealth of Massachusetts 02150.  Rodrigues is a TelexFree Top Level Promoter

66.     Santiago de la Rosa ("De La Rosa") is an individual with a last known usual place of abode of 189 Beacon Hill Avenue, Unit 2, in Lynn, County of Essex, Commonwealth of Massachusetts 01902.  De La Rosa is a TelexFree Top Level Promoter.

67.     Randy N. Crosby ("Crosby") has a last known usual place of abode of 30 Club Court, in Alpharetta, Georgia 30005.  Crosby is a TelexFree Top Level Promoter.

68.     Scott Miller ("Miller") has a last known usual place of adobe of 973 Thornwood Drive, Greenwood, IN 46143.  Miller is a TelexFree Top Level Promoter.

69.     Faith R. Sloan ("Sloan") has a last known usual place of abode of 515 E. End Avenue, Unit 105, in Calumet City, Illinois 60409.  Sloan is a TelexFree Top Level Promoter.

70.     Daniil Shoyfer ("Shoyfer") has a last known usual place of abode of 123 Arbutus Avenue, in Staten Island, New York 10312.  Shoyfer is a TelexFree Top Level Promoter.

71.     Rodrigues, De La Rosa, Crosby, Sloan, Shoyfer, and Miller are collectively referred to herein as "Top Level Promoters."

72.     TelexFree's Founders, Principals, Executive Office, Top Level Promoter Defendants are collectively referred to as "TelexFree's Executives" or "Executives."

73.     By their acts and omissions, each above Founder, Principal, Executive Office, Top Level Promoter Defendant and Associated Individual Defendants transacted business in the Commonwealth of Massachusetts; contracted to supply services and things in the Commonwealth of Massachusetts; caused tortious injury to the putative class in the Commonwealth of Massachusetts; regularly solicited business and engaged in persistent courses of conduct in the Commonwealth of Massachusetts; made use of the laws, rights, and protections offered by the Commonwealth of Massachusetts; and derived substantial revenue from goods used or consumed or services rendered in the Commonwealth of Massachusetts.

b.   Licensed Professionals including Attorneys and Other Professional
Services Providers

74.    Defendant Gerald P. Nehra, Esq. ("Nehra") is an individual who now resides or
formerly resided at 1710 Beach Street, Muskegon, Michigan, 49441 and also maintains a second
residence at 2149 Tall Oak Court, Sarasota, Florida 34232.  Nehra is an attorney duly licensed to
practice law in the State of Michigan.

75.    Defendant Gerald P. Nehra, Attorney at Law, PLLC ("Nehra Law Firm") is a
professional limited-liability company engaged in the practice of law and duly organized and
existing under the laws of Michigan, with offices located at 1710 Beach Street, Muskegon,
Michigan, 49441.  Nehra is its sole member, manager, and registered agent.

76.    Defendant Law Offices of Nehra and Waak ("Nehra and Waak Law Firm") is a
general partnership formed between Defendants Nehra, Waak, Nehra Law Firm, and Waak Law
Firm with primary offices located at 11300 East Shore Drive, Delton, Michigan, 49046, and a
secondary office is located at 1710 Beach Street, Muskegon, Michigan.

77.    Nehra, Nehra Law Firm and Nehra and Waak Law Firm, are collectively referred
to herein as "N&W Attorney Defendants."

78.    Garvey Schubert Barer, P.C. ("Garvey Schubert") is a Professional Corporation
duly organized and existing under the laws of the State of California, having its principal place
of business at 121 SW Morrison Street, 11th Floor, Portland, Oregon 97204.

79.    Robert Weaver ("Weaver") is an individual having a last known usual place of
abode of 2210 NE Thompson Street, Portland, OR 97212.  Weaver is an attorney duly licensed
to practice law in the State of Oregon.

80.    Samuel C. Kauffman ("Kauffman") is an individual having a last known usual
place of abode of 112 SW Abernathy Street, Portland, OR 97279.  Kauffman is an attorney duly

licensed to practice law in the State of Oregon.

81.     Gary P. Tober ("Tober") is an individual having a last known usual place of abode of 12028 200th CT NE, Woodinville, WA 98077.  Tober is an attorney duly licensed to practice law in the States of Washington and Ohio.

82.     Sara P. Sandford ("Sandford") is an individual having a last known usual place of abode of 2522 9th Street, Baker City, OR 97814.  Sandford is an attorney duly licensed to practice law in the States of California, Oregon and Washington and Ohio.

83.     Patrick J. Conti ("Conti") is an individual having a last known usual place of abode of 1211 SE 52nd Avenue, Portland, OR  97215.  Conti is an attorney duly licensed to practice law.

84.     Gregg Rodgers ("Rodgers") is an individual having a last known usual place of abode of 4616 2nd NW Ave., Seattle, WA   98107.  Rodgers is an attorney duly licensed to practice law.

85.     Garvey Schubert Barer, Weaver, Kauffman, Tober, Sandford, Conti and Rodgers are all referred to herein as "Garvey Schubert."

86.     Jeffrey A. Babener ("Babener") is an individual who now resides or formerly resided at 4155 SW Patrick Place, Portland, Oregon 97239.  Babener is an attorney duly licensed to practice law in the State of Oregon.

87.     At all times material herein, Babener also did business under the assumed business name "Babener & Associates," (collectively with Babener, "Babener & Associates" or "Babener") having a business address of Bank of America Financial Center, 121 SW Morrison Street, Suite 1020, Portland, Oregon 97204.

88.     The N&W Attorney Defendants, Garvey Schubert and Babener & Associates are

referred to as "Attorney Defendants."

89.     Defendant Opt3 Solutions, Inc. ("Opt3") is a corporation duly organized and existing under the laws of the State of California, having its principal place of business at 120 Vantis, Suite 300, Alison Viejo, California.

90.     Defendant Jason A. Borromei, also known as Jay Borromei ("Borromei"), is an individual with a last known place of abode located at 23952 Catbird Court, Laguna Niguel, California 92677.   At all material times, Borromei served as president and authorized representative of Opt3.

91.     The Sheffield Group, Inc. ("Sheffield Group") is a corporation duly organized and existing under the laws of the State of Arizona, with its principal offices at 2239 N. Hayden Road, Suite 103, Scottsdale, Arizona 85257.

92.     Michael L. Sheffield ("Sheffield" or "Mike Sheffield") is an individual with a last known usual place of abode located at 1912 N. Oleander Street, Tempe, AZ   85281

93.     Kenneth Lind ("Lind') is an individual with a last known usual place of abode located at 9119 Camino Del Santo, Scottsdale, AZ   85260.

94.     Garvin L. DeShazer ("DeShazer") is an individual with a last known usual place of abode located at 1649 N. Jones Circle, Mesa, AZ   85203

95.     Davene Peruzzini ("Peruzzini") is an individual with a last known usual place of abode located at 4430 84th Pl., Scottsdale, AZ   85251

96.     Debbie (Debra) Stenmoe ("Stenmoe") is an individual with a last known usual place of abode located at 6021 E. Selkirk Circle, Mesa, AZ   85215

97.     The Sheffield Group, Sheffield, Lind, DeShazer, Peruzzini and Stenmoe are collectively referred to herein as the Sheffield Group.

98.     Defendant Telecom Logic, LLC ("Telecom Logic") is a limited liability company duly organized under the laws of the State of Oregon, having its principal place of business at 1550 SW Mitchell St., Portland, Oregon  97239.

99.     Defendant Ryan James Mitchell ("Mitchell") is an individual with a last known address at 818 SW Third Ave, Suite 137, Portland, Oregon 97204.  At all material times, Mitchell served as owner, chief software engineer and authorized representative of Telecom Logic.

100.     Telecom Logic and Mitchell are hereinafter referred to collectively as Telecom Logic.

101.     Borromei, Opt3, the Sheffield Group and Telecom Logic,are collectively referred to herein as "Other Professional Services Providers."

102.     By their acts and omissions, the Attorney Defendants and Other Professional Services Providers have transacted business in the Commonwealth of Massachusetts; contracted to supply services and things in the Commonwealth of Massachusetts; caused tortious injury to the putative class in the Commonwealth of Massachusetts; regularly solicited business and engaged in persistent courses of conduct in the Commonwealth of Massachusetts; made use of the laws, rights, and protections offered by the Commonwealth of Massachusetts; and derived substantial revenue from goods used or consumed or services rendered in the Commonwealth of Massachusetts.

c.   The Accountant Defendants

103.     Defendant Craft is a certified public accountant who privately provided accounting services and financial advice to TelexFree and others before he served as the chief financial officer of TelexFree, Inc. and TelexFree, LLC.

104.     Defendant Craft Financial Solutions, LLC ("Craft Financial") is a limited-liability

company duly organized and existing under the laws of the State of Indiana with a principal

place of business located at 825 E. Main Street, Boonville, Indiana, 47601-1885.  Craft Financial

provided accounting services and financial advice to TelexFree and others.  Craft is also the sole

member and manager of Craft Financial.

105.     PricewaterhouseCoopers, LLP ("PricewaterhouseCoopers" or "PwC")) is a

Registered foreign limited liability partnership, organized and existing under the laws of the

State of Delaware, having a principal place of business in New York, New York, and having a

place of business at 125 High Street, in Boston, County of Suffolk, Commonwealth of

Massachusetts 02110.  At times material herein, PricewaterhouseCoopers provided accounting

services and other professional services to TelexFree.

106.     Jerry Puzey ("Puzey") is an individual with a last known usual place of abode

located at 1440 Brixton Road, Pasedena, CA   91105.

107.     Richard Colabella is an individual with a last known usual place of abode located

at 24137 Park Granada, Calabasas, CA   91302.

108.     PwC, Puzey and Colabella are all referred to herein as PwC and/or

PricewaterhouseCoopers.

109.     Craft, Craft Financial and PricewaterhouseCoopers are collectively referred to

herein as "Accountant Defendants."

110.     By their acts and omissions, the Accountant Defendants have transacted business

in the Commonwealth of Massachusetts; contracted to supply services and things in the

Commonwealth of Massachusetts; caused tortious injury to the putative class in the

Commonwealth of Massachusetts; regularly solicited business and engaged in persistent courses

of conduct in the Commonwealth of Massachusetts; made use of the laws, rights, and protections

offered by the Commonwealth of Massachusetts; and derived substantial revenue from goods used or consumed or services rendered in the Commonwealth of Massachusetts.

111.    The Attorney Defendants, Accountant Defendants and the foregoing Other Professional Services Providers are collectively referred to herein as "Licensed Professionals."

### 3.  FINANCIAL SERVICES PROVIDERS

#### a.  The Bank Defendants

112.    TD Bank, N.A. ("TD Bank") is a national banking institution in the United States chartered and supervised by the federal Office of the Comptroller of the Currency (the "OCC") with its principal place of business at 15 Broad Street in Boston, County of Suffolk, Commonwealth of Massachusetts 02109.

113.    Bank of America, N.A. ("Bank of America") is a national banking institution in the United States chartered and supervised by the OCC with a principal place of business in Charlotte, North Carolina.  Bank of America, N.A. is a subsidiary of Bank of America, and conducts business in the Commonwealth of Massachusetts at, inter alia, 100 Federal Street, in Boston, County of Suffolk, Commonwealth of Massachusetts 02110.

114.    RSB Citizens, N.A. ("Citizens Bank") conducts business in the Commonwealth of Massachusetts at 725 Canton St., Norwood, County of Norfolk, Commonwealth of Massachusetts 02062 and has a branch at 290 Turnpike Road, Westborough, County of Worcester, Commonwealth of Massachusetts 01581.  At all times material herein, Defendant Citizens Bank provided banking services, maintained accounts, and received and executed transfers of funds from or for the benefit of TelexFree.

115.    Wells Fargo Bank, N.A. ("Wells Fargo Bank") is a national banking institution in the United States chartered and is supervised by the federal Office of the Comptroller of the Currency, with an address at P.O. Box 6995, Portland, Oregon 97228 and a branch at 800 North

Magnolia Ave., Orlando, Florida.  Wells Fargo Bank conducts business in the Commonwealth of

Massachusetts at, *inter alia*, 201 Washington Street, in Boston, County of Suffolk,

Commonwealth of Massachusetts.  At all times material herein, Defendant Wells Fargo Bank

provided banking services, maintained accounts, and received and executed transfers of funds

from or for the benefit of TelexFree.

116.     Fidelity Co-operative Bank, doing business as Fidelity Bank, ("Fidelity Bank") is

a Massachusetts Chartered Banking Institution, having its principal offices at 675 Main Street, in

Fitchburg, County of Worcester, Commonwealth of Massachusetts 01420.

117.     John F. Merrill is an individual with a last known usual place of abode of 7

Kinnicutt Road, in Worcester, Massachusetts 01602.

118.     At all material times herein, John F. Merrill served as president and chief

operating officer of Fidelity Bank.

119.     Synovus Bank ("Synovus") is a Georgia Chartered Banking Institution, having its

principal offices at 1148 Broadway, in Columbus, County of Muscogee, Georgia 31901.

120.     PNC Bank, N.A. ("PNC Bank") is a national banking institution in the United

States chartered and supervised by the OCC, with its principal place of business at 300 Fifth

Avenue, The Tower at PNC Plaza, Pittsburgh, Pennsylvania 15222.

121.     TD Bank, Bank of America, Citizens Bank, Fidelity Bank, John F. Merrill, Wells

Fargo Bank, Synovus and PNC Bank are collectively referred to herein as the "Defendant

Banks."

b.   Payment Processing Service Companies

122.     Global Payroll Gateway, Inc. ("GPG") is a corporation duly organized and

existing under the laws of the State of California, having its principal offices at 18662

MacArthur Boulevard, Suite 200, in Irvine, California 92612.

123.     Jayme Amirie ("Amirie") is an individual with a last known usual place of abode at 660 Kings Road, Newport Beach, CA  92663.

124.     GPG and Amirie are collectively referred to herein as GPG.

125.     International Payout Systems, Inc. ("IPS") also doing business as i-Payout, is a corporation duly organized and existing under the laws of the State of Florida, having its principal offices at 2500 East Hallandale Beach Boulevard, Suite 800, Hallandale Beach, Florida 33009.

126.     ProPay, Inc. ("ProPay") is a corporation duly organized and existing under the laws of the State of Utah with its principal offices at 3400 North Ashton Boulevard, Lehi, Utah 84043 and also does business as PROPAY.COM.

127.     Base Commerce, LLC ("Base Commerce") formerly known as Phoenix Payment, LLC, is a limited liability company duly organized and existing under the laws of the State of Arizona with its principal offices at 7910 S. Kyrene Road, Suite 106, Tempe, Arizona 85284, and also does business as Phoenix Payments.

128.     John Hughes ("Hughes") is an individual with a last known usual place of abode of 6455 E. Rustic Drive, Mesa, Arizona 85215.

129.     Alexander Sidel ("Sidel") is an individual having a last known usual place of abode 4989 E. Karsten Drive, Chandler, AZ 85249-7175.

130.     Jason Doolittle ("Doolittle") is an individual having a last known usual place of abode of 9816 E. Cinnabar Avenue, Scottsdale, AZ 85258-4736.

131.     John Kirchhefer ("Kirchhefer") is an individual having a last known usual place of abode of 3039 E. Rock Wren Road, Phoenix, AZ 85048-8732.

132.     Brian Bonfiglio ("Bonfiglio") is an individual having a last known usual place of

abode of 2335 E. Plum Street, Gilbert, AZ 85298-0320.

133.     Vantage Payments, LLC ("Vantage Payments") is a limited liability company duly organized and existing under the laws of the State of Arizona, having its principal offices at 8300 N. Hayden Road #A207, Scottsdale, Arizona 85251.

134.     Dustin Sparman ("Sparman") is an individual with a last known usual place of abode of 8702 E. Plaza Avenue 85610, Scottsdale, Arizona 85250.

135.     Allied Wallet, Ltd. ("Allied Wallet UK") is a limited company having its central office in the United Kingdom, and having its United States office at 900 Sunset Boulevard, Suite 820, West Hollywood, California 90069.

136.     AlliedWallet, Inc., also d/b/a Allied Wallet ("Allied Inc.") (collectively with Allied Wallet UK, "Allied Wallet") is a Nevada corporation with a registered agent address of 769 Basque Way, Suite 300, Carson City, Nevada, and has maintained a principal place of business at 9000 Sunset Boulevard, Suite 820, West Hollywood, California.

137.     Defendant Ahmad Khawaja ("Khawaja") is an individual having a last known usual place of abode in California.  He is the founder, CEO, director, and owner of Allied Inc.

138.     Defendants Moe Diab ("Diab") is an individual having a last known usual place of abode in California. He is the Chief Operations Officer for Allied Inc. and formerly the Director of Risk and Chargebacks.

139.     Amy Rountree ("Rountree") is an individual having a last known usual place of abode in Utah.  She is the VP of Operations for Allied Inc.

140.     Allied Wallet transacts or has transacted business in this district and throughout the United States.

141.     Allied Wallet UK, Allied Wallet Inc., Khawaja, Diab and Rountree are

collectively referred to herein as "Allied Wallet."

142.   Bank Card Consultants, Inc. ("Bank Card Consultants") is a corporation duly organized and existing under the laws of the State of California, with its principal offices at 23461 S Pointe Drive, Suite 350, Laguna Hills, California 92618.

143.   John Yurick ("Yurick") is an individual having a last known usual place of abode of 25212 Earhart Road, Laguna Hills, CA 92653.

144.   Bank Card Consultants and Yurick are collectively referred to herein as "Bank Card Consultants."

145.   Priority Payout, Corp. ("Priority Payout") is a corporation duly organized and existing under the laws of the State of Florida, having its principal place of business at 60 SW Hideaway Place, Stuart, Florida 34994.

146.   Defendant Thomas A. Wells ("Wells) is an individual with a last known place of abode located at 300 NE Town Terrace, Jensen Beach, Florida 34957.   At all material times, Wells served as CEO and authorized representative of Priority Payout.

147.   Priority Payout and Wells are collectively referred to herein as "Priority Payout."

148.   GPG, Amirie, IPS, ProPay, Base Commerce, Vantage Payments, Hughes, Sidel, Doolittle, Kirchhefer, Bonfiglio, Sparman, Allied Wallet, Khawaja, Diab, Rountree, Bank Card Consultants, Yurick, Priority Payout and Wells,  are collectively referred to herein as the "Payment Processing Service Companies" or the "Payment Processor Defendants."

149.   Defendants Bank of America, TD Bank, Fidelity Bank, Synovus, Wells Fargo Bank, PNC Bank, GPG, IPS, ProPay, Base Commerce, Vantage Payments, Allied Wallet, John F. Merrill, Hughes, Sidel, Doolittle, Kirchhefer, Bonfiglio, Sparman, Bank Card Consultants, Yurick and the Doe Banks and Doe Payment Processors are referred to herein collectively as the

"Financial Services Providers".

### 4.  INVESTMENT SERVICES PROVIDERS

150.    Wells Fargo Advisors, LLC ("Wells Fargo Advisors") is a limited liability corporation duly organized and existing under the laws of the State of Delaware and having its principal place of business at One North Jefferson Avenue, St. Louis, Missouri 63103

151.    Mauricio Cardenas ("Cardenas") is an individual having a last known usual place of abode of 8205 NW 74th Ter., Tamarac, FL 33321-4862.  At all times relevant to this Complaint, Mauricio Cardenas was also Wells Fargo Advisors' authorized employee, agent and servant.

152.    Wells Fargo Advisors and Cardenas are collectively referred to herein as "Investment Services Providers."

153.    It is believed that additional parties participated and aided and abetted in TelexFree's Pyramid Scheme but their identities or nature or extent of unlawful participation are as yet unknown.  For ease of reference, they can only be referred to herein at this time as Defendants Doe Top Level Promoters, Doe Licensed Professionals, Doe Banks, Doe Payment Processing Services, Doe Investment Services Providers and Paralegal Doe.

### III.    FACTS AND ALLEGATIONS

**A.** Chronological Overview

154.    The template for TelexFree's Pyramid Scheme was developed and refined in the years immediately prior to the takeoff of its United States enterprise.

155.    In 2010, TelexFree Founders and Principals Wanzeler, Merrill and Costa first formed and registered Ympactus Comercial Ltda ("Ympactus") under the laws of Brazil.

156.    Ympactus operated out of offices in Marlborough, Massachusetts and Brazil.

157.    TelexFree's United States Pyramid Scheme operated out of the same location. [4]

158.    Ympactus was registered as a company that would market cosmetics, perfumery and toilet products.

159.    Later, in Brazil, Ympactus purported to sell internet telephone services, but in reality sold Pyramid Scheme "memberships" to investors.

160.    TelexFree's United States business model and operations were essentially identical to Ympactus' business model and operations in Brazil.[5]

161.    Ympactus and TelexFree's U.S. memberships offered investors (the "Members" or "Promoters") guaranteed high returns in exchange for promoting the company online and recruiting new investors.

162.    Ympactus and TelexFree falsely advertised themselves as a "multi-level marketing" company selling local and international telephone service plans that used unique groundbreaking "voice over internet protocol" ("VoIP") technology.

163.    The VoIP technology used by Ympactus and TelexFree was not unique or groundbreaking.  In fact, it was substandard and offered nothing more than the free Google Voice and Skype.

164.    In February 2012, Wanzeler and Merrill formed TelexFree, Inc. in the Commonwealth of Massachusetts.

165.    Wanzeler and Merrill formed TelexFree, Inc. with the intent to use the same

---

[4] There was considerable overlap between Ympactus, which also operated as TelexFree, and TelexFree's United States companies and operations.  To assist the reader, TelexFree's Brazilian Pyramid Scheme will be referred to as "TelexFree Brazil" or "Ympactus."  "TelexFree" means the various United States-based TelexFree entities, as well as the Operational Defendants as defined herein.

[5] As in Brazil, TelexFree's business model has it accept $299 deposits from Members on the promise of a $20 a week rate of interest for 52 weeks.  The company also pays Members directly based on how many deposits recruited down line affiliates make via a matrix.

unlawful Ympactus business model in the United States.

166.    After they opened TelexFree in the United States, the Operational Defendants methodically released false or misleading information that was intended to, and did, separate publicly TelexFree and TelexFree Brazil or Ympactus and otherwise shower their Scheme with credibility.[6]  While these calculated information releases were sufficient to mislead members of the class, they were detectable by the robust and sophisticated Financial Services Providers' Know Your Customer (as defined herein) investigations and evaluations.

167.    In March 2012, Founders and Principals Costa, Merrill and Wanzeler repurposed Ympactus to front the TelexFree Brazil's VoIP pyramid scheme.

168.    In April 2012, Craft was retained to serve as TelexFree's accountant and prepared its financial statements and taxes.[7]

169.    As early as July 27, 2012, the multilevel marketing news site BehindMLM.com published a detailed analysis of TelexFree's business operation, concluding that:

> The corporate structure of TelexFree and the obvious business relationship between the company and Disk a Vontade and complete lack of disclosure on either company's website is cause for concern…
>
> Personally I believe the ridiculously high membership fee charged by TelexFree (a $299 fee to publish ads for the company?) and the fact that individual members are able to purchase up to five membership positions strongly indicates a lack of external revenue here.[8]

170.    Over the ensuing months, the number of online articles and websites characterizing TelexFree as a Pyramid Scheme increased.

171.    During or about November 2012, TelexFree increased its focus on United States-

---

[6] *See, e.g.,* ¶¶123, 124, 126, 130, 131, 140, 145, 149, 153, 162, 519, *infra*; s*ee also* http://behindmlm.com/companies/telexfree/gerry-nehra-gives-legal-blessing-to-telexfree/.

[7] See Omnibus Decl. of William H. Runge, Case 14-1552-abl, Doc. 13, ¶ 31.  A true and correct copy of this Declaration is attached hereto as Exhibit 2.

[8] *See* Exhibit 3, Decl. of Gray Echavarria at Attachment 5.

based operations including the development of special relationships with United States-based banks, especially those located in the Commonwealth of Massachusetts.

172.     TelexFree's business plan and operations were an unlawful Pyramid Scheme and not a lawful multi-level marketing ("MLM") enterprise.  At all times relevant to this complaint, TelexFree violated the express terms of M.G.L. c. 93, § 69.

173.     In January 2013, Ympactus/TelexFree Brazil came under legal scrutiny in Brazil by the Brazilian Bureau of Consumer Protection (known as Procon).

174.     Procon was suspicious of the company's rapid recruitment of new investors and lack of substantial sales, and Brazilian authorities opened an investigation against Ympactus.

175.     Prior to and at the time Brazilian authorities shut them down for running a Pyramid Scheme, Ympactus also operated under the name TelexFree.

176.     In a January 11, 2013 press release, the Brazilian Bureau of Consumer Protection indicated that its investigation of TelexFree had "detected evidence of crimes."

177.     During early 2013, "TelexFree affiliates were urging recruits to make walk-in deposits at a Bank of America branch located at 188 Boston Turnpike, Shrewsbury, Massachusetts 01545.[9]

178.     In early 2013, TelexFree also preferred to use TD Bank.[10]

179.     In a March 1, 2013 press release, Merrill admitted "[w]e [TelexFree] pay our representatives weekly if they follow our system and advertise our service on the Internet."  This payment condition required no actual sales of the VoIP product.

180.     On March 7, 2013, a TelexFree blog falsely claimed that the TelexFree "program"

_____

[9] *See* Exhibit 3, Decl. of Gray Echavarria, Attachment 35 - Facebook Page with Instructions to Deposit at Bank of America, Shrewsbury, Massachusetts; *see also* Exhibit 3, Decl. of Gray Echavarria, Attachment 22.

[10] *Id.*

had "SEC approval from the USA."

181.    During spring 2013, Labriola, director of marketing for TelexFree, Boston, announced via a TelexFree-approved email that TelexFree was "pulling out of Bank of America."

182.    TelexFree's threatened pull out followed Bank of America's questioning of TelexFree's suspicious, tortious or illegal activity.

183.    During spring 2013, Bank of America had exchanges with TelexFree about terminating their relationship and discontinuing the service of their accounts, but it did not do so until much later.

184.    In an April 2013, TelexFree-approved internet video, Defendant Crosby stated "[t]his company has a joint venture with Best Western."  TelexFree did not have the described business relationship with Best Western.

185.    During spring 2013, the TelexFree website and its president and principal Merrill also falsely promoted the Best Western offer.

186.    In or about May 2013, Defendant Miller appeared in an internet video deceptively touting TelexFree as an opportunity to earn "not just wealth, but generational wealth," which was posted on YouTube and widely distributed via social media, and in which he maliciously boasted of his earnings through TelexFree and encouraged others to join the Scheme.[11]

187.    As part of the June 13, 2013 Court in Acre's Public Prosecutor's injunction, TelexFree Brazil faced fines of R$100,000 a day ($42,500 USD) if they signed up any more Brazilian affiliate investors or paid out any existing ones.

---

[11] See Administrative Complaint of instituted by the Secretary of the Commonwealth of Massachusetts, Securities Division, Dkt. No. 2014-0004, page 39, attached as Attachment 36 to Exhibit 3, Decl. of Gray Echavarria.

188.     On June 19, 2013, the Brazilian Court in Acre issued an injunction putting "a stop to TelexFree Brazil's business operations, including the registration of new affiliate investors, acceptance of new investments and paying any returns owed on existing affiliate investments."[12]

189.     On or about June 20, 2013, after the Court in Acre suspended TelexFree Brazil's activities, TelexFree Principals Merrill and Wanzeler and TelexFree Executive Office employee Labriola all maliciously made false, deceptive and misleading statements in a TelexFree-approved video intended to reassure United States Promoters.  For example, Merrill stated that "[i]nquiries like this are very common in network marketing . . . . We have such unbelievable growth that we're going to draw attention."

190.     Labriola stated that "[t]hese things happen to network marketing companies over and over again…  Let's not worry about it."

191.     Wanzeler added that "[w]e're still here.  We're going to stay here for a long time."

192.     During or before June 2013 (and within weeks of having their Brazilian operation shuttered), Wanzeler, Merrill, Labriola and Costa, with the participation and assistance of others including the Defendants named in this complaint, placed an increased focus on and rapidly expanded their fraud in the United States under the name TelexFree.

193.     During or before June 2013, and after shifting its geographic target market to the United States, TelexFree Top Level Promoters were recruited by Wanzeler, Costa, Merrill, Labriola and others and began to target the Brazilian-American and Dominican-American communities in the United States.

194.     In July 2013, Newport Beach, California became the staging ground for

---

[12] Id.

TelexFree's first United States-based "Extravaganza."  This was approximately one month after the Brazilian Court in Acre had frozen TelexFree's Brazilian assets and enjoined TelexFree from any further membership or registration related efforts in Brazil,

195.    The July 2013 TelexFree "Super Weekend" was organized by Zeek Rewards' high-profile pitchman Thomas More.[13]

196.    Thomas More was a key spokesperson and authorized representative for Zeek Rewards.  More held out that he had acquired over a million Zeek Rewards VIP points and otherwise greatly profited (from the fraud) while it lasted.

197.    At the time More organized TelexFree's Newport Beach "Super Weekend" extravaganza, he was a named defendant in a Zeek Rewards Ponzi scheme-related lawsuit.[14]

198.    During the July 2013 "Super Weekend," Defendant Miller took the stage and falsely promoted a connection and promotion with Best Western Hotel.

199.    During the July 2013 TelexFree "Super Weekend," Attorney Defendant Nehra gave his "blessing" to TelexFree, representing not only that it was a lawful enterprise and why, but also that he was a duly licensed attorney with extensive specialized skill and experience in MLM.[15]

200.    During or about August 2013, Defendant Attorney Jeffery Babener, of the Law Firm Babener & Associates advised TelexFree Principals, Executive Office, Licensed Professionals and others that TelexFree's business model, operations and payout scheme were an unlawful MLM and must be changed.

---

[13] In a widely viewed internet video of the event titled "TelexFree Corporate Speakers at Newport Beach Extravaganza," Merrill specifically thanked Tom More for putting it together.

[14] *See* Exhibit 4, Decl. Carol L. Harris, Exhibit 14.

[15] *Id.*

201.     During or about August 2013, Attorney Babener advised TelexFree Principals,

Executive Office, Licensed Professionals and others that the TelexFree MLM violated M.G.L.

c. 93, §69 and, thus, M.G.L. c. 93A.

202.     In or about August 2013, Brazilian Judge Braz Aristóteles dos Reis found that, in

the public eye, TelexFree (Brazil) and Ympactus are one and the same company.

203.     On August 19, 2013, the TelexFree FaceBook page falsely posted the following:

"The President of Google involved with Telexfree!!  Google's President will be speaking at our

next Telexfree event in Brazil….11 year contract with Best Western 23 Millionaires in 1 year

and now Google's President at our Next event.  Hmmmm is he coming to your's [sic]?.  Didn't

think so....  It's time to get educated.  You get what you pay for!"

204.     In fall 2013, the Secretary of the Commonwealth of Massachusetts, Securities

Division ("SOC") raised questions concerning TelexFree's business model.

205.     In late 2013, Costa withdrew his ownership in Ympactus.

206.     Between mid-November 2013 and March 2014, TelexFree transferred

approximately $30 million from its operating accounts to its Principals and officers and to

affiliate companies with the necessary assistance of the Financial Services Provider Defendants.

207.     On or before December 2013, Craft was hired to serve and did thereafter serve as

TelexFree, LLC's chief financial officer.

208.     In a January 2014 TelexFree promotional video, Labriola misled potential

Promoters with the intent that they invest in TelexFree by stating that "[t]here are some people

that are making incredible money in this."

209.     In January and February 2014, the SOC issued subpoenas.

210.     On February 19, 2014, the National Bank of Rwanda, in conjunction with the

Ministry of Trade and Industry of Rwanda, issued a report concluding that TelexFree's Rwanda-based affiliate, P.L.I. TelexFree Rwanda, Ltd., was a pyramid scheme and could facilitate money laundering, and that the Ministry of Trade and Industry subsequently banned any further operations in the country by TelexFree.

211.    On February 20, 2014, United Kingdom authorities issued a public warning that TelexFree UK was a Ponzi scheme and that its Brazilian operation had been shut down.

212.    During late February 2014 through early March 2014, TelexFree Principals, Executive Office, Licensed Professionals and Top Level Promoters developed during teleconferences strategies to siphon off funds and maximize the exploitation of the rank and file TelexFree Promoters.

213.    During or about late February 2014 through early March 2014, TelexFree Principals, Executive Office, Licensed Professionals and Top Level Promoters held an invitation-only meeting at TelexFree's Marlborough, Massachusetts headquarters with the intent of siphoning off funds and maximizing the exploitation of the rank and file TelexFree Promoters.

214.    On March 9, 2014, TelexFree unilaterally changed its compensation plan, for the first time requiring existing Promoters to actually sell its VoIP product to qualify for the payments that TelexFree had previously promised to pay them.  Before making the change, TelexFree informed its highest grossing Top Level Promoters of the impending change in compensation and held a strategy meeting during which they discussed unfair, deceptive and unlawful ways to further fleece the rank and file TelexFree Members and ways to continue to profit from the unlawful business.

215.    The March 9, 2014 TelexFree compensation plan change generated a storm of protests from Promoters who were unable to recover their money.

216.    On March 9, 2014, Steven Labriola and others traveled to Haiti and made public that they arrived via private jet, and once on the ground, proclaimed "we got in the Prime Minister of Haiti's motorcade."

217.    On April 1, 2014, dozens of Promoters descended upon TelexFree's Marlborough Office to protest the March 9 change and to attempt to reclaim their money.  They left empty-handed.

218.    On April 14, 2014, TelexFree, Inc. along with two affiliated companies, TelexFree, LLC and TelexFree Financial, Inc. (together, the "Bankrupt Companies"), filed for Chapter 11 bankruptcy protection in Nevada claiming that TelexFree revenues were insufficient to meet its obligations.

219.    On or about April 15, 2014, the United States Department of Homeland Security, the Federal Bureau of Investigation (the "FBI") and others raided the offices of TelexFree, shutting down its operation, seizing records and other evidentiary items.

220.    On May 9, 2014, the United States Department of Homeland Security filed criminal proceedings against two of TelexFree's Founders, Wanzeler and Merrill, for conspiracy to commit wire fraud.

221.    Thereafter, the United States Department of Justice (the "DOJ") brought charges of wire fraud and conspiracy to commit wire fraud against TelexFree's owners Wanzeler and Merrill, and the same were indicted by grand jury on July 23, 2014.

222.    TelexFree's other Principals and Operational Defendants are currently under state and federal investigation, and some are the subjects of lawsuits by the Securities and Exchange Commission ("SEC") and the SOC for operating a Pyramid Scheme as detailed herein.

223.    The DOJ announced at the March 3, 2015 status hearing in the above-captioned

MDL 2566 that undisclosed Financial Service Providers are also the subjects of its ongoing investigations.

       **B.**   TelexFree's History, Formation and its Brazilian Links

     224.    In or about 2007, Wanzeler, Merrill, Costa and other Defendants began operating or assisting in the operation of purported telecommunications businesses in the United States and Brazil, under the names "Brazilian Help" and "Disk A Vontade Telefonia," respectively, charging $49.90 monthly for VoIP service.

     225.    Disk A Vontade Telefonia, Ltd., also known as Diskavontade, also known as Disk ("Disk A Vontade"), is a Brazilian limited liability company, now or formerly having its principal offices as Rua Jose Luiz Gabeira, NRO 170, APTO 103 Barro Vermelho.

     226.    Defendant Wanzeler is the chief executive officer of Disk A Vontade.

     227.    Defendant Merrill is vice president and a signatory of Disk A Vontade.

     228.    Disk A Vontade's domain ("discavontade.com") is registered to Defendant Wanzeler.

     229.    Brazilian Help, Inc. ("Brazilian Help") is a domestic profit corporation, organized and existing under the laws of the Commonwealth of Massachusetts, now or formerly having a principal place of business at 225 Cedar Hill Street, Suite 118, in Marlborough, Massachusetts 01752.

     230.    Brazilian Help's Massachusetts office is in the same building in Marlborough, Massachusetts as the Bankrupt TelexFree Companies.

     231.    Defendant Wanzeler is the president, secretary, treasurer, and registered agent of Brazilian Help.

     232.    Brazilian Help and Disk A Vontade were the American and Brazilian branches, respectively, of the same enterprise.

233.    Costa, a longtime friend of Wanzeler, was employed by Disk A Vontade and was Wanzeler's top sales agent in Brazil.

C.  Ympactus, TelexFree's Brazilian-Based Operations

234.    Ympactus is a Brazilian limited liability company, which served as TelexFree's Brazilian branch.

235.    Wanzeler, Costa and Merrill have jointly controlled Ympactus.

236.    The records of the SOC demonstrate no meaningful distinction between U.S. TelexFree operations and Brazilian operations.

237.    As described by TelexFree management, the ownership interests in TelexFree, Inc. (Massachusetts-based), TelexFree LLC (Nevada-based) and Ympactus (Brazilian-based) overlap.

238.    At all times there has been a high degree of operational interdependence among Ympactus and the TelexFree entities and, in many ways, the operations of these entities are indistinguishable.

239.    Paragraph 2.1.2 of the standard TelexFree Pre-March 9 Contract with its Members states "TELEXFREE INC, from its headquarters in, Marlboro [sic], Massachusetts (U.S.), on the basis of an operating contract between the latter and the CONTRACTOR (YMPACTUS), has as its primary activity VoIP telephony, using its equipment installed at its headquarters in Massachusetts, where it makes the necessary connections for these calls; it also provides virtual media, through the website www.telexfree.com to associates and to the Promoters that YMPACTUS/TELEXFREE coordinates and controls, including the respective publicity channels."[16]

---

[16] *See* TelexFree Pre-March 9 Contract, attached herewith as Exhibit 1.

240.   This contract was made available to each Defendant at or prior to the time they became involved with TelexFree.

241.   Each of the Financial Services Defendants was obligated to, and did review the TelexFree contract during its Know Your Customer investigation, analysis and monitoring.

242.   The TelexFree entities used the same executives, management, employees, back office support, physical address and offices, merely providing identical information in multiple languages and under a different name in part after Ympactus was shut down and had its assets seized.

243.   At times relevant to this complaint, TelexFree used essentially identical fraudulent income generation methods as Ympactus.

244.   At times relevant to this complaint, TelexFree used essentially identical promotional materials and marketing techniques as Ympactus.

245.   In January 2013, Ympactus came under legal scrutiny in Brazil by the Brazilian Bureau of Consumer Protection (known as Procon).  Suspicious of the company's rapid recruitment of new investors and lack of substantial sales, Brazilian authorities opened an investigation against Ympactus.

246.   In late 2013, Costa withdrew his ownership in Ympactus for what Merrill characterized as "legal reasons."[17]

247.   Both Merrill and Wanzeler provided testimony to the SEC stating that they transferred at least $3 million to Costa long after Brazilian authorities shut down Ympactus operations.[18]  This was accomplished only with the necessary assistance of the Financial Services

---

[17] See Administrative Complaint of instituted by the SOC, Dkt. No. 2014-0004, page 7, attached as Attachment 36 to Exhibit 3, Decl. of Gray Echavarria.
[18] Id.

Defendants.

248.    The TelexFree entities use the same website and back office support as Ympactus, providing identical information in multiple languages.

249.    Since at least February 15, 2012, there has been a high degree of operational interdependence among TelexFree entities and Ympactus, and, to sophisticated banks and payment processors, the operations of these entities were related.

250.    The TelexFree entities and Ympactus shared common management and ownership.

251.    For example, both Merrill and Wanzeler, self-proclaimed Founders of TelexFree, hold 50% ownership interest in the United States entities and 20% and 40% interests respectively in the Brazilian entity.

252.    At times relevant to this complaint, Costa, head of Brazilian operations and longtime friend of Wanzeler, was an owner of TelexFree, LLC.

253.    More particularly, and at least since February 15, 2012, Defendants Merrill, Wanzeler, Labriola, Craft and Costa have together owned, managed and/or operated the TelexFree entities and Ympactus with no distinction among these entities other than Ympactus' Brazilian operations being shut down by Brazilian authorities.

254.    The TelexFree entities and Ympactus have also shared common financial, strategic, legal and human resources.

255.    TelexFree entities and Ympactus were both wrongfully, fraudulently, unfairly or deceptively organized from the start to unlawfully convert, divert, launder or shelter funds rightfully belonging to Plaintiffs and the putative class.

   **D.**  The Bankrupt TelexFree Companies

256.    Between mid-November 2013 and April 17, 2014, TelexFree, Inc. and TelexFree,

LLC transferred approximately $30 million from their operating accounts to accounts owned and controlled by TelexFree, its affiliated companies or the individual Defendants.

257.    Defendant Ann Genet served as TelexFree's advisor and person on the ground in Nevada.

258.    The investment funds of the putative class inflated TelexFree accounts by hundreds of millions of additional dollars.

259.    The funds of the putative class remain unaccounted for to date.

**E.**   TelexFree, Inc.

260.    Common Cents Communications, Inc. was formed by Merrill, Wanzeler and Labriola in December 2002.

261.    Common Cents Communications, Inc. was a predecessor enterprise to TelexFree, Inc.

262.    In 2012, Costa suggested to Wanzeler that they begin soliciting customers in the United States through online advertisements.

263.    Acting on Costa's proposal, Wanzeler and Merrill changed the name of Common Cents Communications, Inc. to TelexFree, Inc. on February 15, 2012.

264.    Wanzeler and Costa also caused the website, "www.telexfree.com" to be created.

265.    Disk A Vontade was the registered owner of the telexfree.com domain name.

266.    By February 15, 2012 and until approximately April 15, 2014, TelexFree, Inc. maintained a principal office at TelexFree's Marlborough Office.

267.    Co-Defendants Merrill and Wanzeler are officers and directors of TelexFree, Inc., a domestic profit corporation.

268.    Beginning on March 15, 2005, Merrill served as registered agent of Common Cents Communications, Inc., and continued as registered agent thereof after the change of name

to TelexFree, Inc.

269.     Since February 15, 2012, Merrill has maintained a registered address for service of process at TelexFree's Marlborough Office.

270.     Merrill, Wanzeler, Labriola, Craft, Costa, Oliveira and Moreira conducted the business of TelexFree, Inc. in TelexFree's Marlborough Office.

**F.** TelexFree, LLC

271.     In July 2012, Wanzeler, Merrill and Costa together formed TelexFree, LLC.

272.     Telex Free, LLC was organized under the laws of the State of Nevada on July 19, 2012.

273.     TelexFree, LLC was wrongfully, fraudulently, unfairly or deceptively organized from the start to unlawfully convert, divert, launder or shelter funds rightfully belonging to Plaintiffs and the putative class.

274.     There is no distinction between the business operations of TelexFree, LLC and TelexFree, Inc.

275.     At all material times, TelexFree LLC was identified as a limited liability company as registered with the Corporations Division of the Secretary to the Commonwealth of Massachusetts (Identification Number 001105166).  TelexFree, LLC registered with the Secretary of State for the Commonwealth of Massachusetts on April 18, 2013.

276.     TelexFree, LLC maintained an address at the Nevada Post Office Box.

277.     At least between February 15, 2012 and approximately April 15, 2014, TelexFree, LLC operated a Massachusetts office at TelexFree's Marlborough Office.

278.     At all material times, Co-Defendants Costa, Merrill and Wanzeler were the managers of TelexFree, LLC.

279.     At least between February 15, 2012 and approximately April 15, 2014, Merrill

43

was TelexFree, LLC's registered agent for the Commonwealth of Massachusetts whose address

is identified as TelexFree's Marlborough Office.

280.     At least between February 15, 2012 and approximately April 15, 2014, Merrill,

Wanzeler, Labriola, Craft, Costa, Oliveira and Moreira conducted the business of TelexFree,

LLC in TelexFree's Marlborough Office.

     **G.** TelexFree Financial, Inc.

281.     Defendant Craft incorporated TelexFree Financial on December 26, 2013.

282.     TelexFree Financial was wrongfully, fraudulently, unfairly or deceptively

organized from the start to unlawfully convert, divert, launder or shelter funds rightfully

belonging to Plaintiffs and the putative class.

283.     At all material times, Co-Defendants Merrill and Wanzeler were officers and

directors of TelexFree Financial, and Co-Defendant Wanzeler is its registered agent.

284.     On December 30 and December 31, 2013, TelexFree Financial received wire

transfers totaling $4,105,000 from TelexFree, Inc. and TelexFree, LLC.

285.     On April 14, 2014, Defendants TelexFree, Inc., TelexFree, LLC and TelexFree

Financial abruptly sought bankruptcy protection in Nevada under the United States Bankruptcy

Code, Chapter 11, admitting that they could not meet their obligations from VoIP revenues and

seeking authority to reject all their current obligations to Promoters.

     **H.** Relationship of the Bankrupt TelexFree Companies

286.     Since at least February 15, 2012, there has been a high degree of operational

interdependence among TelexFree, LLC, TelexFree, Inc., and TelexFree Financial, and the

operations of these entities are indistinguishable.

287.     TelexFree, LLC, TelexFree, Inc. and TelexFree Financial shared common

management and ownership.

288.    More particularly, and at least since February 15, 2012, Defendants Merrill, Wanzeler, Labriola, Craft and Costa have together owned, managed and/or operated TelexFree, LLC, TelexFree, Inc., and TelexFree Financial with no distinction among these entities.

289.    At least between February 15, 2012 and approximately April 15, 2014, funds were freely transferred between and among TelexFree, LLC, TelexFree, Inc., and TelexFree Financial with no distinction among these entities.

290.    TelexFree, LLC, TelexFree, Inc., and TelexFree Financial have also shared common financial, strategic, legal, and human resources.

291.    TelexFree, LLC, TelexFree, Inc., and TelexFree Financial are alter ego entities that combine to form a single enterprise.

**I.**    Defendants Electric and Mobile

292.    Mobile is a Nevada corporation formed on November 26, 2013.

293.    According to its filings with the State of Nevada Secretary of State Office, Mobile identifies its officers and directors as follows:

- Defendant Merrill is president, secretary and director, having an address at the Nevada Post Office Box;

- Defendant Wanzeler is treasurer and director, having an address at the Nevada Post Office Box;

- Defendant Ann Genet served as their advisor and person on the ground; and

- Defendant Craft provided essential services and integral advice, without which Mobile would not have been able to operate.

294.    TelexFree, Inc. and TelexFree, LLC made a $500,870 "loan" to Mobile during the class period, as indicated by financial statements prepared by Craft.  The loan was a sham.

295.    Wanzeler and Merrill formed Electric in December 2013 as a Nevada limited liability partnership.

296.    Defendant Ann Genet served as Mobile's, Electric's and all TelexFree entities'

advisor and person on the ground.  Defendant Genet provided essential services and integral

advice, which Electric and the other TelexFree Defendants used to further and operate the

Pyramid Scheme.

297.    Defendant Craft provided essential services and integral advice, without which

Electric would not have been able to operate.

298.    According to its filings with the State of Nevada Secretary of State Office, Co-

Defendants Merrill and Wanzeler are Electric's general partners.

299.    Merrill and Wanzeler further list their addresses as the Nevada Post Office Box.

300.    Electric also lists its address as the Nevada Post Office Box.

301.    TelexFree, Inc. and TelexFree, LLC made a $2,022,329 "loan" to Electric during

the class period, as indicated by financial statements prepared by Craft.[19]  The loan was a sham.

302.    The loan was a sham carried out by Craft to wrongfully, fraudulently, unfairly or

deceptively convert, divert, launder or shelter funds invested by Plaintiffs and the putative class.

303.    Electric and Mobile possess funds rightfully belonging to the putative class.

**J.**    **TelexFree's Founders and Principals, Executive Officers and Top Level Promoters**

304.    At all material times Merrill was:

- President, secretary and director of Defendant Mobile and a general partner of Defendant Electric;

- Founder, president, secretary, and director of third-party TelexFree, Inc.;

- Founder and manager of third-party TelexFree, LLC, and was listed with the Massachusetts Secretary of State Corporations Division as an authorized person to execute, acknowledge, deliver, and record any recordable instrument purporting to affect an interest in real property; and

---

[19] See TelexFree, LLC Balance Sheet as of December 31, 2013, a true and correct copy of which is attached hereto as Exhibit 5.

- Founder, president, secretary, and director of third-party TelexFree Financial.

305.    Merrill regularly discussed TelexFree's suspicious, tortious or unlawful business operations with his brother Defendant John Merrill who provided him with advice, services and access to banking.

306.    At all material times, Wanzeler was:

- Founder and general partner of Defendant Electric and Founder, treasurer and director of Defendant Mobile;

- Founder, treasurer and director of third-party TelexFree, Inc.;

- Founder and manager of third-party TelexFree, LLC; and

- Founder, vice-president, treasurer, and director of third-party TelexFree Financial and was listed with the Massachusetts Secretary of State Corporations Division as an authorized person to execute, acknowledge, deliver, and record any recordable instrument purporting to affect an interest in real property.

307.    At all times relevant to this complaint Labriola was:

- Director of Common Cents Communications, Inc., the predecessor of TelexFree, Inc., in its filed Articles of Incorporations with the Massachusetts Secretary of State Office.

- TelexFree's international sales director;

- TelexFree's frequent authorized spokes-person; and

- a member of TelexFree's Executive Office.

308.    At all material times Costa:

- was a Founder, Principal, and a member of TelexFree's Executive Office;

- was a Founder of TelexFree, LLC;

- was a manager of TelexFree, LLC with the Massachusetts Secretary of State Corporations Division;

- made use of the laws, rights and protections of the Commonwealth of Massachusetts; and

- attended meetings at TelexFree's Marlborough Office.

309.    While at TelexFree's Marlborough Office headquarters, on phone conferences and while located elsewhere, Costa unfairly and deceptively conspired with other Defendants to carry on TelexFree's unlawful enterprises.

310.    At times relevant to this complaint, Costa and Craft:

- directly made unfair and deceptive misrepresentations to the putative class;

- transacted business in the Commonwealth;

- contracted to supply services or things in this Commonwealth;

- advanced TelexFree's unlawful enterprise;

- caused tortious injury by an act or omission in this Commonwealth;

- advanced TelexFree's unlawful enterprise;

- otherwise regularly did or solicited business, and engaged in persistent courses of conduct in the Commonwealth of Massachusetts; and

- otherwise derived substantial revenue from TelexFree's and other goods used or consumed or services rendered in this Commonwealth.

311.    At times relevant to this complaint, Craft:

- was a certified public accountant who maintained offices in Indiana and in Kentucky under the name Joe H. Craft, CPA/PFS, CFP;

- served as the chief financial officer of third parties TelexFree, Inc. and TelexFree, LLC;

- prepared and approved the financial statements for third parties TelexFree, Inc. and TelexFree, LLC; and

- was a member of TelexFree's Executive Office.

312.    Katia Wanzeler was at all times relevant to this complaint Wanzeler's partner and co-conspirator in TelexFree's unlawful enterprise.

313.    Katia Wanzeler actively assisted her husband, Carlos Wanzeler, in fraudulently stealing and laundering funds that were derived from the TelexFree Pyramid Scheme, and in converting said funds to their private use.

314.    At all times relevant to the Complaint, Defendants Oliveira's and Moreira's roles and services were as essential implementers of TelexFree's overall Pyramid Scheme as well as its supporting systems at the TelexFree home office.

315.    At all times relevant to this complaint, Rodrigues was a TelexFree Top Level Promoter.

316.    At all times relevant to this complaint, De La Rosa was one of TelexFree's Top Level Promoters.  De La Rosa appears in internet videos promoting the TelexFree Program and is one of its most successful Promoters, having recruited numerous other Promoters within the Dominican community in Massachusetts and elsewhere.

317.    At all times relevant to this complaint, Crosby was a TelexFree Top Level Promoter.  Crosby appears in internet videos promoting the TelexFree Program and is one of its most successful Promoters, having recruited numerous other Promoters, primarily through a website known as "everybodygetspaidweekly.biz," in Massachusetts and elsewhere.

318.    At all times relevant to this complaint, Defendant Miller was a TelexFree Top Level Promoter.  Miller appeared in internet videos promoting the TelexFree program, giving numerous "tutorials," and was one of its most successful at doing so, having recruited numerous other Promoters, primarily through his personal YouTube page at "https://www.youtube.com/user/TelexFreeTrainer" in Massachusetts and elsewhere.

319.    At all times relevant to this complaint, Defendant Miller was a career MLM promoter, doing business primarily through his YouTube page at "https://www.youtube.com/user/TelexFreeTrainer" and "www.join-getpaid-period.com," using many of the same graphics and techniques he used as a TelexFree Promoter.

320.    At all times relevant to this complaint, Sloan was a TelexFree Top Level

Promoter.  Sloan appears in internet videos promoting the TelexFree Program, and is one of its

most successful Promoters, having recruited numerous Promoters.  Sloan promoted TelexFree

through a website known as "telexfreepower.com."

321.    At all times relevant to this complaint, Shoyfer was one of TelexFree's Top Level

Promoters, managing a large network of TelexFree Members in New York City.  Shoyfer

recruited many Promoters through public meetings that he arranged and held in New York City.

Shoyfer's TelexFree network had Members in other states as well, including Massachusetts.

322.    TelexFree changed its compensation plan on or about March 9, 2014, much to the

fury of affiliates, noted below.  Shoyfer, however, continued to promote it unremittingly, sending

group text messages to his network with such as the following:

> Hey..my team Telexfree! ! And here we go again..Come to check out and learn
> about new compensation plan TF 2.0.. and how to grow it even faster and MUCH
> more aggressively and efficiently than the one we had before.…Here is this week's
> schedule. . Monday 03/24 at Salon Delacqua (2027 86 str) at 8.00 pm (in English)
> ..Wednesday 03/26 at SOHO launch(2213 65th street) at 7.45 pm ( in Russian)
> and Thursday 03/27 at 7.30 pm at 63-112 Woodhaven Blvd in a real estate office.
> In my case, since I have started from absulute zero during this passed week Mon
> 03/17- Sun 03/23/14 I booked 11,500 from new one and 21,600 still coming from
> old plan..A total of 31,100 in 7 short days… Go Telex!!!

323.    After the institution of the new TelexFree compensation plan in March 2014,

Shoyfer took part in a closed meeting with TelexFree's directors and owners in Marlborough,

Massachusetts, at which Shoyfer was instructed not to discuss the new TelexFree compensation

plan with others and non-insiders, as the new compensation plan was detrimental to Promoters

and was adopted to forestall filing bankruptcy."

324.    Shoyfer worked in concert with TelexFree management to dupe people into

enrolling right up until the time of TelexFree's bankruptcy filing.

325.    Filings in the TelexFree bankruptcy case suggest that Shoyfer received nearly

$88,000 from TelexFree in two separate payments just prior to the April 13 bankruptcy filing.

The first, for $9,902.37, occurred on March 21, and the second, for $78,037.33, occurred on March 28.

326.     Opt3 and Borromei have a history of providing technical services within the multilevel marketing industry and hold themselves out as having related specialized knowledge. For example, Borromei previously served as chief information officer of Joystar, Inc., later renamed Travelstar, a multilevel marketing company that collapsed in approximately late 2008, and subsequently entered involuntary chapter 7 bankruptcy.

327.     Opt3 and Borromei intentionally, knowingly, unfairly and deceptively set up TelexFree's United States-based servers in Brazil with the intent of directly furthering, aiding or abetting their unlawful and fraudulent operation, including facilitating the placement of evidence of the Pyramid Scheme beyond the jurisdiction of the United States' courts.

328.     Opt3 and Borromei otherwise intentionally, knowingly, unfairly and deceptively set up TelexFree's United States-based servers and electronic data systems with the intent of directly furthering, aiding or abetting their unlawful and fraudulent operation.

329.     Opt3 presently holds itself out as providing substantial technical services to multilevel marketing companies Healthient, Inc. and Travelstar, Inc.  Borromei serves as chief information officer of Healthient, Inc.

330.     At times relevant to this complaint, Opt3 and Borromei:

- directly made unfair and deceptive misrepresentations to the putative class;
- transacted business in the Commonwealth;
- contracted to supply services or things in this Commonwealth;
- advanced TelexFree's unlawful enterprise;
- caused tortious injury by an act or omission in this Commonwealth;
- advanced TelexFree's unlawful enterprise;

- otherwise regularly did or solicited business, and engaged in persistent courses of conduct in the Commonwealth of Massachusetts; and

- otherwise derived substantial revenue from TelexFree's and other goods used or consumed or services rendered in this Commonwealth

331.    John F. Merrill is the brother of TelexFree Founder and Principal, Defendant

James M. Merrill.  At material times herein, John F. Merrill:

- served as president and chief operating officer of Fidelity Bank;

- personally performed integral services and provided essential advice and assistance, and access to banking services that was used to further TelexFree's unlawful business; and

- personally ensured TelexFree was given access to Fidelity Bank's banking services as well as the national banking system, and those banking services were used to further TelexFree's unlawful business.

332.    Defendant Hughes served as manager and president of Base Commerce, LLC and

personally handled TelexFree's account while providing numerous additional services to

TelexFree.  At times relevant to this complaint, Hughes:

- personally performed integral services and provided essential assistance that was used to further TelexFree's unlawful business;

- personally ensured TelexFree was given access to payment-processing and banking services and those services were used to further TelexFree's unlawful business; and

- personally ensured banking services that were used to further TelexFree's unlawful business, as well as access to the national banking system, were made available to TelexFree.

333.    Sparman served as managing partner and founder of Vantage Payments, LLC and

personally handled TelexFree's account while providing numerous additional services to

TelexFree.  At all material times herein, Sparman:

- personally handled TelexFree's account with Vantage Payments;

- performed integral services and provided essential advice and assistance that was used to further TelexFree's unlawful business;

- personally ensured TelexFree was given access to payment-processing and banking services, as well as the national banking system, and those services were used to further TelexFree's unlawful business; and

- solicited services and negotiated with payment processors on TelexFree's behalf.

334.   Despite having knowledge that TelexFree was an enterprise carrying out unlawful, unfair, or deceptive acts or practices, James Merrill, Carlos Wanzeler, Steven Labriola, Carlos Costa, Joseph Craft, Ann Genet, Ana Paula Oliveira, Andreia B. Moreira, Opt 3 Solutions Inc., Jason Borromei, Katia Wanzeler, Sanderley Rodrigues de Vasconcelos, Santiago de la Rosa, Randy Crosby, Faith Sloan, Daniil Shoyfer, Scott Miller, John Merrill, John Hughes and Dustin Sparman all personally performed integral services and provided essential advice and assistance that was used to further TelexFree's unlawful business and fully and knowingly furthered TelexFree's unlawful Pyramid Scheme.

**K.** TelexFree's Unlawful, Unfair and Deceptive Pyramid Scheme

335.   A pyramid scheme is a fraudulent business operation whereby an individual or organization guarantees and sometimes pays returns to its investors from new money paid into the operation by new victims, rather than from profit earned by the operator.

336.   Typically, operators of pyramid schemes entice new victims by promising guaranteed returns that are short-term returns, abnormally high or unusually consistent.

337.   Pyramid schemes inevitably fail when new investors are not recruited quickly enough to pay the promised returns to the earlier investors.  Typically, this is when the investment is revealed to be an illegal scam.

338.   Financial services providers, including banks and payment processing companies, and Investment Services Providers are required to be on alert for pyramid-type Ponzi schemes because they are one of the most common schemes presently being used by international thieves,

and recently, by organized crime.

339.    Pyramid schemes follow a pattern that is well known to the sophisticated personnel and systems that support financial services providers, including the Defendant Financial Services Providers and Investment Services Providers.

340.    As referenced herein, during the putative class period, the TelexFree Pyramid Scheme made use of pyramid-scheme techniques recognizable or known to the Financial Services Provider Defendants.  They include but are not limited to the following:

341.    **The Hook**:  In a pyramid scheme, potential investors are promised that an investment opportunity will achieve an above normal rate of return on investment that is often specified, or very easy to figure out.  The promised interest rate or return on investment in successful pyramid schemes will be an amount high enough to be worthwhile to the investor but not so high as to be unbelievable.  This is called an "above normal rate of return on investment." In violation of M.G.L. c. 93, § 69, TelexFree promised, and purported to deliver to hard-working Promoters, a return rate of over 200% per year for placing ads and performing the other tasks included in its uniform contract and marketing materials.  This was a false promise, as TelexFree's ability to pay any returns whatsoever was contingent on its bilking new victims.

342.    In a pyramid scheme, in addition to lending credibility to the scam, the high rate of return serves as the goal for others to reach and an encouragement to borrow money or drain one's life savings.  Other frequent reasons used to support the specified "above normal rate of return" include "inside information" or "access to an investment opportunity not available to the general public."  Here, TelexFree falsely promoted its VoIP technology as cutting edge and proprietary.  It was not.  The TelexFree product was a grade below what was available for free via Google Voice or Skype.

343.    **The Scheme is Showered with Credibility**:  The victims of pyramid schemes are always given a believable explanation of how their investment will earn the "above normal rate of return on investment."  The explanation must be good enough to convince people to invest and reinvest their money and importantly, to recruit others.  Many times the founders or those running the company operating the pyramid scheme are described as being highly successful, skilled, trained or educated.  For example here, TelexFree falsely represented on its web site that the Founder and Principal Merrill was a college graduate with specialty degrees in a field related to the product they touted as driving the profit.  TelexFree also deceptively touted its Principals long-term experience and involvement in telecommunications.  Most often, perpetrators of pyramid schemes will hire lawyers, certified public accountants ("CPAs"), or other credible professionals to bless the scam as a legal and sound business opportunity.  The lawyers, CPAs and other professionals vouch for the scam in exchange for payoffs.  They will also often have other seemingly credible persons serve as shills by touting the investment as an incredibly great opportunity that worked for them.  Shills include so-called rock stars and so-called regular people all of whom have "gotten rich quick" through the pyramid scheme.

344.    As referenced herein, TelexFree made use of virtually all of the pyramid-scheme techniques recognizable or known to the Financial Services Provider Defendants.  For example, TelexFree first had Defendant Nehra, an attorney who also heavily promoted himself as having specialized MLM experience, guarantee that TelexFree was a legitimate business enterprise.  It also promoted Nehra's partnership with another leading MLM attorney, Waak.  TelexFree also hired CPA Craft to serve as its chief financial officer.  TelexFree was also publicly tied to Bank of America and TD Bank.  At all times, well-known MLM "professionals" with great experience or success were hired to state on TelexFree's behalf that the Pyramid Scheme was legal and a

good investment.  TelexFree made such use of Rodrigues, De La Rosa, Crosby, Sloan, Shoyfer, Smith and others who made over $500,000.

345.     TelexFree, like other major pyramid schemes before it, also held extravagant conferences at hotels that were beyond the means of its victims and hyped the success of individuals who had supposedly "gotten rich quick" through the scheme.  The owners and a select few top promoters surrounded themselves with rich and lavish settings and publicly boasted of their supposed massive earnings and "rags to riches" stories.

346.     **Initial Investors Paid Off**:  In most pyramid schemes, some initial investors will receive the promised return.  This trick is used to convince victims that the investment is not risky and that a return will be received.  The scammers use smaller payouts to bring in bigger ones.  Payouts are also used to prompt victims to bring in the investment cash of their family, friends, co-workers and others.  It is also used to turn the $100 dollar investor into a $1,000 or $10,000 investor.  Pyramid schemes succeed because the majority of victims invest over and over with larger amounts of cash.  They also unwittingly recommend the scheme to their family, friends, and business associates, as the scam appears to provide them with benefits early on. This is all part of the scammers' deliberate plan.  Scam artists will pay the initial investment money to the investors, plus the specified interest rate or return, to lure in more and greater investments.  Many of TelexFree's Promoters initially invested small sums and then after receiving the above normal rate of return on investment invested a great deal more.  Many convinced their family and friends to invest.  Some Promoters took out loans and others emptied their savings accounts.

347.     **Communicated Successes**:  Pyramid scheme principals and others at the top levels will uniformly and heavily promote success stories and build in a system that

communicates motivating success stories.  The historical success of the investment opportunity is another ploy intended to deceptively lend credibility to the pyramid scheme.  Historically, the most damaging pyramid schemes put victims in a position where they believed convincing others close to them to invest money into the scam was doing them a great favor.  TelexFree showered its investors and potential investors with stories and visuals evidencing big payoffs.  TelexFree positioned its owners and Top Level Promoters as "Rock Stars" and they promoted the above normal rate of return on investment, often with great deal of flourish.  Large-scale pyramid schemes also typically sponsor conferences and events at hotels or exotic locations, as did TelexFree.  Large-scale pyramid schemes also commonly promote success stories involving tales of great income, early retirement or other dreams come true.  TelexFree played each of those angles heavily.  TelexFree spokespersons, including the Top Promoters, often sported expensive attire, and promoted the fact they owned luxury cars and boats, lived in enormous homes, and made their dreams come true.

348.    The Federal Trade Commission first took concerted action against a pyramid scheme in the 1970's.  By the 1990's, the incidence of pyramid and Ponzi schemes was increasing.  Today, they are at epidemic levels.[20]

349.    According to the Securities Exchange Commission (the "SEC") and the North American Securities Administrators Association, scammers pitching phony securities cost U.S. investors between $10 and $15 billion a year – more than a million dollars an hour.  Many of these scams use the Ponzi method – paying off a few early investors with other investors' money

---

[20] *See* Dean Jobb, *People Continue to Fall for Ponzi Scheme Swindlers*, The Chronicle Herald, (Mar. 8, 2015), http://thechronicleherald.ca/thenovascotian/1273451-people-continue-to-fall-for-ponzi-scheme-swindlers; *see also* Benjamin B. Wagner, *Crimes on Main Street Are as Devastating as Those on Wall Street*, United States Department of Justice (Dec. 8, 2104), http://www.justice.gov/usao/priority-areas/financial-fraud/investment-fraud (citing surge in Ponzi scheme cases).

– to stir up business.  Telemarketing boiler rooms, whose frauds cost an estimated $40 billion a year, often run Ponzi schemes.[21]

350.    The Better Business Bureau has labeled Ponzi-style financial rings "the biggest single fraud threat confronting American investors."[22]

351.    Since 2009, the Department has authorized 94 new Assistant U.S. Attorney positions, both criminal prosecutors and civil litigators, to combat financial fraud in districts all across the country.[23]

352.    Enforcement cases brought by the Commodity Futures Trading Commission rose by 45% from September 2010 to September 2011, and the Federal Bureau of Investigation opened more than 1000 new investigations into the existence of such schemes during that same time period.[24]  This represented a 150% increase from 2008.

353.    Enforcement steps are having an impact.  Between fiscal year 2008 and fiscal year 2011, the numbers of defendants prosecuted by the U.S. Attorneys' Offices for securities fraud and other financial fraud offenses increased dramatically each year.  More prosecutions of defendants also mean more restitution orders for victims and more forfeiture of ill-gotten gains.[25]

354.    With respect to the TelexFree Scheme, the Federal Trade Commission stated that TelexFree utilized a pyramid scheme structure offering straight recruitment commissions and

---

[21] Association of Certified Fraud Examiners, *Ponzi Schemes*, (last visited Apr. 30, 2015), http://www.acfe.com/ponzi-schemes.aspx.

[22] *Id.*

[23] Benjamin B. Wagner, *Crimes on Main Street Are as Devastating as Those on Wall Street*, United States Department of Justice (Dec. 8, 2104), http://www.justice.gov/usao/priority-areas/financial-fraud/investment-fraud.

[24] *See* Ben Protess, *Post-Madoff, A Greater Awareness of Ponzi Schemes,* DealB%k (Nov. 14, 2011), http://dealbook.nytimes.com/2011/11/14/post-madoff-a-greater-awareness-of-ponzi-schemes/?_r=0.

[25] Benjamin B. Wagner, *Crimes on Main Street Are as Devastating as Those on Wall Street*, United States Department of Justice (Dec. 8, 2104), http://www.justice.gov/usao/priority-areas/financial-fraud/investment-fraud.

binary recruitment commissions.  These commissions directly compensate existing affiliates upon the recruitment of new affiliates into the scheme.

355.    At times relevant to this complaint, the Defendant Founders, Principals, Executive Office, Top Level Promoters and Associated Individual Defendants knew that TelexFree was a Pyramid Scheme and yet actively assisted and profited thereby.

356.    At times relevant to this complaint, the Defendant Attorneys, Defendant Accountants, other Professional Service Providers, and Persons Associated with them knew that TelexFree was a Pyramid Scheme and yet unlawfully, unfairly or deceptively offered substantial assistance, aided and abetted and profited thereby.

357.    At times relevant to this complaint, the Defendant Financial Services Providers and Investment Services Providers knew that TelexFree was a Pyramid Scheme and yet unlawfully unfairly and deceptively actively offered substantial assistance, aided and abetted and profited thereby and were unjustly enriched.

358.    TelexFree presented itself to the putative class as a marketer of telecommunications.

359.    The records and the TelexFree Pre-March 9 Contract, however, establish that TelexFree did not compensate its "Promoters" primarily for sales of the VoIP product, nor for carrying out legitimate advertising.

360.    TelexFree, with the integral assistance of numerous banks, payment processors, professionals and other third parties, operated an unlawful Pyramid Scheme of nationwide and international scope.

361.    As referenced herein, TelexFree was nothing more than a retooling of its illegal operation in Brazil.

362.   Using run-of-the-mill and essentially borrowed technology, TelexFree rebranded Disc A Vontade's VoIP program, offering it for a flat monthly fee of $49.90.

363.   TelexFree deceptively promoted its unlawful enterprise as offering a cutting-edge VoIP service program called "99TelexFree."

364.   Because it featured an inferior product that offered no improvement over what others Google Voice, Skype, or others made available elsewhere for free, Wanzeler, Merrill and Costa's Disk A Vontade's phone service had been unprofitable.  Departing from the unsuccessful Disk A Vontade business model, TelexFree coupled the VoIP program with a purportedly lucrative and fraudulent scheme.  The VoIP program served purely as a façade.

365.   TelexFree, Inc., TelexFree, LLC and TelexFree Financial, Inc. operated a Pyramid Scheme that defrauded hundreds of thousands of individuals out of hundreds of millions of dollars.

366.   TelexFree was willfully and knowingly, wrongfully and maliciously, unfairly and deceptively organized and maintained.  From the start it was intended to, and did, unlawfully convert, divert, launder and shelter funds invested by Plaintiffs and the putative class.

367.   TelexFree could not have successfully carried out its unlawful enterprise, nor launder or shelter its ill-gotten funds, without the integral assistance of the other Defendants, including the cooperating Defendant financial institutions, payment processing service companies and Operational Defendants.

368.   TelexFree purported to sell internet telephone services but, in actuality, generated its income almost exclusively through its recruitment of "Members" (also referred to interchangeably herein as "Promoters").

369.   TelexFree promised its Promoters a guaranteed return on investment in excess of

200% annually, purportedly in exchange for promoting TelexFree's business.

370.    TelexFree created memberships, known as "AdCentral" packages, which entitled Promoters to be paid for cutting-and-pasting spam advertisements on the Internet, creating the illusion that they were performing valuable services in exchange for compensation.

371.    TelexFree promised its Promoters a guaranteed financial return in exchange for their participation in a passive income scheme.

372.    Promoters were financially motivated to recruit and "build" their own network of new Members because they were promised additional compensation when they did.  TelexFree did not monitor the futile make-work activity of cutting-and-pasting of spam advertisements by its Promoters.

373.    At all times relevant to this complaint, TelexFree and each of its Executives and Top Level Promoters, knew that the purported requirement made upon TelexFree Members to place ads was a sham, yet an integral part of the unfair and deceptive acts and practices necessary to carry out and further their unlawful business enterprise.

374.    At times relevant to this complaint, TelexFree and each of its Licensed Professionals, Financial Services Providers, Investment Services Providers, Top Promoters, and Investment Services Providers also knew that the purported requirement made upon TelexFree Members to place ads was economically worthless, yet an integral part of TelexFree's business enterprise.

375.    Though TelexFree was purportedly a separate and distinct legal entity from Ympactus, Wanzeler, Labriola, Merrill and Costa intermingled the resources and assets of the two businesses including the labor and representation of employees and executives, telephones, addresses, office furniture and space, bank and other financial accounts, finances, computer

network systems, and postage.

376.    Wanzeler, Labriola, Merrill and Costa used the TelexFree entity as a convenient vehicle to re-create in the United States the same massive Pyramid Scheme that they had earlier conducted in Brazil, even to the extent, for example, that both companies also provided the same information on their websites.

377.    Contrary to the malicious, false, unfair and deceptive representations made by TelexFree, the TelexFree VoIP service was not groundbreaking, and offered nothing more than what was and is otherwise available for free.  In fact, the TelexFree VoIP technology was not patented or proprietary.

378.    Wanzeler, Merrill, Labriola and Costa, and those working with them, including the Top Promoters, specifically targeted unwitting purchasers (the Members/Promoters) for memberships that promised annualized returns of over 200% in exchange for placing duplicative advertisements on social media.  The bait for TelexFree's scheme was the right to promote and profit from its VoIP product - an illusory menial task willfully designed to convince purchasers of the legitimacy of the business model.

379.    TelexFree similarly used its membership fees ploy to further grow its unlawful and fraudulent enterprise as well as to unjustly and unfairly line the pockets of the Defendants with profits earned through the victimization of the putative class representatives and the other members of the putative class they seek to represent.

380.    Notwithstanding the earlier shutdown of TelexFree's essentially identical operation, Ympactus, and many other indicators of unlawful business operations, each of the Defendants chose to earn handsome fees for providing services to TelexFree's suspicious and unlawful enterprise.

381.    Over time, TelexFree's revenue from sales of its VoIP service plans only accounted for only approximately $1.3 million (or approximately 0.1%) of the nearly $1.1 billion needed to honor its promises to Promoters.  This was because TelexFree had virtually no legitimate business, and almost all of its receipts were simply new investments of more people duped into expecting sizeable returns.

382.    Financial Services Providers and Investment Services Providers who performed the Know Your Customer investigations and analysis were aware of this because the Red Flags directed them to the suspicious, tortious and unlawful activity referenced herein.

383.    The Financial Services Providers and Investment Services Providers who performed the Know Your Customer investigations and analysis were able to recognize with the help of their robust or sophisticated systems or personnel that TelexFree's actual business was the unlawful recruitment of new Promoters.

384.    With hundreds of thousands of victims, TelexFree appears to be one of the largest, if not the largest, pyramid schemes in history by number of members.

385.    New Promoters generated no income by placing advertisements on the Internet. New Promoters did, however, generate income for TelexFree through the recruitment of more new Promoters who paid its membership fees.  TelexFree's operations were unsustainable without a continuous influx of new capital coming from the recruitment of additional participants.

386.    The income-generating activity that drove TelexFree's unlawful passive income scheme was the payment of a fee in the amount of either $289 or $1,375 to become a Promoter. TelexFree offered options that provided for a tiered return.

387.    The first option was known as the "AdCentral" program.  Participation in

AdCentral cost $289 plus a $50 membership fee for a one-year contract.

388.     The $50 membership fee purchased a purported license to sell the product and entitlement to otherwise profit from various bonus structures and recruitment commissions, including the sale of additional memberships.

389.     Promoters participating in TelexFree through the AdCentral program received ten one-month packages of the VoIP service and in return were instructed to place one internet advertisement a day.

390.     For every week a Promoter placed advertisements, they received one additional VoIP package and were guaranteed a weekly payment of $20 ($1,040 for the entire year).

391.     Each of the Financial Services Provider Defendants was given access to TelexFree's Promotional Advertisements at the commencement of or during its relationship with TelexFree.[26]

392.     Each of the Financial Services Provider Defendants reviewed TelexFree's Promotional Advertisements at the commencement of or during its relationship with TelexFree.[27]

393.     The AdCentral program offered a 207% return on the original amount paid.[28]

394.     The second option, known as the "AdCentral Family" program, cost $1,375 plus the $50 membership fee for a one-year contract, a purported license to sell the product.[29]

395.     Promoters in the AdCentral Family program received fifty-one-month VoIP packages and had to post five advertisements on the Internet daily.[30]

396.     The promotional materials stated that those who posted the required

---

[26] See TelexFree Promotional Advertisements, attached herewith as Exhibit 6.

[27] Id.

[28] Id.

[29] Id.

[30] Id.

advertisements received five additional VoIP packages and were guaranteed a weekly payment of $100 if they did ($5,200 over the year).

397.    The AdCentral Family program offered an annual return of 265%.[31]

398.    The TelexFree advertisement kit enabled participants to be paid for posting pre-written advertisements, to pre-determined websites, through an automated TelexFree system.  A participant's daily posting of advertisements generated payments regardless of whether or not Promoters sold any VoIP Programs.

399.    TelexFree's promotional material stated "(y)ou just place your Ad and get paid weekly regardless of if anyone buys what you are selling or regardless of if you ever recruit a single person into this opportunity or not. . . . Sounds good doesn't it?"[32]

400.    Posting advertisements was an effortless process that took, at maximum, a minute per advertisement.  In fact, TelexFree touted, "We will take care of your add (sic) posting and teach you the trick to submit your five ad (sic) in one click"[33]

401.    Members were not required or expected to close any internet phone sales.

402.    Members were compensated solely for recruiting new Members and for performing the menial, pretextual activity of cutting-and-pasting advertisements.  The posting of these supposed advertisements was meaningless.

403.    Promoters were posting a massive volume of nearly identical ads on the same websites in an already saturated market.  Members were not paid according to how many viewers clicked the ads.

404.    The marketing strategy of TelexFree was to recruit more Promoters, not to sell its

---

[31] Id.

[32] Id.

[33] Id.

VoIP programs.

405.    For example, in early April 2014, Adpost.com had in excess of 33,000 TelexFree ads, and ClassifiedsGiant.com had in excess of 25,000 ads posted since February 1, 2014.

406.    Promoters also had other income options.  For example, he or she could sell the additional VoIP Programs they "earned" back to TelexFree for $20.

407.    The TelexFree passive income scheme generated even further returns for participants through various bonus structures and recruitment commissions.  TelexFree and the Defendant Founders deceptively tailored additional income streams to incentivize recruitment. For example, TelexFree provided marketing materials on its website that current Promoters could download and use to recruit new members;[34] new Promoters were promised a one-time bonus of $20 for each recruited AdCentral member and $100 for each recruited AdCentral Family member; and Promoters who recruited two additional Promoters were promised a bonus of $20 for each direct and indirect participant in their "network," up to a maximum of $440.  All these options were maliciously, willfully and knowingly reverse-engineered to unfairly and deceptively drive membership-related income into TelexFree's coffers and did not drive sales of its VoIP product.

408.    TelexFree's unlawful enterprise was particularly reprehensible because it encouraged its Promoters to unwittingly turn their family, friends and close associates into victims.  TelexFree and the Defendant Founders deceptively tailored income streams to capitalize on the tight social and familial immigrant communities they targeted.  Under a "Team Builder Plan," AdCentral Family Promoters who recruited ten other AdCentral Family members, each of whom sold five VoIP packages (to themselves or others), were promised 2% of

---

[34] Id.

TelexFree's net billing in the following month, up to $39,600.  Promoters were promised commissions based on sales of the VoIP service:  90% for the initial VoIP package sold to a customer he/she recruited, 10% monthly for direct participants who renewed the service, and 2% monthly for each indirect participant who renewed their service down to the sixth level of the Promoter's network.

409.    As represented in the TelexFree website and promotional materials mailed out and handed to participants at TelexFree's "Extravaganzas" by Defendant Principals, Executive Office and Top Level Promoters, a Promoter was allowed to invest in more than one advertisement kit and purchase the VoIP Program to earn bonuses.

410.    A feature of TelexFree's bonus structure and recruitment commissions is the fact that TelexFree participants could self-qualify for sales and commissions.

411.    A Promoter was allowed to purchase a VoIP program, never use the program, and still qualify for additional income.

412.    Therefore, without selling any VoIP programs, the Promoter could receive, or expect to receive, a return far over the 200-250% guaranteed return.[35]

413.    TelexFree's revenue from sales of VoIP programs alone was entirely inadequate to satisfy the payments it promised to Promoters.

414.    According to an investigation conducted by the SEC, between August 2012 and March 2014, TelexFree received slightly more than $1.3 million from the sale of approximately 26,300 VoIP programs, while receiving more than $302 million in investments by Promoters, less than one-half of one percent of total revenue during this period from sales of its purported product.

---

[35] Id.

415.     During this period, TelexFree, the Defendant Founders and Top Level Promoters promised to pay Promoters over $1.1 billion.

416.     TelexFree did not produce anywhere near $1.1 billion dollars in VoIP revenue.

417.     According to an investigation by the SOC, in 2012 and 2013 TelexFree identified 4,845,576 VoIP program transactions totaling $238,395,353.80.

418.     Net revenue received by TelexFree from VoIP program sales was inhibited by substantial commission payments.

419.     In other words, only a trivial number, if any, of non-Promoters purchased the VoIP product.  In his statement to the Massachusetts SOC, TelexFree Founder Wanzeler could not identify the number of individuals who purchased only a VoIP program without also becoming a participant, and provided wildly varied estimates when challenged to identify the number of VoIP programs sold to non-participants.

420.     Over the same period, TelexFree received 783,771 package purchases of either $289 or $1,375 totaling $880,189,455.32.

421.     Under this compensation plan, if each of the 783,771 Promoters invested in only one AdCentral package at $289 and only posted one advertisement per day, TelexFree would have owed Promoters $799,446,420.

422.     Under this compensation plan, if each of the 783,771 Promoters invested in the AdCentral Family package at $1,375 and only posted five advertisements per day, TelexFree would have owed $3,997,232,100 to Promoters.

423.     According to data provided by TelexFree, the $1,375 AdCentral Family memberships accounted for 88% of the transactions by Massachusetts-based participants.

424.     Even assuming that only 50% of all participant memberships were at the

AdCentral Family level, TelexFree would still have owed $2,398,897,200, a number that far exceeded TelexFree's reported total revenues over the same period.

425.    This figure of almost $2.4 billion omits further bonuses, recruitment commissions and revenue sharing; including these additional payments would create an even greater disparity between the VoIP program revenue and the guaranteed money paid out of the passive income scheme to Promoters.

426.    At no time during the class period did TelexFree generate sufficient funds from sales of their phone service to make the payments they had contracted to pay to existing Promoters.  Those funds came from the registration fees of subsequent TelexFree Promoters.

      **L.**  Gallery of Rogues Assembled

        1.   The Seasoned Scam Artists

427.    TelexFree, Wanzeler, Merrill, Costa, Labriola and others enlisted the involvement of persons and entities that operated or otherwise had highly publicized involvement in business models that were later found to be fraudulent and unlawful Ponzi Schemes.

428.    For example, prior to his involvement with TelexFree, Rodrigues was charged by the SEC with operating a fraudulent pyramid scheme under the name of Universo FoneClub Corporation, another Massachusetts corporation formed by Rodrigues, in which he acted as officer and director.

429.    Rodrigues settled these charges in 2007.  As a condition of his settlement, Rodrigues was permanently enjoined from violating Section 10(b) of the Exchange Act and Rule 10b-5, and Sections 5(a), 5(c) and 17(a) of the Securities Act.

430.    As a condition of his settlement, Rodrigues was further ordered disgorged of approximately $1.8 million of related ill-gotten gains.

431.    Rodrigues formed and organized WWW Global Business, Inc. ("WWW Global

Business") on or about February 7, 2013, to market and sell TelexFree Memberships.  WWW

Global Business was and is a "shell" corporation holding no, or virtually no, assets and having

no employees beyond its principal, Defendant Rodrigues, who served as its sole director, officer,

and agent for service.  WWW Global Business was organized for the sole purpose of marketing

and selling TelexFree Memberships, *i.e.* AdCentral packages, and did not engage in the sale of

TelexFree's purported VoIP product.

432.    At all times material herein, WWW Global Business was effectively an alter ego

of Defendant Rodrigues, and furthermore, had no legitimate business purpose, failed to maintain

corporate formalities, had no independent board of directors and otherwise served as a "façade"

for the sole benefit of Defendant Rodrigues.

433.    Rodrigues attended meetings at TelexFree's Marlborough Office headquarters.

While at TelexFree's headquarters, on phone conferences and while located elsewhere, he

unfairly and deceptively conspired with other Defendants to carry on TelexFree's unlawful

enterprises.  Despite having knowledge that TelexFree was an enterprise carrying out unlawful,

unfair, or deceptive acts or practices, Rodrigues personally performed integral services and

provided substantial and essential advice and assistance that were used to further TelexFree's

unlawful business.

434.    Rodrigues's SEC and criminal related history was available to the Financial

Services Provider Defendants while they were carrying out Know Your Customer due diligence

investigations.

435.    TelexFree and the Defendant Founders and Principals willfully and knowingly

utilized Rodrigues.  Rodrigues was allowed to join and market the program despite his previous

criminal convictions.  In fact, Rodriques was selected for a prominent role in TelexFree because

he had experience running a related scam.

436.    Another example is Brandon Bradshaw, who had formerly served as vice president and sales director of AddWallet, a now-defunct pyramid scheme, through March 29, 2013.  AddWallet was a successor to Zeek Rewards, an infamous Ponzi scheme.  Zeek Rewards ran from January 2011 into August 2012 when the SEC shut it down.  The Zeek Rewards Ponzi scheme bilked investors out of a purported $850 million dollars.  Prior to being shut down, Zeek Rewards was alleged to have paid out $350 million dollars to early investors.

437.    Under the guise of a penny auction, Zeek Rewards let its members invest in the company and paid out a daily rate of investment that guaranteed affiliates (investors) that over 90 days, they would receive more than 100% of their investment back.  At the time the SEC shut them down, they only had enough capital to keep the business afloat for 90 days.  AddWallet's business structure was based on Zeek Rewards and was intended to lure in former Zeek Rewards members, many of whom had already lost funds in Zeek Reward's collapse.

438.    In March 2013, AddWallet held a conference call intended to assure investors. During the call, AddWallet representatives assured investors that it was an offshore company and immune from the SEC.

439.    Bradshaw answered most of the questions on the call.  He started by lamenting the loss of Zeek Rewards and highlighting the intentional similarities that exist between it and AddWallet.  He stated that:

- [4:52] "After the fall of the major player Zeek (Rewards), we. . . saw a lot of things there."

- [13:34] "It's unfortunate what happened, a lot of good people got hurt.  I thought Zeek was doing a fantastic job."

- [5:26] "We put a base operating system down.  Yes, it's very much like Zeek when you go into the retail profit pool earnings, you see something that you've seen before."

440.    In August 2013, as the AddWallet scheme dwindled, Bradshaw abruptly left his position with AddWallet, without providing any reason to members.  Almost immediately, Bradshaw was a TelexFree spokesperson.

441.    Bradshaw spoke during a September 6, 2013 TelexFree conference call hosted by Labriola, during which Bradshaw promoted sales of TelexFree memberships and instructed and otherwise provided advice to Promoters and potential Promoters on behalf of TelexFree that furthered its unlawful enterprise.

442.    During the September 6, 2013 TelexFree conference call, Bradshaw advised those on the call of the fastest way to transfer payments of membership fees to TelexFree.  Bradshaw directly made other unfair and deceptive misrepresentations to the putative class that furthered TelexFree's unlawful enterprise.

443.    In 2014, Bradshaw became a co-founder of another pyramid scheme, Genesis Global Network, which was characterized in online promotional materials as "operat[ing] just like Zeek and Add Wallet.  The early members in Zeek earned over $1 Million and this one is better and completely offshore."[36]

444.    Another example is Defendant Miller, another big player in the infamous $850 million Zeek Rewards Ponzi scheme, which had a component similar to TelexFree's AdCentral. Like TelexFree Members, Zeek members were told they got paid for posting ads about the company online.  Zeek Rewards told its "Affiliates" that in order to "earn" their points, they were required to place a short, free digital ad each day on one of the many free classified websites available on the Internet.  According to Zeek receiver Kenneth D. Bell, "[i]n reality the ads were just an attempt to manufacture a cover for what was nothing more than the investment

---

[36] *See* https://www.facebook.com/mlmsuccessgroup/posts/772337832778294; *see also* Exhibit 3, Decl. of Gray Echavarria, Attachment 25.

of money by Affiliates with the expectation of receiving daily 'profit' distributions."  Bell targeted Miller in his prosecution of Zeek's massive Ponzi scheme.  Miller spoke on behalf of TelexFree at TelexFree events and was one of its key pitchmen.

445.    According to a video playing on YouTube, Miller was one of the featured TelexFree speakers at the Newport Beach event.  Members of his group claim in videos that, if one sends $15,125 to TelexFree to purchase a "contract," one will emerge with guaranteed earnings of at least $1,100 a week for a year.  The math of the claim is basically this:  $1,100 a week for 52 weeks equals $57,200.  Subtract the original outlay of $15,125, and emerge with $42,075 on the plus side.

446.    Indeed, TelexFree was at all times relevant to the complaint staffed by what amounted to an "all-star team" of online network marketing scam artists.

### 2.   The Professional Legitimizers' Roles

447.    TelexFree, Wanzeler, Merrill, and Costa also enlisted the involvement of persons and entities who provided advice and blessed, or provided opinions that purported to legitimize, business models that were later found to be fraudulent and unlawful pyramid schemes.  For example, Defendant Attorney Nehra publicly opined, during TelexFree conferences and "Super Weekend" events,[37] as well as in communications with the press,[38] that he had examined TelexFree's business model and determined it to be legal, and that TelexFree "pays ONLY on the sale of its VOIP long distance product."

448.    TelexFree's operations had many signs of unlawful, unfair and deceptive wrongdoing that were highly suspicious and in fact constituted Red Flags recognized by the

---

[37] *See* Exhibit 4, Decl. of Carol L. Harris, Exhibit 14.

[38] *Id.*

Federal Financial Institutions Examinations Counsel ("FFIEC").

449.    Moreover, each Defendant had knowledge of the Brazilian authorities' seizure of Ympactus' assets that were directly connected to Wanzeler, Merrill and Costa.

450.    After authorities shut down TelexFree's Brazilian unlawful predecessor, Ympactus, the Licensed Professionals and Financial Services Providers knew that TelexFree was nothing other than a new entity created by the same principals to engage in the same unlawful enterprise yet did business with it.

451.    At times relevant to this complaint, TelexFree had a website that was managed by its Executives and Executive Office, and designed and maintained by Opt3 Solutions Inc. and Defendant Borromei.

452.    The promotional materials posted online by TelexFree and its Executives specifically referred to income received by Promoters for placing ads as part of the AdCentral Packages as "passive income"[39] in violation of Massachusetts black letter law.

453.    In addition to the March 1, 2013 press release, where Merrill admitted TelexFree did not condition payment actual sales of its VoIP product, the multitude of marketing materials provided on the TelexFree website only contained *a single slide* mentioning the VoIP service.

454.    The great bulk of the content centered on the payment for posting of ads, such as "Work over the Internet Posting ads daily," and the membership commission structure.

455.    The website emphasized the simplicity of its advertising system, stating "TelexFree turnkey marketing system makes internet advertising simply & duplicatelable [sic]," and "[w]e have it all computerized [sic], with only 3 steps, in your virtual office."

456.    All of this served as "Red Flags" to the sophisticated Financial Services

---

[39] See TelexFree Promotional Advertisements, attached herewith as Exhibit 6.

Defendants, Investment Services Providers and Licensed Professionals Defendants, who had sophisticated Know Your Client protocols and systems as well as expertise in MLM.

457.    The Attorney Defendants each provided legal services to TelexFree.

458.    The Attorney Defendants each are self-proclaimed MLM and direct marketing specialist attorneys.[40]

459.    The Attorney Defendants each boast on their respective websites that they have vast knowledge and experience representing MLM and direct-sales clients.[41]

460.    The Attorney Defendants each boast on their respective websites that they have specialized knowledge and experience and can discern between legitimate and lawful MLM and direct-sales ventures and illegitimate and unlawful pyramid or Ponzi scheme ventures.[42]

461.    Nehra and Waak Law Firm, Nehra Law Firm, Waak Law Firm, Nehra and Waak, were also persons who the Financial Services Providers knew had prior involvement in pyramid or unlawful MLM schemes.

462.    There was no clear distinction between Nehra, Nehra Law Firm, and Nehra and Waak Law Firm with regard to the legal services that they provided to TelexFree.

463.    Nehra represented or advised ventures that had been shuttered by state or federal authorities as fraudulent pyramid or Ponzi schemes, including Zeek Rewards and AdSurfDaily, both before and concurrent with Nehra's provision of services to TelexFree.

464.    During the investigation of the AdSurfDaily scheme, Attorney Nehra filed an affidavit in court representing that AdSurfDaily was "not a Ponzi Scheme."

465.    AdSurfDaily's operations were shut down as a Ponzi scheme in 2010.

---

[40] *See* Exhibit 4, Decl. of Carol L. Harris, ¶¶ 6-49, Exhibits 1-14.
[41] *See id.*
[42] *See id.*

466.    Zeek Rewards' operations were shut down as an unlawful pyramid and Ponzi scheme in August 2012.

467.    Nehra's extensive experience with MLM and direct-sales ventures, particularly his involvement with the unlawful AdSurfDaily and Zeek Rewards ventures, armed him with the knowledge of what constitutes violations of United States securities law.

468.    The Attorney Defendants were used in an attempt to hide TelexFree's Pyramid Scheme activity with obfuscating phraseology.

469.    Similar to Nehra, Waak claims to have over thirty years advising MLM and direct-selling enterprises.  Waak claims to have managed the legal defense of multiple class action lawsuits involving claims for "pyramiding, securities fraud, false advertising and civil RICO."

470.    As counsel for TelexFree, the Attorney Defendants had actual personal knowledge of TelexFree's product and business model.

471.    Nehra, negligently or recklessly gave his professional opinion as a duly licensed attorney who specialized in MLM for decades.  He informed the putative class in July 2013 that he had "vetted" and "bless[ed]" TelexFree's business model and operation.[43]

472.    The Attorney Defendants negligently or recklessly drew upon their prior experience to substantially aid, abet, and play an integral role in TelexFree's unlawful, unfair, and deceptive acts and practices during the times relevant to this complaint.

473.    Despite their actual knowledge, rather than decline or cease rendering services to TelexFree, the Attorney Defendants failed to adequately provide even minimally acceptable legal counsel.

---

[43] See Exhibit 4, Decl. of Carol L. Harris, ¶ 19, Exhibit 14.

474.    In spring 2013, TelexFree was forced to focus on new markets, including the United States and Canada, because its Brazilian operations had been shut down and all of its Brazilian assets frozen.  TelexFree used the presence, representations and/or statements of the Attorney Defendants to perpetuate and advance the Pyramid Scheme in those new markets.

475.    Nehra's representations and statements that TelexFree's operations in the United States were legitimate and lawful were part of its total "post Brazilian shut down package."

476.    Nehra was aware of how his representations and statements were being used by TelexFree, yet willingly spoke on behalf of TelexFree at an event dubbed a "Super Weekend" in Newport Beach, California on July 26 and 27, 2013.  His focus at the "Super Weekend" event was to reassure Promoters that TelexFree's United States operations were legitimate, lawful and worthy of investment.

477.    Although at the time of the "Super Weekend," TelexFree's Brazilian bank accounts had been frozen and all of TelexFree's Brazilian recruiting and payments had been suspended by court order in its largest affiliate market, Nehra advised attendees that the shutdown in Brazil would not affect TelexFree's operations in the United States.

478.    Nehra spoke at length during that "Super Weekend" and reassured the attendees of the legality and legitimacy of TelexFree's operations in the United States, stating "It is legally designed . . . you are on very solid legal ground," and that TelexFree's operations had been "vetted by the Nehra and Waak law firm."

479.    Nehra's statements and opinions provided legal representations.  Nehra's statements and opinions constituted legal advice.   Nehra knew that TelexFree's conduct constituted a breach of duty to its Promoters.

480.    In addition, at all relevant times, the Attorney Defendants consented to be and

acted as agents of Telex Free and had authority to represent and bind TelexFree.

481.    As agents of TelexFree, the Attorney Defendants owed a duty to the putative class

not to negligently or recklessly make statements or misrepresentations, or offer incorrect

opinions that would support the TelexFree business model or smooth the way for the additional

influx of membership driven funding.

482.    The Attorney Defendants drew direct financial benefit from assisting TelexFree to

perpetuate and further the Pyramid Scheme to the detriment and loss of the putative class.

483.    Plaintiffs and all other members of the putative class are "Investors" under

Massachusetts state securities law.

484.    However, upon the advice of the Nehra and Waak attorneys, TelexFree referred to

the members of the putative class as "Associates," "Members," and "Promoters."

485.    The TelexFree Pre-March 9 Contract at Section 2.6.5 (m) mandates that

Promoters are not to use the term "investment" regarding the registration costs.

486.    Specifically, the TelexFree Pre-March 9 Contract at Section 2.6.5 (m) provides

that the Promoter must not "use terms that distort the real meaning of products or the mechanism

and functioning of multilevel marketing, including, without limitation, expressions that convey

the idea of instant wealth for nothing in exchange, as well as speaking of registration costs as a

'financial investment.'  Similarly, it is expressly prohibited to use the term 'INVESTMENT' at

meetings and in promotional materials in general, orally or in writing."

487.    TelexFree, the Operational Defendants and the Licensed Professional Defendants,

including the Accountant and Attorney Defendants, provided the bad advice that distorted,

furthered and perpetuated the unlawful, unfair and deceptive Pyramid Scheme.

488.    Promotional materials also falsely represented that TelexFree was a "clean &

scam free business."  (Emphasis in original).

      **M.** TelexFree's Fraudulent and Deceptive Use of Best Western Hotel

489.    In addition to the passive income scheme described above, TelexFree maliciously, falsely and deceptively represented that it had a connection with Best Western Hotel in South America that it could offer to its Promoters.  TelexFree represented that they had an interest in a Best Western but did not.

490.    TelexFree's president Merrill falsely described the Best Western Hotel offer.  His promotion of this false opportunity was an important marketing tool intended to bolster TelexFree's credibility.

491.    TelexFree's management maliciously, willfully, knowingly and deceptively featured the offer of the "Hotel Best Western Opportunity" on the front page of the TelexFree website with an accompanying banner and video.

492.    TelexFree presented this Best Western Hotel opportunity as having a guaranteed yearly return of over 8%.

493.    There was no business relationship between TelexFree and Best Western.

494.    TelexFree, Opt 3 and Borromei willfully and knowingly kept the Best Western Hotel opportunity video deceptively on the United States-based TelexFree website for months, being visible for months after the president of Best Western became aware of the video and requested TelexFree's website staff to remove it as part of its "post Brazilian shut down package."  Defendant Opt 3 lists Best Western Hotel as a client although Best Western International Inc has never actually retained it.

495.    Defendants Opt 3 and Defendant Borromei had actual knowledge of and involvement in TelexFree's false representation concerning the Best Western investment.

      **N.** Investigation of, and Injunctions against, TelexFree's Brazilian Operations in

Brazil

496.     The following activities were taking place as TelexFree was carrying out

approximately $865,893,524.99 in transactions with the Defendant Financial Services Providers

and also as the Financial Advisors were carrying out their role in this massive multifaceted and

multilayered fraud

497.     In or about January 2013, the Brazilian Bureau of Consumer Protection (known as

Procon) began to investigate TelexFree.

498.     In its January 11, 2013 press release, Procon indicated that it had "detected

evidence of crimes":

> The investigation initiated by civil prosecution of Consumer Protection
> (no. 01/2013) shows several controversial issues and possible crimes that
> put consumers at risk in time to accept that kind of deal.
>
> Among the possibilities, there is a breach in the Federal Law No.
> 1.521/51, art. 2, according to which it is a crime:
>
> Obtaining or attempting to obtain illicit gains at the expense of the people
> or of undetermined number of people through speculation or processes
> fraudulent ('snowball', 'chains', 'pichardismo' and any other equivalent)
> including Ponzi pyramid.
>
> There is also the possible violation of the Code of Consumer Protection
> (CDC), with false advertising, failure of product information and
> company, abuse of weakness or ignorance of consumers and conditions
> unreasonable disadvantage, among others.[44]

499.     Procon subsequently initiated an official complaint and notified the "State

Prosecutors Office, the Minister of Finance and the Federal Police."[45]

500.     Shortly after January 11, 2013, Procon's investigation of TelexFree was widely

reported online by English-language media.

501.     On February 15, 2013, the MLM news site BehindMLM.com reported that

---

[44] *See* Exhibit 3, Decl. of Gray Echavarria, Attachment 6.
[45] *See*, Exhibit 3, Decl. of Gray Echavarria, Attachment 38.

TelexFree was under criminal investigation in Brazil for having operated an illegal Ponzi scheme.[46]

502.    On February 17, 2013, A (MLM) Skeptic, an MLM blog, reported that Brazil's Bureau of Consumer Protection had investigated TelexFree upon suspicion of operating a Ponzi scheme, and had subsequently forwarded the case to the State Prosecutor's office for filing of formal charges.[47]

503.    On March 9, 2013, the Ministry of Finance, after its investigation, declared that:

> The TelexFree business of selling packages of internet telephony (VoIP, its acronym in English), is not sustainable and suggests a Ponzi scheme, which is a crime against the popular economy.

> That is the conclusion of the Secretariat for Economic Monitoring of the Ministry of Finance (Seae / MF) in a statement on Thursday (14).[48]

504.    As the matter progressed through the Brazilian court system, the Ministry of Finance was ordered not to issue further statements about the matter.

505.    TelexFree and the Defendant Founders seized upon that fact and circulated through its affiliates the following misleading misrepresentation of the order:

> It's official!  The investigation on TelexFree has been absolved of what Behind MLM has researched and posted.[49]

506.    On June 19, 2013, the Brazilian Court in Acre issued an injunction putting "a stop to TelexFree's business operations, including the registration of new affiliate investors, acceptance of new investments and paying any returns owed on existing affiliate investments."[50]

507.    In addition, following a court order in Brazil by Judge Borges for TelexFree to

---

[46] See Exhibit 3, Decl. of Gray Echavarria, Attachment 6.

[47] *See,* Exhibit 3, Decl. of Gray Echavarria, Attachment 27.

[48] Id.

[49] *See* Exhibit 3, Decl. of Gray Echavarria, Attachment 7.

[50] Id.

turn over "data relating to the registration and operation of the accounts of each of the affiliates, including twelve months of retroactive data," TelexFree claimed it had no access to registrations and transfer accounts of the company's Promoters.

508.   This claim directly contradicts the internet video in which Costa is surrounded by stacks of books he falsely claims holds the requested affiliate data.[51]

509.   At no point did TelexFree sell VoIP products legally in Brazil.

510.   On January 26, 2015, the Brazilian government filed a criminal complaint seeking fines and jail time against Defendant Founders Wanzeler and Costa for their failure to register their offering of VoIP products with the Brazilian National Telecommunications Agency.

**O.** TelexFree's Continued United States' Operations

511.   After the Brazilian government's seizure of Ympactus in June 2013, TelexFree continued to operate its Pyramid Scheme in the United States.

512.   In late summer or fall of 2013, TelexFree retained a consulting group, Defendant Sheffield Group, which also markets itself as having extensive MLM expertise and experience, to review its business plan.   Defendant Sheffield Group is addressed in greater detail below.

513.   Defendant Jeffrey Babener of Babener & Associates and the GSB Attorney Defendants suggested to TelexFree that its business plan was unlawful and needed to be redesigned in the fall of 2013.  Babener, Garvey Schubert Barer and the GSB Attorney Defendants market themselves as having specialized MLM expertise and experience.

514.   Despite being advised of the illegality of the TelexFree program by Babener and Babener & Associates and the GSB Attorney Defendants, TelexFree and its Defendant Founders continued operations with the negligent guidance and advice of the Attorney Defendants without

---

[51] See Exhibit 3, Decl. of Gray Echavarria, Attachment 24; "TelexFree claim no affiliate data, fined again," Behind MLM (Jan. 1, 2014) (explaining Judge Borges' request and TelexFree's contentious response).

modification until March 2014.

515.    Each Defendant knew TelexFree was an unlawful Pyramid Scheme, but continued to participate in or aid, abet and further such illegal activities.  Each Defendant knew that TelexFree was shut down in Brazil, but continued to participate, substantially aid and abet and act to further its unlawful operations and activities in the United States.

**P.**    Collapse of TelexFree's United States Operations

516.    On or about February 5, 2014, the SOC, in connection with an investigation of TelexFree's operations, served TelexFree with subpoenas.

517.    At least six banks, not named here as Defendants, rejected TelexFree's business.

518.    However over several years of operations, TelexFree did employ financial accounts, including domestic and international bank accounts and various online payment processors to carry out and facilitate its fraudulent and deceptive Scheme in the Commonwealth of Massachusetts including a nearly continuous banking relationship with Bank of America and TD Bank.

519.    At least three banks, not named here as Defendants, terminated their relationship with TelexFree as its illegal and tortious operations became apparent.

520.    Emails between TelexFree management and financial institutions painted a bleak picture of TelexFree's continuing financial operations.

521.    In an August 28, 2013 email to Defendants Merrill, Craft and Wanzeler, Defendant Hughes, President of Base Commerce, a payment processing company serving TelexFree, clearly stated "[n]o US Bank or Processor . . . will accept your [TelexFree] business given that you are on month five of the Visa Chargeback monitoring program.  You are

one of only three merchants in the USA on month five so you are a real hot-potato as they say."[52]

522.    Financial institutions were an essential part of the TelexFree Pyramid Scheme and provided substantial assistance or encouragement, without which payments from Promoters could not be obtained or funneled through various shell companies and personal accounts. Without the substantial services of the Financial Service Defendants, TelexFree would not have been able to grow, be maintained or flourish as it did.

**Q. TelexFree's Belated Efforts to Legitimize Its Scheme**

523.    On March 9, 2014, TelexFree abruptly changed its compensation plan, requiring Promoters to sell its VoIP product to qualify for the payments that TelexFree had previously promised to pay them.  A central component of the new change affected the ease of participant withdrawals.  TelexFree Participants could no longer withdraw money, even money already "earned," without making a specified number of retail sales and recruiting several new investors.

524.    These changes were put in place in an attempt to forestall the impending collapse of the scheme.

525.    Following these changes, numerous TelexFree Participants frantically contacted the Office of the Secretary of the Commonwealth.

526.    As it became more difficult to withdraw money from TelexFree, TelexFree switched its compensation plan from one that paid participants in United States currency to one that operated on TelexFree "credits," which were essentially worthless.

527.    The switch from payment in United States currency to payment in "credits" was made without any announcement or forewarning to TelexFree's Members, and was designed merely to forestall the impending collapse of the Scheme.

---

[52] Id.

528.    Furthermore, the value of the "credits" issued by TelexFree was not fixed in relation to any currency, thus giving TelexFree and its Executives the power to alter the value of the "credits" to suit their own interests and avoid compensating TelexFree's Members.

529.    On April 1, 2014, dozens of Promoters descended upon TelexFree's Marlborough Office to protest the changes and to attempt to regain access to their money.  Local media covering the chaos interviewed one Promoter who admitted that the VoIP service is "almost impossible to sell."[53]

530.    On April 14, 2014, TelexFree, Inc., TelexFree, LLC and TelexFree Financial abruptly sought bankruptcy protection in Nevada under Chapter 11, admitting that they could not meet their obligations from VoIP revenues and seeking authority to reject all its current obligations to Promoters.

531.    In furtherance of the enterprise, TelexFree mailed fraudulent and inaccurate 1099 (Miscellaneous Income) forms to Promoters in or about mid-April 2014, an attempt to create the illusion that TelexFree had made payments to Promoters when no such payments were made.

532.    The 1099 forms were provided long after the mandated January 31, 2014 deadline, and some after the April 15, 2014 filing deadline.

533.    TelexFree falsely represented that Promoters had received income that they in fact had not received.

534.    TelexFree's former officers or employees stated to the TelexFree bankruptcy transition team that under the TelexFree Pre-March 9 Contract, TelexFree owed its Promoters

---

[53] *See* Exhibit 3, Decl. of Gray Echavarria, Attachment 33; *see also* Scott O'Connell, "Upset customers look for answers at TelexFREE offices," Wicked Local-Dennis (April 1, 2014 (updated April 17, 2014)), http://dennis.wickedlocal.com/article/20140401/NEWS/140409503?sect=More&map=0.

over $5 billion dollars.

**R.** Events Since TelexFree's Bankruptcy Filing

535.    On April 15, 2014, the SOC filed an Administrative Complaint against TelexFree,

Inc. and TelexFree, LLC, alleging violations of the Massachusetts Uniform Securities Act,

MASS. GEN. LAWS, c. 110A.

536.    The SOC sought injunctions and orders requiring TelexFree, Inc. and TelexFree,

LLC to cease and desist from further conduct violating Massachusetts securities laws and

regulations, to provide an accounting of all proceeds received because of TelexFree's fraud, to

provide restitution to Promoters for losses attributable to the fraud operations, and to disgorge all

profits.

537.    Also on April 15, 2014, the SEC filed a civil Complaint and Jury Demand against

TelexFree, Inc. and TelexFree, LLC as well as Defendants Merrill, Wanzeler, Labriola, Craft,

Rodrigues, De La Rosa, Crosby, and Sloan, alleging violations of the Securities Act of 1933, the

Securities Exchange Act of 1934, and SEC Regulations.  The SEC requested and was granted a

preliminary injunction and an order freezing the assets of TelexFree.  The SEC is also seeking

disgorgement of profits and additional civil penalties.

538.    Additionally, on April 15, 2014, the FBI and the DHS conducted a raid of

TelexFree's Marlborough Office.

539.    During this raid by the FBI and DHS, federal agents apprehended Defendant Craft

as he attempted to leave the building with a laptop and approximately $38 million in cashier's

checks in a bag.  He also tried to leave with TelexFree computer equipment containing

incriminating data.

540.    When questioned, Craft stated to the federal agents he was merely a "consultant,"

and claimed that the checks and computer were "personal."

541.     Defendant Katia Wanzeler was apprehended as she attempted to board a flight to Brazil, on which she had a one-way ticket, cash and seventy pounds of luggage.

542.     On or about May 1, 2014, the Montana Securities Commissioner filed a cease and desist order against TelexFree.

543.     The following day, the United States Bankruptcy Court for the District of Nevada, on motion by the SEC, transferred the matter to the federal district court in Massachusetts, Central Division.

544.     During hearings conducted on May 2, 2014, William H. Runge, III, former Chief Restructuring Officer of TelexFree, estimated that as of TelexFree's bankruptcy filing TelexFree had assets of $31 million in its bank accounts, $28 million in brokerage accounts, and nearly $30 million held by payment processing companies.

545.     The location of hundreds of millions of dollars received by TelexFree from Promoters remains unknown.

**S.**     TelexFree's Principals, Founders and Executive Office Controlled TelexFree, Knowingly Perpetrated the Unlawful, Unfair, and Deceptive Pyramid Scheme and Made False Representations about TelexFree

546.     Defendants Merrill, Wanzeler, Labriola, Craft and Costa were responsible for the control and operation of TelexFree.

547.     These Defendants, TelexFree's Founders and Principals, Executive Office and Top Level Promoters knowingly and willfully conspired to perpetrate, and did perpetrate, the TelexFree Pyramid Scheme with full awareness of its unfair, deceptive, and unlawful nature.

548.     Defendant Merrill served as the president, secretary, and director of TelexFree, Inc.; a manager of TelexFree, LLC; president, secretary and director of TelexFree Financial; general partner of Defendant Electric, and president, secretary and director of Defendant Mobile, and in those capacities, exercised significant control over TelexFree's business operations.

549.    Merrill exercised significant control over the TelexFree Pyramid Scheme.  Merrill has appeared in videos posted to the internet – including, among numerous others, a November 3, 2012 YouTube video entitled "TelexFree James Merrill Brasil,"[54] a June 20, 2013 YouTube video entitled "James Merrill Speaks About TelexFREE BR Investigation,"[55] and the highly promoted "TelexFree 1st Extravaganza" video made available on www.TelexFree.comin which he can be seen promoting TelexFree as a revenue opportunity for Promoters.

550.    Merrill also otherwise made numerous false representations in furtherance of the Pyramid Scheme.

551.    In a March 21, 2014 press release, Merrill misrepresented that TelexFree had been "in the VoIP business for more than a decade."

552.    Through to at least March 28, 2014, the TelexFree website included a biography of Merrill, which falsely stated that Merrill was a 1985 graduate of Westfield State University in economics, and that he is "well versed in one of the new technologies of the era (VoIP)."

553.    According to testimony obtained by the SOC, Merrill attended Westfield State University for a mere two years, without either receiving a degree or declaring a major.

554.    In further direct contravention to the representations made on the TelexFree websites, Merrill also testified to the SOC on March 25, 2014 that he had only a basic understanding of VoIP technology.

555.    Defendant Merrill received $3,136,200 on December 26 and 27, 2013 from one of the named Financial Service Provider Defendants.

556.    Defendant Wanzeler served as treasurer and a director of TelexFree, Inc.; a manager of TelexFree, LLC; vice president, treasurer, and a director of TelexFree Financial;

---

[54] Available at https://www.youtube.com/watch?v=8hYuvWNIL2M.

[55] Available at https://www.youtube.com/watch?v=zO4xe-0tE-4.

general partner of Defendant Electric and treasurer and director of Defendant Mobile, and, according to corporate filings on record with SOC, as the chief executive officer of TelexFree, Inc.

557.    In those capacities, Wanzeler exercised significant control over TelexFree's business operations.

558.    Wanzeler exercised significant control over the TelexFree Pyramid Scheme and participated in marketing TelexFree to potential investors.

559.    Wanzeler appeared in TelexFree videos posted to the Internet in which he willfully, maliciously, unfairly, deceptively:

- promoted TelexFree as a revenue opportunity for Promoters;
- detailed the, unlawful and fraudulent TelexFree Program; and
- made false representations regarding returns.

560.    Wanzeler received $4,317,800 on December 26 and 27, 2013, and wired $3.5 million to the Oversea-Chinese Banking Corporation in Singapore on January 2, 2014.

561.    Defendant Wanzeler utilized the services of Defendants Wells Fargo Advisors and his close friend and Wells Fargo Advisors' employee Cardenas to invest, hide or launder illicit funds in his possession.

562.    Defendant Labriola served as the international marketing director for TelexFree, Inc.

563.    Labriola was one of the original directors and founders of Common Cents Communications, Inc.

564.    At all material times, Labriola exercised significant control over TelexFree's business operations and the operations of its interrelated companies.

565.    Labriola also appeared in several videos posted on the Internet promoting

TelexFree as a revenue opportunity for Promoters, detailing the fraudulent TelexFree program and making false representations regarding returns.

566.    Labriola has acted as TelexFree's spokesman to Promoters during post-bankruptcy petition conference calls.

567.    As a director of TelexFree, Inc., Labriola exercised significant control over the TelexFree Pyramid Scheme.

568.    As international marketing director for TelexFree, Inc., Labriola maliciously and knowingly perpetrated the TelexFree fraud through the dissemination of false and misleading advertising and marketing communications.

569.    Defendant Craft is a CPA and served as the chief financial officer ("CFO") of Telex Free, Inc. and TelexFree, LLC.

570.    In his capacity as CFO of TelexFree, Craft was responsible for preparing or approving TelexFree's financial statements, overseeing TelexFree's accounting methods and records, and otherwise exercising significant supervision and control over TelexFree.

571.    According to the SEC, two companies controlled by Craft received more than $2 million from TelexFree between November 19, 2013 and March 14, 2014.

572.    On April 23, 2013, in response to a request for a profit-and-loss statement issued by the SOC, TelexFree produced a document purporting to be TelexFree's 2012 profit-and-loss statement.[56]

573.    TelexFree did not make use of usual and accepted MLM accounting practices. For example, they did not separate out income generated by sales of VoIP from income generated by other means.

---

[56] See Administrative Complaint of instituted by the SOC, Dkt. No. 2014-0004, page 39, attached as Attachment 36 to Exhibit 3, Decl. of Gray Echavarria.

574.    On February 5, 2014, the SOC requested a second profit-and-loss statement from TelexFree for 2012, which TelexFree produced on February 26, 2014.[57]

575.    A comparison of these two profit-and-loss statements – each purporting to be TelexFree's profit-and-loss statement for 2012 – reveals massive discrepancies (and "conflicting statements").

576.    The first statement provided by TelexFree lists total income for 2012 at $1,864,939.70, while the second lists total income for 2012 at $2,834,835.70.[58]

577.    As further examples, agent commission is listed at $520,582.95 in the first, versus $2,105,925.61 in the second; total expenses are listed as $784,899.22 in the first, versus $2,333,893.09 in the second; net operating income is listed as $1,080,040.48 in the first, versus $478,251.56 in the second; and net income is listed as $1,066,313.39 in the first, versus $477,652.23 in the second.[59]

578.    The existence of duplicative accounting records containing egregious discrepancies indicates TelexFree's falsification of accounting records and negligent failure to adhere to Generally Accepted Accounting Principles ("GAAP").

579.    As CFO for TelexFree, Inc. and TelexFree, LLC, and a certified public accountant, Defendant Craft negligently or recklessly perpetuated the TelexFree unlawful enterprise by:

- overseeing TelexFree's creation of accounting records;
- failing to ensure that GAAP accounting methods were adopted and adhered to;

---

[57] Id.

[58] Id.

[59] Id.

- certifying TelexFree's business operations and accounting practices as good and lawful; and

- concealing that the AdCentral packages purveyed by TelexFree were securities.

580.   Defendant Costa was listed as manager of TelexFree, LLC with the Massachusetts Secretary of State Corporations Division.

581.   Costa is one of the original founders of TelexFree, and was involved in the day-to-day management and oversight of TelexFree and was actively involved in and managed its Brazilian operations.

582.   Costa has appeared on numerous websites and videos posted on the Internet promoting TelexFree as a revenue opportunity for Promoters, detailing the fraudulent TelexFree Program and touting its huge financial return.

583.   In an August 15, 2013 video, Costa fraudulently claims that TelexFree "never was, never will be" an illegal pyramid scheme because of its VoIP sales.  He further misrepresented that "[w]e do not depend on everyone coming in in order to pay the people who are already in."

584.   Costa was an outspoken advocate against the Brazilian Court's decision to enjoin TelexFree's Brazilian activities, and publicly supported TelexFree's illegal and corrupt activities.

585.   On June 25, 2013, in an outright misrepresentation, Costa is videoed displaying an insurance notification representing that it was proof of coverage for Promoters' payments; however, in actuality, the document was a notification denying coverage.[60]

586.   At all times relevant to the Complaint, Defendants Oliveira's and Moreira's roles and services were as essential implementers of TelexFree's overall Pyramid Scheme as well as its supporting systems.  Oliveira and Moreira were key members of TelexFree's home office

---

[60] See http://www.youtube.com/watch?v=q2A2IsAPd0I.

who, at a minimum, offered indispensable substantial assistance to the TelexFree Pyramid

Scheme by interacting on a daily basis with the Founders, Licensed Professionals, Financial

Service Providers and Top Level Promoters.  Oliveira and Moreira directly acted as substantial

contributors to TelexFree's operations.

588.    Oliveira's and Moreira's indispensable services also directly allowed those at the

top of TelexFree's unlawful operation to pilfer, skim and extract staggering profits.

588.    In providing substantial and essential services to the TelexFree entities, Oliveira

and Moreira served as point persons who coordinated and directed, as deemed necessary,

communications among Defendants and other parties that furthered TelexFree's unlawful

Scheme.  More specifically, Oliveira and Moreira each managed day-to-day and operated

TelexFree' Home Office while its executive officers jetted all over the world and lived "the life

of the rich and famous."  Oliveira and Moreira conducted and continued TelexFree's business

operations, and their roles were especially important during the Founder's frequent absences

from the executive office.

589.    Oliveira and Moreira were also the liaisons between TelexFree and Promoters,

managed accounts, oversaw transferred funds, scheduled meetings and negotiated with payment

processors and banks.  Oliveira and Moreira were the two known "Hidden Figures" and had

intimate knowledge of and helped manage the SIG system.  As the principal figures charged with

overseeing TelexFree's SIG system, which tracked and monitored TelexFree's Promoter

transactions, each worked closely with Defendants Borromei, and Wanzeler in that capacity.

Oliveira and Moreira were each a go-to person in TelexFree's Executive Office for outsiders as

well as for those who worked within TelexFree's offices.

590.    Oliveira and Moreira also offered substantial and essential assistance with the

actual sale of TelexFree packages.  Oliveira and Moreira were personally responsible for interacting with Promoters regarding incoming and outgoing transfers.  Their oversight, forethought and institutional knowledge of TelexFree were essential to TelexFree's daily operations, growth and success.

591.   As part of the TelexFree Scheme, Defendants Oliveira and Moreira also worked closely with payment processors on various issues, including establishing accounts and addressing customer payment disputes.

592.   Moreira was instrumental in establishing TelexFree's accounts with payment processors, including TelexFree's account with Bank Card Consultants in 2013.

593.   Defendants Oliveira and Moreira served as indispensable staff members and office managers of TelexFree's Executive Office, providing essential services to the TelexFree entities and coordinating between various parties to further the TelexFree Scheme.

594.   Moreira was involved in the TelexFree Scheme from its inception, having been an employee of Disk A Vontade.

595.   Defendants Oliveira and Moreira served as indispensable cogs in TelexFree's Executive Office and provided substantial assistance that advanced the commission of the unlawful Pyramid Scheme throughout the time period relevant to this complaint and insured the TelexFree Pyramid Scheme would exponentially grow.  Throughout the class period, Oliveira and Moreira at all times had actual knowledge that TelexFree was a fraud and an unlawful enterprise and carried out their bad acts to make money.

**T.** TelexFree's Top Level Promoters Played an Integral, Essential and Primary Role and also Aided and Abetted the Pyramid Scheme

596.   TelexFree conducted its Pyramid Scheme through the use and with the participation of several high-profile Promoters referred to herein as "Top Level Promoters,"

including Defendants Rodrigues, De La Rosa, Crosby, Miller, Sloan, Shoyfer and others.

597.    TelexFree's Top Level Promoters played a primary role in the Pyramid Scheme and were integral and essential co-conspirators who at all times knew that they were involved in unlawful activities designed to wrongfully take the funds invested by the class.  In fact, that is why the Founders, Principals, and Executive Office recruited many of them for involvement in TelexFree.

598.    The presence of the Top Level Promoters as well as their suspicious, tortious or unlawful activities were Red Flags for the Financial Services Defendants as identified by the FFIEC.

599.    Each Top Level Promoter deceptively, fraudulently and misleadingly promoted and furthered the Pyramid Scheme with knowledge of its illegality.

> **U.** TelexFree's Attorneys Played an Integral Role in and Aided and Abetted the Unlawful, Unfair, and Deceptive Pyramid Scheme

600.    TelexFree's Attorney Defendants and were a critical component of the TelexFree Pyramid Scheme as their representation of TelexFree went beyond the ordinary attorney-client relationship of delivering legal advice.

601.    At times relevant to this complaint, the Attorney Defendants had actual knowledge that the TelexFree business model was a fraudulent Pyramid Scheme.

602.    The Attorney Defendants were obligated to advise their clients on how to comply with the law, yet TelexFree's Attorney Defendants negligently, recklessly, willfully, knowingly, unfairly and deceptively advised their clients how to avoid detection, maintain the appearance of legality, and maintain and build the Pyramid Scheme.  They knowingly extended their roles to become supporters of the Pyramid Scheme by lending legitimacy to its operation.

603.    Throughout TelexFree's profitable Pyramid Scheme, the Attorney Defendants

acted as legal counsel to TelexFree, and used their positions of authority, education and respect

of the profession of law within the targeted immigrant and other communities as an integral part

of the Pyramid Scheme "and its post Brazilian shut down package."

604.    Beyond his licensure, Attorney Nehra's extensive experience in MLM, and

particularly his involvement with the Ponzi schemes involving AdSurfDaily and Zeek Rewards,

armed him with the knowledge of what constitutes violations of United States securities law,

which he used in an attempt to hide TelexFree's Pyramid Scheme activity with obfuscating

phraseology.

605.    Similar to Attorney Nehra, Attorney Waak also claimed to have over thirty years

of experience in counseling MLM and direct-selling enterprises.[61]

606.    On the website of the Law Offices of Nehra and Waak, the Defendant Attorneys

boasted that "[n]o Company that retained this firm BEFORE LAUNCH has been shut down by a

regulator."[62]  (emphasis in original).

607.    On their website, Attorney Nehra and Attorney Waak claim to specialize in

counseling "domestic and foreign companies operating MLM (multi-level marketing) businesses

in the United States."[63]

608.    The Law Offices of Nehra and Waak provided legal counsel to TelexFree, and

Attorney Waak was principal attorney of the law firm and was charged with oversight of the

firm's daily activities.

609.    Attorneys Nehra and Waak also maintained the Defendant professional limited

liability companies Gerald P. Nehra, Attorney at Law, PLLC and Richard W. Waak, Attorney at

---

[61] See Exhibit 4, Decl. of Carol L. Harris, Exhibit 2.  http://www.mlmatty.com/meet-mlm-attorneys/.

[62] Id.

[63] Id.

Law, PLLC, which also provided legal and counseling services to TelexFree.

610.    Among the N&W Attorney Defendants, and throughout TelexFree's Scheme, there was no clear distinction among the services provided to TelexFree by the Law Offices of Nehra and Waak, the individual N&W Attorney Defendants, and their respective professional limited liability companies.

611.    As general partners of the Law Offices of Nehra and Waak, Attorney Nehra and Attorney Waak are jointly and severally liable for torts and obligations of the firm.

612.    Seeking to profit from TelexFree's exploitation of the members of the putative class, Defendant Nehra drew upon his prior experience to aid, abet and play a substantial and integral part in TelexFree's unlawful, unfair and deceptive acts and practices during times relevant to this complaint.

613.    The Attorney Defendants, including the N&W Attorney Defendants, attended meetings at TelexFree's headquarters in Massachusetts to discuss TelexFree's product, business model, and operations, participated in teleconferences with Defendant Founders, Principals, Executive Office, and Top Level Promoters to discuss TelexFree's product, business model, and operations and had access to and input into TelexFree's documents, including the contracts entered into between TelexFree and the putative class.

614.    Attorney Nehra negligently, recklessly, willfully, knowingly, unfairly or deceptively counseled TelexFree on actions that would serve to evade United States securities laws that were intended to offer, in part, to provide the members of the putative class with protection from pyramid schemes, and advised TelexFree Promoters (excluding Top Level Promoters) to unknowingly participate in the evasion of federal and state securities laws, to enrich himself financially and serve his own selfish interests.

97

615.     Attorney Nehra otherwise negligently, recklessly, willfully, knowingly, unfairly or deceptively counseled and advised TelexFree Promoters (except the Top Level Promoters) to unknowingly participate in the evasion of federal and state securities laws.

616.     Defendant Nehra accomplished this through his reputation as a licensed attorney, his purported experience as an MLM expert and his purported research of TelexFree's business model, which allowed him to hold out TelexFree as a legal business.

617.     Defendant Nehra did this in a variety of ways, including his instruction to Investors to avoid using the terms "investment" regarding AdCentral Packages (*see* TelexFree Pre-March 9 Contract, Paragraph 2.6.5(m)), which was an attempt to conceal, and encouraged others to conceal, TelexFree's sale of securities in an attempt to strip Promoters of the rights afforded them by federal and state securities laws.

618.     In company videos, Attorney Nehra failed, refused and neglected to advise prospective TelexFree Promoters, the putative class members, that their participation in TelexFree presented a risk, including the risk of participating in an unlawful scheme, or that his advice was, in fact, against their own interests.

619.     Attorney Nehra perpetuated and enhanced the Scheme by not advising the putative class member TelexFree Investors that his web-published purported professional advice was intended to serve the interests of TelexFree and himself.

620.     Attorney Nehra's actions exceeded the scope of zealous representation of TelexFree.  Although he was licensed to practice law and purported to offer legal opinions, active and integral participation in a Pyramid Scheme does not fall within the parameters of the profession in which he was licensed to practice.

621.     Nehra negligently told Promoters and prospective members that TelexFree's

actions were within the purview of federal and state law.  As described above, the Defendant

Founders, Principals, Executive Office and Top Level Promoters knowingly used Attorney

Nehra's false legal opinions and misrepresentations as a marketing tool to unfairly and

deceptively further the illegal Pyramid Scheme.

622.    Attorney Nehra's opinions, and the opinions of other N&W Attorney Defendants,

were packaged and promoted as part of TelexFree's total "post Brazilian shut down package" to

the members of the putative class.[64]

623.    On an internet video posted on August 2, 2013, Attorney Nehra provided false

and deceptive assurances to Promoters and potential Promoters, stating that "[t]he special

ingredient is that you have a real product."

624.    Attorney Nehra assured Promoters on internet postings, in writing, and in person

at marketing promotions that, in his professional opinion, the TelexFree business model was

legitimate despite having actual knowledge that TelexFree MLM Network "Partnerships"[65]

involving TelexFree's AdCentral marketing packages were unlawful, as he had actual knowledge

of the ruling of the Brazilian Court, knowledge of and access to TelexFree's United States

operations and its composition, and knowledge of United States law.

625.    More particularly, when he advised potential participants of the soundness of the

venture, Attorney Nehra knew that a Brazilian court had determined that TelexFree's activity

was fraudulent, and that its Brazilian attorneys essentially admitted it was a pyramid scheme.

626.    Defendant Nehra's own comments suggest that when providing legal opinions at

the request of TelexFree and Defendant Founders, he knew that TelexFree intended to use his

---

[65] *See* Exhibit 1 - Standard TelexFree Contract at ¶2.2.1, (Attachement 24).

advice and likeness prominently as a marketing tool on both their localized Brazilian

(Portuguese) and Spanish (Spanish) website portals, in an effort to make TelexFree's business

appear legitimate thereby continuing and perpetuating the ongoing fraud.

627.    Defendant Nehra knew TelexFree used his legal opinions as a marketing tool to

promote its suspicious, tortious or unlawful Pyramid Scheme on Brazilian (Portuguese) and

Spanish/Dominican (Spanish) website portals.

628.    Attorney Nehra aided, abetted, counseled, induced, and/or procured TelexFree's

violations of law regarding the proper segregation and maintenance of customer funds, and acted

in concert and combination with TelexFree in such violations.

629.    Defendant Nehra gave substantial assistance to TelexFree and Defendant

Founders in accomplishing a tortious and illegal result, and Nehra's own conduct, separately

considered, constitutes a breach of duty to Promoters since he:

- negligently misrepresented the legality and sustainability of TelexFree's operations to the detriment of Promoters, and received fees from TelexFree;

- negligently obscured and obfuscated the illegal nature of TelexFree's Scheme by the manipulative use of language, including, e.g., advising TelexFree that using the term "investment" must be avoided;

- breached his duty of professional care to Promoters by failing to exercise proper due diligence in investigating the legality of TelexFree's operations;

- breached his duty of care by encouraging and advising individuals to become and remain Promoters to their detriment, despite his knowledge of the illegality of TelexFree's operations; and

- engaged in a civil conspiracy to defraud TelexFree's Promoters with a Pyramid Scheme, and took a leading role in the Scheme.[66]

630.    Attorney Waak, as general partner and principal attorney of the Law Offices of

---

[66] As stated by Justice William O. Douglas, "just as a fine natural football player needs coaching in the wiles of the sport, so, too, it takes a corporation lawyers with a heart for the game to organize a great stock swindle or income tax dodge and drill the financiers in all the precise details of their play."  William O. Douglas, "Directors Who Do Not Direct," 47 Harv. L. Rev. 1305, 1329 (1934).

Nehra and Waak, and the other Attorney Defendants knew of, oversaw, and participated in Attorney Nehra's tortious and illegal conduct regarding the TelexFree Pyramid Scheme.

631.    With their specialized knowledge of the laws governing MLM and direct-sales ventures and their personal knowledge of TelexFree's product, business model, and operations which were identical to its Brazilian product, business model, and operations, the following publicly available information caused or should have caused all the Attorney Defendants to recognize that TelexFree was an unlawful pyramid or Ponzi scheme and decline or cease providing services to it or provide advice to change the program and make sure it was promptly changed:

- a Brazilian court found TelexFree's Brazilian operations to be fraudulent;

- a Brazilian court described TelexFree's operations in terms of the quintessential pyramid scheme after TelexFree's own Brazilian lawyers unwittingly admitted as much;

- TelexFree's Brazilian lawyer Djacir Falcão ("Falcão") advised the Brazilian court that an injunction would cause the company to enter bankruptcy: "Running the company really becomes difficult because of the court decision, so we will appeal";

- Falcão informed the Brazilian court that "should the company spend a few more days being prohibited from signing up new investors, they would have no money to pay the old ones";

- all of TelexFree's appeals in the Brazilian courts were denied;

- a Brazilian court remarked that the problem is that the earnings will be exhausted when the main source of revenue—new member registrations—stops;

- a Brazilian court remarked that adding new Members was more important to TelexFree than trying to sell its VoIP product;

- a Brazilian court remarked that it is detrimental that many affiliates do not even have the opportunity to recover their initial payment to Telexfree; and

- a Brazilian court entered an order freezing TelexFree's funds in Brazil, blocking future payments to TelexFree in Brazil, and enjoining TelexFree from signing on new members in Brazil.

632.    Despite having knowledge that TelexFree was an enterprise carrying out unlawful, unfair, or deceptive acts or practices, Nehra and Defendant Nehra Law Firm performed integral services and provided essential advice and substantial assistance that was used to further TelexFree's unlawful business.

633.    The Attorney Defendants used their knowledge and experience with MLM and direct-sales ventures, the laws applicable to those types of ventures, and their personal knowledge of TelexFree's product, business model, and operations to assist TelexFree in perpetrating the Pyramid Scheme.  More specifically the N&W Attorney Defendants:

- belatedly advised TelexFree that its compensation plan required amendment;

- advised TelexFree on how to avoid detection from state and federal agencies;

- advised TelexFree on how to maintain the appearance of legality, including to avoid using the term "investment" regarding the AdCentral Packages (TelexFree Pre-March 9 Contract, Paragraph 2.6.5(m)), which was an attempt to conceal, and encourage others to conceal, TelexFree's sale of securities in an attempt to strip Promoters of the rights afforded them by federal and state securities laws;

- advised TelexFree on how to maintain and advance TelexFree;

- advised TelexFree on how to avoid United States securities laws intended to offer, in part, protection from pyramid and Ponzi schemes;

- advised TelexFree Promoters (excluding Top Level Promoters) to unknowingly participate in the evasion of federal and state securities laws;

- advised TelexFree on laws concerning the proper segregation and maintenance of consumer funds;

- failed to inform the putative class that the Attorney Defendants' web-published professional "advice" was intended to serve the interests of TelexFree and the Attorney Defendants;

- failed to inform the putative class that participation in TelexFree presented a risk, including the risk of participating in an unlawful scheme, or that their advice was against the putative class's interests;

- advised Promoters and represented to the putative class that TelexFree was a lawful, legitimate, and sustainable venture under state and federal laws, which TelexFree then used as a potent marketing tool to recruit new members;

- provided legal representations and statements to Defendant Founders, Principals, Executive Office, and Top Level Promoters that Attorney Defendants knew would be used by TelexFree in its efforts to recruit and retain members;

- allowed their names, experience, and likenesses to be used by TelexFree in propaganda aimed at retaining and obtaining members to the Pyramid Scheme like online postings, in-person meetings, company "super weekends" and "extravaganzas," brochures, and videos;

- gave speeches to the putative class at TelexFree's recruiting and retention "extravaganzas," "super weekends," and other events proclaiming with an air of authority that TelexFree's product and model was legitimate and lawful;

- informed the putative class that the Brazilian government's shutdown of TelexFree's activities in Brazil would not affect TelexFree's operations in the United States;

- refused to address questions asked by the putative class regarding implications of the injunction granted against TelexFree's operations in Brazil;

- informed the putative class that TelexFree "is legally designed . . . you are on very solid legal ground," and that TelexFree's operation had been "vetted" and "bless[ed]" by the Attorney Defendants;

- encouraged the putative class to become or remain Promoters; and

- provided assurances to Promoters and the putative class on website postings and other writings, and in person that TelexFree was legitimate and lawful, including assurances that "[t]he special ingredient is that you have a real product."

**V.**  **Attorney Babener Assembled A Team of Legal and Business Professionals Who All Agreed to Assist TelexFree and its Founders Merrill and Wanzeler To Continue to Operate the Unlawful Scheme After the Brazilian Shutdown In Summer 2013.**

634.    As detailed above, by August 2013, TelexFree's banks and payment processors were severing ties with the company and, as a result, TelexFree was experiencing significant

difficulty locating U.S. banks and payment processors willing to service their "business." TelexFree's revenues were generated from website-based purchases, the use of credit cards was inextricably linked to TelexFree's ability to operate.  See Attachment 2 (Runge Dec. at ¶¶ 63-64).

635.    TelexFree's Founders and Executive Officers and Attorney Nehra determined that TelexFree would require the help of outside professionals to sustain its Scheme and to head off the certain collapse of TelexFree if banking or payment processing services were interrupted or shut off or if it suffered a Ympactus-like shut down by United States authorities.

636.    TelexFree required a constant inflow of new investor funds to sustain the pyramid side of its overall scheme.

637.    The constant need for new funds and the staggering profits compelled TelexFree and its co-conspirators, accomplices, aiders and abettors to work with it and each other to increase TelexFree's victim-driven revenue stream.

638.    TelexFree's Founders Merrill and Wanzeler also realized they needed the strategic input and planning of professionals to launder, secret and insulate their continuously accumulating ill-gotten gains from United States' law enforcement.

639.    To address these issues, Founders Merrill and Wanzeler reached out to Attorney Jeffrey A. Babener, a self-described expert on the MLM industry on or about August 1, 2013.

640.    Babener was initially provided with information about TelexFree and some of the problems and issues that it was experiencing by Merrill and Wanzeler.

641.    One of the issues that Babener was initially informed of was TelexFree's difficulty in obtaining the financial services it required.

642.    Another issue that Babener was initially informed of was TelexFree's concern

that it would face the same regulatory scrutiny and governmental action that it was subjected to in Brazil.

643.    Babener was also informed of the staggering profits TelexFree had made in Brazil.  Upon information and belief, TelexFree represented it had income of over one billion dollars through its Brazilian operation before it was shuttered in June 2013.

644.    In response to Merrill's contact, Babener represented himself as not only a legal resource to TelexFree, but also a comprehensive business consultant for it.

645.    Moreover, armed with actual knowledge that TelexFree was an unlawful scheme, Babener immediately assembled a team of professionals with whom he had extensive prior experience and who each held themselves out as having expertise and experience with Multi-Level Marketing ("MLM").  The team was comprised of Babener, the Sheffield Group, Garvey Schubert and PwC and their individual Defendant representatives.  Babener shared his actual knowledge that TelexFree was an unlawful scheme with each member of the team, whom themselves obtained actual knowledge of the same.

646.    Specifically, within seven days of his retention, Babener obtained actual knowledge TelexFree was operating an illegal scheme that was constantly securing massive numbers of new victims.

647.    In an August 15, 2013 email to Merrill and Wanzeler that Babener sent after reviewing TelexFree's standard form contract, promoter compensation plan and other basic operational documents which TelexFree had provided to him at his request, Babener advised TelexFree that he agreed it had the same Ponzi scheme issues as it did in Brazil.[67]  Mike

---

[67] In February 9, 2014 email, Babener admitted that he had been telling Merrill since being retained in August 2013 that TelexFree was an illegal scheme, stating "**Since you retained us in August, I explained** that you had an unknown window of time to implement a more compliance program because **you were running a pyramid/Ponzi** (even if you felt that you were doing

Sheffield, Debbie Stenmoe and Davene Perruzini of The Sheffield Group were copied on the email.

648.    During their initial contact on August 12, 2013, Babener advised Mike Sheffield, Principal of the Sheffield Group, that he suspected or concluded that TelexFree's business model was unlawful.  Babener explained TelexFree and the issues it was facing and requested that Sheffield provide TelexFree with business consulting services that would enable the continuation of TelexFree's current operations as well as create a future compensation plan that would comply with state and federal law.

649.    In an email chain on or about August 24, 2013 between Merrill, Babener and Sheffield, Babener expressly confirmed they possessed actual knowledge that TelexFree's compensation program was unlawful and he further expressed thoughts on changes that needed to be made to make it comply with the law.  Nancy Kikes, Sarah Smith, Mike Sheffield, Davene Peruzzini, and Debbie Stenmoe were copied on the email.

650.    The Sheffield Group's discussions with Babener, Merrill and their specialized knowledge of MLM and direct-sales ventures coupled with their personal knowledge of TelexFree's product, business model, and operations (including those in Brazil) established to them that TelexFree was an unlawful pyramid/Ponzi scheme from the very beginning of their involvement with TelexFree.

651.    Similarly, in his initial email communications with Garvey Schubert on or about September 23, 2013, Babener informed them that TelexFree's business model was unlawful.  On that same day, employees within Garvey Schubert, including Defendants Kaufmann, Tober and Sandford, took part in discussions with TelexFree's executive leadership and Defendants

---

nothing wrong) **and that you were on thin ice before regulatory action, civil or criminal, might occur.**"  (emphasis added).

Babener and The Sheffield Group, in which, upon information and belief, the Brazilian finding that TelexFree was a pyramid scheme and that TelexFree was operating an unlawful business model and the pyramid scheme nature of TelexFree's U.S. operations were openly discussed.

652.    The next day, on or about September 24, 2013, Babener emailed Kauffman and Sandford an article from BehindMLM.com that made plain TelexFree's illegality.

653.    Kauffman, Sandford and Tober of Garvey Schubert were all copied on a September 30, 2013 email by Babener in which he bluntly stated to Merrill, "Your primary challenge: your historical revenue stream has been dominated by distributor payments rather than product/service sales revenue. **You will not survive legally (civil or criminal) or from a business standpoint, unless there is a dramatic change**...", providing each of them with actual knowledge. (emphasis added).

654.    PwC began servicing TelexFree in January 2014 and had actual knowledge that TelexFree was an unlawful pyramid scheme at that time.

655.    Based upon their review of documents produced by TelexFree, as well as their other investigative efforts and intra-MLM A Team communications, Babener, the Sheffield Group, Garvey Schubert and PwC all gained actual knowledge that TelexFree was a pyramid/Ponzi Scheme, including that

- TelexFree was utilizing the same "program/business model" that its parent company Ympactus used prior to being shuttered and declared to be a pyramid scheme in Brazil;
- the express terms of TelexFree's standard form contract violated Massachusetts law; and
- the express content of TelexFree's website or other marketing materials was violative of the law.

656.    That actual knowledge was obtained no later than August 15, 2013 by Babener, no later than August 24, 2013 by the Sheffield Group, no later than September 24, 2013 by

Garvey Schubert, and no later than January 2014 by PwC.

657.    Additional writings described below establish that the MLM A Team had actual knowledge that TelexFree was operating an unlawful business model during or about the foregoing time periods.

658.    Over the course of August 2013 through TelexFree's demise in April 2014, the assembled team of legal and business-related service providers (the "MLM A Team"), ultimately comprised of Babener, The Sheffield Group, Garvey Schubert and PwC, by and through their Defendant representatives, provided substantial assistance to TelexFree's unlawful Scheme by supplying integral services that enabled TelexFree to continue during a time period when its nature as an unlawful pyramid scheme was known to them and its existence threatened as a result of increasing legal scrutiny and its status as a pariah in the financial service providers' industry.

659.    It is not disputed that without access to financial services, including banking and payment processing, TelexFree would collapse within months.[68]

660.    During or about August of 2013, Jeff Babener and the Babener and Associates law firm (together the "Babener Defendants") began servicing TelexFree and continued to do so through TelexFree's April 14, 2014 demise.  The Babener Defendants substantially assisted sustaining TelexFree's broad scope of unlawful operations which generated hundreds of millions of dollars during the time that the Babener Defendants provided services to it.

661.    That the MLM A Team acted in concert to offer assistance is supported by an early explanation of that fact.  Specifically, an August 12, 2013 email from Merrill to Wanzeler first documents that the team of professionals that will assist TelexFree's ongoing operations includes the Sheffield Group. Mike Sheffield and Babener were copied on the email.

---

[68] *See* Exhibit 2, which is Attachment 1 to this complaint (Runge Dec. at ¶¶ 63-64).

662.     During or about August of 2013, the Sheffield Group and its individual

Defendants (together the "Sheffield Group") began servicing TelexFree and continued to do so

through its April 14, 2014 demise.  The Sheffield Group Defendants substantially assisted

sustaining TelexFree's broad scope of unlawful operations which generated hundreds of millions

of dollars during the time that The Sheffield Group provided services to it.

663.     Attorney Babener also presented Garvey Schubert, whom he had worked with on

MLM projects, as part of the team that would not only be a legal resource, but also a

comprehensive business consultancy for TelexFree.

664.     During or about September 2013, the Garvey Schubert law firm and the

individual Garvey Schubert law firm lawyers (together "Garvey Schubert") began servicing

TelexFree and continued to do so through its April 14, 2014 demise.  Garvey Schubert

substantially assisted sustaining TelexFree's broad scope of unlawful operations which generated

hundreds of millions of dollars during the time that Garvey Schubert provided services to it.

665.     Babener and Associates, Garvey Schubert, and the Sheffield Group discussed and

engaged in strategic planning as related to TelexFree's unlawful product, unlawful business

model, and other unlawful ongoing operations and participated in teleconferences among

themselves for the purpose of strategizing, including recommendations as to short- and long-

range plans to maintain both TelexFree's ongoing operations and to begin moving its funds

beyond the reach of the United States' justice system as soon as possible.

666.     During or about December of 2013 and no later than January of 2014, PwC and

the individual PwC defendants (together, "PwC") began servicing TelexFree and continued to do

so through its April 14, 2014 demise.  PwC substantially assisted sustaining TelexFree's broad

scope of unlawful operations which generated hundreds of millions of dollars during the time

that PwC provided services to it.

667.    For the multiple reasons detailed herein, each member of the MLM A Team knowingly chose to provide TelexFree with substantial assistance in sustaining the Scheme's continued operation and exponential growth and acted as its co-conspirators, accomplices, accessories and aiders and abettors by providing services that were intended to and did:

a.   maintain its ongoing unlawful Ponzi/pyramid Scheme operations;

b.   continue its ongoing exponential growth of the unlawful Scheme operations;

c.   conceal the illegality of its daily operations;

d.   launder the funds that the unlawful Scheme operations received;

e.   expand the unlawful Scheme operations overseas;

f.   transition unlawful Scheme operations overseas;

g.   secure banking overseas for the unlawful Scheme;

h.   transition to the use of financial services for the unlawful Scheme overseas; and

i.   move the unlawful Ponzi/pyramid scheme operations funds offshore and out of the reach of the United States' justice system.

668.    The MLM A Team Defendants' services were essential to the unlawful Pyramid Scheme as well its related business of laundering and sheltering funds safely beyond the reach of the United States' justice system.

669.    Each member of the MLM A Team individually and collectively also took actions to conceal, and thereby allow the continued operation and exponential growth of the Scheme, by staving off or otherwise assisting TelexFree to delay and dodge the investigations by government officials, including crafting misleading responses to investigations and submitting two sets of "cooked" books.

670.    After determining TelexFree was unlawful, the MLM A Team did not require

TelexFree to suspend or terminate its unlawful operations immediately as a condition of their representation, rather they chose to service TelexFree's continued unlawful operations and acted to delay indefinitely its overhaul into a lawful business model, all the while each day, new and ongoing victims were fleeced of their hard-earned funds.

671. As a result of the MLM A Team's actions, TelexFree not only continued to exist after August 2013, it expanded exponentially, spread further into the international system, and successfully laundered and placed victims' funds into the coffers of TelexFree's Founders and related entities and individuals as well as offshore beyond the reach of the U.S. civil justice system and law enforcement authorities. The MLM A Team worked together for nearly nine months to avoid a disruption in TelexFree's ongoing operations and as a direct and proximate result the putative class suffered ascertainable – and massive - economic loss.

672. Each member of the MLM A Team also took actions to further, conceal and exponentially grow the fraud. Examples of such actions, include, but are not limited to, the following:

a. **Babener Defendants –** As its point person, Jeffrey Babener devised, implemented, oversaw and coordinated the provision of services by the MLM A Team.

- Babener is referred to as TelexFree's unofficial CEO from the time he entered his appearance until TelexFree's demise in April 2014. By October 1, 2013, Babener represented he was "coordinating, supervising, and interfacing with resources and third parties for international, corporate, tax, international compliance" for TelexFree's Scheme.

- In early September 2013, Babener coached Merrill on drafting a letter that paved the way for the continued operation of the Scheme's funneling of money to top promoters. Babener directed Merrill to provide false information on TelexFree's current business in a letter Merrill sent to a top TelexFree Promoter in Jordan, which the Promoter needed to convince Jordanian banks to accept funds into the accounts of TelexFree promoters. Upon information and belief, the banks accepted those deposits as a result of the Babener-crafted letter.

- In December 2013, Babener, in consultation with Garvey Schubert, also drafted an intentionally misleading letter for Merrill's signature that misrepresented TelexFree's legality to supply to Defendant Bank Card Consultants for use in securing an acquiring bank for its payment processing services.  Upon information and belief, Defendant Bank Card Consultants was able to secure an international acquiring bank as a result.

- On March 19, 2014, at the request of James Merrill, Babener drafted another letter sent to TelexFree's banking partners, particularly Wells Fargo Bank, to continue servicing TelexFree's accounts.  Wells Fargo Bank supplied extensive services to TelexFree's Scheme during the critical 2014 time period.

- Babener coordinated efforts to resolve Merrill's plea that Allied Wallet, a well-known fraud-servicing payment processor and "the only Visa processor we have now," needed documentation to obtain a UK address and registration number" for TelexFree from Regus, a virtual office supplier.  Allied Wallet was able to satisfy that documentation, which regarding AML compliance verification, and gave TelexFree access to the credit card network, with Babener's critical assistance.  Upon information and belief, Allied Wallet was able to satisfy the documentation needs and to give TelexFree access to the credit card network and processed millions of dollars for TelexFree.

- Babener also gave specific instructions to Merrill on how to overcome trademark issues that were preventing TelexFree from forming a company in Florida.  That company was being required by a bank with which they were setting up an account and which was intended to be TelexFree's "US Finance corporation."  The result of those efforts was the incorporation and use of TelexFree Financial, Inc. as TelexFree's primary operating account   Upon information and belief, only after and because of the issue being successfully resolved by Babener, Merrill was enabled to obtain those banking services to further TelexFree's ongoing fraudulent scheme.

- Babener and Garvey Schubert assisted TelexFree to keep banked $20 million from its TD Bank account upon its closure for fraud issues.  They endorsed the breaking of the check into pieces to avoid scrutiny and to launder those funds.

- Babener drafted a December 2013 letter and policies to stop the internal problem of TelexFree participants cross-recruiting and raiding to other programs, which, upon information and belief, was sent by Merrill and addressed the issue.

- Babener provided approval to Merrill in October 2013 for TelexFree's Super Saturday trainings for TelexFree promoters in Florida that TelexFree was continuing to put on without restrictions, which was necessary for the Scheme to continue to operate.

- Babener and The Sheffield Group knowingly, negligently or deceptively played a substantial and instrumental role in developing TelexFree's unlawful March 9,

2014 compensation plan.  Babener and Sheffield Group were explicit in acknowledging that the new compensation plan was being drafted to be a tool to defend TelexFree in the legal investigations against it rather than to make it a truly legal operation, and they further knew that the proposed plan itself was not legal.  Those efforts successfully staved off regulatory action and enable the Scheme to continue.

- Babener and Garvey Schubert were critical actors in structuring TelexFree's international business outlets during fall 2013.

- Babener was involved in aspects of the unethical and unlawful conduct relating to the MLM A Team's crafting of misleading responses and a cooked sets of books to the Massachusetts SOC.

b. **The Sheffield Group** – The Sheffield Group was involved in all aspects of the unethical and unlawful conduct carried out by TelexFree and the MLM A Team.  Despite knowing that TelexFree was operating a pyramid/Ponzi scheme, the Sheffield Group also provided advice, introductions, and offered materials for TelexFree's marketing.

- The Sheffield Group's efforts in September 2013 secured the internet marketing services provided to TelexFree by an expert in the field, Jon Ward.  The Sheffield Group's Garvin Deshazer acted quickly to respond to Ward's hesitations after becoming aware of TelexFree's legal issues, urging Ward to continue working with TelexFree, knowingly and falsely vouched for the TelexFree leadership team and expressing his hopes that he had eased Ward's concerns.  Ward agreed to provide critical website-related services and continued to do so until or after March 2014.

- During fall 2013, The Sheffield Group and Babener assisted TelexFree in a deal involving a company known as My Financial Advantage ("MFA") that offered credit restoration services as part of the TelexFree experience.  TelexFree entered into a contract with MFA and provided staffing and IT services worth $80,000 to TelexFree in connection with the MFA product from October 2013 to March 2014.

- From September 2013 until April 2014, The Sheffield Group wrongfully provided general business management and consulting services to TelexFree, advising TelexFree's executives on matters including Promoter compensation, Promoter recruiting and retention, and structuring transactions involving AdCentral packages.

- They advised TelexFree not to change illegal provisions in its plan or at a minimum guided it to delay any change to a lawful operation for many months so as not to hurt it financially.

- On or about January 28, 2014, Mike Sheffield reviewed and advised Merrill on a potential digital advertising program for TelexFree.

c. **Garvey Schubert Defendants –**Garvey Schubert took a leading role in many of the activities referenced above.  Babener also advised TelexFree from the start that Garvey Schubert would assist in the execution of any plan to move TelexFree's assets and operations offshore.

- Garvey Schubert consulted with Babener in drafting the intentionally misleading letter for Merrill's signature which, upon information and belief, was used to enable processing service provider Bank Card Consultants to secure an acquiring international bank for its processing needs.

- As detailed above, Garvey Schubert also assisted TelexFree in keeping the $20 million from its TD Bank account banked upon its closure.

- Garvey Schubert assisted TelexFree with immigration issues facing several of its top producing – and therefore most harmful to TelexFree's victims – Promoters.

- Garvey Schubert developed a strategy for TelexFree's international expansion. This strategy included the using of a separate "financing company" that would process TelexFree's incoming and outgoing investor payments,  "the primary purpose" of which would be to limit "legal and tax exposure in multiple jurisdictions."  Garvey Schubert warned TelexFree against using payment processors that may be subject to U.S. jurisdiction for foreign payments or who would voluntarily comply with U.S. court orders.

- Garvey Schubert's Sanford used her contacts in the Caribbean to establish TelexFree's foreign base of operations in Grand Cayman.

- Sandford also specialized in "quieting" promoters who made unwanted noise.  For example, through fall 2013, with Babener, Garvey Schubert fielded questions from Spanish authorities, providing misleading responses which prevented any further action on the issue

- Garvey Schubert was involved in aspects of the unethical and unlawful conduct relating to the MLM A Team's crafting of misleading responses and a cooked sets of books to the Massachusetts SOC.

d. **PwC Defendants -** PwC drove the strategy of utilizing offshore accounts to conduct TelexFree's unlawful operations in countries with lax financial fraud enforcement, to shelter funds out of the reach of the United States justice system and to create foreign

shell corporations.

- In or about January 2014, PwC developed and provided to TelexFree and its team a Proposed Global Business Alignment plan in draft form with the objective of, *inter alia*, "[p]repar[ing] a flexible and scalable model for future business growth, expansion, new lines of business, etc." and presented a number of options to achieve that end.  The main point of this document was the shifting of funds and operations offshore to locations beyond the reach of the United States' justice system and to locations with lax pyramid/Ponzi/financial crime enforcement.

- PwC's overarching strategy of moving operations and funds offshore was adopted.  In turn, they provided assistance to TelexFree with regard to proposed expansion into Colombia and Ecuador.

- PwC also provided planning services for TelexFree-related entity, Ympactus (the illegal Brazilian entity), which PwC had identified in its Proposed Global Business Alignment plan as part of TelexFree.

- Nevis was among the financial fraud safe havens identified by the PwC Defendants

- Enactment of PwC's plans also allowed foreign banks to serve as merchant banks.

- TelexFree International, Ltd structuring was "driven" by PwC.  PwC proposed that TelexFree LLC transfer its contractual rights to overseas agents and customers to that entity.  Upon information and belief, they were.

- PwC played a critical role in TelexFree's secreting and illegally laundering funds illegally obtained from its victims through the establishment of a foreign base of operations in the Cayman Islands, TelexFree International, Ltd.  As part of those efforts, PwC worked hand-in-hand with TelexFree Founder Merrill, Babener, Garvey Schubert and TelexFree accountant Craft.

- PwC created and assisted in implementing the strategy of issuing 1099 tax forms to Promoters to cover its fraudulent activities.  The forms were intended to, and did, maintain the illusion that it had made payments to its members and on the negligent advice of PwC, TelexFree mailed fraudulent and inaccurate 1099 forms to its members.

673.   As supported through the foregoing and further facts detail herein, each member

of the MLM A Team intentionally, willfully and knowingly participated in the TelexFree

Pyramid/Ponzi scheme as an active co-conspirator after obtaining actual knowledge that

TelexFree was a wholly unlawful scheme.

674.   Additionally, or in the alternative, each member of the MLM A Team aided and

abetted by providing substantial assistance after actual knowledge of the unlawful scheme.

675.     As members of a conspiracy, each member of the MLM A Team is guilty not only of the crimes and acts they committed in furtherance of their conspiracy and also of other unknown crimes committed by other members of the conspiracy in support of it.

676.     At all times the MLM A Team attorneys were obligated to adhere to standards of conduct imposed by the Rules of Professional Conduct for the states in which they are admitted, including California, Oregon, and the Commonwealth of Massachusetts.

677.     At all times relevant hereto, Jeffrey Babener acted within the regular and usual course of hisr employment and within the scope of his authority as the owner of Defendant Babener & Associates.  Those Defendants are jointly and severable liable.

678.     Defendant Babener & Associates is vicariously, jointly and severally liable for all actions taken by its partners and owner Jeffrey Babener and all of its employees, agents and representatives.

679.     At all times relevant hereto, the Sheffield Group Defendants Mike Sheffield, Lind, Deshazer, Peruzzini and Stenmoe acted within the regular and usual course of their employment and within the scope of their authority as partners/employees of Defendant The Sheffield Group.  Those Defendants are jointly and severable liable.

680.     Defendant The Sheffield Group is vicariously, jointly and severally liable for all actions taken by its partners, employees, agents and representatives, including Mike Sheffield, Lind, Deshazer, Peruzzini and Stenmoe.

681.     At all times relevant hereto, Garvey Schubert Defendants Kauffman,  Weaver, Tober, Sandford, Conti and Rodgers acted within the regular and usual course of their employment and within the scope of their authority as partners/employees of Defendant Garvey

Schubert.  Those Defendants are jointly and severable liable.

682.    Defendant  Garvey Schubertc is vicariously, jointly and severally liable for all actions taken by its partners, employees, agents and representatives, including Kauffman, Weaver, Tober, Sandford, Conti and Rodgers.

683.    At all times relevant hereto, PwC Defendants Puzey and Colabella acted within the regular and usual course of their employment and within the scope of their authority as partners/employees of Defendant PwC.  Those Defendants are jointly and severable liable.

684.    Defendant PwC is vicariously, jointly and severally liable for all actions taken by its partners, employees, agents and representatives, including Puzey and Colabella.

685.    Between the date each MLM A Team began performing services for TelexFree (August 2013) until its April 2014 bankruptcy, the class was caused to suffer ascertainable economic loss as a direct and proximate result of the MLM A Team Defendants' actions and inactions as TelexFree's co-conspirators, accomplices, accessories and aiders and abettors.

1. **The MLM A Team Defendants knew that TelexFree was operating a pyramid/Ponzi scheme prior to providing services or upon otherwise working on TelexFree-related tasks yet joined the TelexFree team.**

686.    As TelexFree's troubles continued to mount, during or about July 2013, Attorney Defendant Nehra recommended that TelexFree retain self-proclaimed MLM specialist Jeffrey Babener and his law firm Babener and Associates.

687.    Defendant Babener was well-versed in the hallmarks of pyramid schemes long before he started representing TelexFree.

611.    At all times relevant to the complaint, Babener held himself and his firm out as multilevel marketing and direct-selling specialists on the websites www.MLMLegal.com, and www.MLMAttorney.com and via various social media accounts, and as offering not only legal, but also business, services.

688.    Babener's specialized knowledge of the laws governing MLM and direct-sales ventures coupled with his personal knowledge of TelexFree's product, business model, and

operations (including its product, business model, and operations in Brazil) established to him that TelexFree was an unlawful pyramid/Ponzi Scheme from the very beginning of his involvement with TelexFree.

689.    As part of his effort to hook TelexFree as a client, Babener followed up after his initial contact with Merrill on or about August 1, 2013 with a letter expressing his hope for the "long-term ongoing representation" of TelexFree and making plain that his intended engagement was as not only a legal resource but also a comprehensive business consultant.  Babener stated in his letter that "[o]ur hope is to grow with the company over time and to help both legally and as an important business resource in the U.S., foreign markets and the network marketing industry."

690.    On August 12, 2013, Babener and his law firm Babener and Associates were formally retained.

691.    Merrill emailed Babener on or about August 12, 2013, confirming that Merrill had sent a requested $6,000 wire transfer as an initial retainment fee and providing information about the TelexFree program, including the TelexFree URL, VoIP terms and conditions, a PowerPoint on TelexFree, the July 2013 compensation plan outline, and the TelexFree contract.

692.    Despite his knowledge that TelexFree was operating a pyramid scheme, Babener began assembling a team to support and enable TelexFree's continued daily operations and to collaborate with him to address TelexFree's regulatory matters, legal issues, and business operations.  In fact, Babener referred to himself as TelexFree's "point person" in dealing with this team of professionals and oversaw and coordinated ongoing contacts between the MLM A Team members and TelexFree, including James Merrill.

693.    On or about August 12, 2013 the Sheffield Group began servicing TelexFree and it ceased its representation on or about April 14, 2014.

694.    Mike Sheffield, James Merrill and Jeffrey L. Babener were in frequent contact over the next eight months.

695.    The focus of the contacts among Mike Sheffield and the other Sheffield Defendants, James Merrill and Babener was to strategize and otherwise cooperatively work to maintain TelexFree's daily – illegal - operations and drive its exponential growth.  Their work included, but was not limited to, compensation plan cover-ups, software selection, operational consulting, strategic consulting, legal referrals, and launch management, and the coordination of financial institutions' and service providers' services to address TelexFree's inability to secure banking and processing needs.

696.    Babener, Mike Sheffield and the Sheffield Group participated in calls or meetings with TelexFree to strategize, among other things, matters that related to keeping TelexFree's business model operational and ongoing.

697.    Babener, Mike Sheffield and the other Sheffield Group Defendants were fully aware that banks and payment processors were rejecting TelexFree's business, and rather than allowing the cessation of TelexFree's daily bilking of victims that would result from its inability to obtain financial servicing, these Defendants helped TelexFree to find solutions and identify alternative outlets which permitted the Scheme to continue on for months.

698.    Upon information and belief, Babener and The Sheffield Group, including Mike Sheffield, Ken Lind and Garvin Deshazer participated in a meeting on September 4, 2013 with Merrill at which time they freely discussed TelexFree's pyramid scheme nature, TelexFree's potential legal issues in the U.S. and the relationship with TelexFree's Brazilian operations. Importantly upon information and belief they also discussed how to keep current operations going uninterrupted.

699.    By thereafter assisting TelexFree continuing to operate without interruption, Mike

Sheffield and The Sheffield Group acted affirmatively to participate in the cover-up of

TelexFree's unlawful business operation and provided plausible deniability, thereby acting as a

valued co-conspirator, accomplice and accessory to TelexFree's ongoing unlawful operations.

700.    In an email dated September 11, 2013, The Sheffield Group's Vice-President of

Operations Debbie Stenmoe made explicit that their services were comprehensive and included

four key areas of Product, Marketing, Operations and Financial, and included a questionnaire

relating to each area. Merrill, Wanzeler, Peruzzini, Mike Sheffield and Chris Sheffield were

copied on the email.

701.    Merrill wired $30,000 to the Sheffield Group's bank as a retention fee on or about

September 12, 2013.

702.    On or about September 17, 2013, Merrill laid out the direct controlling

relationship between TelexFree US and TelexFree Brazil for The Sheffield Group team:

> All marketing including the compensation originates from Carlos Costa in Brazil and is
> roughly translated that is why the Website and other material are not very good when
> translated into English. So there really is no marketing budget in the US. Most of CS
> service is located in Brazil but we have not performed well mainly because of IT issues
> and disorganization. We try to handle the US and International the best we can from
> Marlborough.

Mike Sheffield, Chris Sheffield, Garvin DeShazer, Davene Peruzzini, Debbie Stenmoe, and Joe

Craft was were copied on the email.

703.    By September 17, The Sheffield Group had reviewed the standard TelexFree

contract which expressly states that Ympactus owns and controls TelexFree.

704.    Further, Babener and Mike Sheffield's actual knowledge of the Scheme is evident

in a September 19, 2013 email which Babener sent to Merrill, Wanzeler and Sheffield attaching

information on the criminal indictment and guilty plea of the operator of the AdSurfDaily Ponzi

scheme as well as a follow up September 25, 2013 email containing an article from BehindMLM.com discussing TelexFree's Brazilian issues. Merrill, Wanzeler, Mike Sheffield and Nancy Kikes was copied on the email.

705.    Like the Sheffield Group, the law firm Garvey Schubert and its attorneys were aware from the beginning of their relationship with TelexFree that it was an ongoing illegal pyramid scheme.

706.    In or about late September 2013, Babener introduced TelexFree to Garvey Schubert as an expert on the issues relating to TelexFree's international expansion, tax planning and ongoing violations of federal and state law.

707.    Babener further advised TelexFree that Garvey Schubert would assist in executing the plan to move TelexFree's assets and operations offshore.

708.    Moving TelexFree's assets and operations offshore would have the effect of moving those aspects of the operation beyond the reach of the United States civil justice system and authorities.  Upon information and belief, Babener further advised TelexFree that Garvey Schubert would assist it and the Sheffield Defendants in this regard.

709.    Attorneys Robert Weaver and Samuel Kauffman of Garvey Schubert addressed issues with the Brazilian investigation and potential U.S. regulatory or criminal issues.

710.    Attorneys Sara Sandford and Gary Tober, also of Garvey Schubert, were engaged to assist with international expansion, taxation, and regulatory matters.

711.    All Garvey Schubert attorneys dealt with the Brazilian shutdown, the other suspicious activity including account closures and the closure in Brazil, the rejections by financial institutions, and the well-publicized accusations of operating a pyramid scheme and the many other issues surrounding TelexFree's operations and business model.

712.    Garvey Schubert and each individual Garvey Schubert Defendant was informed that TelexFree was operating an unlawful business model prior to their providing services or otherwise working on TelexFree related tasks, as described above.

713.    In addition, on September 23, 2013, Babener communicated directly with Garvey Schubert's Kauffman.  In his initial email communication, Babener informed them that TelexFree's "sister company is having issues in Brazil and I have concern for spillover here," that he had "concerns about the current program and it is being Modified with assistance of the Sheffield Group to be more compliant," and that he wanted Weaver involved for "potential US issues, regulatory or criminal" issues and Tober and Sandford involved for "international structuring, for corporate, tax and asset protection purposes."

714.    On or about September 24, 2013, Babener emailed Kauffman and Sandford an article from BehindMLM.com that made plain TelexFree's illegality.  It discussed TelexFree's issues in Brazil, titled "TelexFree vows recovery in Bankruptcy Protection." Babener also copied the article and the comments to the article into the body of that email.

715.    The same day, Merrill, Babener, Sandford, and Kauffman participated in a call where they discussed potential regulatory, civil, and/or criminal issues facing TelexFree due to its illegality.

716.    Later the same day, following this conference call discussing the myriad issues facing TelexFree, Garvey Schubert agreed to represent TelexFree as a client, with Sandford emailing TelexFree an engagement letter and requiring a $50,000 advance fee deposit.

717.    On or about September 29, 2013 the Sheffield Group evidenced its actual knowledge and willful and knowing participation in TelexFree's criminal enterprise through its refusal to be associated with the company online.

718.     The Sheffield Group received an email on or about September 29, 2013, from an alleged TelexFree promotor. Mike Sheffield forwarded this email to Merrill and Babener with the instruction to "take my company name and my personal name off your website and any other promotional or educational material. This is important due to the controversy that you are presently facing."

719.     On September 30, 2013, Babener forwarded an email to Mike Sheffield that he had sent to Merrill directly stating TelexFree's illegality with the note "So you understand the discussion."

720.     On or about September 30, 2013, following a conference call between Babener, Merrill, Sandford, Tober, Craft, and Wanzeler, Sandford emailed Babener requesting a copy of the agreement TelexFree used with its promoters.  That same day Babener responded by email, attaching a copy of the agreement.  In another email of that day, Babener copied Kauffman, Sandford and Tober in his response to an email from Merrill regarding an article titled "MLM Pro Ken Stewart Perspective On The Question Of TelexFree Being A Pyramid Or Ponzi."

721.     On or about October 1, 2013, Mike Sheffield was cc'd on a blunt email from Merrill to Wanzeler:

> We are asking people to risk $1425 do a little bit of ad placement work (they don't even do it they have a company do it for them) all they make is $100 a week selling product back to us. We reward them for no effort. We face business failure and or Jail.

Babener, Borromei, and Labriola were also copied on Merrill's email.

722.     On or about October 1, 2013 Babener and all the individual defendants associated with the Babener and Associates and Sheffield Group business entity Defendants were copied on an email making clear they all faced jail time for participation in TelexFree's ongoing unlawful and criminal enterprise.

723.     During or about September 2013, the MLM A Team recommended that TelexFree

restructure its compensation plan in order that it become legally compliant. That having been openly said, at no time did Babener or Garvey Schubert or the Sheffield Group ever insist that this restructuring be implemented and they never recommended suspending new investments pending restructuring or put a timeline in place.  Rather, as detailed herein, they acted as co-conspirators and profited.

724.    Throughout the entire fall of 2013 and well into 2014, TelexFree continued to actively sell its AdCentral plans to victims under its original non-legally compliant compensation plan with the knowledge and assistance of Babener, Garvey Schubert, Sheffield and later, PwC.

725.    Defendant PwC came on board the MLM A Team at or about the end of 2013 at the suggestion of Babener specifically to assist with structuring and effecting that international expansion and international tax-related issues.

726.    By the end of 2013, TelexFree was under intense scrutiny both within the U.S. and internationally.  The company's banks and payment processors were running for the hills.

727.    TelexFree retained PwC during January 2014 - approximately six months after TelexFree had been shuttered by government authorities in Brazil.

728.    PwC was a critical co-conspirator with the other MLM A Team Defendants who enabled and effected the express purposes of TelexFree's proposed international expansion, which were known to PwC:  to keep the Scheme running, to move TelexFree's operations and money beyond the reach of federal and state regulators in the United States and to find banks willing to service TelexFree even though TelexFree was embroiled in legal actions and surrounded by extensive negative publicity.

729.    Previously, during or about November 2013, TelexFree required assistance with handling international taxation matters, specifically a receivable from the TelexFree Brazilian

entity, Ympactus.  Because no member of the TelexFree MLM A Team was a sufficiently experienced international tax consultant, TelexFree CFO Craft recommended in a meeting with Jim Merrill that TelexFree obtain other professionals to handle the international taxation issue.

730.    At that meeting, Merrill called Attorney Babener to request his input.  As a result of Merrill's call, in or about December 2013, Babener introduced him to Richard Colabella at PricewaterhouseCoopers ("PwC") to assist TelexFree with its international tax and regulatory matters.

731.    Attorney Babener had worked with Colabella for twenty years beforehand.

732.    Upon information and belief, Babener informed Colabella of TelexFree's pyramid scheme operation in their discussions related to PwC's engagement.

733.    During or before January 2014, Colabella introduced TelexFree to Jerry Puzey, another PwC partner who was Director of International Tax Services.

734.    PwC was made aware of the fact prior to engaging in due diligence of TelexFree that Ympactus had been shut down in June 2013.

735.    Moreover, during the due diligence period before PwC accepted TelexFree as a client, from December 2013 through the beginning of January 2014, TelexFree executives instructed TelexFree CFO Craft to provide information regarding the company to PwC.

736.    At PwC's request, CFO Craft provided PwC with a copy of TelexFree's financials, including a draft of TelexFree's unadjusted 2013 Q3 financials, its current corporate structure, a proposed new structure involving a holding company and an international TelexFree affiliate, resumes of both Carlos Wanzeler and James Merrill, and answers to a list of due diligence questions.

737.    CFO Craft also had phone calls with PwC personnel to answer questions.

738.    Upon information and belief, as a result of those phone calls, PwC gained actual knowledge that TelexFree's business empire was an unlawful pyramid/Ponzi scheme.

739.    PwC reviewed TelexFree's website and marketing materials and as a result of its due diligence, PwC gained actual knowledge that TelexFree's business empire was an unlawful Pyramid/Ponzi scheme. A simple Google search of TelexFree and/or Ympactus would also have revealed the Brazilian court's findings.

740.    PwC had actual knowledge of the closure in Brazil, the rejections by financial institutions, and well-publicized accusations of operating a pyramid scheme and the many other issues surrounding TelexFree operations and business model.

741.    As part of the MLM A Team, PwC had frequent communications with TelexFree's Defendant Attorneys Babener and Garvey Schubert as they collectively developed and effectuated TelexFree's international strategies and its responses to the investigations begun in the United States by the Massachusetts SOC, Securities Division.

742.    In January 2014, PwC entered into a formal agreement for services with TelexFree.

743.    An email chain from January 26, 2014 to January 29, 2014 including PwC's Puzey and Colabella, TelexFree founder Merrill, TelexFree accountant Craft, and Attorney Defendants Nehra and Babener demonstrates PwC's awareness of TelexFree's domestic legal issues which discussed limiting the information that would be provided by TelexFree to the Massachusetts SOC Securities Division.

744.    In or about January 2014, PwC developed and provided to TelexFree and its team a Proposed Global Business Alignment plan in draft form with the objective of, *inter alia*, "[p]repar[ing] a flexible and scalable model for future business growth, expansion, new lines of

business, etc." and that presented a number of options to achieve that end. The thrust and main

point of this document was the shifting of funds and operations offshore and to locations beyond

the reach of the United States justice system and to locations with lax Pyramid/Ponzi/Financial

Crime enforcement. Although not every granular suggestion along the way worked out, that

executive level concept was adopted by TelexFree.

745.    As part of those services, PwC obtained knowledge of the illegality of

TelexFree's operations but nevertheless provided its services that allowed TelexFree to hide its

illegality and continue to operate during 2014.

**2.  Despite knowing that TelexFree was continually operating as an illegal Scheme, the MLM A Team provided essential services that enabled TelexFree to continue and expand its daily operations and to remove its ill-gotten funds from the reach of its victims and U.S. authorities until the Scheme's collapse.**

746.    Without the agreements, partnering, teamwork and other timely and substantial

assistance of its MLM A Team, TelexFree would have collapsed or been raided and shuttered no

later than the fall of 2013.

747.    Despite knowing that TelexFree was operating as a pyramid scheme, the MLM A

Team took actions that directly supported and enabled the continued operation of the original,

knowingly illegal program and the transfer of the unlawfully obtained victim funds into the

names of the Founders and their related individuals and to non-U.S. banks.

**a.  The MLM A Team substantially assisted TelexFree's business operations' continuation and expansion in the United States after August 2013.**

748.    The MLM A Team sought to preserve TelexFree's ongoing profitability at all

costs, while knowing that each day massive numbers of innocent victims were handing over their

savings to TelexFree.

749.    Notably, despite actual knowledge that TelexFree was operating a wholly

unlawful and criminal enterprise, Michael Sheffield and The Sheffield Group did not appear to

consider or act to have TelexFree suspend or immediately stop recruiting new members and

taking their money.  Instead they affirmatively acted to warn TelexFree and their co-

conspirators, including those on the MLM A Team, that such a course of action would run

against and counter profitability and they advised them against making any immediate changes

that would hurt it financially.  By participating in this act, the Sheffield Defendants and each

member of the MLM A Team acted as a co-conspirator furthering TelexFree's Scheme and

assisted TelexFree to maintain its operations and revenue stream – comprised of the massive

funds being taken daily from innocent victims who would later lose everything.

750.    For example, on or about December 5, 2013, Mike Sheffield sent an internal

email to Garvin Deshazer noting, "While it is important for this client to achieve a working

compensation plan model that is legally defensible, it is equally important that it works

financially so as not to create significant losses in revenue due to a flawed approach."

751.    On or about December 23, 2013, while analyzing financial data for a proposed

new program, Mike Sheffield warned that while the proposed approach "may be a legal remedy,

it could spell disaster from a business perspective." Babener, Nancy Kikes, Sarah Smith,

Wanzeler, Merrill, Deshazer, Lind, Stenmoe, and Peruzzini were all copied on the email thread.

752.    In the same email, Mike Sheffield unequivocally proclaimed to TelexFree and his

co-conspirators his conclusion that TelexFree's numbers only worked as a pyramid scheme:

> We are having great difficulty making your numbers work based on good business
> practice. In fact, it seems that the only way it would work is to use new money in to pay
> for the potential ongoing ADC commitment if your only rule for earning ADC is to create
> 3 customers one time.

753.    On or about December 23, 2013, The Sheffield Group's Executive Consultant

Garvin DeShazer also warned Merrill against immediately imposing requirements that may

render the program compliant but rather argued for some ramp up time for promoters noting

Mike's "concern (and I agree) is that making it all or nothing could result in massive, and

unnecessary, short-term attrition. Borromei, Sheffield, Lind, Stenmoe, and Peruzzini were all

copied on the email.

754.    At the same time, Babener, The Sheffield Group, Garvey Schubert and PwC

provided Merrill and Wanzeler with legal and business assistance and strategies that substantially

assisted and/or enabled TelexFree's continued operation.

755.    The assistance and strategies provided by Babener, The Sheffield Group, Garvey

Schubert, and PwC which substantially assisted and/or enabled the maintenance and expansion

of TelexFree's operations during and after August 2013 included, *inter alia*:

- Finding and securing banking and payment processing outlets to continue and expand operations
- Assisting with the structure of the withdrawal and the subsequent placement of approximately $20 million from TD Bank accounts when those accounts were shut down by TD Bank

- Assisting with TelexFree's business issues, including authorizing continued training at Super Saturday events, assisting with maintaining management at a time when a simple google search would have revealed its legal problems and discourage candidates; providing advice and introductions and offering materials for marketing purposes; investigating and advising on other outlets for VoIP product; and assisting with immigration issues for TelexFree top promoters

- Devising a new, yet knowingly non-compliant, compensation plan aimed at preserving TelexFree's profits

- Staving off legal inquiries so that the illegal operation could continue to operate

- Suborning the submission of two sets of cooked books to the SOC; and

- Advising and assisting TelexFree to prepare and issue unfair, deceptive, inaccurate, suspicious, and unlawful 1099 (Miscellaneous Income) forms.

i. **The MLM A Team secured banking and payment processing outlets to continue and expand TelexFree's illegal operations after August 2013.**

756.     Despite knowing that TelexFree was operating an illegal pyramid/Ponzi scheme, Babener, The Sheffield Group and Garvey Schubert facilitated and substantially assisted critical relationships with financial services providers to service the Scheme.

757.     On or about August 24, 2013, Merrill informed Babener that TelexFree was "getting a hard time from both our credit card processing banks & our commission pay out banks."  On or about August 29, 2013, Merrill again raised TelexFree's issues with banks and payment processors and pled for help because of TelexFree's inability to secure them due to its fraud and chargeback issues.

758.     Despite fully knowing that TelexFree was actively operating an illegal pyramid/Ponzi scheme, Babener emailed Merrill and Sheffield indicating that he was willing to connect Merrill with payment processor companies that he knew.  Babener also suggested that Sheffield would have some ideas.

759.     As early as September 6, 2013, Babener directed Merrill to provide false information on TelexFree's current business in a letter Merrill was being asked to send to a top TelexFree promoter (Zaid Thweib) in Jordan.  Thweib needed the letter to convince Jordanian banks (Societe General Bank and Housing Bank) to accept funds into the accounts of TelexFree promoters.

760.     While knowing TelexFree was operating as a pyramid scheme with no true product, Babener told Merrill not to hold TelexFree out as an advertising company in the letter, but as "a direct selling company that markets consumer products and services through a sales force of independent distributors."

761.     Upon information and belief, the banks accepted those deposits as a result of the Babener-crafted letter.

762.    That letter paved the way for the continued operation of the Scheme's funneling money to top promoters.

763.    Again, on or about September 10, 2013, Merrill sought Babener's assistance because Allied Wallet, a well-known fraud-servicing payment processor and "the only Visa processor we have now," needed documentation to obtain a UK address and registration number for TelexFree from Regus, a virtual office supplier.

764.    Despite the basic credit card network rules that require a merchant to be located in the same geographic jurisdiction as the acquiring bank and define a merchant's location as the country of its principal place of business (generally its headquarters), Babener provided the tools necessary for Merrill to comply with the request:  the services of a UK law firm.  *See* Payment Processing Section.

765.    Babener knew TelexFree Ltd. was a fake shell UK company, with only a mailbox in the U.K.

766.    Babener thereby enabled TelexFree to evade the generally stricter regulatory framework of the U.S. financial system.

767.    Babener introduced TelexFree to two attorneys with Lawrence Graham in London, England who Babener identified to assist in meeting the needs of Allied Wallet regarding AML compliance verification to supply to Regus, a virtual office supplier, to ensure that payments would continue to be processed.

768.    Using his 25-year relationship with Lawrence Graham, Babener introduced TelexFree and its CEO Jim Merrill as his "new client" to Graham and stated merely that "[t]he company has been in business for a couple years, operating in the U.S. and Brazil.  It offers a service to allow customers to call a flat rate to foreign countries.  It intends to expand its line."

He never mentioned that he had determined TelexFree was at that very moment operating a pyramid scheme and that the services the Lawrence Graham would provide would be perpetuating that daily scheme by securing a payment processing outlet.

769.    Jonathan Riley, one of the attorneys introduced by Babener, explained what documents to provide for the bank.

770.    Babener offered substantial assistance by enabling TelexFree's quest to obtain processing and banking services through exploiting his prior business relationships.

771.    Upon information and belief, Allied Wallet was able to satisfy the documentation needs and to give TelexFree access to the credit card network and processed millions of dollars for TelexFree.

772.    Despite knowing that TelexFree was operating an illegal pyramid/Ponzi scheme, Babener and Garvey Schubert helped TelexFree to identify and determine how to best use payment processors to shield their ill-gotten proceeds.

773.    For example, on November 5, 2013, Garvey Schubert's Tober and Sandford attended a telephone conference with Merrill, Babener and Craft and discussed using IPayout for U.S. and foreign transactions (i.e. the receipt victims' funds).  Shortly thereafter, Sandford emailed Merrill cautioning him that she was uncertain if using IPayout would shield foreign revenue from the reach of U.S. regulators in the event of a lawsuit.  Babener, Tober and Wanzeler were included on that email.

774.    Despite knowing that TelexFree was an unlawful pyramid/Ponzi scheme, Babener substantially assisted Jim Merrill in late December 2013 with issues he was having forming a company in Florida which Merrill informed Babener was being required by a bank with which they were setting up an account and which was intended to be TelexFree's "US Finance

corporation."

775.     In an email string beginning on December 29, 2013, Babener and Merrill

discussed trademark issues regarding the use of TelexFree's name and Babener gave Merrill

specific instructions on how to overcome them.

776.     The result of those efforts was the incorporation of TelexFree Financial, Inc.

777.     On December 30 and December 31, 2013, TelexFree Financial received wire

transfers totaling $4,105,000 from TelexFree, Inc. and TelexFree, LLC.

778.     TelexFree Financial funded the operations of the other TelexFree entities from its

PNC Bank's general disbursements bank account.

779.     Propay made deposits into TelexFree Financial's account at PNC Bank.

780.     Upon information and belief, only because of the issue being successfully

resolved by Babener, Merrill was enabled to obtain its banking services to further TelexFree's

ongoing fraudulent scheme.

781.     Further, the MLM A Team stepped in to convince TelexFree's banks and a

payment processor to continue providing services to the Scheme, which were successful.

782.     With respect to payment processor Bank Card Consultants' efforts to secure a

sponsoring bank for processing, on November 26, 2013, Craft reached out to Babener on behalf

of Merrill and requested a "comfort letter" regarding TelexFree's compliance with the law.

783.     Babener initially refused to write such a letter, stating that they do not write them

as a policy and suggested that TelexFree ask Nehra instead.

784.     Babener also offered another solution, an introduction to his colleague, Scott

Fitzpatrick, of Pivotal Payments, one of the largest MLM processors.  Babener touted his

influence with that processor, stating "They just finished at my request, approval for Zinzino, a

Swedish coffee and nutrition company we are bringing to the US." Craft replied accepting the offered introduction and handing it off to Merrill.

785.    Despite his initial refusal to write a letter for his own signature and thereby directly implicate himself, Babener nevertheless later found a way around the issue: drafting a letter for Merrill's signature that sidestepped the issue of TelexFree's legality.

786.    On or about December 8, 2013, in reviewing a letter to supply to a prospective banking services provider drafted by Merrill, Babener stated categorically in an email to Merrill: "You have no basis to make the following statement: Under these laws TelexFREE does not commit or operate with any fraudulent practices." Wanzeler and Nancy Kikes were copied on the email.

787.    Despite the fact that by December 8, 2013, Babener had repeatedly informed TelexFree that they were not in "legal compliance," but rather were operating a pyramid/Ponzi scheme, Babener in that same email drafted an alternative, and intentionally misleading, letter for Merrill's signature including the line: "we are confident that we are in legal compliance as to the offering and delivery of our services." Babener copied Sandford, Tober, and Kauffman on a later email in the chain so that "they understand [his] thoughts on direction."

788.    Garvey Schubert's Tober reviewed the content of Babener's misleading letter.

789.    Bank Card Consultants, upon information and belief, was able to secure the banking service provider as a result of the MLM A Team's efforts connected to the letter, who provided services to TelexFree into 2014.

790.    Substantially assisting to obtain the use of another bank, on January 31, 2014, Garvey Schubert's Sandford and Tober discussed using Wells Fargo Bank with TelexFree's Joe Craft. Later that day, Sandford conferred with her colleague Weaver regarding potential bank

account changes for TelexFree.

791.    Upon information and belief, on March 19, 2014, at the request of James Merrill, Babener drafted another letter sent to TelexFree's banking partners, particularly Wells Fargo Bank, to persuade them to continue servicing TelexFree's accounts.  Robert Weaver of Garvey Schubert was copied on that email.

792.    Following receipt of that letter, Wells Fargo Bank continued to supply services to TelexFree's Scheme during the critical 2014 time period.

793.    Babener also helped Merrill identify other outlets to place money TelexFree was receiving from victims.

794.    For example, on or about November 8, 2013, Babener introduced TelexFree to Neil Kimmelfield and Jeremy Babener—defendant Babener's son—of Lane Powell to analyze a potential TelexFree investment of $2,500,000 in a wind farm. Defendant Craft was President and Chief Financial Officer of the wind farm company.

795.    Upon information and belief, that investment was made.

796.    In that same email, Babener noted, "As you are exploring other banking relationships, you might visit this subject with Neil and Jeremy as Lane Powell has a major banking practice and represents several leading banks... And might have a suggestion."

**ii.  Babener and Garvey Schubert assisted TelexFree to keep banked $20 million from its TD Bank account upon its closure for fraud issues.**

797.    Despite knowing that TelexFree was operating an illegal pyramid/Ponzi scheme, Babener and Garvey Schubert assisted Merrill on structuring the withdrawal and subsequent placement of $20 million from a TD Bank account that was shut down for fraud issues.  They similarly assisted Merrill in locating other banking outlets in connection with that closure.

798.    On November 6, 2013, Merrill informed Babener via email that TD Bank had

closed TelexFree's account and that Merrill had checks for $20,000,000 from TelexFree's TD

Bank accounts. Despite knowing that TelexFree was actively operating an illegal pyramid/Ponzi

scheme, Babener and Garvey Shubert's Tober and Sandford assisted Merrill in finding an

account for those funds.

799.    In his November 6, 2013 email, Merrill told Babener that he was going to him

"with this first" as the team point person regarding TD Bank closing TelexFree's accounts and

let him "decide who we need to involve." Merrill informed Babener.

> I have checks from TD in the amount of 20 million that I am not sure what to do with I
> will try and open another account but wanted to get advice from you on how. I can't just
> walk into a branch with a check for 20 million dollars. Is there a way to get involved with
> another bank without drawing red flags.

800.    Babener responded by choosing Garvey Schubert's Tober and Sandford and asked

them to "weigh in on locating a new bank" and touting **that "$20M is not a bad first deposit."**

(emphasis in original).

801.    Merrill informed Babener he would "go bank [sic] to TD bank and ask them to

brake [sic] the check into under 5 million so it will be easier to bring in several bank partners as

well as some investment partners."

802.    In the same November 6, 2013 email chain, Babener and Sandford endorsed the

breaking down of the check, which would help avoid scrutiny.

803.    Despite knowing those accounts would be used for – and were essential to – the

continued operation of TelexFree's scheme, Babener, Sandford and Tober engaged in a course of

email exchanges on November 7, 2013, to assist Merrill in identifying "possible banks and

locations for new corporate bank accounts" and on November 8, 2013 "re potential banking

options."

804.    Babener followed up again offering to "check for references to banks from

colleagues at merchant processors such as pivotal payments or global pay groups like

Hyperwallet."

805.    Sandford looked for contacts at local banks, noting "When it rains it pours."

806.    On or about November 8, 2013, Sandford introduced Merrill to a contact at The

Commerce Bank of Washington, a bank used by Garvey Schubert, who "may have some ideas

about how you address the banking challenges you mentioned."  Sandford re-sent this

information on November 26, 2013 "per Jim's request" and copied Jack Unbehend of The

Commerce Bank of Washington "so he knows to expect to hear from you."

807.    TD Bank, at TelexFree's request and after Babener's and Sandford's approval,

broke up the original $18,448,267.66 check into five or more pieces—each under $5 million--to

make it easier for Merrill and TelexFree to launder those sums through other financial

institutions.

808.    Upon information and belief, those funds were successfully banked.


### iii. The MLM A Team provided legal and business services and consulting that kept TelexFree's operations running.

809.    Despite knowing that TelexFree was running a pyramid/Ponzi scheme, the MLM

A Team provided legal and business services coupled with consultant services that were integral

to maintaining the Scheme's operation.

810.    Despite knowing that TelexFree was running a pyramid/Ponzi scheme, the MLM

A Team provided legal and business services coupled with consultant services that were integral

to maintaining the Scheme's operation.

811.    For example, on December 9, 2013, Merrill contacted Babener regarding an

internal problem TelexFree was having with its participants "cross-recruiting and other agent

violations" such as raiding to other programs.  The Sheffield Group's Davene and Mike

Sheffield were eventually included in that email chain.

812.     Babener resolved the issue by drafting a letter for Merrill to send to offending participants and told Merrill to adopt the policies Babener had previously drafted and sent to Merrill.

813.     Upon information and belief, that letter was sent by Merrill and addressed the internal issue.

814.     Despite knowing that TelexFree was a pyramid/Ponzi scheme, the Babener team acted as legal and business consultants on other basic issues that were integral to maintaining TelexFree's operation.

815.     In an October 4, 2013 email from Babener to Merrill, which included the team of Mike Sheffield, Garvin Deshazer, Davene Peruzzini, Debbie Stenmoe and Jay Borromei, Babener acknowledged to Merrill that "You are obviously at risk under state and federal legislation so long as you offer the current program."  Nevertheless, he specifically advised Merrill he could go forward with TelexFree's Super Saturday training meetings that TelexFree was continuing to put on in Florida without restrictions, stating that "Florida is historically an aggressive enforcement state on pyramiding (where there is insufficient retailing ratios), but we have not seen major action in quite some time and I assume you have no evidence that you are a subject of interest."  Merrill had described the training sessions to Babener earlier that day as "[w]e do everything like they have done in Brazil."

816.     Despite knowing that TelexFree was operating a Pyramid/Ponzi scheme, Babener and The Sheffield Group also provided advice, introductions, and offered materials for TelexFree's marketing.

817.     On or about October 9, 2013, Merrill cited Babener's advice as the reason not to

respond to negative news articles: ""In the past Jeff has suggested we don't respond this this blog. If we feed the blog it will grow."

818.    On or about November 16, 2013, Babener introduced TelexFree to Clifton Jolley of Advent Communications to manage the public relations side of TelexFree's transition of the future March 9, 2014 compensation plan.

819.    Babener worked directly with Clifton Jolley through April 2014 to comprise and review press releases and communications strategy.

820.    Despite knowing that TelexFree was operating an illegal pyramid/Ponzi scheme, The Sheffield Group's efforts secured the internet marketing services provided to TelexFree by an expert in the field, Jon Ward, who expressed high concern on September 25, 2013 about working with TelexFree, stating

> I've never like the phrase "no smoke without fire."  However, when the air is filled with billowing, black clouds of the stuff.

Mike Sheffield, Debbie Stenmoe, Davene Peruzzini, Ken Lind, and Chris Sheffield were all copied on the email.

821.    Ward stated his concern that he had offered to connect TelexFree with a "trusted internet source" and indicated he'd "prefer to delay it" to protect that company.  He stated that although he like to help Sheffield Group in any way he could, he was not sure now about calling Jim Merrill.

822.    The Sheffield Group's Garvin Deshazer acted quickly, urging Ward to continue working with TelexFree, knowingly and falsely vouching for TelexFree's leadership team and hoping he had eased Ward's concerns.  Mike Sheffield, Stenmoe and Peruzzini were all included in this email chain.

823.    Ward agreed to provide website-related services and continued to do so until or after March 2014.

824.     On or about January 28, 2014, Mike Sheffield reviewed and advised Merrill on a potential digital advertising program for TelexFree.

825.     The Sheffield Group's Deshazer introduced Merrill and TelexFree to an internet marketing expert, Josh Elizetxe, of the company Foresold via Ward.  Merrill touted that with Foresold's help, TelexFree "could see millions of downloads" of TelexFree's mobile app in a few months.

826.     Despite knowing that TelexFree was operating a pyramid/Ponzi scheme, Babener and Garvey Schubert's Tober and Sandford planned TelexFree's tax filings and strategies, including its 2013 year-end tax options and methods for reducing taxable income, which substantially assisted TelexFree in retaining and its ill-gotten victim funds and enabled its continued operation under the radar of authorities.

827.     PwC also provided planning services for TelexFree-related entity, Ympactus, which PwC had identified in its Proposed Global Business Alignment plan as part of TelexFree. An email chain from February 25, 2014 to February 26, 2014 between Craft, Wanzeler, Merrill, and Weaver discusses that PwC approved the treatment of Ympactus Comercial Ltda.

828.     Despite knowing that TelexFree was operating an illegal pyramid/Ponzi scheme, Babener and The Sheffield Group investigated and advised Merrill on other outlets for its program.

829.     During the fall of 2013, The Sheffield Group and Babener assisted TelexFree in a deal involving a company known as My Financial Advantage ("MFA") that offered credit restoration services as part of the TelexFree experience.

830.     On October 4, 2013, James Merrill sent an email to Defendant Babener regarding My Financial Advantage, stating:

This company has been in business 22 years and knows the issues.  The funny thing is when we were in Arizona for our original meeting the Sheffield Group [sic] they seemed more excited about this product than our VOIP product.  Speak to Mike [Sheffield] and Garvin [Deshazer] about this.  I know the industry has a bad rap just like MLM there are good MLM's & bad MLM's.

831.    TelexFree entered into a contract with MFA and provided staffing and IT services worth $80,000 to TelexFree in connection with the MFA product from October 2013 to March 2014.  Merrill noted internally in response that "Sheffield loves this service."

832.    Despite knowing that TelexFree was operating a pyramid/Ponzi scheme, Babener and Garvey Schubert assisted TelexFree with immigration issues facing several of its top producing – and therefore most harmful to TelexFree's victims – promoters.

833.    On or about September 25, 2013, Merrill emailed Babener for immigration assistance for several TelexFree agents looking to attend TelexFree's corporate meeting in Orlando, Florida.

834.    Babener introduced Merrill to Garvey Schubert's immigration partner, Gregg Rodgers, to assist, and who did upon information and belief successfully assist, with the immigration issue.

835.    Babener and The Sheffield Group knowingly, negligently or deceptively played a substantial and instrumental role in developing TelexFree's unlawful March 9, 2014 compensation plan.

836.    Babener and Sheffield Group were explicit in acknowledging that the new compensation plan was being drafted to be a tool to defend TelexFree in the legal investigations against it rather than to make it a truly legal operation, and they further knew that the proposed plan itself was not legal.  Upon information and belief, those efforts successfully staved off regulatory action and enable the Scheme to continue.

141

837.    On or about January 15, 2014, Babener informed Mike Sheffield via email that

the new plan was "subject to questioning" even though it was "light years ahead of the existing

problematic program from a compliance defense standpoint." Nancy Kikes, Merrill, Wanzeler,

Borromei, Stenmoe, Peruzinni, and Deshazer were copied on the email.

838.    On or about January 16, 2014, Mike Sheffield recognized in an email to Borromei

that The Sheffield Group's role was to create a program that would allow Babener to shield

TelexFree from investigation by regulators: "My assignment is to make sure we have a document

that gives Jeff a tool for defense if needed." Merrill, Wanzeler, Stenmoe, Peruzinni, Deshazer,

and Babener were copied on the email.

839.    The Sheffield Group's work on the March 9, 2014 compensation plan included

drafting multiple versions of the plan, creating financial models for how the plan would work,

and assisting in the creation of marketing materials to explain the March 9, 2014 plan.

840.    On or about April 3, 2014, The Sheffield Group performed a "stress test" on the

revised plan, which confirmed that the new plan it had devised and imposed upon victims on

March 9, 2014 was still unsustainable.

841.    During this period, The Sheffield Group wrongfully provided general business

management and consulting services to TelexFree, advising TelexFree's executives on matters

including Promoter compensation, Promoter recruiting and retention, and structuring transactions

involving AdCentral packages.

842.    In an email to Weaver on or about April 2, 2014, Babener suggested that Garvey

Schubert's Weaver and the Greenberg Traurig attorneys should open a civil litigation file for

claims from promoters. Babener later explained: "By altering the terms [of the promoter

contracts], the company is reneging. However, it has no choice because the old program was

illegal." Merrill, Macmillan, Kikes, Wanzeler, Weaver, Conti, Berthiaume (Greenberg Traurig),

and Hayeser (Greenberg Traurig) were copied on the email.

843.    On or about April 8, 2014, Weaver emailed Merrill and Wanzeler, cc'ing

Babener, Sandford, Conti, Berthiaume (Greenberg Traurig) and Hayeser (Greenberg Traurig) to

report that "The lawyers had a telephone meeting this afternoon."  In the same email, Weaver

outlined that threatened lawsuits by promoters risked their strategy to keep TelexFree out of a

criminal prosecution or SEC investigation. Weaver's response was to dedicate another Garvey

Schubert Barer Attorney, Pat Conti, to address all complaints and threats of lawsuits from

lawyers for promoters. Weaver warned "They need to be dealt with quickly and consistently so

as not to provoke complaints to criminal investigative agencies."

### iv.  PwC assisted TelexFree in issuing false tax forms.

844.    As part of its tax services regarding TelexFree's ongoing domestic operations,

PwC negligently advised TelexFree to prepare and issue unfair, deceptive, inaccurate,

suspicious, and unlawful 1099 (Miscellaneous Income) forms in 2014.

845.    In an effort to maintain the illusion that it had made payments to its members and

on the negligent advice of PwC, TelexFree mailed fraudulent and inaccurate 1099

(Miscellaneous Income) forms to its members as described above.

846.    Those inaccurate 1099 forms were filed with the Internal Revenue Service and

State Revenue Offices and will impose an undue burden and hardship on Promoters who may

now be liable to pay taxes on income they never received.

### b.  The MLM A Team devised and implemented a plan for TelexFree to use international outlets through which to operate the Scheme and through which TelexFree safeguarded its cache of victims' funds.

847.    At the same time as they were acting to maintain TelexFree's domestic

operations, the MLM A Team was concurrently devising and implementing a plan to move

TelexFree's assets offshore and to establish international outlets through which to operate the

Scheme.

848.    The express purpose of TelexFree's proposed and accomplished international

expansion was to move TelexFree's operations and money beyond the reach of U.S. victims and

federal and state regulators and to find banks willing to service TelexFree even though TelexFree

was embroiled in legal actions and surrounded by extensive negative publicity.

849.    Ultimately, TelexFree, through the assistance of the MLM A Team, set up a

corporate structure which included companies in financial fraud safe havens Nevis, Dominican

Republic, Canada, England and Wales and Grand Cayman.

850.    Upon information and belief, TelexFree also established companies in Columbia

and Ecuador.

851.    The plan to expand into and exploit international outlets was pursued by the

MLM A Team from the inception of their retainment.

852.    On or about September 10, 2013, Babener emailed Merrill regarding TelexFree's

international expansion, advising TelexFree of the option to retain overseas MLM attorneys to

ensure compliance.  Although he suggested a preference for compliance with foreign laws,

Babener stated that

> Obviously, if you are looking for the correct way to do this, from a legal
> standpoint, this would be the correct way.  However, this is very costly and time
> consuming […]

853.    He further states that practically speaking, "the chances are mixed that you will

hear from a foreign entity."  Babener then gave legal advice that TelexFree may be able to skirt

the law by having affiliates sign up at the US site and hope to go unnoticed by local authorities.

854.    On or about September 11, 2013, Joe Craft emailed Babener inquiring about an

offshore bank account to receive international sales so that "if some US authority freezes our bank accounts, then we would still have cash flow. . . . **We want a bank that would not freeze our bank account if some foreign authority told them to (such as the US)."** Nancy Kikes and Merrill were copied on the email thread.

855.    The MLM A Team, led by Babener and Garvey Schubert, were critical actors in structuring TelexFree's international business outlets during fall 2013.

856.    On or about September 30, 2013, to further his effort to shield TelexFree's ill-gotten gains, Babener suggested that TelexFree legally separate the U.S. market from all other markets and suggested that TelexFree's global parent company be domiciled abroad.

857.    In another email on that date, Babener acknowledged that "to my knowledge, TelexFree has taken no steps to comply or customize its contracts in foreign markets to comply with local direct selling and consumer protection laws" despite its continued operations.

858.    On or about October 10, 2013, Craft emailed Sandford seeking advice on which TelexFree entity was the best one to transact their international business. Sandford replied by noting that the Garvey Schubert Attorney Defendants had formulated a recommended structure for TelexFree. Craft, Merrill, Wanzeler, Babener, Tober, and Kauffman were copied on the email.

859.    On the same day, Craft forwarded an email to Sandford and Tober regarding offshore accounts.  Sandford replied, adding Kauffman to the thread, noting "I just spoke with Sam and he wants to speak with the clients about this before any account transfers occur."

860.    On or about October 15, 2013, Sandford emailed Merrill, Craft, Babener, Wanzeler, Tober and Kauffman attaching a memo "regarding the corporate aspects of potential liability for TelexFREE's U.S. operations in connection with recent developments in Brazil,

along with our suggestions for restructuring TelexFree's operations worldwide and a summary of the pros and cons and open issues related to such proposed structure."

861.    Babener and Garvey Schubert's knowledge that TelexFree's existing compensation plan was actually an illegal pyramid scheme was a factor in their strategy for corporate restructuring.

862.    On or about October 24, 2013, Sara Sandford emailed Babener asking whether the concerns about the existing illegal program justified starting new entities.  In his response, Babener recognized that any new entity would likely have successor liability and so "Biggest protection will be international corp shift. Merrill, Wanzeler, Tober, and Nancy Kikes were copied on Babener's response.

863.    Despite knowing that TelexFree was operating an illegal pyramid scheme, Garvey Schubert developed a strategy for TelexFree's international expansion. This strategy included the using of a separate "financing company" that would process TelexFree's incoming and outgoing investor payments,  "the primary purpose" of which would be to limit "legal and tax exposure in multiple jurisdictions."

864.    As noted by Tober in an email on or about October 29, 2013:

> If the payment and remittance function is a division within TelexFree and not a separate legal entity, the inquiries of the authorities and any sanctions could be pursued against TelexFree's assets. The financing company provides a tax efficient mechanism to handle payments and remittances and provide a level of protection for the assets of TelexFree.

Craft, Merrill, Sandford and Babener were copied on the email.

865.    Sandford and Tober also warned TelexFree against using payment processors that may be subject to U.S. jurisdiction for foreign payments or who would voluntarily comply with U.S. court orders.

866.    In an email dated November 5, 2013, Sandford noted:

Gary and I had one other thought right after we hung up: There may be an issue with using I Payout if you really want to shield foreign revenues from access in the event of some kind of lawsuit in the U.S. That is to say, if the company managing those foreign fund accounts is subject to U.S. jurisdiction (which we understand you said I Payout likely is), they might feel compelled to comply with U.S. court orders, regardless of the location of the accounts themselves.

Merrill, Babener, Tober and Wanzeler were copied on the email.

867.    On or about November 16, 2013, Babener advocated against using a Canadian corporation as TelexFree's international parent company.  Babener argued: "[I]f your program were presented to the Competition Branch, counterpart of our FTC, with respect to an advisory opinion as legitimate MLM vs. Pyramid, **I am quite sure you would be informed that the previous and existing program violates the Competition Act and is a pyramid**."

868.    (emphasis added). Merrill, Wanzeler, Nancy Kikes, Sara Sandford, Gary Tober, and Andreia Moreira was were copied on the email.

869.    Sandford's response to this blunt assessment that TelexFree was a pyramid scheme was simply to suggest that they "match up a 'preferred tax jurisdiction' list with a 'preferred MLM regulatory' list of countries" noting that "[s]ince overseas business is expected to represent about 70% of TelexFree's business, this is an important decision."

870.    TelexFree retained PwC in January 2014, approximately six months after TelexFree had been shuttered by government authorities in Brazil.  Thereafter, PwC began working with Babener, Garvey Schubert and The Sheffield Group to push the international expansion and to address taxation and TelexFree's business structure.

871.    PwC furthered TelexFree's Scheme by, among other things, advising them where to place funds and how to layer the placement of funds and to move funds outside the United States and otherwise provided essential accounting and tax services and advice.

872.    PwC furthered TelexFree's criminal enterprise and ongoing operations and acted

as co-conspirators, accessories, accomplices and aiders and abettor's through its partner Richard Colabella and Director of International Tax Services Jerry Puzey.

873.    PwC, through its partner Richard Colabella and Director of International Tax Services Jerry Puzey worked closely with the MLM A Team and TelexFree Founders Merrill and Wanzeler and as part of the team of co-conspirators assembled to enable TelexFree to continue its ongoing operations, money laundering, and concealment of suspicious banking activities.  They took a lead in the efforts to launder or move overseas (and out of the reach of the United States' justice system) money that they had actual knowledge was obtained through the use of unlawful means.

874.    PwC partners Colabella and Puzey lead the efforts to secret assets through the development of an international organization structure at a time when its status as a pyramid scheme was well-known and other service providers were refusing to provide TelexFree or its related persons and entities with financial services within the United States.

875.    While not every specific offshore safe haven for fraud they targeted as a best place to essentially get away with financial crimes was ultimately selected, their urging of the concept of creating offshore shell companies and financial accounts was in fact aggressively acted upon by TelexFree and PwC's other co-conspirators. So was the tax fraud in the form of the issuance of formal tax documents that they recommended. PWC's affirmative acts of putting forward experience and research driven ideas and analysis, and their other contributions were essential components to the aforementioned activities that did take place.

876.    On January 10, 2014, PwC's Puzey and Colabella attended a telephone conference with TelexFree's accountant Craft and Garvey Schubert's Tober and Sandford regarding development of TelexFree's international structure.

877.    On January 10, 2014, Puzey, Colabella, Craft, Tober, and Sandford discussed establishing a new overseas entity that would become TelexFree International, Ltd.  PwC proposed that TelexFree LLC transfer its contractual rights to overseas agents and customers to that entity.  Upon information and belief, they were.

878.    In January 2014, PwC's Colabella and Puzey met with Merrill, Wanzeler, and Sandford and Tober of Garvey Schubert, and Craft and made a PowerPoint presentation entitled "TelexFree Proposed Global Business Alignment." This presentation set forth PwC's recommendations regarding TelexFree's global expansion, taxation, and regulatory matters.

879.    PwC and its partners and members Colabella and Puzey developed and provided to TelexFree and its team a Proposed Global Business Alignment plan in draft form with the objective of, inter alia, "[p]repar[ing] a flexible and scalable model for future business growth, expansion, new lines of business, etc." and that presented a number of options to achieve that end.  At the time PwC and its partners and members Colabella and Puzey with the cooperation of their Co-conspirators prepared and submitted the plan they acted to further a criminal enterprise to:

a.  avoid detection by law enforcement;

b.  deter or avoid enforcement through the United States civil justice system;

c.  launder illicit money;

d.  move illicit money offshore financial fraud safe havens;

e.  move components of a criminal operations offshore;

f.  move aspects of a criminal operations offshore;

g.  ensure that a criminal enterprise maintained its operation; and

h.  expand a criminal enterprise.

880.    Meanwhile, TelexFree's Craft conducted a phone call with Tober and Sandford of

Garvey Schubert on January 31, 2014, to explore other ways of using Wells Fargo Bank for its banking needs, including to transfer and receive funds in order to shield them from United States authorities.  This phone call occurred soon after the UK TelexFree affiliate Telexfree Ltd. passed a board resolution to move its funds to TelexFree, LLC's Wells Fargo Bank account no. xxxxxx6715 from a Bulgarian bank on January 28, 2014.

881.     PwC played a critical role in TelexFree's secreting and illegally laundering funds illegally obtained from its victims through the establishment of a foreign base of operations in the Cayman Islands under the name TelexFree International, Ltd.

882.     In or about January 2014, PwC's Colabella and Puzey along with Garvey Schubert's Tober and Sandford specifically suggested that TelexFree establish a "foreign base of operations" in Grand Cayman.

883.     The purpose of this foreign base was to permit TelexFree to continue its operations out of the reach of U.S. regulators.

884.     As part of those efforts, PwC worked hand-in-hand with TelexFree Founder Merrill, Babener, Garvey Schubert and TelexFree accountant Craft as evidenced in multiple telephone conferences and email exchanges during winter 2014.

885.     In early February 2014, PwC's Rich Colabella and Jerry Puzey took part in a conference call with Craft, Babener, and other members of TelexFree's leadership, to discuss how to expand TelexFree's international business.

886.     Knowing that the Massachusetts Securities Division was investigating TelexFree, on or about February 9, 2014, Babener once again advised TelexFree to get its assets outside Massachusetts' jurisdiction.  Babener forwarded the email to Robert Weaver and Sara Sandford later the same day, noting "Just FYI":

As to Mass, you, in a deliberate fashion, and under guidance of Weaver, need to get out of Mass as soon as you can. **This means, getting assets beyond the control of Mass.** It means getting your marketing program out of Mass. It means an analysis that hopefully shows historically as small activity in Mass as possible. It probably ultimately means closing Mass, shifting all US and global activity to another state or international sales to an international entity. It may mean you and Carlos and your assets moving outside if [sic] Mass if this can be done in a way that doesn't trigger action by Mass.

887.    PwC's overarching strategy of moving operations and funds offshore was adopted, and so they provided assistance to TelexFree, with regard to proposed expansion into Colombia and Ecuador.

888.    On February 14, 2014, Jeffrey Babener suggested relocating TelexFree's operations to Nevis to "remove foreign revenue out of US regulatory jurisdiction." Merrill, Wanzeler, Weaver, Sandford, Colabella, Puzey, Craft, Tober, and Nancy Kikes were copied on the email.

889.    In the same email, Babener asked Colabella and Puzey to "weigh in," as they were working on the "big picture structuring," according to Babener. Merrill, Wanzeler, Weaver, Sandford, Colabella, Puzey, Craft, Tober, and Nancy Kikes were copied on the email.

890.    In or about early February 2014, Craft conferred with Tober about establishing a bank account for TelexFree in Nevis. Cardenas had previously established a Nevis account for Wanzeler and suggested that one also be established for TelexFree. At Tober's direction, Cardenas opened this account.

891.    Upon information and belief, Merrill utilized the Nevis TelexFree entity to remove funds from U.S. regulatory jurisdiction.

892.    As the Massachusetts SOC investigation progressed, on or about February 16, 2014, Babener emailed Garvey Schubert's Tober and Sandford, and PwC's Colabella, and Puzey conveying Merrill and Wanzeler's concern "to move as fast as possible to a scenario where all

international reps sign up with a non US entity located outside the US. Their reasons are liability and asset protection. . . . they would do the [sic] tomorrow if they could." Tober, Merrill, Wanzeler, Weaver, Sandford, Colabella, Puzey, Craft, and Nancy Kikes were copied on the email.

893.    Knowing that there was a pending Massachusetts investigation, the Garvey Schubert Defendants sped up their formation of an offshore entity to shelter TelexFree's payment processing and victim funds.

894.    PwC was aware of and participated in TelexFree's efforts to shift its international sales to foreign entities which would serve the purpose of placing the scheme's proceeds beyond the reach of United States regulators.  Importantly, enactment of this plan also allowed foreign banks to serve as Merchant Banks.

895.    It is noteworthy that according to co-conspirator Babener, TelexFree International structuring was "driven" by PwC.

896.    From February 25, 2014 to March 3, 2014, Wells, James Merrill, Wanzeler, Moreira, Colabella, Puzey, Babener, Tober, Sandford and Craft engaged in an email exchange regarding the establishment of a foreign entity for TelexFree in the Cayman Islands which would be named TelexFree International, Ltd., and the opening of a new bank account for this entity.

897.    On February 27, 2014, Puzey personally suggested that TelexFree expand into places such as the Caymans, the Netherlands, or Luxembourg. The best location depended on whether tax implications or "with insulating from legal challenges was the primary goal".

898.    On or about February 28, 2014, Sandford emailed her contact at Walkers Global regarding formation of TelexFree's Cayman Islands entity.  On March 5, 2014 Sandford noted Garvey Schubert's willingness to advance the costs for formation:  "Regarding the bill, you may

send the bill in care of me and/or bill Garvey Schubert Barer, if you wish, at my address below. We will then charge TelexFree, Inc., because that company asked us to arrange this formation."

899.    In the same February 28, 2014 email, Defendant Sandford indicated that TelexFree's Brazilian branch had experienced "some difficulties with regulatory authorities in Brazil," but she nevertheless pressed forward with TelexFree's international expansion.

900.    On or about March 2, 2014, Babener went further and suggested that TelexFree have U.S. distributors, as well as international distributors, sign up with an offshore entity: "As to US offering to US distributors, **although unusual, you may wish to have US distributors sign up with an international MLM, such as Cayman, rather than a US entity**. Other leading companies don't do this, but you may wish to consider this option for the US, at least in the short term."  (emphasis supplied). Craft, Colabella, Puzey, Nancy Kikes, Wanzeler, Merrill, Tober, Sandford, and Borromei were copied on the email.

901.    On or about March 3, 2014, Sandford, after consulting her contact, confirmed that a Grand Cayman entity could be incorporated in a single day, which she decribed as "quite quickly" once they had information regarding the proposed name and the identities of shareholders and directors.

902.    Also on or about March 3, 2014, Craft, at the direction of Tober, Sandford, Babener, Puzey, and Colabella, asked Wells Fargo Bank and Wells Fargo Advisors' Mauricio Cardenas to establish a bank account for TelexFree in Grand Cayman, under an entity that Sandford would be setting up through her contacts in the Caribbean as the account holder. The specific purpose was to transfer money TelexFree was having a hard time placing and to move money around through various accounts and to move money offshore.

903.    As a result, Cardenas opened domestic accounts for TelexFree with Wells Fargo

Bank, and attempted to open international accounts at Wells Fargo Bank in Grand Cayman, which upon information and belief were opened, for purposes of transacting business overseas and concealing funds from U.S. regulators. Through international accounts TelexFree intended to conceal funds derived from promoters in the United States and place them outside the reach of U.S. authorities.

904. Craft personally engaged in conversations with Sandford and Tober of Garvey Schubert and PwC regarding establishing TelexFree's foreign base of operations and using accounts with Wells Fargo Bank to transfer and receive funds in order to shield them from United States authorities.

905. Sandford did in fact use her contacts in the Caribbean to establish a TelexFree entity in Grand Cayman, for purposes of off-shoring TelexFree's merchant processing and assets in order to evade federal and state regulators in the United States.

906. By March 6, 2014, TelexFree International Ltd, a Grand Cayman entity, had been formed as a result of Sandford's work with her contacts at Walkers Global, for purposes of off-shoring TelexFree's merchant processing and assets in order to evade federal and state regulators in the United States.

907. On March 14, 2014, as evidenced by handwritten notes, a meeting took place with PwC, Defendant Attorneys Tober and Sandford of Garvey Schubert Barer, and Stuart MacMillan, TelexFree Interim CEO, regarding funding the Grand Cayman company and other items.

908. On March 24, 2014, PwC invoiced TelexFree for its advising regarding the operating plan for the future of TelexFree, identifying MLM favorable jurisdictions to set up a foreign holding company, assisting in preparation of Massachusetts Commission inquiry, and for

advising on US Tax filings including 1099 reporting.

909.    On or about March 26, 2014, Sandford forwarded via email documents she had received from Cayman Islands counsel showing Wanzeler, Merrill and Costa were now the sole Officers, Directors, and Shareholders of TelexFree International, Ltd.  Wanzeler, Merrill, Colabella, Puzey, Tober, Babener, and Craft were copied on the email.

### c.    The MLM A Team Substantially Assisted TelexFree and Its Founders In Hiding The Illegality Of TelexFree's Operations From Authorities.

910.    At all relevant times, the MLM A Team was acutely aware of the closing circle of legal investigations in both the United States and worldwide.  The team's focus was to stave off the investigations to allow them to continue operations and to reap victims' funds under its illegal program while devising and implementing a plan for removing as much of the victims' funds as possible from the reach of the United States before those investigations potentially closed them down and seized those funds.

911.    This goal is explicit in a September 11, 2013 email from Merrill to The Sheffield Group, returning the Phase 2 consulting agreement and noting "I know you all agree the faster we move on this the greater opportunity for success & the least chance for regulatory scrutiny." Stenmoe, Peruzzini, Wanzeler, Mike Sheffield and Chris Sheffield were copied on the email.

912.    In October 2013, Babener and Garvey Schubert acted to shut down international inquiries.

913.    On or about October 8, 2013, Merrill emailed Sandford and Tober regarding an inquiry TelexFree received from a Spanish police department. This inquiry stemmed from a complaint by an individual seeking reimbursement for money paid to TelexFree.  In response, Babener noted "This turn of events is not a surprise, as I noted earlier, given a Spain connection to South America and Brazil.  However, next can come Interpol, FBI, Justice and SEC."

914.    On or about October 9, 2013, Babener advised TelexFree to immediately make a complete refund to the individual who instigated the Spanish police department inquiry with "the primary goal … to prevent a broader problem."

915.    That same day, as part of Babener and the Garvey Schubert's strategy to avoid any further investigation of TelexFree's conduct, Kauffman agreed to reach out to the Spanish police department to request more information about their investigation.

916.    That investigation continued through the fall of 2013, with Babener and Garvey Schubert fielding questions and providing responses which prevented any further action on the issue.

917.    In addition to acting to continue TelexFree's unlawful enterprise and not instituting a firm action plan that would prevent the putative class from suffering their daily continued ascertainable economic loss, the MLM A Team all participated in the submission of two differing and "cooked" sets of books to the SOC.

918.    Also in connection with the SOC investigation, PwC partners Colabella and Puzey took affirmative acts that collectively developed in strategy sessions TelexFree's responses to the investigations begun in the United States by the SOC, with Babener and Garvey Schubert.  Upon information and belief, their ideas and contributions were essential components to the SOC appearance and testimony.

919.    Despite knowing that TelexFree was an illegal pyramid/Ponzi scheme, Babener and Garvey Schubert also knowingly, negligently or deceptively assisted in crafting TelexFree's false responses to the questions and subpoenas of the Massachusetts Secretary of State's Office.

920.    An email chain from January 26, 2014 to January 29, 2014 evidences that PwC's Puzey and Colabella, worked with co-conspirators TelexFree founder Merrill, Craft, and

Attorney Defendants Nehra and Babener to limit the information TelexFree would provide to the SOC. Craft emailed Colabella and Puzey, with Nehra, Merrill, and Babener were copied on the email.

921.    Beginning in or about January 2014, and continuing through at least March 2014, Garvey Schubert also acted as counsel to TelexFree in preparing responses to the SOC's second round of subpoenas to TelexFree.

922.    On or about February 5, 2014, in response to a subpoena from the SOC, Babener emailed Merrill explaining "This is serious and not just a formality" and recommending "Now is the time for Bob Weaver to be representing you here. . . . He should be the one speaking on your behalf to the Mass SEC. . . . I am copying him. We should have a Conf call as soon as possible."

923.    On or about February 6, 2014, Weaver emailed Babener and Sandford to suggest a meeting to get Weaver up to speed.  Babener replied that an in-person meeting was not possible as they were snowed-in but explained "Long story short: old plan was a pyramid/Ponzi (sorry to say this) in which revenue for company and commissions could not be demonstrated to be driven from sale of product or usage, but rather from sale of advertising packages. Old/existing plan would be hard to defend."

924.    On or about February 9, 2014, Babener outlined his goals for Merrill and Wanzeler's deposition testimony before the Massachusetts SOC.

925.    Despite knowing that the changes to TelexFree had been driven by the issues in Brazil, bank accounts being closed, and Babener's own advice, Babener encourages a narrative that:

> last summer they [Merrill and Wanzeler] realized the potential for this global VoIP business and decided to put into motion both enhanced product offerings, but also yo [sic] dramatically upgrade the marketing program to implement far more customer acquisition and adoption of significant consumer protection rules.

Weaver, Merrill, Wanzeler, Nancy Kikes, Nehra, and Berthiaume (Greenberg Traurig)

were copied on the email.

926.    Garvey Schubert worked closely with, and shared information with, Babener, as

well as Wanzeler and Merrill, in crafting deceptive responses to the SOC's inquiries.

927.    In March 2014, Babener acted within the Commonwealth of Massachusetts to

further the goals of the Co-conspirators and TelexFree's unlawful empire by representing James

Merrill and Carlos Wanzeler in their depositions by the Massachusetts Securities Division.

During that testimony, TelexFree's cooked books were addressed.

928.    Babener also assisted with responding to the subpoena and preparing for James

Merrill's and Wanzeler's depositions.

**3.   The MLM A Team Massively Profited From Their Services That Enabled
TelexFree's Continued Operation As A Pyramid Scheme And Safeguarded
Wrongfully Obtained Funds From Victims.**

**a.   The Babener Defendants Billed Hundreds of Thousands Of Dollars In Fees For
Their Substantial Assistance Of The TelexFree Scheme**

929.    Despite knowing that TelexFree was operating an illegal scheme, Babener's

representation of TelexFree started in or around August 2013 and continued until its bankruptcy

filing in April 2014.

930.    In August 2013, TelexFree wired $6,000 to Babener & Associates from

TelexFree's TD Bank Account 0334.

931.    On September 15, 2013, Babener & Associates billed TelexFree a Flat Monthly

Engagement Fee of $6,000.

932.    In October 2013, despite being well aware the TelexFree was operating an illegal

Pyramid/Ponzi scheme, Babener & Associates did not cease representation but rather raised its

Flat Monthly Engagement Fee to $11,000 – almost double the prior month's fee – and assumed a

more central role with TelexFree.

933.    On October 15, 2013, Babener & Associates billed TelexFree a Flat Monthly Engagement Fee of $11,000, which was paid on or about October 22, 2013. Babener explained the additional $5,000 fee to Merrill: "we indicated that when we dived into coordinating corporate, tax, international, etc., we would add an additional $5k per month to our current basic billing of $6k."

934.    On November 15, 2013, Babener & Associates billed TelexFree a Flat Monthly Engagement Fee of $11,000, which was paid on or about December 20, 2013.

935.    On December 15, 2013, Babener & Associates billed TelexFree a Flat Monthly Engagement Fee of $11,000, which was paid on or about December 20, 2013.

936.    On January 15, 2013, Babener & Associates billed TelexFree a Flat Monthly Engagement Fee of $11,000, which was paid on or about February 21, 2014.

937.    On January 26, 2013, Babener requested another pay rise, proposing that his firm receive $20,000 a month in light of how central they were to TelexFree's business. This proposed increase was equivalent to almost double the existing rate and over triple the original billing rate.

938.    Knowing that TelexFree was operating an illegal Pyramid/Ponzi scheme and that regulators were actively investigating the company, Babener's first priority was to ensure that his fees were paid.

939.    After a course of billing TelexFree monthly and receiving payment on those invoices, on or about February 8, 2014, Babener suggested that TelexFree make a deposit to Babener & Associates' trust account for payment of Babener & Associates' fees.

940.    In a matter of days, on February 11, 2014, Babener & Associates received

$250,000 from TelexFree to hold in its trust account for the purpose of paying TelexFree's monthly retainer, equivalent to over a year of Babener & Associate's flat monthly engagement fee.

941.    On February 15, 2014, Babener & Associates billed TelexFree a Flat Monthly Engagement Fee of $11,000, which was paid on or about February 24, 2014.

942.    On March 15, 2014, Babener & Associates deducted $20,000 from TelexFree's account for that month's engagement fee.

943.    In total, Babener & Associates billed and was paid at least $92,000 in attorney's fees by TelexFree between August 2013 and March 2014 and held a further $230,000 in its trust account.

944.    According to TelexFree's bankruptcy filings, Babener was paid a total of $283,000.00 by TelexFree between January 21, 2014 and February 21, 2014.

**b.  The Sheffield Group Received Over $100,000 In Fees For Their Substantial Assistance Of The TelexFree Scheme**

945.    The Sheffield Group began to work with TelexFree in August 2013 continued to work with TelexFree until its bankruptcy filing in April 2014.

946.    On or about August 14, 2013, TelexFree wired $5,000 to The Sheffield Group from TelexFree's TD Bank Account 0334.

947.    On or about September 12, 2013, TelexFree paid The Sheffield Group $30,000 from TelexFree's Fidelity Account 3842.

948.    On or about October 10, 2013, TelexFree wired $12,800 to The Sheffield Group from TelexFree's Fidelity Account 3842.

949.    On or about November 5, 2013, TelexFree wired $12,800 to The Sheffield Group from TelexFree's Fidelity Account 3842.

950.    On or about December 19, 2013, TelexFree wired $12,800 to The Sheffield Group from TelexFree's Fidelity Account 3842.

951.    On or about January 21, 2014, TelexFree paid The Sheffield Group $12,800.

952.    On or about February 11, 2014, TelexFree paid The Sheffield Group $20,600 from Wells Fargo Account 6723.

953.    Between August 2013 and February 2014, TelexFree paid The Sheffield Group at least $106,800.

954.    TelexFree's bankruptcy filings, particularly the Statement of Financial Affairs, indicate that Sheffield Group received $33,400.00 in fees from TelexFree in January and February of 2014.

**c.  The Garvey Schubert Defendants Received Over $600,000 In Fees For Their Substantial Assistance Of The TelexFree**

955.    Despite knowing that TelexFree was operating an illegal scheme, the Garvey Schubert Defendants began to work with TelexFree in September 2013 and continued to work with TelexFree until its bankruptcy filing in April 2014.

956.    On or about September 25, 2013, TelexFree paid Garvey Schubert $50,000 as an advance fee deposit.

957.    On or about October 29, 2013, TelexFree wired $4,245.95 to Garvey Schubert from TelexFree's Fidelity Account 3842 for legal services billed through September 30, 2013.

958.    On or about November 26, 2013, TelexFree wired $21,603.97 to Garvey Schubert from TelexFree's Fidelity Account 3842 for legal services billed through October 31, 2013.

959.    On or about December 23, 2013, TelexFree wired $17,496.72 to Garvey Schubert from TelexFree's Fidelity Account 3842 for legal services billed through November 30, 2013.

960.    On or about January 30, 2014, TelexFree paid Garvey Schubert $14,849.50 for

legal services billed through December 31, 2013.

961.    On or about March 6, 2014, TelexFree paid Garvey Schubert $17,654 from

TelexFree's Wells Fargo Account 8506 for legal services billed through January 31, 2014.

962.    On or about April 3, 2014, TelexFree paid Garvey Schubert $71,677.90 for legal

services billed through February 28, 2014.

963.    September 2013 and April 2014, Garvey Schubert received at least $197,528.04

in attorneys' fees from TelexFree.

964.    Like Babener, after a history of billing TelexFree monthly for attorneys' fees, in

April 2014, knowing that regulators were focused on TelexFree, Garvey Schubert changed to a

retainer for payment of attorneys' fees.

965.    On or about April 11, 2014, TelexFree wired $350,000 from TelexFree Financial,

Inc's PNC Account to Garvey Schubert as a retainer.

966.    According to TelexFree's bankruptcy filings, Garvey Schubert was paid a total of

$532,503.50 by TelexFree between January 22, 2014 and March 6, 2014.

### d.  The PwC Defendants Received $65,000 In Fees For Their Substantial Assistance Of The TelexFree Scheme.

967.    Despite knowing that TelexFree was operating an illegal scheme, the PwC

Defendants began to work with TelexFree in January 2014 continued to work with TelexFree

until its bankruptcy filing in April 2014.

968.    In February 2014, PwC received a $29,970 payment for its services from Wells

Fargo Bank's TelexFree account.

969.    On April 3, 2014, TelexFree Financial, Inc. paid PwC $35,365.66.

970.    The MLM A Team committed their respective acts and omissions with the

knowledge of the fraudulent Scheme and that it was substantially assisting TelexFree to

perpetuate and advance the Pyramid Scheme to the benefit of TelexFree and itself, but to the

detriment and loss of the putative class.

**W.** TelexFree's Accountants and Professional Services Providers Played an Integral Role in and Aided and Abetted the Unlawful, Unfair, and Deceptive Pyramid Scheme

971.    Defendants Craft and Craft Financial participated in and perpetuated TelexFree's

unlawful business operation.

972.    In his dual capacity as CFO and CPA for TelexFree, Craft and Craft Financial

were responsible for preparing or approving TelexFree's financial statements and overseeing

TelexFree's accounting methods and records, and otherwise exercised significant supervision

and control over TelexFree.

973.    In exercising their duties, Craft Financial and Craft negligently participated in,

supervised and controlled conflicting financial statements for TelexFree that reveal massive

discrepancies.

974.    As the CFO and CPA for TelexFree, Inc. and TelexFree, LLC, Craft and Craft

Financial negligently assisted in perpetuating TelexFree's fraudulent Pyramid Scheme by:

- directing or overseeing TelexFree's creation of inaccurate, false or falsified accounting records;

- failing to ensure that GAAP was adopted and adhered to by TelexFree;

- certifying TelexFree's business operations and accounting practices as good and lawful;

- preparing inaccurate financial documents for the affiliated TelexFree entities;

- preparing inaccurate tax returns for the affiliated TelexFree entities;

- knowingly disseminating or allowing to be disseminated inaccurate financial information among and between Promoters; and

- conspiring with TelexFree's Officers to structure and perpetuate the TelexFree business model while enriching TelexFree, Craft Financial and Craft.

975. Defendants Craft and Craft Financial knew when providing their financial assistance that their roles would give substantial assistance or encouragement to the Pyramid Scheme.

976. Craft Financial and Craft also negligently assisted in preparing and sending the inaccurate 1099 forms to TelexFree's members.

977. Those inaccurate 1099 forms were filed with the Internal Revenue Service and State Revenue Offices and will impose an undue burden and hardship on Promoters who may now be liable to pay taxes on income they never received.

978. Craft Financial and Craft, negligently performed services and provided assistance and advice that was integral and essential to TelexFree and used to further TelexFree's unlawful business.

979. Craft Financial and Craft negligently provided TelexFree with these professional services despite having access to TelexFree's internal financial documents, which demonstrated that TelexFree received virtually no income from the sale of its VoIP product and was, in fact, an illegal Pyramid Scheme.

980. Craft Financial and, Craft knew when providing their professional services to TelexFree that their role would give substantial assistance or encouragement to TelexFree to continue its unlawful business model and would further the illegal Scheme.

981. Craft Financial and, Craft knew their representations and statements were false and misleading and that they would be and were used by TelexFree as a marketing tool to further advance its business model and illegal activities.

982. At all times relevant to this complaint, Craft Financial and Craft acted subject to

pervasive control of TelexFree and were subject to TelexFree's will.  Despite having actual

knowledge that TelexFree's Brazilian operations had been found fraudulent and enjoined by

Brazilian courts, Craft Financial and Craft, at the direction of and with information provided by

TelexFree, negligently crafted financial statements and negligently made representations

designed to misrepresent and hide the true nature of TelexFree's product, business model, and

operations in the United States and the effect of the Brazilian courts' findings and orders.

983.    At all times relevant to this complaint, Craft Financial, and Craft consented to be

agents of TelexFree.  Craft Financial and Craft knowingly allowed TelexFree to utilize their

deceptive and misleading financial statements and representations regarding TelexFree as

propaganda to retain and maintain members in the Pyramid Scheme.

984.    As agents of TelexFree, Craft Financial and Craft owed a duty to the putative

class not to make deceptive statements or misrepresentations in order to induce the putative class

to buy into TelexFree's Pyramid Scheme.

985.    Craft Financial Craft committed their respective acts and omissions with the

knowledge of assisting TelexFree to perpetuate and advance the Pyramid Scheme to the benefit

of TelexFree and Craft Financial, and Craft, but to the detriment and loss of the putative class.

986.    At all material times, Defendant Borromei served as the direct contact and liaison

between Defendant Opt3 and TelexFree.

987.    At all material times, Borromei had actual knowledge that TelexFree was an

unlawful Pyramid Scheme.

988.    In addition to providing technical support and assistance with payment

processing, Opt3 and Borromei managed and oversaw the technological aspects of TelexFree's

fraudulent and illegal activities.

989.    In or around 2012, Opt3 and Borromei were contracted by TelexFree to provide internet technology ("IT") services, to establish TelexFree's electronic database in Brazil, to maintain and service TelexFree's computers and electronic database, to provide assistance with processing payments and financial transactions, and to provide other technical support.

990.    Opt3 and Borromei set up and maintained TelexFree's electronic database. Together with TelexFree, Opt3 and Borromei conspired to set up TelexFree's servers in Brazil with the goal of evading U.S. regulators and hindering investigation of TelexFree in the event that TelexFree's Scheme should collapse or be shut down.

991.    On August 13, 2013, Defendant Borromei co-hosted an open webinar with Defendant Labriola, which promoted TelexFree's payment system, which had been established by Opt3 and which utilized Defendant GPG's electronic payment gateway, to TelexFree Investors and potential investors and encouraged them to make further investments using this system.

992.    On August 16, 2013, Borromei hosted an additional open webinar, in which he further promoted the payment system, including Defendant GPG's electronic payment gateway, and encouraged further investments in TelexFree using this system.

993.    By email dated September 27, 2013, Borromei petitioned GPG to allow TelexFree's continued use of its electronic gateway for transmitting Member credit card data.

994.    By email dated September 27, 2013, in response to Borromei's email earlier that same day, Jayme Amirie, President of GPG, indicated to Borromei that, although TelexFree represented a "reputational risk" for GPG, GPG would continue to allow TelexFree to use GPG's electronic gateway to transfer electronic data to Defendant Allied Wallet for processing Members' credit card payments.

995.    Borromei also worked with Defendants Sparman and Vantage Payments to establish TelexFree's payment processing through Allied Wallet.

996.    Opt3 and Borromei continued to provide services to TelexFree until the time of TelexFree's bankruptcy petition.

997.    Opt3 is listed as a trade creditor in TelexFree's initial bankruptcy filings.

998.    Borromei was also copied on numerous emails between and among TelexFree, Defendant Base Commerce's John Hughes, and GPG's Jayme Amirie, discussing the transition of TelexFree's payment processing to Allied Wallet and transfers of funds.

999.    Through their close relationship with co-Defendants Merrill, Wanzeler and Craft, and through their providing TelexFree with technological oversight and support, Borromei and Opt3 had actual knowledge of TelexFree's illegal and fraudulent activities yet continued to provide substantial assistance in the furtherance thereof.

1000.   Defendants Telecom Logic and its owner and chief software engineer Ryan Mitchell provided the software services essential to the operation of TelexFree's databases in connection with the scheme and without them TelexFree would have collapsed.

1001.   At all times relevant hereto, Mitchell acted within the regular and usual course of his employment and within the scope of his authority as sole owner and chief software engineer of Defendant Telecom Logic. Mitchell and Telecom Logic are jointly and severable liable.

1002.   Defendant Telecom Logic is vicariously, jointly and severally liable for all actions taken by its owner, agent and representative Mitchell.

1003.   As identified in a TelexFree executive summary touting its program and team, Mitchell is a software engineer with expertise in VoIP technology as well as IT networking.

1004.   As far back as April 2011, Defendant Mitchell was part of TelexFree Founders

and Executive Officers James Merrill and Carlos Wanzeler's inside team.

1005.   An organizational chart of TelexFree prepared in or about March 2014 identifies

Mitchell as one of three primary actors responsible for TelexFree's United States IT department.

Mitchell is described as TelexFree's "VoIP Communication Engineer . . . contracted from

Telecom Logic" and as being responsible also for overseeing Brazil VoIP and other IT staff.

The other two actors identified in the chart as TelexFree's U.S. IT department are Defendants

Borromei and Opt 3 Consulting and three individuals noted to be members of a Brazil IT team.

All three reported to Wanzeler under the umbrella of the "US Telex IT Dept."

1006.   While in the Commonwealth of Massachusetts, Defendants Telecom Logic and

Mitchell developed and adapted the software necessary for the operation of the TelexFree

program.

1007.   Telecom Logic provided software services that ran TelexFree's USA operations

from the Scheme's inception, when it was well-established that TelexFree had been shuttered as

an illegal scheme in Brazil, when investigation by United States authorities had begun, when

TelexFree's collapse in the United States was imminent and when it actually occurred.  During

that time, Telecom Logic and Mitchell were deeply involved and critical actors in the execution

and maintenance of TelexFree's sham VoIP and membership operations and freely discusse

TelexFree's lack of any true product.

1008.   In December 2012, Mitchell even referred to the program as "BS" (a common

abbreviation for the word "bullshit") when questioning its structure to Merrill in December 2012.

Nevertheless, Telecom Logic, through Mitchell, continued providing its services to TelexFree

and enabling the bilking of victims funds up until the bitter end and TelexFree's collapse in April

2014.

1009.   Defendants Telecom Logic and Mitchell had actual knowledge that TelexFree was running an unlawful Pyramid Scheme, that their software services were a critical part of that Scheme and that James Merrill and Carlos Wanzeler were at the top level of the fraud yet they willfully provided those services that substantially assisted TelexFree's operations from the inception of its United States operations through TelexFree's collapse and filing of a bankruptcy petition in April 2014.

1010.   The relationship between Mitchell and Telecom Logic and TelexFree involved significant amounts of activity through which they voluntary submitted to the jurisdiction of the Commonwealth of Massachusetts.

1011.   In the course of Mitchell and Telecom Logic's services to TelexFree, Mitchell made trips to Massachusetts on multiple occasions, and while on those trips he made the plans and carried out the substantial acts that maintained, sustained and exponentially grew TelexFree's unlawful Pyramid/Ponzi scheme, all while possessing actual knowledge gained through direct and pointed conversations on the point with TelexFree Founders and Executive Officers James Merrill and Carlos Wanzeler.

1012.   The very close business relationship between Mitchell and Telecom Logic and TelexFree began in 2011 and was subject to the laws of Massachusetts from where TelexFree operated its world headquarters at all times relevant to this civil action.  The relationship between Mitchell, Telecom Logic and TelexFree involved significant amounts of money.  This was especially true of TelexFree's use of Mitchell and Telecom Logic software-related transactions.

1013.   Upon information and belief, Mitchell and Telecom Logic received payments from TelexFree in connection with its unlawful enterprise in excess of $500,000.  These payments were made from TelexFree's bank accounts in Massachusetts.

1014.   The torts at issue here were committed within the Commonwealth of Massachusetts.

1015.   A substantial part of the events giving rise to Plaintiff's claims occurred in Massachusetts, a substantial portion of the affected interstate trade and commerce addressed within the complaint was carried out in Massachusetts, and Mitchell and Telecom Logic and TelexFree and its con-conspirators transacted business in Massachusetts.

1016.   Moreover, the activities of Mitchell and Telecom Logic and TelexFree and its co-conspirators were within the flow of, were intended to, and did have a substantial effect on the commerce of the Commonwealth of Massachusetts.

1017.   The United States District Court for the District of Massachusetts has in personam jurisdiction over Telecom Logic, Mitchell and TelexFree because, inter alia, Mitchell and Telecom Logic and TelexFree: (a) transacted business in Massachusetts, (b) transacted substantial business in Massachusetts, (c) had substantial contacts with Massachusetts, and (d) was engaged in an illegal scheme and conspiracy that was directed at and had the intended effect of causing injury to persons and entities residing in, located in, or doing business throughout the Massachusetts.

1018.   The volume and activity was such that Mitchell and Telecom Logic and TelexFree subjected themselves to the jurisdiction of the Commonwealth of Massachusetts who has an interest in the matter and controversies addressed through MDL 2566.

1019.   Mitchell was well aware of the pyramid scheme nature of TelexFree's operations and openly discussed the same with Founders and Executive Officers Merrill and Wanzeler. Mitchell worked hand-in-hand with founders Merrill and Wanzeler to develop, maintain and ensure the highest possible efficiency of the software used to power the scheme.

1020.   In the course of his work with TelexFree, Mitchell discussed TelexFree's strategies with Merrill, including its use of legal representative Nehra as a marketing tool, to give victims the false impression of TelexFree's legality.

1021.   Mitchell helped Merrill and Wanzeler with the Logitel Database.  The total number of minutes each VoIP plan used was automatically copied from the Logitel Database. The Logitel Database contained the actual VoIP technology itself that directed the internet phone calls to maximize speed and efficiency.  The related data clearly established that little to no phone use was in play and that TelexFree's money was generated from new Promoters.  This fact was confirmed by Mitchell when he confronted Merrill early on while they travelled together to Brazil on a plane.

1022.   Nevertheless, Telecom Logic, through Mitchell, worked closely with TelexFree Founders Merrill and Wanzeler and as part of the team assembled to establish TelexFree's United States operations and thereafter enabled it to present the façade of a legal program, all the while knowing it was a pyramid scheme.

1023.   For example, in a June 13, 2012 email, Merrill contacted Mitchell (and cc'd Wanzeler) in connection with the development and furtherance of branding TelexFree's phone service product and its launch in the United States.  He asked Mitchell to get in touch with another company (Blue Jimp, Inc.) to assist in developing and customizing software in that effort.  The following day Merrill again emailed Mitchell urging him to contact Blue Jimp as soon as possible to "speed up our launch."  He informed Mitchell in that same email that the "product is critical to our company being compliant legally and our overall success."  In a reply email that day, Mitchell reassured Merrill and Wanzeler that he was already in touch with the company.  It was known at the time that TelexFree was an unlawful business operation.

1024.   In an email dated June 15, 2012, Mitchell identified himself to Emil Ivov at Blue Jimp as the "principle engineer working with Jim Merrill and company."

1025.   Several days later, in a June 19, 2012 email, Merrill once again urged Mitchell to speed up the project, stating "Ryan is there anything you can do to get started now while until [sic] they are paid.  I know I spoke to you earlier about the importance of this project.  We need this product to keep our momentum in TelexFree."  Mitchell reassured him of his efforts to get TelexFree's new product up and running as soon as possible, stating "it is higher priority for me than my other projects and customers.  I want this to be successful and grow the company, so we will make it work."

1026.   In an email to Mitchell the next day, Merrill made crystal clear that TelexFree's program as it stood was not legal: "In February TelexFree launched we thought it would work but we needed product sales to prove the model and just as important make it legal. What we have now for products evidently did not work. We need something exciting to get the agents buying and reselling product. . . . We need something to get the agents excited about selling products or at least willing to buy for themselves. This makes us legal and profitable."

1027.   One month later, TelexFree's continued illegality was made plain to Mitchell in a July 30, 2012 email from Wanzeler to Mitchell and Merrill.  After Mitchell asked for clarification around a software change Wanzeler wanted to make, Wanzeler expressly stated that it was not a software change but that the current compensation plan needed to change so that they "cannot shut us down inside United States." Wanzeler wanted Mitchell and Telecom Logic LLC's new software in place so that TelexFree could "present this new format [requiring a minimum of 1 customer for its ADCentral to receive commission and bonuses from TelexFree] to our agents with [less] impact."

1028.   Despite knowing that TelexFree's program was operating illegally, from late August 2012, Mitchell entered into discussions with Merrill and Wanzeler regarding increasing his commitment to and involvement with TelexFree, which was "necessary to enable TelexFree success," and regarding becoming its director of engineering.

1029.   Following a discussion with Merrill and Wanzeler on August 31, 2012, Mitchell emailed Merrill and Wanzeler on September 1, 2012 with a proposal for his work commitment and compensation.  He proposed a compensation package for his work on TelexFree consisting of $2,500/month fixed payment, expenses for his trips to Massachusetts, possible health insurance, and a "percentage of [MLM] sales commissions... many times my salary."  Mitchell also committed to "flying to MA for 5 days each month" when Diorgeney was in the US or "5 days every other month" if Diorgeney was not in Massachusetts.

1030.   Mitchell proposed that his role at TelexFree would be as Director of Engineering, where he would take responsibility for "all mission critical telecom and IT components in the company that directly support operations of the TelexFree client software, the databases that power it all, and the networking and telecom software (including continuing work on Diskavontade)."  He wanted to have "final control" over database operations, network security and the configuration and routing of carrier VoIP connections.  Mitchell supported his compensation requests by arguing that "if the volume of business grows by a factor of 5 [which it eventually did] and I've engineered the critical telecom and database systems to enable that to happen, [then] I should be making in bonuses many times my salary."  In short, despite knowing that TelexFree's program as it was operating was illegal, Mitchell committed to build the systems that would allow TelexFree's Pyramid/Ponzi scheme to function and thrive and expected bonus payments that would reflect the centrality of his work to the scheme's success.

1031.   Near the end of September 2012, Mitchell noted in an email to Merrill and Wanzeler that "not too many people are using" TelexFree out calls and wondered if people were having problems.  Mitchell noted that "when I look during the day I only see 2 or 3 simultaneous calls."  In response, in an email on September 21, 2012, Wanzeler explained to Merrill and Mitchell that agents would have to acquire an additional customer paying $49.90 a month before making money on the MLM side of TelexFree.  However, he noted that customer can be the agent himself.  Wanzeler explained this "will be very good to our company" because "[t]his way will have thousand customers/agents pay the monthly fee if his [sic] want make money on MLM side, not only on the advertising side."  Mitchell agreed and proposed doing a "detailed risk and profit analysis of the business model."  He did so knowing that the business model was unlawful and that this would unlawfully maintain, sustain and potentially grow TelexFree's unlawful Pyramid/Ponzi scheme.

1032.   By December 2012, at the latest, Mitchell was aware that sales of the VoIP product were plainly insufficient to support the payments due to victims under the TelexFree plan.

1033.   During a trip to Brazil in December 2012, Mitchell listened to Merrill and Wanzeler's description of TelexFree's business plan and asked an obvious question:  How does a company that takes in $1,425 (from selling an AdCentral Family plan) but then has to pay out $5,200 a year per plan, survive? Where does the money come from?

1034.   During a series of emails between December 7 and 9, 2012, Mitchell asked how much revenue was coming from the sale of the VoIP and added, "If you can't answer these simple questions . . . everyone is eating BS!"  Merrill acknowledged the obvious: "If all the Revenue is from agent start up fees and we pay agents without them acquiring customers, we

would be in trouble." Nevertheless, Telecom Logic and Mitchell knowingly continued providing substantial assistance that enabled TelexFree's program to function, and to take victims' funds, for another 16 months until TelexFree's collapse in April 2014.

1035.   In an email dated January 9, 2013, Merrill discussed with Mitchell bringing on board Defendant Jay Borromei and Opt 3 Solutions for his MLM IT experience as a way to "leverage his MLM IT knowledge as a Marketing tool. Just like we did with Gerry Nehra. Gerry gives our agent comfort that our business model is legally sound.  We used his Bio on our Website."

1036.   In the same email thread, Mitchell reiterated the importance of engineering to TelexFree's ability to grow: "I know everybody likes Rafael, and he did a lot, but he is a programmer and not a high-caliber engineer. We have to do much better otherwise we won't be able to grow. In a few months our new $50,000 database server will be overloaded."

1037.   In mid-January 2013, Mitchell assisted TelexFree in addressing its need for additional bandwidth and installed an additional server.  Mitchell exchanged emails with Wanzeler, Merrill, and Diorgeney in determining TelexFree's approach and Access Northeast's need to shut the network in order to increase TelexFree's bandwidth.

1038.   Telecom Logic and Mitchell were still part of the core TelexFree team in June 2013.  In a June 5, 2013 email, TelexFree's Ana Paula Oliveira sent an email to Wanzeler, Merrill, Costa, Mitchell, and Jay Borromei, cc-ing Andreia Moreira, regarding fraudulent transactions involving ProPay, Inc. and informing them that almost 25% of the transactions completed on June 3, 2013 were fraudulent.

1039.   Even the investigation and closure of TelexFree in Brazil by Brazilian authorities did not deter Mitchell from continuing his knowing provision of software services essential to

TelexFree's unlawful operations in the summer of 2013.

1040.   During a series of emails between July 23 and 30, 2013, Mitchell gave Merrill (and in turn, Defendant Nehra) detailed numbers regarding actual phone calls, but as far as the number of actual customers, Merrill indicated that, "The customers is more complicated it is an ongoing IT issue."

1041.   In an email dated July 30, 2013, Mitchell indicated that there were 75,739 accounts that had made at least one phone call in the past three months, but indicated that he was unable to tell if these were free accounts or active accounts. TelexFree gave new participants 60 minutes free on their VoIP system.

1042.   An email dated January 17, 2014 from Mitchell to Defendant Borromei confirms Mitchell's knowledge of the Brazilian shutdown as an illegal scheme.  In it, Mitchell stated in reference to Wanzeler: "I know he's busy with legal quagmires in Brazil."

1043.   Telecom Logic and Mitchell's servicing of TelexFree's software database needs continued until TelexFree's collapse in 2014.

1044.   In its post-bankruptcy petition filings, TelexFree identified Telecom Logic as one of its contracting agencies providing IT and customer service support and moved for authorization to pay Telecom Logic $16,000 which it estimated to be owed to it prior to the petition date.

1045.   Mitchell's critical role in the scheme was detailed in the Department of Justice's trial brief filed in connection with its criminal action against James Merrill on September 28, 2016.  See United States v. Merrill, U.S.D.C. Mass., Case No. 4:14-cr-40028-TSH, Doc. No. 299 (Government's Trial Mem., dated Sept. 28, 2016) (incorporated herein by reference).

1046.   In the course of their services as well as their personal relationships and

interactions with Founders Merrill and Wanzeler, Defendants Telecom Logic and Mitchell

obtained actual knowledge of the illegality of TelexFree's operations but still provided integral

and essential services that allowed TelexFree to operate and proliferate in the United States.

> **X.** The Financial Services Providers Were Required to Comply With Various
> Statutory and Regulatory Investigation and Monitoring Obligations

1047.   Each of the Financial Services Provider Defendants is a "financial institution"

under the terms of the Bank Secrecy Act, 31 U.S.C. § 5312.

1048.   Each of the Financial Services Provider Defendants is required to implement in

their business operations proven solutions to assure compliance with key anti-bribery and

corruption regulations, including the Bank Secrecy Act ("BSA"), Foreign Corrupt Practices Act

("FCPA"), and critical anti-money laundering ("AML") mandates such as Know Your Customer

("KYC") and the Customer Information Program ("CIP").

1049.   Each of the Financial Services Provider Defendants is required by key anti-

bribery and corruption regulations to possess AML expertise.

1050.   At least six financial institutions not named in this action turned TelexFree away

before opening an account.

1051.   At least six financial institutions not named in this action turned TelexFree away

because of suspicious activity and other numerous "Red Flags" alerting them of fraud during the

same time period that the Defendant Banks transacted millions of dollars in business with

TelexFree.

1052.   Other banks not named in this action discharged TelexFree within weeks of

opening a financial service relationship with them.

1053.   Each Financial Services Provider profited from its relationship with TelexFree

and the other Defendants.

1054.   Given TelexFree's unlawful business operation and the "Know Your Customer" and AML regulations, each Financial Services Provider was obligated to refuse to open any accounts or process any transactions for the benefit of TelexFree.

1055.   Each of the Defendant Financial Services Providers was required to maintain robust, sophisticated and effective due diligence systems for purposes of BSA and AML compliance.

1056.   During times relevant to the complaint, each of the Defendant Financial Services Providers did maintain robust, sophisticated and effective due diligence systems for purposes of BSA and AML compliance.

1057.   When a Financial Services Provider finds out that a client is laundering money or running an unlawful enterprise it should:

- terminate the banking relationship;
- shut down the accounts; and
- file a Suspicious Action Report ("SAR").

1058.   Each of the Financial Services Provider Defendants are required to take precautions against violations of the BSA and AML laws by clearly understanding the risk in their customer base and conducting comprehensive enhanced due diligence that prioritizes those risks.

1059.   At all times relevant to this complaint, each of the Financial Services Provider Defendants was subject to federal regulatory law obligations that required them to:

- obtain and possess knowledge of and understand[69] their clients' business operations;

---

[69] In other words, the Financial Services Defendants did not simply have to gather information; they needed to analyze it and understand their clients' business models and key personnel.

- obtain and possess knowledge of and understand their clients' relationships and activities;

- continue to monitor such information throughout the term of their relationship; and

- take certain and defined steps once indicators of suspicious, tortious or illegal activity existed.

1060.   In particular, each of the Financial Services Provider Defendants was obligated by, without limitation, the BSA, the USA Patriot Act of 2001 (the "Patriot Act"), and federal regulations including 31 C.F.R. § 103.121 and amended 31 C.F.R. § 1020, et seq. (the "Federal Regulations") to perform a reasonable investigation of TelexFree to determine and understand:

- the true identity of its management;

- the true nature of its business activities;

- the true nature of its customer base;

- the true nature of its product offerings; and

- prior to agreeing to provide any financial services or access to the federally regulated banking system.[70]

1061.   Specifically, pursuant to the KYC analysis mandated by 31 C.F.R. § 103.121 and amended 31 C.F.R. § 1020, et seq. (the "Know-Your-Customer Regulations"), each of the Financial Services Providers Defendants was required to collect information sufficient to determine whether TelexFree, or any other customer of the Defendant involved with TelexFree, posed a threat of criminal or other improper conduct.

1062.   KYC controls typically include the following:

- collection and analysis of basic identity information (referred to in U.S. regulations and practice as "Customer Identification Program" or CIP);

- name matching against lists of known parties;

---

[70] *See also* Federal Financial Institution Examination Council, BANK SECRECY ACT ANTI-MONEY LAUNDERING EXAMINATION MANUAL (June 2005).

- determination of the customer's risk in terms of propensity to commit money laundering, terrorist finance, or identity theft;

- creation of an expectation of a customer's transactional behavior;

- monitoring of a customer's transactions against its expected behavior and recorded profile; and

- monitoring of a customer's transactions against that of the customer's peers.

1063.   In addition, at all times relevant to this complaint, the Defendant Financial Services Providers were mandated to conduct due diligence prior to opening an account pursuant to 31 C.F.R. 1010.620.

1064.   At all times relevant to this complaint, the Defendant Financial Services Providers were also mandated without limitation by the BSA, the Money Laundering Control Act of 1986 (the "Money Laundering Control Act"), the Patriot Act, and the Know-Your-Customer Regulations *to continue* to actively monitor TelexFree's business activities, customer base, *and product offerings* once it became a customer.

1065.   Each of the Financial Services Provider Defendants processed transactions in excess of $25,000 in the aggregate on behalf of TelexFree.

1066.   Processed transactions in excess of $25,000 in the aggregate on behalf of TelexFree were suspicious and triggered the SAR requirements set forth in the BSA and the Patriot Act.

1067.   A transaction is "suspicious" if the transaction:  (1) involves funds derived from illegal activities, or is conducted to disguise funds derived from illegal activities; (2) is designed to evade the reporting or recordkeeping requirements of the BSA or regulations under the Act; or (3) has no business or apparent lawful purpose or is not the sort in which the customer would normally be expected to engage, and the bank knows of no reasonable explanation for the transaction after examining the available facts, including the background and possible purpose of

180

the transaction.  31 C.F.R. § 1020.320(a)(2)(i) - (iii).

1068.    As a result of their obligation to file SARs with the Financial Crimes Enforcement

Network of the U.S. Department of the Treasury and other appropriate federal law enforcement

agencies, as required by the BSA and accompanying Federal Regulations, 31 U.S.C. § 5312 et

seq. and 12 CFR § 21.11 (the "Obligation"), each of the Financial Services Providers Defendants

was obligated to determine the nature of TelexFree's normal business activities at the beginning

of their relationship with TelexFree.

1069.    The Obligation to file a SAR with the Financial Crimes Enforcement Network of

the U.S. Department of the Treasury and other appropriate federal law enforcement agencies was

required on an ongoing basis during the course of each Defendant Financial Services Provider's

relationship with TelexFree.

1070.    Each of the Defendant Financial Services Providers performed the above SAR-

related investigations at times relevant to this complaint.

1071.    During times relevant to this complaint, TelexFree's Financial Services Providers

knowingly participated in and aided and abetted TelexFree's Pyramid Scheme by, *inter alia*,

enabling the TelexFree Pyramid Scheme to operate, expand and continue by providing necessary

financial services to TelexFree, the Operational Defendants, and each other, despite actual

knowledge that they were engaged in suspicious, tortious or illegal activity.

1072.    Each of the Defendant Financial Services Providers understood, at a minimum,

TelexFree's business models and key personnel prior to opening accounts.

1073.    Each of the Defendant Financial Services Providers performed the above

investigations and understood, at a minimum, TelexFree's business models and key personnel at

all times after they opened them and while they were servicing TelexFree's accounts.

1074.   At times relevant to this complaint, each of the Financial Services Providers Defendants willfully and knowingly acted unfairly, deceptively and in bad faith by failing to timely or properly act on their knowledge of TelexFree's suspicious, tortious or illegal business operation, and to otherwise fulfill their obligations under the BSA, 31 U.S.C. § 5311 et seq.; the Patriot Act, § 326, 31 U.S.C. § 5318; and 31 C.F.R. § 1020 *et seq.*, or, in the alternative, by failing to disclose or report the nature of TelexFree's business operations.

1075.   At all times material herein, the Financial Services Providers maintained departments responsible for ensuring compliance with the investigation, reporting, and procedural requirements contained in, *inter alia*, the Know-Your-Customer Regulations, 31 U.S.C. § 5312 *et seq.*, 31 U.S.C. § 5311 *et seq.*, the Patriot Act, § 326, and 12 CFR § 21.11 (hereinafter, "Regulatory Account Monitoring Department").

1076.   Each of the Financial Services Providers maintained a Regulatory Account Monitoring Department.

1077.   Each of the Financial Services Providers performed the initial investigations required by the foregoing laws.

1078.   Each of the Financial Services Providers performed the continual monitoring required by the foregoing laws.

1079.   At all times relevant to this complaint, in the course of complying with their regulatory duties and obligations, the Financial Services Providers and their employees and officers obtained actual knowledge that TelexFree, its Defendant Executive Officers and Top Level Promoters were engaged in suspicious, tortious or illegal activity.

1080.   In addition to what has already been set forth, actual knowledge of TelexFree's unlawful operation was based in part on the:

- large magnitude and long duration of the Scheme;

- nature and volume of the deposits;

- open association with others known to have been closely tied to past high profile Ponzi and pyramid schemes;

- extensive negative news reports; and

- the fact that the related accounts and transactions bore the classic hallmarks of a Pyramid Scheme.

1081.   Each of the Financial Service Provider Defendants possess and made use of highly sophisticated software programs that provided them with background information and financial details about prospective customers that are not available to the general public.

1082.   Under the federal AML laws, the Defendant Financial Service Providers must investigate the top managers, directors, and principal owners of their clients.

1083.   The Defendant Financial Service Providers also were aware of many Red Flags of suspicious, tortious, and criminal misconduct by TelexFree.

1084.   At least eleven major news and watchdog websites covering the MLM industry, Ponzi schemes, and online scams analyzed TelexFree in 2012, 2013 and 2014, including, but not limited to:

- BehindMLM.com, an internet watchdog and journalism site dedicated to the MLM industry;

- PatrickPretty.com, an internet watchdog and journalism site covering Ponzi schemes and internet crime;

- Skeptic.blogspot.com, an internet watchdog and blog covering the MLM industry and online scams;

- ASDUpdates.com, an online journal covering internet scams;

- BusinessForHome.org, an internet news site analyzing direct-selling and MLM opportunities;

- CitizenCorps.com, an internet news site analyzing work-from-home and online income opportunities;

- EthanVanderbuilt.com, an internet watchdog and news site covering online scams;

- MLMHelpDesk.com, a blog and news site dedicated to the MLM industry;

- PonziTracker.com, an internet watchdog and news site covering and analyzing Ponzi schemes;

- Scam.com, a community-operated message board analyzing and discussing internet scams; and

- ScamXPoser.com, an internet watchdog site analyzing online income opportunities.

1085.  In addition to the above-listed websites dedicated to the MLM industry, the following websites specifically dedicated to Ponzi schemes and other online scams conducted analysis and exposés on TelexFree in 2012, 2013, and 2014, including, but not limited to:

- http://www.dailymotion.com/video/xwbhex_telexfree-has-launched-in-usa-english-presentation_news, -  video posted on December 30, 2012 by TelexFree Promoter Kelly Isom Tolar, which shows TelexFree Promoters "showering" cash on each other while on stage at a promotional event, and states that TelexFree began in Brazil in January 2012, that it promises "up to $15,360" in income per day, that income is guaranteed without any sales of VoIP, and that TelexFree and Best Western Hotels had partnered to build 500 hotels in Brazil;

- http://www.slideshare.net/growrichteam/telexfree-marketing-plan-english - slide presentation posted on January 18, 2013, which discusses the pyramid structure of TelexFree's operation and states that TelexFree promises payment for posting of ads only, with no sales required;

- http://mmoljbp.blogspot.com/p/telexfree.html - blog posted on January 24, 2013, which repeatedly characterizes TelexFree as a "passive income opportunity," with the opportunity for "six generations of passive income," and discusses the pyramid structure of the operation;

- http://www.getresponse.com/archive/interestedpeople/Interested-People-TelexFree-Earn-20-a-week-for-a-year-no-recruiting-at-all-10992068.html - blog posted by a TelexFree Promoter named "Suzanna" on April 27, 2013, which states that TelexFree had been "sued by the Brazilian SEC"; and

- http://www.realscam.com/f9/telexfree-scam-not-2366/ - inquiry posted on a user-operated message board of the MLM community on May 30, 2013,

stating "It looks like a Ponzy [sic] for me," and requesting feedback, which included a link to BehindMLM.com's exposé of July 27, 2012.

1086.   TelexFree's *own website* admitted TelexFree's connection to Brazil, legal problems, and lack of legitimate income in a way intended to deceive its Promoters, but not in a way that would avoid detection by the robust and sophisticated systems and personnel of the Financial Services Defendants.  For example:

- As of February 25, 2012, the front page of www.TelexFree.com stated "99 TelexFree grows everyday in Brazil" and also included a slideshow presentation "by our President Mr. Jim Merrill" discussing the pyramid structure of the operation;

- As of January 19, 2013, the front page of www.TelexFree.com included a pop-up which stated as follows:  "During this week we have been in contact with several government agencies which was extremely useful to clarify the operation of TelexFree…some [Promoters] are making practices [sic] that go against the law of Brazil…";

- During 2013, www.TelexFree.com included photographs of Defendants Merrill, Wanzeler, Costa and numerous Promoters together on stage at the "1°Extravaganza" event, at which "jumbo" checks were distributed, and Members were encouraged to become "TelexFree millionaires" through increased promotion;

- During the entirety of 2013 until approximately November 6, 2013, the front page of www.TelexFree.com included a certificate stating that, according to data analyst Alexa Internet, Inc., "we are among the most visited sites in Brazil."  (Importantly, no similar certification with respect to any other country was included); and

- From approximately June 2012 through approximately May 25, 2013, the tab header for www.TelexFree.com announced, "Make money by posting ads."

1087.   Moreover, setting aside the highly advanced BSA and AML due diligence programs utilized by the Financial Services Provider Defendants, even the most basic internet investigation of TelexFree's clients or its business model or principals would have revealed to these sophisticated corporate entities with experience in identifying illegal and suspicious operations that TelexFree was running an unlawful Pyramid Scheme in the United States that

was essentially identical to its shuttered and enjoined Brazilian operation and was otherwise

suspicious, tortious or illegal.

1088.   At a minimum, the following high-profile English-language Google search results

generated simply by entering the search term "telexfree" required the Defendant Financial

Services Providers to carry out closer-than-standard inquiry and monitoring:[71]

- January 1, 2013.  The first page of Google search results includes a video posted by promoter Kelly Isom Tolar to dailymotion.com that clearly sets forth the payment structure of company, as well as the Best Western investment opportunity (http://www.dailymotion.com/video/xwbhex_telexfree-has-launched-in-usa-english-presentation_news).  The visible video description by Kelly Isom Tolar states the following: *http://telexfreeusateam.com* "TelexFree has taken over Brazil since January 2012. Now the USA has the green light to open their doors as of November 2012.  In just 11 months, Brazil has created 8 millionaires with 380,000+ reps company wide.  Here comes the USA and our opportunity with TelexFREE.  I look forward to a lucrative business partnership with you."

- January 24, 2013.  A prominent Google result is a Blogspot webpage discussing the income scheme – including references to "6 Generations of Passive Income" – that unambiguously describes a pyramid scheme, and also discusses the hotel opportunity (http://mmoljbp.blogspot.com/p/telexfree.html).

- March 1, 2013.  A first-page Google result is a video entitled "TelexFree Marketing Plan," with transcript, posted to slideshare.net (http://www.slideshare.net/growrichteam/telexfree-marketing-plan-english) that sets forth the structure of TelexFree, clearly describing a pyramid scheme.

- April 27, 2013.  A posting by promoter "Suzanna" on getresponse.com, an online marketing community site, discloses that TelexFree is a "company that originated in Brazil and has even been examined and sued by the Brazilian SEC."  She also describes TelexFree as a passive income opportunity. (http://www.getresponse.com/archive/interestedpeople/Interested-People-TelexFree-Earn-20-a-week-for-a-year-no-recruiting-at-all-10992068.html).

---

[71] *See also* search engine trends for TelexFree (provided by MLMRankings.com): http://www.mlmrankings.com/telexfree/trend.htm.

1089.   There were also many other videos posted to YouTube and other sites that constituted Red Flags to the Financial Services Provider Defendants.

1090.   The already sophisticated eye of the Financial Service Providers in AML monitoring is buttressed by the requirements imposed on them by federal banking regulators under the auspices of the FFEIC.

1091.   FFIEC's Bank Secrecy Act and Anti-Money Laundering Examination Manual (the "FFIEC Examination Manual") requires Financial Services Providers operating in the United States to establish mandatory Anti-Money Laundering Programs and Guidelines.

1092.   According to the FFIEC Examination Manual, every Financial Services Provider must have a written Customer Identification Program ("CIP") that has been approved by the bank's board of directors.

1093.   The purpose of the CIP is to enable the Financial Services Provider to form a reasonable belief that it knows the true identity of each customer.

1094.   The CIP should describe, among other things:

- circumstances in which the Financial Services Providers should not open an account;
- when the Financial Services Providers should close an account after attempts to verify a customer's identity have failed; and
- when the Financial Services Providers should file a SAR.

1095.   The CIP must include procedures for determining whether the customer appears on any federal government list of known or suspected terrorists or terrorist organizations, Office of Foreign Assets Control lists, and lists compiled under 31 CFR 1010.520 (Section 314(a) requests).[72]

---

[72] The Patriot Act Section 314(b) permits financial institutions, upon providing notice to the United States Department of the Treasury, to share information with one another to identify and report to the federal government activities that may involve money laundering or terrorist

1096.   Most major Financial Services Providers use specialized software programs to run these database checks.

1097.   According to the FFIEC Examination Manual, the Financial Services Provider's board of directors must also approve a written BSA/AML compliance program for the institution.

1098.   The Financial Services Provider's board of directors must also evaluate the Financial Services Provider's audit and training programs to ensure that the CIP is adequately incorporated.

1099.   The Financial Services Provider's account opening procedures must mandate that the Provider conduct a risk assessment of prospective customers and classify them as low-risk, medium-risk or higher-risk.

1100.   This risk assessment classification will affect how intensive the Financial Services Provider's BSA and AML due diligence process must be.

1101.   The FFIEC Examination Manual states "the bank may determine that a customer poses a higher risk because of the customer's business activity, ownership structure, anticipated or actual volume and types of transactions, including those transactions involving higher-risk jurisdictions." If so, the bank should consider obtaining, both at account opening and throughout the relationship, the following information on the customer:

- purpose of the account;

- source of funds and wealth;

- individuals with ownership or control over the account, such as beneficial owners, signatories, or guarantors. *Guidance on Obtaining and Retaining Beneficial Ownership Information* was issued by FinCEN, Board of Governors of the Federal Reserve System, Federal Deposit Insurance

activity.  Financial institutions wanting to do so may notify the Treasury Department by clicking on the Section 314(b) Certification link and supplying the required information.

> Corporation, National Credit Union Administration, Office of the
> Comptroller of the Currency, Office of Thrift Supervision, and Securities
> and Exchange Commission, in consultation with the U.S. Commodity
> Futures Trading Commission, in May 2010. The guidance consolidates
> existing regulatory expectations for obtaining beneficial ownership
> information for certain accounts and customer relationships;

- occupation or type of business (of customer or other individuals with ownership or control over the account);

- financial statements;

- banking references;

- domicile (where the business is organized);

- proximity of the customer's residence, place of employment, or place of business to the bank;

- description of the customer's primary trade area and whether international transactions are expected to be routine;

- description of the business operations, the anticipated volume of currency and total sales, and a list of major customers and suppliers; and

- explanations for changes in account activity.

1102.   AML experts consider MLM companies such as TelexFree to be higher-risk customers for BSA and AML purposes, partly because they pose the risk of Ponzi schemes and violations of the Securities Act of 1933.

1103.   AML experts also regard MLMs as higher-risk because those companies have high volumes of sales, high customer dissatisfaction rates, and guaranteed money-back policies.

1104.   In 2013, the Financial Crimes Enforcement Network ("FinCen") instituted a BSA proceeding against TD Bank, which assessed a $37.5 million civil money penalty against that bank for failing to detect and report another Ponzi scheme and was predicated on the theory that Financial Services Providers should treat MLMs as higher-risk for purposes of BSA and AML

due diligence.[73]

1105.   FinCen's action supports the conclusion that MLM companies should be treated

as higher-risk for purposes of BSA and AML compliance.

1106.   To comply with the requirements in FFIEC Examination Manual, the Defendant

Financial Services Providers must also inquire into and consider:

- the customer's source of funds and particularly high volumes of cash transactions;

- the anticipated destination of those funds; and

- the countries and clients with which the customer is doing business.

1107.   The Defendant Financial Services Providers must ascertain and form a reasonable

belief as to the true identity of a customer, including any higher-risk customers.

1108.   In addition to what was set forth above, to comply with the requirements in

FFIEC's Examination Manual, Financial Services Providers must ascertain the customer's true

identity by at a minimum, obtaining the customer's name, date of birth (for individuals), address,

and identification number.

1109.   In addition, for customers that are business entities, the Defendant Financial

Services Providers must obtain documents showing the legal existence of the entity (such as

certified articles of incorporation, an unexpired government-issued business license, a

partnership agreement, or a trust instrument).

1110.   The Defendant Financial Services Providers may require added identifying

information for higher-risk customers.

1111.   Specifically, where, based on their risk assessment of a new account opened by a

---

[73] Concurrently, the Office of the Comptroller of the Currency assessed a second $37.5 million penalty against TD Bank for related violations and the SEC imposed a $15 million penalty on that bank for related securities violations.

customer that is not an individual, the Defendant Financial Services Providers should obtain information about individuals with authority or control over such accounts including signatories, to verify the customer's identity.

1112.   This verification method applies when the Defendant Financial Services Providers cannot verify the customer's true identity using documentary or non-documentary methods.

1113.   For example, a Financial Services Provider may need to obtain information about and verify the identity of a sole proprietor or the principals in a partnership when the bank cannot otherwise satisfactorily identify the sole proprietorship or the partnership.

1114.   The Defendant Financial Services Providers must also verify the customer's identity within a reasonable period of time after opening the account.

1115.   The Defendant Financial Services Providers must report any suspicious activity by completing a Suspicious Activity Elevation Form and submitting it to the appropriate federal regulator.

1116.   The FFIEC Examination Manual also requires Financial Services Providers to conduct "Customer Due Diligence" or "CDD."

1117.   The FFIEC Examination Manual states, "the bank should obtain information at account opening sufficient to develop an understanding of normal and expected activity for the customer's occupation or business operations."

1118.   According to FFIEC, "much of the CDD information can be confirmed through an information-reporting agency, banking references (for larger accounts), correspondence and telephone conversations with the customer, and visits to the customer's place of business. Additional steps may include obtaining third-party references or researching public information (e.g., on the Internet or commercial databases)."

1119.   In addition to ascertaining the customer's identity, the Defendant Financial Services Providers must be entirely satisfied with their understanding of the customer's beneficial ownership, management structures, and usual transaction flows.

1120.   In that regard, the Defendant Financial Services Providers must verify the personal identity of the customer's major shareholders and top managers (especially authorized signatories).

1121.   During CDD, the Defendant Financial Services Providers should also pay attention to any Red Flags.

1122.   FFIEC has identified a long list of BSA and AML Red Flags, including, but not limited to:

- "A customer makes frequent or large transactions and has no record of past or present employment experience."

- "Many funds transfers are sent in large, round dollar, hundred dollar, or thousand dollar amounts."

- "Funds transfer activity occurs . . . when the activity is inconsistent with the customer's business or history."

- "Many small, incoming transfers of funds are received."

- "Funds transfer activity is unexplained, repetitive, or shows unusual patterns."

- "Payments or receipts with no apparent links to legitimate contracts, goods, or services are received."

- "A large volume of cashier's checks, money orders, or funds transfers is deposited into, or purchased through, an account when the nature of the accountholder's business would not appear to justify such activity."

- "Unusual transfers of funds occur among related accounts or among accounts that involve the same or related principals."

- "Goods or services purchased by the business do not match the customer's stated line of business."

- "Payments to or from the company have no stated purpose, do not reference goods or services, or identify only a contract or invoice number."

- "Customer receives large and frequent deposits from online payments systems yet has no apparent online or auction business."

- "A large number of incoming or outgoing funds transfers take place through a business account, and there appears to be no logical business or other economic purpose for the transfers, particularly when this activity involves higher-risk locations."

1123.   Subsequent to an account opening, the Defendant Financial Services Providers must monitor the account and the customer.

1124.   Specifically, to comply with FFIEC's Examination Manual, it is not enough to only conduct CDD at account opening.

1125.   In addition, according to FFIEC, "banks should monitor their lower-risk customers through regular suspicious activity monitoring and customer due diligence processes. If there is indication of a potential change in the customer's risk profile (e.g., expected account activity, change in employment or business operations), management should reassess the customer risk rating and follow established bank policies and procedures for maintaining or changing customer risk ratings."

1126.   The FFIEC goes on to state that the Defendant Financial Services Provider's CDD processes "should include periodic risk-based monitoring of the customer relationship to determine whether there are substantive changes to the original [CDD] information (e.g., change in employment or business operations)."

1127.   Furthermore, the FFIEC clearly mandates that higher-risk customers must undergo enhanced due diligence ("EDD") and that higher-risk customers should be reviewed more frequently and intensively than lower-risk customers and particularly if new Red Flags appear.

1128.   It is generally accepted industry opinion in the financial services industry that customers who have the same amount coming in from hundreds of thousands of people with different last names require closer inquiry and monitoring.

1129.   When a bank finds out that a client is laundering money or running an unlawful enterprise it should terminate the banking relationship, shut down the accounts and file a SAR.

**Y.** TelexFree's Suspicious, Tortious and Unlawful Operation Displayed Red Flags Detectable by the Defendant Financial Service Providers

1130.   After authorities began to shut down TelexFree, Wanzeler, Merrill and Costa's unlawful Pyramid Scheme in Brazil in June of 2013, they simply switched their geographic target market to the United States.

1131.   During the putative class period, the Financial Services Defendants maintained robust, sophisticated, and effective due diligence systems that detected TelexFree's Red Flags because the components of TelexFree's switch from its Brazil-targeted Pyramid Scheme to its United States-targeted Pyramid Scheme would have been included within their search parameters, including, but not limited to, the following:

- use of the identical business name;
- use of the identical business model;
- use of the same product;
- specifically naming their unlawful business operation in Brazil –Ympactus – in their standard contract as owning the product and as a party to the contract;
- use of the same people to serve as officers, executives and management;
- use of the same address, office space and office equipment;
- use of the same back office support;
- changing its public name to TelexFree;
- indiscriminately transferring money from account to account including business to personal;





- obtaining cashier's checks for millions of dollars from business accounts after changing its compensation and business plan; and

- obtaining cashier's checks for millions of dollars from business accounts after filing for bankruptcy.

1132.   The following graphics taken from the public areas of both the English and Spanish TelexFree websites, as well as numerous Promoters' websites and video "tutorials," made no secret of the pyramid structure of the business:









1133.   Sophisticated parties such as the Defendant Financial Services Providers could

not have been fooled by the public announcements and key marketing representations advanced

by TelexFree, its Principals, Executive Officers and the Operating Defendants.

1134.   For example, as noted above, in promoting TelexFree and himself, Merrill held

himself out, including through direct references on the TelexFree website, as having experience

in VoIP and internet phone service and having a college degree.  Neither claim was true.[74]

1135.   In carrying out their FFIEC due diligence, the Financial Service Provider

Defendants were required under the circumstances to investigate and uncover false facts such as

the false past experience and education of a corporate principal.

1136.   As a result of their compliance with the foregoing laws, each of the Financial

Services Providers was actually aware of the facts and evidence of suspicious, tortious, or illegal

activity, or Red Flags as follows, as well as those offered elsewhere in the complaint:

- the TelexFree Program violated the express terms of M.G.L. c. 93, § 69 governing multi-level distribution companies (i.e., MLMs), and thereby M.G.L. c. 93A prohibiting unfair or deceptive acts or practices;

- the TelexFree business operations in Brazil were shuttered by Brazilian authorities and TelexFree and its Principals and Executive Office were enjoined from doing further business;

- the TelexFree program was the subject of extensive MLM coverage warning that it was an unlawful, tortious and suspicious Pyramid Scheme;

- the TelexFree business model expressly sold memberships that enabled Promoters to be paid without the sales of any actual product;

- less than 0.5% of TelexFree's total revenue was derived from sales of its VoIP product, with the remainder deriving from membership fees;

- Promoters were expressly paid for merely placing spam advertisements on the internet or recruiting additional promoters and product sales were expressly unrelated to a *guaranteed* return on investment ("ROI");

- the guaranteed ROI promised to Promoters was exceedingly high with no apparent risk;

---

[74] In sworn testimony given to the SOC on March 25, 2014, Merrill testified to having limited knowledge of VoIP services and never working in the telecom business.

- the memberships were not registered with any governmental agency but were nevertheless marketed and sold to members of the general public via public solicitation over the Internet and otherwise;

- the vast majority of Investors were of Brazilian/Dominican-American ethnicity as evidenced by their sur-names;

- videos by Defendant Founders and Inside Promoters;

- the advertisements posted by Promoters were merely spam ads;

- various Defendant Founders, Principals, and Top Level Promoters were associated with other unlawful and previously exposed Pyramid Schemes;

- an extremely large number of account transactions occurred and that number increased rapidly over time;

- many funds transfers and deposits were received in the exact same dollar amounts and with no apparent links to legitimate contracts, goods, or services.  This latter factor and the high volume of small incoming transactions are considered by the FFIEC as a red flag in its examination handbook;

- credit card payments involving TelexFree were subject to an exceptionally high rate of credit card fraud and chargebacks;

- as a MLM company, TelexFree was regarded as a high-risk customer by banks and payment processing companies;

- funds were commingled between TelexFree entities;

- TelexFree failed to keep financial records in accordance with GAAP standards;

- huge wire transfers of funds were made to personal accounts of certain Defendant Founders and shell corporations;

- wire transfers of large sums to foreign entities occurred;

- TelexFree was widely regarded as a fraudulent scheme by the online MLM community;

- TelexFree maintained a Brazilian affiliate, also operating under the name TelexFree, which was under investigation by the Brazilian government as of February 2013 under suspicion of operating an illegal Ponzi scheme;

- in a March 1, 2013 press release available online, Defendant Merrill, president of TelexFree, admitted that "the real 'secret sauce' of our [TelexFree's] success is our compensation plan…We [TelexFree] pay our

representatives weekly if they follow our system and advertise our service on the Internet," while making no mention of any product or service;

- in June 2013, TelexFree's Brazilian affiliate had publicly falsely claimed that MAPFRE, an international insurance company, served as insurer to TelexFree, prompting MAPFRE to release a public statement online denying any relationship with TelexFree and threatening legal action against TelexFree for making this false statement; and

- in June 2013, TelexFree's Brazilian affiliate Ympactus, also operating under the name TelexFree, was shut down and enjoined from doing further business by the Brazilian government for operating an illegal Ponzi scheme. This event was promptly reported online in English language news sources as was follow up news.

1137.    Pursuant to FFEIC guidelines, the payments being deposited into the accounts maintained at the Bank Defendants or processed by the Defendant Payment Processing Service Companies originated in the majority of instances from individuals bearing foreign surnames, raising actionable concerns regarding potential violations of the Patriot Act and other federal banking laws and regulations regarding issues of potential money laundering, terrorism, drug trafficking, and Ponzi schemes.

1138.    The overwhelming number of Red Flags referenced throughout this complaint was sufficient to have compelled a reasonable Financial Services Provider to make further inquiries and/or decline to provide financial services (as some banks did).  Other information about TelexFree that was available to the Financial Services Providers went beyond raising the specter of suspicious activity and constituted reasonable evidence of tortious or unlawful conduct, of which the Financial Services Providers had actual knowledge.

1139.    To the extent that any of the Financial Services Providers did not comply with its regulatory duties and/or knowingly failed and/or refused to report the results of such Financial Services Provider's own investigation of TelexFree to the proper authorities despite the improper activity revealed by such investigation, it turned a blind eye to the tortious conduct it knew was

occurring.

1140.   TelexFree's Financial Services Providers had sufficient notice of wrongdoing in this case to give rise to a duty on their part to undertake heightened scrutiny of the TelexFree accounts, inquire further and take reasonable steps to prevent a diversion of funds.

1141.   Upon their knowledge of suspicious, tortious or unlawful conduct, TelexFree's Financial Services Providers were required to refuse to do business with TelexFree initially, freeze TelexFree's existing accounts, stop doing new business with TelexFree, and report the activities to federal authorities.

1142.   TelexFree's Financial Services Providers received substantial compensation in exchange for the services they provided to TelexFree and the other TelexFree Pyramid Scheme participant Defendants.

1143.   Each of the Financial Services Providers was an integral cog in the TelexFree Scheme and without them, TelexFree would not have been able to get off the ground, develop, maintain or grow its Pyramid Scheme.

1144.   The Financial Services Providers were also an integral cog in the siphoning off of funds by the Operational Defendants.

1145.   Without the active assistance and cooperation of the Financial Services Providers, the Operational Defendants would not have been able to wrongfully convert the class members' funds to their own personal possession and use.

1146.   Notwithstanding knowledge of suspicious, tortious or illegal activity, the Bank Defendants accepted, processed and maintained deposit accounts on behalf of TelexFree, accepted payment of AdCentral package membership fees from the Promoters on behalf of TelexFree and made transfers of the payments derived from the Scheme.

1147.   Notwithstanding knowledge of suspicious, tortious or illegal activity, the Payment Processing Services Company Defendants processed payments between TelexFree, the Operational Defendants, and its Promoters.

1148.   Notwithstanding knowledge of suspicious, tortious or illegal activity the Payment Processing Services Company Defendants provided the electronic gateway used to send and receive such payments, and provided the electronic interface services used by both TelexFree and its Promoters and were thereby enriched.

**Z.**   The Defendant Banks

1149.   Each Defendant Bank, including the named individuals associated with certain banks (together "Defendant Banks"), possessed actual knowledge of the tortious and unlawful nature of TelexFree's business operations and willfully and knowingly ignored it.  Thereafter, notwithstanding their actual knowledge that TelexFree's business model and related operations were unlawful, each provided substantial assistance through the provision of financial services, introductions, strategies or the other affirmative actions below that were integral to TelexFree's Scheme, including the related money laundering, sheltering in safe havens of unlawfully obtained profits, and the concealment of unlawful activity and banking activity until at least April 2014.

1150.   As detailed herein, at times material to this complaint, the Defendant Banks unjustly received significant funds from victims, TelexFree and other Defendants.

1151.   The tortious and improper acts alleged to have been done by each Defendant Bank were authorized, ordered and performed by its officers or directors, or representatives with authority and carried out while they acted within the permitted scope of that authorization or their employ.  Each Defendant Bank otherwise acted within their authorized scope as a principal or an agent for their employer or co-conspirators with respect to the acts, violations, and

common course of conduct alleged in this complaint.

1152.   Each Defendant Bank is jointly and severally liable, including liability for the acts of its co-conspirators, regardless of whether the conspirators are named as Defendants in this complaint.

1153.   At the time that each Defendant Bank became involved with TelexFree, other banks had declined TelexFree's business because of the same information available to such Defendants.  But for their assistance, TelexFree would have collapsed and the similarly situated members of the putative class would not have thereafter been caused to suffer ascertainable economic loss.

1154.   Notably, the information and findings each Defendant Bank made during its initial KYC merchant application process for each new TelexFree account raised a considerable number of Red Flags that prompted/required each Bank Defendant to carry out a heighten investigation involving an increased level of scrutiny.

1155.   In response to the considerable Red Flags, as depository, merchant and/or acquiring banks, each Defendant Bank was compelled by mandatory internal requirements (often more stringent than the industry standards) to obtain a plethora of detailed information about TelexFree and its principals through the imposition of an extended merchant application process which included additional investigation, review, analysis and assessment of:

   a.   TelexFree's business model and structure;

   b.   TelexFree's compensation plan and standard form contract;

   c.   TelexFree's listing on the Match List and the available expanded banking history through the MATCH program including TelexFree's payment processing, transaction and banking history;

   d.   TelexFree's website;

e.  TelexFree's purported VoIP product and AdCentral promoter packages, and corresponding prices;

f.  TelexFree's corporate documentation;

g.  Documentation as to the location of operations and sales;

h.  TelexFree's, Carlos Wanzeler's, and James Merrill's credit scores;

i.  TelexFree's tax returns for at least the previous two (2) years;

j.  TelexFree's Profit & Loss Statements for at least the previous two (2) years;

k.  TelexFree's balance sheets;

l.  TelexFree's average transaction amount (or "average ticket");

m.  TelexFree's highest anticipated transaction amount (or "high ticket");

n.  TelexFree's anticipated monthly processing volume;

o.  TelexFree's annual and monthly dollar sales volume; and

p.  Information available online regarding TelexFree through additional searches.

1156.  As a result of its own internal, acquiring-bank mandated, and industry-standard due diligence activities, during the time they provided TelexFree, each Bank Defendant gained actual knowledge that:

a.  TelexFree was an MLM – a business profile uniformly considered very high risk and a suspect business to begin with under accepted industry wide and FFEIC standards;

b.  TelexFree was and had been subjected to government action and shut down as a pyramid scheme by the Brazilian government;[75]

c.  TelexFree's Founders and Executive Officers who were signatories and associated with the bank application, including Carlos Wanzeler and James Merrill, were also the subject of the Brazilian government actions;

d.  TelexFree had been placed on the MATCH List;[76]

---

[75] As detailed below, as many learned that United States governmental authorities, including the Commonwealth of Massachusetts SOC, were investigating TelexFree and Founders and Executive Officers who were signatories and associated with their account, they again willfully and knowingly ignored it and continued to provide TelexFree with uninterrupted financial services.

e. TelexFree's chargeback rate was continually well over the maximum allowable industry standard;

f. Other financial institutions had terminated their relationship with TelexFree or suspended and limited their services they provided to it;

g. Other financial institutions had rejected TelexFree and refused to extend banking services to TelexFree;

h. The same was true for TelexFree's Founders and Executive Officers who were signatories and associated with the bank application;

i. TelexFree's merchant profile did not match its transactions;

j. TelexFree's merchant profile did not match its business model;

k. TelexFree lacked a real product and instead unlawfully guaranteed a massive return for passive activity;

l. TelexFree standard form contract contained express objective violations of Massachusetts statutory law; and

m. TelexFree's website and promotional materials also contained express objective violations of Massachusetts statutory law.

1157.   Despite actual knowledge of the tortious or unlawful nature of TelexFree's business operations, the Defendant Banks agreed to provide, and continued to provide, TelexFree with banking and other services that substantially assisted its tortious or unlawful scheme.

1158.   The substantial assistance provided by the Defendant Banks in one form or another included capturing, maintaining, layering, laundering, and transferring Promoters' funds.

1159.   In the context of actual knowledge that TelexFree was operating and unlawful Scheme, and otherwise as detailed below, the financial services provided by each Defendant Bank that were not routine or ordinary included, *inter alia*, the following:

- processing and opening of depository accounts;

- receiving payments made by Promoters to TelexFree to become Members of the TelexFree Program;

- maintaining depository accounts containing funds paid by Promoters to TelexFree for AdCentral Package membership fees;

- making payments to certain Promoters as part of TelexFree's purported return on investment;

- transferring funds paid by Promoters to TelexFree among TelexFree entities, Defendant Founders' personal accounts, foreign companies and shell companies; and

- allowing TelexFree to use the bank's name in its promotional materials thereby lending TelexFree the use of the bank's reputation as a large, nationwide banking institution and credibility.

1160. For example, during the relevant periods, TD Bank and Bank of America maintained accounts on behalf of TelexFree and processed thousands of transactions amounting to millions of dollars for TelexFree.

1161. Similarly, Wells Fargo also maintained accounts on behalf of TelexFree and processed transactions amounting to tens of millions of dollars for TelexFree in 2013 and 2014 and otherwise acted as a depository bank for TelexFree and its known associated persons and entities including Carlos Wanzeler.

1162. Wells Fargo Bank, TD Bank, Bank of America and Synovus also served as acquiring banks with respect to TelexFree promoter payments.

1163. Defendant Base Commerce has a Wells Fargo Bank account.

1164. In accordance with their own, as well as standard industry practice, each acquiring Defendant Bank first required its payment processors to conduct and carry out a due diligence investigation and assessment of TelexFree. Each of the Defendant Banks' payment processors in turn provided the information they obtained along with an underwriting report to its acquiring bank

1165. In the payment processing marketplace, the Defendant Banks who acted as acquiring banks were the financial institution that ultimately approved TelexFree to work within

that marketplace.  Each of acquiring bank gave their payment processors their marching orders whether they were authorized or mandated to:

    a.   approve the issuance of each MID also known as a Merchant ID number to TelexFree;

    b.   place conditions and limits on each Merchant assigned a MID;

    c.   also issue each TID which is a Terminal ID.

1166.  At the time of authorization to operate with the payment processing system, each acquiring bank placed strict limits on the parameters on the electronic transfers that TelexFree could transact.  Each Defendant Bank's payment processor carried out TelexFree's electronic transactions only after receiving specific guidelines and limits on the authorization granted by it. The acquiring banks limits or guidelines are intended to be strictly imposed.  Acquiring banks' underwriting guidelines continually remain in place and are rarely modified.

1167.  Not all the Defendant Banks' transactions were carried out through pay processors.  Some of the substantial assistance provided to TelexFree came about because the Defendant Bank agreed to accept and process TelexFree's financial-service needs that stood apart from those that ran through the Payment Processing Defendants. For examples, wire transfers from a TelexFree business account to an offshore account in Carlos Wanzeler's name.

1168.  Regardless of the nature of the financial services provided, the Defendant Banks obtained actual knowledge of TelexFree's unlawful business model and activities through a number of ways, most predominantly its own investigation, risk assessment, and process of assigning a business profile at the time of each initial account opening[77] and through its ongoing

---

[77] This includes, but is not limited to, its determination as to whether they would accept TelexFree as a customer, the new underwriting assessment they carried out each time they opened a new account, and the determination as to the permitted level of service and the limits, guidelines or restrictions, such as transfer caps, permitted by TelexFree as more fully addressed

monitoring of TelexFree's banking activity.

1169.   As part of the merchant application process, before agreeing to accept any merchant, including TelexFree, and to provide it with services each Defendant Bank collected and reviewed, among other things, the following information:

      a.   The nature of the its business;

      b.   Its history;

      c.   The merchant's website;

      d.   The merchant's reputation;

      e.   The merchant's contracts with customers;

      f.   The merchant's average transaction amount (or "average ticket");

      g.   The merchant's highest anticipated transaction amount (or "high ticket");

      h.   The merchant's anticipated monthly processing volume;

      i.   The credit score of the merchant and all signatories of the merchant;

      j.   Profit & Loss Statements of the merchant;

      k.   The merchant's balance sheet(s);

      l.   Tax returns of the merchant and its signatories.

1170.   As part of the merchant application process, the acquiring bank will also (a) arrange for a site visit of the merchant's principal business location; (b) perform a review of information available online regarding the merchant, typically using use "web spider" software such as G3.

1171.   Each bank will also perform a risk assessment of the merchant, assign a Merchant Identification Number (MID) and Merchant Category Code (MCC), and classify the merchant

---

throughout this complaint.

according to industry category and risk.

1172.   Multi-level marketing companies and money services businesses are universally regarded as extremely high-risk merchants within the bank and payment processing industry and are subject to the highest levels of scrutiny by payment processor, payment facilitators, ISOs, and banks.

1173.   Indeed, many banks, payment processor, payment facilitators, and ISOs will not accept multi-level marketing companies as merchants as a result of the high risk involved.

1174.   Each Defendant Bank also went above and beyond this essential need in one form or another by providing extra effort and assistance during crisis times when TelexFree could not obtain the financial services it required and by providing the other services referenced or set out below in granular detail.  They processed payments between TelexFree and its Promoters, and among and between the accounts of TelexFree or its insiders – for example Carlos Wanzeler – and provided the electronic gateway used to send and receive such payments, provided the electronic interface services used by both TelexFree and its Promoters, as well as other essential services.

1175.   Other above and beyond services, such as introducing TelexFree to other financial service providers and strategies, were essential to TelexFree's ability to sustain its unlawful enterprise[78] were also provided by Banking Defendants.  For example, Maurizio Cardenas' provision of key specialized advice and services including offering assistance with the concealment of suspicious and fraudulent activity including money laundering, help with the creation and use of off shore shell companies, the diversion of victims' funds overseas for the unlawful purpose of sheltering unlawful proceeds outside the reach of the United States justice

---

[78] Throughout this complaint, the terms scheme and enterprise are used interchangeably.

system and expanding its unlawful enterprise.

1176.   The Defendant Banks worked in tandem with the other Defendants, giving letters of reference, sharing information regarding TelexFree and its business activities, transferring large sums offshore when the heat was really on, and otherwise coordinating services to ensure that TelexFree received continuous and uninterrupted financial services.

1177.   The Defendant Banks' services were integral to TelexFree's website-based business.  TelexFree's revenues were derived through e-commerce and electronic transfers of funds were inextricably linked to TelexFree's ability to operate, sustain its unlawful business model, exponentially grow, and expand into new, remote markets.  The services provided by the Defendant Banks were so integral to its unlawful business model that TelexFree would have rapidly collapsed without them.  *See* Runge Dec., Attachment 1.

1178.   Defendant Banks' responsibility for the electronic processed payments involving victim funds is further due to the fact that, for TelexFree, or any merchant, to process payments received from its consumers by a credit or debit card, TelexFree/all merchants must obtain a "merchant account."  Without such a merchant account, merchants such as TelexFree cannot accept consumer credit or debit card payments.  A merchant account is available through a financial institution known as an "acquiring bank" or an "acquirer" that is a member of credit card networks, such as Mastercard, Visa and Discover. As a "payee," TelexFree must be granted the "right" to receive electronic payments within the payment processing "eco-system."

1179.   An acquiring bank is a bank or financial institution that processes credit or debit card payments on behalf of a merchant (here, TelexFree).  The acquiring bank provides the merchant with access to the national credit card payment processing system, such as Visa or MasterCard.  Without access to a merchant account through an acquiring bank, all merchants

including TelexFree, cannot accept consumer credit or debit card payments.

1180.   Those credit or debit card transactions in turn require the services of a third-party payment processor, payment facilitator, and/or independent sales organization ("ISO"), such as the Payment Processing Defendants named herein, who act as the intermediary between the merchant (TelexFree) and the acquiring bank.

1181.   The acquiring bank sets underwriting and risk guidelines that the payment processor, payment facilitator, and/or ISO must follow when considering a merchant application, sets ongoing monitoring requirements that the payment processor, payment facilitator, and/or ISO must follow with respect to the merchant, reviews all due diligence information and documentation obtained and created by the payment processor, payment facilitator, and/or ISO with respect to the merchant, and provides final approval or disapproval of the merchant's application and ongoing transactions.

1182.   After completing its initial application process and eventually granting TelexFree a merchant account, the Defendant Banks imposed limits and guidelines on TelexFree's banking privileges.  Acquiring banks police and strictly track and monitor every individual transaction that results in a payment made to every payee on an individual payee-by-payee basis.  The process can be compared to radar that detects planes and other objects in the air.  The tracking and monitoring of every individual transaction are accomplished through a combination of electronic and human "hands on" systems and protocols.

1183.   Once TelexFree was granted the "right" to receive electronic payments within the Payment Processing "eco-system," the Pay Processor Defendants were required to process each requested payment within the strictly enforced limits and guidelines that were imposed and mandated on TelexFree as an individual client following its initial application.

1184.   Once it accepts a merchant as a client, the acquiring bank, in conjunction with the payment processor, payment facilitators, and ISO, as applicable, will perform ongoing monitoring of the merchant's transactions, typically using fraud detection or "fraud filter" software.

1185.   The acquiring bank will additionally perform ongoing risk review of the merchant's business to detect any red flags regarding the business, including an annual review of the merchant's business as a matter of course.

1186.   As part of this ongoing monitoring and review process, the acquiring bank, in conjunction with the payment processor, payment facilitators, and ISO, as applicable, will specifically review chargebacks and returns, in an effort to detect and determine fraudulent activity.  Chargebacks and returns occur when customers contact their credit card issuing bank to dispute a charge appearing on their credit card account statement.

1187.   GPG President Jayme Amirie pointed out in an August 23, 2013 email to Carlos Wanzeler that the existing compensation structure and passive income generation of TelexFree's illegal enterprise attracted "bad guys" giving rise to a large number of chargebacks.  Licensed professionals Babener, Garvey Schubert, and The Sheffield identified and defined TelexFree as an unlawful business within days of receiving far less documentation that the Defendant Banks reviewed.

1188.   As a result of the acquiring bank's underwriting review, ongoing monitoring, risk reviews, and annual reviews, the acquiring bank was at all times fully aware of TelexFree's unlawful business model, the nature of  its business, any information available online regarding the merchant, and as time went on the aberrant and unlawful transactions and fraudulent activity.

1189.   Activity undertaken on behalf of TelexFree or the other Operational Defendants

generated income to the Financial Services Defendants.

1190.   At times material herein, the Defendant Banks also received investment funds of

Plaintiffs.

1191.   At times material herein, the Defendant Banks profited from their relationship

with TelexFree and other Defendants and were unjustly enriched.

1192.   At diverse times, TelexFree processed through the Defendant Financial Services

Providers over 783,771 investments of either $289 or $1,375 (including combinations thereof).

These transactions did not match either TelexFree's purported VoIP product or its business

profile.  They each did exactly match TelexFree's AdCentral package and its unlawfully

guaranteed a massive return for passive activity.  These transactions alone account for over

$880,189,455.32 in ascertainable loss suffered by the putative class as a direct and proximate

result of the Defendants misconduct.

1193.   The Financial Service Providers derived substantial income from their services to

TelexFree.

1194.   More particularly, the Defendant Banks earned fees from their participation in the

TelexFree Scheme on several levels:

- interest on amounts held on behalf of TelexFree at or above the Federal Funds Rate, currently set at .25%;

- processing fees for each transaction, typically in an amount of 1-4% of the amount transferred per transaction, or, in some cases, $40 per transaction;

- annual ACH processing charges;

- return deposit item fees;

- chargeback fees; and

- miscellaneous fees and servicing charges.

1195.   In general, the Defendant Banks possessed a federal regulatory duty to look for certain types of facts or lack thereof, including the identity and purpose of the individuals opening and making payments into their accounts.

1196.   Even a perfunctory investigation of TelexFree in accordance with their regulatory duties would have revealed the existence of the tortious Pyramid Scheme.  Each of the Defendant Banks became actually aware of the Red Flags surrounding TelexFree and its conduct pursuant to their regulatory duties and also became aware of strong evidence of tortious or illegal activity including the outright fraud on the part of TelexFree, its Founders and Principals, as pled with particularity herein.

1197.   In the alternative, if a Defendant Bank failed to perform any of the required investigations and account monitoring, it willfully turned a blind eye to the tortious conduct it actually knew to underlie TelexFree's activities despite its general awareness of the unlawful nature of the Scheme.

1198.   At times material herein, despite having knowledge that TelexFree was an enterprise carrying out tortious or unlawful, unfair or deceptive acts or practices, the Defendant Banks ensured TelexFree was given access to banking services and those banking services were used to further TelexFree's unlawful business.

1199.   As an integral part of the Pyramid Scheme, the Defendant Banks received funds from Promoters, which funds were then held for the benefit of or transferred from or to TelexFree, its affiliated entities, and its Defendant Founders and Principals, Executive Office, Top Level Promoters and Licensed Professionals.[79]

1200.   Obtaining, maintaining and transferring Promoters' funds was the essence of the

---

[79] *See, e.g.,* check deposited by TelexFree into its account with Fidelity Bank, to wit, account number 211370707, attached as Exhibit 7.

TelexFree Pyramid Scheme and without the services of the Defendant Banks, the TelexFree

United States Pyramid Scheme could not have been opened, been maintained, thrived and been

exploited through to the end where Principals and other Defendants were issued cashier's checks

and either successfully absconded with significant funds or were caught while in the act of doing

so.

1201.   Additional facts specific to each Defendant Bank provide additional particulars of

its further involvement, participation and aiding and abetting of the TelexFree Pyramid Scheme.

1.   Defendant Bank of America

1202.   Bank of America, NA ("Bank of America") first opened accounts in TelexFree's

name in February 2012.

1203.   From 2012 through 2014, Bank of America was one of TelexFree's largest

banking resources and performed both depository services and payment processing. Bank of

America's provision of financial services provided substantial assistance to TelexFree's unlawful

enterprise.

1204.   At the time that Bank of America aided and abetted the TelexFree Scheme by

providing substantial assistance, it possessed actual knowledge of the fraudulent nature of

TelexFree's business operations.

1205.   Bank of America was unjustly enriched as it received fees for providing vital

banking services to TelexFree, which were deducted directly from victim funds held in

TelexFree's Bank of America accounts.

1206.   Well before Bank of America began restricting TelexFree's banking activities, it

was aware that TelexFree was operating a Pyramid Scheme.  As more fully detailed below, when

BOA acted on April 15, 2013 to inform TelexFree, Carlos Wanzeler, and his affiliated entities

that their accounts would be restricted from all debits and credits in twenty-one calendar days

and closed in thirty calendar days due to TelexFree illegal business activities, any question as to their actual knowledge that TelexFree was an unlawful Scheme was removed.

1207.   On April 19, 2013, Bank of America acted in furtherance of a transfer of $1,800,000 between TelexFree, Inc. and TelexFree, LLC from Bank of America to Citizens Bank.  In context, this was non-routine banking because the transfer came after Bank of America had determined by April 15, 2013 a restriction was merited on TelexFree, Carlos Wanzeler, and their affiliated entities accounts prohibiting them from debits and credits and instructing the accounts be closed in thirty calendar days due to TelexFree's illegal business activities.

1208.   On May 17, 2013, Bank of America closed certain accounts held in the name of TelexFree, Carlos Wanzeler, and several affiliated entities.

1209.   Upon information and belief, the accounts were closed for unacceptable banking activities, fraudulent activity indicators and excessive chargebacks.

1210.   Notwithstanding the nature of the forced closure of accounts by Bank of America, it continued to substantially assist TelexFree's unlawful Scheme by continuing to provide financial services to it.

1211.   For example, on November 11, 2013, Bank of America accepted an incoming international wire transfer to a TelexFree account with Bank of America, with incoming transfers labeled "MEMO: Further credit to TelexFree."  Defendant Merrill, while acting on behalf of TelexFree, had directed Allied Wallet to transfer funds.  In context, this cannot be considered routine banking services since, at this time, TelexFree was widely known as operating a Pyramid Scheme and Bank of America had announced that it would no longer provide banking services to TelexFree.

1212.   In December 2013, Bank of America Senior Vice President Kevin Staten and

TelexFree's Craft discussed the fact that TelexFree had been shuttered in Brazil for being a pyramid scheme in the context of continuing to provide financial services.  Staten expressly stated Bank of America concern about TelexFree's operations' legality.  This inquiry provided Bank of America with up-to-date actual knowledge of TelexFree's unlawful Scheme because each opening of a new account triggers the requirement of carrying out a full BSA/ALM Know Your Client merchant evaluation (as detailed above), including an assessment and findings.  As more fully detailed below, Bank of America's North American Account Opening Guide specifically provides that the opening of accounts is "subject to significant scrutiny by regulators and the bank."

1213.   BOA carried out its full KYC evaluation and found the findings listed above required by all Defendant Banks.

1214.   Bank of America's systems, internal and external BSA/ALM requirements, and protocols were highly sophisticated and detected all that was needed to gain actual knowledge that TelexFree was running an unlawful enterprise.  Licensed Professional Defendants Babener, Garvey Schubert and The Sheffield Group had none of the above and figured it out in three days.

1215.   Soon thereafter with the approval of Senior Vice President Staten, who was armed with actual knowledge that TelexFree was operating a sprawling unlawful Scheme, Bank of America did in fact again approve TelexFree's account application, opened a new account, and provided TelexFree with financial servicing that substantially assisted its unlawful enterprise.

1216.   On February 6, 2014, Bank of America, with the able assistance of both Staten and Bank of America associate Samantha Yanez, the members of its BSA/ALM department, and its sophisticated internal banking compliance systems, allowed TelexFree to open an additional account ending in 1477 in Florida.  Eddie Gonzalez, President of IPS, who lived and conducted

business in Florida and had a relationship with Staten, also contributed in part to this approval process. This account was opened, and serviced, despite Bank of America's actual knowledge of TelexFree's illegal activities and this substantially assisted TelexFree with its unlawful enterprise.

1217. On March 17, 2014, (soon after the new Florida account was opened) immediately following the March 14, 2014 announcement by TelexFree that it was changing its compensation program and the "runs" on TelexFree's reserves were in full swing and at the height of TelexFree's pre-demise troubles, $30,000,000 was transferred from TelexFree's Bank of America account through IPS to TelexFree, LLC's Wells Fargo account. This transfer was consistent with both the layering and money laundering movement of funds. With actual knowledge of TelexFree's unlawful Scheme, Bank of America provided it with substantial assistance by moving that$30,000,000.

1218. On February 15, 2012, Carlos Wanzeler on behalf of TelexFree, Inc. applied for a Merchant Processing Account with Bank of America. The application indicated the following limits:

    a.  total cash and credit sales in the amount of $500,000;

    b.  total annual MC/Visa Volume in the amount of $350,000;

    c.  total annual Discover Volume in the amount of $50,000;

    d.  total annual American Express Volume in the amount of $50,000;

    e.  estimated MC/Visa Average Ticket/ Sales Amount in the amount of $150;

    f.  estimated Discovery Average Ticket for this outlet in the amount of $150;

    g.  estimated American Express Average Ticket outlet in the amount of $150; and

    h.  highest ticket amount in the amount of $300; and

    i.  the income would be "keyed in manually" and the products and services sold are "Telecom/Equip. & Tel.SLS." Orders would be entirely from the Internet.

1219.   Bank of America's North American Account Opening Guide (the "Guide") specifically provides that the opening of accounts is "subject to significant scrutiny by regulators and the bank."

1220.   Citing the Know-Your-Customer Requirements, the Guide also states that "regulators require us to be entirely satisfied with our understanding of our clients' identities, beneficial ownership, management structures and usual transaction flows."

1221.   Bank of America performed an investigation of TelexFree and its principals prior to agreeing to accept it as a customer and otherwise further complied with its own internal requirements which, at a minimum, met its obligations under the BSA and in most cases were stronger.  As a result, Bank of America gained actual knowledge that TelexFree was an unlawful enterprise.

1222.   At all times relevant to this complaint, Bank of America complied with due diligence requirements when opening TelexFree's accounts, including the Know-Your-Customer Requirements.  In doing so, Bank of America knew from the February 2012 account application that Carlos Wanzeler was a leading owner of TelexFree, Inc.   Bank of America had information linking him to other accounts.  By this point, Bank of America's automated systems had the ability to "connect parties that were previously unconnected"  and thus to connect the dots linking TelexFree, Inc. through Wanzeler to his other accounts.  In addition, by this point, Bank of America had the "ability to detect attempts by customers who ha[d] had their accounts closed to re-enter our Bank."

1223.   Even more compelling, Bank of America knew from the onset that TelexFree was a pyramid scheme.  At all relevant times, TelexFree's website advertised AdCentral packages as a passive income opportunity, which Bank of America knew was an unlawful offer or sale of an

unregistered security, and constituted a pyramid scheme:

> *Through a ADCENTRAL, that you geot [sic] for the amount of US$299 (annually). The promotor will receive US$20 each week that makes 7 different announcements in websites of free announcements online, from Monday to Sunday. All in a way fast, easy, and standardized in your virtual office (BO) Telexfree.*

1224.  Despite Bank of America's actual knowledge of the illegal nature of TelexFree's business activities, including the facts that its standard form contract was unlawful on its face, that its product was effectively fictitious and represented an insignificant portion of TelexFree's revenues and that its compensation plan unlawfully promised a massive guaranteed return on passive income and violated M.G.L. c. 93, § 69, Bank of America agreed to accept TelexFree as a customer and began to perform banking services.

1225.  On February 19, 2012, Bank of America opened TelexFree's Merchant account ending in 1885, which handled TelexFree's ACH transfers.

1226.  Bank of America acknowledged that it reviewed TelexFree, Inc.'s website as part of its due diligence in opening this account, as reflected in its merchant payment processing application form.  Specifically, under the rubric entitled "Client Visitation," Bank of America checked the box labeled "Website Review completed for Virtual merchants only."  On the following page of the form, it checked the box "Web Page attached."

1227.  Archived versions of that website during that time raise troubling red flags that TelexFree was a Ponzi scheme.  Around the time of TelexFree, Inc.'s merchant processing services and checking account applications, its website, www.telexfree.com, contained a "promoters" link.  The "promoters" page told potential investors that, after an initial investment in the company, they could earn a guaranteed return for a year without actually selling any TelexFree VoIP programs, simply by posting ads for the product, thus advertising AdCentral packages as a passive income opportunity.

1228.   In early 2012, that webpage touted, in part:

*Be our promoter*

*Earn money doing announcements on the Internet!*

*Through a ADCENTRAL, that you geot [sic] for the amount of US$299 (annually).*

*The promotor will receive US$20 each week that makes 7 difference announcements in websites of free announcements online, from Monday to Sunday. All in a way fast, easy, and standardized in your virtual office (BO) Telexfree.*

*This will be for the 52 weeks of the year, of your contract, then see the simulation:*

*52 weeks x $20 (Putting the 7 announcements) = $ 1,040 in the year*

1229.   From the "promoters" webpage, Bank of America had actual knowledge that TelexFree, Inc., was fraudulently attempting to persuade victims to invest their money in a speculative business with few if any sales of actual products or services.  This passive income opportunity, coupled with its promise of a guaranteed profit, constituted the unlawful offer or sale of an unregistered security, as well as evidence of a Ponzi scheme.

1230.   Through this webpage, Bank of America had actual knowledge that TelexFree, Inc.'s business model constituted a classic Ponzi or pyramid Scheme as early as February 2012. Despite that knowledge, Bank of America processed payments and provided banking services to TelexFree.

1231.   Bank of America served as a payment processor and acquiring bank for TelexFree until August 2013 via merchant payment processing account no. 1885.

1232.   As a payment processor and acquiring bank for TelexFree, Bank of America comprehensively scrutinized TelexFree and its business activities as part of its initial review and its ongoing account monitoring requirements.

1233.   More particularly, as a payment processor and acquiring bank for TelexFree,

Bank of America performed an initial underwriting review of TelexFree which included, at the least, collection and review of:

    a.   TelexFree's business model and compensation plan;

    b.   TelexFree's payment processing, transaction, and banking history;

    c.   TelexFree's purported VoIP product and AdCentral promoter packages, and corresponding prices;

    d.   TelexFree's website;

    e.   TelexFree's, Carlos Wanzeler's, and James Merrill's credit scores;

    f.   TelexFree's tax returns for at least the previous two (2) years;

    g.   TelexFree's Profit & Loss Statements for at least the previous two (2) years;

    h.   TelexFree's balance sheets;

    i.   TelexFree's average transaction amount (or "average ticket");

    j.   TelexFree's highest anticipated transaction amount (or "high ticket");

    k.   TelexFree's anticipated monthly processing volume;

    l.   TelexFree's annual and monthly dollar sales volume; and

    m.  Information available online regarding TelexFree.

1234.   Following the initial account opening, evidence of TelexFree's misconduct surfaced so quickly that Bank of America shut down TelexFree, Inc.'s merchant payment processing account no. 1885 within just a few months due to fraud indicators.  However, as discussed below, Bank of America willfully permitted TelexFree's other accounts with the bank to remain open.

1235.   On February 21, 2012, Bank of America opened deposit accounts ending in 0343 and 7408, through which TelexFree received wire transfers and credit card transfers.

1236.   Pursuant to its obligations to perform ongoing customer monitoring of TelexFree, Bank of America's Regulatory Account Monitoring Office, employees and officers discovered

numerous Red Flags for fraud and money laundering, along with evidence of the suspicious, tortious or unlawful activities described herein, yet deliberately ignored them even after notifying TelexFree of its findings.

1237.  Specifically, in May of 2012, TelexFree's merchant account number ending in 1885 had $2,667.97 in chargebacks/reversals and $543.72 in fees.  This was an indisputable red flag for Bank of America since, in 2012, FinCEN advised financial institutions that "particularly high numbers of returns or charge backs (aggregate or otherwise), suggest that the originating merchant may be engaged in unfair or deceptive practices or fraud."

1238.  Notably, on May 31, 2012, Monica Liebler, manager of Bank of America's Security/Risk Department sent Carlos Wanzeler on behalf of TelexFree, Inc. a written correspondence notifying him that one or more batches in the amount of $2,272.00 for merchant account number ending in 1885 were suspended due to "unusually high number of cardholder disputes/chargebacks."

1239.  In response to Ms. Liebler's letter, TelexFree's office manager contacted Bank of America's Customer Services Department and conferred with Ms. Liebler.  Ms. Liebler explained that Bank of America was concerned with the transfers going into TelexFree's merchant account and that this activity was suspicious.  Ms. Liebler, as a Bank of America's Security/Risk Department Manager, specifically explained that her suspicion and concern arose due to:

- Numerous transactions in identical amounts;
- Numerous charge backs; and
- Numerous transactions which originated from outside of the United States.

1240.  Bank of America's own internal standards (and the FFIEC Examination Manual) identify each of these suspicious activities as Red Flags for fraud or money laundering.

1241.   Ms. Liebler requested that TelexFree's office manager produce documentation that supported its financial transactions and provide her with sample invoices that would identify the purpose of the incoming transaction amounts.

1242.   The invoices that Ms. Liebler requested were provided by TelexFree's office manager, and revealed the following:

- Transactions in the amount of $1,425.00 represented the sale of AdCentral Family promotorship packages (including a $1375 "contract" fee and $50 "membership" fee);

- Transactions in the amount of $339.00 represented the sale of AdCentral Individual promotorship packages (including a $289 "contract" fee and $50 "membership" fee); and

- Transactions in the amount of $49.90 represented by the sale of VoIP (voice over internet protocol) communications products.

1243.   These invoices objectively established that TelexFree's revenues were almost entirely comprised of the sale of AdCentral packages and that TelexFree was an unlawful pyramid scheme.  Regardless, Bank of America continued to provide integral banking and financial services to TelexFree.

1244.   On June 26, 2012, Ms. Liebler sent another written correspondence to Carlos Wanzeler on behalf of TelexFree, Inc. informing him that the chargeback ratio for merchant account number ending in 1885 was 6% and needed to be reduced to 1%.  If the rate was not reduced, Bank of America "may be compelled to terminate the merchant account."

1245.   The 6% rate was triple the maximum allowable under accepted industry and internal Bank of America standards.

1246.   A chargeback ratio of 6% constitutes an exceedingly high rate and is a clear Red Flag for unlawful conduct by the merchant or its customers.

1247.   That same day, Ms. Liebler sent a subsequent written correspondence to Carlos

Wanzeler on behalf of TelexFree, Inc. indicating that due to "an increased level of risk" Bank of America was required to create a reserve account in the amount of $25,774.97 from TelexFree's bankcard deposits." Ms. Liebler warned that if TelexFree failed to maintain sufficient funds in the settlement account, Bank of America "may be compelled to terminate [the] merchant account." Ms. Liebler further explained this action was necessary "in light of the risks associated with [TelexFree's] financial profile."

1248.   Despite the high risk and the obvious Red Flags, Bank of America continued to maintain bank accounts for Carlos Wanzeler, TelexFree, and their related companies.

1249.   On July 26, 2012, Ms. Liebler sent yet another written correspondence to Carlos Wanzeler on behalf of TelexFree, Inc. regarding merchant account number ending in 1885. Ms. Liebler informed Carlos Wanzeler that one or more batches in the amount of $160,797.67 were suspended due to "processing unusually high number of charges." The account had $1,673.72 in chargebacks/reversals and approximately $633.98 worth of banking fees.

1250.   Ms. Liebler's May 31 and July 26, 2012 letters establish that Bank of America's automated screening system had TelexFree, Inc.'s account no. 1885 under active surveillance and had flagged the high number of chargebacks and charges in that account as fraud indicators. Both of Liebler's letters explained that "[o]ur systems automatically suspend funding for a number of reasons . . .," establishing that Bank of America had TelexFree's accounts under surveillance and suspended funding in account no. 1885 as early as May 2012. That in turn prompted human review and thorough investigation of TelexFree's accounts and business by Bank of America's Security/Risk department.

1251.   On July 27, 2012, BehindMLM.com, a news blog covering the MLM industry, reported that TelexFree's business model "strongly indicates a lack of external revenue." Other

news outlets soon followed suit.   Through its active monitoring of TelexFree's accounts, Bank of America was aware of these articles.

1252.   All of these factors result in a reasonable and sufficiently supported inference that as early as 2012, Bank of America had actual knowledge of TelexFree's unlawful business model and scheme.  Had they acted on this knowledge, the class would not have suffered the ascertainable economic harm that followed.  But for Bank of America's aiding and abetting, the class would not have suffered the ascertainable economic harm that followed.

1253.   Despite its actual knowledge that TelexFree was an illegal activity, Bank of America continued its relationship with TelexFree, thereby deriving substantial banking fees, to wit:

    a. In March of 2012, TelexFree, Inc.'s Bank of America merchant account number ending 1885 had banking fees in the amount of $119.04.

    b. In May of 2012, TelexFree's merchant account number ending in 1885 had $543.72 in fees.

    c. In June of 2012, merchant account number ending in 1885 had $1,916.62, including $70.00 in wire transfer fees.

    d. In July of 2012, TelexFree, Inc.'s Bank of America merchant account number ending 1885 had approximately $633.98 worth of banking fees.

    e. In July of 2012, TelexFree, Inc.'s bank account ending in 7408 had received approximately $50.00 in wire transfer fees.

    f. In August 2012, Brazilian Help, Inc.'s Bank of America account ending in 2880 had bank fees totaling $4,116.35. Bank of America also received payments from Brazilian Help, Inc.'s account ending in 6064.

    g. As of August 2012, the account ending in 1885 had $7,892.14 in banking fees.

    h. By the end of September of 2012, the account had bank fees in the amount of $15,799.07.

    i. Bank of America received approximately $1256.00 in wire transfer fees in September of 2012 from account ending in 7408.

    j. In February of 2013, TelexFree account ending in 7408 was charged approximately $3,205.00 in wire transfer fees.

k. In March of 2013, Bank of America charged TelexFree, Inc.'s account ending in 7408 approximately $6,144.00 in wire transfer fees.

l. In April of 2013, TelexFree's account ending in 7408 was charged approximately $9,076.00 in wire transfer fees.

1254. On August 6, 2012, Ms. Liebler notified Carlos Wanzeler, on behalf of TelexFree, Inc., that Bank of America would be closing TelexFree's merchant account number ending in 1885 effective August 27, 2012.  The reserve account in the amount of $127,000 would be maintained until all chargeback periods expired.  This account had approximately $615,096.11 remaining in the account.

1255. Notably, even though account ending in 1885 was terminated, Bank of America continued to service TelexFree account ending in 7408 and other accounts owned by Carlos Wanzeler and his affiliated entities, thus allowing the TelexFree Pyramid Scheme to continue and proliferate.

1256. For instance, between August 2012 and September 2012, Diep Vuong, a representative of Bank of America, authored a letter from Bank of America verifying that TelexFree, Inc. held an account ending in 7408 at Bank of America.  This letter was used to assist TelexFree International, LLC in opening a corporate account at Caye International Bank, Ltd., providing it with the substantial assistance it required.  It also opened the door to launder money and to shelter it in a safe haven.

1257. By the end of September of 2012, the account ending in 7408 had chargebacks/reversals in the amount of $28,427.63.

1258. Bank of America continued to service at least eleven other existing TelexFree-related accounts after it shut down account no. 1885 in August 2012.  Again, the provision of service by Bank of America to this substantial amount of accounts allowed TelexFree to skirt BSA/ALM detection because it spread around red flags and suspicious banking activity.  It also

allowed TelexFree to carry out substantial banking activity that one way or another directly and proximately caused the class to suffer economic loss because at a minimum it sustained the unlawful enterprise's ongoing operations.

1259.    Moreover, at that point, Bank of America knew from a February 2012 account application that Carlos Wanzeler was a leading owner of TelexFree, Inc., and also had information linking him to all of these other accounts.  By this point, Bank of America's automated systems had the ability to "connect parties that were previously unconnected" and thus to connect the dots linking TelexFree, Inc., through Wanzeler to those other accounts. In addition, by this point, Bank of America had the "ability to detect attempts by customers who ha[d] had their accounts closed to re-enter our Bank."

1260.    TelexFree, Inc.'s checking account no. 7408, which Bank of America had opened in February 2012, was one of the most important accounts to survive the closure of account no. 1885.

1261.    One reason Bank of America kept account no. 7408 open was to use the deposits in that account to reimburse itself for the chargebacks against account no. 1885.  Otherwise, as Monica Liebler had written in her letter dated June 26, 2012, Bank of America would "suffer a direct financial loss."

1262.    Bank of America had already used account no. 7408 for that purpose in the months preceding the closure of account no. 1885, debiting account no. 7408 for hundreds of thousands of dollars to reimburse account no. 1885 for chargebacks and financial adjustments and thereby protect itself from loss.

1263.    During 2012, account no. 7408 primarily served as the repository for credit card payments by TelexFree's victims processed through the shuttered account no. 1885.  In June

2012, account no. 7408 received total deposits of $11,239.00 from account no. 1885.  Transfers

from account no. 1885 into account no. 7408 totaled $53,381.54 in July 2012.  August 2012 saw

a huge increase in those inflows, with total deposits and other transfers from account no. 1885

into account no. 7408 reaching $395,855.56.

1264.   Through its actions in shutting account no. 1885 down, Bank of America

confirmed that it knew that those funds were tainted and were the likely proceeds of fraud and/or

crime.

1265.   Bank of America also continued to service TelexFree, Inc.'s checking account no.

0343, opened in February 2012, after account no. 1885 was closed.

1266.   At the time of account no. 1885's closure, Carlos Wanzeler had two personal

accounts with Bank of America:  checking account no. 4178, dating back to 1997, and credit

card no. 0814, opened in 2011.  The Bank continued to honor both accounts after August 2012.

1267.   Moreover, as of August 2012, the Carlos and Katia Wanzeler had several joint

accounts with Bank of America.  They included checking account no. 1826 and savings account

no. 1826, opened in 1997, and checking account no. 7507, opened in 2007.  Bank of America

continued to service all three accounts after it closed account no. 1885.

1268.   Bank of America also knew from Brazilian Help Inc.'s 2011 merchant payment

processing account application that Carlos Wanzeler was the 100% owner of Brazilian Help, Inc.

As of August 2012, Brazilian Help maintained checking account no. 6064 with Bank of

America.  The Bank kept account no. 6064 open after it closed account no. 1885.

1269.   Bank of America knew, as of February 2012, that Carlos Wanzeler was the

President of Common Cents Communications, Inc.  That company had three Bank of America

checking accounts:  account no. 2440, opened sometime before March 2009, and accounts no.

0369 and 0372, established in February 2012.  There is no indication that Bank of America closed these accounts when it shuttered account no. 1885 in August 2012.

1270.   By failing to close these related accounts, which were all linked to Carlos Wanzeler after misconduct became apparent in account no. 1885, Bank of America provided TelexFree and Wanzeler with other accounts to use in carrying out the TelexFree criminal scheme.

1271.   New misconduct, much of which resembled the same misconduct that Bank of America had already detected in account no. 1885, surfaced later on in many of these accounts. In this way, Bank of America provided TelexFree with the banking services it needed to continue defrauding investors and by doing so lent substantial assistance to that criminal enterprise.

1272.   Moreover, in September of 2012, Bank of America continued to substantially assist TelexFree by transferring money internationally from TelexFree's bank account ending in 7408.  Bank of America received a wire transfer fee of $45.00 per transaction.

1273.   In January 2013, TelexFree's operations in Brazil came under investigation by the Brazilian Bureau of Consumer Protection, known as "Procon."

1274.   In a January 11, 2013 press release, Procon indicated that as a result of its investigation of TelexFree, "evidence of crimes ha[d] been detected."  Bank of America was aware of this as well as the excessively large deposits made into its accounts held in the names of TelexFree, Wanzeler and Merrill from the exact same TelexFree Brazilian entity.  These deposits also exceeded limits established by Bank of America and those reported by TelexFree.

1275.   Also, Bank of America substantially assisted TelexFree's Pyramid Scheme by allowing Wanzeler to transfer away from the reach of the Brazilian authorities and launder the funds unlawfully obtained through its Brazilian affiliate into his American Bank of America

accounts. For instance:

a. On January 17, 2013, Carlos Wanzeler transferred $1,000,000 from his Banco Do Brasil, S.A. account to his Bank of America account ending in 1826. Seven days later, Carlos Wanzeler transferred $550,000 from his Banco Do Brasil, S.A. account into his Bank of America account ending in 1826.

b. On February 1, 2013, Carlos Wanzeler transferred $1,500,000 from his Banco Do Brasil, S.A. account into his and Katia's Bank of America account ending in 1826.

c. On February 7, 2013, Carlos Wanzeler transferred $2,000,000 from his Banco Do Brasil, S.A. account to the Bank of America account ending in 1826.

d. As of February 19, 2013, Carlos and Katia Wanzeler's account ending in 1826 had a balance of over $2,000,000.

e. On February, 27, 2013, Carlos Wanzeler transferred $1,700,000 from his Banco Do Brasil S.A. to his and Katia's Bank of America account ending in 1826.

f. On March 15, 2013, Carlos Wanzeler transferred $1,999,948. into his and Katia's Bank of America account ending in1826 from his Banco Do Brasil, S.A. account.

1276. TelexFree's Bank of America accounts also received and/or transferred multiple large dollar transactions, each of which constituted an additional Red Flag to Bank of America's compliance department. For instance:

a. On February 6, 2013, TelexFree, Inc.'s account ending in 7408 received $500,000.00 from Propay. The next day, TelexFree, Inc.'s account ending in 7408 received another $500,000.00 from Propay;

b. On February 25, 2013, Carlos Wanzeler wired $1,980,000.00 from his and Katia's account ending in 1826 to Above and Beyond the Limit, LLC, a company owned by Carlos Wanzeler;

c. On April 3, 2013, Propay transferred $3,000,000.00 into TelexFree, Inc.'s account ending in 7408; and

d. On April 11, 2013, TelexFree, Inc.'s account ending in 7408 received a $900,000.00 transfer from ProPay.

1277. By February 15, 2013, news of Procon's press release was circulating in the online English-language media.

1278.   At this time, using Google's search function, a search for "TelexFree" would have revealed several websites characterizing TelexFree as a "fraude" in Portuguese on the first page of Google's search.  For example, an article entitled "TelexFree: a major fraude financeira da historia do Brasil" was published on February 27, 2013, and appears to have been well-circulated on the Internet.   Bank of America learned of this in time to stop providing the TelexFree unlawful Scheme with substantial assistance – but it chose instead to continue on.

1279.   In addition, the fact that all deposits into Bank of America's account ending in 7408 were made for the purchase of an AdCentral package, and not TelexFree's purported VoIP product, was known to Bank of America's Regulatory Account Monitoring Office, employees and officers, and further stablished that TelexFree was operating an illegal pyramid scheme.

1280.   In February of 2013, TelexFree, Inc.'s account ending in 7408 had a total balance of $703,931.86.  Many of the transactions had deposits in identical even amounts, evidence of a fraudulent scheme.  The fact that Bank of America earned substantial wire transfer fees from TelexFree incentivized Bank of America to willfully set aside the blatant illegal activity of which they were aware.

1281.   Specifically, in February 2013 alone, TelexFree, Inc.'s account ending in 7408 had hundreds of transactions (AdCentral's unlawful passive income) in the amount of $1,375 totaling $347,875.00; 79 transactions in the amount of $1,425.00 (same) totaling $112,575.00; 11 transactions in the amount of $50.00 totaling $550.00; and only two transactions in the amount of $49.90 (TelexFree's purported product -VOIP) .  Bank of America charged this account approximately $3,205 in wire transfer fees.

1282.   Additionally, by the end of April 2013, TelexFree, Inc. had a balance of $1,320,970.46 in its account ending in 7408.  The account continued to have identical, even-

dollar deposits throughout April of 2013 and was charged numerous wire transfer fees. This meant that red flags were issued, and that Bank of America followed-up on them as described above.

1283.   There were approximately 281 counter credit transactions (AdCentral's unlawful passive income) into the account ending in 7408 in the amount of $1425, totaling approximately $400,425. Conversely, there were only five transactions VoIP in the amount of $49.90. In April 2013 Bank of America charged approximately $9,076 in wire transfer fees.

1284.   Between September 2012 and May 2013, there were 813 deposits into TelexFree's Bank of America account ending in 7408 in the exact same amount of the fee for an AdCentral Family package ($1,425.00 or $1,375.00), totaling $1,142,635. These deposits were identified as "Counter Credits."   Conversely, there were only nine deposits in the amount of $49.90 (the VoIP purchase price). These multiple identical even dollar debits and credits raised red flags in 2012 and 2013.

1285.   Despite Bank of America's awareness of TelexFree's illicit business activity, on March 11, 2013, it opened Business Checking Account for TelexFree, Inc. ended in 2658.  The welcome letter or this account was signed by Tim A. Burdick, Senior Vice President of Card Services for Bank of America.  Curiously, Carlos Wanzeler was named as Guarantor and advanced a credit line of $10,000.

1286.   TelexFree's marketing materials (as submitted to Bank of America and available online) identified which sums corresponded with the sale of AdCentral memberships.

1287.   TelexFree's "signup procedure" document directed promoters to deposit investments directly into TelexFree account with Bank of America, a fact well.  These sign up procedures were posted on TelexFree's website and available to, and upon information and

belief, known to Bank of America.

1288.   During 2013, TelexFree affiliates were urging recruits to make walk-in deposits at a Bank of America branch in Massachusetts.  These instructions strongly resembled instructions given to recruits in 2008 by another infamous Ponzi scheme, AdSurfDaily.

1289.   More specifically, Members were directed to transfer their membership fees to a "corporate" account at Bank of America under the name "TelexFREE LLC," were provided with the applicable account and routing numbers, and were provided with the Bank of America branch address, "188 Boyson [sic] TPKE Shrewsbury Ma 01545."

1290.   Simply stated, Bank of America substantially assisted TelexFree's Pyramid Scheme by knowingly allowing it to be identified as TelexFree's depository, which further lent an aura of legitimacy to TelexFree's illicit business operations.

1291.   Any doubt that Bank of America had actual knowledge of TelexFree's unlawful scheme is dispelled by April 15, 2013, when it began restricting TelexFree's banking activities. Despite these restrictions, Bank of America continued to provide TelexFree with banking services.

1292.   Despite Bank of America's knowledge that TelexFree was an illegal enterprise, it allowed TelexFree to transfer of $1,800,000 into an account with Citizen's Bank in the name of TelexFree, LLC on April 19, 2013.

1293.   On or about April 24, 2013, Defendant Labriola announced, in a mass email to TelexFree Members, that TelexFree would be "pulling out" of Bank of America.

1294.   Ultimately, on May 17, 2013, Bank of America closed certain accounts held in the name of TelexFree, Carlos Wanzeler, and several affiliated entities.  Regardless, it continued to maintain other accounts from which TelexFree continued to transact its illicit business.

1295.   For instance, Bank of America continued to maintain Brazilian Help, Inc.'s Bank of America Credit Card account ending in 0033, as evidenced by the letter Bank of America of May 20, 2013 to Brazilian Help, Inc. indicating an outstanding balance.

1296.   Also, on August 30, 2013, Defendant Labriola announced during a public conference call with TelexFree Members that payments due-and-owing from Bank of America to members as of July 30, 2013 required manual sorting, since "Bank of America didn't give them a sorted list", indicative of the fact that payments to Promoters were continuing to be made from accounts held with Bank of America.

1297.   Additionally, a document dated November 11, 2013 established that Defendant Merrill, on behalf of TelexFree, directed Allied Wallet to transfer funds via international wire transfer to TelexFree account with Bank of America, with incoming transfers labeled "MEMO: Further credit to TelexFree."

1298.   In or about December 2013, Joseph Craft had a conversation with Bank of America Senior Vice President Kevin Staten, during which they discussed the fact that TelexFree had been shuttered in Brazil for being a pyramid scheme. At that time, Staten shared that Bank of America possessed indications that TelexFree's operations were illegal. Nevertheless, Bank of America did in fact approve TelexFree's account application and allowed Bank of America to continue servicing TelexFree.

1299.   Specifically, on February 6, 2014, Bank of America, with the assistance of its employee, Samantha Yanez, allowed TelexFree to open an additional account ending in 1477 in Florida. This was done in part through influence of Eddie Gonzalez, President of IPS, who lived and conducted business in Florida, and had a relationship with Kevin Staten, and with actual knowledge of TelexFree's illegal activities.

1300.   On March 17, 2014, $30,000,000 was transferred from TelexFree's Bank of America account through IPS to TelexFree, LLC's Wells Fargo account.

1301.   Through its actions, Bank of America substantially assisted in the perpetration of, and otherwise became an integral part of, TelexFree's fraudulent scheme. But for Bank of America providing banking services, TelexFree's Pyramid Scheme would have collapsed.

1302.   At a minimum, Bank of America's initial investigation and ongoing monitoring of TelexFree, provided Bank of America with actual knowledge that TelexFree was engaged in fraudulent and unlawful conduct, but willfully turned a blind eye to the results of its investigation and monitoring, refused to suspend service or terminate its banking relationship with TelexFree or the Operational Defendants, and continued to provide TelexFree with credit and depository services which were integral to the TelexFree Scheme, through at least February of 2014.

1303.   Through its actions, Bank of America knew TelexFree's conduct constituted a breach of duty and violated M.G.L. c. 93, § 69 and M.G.L. c. 93A, and it gave substantial assistance and encouragement to the perpetuation of, and otherwise became an integral part of, TelexFree's unlawful Scheme.

1304.   Bank of America was also unjustly enriched as it received fees for providing vital banking services to TelexFree, which were deducted directly from victim funds held in TelexFree's Bank of America accounts.

2.   Defendant TD Bank

1305.   Plaintiffs incorporate by reference all allegations and the content of all paragraphs contained in this complaint, as though fully set forth herein.

1306.   TD Bank provided banking services, including the receipt of deposits of victims' membership funds, to TelexFree and its affiliates and principles from September 2012 to 2014.

1307.   TD Bank had actual knowledge of TelexFree's fraudulent business activities and

Ponzi/Pyramid scheme business model when TD Bank initially accepted TelexFree and its

affiliates and principal as customers because TD Bank investigated TelexFree's management,

business activities, customer base, and product offerings.

1308.   At that time, TD Bank discovered that TelexFree operated an unlawful

Ponzi/pyramid business model, that its form contract contained express objective violations of

Massachusetts statutory law, and that its website and promotional materials contained express

objective violations of Massachusetts statutory law.

1309.   TD Bank gained further actual knowledge of TelexFree's fraudulent business

activities and Ponzi/Pyramid scheme business model in spring 2013 when TD Bank restricted

and closed several TelexFree accounts due to fraudulent banking activity by TelexFree; yet it

inexplicably kept open other, as well as opened new, TelexFree and TelexFree affiliate accounts,

thereby allowing TelexFree to continue its illegal money laundering scheme and fraudulent

business practices.

1310.   TD Bank also gained further actual knowledge of TelexFree's fraudulent business

activities and Ponzi/Pyramid scheme business model in spring 2013 when voluminous deposits

from credit card processors into TelexFree accounts at TD Bank demonstrated clears signs of

illegal activity as no corresponding transactions for VoIP sales were incoming and those large

deposits were contrary to TelexFree's banking business profile; when numerous large volume

deposits in rounded hundreds or thousands of dollars were made by TelexFree at TD Bank,

signaling red flags of money laundering; when TD Bank allowed TelexFree to process transfers

of large sums of funds into and out of TelexFree accounts knowing such transactions were

layering tactics in money laundering schemes and knowing that TelexFree did not offer services

or products supporting such large monetary transactions; when TelexFree had voluminous

chargebacks in each account signaling fraudulent activity by TelexFree and when news and social media reported in January 2013 that Brazilian authorities were criminally investigating TelexFree for fraudulent business activities.

1311.   At all times relevant to the complaint, Defendant TD Bank maintained multiple accounts on behalf of TelexFree.  From September 2012 through at least September 9, 2013, TD Bank opened six bank accounts for TelexFree, LLC, TelexFree Inc., Carlos Wanzeler and Brazilian Help (a Wanzeler company).

1312.   TD Bank first opened a TelexFree-related checking account, account no. 2808, on September 26, 2012, with an initial $50.00 deposit. This was followed by a second deposit of $200,000 on September 27, 2012.  That $200,000 deposit consisted of a check drawn on TelexFree, Inc.'s Bank of America account no. 7408, a red flag activity and practice consistent with money laundering where large sums of funds are transferred between various financial institutions.

1313.   On September 26, 2012, Brazilian Help Inc., a company owned and operated by Carlos Wanzeler, also opened a checking account with TD bank, account no. 5182, with an initial deposit of $50.00.

1314.   The TD Bank application submitted by TelexFree at account opening represented that TelexFree, Inc. and Brazilian Help Inc. were affiliated through Wanzeler's common ownership and identified both entities as having a business address of "225 Cedar Hill St Ste 200, Marlborough MA 01752."

1315.   With each TelexFree account opening, TD Bank was required to newly employ heightened scrutiny and additional operating procedures, protocols and monitoring that it applies to high risk or red flagged accounts, which included enhanced comprehensive due diligence to

understand TelexFree's business operation and its principals, KYC investigations of TelexFree, and otherwise comply with all internal requirements as well as banking regulations during the 2012-2014 class period.

1316.   During the process of carrying out its procedures, protocols and monitoring of the accounts, TD Bank discovered that TelexFree was operating an unlawful Pyramid Scheme: the source of its income did not match its banking profile; it sold no product to speak of; its business structure and Promoter Compensation Plan, which expressly included massive promises of guaranteed passive income was unlawful; it generated staggering excessive chargebacks well outside the maximum allowed under any related standard of review; and its sister company in Brazil, run by the same individuals that appeared a signatories on the TD Bank applications, was shuttered as an unlawful financial fraud.

1317.   Hallmark events of TD Bank's actual knowledge transpired as early as spring 2013, when TD Bank first restricted, then closed, TelexFree, LLC's account no. 2808 due to fraud.

1318.   In May 2013 TD Bank began restricting TelexFree's banking activities by reducing TelexFree, LLC's banking privileges.  It did so because it had actual knowledge of TelexFree's unlawful business activities.  TD Bank also acted to mark checks drawn on account no. 2808 to payees with a notice explaining: "Account # [2808] does not allow any check activity to be charged to this account," and returned the checks to them.  This action was taken even though account no. 2808, was a "TD Business Premier Checking" account.

1319.   Another restriction action of banking privileges for TelexFree account no. 2808 arose earlier, between September and December 2012, when account no. 2808 first demonstrated an identifiable pattern of unlawful activity.  Total monthly deposits ranged from $0 to slightly

over $350,000 and monthly outflows were all less than $500.  Most of the deposits were five or

six figures, with many consisting of deposits for $50,000 or $150,000 by Co-Defendant Propay.

As a result of the fact that these transactions did not match TelexFree's reported business profile,

TD Bank was objectively notified of unlawful banking activity through system-generated

automatic red flags and required follow up protocols.  As required by TD Banks internal

requirements, these computer system-generated banking security notices were followed by

investigations carried out by employees of TD Bank ranging from branch employees to its

BSA/ALM departments.

1320.   At the time, TelexFree used Propay to process payments for membership fees by

TelexFree's investor victims.  TD Bank was processing these victim's funds.

1321.   Starting in January 2013, the pattern of activity in account no. 2808 changed by

evidencing deposits from credit card processors, like Propay, each in the amount of $1,375.00,

the exact price of an AdCentral Family package.  Meanwhile, there were no transactions relating

to the sale of VoIP, the product described in detail in its business model. When these transactions

did not match TelexFree's reported business profile, TD Bank was objectively notified of this

banking activity through system-generated banking security notices that were immediately

followed by investigations carried out by the specially trained employees of TD Bank.

1322.   This pattern demonstrated a clear sign of illegal activity that TD Bank recognized

through its standard procedures and protocols.  It automatically triggered red flags and mandated

an internal investigation that was carried out with the benefit of the well-established FFIEC

warnings that these "small, incoming transfers of funds" and strikingly "repetitive" fund-transfer

activity were all well-accepted signs of money laundering or fraud.

1323.   This pattern of non-conforming uniform deposits in small amounts that did not

match their banking profile continued over the next five months, with the majority of deposits in the exact amount of $1375, the price for the AdCentral Program, or $1,425, the price of the TelexFree AdCentral Family program plus the $50 membership fee.  There were zero transactions relating to its business profile.  It also did not match the sale or use of the product TD Bank or TelexFree described in detail in its authorized banking business profile.

1324.   Another red flag activity was known by TD Bank starting in January 2013 based on multiple deposits into TD Bank account no. 2808 that were in "large, round dollar, hundred dollar, or thousand dollar amounts." These deposits also automatically triggered red flags and mandated an internal investigation that was carried out by specially trained TD Bank employees with the benefit of the industry used FFIEC Examination Manual designed to identify unlawful activity and/or fraud.

1325.   Specifically, the January 2013 statement for account no. 2808 reflected one deposit for $2,000, three deposits for $4,000, four deposits for $5,000, one deposit for 6,000, one deposit for $7,000, four deposits for $8,000, three deposits for $10,000, and one deposit for $26,000.  None of these deposits matched the business profile or sale of business product for TelexFree that had been authorized by TD Bank.

1326.   Because this sudden influx in deposits by TelexFree's participants and victims into account no. 2808 coincided with several specific major developments with the company, TD Bank's sophisticated fraud detection systems and specially trained employees had the benefit of this additional knowledge that red flagged the clearly illegal nature of this banking activity.

1327.   On January 11, 2013 – the first month that TelexFree participants deposited investments into account no. 2808 – the Brazilian Bureau of Consumer Protection issued a news release stating it had opened an investigation into TelexFree Brazilian "crimes."  This

information became known to TD Bank's attention through its standard customer due diligence systems and activities.

1328.  On January 17, 2013, six days after the Brazilian authorities publicized their criminal investigation into TelexFree, TelexFree redirected investments otherwise destined for Brazil into TD Bank account no. 2808.  The first deposits into that account was for the all-too-familiar amount of $1,375.

1329.  By February 2013, several high-profile websites were branding TelexFree as a "fraude" in Portuguese, something that TD Bank discovered through its ongoing monitoring process of internet activity and bank security and banking industry publications and communications.  This information became known to TD Bank through its standard Customer Due Diligence activities.

1330.  In April 2013, the Securities Division of the Office of the Secretary in Massachusetts (SOC) commenced its own investigation into TelexFree and served the company with a subpoena.

1331.  During 2013, as TelexFree's legal problems mounted in Brazil, TelexFree sought alternative banking resources with which to receive funds from its Brazilian promoters.  TD Bank's sophisticated bank fraud and fraud detection systems, its state of the art and effective standard protocols, policies and software to screen customers and analyze BSA/AML risks, the activities of its specially trained employees, and its BSA/ALM departments picked up more and more of this activity relating to its existing TelexFree customers over time.

1332.  For example, in spring 2013, TelexFree circulated information online via video instructing participants to deposit their investments in the TelexFree scheme directly to TD Bank account no. 2808.  TD Bank had actual knowledge of that online instruction to make deposits

into its bank and also that the instructions came from TelexFree on the heels of the serious

accusations, questions and investigation raised by the Brazilian government.  TD Bank knew that

the Brazilian entity was described as a financial fraud/Ponzi/pyramid scheme.

1333.   TD Bank also had actual knowledge that TelexFree's online instructions clearly

stated that deposits were to be made in its bank and it allowed the deposits to be made in the

amount of $1,425, the cost of a Family AdCentral Package, rather than the cost of VoIP, $49.90.

Many of the deposits were in cash, which in and of itself is a notable red flag that set off a series

of mandatory investigations.  The foregoing disparity immediately alerted TD Bank that

TelexFree's business model was not built upon the sale of a product, but rather constituted a

Pyramid Scheme.

1334.   TD Bank provided substantial assistance because, despite its actual knowledge of

the unlawful nature of the $1,425 deposits, it allowed the stream of them to be made in its bank

1335.   The pattern of TD Bank investigating TelexFree's unlawful deposits and

discovering the unlawful source of the funds repeated itself throughout its banking relationship

with TelexFree.  Upon these events, TD Bank was obligated to close all TelexFree accounts and

freeze all funds.  Instead of stopping or impeding the exponential growth of TelexFree's Scheme

by denying it banking services, TD Bank continued to knowingly process victims' funds,

willfully brushing aside its knowledge of TelexFree's unlawful fraud while continuing to

generate profits and hold large sums.

1336.   At this point, TD Bank was prohibited by its own standards as well as industry-

accepted standards from opening any new accounts.

1337.   Despite TD Bank's expressed concerns with TelexFree account no. 2808, on June

6, 2013, TD Bank again willfully brushed aside its knowledge of TelexFree's unlawful fraud and

opened another checking account for TelexFree, LLC, ending in 0334.  TD Bank's Branch manager, Kathryn A. Coffin, processed the application for this new account.

1338.   The opening of account no 0334 is remarkable for two reasons.  First opening a new account so closely after the action described above, whether before or after the completion of the related investigation, audits and risk analysis, ran completely counter to TD Bank and standard banking industry practice.  Second, the opening of a new account triggered fresh and additional KYC/due diligence inquiries, underscoring TD Bank's actual knowledge of TelexFree's fraudulent Scheme.

1339.   As part of TD Bank's customer due diligence before opening account no. 0334, TD Bank's investigation revealed TelexFree's mounting legal difficulties in Brazil.  In addition, the customer due diligence process linked TelexFree, LLC to TD Bank's past customer problems with Wanzeler which prompted the prior closure of his personal accounts and to the deposits which bore no relationship to TelexFree's banking profile.

1340.   After TelexFree, LLC opened its new TD Bank account no. 0334 in June 2013, it immediately resumed the pattern of unlawful, repetitive deposits of $1,425 by TelexFree participants similar to those deposited into account no. 2808.  These deposits into TelexFree account no. 3304 increased exponentially after TD Bank closed TelexFree account no. 2808.

1341.   TD Bank's closure of account no. 2808 occurred after June 19, 2013 when TelexFree's Brazilian operations were shuttered by the Public Ministry of the State of Acre in Brazil, who determined that TelexFree was an illegal pyramid scheme.  Carlos Wanzeler later attributed TD Bank's decision to close the account to TelexFree's "problems in Brazil."

1342.   Nevertheless, TelexFree resumed its fraudulent activities with TD Bank from June 2013 and October 2013, when one thousand eight hundred (1,800) deposits were made into

TD Bank account no. 0334, held in the name of TelexFree, LLC, in the exact amount of the AdCentral Family package purchase price of $1,425.

1343.   During this same period, there was only one (1) deposit into account no. 0334 in the amount of $49.90, the purchase price of its purported product - VoIP.   Through its enhanced operating procedures, protocols and monitoring of the accounts, TD Bank had actual knowledge of this repetitive pattern of TelexFree's fraudulent transactions.

1344.   Expectedly, but harmfully late, on July 10, 2013, TD Bank unilaterally closed account no. 2808 "due to TelexFree-related suspicious activity," removing any doubt that TD Bank had actual knowledge of TelexFree's unlawful scheme.   At that time TD Bank's internet search revealed that Brazil had shut down TelexFree as an illegal pyramid scheme, further cementing TD Bank's actual knowledge that most of the funds in account no. 2808 were ill-gotten gains from TelexFree's victims. When TD Bank closed TelexFree, LLC's account no. 2808 on July 10, 2013, the balance in that account was $4,369,787.22.

1345.   Nevertheless, TD Bank failed to freeze those funds for the victims' benefit. Rather, TD Bank offered TelexFree banking assistance, which in context was non-routine, by transferring those funds to TelexFree, LLC, account no. 0334 on July 10, 2013, thereby aiding and abetting TelexFree's fraudulent scheme.

1346.   Not surprisingly, one day later, on July 11, 2013, through another similar offer of non-routine banking assistance, $4,000,000 of those funds was withdrawn by a check payable to TelexFree, LLC, representing further aiding and abetting by TD Bank with TelexFree's fraudulent scheme.

1347.   In the first five months, June to October 2013, of account no. 0334, the number of $1,425 deposits increased more than 2500%.

1348.   By September 2013, with the explosion of the facially unlawful $1,425 deposits, the monthly statement for account no. 0334 ballooned to 51 pages.

1349.   Further, as detailed above, as a result of TD Bank's customer due diligence on TelexFree, as well as the marketing materials and standard form contract that TelexFree had provided and that were otherwise omnipresent, TD Bank knew that the $1,425 sum corresponded to the sale of promoter memberships, and that the $49.90 sum corresponded to the sale of product.

1350.   Notwithstanding, and although TD Bank closed account no. 2808 in July 2013, it continued to service TelexFree through account no. 0334.

1351.   Providing further much needed and substantial assistance, TD Bank willfully brushed aside its actual knowledge and opened the following accounts for Telex Free its affiliates and principles:

   a.   On August 8, 2013, TD Bank opened account no. 6982 for TelexFree, Inc., noting TelexFree as an "existing customer."

   b.   On August 9, 2013 TD Bank opened account no. 6958 for Brazilian Help Inc. at Carlos Wanzeler's request.

   c.   On September 9, 2013, TD Bank opened another account for TelexFree, LLC ending in 8409.

1352.   Remarkably, by October 2013, TelexFree was again instructing participants to deposit their investments in this "NEW Account Number" 8409, replicating its fraudulent financial practices from TD Bank account nos. 2808 and 3304   Once again, despite actual knowledge that TelexFree was an unlawful business, TD Bank willfully brushed aside its actual knowledge to continue to assist it by knowingly processing victim's funds.

1353.   This new deposit instruction relating to "NEW Account Number" 8409 also demonstrates at least two other reasons why TelexFree and TD Bank opened new accounts and

shifted banking activity from one to the other.

1354.   First, redirecting funds from account no. 0334 to account no. 8409 enabled TD Bank and TelexFree to deflect scrutiny from the huge influx of participant investments that had and were continuing to stream into the older TD Bank account.  Second, redirecting the account deposits provided a new destination to launder the ill-gotten gains which had accumulated in the older TD Bank accounts.

1355.   With each new account opening, TD Bank was required to, and did, update its customer due diligence on TelexFree, LLC, TelexFree, Inc., Brazilian Help Inc., Carlos Wanzeler, and Merrill, which included standard internet searches and the other items listed in the introduction section above.

1356.   In the meantime, TD Bank listed James M. Merrill as the customer for the new account no. 6958, corroborating Merrill's role as another direct link connecting Brazilian Help Inc., TelexFree, LLC, and TelexFree, Inc. to the TelexFree Scheme. Adding to TD Bank's knowledge, the word "Brazilian" in Brazilian Help Inc.'s name established even more knowledge by August 2013, since TD Bank knew by then that TelexFree had been shuttered by Brazilian authorities for operating a pyramid scheme.  In any event all their previous searches had already tied James Merrill to TelexFree's unlawful sister company in Brazil as well as its forced shuttering.

1357.   James Merrill was also the signatory for the TelexFree Inc. new account no. 6982. The same Branch Manager for TD Bank that opened TelexFree, LLC account no. 0334, Kathryn A. Coffin, also opened account no. 6982 for another sister entity, TelexFree, Inc.

1358.   Indeed, by August 8, 2013, TD Bank was well aware of the relationship between Carlos Wanzeler, TelexFree, Inc., TelexFree, LLC, and Brazilian Help Inc.

1359.   Moreover, as a result of these two account openings, nos. 6982 and 6958, Kathryn

A. Coffin and TD Bank knew that TD Bank was operating accounts both for TelexFree, LLC,

and TelexFree, Inc., and that the two companies were related, and associated with Merrill and

that Merrill and Wanzeler and TelexFree were directly associated with TelexFree that was

shuttered as a pyramid/Ponzi scheme by the Brazilian government.

1360.   Armed with actual knowledge that TelexFree was a Pyramid scheme, one month

later, on September 9, 2013, TD Bank again provided substantial assistance by opening yet

another new checking account for TelexFree, LLC, this one ending in 8409. TD Bank employee

Samantha Brown handled opening for this account, which identified Carlos Wanzeler and James

M. Merrill as signatories on the application.

1361.   The gravity of TD Bank's complicity by this point was underscored by even more

red flags that materialized immediately in two of the newly opened accounts.  For instance,

TelexFree's unlawful pattern of repeated $1,425 deposits and wire transfers that appeared in

account 2808 as early as January 2013 and in account 0334 as early as June 2013 reappeared in

new account no. 8409 starting on September 16, 2013, just one week after that account was

opened.

1362.   In September 2013, hundreds more $1,425 deposits were made into TelexFree,

LLC, account no. 8409, as TelexFree had instructed its participants to do.

1363.   The fact that well over ninety percent (90%) of deposits into TD Bank's accounts

held in the name of TelexFree, LLC were made for the purchase of an AdCentral package, and

not TelexFree's purported VoIP product, was known to TD Bank's Regulatory Compliance

Office, its specially trained employees and its managers and other officers and provided

additional actual knowledge to TD Bank that TelexFree was operating an illegal Pyramid

Scheme.

1364.   This identical pattern of activity is reminiscent of the Scott Rothstein Ponzi scheme enforcement action against TD Bank, wherein the OCC called TD Bank's failure to file SARs reporting Rothstein's account activity "egregious," due to the "volume and velocity of funds" that flowed through his TD Bank accounts.

1365.   By September 3, 2013, TelexFree, Inc. was using new account no. 6982 to accept the incoming bulk credit card payments processed by Base Commerce and to process refunds to participants in the form of chargebacks.

1366.   These bulk credit card payments were a red flag that the processors were depositing "large amounts of currency."

1367.   Meanwhile, the chargebacks were another very alarming indication that customers were complaining about TelexFree fraud, prompting additional red flags of which TD Bank had actual knowledge and carried out a follow- up.

1368.   In context, the mere fact that TD Bank opened these new accounts knowing that TelexFree was engaged in criminal activities constitutes substantial assistance.

1369.   Moreover, and to further assist TelexFree's illegal activities, TD Bank employees wrote reference letters for the TelexFree-related entity Brazilian Help Inc.

1370.   Specifically, on or about August 12, 2013, Stephanie Rivera wrote a reference letter on official TD Bank letterhead, confirming that Brazilian Help Inc. owned checking account no. 6958, which had only been opened by Carlos Wanzeler three days earlier.  This was done in the wake of myriad news and social media reports of Brazilian authorities declaring TelexFree and its affiliate, Brazilian Help, Inc., a fraudulent Ponzi scheme and was done with the intent to offer assistance.

1371.   Upon information and belief, Carlos Wanzeler used that reference letter to encourage other businesses, including financial institutions, to do business with TelexFree-related entities.

1372.   On March 28, 2014, less than three weeks before state and federal authorities shut TelexFree down in the United States, TD Bank branch manager Kathryn A. Coffin authored another reference letter on TD Bank letterhead directed "To Whom It May Concern," confirming that Brazilian Help, Inc. had paid its balance of $65.19 to TD Bank.

1373.   Upon information and belief, Brazilian Help Inc., a TelexFree affiliate, used these letters in an effort to assure other firms and people with which it hoped to do business that it stood in good business standing with TD Bank.

1374.   It is unquestionable that at the time that Kathryn Coffin, on behalf of TD Bank, authored the aforementioned reference letter of March 28, 2014, TD Bank had actual knowledge TelexFree was engaged in a Pyramid Scheme.  Specifically, by March 28, 2014:

      a.   TelexFree was on the brink of collapse;

      b.   TD Bank had closed most of its bank accounts due to its knowledge of fraud;

      c.   TelexFree had been either shut down or the subject of governmental fraud warnings in multiple other countries;

      d.   TelexFree was widely publicized as a pyramid scheme; and

      e.   The Massachusetts SOC was actively investigating, and had already deposed TelexFree's principals, Merrill and Wanzeler.

1375.   By issuing these reference letters, TD Bank intended to, and did, substantially assist TelexFree in advancing its criminal activity at a very critical time.

1376.   Further evidence of TD bank's actual knowledge of TelexFree's fraudulent business and banking activities, TD Bank was named in TelexFree's online "signup procedures"

document as TelexFree's bank into which transfers of membership funds could be made by TelexFree members.  Upon information and belief, TelexFree had actual knowledge of this and knowingly allowed this practice to continue unimpeded, despite having actual knowledge of TelexFree's fraudulent business and banking activities.

1377.   Specifically, TelexFree members were directed to transfer their membership fees to a "corporate" account at TD Bank under the name "TelexFREE LLC," and were provided with the applicable account and routing numbers.

1378.   TD Bank also knowingly assisted TelexFree by permitting TelexFree to identify it as the holder of its accounts and thereby lend credibility to TelexFree's business operations through TelexFree's connection with a large and well-established financial institution.

1379.   On or about September 6, 2013, TelexFree leadership instructed its members via a public conference call that the fastest way to send money to TelexFree was by direct deposit to TelexFree's accounts with TD Bank, underscoring the degree to which TD Bank's assistance facilitated the collection of member funds.  Upon information and belief TD Bank was aware of this.

1380.   The person speaking on behalf of TelexFree during this conference call is believed to have been Bradshaw, a high-profile pyramid scheme regular formerly active with the now-defunct pyramid schemes Zeek Rewards and AddWallet.

1381.   Other indicia of TD Bank's actual knowledge of TelexFree's ongoing criminal enterprise, as well as the substantial assistance it provided, includes

   a.   The enormous sums of money deposited by TelexFree's credit card processors;

   b.   The extensive number of chargebacks which occurred as early as August 2013;

      c.   The patterns of unlawful withdrawals, consistent with the "layering" process of money laundering; and

      d.   The fact many of the deposits were in cash which in and of itself is a notable red flag that set off a series of mandatory investigations.

Each disparity immediately alerted TD Bank that TelexFree's business model was not built upon the sale of a product, but rather constituted a Pyramid Scheme.

1382.   Other evidence of unlawful activity included enormous sums deposited by TelexFree's credit card processors.

1383.   Specifically, Base Commerce (then Phoenix Payments, LLC), deposited $7,434,585.92 in TelexFree, Inc. account no. 6982 on September 26, 2013.  This was well outside TelexFree's banking profile and limits as imposed by TD Bank.

1384.   The following month, Allied Wallet made weekly bulk deposits into TelexFree, LLC, account no. 0334, depositing $889,147.57 on October 3, $908,462.00 on October 10, $1,415,871.24 on October 18, and $1,120,465.21 on October 24.

1385.   TelexFree's enormous chargeback rate also demonstrates a pattern of fraudulent activity and supports TD Bank's actual knowledge.

1386.   The charge-back problem exploded in August 2013 in TelexFree, Inc.'s new account no. 6982.  That month, the account statement showed 196 electronic chargebacks from Base Commerce totaling $180,898.18.

1387.   For September 2013, the monthly statement for account no. 6982 reported another 163 Base Commerce chargebacks totaling $144,217.06.

1388.   TelexFree, LLC's bank statements for September 2013 also demonstrated chargebacks.  The September statement for account no. 0334 showed $17,100 in chargebacks, more for the unlawful amount of $1,425.  Federal regulators expect banks to close accounts when chargebacks are excessive.

1389.   These chargebacks provided TD Bank with actual knowledge of mounting TelexFree fraud.

1390.   The pattern of unlawful withdrawals from TelexFree's TD Bank accounts further establishes the presence of fraudulent activity and underscores TD Banks actual knowledge.

1391.   In particular, one of the essential steps in money laundering is moving funds from account to account to mask their illicit origin and facilitate payouts to criminal perpetrators.

1392.   During the latter half of 2013, TelexFree's accounts with TD Bank exhibited exactly this pattern of unlawful withdrawals and funds movements.

1393.   For example, on July 11, 2013, TelexFree, LLC, withdrew $4 million of the proceeds from the closing of its account no. 2808 via a check payable to itself drawn on account no. 0334.

1394.   Then, in August 2013, TD Bank honored a check drawn by TelexFree, LLC, on account no. 0334 for $73,751.00 to Febe Wanzeler, a sibling of Carlos Wanzeler.

1395.   Febe Wanzeler deposited that check into a JP Morgan Chase account that appeared to end in the number 8272. The check stub for that check stated that TelexFree issued it in response to a "Request July 09/2013 Replacing Voided Check."

1396.   This telltale notation suggests that TelexFree first unsuccessfully tried to write that check on account no. 2808 the day before TD Bank shut down that account.

1397.   The transmission of those funds to Febe Wanzeler indirectly from account no. 2808 into TD Bank account no. 0334 and then into the JP Morgan Chase account is a classic example of the layering phase of money laundering.

1398.   In another instance of layering soon afterward, TD Bank paid two checks written by TelexFree, LLC on account no. 0334, one for $20,582.86 and another for $13, 697.00 to

Lyvia Wanzeler, the daughter of Carlos Wanzeler.

1399.   Meanwhile, Carlos Wanzeler made other illegitimate payments for personal expenses out of TD Bank account no. 6982, owned by TelexFree, Inc.  On October 15, 2013, Wanzeler paid his personal Massachusetts and federal taxes with checks for $13,689 and $67,253 respectively numbered 2512 and 2513 drawn on that corporate account.

1400.   On August 8, 2013, TelexFree, LLC, transferred $400,000 from its account no. 0334 into TelexFree, Inc.'s new account no. 6982, disguising it as a "Loan from TelexFree LLC."

1401.   Later, the September 2013 statement for account no. 0334 reflected a debit of $2,929,411.31 on September 19, 2013, which TelexFree, LLC, immediately transferred to TelexFree, Inc.'s account no. 6982.

1402.   Even more troubling was an unlawful transfer on September 17, 2013.  That day, $3,917,707.48 was transferred from TelexFree, LLC, account no. 0334 to TelexFree, LLC, account no. 8409.

1403.   At the bottom of the Funds Transfer Receipt for that transaction appeared the handwritten words: "1-800-893-8554 Fraud unit to transfer funds." This indicates that the fraud unit at TD Bank not only was aware of the transfer, but actively approved and initiated it.

1404.   Eight days earlier, on September 11, 2013, TD Bank had opened account no. 8409 which allowed TelexFree to launder money by shifting its victims' funds from older TD Bank accounts into this new account, thereby disguising the unlawful activity.

1405.   Through its participation in these "layering" activities, TD Bank allowed TelexFree, LLC to shift funds from one account to another, thereby permitting victims' funds to be transferred to TelexFree's perpetrators and also to pay off earlier investors, keeping the Ponzi

Scheme afloat and making the illicit source of those funds more difficult to trace.

1406.   Another instance of layering occurred on October 2, 2013, when TelexFree, LLC transferred $2,441,000.00 from TD Bank account no. 0334 to TD Bank account no. 8409.

1407.   Perhaps the most compelling instance of layering involved a series of shell-game transactions that occurred on October 18, 2013.

1408.   On that day, at 1:26 p.m., $3,000,000 was transferred from TelexFree, LLC, account no. 0334 to TelexFree, LLC, account no. 8409, both at TD Bank.  Six minutes later, at 1:32 p.m., the same $3,000,000 was withdrawn from account no. 8409.  One minute after that, at 1:33 p.m., the $3,000,000 was deposited into TelexFree, Inc. account no. 6982, again at TD Bank.

1409.   This circuitous route of transfers with which TD Bank substantially assisted was designed to make it difficult to trace the movement of that cash.

1410.   On October 21, 2013, TD Bank issued written notice to Carlos Wanzeler that it was closing TelexFree, LLC. accounts no. 0334, 8409 and 0955, as well as Brazilian Help Inc. account no. 6958, as of October 31, 2013.

1411.   TD Bank also unilaterally closed TelexFree, Inc. account no. 6982 on November 1, 2013.

1412.   When TD Bank closed TelexFree accounts no. 0334, 8409, 0955, and 6982 plus account no. 6958 of Brazilian Help Inc., again, it did not freeze the victims' proceeds in those accounts for safekeeping.  Rather, TD Bank disbursed the balance of those accounts to TelexFree entities and their principals, contrary to the precedent set by the Bank of China enforcement case mandating that financial institutions must effectively freeze account assets when the financial institutions close accounts of knowledge of illegal conduct.  Those disbursements were as

follows:

a.  *TelexFree, LLC, account no. 0334:* On October 30, 2013, TD Bank issued

TelexFree, LLC, an official bank check for $4,527,965.11, representing most

of the balance in its account no. 0334. TD Bank officially closed account no.

0334 on November 4, 2013, by issuing a closeout debit for $88,353.00 "Per

Request of Demarketing," which was paid out on that date and deposited in a

Middlesex Savings Bank account no. 0260 for TelexFree, LLC, on December

9, 2013.

b.  TelexFree*, LLC, account no. 8409*: On November 5, 2013, TD Bank appeared

to close TelexFree, LLC account no. 8409 and issued a closeout debit of

$18,448,267.66 with the notation "Approved by Demarketing."

c.  *TelexFree, Inc. account no. 6982:* On November 1, 2013, at James Merrill's

request, TD Bank issued TelexFree, Inc. an official bank check for

$2,299,408.73 to close account no. 6982.

d.  *Brazilian Help Inc. account no. 6958:*  Also on November 1, 2013, TD Bank

closed Brazilian Help Inc.'s account no. 6958 by issuing an official bank

check to that company at James Merrill's request in the amount of

$136,261.07.TD Bank mailed Brazilian Help another official bank closing

check drawn on account no. 6958 for $1,164.87 on November 7, 2013.

e.  *TelexFree, LLC, account no. 0955*:  On November 15, 2013, TD Bank closed

TelexFree, LLC account no. 0955 and paid out the balance in an official bank

check for $475,713.43. A handwritten notation on a photocopy of that check

stated "deposited in Bank of America $475,713.43."

1413.   When TD Bank closed these five TelexFree accounts and disbursed the balances, it knowingly and substantially assisted the TelexFree criminal enterprise by handing over the victims' funds to TelexFree's perpetrators.  That created the almost inevitable risk that TelexFree's principals would appropriate those funds for their personal use or launder them further at other financial institutions.

1414.   Moreover, when TD Bank closed TelexFree accounts nos. 0334, 8409, 0955, 6958, and 6982, TelexFree's co-owner James Merrill was presented with an immediate pressing problem: he suddenly had approximately $20 million in account payouts on hand that he needed to deposit or invest in other financial institutions.

1415.   The large size of those deposits—particularly the check for $18,448,267.66 from the closure of account no. 8409— raised TD Bank red flags.

1416.   Accordingly, Merrill returned to TD Bank, which agreed to break that sum into smaller checks, to avoid raising red flags when depositing those sums at other institutions.

1417.   TD Bank, at TelexFree's request, knowingly assisted Merrill and TelexFree by breaking up the original $18,448,267.66 check into five or more pieces—each under $5 million-- to make it easier for Merrill and TelexFree to launder those sums through other financial institutions while avoiding AML scrutiny.

1418.   TD Bank engaged in this structuring transaction despite knowing the AML difficulties posed by depositing large checks and with prior knowledge of TelexFree's criminal enterprise.

1419.   Through this action, TD Bank substantially assisted TelexFree's criminal defalcations and money laundering activities.

1420.   Even Jeffrey Babener admitted that the TD Bank account closures were due to

"the internet press and the Brazil issues," providing additional corroborating evidence that TD

Bank was aware of TelexFree's fraud activities.  In context, Babener, Garvey Schubert, and The

Sheffield Group were able to declare TelexFree's business unlawful within days of reviewing a

small fraction of the data that TD Bank obtained and generated through its own

transactions.   Remarkably, even after TD Bank' TelexFree purportedly closed TelexFree

accounts in November 2013, it continued to maintain another TD Bank checking account in the

name of Brazilian Help, Inc., ending in 5183.

1421.   More importantly, TD Bank also reinstated one of TelexFree, LLC's closed

accounts, account no. 8409, in December 2013.

1422.   Both actions disregarded the precedent set by the Bank of China enforcement

case.

1423.   A key feature of a pyramid scheme is that the perpetrators pay back the earlier

investors their promised return on investment with the sums invested by new investors, with the

goal of  avoiding regulatory scrutiny inspiring more new participants to invest. TelexFree, Inc.'s

account no. 6982 with TD Bank was used for this purpose.

1424.   Similar to the Rothstein Ponzi scheme, TelexFree set up separate accounts at TD

Bank to deposit new investments and pay off earlier investors.

1425.   Specifically, the September 2013 statement for account no. 6982 showed eight

payments labeled "CCD DEBIT, ACHSETTLEMENT" starting on September 25, 2013 totaling

$1,689,403.83.  The same account showed twenty-two more payments with the same label

totaling $9,337,065.04 in October 2013.

1426.   An internal TelexFree, Inc. transaction report identified those payments from

account no. 6982, which totaled $11,026,468.87, as "Agent Commission[s]."  The "Agents" who

received these commissions were earlier TelexFree investors who had recruited additional

participants.

1427.   A substantial portion of the funds that were used to pay those commissions came

from money laundering transfers just discussed and included:

   a.   The $400,000 transferred from TelexFree, LLC, TD Bank account no. 0334
        into TelexFree, Inc.'s no. 6982 on August 8, 2013;

   b.   The $2,929,411.31 debited from TD Bank account no. 0334 on September 19,
        2013 and immediately transferred to TelexFree, Inc.'s account no. 6982; and

   c.   The $3,000,000 shifted in the shell game maneuver on October 18, 2013 from
        TD Bank account no. 0334 through TD Bank account no. 8409 to TD Bank
        account no. 6982.

1428.   These payouts to earlier investors had all the hallmarks of a pyramid scheme that

achieved its ends through money laundering.  By allowing these payments to occur, despite

having knowledge of TelexFree's criminal dealings, TD Bank provided TelexFree the conduit to

pay off its early investors and thereby provided added substantial assistance to TelexFree's fraud

on investors.

1429.   Despite having actual knowledge of TelexFree's unlawful scheme and the related

termination and closure of TelexFree accounts, TD Bank nonetheless continued to substantially

assist TelexFree by providing ongoing financial services and maintaining other TelexFree

accounts and opening new TelexFree accounts with actual knowledge of TelexFree's fraudulent

activities

1430.   The above history establishes that TD Bank was fully aware of TelexFree's illegal

enterprise as a result of information it learned during the many account opening processes, the

mandatory follow up on red flags raised, ongoing customer monitoring, which included an

investigation of TelexFree's management, business activities, customer base, and product

offerings and more as repeatedly set out herein.

1431.   Not only did TD Bank have actual knowledge in early spring 2013, TD Bank had actual knowledge of TelexFree's Ponzi/Pyramid Scheme when TD Bank investigated TelexFree's management, business activities, customer base, and product offerings and discovered it operated an unlawful business model - Ponzi/Pyramid scheme, where TD Bank had previous extensive exposure to such Ponzi/Pyramid schemes and knew of their hallmark activities

1432.   The Customer Due Diligence Forms that TD Bank completed for TelexFree, LLC, and for Brazilian Help Inc. prior to opening both above-referenced accounts described, among other things, the two firms' business models, their ownership stakes by Merrill and/or Wanzeler, their anticipated revenues, and likely payors and payees.  Upon TD Bank's examination of these factors, TD Bank knew of the numerous red flag activities and illicit business practices.

1433.   TD Bank's due diligence at account opening also provided them with actual knowledge that, *inter alia*:

   a.   TelexFree, LLC, was a multi-level marketing company (MLM).

   b.   TelexFree's earnings were derived primarily from the sale of AdCentral package memberships;

   c.   The Sale of VoIP to the sale of memberships represented an insignificantly small portion of their gross revenue;

   d.   TelexFree processed international transactions; and

   e.   TelexFree's standard contract contained numerous provisions that violated Massachusetts law.

1434.   At all times relevant to the complaint, when TD Bank first accepted TelexFree and its affiliates and principals as customers and provided them financial services, TD Bank utilized enhanced, state of the art protocols, policies and software to screen and identifying its

unlawful signature activities, high risk customers, red flags, and fraud, laundering, and Ponzi/Pyramid schemes, and analyze BSA/AML risks.

1435. The enhanced protocols, policies and software systems utilized by TD Bank, including its compliance and banking fraud detection departments included, but were not limited to:

a.   In depth customer due diligence forms to identify the level of risk posed;

b.   Standard Investigative Tools – a matrix that listed the data sources it drew on to conduct its BSA, AML, and CIP procedures;

c.   CIP verification using internet searches;

d.   Enhanced due diligence for higher risk customers;

e.   Computerized "spider web" internet searches and

f.   Suspicious activity monitoring.

1436. Application of these enhanced, state of the art protocols, policies and software systems red-flagged TelexFree as a high-risk customer.

1437. James Merrill later testified that TD Bank knew that TelexFree was a multi-level marketing company when it opened the TelexFree accounts. TD Bank's review of the plain language of TelexFree's standard form contract established that TelexFree guaranteed income in violation of Massachusetts law.

1438. Prior to servicing TelexFree's money laundering scheme, as noted above, TD Bank had a previous history of servicing Ponzi/Pyramid schemes. In fact, TD Bank was forced to settle accusations that it provided active assistance to large Ponzi schemes in violation of the BSA and other laws, including Scott Rothstein's infamous $1.2 billion Florida-based Ponzi scheme, for which it was civilly prosecuted and fined.

1439. TD Bank violated BSA suspicious activity reporting requirements by failing to

properly identify, monitor, and report suspicious activity in Rothstein's accounts and by filing late SARs in relation to the so-called Rothstein Ponzi scheme.

1440.   In addition to actively assisting in the Rothstein Ponzi scheme, the Office of the Comptroller of the Currency ("OCC") found TD Bank to have violated the BSA from April 2008 through September 2009, by failing to file SARs in a timely manner, in violation of 31 C.F.R. § 1020.320 and 31 U.S.C. § 5318(g).  TD Bank agreed to a $37.5 million civil money penalty assessed by the OCC.

1441.   Notably, the September 22, 2013 consent decree followed several years of active investigation and negotiations.  At all times in 2012, 2013, and 2014 that TD Bank was servicing TelexFree, it was under investigation by the OCC because it "willfully violated the Bank Secrecy Act's reporting requirements by failing to detect and adequately report suspicious activities in a timely manner in violation of 31 U.S.C. § 5318(g) and 31 C.F.R. § 1020.320."

1442.   As a result of the Rothstein matter, TD Bank enhanced its BSA/AML training and compliance efforts in the wake of the intense regulatory and public scrutiny.  TD Bank enhanced its BSA/AML training and compliance efforts prior to servicing TelexFree.  As quoted in the New York Times, TD Bank declared that "it ha[d] improved its procedures . . ." for BSA/AML oversight.

1443.   There are striking parallels between the TD Bank activity in the Rothstein and the TelexFree Ponzi schemes that would have occasioned heightened scrutiny at TD Bank during the relevant period.  Like the perpetrators in the Rothstein Ponzi scheme, TelexFree opened multiple bank accounts at TD Bank.  In the context of a Pyramid/Ponzi scheme the opening of multiple accounts is used to facilitate money laundering.  Both the Rothstein Ponzi Scheme and the TelexFree Scheme used separate TD Bank accounts "to receive funds from investors" and "to

make payments to . . . investors."  In both cases, "[t]housands of transactions," including illicit

transactions, occurred in both Ponzi schemes' TD Bank accounts. These transactions, in both

cases, caused a high "volume and velocity of funds" to flow through the Ponzi scheme entities'

accounts at TD Bank.  As described in greater detail below, the fact that TD Bank opened and

closed numerous TelexFree accounts in rapid succession also evidences nefarious activity,

particular given that financial institutions are expected to close accounts and restrict account

transactions when the financial institutions close accounts due to unlawful illegal conduct.

1444.   Finally, between 2007 and 2009, the Rothstein Ponzi scheme activity through TD

Bank accounts "repeatedly triggered alerts" in TD Bank's anti-money laundering surveillance

software.  Here, TelexFree's unlawful bank account activity set off numerous alerts in the same

or updated TD Bank software during the relevant period.

1445.   With the parallel business model and activities from the Rothstein Ponzi scheme

and TD Bank's enhanced protocols, policies and software systems, TD Bank had actual

knowledge of TelexFree's Ponzi/Pyramid business model and operations when it first engage

TelexFree business sufficient to cause high risk designation of TelexFree.

1446.   TD Bank had actual knowledge of all of the aforesaid "red flags", understood that

TelexFree was a pyramid scheme that otherwise engaged in illegal and fraudulent activity very

early in its relationship with TelexFree as evidenced by, *inter alia*, the fact that

    a.  TD Bank knew that TelexFree was a multi-level marketing company and a
potential Ponzi scheme since opening the first account in September 2012;

    b.  By that date, TD Bank knew that TelexFree, LLC, and Brazilian Help Inc.
were related entities through Wanzeler's common ownership and their
identical address;

    c.  Just a few months later, in January 2013 and accelerating that spring, the
marked change in account deposit patterns in account no. 2808 sent up red
flags of criminal activity;

    d.   The opening of account no. 0334 in June 2013 was the occasion for new customer due diligence by TD Bank on TelexFree, LLC, Merrill and Wanzeler;

    e.   By January 2013 TelexFree was well publicized as operating a pyramid scheme and under investigation for criminal activity;

    f.   TD Bank took actions consistent with concerns about TelexFree criminal activity, including cutting off checking privileges in account no. 2808 and then closing that account altogether on knowledge of TelexFree fraud;

    g.   On July 10, 2013, TD Bank failed to freeze account no. 2802 funds for the victims' benefit as directed by its protocols. Instead, TD Bank transferred victim funds on July 10, 2013, to TelexFree, LLC, account no. 0334, representing further act of substantial assistance.

    h.   Inexplicably opening new TelexFree accounts after closing account no. 2808 for reasons of fraud;

    i.   On August 9, 2013, TD Bank opened account no. 6958 for Brazilian Help Inc. despite previously closing account no. 2808 due to fraud, and on September 9, 2013, opened account no. 8409 for TelexFree, LLC.

    j.   Carlos Wanzeler's admission that TD Bank's decision to close to TelexFree's account was due to "problems in Brazil […]."

    k.   One day after closing account no. 2808, on July 11, 2013, $4,000,000 of those funds were transferred and later withdrawn from account no. 0334 by a check payable to TelexFree, LLC.

    l.   TelexFree has excessive chargebacks initiating red flags of its fraudulent activities. These transactions went beyond the pale of normal banking activities;

    m.   TelexFree engaged in a series of "layering" tactics through its TD Bank accounts in an effort to conceal the trail of ill-gotten gains.  These transactions went beyond the pale of normal banking activities;

    n.   TelexFree engaged in money laundering activity with its large transfer of funds to various TD Bank accounts and other financial institutions.  These transactions went beyond the pale of normal banking activities;

    o.   By October, TelexFree was instructing participants to deposit their investments in this "NEW Account Number" 8409, with specific instructions not to reveal the account information on social media, demonstrating that the account was intended to deflect scrutiny away from account no. 0334 and the huge influx of participant investments that were streaming into that older TD Bank account.

p.   TD Bank opened these new accounts to provide TelexFree with assistance in the form of a new destination/banking account to shelter funds and launder the ill-gotten gains which had accumulated in the older, shut down TD Bank accounts.

q.   TD Bank's maneuvers constituted a "shell game", providing TelexFree with substantial assistance by creating the appearance of halting TelexFree's illegal activities when in reality it continued to service TelexFree's banking needs through pre-existing and newly opened accounts.

r.   Less than three weeks before state and federal authorities shut TelexFree down in March of 2014, TD Bank managers authored reference letters on TD Bank letterhead, one directed "To Whom It May Concern".  Upon information and belief, Telexfree and its affiliates used these letters to assure other firms and people with which it hoped to do business that it stood in good business standing with TD Bank. TD Bank managers knew these letters would be used by TelexFree to further its illegal business operations.

1447.   Even after TD Bank closed TelexFree, LLC account no. 2808 based on its knowledge of fraud, and despite its ever-increasing knowledge of TelexFree's fraudulent activity, TD Bank subsequently provided an increasingly wider variety of business services that facilitated TelexFree's continued criminal wrongdoing through late March 2014, thereby providing substantial and ongoing assistance to the TelexFree criminal enterprise.  Those services included:

a.   Keeping at least one older TelexFree account at TD Bank open while opening other new TelexFree bank accounts, which allowed new criminal activity to occur in those accounts;

b.   Disbursing victims' funds in those accounts to TelexFree entities, TelexFree's principals, and earlier TelexFree investors;

c.   Facilitating the "layering" step of money laundering by allowing TelexFree to shuttle enormous amounts of money from one account to another;

d.   Providing reference letters for a TelexFree entity;

e.   Structuring the eventual payouts from one TelexFree account into smaller amounts to facilitate money laundering at other financial institutions; and

f.   Facilitating even more deposits by TelexFree investors by reopening one account that had previously been closed for fraud.

1448.   Through its actions and omissions, TD Bank knew TelexFree's conduct constituted a breach of duty and violated M.G.L. c. 93, § 69 and M.G.L. c. 93A and provided substantial assistance and encouragement to the perpetuation of, and otherwise became an integral part of, TelexFree's unlawful Scheme.

3.   Fidelity Bank

1449.   Fidelity Bank opened three accounts for TelexFree, two on August 8, 2013 with initial deposits of $7,123,784.58 and one on September 12, 2013 with deposits of $2,951,337.12.

1450.   Fidelity Bank helped TelexFree to conduct its business more easily by using remote deposit capture.

1451.   Fidelity Bank continued to accept deposits from TelexFree until at least December 26, 2013.

1452.   Notably, the president and chief operating officer of Fidelity Bank, Defendant John Merrill, is the brother of Defendant James Merrill, one of the Founders of the TelexFree Pyramid Scheme.

1453.   John Merrill's knowledge is imputed to Fidelity Bank because at all times material he was its president and chief operating officer.

1454.   This familial relationship facilitated the relationship between TelexFree and Fidelity Bank and made Fidelity Bank privy to information regarding TelexFree and its suspicious, tortious or unlawful conduct.

1455.   At all material times, through his personal relationship with his brother, Defendant John F. Merrill was fully aware of the fact that TelexFree's business operation was nothing more than a Pyramid Scheme, and that TelexFree's other banking relationships were souring.

1456.   Despite this knowledge, Defendant John F. Merrill used his position and influence

265

with Fidelity Bank to procure the described banking services from Fidelity Bank for TelexFree and others including the Defendant Founders.

1457.   Despite Fidelity Bank's actual knowledge of the suspicious, tortious or unlawful nature of TelexFree's business activities, Fidelity Bank agreed to accept TelexFree as a customer and acted as a creditor and depository bank for TelexFree until at least December 31, 2013.

1458.   Fidelity Bank's Regulatory Account Compliance Office did in fact perform an investigation of TelexFree prior to agreeing to accept TelexFree as a customer in or about August 2013.

1459.   Although Fidelity Bank possessed knowledge of the suspicious, tortious or unlawful nature of TelexFree's business activities from the time of its initial investigation of TelexFree, it continued to provide TelexFree with credit and depository services.

1460.   Either through Fidelity Bank's attempts to comply with all banking regulations when opening and maintained its accounts, including the Know-Your-Customer Regulations, or because of the familial relationship between its President and one of TelexFree's masterminds, Fidelity was aware of the Pyramid Scheme characteristics and of TelexFree's unlawful business operation and stopped servicing, terminated its relationship and filed SAR reports but it did not.

1461.   An investigation was initiated by the SOC against Fidelity Bank on April 30, 2014, concerning Fidelity's banking relationship with TelexFree.

1462.   That investigation resulted in the entry into a Consent Decree, dated September 22, 2014, whereby Fidelity Bank agreed to establish an escrow fund of $3.5 million for victims of the Scheme.[80]

1463.   The SOC alleged, *inter alia*, that Fidelity Bank's account opening process in 2013

---

[80] *Id.*

was inadequate and insufficient to handle the voluminous TelexFree deposit accounts. [81]

1464.   These failures to comply even minimally with mandatory banking regulations allowed the bank's president John F. Merrill to obtain the account services for his brother James Merrill, the other TelexFree Founders and TelexFree itself.

1465.   The Consent Decree establishes that Fidelity Bank wrongfully permitted TelexFree to deposit funds received from victims of its illegal Pyramid Scheme in Fidelity Bank's accounts between August 8 and December 26, 2013.[82]

1466.   On or about November 23, 2013, pursuant to Fidelity Bank's obligations to perform ongoing customer monitoring of TelexFree, Fidelity Bank's compliance and BSA officer discovered Red Flags, other evidence of suspicious, tortious or unlawful conduct.

1467.   That officer also discovered further indicators of fraud in the TelexFree business model, and he notified president Merrill and an outside compliance consultant utilized by Fidelity Bank.

1468.   The outside consultant advised Fidelity Bank of his conclusions that TelexFree was a high-risk customer based upon its account balance and extensive wire transfers and that TelexFree's accounts would "require the appropriate monitoring level for a high-risk customer."

1469.   Less than two weeks after this initial investigation, Fidelity Bank made a determination it should close TelexFree's accounts.

1470.   Fidelity Bank notified TelexFree of its determination to close its accounts on December 3, 2013.

1471.   Despite that determination, Fidelity Bank continued to receive the victims' funds obtained by TelexFree until December 27, 2013 and to perform other banking services until

---

[81] *Id.*

[82] SOC Consent Order E 2014-0073 is herewith attached and marked as Exhibit 10.

December 31, 2013.

1472.   Fidelity Bank did not terminate its relationship with TelexFree, refuse to accept victims' funds, or stop servicing accounts and report suspicious activity, after its internal review revealed the suspicious, tortious or unlawful conduct.

1473.   As a result of the direct influence and unfair, deceptive and unlawful involvement of Fidelity Bank president and chief operating officer, Defendant John F. Merrill, Fidelity Bank opened personal accounts for TelexFree Founders and Principals, including Defendant James Merrill (president Merrill's brother) and Wanzeler after Fidelity's internal review revealed the tortious conduct.

1474.   After its November 27, 2013 receipt of the outside consultant's report, Fidelity Bank unfairly, deceptively and unlawfully transferred over $10 million dollars out of TelexFree's and Defendant Founders' accounts and into the personal accounts of Defendants James Merrill and Wanzeler.

1475.   This wrongful transfer included a $3.5 million transfer by Wanzeler to a Singapore account on December 30, 2013.

1476.   The SOC concluded that the use of Fidelity Bank's corporate and personal accounts caused harm to the victims of the TelexFree fraud.

1477.   At a minimum, as a result of Fidelity Bank's initial investigation and ongoing monitoring, the relationship between the Merrill brothers, and its investigation and ongoing monitoring of TelexFree, Fidelity Bank was aware that TelexFree was engaged in tortious conduct, but it deliberately and willfully turned a blind eye to its knowledge and the results of its investigation and monitoring and continued to act as its banking institution, causing the members of the putative class to suffer ascertainable economic harm.

1478.   Although Defendant Fidelity Bank and Defendant John F. Merrill possessed actual knowledge of the suspicious, tortious or illegal nature of TelexFree's business activities at all times it received or held TelexFree funds, they willfully acted in concert with them to until at least December 31, 2013 to:

- further the unlawful Pyramid Scheme;
- unfairly, deceptively and unlawfully siphon class member funds;
- unfairly, deceptively and unlawfully convert class member funds;
- continue to provide TelexFree and James Merrill and Carlos Wanzeler services integral to the TelexFree Scheme; and
- continue to provide TelexFree and James Merrill and Carlos Wanzeler with substantial assistance and encouragement essential to their unlawful plan.

1479.   Through its actions, Fidelity Bank and John Merrill provided substantial assistance and encouragement and otherwise became an integral part of TelexFree's fraudulent Scheme.  Fidelity Bank and John Merrill also assisted TelexFree and its Principals to further achieve their unfair, deceptive and unlawful Scheme that was at a minimum violative of M.G.L. c. 93, § 69.

4.   Synovus

1480.   At all material times, Defendant Synovus served as the "sponsor" bank of Defendants Base Commerce and GPG, and provided depository account and funds transfer services in connection with Base Commerce's and GPG's payment processing services.

1481.   At all material times, Defendants Synovus, Base Commerce, and GPG shared a close business relationship, which included serving common clients, including TelexFree, and sharing information regarding said clients.

1482.   At all material times, Base Commerce served as an agent of Synovus with respect to Synovus' relationship with TelexFree, which began in April 2013.

269

1483.   Synovus performed an investigation of TelexFree prior to agreeing to accept TelexFree as a customer and its initial investigation and ongoing monitoring of TelexFree revealed indicia of suspicious, tortious and unlawful activities.

1484.   Given Synovus' knowledge of the illegal nature of TelexFree's business operations, Synovus was obligated to refuse to open any accounts, process any transactions, or serve as a conduit for payments for the benefit of TelexFree.

1485.   Synovus agreed to accept TelexFree as a customer and began to act as a conduit for TelexFree in April 2013, which services it continued to perform until at least January 16, 2014.

1486.   In August 2013, due to concerns regarding public accusations that TelexFree was running a Pyramid Scheme, and the possibility of an investigation by the Federal Trade Commission or other federal agencies, Defendant Synovus indicated that it would no longer hold funds on TelexFree's behalf.

1487.   More particularly, Synovus instructed Base Commerce and GPG to cease performing payment-processing services for TelexFree by August 31, 2013.

1488.   Nevertheless, Synovus continued to act as the sponsor bank for GPG and Base Commerce thereafter and continued to process payments and make transfers for the benefit of TelexFree.

1489.   For example, Synovus acted as the sponsor bank for Base Commerce's $5 million transfer on or about September 26, 2013 authorized by Base Commerce's Hughes for the benefit of TelexFree.

1490.   Synovus continued to act as GPG's sponsor bank for its electronic payments transmitting credit card processing data to Defendant Allied Wallet until at least January 16,

2014, for the benefit of TelexFree.

1491.   At a minimum, Synovus' initial investigation and ongoing monitoring of TelexFree made it aware that TelexFree was engaged in suspicious, tortious or unlawful conduct and was at a minimum violative of M.G.L. c. 93, § 69, but it continued to provide TelexFree with payment processing services, integral to the TelexFree Scheme until at least January 16, 2014.

1492.   Through its actions, Synovus provided substantial assistance and encouragement to TelexFree.  Synovus also assisted TelexFree and its Principals to further achieve their unfair, deceptive and unlawful Scheme that was at a minimum violative of M.G.L. c. 93, § 69.

5.   PNC Bank

1493.   Defendant PNC Bank began providing banking services to TelexFree in December 2013 when PNC Bank opened two depository and checking accounts at its Pompano Beach, Florida branch for TelexFree and TelexFree Financial, Inc.  PNC Bank continued to provide substantial uninterrupted financial services until TelexFree was shuttered by United States authorities in April 2014.

1494.   Upon information and belief, at the time of the introduction, PNC Bank was advised that TelexFree was a Multi-Level Marketing company having difficulty obtaining the financial services it required, that it had been shuttered in Brazil, and that it had ongoing legal issues it was working on with regard to its compensation plan.

1495.   Notably, these disclosures raised Red Flags that required and prompted PNC Bank to conduct heighten its investigation before accepting TelexFree as a financial services customer.

1496.   In accordance with its own and standard industry protocols, PNC Bank performed an initial underwriting investigation and evaluation and assessment of TelexFree, which included a review and assessment of the following:

a.   TelexFree's business model and structure;

b.   TelexFree's compensation plan and standard form contract;

c.   TelexFree's payment processing, transaction and banking history;

d.   TelexFree's listing on the Match List and the available expanded banking history through the MATCH program;

e.   TelexFree's website;

f.   TelexFree's purported VoIP product and AdCentral promoter packages, and corresponding prices;

g.   TelexFree's corporate documentation;

h.   Documentation as to the location of operations and sales;

i.   TelexFree's, Carlos Wanzeler's, and James Merrill's credit scores;

j.   TelexFree's tax returns for at least the previous two (2) years;

k.   TelexFree's Profit & Loss Statements for at least the previous two (2) years;

l.   TelexFree's balance sheets;

m.   TelexFree's average transaction amount (or "average ticket");

n.   TelexFree's highest anticipated transaction amount (or "high ticket");

o.   TelexFree's anticipated monthly processing volume;

p.   TelexFree's annual and monthly dollar sales volume; and

q.   Information available online regarding TelexFree.

1497.   The findings made during the initial underwriting investigation, evaluation and assessment raised more Red Flags that required and prompted PNC Bank to further heighten its investigation and increase its level of scrutiny before accepting TelexFree as a financial services customer.

1498.   As a result of the foregoing, PNC Bank had actual knowledge of TelexFree's unlawful Scheme at or about the time it accepted it as a new banking customer yet willfully set that aside.  Thereafter, notwithstanding its actual knowledge, PNC Bank moved tens of millions

of dollars of TelexFree's unlawful funds at a time when TelexFree had basically run out of financial service options. Not only did PNC Bank thereafter fail to suspend service or terminate its banking relationship with TelexFree or other related Defendants, including Carlos Wanzeler, it continued to provide TelexFree with the financial services that were integral to sustaining its Pyramid Scheme and related money laundering and sheltering until at least April 2014.

1499. As a result of the disclosures made to it and the results and findings made during its initial underwriting investigation and assessment, at the time PNC Bank began to service TelexFree and at all times subsequent thereto, it had actual knowledge that:

a. TelexFree was an MLM – a business profile uniformly considered very high risk under accepted industry-wide and FFEIC standards;

b. TelexFree was and had been subjected to government action and shut down as a pyramid scheme by the Brazilian government;[83]

c. TelexFree's Founders and Executive Officers who were signatories and associated with the PNC Bank application, including Carlos Wanzeler and James Merrill, were also the subject of the Brazilian government actions;

d. TelexFree had been placed on the MATCH List;[84]

e. TelexFree's chargeback rate was continually well over the maximum allowable industry standard;

f. Other financial institutions had terminated their relationship with TelexFree or suspended and limited their services they provided to it;

g. Other financial institutions had rejected TelexFree and refused to extend banking services to TelexFree;

h. The same was true for TelexFree's Founders and Executive Officers who were signatories and associated with the PNC Bank application;

i. TelexFree's merchant profile did not match its transactions;

---

[83] When PNC Bank later learned that United States governmental authorities, including the Commonwealth of Massachusetts SOC, were investigating TelexFree and its Founders and Executive Officers who were signatories and associated with the account, it again willfully and knowingly set that aside and provided TelexFree with uninterrupted financial services.

    j.   TelexFree's merchant profile did not match its business model;

    k.   TelexFree lacked a real product and instead unlawfully guaranteed a massive return for passive activity;

    l.   TelexFree standard form contract contained express objective violations of Massachusetts statutory law and;

    m.   TelexFree's website and promotional materials also contained express objective violations of Massachusetts statutory law.

1500.   PNC Bank gained further actual knowledge of TelexFree's unlawful business model during this period because each of the following set off PNC Bank-specific, and banking industry standard, audits and business reviews.  Additionally, upon information and belief, the transactions exceeded the limits of TelexFree's authorized business profile.  Importantly, each of the below transactions, as well as others, were carried out while PNC Bank had actual knowledge that TelexFree was operating an unlawful business and were thus otherwise not routine banking services.

1501.   PNC Bank substantially assisted TelexFree's illicit activates by placing their unlawfully obtained funds beyond the reach of United States authorities through multiple aberrant large sum transfers into offshore accounts in the Founders names.

1502.   For example, on January 15, 2014, PNC Bank sent $4,427,490.00 from TelexFree's account to Carlos Wanzeler's personal account #517-852802-001 at Overseas-Chinese Banking Corporation Ltd (OCBC) in Singapore at the order of Wanzeler.

1503.   This transfer ran contrary to the business profile and limits on electronic transactions that PNC Bank had placed on TelexFree.  These transfers were unlawful and raised glaring red flags. Each of these unlawful transfers automatically triggered further audits, inquiries, and business and individual transaction reviews. Each unlawful transfer constituted money laundering.

1504.   The large dollar transfers of domestic funds from TelexFree's business account to offshore accounts in the personal name of TelexFree's Founders was unlawful.  Also, PNC Bank knew that the funds originated from an unlawful enterprise. Yet PNC Bank acted to launder the victims' money and otherwise move it beyond the reach of the United States' justice system.

1505.   The transfer was not an ordinary banking service because it transferred an extremely large sum from a business (MLM) account to the personal account of a person known to be involved in a shuttered pyramid scheme and also because it transferred those funds to an offshore account.

1506.   Setting up these accounts for those purposes does not constitute the provision of ordinary financial services.  The financial services that PNC Bank provided were the specific financial services that TelexFree required to carry out its money laundering and movement of funds offshore and beyond the reach of the United States' justice system.

1507.   PNC Bank also knowingly assisted TelexFree's unlawful scheme by transferring large sums of money to multiple financial institutions in a breach of the guidelines and limits that it had placed on TelexFree, and in breach of banking standards.  From February 11 to March 4, 2014, PNC had actual knowledge of TelexFree's laundering scheme when it aided and abetted TelexFree by processing thirty-one (31) wire transfers totaling more than $1,590,000 to eleven (11) financial institutions.  This laundering activity is commonly known as "layering" where funds are wired and transferred to and though numerous accounts in one or more financial institution.

1508.   From February 10, 2014 through March 4, 2014, TelexFree wired or transferred over $1,400,000 from related TelexFree accounts into a PNC Bank account.

1509.   Despite the fact that other financial institutions had closed TelexFree accounts or

denied TelexFree banking services, in February of 2014 PNC Bank accepted over $10,000,000

of victim funds within one week into accounts in the name of TelexFree, thereby assisting the

ongoing laundering activities of TelexFree, to wit:

     a.  $3,300,000 on February 14, 2014;

     b.  $3,300,000 and $5,000 on February 18, 2014; and

     c.  $3,400,000 on February 19, 2014.

1510.   PNC Bank began working with payment processor Defendants Allied Wallet and

Propay to accept deposits for TelexFree in or about February 2014.  Every Wednesday, PNC

Bank accepted significant transfers from Allied Wallet into TelexFree's PNC Bank account.

1511.   PNC Bank stepped in and provided TelexFree with substantial assistance by

providing those depository services that were the "nuts and bolts" of its unlawful Scheme when

other financial service providers were turning TelexFree away as a fraud.

1512.   During this time, virtually all incoming ACH deposits processed by PNC Bank

were in amounts corresponding to the purchase of AdCentral packages, not VoIP telephone

cards, providing further evidence that TelexFree's scheme was unlawful and inconsistent with its

banking profile.  In addition to the fact that the volume of deposits did not match the business

profile or product alleged to be sold and did match the amount associated with guaranteed

passive income, the deposits triggered a response pursuant to the FFEIC guidelines.

1513.   In TelexFree's filings with the bankruptcy court in April 2014, TelexFree listed

PNC Bank as providing its "primary operating account" and stated that TelexFree funded its

operations from its PNC Bank Account.  TelexFree further stated that its use of the PNC Bank

account was "imperative" to its continued operations.

1514.   As TelexFree's primary operating account, TelexFree used PNC Bank to make

general disbursements, including the laundering of victims' funds though transfers of large, abnormal funds to numerous financial institutions, multiple Founders, executives, insiders, employees, accomplices, accessories and aiders and abettors in amounts that were clearly inconsistent with its business.

1515.   Providing financial services to TelexFree's "primary operating account" and the account that TelexFree self-described as funding its "operations" and "imperative" to its continued operations at the time obviously constitutes substantial assistance.  PNC Bank thus continuously aided and abetted TelexFree and its known associates' unlawful scheme because it provided this substantial assistance while actually knowing that TelexFree was running an unlawful business and carrying out unlawful banking activities.

1516.   It no surprise that (according to TelexFree's filings) PNC Bank still held approximately $2.4 million in TelexFree accounts at the time of its bankruptcy in April 2014.

1517.   With the assistance of PNC Bank, TelexFree carried out numerous activities, which FFIEC identifies as red flags for money laundering, including:

   a. "Many funds transfers . . . sent in large, round dollar, hundred, or thousand-dollar amounts;"

   b. "Funds transfer activity . . . when the activity is inconsistent with the customer's business or history;"

   c. "Funds transfer activity is unexplained, repetitive, or shows unusual patterns;"

   d. "Payments or receipts with no apparent links to no legitimate contracts, goods, or services are received;"

   e. Unusual transfer of funds among related accounts or among accounts that involve the same or related principals;" and

   f. A large number of incoming or outgoing funds transfers take place through a business account, and there appears to be no logical business or other economic purpose for the transfers, particularly when this activity involves higher-risk locations."

1518.   In the week preceding TelexFree's filing of its bankruptcy petition, PNC Bank also transferred millions of dollars out of TelexFree's account through additional aberrant transactions to other parties, such as Defendant Garvey Schubert Barer ($350,000) and Greenberg Traurig ($3.5 million).

1519.   Another means through which PNC Bank substantially assisted the propagation and proliferation of TelexFree's Pyramid Scheme was by making it "as easy as possible" to transfer and abscond with victims' funds by granting TelexFree the use of its "Pinnacle Express Select" service.

1520.   PNC Bank Assistant Vice President Dave Halverson approved and provided information on how to access the Pinnacle Express Select service directly to Merrill in a letter dated January 28, 2014.  Access to this service is remarkable because of its ease and the fact enabled TelexFree to manage its banking activities online.

1521.   Debra Martin, Sales Associate, PNC Bank confirmed via email to James Merrill that TelexFree had opened a Pinnacle Express Select service with PNC Bank.  Merrill in turn forwarded this information to Andreia Bianchi Moreira.

1522.   Upon information and belief, between December 2013 and the April 14, 2014 raid on TelexFree's headquarters, PNC Bank facilitated numerous non-routine banking and wholly unlawful transactions in amounts that did not match TelexFree's business profile.

1523.   Upon information and belief, many of these unlawful transactions exceeded $500,000.  This is noteworthy because increased business and account scrutiny is mandated as transactions exceed $500,000.

1524.   For example, on January 29, 2014, PNC Bank when accepted a $1,000,000 deposit to TelexFree's account it was subject to a level of scrutiny and a review which exceeded

that mandated at the $500,000 level for reasons independent and separate from the fact that, upon information and belief, these amounts were in excess of the maximum allowed TelexFree and was otherwise inconsistent with its business model.

1525.    On February 27, 2014, PNC Bank received and held approximately $10 million in Promoter funds on behalf of TelexFree

1526.    Following the shutdown of TelexFree's operations, authorities seized $2,487,204.68 from PNC Bank account number******1813, held in the name of TelexFree Financial, Inc.

1527.    During its related mandatory audits and business reviews, PNC Bank gained further actual knowledge that TelexFree's Founders, executives, employees, accomplices, aiders and abettors were skimming money out by transferring large sums to themselves or transferring funds offshore.  Then armed with that knowledge, PNC Bank knowingly transferred large sums of money offshore, including the Singapore transaction, in a breach of the guidelines and limits that it had placed on TelexFree, and in breach of banking standards.  In doing so, it substantially assisted TelexFree's unlawful scheme.

1528.    PNC Bank's substantial assistance was critical because it advanced TelexFree's unlawful goals of laundering money that eventually landed in the Founder's personal accounts, and because it moved substantial funds overseas and out of the reach of the United States justice system.  PNC also provided TelexFree's unlawful Scheme with substantial assistance because it provided banking services at a time when other banks had restricted TelexFree's banking limits or terminated or suspended them.

1529.    Through its actions, PNC Bank knew TelexFree's conduct violated M.G.L. c. 93, § 69 and M.G.L. c. 93A and gave substantial assistance and encouragement to the perpetuation

of, and otherwise became an integral part of, TelexFree's unlawful scheme by providing

substantial assistance.

      6.  Wells Fargo Bank

      **i.  Background Allegations**

1530.  Wells Fargo Bank, N.A ("Wells Fargo Bank" or "WF Bank") provided banking

services, including the receipt of deposits of victims' membership funds, to TelexFree and its

affiliates and principles from June 20, 2012 to 2014.

1531.  Wells Fargo Bank served as an acquiring bank with respect to TelexFree

Promoter payments.

1532.  Wells Fargo Bank also maintained accounts on behalf of TelexFree and processed

transactions amounting tens of millions of dollars for TelexFree in 2012, 2013 and 2014.

1533.  It first acted to process victim's transactions as an acquiring bank through a

TelexFree/Propay relationship it approved.

1534.  It also acted as a depository bank for TelexFree and its known associated persons

and entities, including Carlos and Katia Wanzeler.  The related transactions are notorious and

include transactions facilitated by Defendant Mauricio Cardenas for the express purpose of

unlawful laundering/layering or moving of unlawful funds offshore for the express purpose of

sheltering them in safe havens beyond the reach of the United States' justice system.

1535.  WF Bank went even further through its vice-presidents who wrote glowing letters

of recommendation which TelexFree parlayed into additional banking privileges, including the

creation of the aforementioned offshore accounts.

1536.  As detailed below, Wells Fargo Bank had actual knowledge of TelexFree's

fraudulent business activities and Ponzi/Pyramid Scheme business model at the time of WF

Bank's initial acceptance of TelexFree, its affiliates and principal as customers because WF

Bank investigated TelexFree's management, business activities, customer base, and product offerings.  That investigation caused WF Bank to discover, at a bare minimum, that TelexFree operated an unlawful business model - Ponzi/Pyramid scheme, that its form contract contained express objective violations of Massachusetts statutory law because its business structure and Promoter Compensation Plan expressly included massive promises of unlawful guaranteed passive income, that its website and promotional materials contained express objective violations of Massachusetts statutory law, and that its sister company, run by the same individuals that appeared as signatories on the WF Bank applications and operated out of the same address, was shuttered in Brazil as an unlawful Pyramid scheme and massive multibillion dollar financial fraud.

1537.   Each of the many times that WF Bank opened a new TelexFree account, it was required to, and did, employ the heightened scrutiny and additional operating procedures, protocols and monitoring that it applies to high-risk or red-flagged accounts, including enhanced comprehensive due diligence.

1538.   Moreover, WF Bank, continually performed its KYC investigations of TelexFree, and otherwise complied with all internal requirements as well as banking regulations during the 2012-2014 class period.  The investigations included revelations of information that came to it as a result of Red Flags and its mandatory follow up, also described in detail below.  WF Bank gained further actual knowledge of TelexFree's fraudulent business activities and Ponzi/Pyramid Scheme business model continually throughout the class period.

1539.   At all times relevant to the complaint, Defendant WF Bank maintained multiple accounts on behalf of TelexFree.  From September 2012 through TelexFree's shuttering, WF Bank opened a multitude of accounts for TelexFree and its known associated individuals and

entities, including Carlos and Katia Wanzeler.

1540.   WF Bank first opened a TelexFree-related account, on September 20, 2012.

1541.   In 2013 and 2014, Wells Fargo & Company was the parent company of Wells Fargo Bank and Wells Fargo Advisors, LLC (collectively, "Wells Fargo").

1542.   During that time, Wells Fargo & Company was the nation's fourth largest banking enterprise in terms of assets.

1543.   Wells Fargo Bank and Defendant Wells Fargo Advisors ("WF Advisors") individually and jointly (together, the "Wells Fargo Defendants") aided and abetted the TelexFree Scheme by providing it substantial assistance.  Wells Fargo Bank and WF Advisors acted as both accomplices and accessories and performed banking service that are distinguishable from routine banking services in multiple ways.  They did so despite possessing actual knowledge of the fraudulent nature of TelexFree's business operation.

1544.   Unless otherwise noted, the averments advanced against Wells Fargo Defendants and Mauricio Cardenas took place at all times relevant to the causes of action.

1545.   Wells Fargo and WF Advisors are related entities and subsidiaries of their parent company, Wells Fargo & Company.  Throughout the time period relevant to the claims against them, they acted in concert and as one without a legal distinction

1546.   Wells Fargo publicly acknowledges that, as a leading financial institution, it has special anti-money laundering responsibilities.

1547.   As a top-tier U.S. bank, Wells Fargo & Company and its subsidiaries operated an advanced BSA/AML compliance system, designed to monitor financial transactions, recognize suspicious activity and identify red flags of illegal or fraudulent activity.

1548.   Wells Fargo's compliance program made heavy use of automation to detect

282

suspicious patterns of customer conduct.  As early as 2008, Wells Fargo pioneered the use of

artificial intelligence to monitor its customers' activity for irregular conduct.[85]  WF Bank used its

data analytics to detect and flag unlawful TelexFree conduct for action by management.[86]  Wells

Fargo also maintained an "Investigations Controlled Electronically" (ICE) database, which

tracked "CIP Violations."[87]

      1549.   Throughout its service of TelexFree, Wells Fargo similarly operated an elaborate

risk management system employing thousands of risk employees.[88]  This risk management

system used three lines of defense.[89]  The first line of defense consisted of the front-line teams in

Wells Fargo's various businesses within the groups, each of which had an internal risk

management operation.[90]  The primary responsibilities of the first line of defense were to

establish written procedures and processes for risk management, identify, assess and report risks

generated by a business' activities, control and monitor risk, and evaluate risk management's

---

[85] *See* Jo Ann Barefoot, *The Courage to* Change:  Former Wells Fargo BSA Officer Jim Richards, https://www.jsbarefoot.com/podcasts/2018/5/14/the-courage-to-change-former-wells-fargo-bsa-officer-jim-richards; Brian Monroe, In Hearing on Wells Fargo Scandal, AML-Style Data Analytics Come Into Play (Ass'n of Certified Financial Crime Specialists, Sept. 22, 2016), https://www.acfcs.org/news/309114/In-hearing-on-Wells-Fargo-scandal-AML-style-data-analytics-come-into-play.htm.

[86] *See* Barefoot; Monroe, *supra*.

[87] Independent Directors of the Board of Wells Fargo & Company, Sales Practices Investigation Report 33 & n.12 (Apr. 10, 2017), https://www08.wellsfargomedia.com/assets/pdf/about/investor-relations/presentations/2017/board-report.pdf [hereinafter Independent Directors Report].

[88] To give some indication, by 2015, Wells Fargo & Company employed over 10,000 risk professionals, according to the Chief Risk Officer Michael Loughlin.  *Id*. at 107-08.

[89] Wells Fargo & Company, *Learning from the past, transforming for the future:  Business Standards Report* 83 (Dec. 31, 2018), https://www08.wellsfargomedia.com/assets/pdf/about/corporate/business-standards-report.pdf [hereinafter Business Standards Report].

[90] *See id.*; Independent Directors Report at 49, 60.  Wells Fargo's four principal groups during the relevant period were Community Bank, Consumer Lending, Wealth & Investment Management and Wholesale Banking.  Independent Directors Report at 53.

success through a quality assurance program.[91]  For instance, Wells Fargo's Community Bank's internal quality assurance team rated every Wells Fargo branch on an annual basis after inspecting key account documentation relevant to BSA/AML compliance, such as customer IDs and signature capture.[92]

1550.   The second line of defense was Corporate Risk.  Corporate Risk conducted risk management at the enterprise level, under the direction of senior management and Wells Fargo's board of directors.[93]  Within Corporate Risk, the Operational Risk Management and Compliance group handled BSA/AML compliance.[94]  Another group, called Internal Investigations, made decisions about whether to file suspicious activity reports in specific cases.[95]

1551.   As part of the second line of defense, the Enterprise Risk Management Committee, comprised of senior Wells Fargo executives, submitted quarterly written reports to the board of directors identifying the top enterprise risks facing Wells Fargo.[96]  The board's Risk Committee was responsible for overseeing enterprise-wide risk.  Another board committee, the Audit & Enforcement (A&E) Committee, also reviewed issues involving operational risk, legal and regulatory compliance, and financial crimes risk.  In the briefing materials prepared for the A&E Committee on a quarterly basis, the BSA Officer included a status report, "usually dominated by discussion of" BSA, AML and Office of Foreign Asset Control compliance issues. This status report also described the latest Suspicious Activity Report filings for fraud

---

[91] Business Standards Report, at 83-84.

[92] Independent Directors Report at 92.   This team was called the Store Operations Control Review team or SCOR.  *Id.*

[93] Business Standards Report at 84.

[94] Independent Directors Report at 60.

[95] *Id.* at 88.

[96] *Id.* at 60-61, 97.

investigations.[97]   Another quarterly report, prepared by Wells Fargo Audit Services addressed the

"issues most important to the enterprise," notably including "BSA/AML" compliance issues.[98]

1552.   Internal audit was the third and final line of defense.[99]   Wells Fargo Audit

Services conducted internal audits of Wells Fargo's risk management and controls and advised

management on risks.[100]

1553.   As part of the company's first line of defense, Wells Fargo Advisors also

maintained an official Surveillance and Investigations Group charged with ensuring that the

company observed all BSA and AML requirements.   Employees in the Surveillance and

Investigations Group were responsible for investigating customers and transactions that showed

indications of suspicious activity.   In addition, following account openings, the Group's

employees conducted reviews for continuing suspicious activity pursuant to the company's AML

policies and procedures.[101]   In or around the second half of 2012, Wells Fargo's Advisors AML

management alluded to the account closing requirements in the Wells Fargo CIP by announcing

that it planned to decrease the number of continuing activity SAR filings by having the

customers in question cease the activity or by closing their accounts.[102]

1554.         Similarly, during the relevant period, Wells Fargo Bank, N.A., operated its

own BSA/AML compliance program.   Wells Fargo Bank implemented that program according

to a series of written policies, including the customer due diligence policy, the global AML

---

[97] *Id.* at 98-99; *see also* Business Standards Report at 51.

[98] Independent Directors Report at 99.

[99] Business Standards Report at 83.

[100] *Id.* at 85.

[101] *See id.* ¶¶ 4-6.   The company's policies and procedures required that all investigative case notes be memorialized and maintained in the firm's internal systems.   *See id.*

[102] *See id.* ¶ 15.

governance policy, and the unusual activity referral and suspicious activity reporting policy.[103]
This compliance program, which covered corporate customers such as TelexFree, engaged in a
wide range of anti-money laundering activities, ranging from due diligence procedures, customer
risk assessments, and quality assurance testing to front-line monitoring, and BSA/AML
training.[104]  According to the company, all Wells Fargo employees are responsible for
completing all customer due diligence requirements, for being alert to—and reporting—any
unusual suspicious activity to their managers and internal groups responsible for AML
compliance, and for completing all required AML compliance training on a timely basis.[105]

1555.   In sum, during the relevant period, Wells Fargo operated an extensive BSA/AML
due diligence and surveillance program that kept tabs on its customers and prescribed the actions
to be taken if suspicious customer behavior materialized.  This system informed what Wells
Fargo knew about TelexFree's misconduct and defined when Wells Fargo crossed the line into
substantial participation in TelexFree's fraud on investors.

1556.   All Wells Fargo employees are responsible for completing all customer due
diligence requirements and for being alert to—and reporting—any unusual suspicious activity to
their managers and internal groups responsible for AML compliance.

1557.   During the same time period, an aggressive sales culture at Wells Fargo, including

---

[103] *See, e.g.,* FFIEC Manual—Google version, supra note 93, at 57; accord Consent Order 9, In re Wells Fargo Bank,

N.A., AA-EC-2015-79 (Office of the Comptroller of the Currency, Nov. 19, 2015),

https://www.occ.gov/static/enforcement-actions/ea2015-125.pdf  [hereinafter  OCC  Consent
Order for Wells Fargo] at 1-2; Wells Fargo, Our Code of Ethics and Business Conduct 16,
https://www08.wellsfargomedia.com/assets/pdf/about/corporate/code-of-ethics.pdf  [hereinafter
Wells Fargo Ethics Code] at 16.

[104] *See* OCC Consent Order for Wells Fargo at 1-2, 4; Emily Glazer, *Wells Fargo Struggles to
Meet an Enforcement-Action Deadline,* WALL ST. J., Apr. 22, 2018.  *Cf.* Business Standards
Report at 79 (describing enhanced due diligence procedures in Wells Fargo's Wholesale Banking
group).

[105] Wells Fargo Ethics Code 16.

a sales model that emphasized the number of accounts opened, put pressure on employees to open accounts to "low-quality" customers.

1558.   Sales practices like "cross-selling" (selling customers products that were offered by other Wells Fargo groups) and selling "secondary" checking accounts (i.e., accounts sold to customers who already had a checking account) were also associated with the aggressive sales culture.

1559.   During the relevant period, Wells Fargo's Community Bank strenuously pursued a sales model calling for "significant annual growth in the number of products, such as checking accounts, savings accounts and credit cards, sold each year."[106]  Under this sales goal model, "the number of accounts" that Wells Fargo employees "opened and the rate at which those accounts were funded were important to achieve sales goals and incentive compensation targets."[107]

1560.   As part of the sales goal strategy, "the Community Bank's senior management tolerated low quality accounts as a necessary by-product of a sales-driven organization."[108] Wells Fargo's independent directors later explained:  "Community Bank's senior leaders were concerned that tightening up too much on quality would risk lowering sales of products that customers actively used . . . ."[109]

1561.   In order to keep "the sales model intact and sales growing," the Community Bank's managers "had to exert significant, and in some cases extreme pressure on employees to

---

[106] Independent Directors Report at 5.

[107] *Id.* at 26.

[108] *Id.*

[109] *Id.*

meet or exceed their [sales] goals."[110]  Branch employees and their managers had "minimum requirements for products sold per day"[111] and were held responsible for "consistent year-over-year sales growth."[112]  The Community Bank used daily scorecards to rank its employees "against one another on their performance relative to goals," creating "intense pressure to perform" and a "culture of shaming . . ."[113]  Starting in 2010, employees who failed to meet sales goals faced "poor performance reviews" as well.[114]  Many employees "believed that their future at Wells Fargo depended on how many products they sold"[115] and "feared being penalized by their managers for failing to meet sales goals . . . "[116]  As one district manager told a new employee, management's attitude was "[d]o whatever it [takes] to meet numbers unless it [is] downright unethical."[117]

1562.   During periodic sales campaigns including one named "Jump Into January" (which dated back to 2003), the Community Bank ratcheted the daily sales targets even higher.[118] These sales campaigns were "closely associated with increasing misconduct over time."[119]  As the Community Bank's management ramped up its sales goal expectations, "the quality of accounts declined."[120]  Many witnesses interviewed in the later Wells Fargo board investigation

---

[110] *Id.* at 7.

[111] *Id.* at 28.

[112] *Id.* at 19.

[113] *Id.*

[114] *Id.* at 29.

[115] *Id.*

[116] *Id.* at 28; *accord* Business Standards Report at 21 ("some team members were reluctant to raise concerns because of fear of retaliation").

[117] Independent Directors Report at 37.

[118] *Id.* at 21.

[119] *Id.*

[120] *Id.* at 6.

complained that the incentive plan goals "led to bad behavior."[121]

1563.   Wells Fargo's Florida branches boasted some of the most aggressive sales managers and sales practices nationwide.  In their 2018 report, Wells Fargo's independent directors specifically singled out Shelley Freeman, the Lead Regional President in Florida from 2009 until 2013, for blame as "an aggressive sales manager who created significant sales pressure."[122]  While she was in Florida, Freeman "tolerated increased low quality accounts – as did members of Community Bank senior leadership – as a consequence of striving for increased sales."[123]  The Community Bank's Florida branches also ranked third or fourth in the nation for the highest number of sales practice-related allegations and terminations/resignations (third),[124] customer consent allegations (third),[125] and potential simulated funding accounts (fourth).[126] Upon information and belief Mauricio Cardenas and the others he worked with were part of the problem.

1564.   Sales-integrity allegations at Wells Fargo dated back to 2002, peaked in the fourth quarter of 2013 and were not fully resolved until September 2016.  But sales goal model itself "was not fully addressed until September 2016."[127]

1565.   Eventually it emerged that the sales abuse problem was endemic throughout Wells Fargo & Company, cutting across groups and product lines.  Compliance violations were not just limited to bank accounts and credit cards but surfaced with respect to Wells Fargo's

---

[121] *Id.* at 30.

[122] *Id.* at 22.

[123] *Id.* at 23.

[124] *Id.* at 35.

[125] *Id.*

[126] *Id.* at 27.

[127] *Id.* at 44.

automobile lending business, mortgage lending operations, add-on products such as identity theft protection and credit insurance, brokerage and investment advice, fiduciary and custody accounts, foreign exchange, and mortgage loan modifications.[128]

1566.   A review of individual TelexFree account statements at Wells Fargo shows that aggressive sales goals figured prominently in Wells Fargo's opening and handling of TelexFree and related accounts.   Specifically, some of the most egregious sales practices implicated in the Wells Fargo scandal are apparent from the TelexFree and related party account statements at Wells Fargo:

1567.   One way to artificially boost sales at Wells Fargo was to bundle products such as by marketing debit cards as "coming with" personal accounts[129] or checking accounts sold as a unit with other products.[130]   Wells Fargo sold defendant Katia Wanzeler bundled products in the form of a "PMA Account" combining a brokerage account with two bank accounts.[131]   Similarly, Wells Fargo Bank, N.A., sold her husband, defendant Carlos Wanzeler, a debit card, a credit card, and credit insurance along with a checking account and a savings account.[132]

1568.   Another improper way to inflate sales was to sell "secondary" checking accounts (*i.e.*, accounts sold to customers who already had a checking account).[133]   At account opening, Wells Fargo sold TelexFree, LLC, four deposit accounts, including one secondary checking account and one secondary savings account.

---

[128] Business Standards Report at 10-11.

[129] Independent Directors Report at 39.

[130] *Id.* at 45.

[131] *See* Exh. 19-20 to Plaintiff's Memorandum of Law in Opposition to Wells Fargo Advisors LLC's Motion to Dismiss Under Fed. R. Civ. P. 12(b)(6), In re: TelexFree Securities Litigation, MDL No. 4:14-md-2566-TSH (D. Mass., March 4, 2019) [hereinafter Pl. Mem.].

[132] *See* Exh. 15 to Pl. Mem. at 87-90, 98-103.

[133] Independent Directors Report at 40.

1569.   Finally, another improper way to meet sales goals was to open bank accounts that contained no funds.[134]  Wells Fargo engaged in this practice with Katia Wanzeler[135] and TelexFree, LLC.[136]  Meanwhile, the first four bank accounts that Wells Fargo opened for TelexFree, LLC, would have been empty or almost empty in 2013 except for one recurring $150 deposit that shuttled back and forth among those accounts.[137]  This provided the misleading appearance of account activity.

1570.   Wholly apart from TelexFree's own misconduct, these transactions indicate that the Wells Fargo employees who opened these accounts had their own improper motivations—in the form of meeting aggressive sales goals--for agreeing to do business with TelexFree and its principals and family members.

1571.   During the relevant period, Wells Fargo operated four main business groups, specifically, the Community Bank, Consumer Lending, Wealth & Investment Management, and Wholesale Banking.[138]  Wells Fargo's sales abuses occurred throughout the company but are most fully documented inside the Community Bank.

1572.   The Community Bank was "Wells Fargo Bank, N.A.'s business division engaged in retail banking at physical bank branch facilities and call centers and offering financial products and services to Customers, including checking and savings accounts, credit cards, debit cards, unsecured lines of credit, and online bill pay."[139]  Upon information and belief, the

---

[134] *See, e.g.,* Independent Directors Report at 43 & nn.18-19, 48.

[135] *See* Exh. 19 to Pl. Mem. at 121, 123.

[136] *See* Wells Fargo Exh. 3 - TFSD_001077, p. 46.

[137] *See* Exh. 9 to Pl. Mem.

[138] Independent Directors Report at 53; *see also* Business Standards Report at 57.

[139] Settlement Agreement 5 (Dec. 2018) (sales practice settlement agreement between certain state attorneys generals and Wells Fargo & Company, https://www.attorneygeneral.gov/wp-content/uploads/2018/12/Wells-Fargo-Multistate-Settlement-Agreement-12-28-18.pdf.   At the

handling including the deposits and transfers of TelexFree and its associated persons and entities, including Carlos and Katia Wanzeler occurred within the Community Bank.[140]

1573.   Wells Fargo's subsequent review of its sales practice included a review into its procedures for "freezing (and, in many cases, closing) of consumer deposit accounts after the company detected suspected fraudulent activity (by third parties or account holders) that affected those accounts."

> ii.   **Wells Fargo Bank Acted as an Acquiring Bank for TelexFree's Credit Card Processors After It Had Documentation about TelexFree's Fraudulent Scheme.**

1574.   Wells Fargo Bank acted as the acquiring bank for payment processor Defendant ProPay with respect to TelexFree transactions.

1575.   Prior to ProPay's acceptance of TelexFree as its client, James Merrill, on behalf of TelexFree Inc., executed a Merchant Services Application on June 20, 2012.

1576.   Pursuant to the Merchant Services Application, Wells Fargo Bank was a principal signer to the Merchant Services Application.

1577.   As the acquiring bank, Wells Fargo Bank established the underwriting guidelines that ProPay was required to follow with respect to TelexFree's Merchant Services Application. The specifics are, at a minimum, addressed in detail in the Bank Defendants Introductory section above.

1578.   First, ProPay conducted the full underwriting review of TelexFree required by

---

end of 2017, Community Banking was subsumed into the Consumer Banking group.  *See* Business Standards Report at 57.

[140] The Wholesale Banking group serves businesses with annual sales of more than $5 million and mostly offers business financing, including loans, and investment management and banking. *See* Business Standards Report at 79.  TelexFree, LLC, only reported $100,000 in annual gross sales for 2012 when it first opened its Wells Fargo accounts and did not require loans or other financing.  Thus, Wells Fargo likely handled TelexFree's depository business through the Community Bank.

TelexFree's Merchant Services Application.  As part of that background check, ProPay requested and received, inter alia, TelexFree's "business plan," "business marketing plan," "company overview," "6 month sales projections," "last 3-6 months processing statements," "recent bank statement," and "membership packages and prices," and it also reviewed TelexFree's website.

1579.   The foregoing Merchant Services Application and results of ProPay's underwriting review of TelexFree were forwarded to Wells Fargo Bank.

1580.   As a result of this application process and underwriting review, ProPay and Wells Fargo Bank were aware that TelexFree's income was derived primarily from the sale of AdCentral promoter packages, and that TelexFree was marketed as an investment opportunity to potential members.  They were also aware that the VoIP service that purportedly was TelexFree's product was offered for free on the internet by Google and other parties.

1581.   Nevertheless, after reviewing the Merchant Services Application and the additional supporting documentation it requested, required, and investigated, Wells Fargo Bank willfully brushed aside the knowledge that TelexFree was operating an unlawful Scheme, agreed to accept TelexFree as a customer and began processing transactions during or about August 2012.

1582.   At the time of each subsequent TelexFree merchant account application, WF Bank was required to newly employ the heightened scrutiny and additional banking security procedures, protocols and monitoring that it applies to high risk or red flagged accounts.

1583.   On or about early September 2013, TelexFree, Inc. completed a Merchant Application and Agreement with Bank Card Consultants.  (CAC5 ¶ 1245).

1584.   Bank Card Consultants is a registered Independent Sales Organization//Member Services Provider for Wells Fargo Bank, and Wells Fargo Bank was again a party to the

Merchant Application and Agreement signed by TelexFree and Bank Card Consultants.

1585.   During the process of carrying out these procedures, protocols and monitoring of the accounts, WF Bank discovered that (i) TelexFree was operating an unlawful Pyramid Scheme, (ii) it was generating income from Brazil and not the address it listed on its banking application, (iii) the source of its income did not match its banking profile, (iv) it sold no product to speak of, (v) its business structure was an unlawful Pyramid Scheme, (vi) its Promoter Compensation Plan was unlawful because it expressly included massive promises of guaranteed passive income, (vii) it generated staggering excessive chargebacks well outside the maximum allowed under any related standard of review mandating account suspension, termination or in depth business investigation and audit, and (viii) its sister company in Brazil, run by the same individuals that appeared a signatories on the TD Bank applications, was facing additional issues related to shuttering as a notorious and massive unlawful financial fraud.

1586.   Wells Fargo Bank willfully brushed aside the knowledge that TelexFree was operating an unlawful scheme and agreed to accept TelexFree as a customer and began processing transactions.

       **iii.**  **Wells Fargo Acted as Depository and Acquiring Bank After It Had a Substantial Amount of Information about TelexFree's Scheme. Further, It Kept TelexFree's Accounts Open and Active for Far Too Long**

1587.   On April 30, 2013, Jonathan Adreoni of Wells Fargo Bank opened four bank accounts for TelexFree ("April 2013 WF BANK TelexFree Accounts") at its Wigwam and Pecos, Las Vegas, Nevada branch.  Jonathan Adreoni was a Wells Fargo Banker and Officer assigned Portfolio Number: N2513.  TelexFree listed James M. Merrill and Carlos Wanzeler as signers on the account and owners of the business.

1588.   At or about the time that Wells Fargo Bank opened the four April 2013 WF

BANK TelexFree Accounts, TelexFree opened accounts as a phone company and not a membership sales company

1589.   James M. Merrill and Carlos Wanzeler are listed as signers on the account and owners of the business. The application and approval was based on the representation that TelexFree, LLC had $100,000 in gross annual sales and two employees.

1590.   At or about the time that Wells Fargo Bank opened the four April 2013 WF BANK TelexFree Accounts, it knew that TelexFree had gross sales far in excess of $100,000 annually because, *inter alia*, Wells Fargo Bank had processed $1,984,705.45 in revenue payments for TelexFree, LLC in 2013 while acting as an acquiring bank.

1591.   At that time, simple internet searches would have revealed reports that TelexFree was engaged in suspicious activity.

1592.   At that time, TelexFree's website included a slideshow discussing its unlawful compensation plan.

1593.   FFIED expected financial institutions to perform online searches on prospective customers as part of their account opening protocol.

1594.   Similar types of negative publicity had already caused Bank of America to close TelexFree bank accounts in April 2013.

1595.   BSA/AML laws require financial institutions to research and understand their customers' business models before signing off on new accounts.

1596.   By June 1, 2013, Wells Fargo Bank had opened the four accounts under account numbers ending in 6723, 0264, 6715 and 0272.

1597.   They also open two other accounts for "JC Real Estate Management," an entity named after, and known to be affiliated with **J**ames (Merrill) and **C**arlos (Wanzeler).

1598.   Wells Fargo Bank operated the four original bank accounts throughout 2013 and into 2014.

1599.   Wells Fargo Bank operated the four original TelexFree, LLC, bank accounts throughout 2013 and into 2014.  During this period, a remarkable confluence of banks, both big and small, closed TelexFree accounts due to fraud related activity.  Bank of America, N.A., was the first, followed by TD Bank, N.A., Citizens Bank, and eventually Fidelity Bank, headed by James Merrill's own brother.  Meanwhile, both Sovereign Bank and The Commerce Bank entirely rejected TelexFree's merchant applications and requests for financial services.

1600.   Other banks that had carried out online searches identical to those Wells Fargo bank did on TelexFree found the reports of TelexFree's fraud and acted on them.[141]

1601.   Upon the evidence gathered to date, information, and belief, Wells Fargo Bank was closely watching TelexFree during 2013 and 2014 and knew of the growing Internet reports of enforcement measures by other countries and regulators targeting TelexFree's Ponzi and pyramid scheme activities.  From such web searches, Wells Fargo also knew that TelexFree's U.S. operations were an MLM scheme, raising pyramid scheme concerns here in the United States.

1602.   Despite that information - and more- at the end of December 2013 Wells Fargo Bank opened *more* TelexFree accounts and lent substantial assistance to TelexFree's fraudulent

---

[141] On August 24, 2013, Jayme Amirie from Global Payroll Gateway, TelexFree's payroll processor, emailed Carlos Wanzeler by email to express concern about the high level of credit card chargebacks on credit card payments to TelexFree and banks' increasing refusal to allow her company to do payout transactions for TelexFree.  He warned Wanzeler: "banks search on 'TelexFree' and say 'no' . . ."  Amirie pointed out that Citizens Bank had just "shut [TelexFree] off with no warning" and that two large partner banks in Europe were saying "'no' payout transactions for TelexFree."  According to Amirie, three more banks had turned TelexFree down and Synovus Bank was about to "shut you off by [the] end of August."  That same day in an earlier email, Amirie cautioned Wanzeler: "Every bank is seeing your name and telling us 'no' for both credit card processing and electronic payouts."

activities.

1603.   Wells Fargo Bank knowingly provided substantial assistance to TelexFree executives with defalcation of victim funds by transferring millions of dollars overseas to TelexFree's executives' individual accounts and various other destinations, as referenced in the exemplar transactions set forth below.

1604.   By December of 2013, Brazil, Peru and the Dominican Republic had taken or were contemplating action against TelexFree as a suspected Ponzi or pyramid scheme.

1605.   In late 2013, Carlos Wanzeler reached out to Mauricio Cardenás, a Wells Fargo employee.[142] and asked for help with opening bank and investment accounts for himself and TelexFree.

1606.   At that time, Wanzeler and Cardenás openly discussed that TelexFree had been shut down in Brazil.

1607.   Cardenás explained to a TelexFree representative that he could assist TelexFree with opening up accounts at Wells Fargo Bank and providing banking services.

1608.   In December 2013, within the scope of his authority at Wells Fargo & Company/WF Bank/Wells Fargo N.A. Cardenás made a "cross-sell referral" to Wells Fargo Bank and helped Carlos Wanzeler successfully apply for two TelexFree Financial, Inc. deposit accounts with Wells Fargo Bank.

1609.   At all times relevant to this complaint, in addition to the other facts establishing that Wells Fargo Bank possessed actual knowledge that TelexFree was an unlawful enterprise, Cardenás' knowledge of TelexFree's fraud is attributable to Wells Fargo Bank because he acted on their behalf and as their representative.

---

[142] Also, a Financial Advisor for Wells Fargo Advisors, LLC employee.

1610.   Wells Fargo banker Wendy Flores handled the application at the Lighthouse Point branch location in Lighthouse Point, Florida.

1611.   TelexFree Financial, Inc., which had no employees, had been created as a conduit for paying the employees of TelexFree, LLC and TelexFree, Inc., because those entities were having problems with banks.

1612.   On the account, Carlos Wanzeler is listed as the owner of TelexFree Financial, Inc.

1613.   The two accounts were opened with numbers ending in 4252 and 3387.  Wanzeler also opened two accounts for himself ending in 6171 and 4009.

1614.   Again, as other financial institutions stopped doing or refused to do business with TelexFree and its managers and associates, TelexFree moved a substantial portion of its banking business to Wells Fargo.

1615.   On or about December 31, 2013, Wanzeler transferred $3,800,000.00 from Fidelity Bank to Wells Fargo Bank.

1616.   On or about the same date, Fidelity bank made three more transfers totaling more than $305,000 to Wells Fargo Bank.

1617.   The money had to be removed from Fidelity Bank because of fraud-related activity.

1618.   On January 2, 2014, EverBank turned down Wanzeler for an account application. This and the decisions by other banks not to do business with TelexFree further establishes the financial services provided by Wells Fargo bank and its role one of less than a handful of banks that served as a dependable banking partner to TelexFree's massive financial fraud.

1619.   In January 2014, Cardenás unequivocally told a TelexFree representative that

Wells Fargo was concerned by negative publicity that TelexFree was a pyramid scheme. Upon the evidence, information and belief, the concern was raised by John Pisan, the Regional Managing Director of Wells Fargo Advisors, LLC, in Orlando, Florida This mounts to further evidence of WF Bank's actual knowledge that TelexFree was operating an unlawful Pyramid Scheme and further establishes WF Bank knowingly set aside this actual knowledge to offer substantial assistance.

1620.   For example, immediately thereafter on January 29, 2014, TelexFree deposited $1,000,000 into the Wells Fargo Bank account ending in 6723 (opened in April of 2013).

1621.   In February and March 2014, Wells Fargo Bank opened five more new deposit accounts (ending in 7089, 8506, 6810, 6786 and 8498) for TelexFree, LLC.

1622.   On February 25, 2014, TelexFree deposited $5,400,000 into the Wells Fargo account ending in 8498.

1623.   In February of 2014, Wells Fargo Bank opened two accounts for Katia Wanzeler as part of a "PMA Package."

1624.   On February 28, 2014, Wells Fargo Bank opened a new savings account no. ending in 3716 for Katia Barbosa Wanzeler as part of her PMA Package.  Wells Fargo Bank opened this new savings account for Mrs. Wanzeler with two deposits, which both consisted of transfers from the brand new TelexFree, LLC, account no. ending in 8498--one for $1,000,000 and the other for $2,500,000.

1625.   On February 19, 2014, Michael Montalvo, Vice President and Wealth Advisor for Wells Fargo Private Bank, wrote a letter of recommendation on Wells Fargo letterhead for TelexFree and Wanzeler, stating that both "had a great history" with Wells Fargo, they had "managed their relationship with Wells Fargo in a consistent and satisfactory manner" and that

he had known both Wanzeler and TelexFree "personally for over a year and [found] them to be

of great character".  At the time Mr. Montalvo acted, Wells Fargo Defendants had actual

knowledge of TelexFree's unlawful business model, and of Carlos Wanzeler and his spouse

Katia Barbosa Wanzeler, James Merrill, JC Real Estate Investment Company and JC Real Estate

Management Co and Joe Craft's association with the unlawful MLM TelexFree.  Under the

attendant circumstances referenced herein, this extraordinary banking assistance is not

considered routine banking services.  In fact, this letter of recommendation and personal support

of Wanzeler and TelexFree by Wells Fargo exceeded mere routine banking services and elevated

the Wells Fargo Defendants to willful accomplices – also in it for the profit.

1626.   Upon information and belief, TelexFree also used Wells Fargo's letter of

recommendation in its defense during the investigation of its business operation by the

Massachusetts Securities Division.

1627.   On February 24, 2014, Amine Radi, a Vice President at Wells Fargo Bank wrote

another letter vouching for TelexFree, LLC, stating that TelexFree (and "related companies")

had an "established banking relationship" and was "one of our better clients."

1628.   The very next day, on February 25, 2014, funds were wired into TelexFree's

Wells Fargo Bank Account No. 7089 from Allied Wallet per the instructions of Carlos Wanzeler.

1629.   That same day, additional funds were wired into TelexFree's Wells Fargo Bank

Account No. 7089 from Allied Wallet per the instructions of James Merrill.

1630.   Those two Allied Wallet transfers alone totaled more than $7.9 million.

1631.   Again, in the context of the numerous red flags and irregularities, the closing of a

TelexFree account due to suspected fraud in 2013, and its actual notice that TelexFree was an

MLM operating an unlawful business model the banking services provided were not, and are not,

considered routine

1632.   On February 27, 2014, Allied Wallet made two wires transfers totaling $7,970,000 into TelexFree, LLC's Wells Fargo account ending in 7089.

1633.   On or about February 28, 2014, two bank transfers at Wells Fargo Bank totaling $3.5 million moved funds from a TelexFree account into a Wells Fargo account held in the name of Wanzeler's wife, Katia Barbosa Wanzeler.

1634.   Shortly thereafter, another $1.5 million was transferred into Katia Barbosa Wanzeler's WFA account.

1635.   The Massachusetts Securities Division issued subpoenas related to TelexFree on January 22, 2014 and February 5, 2014.

1636.   Upon the evidence, information and belief, during January and February 2014, Cardenás was advised by Carlos Wanzeler that the Massachusetts Securities Division was investigating TelexFree and that Cardenás otherwise knew by then that TelexFree was a pyramid scheme.

1637.   On February 25, 2014, Wells Fargo Bank closed two of the TelexFree, LLC, accounts it had opened in April 2013 (account nos. ending in 6723 and 0264).

1638.   Wells Fargo Bank then willfully acted to brush aside its actual knowledge and consciously decide not to close the other two accounts that had been opened in April 2013.  It further acted to transfer the balance of the closed accounts to one of the other accounts it had opened in April 2013, ending in 6715.  These actions substantially assisted TelexFree's unlawful criminal enterprise by furthering its money laundering and layering efforts.

1639.   On or about the same day, Wells Fargo Bank opened TelexFree, LLC checking account no. ending in 8498 with a $5.468 million deposit made in a Wells Fargo branch.

Cardenas assisted TelexFree with opening said account.

1640.   On February 28, 2014, two transfers from the account no. ending in 8498 totaling $3,500,000 were made into Katia Wanzeler's personal Wells Fargo savings account no. ending in 3716. Katia Wanzeler's transactions were an important component or tool in TelexFree's unlawful enterprise for many reasons including money laundering and sheltering.

1641.   In a March 3, 2014 email from Joseph Craft to James Merrill, on which Carlos Wanzeler, Richard Colabella, Sara Sanford, Jerry Puzey, Gary Tober and Jeffrey Babener were copied, Craft discussed a prior conversation with PriceWaterhouseCoopers and Garvey Shubert, and Babener in which they recommended that TelexFree establish a foreign base of operations for TelexFree in Grand Cayman.

1642.   The stated purpose of this international expansion was that it would allow TelexFree to avoid regulatory intrusions into its (illegal) business operations by governmental agencies and would shelter significant revenue from taxes.

1643.   In that same March 3, 2014 email, Craft memorialized the conference he had with Mauricio Cardenas regarding the establishment of a Wells Fargo Bank Merchant Account for processing international transactions.

1644.   Craft also noted that Sara Sandford from Garvey Schubert would assist TelexFree in establishing this account.

1645.   On March 3, 2014, Sara Sandford responded to Craft's email and copied Carlos Wanzeler, Richard Colabella, Jim Merrill, Jerry Puzey, Gary Tober and Jeffrey Babener, confirming that she had spoken with her "contact in Grand Caymans" and was prepared to "form an entity quite quickly."

1646.   On March 4, 2014, Wells Fargo Bank opened yet another new checking account

for TelexFree, LLC, no. ending in 8506.

1647.   Cardenas acted as a liaison between Wells Fargo Bank and TelexFree (specifically, Wanzeler, Merrill, and TelexFree interim CEO Stuart MacMillan).

1648.   On March 3 and March 6, 2014, respectively, Wells Fargo transferred $1,499,986.74 of the funds in Mrs. Wanzeler's savings account no. ending in 3716 to her Wells Fargo brokerage account no. ending in 3207.  Katia Wanzeler's transactions were an important component or tool in TelexFree's unlawful enterprise for many reasons. This transaction is an example of layering.

1649.   Upon information and belief, because she was the wife of Carlos Wanzeler, Katia Wanzeler was flagged as a person related to TelexFree by Wells Fargo's sophisticated systems.

1650.   On March 6, 2014, Allied Wallet transferred $8,200,000 into TelexFree, LLC's Wells Fargo Bank account ending in 7089.

1651.   Upon the evidence, information and belief, it is believed that each of the above acts of Wells Fargo Bank's provision of substantial assistance to TelexFree's unlawful scheme and the expansion of its criminal enterprise was also facilitated by Cardenas.

1652.   All the while, the unlawful TelexFree account activity continued and expanded at Wells Fargo.

1653.   Upon information and belief, on or around March 12, 2014, two days before TelexFree announced its unilateral change to the standard form TelexFree contract and compensation plan, the total TelexFree cash balance at Wells Fargo was approximately $16,970,000.00.

1654.   Upon information and belief, on or approximate to March 13 or 17, Wells Fargo advised TelexFree that it was "game over."

1655.   On March 17, 2014, TelexFree made a $30,000,000 deposit from International

Payout Systems, Inc., into a Wells Fargo Bank account ending in 8506.[143]

1656.   Upon information and belief, no later than March 19, 2014, Wells Fargo

possessed actual knowledge that the Massachusetts Securities Division had issued subpoenas on

TelexFree.  This supplemented their prior actual knowledge about earlier subpoenas.

1657.   Wells Fargo's own policies, along with banking industry and regulatory

standards, provide that once an account is closed due to suspicion of fraud, all related accounts

and further banking services to that customer should be terminated.

1658.   On March 25, 2014, two letters addressed to TelexFree, LLC, from Cindy

Watson, a Financial Crimes Analyst with Wells Fargo Risk Operations and Fraud Prevention

Services at Wells Fargo Bank state that Wells Fargo Bank was terminating its banking

relationship with TelexFree, LLC.

1659.   The letters further stated that Wells Fargo Bank would close seven TelexFree,

LLC's bank accounts effective April 9, 2014 (no. ending in 8498, 8506, 6786, 6810, 6715, 0272,

and 7089).

1660.   At the time Wells Fargo issued these letters, it had actual knowledge of

TelexFree's criminal wrongdoing.

1661.   Upon information and belief, as of April 7, 2014, the total TelexFree cash balance

at the time Wells Fargo was approximately $29,000,000.

1662.   A TelexFree-related account no. ending in 8506 showed $33 million in total

debits one month (including a bank originated debit, meaning that it had no specified payee, of

over $15 million) and account no. ending in 8498 had bank originated debits totaling $3.5

---

[143] The funds were transferred from Bank of America.

million over that period.

1663.   A multitude of additional specific establish Wells Fargo's provision of substantial assistance.

1664.   Notwithstanding the March 25, 2014 letters and Wells Fargo Bank's prior actions and statements showing actual knowledge on its part of TelexFree's fraud, on Friday, April 11, 2014, Wells Fargo Bank, provided TelexFree's unlawful enterprise with additional substantial assistance. Wells Fargo Bank issued James Merrill and Katia Wanzeler nine cashier's checks totaling $27,550,296.66.

1665.   Shortly thereafter, on Tuesday, April 11, 2014, law enforcement raided TelexFree's headquarters. At that time it was discovered that Wells Fargo Bank had also made another huge disbursement – a cashier's check made out to TelexFree Dominicana SRL, for $10,398,000 – to Carlos Wanzeler on April 3, 2014.

1666.   On April 10, 2014, Wells Fargo Bank allowed TelexFree Financial, Inc., to wire $3.5 million from its account no. ending in 1813 to the law firm Greenberg Traurig.

1667.   On April 11, 2014, Cardenas was terminated.

1668.   The opening of each of the above accounts was a radical departure from ordinary or routine banking services for Wells Fargo for the many reasons referenced.  One obvious reason is the fact that the Wells Fargo Bank's system tracks and relates the banking history of individuals and entities and its system certainly picked up the slew of irregularities and red flags surrounding TelexFree (operations in Brazil and the United States), Carlos Wanzeler and his wife, and others, including JC Real Estate Investment Company, JC Real Estate Management Co. and Joe Craft.

### iv.  Wells Fargo Bank – at times at the Instruction of Cardenas and Assisted in Money Transfers from TelexFree Accounts Long After it

**Knew of TelexFree's Activities.**

1669.  In addition to the above granular detail, Mauricio Cardenás was otherwise instrumental to TelexFree's unlawful enterprise including his assisting to timely effectuate wire transfers from TelexFree, LLC's Wells Fargo Bank accounts.

1670.  For example, on January 27, 2014, Ana Paula Oliveira at TelexFree emailed Cardenás, asking him to wire $60,000 from TelexFree to IDT Domestic Telecom Inc. via TD Bank, N.A., and $20,000 from TelexFree to LIGA Telecom via JP Morgan Chase Bank.

1671.  Within hours, Cardenás emailed her back: "De imediato" and Wells Fargo Bank executed a $60,000 wire to IDT Domestic Telecom Inc. via TD Bank on February 12, 2014, and a $20,000 wire to LIGA Telecom via JP Morgan Chase Bank on February 11, 2014, both from TelexFree, LLC's Wells Fargo Bank checking account no. ending in 6715.  Mauricio Cardenas' transactions were an important component or tool in TelexFree's unlawful enterprise for many reasons.  This is an example of layering, money laundering and sheltering

1672.  The Wells Fargo Defendants carried out the non-routine banking services they provided in multiple ways.  It is also worth noting that the methods by which they performed non routine banking services included angles and efforts TelexFree jointly worked with them through their Wells Fargo employee and authorized agent Mauricio Cardenas

1673.  At the request or instruction of the Wells Fargo Defendants, Cardenas held himself out as an individual that worked for both entities.

1674.  Cardenas was a social friend of TelexFree founder and managing member Carlos Wanzeler.  Facebook contained photos of the two socializing at trendy restaurants, sharing family and other moments.  Together they tore up the ocean on cigarette boats.

1675.  Mauricio Cardenas was Carlos and Katia Barboza Wanzeler's financial advisor.

1676.  In the role of Wells Fargo Bank's authorized agent, Cardenas helped the

Wanzeler's, TelexFree and others siphon off and launder[144] money from TelexFree's coffers.

1677.  By way of review, specific exemplars of his assistance above include, but are not limited to, transferring ill-gotten gains to offshore accounts, moving funds between accounts, and moving funds from one account associated with banking identity to another account associated with another banking identity.  Additional actions are detailed below in the allegations specific to Cardenas and Wells Fargo Advisors.

1678.  Upon information and belief, Mauricio Cardenas an employee of Wells Fargo was terminated by the Wells Fargo Defendants for his dealing with TelexFree's unlawful entities and associated individuals. Wells Fargo Bank's related FINRA disclosure stated:

> THE FIRM DETERMINED THAT IT WOULD NOT DO BUSINESS WITH CERTAIN BUSINESS ENTITIES DUE TO POTENTIAL AML RISKS. THEREAFTER, FA OPENED TWO BROKERAGE ACCOUNTS FOR INDIVIDUALS DIRECTLY RELATED TO THE ENTITIES. THE FA STATED THAT HE DID NOT KNOW THE RELATIONSHIP EXISTED. MANAGEMENT DETERMINED THAT REPRESENTATIVE DEMONSTRATED A LACK OF JUDGMENT IN RECOGNIZING AND MANAGING POTENTIAL AML RISKS.

This limited disclosure refers to the fact Cardenas was fired for dealing with TelexFree despite the obvious illegalities. It does not address the literal multitude of other transactions.

1679.  Cardenas randomly utilized his Wells Fargo Bank and Wells Fargo Advisors email addresses throughout the period that he acted for Wells Fargo Bank and provided substantial assistance to TelexFree.  Upon information and belief, he also otherwise used other means including personal email and text and phone when dealing with Carlos Wanzeler, his wife Katia Barboza Wanzeler and others related to, and on behalf of TelexFree.

---

[144] Money laundering is the generic term used to describe the process by which criminals disguise the original ownership and control of the proceeds of criminal conduct by making such proceeds appear to have derived from a legitimate source. The processes by which criminally derived property may be laundered are extensive. *See also* https://www.int-comp.org/careers/a-career-in-aml/what-is-money-laundering/.

1680.   Mauricio Cardenas efforts on behalf of the Wells Fargo Defendants substantially assisted TelexFree, Carlos Wanzeler and his spouse Katia Barbosa Wanzeler, and others with non-routine financial assistance including but not limited to moving money between accounts, transfer money off shore, transfer money from one named account holder to an account holder with a different name and banking identity.

### AA.        Defendant Payment Processing Service Companies

1681.   Defendants GPG including Jayme Amirie, IPS, ProPay, Base Commerce, Vantage Payments including Dustin Sparman, Allied Wallet including Ahmad Khawaja, Mohammad Diab and Amy Rountree, Bank Card Consultants including John Yurick, Priority Payout including Thomas Wells, and the Doe Payment Processors (together "Payment Processing Defendants") possessed actual knowledge of the tortious and unlawful nature of TelexFree's business operations.  Thereafter, notwithstanding their actual knowledge, each rendered substantial assistance by continuing to provide TelexFree with the financial services, introductions, strategies and other affirmative actions below that were integral to TelexFree's Scheme, including the related money laundering, sheltering in safe havens of unlawfully obtained profits, and the concealment of unlawful activities until at least April 2014.

1682.   As more fully described herein, each Payment Processing Defendant:

a.      acted as a "middle-man" whose primary function was to transfer or process electronic funds from the terminal payor (here, TelexFree's Promoters) to the payee (here, TelexFree) through an acquiring bank; and

b.      issued merchant identification numbers or "MID's" to TelexFree and its related entities under the guidance and restrictions of the acquiring bank[145],

---

[145] The acquiring bank is the financial institution that ultimately approves a merchant to work within the payment processing marketplace.

payment processors' representatives.

1683.   The tortious and improper acts alleged to have been done by each Payment Processing Defendant were authorized, ordered and performed by its officers or directors, or representatives with authority and carried out while they acted within the permitted scope of that authorization or their employ.  Each Payment Processing Defendant otherwise acted within their authorized scope as a principal or an agent of their employers or co-conspirators with respect to the acts, violations, and common course of conduct alleged in this complaint.

1684.   Each Payment Processing Defendant is jointly and severally liable, including liability for the acts of its co-conspirators, regardless of whether the conspirators are named as Defendants in this complaint.

1685.   At the time that each Payment Processing Defendant became involved with TelexFree, other payment processors and banks had declined TelexFree's business because of the same information available to such Defendants.  But for their assistance, TelexFree would have collapsed and the similarly situated members of the putative class would not have thereafter been caused to suffer ascertainable economic loss.[146]

1686.   For example, in accordance with their own as well as standard industry practice, each Payment Processing Defendant was required by their acquiring bank to conduct, and did so carry out, a due diligence investigation and assessment of TelexFree which included a review and assessment of:

    a.   TelexFree's business model and structure;

    b.   TelexFree's compensation plan and standard form contract;

---

[146] *See also* Omnibus Decl. of William H. Runge, Case No. 14-125234-ABL, Doc. 13, ¶ 61, attached herewith as Attachment 1.

c.  TelexFree's payment processing, transaction and banking history;

d.  TelexFree's listing on the Match List and the available expanded banking history through the MATCH program;

e.  TelexFree's website;

f.  TelexFree's purported VoIP product and AdCentral promoter packages, and corresponding prices;

g.  TelexFree's corporate documentation;

h.  Documentation as to the location of operations and sales;

i.  TelexFree's, Carlos Wanzeler's, and James Merrill's credit scores;

j.  TelexFree's tax returns for at least the previous two (2) years;

k.  TelexFree's Profit & Loss Statements for at least the previous two (2) years;

l.  TelexFree's balance sheets;

m.  TelexFree's average transaction amount (or "average ticket");

n.  TelexFree's highest anticipated transaction amount (or "high ticket");

o.  TelexFree's anticipated monthly processing volume;

p.  TelexFree's annual and monthly dollar sales volume; and

q.  Information available online regarding TelexFree.

1687.  Notably, the findings made during the initial due diligence evaluation and review raised more red flags that prompted/required each Payment Processing Defendant to heighten its investigation and increase its level of scrutiny.

1688.  Each Payment Processing Defendant in turn provided similar information along with an underwriting report to its acquiring bank.  The acquiring banks then strictly imposed limits or guidelines on the permitted processing they would allow TelexFree to transact.[147]

1689.  As established and sophisticated financial services providers, each Payment

---

[147] Acquiring banks underwriting guidelines continually remain in place and are rarely modified.

Processing Defendant, and its acquiring bank, obtained a plethora of information about

TelexFree and its principals through their initial new client evaluation.  This information

included that, *inter alia*, TelexFree had been shuttered in Brazil for being a pyramid scheme;

TelexFree had been placed on the MATCH list; TelexFree had excessive levels of chargebacks

and other banking irregularities; TelexFree's standard form contract and Promoter Compensation

Plan was unlawful on its face; and other banks had refused to service or terminated or suspended

banking accounts and activities with TelexFree.

1690.   As a result of its own internal, acquiring-bank mandated, and industry standard

due diligence activities, during the time they provided TelexFree services, each Payment

Processing Defendant had actual knowledge that:

a.  TelexFree was an MLM – a business profile uniformly considered very high risk
    and a suspect business to begin with under accepted industry-wide and FFEIC
    standards.

b.  TelexFree was and had been subjected to government action and shut down as a
    Pyramid scheme by the Brazilian government;[148]

c.  TelexFree's Founders and Executive Officers who were signatories and
    associated with the payment processing application, including Carlos Wanzeler
    and James Merrill, were also the subject of the Brazilian government actions;

d.  TelexFree had been placed on the MATCH List;[149]

e.  TelexFree's chargeback rate was continually well over the maximum allowable
    industry standard;

f.  Other financial institutions had terminated their relationship with TelexFree or
    suspended and limited their services they provided to it;

g.  Other financial institutions had rejected TelexFree and refused to extend banking

---

[148] As detailed below, as many later learned that United States governmental authorities,
including the Commonwealth of Massachusetts SOC, were investigating TelexFree and its
Founders and Executive Officers who were signatories and associated with their account, they
again willfully and knowingly continued to provide TelexFree with uninterrupted financial
services.

services to TelexFree;

h.  The same was true for TelexFree's Founders and Executive Officers who were signatories and associated with the payment processing application;

i.  TelexFree's merchant profile did not match its transactions;

j.  TelexFree's merchant profile did not match its business model;

k.  TelexFree lacked a real product and instead unlawfully guaranteed a massive return for passive activity;

l.  TelexFree standard form contract contained express objective violations of Massachusetts statutory law; and

m.  TelexFree's website and promotional materials also contained express objective violations of Massachusetts statutory law.

1691.  Despite actual knowledge of the tortious or unlawful nature of TelexFree's business operations, the Payment Processing Defendants continued to provide TelexFree with uninterrupted payment processing and other services and substantially assisted its tortious or unlawful scheme.

1692.  The substantial assistance provided by the Payment Processing Defendants included the capturing, maintaining and transferring of Promoters' funds.

1693.  Each Payment Processing Defendant also went above and beyond this essential need by providing extra effort and assistance during crisis times when TelexFree could not obtain the financial services it required and by providing the other services referenced or set out in granular detail.  They processed payments between TelexFree and its Promoters, provided the electronic gateway used to send and receive such payments, provided the electronic interface services used by both TelexFree and its Promoters, as well as other essential services.

1694.  Above and beyond services, such as introducing TelexFree to other financial service providers and providing strategies, were essential to TelexFree's ability to sustain its unlawful enterprise.  Another example of the above-and-beyond assistance the Payment

Processing Defendants provided to TelexFree was direct participation in TelexFree's unlawful business enterprise, which included providing key specialized advice or services such as offering assistance with the concealment of suspicious and fraudulent activity, money laundering, the creation of off shore shell companies and diverting victims' funds overseas for the unlawful purpose of sheltering illegal proceeds outside the reach of the United States' justice system.

1695.   The Payment Processing Defendants also worked in tandem with the other Defendants, sharing information regarding TelexFree and its business activities, and coordinating services to ensure that TelexFree received continuous and uninterrupted payment processing services throughout its operations.

1696.   The Payment Processing Defendants' services were integral to TelexFree's website-based business.  Specifically, since much of TelexFree's revenues were derived through e-commerce and website-based purchases, the use of credit and debit cards was inextricably linked to TelexFree's ability to operate, sustain its unlawful business model, exponentially grow, and expand into new, remote markets.  The services provided by the Payment Processing Defendants were so integral to its unlawful business model that TelexFree would have rapidly collapsed without them.  *See* Runge Dec., Attachment 1.

1697.   For an entity to process payments received from its consumers by a credit or debit card, it must obtain a merchant account.  Without such a merchant account, merchants such as TelexFree cannot accept consumer credit or debit card payments.  A merchant account is available through a financial institution known as an "acquiring bank" or an "acquirer" that is a member of credit card networks, such as Mastercard, Visa and Discover.  As a "payee," TelexFree must be granted the "right" to receive electronic payments within the payment processing "eco-system."

313

1698.   The Payment Processor Defendants worked within strict guidelines imposed and mandated on TelexFree following its initial application.  Acquiring banks police and strictly track and monitor every individual transaction that results in a payment made to every payee on an individual payee-by-payee basis.  The process can be compared to radar that detects planes and other objects in the air.  The tracking and monitoring of every individual transaction is accomplished through a combination of electronic and human "hands on" systems and protocols.

1699.   Once TelexFree was granted the "right" to receive electronic payments within the payment processing "eco-system," the Payment Processing Defendants were required to process each requested payment within the strictly enforced limits and guidelines that were imposed and mandated on TelexFree as an individual client following its initial application.

1700.   The following is a listing of the steps that were undertaken to process the transfer of funds from the TelexFree class member Promoters to TelexFree:

Step 1- The Promoter swipes cards (or keys it in) and creates a trackable transaction
Step 2- Transaction goes out for authorization
Step 3- Transaction runs on either Visa/MC/Disc 'rails'
Step 4- Transaction goes out to the issuing bank of the card (name on the top left of a credit card)
Step 5- Decision to approve or decline based on a variety of factors
Step 6- Approval/Decline decision is sent to the acquiring bank
Step 7- Receipt prints with decision
Step 8- Debit is taken from the customer's account
Step 9- Customer pays the issuing bank back (credit card)
Step 10- Money moves from the issuing bank to the acquiring bank
Step 11- Money moves from the acquiring bank to the merchant's (TelexFree) bank

1701.   The Payment Processing Defendants served as intermediary entities between merchants (here, TelexFree) and acquirers (here, acquiring banks).  The entity form through which they provided this intermediary service included:  1) payment processors; 2) independent sales organizations (ISOs); and 3) payment facilitators.

1702.   Payment processors procure a separate merchant account for each of its merchant-

clients.

1703.    A payment facilitator itself is a merchant registered by an acquirer to facilitate

transactions on behalf of other merchants.  A payment facilitator receives settlement of

transaction proceeds from the acquirer on behalf of each merchant, and disburses the funds to

each merchant.

1704.    A payment facilitator enters into contracts with acquirers to provide payment

services to merchants, and it enters into a separate contract with each merchant to enable

payment acceptance.  When a cardholder makes a purchase, the merchant routes the transaction

data for processing through the payment facilitator's master merchant account.

1705.    Both payment processors and facilitators identify and solicit merchants in need of

credit and debit card processing services and earn commissions and other fees based on the

volume of sales transactions processed through each merchant's account.

1706.    Upon information and belief, some of the Payment Processing Defendants acted

as both payment processors and payment facilitators in connection with TelexFree and all

activities related to the credit card network services are referred to herein as payment processing.

For instance, Payment Processing Defendants Allied Wallet and IPS also served as facilitators.

1707.    Notably, card network rules prohibit an acquiring bank or entity performing

payment processing from misrepresenting the location of a merchant (i.e. the permanent location

at which the merchant's employees, officers, or agents conduct business), which is required to be

in the same geographic jurisdiction (or "area of use") as the acquirer.

1708.    Once a payment processor and its acquirer "board" a merchant and start

processing payments on its behalf, the rules require them to monitor the merchant's sales

transaction activity to detect unusual processing volumes and excessive chargebacks, which can

indicate illegitimate activity, such as fraud or deceptive marketing.

1709.   A high chargeback rate is a primary indicator of fraudulent or deceptive conduct by a merchant.  Chargebacks occur when customers contact their credit card issuing bank to dispute a charge appearing on their credit card account statement.  High chargebacks are an industry-accepted Red Flag used to locate fraudulent activity.

1710.   TelexFree was added to Mastercard's Member Alert to Control High-risk Merchants ("MATCH") database in 2012, indicating that TelexFree was no longer to receive any credit card processing services due to exceptionally high risk.  Inclusion on the MATCH list was very significant because it is a watch list that is maintained by MasterCard and is also accessed by Visa and American Express.

1711.   The MATCH database is a Terminated Merchant File ("TMF") maintained by Mastercard, which acts as a blacklist within the payment processing industry and is designed to prevent high-risk merchants from obtaining payment processing services. Being listed in the MATCH database is an extremely serious Red Flag.

1712.   The intention behind creating and maintaining the MATCH list is, *inter alia*, to hold businesses that have previously engaged in doubtfully legitimate payment processing responsible for past actions.  When placed on the MATCH list, the business and any principals or partners will have an extremely hard time opening any new merchant accounts.  Each new acquiring bank is allowed to contact each previous provider to find out more information to determine if they would deny an application outright or possibly approve it with certain conditions and restrictions.

1713.   Section 11.5 of the MasterCard document sets forth the criteria for a merchant to be added to MATCH list, and includes:

a. Money laundering;

b. Excessive chargebacks;

c. Fraud;

d. Illegal transactions; and

e. Identity theft.

1714.   In addition to the alert from Mastercard's MATCH database in 2012, each of the Payment Processing Defendants became aware of other Red Flags and evidence of tortious or unlawful activities surrounding TelexFree, which, pursuant to their regulatory duties, spawned further investigation.

1715.   Each Payment Processing Defendant otherwise gave TelexFree's Scheme substantial assistance by:

- providing TelexFree with software that connected TelexFree's "back office" platform with the credit card payment processing system;

- processing and opening of TelexFree payment processing accounts;

- receiving payments made by Promoters to TelexFree to become members of the TelexFree Program;

- processing payments by Promoters to TelexFree in the course of TelexFree's fraudulent business operations, which funds were then held for the benefit of TelexFree, its affiliated entities and its Defendant Founders;

- maintaining accounts containing funds paid by Promoters to TelexFree for AdCentral Package membership fees;

- making payments to certain Promoters as part of TelexFree's purported return on investment; and

- transferring funds paid by Promoters to TelexFree between TelexFree entities, Defendant Founders' personal accounts, foreign companies and shell companies.

1716.   Even more, the Payment Processing Defendants' substantial assistance of the TelexFree Scheme went far beyond the above-enumerated activities. As described below, the

Payment Processor Defendants partnered together and took coordinated actions to circumvent card network anti-fraud-based rules and restrictions to procure and provide essential credit card processing services for TelexFree.  They created fake foreign shell companies to open accounts in their names and moved money offshore.

1717.   The creation and use of a fake foreign shell company furthered the Scheme because it allowed TelexFree to circumvent card network rules requiring that a merchant must be located in the same geographic jurisdiction as the acquiring bank.  Those rules define a merchant's location as the country of its principal place of business (generally its headquarters).

1718.   Another tool employed by the Payment Processor Defendants to evade network rules was to open multiple merchant accounts for TelexFree in an attempt to artificially reduce the chargebacks associated with any single account.

1719.   Excessive chargebacks rates are flagged by card networks chargeback monitoring programs.  One hundred (100) or more chargebacks in one month, or a monthly chargeback-to-transaction ratio of one percent or greater, is considered excessive.  TelexFree shattered these FFIEC and industry-standard limits each month.

1720.   Merchants placed in excessive chargeback programs are subject to additional scrutiny by the card networks, as well as possible fines and termination.  As a merchant with stunning levels of excessive chargeback each month, TelexFree was subjected to additional scrutiny by the card networks, the acquiring banks who they "leaned on," and the Payment Processor Defendants, who the acquiring banks "leaned on."

1721.   If a merchant's account is terminated for excessive chargebacks, an acquirer must place the merchant on a list maintained by the credit card networks, such as Mastercard's MATCH database.  Because of that reality, unscrupulous payment processors attempt to avoid

placement in the chargeback monitoring programs and MATCH through strategies designed to artificially manipulate and reduce the merchants' chargeback ratios (i.e., the number of chargeback transactions divided by the number of sales transactions in a given month, expressed as a percentage).

1722.  Like tactics were used by the Payment Processor Defendants. For example, they repeatedly open new merchant accounts, using new corporate shells to make it difficult for acquiring banks to identify them as related to the fraudster merchant.

1723.  As described below, the Payment Processing Defendants engaged in these practices with the assistance of the Licensed Professional and Bank Defendants with respect to their securing of credit card network services for TelexFree.  But for the tortious conduct of the Payment Processor Defendants, including aiding and abetting and conspiracy, TelexFree would have collapsed and the members of the putative class would not have suffered ascertainable economic loss.

1724.  Defendants GPG, IPS, ProPay, Base Commerce, Vantage Payments, Allied Wallet, Bank Card Consultants and the Doe Payment Processors possessed actual knowledge of the suspicious, tortious and unlawful nature of TelexFree's business operations, yet substantially assisted and encouraged them by providing essential payment processing services as early as October 2012.[150]

1725.  Despite actual knowledge of the suspicious, tortious, or unlawful nature of TelexFree's business operations, the Payment Processing Service Company Defendants continued to encourage and provide TelexFree with payment processing services and substantially assisted and encouraged its suspicious, tortious or unlawful conduct.

---

[150] *See also* Omnibus Decl. of William H. Runge, Case No. 14-125234-ABL, Doc. 13, ¶61, attached herewith as Exhibit 2.

1726.   As an integral part of the Pyramid Scheme, the Payment Processing Service Company Defendants processed payments between TelexFree and its Members, provided the electronic gateway used to send and receive such payments, and provided the electronic interface services used by both TelexFree and its Members.

1727.   As set forth below, certain Payment Processing Companies went far beyond this role and became active direct participants in TelexFree's unlawful business enterprise by providing specialized advice and assisting them to skirt the law.

1728.   The services of the Payment Processing Service Company Defendants, including the capturing, maintenance and transferring of Promoters' funds, was essential and without their integral assistance TelexFree's Pyramid Scheme could not have operated.

1729.   Each Payment Processing Service Company Defendant possessed a regulatory duty to look for certain types of facts or lack thereof, including the identity and purpose of the individuals opening and making payments into their accounts.

1730.   In 2012, TelexFree underwent a "several day" period during which they double-billed customers, resulting in a temporary spike in the rate of customer chargebacks, according to an interoffice email of Defendant Base Commerce, dated May 22, 2013.[151]

1731.   As a result of this period of especially heavy chargebacks, TelexFree was added to MasterCard's MATCH database in 2012, indicating that TelexFree was no longer to receive any credit card processing services due to exceptionally high risk.

1732.   In addition to the alert from Mastercard's MATCH database in 2012, each of the Payment Processing Service Company Defendants became aware of other Red Flags and evidence of suspicious, tortious or unlawful activities surrounding TelexFree and pursuant to

---

[151] *See* email from John Hughes, dated May 22, 2013, attached herewith as Exhibit 11.

their regulatory duties they carried out further investigation.

1733.   Each Payment Processing Service Company Defendant discovered the news reports and other evidence detailed in this complaint that reasonably evidenced TelexFree's unlawful conduct during the time they serviced them.

1734.   Each Payment Processing Service Company Defendant performed all of the investigations and monitoring required of it by the federal government yet it:

- failed to act as required;
- failed to monitor the suspicious, tortious or unlawful conduct they identified;
- turned a blind eye to suspicious, tortious or unlawful conduct; and
- failed to detect or report suspicious, tortious or unlawful conduct.

1735.   The services provided by each Payment Processing Service Company Defendant included, *inter alia*, the following:

- processing and opening of TelexFree payment processing accounts;
- receiving payments made by Promoters to TelexFree to become members of the TelexFree Program;
- processing payments by Promoters to TelexFree in the course of TelexFree's fraudulent business operations, which funds were then held for the benefit of TelexFree, its affiliated entities and its Defendant Founders;
- maintaining accounts containing funds paid by Promoters to TelexFree for AdCentral Package membership fees;
- making payments to certain Promoters as part of TelexFree's purported return on investment; and
- transferring funds paid by Promoters to TelexFree between TelexFree entities, Defendant Founders' personal accounts, foreign companies and shell companies.

1.  ProPay

1736.   Defendant ProPay processed electronic transfers of funds on behalf of TelexFree.

1737.   ProPay agreed to accept TelexFree as a customer and began processing

transactions for the benefit of TelexFree in or about October 2012.

1738.   ProPay continued to process transactions for the benefit of TelexFree until at least January 16, 2014.

1739.   According to TelexFree's December 2012 Balance Sheet, as of December 31, 2012, ProPay held a total of $546,947.23 in two accounts for the benefit of TelexFree.

1740.   Furthermore, as of December 31, 2012, ProPay held an additional amount of $279,209.46, which is listed as "on hold" by TelexFree's 2012 Balance Sheet.

1741.   Between October 2012 and December 2012, ProPay processed a total of $1,506,856.60 in incoming transfers of membership fees for the benefit of TelexFree.

1742.   According to TelexFree's July 2013 Balance Sheet, as of July 31, 2013, ProPay held a total of $3,743,049.03 in funds for the benefit of TelexFree.

1743.   Furthermore, as of July 31, 2013, ProPay held an additional amount of $4,698,867.83, which is listed as "on hold" by TelexFree's July 2013 Balance Sheet.

1744.   According to TelexFree's December 2013 Balance Sheet, as of December 31, 2013, ProPay continued to hold funds in the amount of $98,463.24 for the benefit of TelexFree.

1745.   In addition to this amount, as of December 31, 2013, ProPay continued to hold funds in the amount $4,468,411.11 in a "reserve" account for the benefit of TelexFree.

1746.   In the course of providing services to TelexFree, ProPay directly communicated with fellow Defendant Payment Processing Service Companies Base Commerce and GPG regarding the inherent risks and concerns with TelexFree.

1747.   More particularly, in an email to Defendant Hughes, president of Base Commerce, a Payment Processing Company serving TelexFree, ProPay characterized TelexFree as an extremely high-risk client and indicated that no United States bank or processor would be

willing to take on TelexFree as a client given this risk.  This email was referenced in a

subsequent email from Hughes to Defendants Merrill, Wanzeler, and Craft, as well as Defendant

GPG, dated August 28, 2013.

1748.   Hughes, as President of Base Commerce, stated in that August 28, 2013 email to

Defendants Merrill, Craft, and Wanzeler, "[n]o US Bank or Processor . . . will accept your

[TelexFree] business given that you are on month five of the Visa Chargeback monitoring

program.  You are one of only three merchants in the USA on month five so you are a real hot-

potato as they say."[152]

1749.   Despite ProPay's knowledge of TelexFree's legal issues and the risk surrounding

TelexFree, and despite ProPay's own warnings to Base Commerce regarding these issues,

ProPay continued to provide payment processing services to TelexFree into January 2014.

1750.   ProPay continued to provide payment-processing services to TelexFree until at

least January 16, 2014 and during that time ProPay conducted its continued monitoring

obligations under the law.

1751.   Pursuant to its obligations to perform ongoing customer monitoring of TelexFree,

ProPay's Regulatory Monitoring Office, employees and officers discovered the Red Flags and

evidence of suspicious, tortious or unlawful conduct described above.

1752.   At a minimum, ProPay's initial investigation and ongoing monitoring of

TelexFree made it aware that TelexFree was engaged in suspicious, tortious or unlawful conduct

that was at a minimum violative of M.G.L. c. 93, § 69, but it continued to provide TelexFree

with payment processing services, integral to the TelexFree Scheme until at least January 16,

2014.

---

[152] *See* email from Hughes to Merrill, dated August 28, 2013, attached hereto as Exhibit 12.

1753.   Through its actions, ProPay provided substantial assistance and encouragement to TelexFree.  ProPay also assisted TelexFree and its Principals to further achieve their unfair, deceptive and unlawful Scheme that was violative of M.G.L. c. 93, § 69.

2.   GPG

1754.   Defendant GPG is a Payment Processing Service Provider that specializes in merchant gateway services, including, but not limited to, making outgoing payroll and commission payments for clients as well as processing credit card transactions for incoming payment.

1755.   At relevant times, Jayme Amirie was GPG's CEO and was integrally involved in all TelexFree/ GPG related actions, decisions, evaluations, and strategies.

1756.   GPG began processing electronic transfers of funds on behalf of TelexFree during or about April 17, 2013 and continued to render payment processing services that were necessary for, and substantially assisted in, TelexFree's operation and proliferation until at least January 16, 2014, despite actually knowing that TelexFree was an unlawful pyramid scheme.

1757.   GPG gained actual knowledge of TelexFree's unlawful enterprise in April 2013. At that time, GPG continued to render its financial services to TelexFree after its sponsor bank, Defendant Synovus, explicitly instructed it to cease servicing the TelexFree account due to evidence of its fraudulent enterprise. As referenced and detailed herein, GPG and Jayme Amirie thereafter continued to provide TelexFree and its co-conspirators with substantial assistance in furtherance of its unlawful enterprise until at least January 16, 2014.

1758.   GPG and Jayme Amirie stepped in to secure and provide payment processing services to TelexFree at a time when other financial service providers were turning TelexFree away as a fraud and, as a result, TelexFree was finding it virtually impossible to place its pay processing needs.

1759.   Those payment processors and banks would not accept TelexFree's business due to its abundant negative press, including TelexFree's established illegality and shuttering in Brazil and characterization of TelexFree as a pyramid scheme, and other information available to sophisticated financial services providers, including TelexFree's placement on the MATCH list, its excessive level of chargebacks, its rejection by other financial institutions, its unlawful business model which lacked a real product and guaranteed a large financial return, and other suspicious activity.

1760.   GPG typically processed over $10 million in victims' funds per month for TelexFree.  Both by processing payments for TelexFree during critical periods when TelexFree could not find financial service providers willing to work with it, and by processing such large volumes each month, GPG provided substantial assistance to TelexFree.

1761.   GPG's wrongful and unlawful conduct enabled TelexFree to capture, launder or move outside the reach of the United States justice system of millions of dollars paid by victims to TelexFree through credit and debit card transactions.

1762.   At all times material to this complaint, GPG shared a close business relationship with the other Payment Processing Service Company Defendants, including Base Commerce and Synovus, with whom they acted as payment processing partners for customers, including TelexFree, and shared information.

1763.   The relationship between GPG and Base Commerce began in 2011 and was subject to the laws of Arizona.  The relationship between GPG and Base Commerce involved significant amounts of money.  This was especially true of the TelexFree-related transactions.

1764.   The relationship between GPG, Amirie and Base Commerce involved significant amounts of activity, all of which was voluntarily submission to the jurisdiction of the state of

Arizona.

1765.   A substantial part of the events giving rise to Plaintiff's claims occurred in Arizona, a substantial portion of the affected interstate trade and commerce addressed within the complaint was carried out in Arizona, and GPG, Amirie and their co-conspirators transacted business in Arizona.

1766.   Moreover, the activities of GPG, Amirie and their co-conspirators were within the stream of commerce within Arizona, and were intended to, and did in fact, have a substantial effect on the stream of commerce within Arizona.

1767.   The United States District Court for the District of Arizona has in personam jurisdiction over GPG and Amirie because, inter alia, GPG: (a) transacted business in Arizona; (b) transacted substantial business in Arizona; (c) had substantial contacts with Arizona; and (d) was engaged in an illegal scheme and conspiracy that was directed at and had the intended effect of causing injury to persons and entities residing in, located in, or doing business throughout the Arizona.

1768.   The volume and activity was such that GPG and Amirie subjected themselves to the jurisdiction of the state of Arizona whom has an interest in the matter and in controversies addressed through the civil action filed in Arizona (Docket No. CV-15-01906-PHX-NVW) and transferred by the JPMDL to this Court and MDL 2566.

1769.   The United States District Court for the District of Massachusetts also has in personam jurisdiction over GPG and Amirie because, inter alia, GPG and Amirie intentionally directed their conduct that occurred outside the Commonwealth to TelexFree and its members located in the Commonwealth.

1770.   GPG's and Amirie's course of conduct caused tortious injury to thousands of

putative class members located in the Commonwealth.

1771.   GPG's and Amirie's actions allowed them to derive substantial revenue from the services rendered in the Commonwealth.

1772.   GPG and Amirie (1) transacted business in Massachusetts by sending tens of millions of dollars into the Commonwealth, see M.G.L. C. 223A §3(a); (2) contracted to supply services in Massachusetts in the same way, see M.G.L. C. 223A §3(b); and (3) caused tortious injuries by acts in the Commonwealth by making these transfers and repeatedly scheming with TelexFree executives on ways to continue the tortious activities.  See M.G.L. C. 223A §3(c).

1773.   In or about November 2011, GPG and Teledraft, the predecessor company of Base Commerce, entered into a Non-Exclusive, Non-Registered Independent Sales Agent / Office (ISA) Agreement

1774.   That Agreement was negotiated by Jayme Amirie on behalf of GPG and John Hughes, on behalf of Teledraft.

1775.   Paragraph 12.4 of the Agreement, entitled "Governing Law Resolution," provided that Arizona law governed the Agreement and that the parties consented to jurisdiction in Arizona for any action under the Agreement.

1776.   After executing the Agreement on behalf of GPG, Amirie sent a copy of the executed Agreement to Hughes at Teledraft's office in Tempe, Arizona.

1777.   Shortly after executing the Agreement, Amirie made an in-person visit to Teledraft's office in Tempe, Arizona.

1778.   In or about 2012, all assets of Teledraft were transferred to Base Commerce.  As part of the asset transfer, the Agreement between Teledraft and GPG was assigned to Base Commerce (at that time, known as Phoenix Payments).

1779.   In or about April 2013, Amirie contacted Hughes at Base Commerce's office in Arizona and presented TelexFree as a potential customer of Base Commerce.

1780.   In connection with TelexFree's account, at various times since at least June 2013, Hughes communicated with Amirie several times per week by telephone and email from Base Commerce's office in Tempe, Arizona.  Amirie placed telephone calls to Hughes at Base Commerce's office in Tempe.

1781.   In addition to email and telephone communications, Amirie made in-person visits to Base Commerce's office in Tempe, Arizona on at least three occasions in connection with the TelexFree account.

1782.   Upon information and belief, GPG received payments from Base Commerce in connection with the TelexFree account in excess of $500,000.  These payments were made from Base Commerce's Wells Fargo Bank account in Arizona.

1783.   Throughout their relationship, GPG received more than $2 million in payments from Base Commerce and its predecessor, Teledraft, in Arizona.

1784.   Upon information and belief, GPG does business in a number of states, including Arizona and Massachusetts.  GPG provides, inter alia, services for tracking and paying commissions to members of multi-level marketers.  In that capacity, GPG makes commission payments to members wherever they are located.

1785.   In the case of TelexFree, members were located in Massachusetts. As part of its services to TelexFree, GPG made regular payments to TelexFree members in Massachusetts.

1786.   In the case of TelexFree, members were located in Arizona. Accordingly, as part of its services to TelexFree, GPG made regular payments to TelexFree members in Arizona.

1787.   GPG was introduced to TelexFree in early April 2013 by Exigo Software, as set

forth in an April 3, 2014 letter of Amirie to Anthony R. Leone, Assistant Director for

Enforcement at the Massachusetts Securities Division of the Office of the Secretary of the

Commonwealth.

1788.   At that time, GPG was advised that TelexFree had a high amount of fraud on their

credit card processing.

1789.   Amirie further acknowledged that GPG had advanced fraud screening capabilities

and was capable of detecting TelexFree's illegal activities.  Therefore, by admission, GPG had

actual knowledge that TelexFree was operating an unlawful enterprise during or about April

2013

1790.   A full background and credit check on TelexFree was conducted by GPG, in

conjunction with Base Commerce, which provided further documentation and confirmation for

GPG that TelexFree was operating an unlawful enterprise.

1791.   GPG shared information regarding TelexFree and its activities with Base

Commerce and they acted in tandem to provide processing services to TelexFree.

1792.   As part of its customer due diligence procedures, GPG collected, among other

things, TelexFree's prior three months of bank statements, prior three months of merchant

processing statements, recent financial statements, and most recent tax return.

1793.   GPG's background check of TelexFree revealed, inter alia::

    a.   Via Google, two (2) online articles identifying TelexFree as a "scam";

    b.   A "Legal F Rating" on Better Business Bureau;

    c.   "Internet chatter" accusing Common Cents Communication, TelexFree's

        predecessor company, of being a Ponzi scheme; and

    d.   The transaction history from TelexFree's Bank of America merchant

processing account showing that sales of AdCentral packages far

outnumbered sales of VoIP products, and that VoIP sales were virtually

non-existent.

1794.   Despite finding evidence and accusations of fraud against TelexFree, GPG

accepted TelexFree as a merchant in April 2013 and instantly began to provide it with the

financial services it required to sustain its unlawful operations and exponentially grow them.

1795.   On April 17, 2013, GPG entered into a Corporate Client Payroll & Commission

Processing and Payment Services Agreement with TelexFree.

1796.   On April 24, 2013, GPG was paid $10,000 as an implementation fee to commence

its relationship with TelexFree.

1797.   Defendant Synovus acted as the acquiring bank for GPG with respect to

TelexFree transactions.

1798.   As a condition of accepting TelexFree as a merchant for payment processing,

Synovus required a 10% reserve account up to $500,000, which is indicates that TelexFree was

considered to be a very high-risk customer.

1799.   TelexFree's merchant processing application stated that TelexFree's average

monthly processing volume was $2 million, which triggered heightened risk assessment by GPG,

as well as Base Commerce and Synovus.

1800.   However, TelexFree's monthly processing volume in fact far exceeded its stated

$2 million monthly volume.

1801.   For instance, between April 1, 2013 and April 22, 2013, GPG and ProPay

processed $11.7 million for TelexFree.

1802.   Also, between May 1 and May 31, 2013, GPG and ProPay processed $30.9

million for TelexFree.

1803.   Between June 1, 2013 and September 30, 2013, GPG and Base Commerce processed $37.4 million in sales for TelexFree with only about 1% of total sales being attributable to VOIP sales.

1804.   This massive discrepancy between TelexFree's stated monthly volume in its merchant processing application and its actual monthly processing volume triggered additional risk review of TelexFree's business by GPG.  The massive discrepancy constituted suspicious activity and was a further indicator of unlawful business activity because, inter alia, TelexFree sold no product, the revenue was from memberships, the memberships contained an unlawful guarantee of income.

1805.   As part of its ongoing monitoring process, within the first few weeks of starting services in April 2013, GPG observed a very high amount of credit card chargebacks.  High credit card chargebacks are a standard financial services industry indicator of suspicious banking activity and fraud and mandate scrupulous review.

1806.   Although GPG limited the number of credit card transactions for TelexFree, chargebacks continued to rise.

1807.   By July 2013, GPG readily admitted that TelexFree's business model was conducive to fraud, thereby promoting credit card chargebacks.

1808.   GPG's Amirie attended a TelexFree Super Event with Wanzeler and James Merrill in July 2013 in Newport Beach, California.

1809.   With GPG's authorization, GPG's payment processing services to TelexFree were promoted directly to victims and encouraged as the vehicle by to make their "investments."

1810.   GPG increasingly acted as more than simply TelexFree's payment processor,

eventually partnering with TelexFree in propagating its Pyramid Scheme.

1811.   For example, on August 13, 2013, with GPG's permission, TelexFree's marketing director Defendant Labriola co-hosted an open webinar which again promoted GPG's payment processing system and encouraged TelexFree investors and potential investors to make further investments in TelexFree using GPG's system.

1812.   On August 16, 2013, with GPG's authorization, an additional open webinar further promoted GPG's payment system and further encouraged investments in TelexFree using it.

1813.   Upon information and belief, GPG was fully aware that TelexFree was promoting the use of its payment processing platform, and it lent an air of legitimacy to TelexFree's scheme.

1814.   Between August 30, 2013 and October 21, 2013, GPG together with ProPay processed several thousand chargebacks and refunds for TelexFree's account.

1815.   GPG provided those services despite the fact that GPG was "extremely concerned" about Visa's reaction to TelexFree's proposed new product, "My Financial Advantage," due to TelexFree's high chargeback rates, as indicated in James Merrill's email of August 14, 2013.

1816.   GPG's substantial assistance in TelexFree's illegal pyramid scheme exceeded providing payment processing services.  GPG assisted TelexFree in circumventing regulatory requirements to continue its illegal activity.  Additionally, it identified and recommended certain international banks and processor Base Commerce as outlets through which TelexFree could continue to conduct its business, despite its difficulties its rejections by other financial outlets.

1817.   In a series of emails dated August 24, 2013 between Amirie, Wanzeler, James

Merrill, Costa, and Borromei, Amirie voiced his commitment "to do everything [he] possibly can" to help TelexFree continue its business, despite the fact that "[e]very bank is seeing your name and telling us 'no' for both credit card processing and electronic payouts." He assured Carlos Wanzeler that "I am on your team helping all I can and telling you what I think the clear path is."

1818.   Amirie acknowledged that TelexFree's chargebacks had been 2.4% which exceeded Visa's maximum chargeback rate. He further acknowledged that TelexFree was on its fifth month of Visa's Excessive Chargeback Program and that no traditional credit card processors would work with TelexFree because its chargebacks were "way too high" even at 1.5%.

1819.   Amire also worked with TelexFree to find alternative methods to address its rejection by financial outlets, offering the suggestion that TelexFree change its compensation structure to cease paying commissions for merely placing advertisements to reduce TelexFree's "fraud incentive." He stated that "I can't change the way Visa works, or the fact that banks search on 'TelexFree' and say 'no' . . . all I can do its continue to look for alternatives and do the best I can." He further stated that GPG's two largest partner banks in Europe said "'no' payout transactions for TelexFree." Nevertheless, GPG continued to service TelexFree, and in fact endeavored to maintain and expand its Scheme.

1820.   For instance, in that August 24, 2013 email series, Amirie stated that GPG would need to cancel all outgoing international transactions since GPG's international banks were not allowing GPG to process payouts for TelexFree, and recommended using a Caribbean bank instead.

1821.   Amirie further indicated that GPG would continue to process domestic

commission payouts through Synovus.

1822.  In response to Amirie's email, Wanzeler asked that GPG "help us provide payments to all our Agents ASAP or we will have a lot of charge back on our system and we will be accused to the gov't [sic] that we aren't paying," to which Amirie responded, "I am doing everything I possibly can to help you."

1823.  Amirie was also advised by Wanzeler that ProPay was "back," and was again processing payments for TelexFree after temporarily suspending TelexFree's transactions.

1824.  By August 26, 2013, GPG and Amirie's knowledge that TelexFree was a fraudulent scheme is incontrovertible.  In an email of that date to John Hughes and Jason Doolittle, under the re line "need to talk this morning," Amirie stated

> we are talking to TelexFree reps now; we have been led astray; the "service" they are signing up for is not VOIP; its [sic] sitting at home and getting paid to post ads online…
> I will call you in 10 mins

1825.  On August 28, 2013, GPG received an email from Defendant Hughes, president of Base Commerce, that included prior statements by ProPay characterizing TelexFree as an extremely high-risk client and indicating that no United States bank or processor would be willing to take on TelexFree as a client given this risk.

1826.  Nevertheless, GPG and Base Commerce continued to collaborate to process payments for TelexFree and explore international processing options for the scheme.  Hughes informed GPG, Wanzeler and Merrill that he had obtained a payment gateway that would connect them to Defendant U.K. processor Allied Wallet and other EU banks so that TelexFree's business would not be interrupted.

1827.  On or about August 28, 2013, Amirie also promised to provide non-integrated options for TelexFree's processing and banking needs to circumvent the fact that TelexFree could no longer use U.S. banks or processors due to their guidelines.

1828.   On August 20, 2013 GPG's "sponsor bank," Defendant Synovus, explicitly instructed that it cease performing any services for TelexFree by August 31, 2013 due to triggers in its monitoring of TelexFree's accounts.  Although GPG assured Synovus it would do so, it thereafter continued to provide services to TelexFree well after that date.

1829.   For example, during September 2013 alone, GPG and Allied Wallet processed $21.5 million for TelexFree, of which there were numerous declined charges.

1830.   An email from GPG's Amirie to Defendants Merrill, Wanzeler, Labriola and Base Commerce, dated September 3, 2013, documents that against the specific instructions of Defendant Synovus to cease all services for TelexFree, GPG "sneaked" payouts from the bank on TelexFree's behalf.

1831.   GPG's continued services included permitting TelexFree to utilize GPG's electronic payment conduit, or "GPG Gateway," to transmit credit card processing data to Allied Wallet in exchange for a fee rate of 1.25% until at least January 16, 2014.

1832.   On September 27, 2013, Amirie assured Borromei and Merrill that "TelexFree can continue to use the GPG gateway to transmit electronic data to Allied Wallet," but acknowledged that TelexFree "represents too big of a reputational risk for GPG to be involved in monetary transactions."

1833.   Thereafter, in October 2013, GPG and Allied Wallet processed $1.4 million for TelexFree, which once again included numerous declined charges.

1834.   Pursuant to its obligations to perform initial and ongoing customer monitoring of TelexFree, GPG's Regulatory Monitoring Office, employees and officers discovered numerous Red Flags and other evidence indicating that TelexFree was engaging in suspicious, tortious or unlawful conduct.

1835.   As a result of GPG's required initial investigation and ongoing monitoring of TelexFree, ProPay also possessed actual knowledge that TelexFree was engaged in an illegal Pyramid Scheme, yet they willfully chose to offer substantial assistance and encouragement and directly became involved in the TelexFree Scheme.

1836.   Although Defendants GPG and Amirie possessed actual knowledge of the suspicious, tortious or illegal nature of TelexFree's business activities, at all times, they received or held TelexFree funds, they willfully acted in concert with TelexFree to:

- further the unlawful Pyramid Scheme;

- unfairly, deceptively and unlawfully siphon class member funds;

- unfairly, deceptively and unlawfully convert class member funds;

- continue to provide services integral to the TelexFree Scheme; and

- continue to provide TelexFree with substantial assistance and encouragement essential to their unlawful plan.

1837.   Through its actions, GPG provided substantial assistance and encouragement to TelexFree and otherwise became an integral part of TelexFree's fraudulent Scheme.

1838.   At a minimum, GPG's initial investigation and ongoing monitoring of TelexFree, made it aware that TelexFree was engaged in tortious conduct, but it deliberately and willfully discarded the results of its investigation and monitoring.

1839.   GPG through Amirie and others, also set up domestic accounts used to receive funds known to originate from an unlawful enterprise and to launder money.  As referenced herein, setting up these accounts for those purposes does not constitute ordinary payment processing services.  Rather it provided TelexFree with substantial assistance in maintaining and exponentially growing its unlawful enterprise including its Ongoing Operations, Money Laundering, movement of funds offshore and beyond the reach of the United States justice system, and the concealment of suspicious activity.

1840.   Through their affirmative actions, which included, but are not limited to:

    a.   securing processing services by circumventing card network rules that require merchants to be located in the same geographic jurisdiction as Allied Wallet's acquiring banks;

    b.   creating a shell foreign company; and

    c.   enabling TelexFree to obtain processing services through offshore servicers

the GPG, Amirie, and other related Defendants and others who worked with them provided substantial assistance to TelexFree's unlawful enterprise by evading the United States justice system as well as its regulatory framework for financial service providers.

1841.   Although GPG and Amirie possessed knowledge of the tortious nature of TelexFree's business activities from the time of its initial investigation of TelexFree and during their monitoring of TelexFree, they continued to promote and to provide TelexFree with payment processing services integral to the TelexFree Scheme until at least January 16, 2014.

3.   Base Commerce

1842.   At all times material times, Defendants GPG, Base Commerce and Synovus shared a close business relationship, acting as payment processing partners and sharing information regarding customers, including TelexFree.

1843.   In April 2013, Defendants Merrill and Wanzeler, on behalf of TelexFree, submitted an application for payment processing services to Base Commerce, which also does business as Phoenix Payments, GPG's credit card processing partner.

1844.   Despite Base Commerce's knowledge of the suspicious, tortious or unlawful nature of TelexFree's business activities, Base Commerce agreed to accept TelexFree as a customer and began to perform payment processing services for TelexFree, which services it

continued to perform until at least December 31, 2013.

1845.   Although TelexFree's application to Base Commerce for payment processing services requested the Social Security number and date of birth of Wanzeler and Merrill as co-owners of TelexFree, Wanzeler refused to provide his Social Security number and date of birth, which was a Red Flag that prompted Base Commerce to perform additional credit checks, or "pull credit," on both Merrill and Wanzeler.

1846.   Base Commerce's additional credit check involved running a "FraudDefender" search on TelexFree, which resulted in a score of 30/50 for TelexFree, indicating moderate risk, and score of 20/50 for Wanzeler, indicating moderately high risk.

1847.   The results of this "FraudDefender" search were an additional "red flag" to Base Commerce and indicate its actual knowledge of TelexFree's tortious conduct.

1848.   In an interoffice letter dated May 22, 2013, Defendant Hughes, president of Base Commerce, noted that TelexFree was formerly known as Common Cents Communications, stating:

> [t]hat program paid people residual commissions for placing ads online and the network marketing commentators accused them of being a Ponzi scheme as the commission advertised appeared unrealistically high and therefore fictitious.

1849.   At that time, TelexFree was widely and prominently marketed and advertised as a similar passive income scheme in which Members would be paid commissions for placement of online advertisements.

1850.   In the same interoffice letter dated May 22, 2013, Hughes indicated that TelexFree's "current primary market" was Brazil, and that TelexFree would receive a $19 million annual receivable from Ympactus Comercial, Ltda, "a Brazilian Company to whom they license their IOP System."

1851.    Despite Base Commerce's actual knowledge of TelexFree's negative press, its Brazilian investigation and the accusations of operating a Pyramid Scheme, it ultimately accepted TelexFree's application.

1852.    Beginning in June 2013, Base Commerce provided TelexFree with payment processing services via an account held by Base Commerce's "sponsor bank," Defendant Synovus, from which Base Commerce deducted its monthly processing, chargeback, and other service fees.

1853.    The assistance that Base Commerce provided to TelexFree was substantial.  For example, Base Commerce's total deductions from the TelexFree account for the months of June 2013 through January 2014, were as follows:

| | |
|---|---|
| June 2013 | $340,106.76 |
| July 2013 | $565,582.16 |
| August 2013 | $1,164,038.56 |
| September 2013 | $113,672.76 |
| October 2013 | $99,326.90 |
| November 2013 | $61,438.21 |
| December 2013 | $108,181.78 |
| January 2014 | $98,903.07 |

1854.    Base Commerce received instruction from its sponsor bank Defendant Synovus to cease performing payment-processing services for TelexFree by August 31, 2013.

1855.    Only due to this pressure from Synovus, Hughes forwarded a letter to Merrill on August 20, 2013, advising him that Base Commerce would terminate its services with TelexFree "as of 5:00 PM Pacific Standard Time on August 31, 2013."[153]

---

[153] *See* Letter from John Hughes to James Merrill, dated August 20, 2013, attached herewith as

1856.   In a subsequent email from Hughes to Defendants Merrill, Wanzeler, and Craft, as well as GPG, dated August 28, 2013, Hughes stated, regarding TelexFree

> [we] have an MLM with a huge amount of negative news and serious accusations.  Hence, banks and processors are running away based on what the FTC, Treasury Dept., FDIC and Justice Dept. has done to them lately to include suing them,,[sic] fining them and freezing their settlement funds.[154]

1857.   Hughes characterized TelexFree as an extremely high-risk client and indicated that no United States bank or processor would be willing to take on TelexFree as a client given this risk.[155]

1858.   In the same email, in which Hughes also characterized TelexFree as "a real hot-potato as they say," Hughes indicated that Base Commerce had worked, and was continuing to work, to find a replacement processor for TelexFree "such that [TelexFree's] business was not interrupted" and that he had arranged, via Defendant Vantage Payments, for Defendant Allied Wallet, a United Kingdom-based payment processor, to take over payment processing services for TelexFree.

1859.   Hughes also indicated that Base Commerce was actively applying to off-shore banks on TelexFree's behalf, noting "no US Bank or Processor, as evidenced by the email from PROPAY [sic], will accept your business. . . ."[156]

1860.   Hughes also offered Merrill business planning advice, which included advising that TelexFree charge members for its $1,425 AdCentral membership packages by ACH instead of credit card.

---

Exhibit 15.

[154] *See* Exhibit 12, email from John Hughes to James Merrill, dated August 28, 2013.

[155] *See id.*

[156] *See* Exhibit 12 email from John Hughes to James Merrill, dated August 28, 2013.

1861.   In another email from Defendant Merrill to Hughes, also dated August 28, 2013, Merrill indicated that he believed that Base Commerce's activity in soliciting off-shore banking services on TelexFree's behalf was connected with TelexFree's desire to separate its international, U.S.-based, and Brazil-based business among different banks and processors.

1862.   In approximately August 2013, Defendant Sparman, managing partner of Vantage Payments, was contacted by Hughes regarding TelexFree.

1863.   More particularly, Hughes asked Vantage Payments to act as a broker on TelexFree's behalf, and to contact banks and processors with whom it had a business relationship to secure payment-processing services for TelexFree, which services Vantage Payments agreed to perform.

1864.   In an email from Hughes to Defendants Merrill and Wanzeler, dated September 27, 2013, Hughes indicated that, against the instructions of Synovus, he had authorized approximately $5 million in transfers on September 26, 2013, stating:

> "The bank is clearly not happy with me but we are still trying to do the best job we can for you.  Their concerns are that if, god forbid, TelexFree came under a publicized FTC investigation, there could be an indeterminate wave of chargeback's. . . . "[157]

1865.   In September 2013, Base Commerce successfully applied to IPS, on TelexFree's behalf, for TelexFree to receive its ACH processing services through IPS.  This went well beyond its role as a Financial Services Provider.  By working in concert with them to skirt the law, Base Commerce and Hughes became active participants in TelexFree's unlawful operation.

1866.   Thereafter, TelexFree's ACH processing was conducted by IPS, also doing business as e-Wallet.

---

[157] *See* email from Hughes to Merrill, dated September 27, 2013, attached herewith as Exhibit 16.

1867.   On or about October 10, 2013, Hughes reiterated to Merrill his concern over the possibility of a FTC investigation.

1868.   In an email from Defendant Merrill to Hughes, dated January 16, 2014, Merrill indicated that TelexFree, which was continuing to do business with GPG, was having "a great deal of issues with GPG," specifically, regarding TelexFree's reserve balance and cash flow in and out of GPG.

1869.   Hughes, on behalf of Base Commerce, responded that Base Commerce was "happy to help" regarding TelexFree's issue with GPG.

1870.   Despite the numerous Red Flags and evidence of suspicious, tortious or unlawful activity that Base Commerce was aware of, and despite being instructed by its sponsor bank to cease providing services by August 31, 2013, Base Commerce continued to provide services to TelexFree.

1871.   During time periods relevant to the complaint, Defendants Sidel, Doolittle, Kirchhefer and Bonfiglio were officers at Base Commerce, LLC, formerly known as Phoenix Payment, LLC, gained knowledge the covert details of the TelexFree Scheme, were otherwise aware that TelexFree was a Pyramid Scheme, possessed actual knowledge of the illegal nature of the funds processed by Base Commerce.

1872.   Defendants Sidel, Doolittle, Kirchhefer and Bonfiglio substantially assisted the tortious conduct of TelexFree in processing the illegal transactions; performed integral services and provided substantial assistance that was used to further TelexFree's unlawful business; ensured TelexFree was given access to payment-processing and banking services; and ensured banking services that were used to further TelexFree's unlawful business, as well as access to the national banking system, were made available to TelexFree.

1873.   Defendants Sidel, Doolittle, Kirchhefer and Bonfiglio reviewed and approved John Hughes activities as a normal part of their duties at Base Commerce for the purpose of determining bonuses, job performance, and income.

1874.   Defendants Sidel, Doolittle, Kirchhefer and Bonfiglio derived substantial income from the illegal services that Base Commerce provided to TelexFree.

1875.   These services included: processing transactions for TelexFree until at least January 2014, connecting TelexFree with off-shore processors, applying for accounts at off-shore banks on TelexFree's behalf and proving advice and guidance regarding TelexFree's business operations.  By working so in concert with them to skirt the law, Base Commerce, Hughes, Sidel, Doolittle, Kirchhefer and Bonfiglio became active participants in TelexFree's unlawful operation.

1876.   As a result of Base Commerce's required initial investigation and ongoing monitoring of TelexFree, Base Commerce, Hughes, Sidel, Doolittle, Kirchhefer and Bonfiglio possessed actual knowledge that TelexFree was engaged in an illegal Pyramid Scheme.

1877.   At a minimum, Base Commerce's initial investigation and ongoing monitoring of TelexFree, made it generally aware that TelexFree was engaged in tortious conduct, but it deliberately and willfully turned a blind eye to the results of its investigation and monitoring.

1878.   Although Base Commerce, Hughes, Sidel, Doolittle, Kirchhefer and Bonfiglio possessed knowledge of the tortious nature of TelexFree's business activities from the time of its initial investigation of TelexFree and during its monitoring of TelexFree, they continued to promote and to provide TelexFree with payment processing services integral to the TelexFree Scheme.

1879.   Although Defendant Base Commerce, Hughes, Sidel, Doolittle, Kirchhefer and

Bonfiglio possessed knowledge of the suspicious, tortious or illegal nature of TelexFree's business activities at all times it received or held TelexFree funds, they willfully acted in concert with it to:

- further the unlawful Pyramid Scheme;
-  unfairly, deceptively and unlawfully convert class member funds;
- continue to provide services integral to the TelexFree Pyramid Scheme; and
- continue to provide TelexFree with substantial assistance and encouragement essential to their unlawful business enterprise.

1880.   Through their actions, Base Commerce, Hughes, Sidel, Doolittle, Kirchhefer and Bonfiglio provided substantial assistance and encouragement to TelexFree and otherwise became an integral part of TelexFree's Pyramid Scheme.  Base Commerce, Hughes, Sidel, Doolittle, Kirchhefer and Bonfiglio also assisted TelexFree and its Principals to further achieve their unfair, deceptive and unlawful Scheme that was at a minimum violative of M.G.L. c. 93, § 69.

4.   Vantage Payments

1881.   Defendant Vantage Payments, which characterizes itself as an "Independent Sales Agent," served as a broker between TelexFree and other banks and processors for purposes of securing payment-processing services.

1882.   Despite Vantage Payments' knowledge of the suspicious, tortious or unlawful nature of TelexFree's business activities and operation, Vantage Payments agreed to accept TelexFree as a customer in August 2013 and began to solicit payment processing services on behalf of TelexFree, which services it continued to perform up to the time that TelexFree, LLC, TelexFree, Inc., and TelexFree Financial, Inc. declared bankruptcy in April 2014.

1883.   In approximately August 2013, Defendant Sparman, managing partner of Vantage Payments, was contacted by Defendant Hughes of Base Commerce regarding TelexFree, asking it to act as a broker on TelexFree's behalf and to contact banks and processors with whom it had

a business relationship to secure payment processing services for TelexFree, which services

Vantage Payments agreed to perform.

1884.   Thereafter, Vantage Payments contacted Defendant Allied Wallet, and applied on

TelexFree's behalf for Allied Wallet to provide payment-processing services to TelexFree.

1885.   Vantage Payments also contacted an additional payment processor based in the

United Kingdom, who, at that time, refused to provide services to TelexFree due to known

accusations of fraud regarding TelexFree's operations.

1886.   Vantage Payments was able to secure Allied Wallet's agreement to provide

payment processing services to TelexFree, pursuant to which agreement Allied Wallet would

provide a "processing account" and process both incoming and outgoing payments for the

benefit of TelexFree, among other services.[158]

1887.   In connection with TelexFree's agreement with Allied Wallet, Defendant Merrill

instructed Allied Wallet to transfer funds from TelexFree's processing account with Allied

Wallet to accounts with Fidelity Bank.

1888.   Vantage Payments, on behalf of TelexFree, also registered an entity in the United

Kingdom, known as "TelexFree, LTD," to serve as TelexFree's EU-based operation.

1889.   In fact, as Vantage Payments was aware, "TelexFree, LTD" was a shell company

with no physical presence beyond a mere address.

1890.   On or about October 10, 2013, Allied Wallet informed TelexFree that, due to an

increase in both payment volume and chargebacks, it would be increasing the rolling reserve on

TelexFree's processing account to 20%.

1891.   Thereafter, Vantage Payments negotiated extensively with Allied Wallet on

---

[158] *See* Allied Wallet Card Payment Processing Agreement, dated August 26, 2013, attached
herewith and marked as Exhibit 17.

TelexFree's behalf, to have this rolling reserve reduced.

1892.   These negotiations entailed, *inter alia*, Sparman meeting personally with the CEO of Allied Wallet in Los Angeles, California on TelexFree's behalf.

1893.   Ultimately, after extensive lobbying by Vantage Payments on TelexFree's behalf, Allied Wallet agreed to reduce its rolling reserve on the TelexFree processing account to 10%, and also agreed to increase the maximum processing volume on the account

1894.   On or about November 13, 2013, Sparman, on behalf of Vantage Payments, and acting on behalf of TelexFree, once again contacted another United Kingdom-based payment processor in hopes of securing TelexFree additional payment processing volume.[159]

1895.   This effort was ultimately unsuccessful, as this additional United Kingdom-based payment processor declined to perform services for TelexFree in light of the accusations of fraud and illegality surrounding TelexFree.

1896.   The foregoing activities were beyond the scope of Vantage Payments' role as a Financial Services Provider.  By working so in concert with the indicted parties to skirt the law, Vantage Payments and Sparman were active participants in TelexFree's unlawful operation.

1897.   By agreement with TelexFree, Vantage Payments also provided TelexFree with access to its Customer Dispute Resolution Network ("CDRN") Portal to Verifi by Visa's CDRN, the purpose of which was to provide TelexFree with the capability to address issues relating to customer payment disputes.[160]

1898.   TelexFree executed a CDRN Portal Agreement with Vantage Payments on December 5, 2013.

---

[159] *See* email from Dustin Sparman to James Merrill, dated November 13, 2013, attached hereto and marked as Exhibit 18.

[160] *See* Vantage Payments CDRN Portal Agreement, attached hereto and marked as Exhibit 19.

1899.   This authorized TelexFree to make use of Vantage Payments' online CDRN portal for processing of ACH and credit card transactions.

1900.   In return for these services, Vantage Payments charged TelexFree a flat rate of $40 per transaction.

1901.   In connection with this Agreement, Merrill authorized Vantage Payments to transmit all incoming payments to the account of TelexFree, Inc. at Fidelity Bank.

1902.   Vantage Payments continued to provide TelexFree with these portal access services until at least March 13, 2014.

1903.   In an email from Defendant Merrill to Sparman, dated January 15, 2014, Merrill stated, regarding dividing TelexFree's payment processing between Vantage Payments and IPS, "[T]here will be plenty of business to go around.  You deserve your share for getting us started…Whomever treats us best will get most of the business."[161]

1904.   Despite having direct knowledge of the shutdown of TelexFree in Brazil and Rwanda, the United Kingdom scam warning against TelexFree, well-publicized accusations of fraud and illegality on the part of TelexFree, and an enormous number of Red Flags and indicia of the suspicious, tortious or unlawful nature of TelexFree's business operations, Vantage Payments continued to provide processing and processing-related services to TelexFree up to the time that TelexFree, LLC, TelexFree, Inc., and TelexFree Financial, Inc. declared bankruptcy in April 2014.

1905.   Although Defendant Vantage Payments possessed knowledge of the suspicious, tortious or illegal nature of TelexFree's business activities at all times it received or held TelexFree funds, they willfully acted in concert with them to:

---

[161] *See* email from James Merrill to Dustin Sparman, dated January 15, 2014, attached hereto and marked as Exhibit 20.

- further the unlawful Pyramid Scheme;

- unfairly, deceptively and unlawfully convert class member funds;

- continue to provide services integral to the TelexFree Pyramid Scheme; and

- continue to provide TelexFree with substantial assistance and encouragement essential to their unlawful business enterprise.

1906.   Through its actions, Vantage Payments provided substantial assistance and encouragement to TelexFree and otherwise became an integral part of TelexFree's Pyramid Scheme.  Vantage Payments also assisted TelexFree and its Principals to further achieve their unfair, deceptive and unlawful Scheme that was at a minimum violative of M.G.L. c. 93, § 69.

1907.   At a minimum, Vantage Payments' initial investigation and ongoing monitoring of TelexFree, made it generally aware that TelexFree was engaged in suspicious, tortious or unlawful conduct, but it deliberately and willfully turned a blind eye to the results of its investigation and monitoring.

1908.   Although Vantage Payments possessed knowledge of the tortious nature of TelexFree's business activities from the time of its initial investigation of TelexFree and during its monitoring of TelexFree, it continued to promote and to provide TelexFree with payment processing services integral to the TelexFree Scheme until at least April 2014.

5.   Allied Wallet

1909.   Allied Wallet UK and Allied Wallet Inc. individually and jointly (together, "Allied Wallet") aided and abetted the TelexFree Scheme by providing it substantial assistance. Allied Wallet UK and Allied Wallet Inc. acted as both accomplices and accessories and performed services in multiple ways.  They did so despite possessing actual knowledge of the fraudulent nature of TelexFree's business operation.

1910.   Unless otherwise noted, the averments advanced against the Allied Wallet Defendants and the individual Allied Wallet Defendants (Khawaja, Diab and Rountree) took

place at all times relevant to the causes of action.

1911.   Allied Wallet UK and Allied Wallet Inc. are related entities and Defendants Khawaja, Diab and Rountree acted on behalf of each in performing the activities detailed herein and formulated, directed and controlled them had the authority to do so.

1912.   Throughout the time period relevant to the claims against them, they all acted in concert and as one without a legal distinction

1913.   Defendants Allied Wallet have operated as a common enterprise while engaging in the acts and practices alleged in this complaint.

1914.   Defendant Allied Wallet shared a close business relationship with Defendants Vantage Payments and Sparman, and was kept informed by Sparman of information regarding TelexFree, including public accusations of operating a Pyramid Scheme and the investigation and shutdown of TelexFree's operations in Brazil.

1915.   Despite Allied Wallet's knowledge of the suspicious, tortious, or unlawful nature of TelexFree's business activities and operation, Allied Wallet agreed to accept TelexFree as a customer and began in late August 2013 to perform payment processing services for TelexFree.

1916.   Allied Wallet had extensive connections with Vantage Payments in facilitating the Scheme.

1917.   Upon Vantage Payments' application on behalf of TelexFree, Allied Wallet agreed to provide payment-processing services to TelexFree, pursuant to which agreement Allied Wallet would provide a "processing account" and process both incoming and outgoing payments for the benefit of TelexFree, among other services.[162]

1918.   In connection with TelexFree's agreement with Allied Wallet, Defendant Merrill

---

[162] *See* Allied Wallet Card Payment Processing Agreement, dated August 26, 2013, attached herewith and marked as Exhibit 17 (Attachment 19).

instructed Allied Wallet to transfer funds from TelexFree's processing account with Allied Wallet to accounts with Fidelity Bank.

1919.   On or about October 10, 2013, Allied Wallet informed TelexFree that, due to an increase in both payment volume and chargebacks, it would be increasing the rolling reserve on TelexFree's processing account to 20%.

1920.   Thereafter, Vantage Payments negotiated extensively with Allied Wallet on TelexFree's behalf, to have this rolling reserve reduced.

1921.   These negotiations entailed, *inter alia*, Sparman meeting personally with the CEO of Allied Wallet Ahmad Khawaja in Los Angeles, California on TelexFree's behalf.

1922.   Ultimately, after extensive lobbying by Vantage Payments on TelexFree's behalf, Allied Wallet agreed to reduce its rolling reserve on the TelexFree processing account to 10%, and also agreed to increase the maximum processing volume on the account.

1923.   Allied Wallet also made transfers from TelexFree's corporate accounts to private accounts held in the names of Defendant Founders, despite knowledge of the suspicious, tortious or unlawful nature of TelexFree's business enterprise and operations.

1924.   Despite having direct knowledge of the shutdown of TelexFree in Brazil and Rwanda, the United Kingdom scam warning against TelexFree, well-publicized accusations of fraud and illegality on the part of TelexFree, and an enormous number of Red Flags and indicia indicating the suspicious, tortious or unlawful nature of TelexFree's operations, Allied Wallet continued to provide processing and processing-related services to TelexFree up to the time that TelexFree, LLC, TelexFree, Inc., and TelexFree Financial, Inc. declared bankruptcy in April 2014.

1925.   Although Defendant Allied Wallet possessed knowledge of the suspicious,

tortious or illegal nature of TelexFree's business activities at all times it received or held

TelexFree funds, it willfully acted in concert with TelexFree to:

- further the unlawful Pyramid Scheme;

-  unfairly, deceptively and unlawfully convert class member funds;

- continue to provide services integral to the TelexFree Pyramid Scheme; and

- continue to provide TelexFree with substantial assistance and encouragement essential to their unlawful business enterprise.

1926.   Defendant Khawaja has been an owner and a director of Allied Wallet since its

inception.  Ahmad Khawaja was integrally involved in all TelexFree/Allied Wallet-related

actions, decisions, evaluations, and strategies with Roundtree, Diab, and others as referenced

throughout this complaint.

1927.   At all relevant times, Defendant Mohammad Diab was, and currently is, the Chief

Operations Officer for Allied Inc. and formerly was the Director of Risk and Chargebacks.

Mohammad Diab was integrally involved in all TelexFree/Allied Wallet related actions,

decisions, evaluations, and strategies with Roundtree, Khawaja, and others as referenced

throughout this complaint.

1928.   At all relevant times, Defendant Amy Rountree was the Vice-President of

Operations for Allied Inc.  Amy Rountree was integrally involved in all TelexFree/Allied Wallet

related actions, decisions, evaluations, and strategies with Khawaja, Diab and others as

referenced throughout this complaint.

1929.   At all material times, Khawaja, Diab and Rountree served as authorized agents

and representatives of Allied Wallet and within the scope of their authority with respect to its

dealings with TelexFree and with Defendants Vantage Payments and Sparman, Base Commerce

and Priority Payout and its owner Thomas Wells regarding TelexFree.

1930.   Since prior to 2009, Defendants Allied Wallet and Khawaja had a long-time cooperative and collaborative relationship with Co-Defendant Priority Payout and Wells, who according to the FTC had "a public and well-documented history of engaging in unauthorized debiting on behalf of fraudsters."[163]

1931.   In fact, Defendants Allied Wallet and Khawaja have a documented history[164] of partnering with Wells and Priority Payout to enable unscrupulous merchants to obtain and effect credit card processing services, while knowing such entities were engaged in fraudulent enterprises that were stripping the victim cardholders of their monies, and their services were a critical factor that enabled TelexFree to continue capturing credit card network payments and to sidestep the processing restrictions triggered by red flags in account activity.

1932.   Defendant Rountree's coaching of clients after Allied Wallet helped them set up fake shell corporations in the U.K. on how to present their websites to fool investigators performing compliance checks for banks and credit card companies is well-documented, including her written advice to a pornography client in October 2012, to "[r]emove the video of the woman being tortured in the top left corner of the home page," noting the video would violate Mastercard's standards.[165]

1933.   After August 2013 and through April 2014, Defendants Khawaja, Diab and Rountree took affirmative action and provided TelexFree with substantial assistance in maintaining and exponentially growing its unlawful enterprise including its ongoing operations, money laundering, movement of funds offshore and beyond the reach of the United States justice

---

[163] *FTC v. Allied Wallet, Inc.*, Civ. Act. No. 2:19-cv-4355-SVWE, Dkt. 1 at ¶ 53 (Complaint for Permanent Injunction and Other Equitable Relief) (C.D. Cal. May 20,2019).

[164] *See id.* at ¶¶ 53-58.

[165] *See* https://www.chicagotribune.com/nation-world/ct-political-donor-allied-wallet-khawaja-20180802-story.html.

system, and the concealment of suspicious banking activity.  For example, Allied Wallet's affirmative action and contributions to the creation of at a U.K. shell company for TelexFree assisted all of the above.

1934.   At all times Defendants Khawaja, Diab and Rountree drove Allied Wallet's use of tactics to evade card networks' anti-fraud monitoring for TelexFree and communicated with Defendants Priority Payout and Wells about opening and maintaining accounts for TelexFree while actually knowing it was engaged in an illegal fraud.

1935.   Allied Wallet's and Defendants Khawaja's, Diab's and Rountree's knowingly fraudulent and unlawful activities that enabled the TelexFree Scheme to continue and expand were the subject of an FTC action instituted against them in May 2019 and resulted in their entries into consent judgments imposing massive monetary judgments and permanent bans on their performance of certain payment processing services.

1936.   Specifically, as described in the FTC 2019 Complaint, each individual defendant was "involved in Allied's creation of U.K. shell companies for U.S. fraudsters, had knowledge about Allied's use of tactics to evade card networks' anti-fraud monitoring, and has communicated with reseller Wells, Allied employees, and merchants about opening and maintaining accounts for merchants engaged in or likely to be engaged in fraud."[166]

1937.   On June 7, 2019, Defendant Khawaja and Allied Wallet agreed to a massive judgment in excess of $110 million jointly and severally, and a permanent ban from engaging in, and assisting others with obtaining, payment processing for, *inter alia*, certain types of merchants, including sellers and marketers of money-making opportunities and companies listed

---

[166] *FTC v. Allied Wallet, Inc.*, Doc. 1.

on the MasterCard MATCH List for "excessive chargebacks or fraud."[167]  They further agreed to

detailed screening parameters for any prospective high-risk client and monitoring of high-risk

clients.  The conduct was so egregious that Defendants Khawaja is required to turn over his

residence in Los Angeles, California.

1938.   Defendant Rountree's related conduct was so egregious that she agreed on July 3,

2019 to a judgment in excess of $320,000 against her and a permanent ban from engaging in, and

assisting others with obtaining, payment processing for, *inter alia*, any entity offering to sell,

promote or market certain goods or services or certain high-risk merchants.[168]

1939.   Defendant Diab's related conduct was so egregious that he agreed on July 7, 2019

to a $1 million judgment against him and an order that he is permanently enjoined from payment

processing, and from assisting others engaged in payment processing, whether directly or

through an intermediary.  Diab was also ordered to pay $1 million in equitable monetary relief.

1940.   Remarkably, Diab was "awarded the most prestigious award that Allied Wallet

gives out.  [He] was awarded Employee of the Year by CEO Andy Khawaja, and he was

presented with a brand-new Mercedes Benz E550 Cabriolet Convertible. Moe was left

speechless and grateful from the company's generosity and true appreciation of his hard

work."[169]

1941.   On August 16, 2013, Khawaja and Diab received a link to the TelexFree

underwriting package for review.

1942.   As alleged in the 2019 FTC Complaint, that underwriting package contained the

---

[167] *See FTC v. Allied Wallet, Inc.*, Doc. 30 (Stipulated Final Order for Permanent Injunction and Monetary Judgment Against Ahmad ("Andy") Khawaja, Alliedwallet, Inc., Allied Wallet, Ltd., Gtbill, Llc, and Gtbill Ltd.) (C.D. Cal. June 7, 2019).

[168] *FTC v. Allied Wallet*, Doc. 40.

[169] https://www.alliedwallet.com/blog/press-releases/employee-of-the-year-moe-diab/.

following:

- processing statements that showed TelexFree had sometimes made as much as $11 million in sales in a single month from purportedly selling a service consumer could get for free from more well-known companies, which also contradicted TelexFree's claim that it would generate $2 million in sales each month;

- a TelexFree profit and loss statement that revealed TelexFree took millions of dollars from consumers, but paid out only commissions and overhead expenses such as office space and payment processing fees, and the statement showed no payments to secure the goods or services TelexFree claimed to be selling to consumers;

- documents showing TelexFree was placed on the MATCH list for excessive chargebacks, generated significant chargebacks in recent months and had an "F" rating from the Better Business Bureau;

- Google search results with headlines like "TelexFree Scam";

- a printout of a detailed review of TelexFree posted on a website dedicated to multi-level marketing companies TelexFree held itself out as a multi-level marketer. The website printout explained that "all TelexFree members will be doing is publishing ads advertising the income opportunity itself," and that TelexFree's membership fees and structure "strongly indicates" that the company's only source of revenue would be membership fees (emphasis in original); i.e., that it sold no products or goods, and instead was merely a Ponzi scheme or unlawful pyramid.[170]

1943.   Armed with actual knowledge that TelexFree was an unlawful enterprise, on August 21, 2013, Diab affirmatively acted to choose to approve the opening of the account, saying "Lets [sic] do it," in response to an email from Allied's underwriting department that summarized the details described above.

1944.   An August 31, 2013 Merchant Over All Report shows the fees collected by Allied Wallet, settlements totaling $522,994.90, and a wire transfer for TelexFree, Inc. totaling $436,231.74.

1945.   Another report reveals that between September 1, 2013 and September 30, 2013

---

[170] *FTC v. Allied Wallet*, Doc. 1 at ¶¶ 108-11.

Allied Wallet provided processed over $12 million in payments and collected over $400,000 in fees.

1946.   During October 2013, Allied Wallet processed over $5.9 million in payments for TelexFree and collected over $390,000 in fees.  During this time, over $13,000 of these payments were chargebacks.

1947.   During November 2013, Allied Wallet processed over $6.65 million in payments for TelexFree and collected over $450,000 in fees.  Over $80,000, or a little more than one (1) out of four (4) of these payments were chargebacks.

1948.   During December 2013, Allied Wallet processed $19 million in payments for TelexFree, for which it collected over $450,000 in fees while chargebacks continued to increase, totaling $64,424 (3.4%), as did refunds, which totaled $134,453.90.

1949.   According to Priority Payout's Thomas Wells, between January 15, 2014 and April 22, 2014, at a minimum, Allied Wallet attempted to process in excess of $150 million for TelexFree, spread over two processing accounts.  Allied Wallet's gross processing for TelexFree was over $72 million.

1950.   The substantial assistance that Allied Wallet provided to TelexFree went far beyond processing payments took affirmative action and provided TelexFree with substantial assistance in maintaining and exponentially growing its unlawful enterprise including its ongoing operations, money laundering, movement of funds offshore and beyond the reach of the United States' justice system, and the concealment of suspicious banking activity.

1951.   For instance, Allied Wallet with Vantage Payments set up a shell EU corporation for TelexFree known as TelexFree Ltd.

1952.   Moreover, Allied Wallet incorporated TelexFree Ltd. in the UK using a false UK

address as TelexFree's official address.

1953.   Through affirmative action, including, but not limited to, (a) securing processing services by circumventing card network rules that require merchants to be located in the same geographic jurisdiction as Allied Wallet's acquiring banks; (b) creating a shell foreign company; and (c) enabling TelexFree to obtain processing services through offshore servicers, the Allied Wallet-related Defendants and others who worked with them provided substantial assistance to TelexFree's unlawful enterprise by evading the United States' justice system as well as its regulatory framework for financial service providers.

1954.   As alleged in the FTC Complaint, "[u]sing U.K. shell companies to open accounts for non-U.K. or non-E.U. merchants is standard operating procedure at Allied, to the point that the need to procure an "EU Corporation," in addition to the merchant's actual corporate form, is written into Allied's internal account-opening checklist.  These foreign shell companies typically have no employees, officers, or operations located in the U.K. or the E.U."[171]

1955.   That corporation was used by TelexFree to secure additional payment processing services through the entry into a further agreement between December 1 and 31, 2013, with IPS, under the name and address of "TelexFree, LTD," a United Kingdom shell company established by Vantage Payments and Allied Wallet.

1956.   Allied also knowingly provided substantial assistance that furthered TelexFree's unlawful scheme by creating additional shell companies.

1957.   Allied Wallet deceptively, unlawfully and wrongfully acted to enable TelexFree to disguise its nefarious activity and circumvent rules regarding maximum processing limits by establishing three (3) Merchant Identification Numbers for TelexFree.

---

[171] *FTC v. Allied Wallet*, Doc. 1 at ¶¶ 64-65.

1958.   Throughout the course of Allied Wallet's services to the TelexFree Scheme, Khawaja, Diab and Rountree personally possessed actual knowledge of the suspicious, tortious or illegal nature of TelexFree's business activities.

1959.   Khawaja, Diab and Rountree were integrally involved in each of the foregoing actions taken by Allied Wallet and others.  They acted as individuals and as authorized agents and representatives of Allied Wallet and at all times they possessed actual knowledge that TelexFree was an unlawful Pyramid Scheme.  Each provided assistance that was substantially needed to successfully conclude the transactions that flowed through TelexFree and that kept TelexFree's unlawful enterprise going.

1960.   Through their actions, Allied Wallet, Khawaja, Diab and Rountree provided substantial assistance and encouragement and otherwise became an integral part of TelexFree's Pyramid Scheme.  Allied Wallet, Khawaja, Diab and Rountree also assisted TelexFree and its Principals to further achieve their unfair, deceptive and unlawful Scheme that was at a minimum violative of M.G.L. c. 93, § 69.

1961.   At a minimum, Allied Wallet's, Khawaja's, Diab's and Rountree's initial investigation and ongoing monitoring of TelexFree, made them generally aware that TelexFree was engaged in suspicious, tortious or unlawful conduct, but it deliberately and willfully set aside the results of the investigation and monitoring.

1962.   Although Allied Wallet, Khawaja, Diab and Rountree possessed knowledge of the tortious nature of TelexFree's business activities from the time of its initial investigation of TelexFree and during its monitoring of TelexFree, it continued to promote and to provide TelexFree with payment processing services integral to the TelexFree Scheme until at least April 2014.

6.   IPS

1963.   In September 2013, Defendant Base Commerce successfully applied to IPS, on TelexFree's behalf, for TelexFree to receive its ACH processing services through IPS.

1964.   Thereafter, TelexFree's ACH processing was conducted by IPS, also doing business as e-Wallet.

1965.   In approximately December 2013, TelexFree entered into a further agreement with IPS for additional payment processing services, under the name and address of "TelexFree, LTD," the shell company established by Vantage Payments.[172]

1966.   Thereafter, beginning in approximately January 2014, IPS provided TelexFree with a service titled "e-Wallet," which was used by TelexFree for additional processing of funds transferred by Promoters to TelexFree.

1967.   IPS performed an investigation of TelexFree prior to agreeing to accept TelexFree as a customer and its initial investigation and ongoing monitoring of TelexFree revealed indicia of fraud and illegality, or Red Flags, and other evidence of fraud cited above.

1968.   Given IPS's knowledge of the illegal nature of TelexFree's business operations, IPS was obligated to refuse to open any accounts or process any transactions for the benefit of TelexFree.

1969.   Despite IPS's knowledge of the illegal nature of TelexFree's business activities, IPS agreed to accept TelexFree as a customer and began to perform payment processing services for TelexFree in September 2013.

1970.   IPS has a history of representing Ponzi schemes.  Prior clients include the well-publicized Ponzi schemes Spinding, Wealth4AllTeam, Primus Hub, (an attempted reboot of

---

[172] *See* email from Sparman to Merrill, dated December 27, 2013, attached herewith as Exhibit 21.

Wealth4AllTeam following Wealth4AllTeam's collapse), Funky Shark (a planned Ponzi scheme that shut down prior to launch after receiving legal advice and a $40,000 fine), Team Vinh International, MyAdvertisingPays (a 120% return-on-investment advertising-based Ponzi scheme, similar to TelexFree), Diamond Banners, Argent Network (which was advertised as advertised as "a mixture of Zeek Rewards and TelexFree"), and 1BuckAdShare.

1971.   Despite the overwhelming evidence of TelexFree's fraudulent activities, in an October 2013 public statement to the news website *BehindMLM.com*, IPS audaciously stated that they had "done a complete due diligence on TelexFree" and "confirmed the product as compliant with all US laws."  This activity was beyond the scope of its role as a Financial Services Provider.  By publicly endorsing their business model, IPS became an active participant in TelexFree's unlawful operation.

1972.   On or about February 12, 2014, IPS announced that they were partnering with MLM attorney Kevin Thompson of Thompson Burton, PLLC, to "provide up-to-date compliance guidance to their new and existing clients in the Direct Selling and Multi-Level Marketing industry."

1973.   TelexFree was a recipient of such "compliance guidance" services.

1974.   According to a TelexFree balance sheet, dated December 31, 2013, posted by the Washington State Utilities and Transportation Commission, as of December 31, 2013, TelexFree claimed $31,640,192.30 in assets then held by IPS (under the name "e-Wallet") on behalf of TelexFree.[173]  The assistance that IPS offered TelexFree was substantial.

1975.   IPS continued to provide payment-processing services to TelexFree until April 17, 2014, at which time IPS finally disabled its electronic services.

---

[173] *See* TelexFree, LLC Balance Sheet as of December 31, 2013, marked as Exhibit 5.

1976.   Thereafter, in place of the previous e-Wallet online interface, IPS posted a message online stating that TelexFree's payment processing services had been disabled, and suggested that this could be due to TelexFree having "violated Anti-Money Laundering policies."

1977.   Despite having direct knowledge of the shutdown of TelexFree in Brazil and Rwanda, the United Kingdom scam warning against TelexFree, well-publicized accusations of fraud and illegality on the part of TelexFree, and an enormous number of Red Flags and indicia of fraud indicating the fraudulent and illegal nature of TelexFree's operations, IPS continued to provide processing and processing-related services to TelexFree up to the time that TelexFree, LLC, TelexFree, Inc., and TelexFree Financial, Inc. declared bankruptcy in April 2014.

1978.   Although Defendant IPS possessed knowledge of the suspicious, tortious or illegal nature of TelexFree's business activities at all times it received or held TelexFree funds, it willfully acted in concert with TelexFree to:

- further the unlawful Pyramid Scheme;
- unfairly, deceptively and unlawfully convert class member funds;
- continue to provide services integral to the TelexFree Pyramid Scheme; and
- continue to provide TelexFree with substantial assistance and encouragement essential to their unlawful business enterprise.

1979.   Through its actions, IPS provided substantial assistance and encouragement and otherwise became an integral part of TelexFree's Pyramid Scheme.  IPS also assisted TelexFree and its Principals to further achieve their unfair, deceptive and unlawful Scheme that was at a minimum violative of M.G.L. c. 93, § 69.

1980.   At a minimum, IPS's initial investigation and ongoing monitoring of TelexFree, made it generally aware that TelexFree was engaged in suspicious, tortious or unlawful conduct,

but it deliberately and willfully turned a blind eye to the results of its investigation and monitoring.

1981.   Although IPS possessed knowledge of the suspicious, tortious or unlawful nature of TelexFree's business activities from the time of its initial investigation of TelexFree and during its monitoring of TelexFree, it continued to promote and to provide TelexFree with payment processing services integral to the TelexFree Scheme until April 17, 2014.

7.   Priority Payout

1982.   Upon information and belief, Priority Payout, Corp. ("Priority Payout") is a payment facilitator, reseller and Independent Sales Organization (ISO) that had an extensive payment processing relationship with Defendant Allied Wallet.

1983.   At all times material herein, Thomas Wells was the owner of Priority Payout and served as the company's authorized representative acting within the scope of his employ in each of its dealings relating to TelexFree's unlawful enterprise.  Thomas Wells was integrally involved in all TelexFree/Priority Payout-related actions, decisions, evaluations, and strategies.

1984.   In its capacity as a third-party agent, commonly known as a "reseller," Priority Payout earned commissions from the transactions of merchants that it brought to and managed with payment processor Defendant Allied Wallet, including TelexFree.

1985.   Upon information available at this time, Priority Payout's and Well's relationship with TelexFree emanated from a December 20, 2013 email between TelexFree's James Merrill and Allied Wallet's Khawaja and Diab in which they discussed the excessive fraud notifications they were receiving from a bank relating to TelexFree's account with Allied Wallet and ways to move forward without volume restrictions on Allied Wallet's TelexFree processing account.

1986.   Priority Payout and Thomas Wells had actual knowledge of TelexFree's unlawful enterprise from the date it first began to service TelexFree during early January 2014 through

April 2014.

1987.   Subsequent to accepting TelexFree as a merchant client, Priority Payout and Wells provided TelexFree with financial services and the other forms of substantial assistance it required to maintain and exponentially grow its business up until its bankruptcy filing in April 2014.

1988.   At a minimum, between January 15, 2014 and April 22, 2014, according to Wells, Allied Wallet attempted to process over $150 million for TelexFree. The processing was spread over at least two processing accounts.  Upon information and belief, one account was an account Priority Payout worked with Allied Wallet to open.

1989.   In all, Allied processed $86,980,081.00 in consumers' payments for TelexFree, net of chargebacks and refunds.

1990.   Priority Payout and Wells were engaged by TelexFree to secure and manage domestic and international credit card processing for TelexFree at a time when TelexFree was finding it virtually impossible to place its pay processing needs.  Other payment processors and banks would not accept its business and were turning TelexFree away due to its activities.

1991.   As established and sophisticated financial services providers, Priority Payout, as well as each pay processor and bank it worked with, had a plethora of information available to it regarding TelexFree, including, *inter alia*, TelexFree's established illegality and shuttering in Brazil; TelexFree's prior placement on the MATCH list; TelexFree's excessive level of chargebacks and other suspicious banking activities; TelexFree's standard form contract which was unlawful on its face; and the fact and supporting details that other banks had refused or terminated banking accounts or relationships with TelexFree.

1992.   Moreover, in accordance with standard industry practice, following review of the

foregoing information, Priority Payout/Wells obtained, reviewed, investigated and then provided the following information to its acquiring bank:

    a.   TelexFree's business model and compensation plan;

    b.   TelexFree's payment processing, transaction, and banking history;

    c.   TelexFree's purported VoIP product and AdCentral promoter packages, and corresponding prices;

    d.   TelexFree's website;

    e.   TelexFree's, Carlos Wanzeler's, and James Merrill's credit scores;

    f.   TelexFree's tax returns for at least the previous two (2) years;

    g.   TelexFree's Profit & Loss Statements for at least the previous two (2) years;

    h.   TelexFree's balance sheets;

    i.   TelexFree's average transaction amount (or "average ticket");

    j.   TelexFree's highest anticipated transaction amount (or "high ticket");

    k.   TelexFree's anticipated monthly processing volume;

    l.   TelexFree's annual and monthly dollar sales volume; and

    m.  Information available online regarding TelexFree.

1993.   Immediately after TelexFree reached out to Priority Payout and Wells in January 2014, they began to cooperatively carry out unlawful acts with Allied Wallet and others that were intended to and did provide substantial assistance to TelexFree's unlawful operations.

1994.   As referenced in the FTC complaint in the recent case against Allied Wallet

Defendants [Allied Wallet, Khawaja, Diab and Rountree] have submitted merchant applications containing false information, and actively worked with their reseller agents, Thomas Wells and his company Priority Payout, to circumvent card network rules and transaction monitoring designed to prevent fraud.  Defendants were not deterred by a 2009 federal court ruling in the District of Nevada, finding Wells liable for knowingly debiting bank accounts of numerous fraud victims; to the contrary, they continued to

accept numerous referrals of unscrupulous merchant-clients from Wells and benefited from the fraud perpetrated by those clients.[174]

1995.   Wells and Priority Payout have "a public and well-documented history of engaging in unauthorized debiting on behalf of fraudsters," and partnered for years with Allied Wallet to enable unscrupulous merchants, including TelexFree, to obtain and effect credit card processing services, while knowing such entities were engaged in fraudulent enterprises whose transactions were stripping the victim cardholders of their monies, according to the FTC.[175]

1996.   Priority Payout and Wells worked with Defendant Allied Wallet, its owner Khawaja and its officers Diab and Rountree to provide assistance needed to merchants (including TelexFree) to conduct fraudulent schemes, sell illegal products or otherwise engage in deceptive marketing.[176]   They did so by providing entry into and usage of the credit and debit card payment system that they were otherwise denied.

1997.   The financial services provided by and obtained through Priority Payout, Wells and the others they collaborated with enabled TelexFree to continue to procure credit card and debit card payments from victims.   Priority Payout and Wells otherwise helped TelexFree to maintain and grow its unlawful operation and move funds beyond the reach if the United States justice system and launder money.

1998.   Priority Payout and Wells, in cooperation and collaboration with Allied Wallet and other Defendants, enabled TelexFree to conceal its fraudulent activities from the putative class.   For example, they used fake foreign shell companies to establish international accounts in

---

[174] *See FTC v. Allied Wallet, Inc.*, Civ. Act. No. 2:19-cv-4355-SVWE, Doc. 1 at ¶ 4 (C.D. Cal. May 20, 2019).

[175] *Id*. at ¶ 53.

[176] *See FTC v. Interbill, Ltd. and Wells*, Case No. 2:06-cv-1644-JCM-PAL, Doc. 62 at 3 (Emergency Motion for Protective Order to Stay Depositions of Thomas Wells and Priority Payout, and Stay Further Discovery Proceedings) (C.D. Nev. Oct. 1, 2018).

TelexFree's or related entities' names.

1999.   The relationship between Priority Payout and Wells and TelexFree involved significant amounts of activity through which they voluntary submitted to the jurisdiction of the Commonwealth of Massachusetts.

2000.   The torts at issue here were committed within the Commonwealth of Massachusetts.

2001.   A substantial part of the events giving rise to Plaintiff's claims occurred in Massachusetts, a substantial portion of the affected interstate trade and commerce addressed within the complaint was carried out in Massachusetts, and Priority Payout and Wells and TelexFree and its co-conspirators transacted business in Massachusetts.

2002.   Moreover, the activities of Priority Payout and Wells and TelexFree and its co-conspirators were within the flow of, were intended to, and did have a substantial effect on the commerce of the Commonwealth of Massachusetts.

2003.   The United States District Court for the District of Massachusetts has *in personam* jurisdiction over Priority Payout, Wells and TelexFree because, *inter alia,* Priority Payout and Wells: (a) transacted business in Massachusetts, (b) transacted substantial business in Massachusetts, (c) had substantial contacts with Massachusetts, and (d) was engaged in an illegal scheme and conspiracy that was directed at and had the intended effect of causing injury to persons and entities residing in, located in, or doing business throughout the Massachusetts.

2004.   The volume and activity was such that Priority Payout and Wells subjected themselves to the jurisdiction of the Commonwealth of Massachusetts who has an interest in the matter and controversies addressed through MDL 2566.

2005.   Priority Payout's, Wells' and Allied Wallet's cooperation and collaboration to

perpetuate the criminal efforts of joint clients engaged in fraud, predated the assistance they

provided to TelexFree.  Their long history of partnering together to aid and abet fraud was the

subject of the above-cited FTC lawsuit which charged Allied Wallet, its founder Khawaja and its

officers Diab and Rountree with conspiring with Wells and Priority Payout to further numerous

frauds, including TelexFree, which resulted in Allied Wallet, Khawaja, Diab and Rountree each

being permanently enjoined from certain payment processing-related services and activities and

in massive monetary judgments against them handed down in June and July 2019.[177]

2006.   Similarly, as a result of joint activities that Priority Payout and Wells performed

with Allied Wallet, *inter alia*, Priority Payout and Wells were permanently banned in April 2019

from engaging in, and assisting others with, payment processing in any capacity. Priority Payout

and Wells further agreed to a contempt judgment against them in excess of $1.8 million (the

"2019 FTC Judgment").[178]

2007.   The 2019 FTC Judgment emanated from Priority Payout's and Wells' violation of

an earlier April 2009 court order entered against Wells and Wells' then-company Interbill, Ltd.

("Interbill") in an FTC action (the "2009 Order"), finding them guilty of initiating unauthorized

debits against thousands of consumers' accounts while ignoring strong indications that their

merchant-client was eliciting those payments through fraud.[179]

2008.   The court awarded $1.7 million for consumer redress and entered a permanent

injunction enjoining Wells and Interbill from: (a) taking any action to process payments on

behalf of merchant-clients while knowing or consciously avoiding knowing that such merchant-

---

[177] *FTC v. Allied Wallet, Inc.*, *supra*, Docs. 1, 30, 32, 40.

[178] *FTC v. Interbill, Ltd.*, No. 2:06-cv-1644, Doc. 84 (D. Nev. Apr. 10, 2019) (Stipulated Final Judgment, Order For Compensatory Contempt Relief, and Supplemental Order for Permanent Injunction and Other Equitable Relief as to Defendants Thomas Wells, Interbill, Ltd., and Its Successor, Priority Payout Corp.).

[179] *See id.*, Doc. 42.

clients are or are likely to be engaged in deceptive or unfair acts; (b) failing to conduct a

reasonable investigation of prospective merchant-clients and the offers for which they request

payment processing services; and (c) failing to monitor each merchant-client's transactions to

ensure that the merchant-client is not engaged in practices that are deceptive or unfair.  In 2010,

the Ninth Circuit affirmed district court's summary judgment decision.[180]

2009.   That 2009 Order further required Wells and Interbill (and thus Priority Payout) to

perform a reasonable investigation before taking any action in support of providing processing

services, including, but not limited to, (i) obtaining from each prospective client a written

certification or documents stating the nature of the client's business, describing the nature of the

goods or services for which the client seeks payment processing services; (ii) obtaining and

verifying trade and bank references; and (iii) obtaining and reviewing all marketing materials,

promotional materials, websites, and other advertising used or intended to be used by the

prospective client to market its goods or services to consumers.

2010.   The 2009 Order also required Interbill and Wells to

immediately conduct a reasonable investigation of the cause for any chargeback or
return rate that exceeds two and one-half percent (2.5%). In the case of an
investigation of any client triggered by a chargeback or return rate in excess of two
and one-half percent (2.5%), defendants shall immediately suspend payment
processing services, unless, following a reasonable investigation, defendants
determine, based on clear and convincing evidence, that the client's business
practices were not, or are no longer, deceptive, unfair, or abusive.

2011.   Notwithstanding the above court order, TelexFree's account with Allied Wallet

generated an extremely high rate of chargebacks, including one month in which refunds and

chargebacks combined reached 10%.

2012.   This automatically caused industry wide and standard Red Flags to be raised and

---

[180] *See FTC v. Interbill, Ltd.*, 385 Fed. Appx. 712, 713 (9th Cir. 2010).

subjected TelexFree's accounts to the highest level of scrutiny on an ongoing basis.

2013.   While the 2008 case was pending, Wells created Defendant Priority Payout as a successor to Interbill and continued soliciting merchants for Allied Wallet via Priority Payout.

2014.   In agreeing to the 2019 FTC Judgment, Priority Payout and Wells admitted that they worked as a reseller of payment processing services for Allied Wallet from at least 2005 through the end of 2017.

2015.   Priority Payout and Wells further admitted that the FTC had sufficient evidence to establish that they violated the 2009 Order, including that they facilitated processing of consumer payments for merchants while knowing or consciously avoiding knowing that the merchants' business practices were, or were likely to be, deceptive or unfair.[181]

2016.   Priority Payout's and Wells' continued financial servicing of multiple merchants engaged in fraudulent activities formed the basis of the 2019 FTC Judgment.

2017.   Priority Payout's and Wells' improper servicing as relates to TelexFree was the subject of the FTC's 2019 action against Allied Wallet.

2018.   In particular, Priority Payout worked hand-in-hand with Allied Wallet to ensure TelexFree's payment processing needs were met during the time period from January 2014 through its April 2014 demise through frequent and coordinated interactions between Priority Payout's Wells and Allied Wallet's Khawaja.

2019.   Wells collaborated with Amy Rountree, Allied Wallet's Vice President of Operations, to create and utilize TelexFree U.K. based shell corporations for the unlawful purposes referenced herein.  Wells and Roundtree frequently so collaborated regarding merchant customers of Allied Wallet and Priority Payout.

---

[181] *See FTC v. Interbill, Ltd.*, No. 2:06-cv-1644, Doc. 84.

2020.   As described above, Defendant Allied Wallet took active steps to circumvent the restrictions upon TelexFree's "offshore" accounts as a result of the high chargeback rates, and Priority Payout became its partner in those continued unlawful and deceptive actions.

2021.   Without the substantial assistance provided by Priority Payout and Wells, TelexFree would not have been able to carry out the high volume and high dollar transactions that pilfered the class members funds or so successfully move money offshore.

2022.   As evidenced in late February 2014 emails, Wells worked with TelexFree's Home Office manager Andrea Moreira related to TelexFree's access to its international merchant accounts and the "multiple" TelexFree merchant accounts that Wells was obtaining and/or managing for TelexFree.

2023.   The purpose of the multiple accounts was to conceal by spreading out and diluting TelexFree-related Red Flags and suspicious banking transactions.  As described above, the opening of additional merchant accounts is a ruse utilized by unscrupulous financial services providers, such as Priority Payout and Wells (and the other Payment Processing and Bank Defendants), to artificially reduce the chargebacks associated with any single account/merchant and to artificially manipulate and reduce the merchants' chargeback ratios.  As to TelexFree's offshore banking, Priority Payout and Wells utilized that unlawful and deceptive ruse successfully.

2024.   A February 25, 2014 email evidences Wells' knowledge of and deep involvement in TelexFree's unlawful processing strategies.  TelexFree's Andrea Moreira advised that she did not know who was processing the increased transactions for TelexFree of which Defendant Vantage was not a part.  Wells immediately informed her that it was (Priority Payout/Wells' partner in crime) Allied Wallet.

2025.   By February 25, 2014, Priority Payout and Wells were managing, at a minimum four (4) TelexFree four merchant accounts and otherwise satisfying a large amount of processing needs.  Three merchant accounts were maintained by Allied Wallet:  1) one placed by Vantage that was receiving "small" amounts of transactions of victims' monies, estimated at $700,000 per month, 2) another (in the name of AWTELEXFREE 2) that was taking the balance of the then-current transactions, and 3) another new account (named AW TELEXFREE 3) that was set up by Wells at Merrill's request and was live but had not received transactions yet.

2026.   In addition, Priority Payout/Wells set up another merchant identification through IPS, doing business as I-Payout, which was also awaiting instruction.  This assistance further enabled TelexFree's unlawful enterprise to pilfer victims' monies.

2027.   TelexFree Founder James Merrill defined Priority Payout/Wells as an "integral part of our arrangement" and further established the assistance offered by Priority Payout/Wells as substantial in a letter to IPS dated January 14, 2014.  Founder Merrill went on to authorize "Wells of Priority Payout Corp. to organize and manage [TelexFree's] credit card processing controls in concert with International Payout Systems, Inc. and further to represent TelexFree's Merchant Relationship with IPS/ARGUS effective immediately."

2028.   As TelexFree became subject to increased scrutiny in the United States in February 2014, Priority Payout and Wells quickly stepped up to provide substantial assistance to TelexFree's unlawful enterprise by becoming an integral part of the team assembled to secure foreign banking sources beyond the reach of the United States justice system and to otherwise act to secret or move the unlawfully obtained funds TelexFree pilfered from the victim members of the putative class.

2029.   For example, an email exchange extending from February 25, 2014 to March 3,

371

2014, which at various times included Wells, James Merrill, Carlos Wanzeler, Moreira, Craft, Colabella (PwC), Puzey (PwC), Babener, Tober (Garvey Schubert), and/or Sandford (Garvey Schubert), memorializes Wells' involvement.  The general subject of the email chain was the establishment of a foreign entity for TelexFree.  Locations mentioned included the Cayman Islands (TelexFree International, Ltd.).  The opening of an additional new bank account was also discussed.

2030.   TelexFree International, Ltd. was at all times intended to be and was an offshore depository of TelexFree's unlawfully gained funds.  It was created to move victim funds beyond the reach of United States governmental enforcement agencies and the civil justice system.

2031.   At the time Wells acted, he did so as an authorized agent and representative of Priority Payouts and within the scope of the authorization he was granted.  Moreover, at all times he possessed actual knowledge that TelexFree was an unlawful Pyramid Scheme.  Priority Payout and Wells provided assistance that was substantially needed to successfully conclude the transactions that flowed through TelexFree and that kept TelexFree's unlawful pyramid enterprise going.

8.  Bank Card Consultants

2032.   Bank Card Consultants is a payment processing company that touted itself as specializing in servicing merchant accounts that are "high risk" due to the nature of the products or services of the merchant.  The vast majority of legitimate financial services providers refuse to service "high risk" merchant accounts, or alternatively they impose and strictly enforce account limitations, closely monitor account activity, and carry out customer and account audits to ferret out unlawful activity

2033.   At all times material herein, John Yurick was the owner of Bank Card Consultants and served as the company's representative in its dealings with and on behalf of TelexFree.  At

all times relevant herein, Bank Card Consultants was a registered Independent Sales Organization/Member Services Provider for Wells Fargo Bank, N.A.

2034.   In or about September 2013, Defendant Yurick, on behalf of Bank Card Consultants, undertook the process to accept TelexFree as a payment processing customer.

2035.   On its website, Bank Card Consultants touts its ability to have a high risk merchant "set up and processing in as little as 48 hours," and that it is able to do so even though "most processing banks will refuse to handle your account, and those that do, will charge a much higher rate."

2036.   True to that representation, Bank Card Consultants and Yurick established TelexFree as a payment processing customer during or about September 2013.  Bank Card Consultants and Yurick provided payment processing services to TelexFree at a time when other financial service providers refused to work with TelexFree due to its obvious and apparent fraudulent activities.

2037.   Indeed, by August 2013 TelexFree was subject to ubiquitous negative press casting it as a pyramid scheme and reporting its shuttering in Brazil.  It was under investigation in other countries and faced inquiry by the Massachusetts SOC.  Chargebacks were excessive and rampant, and it was placed on the MATCH list.  Its revenues were derived overwhelmingly by the sale of its AdCentral membership programs, which was the source of promoter passive income.  It had no legitimate source of income and was classically structured as a pyramid scheme.  As such, TelexFree was finding it increasingly difficult to secure payment processing services.

2038.   Despite having actual knowledge that TelexFree was operating an unlawful enterprise, Bank Card Consultants contracted to provide TelexFree with the substantial

assistance it required to maintain and expand its unlawful enterprise by creating an "International

Account" and other affirmative action, including, but not limited to:

    a.   processing victim and Scheme transactions that were intended to, and did, enable TelexFree's goal of international expansion;

    b.   circumventing card network rules that require merchants to be located in the same geographic jurisdiction as Allied Wallet's acquiring banks; and

    c.   enabling TelexFree to obtain processing services using offshore servicers.

2039.   Bank Card Consultants and Yurick provided their services to TelexFree until at

least January 2014.

2040.   Bank Card Consultants in August 2013 was identified as a potential payment

processing resource as a direct result of strategy sessions between James Merrill, Payment

Processor Defendant Jayme Amirie of GPG and others, during which they worked to devise a

way for TelexFree to continue to process electronic transactions, including those through which

TelexFree obtained victims' funds.  By August 2013, TelexFree's unlawful Scheme had come

under ever increasing scrutiny from governmental officials and was being rejected by other

financial service providers.

2041.   As evidenced by August 24, 2013 emails between GPG's Amirie and John

Merrill, Amirie was aware that TelexFree operated an unlawful Scheme.  Amirie specifically

informed Merrill that no international banks would allow GPG to carry out payout transactions

for TelexFree and that they were going to need to cancel all outgoing international transactions.

2042.   Amirie conspired with Merrill to ensure that the financial services that GPG

provided (and the related profits it reaped) would not be interrupted.  Specifically, Amirie

instructed TelexFree to reduce its credit card volume (i.e. the receipt of victims' funds) to under

$10 million per month in an effort to reduce the number of chargebacks and attempt to avoid

suspicion.  Amirie also suggested that TelexFree keep all of its business with Allied Wallet,

since that complicit payment processor was the only sure source of payment processing services for TelexFree. Additionally, Amirie advised Merrill that he was coordinating with Propay as an alternative source of payment processing services.

2043. Amirie stated "[w]e are doing all we can for you, but you must act now if you want to continue to accept credit cards and make electronic payments. Every bank is seeing your name and telling us "no" for both credit card processing and electronic payouts."

2044. Rather than limit processing and reduce the Scheme's profits, Merrill sought out and secured a different solution - bring Bank Card Consultants on board to increase processing transactions and further expand TelexFree's unlawful enterprise. Merrill's growth strategy to bring in Bank Card Consultants and increase processing transactions did in fact avoid decreasing the massive amounts it stripped from its victims.

2045. From the outset of their relationship, Bank Card Consultants and Yurick were fully aware that TelexFree was a Pyramid Scheme and engaged in fraudulent and suspicious activity. They were also fully aware that TelexFree was struggling to overcome the extreme difficulty in finding a payment processors and banks that would provide it with services, which was precisely why they sought out Bank Card Consultants.

2046. By email dated September 4, 2013, Yurick provided Merrill with a merchant application and confirmed that Bank Card Consultants would assist TelexFree in obtaining access to "every form of payment available", including "domestic merchant services, international merchant services, echeck/check 21 services/Teledraft and ACH." Yurick further informed Merrill that he would set up a conference call with a chargeback/fraud company and that he would take care of the fraud issue for them.

2047. In the same September 4, 2013 email, Yurick requested background information

on TelexFree, including an explanation of how the system works, copies of its promoter contracts, six months of full business bank statements, one year of processing statements, current P&L, current balance sheet, last two years of business tax returns, and driver's licenses or passports.

2048.   On September 9, 2013, James Merrill introduced Bank Card Consultants (and Yurick) as a "high risk provider of international merchant services that may be of assistance to us," via an email to TelexFree accountant Craft. Yurick was copied.

2049.   Merrill completed a Merchant Application and Agreement with Bank Card Consultants for TelexFree.

2050.   It is worth noting that Wells Fargo Bank, N.A. acted as Bank Card Consultants' Acquiring Bank and was a party to the Merchant Application and Agreement signed by TelexFree and Bank Card Consultants.

2051.   Craft, Moreira and Oliveira soon responded to Yurick's September 4, 2013 email and provided the information sought, including an explanation of TelexFree's business , copies of TelexFree's promoter contracts which was unlawful on its face, six months of full business bank statements, one year of processing statements, current P&L, current balance sheet, last two years of business tax returns, and driver's licenses or passports of Merrill and Wanzeler.

2052.   Bank Card Consultants and Yurick provided this information to Wells Fargo Bank, N.A.

2053.   Bank Card Consultants carried out its process for accepting TelexFree as a client by extensively reviewing TelexFree's financial records, including bank statements, balance and profit and loss sheets, and fraud-to-sale ratio.  It also investigated and reviewed TelexFree's purported product and operations.

2054.  Craft, Moreira and Oliveira continued to provide additional information thereafter.

2055.  TelexFree's Merchant Application with Bank Card Consultants specifically indicated that TelexFree expected to process an average of $10-$15 million each month and that the highest single monthly transaction amount would only be $1,425.  The documentation provided to Bank Card Consultants coupled with the application's indication of remarkably high total monthly dollars processed and the low individual transaction amounts is noteworthy.

2056.  TelexFree's high average monthly transaction volume in light of its low single transaction amount is a classic sign and indicative of an unlawful or fraudulent enterprise to sophisticated, high-risk merchant servicers like Bank Card Consultants and Yurick.

2057.  As a result of Yurick's September 2013 review, Bank Card Consultants obtained actual knowledge aware that incoming payments to TelexFree were in identical amounts corresponding to the purchase of AdCentral packages rather than the sale of VoIP cards.  Yurick and Bank Card Consultants were otherwise aware that TelexFree was a Pyramid Scheme.

2058.  Moreover, as part of Bank Card Consultant's initial due diligence investigation of TelexFree, Yurick conferred with Merrill in which they discussed TelexFree's revenue and compensation structure, VoIP product, negative press, and inability to secure banking and payment processing services.

2059.  Through Yurick's awareness of the negative press on TelexFree's legality and his review of TelexFree's financial records, including bank statements, balance and profit and loss sheets, and fraud-to-sale ratio, as well as TelexFree's purported product and operations, Yurick and Bank Card Consultants gained actual knowledge that TelexFree's operation constituted a fraudulent and unsustainable pyramid scheme in September 2013.

2060.   Despite their actual knowledge of TelexFree was an illegal enterprise, Bank Card Consultants and Yurick approved its merchant application and provided payment processing and other services to TelexFree.  In doing so, Bank Card Consultants and Yurick provided it with the substantial assistance it required to maintain and exponentially grow its unlawful enterprise including its ongoing operations, money laundering, placing of funds offshore and beyond the reach of the United States justice system, and the concealing of suspicious activity.

2061.   Thereafter, despite Yurick's and Bank Card Consultants' actual knowledge of TelexFree's illegality and regulatory issues, Bank Card Consultants wrongly and unlawfully continually processed high-volume transactions for TelexFree until its bankruptcy filing in April 2014.

2062.   During the providing those services, Bank Card Consultants and Yurick obtained even more information that established TelexFree was operating an unlawful enterprise and engaging in continuous suspicious banking activity.

2063.   For instance, in a November 6, 2013 email to Merrill, Will Bowman of Bank Card Consultants requested that TelexFree furnish him with the chargeback reports from Allied Wallet, which demonstrated excessive chargebacks. This information is believed to have been provided to Wells Fargo Bank as well.

2064.   During the time that Bank Card Consultants provided services to TelexFree, Yurick was also instrumental in identifying and obtaining bank accounts for TelexFree to utilize. This assistance in obtaining accounts came at critical junctures when other financial institutions were refusing its business and provided the necessary support that allowed TelexFree's unlawful Scheme continue to operate.

2065.   Despite their knowledge of TelexFree's unlawful enterprise, suspicious activities

and unlawful practices, Bank Card Consultants and Yurick worked with TelexFree founder

Merrill and others including TelexFree executive office personnel and its outside consultants

when issues arose with acquiring banks who raised concerns about TelexFree's operations.  They

cooperatively acted and strategized to ensure that TelexFree's payment processing and financial

services continued and that its massive transactional processing related needs were met.

2066.   For example, in late November 2013, Yurick worked hand-in-hand with

TelexFree's Craft and Moreira to satisfy requests for information from Brian Struzik, a

representative from Cyber Merchant Solutions, another company touting itself as working with

high risk merchant accounts and who was working with an underwriter for a bank that set up an

offshore TelexFree account for the receipt of victims' funds and the other unlawful purposes set

forth above.

2067.   Notably, this information provided by TelexFree through Yurick for the bank's

use was incomplete and otherwise omitted crucial information.  For instance, it failed to provide:

(a) the identity of Know Your Customer documents obtained from TelexFree for resellers (such

as Bank Card Consultants); (b) the reason for chargebacks; (c) an explanation as to how

TelexFree receives traffic; and (d) an explanation as to how TelexFree  monitors its affiliates.

Bank Card Consultants and Yurick intentionally concealed this information to further

TelexFree's illicit activities.

2068.   Despite the foreign bank's request for clarification, Yurick was reluctant to

respond, fearing exposure of TelexFree's illicit activities.

2069.   Upon information and belief, Bank Card Consultants and Yurick knew that the

information sought would reveal TelexFree's pyramid scheme nature.

2070.   Rather, by email dated November 22, 2013, Yurick requested that Oliveira

provide Struzik with only "back end" access to TelexFree's website, to which Oliveira responded by providing login credentials for TelexFree's internal data to Yurick and Struzik.

2071.   On November 26, 2013 Struzik emailed Yurick, and expressed the foreign bank's dissatisfaction with the information provided.  At Struzik's suggestion, Yurick, sought to obtain a legal opinion letter stating that TelexFree's business was "not operating outside of local jurisdictions and that the operations are sustainable, legitimate".

2072.   After a failed attempt to satisfy the bank with a letter obtained by Merrill from TelexFree's telecommunications services provider, Yurick persisted and eventually was able to secure another letter, drafted by Babener for Merrill's signature that was carefully tailored to satisfy the bank without revealing that TelexFree in fact was not a legal enterprise.

2073.   That letter used by Yurick was knowingly intentionally misleading as to TelexFree's legality and upon information and belief, was used by Bank Card Consultants to successfully secure processing services for TelexFree.

2074.   Bank Card Consultants, through Yurick and others, set up domestic and offshore accounts for the receipt of funds known to originate from TelexFree's Pyramid Scheme, and to launder money and move it beyond the reach of the United States justice system. As referenced herein, setting up these accounts for those purposes does not constitute ordinary payment processing services.  Rather Bank Card Consultants and Yurick substantially assisted TelexFree in maintaining and exponentially growing its unlawful enterprise including its ongoing operations, money laundering, movement of funds offshore and beyond the reach of the United States justice system, and the concealment of suspicious activity.

2075.   For example, in early December 2013, Yurick's efforts had paid off and he had succeeded in securing multiple merchant accounts for TelexFree.  More specifically, on

December 6, 2013 Yurick informed Merrill that one bank was "lighting up 5 MIDS [merchant

identification accounts] 3 Offshore 2 Domestic" and that they would be available to run live in a

week.   The opening of multiple merchant identification accounts is not standard processing and

is a means to conceal fraud.

2076.   Yurick conspired with TelexFree to deceive an international merchant bank, by

authoring and instructing James Merrill to sign a statement which read:

> TelexFREE has performed legal due diligence in each of the regions in
> which it operates and is operating under all federal and local jurisdictional
> laws.  Under the laws TelexFREE does not commit or operate with any
> fraudulent practices.

2077.   Yurick knew that statement was false but wrongfully and unlawfully instructed

Merrill to "just copy and paste [the false assertion] on Telexfree letterhead and sign it."

2078.   Merrill provided Yurick with a revised letter drafted by Babener which was, upon

information and belief, provided to the bank and substantial amounts of victims' funds were

processed through that account as a result of that fraud.

2079.   Yurick continued to conspire with Craft, Merrill and Struzik into 2014 to identify

and secure other outlets for TelexFree's payment processing needs.

2080.   For instance, in his January 6, 2014 email to Craft, Yurick requested further

information to support his efforts to set up merchant identification information for three new

accounts with an unidentified bank.

2081.   Despite ever increasing red flags and other suspicious activities, Bank Card

Consultants continued to provide services for TelexFree until its bankruptcy in April 2014.

2082.   Yurick's and Bank Card Consultants' initial investigation and ongoing monitoring

of TelexFree made them actually aware that TelexFree was engaged in suspicious, tortious or

unlawful conduct that was, at a minimum, in violation of M.G.L. c. 93, § 69, but they

nevertheless continued to provide TelexFree with payment processing services, integral to the TelexFree Scheme until TelexFree's eventual bankruptcy.

2083.   Pursuant to their obligations to perform ongoing customer monitoring of TelexFree, Yurick and Bank Card Consultants discovered additional Red Flags and evidence of suspicious, tortious or unlawful conduct described above, all of which provided Yurick and Bank Card Consultants with actual knowledge that TelexFree was engaged in an unlawful enterprise.

2084.   Although Yurick and Bank Card Consultants possessed actual knowledge of the suspicious, tortious or illegal nature of TelexFree's business activities at all times it received or held TelexFree funds, it willfully acted in concert with TelexFree to deceptively, unlawfully and wrongfully:

   a.   further the unlawful Pyramid Scheme;

   b.   unfairly, deceptively and unlawfully convert class member funds;

   c.   continue to provide services integral to the TelexFree Pyramid Scheme; and

   d.   continue to provide TelexFree with substantial assistance and encouragement essential to their unlawful business enterprise.

2085.   Through their affirmative actions, Yurick and Bank Card Consultants substantially assisted TelexFree's unlawful enterprise by assisting it to evade the United States' justice system as well as its regulatory framework for financial service providers.

2086.   Through their actions, Yurick and Bank Card Consultants provided substantial assistance and encouragement to TelexFree.  They also substantially assisted TelexFree and its Principals to further achieve their unfair, deceptive and unlawful Scheme that was in violation of M.G.L. c. 93, § 69.

2087.   As a result of their services to TelexFree, Yurick and Bank Card Consultants greatly profited, through the deduction of fees from TelexFree victim fund transfers.

**BB.**        Investment Services Providers

1.        Mauricio Cardenas

2088.   As described above, during time periods relevant to the Complaint, Wells Fargo

Advisors, LLC's employee, agent and servant Cardenas was Wanzeler's friend, confidant and

primary financial advisor.  Despite having actual knowledge that TelexFree was an unlawful

Pyramid Scheme and that Wanzeler was at the top level of the fraud, over time Cardenas became

chiefly responsible for all strategy and actions taken by Wanzeler regarding funds received by

Wanzeler through the TelexFree Pyramid Scheme.

2089.   During this same time, Defendant Cardenas was employed as a financial advisor

at and an employee of Wells Fargo Advisors.  Wells Fargo Advisors was a registered broker-

dealer and a registered investment advisor under the Investment Advisers Act of 1940.  The

range of the funds that Cardenas helped Wanzeler launder, hide, or otherwise wrongfully move

was in the hundreds of thousands of dollars to millions of dollars range.

2090.   Cardenas had actual knowledge that TelexFree was an unlawful Pyramid Scheme

that Wanzeler was running.  Also, Cardenas had actual knowledge that Wanzeler was making

millions from illegal businesses.  Cardenas further had actual knowledge that Wanzeler needed

to invest, hide or launder those and other illicit funds.  Cardenas was an employee of Wells

Fargo Advisors and was well-placed to carry out Wanzeler's investment, hiding, moving and

laundering of illicit money.

2091.   From 2012 to 2014, Cardenas provided services to his Wells Fargo Advisors'

client, and close friend, Wanzeler and TelexFree.  Through his Wells Fargo Advisors position,

Cardenas provided substantial assistance to Wanzeler's goal of working to protect and increase

his illicit funds by exploiting every opportunity he could.  Setting aside his obligations as an

employee, Cardenas's primary objectives were to protect Wanzeler's illicit funds from seizure,

discovery or loss and to ensure that the funds entrusted to Wells Fargo Advisors financially

benefited Wanzeler, TelexFree and himself.  He offered this substantial and essential assistance

notwithstanding his knowledge that the funds he was working with came from an ongoing illegal

Pyramid Scheme.  This substantial assistance allowed the illicit funds to continue to go

undetected thereby enabling Wanzeler and TelexFree to continue their on-going illegal Pyramid

Scheme.

2092.   Cardenas was an indispensable advisor to and co-conspirator with Wanzeler.

Cardenas developed and fostered a close, personal and business relationship with Wanzeler

throughout periods relevant to the complaint by making sure the substantial contributions he and

Wells Fargo Advisors made were indispensable.  Wanzeler invested his personal and other funds

with Wells Fargo Advisors through Cardenas.  Cardenas was the mechanism through which

Wanzeler was able to transfer, hide, and invest funds unlawfully obtained through TelexFree's

illegal operations and continue to keep TelexFree's illegal operations hidden from the authorities

and investors.

2093.   Cardenas and Wanzeler lived in proximity to each other and over time spent

considerable amounts of time together.  In addition to aiding and abetting Wanzeler launder,

conceal and invest unlawful funds, Cardenas also enjoyed frequent social interactions with

Wanzeler, including speedboat outings, barbecues and travel.  During these interactions,

Cardenas and Wanzeler willfully and knowingly put their own financial interests and that of

TelexFree ahead of the victims.  They conspired to illegally maximize profits, hide assets,

launder illicit monies and place unlawful profits derived from TelexFree's illegal activities into

Wells Fargo Advisor's asset management accounts.  Importantly, the investment services

provided by Cardenas and Wells Fargo Advisors were essential to the exponential growth of

their own careers or fortunes and that of TelexFree.

2094.   Cardenas was discharged from Wells Fargo Advisors in April 2014 as a direct result of his involvement with TelexFree and Wanzeler, and in particular due to that fact that he had invested funds obtained by Wanzeler through TelexFree's illegal activities.  By virtue of discharging Cardenas, Wells Fargo Advisers acknowledged Cardenas' wrong doings, along with their own culpability.

2.      Wells Fargo Advisors

2095.   Defendant Wells Fargo Advisors is vicariously, jointly and severally liable for all actions taken by its employee, agent, representative and servant Mauricio Cardenas.

2096.   Wells Fargo Advisors provided financial and investment services, maintained accounts, and received and executed transfers of funds from or for the benefit of Wanzeler, TelexFree and Cardenas, all of which facilitated the wrongful taking of victim cash and sustained the fraud by essentially hiding the Pyramid Scheme.

2097.   Wells Fargo Advisors is a registered broker-dealer and subject to the same laws and regulations alleged herein regarding potential and established client accounts as the Financial Services Providers, including the Bank Secrecy Act (as amended by the USA PATRIOT Act), the Foreign Corrupt Practices Act, and critical anti-money laundering mandates such as Know Your Customer and Customer Identification Program requirements.  31 U.S.C. §§ 5311 et al.; 31 C.F.R. Chapter X & pt. 1023; FINRA Rule 3310; U.S. Securities & Exchange Commission, Anti-Money Laundering (AML) Source Tool for Broker-Dealers (Jan. 11, 2017), https://www.sec.gov/about/offices/ocie/amlsourcetool.htm; Financial Crimes Enforcement Network et al., Guidance on Obtaining and Retaining Beneficial Ownership Information (Joint Release March 2010), https://www.sec.gov/rules/other/2010/34-61651-guidance.pdf; 15 U.S.C. §§ 78dd-1, et seq.; FINRA Regulatory Notice 11-12, http://www.finra.org/industry/notices/11-

12. All allegations regarding the duties and legal obligations of the Financial Services Providers, and the facts, information and knowledge gained by those providers in performing those duties and due diligence, are incorporated herein by reference as to Wells Fargo Advisors.

2098.   Wells Fargo Advisors similarly possessed a Regulatory Account Monitoring Department that was charged with researching and obtaining information on prospective and current customers.

2099.   Wells Fargo Advisors possessed the same federal regulatory duties as those cited above for the Financial Services Providers to look for certain types of facts or lack thereof, including the identity and purpose of the individuals opening and making payments into their accounts.

2100.   In addition to reviews carried out in the normal course of business, Wells Fargo Advisors carried out other reviews in accordance with their regulatory duties that revealed, among other things, 1) TelexFree's tortious Pyramid Scheme; 2) TelexFree's business model; 3) TelexFree's legal troubles and notorious history; 4) TelexFree's regulatory troubles in the United States and in Brazil; 5) Wanzeler's modest background and rapid rise to substantial wealth; 6) the fact that the source of the substantial funds Wanzeler handed over to Wells Fargo Advisors was derived from unlawful sources; 7) the substantial role Wells Fargo Advisers assumed through their employee Cardenas in the management of Wanzeler and TelexFree's illicit fund management; 8) the suspicious, tortious and illegal activities related to the funds it was managing, including the outright fraud on the part of TelexFree, its Founders and Principals, including Wanzeler; and 9) the overwhelming number of Red Flags and the other indicia of fraud that more than reasonably established the existence of TelexFree's and Wanzeler's tortious conduct and the Pyramid Scheme.

2101.   Wells Fargo Advisors was obligated to know its client and monitor the accounts of its existing clients.

2102.   Wells Fargo Advisors became aware of the Red Flags surrounding Wanzeler and TelexFree during the routine course of fulfilling their regulatory duties and while reviewing Cardenas' deal making, sales, job performance and entitlement to performance related payments.

2103.   The number of TelexFree-related Red Flags and the other indicia of fraud was overwhelming.  Red Flags established the existence of TelexFree's and Wanzeler's tortious conduct and the Pyramid Scheme

2104.   Alternatively, if Wells Fargo Advisors failed to perform any of the required investigations and account monitoring, it turned a blind eye to Cardenas' wrongful conduct, TelexFree's and Wanzeler's unlawful Scheme and the illegal nature of Wanzeler's funds.

2105.   Wells Fargo Advisors employed Defendant Cardenas from 2012 until he was terminated in 2014 and had actual knowledge of, and oversaw, his dealings with Wanzeler. Wells Fargo Advisors oversaw Cardenas' investment activities and maintained a detailed account of the profits made on behalf of his clients.  Defendant Cardenas, as Wells Fargo Advisor's employee, opened and managed accounts for Wanzeler and provided him advice on his own and TelexFree-related operations and funds.

2106.   While Cardenas was acting as Wanzeler's co-conspirator, he did so as an agent, servant and employee of Wells Fargo Advisors.  Cardenas' conduct is imputed to the company he represented - Wells Fargo Advisors.

2107.   As described above, When Wells Fargo Advisors terminated Defendant Cardenas in 2014, it filed the following disclosure concerning the circumstances of his termination with FINRA (https://brokercheck.finra.org/individual/summary/5734441#disclosuresSection):

THE FIRM DETERMINED THAT IT WOULD NOT DO BUSINESS WITH
CERTAIN BUSINESS ENTITIES DUE TO POTENTIAL AML RISKS.
THEREAFTER, FA [Financial Advisor Cardenas] OPENED TWO
BROKERAGE ACCOUNTS FOR INDIVIDUALS DIRECTLY RELATED TO
THE ENTITIES. THE FA STATED THAT HE DID NOT KNOW THE
RELATIONSHIP EXISTED. MANAGEMENT DETERMINED THAT
REPRESENTATIVE DEMONSTRATED A LACK OF JUDGMENT IN
RECOGNIZING AND MANAGING POTENTIAL AML RISKS.

2108.   On information and belief, the "certain business entities" referred to in the first

sentence included TelexFree and the "individuals" referred to in the second sentence included

Wanzeler.

2109.   During the time they did business with TelexFree and Wanzeler, the Defendant

Investment Services Providers, which includes Wells Fargo Advisors and Cardenas, possessed

actual knowledge of the fraudulent nature of TelexFree's business operation and of the illegal

nature of the funds provided to them by Wanzeler.

2110.   At times material herein, despite having knowledge that TelexFree was a

fraudulent enterprise carrying out suspicious, tortious, unlawful, unfair or deceptive acts or

practices and that Wanzeler's funds were illegally obtained, Defendant Investment Services

Providers performed substantial and integral services and provided essential assistance that were

used to further TelexFree's unlawful business and to enable Wanzeler to hide and invest assets

and launder illicit monies derived from TelexFree's illegal activities.  The services provided by

the Defendant Investment Services Providers also included receiving, managing and investing

funds paid by Promoters to TelexFree among Defendant Wanzeler's personal accounts.

2111.   At times material herein, despite having actual knowledge that TelexFree was an

enterprise carrying out at a minimum suspicious, tortious, unlawful, unfair or deceptive acts or

practices or that Wanzeler's funds were unlawfully obtained, the Defendant Investment Services

Providers provided Wanzeler with unfettered access to financial and investment services that

were used to further Wanzeler's and TelexFree's unlawful business.

2112.   Wells Fargo Advisors acted to hide, manage invest and launder illicit monies derived from illegal activities and continued to provide Wanzeler with investment services and substantially assisted his tortious conduct.  Wells Fargo Advisors also allowed Cardenas to carry out other concierge or liaison activities while using the Wells Fargo name and carrying its weight and connections.

2113.   Wells Fargo Advisors' role played a substantial part in the Pyramid Scheme because they managed funds provided by Telexfree and/or Wanzeler, and helped to launder and hide those funds from regulators and other third parties thereby allowing TelexFree to continue to operate and harm investors.

2114.   Wells Fargo Advisors' managing, maintaining, hiding, laundering and transferring of Wanzeler-controlled illicit funds was integral to TelexFree's ongoing operation because without such services, Wanzeler's and the entire Pyramid Scheme could not have been maintained, thrived or exponentially grown.  Without Wells Fargo Advisor's services, Wanzeler could not have hid, spent or absconded with such significant funds and the Pyramid Scheme would have been discovered.

2115.   Defendant Wells Fargo Advisors was actually aware of TelexFree's pyramid scheme nature and specifically determined it would not do business with TelexFree or its associates, including its Founders, due to AML risks.

2116.   Wells Fargo Advisors failed to put in place the proper systems to prevent violation of its legal and regulatory duties and to prevent the opening and servicing of accounts involving illegally-derived funds.

2117.   Despite Wells Fargo Advisors' prior determination that it would not serve

TelexFree or its associates, Wanzeler, working with Cardenas, established brokerage accounts with Wells Fargo Advisors for the purpose of secreting away ill-gotten gains thereby perpetuating the fraud and keeping TelexFree's illegal operations hidden from the authorities and investors.

2118.   By the time Well Fargo Advisors determined that Cardenas had opened brokerage accounts for Wanzeler directly related to TelexFree millions of dollars had been passed.

2119.   Wells Fargo Advisors eventually fired Cardenas after it had enabled and performed the illegal transfer and investment of funds derived from the TelexFree Scheme by Wanzeler and substantially assist in the on-going Pyramid Scheme.

2120.   In exchange for their substantial contributions, Defendant Investment Services Providers derived substantial income from their services to TelexFree and Wanzeler.

2121.   Each of the Financial Services Providers and Investment Services Providers failed to timely or adequately respond to information relating to TelexFree, or persons or entities it was related to, and as a direct and proximate result caused each member of the putative class to similarly suffer ascertainable economic harm.

2122.   Various persons or entities that are not named as Defendants herein have participated as co-conspirators or aiders and abettors in the violations and other claims alleged herein and have performed acts and made statements in furtherance thereof.  These persons or entities have directly participated because they have facilitated, adhered to, and/or communicated with others regarding the Pyramid Scheme or offered substantial assistance or encouragement. Plaintiffs reserve the right to name some or all of these persons as Defendants at a later date.

2123.   Plaintiffs and the putative class representatives seek to obtain damages, restitution and injunctive relief for the Class, as defined, below, from Defendants.

## IV.   CLASS ACTION ALLEGATIONS

2124.   Under Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs sue on their own behalf, and on behalf of all other persons similarly situated ("the Class").  The Class that Plaintiffs seek to represent is:

> All persons residing in the United States who purchased TelexFree AdCentral or AdCentral Family packages and suffered a Net Loss[182] during the period from January 1, 2012 to April 16, 2014 (the "Class Period").

> Excluded from the Class are Defendants and their officers, directors, and employees; any entity in which any Defendant has a controlling interest; the co-conspirators, the so-called Top Level Promoters, legal representatives, attorneys, heirs, and assigns of Defendants.

2125.   Plaintiffs meet the requirements of Federal Rules of Civil Procedure 23(a) because the members of the Class are so numerous that the joiner of all members is impractical. While the exact number of Class members is unknown to Plaintiffs, it is in the hundreds of thousands.

2126.   Plaintiffs meet the requirements of Federal Rules of Civil Procedure 23(a) because there is a well-defined community of interest among the members of the Class, common questions of law and fact predominate, Plaintiffs' claims are typical of the members of the Class, and Plaintiffs can fairly and adequately represent the interests of the Class.

2127.   This action satisfies the requirements of Federal Rule of Civil Procedure 23(b)(3) because it involves questions of law and fact common to the members of the Class that predominate or questions affecting only individual members, including, but not limited to:

- whether the contract under which TelexFree claims to invoke the application of Nevada law is illegal and unenforceable as a matter of law;

- whether TelexFree's claim to invoke the application of Nevada law is enforceable;

---

[182] "Net Loss" is defined as the class member having invested more funds than they withdrew.

- whether TelexFree ran an unlawful Pyramid Scheme or a legitimate business;

- whether TelexFree ran a lawful MLM program or an unlawful pyramid scheme;

- whether each Defendant knew that TelexFree was an illegal Pyramid Scheme, yet continued to aid, abet and further such illegal activities or are otherwise liable for the economic loss suffered by the Putative Class;

- whether the aid that each Defendant provided was a substantial in the context of aiding and abetting;

- was TelexFree a "multi-level distribution company" as defined by Massachusetts General Laws Chapter 93, Section 69(a);

- did the standard TelexFree Pre-March 9 Contract contain promises to pay merely for the recruitment of new members in violation of Massachusetts General Laws Chapter 93, Section 69(a);

- did the standard TelexFree Pre-March 9 Contract contain offers to pay a "finder's fee, bonus, refund, override, commission, cross-commission, dividend or other consideration" to Participants in the TelexFree Program in violation of Massachusetts General Laws Chapter 93, Section 69(a);

- did the TelexFree Program offer its Members payment without requiring them to engage in any "bona fide and essential supervisory, distributive, selling or soliciting" nor exercise any "judgment," "skill," or "control over the operation in violation of Massachusetts General Laws Chapter 93, Section 69(a);

- did each of the Financial Services Defendants have actual knowledge of TelexFree's suspicious, tortious or unlawful activities;

- when did each of the Financial Services Defendants have actual knowledge of TelexFree's suspicious, tortious or unlawful activities;

- whether TelexFree's Financial Services Providers, including the aforesaid banking institutions and payment processing services providers aided and abetted TelexFree's Pyramid Scheme;

- whether TelexFree violated M.G.L. c. 93A;

- whether Massachusetts' Blue Sky Laws will apply to the claims of the Putative Class;

- whether TelexFree violated M.G.L. c. 110A, § 410 - Massachusetts' Blue Sky Laws;

- whether certain Defendants used and employed manipulative and deceptive devices and contrivances in violation of M.G.L. c. 110A, § 410; used means and instrumentalities, directly and indirectly, for the purchase and sale of unregistered securities; and used and employed manipulative and deceptive devices and contrivances in violation of the Massachusetts Uniform Securities Act, M.G.L. c. 110A, § 410(b) and M.G.L. c. 93A;

- whether TelexFree mailed fraudulent and inaccurate 1099 (Miscellaneous Income) forms to investors;

- whether the 1099 (Miscellaneous Income) forms should be declared void as a matter of law;

- whether Defendants' conduct violated any of the articulated Massachusetts state common laws; and

- whether Plaintiffs and the Class are entitled to damages, civil penalties, punitive damages, and/or injunctive relief.

2128.   Plaintiffs' claims are typical of those of other Class members because Plaintiffs were defrauded by Defendants' common Scheme.

2129.   Plaintiffs will fairly and accurately represent the interests of the Class.

2130.   The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications regarding individual members of the Class, which would establish incompatible standards of conduct for Defendants and would lead to repetitive adjudication of common questions of law and fact.

2131.   Class treatment is superior to any other method for adjudicating the controversy. Plaintiffs know of no difficulty likely to be encountered in the management of this litigation that would preclude its maintenance as a class action under Rule 23(b)(3).

2132.   Damages for any individual class member likely cannot justify the cost of individual litigation, so that absent class treatment, the Defendants' violations of law inflicting substantial damages in the aggregate would go un-remedied without certification of the Class.

2133.   Defendants have acted or refused to act on grounds that apply to the Class, as

alleged above, and certification is proper under Rule 23(b)(2).

## V.   FRAUDULENT CONCEALMENT

2134.   Throughout the Class Period, Defendants affirmatively and fraudulently concealed their unlawful conduct from Plaintiffs and the Class.

2135.   Plaintiffs and the members of the Class did not discover, and could not have discovered through the exercise of reasonable diligence, that Defendants were violating the laws as alleged herein until TelexFree claimed bankruptcy in April 2014.  Nor could Plaintiffs and the members of the Class have discovered the violations earlier than that time because Defendants concealed from Plaintiffs and the Class the nature of their unlawful conduct and acts in furtherance thereof, and fraudulently concealed their activities through various other means and methods designed to avoid detection.

2136.   As a result of Defendants' fraudulent concealment of their actions, Plaintiffs and the Class assert the tolling of an applicable statute of limitations affecting the rights of action of Plaintiffs and Class members.

## VI.   CLAIMS FOR RELIEF

FIRST CLAIM FOR RELIEF
VIOLATIONS OF MASSACHUSETTS GENERAL LAWS,
CHAPTER 93, SECTIONS 12 and 69
(Against All Operational Defendants)

2137.   Plaintiffs incorporate by reference all allegations in all previous paragraphs, as though fully set forth here.

2138.   The Operational Defendants were engaged in acts in violation of Massachusetts General Laws Chapter 93, Section 69.

2139.   Massachusetts General Laws Chapter 93, Section 12 provides for a private right

of action for violations of Chapter 93, Section 69.

2140.   In consequence of said Defendants' violative conduct, Plaintiffs and the Putative

Class have suffered great financial losses, and have also incurred considerable expenses and loss

of income, and have otherwise been greatly damaged.

2141.   In consequence of said Defendants' violative conduct or other unfair and

deceptive acts and practices, Plaintiffs and the Putative Class have been similarly caused to

suffer ascertainable economic loss, have incurred expense and have otherwise been similarly

damaged.  Because the Operational Defendants' violations of Massachusetts General Laws

Chapter 93, Section 69 were engaged in with malicious intent to injure the members of the

Putative Class, the Class is entitled to (up to) three times the amount of actual damages

sustained, together with the costs of suit, including reasonable attorneys' fees.

### SECOND CLAIM FOR RELIEF
### VIOLATIONS OF MASSACHUSETTS GENERAL LAWS, CHAPTER 93A, SECTIONS 2 AND 11
(Against All Operational Defendants)

2142.   Plaintiffs incorporate by reference all allegations in all previous paragraphs, as

though fully set forth here.

2143.   All Operational Defendants were engaged in "trade" and "commerce" as defined

by Massachusetts General Laws Chapter 93A, Section 1.

2144.   Plaintiffs and the Putative Class were engaged in "trade" and "commerce" as

defined by Massachusetts General Laws Chapter 93A, Section 1.

2145.   The transactions, actions or inaction of the Operational Defendants constitute

unfair and deceptive acts and practices as defined by, and in violation of, Massachusetts General

Laws, Chapter 93A, Sections 2 and 11.

2146.   In addition, said Defendants engaged in acts in violation of Massachusetts

General Laws Chapter 93, Section 69.  Pursuant to Chapter 93, Section 69(g) any violation of the

provisions of M.G.L. c. 93, section 69 shall constitute an unlawful method, act or practice within

the meaning of clause (a) of section two of chapter ninety-three A.

2147.   As a result, the foregoing transactions, actions and inactions of said Defendants

thereby constitute per se an unlawful method, act or practice within the meaning of

Massachusetts General Laws, Chapter 93A, Section 2(a) by operation of Massachusetts General

Laws, Chapter 93, Section 69(g).

2148.   The foregoing transactions, actions and inactions of said Defendants thereby

constitute per se unfair and deceptive acts and practices as defined by, and in violation of,

Massachusetts General Laws Chapter 93A, §§ 2 and 11.

2149.   In consequence of said Defendants' violative acts, and unfair methods of

competition or unfair or deceptive acts or practices, Plaintiffs and the Putative Class have been

similarly caused to suffer ascertainable economic loss, have incurred expense and have otherwise

been similarly damaged.  The Operational Defendants' violations of Massachusetts General

Laws Chapter 93A, Section 69 were willful or knowing, and the Class is otherwise entitled to (up

to) three times the amount of actual damages sustained, together with the costs of suit, including

reasonable attorneys' fees.

THIRD CLAIM FOR RELIEF
AIDING AND ABETTING VIOLATIONS OF MASSACHUSETTS GENERAL LAWS,
CHAPTER 93, SECTIONS 12 and 69, AND MASSACHUSETTS GENERAL LAWS,
CHAPTER 93A, SECTIONS 2(a) or 11
(Against TelexFree And All Defendants)

2150.   Plaintiffs incorporate by reference all allegations in all previous paragraphs, as

though fully set forth here.

2151.   As described above, to comply with federal anti-money laundering and other

banking laws, the Financial Services Provider Defendants, including Bank of America, TD Bank,

Fidelity Bank, Wells Fargo, Citizens Bank, Synovus, GPG, IPS, ProPay, Base Commerce, Vantage Payments, Allied Wallet and individual defendants John F. Merrill, John Hughes and Dustin Sparman, as well as Defendant Investment Services Provider Wells Fargo Advisors, must understand their customers' business model and must know their clients.

2152.  Under the attendant facts, any application of the mandated Know-Your-Customer Regulations by each of the Financial Services Providers and Defendant Investment Services Provider Wells Fargo Advisors obviously included evaluating whether TelexFree's business model and operations violated Massachusetts General Laws Chapter 93, Section 69.

2153.  Violations of Massachusetts General Laws c. 93, § 69 are per se violations of Massachusetts General Laws Chapter 93A, Section 2(a).

2154.  Under the attendant facts, that TelexFree violated Massachusetts General Laws Chapter 93, Section 69 during 2013 and 2014 was obvious or at a minimum apparent, to the sophisticated eye, as focused by the FFIEC, of the Financial Services Providers and Investment Services Provider Wells Fargo Advisors.

2155.  As described herein, TelexFree and the Operational Defendants, except for Katia Wanzeler, otherwise violated MGL c. 93A.

2156.  Massachusetts General Laws Chapter 93, Sections 12 and 69 and Massachusetts General Laws Chapter 93A created a duty carried by TelexFree and each of the Operational Defendants that inured to the benefit of the putative class.

2157.  The Operational Defendants, the Financial Services Providers and Investment Services Provider Wells Fargo Advisors knew that TelexFree's conduct was suspicious, tortious, unlawful, and constituted a breach of duty owed to each member of the putative class.

2158.  The Operational Defendants, the Financial Services Providers and Defendant

Investment Services Provider Wells Fargo Advisors knew that TelexFree Program violated Massachusetts General Laws Chapter 93, Sections 12 and 69 and that TelexFree's conduct was unfair, deceptive, suspicious, tortious, and unlawful constituted a breach of duty owed to each member of the putative Class.

2159. During the TelexFree Pyramid Scheme, the Financial Services Providers and Defendant Investment Services Provider Wells Fargo Advisors provided essential financial services to TelexFree, the Operational Defendants, and each other, which substantially assisted and enabled them to carry on their unlawful, unfair, and deceptive Pyramid Scheme notwithstanding the presence of suspicious, tortious or illegal activity on TelexFree's part.

2160. As described herein, the assistance and encouragement given to TelexFree and its Founders by the Financial Services Providers and Defendant Investment Services Provider Wells Fargo Advisors to conduct its business operations was essential because TelexFree's business operations were entirely dependent on them.

2161. For example, without the indispensable services provided by the Financial Services Providers, TelexFree would not have been able to accept, process or misappropriate the funds invested by the putative class.

2162. Without the indispensable services provided by the Financial Services Providers, TelexFree would not have been able to otherwise open shop in the United States, develop and maintain its unlawful business operations.

2163. Defendant Investment Services Provider Wells Fargo Advisors, TelexFree played a substantial part in the Pyramid Scheme because they managed funds provided by Telexfree and/or Wanzeler, and helped to launder and hide those funds from regulators and other third parties.

2164.   Wells Fargo Advisors' managing, maintaining, hiding, laundering and transferring of Wanzeler-controlled illicit funds was integral to TelexFree's ongoing operation because without such services, Wanzeler's and the entire Pyramid Scheme could not have been maintained, thrived or exponentially grown.  Without Wells Fargo Advisor's services, Wanzeler could not have hid, spent or absconded with such significant funds.

2165.   As described herein, the assistance and encouragement given to TelexFree by the Financial Services Providers and Defendant Investment Services Provider Wells Fargo Advisors to conduct its business operations was substantial.  According to an investigation by the SOC, in 2012 and 2013 TelexFree identified 4,845,576 VoIP Program transactions totaling $238,395,353.80.  Over the same period, TelexFree received 783,771 package purchases of either $289 or $1,375 totaling $880,189,455.32.

2166.   Each Defendant, while knowing that the other's conduct provided essential and substantial encouragement to TelexFree, the Operational Defendants, and each other, substantially assisted and enabled them to carry on their unlawful, unfair, and deceptive Pyramid Scheme notwithstanding the presence of suspicious, tortious or illegal activity on TelexFree's part.

2167.   Each Defendant provided substantial assistance and/or encouragement to the other Defendants in committing the violations of M.G.L. c. 93, § 69 and M.G.L. c. 93A alleged herein, and did so with unlawful intent and knowledge that such parties were perpetuating a fraudulent and illegal Pyramid Scheme, and yet continued to substantially assist or encourage said Scheme.

2168.   Each Defendant rendered this substantial assistance despite their knowledge that TelexFree's operations constituted an unlawful, unfair, deceptive and unsustainable Pyramid Scheme and violated M.G.L. c. 93 § 69 and M.G.L. c. 93A.

2169.   Such substantial assistance was rendered by Defendants despite their knowledge of the illegal nature of TelexFree's operations, is detailed within this complaint and includes, but is not limited to:

a.   managing and controlling TelexFree and its affiliated entities;

b.   providing accounting services to TelexFree;

c.   providing legal services to TelexFree;

d.   publicly certifying that TelexFree's business model and operations were legal, proper, and economically viable and sustainable;

e.   providing banking, investment and asset management services for TelexFree and its management;

f.   promoting TelexFree AdCentral packages;

g.   continuing to provide financial services following the Brazilian Court's injunction to stop TelexFree's business in Brazil;

h.   processing payments to, from, and on behalf of TelexFree and its affiliated entities;

i.   processing payments for transfers of funds which deepened TelexFree's insolvency;

j.   making transfers from TelexFree's corporate accounts to private accounts held in the names of Defendant Founders, despite knowledge of the fraudulent nature of TelexFree's business enterprise;

k.   investing ill-gotten funds for the benefit of TelexFree's Founders, despite knowledge of the suspicious, tortious or illegal nature of TelexFree's business enterprise;

l.    providing TelexFree's Founders with cashier's checks in amounts totaling millions of dollars and purchased using funds in TelexFree's corporate accounts;

m.    providing credit to TelexFree;

n.    participating in a cover-up by knowingly failing and/or refusing to report the results of such financial services provider's own investigation of TelexFree to the proper authorities, despite the suspicious, tortious or illegal activity revealed by such investigation;

o.    soliciting financial services for the benefit of TelexFree;

p.    negotiating with financial services providers on TelexFree's behalf;

q.    incorporating foreign "shell corporations" on TelexFree's behalf in order to expand TelexFree's suspicious, tortious or illegal business internationally;

r.    providing financial advice to TelexFree designed to keep the violations of M.G.L. c. 93 § 69 and M.G.L. c. 93A and the unlawful MLM Pyramid Scheme alive and avoid detection by regulators;

s.    "sneaking" payments out of bank accounts to TelexFree in order to avoid detection;

t.    appearing in online videos with TelexFree Founders promoting TelexFree to the public;

u.    publicly falsely stating that TelexFree's business operations had been assessed by the financial services provider and determined to be legal; or

v.    otherwise becoming an integral part of TelexFree's Pyramid Scheme by,

inter alia, enabling the TelexFree Pyramid Scheme to expand and
continue by providing necessary financial services to TelexFree, despite
actual knowledge of violations of M.G.L. c. 93 § 69 and M.G.L. c. 93A
by TelexFree and other suspicious, tortious or illegal activities.

2170.   By each Defendant's actions participating in the Pyramid Scheme as described
herein, as alleged above, each Defendant aided and abetted the commission of the causes of
action alleged herein.

2171.   As a direct and proximate result of TelexFree's illegal Pyramid Scheme and all
the activities performed in connection therewith, to which said Defendants provided substantial
assistance, Plaintiffs and the Putative Class sustained ascertainable damages and losses and
demand they be made whole.

FOURTH CLAIM FOR RELIEF
UNJUST ENRICHMENT
(Against All Defendants)

2172.   Plaintiffs incorporate by reference all allegations in all previous paragraphs, as
though fully set forth here.

2173.   Plaintiffs and the Putative Class conferred a benefit upon the Defendants by
furnishing funds, directly or indirectly, to Defendants, who accepted them without protest or
defect and retained and benefitted from them.

2174.   Defendants had an appreciation or knowledge of the benefit.

2175.   Defendants knew of such funds received by them.

2176.   Defendants have unlawfully and in bad faith denied Plaintiffs and the putative
Class access to such funds, and have instead knowingly retained the benefit of such funds for
themselves.

2177.   Acceptance or retention by Defendants of the benefit under the circumstances set

forth herein would otherwise be inequitable without payment for its value.

2178.   As a direct and proximate result of Defendants' actions, as hereinabove set forth, Defendants are, and continue to be, unjustly enriched and Plaintiffs demand they and the Putative Class be made whole.

FIFTH CLAIM FOR RELIEF
CIVIL CONSPIRACY
(Against TelexFree, All Operational Defendants, John Merrill, John Hughes, Alexander Sidel, Jason Doolittle, John Kirchhefer, Brian Bonfiglio, Dustin Sparman, Fidelity Bank, Base Commerce, GPG, IPS, Priority Payout, Bank Card Consultants and the MLM A Team)

2179.   Plaintiffs incorporate by reference all allegations in all previous paragraphs, as though fully set forth here.

2180.   TelexFree, the Operational Defendants, Katia Wanzeler, John Merrill, John Hughes, Alexander Sidel, Jason Doolittle, John Kirchhefer, Brian Bonfiglio, Dustin Sparman, Fidelity Bank, Base Commerce, GPG, IPS, Prioirty Payout, Allied Wallet, the MLM A Team, Wells Fargo Advisors, Wells Fargo Bank and Cardenas, as well as all the individual Defendants included within the definition of each of the foregoing, have combined by common design to enter into a civil conspiracy.

2181.   Said Defendants conspired with each other to operate and maintain in operation a Pyramid Scheme in violation of Massachusetts General Laws Chapter 93, Section 69 and Chapter 93A.

2182.   Said Defendants, by agreement or common design, engaged directly in the operation of, or otherwise worked in concert to further the activities of, the unlawful Pyramid Scheme.

2183.   As detailed above, each of said Defendants engaged in a tortious act in

furtherance of the agreement or common design to engage in the lawful Pyramid Scheme.

2184.   Said Defendants conspired with each other, making use of confidential

information, and used this confidential information to misappropriate the funds of the Putative

Class through the operation and maintenance of unlawful Pyramid Scheme.

2185.   Said Defendants, for an unlawful purpose and using unlawful means, with the

intent of so combining, unlawfully defrauded Plaintiffs and the Putative Class out of funds.

2186.   Said Defendants' conduct constitutes a conspiracy to operate an unlawful

enterprise, rendering all Defendants jointly and severally liable for the breaches of each other's

obligations.

2187.   Said Defendants substantially assisted the Scheme and each other with actual

knowledge of the tortious and illegal nature of the Scheme.

2188.   As a direct and proximate cause of said Defendants' conspiracy, the Putative

Class has and will continue to suffer substantial direct and consequential damages and Plaintiffs

demand they and the Putative Class be made whole.

SIXTH CLAIM FOR RELIEF
PROFESSIONAL NEGLIGENCE
(Against All Licensed Professional Defendants)

2189.   Plaintiffs incorporate by reference all allegations in all previous paragraphs, as

though fully set forth here.

2190.   Craft, Craft Financial, Ann Genet, Nehra, Nehra Law Firm, Nehra and Waak Law

Firm, Opt3 Solutions, Inc., PricewaterhouseCoopers, Jason A. Borromei and each of the

Licensed Professional Defendants owed a duty to Plaintiffs and the Putative Class to act with

reasonable care to avoid negligently misstating, misrepresenting or being misleading about the

true nature of TelexFree's operation and its financial information or its returns, and to comply

with all laws. Each and every one failed and similarly caused the Putative Class to suffer

404

ascertainable economic loss.

2191.   By negligently misstating and omitting relevant information, including the source of and sufficiency of funds for payments to Promoters, said Defendants breached the duty of care they owed to Plaintiffs and the Putative Class.

2192.   Each of the Licensed Service Provider Defendants owed Plaintiffs and the Putative Class a duty to act with reasonable care and to exercise the ordinary skill and ability commonly exercised by such professionals.

2193.   Plaintiffs and the Putative Class relied upon said Defendants' expertise and/or performance of their duties or was similarly affected and similarly caused to incur ascertainable economic loss.

2194.   Plaintiffs and the Putative Class reposed faith, confidence and trust in said Defendants' representations and advice.

2195.   As a direct and proximate result of said Defendants' negligence and carelessness, Plaintiffs and the Putative Class have been caused to suffer and sustain damages and losses and demand they be made whole.

SEVENTH CLAIM FOR RELIEF
NEGLIGENT MISREPRESENTATION
(Against Operational Defendants Except Katia Wanzeler)

2196.   Plaintiffs incorporate by reference all allegations in all previous paragraphs, as though fully set forth here.

2197.   The Operational Defendants, except Katia Wanzeler, directly, and through their agents, servants, employees and/or representatives, negligently made false misrepresentations of material fact and omissions to Plaintiffs and the Putative Class in the course of their businesses for the purpose of obtaining and/or wrongfully appropriating and converting money from Plaintiffs and the Putative Class.

2198.   The said Operational Defendants made negligent misrepresentations and omissions although said Defendants knew, or should have known, that such representations were false.

2199.   Said representations, statements and omissions were material and were relied upon by Plaintiffs and the Putative Class, inducing them to furnish money to Defendants.

2200.   Further, the Licensed Service Provider Defendants failed to exercise proper due diligence in the discharge of their investigatory duties as certified public accountants and attorneys of TelexFree, and knew or should have known Plaintiffs and the Putative Class would have relied upon their expertise and misrepresentations.

2201.   Plaintiffs and the Putative Class reposed faith, confidence and trust in said Operational Defendants' representations and advice.

2202.   In consequence of the reliance on the negligent misrepresentations of said Defendants, Plaintiffs and the Putative Class have suffered great financial losses, have also incurred considerable expenses and loss of income, and have otherwise been greatly damaged and demand they be made whole.

**EIGHTH CLAIM FOR RELIEF**
**VIOLATIONS OF MASSACHUSETTS GENERAL LAWS,**
**CHAPTER 110a, SECTION 410(b)**
**(Against All Operational Defendants except for PricewaterhouseCoopers)**

2203.   Plaintiffs incorporate by reference all allegations in all previous paragraphs, as though fully set forth here.

2204.   For the purposes of this cause of action alone, Defendant PricewaterhouseCoopers is not included within the definition of Licensed Professionals.

2205.   At the time of the wrongs alleged, the Defendant Founders and Principals, Executive Office, Top Level Promoters and Licensed Professionals were each a controlling

406

person, partner, officer, director, person occupying a similar status, agent or employee materially

aiding in the sale of securities, of TelexFree within the meaning of Section 410(b) of the

Massachusetts Uniform Securities Act, Massachusetts General Laws Chapter 110A.

2206.   By their respective positions of authority, the Defendant Founders and Principals,

Executive Office and Licensed Professional had the power and authority, to influence and

control, and influenced and controlled, the decision-making and activities of TelexFree and the

affiliated TelexFree entities and caused them to engage in the wrongful conduct described and in

violations of Section 410(a) of the Massachusetts Uniform Securities Act, M.G.L. c. 110A.

2207.   The Defendant Founders and Principals, Executive Office and Licensed

Professional actively participated in the leadership and decision-making process of the selling

entity causing the dissemination of false and misleading statements and omissions of material

facts.

2208.   By their positions as controlling persons, partners and officers and directors of

TelexFree, and because of the aforementioned conduct, said Defendants are liable under Section

410(b) of the Massachusetts Uniform Securities Act, Massachusetts General Laws Chapter

110A.

2209.   In addition, the Defendant Executive Office, Other Associated Individuals, and

Top Level Promoters and Licensed Professionals were agents who materially aided in the sales

of the fraudulent securities in violation of Sections 410 (b) of the Massachusetts Uniform

Securities Act, Massachusetts General Laws Chapter 110A.

2210.   Said Defendants made significant contributions toward making the sales to

Plaintiffs and the Putative Class possible through their actions detailed above.

2211.   Said Defendants prepared and provided information on, and endorsed and actively

promoted the opportunity regarding the securities on websites and at TelexFree events and

extravaganzas.  Each of the said Defendants provided print materials, electronic materials, and

made oral representations to the Putative Class

2212.   The stated Defendants are liable under 410(b) as a primary violation by TelexFree

was under 410(a) because Defendants materially aided in the sale of unregistered securities, and

knew, or by reasonable diligence should have known, of the primary violation.

2213.   Said Defendants are jointly and severally liable for the primary violations under

Section 410(a)(2) detailed above.

2214.   Plaintiffs and the Putative Class seek the award of actual damages on behalf of the

Class.

2215.   The Putative Class has and will continue to suffer irreparable harm as a result of

the Defendants' conduct that cannot adequately be redressed at law.

2216.   Unless this Court grants injunctive relief, the Putative Class will be irreparably

harmed in a manner not fully compensable by money damages.

<u>NINTH CLAIM FOR RELIEF</u>
FRAUD
(Against Operational Defendants)

2217.   Plaintiffs incorporate by reference all allegations in all previous paragraphs, as

though fully set forth here.

2218.   The Operational Defendants directly, and through their agents, servants,

employees and/or representatives, did intentionally or recklessly make false representations and

omissions of material fact to Plaintiffs and the Putative Class with these misrepresentations being

made to obtain and/or wrongfully appropriate and convert money from Plaintiffs and the Putative

Class.

2219.   Said Defendants' fraudulent or reckless misrepresentations and omissions are detailed above and include, but are not limited to:

    a.    providing false and misleading information on the nature of TelexFree's business operation;

    b.    misrepresenting the financial statements;

    c.    providing false and misleading information on the value of the AdCentral package;

    d.    providing false and misleading information on the method and source from which income was derived;

    e.    providing false and misleading information on the legality of TelexFree's business model;

    f.    providing false and misleading information on the sustainability of the returns to Promoter;

    g.    providing false and misleading information regarding the investigation in Brazil and subsequent closure of TelexFree's Brazilian operations;

    h.    knowingly participating in false and deceptive information televised over the internet and other media;

    i.    failing to comply with federal and state laws;

    j.    employing legal and accountant counsel to mask their illegal and fraudulent activities to further and perpetuate such illegal fraudulent activities; and

    k.    setting up TelexFree's computer servers in a foreign country with

the intent to avoid prosecution, legal service on the benefits of
United States legal process and otherwise with knowledge that
TelexFree was an unlawful Pyramid Scheme.

2220.   Said Defendants knew of the fraudulent or reckless deceptive misrepresentations and omissions of material facts set forth.

2221.   Said Defendants made these intentional or reckless misrepresentations although Defendants knew that such representations were false for the purpose of inducing Plaintiffs and the Putative Class to purchase initially and to continue to purchase memberships and to recruit new members.

2222.   Such misrepresentations and omissions were done knowingly or recklessly for the additional purpose and effect of concealing the true information about the TelexFree Program, including its financial condition and operations.

2223.   Said Defendants received information reflecting the facts regarding TelexFree's business practices and exercised control over the materially misleading misstatements.

2224.   Because of their control over and/or association with the TelexFree Program, said Defendants were active and culpable participants in the fraudulent Scheme.

2225.   Said Defendants knew and recklessly disregarded the false and misleading nature of the information they caused to be disseminated to Promoters and potential Promoters.

2226.   The ongoing fraudulent Pyramid Scheme could not have been perpetrated over a substantial period without the knowledge and complicity of said Defendants.

2227.   These misrepresentations and statements were material and were relied upon by Plaintiffs as true, inducing them to furnish money, directly or indirectly, to said Defendants and recruit new members.

2228.   In consequence of the reliance on the negligent, intentional or reckless misrepresentations, Plaintiffs and the Putative Class have paid artificially inflated prices for worthless membership interests, suffered great financial losses, and have also incurred considerable expenses and loss of income, and have otherwise been greatly damaged during the Class Period and demand to be made whole.

<u>TENTH CLAIM FOR RELIEF</u>
TORTIOUS AIDING AND ABETTING
(Against All Defendants)

2229.   Plaintiffs incorporate by reference all allegations in all previous paragraphs, as though fully set forth here.

2230.   Each Defendant provided substantial assistance or encouragement to the other Defendants in committing the primary causes of action alleged herein, and did so with unlawful intent and knowledge that such parties were perpetuating an illegal Pyramid Scheme yet continuing to substantially assist or encourage.

2231.   Defendants rendered this substantial assistance despite their knowledge that TelexFree's operations constituted an unlawful, unfair, deceptive and unsustainable Pyramid Scheme and financial fraud.

2232.   Such substantial assistance rendered by Defendants despite their knowledge of, or with reasonable diligence they should have known of, the illegal nature of TelexFree's operations, is detailed above and includes, but is not limited to:

a.      managing and controlling TelexFree and its affiliated entities;

b.      providing accounting services to TelexFree;

c.      providing legal services to TelexFree;

d.      publicly certifying that TelexFree's business model and operations were legal, proper, and economically viable and sustainable;

e.      providing banking, investment and asset management services for

TelexFree and its management;

f.      promoting TelexFree AdCentral packages;

g.      continuing to provide financial services following the Brazilian Court's

injunction to stop TelexFree's business in Brazil;

h.      processing payments to, from, and on behalf of TelexFree and its affiliated

entities;

i.      processing payments for transfers of funds which deepened TelexFree's

insolvency; and

j.      setting up TelexFree's computer servers in a foreign country with the

intent to avoid prosecution, legal service on the benefits of United States

legal process and otherwise with knowledge that TelexFree was an

unlawful Pyramid Scheme.

2233.   Each and every action taken by the Defendant's enumerated above as substantial assistance is explicitly incorporated by reference.

2234.   By each Defendant's actions participating in the Pyramid Scheme, as alleged above, each said Defendant aided and abetted the commission of the causes of action alleged herein.

2235.   As a direct and proximate result of TelexFree's illegal Pyramid Scheme and all the activities performed in connection therewith, to which Defendants provided substantial assistance, Plaintiffs and the Putative Class sustained damages and losses and demand to be made whole.

## ELEVENTH CLAIM FOR RELIEF
## TORTIOUS AIDING AND ABETTING
### (Against Defendants Wells Fargo Advisors and Cardenas)

2236.   Plaintiffs incorporate by reference all allegations in all previous paragraphs, as though fully set forth here.

2237.   Defendants Wells Fargo Advisors and Cardenas provided substantial assistance to Defendant Wanzeler in committing the primary causes of action alleged herein against him, and did so with unlawful intent and knowledge that they were perpetuating an illegal Pyramid Scheme yet continuing to substantially assist.

2238.   Defendants Wells Fargo Advisors and Cardenas rendered this substantial assistance despite their knowledge that TelexFree's operations constituted an unlawful, unfair, deceptive and unsustainable Pyramid Scheme and financial fraud and that Wanzeler was engaged in that Scheme.

2239.   Such substantial assistance rendered by Defendants Wells Fargo Advisors and Cardenas despite their knowledge of, or with reasonable diligence they should have known of, the illegal nature of TelexFree's operations and Wanzeler's funds, is detailed above and includes, but is not limited to:

      a.      providing investment and asset management services for TelexFree and Wanzeler in connection with illegally obtained funds;

      b.      opening and managing accounts for Wanzeler and providing him advice on TelexFree's operations and funds when they knew of the fraudulent nature of the TelexFree Scheme;

      c.      continuing to provide financial services following the Brazilian Court's injunction to stop TelexFree's business in Brazil; and

      d.      enabling Wanzeler to hide and invest assets and launder illicit monies

derived from TelexFree's illegal activities.

2240.   By Defendants Wells Fargo Advisor's and Cardenas's actions, as alleged above, each said Defendant aided and abetted the commission of the causes of action alleged herein.

2241.   As a direct and proximate result of TelexFree's illegal Pyramid Scheme and all the activities performed in connection therewith and Wanzeler's tortious conduct, to which said Defendants provided substantial assistance, Plaintiffs and the Putative Class sustained damages and losses and demand to be made whole.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, pray for judgment against Defendants as follows:

1.      The Court determine that this action be maintained as a class action under Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiffs as Class Representatives and their counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class;

2.      The unlawful conduct alleged herein be adjudged and decreed an unlawful Pyramid Scheme in violation of Massachusetts General Laws Chapter 93, § 69 and Chapter 93A, §§ 2 and 11;

3.      Plaintiffs and the members of the Class recover damages, as provided by law, to the maximum extent allowed under the law, including, without limitations, multiple damages, against Defendants;

4.      Plaintiffs and the members of the Class recover their costs of suit, including reasonable attorneys' fees, as provided by law;

5.      Defendants, their affiliates, successors, transferees, assignees and other officers,

directors, partners, agents and employees thereof, and all other persons acting or claiming to act

on their behalf or in concert with them, be permanently enjoined and restrained from in any

manner continuing, maintaining, or renewing the conduct alleged herein, or from entering into,

adopting, or following any practice, plan, program, or device having a similar purpose or effect;

6.      Plaintiffs and the members of the Class be awarded pre- and post-judgment

interest as provided by law, and that such interest be awarded at the highest legal rate from and

after the date of service of this complaint;

7.      Plaintiffs and the members of the Class be granted such other and further relief as

the case may require and the Court may deem just and proper.

## VIII.    DEMAND FOR JURY TRIAL

Plaintiffs and the Putative Class demand a jury trial of their claims to the extent

authorized by law.

Respectfully submitted,

Dated November 29, 2019

/s/ Robert J. Bonsignore
Robert J. Bonsignore, Esq.
(NH Bar #21241)
BONSIGNORE TRIAL LAWYERS, PLLC
3771 Meadowcrest Dr.
Las Vegas, NV 89121
Telephone:  781-856-7650
Email:  rbonsignore@classactions.us

Ronald A. Dardeno, Esq.
(BBO No. 548278)
Alexander D. Wall, Esq.
(BBO No. 688881)
Law Offices of Frank N. Dardeno
424 Broadway
Somerville, MA  02145
Telephone:  617-666-2600
Email: rdardeno@dardeno.com

William R. Baldiga, Esq.
(MA Bar No. 542125)
(NY Bar No. 4813846)
Brown Rudnick LLP
One Financial Center
Boston, MA  02111
Telephone:  617-856-8586
Email:  wbaldiga@brownrudnick.com

Evans J. Carter, Esq.
(MA Bar No. 076560)
Evans J. Carter, P.C.
860 Worcester Road, 2nd Floor
P.O. Box 812
Framingham, MA  01701
Telephone:  508-875-1669
Email:  ejcatty1@verizon.net

D. Michael Noonan, Esq.
(MA Bar No. 558247)
(NH Bar No. 8214)
(VT Bar No. 4050)
(ME Bar No. 7240)
Christine M. Craig, Esq.
(MA Bar No. 631211)
(NH Bar No. 12842)
(ME Bar No. 8954)
Nicholas G. Kline
(MA Bar. No. 704311)
(ME Bar No. 005948)
(NH Bar No. 268422)
Shaheen and Gordon
353 Central Ave.
7th Floor
P.O. Box 977
Dover, NH  03821
Telephone:  603-871-4144
Email: mnoonan@shaheengordon.com
Email: ccraig@shaheengordon.com
Email: cmhart@shaheengordon.com

R. Alexander Saveri, Esq.
(CA Bar No. 173102)
Cadio Zirpoli, Esq.
(CA Bar No. 179108)
Saveri & Saveri, Inc.
706 Sansome Street
San Francisco, CA  94111
Telephone:  415-217-6810
Email:  rick@saveri.com
Email:  cadio@saveri.com
Email:  carl@saveri.com

Ronald P. Passatempo, Esq.

(MA Bar No. 632508)
Ronald P. Passatempo Law Offices
200 Broadway
Lynnfield, MA  01940
Telephone: 781-596-3100
Email: passatempolaw@comcast.net

William Coulthard, Esq.
(NV Bar No. 3927)
Michael Gayan, Esq.
(NV Bar No. 11135)
Kemp, Jones & Coulthard, LLP
Wells Fargo Tower
3800 Howard Hughes Parkway, 17th Floor
Las Vegas, NV  89169
Telephone:  702-385-6000
Email:  w.coulthard@kempjones.com

D. Scott Dulea, Esq.
(MA Bar No. 670416)
Goldberg & Dullea
5 Briscoe Street
Beverly, MA  01915
Telephone:  978-922-4025
Email:  scott@goldberganddulles.com

Jan R. Schlichtmann, Esq.
(MA Bar No. 445900)
Jan R. Schlichtmann, Attorney at Law, PC
P.O. Box 233
Prides Crossing, MA  01965
Telephone:  978-927-1037
Email:  jan@schlichtmannlaw.com

Adriana Contartese, Esq.
(FL Bar No. 89634)
Law Offices of Adriana Contartese
OCN Document Prep Suite 926
19W Flagler Street
Miami, FL  33130
Telephone: 617-268-3557
Email: adriana911@juno.com

Steven Jay German
Begam Marks & Traulsen PA
11201 N Tatum Blvd., Ste. 110
Phoenix, AZ 85028
480-626-2700
Fax: 480-607-9031

Email: steve@bmt-law.com

Ihuoma Igboanugo, Esq.
(NC Bar No. 46618)
The Crescent Law Practice
183 Wind Chime Court, Suite 100
Raleigh, NC  27615
Telephone: 919-341-9707
Email: ihuoma2007@yahoo.com

Stephen M. Smith, Esq.
(NY Bar No. 277784)
(VA Bar No. 14362)
(NY Bar No. 277784)
(DC Bar No. 230995)
Brain Injury Law Center
2100 Kecoughtan Road
Hampton, VA  23661
Telephone:  877-840-3431
Email:  ssmith@braininjurylawcenter.com

Lisa Sleboda, Esq.
(PA No. 71580)
Bonsignore Trial Lawyers, PLLC
23 Forest Street
Medford, Mass. 02155
Telephone:  781-856-7650
Email:  lsleboda@class-actions.us