**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| IN RE: TELEXFREE SECURITIES LITIGATION<br><br>**This Document Relates To:**<br><br>**All Cases** | **MDL No. 4:14-md-2566-TSH** |

| | |
|---|---|
| CELIO DA SILVA, RITA DOS SANTOS, PUTATIVE CLASS REPRESENTATIVES AND THOSE SIMILARLY SITUATED,<br><br>              Plaintiffs,<br>   v.<br><br>TELEXELECTRIC, LLLP; *et al.*,<br><br>            Defendants. | CLASS ACTION<br><br>FIFTH CONSOLIDATED AMENDED COMPLAINT<br><br>DEMAND FOR TRIAL BY JURY |

# TABLE OF CONTENTS

I.    **OVERVIEW** ................................................................................................ **5**

II.   **PROCEDURAL ALLEGATIONS** ............................................................ **14**

III. **PARTIES** .................................................................................................. **14**

   **A. PLAINTIFFS** .......................................................................................... **14**

   **B. DEFENDANTS** ....................................................................................... **15**

     1.   The TelexFree Insiders ........................................................... 15

     2.   The Licensed Professionals ..................................................... 16

     3.   Financial Services Providers ................................................... 19

     4.   Other Defendants ................................................................... 24

     5.   TelexFree Entities ................................................................. 24

   **C. SETTLED DEFENDANTS** ...................................................................... **25**

   **D. THIRD PARTIES** .................................................................................. **27**

IV.  **DETAILED ALLEGATIONS** .................................................................. **30**

   **A. THE TELEXFREE SCHEME** ................................................................ **30**

   **B. THE INSIDERS** ..................................................................................... **31**

     1.   Merrill, Wanzeler and Costa Form TelexFree ........................... 31

     2.   The Numerous TelexFree Entities Overlapped and Functioned As One ..................... 32

     3.   TelexFree Relied on Its Home Office Employees To Carry Out Unlawful Acts ......... 35

   **C. TELEXFREE'S PROMISED RETURNS** ............................................... **36**

   **D. TELEXFREE'S BACK OFFICE** ............................................................ **38**

    **E. TELEXFREE'S MARKETING AND PUBLIC STATEMENTS WERE EASILY DETECTABLE BY THE DEFENDANTS** .................................................. **39**

     **F. BRAZILIAN AUTHORITIES INVESTIGATE AND THEN CLOSE DOWN TELEXFREE BRAZIL IN 2013** .............................................................. **42**

   **G. GOVERNMENTAL INVESTIGATIONS LEAD TO TELEXFREE'S DEMISE** ..... **43**

   **H. ENFORCEMENT ACTIONS BY STATE AND FEDERAL AUTHORITIES** ......... **44**

   **I. THE ROLE OF THE BANKS** ................................................................. **48**

     1.   Legal Obligations of Banks To Understand And Monitor Their Customers' Business Activities ................................................................... 49

     2.   The Defendant Banks' "Know Your Client" Protocols Identified TelexFree As A Fraudulent Enterprise ................................................................. 52

     3.   Monitoring ........................................................................... 59

     4.   Money Laundering ................................................................. 62

   **J. THE ROLE OF PAYMENT PROCESSORS** ......................................... **63**

     1.   How the Payment Processing System Works ............................. 66

   **K. THE ROLE OF THE LICENSED PROFESSIONALS** ............................. **71**

V.   **DETAILED ALLEGATIONS ABOUT EACH DEFENDANT** ..................... **74**

   **A. DEFENDANT BANKS** ........................................................................... **74**

     1.   Defendant Bank of America ..................................................... 74

     2.   Defendants Wells Fargo Bank, Wells Fargo Advisors, and Mauricio Cardenas .......... 97

3.     Defendant TD Bank .................................................................................... 128
4.     Settled Defendants Fidelity Bank and John Merrill ................................... 147
5.     Defendant PNC Bank ................................................................................. 151
6.     Settled Defendant Synovus ........................................................................ 158

**B. DEFENDANT PAYMENT PROCESSING SERVICES COMPANIES ..... 159**
1.     How The Payment Processing System Works ........................................... 161
2.     TelexFree's Relationship With and Use of Payment Processors ............... 164
3.     ProPay ......................................................................................................... 167
4.     Third Party GPG ......................................................................................... 169
5.     Settled Defendant Base Commerce ........................................................... 169
6.     Vantage Payments ...................................................................................... 176
7.     Allied Wallet .............................................................................................. 180
8.     IPS ............................................................................................................... 182
9.     Bank Card Consultants .............................................................................. 189
10.    Priority Payout ........................................................................................... 198

**C. LICENSED PROFESSIONALS ................................................................. 208**
1.     The Nehra Defendants ................................................................................ 211
2.     The Babener Defendants ............................................................................ 217
3.     The Garvey Schubert Defendants .............................................................. 226
4.     The Sheffield Group ................................................................................... 240
5.     PWC ............................................................................................................ 247

**D. OTHER DEFENDANTS ............................................................................. 254**
1.     Telecom Logic and Ryan Mitchell ............................................................ 254

**VI.   CLASS ACTION ALLEGATIONS ............................................................... 263**

**VII. FRAUDULENT CONCEALMENT ............................................................... 267**

**VIII. CLAIMS FOR RELIEF ................................................................................. 268**

FIRST CLAIM FOR RELIEF VIOLATIONS OF MASSACHUSETTS GENERAL
LAWS,   CHAPTER 93, SECTIONS 12 and 69 (Against TelexElectric, LLLP, Telex
Mobile, Holdings, Inc., James M. Merrill, Carlos N. Wanzeler, Carlos Roberto Costa, Steven
M. Labriola, Joseph H. Craft, Ana Paula Oliveira, Andreia B. Moreira, Katia Wanzeler, The
Estate of Jeffrey A. Babener, Gerald P. Nehra, Gerald P. Nehra, Attorney at Law, Nehra and
Waak) ........................................................................................................................ 268
SECOND CLAIM FOR RELIEF VIOLATIONS OF MASSACHUSETTS GENERAL
LAWS,   CHAPTER 93A, SECTIONS 2 AND 11 (Against James M. Merrill, Carlos
N. Wanzeler, Carlos Roberto Costa, Steven M. Labriola, Joseph H. Craft, Ana Paula Oliveira,
Andreia B. Moreira, Katia Wanzeler, The Estate of Jeffrey A. Babener, Gerald P. Nehra,
Gerald P. Nehra, Attorney at Law, and Nehra and Waak) ...................................... 269
THIRD CLAIM FOR RELIEF CIVIL CONSPIRACY (Against TelexElectric, LLLP,
Telex Mobile, Holdings, Inc., James M. Merrill, Carlos N. Wanzeler, Carlos Roberto Costa,
Steven M. Labriola, Joseph H. Craft, Ana Paula Oliveira, Andreia B. Moreira, Katia
Wanzeler, The Estate of Jeffrey A. Babener, Gerald P. Nehra, Gerald P. Nehra, Attorney at
Law, Nehra and Waak, Garvey Schubert P.C., Robert Weaver, Sara P. Sandford, The

Sheffield Group, Inc., Telecom Logic, LLC, Ryan James Mitchell, Fidelity Co-operative Bank John Merrill, Kevin Staten, International Payout Systems, Inc., Edwin Gonzalez, Natalia Yenatska, Base Commerce, John Hughes, Dustin Sparman, Allied Wallet, Inc, Ahmad Khawaja, Mohammad Diab, Priority Payout, Corp., Thomas A. Wells, ) .............................. 271

**FOURTH CLAIM FOR RELIEF NEGLIGENT MISREPRESENTATION** (Against TelexElectric, LLLP, Telex Mobile, Holdings, Inc., James M. Merrill, Carlos N. Wanzeler, Carlos Roberto Costa, Steven M. Labriola, Joseph H. Craft, Ana Paula Oliveira, Andreia B. Moreira, Katia Wanzeler, The Estate of Jeffrey A. Babener, Gerald P. Nehra, Gerald P. Nehra, Attorney at Law, Nehra and Waak) ...................................................................................... 273

**FIFTH CLAIM FOR RELIEF VIOLATIONS OF MASSACHUSETTS GENERAL LAWS, CHAPTER 110a, SECTION 410(b)** (Against TelexElectric, LLLP, Telex Mobile, Holdings, Inc., James M. Merrill, Carlos N. Wanzeler, Carlos Roberto Costa, Steven M. Labriola, Ana Paula Oliveira, Andreia B. Moreira, Katia Wanzeler, The Estate of Jeffrey A. Babener, Gerald P. Nehra, Gerald P. Nehra, Attorney at Law, Nehra and Waak) ............ 274

**SIXTH CLAIM FOR RELIEF FRAUD** (Against TelexElectric, LLLP, Telex Mobile, Holdings, Inc., James M. Merrill, Carlos N. Wanzeler, Carlos Roberto Costa, Steven M. Labriola, Ana Paula Oliveira, Andreia B. Moreira, Katia Wanzeler, The Estate of Jeffrey A. Babener, Gerald P. Nehra, Gerald P. Nehra, Attorney at Law, Nehra and Waak ............. 276

**SEVENTH CLAIM FOR RELIEF TORTIOUS AIDING AND ABETTING** (Against All Defendants) .................................................................................................................... 279

**EIGHTH CLAIM FOR RELIEF UNJUST ENRICHMENT** (Against All Defendants) 280

**IX. PRAYER FOR RELIEF** .................................................................................... 281

**X. DEMAND FOR JURY TRIAL** ........................................................................ 282

Putative Class Representative Rita Dos Santos ("Dos Santos") and Anthony Cellucci ("Cellucci") on behalf of themselves and all others similarly situated ("Plaintiffs" or "Class Representatives") through their undersigned attorneys, hereby bring this this action against the defendants named herein. The allegations are based on Plaintiffs' personal knowledge as to their own acts, and on information and belief as to all other matters, except for the allegations sounding in fraud, acts supported by documentary evidence, and such information and belief having been informed by the investigation conducted by Plaintiffs' counsel. Plaintiffs' investigation has included, without limitation:

(a) interviews with TelexFree CPA and CFO Joseph Craft and review and analysis of documents provided by Mr. Craft;

(b) review and analysis of documents obtained in October 2020 from the Bankruptcy Trustee in the TelexFree bankruptcy proceedings;

(c) interviews with TelexFree victims and former officers and employees;

(d) review of various newly filed public records associated with TelexFree, its control persons, and its properties including recent SEC guilty pleas; and

(e) expert analysis.

Counsel's investigation into the matters alleged herein is ongoing and many relevant facts continue to be known only to, or remain exclusively within the custody or control of, the Defendants. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

On behalf of themselves and the class they seek to represent, Plaintiffs allege as follows:

## I.   OVERVIEW

1.      This case stems from one of the biggest pyramid and Ponzi schemes in history.

TelexFree, Inc., TelexFree LLC, TelexFree Financial, Inc., and their related entities, insiders and associates (collectively "TelexFree") purported to be in the sale of long-distance telephone business. In reality, TelexFree had virtually no income from its purported business. Instead, it sold "memberships" to its unsophisticated victims falsely promising a guaranteed passive return. The resale of the Ad Central membership plans was at the heart of the pyramid scheme.

2.      TelexFree falsely represented that it had developed cutting edge technology. TelexFree targeted vulnerable individuals in immigrant communities who spoke English as a second language, religious communities, and the uneducated, among others. To build trust and expand its market, TelexFree encouraged individual participants to target family members and friends.

3.      Specifically, TelexFree held itself out as a competitor of Skype-like long-distance calling plans. TelexFree sold a monthly unlimited calling plan called 99TelexFree Voice. For $49.90 a month the buyer received unlimited international calling over TelexFree's voice over internet system ("VOIP").

4.      TelexFree held itself out as a multilevel marketing or "MLM" enterprise. In addition to its 99TelexFree Voice product, TelexFree also invited the public to purchase "memberships" which purported to allow an individual to buy and resell 99TelexFree Voice to others.  These were falsely presented as a lucrative business opportunity which would provide guaranteed passive returns.

5.      Membership cost $50. Once a member, an individual could buy two types of packages. For $289, the member received an ADCENTRAL kit which contained ten (10) one-month 99TelexFree Voice products. For $1,375, members could purchase an ADCENTRAL FAMILY membership kit which was equivalent to five (5) ADCENTRAL packages. TelexFree

openly and unlawfully offered its members a guaranteed passive return.

6.      While each one-month subscription was ostensibly for resale, members were not required to sell them to receive a return. For example, if the member who purchased an individual ADCENTRAL kit posted one copy of an advertisement provided by TelexFree on the internet each day for one week, TelexFree would "buy back" any unsold VOIP plan for $20. The work required to post the ads was minimal – it could be accomplished in a few minutes – and each ADCENTRAL kit allowed a member to do this for one year.

7.      If a member who purchased an ADCENTRAL FAMILY kit posted five advertisements per day for one week, TelexFree would "buy back" any unsold VOIP plans for $100. Thus, as TelexFree emphasized on its website, in its promotional materials, and at its "extravaganzas" held around the world, members were guaranteed a return on their investment of over 200% even if they never sold a single one-month subscription of 99TelexFree Voice. TelexFree's website assured its unsophisticated victims that they were guaranteed to make money even if they never sold TelexFree's VOIP product. The website announced:

> Be our promoter
> Earn money doing announcements on Internet!
> Through a ADCENTRAL, that you geot [sic] for the amount of US $299 (annually).
> The promoter will receive US$20 each week that makes 7 different announcements in websites of free announcements online, from Monday to Sunday. All in a way fast, easy, and standardized in your virtual office (BO) TelexFree.
> This will be for the 52 weeks of the year, of your contract, then see the situation:
> 52 weeks x $20 (Putting the 7 announcements) = $1,040 in the year.

8.      This is what TelexFree's victims signed up for. A member could buy as many of these packages as they wanted and were encouraged to do so by TelexFree.

9.      In fact, however, contrary to TelexFree's false descriptions of its business as a telecommunications company, virtually all of its revenue came from the sales of ADCENTRAL

and ADCENTRAL FAMILY memberships – not the sale of telephone services. For example, according to the Massachusetts Secretary of the Commonwealth ("SOC"), in 2012 and 2013, TelexFree had 783,771 investments of either $289.00 or $1,375.00 totaling $880,189,455.32. During the same period the SOC could identify less than one percent (1%) of TelexFree's total income as sales of VOIP.

10.     To a professional banker, or other financial professional, TelexFree's business model had the classic hallmarks of both a Ponzi scheme and a pyramid scheme.  In a Ponzi scheme, a business fraudulently persuades victims to invest money in a seemingly legitimate business, often by guaranteeing a return on investment. In reality, the business has no or negligible legitimate operations and provides few or no actual products or services. A pyramid scheme is a variation on a Ponzi scheme. In a pyramid scheme, a participant makes a payment to a multilevel marketing ("MLM") company in return for the right to sell a product and the right to receive rewards for recruiting other participants with little or no relation to the sale of the product to end users. Each new group of recruits forms a tier in a pyramid, hence the name "pyramid scheme."

11.     In each type of scheme, the fraudsters promise to pay – and do pay some – returns and/or commissions to the earlier investors to bring in new investors/participants to ensure a continual flow of new funds. Continual expansion is essential because the business has no meaningful legitimate operations and, therefore, no legitimate income to use to fulfill its promises of payment to its participants. Massive continuing and ever-growing new investment is essential to prolong the scheme. Inevitably, however, the influx of new investments and participants stops or slows such that the promised returns cannot be paid and the scheme collapses. This happened to TelexFree in mid-April 2014.

12.     TelexFree operated its unlawful scheme in many countries around the world, including Brazil, Peru, Rwanda, the United Kingdom, Canada, and Haiti, among other places. It operated in the United States from 2012 and through mid- April 2014. During this time, Carlos Wanzeler, James Merrill and the other TelexFree fraudsters swindled well over 700,000 victims, taking them for over $1 billion.  TelexFree's operations were headquartered in Marlborough, Massachusetts and a substantial part of the illicit funds obtained by TelexFree worldwide passed through bank accounts in the United States.

13.     The services of banks, payment processors, lawyers, accountants and other professionals are essential to the operation of pyramid/Ponzi schemes because they generate huge sums of illicit cash.  For the crooked insiders to achieve their goal -- to abscond with large amounts of their victims' money -- the cash needs to be collected, consolidated in bank accounts, and then siphoned off and laundered to hide its illegal origin. In addition, to prolong the enterprise before its inevitable collapse, pyramid/Ponzi schemes need to pay participants some amount of their promised returns so that the fraud is not exposed, and they need financial providers to do this.

14.     As detailed below financial service providers also provide the only means of making the source of illegal money as difficult to detect as possible by progressively adding transactional complexity and legitimacy to the equation. Depending on the nature, timing and landing place of the victim funds, this process is alternatively defined as layering, laundering or sheltering.  Finally, financial service providers also provide the only means for financial scamsters to move victim funds out of the reach of the justice system, most often into an offshore account. This is called sheltering.

15.     Banking and anti-money laundering regulations make clear that the definition of

routine banking excludes all activity after a financial institution obtains actual knowledge that the customer is operating an unlawful enterprise

16.     Every Ponzi or pyramid scheme depends on the provision of financial services by banks, payment processors and other financial services companies, as well as accountants, lawyers and other professionals.

17.     TelexFree was no different. During its operation, it collected and deposited enormous amounts of money – over one billion dollars. Cash receipts averaged $6.4 million a month in spring 2013 and increased to $66 million a month in the spring of 2014. Without these financial services, TelexFree's operations would have collapsed. The assistance provided by the Defendant Banks, Payment Processors and other professionals allowed TelexFree to continue to operate and expand and allowed TelexFree's principals to abscond with large sums of money paid in by participants. These Defendants were aware that TelexFree was a fraudulent enterprise when they provided this assistance.

18.     The Defendant Banks, among other things, provided essential bank accounts and other services that the TelexFree insiders used to collect and abscond with massive amounts of money from their victims. The Banks did so knowing that TelexFree was a fraud. Each Defendant Bank learned of the TelexFree fraud because they were legally required to investigate and monitor their clients. The fact that each closed TelexFree accounts confirmed their knowledge. Decisively, each Defendant Bank continued after such closures to provide other accounts and services enabling TelexFree's unlawful MLM to continue. As a result, TelexFree continued to use the Banks to fraudulently collect huge sums of money from their victims, and to launder and abscond with it.

19.     The payment processors likewise used their systems to collect enormous sums

from TelexFree's victims via credit card payments and facilitated their deposit into the TelexFree bank accounts, among other things.

20.     The lawyers, accountants and other professionals facilitated the fraud advising the TelexFree insiders on the means to avoid the attention and oversight of regulatory authorities and law enforcement by creating an illusion of legitimacy for the TelexFree operations and by instructing TelexFree how to shelter its ill-gotten gains.

21.     No later than February 2013, the fact that TelexFree was investigated by numerous law enforcement bodies around the world, including the Brazilian Bureau of Consumer Protection ("ProCon") in Acre, Brazil and the Massachusetts Securities Division was known to its financial services providers. ProCon effectively shut down TelexFree's operations in Brazil in June 2013.

22.     It is not disputed that during the Spring of 2013:

a.  a Brazilian court found TelexFree's Brazilian operations to be fraudulent;

b.  a Brazilian court described TelexFree's operations in terms of the quintessential pyramid scheme;

c.   TelexFree's own Brazilian lawyers unwittingly admitted its operations in what was a quintessential pyramid scheme;

d.  TelexFree's Brazilian lawyer Djacir Falcão ("Falcão") advised the Brazilian court that an injunction would cause the company to enter bankruptcy and: "Running the company really becomes difficult because of the court decision, so we will appeal";

e.  Falcão informed the Brazilian court that "should the company spend a few more days being prohibited from signing up new investors, they would have no money

to pay the old ones";

    f.   all of TelexFree's appeals in the Brazilian courts were denied;

    g.   a Brazilian court found that the problem is earnings will be exhausted when the main source of revenue—new member registrations—stops;

    h.   a Brazilian court found that adding new Members was more important to TelexFree than trying to sell its VoIP product;

    i.   a Brazilian court found that many affiliates suffered detrimental losses.  affiliates do not have the opportunity to recover their initial payment to TelexFree; and

    j.   In June 2013, Brazilian court entered an order freezing TelexFree's funds in Brazil, blocking future payments to TelexFree in Brazil, and enjoining TelexFree from signing on new members in Brazil.

23.    It is also not disputed that:

    a.   TelexFree required the constant inflow of new investor funds to sustain the pyramid side of its overall scheme;

    b.   TelexFree's revenues were generated from website-based purchases;

    c.   TelexFree's use of credit cards was inextricably linked to TelexFree's ability to operate.

    d.   TelexFree would collapse within months without access to financial services, including banking and payment processing.

    e.   TelexFree met this need by committing fraud on the victim Putative Class members;

24. It cannot be disputed that:

    a.   TelexFree's banks and payment processors were severing ties with the company

by August 2013;

    b.   as a result, TelexFree was experiencing significant difficulty locating U.S. banks and payment processors willing to service their "business";

    c.    Bank of America had severed ties but then immediately reopened new accounts using an unlawful method the industry refers to as layering.

25.    The constant need for new funds – and the unparalleled success bilking members of the Putative Class - drove TelexFree and its co-conspirators, accomplices, aiders and abettors to work with each other to ever increase TelexFree's victim-funded revenue stream.

26.    As detailed below, thereafter the fact that TelexFree was operating an unlawful MLM came to the attention of the financial service providers thereafter again and again in ever increasingly clear, direct, and incontrovertible ways.

27.    As the governmental investigations and publicity about them intensified, TelexFree collapsed. On April 14, 2014, three TelexFree entities—TelexFree Inc., TelexFree LLC, and TelexFree Financial LLC—filed for Chapter 11 bankruptcy protections in the United States Bankruptcy Court for the District of Nevada. The company's U.S. website was taken down the same day, preventing participants from accessing funds held in TelexFree's systems.

28.    The next day, on April 15, 2014, federal agents from the FBI and Homeland Security executed search warrants at TelexFree headquarters in Marlborough, Massachusetts. During the search, an officer intercepted Settled Defendant Joseph H. Craft—TelexFree's CFO—trying to leave the premises. Craft was carrying ten cashier's checks issued by Defendant Wells Fargo Bank totaling $37,948,296 dated just prior to the bankruptcy filing.

29.    The same day, the U.S. Securities and Exchange Commission and the Massachusetts Securities Division filed actions against TelexFree and its insiders. On July 23,

2014, Wanzeler and Merrill were indicted by the Grand Jury. James Merrill eventually pled guilty on October 22, 2016 to one count of wire fraud conspiracy and eight counts of wire fraud. Merrill was sentenced on March 22, 2017 to six years in prison followed by three years of supervised release. He remains in prison. Merrill also agreed to forfeit approximately $140 million and other assets. Carlos Wanzeler fled to Brazil upon learning that he was under investigation and remains a fugitive. There is currently a federal warrant for his arrest.

## II.    PROCEDURAL ALLEGATIONS

30.     This Court has subject-matter jurisdiction over the instant matter pursuant to 28 U.S.C. § 1332(d) and the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §§ 1711, *et seq*., which vest original jurisdiction in the district courts of the United States for any multi-state class action where the aggregate amount in controversy exceeds $5,000,000 and where the citizenship of any member of the class of plaintiffs is different from that of any defendant.  The $5,000,000 amount-in-controversy and diverse citizenship requirements of CAFA are satisfied in this case.

31.     Venue is proper under 28 U.S.C. § 1391 since a substantial part of the acts, omissions and transactions giving rise to this action occurred in this district; certain Defendants reside in this district; and TelexFree, LLC, TelexFree, Inc. and TelexFree Financial, Inc. (related entities not named as Defendants) are currently debtors in Chapter 11 proceedings pending in this district.

## III.    PARTIES

### A. PLAINTIFFS

32.     Plaintiff Anthony Cellucci ("Cellucci") is an individual who resides in Belmont, Massachusetts. Cellucci tendered funds for a TelexFree Membership and its promised pre-March

9, 2014 return on investment.

33.     Plaintiff Rita D. Dos Santos ("Dos Santos") is an individual who resides in Massachusetts.  Dos Santos tendered funds for a TelexFree Membership and its promised pre-March 9, 2014 return on investment.

## B. DEFENDANTS

### 1. The TelexFree Insiders

34.     James M. Merrill ("Merrill") is an individual and is currently incarcerated at FMC Devens in Devens, Massachusetts for his role in TelexFree.  Merrill co-founded TelexFree and served as CEO and held multiple other executive titles and filled across the board roles in pyramid scheme design, marketing, management sales and finance.

35.     Carlos N. Wanzeler ("Wanzeler") is an individual with a last known usual place of abode of 373 Howard Street, Northborough, Massachusetts. Wanzeler cofounded TelexFree and held multiple executive titles and served across the board roles in pyramid scheme design, marketing, management, sales, and financing. Wanzeler is currently a fugitive after absconding to Brazil during federal and state investigations into TelexFree.

36.     Carlos Roberto Costa ("Costa") is an individual with a last known usual place of abode of Rua Umbizeiro, 37, Bairro de Itapoa, Vila Velha, Espirito Santo, 29101-00 Brazil. Costa co-founded TelexFree and ran the Brazilian side of the scheme.

37.     Steven M. Labriola ("Labriola") is an individual with a last known usual place of abode of 21 Kiwanis Beach Road, Upton, Massachusetts 01568. As the International Marketing Director, Labriola was the day-to-day face of the company for many Promoters as he participated in marketing events and conference calls.

38.     Andreia B. Moreira, also known as Andreia Moreira Biachi, also known as Andreia Pinto ("Moreira"), is an individual having a last known usual place of abode of 216 W.

Union Street, Ashland, Massachusetts 01721. Moreira filled across the board roles in marketing, management, sales, and finance.

39.     Ana Paula Oliveira ("Oliveira"), is an individual having a last known usual place of abode of 40 Harvard Street, Apt 2, Marlborough, Massachusetts 01752. Oliveira filled across the board roles in marketing, management, sales, and finance.

40.     Moreira and Oliveira worked at TelexFree's Marlborough Office and were also responsible for implementing the day-to-day activities of the company. For example, they sent wire transfers, addressed Promoter questions and complaints, and interacted with TelexFree's financial services contacts.

41.     Katia Wanzeler is an individual with a last known usual place of abode of 373 Howard Street, Northborough, Massachusetts 01532. Katia Wanzeler is the wife of Carlos Wanzeler and actively assisted her husband in fraudulently stealing and laundering funds that were derived from the TelexFree Pyramid Scheme. On or about May 14, 2014, Katia Wanzeler was apprehended as she attempted to board a flight to Brazil, on which she had a one-way ticket, cash and seventy pounds of luggage.

### 2.  The Licensed Professionals

#### a.  *The Lawyer Defendants*

42.     Gerald P. Nehra, Esq. ("Nehra") is an individual who now resides or formerly resided at 1710 Beach Street, Muskegon, Michigan, 49441 and maintains a second residence at 2149 Tall Oak Court, Sarasota, Florida 34232. Nehra is an attorney duly licensed to practice law in the State of Michigan. Nehra was the first of the defendant attorneys to represent TelexFree and publicly vouched for the legality of the scheme.

43.     Gerald P. Nehra, Attorney at Law, PLLC ("Nehra Law Firm") is a professional limited liability company engaged in the practice of law and duly organized and existing under

the laws of Michigan, with offices located at 1710 Beach Street, Muskegon, Michigan, 49441.  Nehra is its sole member, manager, and registered agent.

44.     Law Offices of Nehra and Waak ("Nehra and Waak Law Firm") is a general partnership formed between Defendants Nehra, Waak, Nehra Law Firm, and Waak Law Firm with primary offices located at 11300 East Shore Drive, Delton, Michigan, 49046, and a secondary office located at 1710 Beach Street, Muskegon, Michigan.

45.     The Estate of Jeffrey A. Babener was created on April 10, 2020 by the Oregon Circuit Court for the County of Multnomah. Jeffrey A. Babener was retained by TelexFree in August 2013 and worked to create a team of MLM experts to assist the scheme. Mr. Babener was an attorney duly licensed to practice law in the State of Oregon. Mr. Babener died on or about March 16, 2020.

46.     At all times material herein, Mr. Babener did business under the assumed business name "Babener & Associates" with a business address of Bank of America Financial Center, 121 SW Morrison Street, Suite 1020, Portland, Oregon 97204.

47.     Garvey Schubert Barer, P.C. was a Professional Corporation duly organized and existing under the laws of the State of Washington at the time of the actions alleged in this complaint. In 2019, the law firm Foster Garvey P.C. was formed through the combination of Garvey Schubert Barer, P.C. and Foster Pepper PLLC. Foster Garvey P.C. is a Professional Service Corporation duly organized and existing under the laws of the State of Washington, with its principal office located at 1111 3rd Avenue, Suite 3000, Seattle, Washington  98101.

48.     Robert Weaver ("Weaver") is an individual having a last known usual place of abode of 2210 NE Thompson Street, Portland, OR 97212. Weaver was the first attorney at Garvey Schubert Barer emailed by Babener when it became clear that TelexFree needed further

legal assistance. Weaver represented TelexFree in criminal defense matters and was particularly involved in preparing TelexFree's defense and submission of false and misleading evidence to the Massachusetts Securities Division. Weaver is an attorney duly licensed to practice law in the State of Oregon.

49.     Samuel C. Kauffman ("Kauffman") is an individual having a last known usual place of abode of 112 SW Abernathy Street, Portland, OR 97279. Kauffman was part of Garvey Schubert Barer's TelexFree team and represented TelexFree in criminal defense matters, particularly in late 2013. Kauffman is an attorney duly licensed to practice law in the State of Oregon.

50.     Gary P. Tober ("Tober") is an individual having a last known usual place of abode of 12028 200th CT NE, Woodinville, WA 98077. Tober was part of Garvey Schubert Barer's TelexFree team and represented TelexFree in its international restructuring and worked on plans to move TelexFree's assets—victim's funds—offshore. Tober is an attorney duly licensed to practice law in the States of Washington and Ohio.

51.     Sara P. Sandford ("Sandford") is an individual having a last known usual place of abode of 9416 Tulalip Shores Road, Tulalip, WA 98271. Sandford was part of Garvey Schubert Barer's TelexFree team and represented TelexFree in its international restructuring and designed and saw through TelexFree's sheltering of victim's funds offshore. Sandford was the lead in forming TelexFree's Grand Cayman entity. Sandford is an attorney duly licensed to practice law in the States of California, Oregon and Washington and Ohio.

52.     At all times each of the above referenced Garvey Schubert attorneys acted within the usual and ordinary course of their employ and with the firm's knowledge and consent

53.     The Sheffield Group, Inc. ("Sheffield Group") is a corporation duly organized and

existing under the laws of the State of Arizona, with its principal offices at 2239 N. Hayden

Road, Suite 103, Scottsdale, Arizona 85257. The Sheffield Group specializes in multi-level

marketing and worked with TelexFree to develop the pre and post March 9, 2014 compensation

plan.

54.     PricewaterhouseCoopers, LLP ("PwC") is a registered foreign limited liability

partnership, organized and existing under the laws of the State of Delaware, having a principal

place of business in New York, New York, and having a place of business at 125 High

Street, Boston, Massachusetts 02110. PwC was retained to assist Defendant Craft and to assist

in TelexFree's international restructuring plans to move TelexFree's assets—victims' funds—

offshore. PwC was an integral part of and lead consultant of the outside TelexFree relied upon in

its international restructuring and designed and worked to ensure that TelexFree's sheltering of

victim's funds offshore was accomplished. PwC was a lead in forming TelexFree's Grand

Cayman entity, and other offshore entities. PwC provided the tax advice that lead to the $15

million dollar IRS preferred lien entered into the docket of the bankruptcy court last month.

### 3. Financial Services Providers

#### a. *The Bank Defendants*

55.     TD Bank, N.A. ("TD Bank") is a national banking institution chartered and

supervised by the federal Office of the Comptroller of the Currency (the "OCC") with its

principal place of business at 15 Broad Street, Boston, Massachusetts 02109. TD Bank provided

banking services to TelexFree from no later than September 2012 to at least November 2013.

56.     Bank of America, N.A. ("Bank of America") is a national banking

institution chartered and supervised by the OCC with a principal place of business in Charlotte,

North Carolina.  Bank of America conducts business in the Commonwealth of Massachusetts at,

*inter alia*, 100 Federal Street, Boston, Massachusetts 02110. Bank of America provided banking

services to TelexFree from no later than February 2012 to March 2014.

57.      Kevin Staten is an individual with a last known place of abode located at 8518 SW Sea Captain Drive, Stuart, Florida 34997. At all material times, Staten was a Senior Vice President with Bank of America. Staten was actively involved in arranging for TelexFree to open an account at Bank of America in February 2014.

58.      Wells Fargo Bank, N.A. ("Wells Fargo") is a national banking institution chartered and supervised by the OCC, with an address at P.O. Box 6995, Portland, Oregon 97228 and a branch at 800 North Magnolia Ave., Orlando, Florida. Wells Fargo conducts business in the Commonwealth of Massachusetts at, *inter alia*, 201 Washington Street, Boston, Massachusetts. Wells Fargo provided banking services, maintained accounts, and received and executed transfers of funds from or for the benefit of TelexFree from no later than June 2012 to April 2014.

59.      Wells Fargo Advisors, LLC ("Wells Fargo Advisors"), at all relevant times, is a limited liability corporation duly organized and existing under the laws of the State of Delaware and having its principal place of business at One North Jefferson Avenue, St. Louis, Missouri 63103. Upon information and belief, in November 2016, Wells Fargo Advisors, LLC's name was changed to Wells Fargo Clearing Services, LLC. Upon further information and belief and representations of counsel, Wells Fargo Advisors, LLC is now known as Wells Fargo Financial Network, LLC.

60.      Mauricio Cardenas ("Cardenas") is an individual having a last known usual place of abode of 12880 Lower River Blvd. Orlando, Florida  32828. During the class period, Cardenas was a Financial Advisor and broker for Wells Fargo Advisors. Cardenas was a close friend of Carlos Wanzeler, advised him how to launder TelexFree's money, and opened multiple

accounts for Wanzeler and TelexFree.

61.     PNC Bank, N.A. ("PNC Bank") is a national banking institution chartered and supervised by the OCC, with its principal place of business at 300 Fifth Avenue, The Tower at PNC Plaza, Pittsburgh, Pennsylvania 15222. PNC Bank conducts business in the Commonwealth of Massachusetts at, *inter alia*, 44 Cedar Street, Worcester, Massachusetts  01609. PNC Bank provided banking services, maintained accounts, and received and executed transfers of funds from or for the benefit of TelexFree from no later than December 2013 to April 2014.

### b.  Payment Processing Service Companies

62.     International Payout Systems, Inc. ("IPS"), also doing business as i-Payout, is a corporation duly organized and existing under the laws of the State of Florida, having its principal offices at 540 NE 4th Street, Second Floor, Fort Lauderdale, Florida  33301. IPS provided payment processing services to TelexFree from at least September of 2013 to at least April of 2013, processing over $101 million in a four (4) month period.

63.     Edwin Gonzalez ("Gonzalez") is an individual with a last known usual place of abode at 12505 Keystone Island, Florida  33181. Gonzales is the President of IPS. Gonzales was actively involved in the TelexFree account and assisted TelexFree with payment processing services.

64.     Natalia Yenatska ("Yenatska") is an individual with a last known usual place of abode at 644 SW 7th Ct, Hallandale Beach, Florida 33009-6920. Yenatska served as IPS' Chief Financial Officer during the class period. Yenatska was actively involved in the TelexFree account and assisted TelexFree with payment processing and marketing services.

65.     ProPay, Inc. ("ProPay"), also doing business as PROPAY.COM, is a corporation duly organized and existing under the laws of the State of Utah with its principal offices at 3400 North Ashton Boulevard, Lehi, Utah 84043. ProPay provided payment processing services to

TelexFree from at least October 2012 to at least January 2014, processing approximately $112 million in a six (6) month period.

66.     Vantage Payments, LLC ("Vantage Payments") is a limited liability company duly organized and existing under the laws of the State of Arizona, having its principal offices at 8300 N. Hayden Road #A207, Scottsdale, Arizona 85251. Vantage Payments provided payment processing related services to TelexFree from at least August 2013 to at least April 2014.

67.     Dustin Sparman ("Sparman") is an individual with a last known usual place of abode of 8702 E. Plaza Avenue 85610, Scottsdale, Arizona 85250. served as Vantage Payments' Managing Partner during the class period and assisted TelexFree with obtaining payment processing services and establishing TelexFree, Ltd.

68.     AlliedWallet, Inc., also d/b/a Allied Wallet ("Allied Inc.") (collectively with Allied Wallet, Ltd. , "Allied Wallet") is a Nevada corporation with a registered agent address of 769 Basque Way, Suite 300, Carson City, Nevada, and has maintained a principal place of business at 9000 Sunset Boulevard, Suite 820, West Hollywood, California.

69.     Allied Wallet, Ltd. is a limited company having its central office in the United Kingdom and its United States office at 900 Sunset Boulevard, Suite 820, West Hollywood, California 90069.

70.     Allied Wallet provided payment processing services to TelexFree from at least August 2013 to at least April of 2014, processing approximately $86 million for TelexFree in a five (5) month period.

71.     Ahmad Khawaja ("Khawaja"), also known as Andy Khawaja, is an individual having a last known usual place of abode of 1800 Rising Glen Road, West Hollywood, CA 90069. Khawaja is the founder, CEO, director, and owner of Allied Wallet.

72.     In or about April 2019, AlliedWallet, Inc. Allied Wallet, Ltd., and Khawaja, along with two other entities, agreed to pay $110,050,941 to settle an action brought by the FTC concerning Allied Wallet's payment processing activity for high risk clients, including TelexFree (the "FTC Action").

73.     Mohammad Diab ("Diab"), also known as Moe Diab, is an individual having a last known usual place of abode of 1123 Spazier Avenue, Glendale, California 91201. Diab is the Chief Operations Officer for Allied Inc. and formerly the Director of Risk and Chargebacks. On or about June 21, 2019, a monetary judgment of $1,000,000 was entered against Diab in the FTC Action pursuant to stipulation.

74.     Amy Rountree ("Rountree") is an individual having a last known usual place of abode of 90 East 1370 South Place, Logan, Utah  84321.  She was the VP of Operations for Allied Inc. On or about July 3, 2019, a monetary judgment of $320,429.82 was entered against Rountree in the FTC Action pursuant to stipulation.

75.     Bank Card Consultants, Inc. ("Bank Card Consultants") is a corporation duly organized and existing under the laws of the State of California, with its principal offices at 23461 S Pointe Drive, Suite 350, Laguna Hills, California 92618. Bank Card Consultants provided payment processing services to TelexFree from at least September 2013 to at least December 2013.

76.     John Yurick ("Yurick") is an individual having a last known usual place of abode of 25212 Earhart Road, Laguna Hills, CA 92653. Yurick was Bank Card Consultant's owner during the class period. Yurick was actively involved in the TelexFree account and assisted TelexFree with payment processing services.

77.     Priority Payout, Corp. ("Priority Payout") is a corporation duly organized and

existing under the laws of the State of Florida, having its principal place of business at 60 SW

Hideaway Place, Stuart, Florida 34994. Priority Payout provided payment processing services to

TelexFree from at least January 2014 to at least April 2014.

78.     Thomas A. Wells ("Wells") is an individual with a last known place of abode

located at 300 NE Town Terrace, Jensen Beach, Florida 34957. At all material times, Wells

served as CEO and authorized representative of Priority Payout. Wells was actively involved in

the TelexFree account and assisted TelexFree with payment processing services.

### 4.   Other Defendants

79.     Telecom Logic, LLC ("Telecom Logic") is a limited liability company duly

organized under the laws of the State of Oregon, having its principal place of business at 1550

SW Mitchell St., Portland, Oregon  97239. Telecom Logic provided TelexFree with ever

increasingly deceptive, slick and difficult to trace services it needed to collect victim funds long

after it confronted TelexFree's founders and bluntly told them they were running a scam.

80.     Ryan James Mitchell ("Mitchell") is an individual with a last known address at

818 SW Third Ave, Suite 137, Portland, Oregon 97204.  At all material times, Mitchell served as

owner, chief software engineer and authorized representative of Telecom Logic.

### 5.   TelexFree Entities

81.     TelexElectric, LLLP ("TelexElectric") is a limited liability limited partnership

organized under the laws of the State of Nevada.  Its registered agent is BWFC Processing

Center, LLC, 3960 Howard Hughes Parkway, Suite 500, Las Vegas, Nevada 89169.

TelexElectric received funds totaling $2,022,329 from TelexFree Inc. and TelexFree LLC.

82.     Telex Mobile, Holdings, Inc. ("Mobile") is a corporation organized and existing

under the laws of the State of Nevada, and having its registered agent as BWFC Processing

Center, LLC, 3960 Howard Hughes Parkway, Suite 500, Las Vegas, Nevada 89169. Mobile

received funds totaling $500,870 from TelexFree Inc. and TelexFree LLC.

## C. SETTLED DEFENDANTS

83.    The Settled Defendants are included because they are necessary to put facts into context and to provide background for the larger conspiracy.

84.    Joseph H. Craft, also known as Joe H. Craft ("Craft") is an individual with a last known usual place of abode at 825 E. Main Street in Boonville, Indiana 47601-1885. Craft is a CPA and privately provided accounting services and financial advice to TelexFree and others before serving as the Chief Financial Officer of TelexFree, Inc. and TelexFree, LLC. Craft was introduced to TelexFree by Nehra in 2012 and stayed involved through to the very end.

85.    Craft Financial Solutions, LLC ("Craft Financial") is a limited-liability company duly organized and existing under the laws of the State of Indiana with a principal place of business located at 825 E. Main Street, Boonville, Indiana, 47601-1885.  Settled Defendant Craft is the sole member and manager of Craft Financial. Craft Financial, through Settled Defendant Craft, provided accounting services and financial advice to TelexFree and others.

86.    Fidelity Co-operative Bank, doing business as Fidelity Bank, ("Fidelity Bank") is a Massachusetts Chartered Banking Institution, having its principal offices at 675 Main Street, in Fitchburg, Massachusetts 01420. Fidelity Bank provided banking services, maintained accounts, and received and executed transfers of funds from or for the benefit of TelexFree and its founders from no later than August 2013 to at least February 2014.

87.    John F. Merrill is an individual with a last known usual place of abode of 7 Kinnicutt Road, Worcester, Massachusetts 01602. John F. Merrill is the brother of Defendant Merrill and served as President and Chief Operating Officer of Fidelity Bank during the class period. Mr. Merrill authorized the transfer of millions of dollars from TelexFree's accounts at Fidelity Bank to the personal accounts of Merrill and Wanzeler.

88.     Synovus Bank ("Synovus") is a Georgia Chartered Banking Institution, having its principal offices at 1148 Broadway, in Columbus, Georgia 31901. Synovus served as the Sponsor Bank for Settled Defendant payment processor Base Commerce during the class period.

89.     Base Commerce, LLC ("Base Commerce") formerly known as Phoenix Payments, LLC, is a limited liability company duly organized and existing under the laws of the State of Arizona with its principal offices at 7910 S. Kyrene Road, Suite 106, Tempe, Arizona 85284. Base Commerce provided payment processing services to TelexFree from at least April 2013 to at least December 2013, processing approximately $36 million in a two (2) month period.

90.     John Hughes ("Hughes") is an individual with a last known usual place of abode of 6455 E. Rustic Drive, Mesa, Arizona 85215. Hughes served as Base Commerce's President during the class period and assisted TelexFree with payment processing services.

91.     Alexander Sidel ("Sidel") is an individual having a last known usual place of abode 4989 E. Karsten Drive, Chandler, AZ 85249-7175. Sidel worked for Base Commerce during the class period and assisted TelexFree with payment processing services.

92.     Jason Doolittle ("Doolittle") is an individual having a last known usual place of abode of 9816 E. Cinnabar Avenue, Scottsdale, AZ 85258-4736. Doolittle worked for Base Commerce during the class period and assisted TelexFree with payment processing services.

93.     John Kirchhefer ("Kirchhefer") is an individual having a last known usual place of abode of 3039 E. Rock Wren Road, Phoenix, AZ 85048-8732. Kirchhefer worked for Base Commerce during the class period and assisted TelexFree with payment processing services.

94.     Brian Bonfiglio ("Bonfiglio") is an individual having a last known usual place of abode of 2335 E. Plum Street, Gilbert, AZ 85298-0320. Bonfiglio worked for Base Commerce

during the class period and assisted TelexFree with payment processing services.

**D. THIRD PARTIES**

95.     Third Party TelexFree, Inc. is a corporation organized under the laws of the
Commonwealth of Massachusetts having a last known principal place of business at 225 Cedar
Hill Street, Suite 200, Marlborough, Massachusetts 01752 (the "Marlborough Office").
TelexFree, Inc. was dissolved "by court order or by the SOC" on or about June 30, 2017.

96.     Third Party TelexFree, LLC is a limited liability company organized under the
laws of Nevada, having a purported place of business at 4705 S. Durango Drive, #100-J51, Las
Vegas, Nevada 89147. However, this address is a Post Office Box. TelexFree, LLC in reality
operated from the Marlborough Office in Massachusetts. At all material times, TelexFree, LLC
was registered with the Corporations Division of the Secretary to the Commonwealth of
Massachusetts (Identification Number 001105166). According to the Nevada Secretary of State's
website, TelexFree, LLC's status is "revoked."

97.     Third Party TelexFree Financial, Inc. is a corporation organized under the laws of
the State of Florida. TelexFree Financial has an "inactive" status per the Florida Secretary of
State's website following an administrative "dissolution for annual report" on September 26,
2014. TelexFree Financial's registered principal place of business at 2321 NW 37th Avenue,
Coconut Creek, Florida 33063 is a residential property. In reality, TelexFree Financial operated
from the Marlborough Office in Massachusetts. TelexFree Financial is a wholly owned
subsidiary of TelexFree, LLC.

98.     TelexFree, Inc., TelexFree, LLC, and TelexFree Financial, Inc. are not currently
Defendants due to their Chapter 11 bankruptcy protections, but they are third-party participants
in the unlawful activities described in this complaint.

99.     Third Party Opt3 Solutions, Inc. ("Opt3"), is a corporation duly organized and

existing under the laws of the State of California, having had its principal place of business at 120 Vantis, Suite 300, Alison Viejo, California.

100.    Third Party Jason A. Borromei, also known as Jay Borromei ("Borromei"), is an individual with a last known place of abode located at 23952 Catbird Court, Laguna Niguel, California 9267. At all material times, Borromei served as President and as an authorized representative of Opt3.

101.    Opt3 and Borromei are not currently named as defendants due to their Chapter 11 bankruptcy protections, but they are third-party participants in the unlawful activities described in this complaint.

102.    Third Party Michael L. Sheffield ("Sheffield" or "Mike Sheffield") is an individual. Sheffield is the founder of Sheffield Group and was recruited to the TelexFree Scheme by Babener and worked on the pre and post March 9, 2014 compensation plan. Together with the lawyers, Sheffield advised TelexFree to keep operating and not to shut down until the business model which they had concluded was unlawful, was made legal.

103.    Third Party Kenneth Lind ("Lind') is an individual. Lind works for the Sheffield Group and worked on the pre and post March 9, 2014 compensation plan.

104.    Third Party Garvin L. DeShazer ("DeShazer") is an individual. DeShazer is an Executive Consultant for The Sheffield Group and worked on the pre and post March 9, 2014 compensation plan.

105.    Third Party Davene Peruzzini ("Peruzzini") is an individual. Peruzzini is Director of Project Management for The Sheffield Group. Peruzzini coordinated TelexFree's initial meetings with The Sheffield Group and worked on the pre and post March 9, 2014 compensation plan.

106.     Third Party Debra (Debbie) Stenmoe ("Stenmoe") is an individual. Stenmoe is Vice President of Operations for The Sheffield Group. Stenmoe coordinated TelexFree's initial meetings with The Sheffield Group and worked on the pre and post March 9, 2014 compensation plan.

107.     Third Party Banc of America Merchant Services, LLC, doing business as Bank of America Merchant Services ("BAMS"), is a Limited Liability Company, with a principal place of business in Charlotte, North Carolina. BAMS conducts business in the Commonwealth of Massachusetts at, *inter alia*, 100 Federal Street, in Boston, County of Suffolk, Commonwealth of Massachusetts 02110.

108.     BAMS is a joint venture of Bank of America and First Data Corporation, and acts as Bank of America's payment processing division. Bank of America's website indicates that "*Merchant Services are provided by Bank of America, N.A. and its representative Banc of America Merchant Services, LLC.*"

109.     Third Party Kathryn A. Ashman (formerly Kathryn A. Coffman) is an individual. At all material times, Ashman was a Branch Manager with TD Bank. Ashman actively assisted TelexFree with opening accounts at TD Bank and executing transfers (including money layering transfers) between TelexFree's accounts at TD Bank.

110.     Third Party Michael Montalvo is an individual. At all material times, Montalvo was a Vice President and Wealth Advisor with Wells Fargo Bank. Montalvo was actively involved in the TelexFree account and served as a banker for TelexFree in coordination with Wells Fargo Advisors' Mauricio Cardenas. Upon information and belief, Montalvo was also employed by Wells Fargo Advisors, LLC.

111.     Third Party Richard Colabella is an individual. Colabella was recommended

to TelexFree by Babener, who had known him for approximately twenty years. Colabella is/was a ranking member of PwC and all of PwC's efforts described below were a result of his efforts.

112.    Third Party Jerry Puzey ("Puzey") is an individual. Puzey is/was a ranking member of PwC and all PWC's efforts described below were a result of his efforts.

113.    Third Party Global Payroll Gateway, Inc. ("GPG") is a corporation duly organized and existing under the laws of the State of California, having its principal offices at 18662 MacArthur Boulevard, Suite 200, in Irvine, California 92612. GPG provided payment processing services to TelexFree from at least April of 2013 to at least January of 2014, processing approximately $110 million in an eight (8) month period.

114.    Third Party Jayme Amirie ("Amirie") is an individual. Amirie was GPG's owner and CEO during the class period. Amirie was actively involved in the TelexFree account and assisted TelexFree with payment processing services.

## IV.    DETAILED ALLEGATIONS

## A. THE TELEXFREE SCHEME

115.    TelexFree purported to sell a Voice over Internet Protocol ("VoIP") telephone service called 99TelexFree. VoIP technology allows users to make telephone calls over the Internet, often far cheaper than they can through traditional carriers. Users could download the 99TelexFree product on their computer or (later) their smartphone and then register their phone number with TelexFree. From the registered phone number, the user would call a local access number, the TelexFree system would recognize a call by a registered phone number, and the user would then hear a new dial tone that would allow them to complete their international call. However, TelexFree's purported VoIP product accounted for just 1% of all TelexFree's revenue.

116.    In the hallmark of a Ponzi/pyramid scheme, TelexFree's real source of income—

about 99% of its revenue—was a scheme whereby members were rewarded for bringing in new members. TelexFree's AdCentral program invited people to invest significant sums to join TelexFree and then allowed them to earn money without ever selling TelexFree's VOIP product. The money from new promoters was used, in turn, to pay TelexFree's financial obligations to the existing promoters. TelexFree's entire business depended on this constant influx of money from new promoters to meet its obligations.

117.    TelexFree used a variety of techniques to draw new promoters into its program, including maintaining a website at www.telexfree.com, posting instructional marketing videos to YouTube and other social media sites, and hosting conferences.

## B. THE INSIDERS

### 1. Merrill, Wanzeler and Costa Form TelexFree

118.    TelexFree was the brainchild of three men: James M. Merrill, Carlos N. Wanzeler, and Carlos Costa.

119.    Merrill and Wanzeler had known each other since the 1990s and formed Common Cents Communications, Inc. in December 2002 in connection with their work as agents for MLM company, WorldxChange.

120.    In 2007, Wanzeler formed Brazilian Help, Inc. in Massachusetts. Working under the name, "Diskavontade," Merrill and Wanzeler bought their own telecom/VOIP switches and offered a $49.90 calling plan. Diskavontade marketed its VOIP product to the Brazilian community in Massachusetts over local television commercials.

121.    In 2010, Costa established Ympactus Comercial Ltda in the Brazilian state of Acre to sell cosmetics, perfume, and personal hygiene products. Costa was a friend of Wanzeler's and experienced in multi-level marketing.

122.    In 2012, Merrill, Wanzeler and Costa created TelexFree in the same form as

a Ponzi Scheme named Universo Foneclub that was designed and owned by major TelexFree promoter Sanderley Rodrigues de Vasconcelos (aka Sann Rodrigues). Universo Foneclub was registered in the US and targeted the Brazilian community. It was shut down by the U.S. Securities and Exchange Commission in May 2006.

### 2.   The Numerous TelexFree Entities Overlapped and Functioned As One

123.    On or about February 15, 2012, Wanzeler and Merrill changed the name of Common Cents Communications to TelexFree, Inc. and caused the website www.telexfree.com to be created. Diskavontade was the registered owner of the TelexFree domain name.

124.    The first page of TelexFree's standard form contract identified the Brazilian corporation "Ympactus Comercial Ltda" (Ympactus"), as its parent and controlling company. Ympactus, was a Brazilian corporation licensed to sell perfume whose license was suspended on June 13, 2013, by order of the court of Acre State for running a Pyramid scheme.

125.    Ympactus and TelexFree had overlapping ownership structures. In 2012, Merrill and Wanzeler became part owners in Ympactus – split Merrill (20%), Wanzeler (30%), and Costa (50%).

126.    Costa became a part owner of TelexFree in the United States until late 2013 and continued to receive funds from TelexFree even after he was no longer officially an owner. Both Merrill and Wanzeler both testified that they transferred at least $3 million to Costa after Brazilian authorities shut down Ympactus' operations.

127.    Costa was an outspoken advocate against the Brazilian Court's decision to enjoin TelexFree's Brazilian activities and appeared in heavily marketed and highly visible YouTube videos promoting TelexFree. In one such video, on June 25, 2013, Costa displayed an insurance notification and represented that it was proof that Promoters' investments would be "protected". In fact, the document was a notification denying coverage.  The company, Liberty Seguros

released a note on its website, in response to statements made by TelexFree "Liberty Seguros informs that has no partnership with the company TelexFree." TelexFree heavily marketed other such false representations involving the Best Western Hotels and Google. All of these were noticed by the Defendant Banks automated BSA/ALM systems. (described below)

128.    Within the U.S., TelexFree operated primarily through TelexFree, Inc., a Massachusetts corporation, and TelexFree, LLC, a Nevada limited liability company. Merrill and Wanzeler each owned both companies. Later, on or about December 26, 2013, Craft formed TelexFree Financial Inc., a Florida corporation. On December 30 and December 31, 2013, TelexFree Financial received wire transfers totaling $4,105,000 from TelexFree, Inc. and TelexFree, LLC.

129.    TelexFree's entire unlawful enterprise including its Pyramid scheme and related money laundering and sheltering operated as one entity, sharing staff, resources, transferring funds between entities, and overlapping ownership structures. Everything was run from TelexFree's International Headquarters located in Marlborough, Massachusetts.

130.    In addition to the three core TelexFree entities in the U.S., Merrill, Wanzeler, and Costa created entities to funnel funds away from victims and to gain access to new financial institutions and other opportunities.

131.    For example, Telex Mobile Holdings, Inc. is a Nevada corporation formed on November 26, 2013. Ownership was split between Merrill (approximately 46%) and Wanzeler (approximately 54%). TelexFree, Inc. and TelexFree, LLC made a $500,870 "loan" to Mobile during the class period. Merrill served as President, Secretary and Director while Wanzeler served as Treasurer and Director. Craft was integral in setting up Mobile and Ann Genet served as an advisor and their "person on the ground."

132. TelexElectric LLLP is a Nevada Limited Liability Limited Partnership that was formed in December 2013. Ownership was split equally between Merrill and Wanzeler. Craft was again involved in setting up the partnership and Ann Genet served as advisor and their "person on the ground." TelexFree, Inc. and TelexFree, LLC made a $2,022,329 "loan" to Electric during the class period.

133. In September 2012, TelexFree International LLC, a Nevis Limited Liability Company was formed with ownership split between Merrill, Wanzeler, and Costa. Nevis, an island in the Caribbean, is a known tax haven. On or about September 11, 2012, Wanzeler, Merrill, and Costa were appointed managers of the company.

134. On or about November 17, 2013, Defendant Babener explained the appeal of TelexFree International's Nevis location:

> From a pr standpoint Nevis sounds like a place that us internationals might base, similar to Herbalife in the caymans and also probably doesn't have pyramid laws and also it probably would not be an issue to omit this tiny place, with 12,000 population, from the marketing program. It is known as an international finance haven, although it has been the subject of black listing among offshore havens… But seems to have been cleared.

135. On or about June 14, 2013, TelexFree Canada Inc. was incorporated in British Columbia, Canada with ownership split equally between Merrill, Wanzeler, and Costa.

136. On or about August 28, 2013, TelexFree Ltd. was incorporated under the laws of England and Wales. Wanzeler was the sole Director and Shareholder at incorporation. TelexFree Ltd. was founded for the sole purpose of gaining access to financial services providers based in the UK.

137. On or about March 6, 2014, Wanzeler, Costa and Merrill created TelexFree International, Ltd., a Grand Cayman corporation. As of March 21, 2014, ownership was split between Wanzeler (35%), Costa (35%), and Merrill (30%).

### 3.   TelexFree Relied on Its Home Office Employees To Carry Out Unlawful Acts

138.    In addition to Merrill, Wanzeler, and Costa, TelexFree relied on a small core group of individuals to drive the scheme and ensure it continued to function.

139.    Defendant Steve Labriola was involved from the very beginning. Labriola met Merrill and Wanzeler through their prior work at WorldxChange and was a Director of Common Cents Communications, Inc. at formation. Labriola stayed with Merrill and Wanzeler at TelexFree as the International Marketing Director. Labriola was the day-to-day face of the company for many Promoters as he participated in marketing events and conference calls.

140.    Settled Defendant Joseph Craft was introduced to TelexFree by one of TelexFree's attorneys, Defendant Nehra. Craft is a CPA and first served as its outside CPA. He later was transitioned by the company to serve as its chief financial officer ("CFO"). Craft stayed involved with TelexFree through to the very end.

141.    Katia Wanzeler is the wife of Carlos Wanzeler and served as an agent, servant, or authorized representative of TelexFree and her husband. Katia Wanzeler actively assisted her husband, Carlos Wanzeler, in fraudulently stealing, sheltering, laundering, and converting victims' funds to their private use. On or about May 14, 2014, Katia Wanzeler was apprehended as she attempted to board a flight to Brazil, on which she had a one-way ticket, cash and seventy pounds of luggage.

142.    Andreia Moreira and Ana-Paula Oliveira worked at TelexFree's Headquarters and were responsible for management, marketing and implementing the day-to-day activities of the company. For example, they sent wire transfers, addressed Promoter questions and complaints, and interacted with TelexFree's financial services contacts and coordinated the acquisition of new financial service providers.

143.    TelexFree's associated individuals that would come up in the BSA/ALM

35

investigations carried out by the financial service providers, including but not limited to the

infamous serial pyramid scheme profiteers Sanderley Rodrigues de Vasconcelos, Santiago de la

Rosa, Randy N. Crosby, Scott Miller, Faith R. Sloan, and Daniil Shoyfer were highly visible

associated individuals.

**C. TELEXFREE'S PROMISED RETURNS**

144.   TelexFree's compensation plan was convoluted, with multiple levels for entry.

TelexFree promised a variety of ways to earn additional compensation.

145.   All users were required to pay a $50 membership fee to TelexFree. After payment

of the membership fee, users were provided with a "back office" page on the TelexFree website.

The back office page was an electronically accessed account display. Notably, once users paid

the membership fee, they tracked their TelexFree purchase and profit online. The system was

designed and promoted as being essentially paperless.

146.   Users could then purchase an "ADCENTRAL" package for $289 (for a total cost

of $339) or an "ADCENTRAL FAMILY" package for $1,375 (for a total cost of $1,425). With

either package, TelexFree purported to give the promoter VOIP packages to sell, although there

was no physical product conveyed.

147.   The ADCENTRAL plan gave the promoter access to ten VOIP products to sell

each week of the year-long agreement. If the promoter posted one ad for seven consecutive days,

TelexFree would "buy back" any unsold stock for $20 and would do so every week. Thus, an

investment of $339 resulted in a guaranteed annual return of $1,040 ($20 x 52 weeks), without

ever selling the VOIP product, so long as the promoter posted template ads on classified ad

websites that were already saturated with TelexFree ads from other promoters. While posting ads

required minimal effort, promoters could also pay third parties to post on their behalf.

148.   The ADCENTRAL FAMILY plan gave the promoter access to fifty VOIP

products to sell each week of the year-long agreement. If the promoter posted five ads per day, the company would "buy back" any unsold stock at the end of the seven-day period for $100 and would do so every week. Thus, an investment of $1,425 resulted in a guaranteed annual return of $5,200, regardless of whether they sold the VOIP product.

149.     If the ads did in fact lead to a retail sale, the promoter was promised a 90% commission of the $49.99 paid by the retail customer for the first month of TelexFree's VOIP service. If the retail customer renewed on a monthly basis, the promoter earned an additional 10% commission each time.

150.     TelexFree also offered a variety of recruitment-related bonuses that purported to require promoters to make one retail sale of the VOIP product. But, as TelexFree knew, numerous promoters simply bought the VOIP product themselves, using a different username, and paid the monthly $49.90 cost of the service with credits that they had collected in TelexFree's virtual "back office."

151.     Promoters were paid to recruit other people and then compensated again when their recruits recruited additional people, all without any one level of participants being required to make real retail sales of the VOIP product.

152.     For example, for each direct recruit brought into TelexFree at the ADCENTRAL level, the recruiter received a $20 'fast start' bonus. For each direct recruit brought into TelexFree at the ADCENTRAL FAMILY level, the recruiter received $100. Excluding the purported sale of one VOIP product, promoters received these bonuses without any real retail sales of the VOIP product.

153.     Promoters would also receive an additional $20 or $80 each time they completed a pairing of recruits on the right and left side of their pyramid.

154.    Promoters would also be paid for TelexFree's "buy backs" from promoters they had recruited going six levels deep and they would also profit from actual VOIP sales made by promoters they had recruited.

155.    TelexFree also offered a "Team Builder" bonus. If a promoter made five retail sales of the VOIP product, directly recruited 10 AdCentral Family promoters, and then each of those recruits made five retail sales of the VOIP product, the promoter could earn a maximum bonus of $39,600.

156.    All of this information was available from a review of TelexFree's website and/or its membership contract.

157.    In addition to the AdCentral program, TelexFree's website promoted a fraudulent opportunity to participate in a Best Western hotel investment through a Brazilian affiliate. The Best Western investment opportunity was prominently promoted on the front page of TelexFree's website and guaranteed a yearly annual return of 8%. TelexFree viewed the opportunity as an important marketing tool to bolster TelexFree's credibility worldwide. There was no business relationship between TelexFree and Best Western.

**D. TELEXFREE'S BACK OFFICE**

158.    With the purchase of an AdCentral or AdCentral Family membership, TelexFree provided a "back office" page on the TelexFree website as a place to manage their sales activities. When promoters earned compensation from TelexFree, it would appear as credits on the promoter's back office page. Once the credits reached a certain balance, promoters could withdraw the credits as cash. Promoters could also use their credits to 'pay' for additional promoter positions or for another person's VOIP service.

159.    The back office system allowed TelexFree to manipulate how its revenue figures were presented. For example, every time a promoter bought a VOIP package with back office

credits, the "sale" was recorded in the back office system as a retail sale of the VOIP product even though, in reality, there was no real customer and the vast majority of the VOIP packages were never used.

## E. TELEXFREE'S MARKETING AND PUBLIC STATEMENTS WERE EASILY DETECTABLE BY THE DEFENDANTS

160.    TelexFree was an internet-based business and leveraged its website and social media to draw new promoters into the scheme. TelexFree targeted and marketed to members of the Brazilian and Latin American immigrant communities in Massachusetts, the United States, and around the world.

161.    For example, in or about the summer of 2012, TelexFree's website advertised the fact that promoters could make money without ever selling TelexFree's VOIP product. The website announced:

> Be our promoter
> Earn money doing announcements on Internet!
> Through a ADCENTRAL, that you geot [sic] for the amount of US $299 (annually).
> The promoter will receive US$20 each week that makes 7 different announcements in websites of free announcements online, from Monday to Sunday. All in a way fast, easy, and standardized in your virtual office (BO) TelexFree.
> This will be for the 52 weeks of the year, of your contract, then see the simulation:
> 52 weeks x $20 (Putting the 7 announcements) = $1,040 in the year.

162.    A PowerPoint presentation available to download on TelexFree's website made similar claims, with one version of the presentation announcing: "Earn money the smart way! Without having to invite anyone, without selling anything in the comfort of your own home." The presentation explained the AdCentral program and the opportunity to make $1,040 or $5,200 a year, depending on the level joined.

163.    In addition to their own website, TelexFree's executives and other representatives

used social media sites, including YouTube, to communicate with existing promoters and to reach out to new promoters. TelexFree created recordings specifically for Internet distribution and was also aware that recordings of TelexFree's corporate events were distributed online by others.

164.    For example, on August 19, 2013, a TelexFree Facebook page falsely posted:

"The President of Google involved with Telexfree!!  Google's President will be speaking at our next Telexfree event in Brazil….11 year contract with Best Western 23 Millionaires in 1 year and now Google's President at our Next event. Hmmmm is he coming to your's [sic]?.  Didn't think so….  It's time to get educated.  You get what you pay for!"

165.    TelexFree also used these online resources to mislead existing and potential Promoters about the investigations into TelexFree's Scheme. For example, following the shutdown of TelexFree in Brazil, Merrill, Wanzeler, and other TelexFree executives assured U.S. promoters that there was nothing to worry about.

166.    In a TelexFree conference call, which was posted to YouTube on June 20, 2013, Merrill reassured listeners that there was nothing to worry about, claiming that such inquiries were very common in network marketing and urging Promoters to keep working, asserting "nothing will affect the U.S."

167.    In a January 2014 call with promoters, which was published on YouTube, Labriola stated "there is no investigation . . . in any way, shape or form."

168.    TelexFree also hosted "extravaganzas" where TelexFree's executives would speak directly to promoters. The events happened at various locations around the world with hundreds or thousands of promoters in attendance. Merrill and Wanzeler, along with the other speakers, would promote a lavish, upbeat image of the company and its prospects and seek to build excitement, positioning Merrill as a minor celebrity.

169.   In July 2013, Newport Beach, California became the staging ground for TelexFree's first United States-based "Extravaganza." The July 2013 TelexFree "Super Weekend" was organized by pyramid scheme Zeek Rewards' high-profile pitchman Thomas More. At the time More organized TelexFree's Newport Beach "Super Weekend" extravaganza, he was a named defendant in a Zeek Rewards Ponzi scheme-related lawsuit.

170.   During the July 2013 TelexFree "Super Weekend," Defendant Nehra gave his "blessing" to TelexFree, representing not only that it was a lawful enterprise and why, but also that he was a duly licensed attorney with extensive specialized skill and experience in MLM.

171.   On November 5 and 6, 2013, TelexFree hosted another "Super Weekend" in Orlando, Florida with tickets costing $196 per person. Merrill dismissed commentary calling TelexFree a pyramid scheme and assured the crowd that they could "trust and believe" in what they were doing:

> I hate to bring up a negative, but it's important. Because negatives get turned into positives. We have plenty of blogs out there that, you know, don't – don't always speak kindly about us, they don't know us. But we know what they're about. They want you guys to go on their website and your competitors will go on their website, drawing traffic that will help them earn a living. I don't blame them. It's business. But what a difference is between you people is trust and belief in what we're doing, and I thank you all for believing in us and helping us get to that next level.

172.   On December 15-16, 2013, TelexFree hosted a sponsored event in Brazil on a cruise ship off the Brazilian coast. Merrill announced that TelexFree was "just getting started." Later, TelexFree offered a DVD of the event for sale that featured Brazil promoters who had become millionaires.

173.   On March 1-2, 2014, a "mega event" was held in Spain.

174.   On or about March 9, 2014, TelexFree hosted a "New Compensation Plan" Conference at the Marriott Copley Place Hotel in Boston, Massachusetts. During this conference,

TelexFree executives touted the quality of the VOIP product. Merrill told the crowd, "You're gonna get paid," and "We are here to help you make money." Wanzeler falsely claimed that in the preceding month, "Over 600,000 customers paid $49.90 to TelexFree99."

## F. BRAZILIAN AUTHORITIES INVESTIGATE AND THEN CLOSE DOWN TELEXFREE BRAZIL IN 2013

175.    In January 2013, following inquiries from consumers, the Brazilian Bureau of Consumer Protection ("Procon") in Acre announced that it had been investigating TelexFree's Brazilian operations. Procon's press release stated its concern that TelexFree's scheme violated the Brazilian law prohibiting Ponzi/Pyramid schemes and that Procon had notified the State Public Ministry, the Secretariat for Economic Monitoring of the Ministry of Finance and the Federal Police.

176.    According to later filings by the U.S. Department of Justice, as of February 19, 2013, TelexFree's Brazilian bank balances totaled over $200,000,000 and TelexFree bank accounts in Brazil had received approximately $446,000,000 in U.S. dollars during the period they were recruiting promoters in Brazil. Much of this money was transferred to TelexFree's U.S. accounts.

177.    In June 2013, Brazilian authorities won an injunction prohibiting TelexFree from recruiting new promoters and from taking in funds or paying money to existing TelexFree promoters. The injunction essentially closed TelexFree's Brazilian operations.

178.    TelexFree in Brazil released a note on its website explaining the court's decision. The note says as follows (translated from the original Portuguese) and viewed by the banks and pay processors that accepted them as a client was the following splash page on the website

> By judicial decision issued on June 13th, 2013, Judge Thais Queiroz B. de Oliveira Abou Khalil, in the records of the Preparatory Action No. 0005669-76.2013.8.01.0001, filed by the Prosecutor of the Acre State, in the 2nd Civil Court of Rio Branco - AC, new subscriptions to the Telexfree network are

prohibited in the Partner or Promoter conditions; receiving of Returnable Deposit Funds and Costs of Reserve Position by Telexfree are forbidden; sales of 99Telexfree VoIP accounts in ADCentral and ADCentral Family modalities are prohibited; payments are prohibited, both to partners and promoters, of commissions, bonuses and any benefits derived from the Telexfree network (from sales of VoIP 99 Telexfree accounts, from new registration, ad postings, forming new direct or indirect binaries, royalty, Team Builder, among others which may be owed); that the breach of any of the above determinations will incur in the payment of a fine of R$ 100,000.00 (one hundred thousand Reais) for each new registration or re-registration and each improper payment.

— *Telexfree Brazil, via a splash page on its website*

## G. GOVERNMENTAL INVESTIGATIONS LEAD TO TELEXFREE'S DEMISE

179.    The Massachusetts Securities Division ("SOC" or "COMSOC") also started an investigation into TelexFree. On April 4, 2013, the Division issued requests for information to TelexFree, Inc. On or about January 22, 2014 and February 5, 2014, the Massachusetts Securities Division investigation reappeared when TelexFree was served with subpoenas and the Division sought to depose Merrill and Wanzeler. They were deposed on March 25 and 26, 2014.

180.    With the Massachusetts Securities Division investigation looming large, TelexFree's executives and advisors refocused their efforts on making changes to the program, with a view to offering a "more compliant" plan as part of TelexFree's defense strategy.

181.    On March 9, 2014, TelexFree announced changes to its program. The new program purported to impose new requirements on promoters, including requiring participants to sell the VoIP product in order to qualify for the promised payments. These changes were an attempt to portray TelexFree as a legitimate MLM company. They also essentially nullified the promises regarding weekly payments which were the key to TelexFree's sales of its AdCentral and AdCentral Family memberships.

182.    The new program was not well received. Daily revenues dropped from approximately $3,000,000 a day to between $100,000 and $300,000 per day. In the week following the introduction of the [March 9 Plan], members asserted claims for an aggregate of $8

43

million from their back office accounts, then $20 million the following week, $30 million each of the following two weeks, and $86 million the week before they went bankrupt.

183.    On April 1, 2014, dozens of members descended upon TelexFree's Marlborough, Massachusetts office to protest this change and attempt to regain access to their money. One protestor was quoted in the press as saying the product was "impossible to sell."

184.    The end came quickly. Little more than a month after announcing its new program, on April 14, 2014, three TelexFree entities—TelexFree Inc., TelexFree LLC, and TelexFree Financial LLC—filed for Chapter 11 bankruptcy protections in the United States Bankruptcy Court for the District of Nevada.

## H. ENFORCEMENT ACTIONS BY STATE AND FEDERAL AUTHORITIES

185.    The very next day, on April 15, 2014, federal agents from the FBI and Homeland Security executed search warrants, including at TelexFree's headquarters in Marlborough, Massachusetts. During the search, an officer intercepted Settled Defendant Craft trying to leave the premises with a laptop and a bag. While Craft claimed he was a consultant and retrieving personal items, officers found ten Wells Fargo Bank cashiers' checks totaling $37,948,296 in his bag. Eight of the checks were dated April 11, 2014 – the Friday before TelexFree filed for bankruptcy – and were remitted to Merrill. Five of these checks were made out to TelexFree LLC, in the total amount of $25,548,809. One check was made out to Wanzeler's wife in the amount of $2,000,635. One check, dated April 3, 2014, and remitted to Wanzeler himself was made out to TelexFree Dominicana SRL in the amount of $10,398,000.

186.    The same day, the U.S. Securities and Exchange Commission filed charges against TelexFree in the United States District Court seeking an immediate asset freeze which the Court granted.

187.    The same day, April 15, 2014, the Massachusetts Securities Division filed its

Administrative Complaint against TelexFree, Inc. and TelexFree LLC alleging violations of the Massachusetts Uniform Securities Act and related regulations. The complaint alleged that TelexFree raised over $90,000,000 in the Commonwealth and nearly $1,000,000,000 worldwide.

188.    On May 9, 2014, the U.S. Department of Justice filed a criminal complaint against Carlos Wanzeler and James Merrill alleging conspiracy to commit wire fraud. The DOJ estimated that TelexFree's victims worldwide lost $3,045,000,000 when the scheme collapsed. On July 23, 2014, Wanzeler and Merrill were indicted by the Grand Jury and on October 24, 2016, the day his trial was scheduled to begin, James Merrill pled guilty to one count of wire fraud conspiracy and eight counts of wire fraud. Merrill was sentenced to six years in prison followed by three years of supervised release. He remains in prison to this day. Merrill also agreed to forfeit approximately $140 million and other assets. Carlos Wanzeler fled to Brazil upon learning that he was under investigation and remains a fugitive.

189.    On or about May 14, 2014, Katia Wanzeler was arrested on a material witness warrant at JFK International Airport as she attempted to leave the United States. Mrs. Wanzeler was later released after giving up her passports.

190.    On September 22, 2014, the Massachusetts Securities Division entered into a Consent Order with Fidelity Co-Operative Bank resolving issues around Fidelity Bank's involvement with TelexFree. Under the terms of the Consent Order, Fidelity Bank agreed to pay $3,500,000 into a Massachusetts Victim Relief Fund.

191.    On September 16, 2015, TelexFree in Brazil (Ympactus Comercial SA) was ordered to pay 3 million Brazilian reals or over $500,000 U.S. Dollars in damages.

192.    On December 21, 2015, the Bankruptcy Court found that TelexFree LLC, TelexFree Inc., and TelexFree Financial Inc. operated a pyramid and Ponzi scheme and were

joint and severally liable for damages.

193.    On May 25, 2017, the SEC settled with Sanderley Rodrigues de Vasconcelos for $1.83 million, including $1.7 million in disgorgement and prejudgment interest and a $150,000 civil penalty. Rodrigues admitted that he was a promoter of TelexFree, appeared at TelexFree-sponsored public events and other gatherings at hotels and resorts. He also admitted that he appeared in promotional videos that were posted to YouTube and that he had posted at least one video himself. Rodrigues was required to transfer certain assets to settle an adversary action filed by the Chapter 11 Trustee. At all times Sanderley Rodrigues was a known associate of TelexFree and one of its top US promoters.

194.    On July 14, 2017, the SEC settled with Steven Labriola. Labriola was ordered to pay $25,000 in disgorgement and prejudgment interest. Labriola admitted that he was responsible for TelexFree's relationships with its promoters, ran numerous training conferences, and that he was one of the main public faces of TelexFree, providing periodic "corporate updates" and appearing in other promotional videos that were posted on YouTube.

195.    On September 12, 2017, the SEC settled with Merrill and Craft. Merrill's final judgment of approximately $3.6 million in disgorgement and prejudgment interest was deemed satisfied by the order of restitution in the criminal case. Craft's final judgment to pay $298,708 in disgorgement and prejudgment interest and a $50,000 penalty was deemed satisfied by an order requiring Craft to transfer certain assets to settle an adversary action in the bankruptcy case. Merrill had previously pled guilty to criminal charges. Craft admitted to preparing financial statements provided to telecommunications regulators, as well as a financial regulator, materially overstating the pyramid scheme's income.

196.    On February 8, 2018, Cleber Rene Rizerio Rocha was sentenced to 33 months in

prison and one year of supervised release after he pleaded guilty to one count of conspiring to commit money laundering and one count of money laundering. After Wanzeler fled the U.S., he left millions of dollars behind him. Rocha flew from Brazil to New York City in January 2017 as part of a scheme to help launder Wanzeler's cash out of the United States. DOJ agents followed Rocha to an apartment in Westborough, Massachusetts where approximately $20 million in cash was found hidden in a mattress box spring.

197.    On April 27, 2018, the SEC obtained a final judgment against Randy Crosby ordering him to pay $294,014 in disgorgement by transferring assets to settle an adversary action filed by the Chapter 11 Trustee and enjoining him from future violations of Section 5 of the Securities Act of 1933. Crosby admitted that he was a promoter of TelexFree, appearing in promotional videos that were posted on YouTube and making daily marketing presentations. At all times Crosby was a known associate of TelexFree and one of its top US promoters.

198.    On August 14, 2018, the SEC settled with Santiago De La Rosa. As a result of the settlement, De La Rosa was ordered to pay $1,092,013 in disgorgement and prejudgment interest, which was deemed satisfied by an order requiring De La Rosa to transfer certain assets to settle an adversary action in the bankruptcy case. On June 4, 2019, the SEC settled with Faith Sloan. Sloan was ordered to pay $1,271,215 in disgorgement and prejudgment interest and a civil penalty of $7,500. The payment was deemed partially offset by an order requiring Sloan to transfer certain assets to settle an adversary action in the bankruptcy action.

199.    At all times relevant De la Rosa and Sloan were highly visible TelexFree marketing fixtures and highly profitable promoters who appeared at public events to recruit for TelexFree and in promotional videos that were posted on YouTube. At all times De La Rosa and Sloan were known associates of TelexFree and among its top US promoters. As explained below,

BSA/AML investigations tied De La Rosa to TelexFree not only during the account opening phase, but also during the KYC monitoring phase.

200.     On September 28, 2018, the SEC settled with TelexFree, Inc. and TelexFree, LLC. As a result of the settlement the companies were enjoined from future violations of the Securities Laws. The companies both admitted that they were engaged in a Ponzi and pyramid scheme. The SEC also voluntarily dismissed its unjust enrichment claims against TelexFree Financial, Inc.

201.     On November 2, 2018, the SEC obtained default judgments against TelexElectric, LLLP and Telex Mobile Holdings, Inc. TelexElectric was ordered to pay $2,0222,239 and Telex Mobile Holdings was ordered to pay $500,870.

202.     On March 26, 2020, the first in what is expected to be a number of significant awards to the IRS was entered. Specifically, the IRS was granted summary judgment in its claim to be granted an elevated prepetition priority unsecured claim to over $15.5 million of the bankruptcy estate's assets based upon a 2013 erroneous tax refund given to TelexFree. *See In re: TelexFree, LLC*, Case No. 14-40987, Adv. Proc. No. 18-4091, 2020 WL 1659472 (Bankr. D. Mass. Mar. 26, 2020). Some, if not all will be attributed to the aiding and abetting of TelexFree's pyramid scheme by PwC.

## I. THE ROLE OF THE BANKS

203.     The Defendant Banks were knowing and active participants in the TelexFree scheme. Each provided essential assistance to the scheme.

204.     In 2012 through 2014, when the events in this case took place, banks and other financial institutions had (and continue to have) sophisticated systems to identify illegal and suspicious customer conduct and to avoid becoming conduits for illegal financial transactions. Financial institutions implement these systems because they are required by federal anti-money

laundering and anti-terrorism laws to do so.  They also function as a loss prevention measure.

205.     Each of the defendant banks herein had such systems in place while the TelexFree scheme was operating.   Under these systems, banks and other financial institutions do not sit passively until suspicious behavior is brought to their attention. Rather, they are required to, and do, actively investigate and research each of their customers before opening accounts, and they constantly monitor each transaction of each of their customers while their accounts are active and electronic systems notify specially charged individuals of each transaction that is an anomaly. These notifications are universally referred to in the industry as "red flags"' As alleged in more detail below, anomalies that set off red flags include those required by the BSA and the Patriot Act, those set in place by each bank as part of their anti-money laundering protocols or their profit protection restrictions, and transactions that do not fit a Merchants' profile as reflected, *inter alia,* in its banking application. As described below, as a result of both routine banking procedures and the extreme anomalous banking of TelexFree and its associated individuals each Defendant Bank identified TelexFree as a fraudulent enterprise and knowingly provided substantial assistance to the fraud causing great harm to Plaintiffs and the putative class.

### 1.  Legal Obligations of Banks To Understand And Monitor Their Customers' Business Activities

206.     By federal law, every financial institution must observe the bank secrecy and anti-money-laundering requirements of the Bank Secrecy Act (BSA), as amended by the USA PATRIOT Act of 2001. If a bank fails to abide by a banking regulation it not only violates the BSA, Patriot Act and other ALM requirements, it violates its charter, policies and protocols. Services performed in violation of the banking regulations and a bank's own charter and internal policies and protocols fall outside the definition of routine banking services.

207.     After the 9/11 terrorist attacks, Congress increased the depth and scope of

49

customer surveillance required of financial institutions. Under the USA PATRIOT Act, financial institutions must adopt and employ procedures to detect money laundering and other criminal activities and to prevent being used by customers as conduits for those activities. In addition, financial institutions must file Suspicious Activity Reports (SARs) with federal law enforcement authorities and the Department of the Treasury where they detect known or suspected federal criminal violations involving transactions conducted through the institution.

208.    Federal financial regulators examine financial institutions for BSA and anti-money laundering (AML) compliance and impose sanctions for violations. The obligation to file SARs depends on whether a transaction or transactions is "suspicious." Financial institutions must report, among other things, transactions or patterns of transactions involving or aggregating at least $5,000 or more that the institution either knows, suspects or has reason to suspect are "suspicious" in nature.

209.    Under the federal BSA/AML regulations in effect in 2012 and 2013, a transaction was "suspicious" if the transaction: (1) involved funds derived from illegal activities, or was conducted to disguise funds derived from illegal activities; (2) was designed to evade the reporting or recordkeeping requirements of the BSA or its implementing regulations; or (3) had no business or apparent lawful purpose or was not the sort in which the customer would normally be expected to engage, and the bank knew of no reasonable explanation for the transaction after examining the available facts, including background and possible purpose of the transaction. Importantly, this means that BSA/AML regulatory obligations extend not only to money laundering, but also to otherwise routine banking transactions involving "funds derived from illegal activity," including funds from securities fraud and pyramid or Ponzi schemes.

210.    The Federal Financial Institutions Examination Council (FFIEC) operationalized

the core BSA/AML compliance requirements in its *Bank Secrecy Act/ Anti-Money Laundering Examination Manual* (Money Laundering Manual or Manual). The Money Laundering Manual is a compilation of FFIEC guidance on BSA and AML compliance and financial institutions used and use it "as a valuable resource to evaluate their BSA/AML programs and ensure they align with the regulators' expectations."

211.     The 2010 edition of the Manual was in effect throughout the relevant period of 2012 through spring 2014. As a product of these BSA/AML requirements, during the relevant period, financial institutions had well-established analytics and systems to detect illegal activity by customers. Further, BSA/AML compliance policies defined when individual financial institutions were to terminate customer relationships and freeze account balances once they detected suspicious customer conduct.

212.     According to the Money Laundering Manual, every financial institution had to have a written Customer Identification Program (CIP) that the institution's board of directors approved as part of its BSA/AML compliance program. The purpose of the CIP is to enable the financial institution to form a reasonable belief that it knows the true identity of each customer and understands the intended uses of the banking accounts or other services the customer will utilize. For businesses, this requires that the Bank have a detailed understanding of the customer's business. The CIP also states when an institution should decline to open an account, and when it should close an account. Together, the CIP and the procedures it establishes are popularly known as the "Know Your Customer" or "KYC" protocols.

213.     The FFIEC Manual made clear that all levels of the company had to comply with the BSA/AML requirements, including those set forth in the Manual, from the boardroom and the executive suite to branch employees. The board of directors of every financial institution

51

were required to ensure that the CIP and its anti-money laundering and BSA protocols were observed throughout the company.

214.    Financial institutions had to "provide training for all personnel whose duties require[d] knowledge of the BSA" and train new staff on BSA/AML requirements.  Each institution's BSA/AML training program had to "ensure that all employees under[stood] their role in maintaining an effective BSA/AML compliance program."

## 2. The Defendant Banks' "Know Your Client" Protocols Identified TelexFree As A Fraudulent Enterprise

215.    When new customers applied to open bank accounts, financial institutions had a duty to evaluate them for warning signs of suspicious behavior. For entities like TelexFree, this Know Your Customer investigation required establishing the identity of the company and its principals, review of the entity's business including documentary evidence, and review of publicly available information about the entity. It also required classifying all new customers as lower- or higher-risk. The risk classification affected how much due diligence a financial institution undertook for any given customer. Higher-risk customers underwent closer scrutiny, known as "enhanced due diligence" or "EDD."

216.    Enhanced due diligence for higher-risk customers was "especially critical in understanding their anticipated transactions and implementing a suspicious activity monitoring system that reduce[d] the bank's reputation, compliance, and transaction risks."  Higher-risk customers and their transactions, FFIEC explained, were "reviewed more closely at account opening and more frequently throughout the term of their relationship with the bank." According to FFIEC, a customer could be higher-risk "because of the customer's business activity, ownership structure, anticipated or actual volume and types of transactions, including those transactions involving higher-risk jurisdictions."

217.     TelexFree's business activities and business model instantly flagged it as a higher-risk customer for two reasons. First, TelexFree held itself out as a passive income scheme requiring no actual sales or products or services, raising immediate and obvious concerns as to a possible Ponzi scheme. Federal banking regulators had emphasized that MLMs are higher-risk by imposing sanctions for Bank Secrecy Act violations involving customers that later turned out to be Ponzi schemes. Second, TelexFree qualified as higher-risk *per se* because it guaranteed its participants an investment return (in TelexFree's case, of at least 200 percent).

218.     A customer's risk classification was determined through the due diligence process, which involved several steps. First, a financial institution had to form a reasonable belief as to a customer's true identity within a reasonable period of time after opening the account. This required, at a minimum, obtaining the customer's name, date of birth (for individuals), address, and identification number. For business entities, banks typically obtained documents evidencing the legal existence of the entity, such as certified articles of incorporation, an unexpired government-issued business license, a partnership agreement, or a trust instrument.

219.     In addition, for higher-risk customers that were not individuals, financial institutions typically collected information about individuals with authority or control over their accounts, including signatories. The enhanced due diligence for higher-risk customers included steps "to identify and verify beneficial owners . . . and to reasonably understand the relationship between the customer and the beneficial owner."

220.     Due diligence also entailed becoming familiar with a customer's business model and operations.  The Manual stated that "the bank should obtain information at account opening sufficient to develop an understanding of normal and expected activity for the customer's occupation or business operations."

53

221.    For higher-risk customers such as TelexFree, the Manual directed financial institutions to collect in-depth information, including:

   a.  Purpose of the account;

   b.  Source of funds and wealth;

   c.  Individuals with ownership or control over the account, such as beneficial owners, signatories, or guarantors;

   d.  Occupation or type of business (of customer or other individuals with ownership or control over the account);

   e.  Financial statements;

   f.  Banking references;

   g.  Domicile (where the business is organized);

   h.  Proximity of the customer's residence, place of employment, or place of business to the bank;

   i.  Description of the customer's primary trade area and whether international transactions are expected to be routine;

   j.  Description of the business operations, the anticipated volume of currency and total sales, and a list of major customers and suppliers; and

   k.  Explanations for changes in account activity.

222.    To verify this information, FFIEC expected financial institutions to research the customer's operations through information-reporting agencies, banking references, correspondence and telephone conversations with the customer, and visits to the customer's place of business. In addition, FFIEC recommended "researching public information (e.g., on the Internet or commercial databases)," such as through Google searches.

223.   The Defendant Banks did discover as a result of their Know Your Customer investigations at the outset of their relationships that TelexFree was a fraudulent pyramid/Ponzi scheme, as set forth in more detail below. While each Defendant Bank's circumstances vary, each Bank became aware that TelexFree was a fraud for at least three general reasons.

224.   First, as noted above, because TelexFree held itself out as a Multi-Level Marketing business it would have been and was immediately identified by the Defendant Banks as a high-risk customer.

225.   Second, examination of TelexFree's business model disclosed that it was also a passive investment scheme promising guaranteed returns to its members of over 200%. This is evident in TelexFree's marketing materials.

226.   Third, examination of TelexFree's Promoter Compensation Contract reveals that it  blatantly violated Massachusetts Law.  Specifically, at all times material herein, TelexFree was a "multi-level distribution company" as defined by M.G.L., Chapter 93, Section 69(a).

227.   M.G.L., Chapter 93, Section 69(d)(2) prohibits any multi-level distribution company from offering or paying any "finder's fee, bonus, refund, override, commission, cross-commission, dividend or other consideration" to any participant therein "solely for the solicitation or recruitment of other participants."

228.   The TelexFree Pre-March 9 Contract, on its face, contains numerous instances of promising payment merely for recruitment of new Participants as defined by M.G.L., Chapter 93, Section 69, including, but not limited to, the following:

> Clause 5.7:  "A PROMOTER will achieve TEAM BUILDER status when he is active in an ADCentral FAMILY position (in the marketing network) that has 10 (ten) ADCentral FAMILIES on the incentive plan registered directly by him on his site."

Clause 5.7.1:  "As long as he is fulfilling the qualification in clause 5.9.2[1] [sic], a TEAM BUILDER will earn a payment of 2% (two percent) of the company's net billing in the following month…the maximum amount for this earning, by contract, which is for one year, is up to US$ 39,600.00…"

Clause 5.8:  "THE PROMOTER shall receive as an incentive a bonus of US$ 20.00 (twenty U.S. dollars), for each VOIP ADCentral kit that his direct lower PARTNER acquires and a US$ 100.00 (one hundred U.S. dollars) bonus for each VOIP FAMILY kit that his direct lower PARTNER acquires."

Clause 6.1:  "A PROMOTER who directly registers 2 (two) new promoters, with one on the left side and the other on the right side of his marketing network, qualifies for direct and indirect binary earnings, and for 2% (two percent) of the network from the first to the 6th level, assessed only on plans whose owners have at least one active VOIP client, that is, who have at least one active 99TELEXFREE plan."

Clause 6.1.1:  Upon qualifying in the manner described in the clause above by selling 2 (two) new ADCENTRAL kits to people in his network, with 1 (one) on the left side and the other on the right side, he shall receive an additional gratuity of US$20 (twenty U.S. dollars), called the binary cycle, with the maximum daily earning in this status being US$ 440.00 (four hundred and forty U.S. dollars), for 22 (twenty-two) binary cycles.

Clause 6.1.2:  If the sale is of 2 (two) VOIP ADCentral FAMILY kits, this cycle will yield an additional US$ 20.00 (twenty U.S. dollars), for the ADCentral principals, plus US$ 60 (sixty U.S. dollars), for 3 (three) of the 4 (four) ADCentral additional…"

Clause 8.1:  "THE PROMOTER shall be entitled to a payment of 1% (one percent), in the form of ROYALTIES, from the company's net billing, if within 1 (one) calendar month (from the 1st (first) day – to the last day of the month) the PROMOTER shall have closed 22 (twenty-two) cycles in 20 (twenty) days, which need not necessarily be consecutive days."

229.    The above provisions of the standard TelexFree Pre-March 9 Contract are clear and direct violations of M.G.L. c. 93, § 69(d), as they promise payments, including cash payments, "bonuses," "gratuities," "royalties," and dividends, merely for the recruitment of new TelexFree members/participants (i.e. through the sale of AdCentral membership accounts).

---

[1] The TelexFree Pre-March 9 Contract does not include a clause numbered 5.9.2.

230.     Furthermore, M.G.L. Chapter 93, Section 69(d)(3)-(4) also prohibits any multi-level distribution company from offering or paying any "finder's fee, bonus, refund, override, commission, cross-commission, dividend or other consideration" to any participant therein:

  a.   "unless such participant performs a bona fide and essential supervisory, distributive, selling or soliciting function in the sale or delivery of such product or services,"

  b.   "where no amount of judgment or skill exercised by the participant has any appreciable effect" upon such payment," or

  c.   "where the participant is without that degree of control over the operation of such plan as to enable him substantially to affect the amount" of such payment.

231.     The TelexFree Pre-March 9 Contract, on its face, contains clear, obvious and direct violations of M.G.L. c. 93, § 69(d)(3)-(4), including:

Clause 5.4:  "ADCENTRAL PROMOTERS: After setting up his membership, a PARTNER may acquire an "ADCentral" kit consisting of 10 99TELEXFREE VOIP accounts, for which he must pay the equivalent of US$ 289.00 (two hundred and eighty-nine U.S. dollars)."

Clause 5.4.1:  "with this qualification, the PARTNER will become a TELEXFREE PROMOTER and, accordingly, shall have his own active ad central for 12 (twelve) months, counting from the date of his membership (and not from the date of the purchase of the kit)."

Clause 5.4.2:  "He must also post 1 (one) announcement (prepared by TELEXFREE) per day on internet announcement sites (whether free of charge or not), so that at the end of each cycle of 7 (seven) announcements for the week, the PROMOTER shall receive one 99TELEXFREE account."

Clause 5.5:  "ADCENTRAL FAMILY MEMBERSHIP – A PROMOTER wishing to attain the status of an "ADCentral FAMILY Member" must pay the equivalent of US$ 1,375.00 (one thousand three hundred and seventy-five U.S. dollars)."

Clause 5.5.1:  "With this membership, a PROMOTER shall have 5 (five) active announcement centrals for 12 (twelve) months, counting from the date of his

activation."

Clause 5.5.2: "He must, in turn, post 1 (one) announcement (prepared by TELEXFREE) per day at internet announcement sites (whether free of charge or not) on each one of the 5 (five) ADCentral sites. At the end of the 35 (thirty-five) announcements the PROMOTER shall receive 5 (five) 99TELEXFREE accounts as remuneration for these announcements."

232.    Fourth, searches of publicly available information disclosed the TelexFree fraud. At any time after the Brazilian anti-fraud agency Procon announced its investigation in January 2013, a search of the internet would have flagged TelexFree as a potential Pyramid/Ponzi scheme.

233.    In a January 11, 2013 press release, Procon indicated that its investigation of TelexFree revealed, "evidence of crimes ha[d] been detected." By February 15, 2013, news of Procon's press release was circulating in the online English-language media. Moreover, using Google's search function, a Google search for "TelexFree" in February 2013 would have brought up several websites characterizing TelexFree as a "fraude" in Portuguese on the first page of Google's search results. For example, an article entitled "TelexFree: a maior fraude financeira da história do Brasil" was published on February 27, 2013, and appears to have been well circulated on the Internet.  Later, on June 19, 2013, the Public Ministry of the State of Acre in Brazil shut down Ympactus' operations for allegedly operating an illegal pyramid scheme. News of this shutdown was immediately widely circulated online in Portuguese. English-language reports followed the next day. On June 20, 2013, an English-language online news source quoted a representative of the Brazilian government as saying:

Owners of the company [TelexFree] are suspected of mounting a financial pyramid. Telexfree in Brazil is recruiting investors and creating a pyramid scheme under the guise of multilevel marketing. There are multilevel marketing companies already established in the market as Herbalife, Mary Kay and Tupperware. They work with this system, in the case of Telexfree the interest is not to sell products but to recruit new people. The focus of Telexfree in Brazil is

not the sale of products or services, but membership [of] new people to feed the
payment system.

Searches after June, 2013 disclosed that Procon had essentially shut TelexFree down.

234.    Similarly, the investigations by the Massachusetts SOC and other government

agencies were also reported on the internet. Google searches would have timely flagged official

investigations into TelexFree as a suspected Ponzi scheme in this case. In April 2013, the

Securities Division of the Office of the Secretary of the Commonwealth of Massachusetts

(Securities Division of the Massachusetts SOC) opened an investigation into TelexFree and

served it with a subpoena. James Merrill told TelexFree's outside CPA at the time, Joseph Craft,

that TelexFree's banks had learned of this Massachusetts SOC investigation and were concerned

about it. Craft was aware that TelexFree by then used Bank of America, Wells Fargo Bank, and

TD Bank to provide banking services. Similarly, the U.S. Department of Homeland Security was

investigating TelexFree for money laundering by October 2013.

235.    Even before the Procon investigation was announced, there were many reports of

TelexFree's potentially unlawful activities.

### 3.  Monitoring

236.    Customer due diligence did not end with account openings. Instead, due diligence

was an ongoing process. Financial institutions oversaw customer activities "through regular

suspicious activity monitoring and customer due diligence processes." If there were signs of "a

potential change in the customer's risk profile (e.g., expected account activity, change in

employment or business operations), management [was to] reassess the customer risk rating and

follow established bank policies and procedures for maintaining or changing customer risk

ratings."

237.    Each Defendant Bank also identified a number of "red flags" and "suspicious

activities" through their customer monitoring systems. Some even closed accounts. All, however, continued to knowingly assist the fraud and none notified authorities by filing a SAR or otherwise.

238.    For higher-risk customers such as TelexFree, financial institutions used enhanced due diligence throughout the customer relationship "for monitoring purposes and to determine whether there [were] discrepancies between information obtained regarding the account's intended purposes and expected account activity and the actual sources of funds and uses of the account."

239.    During this ongoing monitoring, higher-risk customers underwent more frequent and intensive scrutiny than lower-risk customers, particularly if new red flags appeared. These red flags notified financial institutions of suspicious conduct. FFIEC identified a long list of red flags of money laundering, including:

   a.  "Many funds transfers . . . sent in large, round dollar, hundred dollar, or thousand dollar amounts."

   b.  "Funds transfer activity . . . when the activity is inconsistent with the customer's business or history."

   c.  "Many small, incoming transfers of funds . . . received."

   d.  "Funds transfer activity is unexplained, repetitive, or shows unusual patterns."

   e.  "Payments or receipts with no apparent links to legitimate contracts, goods, or services are received."

   f.  "A large volume of cashier's checks, money orders, or funds transfers is deposited into, or purchased through, an account when the nature of the accountholder's business would not appear to justify such activity."

g. "Unusual transfers of funds occur among related accounts or among accounts that involve the same or related principals."

h. "Goods or services purchased by the business do not match the customer's stated line of business."

i. "Payments to or from the company have no stated purpose, do not reference goods or services, or identify only a contract or invoice number."

j. "Customer receives large and frequent deposits from online payments systems yet has no apparent online or auction business."

k. "A large number of incoming or outgoing funds transfers take place through abusiness account, and there appears to be no logical business or other economic purpose for the transfers, particularly when this activity involves higher-risk locations."

240.    Large financial institutions used sophisticated automated systems to analyze funds moving in and out of accounts for red flags requiring immediate attention.  The Defendant Banks each utilized such systems. During their relationships with TelexFree, each Defendant Bank identified TelexFree as a fraudulent enterprise.

241.    First, the TelexFree accounts experienced a very high number of chargebacks. Chargebacks are an indication of potentially fraudulent activity because they result when a customer challenges or cancels a payment. They are indications that customers are dissatisfied with the service or maintain that they have been charged in error.  When levels of chargebacks are high, therefore, it is a strong indication of illicit activity. TelexFree accounts at each Defendant Bank incurred high levels of chargebacks.

242.    The Banks' monitoring of TelexFree's accounts also showed that the activities in the accounts did not match TelexFree's representations about how the accounts would be used.

The vast amounts of money passing through the accounts far exceeded what TelexFree told the Banks when the accounts were opened.

243.    For instance, TelexFree represented in its Merchant Account Application to Bank of America that its account number 1885 would have an annual credit card volume of only $500,000. By February 2013 monthly credit card volume alone exceeded that amount.

244.    Similarly, the transactions in the accounts did not match TelexFree's representations to the Banks about its business. The Banks all had the ability to see, and reviewed, the individual transactions in the TelexFree accounts. This review disclosed that virtually all of TelexFree's payments were for ADCENTRAL and ADCENTRAL FAMILY memberships. Almost none were for TelexFree's purported principal business -- the sale of 99TelexFree Voice subscriptions. This fact confirmed beyond any doubt the true nature of TelexFree's operations.

245.    The TelexFree accounts displayed numerous other red flags as well, including large unexplained transactions, transfers between related accounts, and an exceptionally large number of chargebacks.

**4.  Money Laundering**

246.    Many of the irregularities identified by the Defendant Banks also bore the hallmarks of money laundering.

247.    TelexFree deposited investors' money into bank accounts under its name at multiple banks. In many cases, the duped investors deposited their investments directly into TelexFree bank accounts. This is apparent from the SOC's review of certain TelexFree bank accounts, which found "unusual patterns of deposits, withdrawals and transfers—in many cases at very high frequencies and often in cash," with "scores of daily deposits in small sums by participants." "The vast majority" of these small deposits "appear[ed] to be buy-in fees for

TelexFree promoters." In other cases, TelexFree victims paid for their investments using credit cards. These credit card payments were processed and bundled by the defendant payment processors for later deposit at TelexFree's banks. Still other deposits by TelexFree victims were made online or through overseas wire transfers.

248.    Once these funds were deposited, TelexFree's ensuing movement of those funds presented the classic signature of a money laundering scheme. Generally, money laundering consists of three basic steps—placement, layering, and integration--which "cleanse" the proceeds from criminal activities through a series of transactions so that they appear to be proceeds from legal activities:

249.    *Placement* involves the introduction of unlawful proceeds into the financial system with the hope of not attracting the attention of financial institutions or law enforcement. TelexFree accomplished the placement step by pretending that the payments by its participants related to the legitimate sale of VoIP programs.

250.    *Layering* "involves moving funds around the financial system, often in a complex series of transactions to create confusion and complicate the paper trail." The purpose of layering is to mask the trail of the original source of funds. Examples of layering include "wiring and transferring funds to and through numerous accounts in one or more financial institutions." TelexFree-related entities maintained multiple bank accounts at Bank of America, N.A., and at other banks through which they shuttled funds through wire transfers and otherwise.

251.    *Integration* creates "the appearance of legality through additional transactions," such as through the purchase of real estate or investment securities.

## J. THE ROLE OF PAYMENT PROCESSORS

252.    The Payment Processing Defendants (or "Processors") played an integral role in the TelexFree Scheme. They allowed TelexFree to collect payment for the sale of ADCENTRAL

and ADCENTRAL FAMILY memberships via credit card. Over the course of its scheme, Telex Free collected over one billion dollars via credit card payments facilitated by the Payment Processing Defendants.  The Processors also provided ongoing assistance to manage TelexFree's ongoing problems in obtaining essential financial services, including devising and executing strategies to conceal TelexFree's illicit activities and to avoid oversight and regulation by law enforcement and regulatory authorities.  They also worked to find new financial service providers to replace those who ceased their work for TelexFree as a result of the various investigations and other oversight activities by law enforcement and regulatory authorities.  The Payment Processors (with some exceptions) also facilitated and enabled TelexFree to make payments to its members to perpetuate the scheme.

253.    Like the Bank Defendants, the Payment Processing Defendants were aware of the fraudulent nature of the TelexFree scheme and were required by law to investigate new clients. Each Processor learned that that TelexFree was operating an unlawful enterprise as part of their initial investigation. Second, like the Banks, the Processors were required by law to monitor the activities of their clients during the customer relationship. Each Processor gained knowledge that TelexFree was operating an unlawful enterprise as a result of their ongoing monitoring. The Processors also gained knowledge of TelexFree's unlawful activities as a result of notifications and demands for formal investigative reports of suspicious and "red flag" activities from their associated banks related to TelexFree's operations as well as personal interactions with TelexFree insiders, among other things. .

254.    In general, the Payment Processors knew from their initial investigations that TelexFree was a fraudulent operation because their investigations showed, among other things: 1) TelexFree was a multi-level marketing operation, and, therefore, suspect; 2) that it was being

investigated as an unlawful pyramid/Ponzi scheme by authorities around the world; 3) that it illegally promised its members guaranteed returns on passive investments; and 4) that it was on chargeback watch lists maintained by MasterCard and Visa for the purpose of identifying fraud.

255.     In general, the Payment Processors confirmed based on their monitoring of TelexFree's accounts that it was a fraudulent operation because, among other things: 1) TelexFree's accounts experienced high charge back levels; 2) virtually all of the payments received by TelexFree (i.e. 99%) were for memberships guaranteeing passive income, not the sale of VOIP products; 3) many other ways in which the activity in TelexFree's accounts did not match its purported business model; and 4) ongoing refusals of banks to work with TelexFree. In addition, the government investigations around the world progressed and were prominently reported on various websites.

256.     Many of the Payment Processors also knew that some of the TelexFree Insiders and Top Promoters had been associated with other well-known MLM Pyramid/Ponzi schemes.

257.     With this knowledge, the Payment Processing Defendants provided substantial and essential assistance to TelexFree in the perpetuation and expansion of its Scheme, including without limitation:

     a.   Opening TelexFree's payment processing accounts;

     b.   receiving and processing payments made by Promoters to TelexFree;

     c.   making and processing payments to Promoters from TelexFree's accounts;

     d.   holding illicit funds for the benefit of TelexFree, its affiliated entities and its Defendant Insiders and transferring them to personal and foreign accounts, foreign companies and shell companies to avoid regulatory scrutiny and/or seizure;

e.   transferring illicit funds between TelexFree entities, which funds were then held

for the benefit of the Defendant Insiders, including transferring TelexFree funds

to personal accounts of the TelexFree Insiders, including foreign accounts, foreign

companies and shell companies to avoid regulatory scrutiny and/or seizure.

### 1.   How the Payment Processing System Works

258.   While a credit card transaction generally takes less than a minute to complete, the
process is complex and involves several parties.

259.   A credit card is issued by a bank called an "Issuing Bank" or "Issuer".  The
Issuing Bank is responsible for payment for purchases by the card holder. Because it pays for the
purchase and then bills the cardholder later, it assumes the risk of non-payment by the
cardholder.

260.   In order to accept credit and debit card transactions, a merchant must contract
with a bank called an Acquiring Bank or Acquirer. The Acquiring Bank receives payment from
the Issuing Bank and transmits it to the merchant.

261.   If a purchaser reverses a purchase because, for example, the credit card
transaction was not authorized properly or was fraudulent, it is called a "chargeback."  The
Acquiring Bank assumes the risk that if there is a chargeback, the Merchant will not repay the
funds it received. In other words, it essentially extends a line of credit to the merchant for the
charge back time limit expires.

262.   The Acquiring Bank will typically hold back a portion of the funds due the
merchant in a separate account as a security. Such an account is called a "Merchant Account
Reserve". This way, Acquiring Banks insulate themselves against loss in the event that a
merchant experiences excessive chargeback.

263.   Payment or Card Networks like Visa, MasterCard, American Express, and debit

cards serve as the link between acquiring banks and issuing banks. The Card Network also authorizes 1) the Issuing Banks to issue credit cards linking the network to their customers and 2) the Acquiring Banks to enter relationships with their merchants as part of the network.

264.    Payment Processors provide the link between the merchant and the Acquiring Bank and the credit card network. Among other things, the Processors collect and consolidate money from large numbers of transactions and transmit it to the Acquiring Bank. The Processors may also withhold money and maintain Merchant Account Reserves. The Processors also provide Automated Clearinghouse services (known as "ACH").

265.    Charge backs evidence fraud, trigger reporting requirements for the bank and require the bank to recover money paid to the merchant. Charge backs, therefore, present expensive problem for Acquiring Banks. They also present a credit risk – i.e., the possibility that the Acquiring Bank will not be able to recover the payments it has made to the merchant. A charge back rate of over 1% is regarded as excessive and generally will not be tolerated by banks, payment processors or the Card Networks.

266.    The Card Networks maintain records of merchants with excessive charge backs. MasterCard maintains a database called MATCH for this purpose. A MATCH listing indicates that a merchant is no longer to receive any credit card processing services due to exceptionally high risk. A MATCH Listing is a permanent record that follow a merchant and is seen by each Financial Service Provider.

267.    A credit card transaction consists of the following steps:

a.    Cardholder: Uses card for a purchase from the Merchant, who enters Cardholder information into the Payment Gateway and authorizes the transaction.

b.    Payment Gateway: The computer link to the Card Network which transmits the

transaction information to the Payment Processor.

c. Payment Processor: Serves as a facilitator on behalf of the Acquiring Bank by forwarding transaction information from the Payment Gateway to the Card Network.

d. Card Network: Routes the transaction information to the correct Issuing Bank in order to receive the Issuing Bank's authorization.

e. Issuing Bank: Receives and verifies the transaction information; if the credit or debit is available, the issuer sends an authorization code for the transaction back to the Card Network.

f. Card Network: Receives the authorization approval from the Issuing Bank, then forwards the authorization to the Processor.

g. Payment Processor: Receives the issuer's authorization approval from the Card Network, then forwards that information to the Payment Gateway.

h. Payment Gateway: Receives the Issuing Bank's authorization approval from the Processor, forwards it to the Merchant to complete the transaction.

i. Merchant: Receives the authorization, fulfills the order, and batches the transaction information along with the rest of the day's sales.

j. Acquiring Bank: Receives the batched transactions at the end of the day, then deposits an amount into the Merchant's account equal to the total of the batch, minus applicable fees, holdbacks, etc.

268. Payment Processors can only operate in conjunction with an Acquiring Bank. The Acquiring Bank dictates the procedures and practices the Processor must follow. It also dictates the types of transactions merchants may engage in and the specific terms and conditions

merchants must adhere to. Since an Acquiring Bank can terminate its relationship with a Pay Processor or any merchant at any time, the Payment Processors are at all times beholden to the Acquiring Bank.

269.    The Processors are subject to the same rules, regulations, regulations and restrictions applicable to Banks detailed above. They are also generally subject to their Acquiring Bank's Know Your Customer and other monitoring protocols.

270.    As explained above, Banks, including Acquiring Banks, are required to investigate new customers and, after they are accepted as customers, monitor their activities for money laundering and fraud under the BSA, Patriot Act and other anti-money laundering rules and regulations. Acquiring Banks develop their own mandatory protocols and procedures for this purpose. Most banks have highly sophisticated departments devoted to this process, and all have continuous computer driven analysis that identifies red flag transactions for mandatory review.

271.    Payment Processors are involved in the investigation and monitoring of merchant activity. Acquiring Banks often first call upon Pay Processors to do the initial investigative work on a questionable transaction.  The Acquiring Banks communicate regarding the Processor's knowledge of a merchant and each questionable or batch of questionable transactions as part of their mandatory process of determining whether further investigation is needed and whether a merchant's processing services should be continued, terminated, or otherwise acted upon.

272.    As a result of a period of especially heavy chargebacks, TelexFree was added to MasterCard's MATCH database in 2012, indicating that TelexFree was no longer to receive any credit card processing services due to exceptionally high risk.

273.    TelexFree, at least as early as the Spring of 2013, was also listed on Visa's chargeback problem list.  As one Processor executive informed TelexFree executives in August

of 2013: "[n]o US Bank or Processor . . . will accept your [TelexFree] business given that you are on month five of the Visa Chargeback monitoring program.  You are one of only three merchants in the USA on month five so you are a real hot-potato as they say."

274.    As TelexFree was cut off by some financial institutions, some of the Payment Processors also assisted TelexFree in obtaining the services of other financial service providers necessary for TelexFree's operations to continue and, along with the TelexFree Insiders, devised and implemented ways that TelexFree could avoid regulatory oversight and continue the fraud.

275.    For example, by August 2013, TelexFree was struggling to find financial services partners as a result of the Brazilian shutdown and issues—including excessive chargebacks—faced by TelexFree's business in the U.S. In response, GPG, Base Commerce, and Vantage Payments leveraged their industry connections and knowledge to assist the TelexFree scheme, including "sneaking" payouts on TelexFree's behalf.

276.    Hughes and Base Commerce brought in Vantage Payments to act as a broker on TelexFree's behalf. Vantage Payments in turn applied to Allied Wallet on TelexFree's behalf and formed a shell company in the United Kingdom—TelexFree, LTD—to serve as TelexFree's EU-based operation. As a result of Vantage Payments' efforts, Allied Wallet agreed to provide payment processing services to TelexFree. Vantage Payments continued to serve as a primary contact between Allied Wallet and TelexFree. Sparman, Vantage Payments managing partner, later successfully negotiated with Allied Wallet on TelexFree's behalf to avoid a threatened increase in Allied Wallet's rolling reserve and to increase Allied Wallet's processing volume for TelexFree.

277.    During August 2013, GPG's Amirie participated in strategy sessions with Merrill and others to devise a way for TelexFree to continue to process electronic transactions. Bank

Card Consultants was identified as a potential resource during these sessions and was brought into the scheme in September 2013 as an "International Account."

278.   Also during August 2013 and in response to the challenges facing TelexFree's U.S. business, GPG and Base Commerce—through Amirie and Hughes—advised TelexFree to seek off-shore banks and on other ways to reduce chargebacks and avoid stringent monitoring under U.S. banking laws.

279.   In September 2013, despite the fact GPG was no longer involved in monetary transactions for TelexFree, Amirie allowed TelexFree to continue to use the GPG gateway to transmit electronic data to Allied Wallet until October 10, 2013. During September 2013 alone, GPG and Allied Wallet processed $21.5 million for TelexFree, of which there were numerous declined charges.

280.   In September 2013, Base Commerce, on TelexFree's behalf, also arranged for TelexFree to use ACH processing services through IPS as a means to avoid the oversight of regulators and banks.

281.   Like the Banks, each Payment Processing Service Company Defendant performed all of the investigations and monitoring required of it by the federal government and gained actual knowledge that TelexFree was operating an unlawful enterprise.  Despite this knowledge, each Processor provided essential assistance to TelexFree's fraudulent scheme.

## K. THE ROLE OF THE LICENSED PROFESSIONALS

282.   Running a massive, global Ponzi scheme is complicated. TelexFree brought in the most experienced MLM experts available to guide them on how to continue bringing in millions of dollars from victims while avoiding the attention of regulators. All of them were in a position to recognize TelexFree as a Pyramid/Ponzi scheme on its face and they did. Yet, despite knowing that TelexFree was a Pyramid/Ponzi scheme and – for many of the Licensed

Professionals – ethical obligations imposed by their licensing authorities, the Licensed Professionals turned a blind eye to TelexFree's illegality and instead leveraged their contacts and considerable expertise to assist in TelexFree's continued growth.

283.    Each individual Licensed Professional defendant was brought into the scheme for their particular expertise.

284.    Attorneys Nehra and Waak are self-proclaimed MLM experts of some thirty years standing. They, individually and through their respective law firms and partnerships were the first attorneys to join TelexFree, with a retainer agreement in or about May 2012. Nehra reviewed TelexFree's documents and willingly participated in marketing events and materials professing TelexFree's legality. Once the scheme was too much for Nehra to manage, he recommended that TelexFree bring in Defendant Babener, another MLM expert attorney.

285.    Defendant Babener joined the scheme in August 2013 and immediately recognized TelexFree as a Ponzi/Pyramid scheme. Babener participated in and advised on almost every aspect of the scheme – from Promoter agreements to international restructuring to criminal defense. Babener leveraged his contacts and expertise in the MLM space to assist TelexFree and assemble a team of experts to perpetuate TelexFree's continuing fraud, ultimately serving as a de facto CEO for the company.

286.    First, Mr. Babener reached out to Mike Sheffield and The Sheffield Group, another group of self-described MLM experts, for assistance in revising TelexFree's compensation plan. Babener and Sheffield had worked together many times before and Babener was clear with Sheffield and his team from the beginning that TelexFree's guaranteed compensation plan was illegal. Even with Babener's warning, Sheffield and his team came on board and continued to work with TelexFree until the bankruptcy filing. The Sheffield team

worked on revising TelexFree's compensation plan and were clear that the plan only worked as a Pyramid scheme – the numbers just wouldn't work any other way.

287.    Next, Babener reached out to attorneys he knew at Garvey, Schubert & Barer to support him on legal issues. Babener sought out Defendant Weaver, and then Defendant Kauffman, for their criminal defense expertise in light of Babener's concern that the Brazilian shut down could lead to issues for TelexFree within the U.S. too. Babener sought to add Defendant Tober and Defendant Sandford to the team for their international restructuring expertise.

288.    In his very first email to the Garvey Schubert Barer attorneys, Babener highlighted the issues with TelexFree's plan yet the Garvey Schubert Barer attorneys agreed to represent TelexFree anyway. Kauffman and then Weaver worked to address criminal issues and on strategies to shield TelexFree from the notice of regulatory authorities, eventually bringing another lawyer into the team to focus on quieting Promoter complaints. Tober and Sandford worked on a global restructuring plan, in consultation with PWC, designed to offshore TelexFree's assets and shield them from recovery by victims of the scheme. For example, in March 2014, knowing that the Massachusetts Securities Division investigation was closing in on TelexFree, Defendant Sandford formed TelexFree's Grand Cayman entity in a matter of days. Both Tober and Sandford strategized on the best ways for TelexFree to continue processing victim's funds while evading U.S. jurisdiction. Sandford also participated in seeking out new banking partners for TelexFree following account closures towards the end of 2013. Babener recommended another Garvey Schubert Barer attorney to the team to advise on immigration issues facing high-performing Promoters seeking to attend a TelexFree marketing event.

289.    Later, Babener recommended Richard Colabella of PwC as a contact of some

twenty-plus years who could assist TelexFree with its tax and international restructuring needs. In late 2013 or early 2014, PwC joined the scheme. PwC worked with Settled Defendant Craft and Defendants Tober and Sandford to develop a plan for TelexFree's international restructuring, again with the focus on avoiding U.S. jurisdiction and shielding TelexFree's assets. PwC also advised and participated in TelexFree's tax strategy, that led to the issuance of fraudulent 1099 forms to Promoters.

## V.   DETAILED ALLEGATIONS ABOUT EACH DEFENDANT

### A.  DEFENDANT BANKS

#### 1.  Defendant Bank of America

290.    Defendant Bank of America N.A. provided essential banking services to the TelexFree scheme.

291.    Bank of America maintained, among other things, multiple accounts for the TelexFree companies, their affiliates and insiders between February 2012 and May 2013, when it closed most of the accounts. Even after this time, however, Bank of America continued to maintain some accounts used by TelexFree to perpetuate its fraudulent scheme.

292.    From February 2012 through at least May 2013, Bank of America maintained numerous bank accounts for TelexFree, LLC, TelexFree Inc., Carlos Wanzeler and Brazilian Help. Defendant Bank of America knew that these accounts were used by TelexFree to effectuate its fraudulent scheme—i.e., to collect and consolidate enormous amounts of illicit funds TelexFree was fraudulently obtaining from its members; to create the false appearance of legitimacy for TelexFree by repaying some of this money to members; and to launder the money obtained so that the insiders could abscond with it.

293.    Defendant Bank of America gained knowledge of the TelexFree fraud as a result

of their initial "Know Your Customer" investigations required by law when it opened each of the TelexFree accounts and as a result of its monitoring of TelexFree's use of the accounts – also required by law – while they were active.

294.    Defendant Bank of America is one of the nation's largest banks, and had sophisticated monitoring protocols.

295.    Bank of America's knowledge of the TelexFree fraud is confirmed by the fact that they closed a TelexFree merchant account for suspicious activity in August 2012. The closure followed, among other things, considerable suspicious activity in the account and online reports that TelexFree was a passive income scheme lacking in external revenue.

296.    Despite this closure, however, Bank of America continued to provide essential services to TelexFree. It continued to maintain other TelexFree accounts and it opened new accounts for TelexFree entities. These accounts continued to be used by TelexFree to collect and consolidate illicit funds and otherwise continue the fraudulent scheme.

297.    Bank of America's knowledge of the TelexFree fraud is also confirmed by its participation in money laundering. The TelexFree insiders used Bank of America accounts to launder funds they received from victims.

298.    During the relevant period, Bank of America, NA ("BOA" or "Bank of America") was a global banking giant with a sophisticated BSA/AML detection and compliance system befitting of its stature. At year-end 2012 when measured by assets, Bank of America, N.A., was the second largest U.S. commercial bank, with consolidated assets exceeding $2.47 trillion. Publicly available documents describe the types of BSA and AML surveillance and compliance that Bank of America engaged in during the relevant period and they were among the most advanced in the world. In 2012, Bank of America boasted of its culture of compliance,

stating: "Compliance is at the core of the Corporation's culture and is a key component of risk management discipline."

299.   Upon information and belief, at all times material herein, and specifically with respect to TelexFree, Bank of America maintained a shared customer information and customer due diligence database, maintained shared account monitoring systems, and otherwise shared all information relating to customers and account activity.

300.   BOA opened accounts in TelexFree's name in February 2012. Bank of America was one of TelexFree's largest banking resources during 2012 and 2013.  During that period, Bank of America provided both depository services and payment processing services for TelexFree.  Bank of America's services allowed TelexFree to flourish and grow rapidly.

301.   Bank of America's knowledge of, and substantial assistance of, TelexFree's criminal scheme unfolded over three periods.

> ### a.   *First Period -- Actual Knowledge Established Through First Account Closure*

302.   During the first period, Bank of America became aware of TelexFree's passive income business model immediately upon account opening in February 2012.

303.   On February 15, 2012, Carlos Wanzeler, on behalf of TelexFree, Inc., applied for a Merchant Processing Account with Bank of America and BAMS.

304.   On February 19, 2012, Bank of America opened TelexFree's Merchant account ending in 1885, which handled TelexFree's payment processing, including credit and debit card transactions. On February 21, 2012, Bank of America opened two additional TelexFree, Inc. deposit accounts -- ending in 0343 and 7408 -- through which TelexFree received wire transfers and credit card transfers. Wanzeler and Defendant Merrill were listed on the signature cards.

305.   The Bank of America merchant processing application required that applicants

provide extensive information about their prospective use of the account. TelexFree, Inc.

estimated that its annual credit card volume would be $500,000; it average ticket size (i.e. credit

card charge) would be $150; and its highest ticket size would be $300. It explained its

business as telecommunications and equipment and indicated that customers would place orders

only over the internet.

306.    As part of its initial due diligence investigation, Bank of America and BAMS also

reviewed TelexFree, Inc.'s website.  This is confirmed by TelexFree's merchant payment

processing application in which Bank of America and BAMS indicated: "Website Review

completed for Virtual merchants only."  This was verified on the following page of the

application, which indicated "Web Page attached." Bank of America also gained knowledge

that TelexFree was a pyramid scheme from its review of its website. Indeed, this website

advertised AdCentral packages as a passive income opportunity guaranteeing more than a 300%

return, which BOA knew to be illegal and to constitute a pyramid /Ponzi scheme. TelexFree

Inc.'s website stated:

> *Through a ADCENTRAL, that you geot [sic] for the amount of US$299*
> *(annually). The promotor will receive US$20 each week that makes 7 different*
> *announcements in websites of free announcements online, from Monday to*
> *Sunday. All in a way fast, easy, and standardized in your virtual office*
> *(BO) Telexfree. This will be for the 52 weeks of the year, of your*
> *contract, thgen see the situation:*
> *52 weeks x $20 (Putting the 7 announcements) = $1,040 in the year*

307.    This passive income model, combined with guaranteed returns, constituted an

unlawful offer or sale of an unregistered security, and identified TelexFree as a likely

pyramid/Ponzi scheme. From this website content, Bank of America had knowledge

that TelexFree's business was likely fraudulent.

308.    Bank of America would also have known that banking services are essential to

pyramid/ Ponzi schemes, as explained above. Indeed, TelexFree's Bank of America accounts enabled it to collect and consolidate millions of dollars from its victims.

309.     As explained above, financial institutions like Bank of America are required by law to monitor their customers for financial fraud and money laundering. Within just a few months, Bank of America's sophisticated automated surveillance system flagged suspicious activity in TelexFree's merchant account no. 1885. This prompted staff at BAMS' Security/Risk Department to review that account and to send at least five letters expressing concerns about TelexFree's "financial profile" and restricting use of that account. Communications between Bank of America and TelexFree in the weeks leading up to the closure show that Bank of America had flagged the risk of fraud posed by TelexFree's "financial profile" (to use Bank of America's words).

310.     In May of 2012, TelexFree's merchant account no. 1885 had excessive chargebacks/reversals and fees.

311.     On May 31, 2012, Monica Liebler, manager in BAMS' Security/Risk Department sent Carlos Wanzeler on behalf of TelexFree, Inc. a letter notifying him that one or more batches for merchant account number ending in 1885 were suspended due to "for a number of reasons, including but not limited to: -- unusually high number of cardholder disputes/chargebacks."

312.     In response to Liebler's letter, TelexFree's office manager, Andreia B. Moreira, contacted Bank of America's Customer Services Department and conferred with Liebler. Liebler explained that Bank of America was concerned with the transfers going into TelexFree's merchant account and that this activity was suspicious. Liebler explained that the Bank's suspicion and concern arose due to a number of red flags:

    a.   Numerous transactions in identical amounts;

    b.   Numerous charge backs; and

    c.   Numerous transactions which originated from outside of the United States.

313.    Liebler requested that TelexFree's office manager Moreira produce documentation that supported its financial transactions and provide her with documentation that would explain these transactions.

314.    In response, Moreira provided Liebler sample invoices. These showed that:

    a.   Transactions in the amount of $1,425.00 represented the sale of AdCentral Family membership packages (including a $1375 "contract" fee and $50 "membership" fee);

    b.   Transactions in the amount of $339.00 represented the sale of AdCentral Individual membership packages (including a $289 "contract" fee and $50 "membership" fee); and

    c.   Transactions in the amount of $49.90 represented by the sale of VoIP (voice over internet protocol) communications products.

315.    These invoices and the high volume of repeat monetary transactions in the amounts of TelexFree's AdCentral and AdCentral Family promoter packages in account no. 1885, along with the corresponding lack of transactions in amounts representing the sale of VoIP software, confirmed to Bank of America's sophisticated and specially trained Security/Risk Department that TelexFree was a likely fraudulent pyramid/Ponzi scheme because it had little or no income from its supposed primary VOIP business.

316.    Despite this information, Bank of America lifted the suspension on TelexFree's merchant account and allowed TelexFree's payment processing to resume.

317.     On June 26, 2012, Liebler sent another letter to Wanzeler informing him that the chargeback ratio for TelexFree's merchant account no. 1885 was at 6% and needed to be reduced to 1%. Liebler further made clear that if the rate was not reduced, Bank of America and BAMS "may be compelled to terminate the merchant account." The 6% rate was triple the maximum allowable under accepted industry standards.

318.     On the same day, Liebler sent a third letter to Wanzeler indicating that due to "an increased level of risk," Bank of America would create a reserve account in the amount of $25,774.97 from TelexFree's bankcard deposits. Liebler further warned that if TelexFree failed to maintain sufficient funds in the settlement account, Bank of America and BAMS "may be compelled to terminate [the] merchant account." Liebler further explained that this action was necessary "in light of the risks associated with [TelexFree's] financial profile."

319.     Liebler's reference to TelexFree's "financial profile" is noteworthy. It confirms that Bank of America knew by this point that TelexFree was a likely Ponzi scheme and that they had it under enhanced due diligence.  Nevertheless, Bank of America kept account no. 1885 open in July 2012 and allowed it to process more credit card payments from TelexFree's victims.

320.     The red flags continued in account no. 1885 in July 2012.  The account continued to experience a high rate of chargebacks.  In addition, the activity in the account increased dramatically. The activity in the account far exceeded what TelexFree had indicated in its application. On July 26, 2012, Liebler advised Wanzeler that one or more batches totaling $160,797.67 and all subsequent deposits were suspended in TelexFree's merchant account no. 1885 for several reasons including a new one -"processing unusually high number of charges."  Since TelexFree, Inc., had estimated its total annual credit card sales at $500,000 in its original account application,[1] $160,797.67 in charges in less than a month was

suspicious.   Such a large, unexplained influx in funds transfers was a red flag for fraud. Indeed, the sharp increase in the amounts processed through account no. 1885 was unmistakable. The totals for the account increased from a few thousand in the spring of 2012 to $236,716 in July 2012. In August 2012, deposits amounted to $436,601.

321.   Liebler's letters made clear that Bank of America and BAMS' automated surveillance system had kicked in and suspended funding in account no. 1885 as early as May 2012 as a result of the myriad red flags the account exhibited.   That in turn prompted human review of that suspension by Bank of America's Security/Risk Department and Liebler's subsequent letters to TelexFree, Inc.   As this sequence of events shows, Bank of America's escalation processes came into play. Nevertheless, the Bank kept account no. 1885 open in July 2012 and allowed it to process more credit card payments by TelexFree's unsuspecting investors.

322.   On July 27, 2012, BehindMLM.com, a news blog covering the MLM industry, reported that TelexFree's business model "strongly indicates a lack of external revenue."  Other news outlets soon followed suit.   Through their active monitoring of TelexFree's accounts, Bank of America was likely aware of these articles.

323.   Finally, as a result of these overwhelming indicia of fraud, by letter dated August 6, 2012, Liebler notified Wanzeler/TelexFree, Inc. that Bank of America and BAMS were terminating TelexFree's merchant account no. 1885 effective August 27, 2012. The reserve account in the amount of $127,000 would be maintained until chargeback periods expired. This account had approximately $615,096.11 remaining in the account.

324.   Bank of America and BAMS' closure of account no. 1885 had few practical ramifications., however. Even though the Bank closed that account due to rampant signs of

financial misconduct, it did not freeze the balance in that account. Bank of America declined to freeze those funds even though it had previously frozen funds in other accounts when it suspected fraud or other misconduct.

325.    Instead, on February 8, 2013, Bank of America deposited $300,000 from account no. 1885 into TelexFree, Inc.'s Bank of America checking account no. 7408.[2] Because these funds, in all likelihood, consisted of investments by TelexFree's defrauded investors, Bank of America's failure to freeze those funds and its action in moving those funds to another open TelexFree account delivered those funds into the hands of TelexFree's perpetrators.

326.    In addition, because Bank of America made the judgment to keep TelexFree, Inc.'s checking account no. 7408 open, TelexFree's operations continued without meaningful interruption.

327.    After August 2012, TelexFree, Inc., collected millions of dollars in deposits from its victims in account no. 7408.

328.    Bank of America profited from TelexFree's continuing operations in several ways. It was able to use the continuing deposits by TelexFree's victims for reimbursement of the chargebacks. And the huge flows of cash generated fees and other benefits for the Bank.

329.    For instance, the Bank derived fees from the huge flow of transactions in and out of TelexFree accounts, including transactional processing fees, ACH processing charges, return deposit item fees, chargeback fees, and miscellaneous fees. The Bank also benefitted by lending out victim funds at interest on the overnight lending market, thus profiting directly from its own use of these funds.

330.    Bank of America's branch-level and other customer-facing employees were also incentivized to open and maintain TelexFree accounts in the face of known illegality as a result

Bank of America's "pay-for-performance" program and "Pay-for-Performance Compensation Philosophy," which rewarded Bank of America employees for acquiring bank customers and opening multiple customer accounts.

331.    Furthermore, Bank of America is institutionally incentivized to maintain as many large accounts as possible in order to maintain and increase its total deposits, thus increasing its lending capacity. Increasing its total deposits would also give rise to the appearance that Bank of America was growing, thereby benefiting its stock price.

332.    By continuing to do business with TelexFree and its principals and related entities, Bank of America allowed TelexFree's operations to continue and proliferate and thus provided substantial assistance to TelexFree's fraudulent scheme.

#### b.    Second Period – Bank of America Knowingly Perpetuates TelexFree's Fraud

333.    After the shutdown of account no. 1885, activity in account no. 7408 increased dramatically. Deposits into account no. 7408 grew from approximately $150,000 in July 2012, to over $600,000 in August, 2012 to over $1.8 million in February 2013, and finally to over $4.3 million in April 2013.

334.    It is clear, moreover, that one reason Bank of America did not close all of TelexFree's accounts was to provide a further source of money for Bank of America to recoup potential losses from chargebacks to account no. 1885. As Ms. Liebling had made clear, one reason the Bank was concerned about chargeback activity in TelexFree's accounts was that it could directly cost the Bank money.

335.    By transferring $300,000 from account no. 1885 to account no. 7408, and allowing continuing TelexFree deposits into account no. 7408, the Bank ensured that funds would be available to it. The Bank took advantage of this resource and paid itself substantial

amounts from TelexFree accounts after it closed account no. 1885. In August and September 2012, for example, the Bank transferred almost $500,000 from account no. 7408 to closed account no. 1885 in chargeback reimbursements.  Plaintiffs lack records for account no. 7408 after September 2012, but it is likely the Bank paid itself substantial additional amounts from TelexFree funds.

336.     Account no. 7408 also continued to show the same patterns of fraud that led to the closure of account no. 1885. – namely high levels of chargebacks, activity confirming the "financial profile" of TelexFree as a fraudulent scheme, high numbers of identical charges, and high numbers of charges from outside the United States.

337.     Thus, for example, account no. 7408 continued to experience high levels of chargebacks. By the end of September of 2012, the account ending in 7408 had chargebacks/reversals in the amount of $28,427.

338.      Similarly, the transactions in account no. 7408 continued to reflect almost entirely sales of AdCentral memberships rather than sales of VOIP products, purportedly TelexFree's main business. As before, this confirmed that TelexFree was a fraudulent scheme selling guaranteed return passive investments, rather than a legitimate seller of VOIP products. For example, in February 2013, TelexFree, Inc.'s account no. 7408 had 253 transactions in the amount of $1,375 (the price of an AdCentral Family membership) totaling $347,875.00; 79 transactions in the amount of $1,425.00 (the price of an AdCentral Family membership plus $50 membership fee) totaling $112,575.00; 11 transactions in the amount of $50.00(membership fee) totaling $550.00; and only two transactions in the amount of $49.90 (VOIP).

339.     Similarly, in April 2013, account no.7408 had approximately 281 counter credit transactions in the amount of $1425, totaling approximately $400,425. A "counter credit" (or

"counter deposit") refers to a cash deposit at the counter of a physical bank branch. Whenever anyone visits a bank and deposits cash it is recorded as a counter credit. Of the 281 counter credit transactions, there were only five VoIP transactions in the amount of $49.90.

340.    TelexFree's posted "signup procedures" directed promoters to deposit investments directly into a specific TelexFree account with Bank of America. These sign up procedures were posted on TelexFree's website and available to and otherwise known to Bank of America. These "sign up procedures" resulted in a large volume of "counter deposits.".

341.    BOA knew about this large volume of counter deposits and provided substantial assistance by knowingly serving as a "toll booth attendant" for the pyramid scheme.

342.    Bank of America expressly authorized and encouraged the process by which TelexFree's victims would bring cash to its branch office in Shrewsbury, Massachusetts. During 2013, TelexFree members were directed to transfer their membership fees to a "corporate" account at Bank of America under the name "TelexFree, LLC." They were provided with the applicable account and routing numbers, and directed to make payments in person at the Bank of America located at 188 Boston Turnpike, Shrewsbury Massachusetts 01545.

343.    This posting was approved by, and coordinated with, Bank of America's Shrewsbury branch manager, who specified using the Shrewsbury branch in order to assist TelexFree. The posting resulted in a large number of walk-in deposits by promoters who purchased AdCentral packages.  Thus, Bank of America purposefully and directly assisted TelexFree with one if its primary objectives – obtaining victims' money.

344.    By knowingly allowing itself to be identified as TelexFree's depository and serving as a credible intermediary that implicitly endorsed this process, BOA substantially assisted TelexFree's pyramid scheme by lending an aura of legitimacy to TelexFree's illicit

business operations.

345.    Account no. 7408 also continued to show substantial activity, eventually receiving deposits well in excess of $1 million a month, again, far exceeding the $500,000 in annual deposits represented in the TelexFree banking application. Furthermore, the account continued to experience an unusually high number of identical charges, and an unusually high number of charges originating outside of the United States.

346.    In addition to account no. 7408, Bank of America continued to maintain at least eleven other existing TelexFree-related accounts after it closed TelexFree's merchant account in August 2012.  These included:  TelexFree, Inc. checking account no. 0343; two Carlos Wanzeler accounts -- checking no. 4178 and credit card account no. 0814; four Carlos and Katia Wanzeler joint accounts – checking accounts nos. 1826 and 7507, savings account no. 1826; Brazilian Help checking account no. 6064; and Common Cents Corporations, Inc. checking accounts nos. 0369, 0372, and 2440. Bank of America knew that all of these accounts were associated with Carlos Wanzeler and that Wanzeler was one of the TelexFree fraudsters.

347.    Bank of America also opened new accounts for TelexFree and the TelexFree fraudsters, thus providing TelexFree and its founders with other accounts to use in carrying out its criminal scheme. Each new account opening also would have resulted in another Bank of America due diligence check on the applicant and its owner or owners.

348.    The Bank opened accounts for two new companies created by Carlos Wanzeler and James Merrill which shared the moniker of "JC Real Estate."  On July 26, 2012, the same day that Monica Liebler sent another warning letter to Wanzeler about TelexFree, Inc., account no. 1885--Merrill and Wanzeler formed JC Real Estate Management Company, LLC, and JC Real Estate Investment Company, LLC, as Nevada LLCs. On August 3, 2012 Bank of America

opened JC Real Estate *Management* Company, LLC, checking accounts no. 9064 and 9051, each with a $50.00 deposit. Bank of America knew at the time that Carlos Wanzeler and James Merrill were the sole officers and managers of JC Real Estate Management Company, LLC, from Nevada public records and would have independently inquired into its ownership.

349.    On August 3, 2012, Bank of America opened two more new checking accounts no. 9035 and 9116, this time for Wanzeler's newly formed entity JC Real Estate Investment Company, LLC.

350.    In addition, soon after its creation on September 19, 2012, Bank of America opened three new accounts for Above & Beyond the Limit, LLC, another company controlled by Wanzeler:  checking account no. 7440, checking account no. 7437 and an unidentified deposit account at Bank of America's Singapore office.

351.    The formation of these new TelexFree-related entities around this time and their quick enrollment in new Bank of America accounts were signs that TelexFree's U.S. operations were developing their ability to launder money through additional entities.  Merrill and Wanzeler subsequently used Bank of America's accounts with at least two of these three new LLCs for exactly that purpose.

352.    On or about March 11, 2013, Bank of America also opened a Cash Rewards for Business Credit Card Account no. 2658 for TelexFree, Inc. The welcome letter was signed by Tim A. Burdick, Senior Vice President, Card Services for Bank of America. Carlos Wanzeler was named as Guarantor.

353.    Bank of America knew that Wanzeler and TelexFree were linked to all of the old accounts they did not close, as well as the new accounts.  Bank of America's automated systems had the ability to "connect parties that were previously unconnected" and thus to connect the

dots linking TelexFree, Inc., through Wanzeler to those other accounts. In addition, Bank of America had the "ability to detect attempts by customers who ha[d] had their accounts closed to re-enter our Bank.".

354.     Maintaining so many accounts for TelexFree and related entities and individuals is not routine. Rather disbursing illegal activity among multiple accounts is a known technique to circumvent BSA/ALM reporting requirements. By maintaining that number of accounts for TelexFree, Bank of America was also able to disguise the high number of red flags created by TelexFree's suspicious banking activity.

### c.   Money Laundering

355.     Bank of America also allowed the accounts it failed to close to be used by TelexFree to launder tens of millions of dollars.

356.     In January 2013, ProCon announced its investigation into TelexFree's Brazilian operation. This was a crisis for TelexFree and an indication that Brazil was no longer a safe venue for TelexFree to operate or maintain assets. As ProCon noted when it announced its investigation in January 2013: "evidence of crimes ha[d] been detected."

357.     Bank of America further knew of large deposits made into its accounts held in the names of TelexFree, Wanzeler and Merrill from the TelexFree Brazilian entity that was being shut down.  The corresponding deposits exceeded limits established by Bank of America and those reported by TelexFree., and also exhibited telltale signs of "layering" and other money laundering techniques.

358.     Bank of America substantially assisted TelexFree's pyramid scheme by allowing Wanzeler to launder funds unlawfully obtained through its Brazilian affiliate and transfer them away from the reach of the Brazilian authorities and into his American Bank of America accounts.  Over the course of about eight weeks, Wanzeler moved approximately $11.75 million

into his  Bank of America account no. 1826 from a Banco de Brasil account. Of this amount, at least $7.75 million was immediately, or very shortly, transferred out of the account to other accounts controlled by Wanzeler:

    a.  On January 17, 2013, Wanzeler transferred $1,000,000;

    b.  On January 22, 2013, Wanzeler transferred $1,000,000; the same day $1,000,000 was transferred from account no. 1826 to Bank of America account no. 7440 belonging to Above and Beyond the Limit, LLC, the company Wanzeler had recently created.

    c.  On January 29, 2013, Wanzeler transferred $550,000; the next day the same amount was transferred out of the 1826 account to Bank of America account no. 7437 belonging to Above and Beyond the Limit, LLC;

    d.  On February 1, 2013, Wanzeler transferred $1,500,000;

    e.  On February 6, 2013, $640,000 was transferred out of account no. 1826 to Bank of America account no. 7437 belonging to Above and Beyond the Limit, LLC;

    f.  On February 7, 2013, Wanzeler transferred $2,000,000;

    g.  On February 25, 2013, $1,980,000 was transferred out of account no. 1826 to Above and Beyond the Limit, LLC;

    h.  On March 15, 2013, Wanzeler transferred $1,999,948;

    i.  On March 27, 2013, Wanzeler transferred $1,700,000;

    j.  On April 1, 2013, $645,000 was transferred out of account no. 1826  to Bank of America account no. 5149 at the Chadwick Square Banking Center in Worcester, Massachusetts belonging to the daughter of Carlos Costa, the head of TelexFree's Brazil operations;

    k.  On April 11, 2013, there was an agent assisted transfer of $1,100,000 out of account

no. 1826  to the Wanzelers' joint Bank of America savings account no. 1826;

l.   On April 30, 2013, $911,083 was wired from the joint savings account to David W.
Lia at RBS Citizens N.A.;

m.   On May 28, 2013, Wanzeler transferred $900,000 from the Banco de Brasil account
through Bank of America and deposited it in Wanzeler's Citizen's Bank account no.
1113.

359.   Each of these transactions was a classic instance of money laundering, and a
classic instance of the money laundering technique known as  "layering" whereby funds are
transferred between multiple accounts to obscure their origin. Further, as Bank of America well
knew, such money laundering is an integral part of pyramid/Ponzi schemes. It is essential to
fulfill the principal aim of the fraudsters – to abscond with their victim's money. When Bank of
America closed account no. 1885 because it had identified TelexFree as a fraud, it knew that by
allowing the fraud to continue via other Bank of America accounts, it was actively facilitating
fraud, and that money laundering through its accounts was inevitable.

360.   TelexFree's Bank of America accounts also were used to launder its illicit
monies. During the same time period, at least $8 million passed through Bank of America
accounts to other accounts, again, in classic instances of "layering":

a.   On February 6, 2013, $1.4 million was withdrawn from TelexFree, Inc.'s account
no. 7408 and deposited into TelexFree LLC's Citizens Bank account no
8026. The ledger described the payment as a loan to TelexFree LLC.

b.   On April 12, $1.8 million was withdrawn from TelexFree, Inc.'s account no.
7408 and paid into a TelexFree, LLC checking account at Citizens Bank on April
19, 2013. Again, the transaction was described as a loan from TelexFree, Inc.

to TelexFree LLC.

c. On April 19, another $1.8 million was withdrawn from TelexFree, Inc.'s account no. 7408 and paid to TelexFree, LLC.'s Citizen's Bank account no. 8026.  Again, the transaction was described as a loan from TelexFree, Inc. to TelexFree LLC.

d. On April 22, another 1.8 million was withdrawn from TelexFree, Inc.'s account no. 7408 and paid to TelexFree, LLC. Once again, the transaction was described as a loan from TelexFree, Inc. to TelexFree LLC.

e. On May 20, 2013, TelexFree, Inc. deposited a Bank of America cashier's check for $1,382,941 in TelexFree LLC's Citizens Bank account no 8026.

361.    Similarly, James Merrill wired himself cash from TelexFree Bank of America accounts.  On April 23 and 24, 2013, Merrill wired himself almost $850,000 from TelexFree, Inc. Bank of America account no. 7408. The money was deposited in a Citizens Bank account.

362.    Again, this was the inevitable consequence of Bank of America's decision to continue to allow TelexFree to use Bank of America accounts to perpetuate its fraud.

363.    Finally, after the closure of account no. 1885, Bank of America also continued to provide accounts enabling TelexFree's payment processors to collect and deliver tens of millions of dollars of credit card payments for TelexFree's worthless AdCentral packages even though it knew that the money collected by the payment processors was the product of TelexFree's fraud.

364.    From 2012, through TelexFree's bankruptcy, Defendant International Payout Systems, Inc. ("IPS") processed and delivered huge sums to TelexFree using Bank of America accounts. In another striking instance of money laundering, on March 17, 2014 – less than a month before TelexFree filed for bankruptcy – $30 million was wired from a Bank of

America account through IPS into TelexFree's Wells Fargo Bank checking account no. 8506.

365.    Again, this was the inevitable consequence of Bank of America's decision to continue to allow TelexFree to use Bank of America accounts to perpetuate its fraud.

366.    Defendant ProPay, another payment processor, also used Bank of America accounts to collect and deposit at least $4.4 million in illicit funds into TelexFree accounts. All of these funds were deposited into TelexFree, Inc.'s account no. 7408.

367.    A document dated November 11, 2013, established that Defendant Merrill, on behalf of TelexFree, directed another payment processor Defendant Allied Wallet, to transfer funds via international wire transfer to TelexFree's account with Bank of America. Settled Defendant Craft confirmed that from 2012 through the bankruptcy, Bank of America processed incoming payments to TelexFree. Such transactions were labeled "MEMO: Further credit to TelexFree."

### d.   Third Period – Bank of America Continued to Provide Financial Services to TelexFree

368.    The third period began after the May 2013 account closures. Despite its indisputable knowledge of TelexFree's fraud, the Bank of America continued to provide financial services to the TelexFree fraudsters and allowed them to transfer offshore and abscond with tens of millions of dollars more.

369.    In May of 2013, Bank of America again closed several of its TelexFree associated accounts based on its knowledge of the TelexFree fraud.  The Bank closed TelexFree's account no. 7408; Carlos and Katia Wanzeler's accounts nos. 1826 and 7507; Brazilian Help's accounts nos. 6064 and 0421; K&C Cleaning Services, Inc, Carlos Wanzeler dba account no. 4178; and Cleaner Image USA's account no. 1850.

370.    Again, however, Bank of America did not freeze the money in the accounts and

did not close all of the TelexFree accounts. Instead, the Bank issued cashier's check for the balances which the TelexFree fraudsters absconded with, as Bank of America knew they would.

371.    Thus, for example, Bank of America paid out the closing balance of TelexFree Inc. account no. 7408 -- $1,382,941 – by cashier's check dated May 15, 2013, payable to TelexFree LLC. That check was deposited into a TelexFree LLC Citizens Bank account on May 20, 2013, marked as a "special deposit." TelexFree, Inc.'s ledger described it as a "loan".

372.    Bank of America similarly paid out the balances of the other accounts by cashier's checks made out or given to the Wanzelers.

373.    Finally, Bank of America opened new accounts for TelexFree related entities even after closing accounts for fraud a second time. Late in 2013, Joseph Craft had several conversations with Defendant Kevin Staten, a Senior Vice President with Bank of America, during which they discussed the fact that TelexFree had been shuttered in Brazil for being a pyramid scheme.

374.    Craft had been introduced to Staten through the influence of Edwin J. Gonzalez, President of IPS, who was assisting TelexFree as a Pay Processor and who likewise had actual knowledge of TelexFree's illegal activities. Gonzalez knew Staten and personally arranged for Staten to speak with Craft regarding TelexFree's desire for another Bank of America account. Gonzalez had already told Staten that since IPS was handling TelexFree's payment processing, there would be fewer individual deposits and therefore fewer chargebacks in the account, and therefore lower financial risk for Bank of America.

375.    Staten specifically told Craft that Bank of America was concerned that TelexFree's operations were not legal. Staten also indicated that he was aware that Bank of America had previously conducted business with TelexFree and had already closed TelexFree

accounts.

376.    Notwithstanding Staten's explicit knowledge regarding TelexFree, Staten, on behalf of Bank of America, agreed to approve TelexFree's application for an additional account and arranged for the account to be opened.

377.    Staten referred Craft to Naquina Loachamin, a Small Business Banking Manager at Bank of America, to open the account. As part of the process, Craft provided Loachamin with information regarding TelexFree's principals, business operation, and financials. By e-mail dated January 27,2014, Loachamin apologized to Craft for the delay in opening the account, explained that Bank of America had performed their due diligence review through their "RISK" department, and asked for further information regarding TelexFree, Wanzeler and Merrill in order to approve opening the account.

378.    Craft complied with this request and provided the additional information to Loachamin. Upon information and belief, after Craft had provided the requested information, Staten arranged for Loachamin to approve the account application and open the account.

379.    On February 6, 2014, Bank of America, with the additional assistance of another Bank of America employee, Samantha Yanez, opened account no. 1477 for TelexFree in Florida.

380.    On February 18, 2014, TelexFree deposited $475,713.43 in victim funds into new account no. 1477.

381.    Joseph Craft deposited approximately $40,000.00 into TelexFree's newly established Bank of America account at the Marlborough, Massachusetts branch in February or March 2014.

382.    On March 17, 2014, $30,000,000 was transferred from TelexFree's Bank of America account through IPS to TelexFree, LLC's Wells Fargo account.

383.    Through its actions, Bank of America substantially assisted in the perpetuation of, and otherwise became an integral part of, TelexFree's fraudulent scheme.

384.    Bank of America was also unjustly enriched as it received fees for providing vital banking services to TelexFree, which were deducted directly from victim funds held in TelexFree's Bank of America accounts.

385.    Bank of America also helped TelexFree obtain financial services from other institutions. For example, in late summer 2012, Diep Vuong, an Assistant Banking Manager with Bank of America, authored a letter verifying that TelexFree, Inc. held an account ending in 7408 at Bank of America.  This letter was used to assist TelexFree International LLC open a corporate account at Caye International Bank, Ltd., located in Belize for the purpose of laundering and sheltering money out of the reach of United States authorities.

386.    TelexFree also actively promoted its involvement with Bank of America in its efforts to lure in new recruits and new investments. For example, TelexFree indicated that it was working with Bank of America and included Bank of America's logo in PowerPoint presentations at TelexFree promotional events.

387.    Also, in 2013, TelexFree prominently included Bank of America's logo on the scheme's website and characterized Bank of America as one of its banking partners.

388.    During the course of its repeated account-opening due diligence on TelexFree during 2013, Bank of America would have reviewed TelexFree's website and seen Bank of America's logo displayed prominently on the website. Bank of America took no steps to have the logo removed from TelexFree's website, and, in fact, the logo was permitted to remain on TelexFree's website until at least December 2013, when IPS's Natalia Yenatska advised TelexFree to remove it.

### e.   *Bank of America Investigated TelexFree for Fraud*

389.     Finally, Bank of America conducted at least two investigations into TelexFree operations and the conduct of its employees and agents.

390.     In September 2013, Bank of America opened an investigation into one of its personal bankers, Stephanie N. Martins, on suspicion of involvement with TelexFree. In the course of the Martins investigation, it came out that TelexFree had been the subject of a prior Bank of America anti-money laundering investigation.

391.     With regard to the Martins investigation, on September 28, 2013, Bank of America's Global Financial Crimes Compliance (GFCC) unit received notification from the Bank's Anti-Money Laundering Department that out of state cash deposits were being completed in Bank of America accounts associated with Martins and her husband, Alisson Charles De Oliviera. According to a management narrative prepared by Bank of America, these accounts displayed "out of state cash deposits, structured cash withdrawals and credits posted by a company whose activity is rumored to be representative of a high-yield investment scam. . . ." The narrative continued that this company "was a subject of a prior BAC Anti Money Laundering investigation."

392.     Bank of America interviewed Martins on December 23, 2013. During that interview, she told the Bank that her husband had opened a new business as a franchise (i.e. a promoter) of TelexFree. Martins stated that TelexFree was "blocked in Brazil, and TelexFree keeps fighting in court and they cannot state the crime they committed but they will not also allow the company to resume activities." The interview also explicitly discussed whether TelexFree was a Ponzi scheme.

393.     Despite this investigation, Bank of America failed to close its then-active TelexFree and TelexFree-related accounts and proceeded to open at least one additional account

for TelexFree in February 2014, as discussed above.

### 2. Defendants Wells Fargo Bank, Wells Fargo Advisors, and Mauricio Cardenas

#### a. *Background Allegations*

314.    Wells Fargo Bank, N.A ("WF Bank" or "WFB") and Defendant Wells Fargo Advisors ("WF Advisors" or "WFA") are related entities and subsidiaries of their parent company, Wells Fargo & Company.   Throughout the time period relevant to the claims against them, they acted in concert and as one without a legal distinction. WF Bank provided banking services to TelexFree, its affiliates and principles from June 20, 2012 to April 2014. In addition to providing depositary banking services to TelexFree, WFB also acted as an acquiring bank for TelexFree via ProPay, from approximately August 2012 to June 2013. As detailed below, later Wells Fargo Bank continued to service TelexFree despite closing accounts because of fraud related to the unlawful MLM by opening multiple bank accounts for TelexFree, affiliates and principals that were used to layer and syphon victim funds.

394.    Wells Fargo Advisors provided financial and investment services, maintained accounts, and received and executed transfers of funds from or for the benefit of Wanzeler and TelexFree  They also worked in tandem with TelexFree, Wells Fargo Bank, Cardenas, Montalvo, and all the PwC, Garvey Schubert, Nehra and Babener Licensed Professional Defendants to separate the victims funds from them and move them off shore for the express purpose of sheltering it out of the reach of the United States justice system.

395.    Defendant Mauricio Cardenas was employed as a financial advisor and was an employee of Wells Fargo Advisors as a registered broker-dealer and a registered investment advisor under the Investment Advisers Act of 1940.  Cardenas, importantly, was also Wanzeler's friend, confidant and primary financial advisor.  Despite having actual knowledge that TelexFree

was an unlawful Pyramid Scheme and that Wanzeler was at the top level of the fraud, over time Cardenas became chiefly responsible for strategy and implantation of plan actions taken by Wanzeler and the above group, regarding funds received through the TelexFree Pyramid Scheme including funds that Wanzeler siphoned.

396.    WF Advisors and WF Bank are vicariously, jointly and severally liable for the actions taken by these employees, agents, and representatives.  Defendant Mauricio Cardenas performed duties related to and in the ordinary and usual course of his employ for both Wells Fargo Bank and Wells Fargo Advisors with the knowledge and consent of management.  Michael Montalvo also worked closely with Cardenás in servicing TelexFree, they shared relevant information and referred to themselves as a "two-advisor team."

397.    Cardenas was assigned and utilized both a Wells Fargo Bank and Wells Fargo Advisors email address throughout his tenure with Wells Fargo. His knowledge and acts are imputed to both WF Bank and WFA.  WF Bank, WF Advisors, Cardenas, Montalvo and others including management as a matter of Wells Fargo policy shared information and specifically shared information regarding TelexFree, James Merrill, Carlos Wanzeler, Katia Wanzeler and Sanderley Rodrigues de Vasconcelos, and their related persons and entities or purposes in assisting the TelexFree Scheme. Upon information and belief, Cardenas, Montalvo and others communicated with Carlos Wanzeler, his wife Katia Barboza Wanzeler and others related to, and on behalf of TelexFree through personal email, text messages and telephone. Cardenas often stayed at the Wanzeler residence during frequent trips to TelexFree's World HQ in Massachusetts.

398.    Wells Fargo Bank served as an acquiring bank with respect to TelexFree Promoter payments and also acted as a depository bank for TelexFree and its known associated

persons and entities, including Carlos and Katia Wanzeler. WF Advisors, through Cardenas, also

opened a brokerage account for Katia Wanzeler for the benefit of TelexFree. The related

transactions include transactions facilitated by Defendant Mauricio Cardenas, who was integral

to the TelexFree Scheme and who advised and assisted the Scheme with unlawful laundering,

layering, smurfing and offshoring sheltering of TelexFree victim funds.

399.    All these Defendants engaged in the above tasks and activities and provided

substantial assistance to TelexFree with actual knowledge that TelexFree was engaged in an

illegal Pyramid scheme to the damage of the investors and that the services provided were in

furtherance thereof.

### b. Actual Knowledge

400.    As detailed below, soon after opening its first account in 2012, Wells

Fargo gained actual knowledge that TelexFree was an illegal enterprise or otherwise engaged in

unlawful or fraudulent activity through its industry leading three level BSA/ALM system. It is

not disputed that during the relevant period, Wells Fargo operated a sophisticated BSA/AML

compliance program, befitting its rank as a top U.S. bank.  In 2013 and 2014, the years at issue

here, Wells Fargo & Company (the parent company of Well Fargo Bank, N.A., and Wells Fargo

Advisors, LLC) was the nation's fourth largest banking enterprise in terms of assets. By 2014,

Wells Fargo & Company boasted $1.636 trillion in total assets and was one of the world's

leading financial institutions.   Wells Fargo publicly acknowledges that it has "special" anti-

money laundering responsibilities as one of the world's leading financial institutions:

> As a global financial institution, we have special responsibilities to help combat
> money laundering.  Our Global AML Governance Policy and related procedures
> are designed to comply with all applicable laws and regulations related to money
> laundering and terrorist financing.  Team members are required to comply with
> these policies, procedures, and controls.

401.    As a top-tier U.S. bank, Wells Fargo & Company and its subsidiaries operated an

advanced BSA/AML compliance system, designed to monitor financial transactions, recognize suspicious activity and identify red flags of illegal or fraudulent activity.

402.    Throughout the relevant period, and at the start, Wells Fargo similarly operated an elaborate risk management system employing thousands of risk employees.  This fact is evidenced through related documents and actions including account closing.  Later, WF Bank's actual knowledge is evidenced through direct sources and admissions.  It is in this context that Wells Fargo Bank's account opening, and ongoing account monitoring must be viewed.

403.    Inferences relating to Wells Fargo's actual knowledge at any time are also informed by what was actually going on during the relevant period.  Wells Fargo's Community Bank strenuously pursued a sales model calling for "significant annual growth in the number of products, such as checking accounts, savings accounts and credit cards, sold each year."  Under this sales goal model, "the number of accounts" that Wells Fargo employees "opened and the rate at which those accounts were funded were important to achieve sales goals and incentive compensation targets."

404.    It cannot be disputed that as part of Wells Fargo's sales goal strategy, "the Community Bank's senior management tolerated low quality accounts as a necessary by-product of a sales-driven organization. Also, that in order to keep "the sales model intact and sales growing," the Community Bank's managers "had to exert significant, and in some cases extreme pressure on employees to meet or exceed their [sales] goals." Branch employees and their managers had "minimum requirements for products sold per day" and were held responsible for "consistent year-over-year sales growth." The Community Bank used daily scorecards to rank its employees "against one another on their performance relative to goals," creating "intense

pressure to perform" and a "culture of shaming."  Starting in 2010, employees who failed to meet sales goals faced "poor performance reviews" as well.

405.    Wells Fargo's Florida branches boasted some of the most aggressive sales managers and sales practices nationwide.  In their 2018 report, Wells Fargo's independent directors specifically singled out Shelley Freeman, the Lead Regional President in Florida from 2009 until 2013, for blame as "an aggressive sales manager who created significant sales pressure." Wells Fargo's internal documents make clear that sales misconduct extended to "dishonest" acts involving selling bank accounts and other products to the "wrong customer" during this period.  Moreover, in these incidents, Wells Fargo opened accounts that "never should have been sold to the customer in the first place."  It is no surprise that in the aftermath of the sales abuse scandal, Wells Fargo opened a review into its failed procedures for freezing and closing accounts after the company detected suspected fraudulent activity by third parties or account holders that affected those accounts.

406.    A review of individual TelexFree account statements at Wells Fargo shows that aggressive sales goals figured prominently in Wells Fargo's opening and handling of TelexFree and related accounts.  Specifically, some of the most egregious sales practices implicated in the Wells Fargo scandal are apparent from the TelexFree and related party account statements at Wells Fargo. For example:

a.  One way to artificially boost sales at Wells Fargo was to bundle products such as by marketing debit cards as "coming with" personal accounts or checking accounts sold as a unit with other products. Wells Fargo sold defendant Katia Wanzeler bundled products in the form of a "PMA Account" combining a brokerage account with two bank accounts. Similarly, Wells Fargo Bank, N.A.,

sold her husband, defendant Carlos Wanzeler, a debit card, a credit card, and credit insurance along with a checking account and a savings account.

b. Another improper way to inflate sales was to sell "secondary" checking accounts (*i.e.*, accounts sold to customers who already had a checking account). At account opening, Wells Fargo sold TelexFree, LLC, four deposit accounts, including one secondary checking account and one secondary savings account.

c. Finally, another improper way to meet sales goals was to open bank accounts that contained no funds. Wells Fargo engaged in this practice with Katia Wanzeler and TelexFree, LLC. Meanwhile, the first four bank accounts that Wells Fargo opened for TelexFree, LLC, would have been empty or almost empty in 2013 except for one recurring $150 deposit that shuttled back and forth among those accounts. This provided the misleading appearance of account activity.

407. Wholly apart from TelexFree's own misconduct, these transactions indicate that the Wells Fargo employees who opened these accounts had their own improper motivations—in the form of meeting aggressive sales goals--for agreeing to do business with TelexFree and its principals and family members.

408. As described throughout, each account opening triggers a mandatory fresh comprehensive BSA/ALM review. In addition to learning that it was an MLM scheme, which automatically subjected it to a higher level of scrutiny that included examination of its standard form contract, website, business plan, credit history, banking history and product, WF Bank discovered that (i) TelexFree was generating income from Brazil, (ii) the source of its income did not match its banking profile, (iii) it sold no product to speak of, (v) its business structure was an unlawful pyramid scheme, (vi) its Promoter Compensation Plan was unlawful because it

expressly promised guaranteed passive income and payments for signing up new members without requiring product sales.

409.    From at least April 2013 through May 2014, Wells Fargo had mounting knowledge of suspected TelexFree fraud.  Its decision to retain TelexFree as its customer and provide it with more financial services despite that knowledge alone - lent substantial assistance to TelexFree's illegal scheme and allowed TelexFree to keep operating because they processed victim payments during the post Brazilian shut down and thereafter, as detailed below, with ever increasing volume and forbidden transactions.

410.    Additional facts that solidly support the inference that Wells Fargo has actual knowledge that TelexFree was operating an unlawful MLM include the fact that the well-publicized fraud that caused Bank of America to close its bank accounts in April 2013 was equally available to Wells Fargo. In context, Bank of America, and Wells Fargo Bank were both top four U.S. bank that year and Wells Fargo had better due diligence procedures, did comparable research, uncovered similar reports and in addition to its industry leading automated system, Wells Fargo also had a risk management system that used three lines of defense and its KYC investigation and reporting was specifically designed to identify and prevent precisely the breached of BSA/ALM that were rampant in the continued and expanding servicing of TelexFree.

411.    Even later in 2013 and during its mandatory, exacting and regular KYC monitoring and during every renewed KYC investigation and reporting that necessarily took place each time a new account was opened, WF Bank had knowledge that TelexFree generated staggering excessive chargebacks, well outside the industry standard maximum and its Brazilian parent company Ympactus was judicially charged and later found to be fraudulent and

enjoined from operating an unlawful pyramid scheme.

412.   There is also direct evidence of actual knowledge long before Cardenas'

involvement that ices the cake. There can be no reasonable dispute that at least by April 2013,

Wells Fargo had actual knowledge.

413.   It is not disputed that:

a.   during or about April 30, 2013, Jonathan Andreoni, a "Banker and Officer" at a

Las Vegas Nevada Wells Fargo Bank branch accepted applications from

TelexFree, LLC for four deposit accounts;

b.   that the purpose of the accounts was to take in victim funds, and then process and

place under them under the control of TelexFree;

c.   that each application listed James M. Merrill and Carlos Wanzeler as owners of

TelexFree, LLC's;

d.   That Wells Fargo, as part of its heightened MLM account opening protocol

reviewed TelexFree's website, www.telexfree.com which included a slideshow

presentation by TelexFree President Mr. Jim Merrill that laid bare TelexFree's

unlawful compensation plan.  The slideshow even went so far as to depict this

pyramid in describing the compensation plan:



e.  that account applications indicated that TelexFree, LLC represented that its
    annual gross sales for the year ending December 31, 2012, totaled $100,000.00;

f.  that at the time Wells Fargo Bank opened these four Accounts it knew that
    TelexFree's representation that it had gross sales of $100,000 annually was false
    because Wells Fargo Bank had processed $1,984,705.45 in revenue payments for
    TelexFree, LLC in 2013 while acting as its acquiring bank;

g.  and that notwithstanding this knowledge, by June 1, 2013, Wells Fargo had
    opened all four accounts under account nos.  ending in 6723, 0264, 6715,
    and 0272.

h.  At the time he opened the account, Jonathan Andreoni was aware of the conflict
    between the representation and the actual revenue payments;

414.  This knowledge triggered the responsibility to comply with the account closing
criteria in Wells Fargo Bank's CIP and required the Bank, short of closing, to treat TelexFree as

higher risk and place TelexFree under heavy surveillance going forward.

415.   Within weeks, TelexFree's parent company Ympactus was shuttered. Wells Fargo's BSA/ALM systems picked up on this bombshell and in so doing gained actual knowledge that TelexFree, whose programs were identical, was an unlawful MLM/Ponzi scheme.

416.   Despite this knowledge, in early September 2013, Wells Fargo Bank agreed to open a merchant processing account for Bank Card Consultants to handle TelexFree transactions and began processing credit card payments for TelexFree.  As part of a background check, Wells Fargo Bank received updated company and financial information for TelexFree. Similarly, Wells Fargo Bank kept operating its other TelexFree accounts.  That decision, and its decision at the end of December 2013 to open *more* TelexFree accounts, lent substantial assistance to TelexFree's fraudulent activities and allowed TelexFree to stay in operation.

417.   Moreover, no later than December 2013, Carlos Wanzeler reached out to Mauricio Cardenás and asked for help with opening bank and investment accounts for himself, his wife Katia and TelexFree.  At that time, Wanzeler and Cardenás openly discussed the fact that TelexFree had been shut down in Brazil for being a pyramid scheme. They also discussed the negative publicity surrounding TelexFree, the fact that TelexFree was under investigation by the Massachusetts SOC, and the fact that TelexFree was experiencing difficulty securing banking and payment processing relationships and that its banking privileges had been terminated by multiple banks and pay processors.

418.   At all times Wells Fargo Bank and Wells Fargo Advisors shared the same BSA/ALM findings.

419.   Wells Fargo Advisors was privy to the same information and knowledge both

from its own compliance systems and through its employee, Mauricio Cardenas.

420.    Wells Fargo Advisors is a registered broker-dealer and subject to the same laws and regulations alleged herein regarding potential and established client accounts as the Financial Services Providers, including the Bank Secrecy Act (as amended by the USA PATRIOT Act), the Foreign Corrupt Practices Act, and critical anti-money laundering mandates such as Know Your Customer and Customer Identification Program requirements.  31 U.S.C. §§ 5311 et al.; 31 C.F.R. Chapter X & pt. 1023; FINRA Rule 3310; U.S. Securities & Exchange Commission, Anti-Money Laundering (AML) Source Tool for Broker-Dealers (Jan. 11, 2017), https://www.sec.gov/about/offices/ocie/amlsourcetool.htm; Financial Crimes Enforcement Network et al., Guidance on Obtaining and Retaining Beneficial Ownership Information (Joint Release March 2010), https://www.sec.gov/rules/other/2010/34-61651-guidance.pdf; 15 U.S.C. §§ 78dd-1, et seq.; FINRA Regulatory Notice 11-12, http://www.finra.org/industry/notices/11-12.  All allegations regarding the duties and legal obligations of the Financial Services Providers, and the facts, information and knowledge gained by those providers in performing those duties and due diligence, are incorporated herein by reference as to Wells Fargo Advisors.

421.    Wells Fargo Advisors similarly possessed a Regulatory Account Monitoring Department that was charged with researching and obtaining information on prospective and current customers.

422.    Wells Fargo Advisors possessed the same federal regulatory duties as those cited above for the Financial Services Providers to look for certain types of facts or lack thereof, including the identity and purpose of the individuals opening and making payments into their accounts.

423.    In addition to reviews carried out in the normal course of business, Wells Fargo

Advisors carried out other reviews in accordance with their regulatory duties that revealed, among other things, 1) TelexFree's tortious Pyramid Scheme; 2) TelexFree's business model; 3) TelexFree's legal troubles and notorious history; 4) TelexFree's regulatory troubles in the United States and in Brazil; 5) Wanzeler's modest background and rapid rise to substantial wealth; 6) the fact that the source of the substantial funds Wanzeler handed over to Wells Fargo Advisors was derived from unlawful sources; 7) the substantial role Wells Fargo Advisers assumed through their employee Cardenas in the management of Wanzeler and TelexFree's illicit fund management; 8) the suspicious, tortious and illegal activities related to the funds it was managing, including the outright fraud on the part of TelexFree, its Founders and Principals, including Wanzeler; and 9) the overwhelming number of Red Flags and the other indicia of fraud that more than reasonably established the existence of TelexFree's and Wanzeler's tortious conduct and the Pyramid Scheme.  WF Advisors was obligated to know its client and monitor accounts of existing clients

424.    Wells Fargo Advisors also became aware of the Red Flags surrounding Wanzeler and TelexFree during the routine course of fulfilling their regulatory duties and while reviewing Cardenas' deal making, sales, job performance and entitlement to performance related payments.

425.    Wells Fargo Advisors employed Defendant Cardenas from 2012 until he was terminated in 2014 and had actual knowledge of, and oversaw, his dealings with Wanzeler. Wells Fargo Advisors oversaw Cardenas' investment activities and maintained a detailed account of the profits made on behalf of his clients.

426.    While Cardenas was acting as Wanzeler's co-conspirator, he did so as an agent, servant and/or employee of Wells Fargo Advisors and WF Bank and as such Cardenas' conduct is imputed to the companies he represented.

427.    Also, throughout this time, Cardenas was Wanzeler's friend, confidant and primary financial advisor and well aware of the TelexFree scheme. Cardenas and Wanzeler lived in proximity to each other and over time spent considerable amounts of time together.  In addition to aiding and abetting Wanzeler launder, conceal and invest unlawful funds, Cardenas also enjoyed frequent social interactions with Wanzeler, including speedboat outings, barbecues and travel.  Through this relationship he knew that Wanzeler and TelexFree where engaged in an illegal scheme.

428.    Wanzeler and Cárdenas openly discussed the fact that TelexFree had been shut down in Brazil as a pyramid scheme.  They also discussed the negative publicity surrounding TelexFree, that TelexFree was under investigation by the Massachusetts SOC, and that TelexFree was experiencing problems securing banking and payment processing relationships.

429.    Undeterred, Cárdenas promised to assist TelexFree with opening up accounts at Wells Fargo Bank, N.A., and providing banking services.  Cárdenas proceeded to help Wanzeler successfully apply for two TelexFree Financial, Inc., deposit accounts with Wells Fargo Bank on December 28, 2013.  Wells Fargo banker Wendy Flores at the Lighthouse Point, Florida, branch processed the application.  Wells Fargo assigned numbers ending in 4252 and 3387 to the two accounts.  This assistance from Wells Fargo Bank substantially aided TelexFree's pyramid scheme since other banks were refusing to serve the company and otherwise, TelexFree's pyramid scheme would have promptly collapsed.

430.    By January 2014, Wells Fargo actually knew about negative publicity that TelexFree was a pyramid scheme and had internally voiced its concerns.  This prompted Wells Fargo Advisors' employee Cárdenas to have Joseph Craft, TelexFree's CPA, write a letter to John Pisan at Wells Fargo Advisors, LLC, on February 7 providing assurance that other financial

institutions had also established accounts with TelexFree.

431.     It is also not disputed that Michael Montalvo carried out a subsequent equally thorough account opening including and up to Wells Fargo standard KYC investigation during or about early January 7, 2014  and that his results were shared or otherwise available to both Wells Fargo Bank and Wells Fargo Advisors and that during that investigation he learned and reported that TelexFree's parent company, Ympactus was found to be a pyramid scheme and shuttered by Brazilian authorities.

432.     Thus, the combination of Red Flags and public information known to both WF Bank and WF Advisors beginning at least in April 2013 and no later than December 2013, combined with the insider knowledge of Cardenas, and documentation of the standard results whenever TelexFree applied for a new Wells Fargo account overwhelmingly establishes that WF Bank and WF Advisors knew that TelexFree was a fraudulent pyramid/Ponzi scheme.

### c.  Summary of Substantial Assistance

433.     Given the long period that they extended banking privileges to the pyramid scheme, Wells Fargo Bank and Wells Fargo Advisors directly and through the actions of Cardenas provided TelexFree with essential and substantial assistance in a variety of ways. They opened many accounts for the same TelexFree related entities and individuals effectively disbursing the number of suspicious activities and red flags associated with a single account holder and made money laundering and layering easy by accepting, transferring or intermingling victim funds between or among TelexFree related entities and individuals accounts. They did the same by creating WF Bank offshore accounts and also by transferring funds to non- related offshore accounts. The last exemplar of the substantial assistance provided was the acceptance in, intermingling and transfer out of large, anomalous sums of the victims' funds at times when it and other Banks had terminated or suspended related banking privileges. Also, at this time,

Montalvo and others wrote glowing letters of recommendation that facilitated TelexFree opening offshore accounts that were quickly used shelter victim's funds. Wells Fargo did not hold or suspend accounts holding victim funds after fraud was detected and the heat was on, rather they released the funds in the form of easily negotiated cashier's checks.

434.    At times material herein, despite having knowledge that TelexFree was a fraudulent enterprise carrying out suspicious, tortious, unlawful, unfair or deceptive acts or practices and that Wanzeler's funds were illegally obtained, WF Bank, WF Advisors and Cardenas performed substantial and integral services and provided essential assistance that were used to further TelexFree's unlawful business and to enable Wanzeler and TelexFree to hide and invest assets and launder illicit monies derived from TelexFree's illegal activities and provided TelexFree with unfettered access to banking, financial and investment services that were used to further Wanzeler's and TelexFree's unlawful business.

435.    Cardenas was an indispensable advisor to and co-conspirator with Wanzeler and TelexFree.  Cardenas developed and fostered a close, personal and business relationship with Wanzeler throughout periods relevant to the complaint by making sure the substantial contributions he and Wells Fargo Advisors and Wells Fargo Bank made were indispensable. Cardenas was the mechanism through which Wanzeler and TelexFree were able to transfer, hide, and invest funds unlawfully obtained through TelexFree's illegal operations and continue to keep TelexFree's illegal operations hidden from the authorities and investors. Through Cardenas' assistance, TelexFree LLC was able to continue operating its Ponzi scheme with innumerable high value wire transfers, debits and credits between accounts and to vendors and from payment processors. Without his assistance, the scheme would have collapsed.

436.    During these interactions, Cardenas and Wanzeler willfully and knowingly put

their own financial interests and that of TelexFree ahead of the victims.  They conspired to illegally maximize profits, hide assets, launder illicit monies and place unlawful profits derived from TelexFree's illegal activities for Wells Fargo Advisors and Wells Fargo Bank.  Importantly, the services provided by Cardenas and Wells Fargo Advisors were essential to the growth of their own careers or fortunes and that of TelexFree.

437.    In exchange for their substantial contributions, Defendants derived substantial income from their services to TelexFree and Wanzeler and their actions were the direct and proximate cause for each member of the putative class to similarly suffer ascertainable economic harm

### d.  Wells Fargo Continued Role as a Depository and Acquiring Bank Provided TelexFree's Scheme with Substantial Assistance

438.    During mid- 2013 and through to the FBI raid and shuttering of TelexFree in 2014, a remarkable number of banks, both big and small, closed TelexFree accounts due to fraud-related activity. The ranks include Synovus Bank, Bank of America, N.A., TD Bank, N.A., Citizens Bank, and eventually even Fidelity Bank headed by Merrill's brother. Sovereign Bank, The Commerce Bank and others entirely rejected TelexFree's merchant applications and requests for financial services

439.    Beginning in or about September 2013, WFB also acted as acquiring bank for Bank Card Consultants ("BCC") in its processing for TelexFree. This occurred in the wake of the shuttering of TelexFree's Brazilian parent Company Ympactus. During this time banks and pay processing companies were threatening to and did close accounts and reduce processing services. By agreeing to become an acquiring bank at this precise time, Wells Fargo Bank gave TelexFree what it needed to sustain its operations – access to an acquiring bank that would accept, process and place into its control, the payments made to it by its victims.

440.    Even as other financial institutions stopped doing or refused to do business with TelexFree and its managers and associates, TelexFree moved a substantial portion of its banking business to Wells Fargo who continued to provide it with ever increasing disbursed ACH access. This of course substantially contributed to TelexFree's ability to continue its operations and accept, launder and shelter Victim funds without government enforcement. As referenced in the exemplar transactions below, easily detected white-collar financial fraud techniques were employed and thus required the willful participation of Wells Fargo.

441.    It also opened two other accounts for "JC Real Estate Management," an entity named after, and known to be affiliated with James (Merrill) and Carlos (Wanzeler).

442.    Wells Fargo Bank further substantially assisted TelexFree's enterprise, including related coconspirators, by transferring tens of millions of dollars overseas and out of the reach of the United States justice system. Each transfer comingled victim funds into the accounts of TelexFree shell companies, its executives' individual accounts, or related accounts.

443.    Beginning no later than December 2013, Cardenás assisted TelexFree with having accounts approved by WFB.

444.    Thereafter, TelexFree began transitioning the bulk of its banking over to WFB. From December 2013 through February 2014, TelexFree made numerous multi-million-dollar transfers into its multiple WFB accounts.

445.    For example, in December 2013 Cardenás made a "cross-sell" that helped Carlos Wanzeler successfully apply for deposit accounts with Wells Fargo Bank. Specifically, Cardenas and Lighthouse Point, Florida Wells Fargo banker Wendy Flores handled the application and opened these two additional TelexFree Financial, Inc. deposit accounts

446.    At the time, Cardenas and Flores knew that TelexFree Financial, Inc. had no

employees and had been created as a conduit for paying the employees of TelexFree, LLC and

TelexFree, Inc., because those entities were having problems with banks.  The creation and

servicing of the account provided TelexFree with substantial assistance because without them,

TelexFree would have been unable to meet payroll responsibilities and thus been forced to close.

On the account, Carlos Wanzeler is listed as the owner of TelexFree Financial, Inc. The two

accounts were opened with numbers ending in 4252 and 3387. Wanzeler also opened two

accounts for himself ending in 6171 and 4009.

447.    On or about the same time, Wanzeler transferred $3,800,000.00 from Fidelity

Bank to Wells Fargo Bank. On or about the same date, Fidelity Bank made three more transfers

totaling more than $305,000 to Wells Fargo Bank.  In context, TelexFree had been forced out of

Fidelity Bank for suspected financial fraud, Wells Fargo had actual knowledge of this and the

fact that TelexFree could not find another bank to take the transfer prior to accepting the funds.

Thus, Wells Fargo Bank substantially assisted TelexFree place the funds, launder and eventually

shelter them.

448.    TelexFree found itself under increasing pressure at the beginning of 2014.  On

January 2, 2014, EverBank turned down Carlos Wanzeler for a bank account application due to

inability to verify his identity or his social security number, residence, or business.   This and

decisions by other banks to not do business with TelexFree squeezed TelexFree even further to

find a dependable banking partner.

449.    About the same time that EverBank rejected Wanzeler's application to open an

account on January 2, 2014, on January 7, 2014, Michael Montalvo, Vice President and Wealth

Advisor for Wells Fargo Private Bank, performed a background check on Carlos Wanzeler

which again confirmed what it already knew: Wanzeler and Merrill's association with TelexFree,

and that TelexFree was a massive pyramid scheme that had already been shuttered in Brazil. Also providing important context, during January 2014, while acting as a jointly authorized representative for both entities, Cardenás unequivocally told Joseph Craft that Wells Fargo Bank and WF Advisors were concerned with negative publicity calling TelexFree a pyramid scheme. Cardenas specifically mentioned that this concern was raised by John Pisan, the Regional Managing Director of Wells Fargo Bank, in Orlando, Florida.

450. Immediately thereafter, on January 29, 2014, Wells Fargo Bank provided TelexFree with additional and substantial assistance by permitting it to deposit another "impossible to place at the time" $1,000,000 into the Wells Fargo Bank account, this time the one ending in 6723 (opened in April of 2013).

451. Beginning in February 2014, TelexFree was under hot and active investigation by the COMSOC and was otherwise out of options and unable to find US based banks to service its accounts. Wells Fargo Bank provided TelexFree, LLC with substantial assistance by opening five more new deposit accounts (ending in 7089, 8506, 6810, 6786 and 8498).

452. The purpose of these numerous bank accounts was to make TelexFree's money laundering and offshoring activities more difficult to trace.

453. Also beginning in February 2014, Cardenás became a key part of TelexFree's international expansion plans. TelexFree utilized Cardenás to open international bank accounts in accordance with the planned international expansion devised by Merrill, Wanzeler, Babener, PwC, and the attorneys at Garvey Schubert.

454. On February 14, 2014, the legal team of Garvey Schubert, Babener, and Nehra and PwC's foreign enterprise and sheltering team including Puzey and Colabella advised that relocating TelexFree's operations offshore, possibly to Nevis, would "remove foreign revenue

out of US regulatory jurisdiction. This general advice was greatly expanded soon after. Also, and as is later detailed, a related action took place on February 24, 2014 when Wells Fargo Bank opened two accounts for Katia Wanzeler as part of a "PMA Package." In sum, this account was later used as a conduit to launder money and transfer funds to an offshore sheltering account.

455.    On February 19, 2014, Michael Montalvo – the same employee whose background check on TelexFree just over a month earlier had referred to the company as a "*fraude*" – wrote provided TelexFree with substantial assistance via a letter of recommendation on Wells Fargo letterhead for TelexFree and Wanzeler, stating that both "had a great history" with Wells Fargo, they had "managed their relationship with Wells Fargo in a consistent and satisfactory manner" and that he had known both Wanzeler and TelexFree "personally for over a year and [found] them to be of great character." At the time Montalvo wrote the letter of recommendation he knew it would be used by TelexFree in its defense during the investigation by the Massachusetts Securities Division.

456.    Mr. Montalvo's own background investigation a month earlier revealed that TelexFree was a massive pyramid scheme shuttered in Brazil, and that both Wanzeler and Merrill were affiliated with and implicated in the scheme. Montalvo's letter of recommendation and personal support of Wanzeler and TelexFree on behalf of Wells Fargo far exceeded routine banking services and elevated the Wells Fargo Defendants to willful accomplices seeking to profit from the illegal enterprise.

457.    Rather than proceed with terminating the remainder of TelexFree's business, WFB kept the remaining TelexFree accounts open, and transferred the balance of the closed accounts to another WFB account. On or about the same day, Cardenás also arranged for WFB to open another TelexFree, LLC checking account with a deposit of almost $5.5 million

458.     On February 24, 2014, Amine Radi, a Vice President at Wells Fargo Bank, wrote another letter vouching for TelexFree, LLC, stating that TelexFree (and "related companies") had an "established banking relationship" and was "one of our better clients."

459.     Both letters of recommendation gave TelexFree "a veil of legitimacy" and allowed TelexFree to trade on the Wells Fargo name, weight and connections in order to boost TelexFree's credibility with third parties and continue preying on investors.  TelexFree, LLC, and Wanzeler used the letters to, among other things, secure banking and/or payment processing services from third parties.  Within days of Ms. Radi's letter, payment processor Allied Wallet Ltd. initiated two wire transfers, one for $7,827,339.69 and the other for $170,786.19, for deposit into TelexFree, LLC's Wells Fargo account no. ending in 7089. This close timing evidences the fact that Ms. Radi's letter gave Allied Wallet whatever assurances it needed to make these deposits.  This also bears directly on the nature of Wells Fargo's substantial assistance because the funds that Allied Wallet deposited into TelexFree, LLC's Wells Fargo account consisted of victim credit card payments into the TelexFree Pyramid scheme.

460.     The very next day, on February 25, 2014, funds were wired into TelexFree's Wells Fargo Bank Account no. 7089 from Allied Wallet per the instructions of Carlos Wanzeler.

461.     On February 25, 2014, Wells Fargo also permitted TelexFree to make a deposit in the amount of $5,400,000 into the Wells Fargo account ending in 8498. A WF Bank management level employee approved the deposit. The transaction fell far outside the Customer Profile that Wells Fargo Bank had assigned TelexFree and came at a time when TelexFree had accounts being terminated. Wells Fargo Bank provided TelexFree with substantial assistance both by providing service when all else were terminating relationships and by placing into a safe

account it controlled over five million dollars of victim funds. Those funds were eventually moved offshore and sheltered. But for those, and a handful of other accounts, TelexFree would have collapsed under its own weight and been shuttered.

462.    On February 25, 2014, Wells Fargo Bank closed two of the TelexFree, LLC, accounts that it had opened in April 2013 (account nos. 6723 and 0264).   When the Massachusetts Securities Division later interviewed Carlos Wanzeler, he blamed the subpoenas served by the Division for Wells Fargo's account closings:

> Because the banks and that's the biggest problem we have today, when they hear – like I tell the true, guys, when they hear we have a subpoenas here, I just lost Wells Fargo; Now Wells Fargo doesn't want to do business with us because have subpoenas today.  I know that's not you guys' problem, but that's what happened to our company today.

463.    On or about the same day, Wells Fargo Bank opened TelexFree, LLC checking account no. 8498 with a $5.468 million deposit made in a Wells Fargo branch.  Cardenas assisted TelexFree with opening this account.

464.    Wells Fargo's bank account applications listed Carlos Wanzeler as one of TelexFree, LLC's two owners. They also held joint Wells Fargo accounts. This information flagged Wanzeler's wife, Katia Barbosa Wanzeler, who received large transfers out of TelexFree's bank accounts, as a person related to TelexFree.

465.    At this same time in February 2014, WFB had also opened two personal accounts for Katia Wanzeler, which were used for siphoning and concealing funds. These accounts were opened as part of the PMA package which included also a brokerage account with WF Advisors (account no. 3207) naming Cardenas as her advisor and a high yield savings account (account no. 3716). On February 28, 2014, just three days after closing the above WFB accounts (nos. 6723 and 0264), two transfers from the newly opened account no. 8498--one for $1,000,000 and

the other for $2,500,000—were made into Katia Barbosa Wanzeler's personal Wells Fargo savings account no. 3716. It is important to note that the source of the transfer was victims' funds held by TelexFree, LLC in its corporate account.

466.   Within days, on March 3 and March 6, 2014, respectively, Wells Fargo transferred $1,499,986.74 of those funds electronically from Mrs. Wanzeler's savings account no. ending in 3716 to her Wells Fargo brokerage account no. ending in 3207. In this way, Wells Fargo used its bank accounts in tandem with its Wells Fargo Advisors brokerage accounts to launder TelexFree, LLC's illicit proceeds thus providing TelexFree with the substantial assistance it required to place, layer, otherwise launder and eventually shelter the victims funds beyond their reach.

467.   Thus, Wells Fargo Bank knowingly intermingled victims' funds totaling $3,500,000 that had been held in a TelexFree, LLC corporate account into Katia Wanzeler's personal Wells Fargo savings account. These laundering and layering transactions were unlawful as well as essential for the subsequent transfer of the victim's funds to offshore accounts out of the reach of United States authorities.

468.   During early 2014, TelexFree's Wells Fargo bank account statements showed suspicious multi-million-dollar deposit inflows as TelexFree funds flooded from other banks and payment processors into certain TelexFree, LLC, accounts.  These inflows included:

     a.  a $5.4 million deposit on February 25, 2014, into Wells Fargo account no. ending in 8498;

     b.   a $7,827,359.69 deposit and a $170,806.19 deposit by Allied Wallet on or about February 27, 2014, into Wells Fargo account no. ending in 7089;

     c.  an $8,251,564.76 deposit and a $146,632.36 deposit by Allied Wallet on or about

March 5 or 6, 2014, into the same account (account no. ending in 7089);

d.   a series of large deposits into Wells Fargo account no. ending in 8506:

e.   a $2 million deposit labeled "Commissions" on March 4, 2014;

f.   another $2 million deposit labeled "Commissions" on March 13, 2014; and

g.   a $30 million deposit wired from International Payout Systems, Inc., on March 17, 2014.

469.   These enormous inflows of cash into TelexFree, LLC's accounts triggered immediate red flags that Wells Fargo's automated surveillance systems tracked. This again established the obvious. Wells Fargo bank possessed actual knowledge.

470.   At the time it all other banks were terminating TelexFree, Wells Fargo became its go to bank of first resort and the level of transactions of course provided TelexFree with the substantial assistance it needed.

471.   On February 27, 2014, Allied Wallet made two wires transfers totaling $7,970,000 into TelexFree, LLC's Wells Fargo account ending in 7089.

472.   That same day, additional funds were wired into TelexFree's Wells Fargo Bank Account no. 7089 from Allied Wallet per the instructions of James Merrill.

473.   No other United States bank would accept TelexFree as a customer or these funds and its existing banks were also advising them, they would not be servicing them going forward.

474.   There is no reasonable doubt that by the time of the aforementioned significant and anomalous transfers that Wells Fargo management had made conscious decision to open these accounts, capture the victim's funds and place them into the control of TelexFree, LLC thus providing substantial assistance to TelexFree's ongoing unlawful MLM.

475.     Other red flags were present. Two of the TelexFree, LLC, accounts also had multimillion-dollar outflows in February and March 2014 indicative of layering and integration. Account no. ending in 8506 showed $33 million in total debits one month (including a bank originated debit of over $15 million) and account no. ending in 8498 had bank originated debits totaling $3.5 million over that period.  Three of the four accounts (nos. ending in 7089, 8506, and 8498) had been newly applied for or opened in late February or early March 2014.  By definition, the bank originated debits were initiated by Wells Fargo Bank, N.A., itself and no stated payees were named in the account statements.  These debits were a telltale sign of money laundering and evidenced actual participation by Wells Fargo in the moving of illicit funds.

476.     As referenced earlier, during February and March of 2014, Joseph Craft conferred with Richard Colabella, Sara Sanford, Jerry Puzey, Gary Tober and Jeffrey Babener, wherein they recommended establishing a foreign base of operations for TelexFree in Grand Cayman, On February 27, 2014, Puzey personally suggested that TelexFree expand into places such as the Caymans, the Netherlands, or Luxembourg. The express purpose for this international expansion was to allow TelexFree to avoid regulatory intrusions into its business operations by governmental agencies and to shelter significant revenue from taxes. TelexFree thereafter utilized Cardenas, its advisor and Wells Fargo insider, to open international bank accounts in accordance with the planned international expansion

477.     By helping TelexFree locate and establish bank accounts, including efforts to open international accounts, Cardenas, Wells Fargo Bank and Wells Fargo Advisors substantially assisted TelexFree's illegal pyramid scheme and became key collaborators in assisting TelexFree with laundering and sheltering victims' funds.

478.     On or about March 3, 2014, on Tober's, Sandford's, Puzey's, and Colabella's

suggestion, Craft again asked Cardenas to establish a bank account in Grand Cayman for purposes of offshoring TelexFree's merchant processing and funds, using an entity that Sandford had established in the Caribbean as the account holder. Mauricio Cardenas did establish Wells Fargo Bank accounts for processing international transactions.

479.    On March 3 and March 6, 2014, respectively, Wells Fargo transferred $1,499,986.74 of the funds in Mrs. Wanzeler's savings account no. 3716 to her Wells Fargo brokerage account no. ending in 3207.  The money originated as victim funds, were passed through TelexFree's corporate accounts, landed in Katia Wanzeler's personal accounts and were eventually furthered laundered, layered and/or sheltered. The Katia Wanzeler transactions were otherwise an important component of TelexFree's unlawful enterprise for many reasons. As Katia Wanzeler was the wife of Carlos Wanzeler, she was flagged as a person related to TelexFree by Wells Fargo's sophisticated systems. She was a known associated person clearly establishing that Wells Fargo Bank was a knowing accomplice.

480.    On March 4, 2014, Wells Fargo Bank opened yet another new checking account for TelexFree, LLC, ending in 8506.

481.    On March 6, 2014, Allied Wallet transferred $8,200,000 into TelexFree, LLC's Wells Fargo Bank account no. 7089.  Cardenas was involved in facilitating each of the above transactions.

482.    Upon information and belief, on or around March 12, 2014, two days before TelexFree announced its unilateral change to the standard form TelexFree contract and compensation plan, the total TelexFree cash balance at Wells Fargo was approximately $16,970,000.00.

483.    On Friday, March 14, 2014, Craft conferred with Cardenas, who assured Craft

that he was working directly with another representative at Wells Fargo Bank in an effort to open accounts for TelexFree's Grand Cayman corporation. They discussed TelexFree's financials and Cardenas requested, and Craft agreed to provide, TelexFree's 2013 financial records. Cardenas indicated that this would satisfy Wells Fargo Bank and anticipated that an account would be established the coming Monday. All the while, additional unlawful TelexFree account activity continued and expanded at Wells Fargo.

484.     On March 17, 2014, TelexFree made a $30,000,000 deposit from International Payout Systems, Inc., into a Wells Fargo Bank account ending in 8506.[3] Once again, Wells Fargo Bank stepping up provided TelexFree's unlawful MLM with substantial assistance because no other bank would touch this thirty million dollars due to BSA/ALM prohibitions and reporting requirements. .

485.     No later than March 19, 2014, Wells Fargo possessed actual knowledge that the Massachusetts Securities Division had issued subpoenas on TelexFree. This supplemented their prior actual knowledge about earlier subpoenas.

486.     When TelexFree became concerned that the investigation into TelexFree was hurting its relationship with Wells Fargo, James Merrill reached out to Cardenas again to help. On March 20th, 2014 at 12:54 pm, James ("Jim") Merrill emailed with Stuart MacMillan, Interim CEO, TelexFree and Mauricio Cardenas, Financial Advisor, Wells Fargo Advisors introducing the men to each other and discussing the issues with the banking relationship between TelexFree and Wells Fargo. This resulted in a face to face meeting and thereafter Wells Fargo Bank continued to service TelexFree which continued until TelexFree declared bankruptcy April 2014.

487.     Notwithstanding Wells Fargo's closure of accounts no. ending in 6723 and 0264,

Wells Fargo took no action to close the other two April 2013 WF Bank TelexFree Accounts. Instead, it kept them open.  When Wells Fargo closed TelexFree, LLC, account no. ending in 6723, it transferred the balance to one of the other two original TelexFree, LLC, accounts, the one ending in 6715, at Wells Fargo.  Similarly, when Wells Fargo closed account no. ending in 0264, it transferred the balance to the same TelexFree, LLC, account no. ending in 6715.

488.    Banking industry and regulatory standards make clear that once an account, especially an MLM account, is closed due to suspicion of fraud, all related accounts and further banking services to that customer should be terminated.  Wells Fargo Bank had this very policy, which we can see from the notices that it sent to TelexFree, LLC later on when the Bank finally announced it was terminating TelexFree, LLC's banking relationship for good.  In those notices, dated March 25, 2014, the Bank's Risk Operations and Fraud Prevention Services unit informed TelexFree, LLC:  "Effective immediately, the Bank will not open any new bank accounts for TelexFree, LLC and will not accept any additional deposits into the Closing Accounts." Nevertheless, Wells Fargo ignored its own policy when it kept the other two original TelexFree, LLC, accounts open on February 25.

489.    Remarkably, Wells Fargo Bank willfully expanded its services for TelexFree and actually increased its level of support after it closed the two accounts due to the Massachusetts investigation on February 25. On March 4, 2014, Wells Fargo opened yet another new checking account for TelexFree, LLC, no. ending in 8506. Wells Fargo Bank continued to service multiple other TelexFree accounts after closing the two accounts due to the Massachusetts' investigation into securities fraud.

490.    In late March 2014, Wells Fargo Bank temporarily froze transfers on one of TelexFree's accounts. However, with the assistance of Cardenas, the restrictions on these

accounts were later lifted and Wells Fargo Bank continued to service TelexFree until at least April 11, 2014. Wells Fargo's own policies, along with banking industry and regulatory standards, provide that once an account is closed due to suspicion of fraud, all related accounts and further banking services to that customer should be terminated

491.    On March 25, 2014, two letters addressed to TelexFree, LLC, from Cindy Watson, a Financial Crimes Analyst with Wells Fargo Risk Operations and Fraud Prevention Services at Wells Fargo Bank, stated that Wells Fargo Bank was terminating its banking relationship with TelexFree, LLC.  The letters further stated that Wells Fargo Bank would close seven TelexFree, LLC's bank accounts effective April 9, 2014 (nos. 8498, 8506, 6786, 6810, 6715, 0272, and 7089).

492.    Upon information and belief, as of April 7, 2014, the total TelexFree cash balance at Wells Fargo was approximately $29,000,000.

493.    Less than a month after it was opened TelexFree account no. 8506 showed $33 million in total debits one month (including a bank originated debit, meaning that it had no specified payee, of over $15 million) and account no. 8498 had bank originated debits totaling $3.5 million over that period. This was in no way consistent with its Merchant Profile. Wells Fargo was compelled by BSA/ALM requirements to suspend TelexFree's accounts and freeze all funds. It did not. Rather it kept providing substantial assistance.

494.    On April 10, 2014, Wells Fargo Bank allowed TelexFree Financial, Inc., to wire $3.5 million from its account ending in no. 1813 to the law firm Greenberg Traurig

495.    On April 11, 2014, Wells Fargo Bank did not follow through on the representation made in its March 25, 2014 letters and Wells Fargo Bank's and stop servicing TelexFree. Rather, despite its prior actions and statements establishing its actual knowledge of

TelexFree's fraud, Wells Fargo Bank continued to provide TelexFree's unlawful enterprise with additional substantial assistance. In fact, Wells Fargo Bank unlawfully issued James Merrill and Katia Wanzeler nine cashier's checks totaling $27,550,296.66.  The funds belonged to TelexFree's victims.

496.    Shortly thereafter, on Tuesday, April 15, 2014, law enforcement raided TelexFree's headquarters. At that time, it was discovered that Wells Fargo Bank had also made another huge disbursement of the Victims funds - a cashier's check made out to TelexFree Dominicana SRL, for $10,398,000 – to Carlos Wanzeler on April 3, 2014.

497.    On that same day Cardenas was terminated by Wells Fargo.

### e.  *Wells Fargo Bank – At Times At The Instruction Of Cardenas - Assisted In Money Transfers From TelexFree Accounts Long After It Knew Of TelexFree's Activities.*

498.    In addition to the foregoing, Mauricio Cardenás was otherwise instrumental to TelexFree's unlawful enterprise by assisting in wire transfers from TelexFree, LLC's Wells Fargo Bank accounts.

499.    More particularly, on January 27, 2014, TelexFree's Ana Paula Oliveira emailed Cardenás, requesting that he wire $60,000 from TelexFree to IDT Domestic Telecom Inc. via TD Bank, N.A., and $20,000 from TelexFree to LIGA Telecom via JP Morgan Chase Bank.

500.    Within hours, Cardenás emailed her back: "*De imediato*"[4] and Wells Fargo Bank executed a $60,000 wire to IDT Domestic Telecom Inc. via TD Bank on February 12, 2014, and a $20,000 wire to LIGA Telecom via JP Morgan Chase Bank on February 11, 2014, both from TelexFree, LLC's Wells Fargo Bank checking account no. ending in 6715.  The funds were known to have originated from the victims. Mauricio Cardenas' transactions were an important component of TelexFree's unlawful enterprise as they were integral to the layering, laundering and sheltering of TelexFree's illegally obtained funds.

501.    As described above, TelexFree eventually collapsed under the weight of its obligations and filed for Chapter 11 bankruptcy on April 14, 2014. The next day, on April 15, 2014, federal agents executed three search warrants, including one at TelexFree's headquarters in Marlborough, Massachusetts. During that search, a law enforcement officer intercepted TelexFree's Chief Financial Officer, Joseph Craft, attempting to walk out with a laptop and a bag.  Inside the bag were ten cashier's checks drawn on Wells Fargo Bank, N.A., totaling $37,947,443.28.  Eight of the checks were dated April 11, 2014 and were remitted to James Merrill.  Of those eight checks, five checks totaling $25,548,808.52 were payable to TelexFree, LLC. A ninth check dated April 3, 2014 and remitted to Carlos Wanzeler, was made out to TelexFree Dominicana SRL for $10,398,000.  The tenth, dated April 11, 2014, was made out to Wanzeler's wife in the name of "Katia B Wanzeler," for $2,000,634.76.

502.    Cárdenas served as a valuable conduit to TelexFree by arranging and providing many of the Wells Fargo banking services necessary for TelexFree to facilitate its illegal operations.  In so doing, Wells Fargo Bank, Wells Fargo Advisors, LLC, and Cárdenas lent substantial assistance to TelexFree, the Wanzelers, and others associated with TelexFree's wrongdoing. These activities, described below, included lining up Wells Fargo accounts; serving as Financial Advisor; processing transfers of investor funds and providing TelexFree access to the international payment system; allowing participants' funds to be transferred into the personal accounts of TelexFree's principals; providing TelexFree with positive reference letters; and assisting TelexFree with its international expansion, all while knowing of the suspicions surrounding TelexFree's fraud. In the process, Cárdenas knowingly helped TelexFree hide its illicit funds derived from its defrauded investors and helped Wanzeler and his wife, Katia Barbosa Wanzeler, launder, hide, or otherwise wrongfully move millions of dollars.

503.     Mauricio Cardenas was terminated by the Wells Fargo Defendants due to his dealings with TelexFree's unlawful entities and associated individuals. Wells Fargo Bank's related FINRA disclosure stated:

> THE FIRM DETERMINED THAT IT WOULD NOT DO BUSINESS WITH CERTAIN BUSINESS ENTITIES DUE TO POTENTIAL AML RISKS. THEREAFTER, FA OPENED TWO BROKERAGE ACCOUNTS FOR INDIVIDUALS DIRECTLY RELATED TO THE ENTITIES. THE FA STATED THAT HE DID NOT KNOW THE RELATIONSHIP EXISTED. MANAGEMENT DETERMINED THAT REPRESENTATIVE DEMONSTRATED A LACK OF JUDGMENT IN RECOGNIZING AND MANAGING POTENTIAL AML RISKS.

504.     By virtue of discharging Cardenas, Wells Fargo Advisers acknowledged Cardenas' wrong doings, along with their own culpability.

### 3. Defendant TD Bank

505.     Defendant TD Bank provided essential banking services to the TelexFree scheme. It maintained, among other things, multiple accounts for the TelexFree companies, their affiliates and insiders between September 2012 and April 2014.

506.     From September 2012 through at least September 9, 2013, TD Bank opened at least six bank accounts for TelexFree, LLC, TelexFree Inc., Carlos Wanzeler and Brazilian Help. Defendant TD Bank knew that each of these accounts was used by TelexFree to effectuate its fraudulent scheme—i.e., to collect and consolidate enormous amounts of illicit funds TelexFree was fraudulently obtaining from its members; to create the false appearance of legitimacy for TelexFree by repaying some of this money to members; and to launder the money obtained so that the insiders could abscond with it.

507.     The use of multiple TD Bank accounts allowed TelexFree to shift their huge volume of incoming member deposits from one account to another in a kind of "shell game," thus reducing scrutiny on individual accounts. As discussed in further detail below, TelexFree twice instructed its members to cease making deposits to an older TD Bank account and instead

shift their deposits over to a new account at the bank. The TD Bank branch employees – notably Kathryn A. Ashman – who opened these numerous accounts for TelexFree permitted the opening of these accounts in order to avoid losing TelexFree as a bank customer.

508.   The use of numerous bank accounts at TD Bank was also intended to make TelexFree's money laundering and offshoring activities more difficult to trace.

509.   Opening these new accounts also helped TD Bank employees to reach their monthly and quarterly "SR" (solutions and referrals) employee incentive goals.

510.   Defendant TD Bank initially gained knowledge of the TelexFree fraud as a result of its initial "Know Your Customer" investigations required by law when it opened each of the TelexFree accounts and as a result of its monitoring of TelexFree's use of the accounts – also required by law – while they were active.

511.   Defendant TD Bank is one of the nation's largest and, like the other Bank Defendants, had sophisticated monitoring protocols.

512.   TD Bank also had experience with Ponzi/pyramid schemes. In 2008 and 2009, TD Bank maintained bank accounts for an infamous $1.2 billion Ponzi scheme run by lawyer Scott Rothstein. After a lengthy investigation, the Comptroller of the Currency ("OCC") and the Financial Crimes Enforcement Network ("FinCEN"), in September 2013, assessed a civil penalty against TD Bank of $37.5 million for Bank Secrecy Act violations.

513.   The violations were based on TD Bank's failure to file Suspicious Activity Reports (SARS) based on activity in Rothstein's accounts. As the office of OCC noted: "The failures to file SARS were significant and egregious for a number of reasons, including the number of alerts generated by these accounts and the volume and velocity of funds that flowed through them."

514.    At the same time, the SEC assessed a $15 million penalty, plus a cease and desist order, for related violations of securities law.

515.    As a result of its involvement in the Rothstein Ponzi scheme, TD Bank enhanced its BSA/AML training and compliance efforts in the wake of the intense regulatory and public scrutiny.  As quoted in the New York Times, TD Bank declared that "it ha[d] improved its procedures . . ." for BSA/AML oversight.

516.    TD Bank's knowledge of the TelexFree fraud is confirmed by the fact that it closed a TelexFree account for suspicious activity in July 2013. The closure followed, among other things, considerable suspicious activity in the account and the well-publicized shutdown of TelexFree's Brazilian operation.

517.    Despite this closure, however, TD Bank and Ashman continued to provide essential services to TelexFree. TD Bank continued to maintain other TelexFree accounts and it opened new accounts for TelexFree entities. These accounts continued to be used by TelexFree to collect and consolidate illicit funds and otherwise continue the fraudulent scheme.

518.    TD Bank and Ashman's knowledge of the TelexFree fraud is also confirmed by their participation in money laundering. The TelexFree insiders used the new and remaining TD Bank accounts to launder the funds they contained. TD Bank and Ashman knowingly and actively participated in this laundering, including blatant acts of structuring and layering.

519.     For example, when TD Bank finally closed the bulk of TelexFree's accounts in late October and November of 2013, they contained over $25 million. Instead of freezing the accounts, TD Bank simply issued checks – including one for over $18 million -- to various TelexFree entities.

520.    The $18 million check was a problem, however. TelexFree could not deposit such

a large check without setting off alarms that would likely lead to the freezing or seizure of the money.  As Merrill explained in an email to TelexFree's lawyer Defendant Babener: "I can't just walk into a branch with a check for 20 million dollars." Many banks would simply refuse TelexFree's business – and had been. Its existing banks could not accept such a check without setting off alarms.

521.    TelexFree decided the best course of action was to break the check up and make a series of smaller deposits in multiple different banks, brokerage houses and other institutions, including foreign banks. Incredibly, when TelexFree asked TD Bank to reissue the $18 million check in smaller amounts, it agreed and issued at least five separate checks.

522.    In the second half of 2013, TelexFree also transferred large sums between its TD Bank accounts in clear examples of "layering" – a money laundering technique designed to obscure the origins of illicit funds. TD Bank expressly authorized such transactions.

### a.  TD Bank's Initial investigation Shows Fraud

523.    Through its initial due diligence investigation, TD Bank discovered that TelexFree was operating a pyramid/Ponzi scheme.  Among other things, TD Bank discovered that the source of TelexFree's income did not match its business model; that TelexFree effectively sold no product; and that TelexFree's business structure and Promoter Compensation Plan was unlawful.

524.    TD Bank opened its first TelexFree accounts on September 26, 2012. It opened checking account no. 2808 in the name of TelexFree, LLC on September 26, 2012 and checking account no. 5182 in the name of Brazilian Help Inc., both with an initial deposit of $50.00.

525.    TelexFree made a second deposit of $200,000 into the TelexFree, LLC account no. 2808 on September 27, 2012. That $200,000 deposit consisted of a check drawn from TelexFree, Inc.'s Bank of America account no. 7408.

526.    The TD Bank application and other information submitted by TelexFree disclosed, among other things, that TelexFree LLC was a multilevel marketing company and that TelexFree LLC and Brazilian Help Inc. were affiliated through Wanzeler's common ownership. The application also identified both entities as having the same business address of "225 Cedar Hill St Ste 200, Marlborough MA 01752."  James Merrill later testified that TD Bank knew that TelexFree was a multi-level marketing company when it opened the TelexFree accounts.

527.    Online searches relating to TelexFree's business, or review of its website, would have also disclosed that TelexFree was an MLM operation promising high guaranteed returns on passive investments. TelexFree's membership contract also made this clear.

### b.  TD Bank's Monitoring Confirmed That TelexFree's Operations Were Fraudulent

528.    Between September and December 2012, account no. 2808 first demonstrated an identifiable pattern of unlawful activity. Total monthly deposits ranged from $0 to slightly over $350,000 and monthly outflows were all less than $500. Most of the deposits were five or six figures, with many consisting of deposits for $50,000 or $150,000 by Co-Defendant ProPay.

529.    Because these transactions did not match TelexFree's reported business profile, the account was promptly "red flagged" for suspicious activity. As required by TD Bank's internal controls, these automated banking security notices were followed by investigations carried out by TD Bank's BSA/ALM departments.

530.    Beginning in January 2013, account no. 2808 recognized a number of deposits from payment processors, each corresponding to the sale of AdCentral Packages.  Conspicuously absent were any deposits corresponding to the sale of VoIP. TD Bank was advised of this suspicious activity through system-generated banking security notices, followed by investigations into TelexFree's activities.

531.    This pattern of non-conforming uniform deposits inconsistent with TelexFree's banking profile continued over the next five months, during which there were over 1,500 deposits for AdCentral Family packages (in the amounts of $1375  or $1,425) but almost no transactions corresponding to the sale of VoIP, demonstrating the true nature of TelexFree's operation.

532.    Furthermore, beginning in January 2013, account no. 2808 also saw a pattern of deposits in large, round dollar, hundred dollar, or thousand dollar amounts, which also automatically triggered internal Red Flag warnings and mandated an internal investigation by TD Bank.

533.    Specifically, the January 2013 statement for account no. 2808 reflected one deposit for $2,000, three deposits for $4,000, four deposits for $5,000, one deposit for $6,000, one deposit for $7,000, four deposits for $8,000, three deposits for $10,000, and one deposit for $26,000. None of these deposits were consistent with TelexFree's stated business profile or product.

534.    This sudden influx of suspicious deposits into account no. 2808 coincided with Brazil's investigation of TelexFree as a pyramid scheme, a fact which would have been known to TD Bank's BSA/AML Department.

535.    By February 2013 TD Bank's ongoing monitoring of internet activity and standard Customer Due Diligence activities revealed that several high-profile websites branded TelexFree as a "fraude".

536.    Through its automated fraud detection systems and customer monitoring activities, TD Bank learned that in the spring of 2013, TelexFree circulated an online video instructing participants to deposit their investments in the TelexFree scheme directly to TD Bank

account no. 2808.

### c. TD Bank Closes One TelexFree Account Because Of Concerns Of Fraud

537.     Cognizant of TelexFree's fraudulent activities, TD Bank began restricting

TelexFree's banking activities in May 2013. Among other things, TD Bank returned checks

drawn on TelexFree's account no. 2808 marked "Account # [2808] does not allow any check

activity to be charged to this account," effectively blocking withdrawals from the account.

538.     At the same time, TD Bank also restricted incoming wires due to what it

characterized as "fraud attempts".

539.     TelexFree insiders and payment processors attributed the restrictions to excessive

chargebacks and the fact that TelexFree had been listed on MasterCard's MATCH database in

September of 2012 as well as the ongoing Brazilian investigations.

540.     After the Brazilian shutdown in June 2013, representatives of TD Bank discussed

with James Merrill the restrictions they had imposed on the TelexFree account and their concerns

regarding TelexFree's negative publicity and the shutdown of their Brazilian operation. Merrill

subsequently discussed TD Bank's concerns with Craft.

541.     On July 10, 2013, TD Bank unilaterally closed account no. 2808. The previous

day TelexFree LLC had withdrawn $3 million from the account and deposited with Citizens

Bank. TD Bank closed the account because the Bank had red flagged it for suspicious activity.

TelexFree insiders attributed the Bank's decision to the Brazilian shutdown.

### d. Despite Its Knowledge Of TelexFree's Fraud, TD Bank Continued To Provide Services Essential To Its Continuation

542.     Rather than close all TelexFree accounts and freeze all funds, however, TD Bank

continued to afford TelexFree banking services necessary to continue operating its fraudulent

scheme. They allowed TelexFree the continued use of other accounts, and opened new ones.

543.     For example, despite TD Bank's explicit concerns with TelexFree, on June 6, 2013, TD Bank opened another checking account for TelexFree, LLC, no. 0334. TD Bank's Branch manager, Kathryn A. Ashman, processed the application for this new account and approved it despite the bank's concerns.

544.     The opening of account no. 0334 is remarkable for two reasons. First, opening a new account in the midst of, or shortly after, a fraud investigation, audit and risk analysis, ran completely counter to TD Bank and standard banking industry practice. Second, the opening of a new account triggered fresh and additional KYC/due diligence inquiries, confirming TD Bank's actual knowledge of TelexFree's fraudulent scheme.

545.     TD Bank's due diligence investigation for account no. 0334 revealed TelexFree's mounting legal difficulties in Brazil, and linked TelexFree, LLC to TD Bank's past customer problems with Wanzeler which had prompted the prior closure of his personal accounts, as well as to the suspicious deposit activity in account no. 2808.

546.     When TD Bank closed account no. 2808 on July 10, 2013, the account balance was $4,369,787.22. Despite its knowledge that these funds were likely the ill-gotten gains of TelexFree's fraudulent scheme, TD Bank did not freeze them., or take any step that would meaningfully impede TelexFree's ongoing fraud. Instead, one day later, it simply transferred the bulk of those funds -- $4 million – to new account no. 0334.

547.     TD Bank's purpose in switching account no. 2808 with account no. 0334 for receiving incoming victim funds and holding existing funds, was to create the false appearance of taking fraud prevention measures while actually protecting TelexFree's ongoing access to funds. This is a known unlawful practice within the banking industry and is used to assist the bank's customer with concealing suspicious activity.

548.     On July 11, 2013, $4,000,000 of those funds was withdrawn by a check payable to TelexFree, LLC, thereby further aiding and abetting TelexFree's fraudulent scheme.

549.     The pattern of repetitive deposits of $1,425 by TelexFree participants, similar to those made into account no. 2808, continued in account no. 0334.

550.     From June 2013 to October 2013, one thousand eight hundred (1,800) deposits were made into TD Bank account no. 0334 in the exact amount of the AdCentral Family package purchase price of $1,425 including the $50 membership fee.

551.     During this same period, there was only one (1) deposit into account no. 0334 in the amount of $49.90, the purchase price of its purported VOIP product.   Through its account monitoring protocols, TD Bank had actual knowledge of this repetitive pattern of TelexFree's fraudulent transactions.

552.     From June 2013 to October 2013, the number of $1,425 deposits into TelexFree's account no. 0334 increased by more than 2,500%.

553.     By September 2013, with the explosion of the facially unlawful $1,425 deposits, the monthly statement for account no. 0334 ballooned to 51 pages.

554.     TD Bank also opened at least three additional TelexFree accounts after closing no. 2808. These accounts allowed TelexFree's fraudulent activities to continue.

555.     On August 8, 2013, TD Bank opened account no. 6982 for TelexFree, Inc., noting TelexFree as an "existing customer." Merrill was the signatory. Kathryn Ashman was the TD Bank manager who opened the account. By the next month, this account was used to accept incoming bulk credit card payments from Base Commerce (dba Phoenix Payments) and process refunds in the form of chargebacks. The bulk payments were a red flag that the processors were depositing "large amounts of currency"; the chargebacks were continuing indicia of fraud.

556.    On August 9, 2013, TD Bank opened account no. 6958 for Brazilian Help Inc. at Carlos Wanzeler's request.   Merrill was listed as the customer for this account.

557.    On September 9, 2013, TD Bank opened another account for TelexFree, LLC, ending in 8409.  By October 2013, TelexFree was again instructing participants to deposit their investments in this "NEW Account Number" 8409, replicating its fraudulent financial practices from TD Bank account nos. 2808 and 3304.

558.    This new deposit instruction relating to "NEW Account Number" 8409 also demonstrates at least two other reasons why TelexFree and TD Bank opened new accounts and shifted banking activity from one to the other.

559.    First, redirecting funds from account no. 0334 to account no. 8409 enabled TD Bank and TelexFree to deflect scrutiny from the huge influx of participant investments that had and were continuing to stream into the older TD Bank account. Second, redirecting the account deposits provided a new destination to launder the ill-gotten gains which had accumulated in the older TD Bank accounts.

560.    The pattern of repeated $1,425 deposits and wire transfers appeared in new account no. 8409 starting on September 16, 2013, just one week after that account was opened.  Hundreds of $1,425 deposits were made directly into the account of TelexFree, LLC, as TelexFree had instructed its participants to do.

561.    With each new account opening, TD Bank was required to, and did, update its customer due diligence on TelexFree, LLC, TelexFree, Inc., Brazilian Help Inc., Carlos Wanzeler, and Merrill.

562.    Indeed, by August 8, 2013, TD Bank was well-aware of the relationship between Carlos Wanzeler, TelexFree, Inc., TelexFree, LLC, and Brazilian Help Inc.

563.     Moreover, as a result of these two account openings, nos. 6982 and 6958, TD Bank knew that they were operating accounts both for TelexFree, LLC, and TelexFree, Inc., and that the two companies were related, and associated with Merrill and that Merrill and Wanzeler and TelexFree were directly associated with TelexFree that was shuttered as a pyramid/Ponzi scheme by the Brazilian government.

564.     By September 3, 2013, TelexFree, Inc. was using new account no. 6982 to accept the incoming bulk credit card payments processed by Base Commerce and to process refunds to participants in the form of chargebacks.

565.     These bulk deposits of credit card payments by payment processors were an additional red flag for fraud.

566.     Meanwhile, TelexFree's extremely high chargeback rate was another very alarming indication that customers were complaining about fraudulent activity. This triggered additional warnings within TD Bank's automated account monitoring system.

567.     The mere fact that TD Bank opened these new accounts knowing that TelexFree was engaged in criminal activities constitutes substantial assistance.

568.     TD Bank employees also wrote reference letters for the TelexFree-related entity Brazilian Help Inc.  which further enabled TelexFree's fraud.

569.     Specifically, on or about August 12, 2013, TD Bank employee Stephanie Rivera wrote a reference letter on official TD Bank letterhead, confirming that Brazilian Help Inc. owned checking account no. 6958, which had only been opened by Carlos Wanzeler three days earlier. This was done in the wake of myriad news and social media reports of Brazilian authorities declaring TelexFree a fraudulent Ponzi scheme and was done with the intent to offer assistance.

570.    Upon information and belief, Carlos Wanzeler used that reference letter to encourage other businesses, including financial institutions, to do business with TelexFree-related entities.

571.    On March 28, 2014, less than three weeks before state and federal authorities shut TelexFree down in the United States, TD Bank branch manager Kathryn A. Ashman authored another reference letter on TD Bank letterhead directed "To Whom It May Concern," confirming that Brazilian Help, Inc. had paid its balance of $65.19 to TD Bank.

572.    Upon information and belief, Brazilian Help Inc. used these letters to assure other firms and people with which it hoped to do business that it stood in good business standing with TD Bank.

573.    At the time that Kathryn A. Ashman, on behalf of TD Bank, authored the aforementioned reference letter of March 28, 2014, TD Bank had actual knowledge TelexFree was engaged in a pyramid scheme.  Specifically, by March 28, 2014:

    a.    TelexFree was on the brink of collapse;

    b.    TD Bank had closed most of its bank accounts due to its knowledge of fraud;

    c.    TelexFree had been either shut down or subject to governmental fraud warnings in multiple other countries;

    d.    TelexFree was widely publicized as a pyramid scheme; and

    e.    The Massachusetts SOC was actively investigating, and had already deposed TelexFree's principals, Merrill and Wanzeler.

574.    By issuing these reference letters, TD Bank knowingly and substantially assisted TelexFree in advancing its criminal activity.

575.    TD Bank was also named in TelexFree's online "signup procedures" document as

TelexFree's bank into which transfers of membership funds could be made by TelexFree members. Upon information and belief, TD Bank had actual knowledge of this and knowingly allowed this practice to continue unimpeded, despite having actual knowledge of TelexFree's fraudulent business and banking activities.

576.    Specifically, TelexFree members were directed to transfer their membership fees to a "corporate" account at TD Bank under the name "TelexFREE LLC," and were provided with the applicable account and routing numbers.

577.    TD Bank also knowingly assisted TelexFree by permitting TelexFree to identify it as the holder of its accounts and thereby lend credibility to TelexFree's business operations through TelexFree's connection with a large and well-established financial institution.

578.    On or about September 6, 2013, TelexFree leadership instructed its members via a public conference call that the fastest way to send money to TelexFree was by direct deposit to TelexFree's accounts with TD Bank, underscoring the degree to which TD Bank and Ashman's assistance facilitated the collection of member funds.

579.    Other indicia of TD Bank's actual knowledge of and substantial assistance in TelexFree's ongoing criminal enterprise, included:

   a.   The enormous sums of money deposited by TelexFree's credit card processors;

   b.   The extensive number of chargebacks which occurred as early as August 2013;

   c.   The patterns of unlawful withdrawals, consistent with the "layering" process of money laundering; and

   d.   The high volume of cash deposits.

580.    Base Commerce (then Phoenix Payments, LLC), deposited $7,434,585.92 in TelexFree, Inc. account no. 6982 on September 26, 2013. This was well outside TelexFree's

banking profile and limits as imposed by TD Bank.

581.    The following month, Allied Wallet made weekly bulk deposits into TelexFree, LLC account no. 0334, depositing $889,147.57 on October 3; $908,462.00 on October 10; $1,415,871.24 on October 18; and $1,120,465.21 on October 24.

582.    The chargeback problem exploded in August 2013 in TelexFree, Inc.'s new account no. 6982.  That month, the account statement showed 196 electronic chargebacks from Base Commerce totaling $180,898.18.

583.    For September 2013, the monthly statement for account no. 6982 reported another 163 Base Commerce chargebacks totaling $144,217.06.

584.    TelexFree, LLC's bank statement for September 2013 was also replete with chargebacks. The September statement for account no. 0334 demonstrated $17,100 in chargebacks, predominantly in the amount of $1,425.

585.    These chargebacks provided TD Bank with actual knowledge of mounting TelexFree fraud.

### e.   Money Laundering

586.    The pattern of unlawful withdrawals from TelexFree's TD Bank accounts further establishes the presence of fraudulent activity and underscores TD Banks actual knowledge.

587.    One of the essential steps in money laundering is moving funds from account to account to mask their illicit origin and facilitate payouts to criminal perpetrators.

588.    During the latter half of 2013, TelexFree's accounts with TD Bank exhibited exactly this pattern of unlawful withdrawals and funds movements.

589.    For example, on July 11, 2013, TelexFree, LLC, withdrew $4 million of the proceeds from the closing of its account no. 2808 via a check payable to itself drawn on account no. 0334.

590.     Then, in August 2013, TD Bank honored a check drawn by TelexFree, LLC, on account no. 0334 for $73,751.00 to Febe Wanzeler, a sibling of Carlos Wanzeler.

591.     Febe Wanzeler deposited that check into a JP Morgan Chase account that appeared to end in the number 8272. The check stub for that check stated that TelexFree issued it in response to a "Request July 09/2013 Replacing Voided Check."

592.     This telltale notation suggests that TelexFree first unsuccessfully tried to write that check on account no. 2808 the day before TD Bank shut down that account.

593.     The transmission of those funds to Febe Wanzeler indirectly from account no. 2808 into TD Bank account no. 0334 and then into the JP Morgan Chase account is a classic example of the layering phase of money laundering.

594.     In another instance of layering soon afterward, TD Bank paid two checks written by TelexFree, LLC on account no. 0334, one for $20,582.86 and another for $13,697.00 to Lyvia Wanzeler, the daughter of Carlos Wanzeler.

595.     Meanwhile, Carlos Wanzeler made other illegitimate payments for personal expenses out of TD Bank account no. 6982, in the name of TelexFree, Inc.  On October 15, 2013, Wanzeler paid his personal Massachusetts and federal taxes with checks for $13,689 and $67,253, respectively, numbered 2512 and 2513 drawn on that corporate account.

596.     On August 8, 2013, TelexFree, LLC, transferred $400,000 from its account no. 0334 into TelexFree, Inc.'s new account no. 6982, disguising it as a "Loan from TelexFree LLC."

597.     Later, the September 2013 statement for TelexFree, LLC account no. 0334 showed a transfer of $2,929,411.31 on September 19, 2013 to which TelexFree, LLC, into TelexFree, Inc.'s account no. 6982.

598.     On September 17, 2013, $3,917,707.48 was transferred from TelexFree, LLC, account no. 0334 to TelexFree, LLC, account no. 8409.  At the bottom of the Funds Transfer Receipt for that transaction appeared the handwritten words: "1-800-893-8554 Fraud unit to transfer funds." This indicates that the fraud unit at TD Bank not only was aware of the transfer, but actively approved and initiated it.

599.     Through its participation in these "layering" activities, TD Bank allowed TelexFree, LLC to shift funds from one account to another, thereby permitting victims' funds to be transferred to TelexFree's perpetrators and also to pay off earlier investors, keeping the Ponzi scheme afloat and making the illicit source of those funds more difficult to trace.

600.     Another instance of layering occurred on October 2, 2013, when TelexFree, LLC transferred $2,441,000.00 from TD Bank account no. 0334 to TD Bank account no. 8409.

601.     Another instance of layering involved a series of shell-game transactions that occurred on October 18, 2013.

602.     On that day, at 1:26 p.m., $3,000,000 was transferred from TelexFree, LLC, account no. 0334 to TelexFree, LLC, account no. 8409, both at TD Bank.  Six minutes later, at 1:32 p.m., the same $3,000,000 was withdrawn from account no. 8409.  One minute after that, at 1:33 p.m., the $3,000,000 was deposited into TelexFree, Inc. account no. 6982, again at TD Bank.

603.     This circuitous route of transfers was designed to make it difficult to trace the movement of that cash

604.     Ashman authorized these circuitous transfers between TelexFree's TD Bank accounts.

605.     On October 21, 2013, TD Bank issued written notice to Carlos Wanzeler that it

was closing TelexFree, LLC accounts nos. 0334, 8409 and 0955, as well as Brazilian Help Inc. account no. 6958, as of October 31, 2013.

606.    TD Bank also unilaterally closed TelexFree, Inc. account no. 6982 on November 1, 2013.

607.    When TD Bank closed TelexFree accounts nos. 0334, 8409, 0955, and 6982 plus account no. 6958 of Brazilian Help Inc., again, it disbursed the balance of those accounts to TelexFree entities and their principals instead of freezing the account.

608.    By allowing the foregoing disbursements, TD Bank knowingly and substantially assisted the TelexFree criminal enterprise by handing over the victims' funds to TelexFree's perpetrators.  That created the almost inevitable risk that TelexFree's principals would misappropriate those funds for their personal use or launder them further at other financial institutions.

609.    Moreover, when TD Bank closed TelexFree accounts nos. 0334, 8409, 0955, 6958, and 6982, TelexFree's co-owner James Merrill was presented with an immediate and pressing problem: he suddenly had over $25 million in account payouts on hand that he needed to deposit or invest in other financial institutions.

610.    The large size of those deposits—particularly the check for $18,448,267.66 from the closure of account no. 8409— was concerning as deposits of that size would raise red flags with any financial institution.

611.    Accordingly, Merrill returned to TD Bank and TD Bank, aware of Merrill's concerns, agreed to break that sum into smaller checks to avoid raising red flags when depositing those sums at other institutions.

612.    TD Bank re-issued the original $18,448,267.66 check in five or more separate

checks—each under $5 million--to make it easier for Merrill and TelexFree to launder those

sums through other financial institutions while avoiding AML scrutiny. This clear and obvious

example of structuring – a well-known means of money laundering – establishes beyond a doubt

TD Bank's knowing participation in the TelexFree fraud.

613.    Even Jeffrey Babener acknowledged that the TD Bank account closures were due

to "the internet press and the Brazil issues," providing additional corroborating evidence that TD

Bank was aware of TelexFree's fraud activities.

614.    Remarkably, even after TD Bank purportedly closed TelexFree accounts in

November 2013, it continued to maintain another TD Bank checking account in the name of

Brazilian Help, Inc.no. 5183.

615.    TD Bank also reinstated one of TelexFree, LLC's closed accounts, account no.

8409, in December 2013.

616.    A key feature of a pyramid scheme is that the perpetrators pay back the earlier

investors their promised return on investment with the sums invested by new investors, with the

goal of avoiding regulatory scrutiny thus inspiring more new participants to invest. TelexFree,

Inc.'s account no. 6982 with TD Bank was used for this purpose.

617.    Similar to the Rothstein Ponzi scheme, TelexFree set up separate accounts at TD

Bank to deposit new investments and pay off earlier investors.

618.    For example, the September 2013 statement for account no. 6982 showed eight

payments labeled "CCD DEBIT, ACHSETTLEMENT" starting on September 25, 2013 totaling

$1,689,403.83.  The same account showed twenty-two more payments with the same label

totaling $9,337,065.04 in October 2013.

619.    An internal TelexFree, Inc. transaction report identified those payments from

account no. 6982, which totaled $11,026,468.87, as "Agent Commission[s]." The "Agents" who received these commissions were earlier TelexFree investors who had recruited additional participants.

620.   A substantial portion of the funds that were used to pay those commissions came from money laundering transfers, and included:

     a.   The $400,000 transferred from TelexFree, LLC, TD Bank account no. 0334 into TelexFree, Inc.'s no. 6982 on August 8, 2013;

     b.   The $2,929,411.31 debited from TD Bank account no. 0334 on September 19, 2013 and immediately transferred to TelexFree, Inc.'s account no. 6982; and

     c.   The $3,000,000 shifted in the shell game maneuver on October 18, 2013 from TD Bank account no. 0334 through TD Bank account no. 8409 to TD Bank account no. 6982.

621.   By allowing these payments to occur, despite having knowledge of TelexFree's criminal dealings, TD Bank provided TelexFree the conduit to pay off its earlier investors and thereby provided added substantial assistance to TelexFree's fraud.

622.   The above history establishes that TD Bank was fully aware of TelexFree's illegal enterprise as a result of information it learned during the many account opening processes, the Bank's mandatory follow-up investigation on red flags raised, and its ongoing customer monitoring, which included an investigation of TelexFree's management, business activities, customer base, and product offerings.

623.   TelexFree's unlawful bank account activity set off numerous alerts in the same or updated TD Bank software during the relevant period.

624.   Through its actions and omissions, TD Bank knew TelexFree's conduct

constituted a breach of duty and violated M.G.L. c. 93, § 69 and M.G.L. c. 93A and provided substantial assistance and encouragement to the perpetuation of, and otherwise became an integral part of, TelexFree's unlawful Scheme.

### 4. Settled Defendants Fidelity Bank and John Merrill

#### a. *Actual Knowledge*

625.    Settled Defendant John Merrill was at all times relevant the president and chief operating officer of Fidelity Bank and the brother of Defendant James Merrill, a founder, money launderer, and owner of the TelexFree pyramid scheme. Through this familial relationship John Merrill facilitated and perpetuated the relationship between TelexFree and Fidelity Bank and made Fidelity Bank privy to information regarding TelexFree unlawful enterprise.

626.    At all material times, through his personal relationship with his brother, Settled Defendant John F. Merrill was fully aware of the fact that TelexFree's business operation was a Pyramid Scheme that included money laundering and sheltering. He also knew that TelexFree's other banking relationships were souring. John Merrill's knowledge is imputed to Fidelity Bank because at all times material he was its president and chief operating officer and acted in the ordinary and usual course of his employ.

627.    Fidelity Bank otherwise had actual knowledge.

628.    Fidelity Bank's Regulatory Account Compliance Office did in fact perform an investigation of TelexFree prior to agreeing to accept TelexFree as a customer in or about August 2013. As a result of that investigation TelexFree was identified as a high risk MLM and a possible pyramid scheme.

629.    Otherwise either through Fidelity Bank's attempts to comply with all banking regulations when opening and maintaining its accounts, including the Know-Your-Customer Regulations, or because of the familial relationship between its President and one of TelexFree's

masterminds, Fidelity Bank was aware of the Pyramid Scheme characteristics and of TelexFree's unlawful business operations and its obligation to stop servicing and to terminate its relationship with TelexFree and to file SAR reports, but it did not.

630.    Although Fidelity Bank possessed knowledge of the suspicious, tortious or unlawful nature of TelexFree's business activities from the time of its initial investigation of TelexFree, it agreed to accept TelexFree as a customer.   Because Fidelity and John Merrill have not responded to document requests through the date of this filing, the identity and level of participation of others involved remains known only to them.

### b.   Substantial Assistance

631.    Settled Defendant John F. Merrill used his position and influence with Fidelity Bank to procure and prolong and expand and skirt corners as to the described banking services from Fidelity Bank for TelexFree and others including the Defendant Founders and other money launderers. Fidelity Bank opened three accounts for TelexFree, two on August 8, 2013 with initial deposits totaling $7,123,784.58 and one on September 12, 2013 with deposits of $2,951,337.12.

632.    Fidelity Bank helped TelexFree to conduct its business more easily by using remote deposit capture. Remote Deposit is a way to process payments without sending paper checks to your bank or credit union. By scanning (or snapping) an image of checks instead of moving physical documents around.

633.    On or about November 23, 2013, pursuant to Fidelity Bank's obligations to perform ongoing customer monitoring of TelexFree, Fidelity Bank's compliance and BSA officer discovered Red flags, other evidence of suspicious, tortious or unlawful conduct.

634.    That officer also discovered further indicators of fraud in the TelexFree business model, and he notified President Merrill and an outside compliance consultant utilized by

Fidelity Bank.

635.    The outside consultant advised Fidelity Bank of his conclusions that TelexFree was a high-risk customer based upon its account balance and extensive wire transfers and that TelexFree's accounts would "require the appropriate monitoring level for a high-risk customer."

636.    Less than two weeks after this initial investigation, Fidelity Bank made a determination it should close TelexFree's accounts.

637.    Fidelity Bank notified TelexFree of its determination to close its accounts on December 3, 2013.

638.    Fidelity Bank continued to accept deposits from TelexFree until at least December 26, 2013, including deposits from victims. Fidelity also continued to provide TelexFree with credit and depository services and act as a creditor and depository bank for TelexFree until at least December 31, 2013.

639.    An investigation was initiated by the SOC against Fidelity Bank on April 30, 2014, concerning Fidelity's banking relationship with TelexFree.

640.    That investigation resulted in the entry into a Consent Decree, dated September 22, 2014, whereby Fidelity Bank agreed to establish an escrow fund of $3.5 million for resident Massachusetts based victims of the Scheme.

641.    The SOC alleged, inter alia, that Fidelity Bank's account opening process in 2013 was inadequate and insufficient to handle the voluminous TelexFree deposit accounts.

642.    These failures to comply even minimally with mandatory banking regulations allowed the bank's president John F. Merrill to obtain the account services for his brother James Merrill, the other TelexFree Founders and TelexFree itself.

643.    The Consent Decree establishes that Fidelity Bank wrongfully permitted

TelexFree to deposit funds received from victims of its illegal Pyramid Scheme in Fidelity

Bank's accounts between August 8 and December 26, 2013.

644.    Despite that determination, Fidelity Bank continued to receive the victims' funds

obtained by TelexFree until December 27, 2013 and to perform other banking services until

December 31, 2013.

645.    Fidelity Bank did not terminate its relationship with TelexFree, refuse to accept

victims' funds, or stop servicing accounts and report suspicious activity, after its internal review

revealed the suspicious, tortious or unlawful conduct.

646.    As a result of the direct influence and unfair, deceptive and unlawful involvement

of Fidelity Bank president and chief operating officer, Settled Defendant John F. Merrill, Fidelity

Bank opened personal accounts for TelexFree Founders and Principals, including Defendant

James Merrill (president Merrill's brother) and Wanzeler after Fidelity's internal review revealed

the tortious conduct.

647.    After its November 27, 2013 receipt of the outside consultant's report, Fidelity

Bank unfairly, deceptively and unlawfully transferred over $10 million dollars out of

TelexFree's and Defendant Founders' accounts and into the personal accounts of Defendants

James Merrill and Wanzeler.

648.    This wrongful transfer included a $3.5 million transfer by Wanzeler to a

Singapore account on December 30, 2013.

649.    The SOC concluded that the use of Fidelity Bank's corporate and personal

accounts caused harm to the victims of the TelexFree fraud.

650.    At a minimum, as a result of Fidelity Bank's initial investigation and ongoing

monitoring, the relationship between the Merrill brothers, and its investigation and ongoing

monitoring of TelexFree, Fidelity Bank was aware that TelexFree was engaged in tortious conduct, but it deliberately and willfully turned a blind eye to its knowledge and the results of its investigation and monitoring and continued to act as its banking institution, causing the members of the putative class to suffer ascertainable economic harm.

651.     Although Settled Defendant Fidelity Bank and Settled Defendant John F. Merrill possessed actual knowledge of the suspicious, tortious or illegal nature of TelexFree's business activities at all times it received or held TelexFree funds, they willfully acted in concert with them until at least December 31, 2013 to:

    a.   further the unlawful Pyramid Scheme;

    b.   unfairly, deceptively and unlawfully siphon class member funds;

    c.   unfairly, deceptively and unlawfully convert class member funds;

    d.   continue to provide TelexFree and James Merrill and Carlos Wanzeler services integral to the TelexFree Scheme; and

    e.   continue to provide TelexFree and James Merrill and Carlos Wanzeler with substantial assistance and encouragement essential to their unlawful plan.

652.     Through its actions, Fidelity Bank and John Merrill provided substantial assistance and encouragement and otherwise became an integral part of TelexFree's fraudulent Scheme.  Fidelity Bank and John Merrill also assisted TelexFree and its Principals to further achieve their unfair, deceptive and unlawful Scheme that was at a minimum violative of M.G.L. c. 93, § 69.

### 5.  Defendant PNC Bank

653.     PNC Bank began providing banking services to TelexFree in December 2013 when PNC Bank opened two depository and checking accounts at its Pompano Beach, Florida branch for TelexFree and TelexFree Financial, Inc.  PNC Bank continued to provide substantial

uninterrupted financial services until TelexFree was shuttered by United States authorities in April 2014.

654.    TelexFree was introduced to PNC Bank through Carlos Wanzeler.  At the time of the introduction, PNC Bank was advised that TelexFree was a Multi-Level Marketing company and experiencing difficulty obtaining the financial services it required, that it had been shuttered in Brazil, and that it had ongoing legal issues it was working on with regard to its compensation plan.

655.    In accordance with its own and standard industry protocols, PNC Bank performed an initial underwriting investigation and evaluation and assessment of TelexFree, which included receipt of and a review and assessment of the following:

    a.  TelexFree's business model and structure;

    b.  TelexFree's compensation plan and standard form contract;

    c.  TelexFree's payment processing, transaction and banking history;

    d.  TelexFree's listing on the Match List and the available expanded banking history through the MATCH program;

    e.  TelexFree's website;

    f.  TelexFree's purported VoIP product and AdCentral promoter packages, and corresponding prices;

    g.  TelexFree's corporate documentation;

    h.  Documentation as to the location of operations and sales;

    i.  TelexFree's, Carlos Wanzeler's, and James Merrill's credit scores;

    j.  TelexFree's tax returns for at least the previous two (2) years;

    k.  TelexFree's Profit & Loss Statements for at least the previous two (2) years;

l.   TelexFree's balance sheets;

m.   TelexFree's average transaction amount (or "average ticket");

n.   TelexFree's highest anticipated transaction amount (or "high ticket");

o.   TelexFree's anticipated monthly processing volume;

p.   TelexFree's annual and monthly dollar sales volume; and

q.   Information available online regarding TelexFree.

656.   As a result of the disclosures made to it and the results and findings made during its initial underwriting investigation and assessment, at the time PNC Bank began to service TelexFree and at all times subsequent thereto, it had actual knowledge that:

a.   TelexFree was an MLM – a business profile uniformly considered very high risk under accepted industry-wide and FFEIC standards;

b.   TelexFree was and had been subjected to government action and shut down as a pyramid scheme by the Brazilian government;

c.   TelexFree's Founders and Executive Officers who were signatories and associated with the PNC Bank application, including Carlos Wanzeler and James Merrill, were also the subject of the Brazilian government actions;

d.   TelexFree had been placed on the MATCH List;

e.   TelexFree's chargeback rate was continually well over the maximum allowable industry standard;

f.   Other financial institutions had terminated their relationship with TelexFree or suspended and limited their services they provided to it;

g.   Other financial institutions had rejected TelexFree and refused to extend banking services to TelexFree;

h.   The same was true for TelexFree's Founders and Executive Officers who were signatories and associated with the PNC Bank application;

i.   TelexFree's merchant profile did not match its transactions;

j.   TelexFree's merchant profile did not match its business model;

k.   TelexFree lacked a real product and instead unlawfully guaranteed a massive return for passive activity;

l.   TelexFree standard form contract contained express objective violations of Massachusetts statutory law and;

m.   TelexFree's website and promotional materials also contained express objective violations of Massachusetts statutory law.

657.   PNC Bank gained further actual knowledge of TelexFree's unlawful business model during this period because each of the following set off PNC Bank-specific, and banking industry standard, audits and business reviews.  Additionally, upon information and belief, the transactions exceeded the limits of TelexFree's authorized business profile.  Importantly, each of the below transactions, as well as others, were carried out while PNC Bank had actual knowledge that TelexFree was operating an unlawful business and were thus otherwise not routine banking services.

658.   Nevertheless, despite actual knowledge of the above, PNC Bank moved tens of millions of dollars of TelexFree's funds at a time when TelexFree had basically run out of financial service options and substantially assisted TelexFree's illicit activates by placing their unlawfully obtained funds beyond the reach of United States authorities through multiple aberrant large sum transfers into offshore accounts in the Founders names.

659.   For example, on January 15, 2014, PNC Bank sent $4,427,490.00 from

TelexFree's account to Carlos Wanzeler's personal account #517-852802-001 at Overseas-Chinese Banking Corporation Ltd (OCBC) in Singapore at the order of Wanzeler.

660.    This transfer ran contrary to the business profile and limits on electronic transactions that PNC Bank had placed on TelexFree.

661.    Despite the fact that other financial institutions had closed TelexFree accounts or denied TelexFree banking services, in February of 2014 PNC Bank accepted over $10,000,000 of victim funds within one week into accounts in the name of TelexFree Financial, thereby assisting the ongoing laundering activities of TelexFree, to wit:

    a.   $3,300,000 on February 14, 2014;

    b.   $3,300,000 and $5,000 on February 18, 2014; and

    c.   $3,400,000 on February 19, 2014.

662.    The foregoing and subsequent funds then went through the money laundering process.  From February 11 to March 4, 2014, PNC processed thirty-one (31) wire transfers totaling more than $1,590,000 to eleven (11) financial institution.  These large sum transactions were in breach of the guidelines and limits that it had placed on TelexFree, and in breach of banking standards.  These activities occurred under the veil of PNC Bank's actual knowledge of TelexFree's illegal business activities and operation.

663.    From February 10, 2014 through March 4, 2014, TelexFree also wired or transferred over $1,400,000 from related TelexFree accounts into a PNC Bank account.

664.    In or about February 2014 PNC Bank began working with Allied Wallet and ProPay to accept deposits for TelexFree.  Every Wednesday, PNC Bank accepted significant transfers from Allied Wallet into TelexFree's PNC Bank account.  These depository services were the "nuts and bolts" of TelexFree's unlawful Scheme when other financial service

providers were turning TelexFree away as a fraud.

665.    During the time PNC Bank serviced TelexFree, virtually all incoming ACH deposits processed by PNC Bank were in amounts corresponding to the purchase of AdCentral packages, not VoIP telephone cards, and inconsistent with TelexFree's business profile or product alleged to be sold, providing further evidence that TelexFree's scheme was unlawful and inconsistent with its banking profile.

666.    In TelexFree's filings with the bankruptcy court in April 2014, TelexFree listed PNC Bank as providing its "primary operating account" and stated that TelexFree funded its operations from its PNC Bank Account.  TelexFree further stated that its use of the PNC Bank account was "imperative" to its continued operations.

667.    As TelexFree's primary operating account, TelexFree used PNC Bank to make general disbursements, including the laundering of victims' funds though transfers of large, abnormal funds to numerous financial institutions, multiple Founders, executives, insiders, employees, accomplices, accessories and aiders and abettors in amounts that were clearly inconsistent with its business model.

668.    PNC Bank still held approximately $2.4 million in TelexFree accounts at the time of its bankruptcy in April 2014.

669.    With the assistance of PNC Bank, TelexFree was able to accomplish, among other things:

    a.    "Many funds transfers . . . sent in large, round dollar, hundred, or thousand-dollar amounts;"

    b.    "Funds transfer activity . . . when the activity is inconsistent with the customer's business or history;"

    c.   "Funds transfer activity is unexplained, repetitive, or shows unusual patterns;"

    d.   "Payments or receipts with no apparent links to no legitimate contracts, goods, or services are received;"

    e.   Unusual transfer of funds among related accounts or among accounts that involve the same or related principals;" and

    f.   A large number of incoming or outgoing funds transfers take place through a business account, and there appears to be no logical business or other economic purpose for the transfers, particularly when this activity involves higher-risk locations."

670.    In the week preceding TelexFree's filing of its bankruptcy petition, PNC Bank also transferred millions of dollars out of TelexFree's account through additional aberrant transactions to other parties, such as Garvey Schubert Barer ($350,000) and Greenberg Traurig ($3.5 million).

671.    Another means through which PNC Bank substantially assisted the propagation and proliferation of TelexFree's Pyramid Scheme was by making it "as easy as possible" to transfer and abscond with victims' funds by granting TelexFree the use of its "Pinnacle Express Select" service.

672.    PNC Bank Assistant Vice President Dave Halverson approved and provided information on how to access the Pinnacle Express Select service directly to Merrill in a letter dated January 28, 2014.  Access to this service is remarkable because of its ease and the fact that it enabled TelexFree to manage its banking activities online.

673.    Debra Martin, Sales Associate, PNC Bank confirmed via email to James Merrill that TelexFree had opened a Pinnacle Express Select service with PNC Bank.  Merrill in turn

forwarded this information to Andreia Bianchi Moreira.

674.    Between December 2013 and the April 14, 2014 raid on TelexFree's headquarters, PNC Bank facilitated numerous non-routine banking transactions in amounts exceeding TelexFree's $500,000 limit imposed by PNC Bank and were otherwise inconsistent with its business model.  For instance, on January 29, 2014, PNC Bank accepted a $1,000,000 deposit to TelexFree's account.  These amounts were in excess of the maximum allowed TelexFree.

675.    Following the shutdown of TelexFree's operations, authorities seized $2,487,204.68 from PNC Bank account no. 1813, held in the name of TelexFree Financial, Inc.

676.    PNC Bank's substantial assistance was critical to advancing TelexFree's unlawful goals of laundering money that eventually landed in the Founder's personal accounts, and because it moved substantial funds overseas and out of the reach of the United States justice system.

677.    PNC Bank provided substantial assistance and essential banking services to TelexFree from December, 2013 until it's closure in 2014, during which time very few banks and processors were willing to provide TelexFree with any services due to the Brazilian shutdown, suspicious activity, and well-publicized accusations of operating a pyramid scheme. During this time, PNC Bank's services were absolutely essential to keeping TelexFree operating. Otherwise, TelexFree would have soon collapsed.

### 6.  Settled Defendant Synovus

678.    At all material times, Settled Defendant Synovus served as the "sponsor" bank of Base Commerce and GPG and provided depository account and funds transfer services in connection with Base Commerce's and GPG's payment processing services.

679.    At all material times, Synovus, Base Commerce, and GPG shared a close business

relationship, which included serving common clients, including TelexFree, and sharing information regarding said clients.

680.    As a condition of accepting TelexFree as a merchant for payment processing, Synovus, the acquiring bank of GPG and Base Commerce, required a 10% reserve account due to the fact that TelexFree was considered a very high-risk customer.

681.    In August 2013, Synovus instructed Base Commerce and GPG to cease performing payment-processing services for TelexFree by August 31, 2013.

682.    Synovus continued to act as GPG's sponsor bank for its electronic payments transmitting credit card processing data to Defendant Allied Wallet until at least January 16, 2014, for the benefit of TelexFree.


**B.  DEFENDANT PAYMENT PROCESSING SERVICES COMPANIES**

683.    The Payment Processing Defendants (or "Processors") played an integral role in the TelexFree Scheme. They allowed TelexFree to collect payment for the sale of ADCENTRAL and ADCENTRAL FAMILY memberships via credit card. Over the course of its scheme, Telex Free collected over one billion dollars via credit card payments facilitated by the Payment Processing Defendants.  The Processors also provided ongoing assistance to manage TelexFree's ongoing problems in obtaining essential financial services, including devising and executing strategies to conceal TelexFree's illicit activities and to avoid oversight and regulation by law enforcement and regulatory authorities.  They also worked to find new financial service providers to replace those who ceased their work for TelexFree as a result of the various investigations and other oversight activities by law enforcement and regulatory authorities.  The Payment Processors (with some exceptions) also facilitated and enabled TelexFree to make payments to its members to perpetuate the scheme.

684.   Like the Bank Defendants, the Payment Processing Defendants were aware of the fraudulent nature of the TelexFree scheme and were required by law to investigate new clients. Each Processor learned that that TelexFree was operating an unlawful enterprise as part of their initial investigation. Second, like the Banks, the Processors were required by law to monitor the activities of their clients during the customer relationship. Each Processor gained knowledge that TelexFree was operating an unlawful enterprise as a result of their ongoing monitoring. The Processors also gained knowledge of TelexFree's unlawful activities as a result of notifications and demands for formal investigative reports of suspicious and "red flag" activities from their associated banks related to TelexFree's operations as well as personal interactions with TelexFree insiders, among other things. .

685.   In general, the Payment Processors knew from their initial investigations that TelexFree was a fraudulent operation because their investigations showed, among other things: 1) TelexFree was a multi-level marketing operation, and, therefore, suspect; 2) that it was being investigated as an unlawful pyramid/Ponzi scheme by authorities around the world; 3) that it illegally promised its members guaranteed returns on passive investments; and 4) that it was on chargeback watch lists maintained by MasterCard and Visa for the purpose of identifying fraud.

686.   In general, the Payment Processors confirmed based on their monitoring of TelexFree's accounts that it was a fraudulent operation because, among other things: 1) TelexFree's accounts experienced high charge back levels; 2) virtually all of the payments received by TelexFree (i.e. 99%) were for memberships guaranteeing passive income, not the sale of VOIP products; 3) many other ways in which the activity in TelexFree's accounts did not match its purported business model; and 4) ongoing refusals of banks to work with TelexFree. In addition, the government investigations around the world progressed and were prominently

reported on various websites.

687.    Many of the Payment Processors also knew that some of the TelexFree Insiders and Top Promoters had been associated with other well-known MLM Pyramid/Ponzi schemes.

688.    With this knowledge, the Payment Processing Defendants provided substantial and essential assistance to TelexFree in the perpetuation and expansion of its Scheme, including without limitation:

a.    Opening TelexFree's payment processing accounts;

b.    receiving and processing payments made by Promoters to TelexFree;

c.    making and processing payments to Promoters from TelexFree's accounts;

d.    holding illicit funds for the benefit of TelexFree, its affiliated entities and its Defendant Insiders and transferring them to personal and foreign accounts, foreign companies and shell companies to avoid regulatory scrutiny and/or seizure;

e.    transferring illicit funds between TelexFree entities, which funds were then held for the benefit of the Defendant Insiders, including transferring TelexFree funds to personal accounts of the TelexFree Insiders, including foreign accounts, foreign companies and shell companies to avoid regulatory scrutiny and/or seizure.

**1.    How The Payment Processing System Works**

689.    While a credit card transaction generally takes less than a minute to complete, the process is complex and involves several parties.

690.    A credit card is issued by a bank called an "Issuing Bank" or "Issuer". The Issuing Bank is responsible for payment for purchases by the card holder. Because it pays for the purchase and then bills the cardholder later, it assumes the risk of non-payment by the cardholder.

691.    In order to accept credit and debit card transactions, a merchant must contract with a bank called an Acquiring Bank or Acquirer. The Acquiring Bank receives payment from the Issuing Bank and transmits it to the merchant.

692.    If a purchaser reverses a purchase because, for example, the credit card transaction was not authorized properly or was fraudulent, it is called a "chargeback."  The Acquiring Bank assumes the risk that if there is a chargeback, the Merchant will not repay the funds it received. In other words, it essentially extends a line of credit to the merchant for the charge back time limit expires.

693.    The Acquiring Bank will typically hold back a portion of the funds due the merchant in a separate account as a security. Such an account is called a "Merchant Account Reserve". This way, Acquiring Banks insulate themselves against loss in the event that a merchant experiences excessive chargeback.

694.    Payment or Card Networks like Visa, MasterCard, American Express, and debit cards serve as the link between acquiring banks and issuing banks. The Card Network also authorizes 1) the Issuing Banks to issue credit cards linking the network to their customers and 2) the Acquiring Banks to enter relationships with their merchants as part of the network.

695.    Payment Processors provide the link between the merchant and the Acquiring Bank and the credit card network. Among other things, the Processors collect and consolidate money from large numbers of transactions and transmit it to the Acquiring Bank. The Processors may also withhold money and maintain Merchant Account Reserves. The Processors also provide Automated Clearinghouse services (known as "ACH")

696.    Charge backs evidence fraud, trigger reporting requirements for the bank and require the bank to recover money paid to the merchant. Charge backs, therefore, present

expensive problem for Acquiring Banks. They also present a credit risk – i.e., the possibility that the Acquiring Bank will not be able to recover the payments it has made to the merchant. A charge back rate of over 1% is regarded as excessive and generally will not be tolerated by banks, payment processors or the Card Networks.

697.    The Card Networks maintain records of merchants with excessive charge backs. MasterCard maintains a database called MATCH for this purpose. A MATCH listing indicates that a merchant is no longer to receive any credit card processing services due to exceptionally high risk. A MATCH Listing is a permanent record that follow a merchant and is seen by each Financial Service Provider.

698.    A credit card transaction consists of the following steps:

   a.   **Cardholder:** Uses card for a purchase from the Merchant, who enters Cardholder information into the Payment Gateway and authorizes the transaction.

   b.   **Payment Gateway:** The computer link to the Card Network which transmits the transaction information to the Payment Processor.

   c.   **Payment Processor:** Serves as a facilitator on behalf of the Acquiring Bank by forwarding transaction information from the Payment Gateway to the Card Network.

   d.   **Card Network:** Routes the transaction information to the correct Issuing Bank in order to receive the Issuing Bank's authorization.

   e.   **Issuing Bank:** Receives and verifies the transaction information; if the credit or debit is available, the issuer sends an authorization code for the transaction back to the Card Network.

   f.   **Card Network:** Receives the authorization approval from the Issuing Bank, then

forwards the authorization to the Processor.

g. **Payment Processor**: Receives the issuer's authorization approval from the Card Network, then forwards that information to the Payment Gateway.

h. **Payment Gateway:** Receives the Issuing Bank's authorization approval from the Processor, forwards it to the Merchant to complete the transaction.

i. **Merchant:** Receives the authorization, fulfills the order, and batches the transaction information along with the rest of the day's sales.

j. **Acquiring Bank:** Receives the batched transactions at the end of the day, then deposits an amount into the Merchant's account equal to the total of the batch, minus applicable fees, holdbacks, etc.

### 2. TelexFree's Relationship With and Use of Payment Processors

699.    Payment Processors can only operate in conjunction with an Acquiring Bank. The Acquiring Bank dictates the procedures and practices the Processor must follow. It also dictates the types of transactions merchants may engage in and the specific terms and conditions merchants must adhere to. Since an Acquiring Bank can terminate its relationship with a Pay Processor or any merchant at any time, the Payment Processors are at all times beholden to the Acquiring Bank.

700.    The Processors are subject to the same rules, regulations, regulations and restrictions applicable to Banks detailed above. They are also generally subject to their Acquiring Bank's Know Your Customer and other monitoring protocols.

701.    As explained above, Banks, including Acquiring Banks, are required to investigate new customers and, after they are accepted as customers, monitor their activities for money laundering and fraud under the BSA, Patriot Act and other anti-money laundering rules and regulations. Acquiring Banks develop their own mandatory protocols and procedures for this

purpose. Most banks have highly sophisticated departments devoted to this process, and all have continuous computer driven analysis that identifies red flag transactions for mandatory review.

702.     Payment Processors are involved in the investigation and monitoring of merchant activity. Acquiring Banks often first call upon Pay Processors to do the initial investigative work on a questionable transaction.  The Acquiring Banks communicate regarding the Processor's knowledge of a merchant and each questionable or batch of questionable transactions as part of their mandatory process of determining whether further investigation is needed and whether a merchant's processing services should be continued, terminated, or otherwise acted upon.

703.     As a result of a period of especially heavy chargebacks, TelexFree was added to MasterCard's MATCH database in 2012, indicating that TelexFree was no longer to receive any credit card processing services due to exceptionally high risk.

704.     TelexFree, at least as early as the Spring of 2013, was also listed on Visa's chargeback problem list.  As one Processor executive informed TelexFree executives in August of 2013: "[n]o US Bank or Processor . . . will accept your [TelexFree] business given that you are on month five of the Visa Chargeback monitoring program.  You are one of only three merchants in the USA on month five so you are a real hot-potato as they say."

705.     As TelexFree was cut off by some financial institutions, some of the Payment Processors also assisted TelexFree in obtaining the services of other financial service providers necessary for TelexFree's operations to continue and, along with the TelexFree Insiders, devised and implemented ways that TelexFree could avoid regulatory oversight and continue the fraud.

706.     For example, by August 2013, TelexFree was struggling to find financial services partners as a result of the Brazilian shutdown and issues—including excessive chargebacks— faced by TelexFree's business in the U.S. In response, GPG, Base Commerce, and Vantage

Payments leveraged their industry connections and knowledge to assist the TelexFree scheme, including "sneaking" payouts on TelexFree's behalf.

707.    Hughes and Base Commerce brought in Vantage Payments to act as a broker on TelexFree's behalf. Vantage Payments in turn applied to Allied Wallet on TelexFree's behalf and formed a shell company in the United Kingdom—TelexFree, LTD—to serve as TelexFree's EU-based operation. As a result of Vantage Payments' efforts, Allied Wallet agreed to provide payment processing services to TelexFree. Vantage Payments continued to serve as a primary contact between Allied Wallet and TelexFree.  Sparman, Vantage Payments managing partner, later successfully negotiated with Allied Wallet on TelexFree's behalf to avoid a threatened increase in Allied Wallet's rolling reserve and to increase Allied Wallet's processing volume for TelexFree.

708.    During August 2013, GPG's Amirie participated in strategy sessions with Merrill and others to devise a way for TelexFree to continue to process electronic transactions. Bank Card Consultants was identified as a potential resource during these sessions and was brought into the scheme in September 2013 as an "International Account."

709.    Also during August 2013 and in response to the challenges facing TelexFree's U.S. business, GPG and Base Commerce—through Amirie and Hughes—advised TelexFree to seek off-shore banks and on other ways to reduce chargebacks and avoid stringent monitoring under U.S. banking laws.

710.    In September 2013, despite the fact GPG was no longer involved in monetary transactions for TelexFree, Amirie allowed TelexFree to continue to use the GPG gateway to transmit electronic data to Allied Wallet until October 10, 2013. During September 2013 alone, GPG and Allied Wallet processed $21.5 million for TelexFree, of which there were numerous

declined charges.

711.    In September 2013, Base Commerce, on TelexFree's behalf, also arranged for TelexFree to use ACH processing services through IPS as a means to avoid the oversight of regulators and banks.

712.    Like the Banks, each Payment Processing Service Company Defendant performed all of the investigations and monitoring required of it by the federal government and gained actual knowledge that TelexFree was operating an unlawful enterprise.  Despite this knowledge, each Processor provided essential assistance to TelexFree's fraudulent scheme.

### 3.    ProPay

713.    Defendant ProPay, Inc. ("ProPay") is a Payment Processor located in Utah. ProPay agreed to accept TelexFree as a customer and began processing transactions for the benefit of TelexFree in or about October 2012. It continued to provide processing and other financial services to TelexFree until at least January 16, 2014.

714.    From the outset of ProPay's introduction to, and subsequent relationship with, TelexFree, it had actual knowledge that TelexFree was operating a fraudulent business enterprise and was an unlawful pyramid scheme. Despite this knowledge, it provided substantial assistance to TelexFree's fraudulent scheme. Among other things, the scheme could not operate without the ability provided by ProPay to collect and consolidate credit card payments for ADCENTRAL and ADCENTRAL FAMILY memberships. ProPay's services also allowed TelexFree to make some initial payments to purchasers of ADCENTRAL and ADCENTRAL FAMILY memberships to convince them that the scheme was not a fraud.

715.    Through its due diligence protocols, risk assessment and background check, ProPay had actual knowledge, prior to, and after agreeing to provide payment processing services for TelexFree, that TelexFree was a fraudulent business, including but not limited to,

TelexFree's placement on MATCH, TelexFree's VOIP product represented 1% of its total sales whereas membership sales represented 99% of total sales, the shuttering of TelexFree's Brazilian operations by governmental agencies, TelexFree's estimated payment processing volume was far exceeded by its actual payment processing volume and TelexFree's excessive chargebacks.

716.    Between May 1, 2013 and September 30, 2013, ProPay had knowledge that GPG and Base Commerce processed $68.3 million in sales for TelexFree with only about 1% of total sales being attributable to VOIP sales.

717.    During the time it worked for TelexFree, ProPay processed at least $110 million of payments for TelexFree. According to TelexFree's accounting records, as of December 31, 2012, ProPay held a total of $546,947.23 in two accounts for the benefit of TelexFree. ProPay also held an additional amount of $279,209.4 "on hold" for TelexFree.

718.    Between October 2012 and December 2012, ProPay processed a total of $1,506,856.60 in incoming transfers of membership fees for the benefit of TelexFree.

719.    According to TelexFree's July 2013 Balance Sheet, as of July 31, 2013, ProPay held a total of $3,743,049.03 for the benefit of TelexFree.

720.    ProPay held an additional amount of $4,698,867.83 "on hold" for TelexFree.

721.    According to TelexFree's December 2013 Balance Sheet, as of December 31, 2013, ProPay held $98,463.24 for the benefit of TelexFree.  In addition, as of December 31, 2013, ProPay held $4,468,411.11 in a "reserve" account for the benefit of TelexFree.

722.    In the course of providing services to TelexFree, ProPay directly communicated with fellow Payment Processing Service Companies Base Commerce and GPG regarding the inherent risks and concerns with TelexFree.

723.    More particularly, in an email to Settled Defendant Hughes, president of Base

Commerce, a Payment Processing Company serving TelexFree, ProPay characterized TelexFree as an extremely high-risk client and indicated that no United States bank or processor would be willing to take on TelexFree as a client given this risk.  This email was referenced in a subsequent email from Hughes to Defendants Merrill, Wanzeler, and Craft, as well as GPG, dated August 28, 2013.

### 4.   Third Party GPG

724.    Third Party GPG specializes in merchant gateway services, including, but not limited to, making outgoing payroll and commission payments for clients as well as processing credit card transactions for incoming payment.

725.    At relevant times, Third Party Jayme Amirie was GPG's CEO and was involved in all aspects of GPG's relationship with TelexFree. He communicated regularly with TelexFree Insiders including Wanzeler, Merrill and Craft.

### 5.   Settled Defendant Base Commerce

726.    Settled Defendant Base Commerce, LLC ("Base Commerce"), formerly known as Phoenix Payment, LLC, is a limited liability company duly organized and existing under the laws of the State of Arizona. Its principal office is located in Tempe, Arizona. Base Commerce also does business as Phoenix Payments.

727.    Settled Defendant John Hughes was the president of Base Commerce during the time it was involved with TelexFree.

728.    Settled Defendants Sidel, Doolittle, Kirchhefer and Bonfiglio were employees/officers of Base Commerce during the time it was involved with TelexFree.

729.    At all material times, Third Party GPG, Base Commerce and Synovus shared a close business relationship, acting as payment processing partners and sharing information regarding customers, including TelexFree.

730.    As alleged above, Third Party GPG served as a sales agent for Base Commerce and urged Base Commerce to take TelexFree on as a client. After an introduction by Third Parties GPG and Amirie, in April 2013, Defendants Merrill and Wanzeler, on behalf of TelexFree, submitted an application for payment processing services to Base Commerce.

731.    Despite Base Commerce's knowledge of the unlawful nature of TelexFree's business activities, Base Commerce agreed to accept TelexFree as a customer. It performed payment processing services for TelexFree continually from April 19, 2013 until at least December 31, 2013.

732.    Base Commerce's initial investigation of TelexFree disclosed the fraudulent nature of its business. As a result of its investigation, Base Commerce was aware that TelexFree operated an MLM scheme promising guaranteed returns for passive investments.  It was also aware that TelexFree's business could not support the returns it promised to its members.

733.    Base Commerce was also aware, by virtue of its relationship with GPG and Jayme Amirie, of all of the facts discovered by GPG and Amirie as alleged above.

734.    Base Commerce was also aware of other facts demonstrating the fraudulent nature of TelexFree's operations. For example, although Base Commerce's application form requested the social security number and date of birth of Wanzeler and Merrill as co-owners of TelexFree, Wanzeler refused to provide that information. By itself, this was a clear violation of Know Your Customer rules. It also prompted Base Commerce to perform additional credit checks on both Merrill and Wanzeler.

735.    Base Commerce's investigation included running a "FraudDefender" search on TelexFree, which returned poor scores for TelexFree and Wanzeler.

736.    Base Commerce also discovered that TelexFree, when it was known as Common

Cents Communications, had been accused of being a Ponzi scheme. In an interoffice letter dated

May 22, 2013, Settled Defendant Hughes, president of Base Commerce, noted:

> [t]hat program paid people residual commissions for placing ads online and the
> network marketing commentators accused them of being a Ponzi scheme as the
> commission advertised appeared unrealistically high and therefore fictitious.

737.    At that time, TelexFree continued to widely and prominently market and advertise

itself as a passive income scheme in which Members would be paid commissions for placement

of online advertisements.

738.    In the same interoffice letter dated May 22, 2013, Hughes indicated that

TelexFree's "current primary market" was Brazil, and that TelexFree would receive a $19

million annual receivable from Ympactus Comercial, Ltda, "a Brazilian Company to whom they

license their IOP System."

739.    Beginning in June 2013, Base Commerce provided TelexFree with payment

processing services via an account held by Base Commerce's "sponsor bank," Settled Defendant

Synovus, from which Base Commerce deducted its monthly processing, chargeback, and other

service fees.

740.    During the course of its work for TelexFree, Base Commerce processed credit

card transactions – i.e., collected and delivered to or on behalf of TelexFree -- more than $36

million. Base Commerce also facilitated payment services allowing TelexFree to pay members

during the course of its engagement.

741.    As a result, among other things, of government investigations of TelexFree, on or

about August 20, 2013, Base Commerce received instruction from its sponsor bank Settled

Defendant Synovus to cease performing payment-processing services for TelexFree by August

31, 2013.

742.     Due to this pressure from Synovus, Hughes forwarded a letter to Merrill on August 20, 2013, advising him that Base Commerce would terminate TelexFree "as of 5:00 PM Pacific Standard Time on August 31, 2013."

743.     In a later email to Merrill, Wanzeler, Craft, and Amirie, dated August 28, 2013, Hughes stated, regarding TelexFree:

> [we] have an MLM with a huge amount of negative news and serious accusations. Hence, banks and processors are running away based on what the FTC, Treasury Dept., FDIC and Justice Dept. has done to them lately to include suing them,,[sic] fining them and freezing their settlement funds.

744.     Hughes characterized TelexFree as an extremely high-risk client and indicated that no United States bank or processor would be willing to take on TelexFree as a client given this risk.

745.     In the same email, in which Hughes also characterized TelexFree as "a real hot-potato as they say," Hughes indicated that Base Commerce had worked, and was continuing to work, to find a replacement processor for TelexFree "such that [TelexFree's] business was not interrupted" and that he had arranged, via Defendant Vantage Payments, for Defendant Allied Wallet, a United Kingdom-based payment processor, to take over payment processing services for TelexFree.

746.     Hughes also indicated that Base Commerce was actively applying to offshore banks on TelexFree's behalf, noting "no US Bank or Processor, as evidenced by the email from PROPAY [sic], will accept your business. . . ."

747.     In the same email, Hughes also advised that TelexFree should charge members for its membership packages by ACH instead of credit card as a means to avoid regulatory scrutiny and oversight by banks.

748.     On the same day, Defendant Merrill emailed Hughes stating that he believed that

Base Commerce's activity in soliciting offshore banking services on TelexFree's behalf was connected with TelexFree's desire to separate its international, U.S.-based, and Brazil-based business among different banks and processors. GPG and Amirie contributed and were in the loop.

749.    In approximately August 2013, Defendant Sparman, managing partner of Vantage Payments, was contacted by Hughes regarding TelexFree.

750.    Hughes asked Vantage Payments to act as a broker on TelexFree's behalf, and to contact banks and processors with whom it had a business relationship to secure payment-processing services for TelexFree.  Sparmen agreed to do so.

751.    On September 27, 2013, Hughes emailed Merrill and Wanzeler stating that, against the instructions of Synovus, he had authorized approximately $5 million in transfers on September 26, 2013, stating:

> The bank is clearly not happy with me but we are still trying to do the best job we can for you.  Their concerns are that if, god forbid, TelexFree came under a publicized FTC investigation, there could be an indeterminate wave of chargeback's.

752.    GPG and Amirie assisted in this transaction.

753.    In September 2013, Base Commerce successfully applied to IPS to provide ACH processing for TelexFree. Thereafter, as explained further below, IPS – doing business as e-Wallet -- collected over $101 million for TelexFree via its ACH services.   This went well beyond its role as a Financial Services Provider.  By working in concert with them to skirt the law, Base Commerce and Hughes became coconspirators in TelexFree's unlawful operation.

754.    On or about October 10, 2013, Hughes reiterated to Merrill his concern over the possibility of an FTC investigation.

755.    In an email from Defendant Merrill to Hughes, dated January 16, 2014, Merrill

complained that TelexFree was having "a great deal of issues with GPG," specifically, regarding TelexFree's reserve balance and cash flow in and out of GPG, Hughes, on behalf of Base Commerce, responded that Base Commerce was "happy to help" regarding TelexFree's issue with GPG.

756.    Despite the numerous Red Flags and evidence of suspicious, tortious or unlawful activity that Base Commerce was aware of, and despite being instructed by its sponsor bank to cease providing services by August 31, 2013, Base Commerce continued to provide services to TelexFree.

757.    During time periods relevant to the complaint, Settled Defendants Sidel, Doolittle, Kirchhefer and Bonfiglio were officers at Base Commerce, LLC, formerly known as Phoenix Payment, LLC, worked closely with Hughes and gained knowledge that TelexFree was a fraudulent Pyramid/Ponzi Scheme, and that the funds processed by Base Commerce were the proceeds of TelexFree's fraud.

758.    Despite this knowledge, Settled Defendants Sidel, Doolittle, Kirchhefer and Bonfiglio substantially assisted the tortious conduct of TelexFree in processing the illegal transactions; performed integral services and provided substantial assistance that was used to further TelexFree's unlawful business; ensured TelexFree was given access to payment-processing and banking services; and ensured banking services that were used to further TelexFree's unlawful business, as well as access to the national banking system, were made available to TelexFree.

759.    Settled Defendants Sidel, Doolittle, Kirchhefer and Bonfiglio reviewed and approved John Hughes' activities as a normal part of their duties at Base Commerce for the purpose of determining bonuses, job performance, and income.

760.     Settled Defendants Base Commerce, Hughes, Sidel, Doolittle, Kirchhefer and Bonfiglio derived substantial income from the illegal services that Base Commerce provided to TelexFree.

761.     By working so in concert with them to skirt the law, Base Commerce, Hughes, Sidel, Doolittle, Kirchhefer and Bonfiglio became active participants in TelexFree's unlawful operation.

762.     At a minimum, Base Commerce was aware that TelexFree was engaged in tortious conduct, but it deliberately and willfully turned a blind eye to the results of its investigation and monitoring.

763.     Although Base Commerce, Hughes, Sidel, Doolittle, Kirchhefer and Bonfiglio possessed knowledge of the tortious nature of TelexFree's business activities from the time of its initial investigation of TelexFree and during its monitoring of TelexFree, they continued to promote and to provide TelexFree with payment processing services integral to the TelexFree Scheme and willfully acted in concert with it to:

    a.  further the unlawful Pyramid Scheme;

    b.   unfairly, deceptively and unlawfully convert class member funds;

    c.  continue to provide services integral to the TelexFree Pyramid Scheme; and

    d.  continue to provide TelexFree with substantial assistance and encouragement essential to their unlawful business enterprise.

764.     Through their actions, Base Commerce, Hughes, Sidel, Doolittle, Kirchhefer and Bonfiglio provided substantial assistance and encouragement to TelexFree and otherwise became an integral part of TelexFree's Pyramid Scheme.  Base Commerce, Hughes, Sidel, Doolittle, Kirchhefer and Bonfiglio also assisted TelexFree and its Principals to further achieve their

unfair, deceptive and unlawful Scheme that was at a minimum violative of M.G.L. c. 93, § 69.

### 6. Vantage Payments

765.    Defendant Vantage Payments LLC ("Vantage Payments") is located in Arizona. It characterizes itself as an "Independent Sales Agent."  Defendant Dustin Sparman was the managing partner of Vantage Payments during its association with TelexFree.  Vantage Payments served as a broker for TelexFree for the purpose of finding other banks and processors for purposes of securing payment-processing services.

766.    Despite Vantage Payments' knowledge of the unlawful nature of TelexFree's business activities and operation, Vantage Payments agreed to accept TelexFree as a customer in August 2013 and began to solicit payment processing services on behalf of TelexFree, which services it continued to perform up to the time that TelexFree, LLC, TelexFree, Inc., and TelexFree Financial, Inc. declared bankruptcy in April 2014.

767.    Vantage Payment's initial investigation of TelexFree disclosed the fraudulent nature of its business. As a result of its investigation, Vantage Payments was aware that TelexFree operated an MLM scheme promising guaranteed returns for passive investments.  It was also aware that TelexFree's business could not support the returns it promised to its members.

768.    In approximately August 2013, Defendant Sparman, managing partner of Vantage Payments, was contacted by Settled Defendant Hughes of Base Commerce regarding TelexFree, asking it to act as a broker on TelexFree's behalf and to contact banks and processors with whom it had a business relationship to secure payment processing services for TelexFree. Vantage Payments agreed.

769.    Thereafter, Vantage Payments contacted two payment processors in the United Kingdom to attempt to find one who would agree to provide payment processing services so that

TelexFree's scheme could continue. One declined based on known accusations of fraud regarding TelexFree's operations.  The other, Allied Wallet, agreed to do so.

770.    Allied Wallet agreed to provide a "processing account" and process both incoming and outgoing payments for the benefit of TelexFree, among other services.

771.    In connection with TelexFree's agreement with Allied Wallet, Defendant Merrill instructed Allied Wallet to transfer funds from TelexFree's processing account with Allied Wallet to accounts with Fidelity Bank.

772.    Vantage Payments, on behalf of TelexFree, also registered an entity in the United Kingdom, known as "TelexFree, LTD," to serve as TelexFree's EU-based operation.

773.    In fact, as Vantage Payments was aware, "TelexFree, LTD" was a shell company with no physical presence beyond a mere address.

774.    Vantage Payments also helped TelexFree avoid an increase in the amount of payments Allied Wallet would hold in reserve. On or about October 10, 2013, Allied Wallet informed TelexFree that, due to an increase in both payment volume and chargebacks, it would be increasing the rolling reserve on TelexFree's processing account to 20%.

775.    Thereafter, Vantage Payments negotiated extensively with Allied Wallet on TelexFree's behalf, to have this rolling reserve reduced.

776.    These negotiations entailed, *inter alia*, Sparman meeting personally with the CEO of Allied Wallet in Los Angeles, California on TelexFree's behalf.

777.    Ultimately, after extensive lobbying by Vantage Payments on TelexFree's behalf, Allied Wallet agreed to reduce its rolling reserve on the TelexFree processing account to 15% and then to its original rolling reserve of 10%. Sparman also negotiated, on TelexFree's behalf, an increase of the maximum processing volume on the account.

778.    On or about November 13, 2013, Sparman, on behalf of Vantage Payments, and acting on behalf of TelexFree, once again contacted another United Kingdom-based payment processor in hopes of securing TelexFree additional payment processing volume.

779.    This effort was ultimately unsuccessful, as this additional United Kingdom-based payment processor declined to perform services for TelexFree in light of the accusations of fraud and illegality surrounding TelexFree.

780.    The foregoing activities were beyond the scope of Vantage Payments' role as a Financial Services Provider.  By working so in concert with the indicted parties to skirt the law, Vantage Payments and Sparman were active participants in TelexFree's unlawful operation.

781.    By agreement with TelexFree, Vantage Payments also provided TelexFree with access to its Customer Dispute Resolution Network ("CDRN") Portal to Verifi by Visa's CDRN, the purpose of which was to provide TelexFree with the capability to address issues relating to customer payment disputes.

782.    TelexFree executed a CDRN Portal Agreement with Vantage Payments on December 5, 2013. In return for these services, Vantage Payments charged TelexFree a flat rate of $40 per transaction. In connection with this Agreement, Merrill authorized Vantage Payments to transmit all incoming payments to the account of TelexFree, Inc. at Fidelity Bank. Vantage Payments continued to provide TelexFree with these portal access services until at least March 13, 2014.

783.    In an email from Defendant Merrill to Sparman, dated January 15, 2014, Merrill stated, regarding further servicing TelexFree, "[T]here will be plenty of business to go around. You deserve your share for getting us started…Whomever treats us best will get most of the business."

784.    Despite having direct knowledge of the shutdown of TelexFree in Brazil and Rwanda, the United Kingdom scam warning against TelexFree, well-publicized accusations of fraud and illegality on the part of TelexFree, and an enormous number of Red Flags and indicia of the suspicious, tortious or unlawful nature of TelexFree's business operations, Vantage Payments continued to provide processing and processing-related services to TelexFree up to the time that TelexFree, LLC, TelexFree, Inc., and TelexFree Financial, Inc. declared bankruptcy in April 2014.

785.    Although Defendants Vantage Payments and Sparman possessed knowledge of the suspicious, tortious or illegal nature of TelexFree's business activities at all times it received or held TelexFree funds, they willfully acted in concert with them to:

  a.  further the unlawful pyramid scheme;

  b.   unfairly, deceptively and unlawfully convert class member funds;

  c.  continue to provide services integral to the TelexFree Pyramid Scheme; and

  d.  continue to provide TelexFree with substantial assistance and encouragement essential to their unlawful business enterprise.

786.    Through their actions, Vantage Payments and Sparman provided substantial assistance and encouragement to TelexFree and otherwise became an integral part of TelexFree's Pyramid Scheme.  Vantage Payments and Sparman also assisted TelexFree and its Principals to further achieve their unfair, deceptive and unlawful Scheme that was at a minimum violative of M.G.L. c. 93, § 69.

787.    At a minimum, Vantage Payments' initial investigation and ongoing monitoring of TelexFree, made it generally aware that TelexFree was engaged in suspicious, tortious or unlawful conduct, but it deliberately and willfully turned a blind eye to the results of its

investigation and monitoring.

### 7. Allied Wallet

788.     Defendant Allied Wallet, Ltd and Allied Wallet, Inc. ("Allied Wallet") shared a

close business relationship with Defendants Vantage Payments and Sparman and was kept

informed by Sparman of information regarding TelexFree, including public accusations of

operating a Pyramid Scheme and the investigation and shutdown of TelexFree's operations in

Brazil.

789.     Despite Defendants Allied Wallet, Khawaja, Diab, and Rountree's knowledge of

the unlawful nature of TelexFree's business activities and operation, Allied Wallet agreed to

accept TelexFree as a customer and began in late August 2013 to perform payment processing

services for TelexFree.

790.     Allied Wallet had extensive connections with Vantage Payments in facilitating the

Scheme.

791.     Upon Vantage Payments' application on behalf of TelexFree, Allied Wallet

agreed to provide payment-processing services to TelexFree, pursuant to which agreement Allied

Wallet would provide a "processing account" and process both incoming and outgoing payments

for the benefit of TelexFree, among other services.

792.     From the time it began processing payments for TelexFree through TelexFree's

bankruptcy, Allied Wallet collected and transferred to TelexFree accounts over $86 million.

793.     In connection with TelexFree's agreement with Allied Wallet, Defendant Merrill

instructed Allied Wallet to transfer funds from TelexFree's processing account with Allied

Wallet to accounts with Fidelity Bank.

794.     On or about October 10, 2013, Allied Wallet informed TelexFree that, due to an

increase in both payment volume and chargebacks, it would be increasing the rolling reserve on

TelexFree's processing account to 20%.

795.    Thereafter, Vantage Payments negotiated extensively with Allied Wallet's Diab and Khawaja on TelexFree's behalf, to have this rolling reserve reduced.

796.    These negotiations entailed, *inter alia*, Sparman meeting personally with Allied Wallet's CEO, Khawaja, in Los Angeles, California on TelexFree's behalf.

797.    Ultimately, after extensive lobbying by Vantage Payments on TelexFree's behalf, Allied Wallet agreed to reduce its rolling reserve on the TelexFree processing account to 15% and then 10%, and also agreed to increase the maximum processing volume on the account.

798.    Allied Wallet, Diab, and Rountree also made transfers from TelexFree's corporate accounts to private accounts held in the names of Defendant Founders, despite knowledge of the suspicious, tortious or unlawful nature of TelexFree's business enterprise and operations.

799.    Despite having direct knowledge of the shutdown of TelexFree in Brazil and Rwanda, the United Kingdom scam warning against TelexFree, well-publicized accusations of fraud and illegality on the part of TelexFree, and an enormous number of Red Flags and indicia indicating the suspicious, tortious or unlawful nature of TelexFree's operations, Allied Wallet, Khawaja, Diab, and Rountree continued to provide processing and processing-related services to TelexFree up to the time that TelexFree, LLC, TelexFree, Inc., and TelexFree Financial, Inc. declared bankruptcy in April 2014.

800.    Although Defendant Allied Wallet, Khawaja, Diab and Rountree possessed knowledge of the suspicious, tortious or illegal nature of TelexFree's business activities at all times Allied Wallet received or held TelexFree funds, they willfully acted in concert with TelexFree to:

     a.   further the unlawful pyramid scheme;

b.   unfairly, deceptively and unlawfully convert class member funds;

c.   continue to provide services integral to the TelexFree Pyramid Scheme; and

d.   continue to provide TelexFree with substantial assistance and encouragement essential to their unlawful business enterprise.

801.   Through their actions, Allied Wallet, Khawaja, Diab and Rountree provided substantial assistance and encouragement and otherwise became an integral part of TelexFree's Pyramid Scheme.  Allied Wallet, Khawaja, Diab and Rountree also assisted TelexFree and its Principals to further achieve their unfair, deceptive and unlawful Scheme that was at a minimum violative of M.G.L. c. 93, § 69.

802.   At a minimum, Allied Wallet's initial investigation and ongoing monitoring of TelexFree, made it generally aware that TelexFree was engaged in suspicious, tortious or unlawful conduct, but it deliberately and willfully turned a blind eye to the results of its investigation and monitoring.

803.   Although Allied Wallet, Khawaja, Diab and Rountree possessed knowledge of the fraudulent nature of TelexFree's business activities from the time of its initial investigation of TelexFree and during its monitoring of TelexFree, they continued to promote and to provide TelexFree with payment processing services integral to the TelexFree Scheme until at least April 2014.

**8.  IPS**

804.   In September 2013, Settled Defendant Base Commerce successfully applied to IPS, on TelexFree's behalf, for TelexFree to receive its ACH processing services through IPS. IPS President and CEO, Edwin J. Gonzalez was integrally involved and shepherded the process, As evidenced in great granular detail below, he had actual knowledge at the time that TelexFree was operating an unlawful enterprise.

182

805.    By September 16, 2013, IPS began processing payments for TelexFree, with an initial $100 payment, which was likely a test payment, personally approved by IPS's CFO, Natalia Yenatska. Thereafter, TelexFree's ACH processing was conducted by IPS, also doing business as e-Wallet.

806.    In approximately December 2013, TelexFree entered into a further agreement with IPS for additional payment processing services, under the name and address of "TelexFree, LTD," the shell company established by Vantage Payments.

807.    Thereafter, beginning in approximately January 2014, IPS provided TelexFree with a service titled "e-Wallet," which was used by TelexFree for additional processing of funds transferred by Promoters to TelexFree.

808.    IPS performed an investigation of TelexFree prior to agreeing to accept TelexFree as a customer and its initial investigation and ongoing monitoring of TelexFree revealed that TelexFree was a fraud.

809.    As part of its Customer Due Diligence, IPS, Gonzales and Yenatska discovered an article on the MLM news website *BehindMLM.com* accusing TelexFree of being a Ponzi scheme. Yenatska volunteered to provide a written response to the blog, on behalf of TelexFree, claiming that TelexFree was not a Ponzi scheme.

810.    IPS also discovered substantial additional evidence and was tipped off that TelexFree was a so called "hot potato'.

811.    Given IPS's knowledge of the illegal nature of TelexFree's business operations, IPS was obligated to refuse to open any accounts or process any transactions for the benefit of TelexFree.

812.    Despite IPS's knowledge of the illegal nature of TelexFree's business activities,

IPS agreed to accept TelexFree as a customer and began to perform payment processing services for TelexFree in September 2013.

813.    IPS has a history of representing Ponzi schemes.  Prior clients include the well-publicized Ponzi schemes Spinding, Wealth4AllTeam, Primus Hub, (an attempted reboot of Wealth4AllTeam following Wealth4AllTeam's collapse), Funky Shark (a planned Ponzi scheme that shut down prior to launch after receiving legal advice and a $40,000 fine), Team Vinh International, MyAdvertisingPays (a 120% return-on-investment advertising-based Ponzi scheme, similar to TelexFree), Diamond Banners, Argent Network (which was advertised as advertised as "a mixture of Zeek Rewards and TelexFree"), and 1BuckAdShare.

814.    Despite the overwhelming evidence of TelexFree's fraudulent activities, in its October 2013 public statement to the news website *BehindMLM.com*, IPS audaciously stated that they had "done a complete due diligence on TelexFree" and "confirmed the product as compliant with all US laws."  This activity was beyond the scope of its role as a Financial Services Provider.  By publicly endorsing their business model, IPS became an active participant in TelexFree's unlawful operation.  This was intended to and did serve to place a blanket of legitimacy over TelexFree's unlawful pyramid scheme.

815.    IPS and Yenatska also provided TelexFree with advice on branding and marketing, such as development of an international logo.

816.    For instance, on November 27, 2013, Yenatska sent an email to Borromei, James Merrill, Craft, and Carlos Wanzeler, suggesting that IPS could assist TelexFree with branding and writing: "*The only thing needed now is money ☺ I can draw from the TelexFree Merchant Funds if you like and wire the required half for the beginning of the process.*"

817.    Yenatska offered to remove unaccounted-for investor funds from TelexFree's

processing account and provide them to TelexFree for branding expenses. Gonzalez had actual knowledge of this and acted in concert with Yenatska and TelexFree. Thus, in addition to aiding and abetting, Gonzalez and Yenatska again acted as TelexFree co-conspirators.

818.    Merrill responded by agreeing with Yenatska's plan, writing "I am for it" and that it would be a "profit center."

819.    IPS also helped TelexFree obtain a bank account with Defendant Bank of America. On December 2, 2013, Merrill sent an email to Yenatska, writing:

> Natalia,
> I would like to continue our talk with you & Eddie [Gonzalez] regarding the operational bank account with BOA.  I need to know if in your opinion there are any risks attempting to set up this might jeopardize TelexFREE's  relationship with I-payout.[…]  I would like to feel secure that BOA would not have a problem with our relationship and try to stop us from working together. Please copy Eddie with your reply and let me know the best time for us to speak.
> Thanks
> Jim
>
> PS I know Eddie spoke with Carlos trying to set up a meeting with a BOA Regional Manager (Not sure of the title) and Carlos in Florida. I assume that never happened. Let me know if it did.

820.    In December 2013, Gonzalez personally contacted Kevin Staten and influenced Bank of America to re-open accounts and resume providing banking services to TelexFree.  In point of fact, Gonzalez did successfully set up a meeting between Bank of America Vice President Kevin Staten and TelexFree, as discussed above and BOA kept servicing TelexFree.

821.    In response to Merrill's December 2, 2013, email, Yenatska wrote that IPS had spoken to its "banking team" regarding the issue, writing:

> I asked them regarding standard banking for a client of ours that had a history with BOA merchant account. The response was that for standard banking (regular payments of salaries, regular expenses, etc) should be no problem. We will discuss TelexFree in more details with the banking team tomorrow […].

822.    In the same email, Yenatska also requested a legal opinion letter regarding the

Brazilian shutdown, writing "*This would be something necessary to have on hand when we explain everything and, of course, for the bank to retain on file to show that TelexFree is doing everything to resolve the issue in Brazil [...]*."

823.    Upon information and belief, the opinion letter provided by TelexFree's lawyer Babener was given to Bank of America by IPS at or about the time that IPS set up a TelexFree account at the bank.

824.    In addition to processing TelexFree's ACH commission payments, IPS was also tasked with managing TelexFree's credit card processing controls "in concert with" Defendants Priority Payout and Thomas Wells.

825.    Gonzalez personally worked with Wells to shift TelexFree's credit card processing overseas and outside the reach of U.S. regulators.

826.    For instance, Gonzalez worked with Wells to establish international processing MIDs (merchant IDs) for TelexFree that would allow TelexFree to route credit card payments through overseas processors and acquiring banks.

827.    In fact, Gonzalez and IPS established multiple foreign processing MIDs (merchant identification accounts) for TelexFree, for the purpose of allowing TelexFree to spread its credit card payments across multiple foreign processing accounts and thereby fraudulently conceal the total amount of its payments.

828.    The assistance that IPS offered TelexFree was substantial. According to a TelexFree balance sheet, dated December 31, 2013, posted by the Washington State Utilities and Transportation Commission, as of December 31, 2013, TelexFree claimed $31,640,192.30 in assets then held by IPS (under the name "e-Wallet") on behalf of TelexFree.

829.    The volume of payments processed for TelexFree by IPS was massive. In 2013

alone, IPS processed approximately $101.5 million in payments for TelexFree.

830.    On or about February 12, 2014, IPS announced that they were partnering with MLM attorney Kevin Thompson of Thompson Burton, PLLC, to "provide up-to-date compliance guidance to their new and existing clients in the Direct Selling and Multi-Level Marketing industry."

831.    TelexFree was a recipient of such "compliance guidance" services.

832.    On March 6, 2014 – in the midst of the Massachusetts SOC's investigation of TelexFree and overwhelming negative publicity surrounding the Scheme – Kendall Myles of PayWithMyBank, another payment processing company that TelexFree solicited for payment services, sent an email to Gonzalez and Angie Stiles, another IPS employee, writing (emphasis added):

> *Hi Eddie and Angie,*
> *We are having trouble getting i-Payout approved with ProfitStars for ACH underwriting. Their risk teams have identified numerous issues (though not shared with me) that give them concern as to the types of merchants you have in your portfolio. […] I also looked at TelexFREE to understand their background prior to even giving it to ProfitStars for potential underwriting. They look like they have had trouble in the past with fraudulent activity. What background and relationship do you have with them? Thanks,*
> *Ken*

833.    Alarmed by the increasing exposure of TelexFree's fraud, Gonzalez forwarded this email to Carlos Wanzeler, simply adding: "*it is hard ! we need good press !*"

834.    On March 26, 2014, Joseph H. Craft emailed Gonzalez, telling him that TelexFree was having difficulty establish a "long-term deposit relationship with a bank," and asking Gonzalez if IPS would be willing to offer "some type of bill pay service" to the Scheme.

835.    Gonzalez responded by writing: "*Joe, You guys have so much bad publicity it is almost impossible but I have some things in the works that should help!*"

836.    In response to Gonzalez and Yenatska's advice, Merrill requested legal opinion letters from Horst Fuchs, TelexFree's lead attorney in Brazil, and from Babener.

837.    IPS continued to provide payment-processing services to TelexFree until April 17, 2014, at which time IPS finally disabled its electronic services.

838.    Thereafter, in place of the previous e-Wallet online interface, IPS posted a message online stating that TelexFree's payment processing services had been disabled and suggested that this could be due to TelexFree having "violated Anti-Money Laundering policies."

839.    Despite having direct knowledge of the shutdown of TelexFree in Brazil and Rwanda, the United Kingdom scam warning against TelexFree, well-publicized accusations of fraud and illegality on the part of TelexFree, and an enormous number of Red Flags and indicia of fraud indicating the fraudulent and illegal nature of TelexFree's operations, IPS, Gonzalez and Yenatska continued to provide processing and processing-related services to TelexFree up to the time that TelexFree, LLC, TelexFree, Inc., and TelexFree Financial, Inc. declared bankruptcy in April 2014.

840.    Although Defendant IPS, Gonzalez and Yenatska possessed knowledge of the suspicious, tortious or illegal nature of TelexFree's business activities at all times it received or held TelexFree funds, it willfully acted in concert with TelexFree to:

      a.  further the unlawful pyramid scheme;

      b.   unfairly, deceptively and unlawfully convert class member funds;

      c.  continue to provide services integral to the TelexFree Pyramid Scheme; and

      d.  continue to provide TelexFree with substantial assistance and encouragement essential to their unlawful business enterprise.

841.    Through its actions, IPS, Gonzalez and Yenatska provided substantial assistance and encouragement and otherwise became an integral part of TelexFree's Pyramid Scheme.  IPS also assisted TelexFree and its Principals to further achieve their unfair, deceptive and unlawful Scheme that was at a minimum violative of M.G.L. c. 93, § 69.

842.    At a minimum, IPS's initial investigation and ongoing monitoring of TelexFree, made it generally aware that TelexFree was engaged in suspicious, tortious or unlawful conduct, but it deliberately and willfully turned a blind eye to the results of its investigation and monitoring.

843.    Although IPS, Gonzalez and Yenatska possessed knowledge of the suspicious, tortious or unlawful nature of TelexFree's business activities from the time of its initial investigation of TelexFree and during its monitoring of TelexFree, it continued to promote and to provide TelexFree with payment processing services integral to the TelexFree Scheme until April 17, 2014.

### 9.  Bank Card Consultants

844.    Bank Card Consultants is a payment processing company that touted itself as specializing in servicing merchant accounts that are "high risk" due to the nature of the products or services of the merchant.  The vast majority of legitimate financial services providers refuse to service "high risk" merchant accounts, or alternatively they impose and strictly enforce account limitations, closely monitor account activity, and carry out customer and account audits to ferret out unlawful activity

845.    At all times material herein, John Yurick was the owner of Bank Card Consultants and served as the company's representative in its dealings with and on behalf of TelexFree. The actions of Bank Card Consultants and Yurick are identical.

846.    At all times relevant herein, Bank Card Consultants was a registered Independent

Sales Organization/Member Services Provider for Wells Fargo Bank, N.A.

847.    Bank Card Consultants in August 2013 was identified as a potential payment processing resource as a direct result of strategy sessions between James Merrill, Third Party Jayme Amirie of GPG and others, during which they worked to devise a way for TelexFree to continue to process electronic transactions, including those through which TelexFree obtained victims' funds.

848.    On its website, Bank Card Consultants touts its ability to have a high risk merchant "set up and processing in as little as 48 hours," and that it is able to do so even though "most processing banks will refuse to handle your account, and those that do, will charge a much higher rate."

849.    True to that representation, Bank Card Consultants and Yurick established TelexFree as a payment processing customer during or about September 2013 and provided payment processing services to TelexFree at a time when other financial service providers refused to work with TelexFree due to its obvious and apparent fraudulent activities.

850.    Indeed, by August 2013 TelexFree was subject to ubiquitous negative press casting it as a pyramid scheme and reporting its shuttering in Brazil.  It was under investigation in other countries and faced inquiry by the Massachusetts SOC.  Chargebacks were excessive and rampant, and it was placed on the MATCH list.  Its revenues were derived overwhelmingly by the sale of its AdCentral membership programs, which was the source of promoter passive income.  It had no legitimate source of income and was classically structured as a pyramid scheme.  As such, TelexFree was finding it increasingly difficult to secure payment processing services and was being rejected by other financial services providers. In September of 2013 Bank Card Consultants and Yurick had actual knowledge of these illicit facts.

851. Bank Card Consultants contracted to provide TelexFree with the substantial assistance it required to expand and maintain its unlawful enterprise by creating an "International Account" and other affirmative action, including, but not limited to:

    a. processing victim and Scheme transactions that were intended to, and did, enable TelexFree's goal of international expansion;

    b. circumventing card network rules that require merchants to be located in the same geographic jurisdiction as Allied Wallet's acquiring banks; and

    c. enabling TelexFree to obtain processing services using offshore servicers.

852. Bank Card Consultants was brought in to provide TelexFree with an "International Account" for transaction processing that would assist in TelexFree's goal of international expansion and also to increase processing transactions and further expand TelexFree's unlawful enterprise, all part of Merrill's growth strategy which further stripped massive amounts of funds from its victims.

853. From the outset of their relationship, Bank Card Consultants and Yurick were fully aware that TelexFree was a Pyramid Scheme and engaged in fraudulent and suspicious activity. They were also fully aware that TelexFree was struggling to overcome the extreme difficulty in finding a payment processors and banks that would provide it with services, which was precisely why they sought out Bank Card Consultants. Despite knowing this and having actual knowledge that TelexFree was operating an unlawful enterprise, Bank Card Consultants contracted to provide TelexFree with the substantial assistance it required to maintain and expand its unlawful enterprise by creating an "International Account" and other affirmative action, including, but not limited to:

    a. processing victim and Scheme transactions that were intended to, and did, enable

TelexFree's goal of international expansion;

b.  circumventing card network rules that require merchants to be located in the same geographic jurisdiction as Allied Wallet's acquiring banks; and

c.  enabling TelexFree to obtain processing services using offshore servicers.

854.  By email dated September 4, 2013, Yurick provided Merrill with a merchant application and confirmed that Bank Card Consultants would assist TelexFree in obtaining access to "every form of payment available", including "domestic merchant services, international merchant services, echeck/check 21 services/Teledraft and ACH."  Yurick further informed Merrill that he would set up a conference call with a chargeback/fraud company and that he would take care of the fraud issue for them.

855.  In the same September 4, 2013 email, Yurick requested background information on TelexFree, including an explanation of how the system works, copies of its promoter contracts, six months of full business bank statements, one year of processing statements, current P&L, current balance sheet, last two years of business tax returns, and driver's licenses or passports.

856.  Merrill completed the Merchant Application and Agreement with Bank Card Consultants for TelexFree. Wells Fargo Bank, N.A. acted as Bank Card Consultants' Acquiring Bank and was a party to the Merchant Application and Agreement signed by TelexFree and Bank Card Consultants.

857.  Craft, Moreira and Oliveira responded to Yurick's September 4, 2013 email and provided the information sought, including an explanation of TelexFree's business , copies of TelexFree's promoter contracts which was unlawful on its face, six months of full business bank statements, one year of processing statements, current P&L, current balance sheet, last two years

of business tax returns, and driver's licenses or passports of Merrill and Wanzeler.

858.   Bank Card Consultants and Yurick provided this information to Wells Fargo Bank, N.A. It also reviewed TelexFree's financial records, including bank statements, balance and profit and loss sheets, and fraud-to-sale ratio.  It also investigated and reviewed TelexFree's purported product and operations.

859.   TelexFree's Merchant Application with Bank Card Consultants and other information provided Bank Card Consultants with classic signs and knowledge of an unlawful or fraudulent scheme including that:

860.   TelexFree expected to process an average of $10-$15 million each month and that the highest single monthly transaction amount would only be $1,425.

861.   incoming payments to TelexFree were in identical amounts corresponding to the purchase of AdCentral packages rather than the sale of VoIP cards

862.   Moreover, as part of Bank Card Consultant's initial due diligence investigation of TelexFree, Yurick conferred with Merrill in which they discussed TelexFree's revenue and compensation structure, VoIP product, negative press, and inability to secure banking and payment processing services.

863.   Through Yurick's awareness of the negative press on TelexFree's legality and his review of TelexFree's financial records, including bank statements, balance and profit and loss sheets, and fraud-to-sale ratio, as well as TelexFree's purported product and operations, Yurick and Bank Card Consultants gained actual knowledge that TelexFree's operation constituted a fraudulent and unsustainable pyramid scheme in September 2013.

864.   Despite their actual knowledge of TelexFree was an illegal enterprise, Defendant Bank Card Consultants and Yurick approved its merchant application and provided payment

processing and other services to TelexFree and processed high-volume transactions for TelexFree until its bankruptcy filing in April 2014.

865.     Bank Card Consultants and Yurick obtained even more information after September 2013 that established TelexFree was operating an unlawful enterprise. For example, on November 6, 2013, Will Bowman of Bank Card Consultants emailed Merrill requesting chargeback reports from Allied Wallet. These reports demonstrated excessive chargebacks. This information is believed to have been provided to Wells Fargo Bank as well.

866.     During the time that Bank Card Consultants provided services to TelexFree, Yurick was also instrumental in identifying and obtaining bank accounts for TelexFree to utilize. This assistance in obtaining accounts came at critical junctures when other financial institutions were refusing its business and provided the necessary support that allowed TelexFree's unlawful Scheme continue to operate.

867.     Despite their knowledge of TelexFree's unlawful enterprise, suspicious activities and unlawful practices, Bank Card Consultants and Yurick worked with TelexFree founder Merrill and others including TelexFree executive office personnel and its outside consultants when issues arose with acquiring banks who raised concerns about TelexFree's operations.  They cooperatively acted and strategized to ensure that TelexFree's payment processing and financial services continued and that its massive transactional processing related needs were met.

868.     On November 26, 2013, Craft reached out to one of TelexFree's lawyers, Defendant Babener and requested a "comfort letter" regarding TelexFree's compliance with the law to aid in these efforts.

869.     In late November 2013, Yurick worked hand-in-hand with TelexFree's Craft and Moreira to satisfy requests for information from Brian Struzik, a representative from Cyber

Merchant Solutions, another company touting itself as working with high risk merchant accounts and who was working with an underwriter for a bank that set up an offshore TelexFree account to consolidate victims' funds.

870.     Notably, this information provided by TelexFree through Yurick for the bank's use was incomplete and otherwise omitted crucial information.  For instance, it failed to provide: (a) Know Your Customer documents obtained from TelexFree for resellers (such as Bank Card Consultants); (b) the reason for chargebacks; (c) an explanation as to how TelexFree receives traffic; and (d) an explanation as to how TelexFree monitors its affiliates.  Bank Card Consultants and Yurick intentionally concealed this information to further TelexFree's illicit activities.

871.     Despite the foreign bank's request for clarification, Yurick was reluctant to respond, fearing exposure of TelexFree's illicit activities.

872.     Upon information and belief, Bank Card Consultants and Yurick knew that the information sought would reveal TelexFree's pyramid scheme nature.

873.     Rather, by email dated November 22, 2013, Yurick requested that Oliveira provide Struzik with only "back end" access to TelexFree's website, to which Oliveira responded by providing login credentials for TelexFree's internal data to Yurick and Struzik.

874.     On November 26, 2013 Struzik emailed Yurick and expressed the foreign bank's dissatisfaction with the information provided.  At Struzik's suggestion, Yurick, sought to obtain a legal opinion letter stating that TelexFree's business was "not operating outside of local jurisdictions and that the operations are sustainable, legitimate".

875.     After a failed attempt to satisfy the bank with a letter obtained by Merrill from TelexFree's telecommunications services provider, Yurick persisted and eventually was able to

secure another letter, drafted by Babener for Merrill's signature that was carefully tailored to satisfy the bank without revealing that TelexFree in fact was not a legal enterprise.

876.    The letter used by Yurick was intentionally misleading as to TelexFree's legality and upon information and belief, was used by Bank Card Consultants to successfully secure processing services for TelexFree.

877.    Despite actual knowledge, Bank Card Consultants was able to secure the banking service provider who provided services to TelexFree into January of 2014.

878.    Bank Card Consultants, through Yurick and others, set up domestic and offshore accounts for the receipt of funds known to originate from TelexFree's Pyramid Scheme, and to launder money and move it beyond the reach of the United States justice system. Setting up accounts for these purposes does not constitute ordinary payment processing services.  Rather Bank Card Consultants and Yurick substantially assisted TelexFree in maintaining and growing its unlawful enterprise including its ongoing operations, money laundering, movement of funds offshore and beyond the reach of the United States justice system, and the concealment of suspicious activity.

879.    Pursuant to their obligations to perform ongoing customer monitoring of TelexFree, Yurick and Bank Card Consultants discovered additional Red Flags and evidence of suspicious, tortious or unlawful conduct described above and all these and more provided Yurick and Bank Card Consultants with actual knowledge of the illegal nature of TelexFree.

880.    For example, in early December 2013, Yurick's efforts had paid off and he had succeeded in securing multiple merchant accounts for TelexFree.  More specifically, on December 6, 2013 Yurick informed Merrill that one bank was "lighting up 5 MIDS [merchant identification accounts] 3 Offshore 2 Domestic" and that they would be available to run live in a

week. The opening of multiple merchant identification accounts is not standard processing and is a means to conceal fraud.

881.    In December 2013, Babener, in consultation with Garvey Schubert, also drafted an intentionally misleading letter for Merrill's signature that misrepresented TelexFree's legality to supply to Defendant Bank Card Consultants for use in securing an acquiring bank for its payment processing services.  Upon information and belief, Defendant Bank Card Consultants was able to secure an international acquiring bank as a result

882.    Yurick conspired with TelexFree and the lawyers to deceive an international merchant bank, by authoring and instructing James Merrill to sign a statement which read:

> TelexFREE has performed legal due diligence in each of the regions in which it operates and is operating under all federal and local jurisdictional laws.  Under the laws TelexFREE does not commit or operate with any fraudulent practices.

883.    Yurick knew that statement was false but wrongfully and unlawfully instructed Merrill to "just copy and paste [the false assertion] on TelexFree letterhead and sign it." Thus, this act and the others, make clear that Yurick not only aided and abetted – he was a coconspirator.

884.    Merrill provided Yurick with a revised letter drafted by Babener which was, upon information and belief, provided to the bank and substantial amounts of victims' funds were processed through that account as a result of that fraud.

885.    Yurick continued to conspire with Craft, Merrill and Struzik into 2014 to identify and secure other outlets for TelexFree's payment processing needs.

886.    For instance, in his January 6, 2014 email to Craft, Yurick requested further information to support his efforts to set up merchant identification information for three new accounts with an unidentified bank.

887.    Although Yurick and Bank Card Consultants possessed actual knowledge of the suspicious, tortious or illegal nature of TelexFree's business activities at all times it received or held TelexFree funds, it willfully acted in concert with TelexFree to deceptively, unlawfully and wrongfully:

    a.   further the unlawful Pyramid Scheme;

    b.   unfairly, deceptively and unlawfully convert class member funds;

    c.   continue to provide services integral to the TelexFree Pyramid Scheme;

    d.   continue to provide TelexFree with substantial assistance and encouragement essential to their unlawful business enterprise;

    e.   assist TelexFree to evade the United States' justice system as well as its regulatory framework for financial service providers and

    f.   assist TelexFree to evade the United States' justice system.

888.    Through their actions, Yurick and Bank Card Consultants provided substantial assistance and encouragement to TelexFree.  They also substantially assisted TelexFree and its Principals to further achieve their unfair, deceptive and unlawful Scheme that was in violation of M.G.L. c. 93, § 69.

889.    As a result of their services to TelexFree, Yurick and Bank Card Consultants greatly profited, through the deduction of fees from TelexFree victim fund transfers and all to the damage of plaintiffs.

### 10. Priority Payout

890.    Upon information and belief, Priority Payout, Corp. ("Priority Payout") is a payment facilitator, reseller and Independent Sales Organization (ISO) that had an extensive payment processing relationship with Defendant Allied Wallet.

891.    At all times material herein, Thomas Wells was the owner of Priority Payout and

served as the company's authorized representative acting within the scope of his employ in each of its dealings relating to TelexFree's unlawful enterprise. Thomas Wells was integrally involved in all TelexFree/Priority Payout-related actions, decisions, evaluations, and strategies.

892. In its capacity as a third-party agent, commonly known as a "reseller," Priority Payout earned commissions from the transactions of merchants that it brought to and managed with payment processor Defendant Allied Wallet, including TelexFree.

893. The relationship between Priority Payout and Wells and TelexFree involved significant amounts of activity through which they voluntarily submitted to the jurisdiction of the Commonwealth of Massachusetts.

894. The torts at issue here were committed within the Commonwealth of Massachusetts.

895. A substantial part of the events giving rise to Plaintiff's claims occurred in Massachusetts, a substantial portion of the affected interstate trade and commerce addressed within the complaint was carried out in Massachusetts, and Priority Payout and Wells and TelexFree and its co-conspirators transacted business in Massachusetts.

896. Moreover, the activities of Priority Payout and Wells and TelexFree and its co-conspirators were within the flow of, were intended to, and did have a substantial effect on the commerce of the Commonwealth of Massachusetts.

897. The United States District Court for the District of Massachusetts has *in personam* jurisdiction over Priority Payout, Wells and TelexFree because, *inter alia,* Priority Payout and Wells: (a) transacted substantial business in Massachusetts, (b) had substantial contacts with Massachusetts, and (c) was engaged in an illegal scheme and conspiracy that was directed at and had the intended effect of causing injury to persons and entities residing in, located in, or doing

business throughout the Massachusetts.

898.    The volume and activity was such that Priority Payout and Wells subjected themselves to the jurisdiction of the Commonwealth of Massachusetts who has an interest in the matter and controversies addressed through MDL 2566.

899.    Wells and Priority Payout have "a public and well-documented history of engaging in unauthorized debiting on behalf of fraudsters," and partnered for years with Allied Wallet to enable unscrupulous merchants, including TelexFree, to obtain and effect credit card processing services, while knowing such entities were engaged in fraudulent enterprises whose transactions were stripping the victim cardholders of their monies, according to the FTC.

900.    Priority Payout and Wells worked with Defendant Allied Wallet, its owner Khawaja and its officers Diab and Rountree to provide assistance needed to merchants (including TelexFree) to conduct fraudulent schemes, sell illegal products or otherwise engage in deceptive marketing. They did so by providing entry into and usage of the credit and debit card payment system that they were otherwise denied.

901.    Priority Payout, Wells and Allied Wallet had a long history of partnering together to aid and abet fraud. The above-cited FTC lawsuit was based in part on their participation in the TelexFree fraud. The FTC lawsuit resulted in Allied Wallet, Khawaja, Diab and Rountree each being permanently enjoined from certain payment processing-related services and activities and in substantial monetary judgments against them handed down in June and July 2019.

902.    Among other things, Priority Payout and Wells agreed to a contempt judgment against them in excess of $1.8 million (the "2019 FTC Judgment").

903.    The 2019 FTC Judgment was based on the violation by Priority Payout and Wells of an earlier April 2009 court order entered in another FTC action against Wells and his

company Interbill, Ltd. ("Interbill")  (the "2009 Order"), finding them guilty of initiating

unauthorized debits against thousands of consumers' accounts while ignoring strong indications

that their merchant-client was eliciting those payments through fraud.

904.    The court awarded $1.7 million for consumer redress and entered a permanent

injunction enjoining Wells and Interbill from: (a) taking any action to process payments on

behalf of merchant-clients while knowing or consciously avoiding knowing that such merchant-

clients are or are likely to be engaged in deceptive or unfair acts; (b) failing to conduct a

reasonable investigation of prospective merchant-clients and the offers for which they request

payment processing services; and (c) failing to monitor each merchant-client's transactions to

ensure that the merchant-client is not engaged in practices that are deceptive or unfair.  In 2010,

the Ninth Circuit affirmed district court's summary judgment decision.

905.    That 2009 Order further required Wells and Interbill to perform a reasonable

investigation before taking any action in support of providing processing services, including, but

not limited to, (i) obtaining from each prospective client a written certification or documents

stating the nature of the client's business, describing the nature of the goods or services for

which the client seeks payment processing services; (ii) obtaining and verifying trade and bank

references; and (iii) obtaining and reviewing all marketing materials, promotional materials,

websites, and other advertising used or intended to be used by the prospective client to market its

goods or services to consumers.

906.    The 2009 Order also required Interbill and Wells to

immediately conduct a reasonable investigation of the cause for any chargeback
or return rate that exceeds two and one-half percent (2.5%). In the case of an
investigation of any client triggered by a chargeback or return rate in excess of
two and one-half percent (2.5%), defendants shall immediately suspend payment
processing services, unless, following a reasonable investigation, defendants
determine, based on clear and convincing evidence, that the client's business

practices were not, or are no longer, deceptive, unfair, or abusive.

907.    Priority Payout's and Well's relationship with TelexFree began in approximately December 2013. Defendant Merrill and Allied Wallet's Khawaja and Diab had an email exchange in which they discussed the excessive fraud notifications they were receiving from a bank relating to TelexFree's account with Allied Wallet and ways to move forward without volume restrictions on Allied Wallet's TelexFree processing account.

908.    Priority Payout and Thomas Wells had actual knowledge of TelexFree's unlawful enterprise from the date it first began to service TelexFree during early January 2014 through April 2014, when TelexFree declared bankruptcy. During this time, Priority Payout and the processing companies it worked with collected and delivered over $80 million in illicit funds to TelexFree accounts.

909.    Subsequent to accepting TelexFree as a merchant client, Priority Payout and Wells provided TelexFree with financial services and the other forms of substantial assistance it required to maintain and grow its business up until its bankruptcy filing in April 2014.

910.    Priority Payout and Wells were engaged by TelexFree to secure and manage domestic and international credit card processing for TelexFree at a time when TelexFree was finding it virtually impossible to place its pay processing needs.  Other payment processors and banks would not accept its business and were turning TelexFree away due to its activities.

911.    At a minimum, between January 15, 2014 and April 22, 2014, according to Wells, Allied Wallet attempted to process over $150 million for TelexFree. The processing was spread over at least two processing accounts.  Upon information and belief, one account was an account Priority Payout worked with Allied Wallet to open.

912.    In all, Allied Wallet processed $86,980,081.00 in consumers' payments for

TelexFree, net of chargebacks and refunds.

913.    As established and sophisticated financial services providers, Priority Payout, as well as each pay processor and bank it worked with, had a plethora of information available to it regarding TelexFree, including, *inter alia*, TelexFree's established illegality and shuttering in Brazil; TelexFree's prior placement on the MATCH list; TelexFree's excessive level of chargebacks and other suspicious banking activities; TelexFree's standard form contract which was unlawful on its face; and the fact and supporting details that other banks had refused or terminated banking accounts or relationships with TelexFree.

914.    Moreover, in accordance with standard industry practice, following review of the foregoing information, Priority Payout/Wells obtained, reviewed, investigated and then provided the following information to its acquiring bank:

a.  TelexFree's business model and compensation plan;

b.  TelexFree's payment processing, transaction, and banking history;

c.  TelexFree's purported VoIP product and AdCentral promoter packages, and corresponding prices;

d.  TelexFree's website;

e.  TelexFree's, Carlos Wanzeler's, and James Merrill's credit scores;

f.  TelexFree's tax returns for at least the previous two (2) years;

g.  TelexFree's Profit & Loss Statements for at least the previous two (2) years;

h.  TelexFree's balance sheets;

i.  TelexFree's average transaction amount (or "average ticket");

j.  TelexFree's highest anticipated transaction amount (or "high ticket");

k.  TelexFree's anticipated monthly processing volume;

l.   TelexFree's annual and monthly dollar sales volume; and

m.   Information available online regarding TelexFree.

915.   Immediately after TelexFree reached out to Priority Payout and Wells in January 2014, they began to cooperatively carry out unlawful acts with Allied Wallet and others that were intended to and did provide substantial assistance to TelexFree's unlawful operations.

916.   As stated in the FTC complaint in the recent case against Allied Wallet:

Defendants [Allied Wallet, Khawaja, Diab and Rountree] have submitted merchant applications containing false information, and actively worked with their reseller agents, Thomas Wells and his company Priority Payout, to circumvent card network rules and transaction monitoring designed to prevent fraud. Defendants were not deterred by a 2009 federal court ruling in the District of Nevada, finding Wells liable for knowingly debiting bank accounts of numerous fraud victims; to the contrary, they continued to accept numerous referrals of unscrupulous merchant-clients from Wells and benefited from the fraud perpetrated by those clients.

917.   The financial services provided by and obtained through Priority Payout, Wells and the others they collaborated with enabled TelexFree to continue to procure credit card and debit card payments from victims. Priority Payout and Wells otherwise helped TelexFree to maintain and grow its unlawful operation and move funds beyond the reach if the United States justice system and launder money.

918.   Priority Payout and Wells, in cooperation and collaboration with Allied Wallet and other Defendants, enabled TelexFree to conceal its fraudulent activities from the putative class. For example, they used fake foreign shell companies to establish international accounts in TelexFree's or related entities' names.

919.   Notwithstanding the above court order, TelexFree's account with Allied Wallet generated an extremely high rate of chargebacks, including one month in which refunds and chargebacks combined reached 10%.

920.    While the 2008 case was pending, Wells created Defendant Priority Payout as a successor to Interbill and continued soliciting merchants for Allied Wallet via Priority Payout.

921.    In agreeing to the 2019 FTC Judgment, Priority Payout and Wells admitted that they worked as a reseller of payment processing services for Allied Wallet from at least 2005 through the end of 2017.

922.    Priority Payout and Wells further admitted that the FTC had sufficient evidence to establish that they violated the 2009 Order, including that they facilitated processing of consumer payments for merchants while knowing or consciously avoiding knowing that the merchants' business practices were, or were likely to be, deceptive or unfair.

923.    Priority Payout's and Wells' continued financial servicing of multiple merchants engaged in fraudulent activities, including TelexFree, formed the basis of the 2019 FTC Judgment.

924.    Priority Payout's and Wells' improper servicing as relates to TelexFree was the subject of the FTC's 2019 action against Allied Wallet.

925.    In particular, Priority Payout worked hand-in-hand with Allied Wallet to ensure TelexFree's payment processing needs were met during the time period from January 2014 through its April 2014 demise through frequent and coordinated interactions between Priority Payout's Wells and Allied Wallet's Khawaja.

926.    Wells collaborated with Amy Rountree, Allied Wallet's Vice President of Operations, to create and utilize TelexFree U.K. based shell corporations for the unlawful purposes referenced herein.  Wells and Roundtree frequently so collaborated regarding merchant customers of Allied Wallet and Priority Payout.

927.    As described above, Defendant Allied Wallet took active steps to circumvent the

restrictions upon TelexFree's "offshore" accounts as a result of the high chargeback rates, and Priority Payout became its partner in those continued unlawful and deceptive actions.

928.    Without the substantial assistance provided by Priority Payout and Wells, TelexFree would not have been able to carry out the high volume and high dollar transactions that pilfered the class members funds or so successfully move money offshore.

929.    As evidenced in late February 2014 emails, Wells worked with TelexFree's Home Office manager Andrea Moreira related to TelexFree's access to its international merchant accounts and the "multiple" TelexFree merchant accounts that Wells was obtaining and/or managing for TelexFree.

930.    The purpose of the multiple accounts was to conceal by spreading out and diluting TelexFree-related Red Flags and suspicious banking transactions.  As described above, the opening of additional merchant accounts is a ruse utilized by unscrupulous financial services providers, such as Priority Payout and Wells (and the other Payment Processing and Bank Defendants), to artificially reduce the chargebacks associated with any single account/merchant and to artificially manipulate and reduce the merchants' chargeback ratios.  As to TelexFree's offshore banking, Priority Payout and Wells utilized that unlawful and deceptive ruse successfully.

931.    A February 25, 2014 email evidences Wells' knowledge of and deep involvement in TelexFree's unlawful processing strategies.  TelexFree's Andrea Moreira advised that she did not know who was processing the increased transactions for TelexFree of which Defendant Vantage was not a part.  Wells immediately informed her that it was (Priority Payout/Wells' partner in crime) Allied Wallet.

932.    By February 25, 2014, Priority Payout and Wells were managing, at a minimum

four (4) TelexFree four merchant accounts and otherwise satisfying a large amount of processing needs.  Three merchant accounts were maintained by Allied Wallet:  1) one placed by Vantage that was receiving "small" amounts of transactions of victims' monies, estimated at $700,000 per month, 2) another (in the name of AWTELEXFREE 2) that was taking the balance of the then-current transactions, and 3) another new account (named AW TELEXFREE 3) that was set up by Wells at Merrill's request and was live but had not received transactions yet.

933.    In addition, Priority Payout/Wells set up another merchant identification through IPS, doing business as I-Payout, which was also awaiting instruction.  This assistance further enabled TelexFree's unlawful enterprise to pilfer victims' monies.

934.    TelexFree Founder James Merrill defined Priority Payout/Wells as an "integral part of our arrangement" and further established the assistance offered by Priority Payout/Wells as substantial in a letter to IPS dated January 14, 2014.  Founder Merrill went on to authorize "Wells of Priority Payout Corp. to organize and manage [TelexFree's] credit card processing controls in concert with International Payout Systems, Inc. and further to represent TelexFree's Merchant Relationship with IPS/ARGUS effective immediately."

935.    As TelexFree became subject to increased scrutiny in the United States in February 2014, Priority Payout and Wells quickly stepped up to provide substantial assistance to TelexFree's unlawful enterprise by becoming an integral part of the team assembled to secure foreign banking sources beyond the reach of the United States justice system and to otherwise act to secret or move the unlawfully obtained funds TelexFree pilfered from the victim members of the putative class.

936.    For example, an email exchange extending from February 25, 2014 to March 3, 2014, which at various times included Wells, James Merrill, Carlos Wanzeler, Moreira, Craft,

Colabella (PwC), Puzey (PwC), Babener, Tober (Garvey Schubert), and/or Sandford (Garvey Schubert), memorializes Wells' involvement.  The general subject of the email chain was the establishment of a foreign entity for TelexFree.  Locations mentioned included the Cayman Islands (TelexFree International, Ltd.).  The opening of an additional new bank account was also discussed.

937.     TelexFree International, Ltd. was at all times intended to be and was an offshore depository of TelexFree's unlawfully gained funds.  It was created to move victim funds beyond the reach of United States governmental enforcement agencies and the civil justice system.

938.     At the time Wells acted, he did so as an authorized agent and representative of Priority Payouts and within his scope of authorization.  At all times he possessed actual knowledge that TelexFree was an unlawful Pyramid Scheme.  Priority Payout and Wells provided assistance that was substantially needed to successfully conclude the transactions that flowed through TelexFree and that kept TelexFree's unlawful pyramid enterprise going.

## C.  LICENSED PROFESSIONALS

939.     During the summer of 2013, TelexFree's Founders, Executive Officers, and Attorney Nehra determined that TelexFree would require the help of outside professionals to sustain its scheme and to head off the certain collapse of TelexFree if it suffered an Ympactus-like shut down by United States authorities. TelexFree was bringing in millions of dollars a month and they acknowledged that they needed the strategic input and planning of professionals to shelter, launder, and insulate their continuously accumulating ill-gotten gains from United States' law enforcement. TelexFree would have collapsed within months if its banking or payment processing services were interrupted or shut off and an Ympactus-like government shutdown would have put an end to their unlawful enterprise.

940.     To address these issues, Merrill and Wanzeler eventually contacted Defendant

Jeffrey A. Babener, an attorney and self-described expert in Multi-Level Marketing ("MLM") on or about August 1, 2013. Babener immediately set to assembling a group of lawyers, accountants and marketers with whom he worked previously and who also held themselves out MLM experts. The others were: Michael Sheffield, Garvin DeShazer, Davene Peruzzini, Debbie Stenmoe, and Kenneth Lind of The Sheffield Group, a consulting firm; Robert Weaver, Samuel Kauffman, Gary Tober, and Sara Sandford of Garvey Schubert, a law firm; and Richard Colabella and Jerry Puzey of PwC, an accounting firm. These Defendants worked together with Nehra, Wanzeler and Merrill and others to perpetuate the TelexFree fraud, including laundering and offshoring TelexFree's ill-gotten gains.

941.    Based upon their review of documents produced by TelexFree, other investigative efforts, their specialized education training and experience, and intra- team communications, each Babener and Garvey Schubert individual Defendant gained actual knowledge that TelexFree was a pyramid/Ponzi Scheme and that:

a.   TelexFree utilized the same "program/business model" that its related Brazilian company used before its shut down;

b.   The terms of TelexFree's standard form contract violated Massachusetts law;

c.   the content of TelexFree's website or other marketing materials was violative of the law; and

d.   new victims, and existing victims, were continuing to be defrauded of the funds they were investing in TelexFree.

942.    Babener's team concluded TelexFree <u>must</u> restructure its unlawful compensation plan – i.e., its promises of guaranteed returns on a passive investment -- to make it legal. They never did so. Rather, they simply aided and abetted the continuation of the fraud.

943.    At all relevant times during the Fall of 2013, Babener, Garvey Schubert, The Sheffield Group and PwC were acutely aware of the closing circle of legal investigations in both the United States and worldwide.  The team's focus was to stave off the investigations as long as possible so the fraud could continue and they could implement a plan to remove as much of TelexFree's illicit gains as possible from the reach of the United States legal system.

944.    The assistance and strategies provided by Babener, The Sheffield Group, Garvey Schubert, and PwC included:

a.  Finding and securing banking and payment processing outlets to continue and expand operations

b.  Assisting with the structuring of the withdrawal and the subsequent placement of funds as Banks closed their accounts, including approximately $20 million from TD Bank accounts;

c.  Assisting with TelexFree's business issues, including authorizing continued training at Super Saturday events, assisting with maintaining management; providing advice and introductions and offering materials for marketing purposes; investigating and advising on other outlets for VoIP product; and assisting with immigration issues for TelexFree top promoters

d.  Suborning the submission of two sets of cooked books to the SOC; and

e.  advising TelexFree on how to avoid detection from state and federal agencies, and to maintain the appearance of legality, and conceal and encourage others to conceal TelexFree's activities;

945.    As a result of the Professional Defendants actions, TelexFree not only continued its fraudulent activities after August 2013, it expanded exponentially. In addition, they assisted to

successfully launder and place victims' funds into the coffers of TelexFree's Founders and related entities and individuals as well as offshore beyond the reach of the U.S. civil justice system and law enforcement authorities.  The Licensed Professional Defendants worked together for nearly nine months to avoid a disruption in TelexFree's ongoing operations and as a direct and proximate result the putative class suffered ascertainable – and massive - economic loss.

946.    The Licensed Professional Defendants attended meetings at TelexFree's headquarters in Massachusetts to discuss TelexFree's product, business model, and operations, participated in teleconferences or directed that tortious actions be undertaken in the Commonwealth of Massachusetts with TelexFree insiders and others to discuss TelexFree's product, business model, and operations. The Attorney Defendants had access to and input into TelexFree's documents, including the contracts entered into between TelexFree and its victims.

947.    Each Licensed Professional Defendant otherwise negligently, recklessly, willfully, knowingly, unfairly or deceptively counseled and advised TelexFree to participate in the evasion of federal and state laws.

## 1. The Nehra Defendants

948.    Nehra drew upon his prior experience to aid, abet and play a substantial and integral part in TelexFree's unlawful, unfair and deceptive acts and practices. At all times relevant, there was no clear distinction between Nehra, Nehra Law Firm, and Nehra and Waak Law Firm with regard to the legal services that they provided to TelexFree.

949.    Nehra was retained by TelexFree in early 2013

950.    Nehra and his affiliates – the Nehra and Waak Law Firm, the Nehra Law Firm, the Waak Law Firm, and Richard Waak, were lawyers with experience in pyramid and unlawful MLM schemes.

951.    On their website, Attorney Nehra and Attorney Waak claim to specialize in

counseling "domestic and foreign companies operating MLM (multi-level marketing) businesses in the United States"[2] boasting that "[n]o Company that retained this firm BEFORE LAUNCH has been shut down by a regulator."[3]  (emphasis in original).

952.    However, Nehra was notorious for having represented or advised ventures that had been shuttered by state or federal authorities as fraudulent pyramid or Ponzi schemes, including Zeek Rewards and AdSurfDaily.  For example, during the investigation of the AdSurfDaily scheme, Attorney Nehra filed an affidavit in court representing that AdSurfDaily was "not a Ponzi Scheme." AdSurfDaily's operations were shut down as a Ponzi scheme in 2010. Zeek Rewards' operations were shut down as an unlawful pyramid and Ponzi scheme in August 2012.

### a.    *Nehra Knew That TelexFree Was a Pyramid/Ponzi Scheme in or about Spring 2013*

953.    Nehra advised TelexFree that its business model was unlawful during the Spring of 2013. Despite this knowledge, the Nehra Defendants worked with TelexFree until the bankruptcy filing in April 2014.

954.    Nehra had actual knowledge of the ruling of the Brazilian Court, knowledge of and access to TelexFree's United States operations and its composition, and knowledge of United States law.

### b.    *Nehra Provided Substantial Assistance to TelexFree Until April 2014*

955.    Nehra was involved in all aspects of TelexFree's scheme from the drafting of TelexFree's contracts with promoters through to marketing and the response to governmental investigations into TelexFree's activities.

956.    Nehra attended meetings at TelexFree's headquarters in Massachusetts to discuss TelexFree's product, business model, and operations. Nehra also participated in teleconferences

with the TelexFree insiders and others to discuss TelexFree's product, business model, and operations.

957.    Nehra had access to TelexFree's documents, including the contracts entered into between TelexFree and its victims. On July 10, James Merrill sent a proposed change to TelexFree's compensation plan to Nehra for advice.

958.    Upon the advice of the Nehra and Waak attorneys, TelexFree referred to the members of the putative class as "Associates," "Members," and "Promoters." Nehra contributed to the language in the TelexFree Pre-March 9 Contract at Section 2.6.5 (m) that mandated that Promoters are not to use the term "investment" regarding the registration costs. The Putative Class are "Investors" under Massachusetts state securities law. Armed with the knowledge of what constitutes violations of United States securities law, Nehra acted to assist TelexFree to hide its Pyramid Scheme activity with obfuscating phraseology.

959.    Nehra assured Promoters on internet postings, in writing, and in person at marketing events that, in his professional opinion, the TelexFree business model was legitimate despite having actual knowledge that TelexFree's AdCentral marketing packages were unlawful.

960.    Nehra's onsite and recorded marketing statements and opinions provided legal representations and constituted legal advice including:

    a.  that he had vetted TelexFree and gave his "blessing" to its business model and operation and determined it to be legal;

    b.  that TelexFree's operations in the United States were legitimate and lawful;

    c.  that the shutdown in Brazil would not affect TelexFree's operations in the United States;

    d.  "It is legally designed . . . you are on very solid legal ground," and that

TelexFree's operations had been "vetted by the Nehra and Waak law firm."

961.    Nehra also participated in TelexFree's in-person marketing activities for Promoters. For example, in July 2013, just after TelexFree's Brazilian operation had been shut down by authorities, TelexFree hosted its first United States-based "Extravaganza" in Newport Beach, California. It was intended to provide fodder for marketing the Pyramid scheme and to otherwise promote the unlawful enterprise.

962.    The "Extravaganza" was organized by Zeek Rewards' key spokesperson, authorized representative and high-profile pitchman Thomas More.[1]  At the time More organized the Extravaganza (also called a  "Super Weekend"), he was a named defendant in a Zeek Rewards Ponzi scheme-related lawsuit.[2]  Defendants Merrill, Katia and Carlos Wanzeler, Moreira, Mitchell, Telecom Logic, OPT 3, Borromei, Paola, Labriola, and Nehra.

963.    Nehra appeared on stage at the Extravaganza and spoke at length. He reassured the attendees of the legality and legitimacy of TelexFree's operations in the United States, stating "It is legally designed . . . you are on very solid legal ground," and that TelexFree's operations had been "vetted by the Nehra and Waak law firm."

964.     TelexFree, along with Nehra, developed a presentation to minimize and post Brazilian shut down marketing package. Nehra knew this and encouraged it. On August 2, 2013 Nehra again gave his "legal blessing" to TelexFree in another internet video including the statement "the special ingredient is that you have real product".

965.    In company videos, Attorney Nehra failed, refused and neglected to advise prospective and current TelexFree Promoters that their participation in TelexFree presented a risk, including the risk of participating in an unlawful scheme, or that his advice was, in fact, against their own interests.

966.    Attorney Nehra's actions fell below the standards of professional attorneys nationally that advise corporations in federal and state security law matters.

967.    TelexFree recognized the value Promoters placed on having attorney support for its program. On January 9, 2013, James Merrill sent an email to Ryan Mitchell/Telecom Logic advising that Nehra gave participants comfort "that our business model is legally sound. We used his bio on our Website….".

968.    Nehra was also contacted directly by Promoters and potential promoters. On November 8, 2013, Attorney Nehra provided assurances to a TelexFree promoter who questioned the legality of TelexFree. Nehra continued to provide TelexFree victims with his legal opinion that TelexFree was a lawful enterprise and otherwise continue to serve as a coconspirator in that regard.

969.    On July 30, 2013 Nehra sent a marketing email to James Merrill.

970.    Nehra was actively involved in TelexFree's responses to governmental and regulatory investigations.

971.    On April 23, 2013 Gerald Nehra and Andrea Moreira sent information to the COMSOC in response to subpoenas issued by the Massachusetts' Securities Division. The information provided was false and misleading.

972.    On January 22, Nehra and Nehra and Waak Law Firm participated in the defense/response of TelexFree to a second investigation by the COMSOC.

973.    On January 26, and 28, 2020 Nehra was involved in planning to limit the information that TelexFree would provide the COMSOC. Others included Craft, James Merrill and PWC's Puzey and Colabella and Babener.

974.    On January 30, 2020 Nehra emailed the group to advise them that the first set of

documents they provided to the COMSOC are no longer retrievable. Eventually, TelexFree submitted a second set of "cooked books" with the help of this group.

975.   From February 9 - 20, 2020 Nehra participated in the defense of the appearance of James Merrill and Carlos Wanzeler before the COMSOC including the preparation of the "goals"" of the sworn testimony with Attorney Babener and the Garvey Schubert counsel.

976.   Nehra also assisted TelexFree to respond to inquiries by Pay Processors and ISO'S. During late November/early December of 2013 James Merrill asked Nehra to write a letter to Bank Card Consultants regarding TelexFree's compliance with the law.

977.   In sum, despite knowing that TelexFree was a Pyramid/Ponzi scheme, Defendant Nehra gave substantial assistance to TelexFree's unlawful enterprise for over a full year and through to at least the Spring of 2014 by:

    a.   negligently or willfully misrepresented the legality and sustainability of TelexFree's operations to the detriment of Promoters, and received fees from TelexFree;

    b.   negligently or willfully obscured the illegal nature of TelexFree's Scheme by the use of manipulative language, advising TelexFree that using the term "investment" must be avoided;

    c.   failing to exercise proper due diligence in investigating the legality of TelexFree's operations;

    d.   encouraging and advising individuals to become and remain Promoters to their detriment, and falsely and knowingly assuring them of TelexFree's legality and legitimacy;

    e.   allowing his name, experience, and likeness to be used by TelexFree in marketing

materials designed to recruit and retain members e.g., online postings, in-person meetings, company "super weekends" and "extravaganzas," brochures, and videos;

    f.    gave speeches to the putative class at TelexFree's recruiting and retention "extravaganzas," "super weekends," and other events proclaiming with an air of authority that TelexFree's product and model was legitimate and lawful;

    g.    informed the putative class that the Brazilian government's shutdown of TelexFree's activities in Brazil would not affect TelexFree's operations in the United States;

    h.    informed the putative class that TelexFree "is legally designed . . . you are on very solid legal ground," and that TelexFree's operation had been "vetted" and bless[ed]" by the Attorney Defendants; and

    i.    otherwise encouraged the putative class to become or remain Promoters by providing mass marketing assurances directed at members of the putative class on website postings and writings that TelexFree was legitimate and lawful.

## 2. The Babener Defendants

978.    As TelexFree's troubles continued to mount, during or about late July/early August 2013, Defendant Nehra recommended that TelexFree retain self-proclaimed MLM specialist Jeffrey Babener and his law firm Babener and Associates.

979.    At all times relevant, there was no clear distinction between Babener and his law firm, and with regard to the legal services that he provided to TelexFree. Babener drew upon his prior experience to aid, abet and play a substantial and integral part in TelexFree's unlawful, unfair and deceptive acts and practices during times relevant to this complaint.

### a.  *Babener Knew That TelexFree Was a Pyramid/Ponzi Scheme From the Very Beginning*

980.    From the very beginning of his representation, Babener recognized that TelexFree was a Pyramid/Ponzi scheme.

981.    Babener followed up after his initial contact with Merrill on or about August 1, 2013 with a letter expressing his hope for the "long-term ongoing representation" of TelexFree and making plain that his intended engagement was as not only a legal resource but also as a comprehensive business consultant.  Babener stated in his letter that "[o]ur hope is to grow with the company over time and to help both legally and as an important business resource in the U.S., foreign markets and the network marketing industry."

982.    Merrill emailed Babener on or about August 12, 2013, confirming that Merrill had sent a requested $6,000 wire transfer as an initial retainer fee and providing information about the TelexFree program, including the TelexFree URL, VoIP terms and conditions, a PowerPoint on TelexFree, the July 2013 compensation plan outline, and the TelexFree contract.

983.    On August 15, 2013, after reviewing these documents, including TelexFree's standard form contract, Babener emailed Merrill and Wanzeler advising them that he agreed that the United States operation had the same Ponzi scheme problems as it did in Brazil.[1]

984.    In a September 30, 2013 email, Babener bluntly stated to Merrill, "Your primary challenge: your historical revenue stream has been dominated by distributor payments rather than product/service sales revenue. You will not survive legally (civil or criminal) or from a business standpoint, unless there is a dramatic change...". Garvey Schubert lawyers Kauffman, Sandford and Tober were copied on this email.

985.    On or about October 1, 2013 Babener and The Sheffield Group were copied on an email from Merrill to Wanzeler recognizing TelexFree's ongoing unlawful and criminal

enterprise:

> We are asking people to risk $1425 do a little bit of ad placement work (they
> don't even do it they have a company do it for them) all they make is $100 a week
> selling product back to us. We reward them for no effort. We face business failure
> and or Jail.

### b. *Babener Provided Substantial Assistance to TelexFree Through April 2014*

986.     On August 12, 2013, Babener and his law firm Babener and Associates were

formally retained by TelexFree. Babener quickly became TelexFree's "unofficial CEO" until

TelexFree's demise in April 2014. Indeed, Babener referred to himself as TelexFree's "point

person" and oversaw and coordinated ongoing contacts between team members Garvey

Schubert, The Sheffield Group, PWC and TelexFree, including James Merrill.

987.     As detailed above, Babener aided and abetted and acted as a coconspirator by

bringing in and working with  Garvey Schubert and The Sheffield Group, whom he had worked

with on MLM projects, as part of the team that would not only be a legal resource, but also a

comprehensive business consultancy for TelexFree.

988.     Babener's work with TelexFree ranged from reviewing documents, leveraging his

contacts to aid TelexFree in its scheme, and strategizing in how to respond and shield TelexFree

from regulators.

989.     On or about August 24, 2013, Merrill informed Babener that TelexFree

was "getting a hard time from both our credit card processing banks & our commission pay out

banks."  On or about August 29, 2013, Merrill again raised TelexFree's issues with banks and

payment processors and pled for help because of TelexFree's inability to secure them due to its

fraud and chargeback issues.

990.     Babener emailed Merrill and Sheffield indicating that he was willing to connect

Merrill with payment processor companies that he knew. Babener also suggested that Sheffield would have some ideas.

991.    As early as September 6, 2013, Babener directed Merrill to provide false information on TelexFree's current business in a letter Merrill was being asked to send to a top TelexFree promoter (Zaid Thweib) in Jordan.  Thweib needed the letter to convince Jordanian banks (Societe General Bank and Housing Bank) to accept funds into the accounts of TelexFree promoters. Upon information and belief, the banks accepted those deposits as a result of the Babener-crafted letter.

992.    While knowing TelexFree was operating as a pyramid scheme with no true product, Babener told Merrill not to hold TelexFree out as an advertising company in the letter, but as "a direct selling company that markets consumer products and services through a sales force of independent distributors."

993.    Upon information and belief, the banks accepted those deposits as a result of the Babener-crafted letter.

994.    Again, on or about September 10, 2013, Merrill sought Babener's assistance because Allied Wallet, a payment processor company known in the industry to assist fraud was "the only Visa processor we have now," needed documentation to obtain a UK address and registration number for TelexFree from Regus, a virtual office supplier.

995.    Basic credit card network rules require a merchant to be located in the same geographic jurisdiction as the acquiring bank and define a merchant's location as the country of its principal place of business (generally its headquarters). TelexFree therefore needed a U.K. presence to be able to use Allied Wallet.

996.    Babener introduced TelexFree to two attorneys with the Lawrence Graham firm

in London, England. Using his 25-year relationship with Lawrence Graham, Babener introduced TelexFree and its CEO Jim Merrill as his "new client" and falsely described TelexFree: "[t]he company has been in business for a couple years, operating in the U.S. and Brazil.  It offers a service to allow customers to call a flat rate to foreign countries.  It intends to expand its line."  He never mentioned that he had determined TelexFree was at that very moment operating a pyramid scheme and that the services the Lawrence Graham firm would provide would be perpetuating that daily scheme by securing a payment processing outlet.

997.     Jonathan Riley, one of the attorneys introduced by Babener, explained what documents to provide for the bank.  Upon information and belief, Allied Wallet was able to satisfy the documentation needs and to give TelexFree access to the credit card network and processed millions of dollars for TelexFree.

998.     As described in more detail below, in November 2013, Babener and Garvey Schubert assisted TelexFree to keep millions from its TD Bank accounts banked upon its closure for fraud issues.  They endorsed a plan to obtain banking services and avoid regulatory scrutiny by breaking up a check for over $18 million into pieces to avoid scrutiny and to launder those funds – i.e., structuring. They advised Merrill to ask TD Bank to issue several smaller checks for deposit in different financial institutions and TD Bank agreed.

999.     With respect to payment processor Bank Card Consultants' efforts to secure a sponsoring bank for processing, on November 26, 2013, Craft reached out to Babener on behalf of Merrill and requested a "comfort letter" regarding TelexFree's compliance with the law.  Babener initially refused to write such a letter, stating that they do not write them as a policy and suggested that TelexFree ask Nehra instead." Garvey Schubert was also involved in addressing this need.

1000.   Babener also offered another solution, an introduction to his colleague, Scott Fitzpatrick, of Pivotal Payments, one of the largest MLM processors.  Babener touted his influence with that processor, stating "They just finished at my request, approval for Zinzino, a Swedish coffee and nutrition company we are bringing to the US."  Craft replied accepting the offered introduction and handing it off to Merrill.

1001.   Despite his initial refusal to write a letter for his own signature and thereby directly implicate himself, Babener nevertheless later found a way around the issue:  drafting a letter for Merrill's signature that sidestepped the issue of TelexFree's legality.

1002.   On or about December 8, 2013, in reviewing a letter to supply to a prospective banking services provider drafted by Merrill, Babener stated categorically in an email to Merrill: "You have no basis to make the following statement: Under these laws TelexFree does not commit or operate with any fraudulent practices." Wanzeler and Nancy Kikes were copied on the email.

1003.   Despite the fact that by December 8, 2013, Babener had repeatedly informed TelexFree that they were not in "legal compliance," but rather were operating a pyramid/Ponzi scheme, Babener in that same email drafted an alternative, and intentionally misleading, letter for Merrill's signature including the line: "we are confident that we are in legal compliance as to the offering and delivery of our services." Babener copied and discussed this with Garvey Schubert's Sandford, Tober, and Kauffman on a later email in the chain so that "they understand [his] thoughts on direction.

1004.   Babener also gave specific instructions to Merrill on how to overcome trademark issues that were preventing TelexFree from forming a company in Florida. Babener was instrumental in setting up TelexFree Financial, Inc.    Upon information and belief, only after

and because of the trademark issues successfully resolved by Babener, was TelexFree Financial, Inc able to obtain related banking services which became its primary operating account.

1005.   Babener, Colabella, Puzey, Sanford, and Tober were aware that, through payment processor Thomas Wells and others, TelexFree had established multiple Merchant IDs ("MIDs") with its payment processors in order to disguise its extremely high payment processing chargeback rate. This fraudulent use of multiple MIDs was discussed in an email exchange in late February and early March 2014, which included Craft, Wells, Moreira, Merrill, Wanzeler, Colabella, Puzey, Sanford, and Tober.

1006.   Babener also helped Merrill identify other outlets to place money TelexFree was receiving from victims. For example, on or about November 8, 2013, Babener introduced TelexFree to Neil Kimmelfield and Jeremy Babener—defendant Babener's son—of Lane Powell to analyze a potential TelexFree investment of $2,500,000 in a wind farm. Settled Defendant Craft was President and Chief Financial Officer of the wind farm company. Upon information and belief, that investment was made.  In that same email, Babener noted, "As you are exploring other banking relationships, you might visit this subject with Neil and Jeremy as Lane Powell has a major banking practice and represents several leading banks... And might have a suggestion."

1007.   In January and February of 2014, Babener was involved in aspects of the unethical and unlawful conduct relating to the crafting of misleading responses and a cooked set of books to the Massachusetts SOC.

1008.   On or about February 9, 2014, Babener outlined his goals for Merrill and Wanzeler's deposition testimony before the Massachusetts SOC. Despite knowing that the changes to TelexFree had been driven by the issues in Brazil, bank accounts being closed, and Babener's own advice, Babener encouraged a false narrative that:

> last summer they [Merrill and Wanzeler] realized the potential for this global
> VoIP business and decided to put into motion both enhanced product offerings,
> but also to [sic] dramatically upgrade the marketing program to implement far
> more customer acquisition and adoption of significant consumer protection rules.

Weaver, Merrill, Wanzeler, Nancy Kikes, Nehra, and Berthiaume (Greenberg Traurig) were

copied on the email.

1009.   Knowing that the Massachusetts Securities Division was investigating TelexFree,

on or about February 9, 2014, Babener once again advised TelexFree to get its assets outside

Massachusetts' jurisdiction.  Babener forwarded the email to Robert Weaver and Sara Sandford

later the same day, noting "Just FYI":

> As to Mass, you, in a deliberate fashion, and under guidance of Weaver, need to
> get out of Mass as soon as you can. **This means, getting assets beyond the
> control of Mass.** It means getting your marketing program out of Mass. It means
> an analysis that hopefully shows historically as small activity in Mass as possible.
> It probably ultimately means closing Mass, shifting all US and global activity to
> another state or international sales to an international entity. It may mean you and
> Carlos and your assets moving outside if [sic] Mass if this can be done in a way
> that doesn't trigger action by Mass.

1010.   On or about March 2, 2014, Babener went further and suggested that TelexFree

have U.S. distributors, as well as international distributors, sign up with an offshore entity: "As

to US offering to US distributors, although unusual, you may wish to have US distributors sign

up with an international MLM, such as Cayman, rather than a US entity. Other leading

companies don't do this, but you may wish to consider this option for the US, at least in the short

term." (emphasis supplied). Craft, Colabella, Puzey, Nancy Kikes, Wanzeler, Merrill, Tober,

Sandford, and Borromei were copied on the email.

1011.   In March 2014, Babener acted within the Commonwealth of Massachusetts to

further the goals of the Co-conspirators and TelexFree's unlawful empire by representing James

Merrill and Carlos Wanzeler in their depositions by the Massachusetts Securities Division.

During that testimony, TelexFree's cooked books were addressed.

1012.   Babener also supported TelexFree's marketing activities and outreach to new and existing members.

1013.   In October 2013, Babener approved TelexFree's Super Saturday trainings for TelexFree promoters in Florida. In an October 4, 2013 email from Babener to Merrill, which included the team of Mike Sheffield, Garvin Deshazer, Davene Peruzzini, Debbie Stenmoe and Jay Borromei, Babener acknowledged to Merrill that "You are obviously at risk under state and federal legislation so long as you offer the current program."

1014.   Nevertheless, he specifically advised Merrill he could go forward with TelexFree's Super Saturday training meetings, stating that "Florida is historically an aggressive enforcement state on pyramiding (where there is insufficient retailing ratios), but we have not seen major action in quite some time and I assume you have no evidence that you are a subject of interest."  Merrill had described the training sessions to Babener earlier that day as "[w]e do everything like they have done in Brazil."

1015.   Babener and The Sheffield Group also provided advice, introductions, and materials for TelexFree's marketing. On or about October 9, 2013, Merrill cited Babener's advice as the reason not to respond to negative news articles: "In the past Jeff has suggested we don't respond this this blog. If we feed the blog it will grow."

1016.   On or about November 16, 2013, Babener introduced TelexFree to Clifton Jolley of Advent Communications to manage the public relations side of TelexFree's transition of the future March 9, 2014 compensation plan.

1017.   On December 9, 2013, Merrill contacted Babener regarding an internal problem TelexFree was having with its participants "cross-recruiting and other agent violations" such as

raiding other programs.  The Sheffield Group's Davene and Mike Sheffield were eventually

included in that email chain.  Babener resolved the issue by drafting the letter Merrill sent to

offending participants and told Merrill to adopt the policies Babener had previously drafted and

sent to Merrill. Upon information and belief, that letter was sent by Merrill and addressed the

internal issue.

1018.   Babener also composed, reviewed, and approved misleading press

releases through April 2014.

### 3.  The Garvey Schubert Defendants

1019.   At all times relevant hereto, Garvey Schubert Defendants Kauffman, Weaver,

Tober, and Sandford acted within the regular and usual course of their employment and within

the scope of their authority as partners/employees of Defendant Garvey Schubert and each

is jointly and severable liable.

1020.   Each Garvey Schubert Defendant is vicariously, jointly and severally liable for

all actions taken by its partners, employees, agents and representatives, including Kauffman,

Weaver, Tober, and Sandford.

### a.  *Garvey Schubert Barer Knew That TelexFree Was a Pyramid/Ponzi Scheme from the Beginning of Their Representation*

1021.   Babener expressly advised the Garvey Schubert Defendants that TelexFree was

operating an unlawful business. Subsequently Babener and the Garvey Schubert repeatedly

confirmed their actual knowledge in multiple ways including writings, actions and inaction. The

Garvey Schubert Defendants had actual knowledge that TelexFree was a fraudulent scheme at all

relevant times.

1022.   On September 23, 2013, Babener communicated directly with Garvey Schubert's

Kauffman.  In his initial email communication, Babener informed him that TelexFree's "sister

company is having issues in Brazil and I have concern for spillover here," that he had "concerns about the current program and it is being Modified with assistance of the Sheffield Group to be more compliant," and that he wanted Weaver and then Kauffman involved for "potential US issues, regulatory or criminal" issues and Tober and Sandford involved for "international structuring, for corporate, tax and asset protection purposes." Also, on September 24, 2013, Babener emailed Kauffman and Sandford an article from BehindMLM.com that made plain TelexFree's illegality.  It discussed TelexFree's issues in Brazil, titled "TelexFree vows recovery in Bankruptcy Protection." Babener also copied the article and the comments to the article into the body of that email. Upon information and belief, Kauffman passed both messages along to the Garvey Schubert team.

1023.   Merrill, Babener, Sandford, and Kauffman participated in a call where they discussed potential regulatory, civil, and/or criminal issues facing TelexFree due to its illegality. Later the same day, Garvey Schubert agreed to represent TelexFree as a client, with Sandford emailing TelexFree an engagement letter and requiring a $50,000 advance fee deposit.

1024.   In a September 25, 2013 email from Babener to Merrill and the Garvey Schubert attorneys, Babener disclosed that Costa had sold his TelexFree shares to Merrill to cut ties between TelexFree and Ympactus. He also raised confidentiality regarding communications with Craft – i.e., that they would not be protected. Babener stated:

> "I am sure he acts as a virtual CFO for nancy [sic] clients, although not formally employed or an actual part of management. I tend to doubt that, unless the role as a part of management is formalized, that communications with him are protected by attorney client privilege confidentiality in a way that is different than any other CPA firm. ***Given some vetw [sic] delicate legal issues, I would like Sara and Sam to weigh in here*** Again, Joe is an important part of your business and his involvement is pivotal, and it will be. Nevertheless, confidentiality of upcoming communication is essential."

(emphasis in original). Sandford and Kaufman resolved the issue.

1025.   On or about September 30, 2013, following a conference call between Babener,

Merrill, Sandford, Tober, Craft, and Wanzeler, Sandford emailed Babener requesting a copy of

the agreement TelexFree used with its promoters.  That same day Babener emailed Sandford

stating he was attaching in pdf the terms of agreement that TelexFree uses [for

promoters].  Babener flagged:

> We have not worked on these to modify them.  Rather, we have focused on the
> compensation and marketing program, which substantially need to be addressed.
> [We] provided Merrill with suggested rep agreement terms and policies.  We
> think the company would do well to adopt what we have drafted as our drafts
> address many consumer protection compliance issues and dovetail with
> the advice we are giving about changing the marketing approach to be driven by
> customer revenue rather than distributor fees."

1026.   In another email of that day, Babener copied Kauffman, Sandford and Tober in

his response to an email from Merrill regarding an article titled "MLM Pro Ken Stewart

Perspective on The Question of TelexFree Being A Pyramid or Ponzi.

1027.   On September 30, 2014, Babener copied Kauffman, Sandford and Tober of

Garvey Schubert on an email to Merrill in which he bluntly told Merrill:

> "Your primary challenge: your historical revenue stream has been dominated by
> distributor payments rather than product/service sales revenue. **You will not
> survive legally (civil or criminal) or from a business standpoint, unless there
> is a dramatic change**...", providing each of them with actual knowledge.

(emphasis added).

1028.   The combination of their own review of TelexFree's documents and Babener's

guidance ensured that Garvey Schubert Barer and its individual attorneys were aware that

TelexFree was an illegal Pyramid/Ponzi scheme from the very beginning of its representation.

### b.   *Garvey Schubert Provided Substantial Assistance to TelexFree Through April 2014*

1029.   Each Defendant Garvey Schubert attorney drew upon their prior experience to

aid, abet and play a substantial and integral part in TelexFree's unlawful, unfair and deceptive acts and practices. While Babener provided lots of face time and took lots of credit, Garvey Schubert did the heavy lifting and took the lead or co-lead role in most of the essential assistance offered by the Attorney Defendants including:

    a.  Tax Filings and strategies;

    b.  the execution of all plans to move TelexFree's assets and operations offshore;

    c.  drafting the intentionally misleading letter Merrill signed and sent that was used to enable pay processing service provider Bank Card Consultants to secure an acquiring international bank when the US based options had dried up;

    d.  assisting TelexFree keep the $20 million from its TD Bank account banked upon its forced closure; and

    e.  leading the strategy and presentation of the TelexFree, Merrill and Wanzeler's 2014 COMSOC investigation defense.

1030.  More specifically:

    a.  Tober and Sandford planned TelexFree's tax filings and strategies, including its 2013 year-end tax options and methods for reducing taxable income, which substantially assisted TelexFree in retaining its ill-gotten victim funds and enabled its continued operation under the radar of authorities;

    b.  Attorneys Robert Weaver and Samuel Kauffman of Garvey Schubert addressed issues with the Brazilian investigation and potential U.S. and Spanish regulatory or criminal issues;

    c.  Attorneys Sara Sandford and Gary Tober, also of Garvey Schubert, were engaged to assist with international expansion, taxation, and regulatory matters;

    d.   All Garvey Schubert attorneys dealt with the Brazilian shutdown, the other suspicious activity including account closures and the closure in Brazil, the rejections by financial institutions, and the well-publicized accusations of operating a pyramid scheme and the many other issues surrounding TelexFree's operations and business model;

    e.   Sanford used her contacts in the Caribbean to establish TelexFree's foreign base of operations in Grand Cayman;

    **f.**   Garvey Schubert also specialized in "quieting" promoters who made unwanted noise.  For example, through fall 2013, with Babener, Garvey Schubert fielded questions from Spanish authorities.

1031.  On or about September 30, 2013, Babener in consultation with Garvey Schubert provided advice intended to maintain TelexFree's unlawful enterprise and shelter its ill-gotten gains Specifically, they advised TelexFree to legally separate the U.S. market from all other markets and also advised TelexFree to domicile its global parent company and move its assets abroad. In another email on that date, Babener acknowledged that "to my knowledge, TelexFree has taken no steps to comply or customize its contracts in foreign markets to comply with local direct selling and consumer protection laws" despite its continued operations.

1032.  Garvey Schubert and its individual Defendant lawyers took the lead as critical strategists in structuring TelexFree's international business outlets during fall 2013.

1033.  On or about October 10, 2013, Craft emailed Sanford seeking advice on which TelexFree entity was the best one to transact their international business. Sanford replied by noting that the Garvey Schubert Attorney Defendants had formulated a recommended structure for TelexFree. Craft, Merrill, Wanzeler, Babener, Tober, and Kauffman were copied on

the email.

1034.   On the same day, Craft forwarded an email to Sandford and Tober regarding offshore accounts.  Sandford replied, adding Kauffman to the thread, noting "I just spoke with Sam and he wants to speak with the clients about this before any account transfers occur." Upon information and belief that call went forward with Kaufman providing essential advice.

1035.   On or about October 15, 2013, Sandford emailed Merrill, Craft, Babener, Wanzeler, Tober and Kauffman attaching a memo "regarding the corporate aspects of potential liability for TelexFree's U.S. operations in connection with recent developments in Brazil, along with our suggestions for restructuring TelexFree's operations worldwide and a summary of the pros and cons and open issues related to such proposed structure."

1036.   On or about October 24, 2013, Sara Sandford emailed Babener asking whether the concerns about the existing illegal program justified starting new entities.  In his response, Babener recognized that any new entity would likely have successor liability and so "Biggest protection will be international corp shift." Merrill, Wanzeler, Tober, and Nancy Kikes were copied on Babener's response.

1037.   Knowing that TelexFree was operating an illegal pyramid scheme, Garvey Schubert developed a strategy for TelexFree's international expansion. Among other things, the strategy included the use of a separate "financing company" that would process TelexFree's incoming and outgoing investor payments. "The primary purpose" of the "financing company" was expressly to limit "legal and tax exposure in multiple jurisdictions."

1038.   Similarly, Tober noted in an email on or about October 29, 2013:  If the payment and remittance function is a division within TelexFree and not a separate legal entity, the inquiries of the authorities and any sanctions could be pursued against TelexFree's assets. The

financing company provides a tax efficient mechanism to handle payments and remittances and provide a level of protection for the assets of TelexFree. Craft, Merrill, Sandford and Babener were copied on the email.

1039. Sandford and Tober also warned TelexFree against using payment processors that may be subject to U.S. jurisdiction for foreign payments or who would voluntarily comply with U.S. court orders. On November 5, 2013, Tober and Sandford participated in a telephone conference with Merrill, Babener and Craft where they discussed using iPayout for U.S. and foreign transactions. Shortly thereafter, Sandford emailed Merrill noting:

> Gary and I had one other thought right after we hung up: There may be an issue with using I Payout if you really want to shield foreign revenues from access in the event of some kind of lawsuit in the U.S. That is to say, if the company managing those foreign fund accounts is subject to U.S. jurisdiction (which we understand you said I Payout likely is), they might feel compelled to comply with U.S. court orders, regardless of the location of the accounts themselves.

Merrill, Babener, Tober and Wanzeler were copied on the email.

1040. Garvey Schubert also assisted TelexFree's efforts to keep banked $20 million from its TD Bank account upon its closure for fraud issues. Knowing TelexFree was operating an illegal pyramid/Ponzi scheme, Garvey Schubert and Babener assisted Merrill on structuring the withdrawal and subsequent placement of $20 million from a TD Bank account that was shut down for fraud issues to avoid detection and reporting requirements under the BSA/AML. They similarly assisted Merrill in locating other banking outlets in connection with that closure.

1041. On November 6, 2013, Merrill informed Babener via email that TD Bank had closed TelexFree's account and that Merrill had checks for $20,000,000 from TelexFree's TD Bank accounts. Tober and Sandford assisted Merrill in finding an account for those funds.

1042. In his November 6, 2013 email, Merrill told Babener that he was going to him "with this first" as the team point person regarding TD Bank closing TelexFree's accounts and

let him "decide who we need to involve."  Merrill informed Babener: "I have checks from TD in the amount of 20 million that I am not sure what to do with I will try and open another account but wanted to get advice from you on how. I can't just walk into a branch with a check for 20 million dollars. Is there a way to get involved with another bank without drawing red flags?"

1043.   Babener responded by choosing Garvey Schubert's Tober and Sandford and asked them to "weigh in on locating a new bank" and touting that "$20M is not a bad first deposit."  (emphasis in original). Merrill informed Babener he would "go bank [sic] to TD bank and ask them to brake [sic] the check into under 5 million so it will be easier to bring in several bank partners as well as some investment partners."

1044.   In the same November 6, 2013 email chain, Babener and Sandford endorsed the breaking down of the check, which would help avoid scrutiny. [1]

1045.   Despite knowing those accounts would be used for – and were essential to – the continued operation of TelexFree's scheme, Babener, Sandford and Tober engaged in a course of email exchanges on November 7, 2013, to assist Merrill in identifying "possible banks and locations for new corporate bank accounts" and on November 8, 2013 "re potential banking options." For example, Sandford emailed recommending Zion Bank in Seattle.

1046.   While Sandford worked hard to find contacts at local banks, Babener assisted by again offering to "check for references to banks from colleagues at merchant processors such as pivotal payments or global pay groups like Hyperwallet."

1047.   On or about November 8, 2013, Sandford introduced Merrill to a contact at The Commerce Bank of Washington, a bank used by Garvey Schubert, who "may have some ideas about how you address the banking challenges you mentioned."  Sandford re-sent this information on November 26, 2013 "per Jim's request" and copied Jack Unbehend of The

Commerce Bank of Washington "so he knows to expect to hear from you."

1048.   After receiving Sandford and Babener's advice, Merrill asked TD Bank to break up the original $18,448,267.66 check into five or more pieces—each under $5 million. The purpose was twofold: 1. avoid reporting requirements and 2. make it easier to launder those sums through other financial institutions.

1049.   On or about November 16, 2013, in consultation with Garvey Schubert, Babener communicated his objection to using a Canadian corporation as TelexFree's international parent company: "[I]f your program were presented to the Competition Branch, counterpart of our FTC, with respect to an advisory opinion as legitimate MLM vs. Pyramid, …..I am quite sure you would be informed that the previous and existing program violates the Competition Act and is a pyramid." (emphasis added) Merrill, Wanzeler, Nancy Kikes, Sara Sandford, Gary Tober, and Andreia Moreira were copied on the email.

1050.   Sandford's follow up advice to the blunt assessment that TelexFree was a pyramid scheme was that legal counsel should look to "match up a 'preferred tax jurisdiction' list with a 'preferred MLM regulatory' list of countries".

1051.   In December 2013, Garvey Schubert, in consultation with Babener provided an intentionally misleading letter for Merrill's signature that misrepresented TelexFree's legality for use by Defendant Bank Card Consultants in securing an acquiring bank for its payment processing services.  Upon information and belief, Defendant Bank Card Consultants was able to secure an international acquiring bank as a result

1052.   On January 10, 2014, Tober and Sandford participated in a telephone conference with Craft and PwC's Puzey and Colabella regarding the development of TelexFree's international structure. They discussed establishing a new overseas entity that would become

TelexFree International, Ltd. PwC proposed that TelexFree LLC transfer its contractual rights to overseas agents and customers to that entity.

1053.   On January 31, 2014, Garvey Schubert's Sandford and Tober discussed using Wells Fargo Bank with TelexFree's Joe Craft.  Later that day, Sandford conferred with her colleague Weaver regarding potential bank account changes for TelexFree.

1054.   This phone call occurred soon after the UK TelexFree affiliate TelexFree Ltd. passed a board resolution to move its funds to TelexFree, LLC's Wells Fargo Bank account no. xxxxxx6715 from a Bulgarian bank on January 28, 2014.

1055.   In or about early February 2014, Craft conferred with Tober about establishing a bank account for TelexFree in Nevis.  Cardenas had previously established a Nevis account for Wanzeler and suggested that one also be established for TelexFree.  At Tober's direction, Cardenas opened this account.

1056.   Upon information and belief, Merrill utilized the Nevis TelexFree entity to remove funds from U.S. regulatory jurisdiction.

1057.   On February 16, 2014, Babener emailed Garvey Schubert attorneys Weaver, Tobey and Sandford stating: "I spoke at length today with Jim and Carlos. They are anxious to move as fast as possible to a scenario where all international reps sign up with a non-US entity located outside the US. Their reasons are liability and asset protection. Obviously, this is the direction of the ultimate structuring. However, my impression is that they would do the tomorrow if they could. And so, they would like the structuring to happen as soon as practicable."  These parties then held a teleconference on February 21, 2014 to discuss the above.

1058.   The Garvey Schubert Defendants then sped up their formation of an offshore

entity to shelter TelexFree's payment processing and illicit gains. From February 25, 2014 to

March 3, 2014, Wells, Merrill, Wanzeler, Moreira, Colabella, Puzey, Babener, Tober, Sandford,

and Craft engaged in an email exchange regarding the establishment of a foreign entity for

TelexFree in the Cayman Islands which would be named TelexFree International, Ltd., and the

opening of a new bank account for this entity. Garvey Schubert and PwC were the leads in this

endeavor.

1059.   On or about February 28, 2014, with knowledge that the Massachusetts Securities

Division was closing in on TelexFree, Sandford emailed her contact at Walkers Global regarding

formation of TelexFree's Cayman Islands entity.  In the same February 28, 2014 email,

Defendant Sandford indicated that TelexFree's Brazilian branch had experienced "some

difficulties with regulatory authorities in Brazil," but she nevertheless pressed forward with

TelexFree's international expansion.

1060.   On or about March 3, 2014, Sandford, after consulting her contact, confirmed that

a Grand Cayman entity could be incorporated in a single day, which she described as "quite

quickly" once they had information regarding the proposed name and the identities of

shareholders and directors.

1061.   Also on or about March 3, 2014, Craft, at the direction of Tober, Sandford,

Babener, Puzey, and Colabella, asked Wells Fargo Bank and Wells Fargo Advisors' Mauricio

Cardenas to establish a bank account for TelexFree in Grand Cayman, under an entity that

Sandford would be setting up through her contacts in the Caribbean as the account holder. The

specific purpose was to transfer money TelexFree was having a hard time placing and moving

money around through various accounts and to move money offshore.

1062.   As a result, Cardenas opened domestic accounts for TelexFree with Wells

Fargo Bank, and attempted to open international accounts at Wells Fargo Bank in Grand

Cayman, which upon information and belief were opened, for purposes of transacting business

overseas and concealing funds from U.S. regulators.  Through international accounts TelexFree

intended to conceal funds derived from promoters in the United States and place them outside

the reach of U.S. authorities.

1063.   On March 5, 2014 Sandford noted Garvey Schubert's willingness to advance the

costs for formation: "Regarding the bill, you may send the bill in care of me and/or bill Garvey

Schubert Barer, if you wish, at my address below. We will then charge TelexFree, Inc., because

that company asked us to arrange this formation."

1064.   By March 6, 2014, TelexFree International Ltd, a Grand Cayman entity, had been

formed as a result of Tober, Sandford, Babener, Puzey, and Colabella advice, Sandford's

work and Wells Fargo Bank, Wells Fargo Advisors, and Cardenas'' non-routine banking

substantial assistance.

1065.   On March 14, 2014, a meeting took place with PwC, Defendant Attorneys Tober

and Sandford of Garvey Schubert Barer, and Stuart MacMillan, TelexFree Interim CEO,

regarding funding the Grand Cayman company and other items.

1066.   On March 19, 2014, at the request of James Merrill, Robert Weaver drafted

another letter for Babener to send to TelexFree's banking partners, particularly Wells Fargo

Bank, to persuade them to continue servicing TelexFree's accounts.  Following receipt of

that letter, and with the assistance of Cardenas and/or other Wells Fargo employees, Wells Fargo

Bank continued to supply services to TelexFree's Scheme during the critical 2014 time period.

1067.   On or about March 26, 2014, Sandford forwarded via email documents she had

received from Cayman Islands counsel showing Wanzeler, Merrill and Costa were now the sole

Officers, Directors, and Shareholders of TelexFree International, Ltd.  Wanzeler, Merrill, Colabella, Puzey, Tober, Babener, and Craft were copied on the email.

1068.   Tober and Sandford also worked extensively on TelexFree's tax filings and strategies, including its 2013 year-end tax options and methods for reducing taxable income which provided them with further detailed knowledge of TelexFree's fraudulent operations.

1069.   The Garvey Schubert Attorneys also worked to prolong TelexFree's scheme by assisting them in evading the notice of regulators and then in reacting to the investigations by governmental authorities.

1070.   On or about October 8, 2013, Merrill emailed Sandford and Tober for advice regarding an inquiry TelexFree received from a Spanish police department. This inquiry stemmed from a complaint by an individual seeking reimbursement for money paid to TelexFree. In response, Babener noted "This turn of events is not a surprise, as I noted earlier, given a Spain connection to South America and Brazil.  However, next can come Interpol, FBI, Justice and SEC. I would like Sam [Kaufman] to be the contact person and the we [sic] will work closely with him as you finish a more retail oriented program that he can share before issues spiral the wrong way." Thereafter, Garvey Schubert took action to shut down international inquiries.

1071.   On or about October 9, 2013, TelexFree was advised immediately make a complete refund to the individual who instigated the Spanish police department inquiry with "the primary goal … to prevent a broader problem." That same day, as part of Garvey Schubert's strategy to avoid any further investigation of TelexFree's conduct, Kauffman agreed to reach out to the Spanish police department to request more information about their investigation. He did so. That investigation continued through the fall of 2013, with Garvey Schubert fielding questions and providing responses which prevented any further adverse action on the issue.

1072.   Notably, on October 10, 2013 Sandford of Garvey Schubert emailed Detective Torres of the Olot police in Spain to diffuse the fraud investigation and falsely represented that "Telexfree provides VOIP long distance flat fee telecom service throughout the world. At any one time, the company has tens of thousands of customers using its telecom service. The product is marketed through its sales force."  Sandford knew that Telexfree services were not Voip but purchases of AdCentral packages where promoters cut and paste ads to TelexFree websites.

1073.   Garvey Schubert also worked closely with, and shared information with, Babener, as well as Wanzeler and Merrill, in crafting deceptive responses to the SOC's inquiries.

1074.   In an email to Weaver on or about April 2, 2014, Babener and Weaver agreed that Garvey Schubert and Greenberg Traurig attorneys should open a civil litigation file for claims from promoters. The lawyer's purpose was clearly stated: "By altering the terms [of the promoter contracts], the company is reneging. However, it has no choice because the old program was illegal." Merrill, Macmillan, Kikes, Wanzeler, Weaver, Conti, Berthiaume (Greenberg Traurig), and Hayeser (Greenberg Traurig) were copied on the email.

1075.   On or about April 8, 2014, Weaver emailed Merrill and Wanzeler, cc'ing Babener, Sandford, Conti, Berthiaume (Greenberg Traurig) and Hayeser (Greenberg Traurig) to report that "The lawyers had a telephone meeting this afternoon."  In the same email, Weaver outlined that threatened lawsuits by promoters risked their strategy to keep TelexFree out of a criminal prosecution or SEC investigation. Weaver's response was to dedicate another Garvey Schubert Barer Attorney, Pat Conti, to address all complaints and threats of lawsuits from lawyers for promoters. Weaver warned "They need to be dealt with quickly and consistently so as not to provoke complaints to criminal investigative agencies."

1076.   In January and February of 2014, Garvey Schubert was lead legal workhorse and

strategist, with PwC leading the accounting end, in all aspects of the crafting of misleading responses and the inadvertent submission of a cooked set of books to the Massachusetts SOC that differed from the one Nehra had submitted in the Spring of 2013. While Nehra and TelexFree claimed to have lost the first set of books, the COMSOC had not.

1077.   Between September 2013 and April 2014, Garvey Schubert Barer was paid at least $197,528.04 in attorneys' fees by TelexFree. On or about April 11, 2014, TelexFree wired a further $350,000 from TelexFree Financial, Inc's PNC Account to Garvey Schubert as a retainer.

1078.   According to TelexFree's bankruptcy filings, Garvey Schubert Barer was paid a total of $532,503.50 by TelexFree between January 22, 2014 and March 6, 2014.

### 4.   The Sheffield Group

1079.   Defendant The Sheffield Group is vicariously, jointly and severally liable for all actions taken by its partners, employees, agents and representatives, including Mike Sheffield, Lind, Deshazer, Peruzzini and Stenmoe

#### a.   *The Sheffield Group Knew That TelexFree Was A Pyramid/Ponzi Scheme*

1080.   The Sheffield Group knew that TelexFree was a Pyramid/Ponzi scheme from the very beginning of their work with TelexFree.

1081.   During their initial contact on August 12, 2013, Babener advised Mike Sheffield, Principal of the Sheffield Group, that he suspected or concluded that TelexFree's business model was unlawful.

1082.   Mike Sheffield, Debbie Stenmoe and Davene Peruzzini of The Sheffield Group were also copied on Babener's August 15, 2013 email, described above, that confirmed TelexFree's United States operation faced the same Ponzi scheme issues as it did in Brazil.

1083.   In another email chain on or about August 24, 2013 between Merrill, Babener and Sheffield, Babener again expressly confirmed that TelexFree's compensation program was unlawful.  Nancy Kikes, Sarah Smith, Mike Sheffield, Davene Peruzzini, and Debbie Stenmoe were copied on the email.

1084.   Upon information and belief, Babener and The Sheffield Group, including Mike Sheffield, Ken Lind and Garvin DeShazer participated in a meeting on September 4, 2013 with Merrill at which time they freely discussed TelexFree's pyramid scheme nature, TelexFree's potential legal issues in the U.S. and the relationship with TelexFree's Brazilian operations. Upon information and belief, they also discussed how to keep current operations going uninterrupted.

1085.   In a September 11, 2013 email from Merrill to The Sheffield Group, returning the Phase 2 consulting agreement, Merrill noted: "I know you all agree the faster we move on this the greater opportunity for success & the least chance for regulatory scrutiny." Stenmoe, Peruzzini, Wanzeler, Mike Sheffield and Chris Sheffield were copied on the email.

1086.   By September 17, 2013, The Sheffield Group had reviewed the standard TelexFree contract which expressly states that Ympactus owns and controls TelexFree.

1087.   Babener and The Sheffield Group's actual knowledge of the Scheme is further evident in a September 19, 2013 email from Babener to Merrill, Wanzeler and Sheffield attaching information on the criminal indictment and guilty plea of the operator of the AdSurfDaily Ponzi scheme as well as a follow up September 25, 2013 email containing an article from BehindMLM.com discussing TelexFree's Brazilian issues. Merrill, Wanzeler, Mike Sheffield and Nancy Kikes were copied on the email.

1088.   Subsequently Babener and The Sheffield Group repeatedly confirmed their actual

knowledge in multiple ways including writings, actions and inaction.  For example, on or about

September 29, 2013 The Sheffield Group evidenced its actual knowledge and willful and

knowing participation in TelexFree's criminal enterprise through its refusal to be associated with

the company online.

1089.   The Sheffield Group received an email on or about September 29, 2013, from an

alleged TelexFree promotor. Mike Sheffield forwarded this email to Merrill and Babener with

the instruction to "take my company name and my personal name off your website and

any other promotional or educational material. This is important due to the controversy that you

are presently facing."

1090.   Furthermore, on September 30, 2013, Babener forwarded an email to Mike

Sheffield that he had sent to Merrill directly stating TelexFree's illegality with the note "So you

understand the discussion."

1091.   The Sheffield Group also heard about TelexFree's illegality directly from Merrill.

On or about October 1, 2013, Mike Sheffield was cc'd on a blunt email from Merrill to

Wanzeler: **"We are asking people to risk $1425 do a little bit of ad placement work (they don't

even do it they have a company do it for them) all they make is $100 a week selling product back

to us. We reward them for no effort. We face business failure and or Jail."** Babener, Borromei,

and Labriola were also copied on Merrill's email.

> ### b.   *The Sheffield Group Substantially Assisted TelexFree's Scheme Through April 2014*

1092.   On or about August 12, 2013 The Sheffield Group began servicing TelexFree and

it ceased its representation on or about April 14, 2014. The Sheffield Group provided general

business management and consulting services to TelexFree, advising TelexFree's executives on

matters including Promoter compensation, Promoter recruiting and retention, and structuring

transactions involving AdCentral packages.

1093.   The Sheffield Group, particularly Mike Sheffield, Merrill and Babener were in frequent contact over the next eight months to strategize and otherwise cooperatively work to maintain TelexFree's daily – illegal - operations and to drive its exponential growth. Their work included, but was not limited to, compensation plan cover-ups, software selection, operational consulting, strategic consulting, legal referrals, launch management, and the coordination of financial institutions' and service providers' services to address TelexFree's inability to secure banking and processing needs.

1094.   By assisting TelexFree to operate without interruption, The Sheffield Group acted affirmatively to participate in the cover-up of TelexFree's unlawful business operation and provided plausible deniability, thereby acting as a valued co-conspirator, accomplice and accessory to TelexFree's ongoing unlawful operations.

1095.   In an email dated September 11, 2013, The Sheffield Group's Vice-President of Operations, Debbie Stenmoe, made explicit that their services were comprehensive and included four key areas: Product, Marketing, Operations and Financial, and included a questionnaire relating to each area. Merrill, Wanzeler, Peruzzini, Mike Sheffield and Chris Sheffield were copied on the email.

1096.   On or about September 12, 2013, Merrill wired $30,000 to the Sheffield Group's bank as a retention fee.

1097.   On or about September 17, 2013, Merrill laid out the direct relationship between TelexFree US and TelexFree Brazil for The Sheffield Group team: "All marketing including the compensation originates from Carlos Costa in Brazil and is roughly translated that is why the Website and other material are not very good when translated into English. So there really is no

marketing budget in the US. Most of CS service is located in Brazil but we have not performed well mainly because of IT issues and disorganization. We try to handle the US and International the best we can from Marlborough." Mike Sheffield, Chris Sheffield, Garvin DeShazer, Davene Peruzzini, Debbie Stenmoe, and Joe Craft was were copied on the email.

1098.   The Sheffield Group expressly advised TelexFree not to change illegal provisions in its plan or at a minimum guided it to delay any change to a lawful operation for many months so as not to hurt TelexFree financially.

1099.   On or about December 5, 2013, Mike Sheffield sent an internal email to Garvin DeShazer noting, "While it is important for this client to achieve a working compensation plan model that is legally defensible, it is equally important that it works financially so as not to create significant losses in revenue due to a flawed approach."

1100.   On or about December 23, 2013, while analyzing financial data for a proposed new program, Mike Sheffield warned that while the proposed approach "may be a legal remedy, it could spell disaster from a business perspective." Babener, Nancy Kikes, Sarah Smith, Wanzeler, Merrill, Deshazer, Lind, Stenmoe, and Peruzzini were all copied on the email thread.

1101.   In the same email, Mike Sheffield unequivocally proclaimed to TelexFree and his co-conspirators his conclusion that TelexFree's numbers only worked as a pyramid scheme:

> We are having great difficulty making your numbers work based on good business practice. In fact, it seems that the only way it would work is to use new money in to pay for the potential ongoing ADC commitment if your only rule for earning ADC is to create 3 customers one time.

1102.   On or about December 23, 2013, The Sheffield Group's Executive Consultant Garvin DeShazer also warned Merrill against immediately imposing requirements that may render the program compliant but rather argued for some ramp up time for promoters noting Mike's "concern (and I agree) is that making it all or nothing could result in massive, and

unnecessary, short-term attrition." Borromei, Sheffield, Lind, Stenmoe, and Peruzzini were all copied on the email.

1103.   Babener and The Sheffield Group knowingly, negligently or deceptively played a substantial and instrumental role in developing TelexFree's unlawful March 9, 2014 compensation plan. Babener and The Sheffield Group were explicit in acknowledging that the new compensation plan was being drafted to be a tool to defend TelexFree in the legal investigations against it rather than to make it a truly legal operation, and they further knew that the proposed plan itself was not legal.  Upon information and belief, those efforts successfully staved off regulatory action and enable the Scheme to continue.

1104.   On or about January 15, 2014, Babener informed Mike Sheffield via email that the new plan was "subject to questioning" even though it was "light years ahead of the existing problematic program from a compliance defense standpoint." Nancy Kikes, Merrill, Wanzeler, Borromei, Stenmoe, Peruzzini, and DeShazer were copied on the email.

1105.   On or about January 16, 2014, Mike Sheffield recognized in an email to Borromei that The Sheffield Group's role was to create a program that would allow Babener to shield TelexFree from investigation by regulators: "My assignment is to make sure we have a document that gives Jeff a tool for defense if needed." Merrill, Wanzeler, Stenmoe, Peruzzini, DeShazer, and Babener were copied on the email.

1106.   The Sheffield Group's work on the March 9, 2014 compensation plan included drafting multiple versions of the plan, creating financial models for how the plan would work, and assisting in the creation of marketing materials to explain the March 9, 2014 plan.

1107.   On or about April 3, 2014, The Sheffield Group performed a "stress test" on the revised plan, which confirmed that the new plan it had devised and imposed upon victims on

March 9, 2014 was still unsustainable.

1108.   Despite knowing that TelexFree was operating an illegal pyramid/Ponzi scheme, The Sheffield Group secured an internet marketing expert, Jon Ward, and convinced him to work with TelexFree. Ward expressed high concern on September 25, 2013 about working with TelexFree, stating: "I've never liked the phrase "no smoke without fire."  However, when the air is filled with billowing, black clouds of the stuff."  Mike Sheffield, Debbie Stenmoe, Davene Peruzzini, Ken Lind, and Chris Sheffield were all copied on the email.

1109.   Ward also stated his concern that he had offered to connect TelexFree with a "trusted internet source" and indicated he'd "prefer to delay it" to protect his contact. He stated that although he would like to help The Sheffield Group in any way he could, he was not sure now about calling Jim Merrill. The Sheffield Group's Garvin Deshazer acted quickly, urging Ward to continue working with TelexFree, vouching for TelexFree's leadership team. Mike Sheffield, Stenmoe and Peruzzini were all included in this email chain. Ward agreed to provide website-related services and continued to do so until or after March 2014.

1110.   The Sheffield Group also reviewed and advised TelexFree on new programs.

1111.   During fall 2013, The Sheffield Group and Babener assisted TelexFree in a deal involving a company known as My Financial Advantage ("MFA") that offered credit restoration services.  TelexFree entered into a contract with MFA and MFA provided staffing and IT services worth $80,000 to TelexFree in connection with their product from October 2013 to March 2014.

1112.   On or about January 28, 2014, Mike Sheffield reviewed and advised Merrill on a potential digital advertising program for TelexFree. The Sheffield Group's DeShazer introduced Merrill and TelexFree to an internet marketing expert, Josh Elizetxe, of the company Foresold

via Ward. Merrill touted that with Foresold's help, TelexFree "could see millions of downloads" of TelexFree's mobile app in a few months.

### 5. PWC

1113.   PwC began working with TelexFree in November 2013, were formally retained in January 2014, and continued to work with TelexFree through its April 14, 2014 demise.  PwC substantially assisted sustaining TelexFree's broad scope of unlawful operations which generated hundreds of millions of dollars during the time that PwC provided services to it. PWC drove TelexFree's international restructuring planning and advised and assisted TelexFree in preparing and issuing unfair, deceptive, inaccurate, suspicious, and unlawful 1099 (Miscellaneous Income) forms.

1114.   PwC furthered TelexFree's criminal enterprise and ongoing operations and acted as co-conspirators, accessories, accomplices and aiders and abettors through its partner Richard Colabella and its Director of International Tax Services Jerry Puzey.

1115.   Colabella and Puzey drove the efforts to develop an international organization structure at a time when TelexFree's status as a pyramid scheme was well-known and other service providers were refusing to provide TelexFree or its related persons and entities with financial services within the United States.

1116.   This included using offshore accounts to conduct TelexFree's unlawful operations in countries with lax financial fraud enforcement to shelter funds out of the reach of the United States justice system and to create foreign shell corporations.

1117.   PWC's affirmative acts of putting forward experience and research driven ideas and analysis, and their other contributions were essential components to the activities that did take place.

1118.   Defendant PwC is vicariously, jointly and severally liable for all actions taken by

its partners, employees, agents and representatives, including Puzey and Colabella.

### a.  PWC Knew That TelexFree Was a Pyramid/Ponzi Scheme

1119.   PwC knew that TelexFree was a Pyramid/Ponzi scheme from the very beginning of its work with TelexFree.

1120.   During November 2013, TelexFree needed assistance with international taxation matters, specifically a receivable from TelexFree's Brazilian entity. Babener introduced Merrill, Wanzeler and Craft to Colabella to assist TelexFree with international tax and regulatory matters. Colabella, in turn, recruited Puzey to the team.

1121.   During PwC's due diligence period between November 2013 and January 2014, Craft personally discussed with Colabella the fact that TelexFree had been shuttered in Brazil in June 2013 due to allegations that it was engaged in a pyramid scheme and that allegations surrounding TelexFree's identical business model in the United States were of concern.

1122.   On or about November 20, 2013, Craft spoke with Colabella to discuss further information that PwC needed to complete its due diligence on TelexFree. This request was confirmed in Colabella's email of November 26, 2013 to Craft.

1123.   Craft provided PwC with a copy of TelexFree's financials, including a draft of TelexFree's unadjusted 2013 Q3 financials, its then current corporate structure, a proposed new structure involving a holding company and an international TelexFree affiliate, resumes of both Carlos Wanzeler and James Merrill, and answers to a list of due diligence questions. Craft also had phone calls with PwC personnel to answer questions. Upon information and belief, PwC also reviewed TelexFree's website and marketing materials.

1124.   PwC specifically discussed the shuttering in Brazil and was also advised by Babener and other TelexFree representatives of the unlawful terms in the standard form Promoters contract, the fact TelexFree sold no product and was dependent on new promoter

money coming in to sustain its operation, and the tax issues it faced relating to its income and

pay outs to its Promoters including Net Winners.  Indeed, at the beginning of each TelexFree

USA meeting and phone conference, Colabella asked about TelexFree's legal issues in Brazil.

### b.  *PwC Provided Substantial Assistance to TelexFree*

1125.   After TelexFree formally retained PwC in January 2014, TelexFree immediately

began working closely with Puzey and Colabella on moving money overseas, international

expansion, taxation, and redeveloping TelexFree's business structure. Craft, Babener, Sanford

and Tober personally worked with Colabella and Puzey to develop and implement these

strategies and participated in several telephone conferences and meetings.

1126.   PwC was aware that the express purpose of TelexFree's proposed international

expansion was to relocate TelexFree's operations and money beyond the reach of United

States regulators, and to locate banks willing to service TelexFree. It was also aware that its

association with TelexFree provided a veneer of credibility to TelexFree's illicit scheme during

the crucial final months of its existence.

1127.   Despite knowing that TelexFree was operating a Pyramid/Ponzi scheme, rather

than advise TelexFree to refund the class, PwC acted to assist TelexFree to launder and shelter

funds offshore.

1128.   During the critical time when TelexFree was having difficulty securing banking

and merchant processing services, PwC worked with Garvey Shubert to provide advice in

locating foreign locations with lax tax regulations and favorable MLM laws. Puzey and

Colabella recommended countries where TelexFree should open accounts and provided advice as

to the method by which TelexFree should remove funds from the United States and into foreign

jurisdictions.

1129.   In or about January 2014, PwC developed and provided to TelexFree and its team

a Proposed Global Business Alignment plan in draft form with the objective of, *inter alia*, "[p]repar[ing] a flexible and scalable model for future business growth, expansion, new lines of business, etc." and that presented a number of options to achieve that end. The focus of the plan was shifting funds and operations offshore to locations beyond the reach of the United States justice system and with lax Pyramid/Ponzi/Financial Crime enforcement. Although not every granular suggestion along the way worked out, that executive level concept was adopted by TelexFree.

1130.   On January 10, 2014, Puzey and Colabella attended a telephone conference with Craft and Garvey Schubert's Tober and Sandford regarding development of TelexFree's international structure. They discussed establishing a new overseas entity that would become TelexFree International, Ltd.  PwC proposed that TelexFree LLC transfer its contractual rights to overseas agents and customers to that entity. Upon information and belief, they were transferred.

1131.   Also, in January 2014, PwC's Colabella and Puzey met with Merrill, Wanzeler, Garvey Schubert's Sandford and Tober, to present "TelexFree Proposed Global Business Alignment." This presentation set forth PwC's initial recommendations regarding TelexFree's global expansion, taxation, and regulatory matters. They also discussed the fact that TelexFree was facing regulatory concerns, and that their objective was to restructure TelexFree in order to avoid US regulators, divert funds offshore, and minimize United States taxes. The presentation demonstrated that PwC, Colabella and Puzey understood that TelexFree's revenues were derived primarily from the sale of AdCentral packages.

1132.   In early February 2014, PwC's Colabella and Puzey took part in a conference call with Craft, Babener, and other members of TelexFree's leadership to discuss how to expand TelexFree's international business.

1133.   On February 14, 2014, Jeffrey Babener suggested relocating TelexFree's operations to Nevis to "remove foreign revenue out of US regulatory jurisdiction." In the same email, Babener asked Colabella and Puzey to "weigh in," as they were working on the "big picture structuring." Merrill, Wanzeler, Weaver, Sandford, Colabella, Puzey, Craft, Tober, and Nancy Kikes were copied on the email. In another email Babener indicated that TelexFree's international restructuring was being "driven" by PwC.

1134.   As the Massachusetts SOC investigation progressed, on or about February 16, 2014, Babener emailed Garvey Schubert's Tober and Sandford, and PwC's Colabella, and Puzey conveying Merrill and Wanzeler's concern "to move as fast as possible to a scenario where all international reps sign up with a non US entity located outside the US. Their reasons are liability and asset protection. . .. they would do the [sic] tomorrow if they could." Tober, Merrill, Wanzeler, Weaver, Sandford, Colabella, Puzey, Craft, and Nancy Kikes were copied on the email.

1135.   From February 25, 2014 to March 3, 2014, Wells, James Merrill, Wanzeler, Moreira, Colabella, Puzey, Babener, Tober, Sandford and Craft engaged in an email exchange regarding the establishment of a foreign entity for TelexFree in the Cayman Islands which would be named TelexFree International, Ltd., and the opening of a new bank account for this entity.

1136.   Babener tasked Puzey and Colabella with finding and analyzing foreign jurisdictions that would minimize U.S. and international taxation and U.S. governmental regulation of TelexFree's operations. In a February 27, 2014 email, Puzey personally suggested that TelexFree expand into places such as the Caymans, the Netherlands, or Luxembourg. The best location depended on whether tax implications or "insulating from legal challenges" was the

primary goal. PwC recommended the Cayman Islands due to their lenient MLM laws and regulations.

1137.   As described above, the Cayman Islands entity that PwC  recommended was formed by Garvey Schubert's Sandford on or about March 6, 2014 with the name TelexFree International, Ltd.

1138.   In an April 4, 2014 email from Babener to Merrill, Wanzeler, Greenberg Traurig, and Stuart MacMillan – which cc'ed Colabella, Puzey, and Sanford – Babener discussed the post-March 2014 compensation plan and the Massachusetts SOC investigation. In this email, Babener acknowledged that TelexFree's prior compensation plan was "legally challenged." He also indicated that TelexFree's international expansion was being "led by Sara [Sanford], Gary [Tober], Rich [Colabella], Jerry [Puzey], Joe [Craft]."

1139.   PwC's overarching strategy of moving operations and funds offshore was adopted, and so they provided assistance to TelexFree, with regard to proposed expansion into Colombia and Ecuador. Enactment of PwC's plans also allowed foreign banks to serve as merchant banks.

1140.   PwC also assisted TelexFree with tax issues.

1141.   In February 2014, PwC was also asked to analyze the tax treatment of TelexFree's Brazilian entity's 2013 income. Upon information and belief, PwC permitted TelexFree to deceptively treat this revenue as a "licensing fee."

1142.   As part of its tax services regarding TelexFree's ongoing domestic operations, PwC willfully advised TelexFree to prepare and issue unfair, deceptive, inaccurate, suspicious, and unlawful 1099 (Miscellaneous Income) forms in 2014.

1143.   In an effort to maintain the illusion that it had made payments to its members

252

and on the negligent advice of PwC, TelexFree mailed fraudulent and inaccurate 1099 (Miscellaneous Income) forms to its members as described above.

1144.   Those inaccurate 1099 forms were filed with the Internal Revenue Service and State Revenue Offices and will impose an undue burden and hardship on Promoters who may now be liable to pay taxes on income they never received.

1145.   PwC also participated in TelexFree's response to the Massachusetts Securities Division investigation.

1146.   PwC was made aware of the second Massachusetts SOC investigation once TelexFree received a subpoena in or about the end of January 2014.

1147.   In or about February 2014, Puzey attended at least one meeting in TelexFree's Marlborough, Massachusetts office to discuss the second SOC investigation, along with Merrill, Craft and Berthiaume (of Greenberg Traurig).

1148.   During this meeting, Wanzeler proposed misrepresenting to the SOC that all of TelexFree's income from Massachusetts transactions was processed exclusively through TelexFree, Inc. Prior to this meeting, Puzey, Merrill, Babener and Craft had discussed Wanzeler's efforts to mislead the SOC.

1149.   The Babener, Garvey Schubert, Nehra and PwC team participated in the submission of two differing and "cooked" sets of books to the SOC. While TelexFree and Nehra had lost the set of books that Nehra had submitted in the Spring of 2013, the Massachusetts Securities Division had not.

1150.   In an email chain from January 26, 2014 to January 29, 2014, PwC's Puzey and Colabella worked with Merrill and the Attorney Defendants to limit the information TelexFree would provide to the SOC. Craft emailed Colabella and Puzey for advice. Nehra, Merrill, and

Babener were copied on the email.

1151.   In one email of February 14, 2014, Babener suggested relocating TelexFree's operations to Nevis as it would "probably remove foreign revenue out of US regulatory jurisdiction." Attorney Babener then asked Sandford, Weaver, Colabella, and Puzey to "weigh in" as they were working on the "big picture structuring."

1152.   PwC partners Colabella and Puzey also participated in strategy sessions with Babener and Garvey Schubert regarding TelexFree's responses to the Massachusetts Securities Division investigation. Upon information and belief, their ideas and contributions were essential components to the SOC appearance and testimony.

## D.   OTHER DEFENDANTS

### 1.   Telecom Logic and Ryan Mitchell

1153.   Defendants Telecom Logic and its owner and chief software engineer Ryan Mitchell provided the software services essential to the operation of TelexFree's databases in connection with the scheme and without them TelexFree would have collapsed.

1154.   Defendants Telecom Logic and Mitchell had actual knowledge that TelexFree was running an unlawful Pyramid Scheme, that their software services were a critical part of that Scheme and that James Merrill and Carlos Wanzeler were at the top level of the fraud yet they willfully provided those services that substantially assisted TelexFree's operations from the inception of its United States operations when it was well-established that TelexFree had been shuttered as an illegal scheme in Brazil, when investigation by United States authorities had begun, when TelexFree's collapse in the United States was imminent and when it actually occurred through TelexFree's collapse and filing of a bankruptcy petition in April 2014.

1155.   The relationship between Mitchell and Telecom Logic and TelexFree involved significant amounts of activity through which they voluntary submitted to the jurisdiction of the

Commonwealth of Massachusetts.

1156.   In the course of Mitchell and Telecom Logic's services to TelexFree, Mitchell made trips to Massachusetts on multiple occasions, sometimes five (5) trips per month over several months, and while in Massachusetts he made the plans and carried out the substantial acts that maintained, sustained and exponentially grew TelexFree's unlawful  Pyramid/Ponzi scheme.

1157.   The very close business relationship between Mitchell and Telecom Logic and TelexFree began in 2011 and was subject to the laws of Massachusetts from where TelexFree operated its world headquarters at all times relevant to this civil action. The relationship between Mitchell, Telecom Logic and TelexFree involved significant amounts of money. This was especially true of TelexFree's use of Mitchell and Telecom Logic software-related transactions.

1158.   Upon information and belief, Mitchell and Telecom Logic received payments from TelexFree in connection with its unlawful enterprise in excess of $500,000. These payments were made from TelexFree's bank accounts in Massachusetts.

1159.   The torts at issue here were committed within the Commonwealth of Massachusetts.

1160.   Moreover, the activities of Mitchell and Telecom Logic and TelexFree and its co-conspirators were within the flow of, were intended to, and did have a substantial effect on the commerce of the Commonwealth of Massachusetts.

1161.   The United States District Court for the District of Massachusetts has in personam jurisdiction over Telecom Logic, Mitchell and TelexFree because, inter alia, Mitchell and Telecom Logic and TelexFree: (a) had substantial contacts, events and transaction giving rise to Plaintiff's claims occurring in Massachusetts, (b) had carried out a substantial portion of the affected interstate trade and commerce addressed within the complaint in Massachusetts and (c)

was engaged in an illegal scheme and conspiracy that was directed at and had the intended effect of causing injury to persons and entities residing in, located in, or doing business throughout the Massachusetts.

1162.   The volume and nature of activity was such that Mitchell and Telecom Logic and TelexFree subjected themselves to the jurisdiction of the Commonwealth of Massachusetts who has an interest in the matter and controversies addressed through MDL 2566.

1163.   As identified in a TelexFree executive summary touting its program and team, Mitchell is a software engineer with expertise in VoIP technology as well as IT networking.

1164.   As far back as April 2011, Defendant Mitchell was part of TelexFree Founders and Executive Officers James Merrill and Carlos Wanzeler's inside team.

1165.   An organizational chart of TelexFree prepared in or about March 2014 identifies Mitchell as one of three primary actors responsible for TelexFree's United States IT department. Mitchell is described as TelexFree's "VoIP Communication Engineer . . . contracted from Telecom Logic" and as being responsible also for overseeing Brazil VoIP and other IT staff.

1166.   While in the Commonwealth of Massachusetts, Defendants Telecom Logic and Mitchell developed and adapted the software necessary for the operation of the TelexFree program.  As Mitchell stated in an email to Merrill on September 12, 2012, "I will maintain responsibility for all mission critical telecom and IT components in the company that directly support operations of the TelexFree client software, the databases that power it all, and the networking and telecom software."  Mitchell and Telecom Logic provided the software and IT oil that kept the TelexFree machine running.

1167.   Beginning in March of 2012, Mitchel and Telecom Logic became intimately familiar with TelexFree's business model and structure and its growth potential so that Mitchell

can properly prepare for network volume so much so that on June 6, 2012 Mitchell emailed

Merrill demanding to be made a partner and lead the engineering side of the business.

1168.   In the course of his work with TelexFree, Mitchell discussed TelexFree's

strategies with Merrill, including its use of legal representative Nehra as a marketing tool, to give

victims the false impression of TelexFree's legality.

1169.   Mitchell helped Merrill and Wanzeler with the Logitel Database. The total

number of minutes each VoIP plan used was automatically copied from the Logitel Database.

The Logitel Database contained the actual VoIP technology itself that directed the internet phone

calls to maximize speed and efficiency. The related data clearly established that little to no phone

use was in play and that TelexFree's money was generated from new Promoters. This fact was

confirmed by Mitchell when he confronted Merrill early on while they travelled together to

Brazil.

1170.   Nevertheless, Telecom Logic, through Mitchell, worked closely with TelexFree

Founders Merrill and Wanzeler and as part of the team assembled to establish TelexFree's

United States operations and thereafter enabled it to present the façade of a legal program, all the

while knowing it was a pyramid scheme.

1171.   For example, in a June 13, 2012 email, Merrill contacted Mitchell (and cc'd

Wanzeler) in connection with the development and furtherance of branding TelexFree's phone

service product and its launch in the United States. He asked Mitchell to get in touch with

another company (Blue Jimp, Inc.) to assist in developing and customizing software in that

effort. The following day Merrill again emailed Mitchell urging him to contact Blue Jimp as

soon as possible to "speed up our launch." He informed Mitchell in that same email that the

"product is critical to our company being compliant legally and our overall success." In a reply

email that day, Mitchell reassured Merrill and Wanzeler that he was already in touch with the company. It was known at the time that TelexFree was an unlawful business operation.

1172.   In an email dated June 15, 2012, Mitchell identified himself to Emil Ivov at Blue Jimp as the "principle engineer working with Jim Merrill and company."

1173.   Several days later, in a June 19, 2012 email, Merrill once again urged Mitchell to speed up the project, stating "Ryan is there anything you can do to get started now while until [sic] they are paid. I know I spoke to you earlier about the importance of this project. We need this product to keep our momentum in TelexFree." Mitchell reassured him of his efforts to get TelexFree's new product up and running as soon as possible, stating "it is higher priority for me than my other projects and customers. I want this to be successful and grow the company, so we will make it work."

1174.   The following day Mitchell's actual knowledge of TelexFree's illegal pyramid structure was crystalized when James Merrill described the scheme's current state: "We need this to be an agent driven product. In February TelexFree launched [sic] we thought it would work but we needed product sales to prove the model and just as important make it legal. What we have now for products evidently did not work.  We need something exciting to get the agents buying and reselling product. . . We need something to get the agents excited about selling products or at least willing to buy for themselves. This makes us legal and profitable. . . We didn't think about pursuing this [Ponzi scheme] until we found product sales were not going to be enough to make us legal and we knew our agent base was large enough to make this project work. . . We need something to get the agents excited about selling products or at least willing to buy for themselves. This makes us legal and profitable."

1175.   One month later, TelexFree's continued illegality was made plain to Mitchell in a

July 30, 2012 email from Wanzeler to Mitchell and Merrill. After Mitchell asked for clarification around a software change Wanzeler wanted to make, Wanzeler expressly stated that it was not a software change but that the current compensation plan needed to change so that they "cannot shut us down inside United States." Wanzeler wanted Mitchell and Telecom Logic LLC's new software in place so that TelexFree could "present this new format [requiring a minimum of 1 customer for its ADCentral to receive commission and bonuses from TelexFree] to our agents with [less] impact."

1176.   To hammer home the point of TelexFree's illegal operations, on August 17, 2012, Wanzeler emails Merrill and Mitchell stating:

> Please look what happen with this company, was closed for investigation inside US, the [sic] have the same lawyer we have. http://www.youtube.com/watch?v=s2w841icVBg.  Breaking Zeek Rewards News: Rex Venture Group Closes Doors Due To Escalated Investigation.  This is another reason we need work fast to bring more product to our company to make our company more profit by the product not on Agents setup FEE.

1177.   Despite knowing that TelexFree's program was operating illegally, from late August 2012, Mitchell entered into discussions with Merrill and Wanzeler regarding increasing his commitment to and involvement with TelexFree, which was "necessary to enable TelexFree success," and regarding becoming its director of engineering.

1178.   Following a discussion with Merrill and Wanzeler on August 31, 2012, Mitchell emailed Merrill and Wanzeler on September 1, 2012 with a proposal for his work commitment and compensation. He proposed a compensation package for his work on TelexFree consisting of $2,500/month fixed payment, expenses for his trips to Massachusetts, possible health insurance, and a "percentage of [MLM] sales commissions... many times my salary." Mitchell also committed to "flying to MA for 5 days each month" when Diorgeney was in the US or "5 days every other month" if Diorgeney was not in Massachusetts.

1179.   Mitchell proposed that his role at TelexFree would be as Director of Engineering, where he would take responsibility for "all mission critical telecom and IT components in the company that directly support operations of the TelexFree client software, the databases that power it all, and the networking and telecom software (including continuing work on Diskavontade)." He wanted to have "final control" over database operations, network security and the configuration and routing of carrier VoIP connections. Mitchell supported his compensation requests by arguing that "if the volume of business grows by a factor of 5 [which it eventually did] and I've engineered the critical telecom and database systems to enable that to happen, [then] I should be making in bonuses many times my salary." In short, despite knowing that TelexFree's program as it was operating was illegal, Mitchell committed to build the systems that would allow TelexFree's Pyramid/Ponzi scheme to function and thrive and expected bonus payments that would reflect the centrality of his work to the scheme's success.

1180.   Near the end of September 2012, Mitchell noted in an email to Merrill and Wanzeler that "not too many people are using" TelexFree out calls and wondered if people were having problems. Mitchell noted that "when I look during the day I only see 2 or 3 simultaneous calls." In response, in an email on September 21, 2012, Wanzeler explained to Merrill and Mitchell that agents would have to acquire an additional customer paying $49.90 a month before making money on the MLM side of TelexFree. However, he noted that customer can be the agent himself. Wanzeler explained this "will be very good to our company" because "[t]his way will have thousand customers/agents pay the monthly fee if his [sic] want make money on MLM side, not only on the advertising side." Mitchell agreed and proposed doing a "detailed risk and profit analysis of the business model." He did so knowing that the business model was unlawful and that this would unlawfully maintain, sustain and potentially grow TelexFree's unlawful

Pyramid/Ponzi scheme.

1181.   By December 2012, at the latest, Mitchell was aware that sales of the VoIP product were plainly insufficient to support the payments due to victims under the TelexFree plan.

1182.   During a trip to Brazil in December 2012, Mitchell listened to Merrill and Wanzeler's description of TelexFree's business plan and asked an obvious question: How does a company that takes in $1,425 (from selling an AdCentral Family plan) but then has to pay out $5,200 a year per plan, survive? Where does the money come from?

1183.   During a series of emails between December 7 and 9, 2012, Mitchell asked how much revenue was coming from the sale of the VoIP and added, "If you can't answer these simple questions . . . everyone is eating BS!" Merrill acknowledged the obvious: "If all the Revenue is from agent start up fees and we pay agents without them acquiring customers, we would be in trouble."

1184.   On January 7, 2012 Mitchell emails Wanzeler confirming he understands the finance side of the pyramid scheme and explains that "the business plan is to grow the network as large as possible, then tweak commissions/bonus so growth slows/halts (without collapsing the network)".  He then emails Merrill and Wanzeler that same day regarding his understanding of TelexFree's scheme, stating "Considering that we have a variety of agents that have earned millions with very little actual product sold, that makes X (the average liability per agent) a big negative for us."

1185.   Despite knowing TelexFree was "BS", Telecom Logic and Mitchell knowingly continued providing substantial assistance that enabled TelexFree's program to function, and to take victims' funds, for another 16 months until TelexFree's collapse in April 2014.

1186.   In mid-January 2013, Mitchell assisted TelexFree in addressing its need for additional bandwidth and installed an additional server. Mitchell exchanged emails with Wanzeler, Merrill, and Diorgeney in determining TelexFree's approach and Access Northeast's need to shut the network in order to increase TelexFree's bandwidth.

1187.   Telecom Logic and Mitchell were still part of the core TelexFree team in June 2013. In a June 5, 2013 email, TelexFree's Ana Paula Oliveira sent an email to Wanzeler, Merrill, Costa, Mitchell, and Jay Borromei, cc-ing Andreia Moreira, regarding fraudulent transactions involving ProPay, Inc. and informing them that almost 25% of the transactions completed on June 3, 2013 were fraudulent.

1188.   Even the investigation and closure of TelexFree in Brazil by Brazilian authorities did not deter Mitchell from continuing his knowing provision of software services essential to TelexFree's unlawful operations in the summer of 2013, by, inter alia, providing technical support with manual upload numbers for consumers to use 99telexfree service, assisting with the Asterisk SIP configuration details and dial plan for a trunk of TelexFree/Diskavontade, and spearheading Mobile Virtual Network Operator (MVNO) plan.

1189.   An email dated January 17, 2014 from Mitchell to Defendant Borromei confirms Mitchell's knowledge of the Brazilian shutdown as an illegal scheme. In it, Mitchell stated in reference to Wanzeler: "I know he's busy with legal quagmires in Brazil."

1190.   With the Brazilian investigation ongoing, in January of 2014 Mitchell assisted TelexFree's Diorgeney by altering TelexFree's database by migrating only Brazilian promoter data and creating a temporary database for US promoter data. TelexFree was required to turned over its data to legal authorities in Brazil, but Diorgeney informed Mitchell in an email dated January 17, 2014 that "Carlos want to make a copy of our database in another server ( we can use

the last backup that you did), and  use a separate web server with SIG only, not the website (only some reports from SIG). I will work with Gabriel Tamanini with it. We have until friday to finish everything."

1191.   In its post-bankruptcy petition filings, TelexFree identified Telecom Logic as one of its contracting agencies providing IT and customer service support and moved for authorization to pay Telecom Logic $16,000 which it estimated to be owed to it prior to the petition date.

1192.   Mitchell's critical role in the scheme was detailed in the Department of Justice's trial brief filed in connection with its criminal action against James Merrill on September 28, 2016. See United States v. Merrill, U.S.D.C. Mass., Case No. 4:14-cr-40028-TSH, Doc. No. 299 (Government's Trial Mem., dated Sept. 28, 2016) (incorporated herein by reference).

## VI.    CLASS ACTION ALLEGATIONS

1193.   Under Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs sue on their own behalf, and on behalf of all other persons similarly situated ("the Class").  The Class that Plaintiffs seek to represent is:

> All persons residing in the United States who purchased TelexFree AdCentral or AdCentral Family packages and suffered a Net Loss[2] during the period from January 1, 2012 to April 16, 2014 (the "Class Period").

1194.   Excluded from the Class are Defendants and their officers, directors, and employees; any entity in which any Defendant has a controlling interest; the co-conspirators, the so-called Top-Level Promoters, legal representatives, attorneys, heirs, and assigns of Defendants.

1195.   Plaintiffs meet the requirements of Federal Rules of Civil Procedure 23(a) because the members of the Class are so numerous that the joiner of all members is impractical.

---

[2] "Net Loss" is defined as the class member having invested more funds than they withdrew.

While the exact number of Class members is unknown to Plaintiffs, it is in the hundreds of thousands.

1196.   Plaintiffs meet the requirements of Federal Rules of Civil Procedure 23(a) because there is a well-defined community of interest among the members of the Class, common questions of law and fact predominate, Plaintiffs' claims are typical of the members of the Class, and Plaintiffs can fairly and adequately represent the interests of the Class.

1197.   This action satisfies the requirements of Federal Rule of Civil Procedure 23(b)(3) because it involves questions of law and fact common to the members of the Class that predominate or questions affecting only individual members, including, but not limited to:

a.   whether the contract under which TelexFree claims to invoke the application of Nevada law is illegal and unenforceable as a matter of law;

b.   whether TelexFree's claim to invoke the application of Nevada law is enforceable;

c.   whether TelexFree ran an unlawful Pyramid Scheme or a legitimate business;

d.   whether TelexFree ran a lawful MLM program or an unlawful pyramid scheme;

e.   whether each Defendant knew that TelexFree was an illegal Pyramid Scheme, yet continued to aid, abet and further such illegal activities or are otherwise liable for the economic loss suffered by the Putative Class;

f.   whether the aid that each Defendant provided was a substantial in the context of aiding and abetting;

g.   was TelexFree a "multi-level distribution company" as defined by Massachusetts General Laws Chapter 93, Section 69(a);

h.   did the standard TelexFree Pre-March 9 Contract contain promises to pay merely

for the recruitment of new members in violation of Massachusetts General Laws Chapter 93, Section 69(a);

i.  did the standard TelexFree Pre-March 9 Contract contain offers to pay a "finder's fee, bonus, refund, override, commission, cross-commission, dividend or other consideration" to Participants in the TelexFree Program in violation of Massachusetts General Laws Chapter 93, Section 69(a);

j.  did the TelexFree Program offer its Members payment without requiring them to engage in any "bona fide and essential supervisory, distributive, selling or soliciting" nor exercise any "judgment," "skill," or "control over the operation in violation of Massachusetts General Laws Chapter 93, Section 69(a);

k.  did each of the Financial Services Defendants have actual knowledge of TelexFree's suspicious, tortious or unlawful activities;

l.  when did each of the Financial Services Defendants have actual knowledge of TelexFree's suspicious, tortious or unlawful activities;

m.  whether TelexFree's Financial Services Providers, including the aforesaid banking institutions and payment processing services providers aided and abetted TelexFree's Pyramid Scheme;

n.  whether TelexFree violated M.G.L. c. 93A;

o.  whether Massachusetts' Blue Sky Laws will apply to the claims of the Putative Class;

p.  whether TelexFree violated M.G.L. c. 110A, § 410 - Massachusetts' Blue Sky Laws;

q.  whether certain Defendants used and employed manipulative and deceptive

devices and contrivances in violation of M.G.L. c. 110A, § 410; used means and

instrumentalities, directly and indirectly, for the purchase and sale of unregistered

securities; and used and employed manipulative and deceptive devices and

contrivances in violation of the Massachusetts Uniform Securities Act, M.G.L. c.

110A, § 410(b) and M.G.L. c. 93A;

r.   whether TelexFree mailed fraudulent and inaccurate 1099 (Miscellaneous

Income) forms to investors;

s.   whether the 1099 (Miscellaneous Income) forms should be declared void as a

matter of law;

t.   whether Defendants' conduct violated any of the articulated Massachusetts state

common laws; and

u.   whether Plaintiffs and the Class are entitled to damages, civil penalties, punitive

damages, and/or injunctive relief.

1198.   Plaintiffs' claims are typical of those of other Class members because Plaintiffs

were defrauded by Defendants' common Scheme.

1199.   Plaintiffs will fairly and accurately represent the interests of the Class.

1200.   The prosecution of separate actions by individual members of the Class would

create a risk of inconsistent or varying adjudications regarding individual members of the Class,

which would establish incompatible standards of conduct for Defendants and would lead to

repetitive adjudication of common questions of law and fact.

1201.   Class treatment is superior to any other method for adjudicating the controversy.

Plaintiffs know of no difficulty likely to be encountered in the management of this litigation that

would preclude its maintenance as a class action under Rule 23(b)(3).

1202.   Damages for any individual class member likely cannot justify the cost of individual litigation, so that absent class treatment, the Defendants' violations of law inflicting substantial damages in the aggregate would go un-remedied without certification of the Class.

1203.   Defendants have acted or refused to act on grounds that apply to the Class, as alleged above, and certification is proper under Rule 23(b)(2).

## VII.   FRAUDULENT CONCEALMENT

1204.   Throughout the Class Period, Defendants affirmatively and fraudulently concealed their unlawful conduct from Plaintiffs and the Class.

1205.   Plaintiffs and the members of the Class did not discover and could not have discovered through the exercise of reasonable diligence that Defendants were violating the laws as alleged herein until TelexFree claimed bankruptcy in April 2014.  Nor could Plaintiffs and the members of the Class have discovered the violations earlier than that time because Defendants concealed from Plaintiffs and the Class the nature of their unlawful conduct and acts in furtherance thereof, and fraudulently concealed their activities through various other means and methods designed to avoid detection.

1206.   As a result of Defendants' fraudulent concealment of their actions, Plaintiffs and the Class assert the tolling of an applicable statute of limitations affecting the rights of action of Plaintiffs and Class members.

## VIII.   CLAIMS FOR RELIEF

**FIRST CLAIM FOR RELIEF**
**VIOLATIONS OF MASSACHUSETTS GENERAL LAWS,**
**CHAPTER 93, SECTIONS 12 and 69[3]**
**(Against TelexElectric, LLLP, Telex Mobile, Holdings, Inc., James M. Merrill, Carlos N. Wanzeler, Carlos Roberto Costa, Steven M. Labriola, Joseph H. Craft, Ana Paula Oliveira, Andreia B. Moreira, Katia Wanzeler, The Estate of Jeffrey A. Babener, Gerald P. Nehra, Gerald P. Nehra, Attorney at Law, Nehra and Waak)**

1207.   Plaintiffs incorporate by reference all allegations in all previous paragraphs, as though fully set forth here.

1208.   Defendants TelexElectric, LLLP, Telex Mobile, Holdings, Inc., James M. Merrill, Carlos N. Wanzeler, Carlos Roberto Costa, Steven M. Labriola, Joseph H. Craft, Ana Paula Oliveira, Andreia B. Moreira, Katia Wanzeler, The Estate of Jeffrey A. Babener, Gerald P. Nehra, Gerald P. Nehra, Attorney at Law, and Nehra and Waak engaged in acts in violation of Massachusetts General Laws Chapter 93, Section 69.

1209.   Massachusetts General Laws Chapter 93, Section 12 provides for a private right of action for violations of Chapter 93, Section 69.

1210.   In consequence of said Defendants' violative conduct, Plaintiffs and the Putative Class have suffered great financial losses and have also incurred considerable expenses and loss of income and have otherwise been greatly damaged.

1211.   In consequence of said Defendants' violative conduct or other unfair and

---

[3] **Section 69: Definition; requirements:** Section 69. (a) As used in this section the term "multi-level distribution company" shall mean any person, firm, corporation or other business entity which distributes for a valuable consideration, goods or services through independent agents, contractors or distributors, at different levels, wherein participants in the marketing program may recruit other participants, and wherein commissions, cross-commissions, bonuses, refunds, discounts, dividends or other considerations in the marketing program are or may be paid as a result of the sale of such goods and services or the recruitment, actions or performances of additional participants.

deceptive acts and practices, Plaintiffs and the Putative Class have been similarly caused to

suffer ascertainable economic loss, have incurred expense and have otherwise been similarly

damaged.  Because these defendants' violations of Massachusetts General Laws Chapter 93,

Section 69 were done with malicious intent to injure the members of the Putative Class, the Class

is entitled to (up to) three times the amount of actual damages sustained, together with the costs

of suit, including reasonable attorneys' fees.

### SECOND CLAIM FOR RELIEF
### VIOLATIONS OF MASSACHUSETTS GENERAL LAWS, CHAPTER 93A, SECTIONS 2 AND 11
**(Against James M. Merrill, Carlos N. Wanzeler, Carlos Roberto Costa, Steven M. Labriola, Joseph H. Craft, Ana Paula Oliveira, Andreia B. Moreira, Katia Wanzeler, The Estate of Jeffrey A. Babener Gerald P. Nehra, Gerald P. Nehra, Attorney at Law, and Nehra and Waak)**

1212.   Plaintiffs incorporate by reference all allegations in all previous paragraphs, as

though fully set forth here.

1213.   Defendants James M. Merrill, Carlos N. Wanzeler, Carlos Roberto Costa, Steven

M. Labriola, Joseph H. Craft, Ana Paula Oliveira, Andreia B. Moreira, Katia Wanzeler, The

Estate of Jeffrey A. Babener, Gerald P. Nehra, Gerald P. Nehra, Attorney at Law, and Nehra and

Waak were engaged in "trade" and "commerce" as defined by Massachusetts General Laws

Chapter 93A, Section 1.

1214.   Plaintiffs and the Putative Class were engaged in "trade" and "commerce" as

defined by Massachusetts General Laws Chapter 93A, Section 1.

1215.   The transactions, actions or inaction of the Operational Defendants constitute

unfair and deceptive acts and practices as defined by, and in violation of, Massachusetts General

Laws, Chapter 93A, Sections 2 and 11.

1216.   In addition, said Defendants engaged in acts in violation of Massachusetts

General Laws Chapter 93, Section 69.  Pursuant to Chapter 93, Section 69(g) any violation of the provisions of M.G.L. c. 93, section 69 shall constitute an unlawful method, act or practice within the meaning of clause (a) of section two of chapter ninety-three A.

1217.   As a result, the foregoing transactions, actions and inactions of said Defendants thereby constitute per se an unlawful method, act or practice within the meaning of Massachusetts General Laws, Chapter 93A, Section 2(a) by operation of Massachusetts General Laws, Chapter 93, Section 69(g).

1218.   The foregoing transactions, actions and inactions of said Defendants thereby constitute per se unfair and deceptive acts and practices as defined by, and in violation of, Massachusetts General Laws Chapter 93A, §§ 2 and 11.

1219.   In consequence of said Defendants' violative acts, and unfair methods of competition or unfair or deceptive acts or practices, Plaintiffs and the Putative Class have been similarly caused to suffer ascertainable economic loss, have incurred expense and have otherwise been similarly damaged.  These defendants' violations of Massachusetts General Laws Chapter 93A, Section 69 were willful or knowing, and the Class is therefore entitled to (up to) three times the amount of actual damages sustained, together with the costs of suit, including reasonable attorneys' fees.

## THIRD CLAIM FOR RELIEF
### CIVIL CONSPIRACY
**(Against TelexElectric, LLLP, Telex Mobile, Holdings, Inc., James M. Merrill, Carlos N. Wanzeler, Carlos Roberto Costa, Steven M. Labriola, Joseph H. Craft, Ana Paula Oliveira, Andreia B. Moreira, Katia Wanzeler, The Estate of Jeffrey A. Babener, Gerald P. Nehra, Gerald P. Nehra, Attorney at Law, Nehra and Waak, Garvey Schubert P.C., Robert Weaver, Sara P. Sandford, The Sheffield Group, Inc. , Telecom Logic, LLC,  Ryan James Mitchell, Fidelity Co-operative Bank John Merrill, Kevin Staten, International Payout Systems, Inc., Edwin Gonzalez, Natalia Yenatska, Base Commerce, John Hughes, Dustin Sparman, Allied Wallet, Inc, , Ahmad Khawaja,  Mohammad Diab, Priority Payout, Corp., Thomas A. Wells)**

1220.   Plaintiffs incorporate by reference all allegations in all previous paragraphs, as though fully set forth here.

1221.   Defendants TelexElectric, LLLP, Telex Mobile, Holdings, Inc., James M. Merrill, Carlos N. Wanzeler, Carlos Roberto Costa, Steven M. Labriola, Joseph H. Craft, Ana Paula Oliveira, Andreia B. Moreira, Katia Wanzeler, The Estate of Jeffrey A. Babener, Gerald P. Nehra, Gerald P. Nehra, Attorney at Law, Nehra and Waak Garvey Schubert P.C., Robert Weaver, Sara P. Sandford, The Sheffield Group, Inc. , Telecom Logic, LLC,  Ryan James Mitchell , Fidelity Co-operative Bank, John Merrill, Kevin Staten, International Payout Systems, Inc., Natalia Yenatska, Base Commerce, John Hughes, Dustin Sparman, Allied Wallet, Inc, Ahmad Khawaja,  Mohammad Diab,  Priority Payout Corp., Thomas A. Wells, and the third party TelexFree entities combined by common design to enter into a sprawling pyramid scheme and money laundering and sheltering civil conspiracy.

1222.   Said Defendants and the third party TelexFree entities conspired with each other to operate, maintain, sustain, profit from, expand and maintain a fraudulent Pyramid Scheme including but not limited to money laundering, syphoning and sheltering, in violation of Massachusetts General Laws Chapter 93, Section 69 and Chapter 93A or to further TelexFree's unlawful enterprise including, but not limited to, money laundering, syphoning and sheltering.

1223.   Said Defendants and the third party TelexFree entities, by agreement or common

design, engaged directly in the operation of, or otherwise worked in concert to further the activities of, the unlawful Pyramid Scheme.

1224.   As detailed above, each of said Defendants and the third party TelexFree entities engaged in a tortious act in furtherance of the agreement or common design to engage in the unlawful Pyramid Scheme.

1225.   Said Defendants and the third party TelexFree entities conspired with each other, making use of confidential information, and used this confidential information to misappropriate the funds of the Putative Class through the operation and maintenance of the unlawful Pyramid Scheme.

1226.   Said Defendants and the third party TelexFree entities, for an unlawful purpose and using unlawful means, with the intent of so combining, unlawfully defrauded Plaintiffs and the Putative Class out of funds.

1227.   Said Defendants and the third party TelexFree entities' conduct constitutes a conspiracy to operate an unlawful enterprise, rendering all Defendants jointly and severally liable for the breaches of each other's obligations.

1228.   Said Defendants and the third party TelexFree entities substantially assisted the Scheme and each other with actual knowledge of the tortious and illegal nature of the Scheme.

1229.   As a direct and proximate cause of said Defendants and the third party TelexFree entities' conspiracy, the Putative Class has and will continue to suffer substantial direct and consequential damages and Plaintiffs demand they and the Putative Class be made whole.

## FOURTH CLAIM FOR RELIEF
## NEGLIGENT MISREPRESENTATION
**(Against TelexElectric, LLLP, Telex Mobile, Holdings, Inc., James M. Merrill, Carlos N. Wanzeler, Carlos Roberto Costa, Steven M. Labriola, Joseph H. Craft, Ana Paula Oliveira, Andreia B. Moreira, Katia Wanzeler, The Estate of Jeffrey A. Babener, Gerald P. Nehra, Gerald P. Nehra, Attorney at Law, Nehra and Waak)**

1230.   Plaintiffs incorporate by reference all allegations in all previous paragraphs, as though fully set forth here.

1231.   The Defendants TelexElectric, LLLP, Telex Mobile, Holdings, Inc., James M. Merrill, Carlos N. Wanzeler, Carlos Roberto Costa, Steven M. Labriola, Joseph H. Craft, Ana Paula Oliveira, Andreia B. Moreira, Katia Wanzeler, The Estate of Jeffrey A. Babener, Gerald P. Nehra, Gerald P. Nehra, Attorney at Law, Nehra and Waak), directly, and through their agents, servants, employees and/or representatives, negligently made false misrepresentations of material fact and omissions to Plaintiffs and the Putative Class in the course of their businesses for the purpose of obtaining and/or wrongfully appropriating and converting money from Plaintiffs and the Putative Class.

1232.   These Defendants made negligent misrepresentations and omissions. Said Defendants knew or should have known, that such representations were false.

1233.   Said representations, statements and omissions were material and were relied upon by Plaintiffs and the Putative Class, inducing them to furnish money to Defendants.

1234.   Further, these Defendants failed to exercise proper due diligence in the discharge of their investigatory duties as certified public accountants and attorneys of TelexFree and knew or should have known Plaintiffs and the Putative Class would have relied upon their expertise and misrepresentations.

1235.   Plaintiffs and the Putative Class reposed faith, confidence and trust in said said Defendants' representations and advice.

1236.   In consequence of the reliance on the negligent misrepresentations of said

Defendants, Plaintiffs and the Putative Class have suffered great financial losses, have also

incurred considerable expenses and loss of income, and have otherwise been greatly damaged

and demand they be made whole.

**FIFTH CLAIM FOR RELIEF**
**VIOLATIONS OF MASSACHUSETTS GENERAL LAWS,**
**CHAPTER 110a, SECTION 410(b)**
**(Against TelexElectric, LLLP, Telex Mobile, Holdings, Inc., James M. Merrill, Carlos**
**N. Wanzeler, Carlos Roberto Costa, Steven M. Labriola, Ana Paula Oliveira, Andreia B.**
**Moreira, Katia Wanzeler, The Estate of Jeffrey A. Babener, Gerald P. Nehra, Gerald P.**
**Nehra, Attorney at Law, Nehra and Waak)**

1237.   Plaintiffs incorporate by reference all allegations in all previous paragraphs, as

though fully set forth here.

1238.   At the time of the wrongs alleged, the Defendants TelexElectric, LLLP, Telex

Mobile, Holdings, Inc., James M. Merrill, Carlos N. Wanzeler, Carlos Roberto Costa, Steven M.

Labriola, Ana Paula Oliveira, Andreia B. Moreira, Katia Wanzeler, The Estate of Jeffrey

A. Babener, Gerald P. Nehra, Gerald P. Nehra, Attorney at Law, Nehra and Waak were each a

controlling person, partner, officer, director, person occupying a similar status, agent or

employee materially aiding in the sale of securities, of TelexFree within the meaning of Section

410(b) of the Massachusetts Uniform Securities Act, Massachusetts General Laws Chapter

110A.

1239.   By their respective positions of authority, each had the power and authority, to

influence and control, and influenced and controlled, the decision-making and activities of

TelexFree and the affiliated TelexFree entities and caused them to engage in the wrongful

conduct described and in violations of Section 410(a) of the Massachusetts Uniform Securities

Act, M.G.L. c. 110A.

1240.   Defendants TelexElectric, LLLP, Telex Mobile, Holdings, Inc., James M. Merrill,

Carlos N. Wanzeler, Carlos Roberto Costa, Steven M. Labriola, Ana Paula Oliveira, Andreia B. Moreira, Katia Wanzeler, The Estate of Jeffrey A. Babener, Gerald P. Nehra, Gerald P. Nehra, Attorney at Law, Nehra and Waak actively participated in the leadership and decision-making process of the selling entity causing the dissemination of false and misleading statements and omissions of material facts.

1241.   By their positions and participation, and because of the aforementioned conduct, said Defendants are liable under Section 410(b) of the Massachusetts Uniform Securities Act, Massachusetts General Laws Chapter 110A.

1242.   In addition, Defendants James M. Merrill, Carlos N. Wanzeler, Carlos Roberto Costa, Steven M. Labriola, Ana Paula Oliveira, Andreia B. Moreira, Katia Wanzeler, The Estate of Jeffrey A. Babener, Gerald P. Nehra, Gerald P. Nehra, Attorney at Law, Nehra and Waak were agents who materially aided in the sales of the fraudulent securities in violation of Sections 410 (b) of the Massachusetts Uniform Securities Act, Massachusetts General Laws Chapter 110A.

1243.   Said Defendants made significant contributions toward making the sales to Plaintiffs and the Putative Class possible through their actions detailed above.

1244.   Said Defendants prepared and provided information on and endorsed and actively promoted the opportunity regarding the securities on websites and at TelexFree events and extravaganzas.  Each of the said Defendants provided print materials, electronic materials, and made oral representations to the Putative Class

1245.   The stated Defendants are liable under 410(b) for the primary violation by TelexFree under 410(a) because Defendants materially aided in the sale of unregistered securities, and knew, or by reasonable diligence should have known, of the primary violation.

1246.   Said Defendants are jointly and severally liable for the primary violations under Section 410(a)(2) detailed above.

1247.   Plaintiffs and the Putative Class seek the award of actual damages on behalf of the Class.

1248.   The Putative Class has and will continue to suffer irreparable harm as a result of the Defendants' conduct that cannot adequately be redressed at law.

1249.   Unless this Court grants injunctive relief, the Putative Class will be irreparably harmed in a manner not fully compensable by money damages.

**SIXTH CLAIM FOR RELIEF**
**FRAUD**
**TelexElectric, LLLP, Telex Mobile, Holdings, Inc., James M. Merrill, Carlos N. Wanzeler, Carlos Roberto Costa, Steven M. Labriola, Ana Paula Oliveira, Andreia B. Moreira, Katia Wanzeler, The Estate of Jeffrey A. Babener, Gerald P. Nehra, Gerald P. Nehra, Attorney at Law, Nehra and Waak**

1250.   Plaintiffs incorporate by reference all allegations in all previous paragraphs, as though fully set forth here.

1251.   Defendants TelexElectric, LLLP, Telex Mobile, Holdings, Inc., James M. Merrill, Carlos N. Wanzeler, Carlos Roberto Costa, Steven M. Labriola, Ana Paula Oliveira, Andreia B. Moreira, Katia Wanzeler, The Estate of Jeffrey A. Babener, Gerald P. Nehra, Gerald P. Nehra, Attorney at Law, Nehra and Waak directly, and through their agents, servants, employees and/or representatives, did intentionally or recklessly make false representations and omissions of material fact to Plaintiffs and the Putative Class with these misrepresentations being made to obtain and/or wrongfully appropriate and convert money from Plaintiffs and the Putative Class.

1252.   Said Defendants' fraudulent or reckless misrepresentations and omissions are detailed above and include, but are not limited to:

a.   providing false and misleading information on the nature of TelexFree's business

operation;

b.  misrepresenting the financial statements;

c.  providing false and misleading information on the value of the AdCentral
    package;

d.  providing false and misleading information on the method and source from which
    income was derived;

e.  providing false and misleading information on the legality of TelexFree's
    business model;

f.  providing false and misleading information on the sustainability of the returns to
    Promoter;

g.  providing false and misleading information regarding the investigation in Brazil
    and subsequent closure of TelexFree's Brazilian operations;

h.  knowingly participating in false and deceptive information broadcast over the
    internet and other media;

i.  failing to comply with federal and state laws;

j.  employing legal and accountant counsel to mask their illegal and fraudulent
    activities to further and perpetuate such illegal fraudulent activities; and

k.  setting up TelexFree's computer servers in a foreign country with the intent to
    avoid prosecution, legal service on the benefits of United States legal process and
    otherwise with knowledge that TelexFree was an unlawful Pyramid Scheme.

1253.   Said Defendants knew of the fraudulent or reckless deceptive misrepresentations
and omissions of material facts set forth.

1254.   Said Defendants made these intentional or reckless misrepresentations although

Defendants knew that such representations were false for the purpose of inducing Plaintiffs and the Putative Class to purchase initially and to continue to purchase memberships and to recruit new members.

1255.   Such misrepresentations and omissions were done knowingly or recklessly for the additional purpose and effect of concealing the true information about the TelexFree Program, including its financial condition and operations.

1256.   Said Defendants received information reflecting the facts regarding TelexFree's business practices and exercised control over the materially misleading misstatements.

1257.   Because of their control over and/or association with the TelexFree Program, said Defendants were active and culpable participants in the fraudulent Scheme.

1258.   Said Defendants knew and recklessly disregarded the false and misleading nature of the information they caused to be disseminated to Promoters and potential Promoters.

1259.   The ongoing fraudulent Pyramid Scheme could not have been perpetrated over a substantial period without the knowledge and complicity of said Defendants.

1260.   These misrepresentations and statements were material and were relied upon by Plaintiffs as true, inducing them to furnish money, directly or indirectly, to said Defendants and recruit new members.

1261.   In consequence of the reliance on the negligent, intentional or reckless misrepresentations, Plaintiffs and the Putative Class have paid artificially inflated prices for worthless membership interests, suffered great financial losses, and have also incurred considerable expenses and loss of income, and have otherwise been greatly damaged during the Class Period and demand to be made whole.

### SEVENTH CLAIM FOR RELIEF
### TORTIOUS AIDING AND ABETTING
### (Against All Defendants)

1262.  Plaintiffs incorporate by reference all allegations in all previous paragraphs, as though fully set forth here.

1263.  Each Defendant provided substantial assistance or encouragement to the other Defendants in committing the primary causes of action alleged herein and did so with unlawful intent and knowledge that such parties were perpetuating an illegal Pyramid Scheme yet continuing to substantially assist or encourage.

1264.  Defendants rendered this substantial assistance despite their knowledge that TelexFree's operations constituted an unlawful, unfair, deceptive and unsustainable Pyramid Scheme and financial fraud.

1265.  Such substantial assistance rendered by Defendants despite their knowledge of the illegal nature of TelexFree's operations, is detailed above and includes, but is not limited to:

    a.  managing and controlling TelexFree and its affiliated entities;

    b.  providing accounting services to TelexFree;

    c.  providing legal services to TelexFree;

    d.  publicly certifying that TelexFree's business model and operations were legal, proper, and economically viable and sustainable;

    e.  providing banking, investment and asset management services for TelexFree and its management;

    f.  promoting TelexFree AdCentral packages;

    g.  continuing to provide financial services following the Brazilian Court's injunction to stop TelexFree's business in Brazil;

    h.  processing payments to, from, and on behalf of TelexFree and its affiliated

entities;

    i.    processing payments for transfers of funds which deepened TelexFree's insolvency; and

    j.    setting up TelexFree's computer servers in a foreign country with the intent to avoid prosecution, legal service on the benefits of United States legal process and otherwise with knowledge that TelexFree was an unlawful Pyramid Scheme.

1266.   Each and every action taken by the Defendants enumerated above as substantial assistance is explicitly incorporated by reference.

1267.   By each Defendant's actions participating in the Pyramid Scheme, as alleged above, each said Defendant aided and abetted the commission of the causes of action alleged herein.

1268.   As a direct and proximate result of TelexFree's illegal Pyramid Scheme and all the activities performed in connection therewith, to which Defendants provided substantial assistance, Plaintiffs and the Putative Class sustained damages and losses and demand to be made whole.

## EIGHTH CLAIM FOR RELIEF
### UNJUST ENRICHMENT
### (Against All Defendants)

1269.   Plaintiffs incorporate by reference all allegations in all previous paragraphs, as though fully set forth here.

1270.   Plaintiffs and the Putative Class conferred a benefit upon the Defendants by furnishing funds, directly or indirectly, to Defendants, who accepted them without protest or defect and retained and benefitted from them.

1271.   Each of the defendants obtained actual knowledge that TelexFree was operating an unlawful pyramid scheme and yet continued to provide it or its associated persons and entities after knowing they were getting paid for efforts that supported and advanced a criminal enterprise and are thus not entitled to payment.

1272.   Participation in a criminal enterprise does not constitute a compensable event.

1273.   Defendants had an appreciation or knowledge of the benefit.

1274.   Defendants knew of such funds received by them.

1275.   Defendants have unlawfully and in bad faith denied Plaintiffs and the putative Class access to such funds and have instead knowingly retained the benefit of such funds for themselves.

1276.   Acceptance or retention by Defendants of the benefit under the circumstances set forth herein would otherwise be inequitable without payment for its value.

1277.   As a direct and proximate result of Defendants' actions, as hereinabove set forth, Defendants are, and continue to be, unjustly enriched and Plaintiffs demand they and the Putative Class be made whole.

## IX.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, pray for judgment against Defendants as follows:

1.   The Court determine that this action be maintained as a class action under Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiffs as Class Representatives and their counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class;

2. The unlawful conduct alleged herein be adjudged and decreed an unlawful Pyramid Scheme in violation of Massachusetts General Laws Chapter 93, § 69 and Chapter 93A, §§ 2 and 11 and the contracts with TelexFree and related entities be declared void and that any tax liability against them for alleged income they never received be declared void;

3. Plaintiffs and the members of the Class recover damages, as provided by law, to the maximum extent allowed under the law, including, without limitations, multiple damages, against Defendants;

4. Plaintiffs and the members of the Class recover their costs of suit, including reasonable attorneys' fees, as provided by law;

5. Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the conduct alleged herein, or from entering into, adopting, or following any practice, plan, program, or device having a similar purpose or effect;

6. Plaintiffs and the members of the Class be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this complaint; and

7. Plaintiffs and the members of the Class be granted such other and further relief as the case may require and the Court may deem just and proper.

## X.    DEMAND FOR JURY TRIAL

Plaintiffs and the Putative Class demand a jury trial of their claims to the extent

authorized by law.

Respectfully submitted,

*/s/ Robert J. Bonsignore*
Robert J. Bonsignore Esq.
(BBO No. 547880)(NH Bar No 21241)
Bonsignore Trial Lawyers, PLLC
23 Forest St.
Medford, MA  02155
Telephone:  781-856-7650
Email: rbonsignore@class-actions.us

**Plaintiffs' Interim Lead Counsel**

Ronald A. Dardeno, Esq.
(BBO No. 548278)
Law Offices of Frank N. Dardeno
424 Broadway
Somerville, MA  02145
Telephone:  617-666-2600
Email: rdardeno@dardeno.com
Telephone:  617-856-8586

D. Michael Noonan, Esq.
(NH Bar No. 8214) (MA Bar No. 558247)
Shaheen and Gordon
140 Washington Street
P.O. Box 977
Dover, NH  03821
Telephone:  603-871-4144
Email: mnoonan@shaheengordon.com

R. Alexander Saveri, Esq.
(CA Bar No. 173102)
Saveri & Saveri, Inc.
706 Sansome Street
San Francisco, CA  94111
Telephone:  415-217-6810
Email: rick@saveri.com

**Plaintiffs Interim Executive Committee**

Edwin Howard (BBO 241700)

Mark Meehan (BBO 565348)
Bonville and Howard
154 Prichard Street
Fitchburg, Massachusetts 01420
Telephone (978) 345 4144
ed@bonvillelaw.com
mark@bonville.com