**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____
                                         )
**IN RE: TELEXFREE SECURITIES**          )
**LITIGATION**                           )          **CIVIL ACTION**
                                         )          **NO.  4:14-md-02566-TSH**
                                         )
_____ )


<u>**ORDER AND MEMORANDUM ON DEFENDANTS' MOTIONS TO DISMISS (Docket**</u>
<u>**Nos. 1287, 1291, 1294, 1297, 1299, 1301, 1303, 1305, 1307, 1310, 1311, 1316, 1317)**</u>

**August 31, 2022**

**HILLMAN, D.J.**

Numerous defendants in the TelexFree multidistrict litigation move to dismiss the Fifth

Consolidated Amended Complaint (the "5CAC").  For the reasons stated in this omnibus order:

the motions filed by The Sheffield Group, Inc. (Docket No. 1299),[1] PNC Bank, N.A. (Docket No.

1301), International Payout Systems, Inc. (Docket No. 1305), Garvey Schubert Barer, P.C.

(Docket No. 1310), and PricewaterhouseCoopers LLP (Docket No. 1317) are ___**granted**___; the motion

filed by The Estate of Jeffrey A. Babener (Docket No. 1311) is ___**granted in part**___ and ___**denied in part**___;

and the motions filed by Mauricio Cardenas (Docket No. 1287), Bank of America, N.A. (Docket

No. 1291), Dustin Sparman and Vantage Payments, LLC (Docket No. 1294), TD Bank, N.A.

(Docket No. 1303), Wells Fargo Advisors LLC and Wells Fargo Bank N.A. (Docket No. 1307),

and ProPay, Inc. (Docket No. 1316) are ___**denied**___.

<u>**Background**</u>

TelexFree was a billion-dollar pyramid scheme that operated from 2012 to mid-April 2014.

5CAC at ¶ 12.  Holding itself out as a multilevel marketing company, TelexFree generated revenue

---

[1] The Sheffield Group's other motion (Docket No. 1297) is ___**denied**___.

by selling packages of Voice over Internet Protocol ("VoIP") calling plans to "promoters." *Id.* at ¶¶ 4, 116. TelexFree charged promoters $50 for membership, and then $289 for the right to sell 10 VoIP plans per month for a year, or $1,375 for the right to sell 50 VoIP plans per month for a year. *Id.* at ¶¶ 147-48. In theory, promoters could make money by selling VoIP plans to consumers. *Id.* at ¶¶ 115, 146, 149. The plans, however, were "impossible to sell." *Id.* at ¶ 182. No matter, TelexFree guaranteed promoters a return on investment, touting, at least until March 9, 2014, that promoters could make money "without selling anything." *Id.* at ¶¶ 161-62.

If a promoter posted TelexFree advertisements on the Internet each day, TelexFree would "buy back" from the promoter any unsold plans for more than three times the amount the promoter paid for them. *Id.* TelexFree paid promoters in "credits." *Id.* at ¶ 158. Once a promoter's credits reached a certain balance, the promoter could withdraw the credits as cash. *Id.* The plaintiffs, Anthony Cellucci and Rita Dos Santos, tendered funds for TelexFree memberships and their promised pre-March 9, 2014 returns. *Id.* at ¶¶ 32-33.

In January 2013, Brazilian regulators announced that they were investigating TelexFree in Brazil, stating that they were concerned that TelexFree violated Brazilian laws against Ponzi schemes. *Id.* at ¶ 175. In June 2013, a Brazilian court issued an injunction prohibiting TelexFree from recruiting new promoters in Brazil, effectively closing the scheme's operations there. *Id.* at ¶ 177. Although TelexFree was also under investigation here, TelexFree executives assured promoters in the United States, like the plaintiffs, that they had nothing to worry about. *Id.* at ¶¶ 165, 167.

On March 9, 2014, TelexFree announced that promoters would have to sell VoIP plans to make money. *Id.* at ¶ 181. The scheme's daily revenues plummeted, and promoters began to demand cash withdrawals of their credits. *Id.* at ¶ 182. Promoters made over $150 million worth

of requests in the weeks following the announcement. *Id.* On April 14, 2014, the scheme unraveled and TelexFree filed for bankruptcy. *Id.* at ¶ 184. The plaintiffs "suffered great financial losses." *Id.* at ¶ 1261.

The next day, law enforcement intercepted a TelexFree executive leaving the scheme's Marlborough, Massachusetts headquarters with a bag containing $38 million in cashier's checks. *Id.* at ¶ 185. The following month, two of the scheme's founders, James Merrill and Carlos Wanzeler, were charged federally with several counts of wire fraud and conspiracy to commit wire fraud. *Id.* at ¶ 188. Merrill pleaded guilty and was sentenced to six years in prison. *Id.* Wanzeler fled to Brazil. *Id.* Years later, law enforcement intercepted an individual traveling from Brazil to the United States to retrieve cash Wanzeler had left behind. *Id.* at ¶ 196. Law enforcement followed the individual to an apartment in which they found $20 million hidden in a mattress box spring. *Id.*

Shortly after the scheme unraveled, plaintiffs filed civil actions in federal district courts across the United States seeking to recover losses against dozens of defendants, ranging from the operators of the scheme to their advisors, payments processors, and banks. In October 2014, the Judicial Panel on Multidistrict Litigation joined the actions into a multidistrict litigation and ordered transfer of all actions to the District of Massachusetts for coordinated pretrial proceedings.

In March 2015, the plaintiffs filed their first consolidated complaint, later amending it once as of right. Many of the defendants moved to dismiss. After a lengthy stay in favor of criminal proceedings, the Court addressed the motions to dismiss in a series of orders in January and February 2019. Thereafter, the plaintiffs moved to amend their complaint, in part to revive claims against several of the dismissed defendants. In December 2021, the Court granted in part the plaintiffs' motion to amend, paving the way to the current operative complaint: the 5CAC. Now,

over a dozen defendants move to dismiss the claims against them in the 5CAC.  This omnibus order addresses each motion in turn.

## Legal Standards

In evaluating a Rule 12(b)(6) motion to dismiss, the Court must determine "whether, construing the well-pleaded facts of the complaint in the light most favorable to the plaintiff[], the complaint states a claim for which relief can be granted." *Cortés-Ramos v. Martin-Morales*, 956 F.3d 36, 41 (1st Cir. 2020) (quoting *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 7 (1st Cir. 2011).  The complaint must allege a "plausible" entitlement to relief.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 559 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  For claims involving fraud, the complaint must allege the circumstances of fraud "with particularity."  *Rodi v. S. New. Enl. Sch. of Law*, 389 F.3d 5, 15 (1st Cir. 2004).  Even so, "intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).

In evaluating a Rule 12(b)(1) motion to dismiss for lack of standing, the "same basic principles apply."  *Hochendoner v. Genzyme Corp.*, 823 F.3d 724, 730 (1st Cir. 2016).  Accepting the well-pleaded factual allegations in the complaint as true, the Court must determine whether the complaint plausibly alleges that the plaintiff has standing to pursue his or her claims in federal court.  *See Gustavsen v. Alcon Laboratories, Inc.*, 903 F.3d 1, 8 (1st Cir. 2018).

In evaluating a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction (under the prima facie standard), the Court considers "whether the plaintiff has proffered evidence that, if credited, is enough to support findings of all facts essential to personal jurisdiction."  *Boit v. Gar-Tec Products, Inc.*, 967 F.2d 671, 675 (1st Cir. 1992).  The Court draws the facts from the

plaintiffs' pleadings and supplemental filings, *see Kuan Chen v. United States Sports Academy, Inc.*, 956 F.3d 45, 52 (1st Cir. 2020), taking them as true, even if disputed by the defendant, *see Adelson v. Hananel*, 510 F.3d 43, 48 (1st Cir. 2001).  The Court may consider the defendant's proffered facts "only to the extent that they are uncontradicted."  *Adelson*, 510 F.3d at 48.

## Discussion

### 1.  Banks

#### a.  Wells Fargo Defendants – Docket Nos. 1287 & 1307

The plaintiffs seek to hold Wells Fargo Bank N.A., Wells Fargo Advisors, LLC, and Mauricio Cardenas (collectively, "the Wells Fargo Defendants") liable for tortious aiding and abetting.[2]  A claim for tortious aiding and abetting under Massachusetts law has three elements: (1) a tortfeasor committed an underlying tort; (2) the defendant knew that the tortfeasor was committing the underlying tort; and (3) the defendant actively participated in or substantially assisted the tortfeasor in committing the underlying tort.  *See Massachusetts Port Authority v. Turo, Inc.*, 166 N.E.3d 972, 981 (Mass. 2021); *Go-Best Assets Ltd. v. Citizens Bank of Mass.*, 972 N.E.2d 426, 438 (Mass. 2012).  The Wells Fargo Defendants argue that the 5CAC fails to state a claim because it does not sufficiently plead the first element: that a tortfeasor committed an underlying tort.  *See* Docket No. 1288 at 11; Docket No. 1308 at 7.

The underlying tort at issue in this case is common law fraud.  To state a claim for common law fraud under Massachusetts law, a plaintiff must allege that the defendant "made a false

---

[2] The 5CAC also includes a claim for unjust enrichment against the Wells Fargo Defendants.  The plaintiffs, in their motion to amend, represented that they intended to reassert their unjust enrichment claim only to preserve their appellate rights.  *See* Docket No. 984 at 47-48.  The plaintiffs reiterate this intention in opposition to the Wells Fargo Defendants' motions to dismiss.  *See* Docket No. 1342 at 13.  To be clear, the unjust enrichment claim against the Wells Fargo Defendants remains dismissed.

representation of material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff reasonably relied upon the representation as true and acted upon it to his damage." *Taylor v. Am. Chem. Council*, 576 F.3d 16, 31 (1st Cir. 2009) (quoting *Russell v. Cooley Dickinson Hosp. Inc.*, 772 N.E.2d 1054, 1066 (Mass. 2002)).

To comply with the heightened pleading requirements of Rule 9(b), a plaintiff typically must specify "the who, what, where, and when of the allegedly false or fraudulent representation." *Alternative Sys. Concepts, Inc. v. Synopsys, Inc.*, 374 F.3d 23, 29 (1st Cir. 2004). "Strict application of the requirements of Rule 9(b) may be relaxed," however, where the alleged fraudulent scheme involves "numerous transactions that occur over a long period of time, and pleading the precise specifics with regard to every instance of fraudulent conduct may be impractical." *In re Pharm. Indus. Average Wholesale Price Litig.*, 478 F. Supp. 2d 164, 171-72 (D. Mass. 2007). In such cases, the plaintiff meets the pleading requirements of Rule 9(b) by alleging the basic framework, procedures, and nature of the scheme. *See 4 MVR, LLC v. Warren W. Hill Construction Co., Inc.*, 2016 WL 4775451, at *3 (D. Mass. Sept. 13, 2016); *In re Pharm. Indus. Average Wholesale Price Litig.*, 478 F. Supp. 2d at 172; *United States ex rel. Harris v. Bernad*, 275 F. Supp. 2d 1, 8 (D.D.C. 2003).

The 5CAC alleges that TelexFree charged promoters $50 for membership, and then $289 for the right to sell 10 VoIP plans per month for a year, or $1,375 for the right to sell 50 VoIP plans per month for a year. 5CAC at ¶¶ 147-48. The 5CAC further alleges that, without requiring promoters to sell VoIP plans, TelexFree guaranteed promoters a return on investment of over 300%, at least until March 9, 2014, by purporting to pay promoters $1,040 for any unsold plans in each $289 package and $5,200 for any unsold plans in each $1,375 package. *Id.* at ¶¶ 147-48, 181.

The 5CAC alleges that the plaintiffs tendered funds for TelexFree memberships and their promised pre-March 9, 2014 returns, and ultimately suffered financial losses. *Id.* at ¶¶ 32-33, 1261.

Read as a whole, *see Garcia-Catalan v. United States*, 734 F.3d 100, 103 (1st Cir. 2013), the 5CAC adequately pleads an underlying fraud. The promised returns to which the plaintiffs' allegations refer are sufficiently clear: a $1,040 return for a $50 membership and a $289 package, and a $5,020 return for a $50 membership and a $1,375 package. The timing and perpetrator of those alleged false promises, moreover, are likewise sufficiently clear: TelexFree (the organization and its operators) guaranteed returns until March 9, 2014, when it adjusted its compensation model to require promoters to sell VoIP plans. Given the expanse and complexity of the scheme, the fraudulent nature of which is otherwise undisputed, the 5CAC adequately pleads an underlying fraud. Accordingly, the Wells Fargo Defendants' motions to dismiss are ***denied***.

### b. Bank of America – Docket No. 1291

The plaintiffs seek to hold Bank of America, N.A. ("Bank of America") liable for tortious aiding and abetting.[3] Bank of America contends that the 5CAC fails to state a claim because it does not sufficiently plead (1) an injury, (2) actual knowledge, (3) substantial assistance, and (4) shared intent.

Allegations. In February 2012, TelexFree opened two deposit accounts at Bank of America and one merchant account at Banc of America Merchant Services, LLC ("BAMS"), Bank of America's payment processing division. *Id.* at ¶¶ 108, 304. Because TelexFree held itself out as a passive investment scheme with guaranteed returns, Bank of America's due diligence flagged TelexFree as a high-risk customer. *Id.* at ¶¶ 217, 316.

---

[3] The 5CAC also includes a claim for unjust enrichment against Bank of America. The plaintiffs included it in the 5CAC only to preserve their appellate rights. *See* Docket No. 1347 at 23. To be clear, the unjust enrichment claim against Bank of America remains dismissed.

The BAMS merchant account processed payments made to TelexFree.  *Id.* at ¶ 304.  In May 2012, BAMS informed TelexFree that it was suspending the merchant account due to a high number of chargebacks.  *Id.* at ¶ 311.  Chargebacks indicate potentially fraudulent activity and occur when a customer challenges or cancels a payment.  *Id.* at ¶ 241.  BAMS expressed concern about the number of chargebacks, the number of transactions in identical amounts, and the number of transactions originating from outside the United States.  *Id.* at ¶ 312.  Upon receiving sample invoices from TelexFree, however, BAMS lifted the suspension and continued processing payments.  *Id.* at ¶ 316.

In June 2012, BAMS informed TelexFree that its chargeback ratio was too high, and that Bank of America was creating a reserve account from TelexFree deposits due to risks associated with TelexFree's "financial profile."  *Id.* at ¶ 318.  In August 2012, after the high rate of chargebacks persisted, BAMS closed the merchant account.  *Id.* at ¶¶ 295, 320.  That month, Bank of America transferred $300,000 from the merchant account to a TelexFree deposit account.  *Id.* at ¶ 325.  Later, Bank of America transferred nearly $500,000 from the deposit account back to the merchant account for chargeback reimbursements.  *Id.* at ¶ 335.

Through May 2013, Bank of America allowed promoters to deposit funds into TelexFree deposit accounts.  *Id.* at ¶ 360.  A Bank of America branch manager in Massachusetts even authorized and encouraged promoters to deposit cash in person at a local Bank of America branch.  *Id.* at ¶ 342.  Bank of America also allowed TelexFree to withdraw funds from deposit accounts.  *Id.* at ¶ 360.  Between February 2013 and May 2013, TelexFree withdrew at least $8 million, and, at one point, TelexFree co-founder Merrill wired himself almost $850,000.  *Id.* at ¶¶ 360-61.

During this time, Bank of America also provided banking services to TelexFree co-founder Wanzeler and entities controlled by Wanzeler and/or Merrill.  *Id.* at ¶ 346.  In early 2013, as

Brazilian authorities announced that they were investigating TelexFree in Brazil, Wanzeler transferred approximately $11.75 million from a bank account in Brazil to an account he held jointly with his wife at Bank of America.  *Id.* at ¶ 358.  Shortly thereafter, Wanzeler transferred at least $7.75 million to other accounts controlled by him (or associates), both inside and outside Bank of America.  *Id.*

In May 2013, Bank of America closed many of the accounts associated with TelexFree, including the main TelexFree deposit account and the joint account Wanzeler held with his wife. *Id.* at ¶ 369.  Rather than freezing the funds in those accounts, Bank of America issued cashier's checks for their remaining balances.  *Id.* at ¶ 370.  Thereafter, the plaintiffs allege, Bank of America "continued to maintain some accounts used by TelexFree."  *Id.* at ¶ 291.

Late in 2013, Edwin Gonzalez, the President of one of TelexFree's payment processors, International Payout Systems, Inc. ("IPS"), arranged for Kevin Staten, a Senior Vice President at Bank of America, to speak with Joseph Craft, TelexFree's Chief Financial Officer, regarding a new TelexFree account at Bank of America.  *Id.* at ¶¶ 373-74.  Gonzalez told Staten that because IPS was handling TelexFree's payment processing, there would be fewer chargebacks and a lower financial risk for Bank of America.  *Id.* at ¶ 374.  Staten told Craft that Bank of America was concerned that TelexFree's operations were not legal.  *Id.* at ¶ 375.  Staten further indicated that he was aware that Bank of America had previously conducted business with TelexFree and had closed TelexFree accounts.  *Id.*  Nonetheless, Staten agreed to open a new account for TelexFree, which was opened on February 6, 2014.  *Id.* at ¶¶ 376, 379.  On February 18, 2014, TelexFree

deposited $475,713.43 into the account.  *Id.* at ¶ 380.  On February 21, 2014, Bank of America closed the account, refunding the full balance to TelexFree.[4]  Docket No. 1293 at ¶ 11.

On March 17, 2014, Bank of America wired $30 million from an IPS account at Bank of America to a TelexFree account at Wells Fargo Bank.  *Id.* at ¶¶ 364, 382.  The transaction statement for the wire referenced "Telex Balance."[5]  Docket No. 1382-1 at 1.

Injury.  Bank of America contends that the 5CAC does not properly plead an actual injury.  *See* Docket No. 1292 at 30.  The plaintiffs allege that they bought into a billion-dollar pyramid scheme and suffered financial losses.  *Id.* at ¶¶ 1, 12, 32-33, 1261.  The plaintiffs' injuries plainly are plausible, and the cases on which Bank of America relies to argue otherwise are inapposite.  Three of the cases Bank of America cites concern conduct that is less obviously damaging.  *See Giannetta v. Boucher*, 1992 WL 379416, at *4-5 (1st Cir. 1992) (a change in credit rating); *Fine v. Sovereign Bank*, 2010 WL 3001194, at *6 (D. Mass. Jul. 28, 2010) (a "post-fraud" failure to investigate); *Nguyen v. FXCM Inc.*, 364 F. Supp. 3d 227, 240 (S.D.N.Y. 2019) (an undisclosed conflict of interest).  In the fourth case Bank of America cites, the plaintiff invested into an entity that had previously been the victim of a fraudulent transaction.  *See Burns v. Stratos*, 2022 WL 212303, at *1, 6-7 (E.D. Pa. Jan. 24, 2022).  Here, by contrast, the 5CAC indicates that the plaintiffs invested into the ongoing fraudulent scheme.

---

[4] This fact is not included in the 5CAC, but the plaintiffs do not dispute it, and it is based on documents central to the plaintiffs' claim and sufficiently referenced in the 5CAC.  *See Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993).  The plaintiffs' motion to strike Bank of America's declaration (Docket No. 1348), which takes issue with the declaration primarily for other reasons (namely, its assertion that no Bank of America employee assisted TelexFree in opening the account), is ***denied***.

[5] Just as the Bank of America account statements are sufficiently referenced in the 5CAC, so too is the Wells Fargo Bank account statement memorializing the $30 million transfer.  5CAC at ¶¶ 364, 468.

Actual knowledge.  Bank of America argues that the 5CAC does not properly plead actual knowledge.  *See* Docket No. 1292 at 21.  To state a claim for tortious aiding and abetting, a plaintiff must allege facts which give rise to a "strong inference" that the defendant "actually knew" that the underlying tort was being committed.  *See Vasquez v. Hong Kong and Shanghai Banking Corp. Ltd.*, 2019 WL 2327810, at *17 (S.D.N.Y. May 30, 2019); *Mansor v. JPMorgan Chase Bank, N.A.*, 183 F. Supp. 3d 250, 264 (D. Mass. 2016); *El Camino Resources, LTD v. Huntington Nat. Bank*, 722 F. Supp. 2d 875, 907 (W.D. Mich. 2010).  While allegations of constructive knowledge are insufficient, *see Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 293 (2d Cir. 2006); *Go-Best*, 972 N.E.2d at 432; *Cahaly v. Benister Prop. Exch. Trust. Co., Inc.*, 885 N.E.2d 800, 812 (Mass. 2008), a plaintiff may rely on circumstantial evidence, *see Zayed v. Associated Bank, N.A.*, 913 F.3d 709, 715 (8th Cir. 2019); *Silvercreek Mgmt., Inc. v. Citigroup, Inc.*, 346 F. Supp. 3d 473, 487 (S.D.N.Y. 2018).

The 5CAC does not support an inference that, before June 2013, Bank of America had actual knowledge that TelexFree was operating a fraudulent scheme.  While the plaintiffs argue that Bank of America had actual knowledge of the fraud as early as August 2012, an account closure due to suspicious activity does not, on its own, give rise to a strong inference of actual knowledge.  *See* Docket No. 1176 at 13; *see also Ryan v. Hunton & Williams*, 2000 WL 1375265, at *9 (E.D.N.Y. Sept. 20, 2000).

The 5CAC does support an inference, however, that Bank of America had actual knowledge that TelexFree was operating a fraudulent scheme by late 2013.  By then, not only had TelexFree been shut down in Brazil, but Bank of America had closed TelexFree accounts due to suspicious activity and openly informed TelexFree that it was concerned that TelexFree was operating illegally.  These allegations give rise to a strong inference of actual knowledge.  *See*

*Silvercreek*, 346 F. Supp. 3d at 487 (noting that "circumstantial evidence can be sufficient to support a finding of actual knowledge"); *see also Carbon Investment Partners, LLC v. Bressler*, 2021 WL 3913526, at *5 (S.D.N.Y. Sept. 1, 2021).

Substantial assistance. Bank of America contends that the 5CAC does not properly plead substantial assistance. *See* Docket No. 1292 at 11. To state a claim for tortious aiding and abetting, a plaintiff must allege that the defendant's actions were a "substantial factor" in the tortfeasor's ability to commit the underlying tort. *See Turo*, 166 N.E.3d at 981. The provision of routine banking services typically does not constitute substantial assistance. *See In re Agape Litig.*, 681 F. Supp. 2d 352, 365 (E.D.N.Y. 2010). However, when a bank has actual knowledge that its routine services are assisting a customer in committing a specific tort, the provision of those services may constitute substantial assistance. *See Mansor*, 183 F. Supp. 3d at 269; *El Camino*, 722 F. Supp. 2d at 911; *see also Turo*, 166 N.E.3d at 983. Indeed, factual allegations supporting a reasonable inference that a defendant's conduct enabled a perpetrator to maintain an illegal pyramid scheme and abscond with investor funds are sufficient at the pleading stage to establish substantial assistance. *See Mansor*, 183 F. Supp. 3d at 268; *see also Sihler v. Fulfillment Lab, Inc.*, 2021 WL 1293839, at *5 (S.D. Cal. Apr. 7, 2021); *Benson v. JPMorgan Chase Bank, N.A.*, 2010 WL 1526394, at *5 (N.D. Cal. Apr. 15, 2010).

The plaintiffs allege that, after Bank of America acquired actual knowledge of the underlying fraud, Bank of America "continued to maintain some accounts used by TelexFree," opened a new TelexFree account in February 2014, and wired $30 million from an IPS account to a TelexFree account at Wells Fargo Bank on March 17, 2014. 5CAC at ¶¶ 291, 364, 379.

The allegation that Bank of America "continued to maintain some accounts used by TelexFree" is conclusory and fails to meet the heightened pleading requirements of Rule 9(b). *See*

*Penalbert-Rosa v. Fortuna-Burset*, 631 F.3d 592, 595 (1st Cir. 2011); *In re State Street Cases*, 2013 WL 5508151, at *22 (D. Mass. Aug. 21, 2013). In addition, the plaintiffs' briefing indicates that these accounts were affiliated with TelexFree only indirectly. *See* Docket No. 1347 at 6, 16. Importantly, the 5CAC does not support an inference that Bank of America had actual knowledge that these indirectly affiliated accounts were connected to the fraudulent scheme.

The allegation that Bank of America opened a new deposit account in February 2014 likewise does not constitute substantial assistance. The account was closed days later, and the only deposit made into the account was refunded. *See El Camino*, 722 F. Supp. 2d at 911 (assistance must further the fraud, not merely aid the tortfeasor, to be considered substantial). Bank of America had no affirmative duty to freeze the funds, *see Lerner*, 459 F.3d at 295, and TelexFree was left in an essentially unchanged position by the brief opening and closure of the account.

The allegation that Bank of America transferred $30 million to a TelexFree account at Wells Fargo Bank on March 17, 2014, however, plausibly constitutes substantial assistance. By March 17, 2014, TelexFree had announced changes to its compensation model and droves of TelexFree promoters had begun to request withdrawal of their credits. The scheme would unravel less than one month later. It is plausible, therefore, that Bank of America's facilitation of a $30 million transfer from IPS to TelexFree on March 17, 2014 substantially aided TelexFree in absconding with victim funds. Indeed, the day after TelexFree filed for bankruptcy, law enforcement intercepted Craft leaving the TelexFree headquarters with $38 million in cashier's checks issued by Wells Fargo Bank; later, law enforcement uncovered $20 million in cash in an apartment connected to Wanzeler.

Importantly, on March 17, 2014, it is plausible that Bank of America knew that TelexFree was operating a fraudulent pyramid scheme, that IPS was processing payments for the fraudulent

scheme, and that the transfer from IPS to a TelexFree account at Wells Fargo Bank would further the scheme.  TelexFree had been shut down in Brazil, Bank of America had previously closed TelexFree accounts, and Bank of America was concerned that TelexFree was operating illegally. Gonzalez had told Staten that IPS was processing payments for TelexFree.  And the reference notation on the wire transfer -- which was sent to an account belonging to TelexFree, LLC -- was "Telex Balance."  As noted, where a bank has actual knowledge that its services are facilitating fraud, those services can constitute substantial assistance.  *See Mansor*, 183 F. Supp. 3d at 269.[6]

Accepting the factual allegations in the 5CAC as true, the plaintiffs' financial losses plausibly were a direct and reasonably foreseeable result of Bank of America's facilitation of the $30 million transfer.  Embedded in the substantial assistance requirement is a proximate cause analysis, which requires determining whether the plaintiff's injury is a direct or reasonably foreseeable result of the defendant's conduct.  *See Silvercreek*, 346 F. Supp. 3d at 487-88; *see also Saunwin Int'l Equities Fund LLC v. Donville Kent Asset Mgmt. Inc.*, 2018 WL 3543533, at *17 (D. Mass. Jul. 20, 2018).  Here, it is at least plausible that the $30 million transfer enabled TelexFree insiders to abscond with investor funds, such as funds invested by plaintiffs, as the scheme unraveled.

Shared intent.  Bank of America asserts that the 5CAC does not properly plead shared intent.  *See* Docket No. 1292 at 27.  To the extent shared intent is a required element of tortious aiding and abetting under Massachusetts law, *see Turo*, 166 N.E.3d at 983 n.4; *Planned Parenthood League of Mass., Inc. v. Blake*, 631 N.E.2d 985, 993-94 (Mass. 1994), the allegations

---

[6] To reiterate, the allegations in the 5CAC suggest more than routine banking services coupled with suspicions of fraudulent activity.  *See In re Agape Litig.*, 681 F. Supp. 2d at 365.  The allegations suggest routine banking services coupled with actual knowledge of fraudulent activity.

supporting an inference that Bank of America furthered the TelexFree scheme despite knowledge of its fraudulent nature also support an inference that Bank of America acted with the requisite shared intent, *see Mansor*, 183 F. Supp. 3d at 273 (finding that a plaintiff had adequately pled shared intent by alleging repeated assistance, coupled with actual knowledge).

The 5CAC states a plausible claim for tortious aiding and abetting against Bank of America.  Accordingly, Bank of America's motion to dismiss is ***denied***.

### c. PNC – Docket No. 1301

The plaintiffs seek to hold PNC Bank, N.A. ("PNC") liable for tortious aiding and abetting.[7]  PNC argues that the 5CAC fails to state a claim because, *inter alia*, it does not sufficiently allege actual knowledge.  *See* Docket No. 1302 at 15.

<u>Allegations</u>.  PNC opened two deposit accounts for TelexFree in December 2013.  *Id.* at ¶ 653.  When so doing, PNC was advised that TelexFree was a multilevel marketing company; that TelexFree was having trouble obtaining financial services; that TelexFree had been shuttered in Brazil; and that TelexFree had ongoing legal issues regarding its compensation plan.  *Id.* at ¶ 654.  Through its due diligence, PNC also learned that TelexFree had a history of excessive chargebacks, and that TelexFree guaranteed massive returns for passive activity to its promoters.  *Id.* at ¶ 656.

On January 14, 2014, PNC transferred nearly $4.5 million in TelexFree funds to TelexFree co-founder Wanzeler's personal account at a bank in Singapore.  *Id.* at ¶ 659.  From February 2014 to March 2014, PNC processed over thirty transactions for TelexFree, totaling more than $1.5 million.  *Id.* at ¶ 662.  In February 2014, PNC accepted over $10 million in deposits for TelexFree,

---

[7] The 5CAC also includes a claim for unjust enrichment against PNC.  The Court has not previously dismissed an unjust enrichment claim against PNC.  Nonetheless, for the reasons stated in the Court's previous orders, *see, e.g.*, Docket No. 602 at 6-7, the 5CAC fails to state a claim for unjust enrichment against PNC.

including deposits from TelexFree payment processors. *Id.* at ¶¶ 661, 664. When TelexFree filed for bankruptcy in April 2014, PNC held approximately $2.4 million in TelexFree deposits. *Id.* at ¶ 668. In bankruptcy filings, TelexFree listed PNC as providing its "primary operating account," which was "imperative" to its continued operations. *Id.* at ¶ 666.

Actual knowledge. The 5CAC does not permit a strong inference that PNC had actual knowledge of the underlying fraud. The allegations concern only red flags. *See Berdeaux v. OneCoin Ltd.*, 561 F. Supp. 3d 379, 412-14 (S.D.N.Y. 2021). In contrast to other bank defendants, such as Bank of America, there are no allegations relating to how PNC processed or responded to the red flags. For example, there is no allegation that PNC closed any TelexFree accounts due to suspicious activity or expressed concern to TelexFree that its operations were illegal. The allegations against PNC suggest at most that PNC should have known that TelexFree was a fraud, not that PNC knew that TelexFree was a fraud. Therefore, PNC's motion to dismiss is ***granted***.

### d. TD Bank – Docket No. 1303

The plaintiffs seek to hold TD Bank, N.A. ("TD Bank") liable for tortious aiding and abetting.[8] TD Bank contends that the 5CAC fails to state a claim because it does not sufficiently allege (1) an injury caused by an underlying fraud, (2) actual knowledge, (3) substantial assistance, and (4) shared intent.

Allegations. In September 2012, TD Bank opened a deposit account for TelexFree, LLC. *Id.* at ¶ 524. The account was quickly "red flagged" for suspicious activity because it did not match TelexFree's reported business profile. *Id.* at ¶ 529. Beginning in January 2013, the account saw a pattern of large, round dollar deposits, again raising red flags. *Id.* at ¶ 532. By February

---

[8] The 5CAC also includes a claim for unjust enrichment against TD Bank. The plaintiffs included this claim only to preserve their appellate rights. *See* Docket No. 1351 at 9. To be clear, the unjust enrichment claim against TD Bank remains dismissed.

2013, TD Bank's ongoing due diligence uncovered several "high-profile websites" that had branded TelexFree a "fraude." *Id.* at ¶ 535. In May 2013, TD Bank began restricting banking services to TelexFree, including effectively blocking withdrawals from and restricting wire transfers to the TelexFree, LLC account. *Id.* at ¶¶ 537-38. On July 10, 2013, TD Bank unilaterally closed the account due to suspicious activity. *Id.* at ¶ 541.

A month earlier, on June 6, 2013, TD Bank had opened a second deposit account for TelexFree, LLC. *Id.* at ¶ 543. The due diligence involved in opening that account revealed that TelexFree had mounting legal challenges in Brazil. *Id.* at ¶ 545. Indeed, TD Bank later informed TelexFree co-founder Merrill that it had concerns regarding TelexFree's negative publicity and issues in Brazil. *Id.* at ¶ 540.

Nonetheless, in July 2013, after TD Bank closed the first TelexFree, LLC account, TD Bank transferred most of the funds in the closed account to the second account. *Id.* at ¶ 546. On August 8, 2013, furthermore, TD Bank opened a deposit account for TelexFree, Inc., noting that TelexFree was an existing customer, and listing Merrill as the signatory. *Id.* at ¶ 555. By September 3, 2013, TelexFree was using the TelexFree, Inc. account to accept incoming bulk credit card payments from one of its payment processors and to process refunds to participants in the form of chargebacks. *Id.* at ¶ 546.

On September 9, 2013, TD Bank opened a third account for TelexFree, LLC, redirecting funds from the second account to this new account. *Id.* at ¶¶ 557, 559, 598. On September 17, 2013, for instance, TD Bank transferred nearly $4 million from the second account to the third account, with the words, "1-800-893-8554 Fraud unit to transfer funds," written on the transaction receipt. *Id.* at ¶ 598.

17

On October 18, 2013, a TD Bank employee authorized a $3 million transfer between the second and third account, and six minutes later, a $3 million withdrawal from the third account, and one minute after that, a $3 million deposit into the TelexFree, Inc. account.  *Id.* at ¶ 602.  When TD Bank ultimately closed the third TelexFree, LLC account, it issued TelexFree a check totaling over $18 million.  *Id.* at ¶ 610.  Concerned that a single deposit of $18 million would raise flags at other banks, Merrill returned the check to TD Bank, which agreed to break the check into smaller amounts.  *Id.* at ¶ 612.

Injury caused by an underlying fraud.  TD Bank argues that the 5CAC does not plead an injury caused by an underlying fraud.  *See* Docket No. 1304 at 14.  As explained with respect to the Wells Fargo Defendants, the 5CAC adequately alleges an underlying fraud.  Moreover, the 5CAC specifically alleges that, in reliance on the misrepresentations of TelexFree and its operators, the plaintiffs "paid artificially inflated prices for worthless membership interests, suffered great financial losses, and . . . incurred considerable expenses and loss of income."  5CAC at ¶ 1261.  The allegations that the plaintiffs lost money after tendering funds to a pyramid scheme plainly are plausible.

Actual knowledge.  TD Bank asserts that the 5CAC does not plead actual knowledge.  *See* Docket No. 1304 at 15.  The 5CAC's allegations of red flags -- suspicious transactions and high-profile websites declaring TelexFree a fraud -- are insufficient on their own to establish actual knowledge.  However, the 5CAC also includes allegations of TD Bank's reactions to the red flags: namely, discussions between TD Bank and TelexFree concerning the scheme's negative publicity and shutdown in Brazil.  This is not a case where, despite certain suspicious activity, a bank failed to detect an underlying fraud.  *See, e.g.*, *Go-Best*, 972 N.E.2d at 431-32.  Rather, TD Bank's reactions to red flags, as alleged in the 5CAC, constitute circumstantial evidence that TD Bank

"actually knew" that TelexFree was a fraud. *See Silvercreek*, 346 F. Supp. 3d at 487; *Carbon Investment Partners*, 2021 WL 3913526, at *5.

<u>Substantial assistance</u>. TD Bank argues that the 5CAC does not plead substantial assistance. *See* Docket No. 1304 at 26. The 5CAC alleges that TD Bank transferred TelexFree funds from account to account to help TelexFree conceal the source of its funds. After TD Bank shut down its first TelexFree account, TD Bank transferred funds from the first account to a second account. TD Bank later transferred funds from the second account to a third account, with the words, "1-800-893-8554 Fraud unit to transfer funds," written on the transaction receipt. TD Bank then authorized large transfers between accounts in rapid succession. The 5CAC suggests that these services allowed TelexFree insiders to abscond with funds and extend the duration of the fraud. Given the inference of actual knowledge, these allegations are sufficient at the pleading stage to establish substantial assistance. *See Mansor*, 183 F. Supp. 3d at 269.

<u>Shared intent</u>. TD Bank contends that the 5CAC does not plead shared intent. *See* Docket No. 1304 at 23. The same alleged facts that support an inference that TD Bank knew of the underlying fraud yet continued to assist the underlying fraud by helping TelexFree conceal and abscond with funds also support an inference that TD Bank shared TelexFree's intent to defraud. *See Mansor*, 183 F. Supp. 3d at 273.

The 5CAC plausibly states a tortious aiding and abetting claim against TD Bank. Accordingly, TD Bank's motion to dismiss is ***denied***.

### 2. *Payment Processors*

#### a. *Vantage Payments & Dustin Sparman – Docket No. 1294*

The plaintiffs seek to hold Vantage Payments, LLC ("Vantage") and its managing partner, Dustin Sparman, liable for tortious aiding and abetting. The plaintiffs also seek to hold Sparman

liable for civil conspiracy.[9]  Vantage and Sparman argue that, as to tortious aiding and abetting, the 5CAC does not sufficiently allege actual knowledge and substantial assistance, and as to civil conspiracy, a tortious act taken in furtherance of the conspiracy.

Allegations.  Vantage acted as a broker for TelexFree in securing and maintaining payment processing services from August 2013 to April 2014.  5CAC at ¶ 765.  When Vantage began working with TelexFree, Vantage was aware that TelexFree operated a multilevel marketing scheme that guaranteed returns for passive investments, and that TelexFree's business model could not support the returns it promised.  *Id.* at ¶ 767.  Nonetheless, Vantage solicited payments processors for TelexFree and registered an entity, TelexFree, LTD, in the United Kingdom to serve the scheme's EU-based operations.  *Id.* at ¶ 769, 772.

In October 2013, one of TelexFree's payment processors, Allied Wallet, informed TelexFree that, due to an increase in payment volume and chargebacks, it would be increasing its "rolling reserve" on TelexFree's processing account.  *Id.* at ¶ 774.  Thereafter, Sparman negotiated extensively with Allied Wallet to have the rolling reserve reduced.  *Id.* at ¶¶ 707, 775.  Allied Wallet eventually agreed to reduce the rolling reserve to its original amount.  *Id.* at ¶ 777.  Sparman also negotiated for Allied Wallet to increase its processing volume for TelexFree.  *Id.* at ¶¶ 707, 777, 797.

Aiding and abetting.  The Court previously determined, based on a review of evidence submitted in conjunction with the plaintiffs' motion for a preliminary injunction, that the plaintiffs have a reasonable likelihood of success on their tortious aiding and abetting claim against Vantage

---

[9] The 5CAC also includes a claim for unjust enrichment against Vantage and Sparman. The plaintiffs included this claim only to preserve their appellate rights.  *See* Docket No. 1355 at 17.  To be clear, the unjust enrichment claim against Vantage and Sparman remains dismissed.

and Sparman.  *See* Docket No. 1128.  In their motion to dismiss the 5CAC, Vantage and Sparman ask the Court to reconsider that determination, essentially because the allegations in the 5CAC lack specificity.[10]  *See* Docket No. 1295 at 1-2.  The purpose of Rule 9(b)'s particularity requirement is to put the defendants on notice of the plaintiffs' claims and prevent frivolous charges.  *See New Engl. Data Servs., Inc. v. Becher*, 829 F.2d 286, 289 (1st Cir. 1987).  Indeed, a plaintiff is not required to plead evidence.  *See Miss. Pub. Employees' Ret. Sys. v. Bos. Sci. Corp.*, 523 F.3d 75, 90 (1st Cir. 2008).  In the circumstances of this case, where the parties have conducted discovery and submitted evidence to the Court, which the Court has then considered to determine that the plaintiffs have a reasonable likelihood of success on the merits, it makes little sense to dismiss the plaintiffs' claims under Rule 9(b).  In any event, the 5CAC plausibly alleges that Vantage and Sparman are liable for tortious aiding and abetting.

Conspiracy.  Sparman argues that the 5CAC does not adequately plead a "common design" conspiracy, *see* Docket No. 1295 at 19-20, which requires proof of a tortious act taken in furtherance of the conspiracy, *see Thomas v. Harrington*, 909 F.3d 483, 490 (1st Cir. 2018).  In response, the plaintiffs indicate that they are alleging a "substantial assistance" conspiracy, *see* Docket No. 1355 at 21-22, which mirrors a claim for tortious aiding and abetting, *see Kurker v. Hill*, 689 N.E.2d 833, 837 (Mass. App. Ct. 1998); *see also Thomas*, 909 F.3d at 491.  The 5CAC alleges both theories of civil conspiracy.  *See* 5CAC at ¶¶ 1221, 1223-24, 1228.  Because the plaintiffs offer no response to Sparman's argument that they fail to plead a "common design"

---

[10] Vantage and Sparman also contend that the Court's analysis in the preliminary injunction order was incorrect.  *See* Docket No. 1295 at 3.  Consistent with the principles in *El Camino*, 722 F. Supp. 2d at 897, however, the case on which Vantage and Sparman primarily rely, the Court considered the likelihood that Vantage and Sparman had actual knowledge that TelexFree was operating a fraudulent scheme, as well as the likelihood that Vantage and Sparman knowingly and substantially assisted that scheme.  *See* Docket No. 1128 at 9-11.

conspiracy, that theory is abandoned as to Sparman.  *See Nikijuluw v. Gonzales*, 427 F.3d 115, 120 n.3 (1st Cir. 2005).  However, because the 5CAC states a claim against Sparman for tortious aiding and abetting, the 5CAC also states a claim against Sparman for "substantial assistance" conspiracy.  *See Kurker*, 689 N.E.2d at 837 n.5.

Accordingly, the motion to dismiss filed by Vantage and Sparman is ***denied***.

### b. International Payout Systems – Docket No. 1305

The plaintiffs seek to hold International Payout Systems, Inc. ("IPS") liable for tortious aiding and abetting and civil conspiracy.  The 5CAC also includes a claim for unjust enrichment against IPS.  IPS argues only that the unjust enrichment claim should be dismissed.  *See* Docket No. 1306 at 1-2.  The plaintiffs, in their motion to amend, represented that they intended to reassert their unjust enrichment claim only to preserve their appellate rights.  *See* Docket No. 984 at 47-48.  The plaintiffs reiterate this intention in response to IPS's motions to dismiss.  *See* Docket No. 1336 at 2.  To be clear, the unjust enrichment claim against IPS remains dismissed.  To the extent IPS's motion seeks to dismiss the unjust enrichment claim, therefore, it is ***granted***.

### c. ProPay – Docket No. 1316

The plaintiffs seek to hold ProPay, Inc. ("ProPay") liable for tortious aiding and abetting.[11] ProPay provided payment processing services to TelexFree from October 2012 to at least January 2014, processing at least $110 million in payments for TelexFree during that time.  5CAC at ¶¶ 713, 717.  Meanwhile, ProPay was aware of TelexFree's business model and legal issues in Brazil.  *Id.* at ¶ 715.  In an email to another payment processor, ProPay characterized TelexFree as an extremely high-risk client and indicated that no United States bank or processor would be willing

---

[11] The 5CAC also includes a claim for unjust enrichment against ProPay.  The plaintiffs included this claim only to preserve their appellate rights.  *See* Docket No. 1341 at 7.  To be clear, the unjust enrichment claim against ProPay remains dismissed.

to take on TelexFree as a client given that risk.  *Id.* at ¶ 723.  ProPay argues that the 5CAC fails to demonstrate the plaintiffs' Article III standing.[12]   To establish standing, the plaintiffs must demonstrate that they have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

To demonstrate injury, the plaintiffs must show "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"  *Id.* at 339 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).  The "particularization" aspect of this showing "reflects the commonsense notion that the party asserting standing must not only allege injurious conduct attributable to the defendant but also must allege that he, himself, is among the persons injured by that conduct."  *Hochendoner*, 823 F.3d at 731-32.  In a class action, the named plaintiffs "must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong."  *Warth v. Seldin*, 422 U.S. 490, 502 (1975).  Here, the plaintiffs allege that they suffered financial losses.  5CAC at ¶ 1261.  This is sufficient at the pleading stage to establish an injury in fact.  *See Nat. Res. Def. Council, Inc. v. U.S. Food & Drug Admin.*, 710 F.3d 71, 85 (2d Cir. 2013) ("Even a small financial loss is an injury for purposes of Article III standing.").

To demonstrate traceability, the plaintiffs must show "a sufficiently direct causal connection between the challenged action and the identified harm."  *Dantzler, Inc. v. Empresas Berrios Inventory & Operations, Inc.*, 958 F.3d 38, 47 (1st Cir. 2020).  "Because the opposing

---

[12] ProPay also asserts that the 5CAC does not adequately plead tortious aiding and abetting. *See* Docket No. 1316-1 at 9.  ProPay acknowledges, however, that the Court rejected this argument in denying its earlier motion to dismiss.  *See* Docket No. 600.  ProPay represents that it has reasserted the argument to avoid waiver.  *See* Docket No. 1316-1 at 9.

party must be the source of the harm, causation is absent if the injury stems from the independent action of a third party." *Katz v. Pershing, LLC*, 672 F.3d 64, 71-72 (1st Cir. 2012). A third party's action is not "independent," however, if it was aided and abetted by the defendant, *see Mastafa v. Australian Wheat Bd. Ltd.*, 2008 WL 4378443, at *2-3 (S.D.N.Y. Sept. 25, 2008), provided that the defendant and the third party had a direct relationship, *see Abecassis v. Wyatt*, 704 F. Supp. 2d 623, 643 (S.D. Tex. 2010). Here, the plaintiffs allege that ProPay substantially assisted the fraudulent scheme by processing over $100 million in payments for TelexFree. 5CAC at ¶¶ 714, 717. By alleging that ProPay furthered the unlawful scheme -- whether before or after their investments -- the plaintiffs have sufficiently established at the pleading stage that their losses are "fairly traceable" to ProPay. *See Attias v. Carefirst, Inc.*, 856 F.3d 620, 629 (1st Cir. 2017) ("Article III standing does not require that the defendant be the most immediate cause, or even a proximate cause, of the plaintiffs' injuries; it requires only that those injuries be 'fairly traceable' to the defendant.").

The plaintiffs' allegations are sufficient to establish Article III standing. *See In re TelexFree Securities Litig.*, 358 F. Supp. 3d 118, 121 (D. Mass. 2019). Accordingly, ProPay's motion is ***denied***.

### 3. Advisors

#### a. The Sheffield Group – Docket Nos. 1297 & 1299

The plaintiffs seek to hold The Sheffield Group, Inc. ("Sheffield") liable for tortious aiding and abetting and civil conspiracy.[13] Sheffield moves to dismiss the 5CAC for lack of personal jurisdiction, as well as for failure to state a claim.

---

[13] The 5CAC also includes a claim for unjust enrichment against Sheffield. The Court has not previously dismissed an unjust enrichment claim against Sheffield. Nonetheless, for the

Allegations.  From August 2013 to April 2014, Sheffield provided business consulting services to TelexFree, advising the scheme on compensation plans, software selection, operations, strategy, and coordination with financial institutions.  5CAC at ¶ 1092.  In August 2013, TelexFree legal advisor Jeffrey Babener informed Sheffield that TelexFree operated an unlawful business. *Id.* at ¶¶ 1081-83.  Sheffield understood that it was responsible for creating "a document that gives [Babener] a tool for defense if needed."  *Id.* at ¶ 1105.  In September 2013, Sheffield requested that its name be removed from the TelexFree website due to the "controversy" surrounding the scheme.  *Id.* at ¶ 1089.

In September 2013, Sheffield recruited an Internet marketing expert to work with TelexFree.  *Id.* at ¶ 1108.  Although the marketing expert was hesitant, he agreed to provide services, and in fact did, after Sheffield vouched for TelexFree's leadership team.  *Id.* at ¶ 1109. Sheffield similarly helped TelexFree find staffing and IT services from October 2013 to March 2014.  *Id.* at ¶ 1111.

In December 2013, an email between two Sheffield consultants noted that while it was important to achieve a legally defensible compensation plan, it was "equally important" that that plan work financially "so as not to create significant losses in revenue due to a flawed approach." *Id.* at ¶ 1099.  That same month, Sheffield warned TelexFree that although a certain proposed approach "may be a legal remedy, it could spell disaster from a business perspective," resulting in "massive, and unnecessary, short-term attrition."  *Id.* at ¶¶ 1100, 1102.

Sheffield ultimately helped TelexFree develop the updated compensation plan that TelexFree publicly announced on March 9, 2014.  *Id.* at ¶ 1103.  Babener informed Sheffield that

reasons stated in the Court's previous orders, *see, e.g.*, Docket No. 602 at 6-7, the 5CAC fails to state a claim for unjust enrichment against Sheffield.

the plan was "subject to questioning" even though it was "light years ahead of the existing problematic program from a compliance defense standpoint." *Id.* at ¶ 1104. Sheffield made clear that the plan only worked as a pyramid scheme. *Id.* at ¶¶ 186, 1101.

Sheffield is incorporated in Arizona and has its principal place of business in Scottsdale, Arizona. Docket No. 1298-1 at ¶ 3. Sheffield maintains an office in Arizona, and all its employees work out of that office, except for one, who works remotely from and lives in Kansas. *Id.* at ¶ 5. Sheffield began advising TelexFree after Babener, who was based in Oregon, solicited Sheffield do so. *Id.* at ¶ 8. Sheffield advised TelexFree pursuant to a consulting agreement, which identified TelexFree's principal place of business as Marlborough, Massachusetts. Docket No. 1359-1. Sheffield performed its consulting work for TelexFree in Arizona; no Sheffield employee ever traveled to Massachusetts for work with TelexFree. Docket No. 1298-1 at ¶¶ 8-9.

Personal jurisdiction. Sheffield contends that the 5CAC should be dismissed for lack of personal jurisdiction. *See* Docket No. 1298. The plaintiffs bear the burden of demonstrating personal jurisdiction (1) under the Massachusetts long-arm statute[14] and (2) consistent with due process. *See Motus, LLC v. CarData Consultants, Inc.*, 23 F.4th 115, 124 (1st Cir. 2022).

The plaintiffs contend that Sheffield is subject to personal jurisdiction under the Massachusetts long-arm statute because Sheffield, through its consulting services, "transact[ed] . . . business" in Massachusetts, *see* M. G. L. c. 233A, § 3(a), and "contract[ed] to supply services" in Massachusetts, *see id.* at § 3(b).

In determining whether a defendant "transact[ed] . . . business" in Massachusetts, courts consider broadly "whether the defendant attempted to participate in the commonwealth's

---

[14] Because Sheffield was added to this litigation via the MDL, personal jurisdiction must be proper in the MDL court's home state, Massachusetts. *See In re Takata Airbag Prod. Liab. Litig.*, 396 F. Supp. 3d 1101, 1137 (S.D. Fla. 2019).

economic life." *United Elec., Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp.*, 960 F.2d 1080, 1087 (1st Cir. 1992).  Here, although Sheffield did not solicit TelexFree, Sheffield agreed to provide advice and assistance to TelexFree on marketing, organizational structure, product, and project management.  *See* Docket No. 1359-1 at 2-3.  The consulting agreement into which Sheffield and TelexFree entered specified that TelexFree was based in Massachusetts.  *See id.* at 2.  And Sheffield provided advice and assistance to TelexFree pursuant to that agreement.  5CAC at ¶¶ 1085, 1092.  Viewing the facts in the plaintiffs' favor, *see Cossart v. United Excel Corp.*, 804 F.3d 13, 18 (1st Cir. 2015), Sheffield "attempted to participate in the commonwealth's economic life," *see United Elec.*, 960 F.2d at 1087.

Further, as the consulting agreement exemplifies, Sheffield "contract[ed] to supply services" in Massachusetts.  TelexFree, a Massachusetts-based entity, hired Sheffield to provide advice concerning, *inter alia*, its mission statement, corporate values, and organizational structure.  Docket No. 1359-1.  Even though Sheffield was located outside Massachusetts when it rendered this advice, Sheffield in effect delivered this advice to Massachusetts, for use in Massachusetts.  *See Droukas v. Divers Training Acad., Inc.*, 376 N.E.2d 548, 553 (Mass. 1978).

For jurisdiction to be proper under the Massachusetts long-arm statute, the plaintiffs' claims must "aris[e] from" the defendant's relevant conduct.  *See Singer v. Piaggio & C.*, 420 F.2d 679, 681 (1st Cir. 1970).  In deciding whether a claim "aris[es] from" a defendant's relevant conduct, courts assess whether the defendant's relevant conduct was a "but for" cause of the plaintiff's alleged harm.  *See Cossart*, 804 F.3d at 18.  The plaintiffs allege that Sheffield helped TelexFree "operate without interruption," by, among other things, facilitating staffing and IT services for TelexFree.  5CAC at ¶¶ 1094, 1111.  It is plausible that, but for Sheffield's involvement with TelexFree's operations, the plaintiffs would have withdrawn their investments

27

before the scheme's eventual collapse, and accordingly, would not have suffered financial losses. Thus, Sheffield is subject to personal jurisdiction under the Massachusetts long-arm statute.

Due process requires that the defendant "have certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)).   Courts consider (1) whether the plaintiffs' claims directly arise from or relate to the defendant's activities in the forum, (2) whether the defendant purposefully availed itself of the privilege of conducting activities in the forum, and (3) whether the exercise of jurisdiction is reasonable under the circumstances. *See Motus*, 23 F.4th at 122.

For the reasons already stated, the plaintiffs' claims sufficiently "arise from" Sheffield's Massachusetts-related conduct.   Moreover, through its agreement to provide consulting services to TelexFree, a Massachusetts-based entity, Sheffield purposefully availed itself of privilege of conducting business in Massachusetts.   Sheffield agreed to help TelexFree develop a new multilevel marketing plan, and then advised TelexFree for months relative to that plan.   Sheffield's conduct appears to have been voluntary, and, given the nature of multilevel marketing schemes, *see, e.g., United States v. Bunchan*, 580 F.3d 66, 67 (1st Cir. 2009), Sheffield reasonably should have foreseen the possibility of being subject to suit in Massachusetts, *see Kuan Chen*, 956 F.3d at 59.   While the consulting agreement states that disputes related to the enforcement of the agreement shall be proper only in Arizona, *see* Docket No. 1359-1 at 7, not all disputes arising from Sheffield's consulting services, like this one, relate to enforcement of the consulting agreement.   Finally, the exercise of jurisdiction is reasonable under the circumstances. *See Adelson*, 510 F.3d at 51.   Accordingly, Sheffield's motion to dismiss for lack of personal jurisdiction is ***denied***.

Failure to state a claim.  Sheffield argues that the 5CAC should be dismissed for failure to state a claim because, *inter alia*, it fails to plead substantial assistance.  *See* Docket No. 1300 at 10-13.  A defendant provides substantial assistance to a tortfeasor when the defendant's actions are a "substantial factor" in the tortfeasor's ability to commit the underlying tort.  *See Turo*, 166 N.E.3d at 981.  The plaintiffs argue that Sheffield substantially assisted TelexFree by (1) recruiting Internet marketing experts to work on behalf of the scheme, (2) facilitating the provision of staffing and IT services to the scheme, and (3) helping develop a new compensation model intended for use as a legal defense.  *See* Docket No. 1344 at 5, 10.  None of these actions, at least insofar as they are alleged in the 5CAC, substantially assisted the underlying fraud.  *See JPMorgan Chase Bank v. Winnick*, 406 F. Supp. 2d 247, 257 (S.D.N.Y. 2005).

First, the plaintiffs allege that Sheffield convinced an Internet marketing expert to work for TelexFree.  5CAC at ¶ 1108.  The plaintiffs do not allege what, if anything, the Internet marketing expert did for TelexFree.  They allege only that the Internet marketing expert provided TelexFree with "website-related services."  *Id.* at ¶ 1109.  Without more detail, this does not plausibly constitute substantial assistance.[15]

Second, the plaintiffs allege that Sheffield helped TelexFree procure staffing and IT services.  *Id.* at ¶ 1111.  Again, without more detail, it is unclear how these staffing and IT services substantially contributed to the underlying fraud.  To be sure, it is possible, when drawing all inferences in the plaintiffs' favor, that these services helped TelexFree in some way.  But, as alleged, it is implausible that these services substantially contributed to the fraudulent scheme.

---

[15] The plaintiffs also allege that Sheffield introduced TelexFree to an Internet marketing expert who touted that he could help TelexFree "see millions of downloads," 5CAC at ¶ 1112, but the plaintiffs do not allege that TelexFree in fact hired this Internet marketing expert.

Finally, the plaintiffs allege that Sheffield developed the updated promoter compensation plan that TelexFree publicly announced on March 9, 2014. *Id.* at ¶¶ 1103, 1105. The plaintiffs do not allege, however, that they invested in TelexFree based on this updated plan. Moreover, it is unclear how the development of this updated plan furthered the underlying fraud in any way. Quite the opposite, the 5CAC suggests that the updated plan led directly to the scheme's demise; once the plan was announced, the scheme's revenues plummeted, and promoters began increasingly requesting cash withdrawals of their credits. *Id.* at ¶¶ 182-84. As alleged in the 5CAC, therefore, Sheffield's actions, individually and taken together, do not plausibly constitute substantial assistance. Accordingly, Sheffield's motion to dismiss for failure to state a claim is ***granted***.

### b. Garvey Schubert et al. – Docket No. 1310

The plaintiffs seek to hold Garvey Schubert Barer, P.C. ("Garvey Schubert") and four of its former partners, Robert Weaver, Samuel Kauffman, Gary Tober, and Sara Sandford (collectively, the "Garvey Schubert Defendants") liable for tortious aiding and abetting and civil conspiracy.[16] The Garvey Schubert Defendants argue, *inter alia*, that the Court lacks personal jurisdiction.

<u>Allegations</u>. In September 2013, TelexFree retained the Garvey Schubert Defendants for their criminal defense and international restructuring expertise. 5CAC at ¶¶ 287, 1023. Babener told Garvey Schubert that TelexFree was operating an unlawful business. *Id.* at ¶ 1021. Babener told Kauffman that TelexFree was having issues in Brazil, and that its United States operations were being modified with assistance from Sheffield "to be more compliant." *Id.* at ¶ 1022.

---

[16] The 5CAC also includes a claim for unjust enrichment against the Garvey Schubert Defendants. The Court has not previously dismissed an unjust enrichment claim against them. Nonetheless, for the reasons stated in the Court's previous orders, *see, e.g.*, Docket No. 602 at 6-7, the 5CAC fails to state a claim for unjust enrichment against the Garvey Schubert Defendants.

Through an email to Merrill, Babener told Kauffman, Sandford, and Tober that TelexFree would not survive legally unless its operations changed dramatically.  *Id.* at ¶¶ 1025, 1027.

On October 8, 2013, Merrill emailed Sandford and Tober for advice regarding an inquiry from a Spanish law enforcement agency.  *Id.* at ¶ 1070.  Babener recommend that Kauffman take the lead.  *Id.*  Kauffman contacted the Spanish agency to request more information on the investigation.  *Id.* at ¶ 1071.  Sandford (or Kauffman[17]) emailed a representative at the agency, stating that TelexFree had tens of thousands of customers using its VoIP service, and that TelexFree marketed VoIP plans through its sales force.  *Id.* at ¶ 1072.

That same month, Sandford sent TelexFree a memo regarding "potential liability" for operations in the United States "in connection with recent developments in Brazil," along with suggestions for restructuring TelexFree's operations worldwide.  *Id.* at ¶ 1035.  Garvey Schubert advised TelexFree to legally separate the United States market from all other markets and to move its assets abroad.  *Id.* at ¶ 1031.  Sandford and Tober cautioned TelexFree against using payment processors that may be subject to jurisdiction in the United States or that may voluntarily comply with United States court orders.  *Id.* at ¶ 1039.  Sandford and Tober identified possible banks and locations for new accounts.  *Id.* at ¶ 1045.

In December 2013, Garvey Schubert helped TelexFree secure new banking relationships by provided a misleading letter for Merrill's signature regarding TelexFree's legality.  *Id.* at ¶ 1051.  Sandford and Tober also planned tax strategies for TelexFree, including advising on 2013 year-end tax options and methods for reducing taxable income and limiting tax exposure.  *Id.* at ¶¶ 1030-37.

---

[17] An email attached to the Garvey Schubert Defendants' motion to dismiss suggests that it was Kauffman, not Sandford, who sent this email.  Docket No. 1310-8.

On March 6, 2014, TelexFree formed an entity in the Cayman Islands. *Id.* at ¶ 1064. Garvey Schubert assisted in setting up this entity, as well as a related bank account, for the purpose of moving money out of the United States. *Id.* at ¶¶ 1058, 1061. On March 19, 2014, Weaver drafted a letter for Babener to send to TelexFree's banking partners to persuade them to continue servicing TelexFree's accounts. *Id.* at ¶ 1066. On April 8, 2014, Weaver advised TelexFree that lawsuits from promoters needed to be dealt with quickly and consistently to avoid provoking complaints to criminal investigative agencies. *Id.* at ¶ 1075. Weaver also helped TelexFree craft misleading responses to Massachusetts regulatory inquiries. *Id.* at ¶¶ 48, 1076.

During 2013 and 2014, Garvey Schubert maintained offices in Washington, Oregon, Alaska, New York, Washington, D.C., and China. Docket No. 1310-1 at ¶ 4. Tober worked out of the Washington office. Docket No. 1310-2 at ¶ 1. While advising TelexFree, he communicated sporadically with two TelexFree employees via email and telephone. *Id.* at ¶ 5. At no point did he travel to Massachusetts. *Id.* at ¶ 7. Kauffman worked out of the Oregon office. Docket No. 1310-4 at ¶ 1. He billed 6.8 hours to TelexFree and communicated with two TelexFree employees via email and telephone. *Id.* at ¶¶ 3, 6. He also did not travel to Massachusetts at any point. *Id.* at ¶ 8. Sandford worked out of the Washington office. Docket No. 1310-5 at ¶ 1. She communicated with three TelexFree employees via email and telephone and did not travel to Massachusetts in connection with her representation of TelexFree. *Id.* at ¶¶ 5, 7. Weaver worked out of the Oregon office. Docket No. 1310-3 at ¶ 1. He traveled to Massachusetts twice to meet with Merrill and Wanzeler in connection with an investigation by Massachusetts securities regulators. *Id.* at ¶ 6.

<u>Personal jurisdiction</u>. The Garvey Schubert Defendants argue that the 5CAC should be dismissed for lack of personal jurisdiction. *See* Docket No. 1312 at 12. The plaintiffs bear the

32

burden of demonstrating personal jurisdiction (1) under the Massachusetts long-arm statute and (2) consistent with due process.  *See Motus*, 23 F.4th at 124.

The Massachusetts long-arm statute permits personal jurisdiction over, *inter alia*, "a person, who acts directly or by an agent, as to a cause of action in law or equity arising from the person's (a) transacting any business in this commonwealth."  M. G. L. c. 223A, § 3.  Courts construe the term "transacting any business" broadly.  *See Workgroup Tech. Corp. v. MGM Grand Hotel, LLC*, 246 F. Supp. 2d 102, 109 (D. Mass. 2003).  "A defendant need not be physically present in a state to 'transact business' in that state."  *M-R Logistics, LLC v. Riverside Rail, LLC*, 537 F. Supp. 2d 269, 275 (D. Mass. 2008).  The defendant, however, must have "attempted to participate in the commonwealth's economic life," *see United Elec.*, 960 F.2d at 1087, by engaging in a "purposeful" act in or directed at Massachusetts, *see Hannon v. Beard*, 524 F.3d 275, 280 (1st Cir. 2008).  In deciding whether a claim "arises from" from a defendant's "transacting any business" in Massachusetts, courts consider "whether the transacted business was a 'but for' cause of the harm alleged in the claim."  *Cossart*, 804 F.3d at 18.

The plaintiffs allege that Kauffman assisted TelexFree in responding to an inquiry from a Spanish law enforcement agency, and that Tober and Sandford worked with TelexFree on international restructuring and tax matters, advising TelexFree to, *inter alia*, use payment processors outside the United States.  Kauffman, Tober, and Sandford never traveled to Massachusetts; they communicated with TelexFree employees only by email and telephone.  An out-of-state attorney's contacts with a forum state client -- on matters unrelated to the forum state -- do not confer personal jurisdiction over the out-of-state attorney in the forum state.  *See Sawtelle v. Farrell*, 70 F.3d 1381, 1391 (1st Cir. 1995).  The cases on which the plaintiffs rely are distinguishable.  In *JRS Partners, GP v. Leech Tishman Fuscaldo & Lampl, LLC*, 2020 WL

5877131, at *5 (M.D. Tenn. Oct. 2, 2020), for example, the defendant attorney spoke directly with the plaintiffs in the forum state, making misrepresentations which gave rise to the plaintiffs' claims.  Here, by contrast, Kauffman, Tober, and Sandford's alleged representation of TelexFree was not directed at Massachusetts.  Thus, Kauffman, Tober, and Sandford are not subject to personal jurisdiction in Massachusetts for their alleged representation of TelexFree.

The plaintiffs allege that Weaver assisted TelexFree in connection with a Massachusetts-based investigation and traveled to Massachusetts twice to meet with Merrill and Wanzeler.  This alleged representation -- Weaver's only Massachusetts-related contact -- was not plausibly a "but for" cause of the plaintiffs' harm.  The plaintiffs allege that they suffered financial losses after tendering funds for TelexFree memberships and their promised pre-March 9, 2014 returns.  The plaintiffs assert, generally, that their injuries can be attributed to any defendant who helped further the scheme.  While the plaintiffs' injuries plausibly can be connected to defendants who helped the scheme operate, grow, and divert funds, Weaver's alleged representation of TelexFree in Massachusetts did not plausibly help the scheme in these ways.  It is implausible that, but for Weaver's representation of TelexFree before Massachusetts regulators, the plaintiffs would not have been injured.  Thus, Weaver is not subject to personal jurisdiction in Massachusetts for his alleged representation of TelexFree.

The plaintiffs contend that Garvey Schubert is vicariously liable for the actions taken by Kauffman, Tober, Sandford, and Weaver.  Because the Court lacks personal jurisdiction over the individual defendants, the Court lacks personal jurisdiction over Garvey Schubert as well.  The plaintiffs also assert that personal jurisdiction is proper under a conspiracy theory of jurisdiction. The First Circuit has not adopted this theory, *see Glaros v. Perse*, 628 F.2d 679, 682 (1st Cir. 1980); *Ward v. Auerbach*, 2017 WL 2724938, at *12 n.8 (D. Mass. Jun. 23, 2017), and the Court

declines to do so here.  Finally, the plaintiffs' explanation that they do not have every detail concerning Garvey Schubert's activities directed at Massachusetts does not, without more, warrant jurisdictional discovery.  *See Motus*, 23 F.4th at 128.  Accordingly, the Garvey Schubert Defendants' motion to dismiss is ***granted***.

### c. Estate of Babener – Docket No. 1311

The plaintiffs seek to hold the Estate of Jeffery A. Babener (the "Estate") liable for violations of M. G. L. c. 93, §§ 12 and 69, violations of M. G. L. c. 93A, §§ 2 and 11, civil conspiracy, negligent misrepresentation, violations of M. G. L. c. 410(b), fraud, and tortious aiding and abetting.[18]  The Estate argues that the 5CAC should be dismissed for lack of personal jurisdiction and for failure to state a claim.

<u>Allegations</u>.  Babener provided legal and business advice to TelexFree from August 2013 to April 2014.  5CAC at ¶¶ 285, 981, 986.  In August 2013, Babener advised TelexFree that its United States operations had the same legal problems as its operations in Brazil.  *Id.* at ¶ 983.  In September 2013, Babener advised Merrill that TelexFree "will not survive legally (civil or criminal) . . . unless there is a dramatic change."  *Id.* at ¶ 984.  In October 2013, Babener advised Merrill that TelexFree was "at risk under state and federal legislation so long as you offer the current program."  *Id.* at ¶ 1013.

Despite this advice, Babener acted as TelexFree's "unofficial CEO," referring to himself as TelexFree's "point person" relative to outside consultants.  *Id.* at ¶ 986.  Babener reviewed documents, leveraged contacts, and strategized about how to respond to regulators.  *Id.* at ¶ 988.

---

[18] The 5CAC also includes a claim for unjust enrichment against the Estate.  The Court has not previously dismissed an unjust enrichment claim against the Estate.  Nonetheless, for the reasons stated in the Court's previous orders, *see, e.g.*, Docket No. 602 at 6-7, the 5CAC fails to state a claim for unjust enrichment against the Estate.

Babener introduced TelexFree to attorneys in England and Florida for assistance in those jurisdictions. *Id.* at ¶¶ 995-97, 1004. Babener also offered to introduce TelexFree to a new payment processor; endorsed a plan to break up an $18 million check into smaller amounts to avoid scrutiny; identified new investment opportunities; and crafted misleading responses to regulators. *Id.* at ¶¶ 998, 1000, 1006-07. Babener further advised TelexFree to move its funds outside of Massachusetts, to have promoters in the United States sign up with offshore entities instead, and to continue to hold promoter training events in Florida. *Id.* at ¶¶ 1010-11, 1014. Finally, Babener composed, reviewed, and approved misleading press releases. *Id.* at ¶ 1018.

Babener was based in Oregon and traveled to Massachusetts only once in connection with his representation of TelexFree. Docket No. 1314-2 at 2. He attended depositions taken of Merrill and Wanzler by Massachusetts securities regulators. *Id.* The plaintiffs added Babener as a defendant in this case in the Fourth Consolidated Amended Complaint. After Babener died in 2020, the Court allowed the plaintiffs to substitute the Estate as a defendant in Babener's place.

Personal jurisdiction. The Estate argues that the Court lacks personal jurisdiction. *See* Docket No. 1314 at 14. The plaintiffs bear the burden of demonstrating personal jurisdiction (1) under the Massachusetts long-arm statute and (2) consistent with due process. *See Motus*, 23 F.4th at 124.

The Massachusetts long-arm statute permits personal jurisdiction over, *inter alia*, "a person, who acts directly or by an agent, as to a cause of action in law or equity arising from the person's (a) transacting any business in this commonwealth." M. G. L. c. 223A, § 3. Courts construe the term "transacting any business" broadly. *See Workgroup Tech. Corp.*, 246 F. Supp. 2d at 109. "A defendant need not be physically present in a state to 'transact business' in that state." *M-R Logistics*, 537 F. Supp. 2d at 275. The defendant, however, must have "attempted to

participate in the commonwealth's economic life," *see United Elec.*, 960 F.2d at 1087, by engaging in a "purposeful" act in or directed at Massachusetts, *see Hannon*, 524 F.3d at 280.  In deciding whether a claim "arises from" from a defendant's "transacting any business" in Massachusetts, courts consider "whether the transacted business was a 'but for' cause of the harm alleged in the claim." *Cossart*, 804 F.3d at 18.

Here, although Babener traveled to Massachusetts only once, the plaintiffs allege that he provided legal and business advice to TelexFree over the course of eight months.  This legal advice was not directed solely at matters outside Massachusetts. *Cf. Sawtelle*, 70 F.3d at 1391.  Rather, the plaintiffs allege that Babener helped TelexFree defend itself against an investigation by Massachusetts regulators.  In addition, the plaintiffs allege that Babener provided business advice to TelexFree by coordinating various outside advisors, providing investment recommendations, and leveraging his contacts.  These actions, concerning TelexFree's Massachusetts-centered operations, were sufficiently directed at Massachusetts to constitute attempts by Babener to participate in the Commonwealth's economic life. *See United Elec.*, 960 F.2d at 1087.  Further, it is at least plausible that these efforts to assist TelexFree with its operations were a "but for" cause of the plaintiffs' harm.  For example, by functioning as TelexFree's "point person" relative to outside consultants, Babener plausibly helped TelexFree continue to operate its fraudulent scheme and abscond with investor funds.

Due process requires that the defendant "have certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co*, 326 U.S. at 316 (quoting *Milliken*, 311 U.S. at 463).  Courts consider (1) whether the plaintiffs' claims directly arise from or relate to the defendant's activities in the forum, (2) whether the defendant purposefully availed itself of the privilege of conducting activities in the

forum, and (3) whether the exercise of jurisdiction is reasonable under the circumstances.  *See Motus*, 23 F.4th at 122.

Here, the plaintiffs' claims "directly arise from" Babener's activities in Massachusetts. The plaintiffs allege that Babener helped operate the unlawful scheme, which was based in Massachusetts.  Babener also "purposefully availed" himself of the privilege of conducting activities in Massachusetts.  Babener not only provided legal advice in connection with a Massachusetts regulatory investigation and advised TelexFree on its operations, but Babener advised TelexFree to get "out of [Massachusetts] as soon as you can," to get "assets beyond the control of [Massachusetts]," and to do so in a way "that doesn't trigger action by [Massachusetts]." 5CAC at ¶ 1009.  By advising TelexFree to move its assets beyond the reach of Massachusetts regulators, knowing that Massachusetts was investigating TelexFree for potential securities violations, and knowing that TelexFree had been operating unlawfully, Babener reasonably should have foreseen being "haled into court" in Massachusetts.  *See PREP Tours, Inc. v. Am. Youth Soccer Org.*, 913 F.3d 11, 20 (1st Cir. 2019).  Finally, considering that the scheme was based in Massachusetts, and that pretrial proceedings have been consolidated in Massachusetts, the exercise of jurisdiction in Massachusetts is reasonable under the circumstances.  *See Ticketmaster-New York, Inc. v. Alioto*, 26 F.3d 201, 209 (1st Cir. 1994) (outlining factors).

<u>Choice of law</u>.  The Estate argues that Oregon law applies to the plaintiffs' claims.  *See* Docket No. 1314 at 23.  The plaintiffs counter that Massachusetts law applies.  *See* Docket No. 1350 at 71.  Massachusetts choice-of-law principles determine which state's substantive law applies.  *See In re Volkswagen & Audi Warranty Extension Litig.*, 692 F.3d 4, 17 (1st Cir. 2012). Massachusetts courts follow a "functional approach to choice of law," *Levin v. Dalva Brothers. Inc.*, 459 F.3d 68, 74 (1st Cir. 2006) (quoting *Bushkin Assocs., Inc. v. Raytheon Co.*, 473 N.E.2d

662, 668 (Mass. 1985)), which means that they consider which state has the "most significant relationship" to the claims at issue, *see Foise v. Worcester Polytechnic Institute*, 967 F.3d 27, 41-42 (1st Cir. 2020).  To determine which state has the most significant relationship to a claim that sounds in tort, as the plaintiffs' claims do here, "Massachusetts courts consider, among other things, the place where the injury occurred, the place where the conduct causing the injury occurred, the domicil, residence, nationality, place of incorporation and place of business of the parties, and the place where the relationship, if any, between the parties is centered."  *Cornwell Entertainment, Inc. v. Anchin, Block & Anchin, LLP*, 830 F.3d 18, 34 (1st Cir. 2016) (quotations omitted).  Here, the plaintiffs' injury appears to have occurred in Massachusetts; Babener's conduct mostly occurred in Oregon; the parties' domiciles were split between Massachusetts and Oregon; and the parties did not have a direct relationship.  The TelexFree scheme, however, was centered in Massachusetts, and the plaintiffs allege that Babener furthered the scheme by providing legal and business advice to its operators over the course of eight months.  On balance, Massachusetts has the most significant relationship to the plaintiffs' claims.  Accordingly, Massachusetts law applies.[19]

Statutory claims.  The plaintiffs assert three statutory claims against the Estate: violations of the Massachusetts multilevel marketing law, M. G. L. c. 93, §§ 12 and 69; violations of the Massachusetts consumer protection law, M. G. L. c. 93A, §§ 2 and 11; and violations of the Massachusetts securities law, M. G. L. c. 110a, § 410(b).

The Massachusetts multilevel marketing law prohibits multilevel marketing companies and any "participant" from operating or participating in any multilevel marketing program where

---

[19] The Estate argues that the plaintiffs' tort claims are time-barred only under Oregon law, which does not apply.

financial gains to participants are "primarily dependent upon the continued, successive recruitment of other participants and where retail sales are not required as a condition precedent to realization of such financial gains."  M. G. L. c. 93, § 69.  The Estate argues that the 5CAC fails to state a claim under the Massachusetts multilevel marketing law because Babener was not a "participant" in the scheme, which the Court previously defined as encompassing individuals who participate in the distribution chain for goods or services offered by the multilevel marketing company, recruit new participants, and pay or receive commissions, bonuses, or finder's fees.  *See In re TelexFree Securities Litig.*, 358 F. Supp. 3d 98, 101 (D. Mass. 2019).  The plaintiffs contend that Babener was a "participant" in the scheme because he coordinated outside consultants, advised on operations, and acted as a "de facto CEO."  *See* Docket No. 1350 at 64.  Despite the plaintiffs' characterization of Babener as a "de facto CEO," the plaintiffs' allegations do not suggest that Babener actively recruited promoters to the scheme or received compensation for such recruitment.  *Cf. In re TelexFree Securities Litig.*, 358 F. Supp. at 101.  Even accepting that Babener assisted the scheme's operations, Babener was not a "participant" in the scheme within the meaning of the statute.  Accordingly, the 5CAC fails to state a claim under M. G. L. c. 93, §§ 12 and 69.

The Massachusetts consumer protection law prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce."  *See* M. G. L. c. 93A, § 2.  For an attorney to be held liable under M. G. L. c. 93A, the attorney must have been "acting in a business context."  *Miller v. Mooney*, 725 N.E.2d 545, 551 (Mass. 2000).  Here, the plaintiffs do not allege that they had any direct contact with Babener.  This case is thus unlike *Kirkland Const. Co. v. James*, 658 N.E.2d 699, 701 (Mass. App. Ct. 1995), on which the plaintiffs rely.  Even accepting that Babener provided business advice, not just legal advice, to TelexFree, the 5CAC fails to state a claim against Babener under M. G. L. c. 93A.

The Massachusetts securities law prohibits any seller or "partner, officer, or director of such a seller" from selling a "security" by means of any untrue statement or omission of material fact.  *See* M. G. L. c. 110, § 410.  Although the plaintiffs contend that he was a de facto CEO of TelexFree, the plaintiffs have not identified any untrue statement of material fact, or omission of material fact, Babener made in connection with the sale of a security.  Thus, the 5CAC fails to state a claim under M. G. L. c. 110, § 410(b).

<u>Fraud claims</u>.  The plaintiffs allege that the Estate is liable for fraud and negligent misrepresentation.  To state a claim for fraud under Massachusetts law, the plaintiff must plead that "(1) the defendant made a false representation of a material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon; (2) the plaintiff relied upon the representation as true and acted upon it to his or her detriment; and (3) such reliance was reasonable under the circumstances."  *H1 Lincoln, Inc. v. South Washington Street, LLC*, 179 N.E.3d 545, 560 (Mass. 2022) (cleaned up).  To state a claim for negligent misrepresentation under Massachusetts law, the plaintiff must plead that the defendant "(1) in the course of its business, (2) supplied false information for the guidance of others (3) in their business transactions, (4) causing and resulting in pecuniary loss to those others (5) by their justifiable reliance upon the information, and (6) that it failed to exercise reasonable care or competence in obtaining or communicating the information."  *Cummings v. HPG Intern., Inc.*, 244 F.3d 16, 24 (1st Cir. 2001).  The plaintiffs allege that Babener "composed, reviewed, and approved misleading press releases through April 2014."  5CAC at ¶ 1018.  This sole allegation is conclusory and lacks the specificity required by Rule 9(b).  Thus, the 5CAC fails to state a claim for fraud and negligent misrepresentation against the Estate.

Aiding and abetting & civil conspiracy. The plaintiffs allege that the Estate is liable for tortious aiding and abetting and civil conspiracy. A claim for tortious aiding and abetting requires proof that (1) an underlying tort was committed, (2) the defendant had actual knowledge of the underlying tort, and (3) the defendant substantially assisted the commission of the underlying tort. *See Turo*, 166 N.E.3d at 981. A claim for civil conspiracy (under a substantial assistance theory, *see* Docket No. 1350 at 65) similarly requires proof that (1) the defendant gave substantial assistance to or encouraged a tortfeasor's conduct, and (2) the defendant knew that such conduct was tortious. *See Kyte v. Philip Morris Inc.*, 556 N.E.2d 1025, 1027 (Mass. 1990).

The 5CAC plausibly alleges that Babener had actual knowledge of and substantially assisted the TelexFree fraud. In September 2013, Babener told Merrill that TelexFree "will not survive legally . . . unless there is a dramatic change." 5CAC at ¶ 984. As Babener continued to advise TelexFree, no such "dramatic change" occurred, at least until March 2014. Babener assisted the scheme by reviewing documents, advising TelexFree on how to position itself to banks, bringing in other consultants and advisors, and identifying outlets into which to relocate victim funds. *Id.* at ¶¶ 988, 991-92, 996, 1003, 1006, 1016. This assistance plausibly was a "substantial factor" in the commission of the underlying fraud. Had Babener not stepped in to assist TelexFree when he did, it is plausible that the scheme would not have been able to attract new investors and abscond with new and existing investor funds. Thus, the 5CAC states a claim for tortious aiding and abetting and civil conspiracy against the Estate.

Accordingly, the Estate's motion is ***granted in part*** and ***denied in part***. The motion is denied as the plaintiffs' tortious aiding and abetting and civil conspiracy claims. The motion is granted as to the plaintiffs' remaining claims.

*d.  PwC – Docket No. 1317*

The plaintiffs seek to hold PricewaterhouseCoopers LLP ("PwC") liable for tortious aiding and abetting.[20]  PwC argues that the plaintiffs lack Article III standing, and that the 5CAC fails to state a claim by not adequately alleging, *inter alia*, substantial assistance.

Allegations.  PwC provided tax and business advice to TelexFree from January 2014 to April 2014.  5CAC at ¶ 1113.  Before doing so, PwC learned that TelexFree had been shuttered in Brazil due to allegations that it was engaged in a pyramid scheme, and that it was facing allegations concerning its identical business model in the United States.  *Id.* at ¶ 1121.  PwC also learned that TelexFree sold no product and was dependent on funds from new promoters to sustain its operations.  *Id.* at ¶ 1124.

Beginning in January 2014, Richard Colabella and Jerry Puzey, two high-level PwC employees, worked with TelexFree on moving money overseas, international expansion, taxation, and corporate restructuring.  *Id.* at ¶ 1125.  Colabella and Puzey recommended that TelexFree open accounts in countries with lax tax regulations and favorable multilevel marketing laws and suggested that TelexFree, LLC transfer its contractual rights to overseas agents and customers to a new overseas entity.  *Id.* at ¶¶ 1128, 1130.

PwC developed a "Proposed Global Business Alignment" for TelexFree, which Colabella and Puzey presented to Merrill and Wanzeler in January 2014.  *Id.* at ¶¶ 1129, 1131.  During the presentation, the group discussed the fact that TelexFree was facing regulatory scrutiny, and that their objective was to restructure TelexFree to avoid United States regulators, divert funds offshore, and minimize United States taxes.  *Id.* at 1131.  TelexFree ultimately adopted the presentation's "executive level concept" and "overarching strategy."  *Id.* at ¶¶ 1129, 1139.

---

[20] The 5CAC also includes a claim for unjust enrichment against PwC.  The plaintiffs included this claim only to preserve their appellate rights.  *See* Docket No. 1339 at 13.  To be clear, the unjust enrichment claim against PwC remains dismissed.

Later, Colabella and Puzey participated in an email exchange with Merrill, Wanzeler, Babener, Garvey Schubert, and others regarding the establishment of a foreign entity for TelexFree in the Cayman Islands, a location PwC had recommended, as well as the establishment of a bank account for that entity. *Id.* at ¶¶ 1135-36. Garvey Schubert formed the Cayman entity on March 6, 2014. *Id.* at ¶ 1137. PwC also helped TelexFree expand into Colombia and Ecuador. *Id.* at ¶ 1139.

PwC further helped TelexFree with tax issues, advising TelexFree to prepare "inaccurate" 1099 forms, which TelexFree did. *Id.* at ¶¶ 1140, 1142. Finally, PwC worked with Merrill to limit the information TelexFree provided to Massachusetts regulators and participated in the submission of a "cooked" set of books to Massachusetts regulators. *Id.* at ¶¶ 1149-50.

Standing. PwC contends that the plaintiffs lack Article III standing. *See* Docket No. 1318 at 15. To establish standing, the plaintiffs must demonstrate that they have suffered an "injury in fact" that is "fairly traceable" to the defendant's conduct and "redressable" by the court. *Spokeo*, at 338. The plaintiffs allege that they suffered financial losses, which is sufficient at the pleading stage to establish an injury in fact. *See Nat. Res. Def. Council, Inc.*, 710 F.3d at 85. The plaintiffs also allege that PwC helped TelexFree sustain its illegal operations, which is sufficient at the pleading stage to establish traceability. *See Mastafa*, 2008 WL 4378443, at *2-3 (finding causation for purposes of Article III standing satisfied where the plaintiffs alleged that the defendant aided and abetted the principal tortfeasor). Contrary to PwC's assertion, the timing of the plaintiffs' investment is not dispositive. It is at least plausible that the longer the scheme lasted, and the greater number of promises the scheme made to investors, the more likely the plaintiffs' losses from earlier investments became. To the extent the plaintiffs allege that PwC helped TelexFree sustain its illegal operations, therefore, the plaintiffs sufficiently allege that their losses are "fairly

traceable" to PwC's conduct.  *See Attias v. Carefirst, Inc.*, 856 F.3d at 629.  The plaintiffs'
allegations are sufficient at the pleading stage to establish Article III standing.  *See In re TelexFree
Securities Litig.*, 358 F. Supp. 3d at 121.

Substantial assistance.  PwC argues that the 5CAC does not adequately allege substantial
assistance.  *See* Docket No. 1318 at 20-24.  A defendant provides substantial assistance to a
tortfeasor when the defendant's actions are a "substantial factor" in the tortfeasor's ability to
commit the underlying tort.  *See Turo*, 166 N.E.3d at 981.  While the 5CAC alleges that PwC
advised TelexFree on moving money overseas, international expansion, corporate restructuring,
and taxation, the 5CAC does not allege how this advice contributed to the underlying fraud.  *See
JPMorgan Chase Bank v. Winnick*, 406 F. Supp. 2d 247, 257 (S.D.N.Y. 2005).

First, the 5CAC does not allege that PwC's advice caused TelexFree to move money
overseas.  Although the 5CAC alleges, "[u]pon information and belief," that Merrill used an entity
in Nevis to move money outside the United States, *see* 5CAC at ¶ 1056, the 5CAC does not clearly
link the Nevis entity to PwC, *see id.* at ¶ 1133 (alleging that Babener suggested moving money to
Nevis); *see also* Docket No. 1415 at 5-6.  Moreover, while the 5CAC clearly links PwC to the
formation of a Cayman entity, the 5CAC does not allege that the Cayman entity was used to
offshore funds.

Second, the 5CAC does not allege how PwC's advice on international expansion and
corporate restructuring, even if acted upon at a high level, *see* 5CAC at ¶¶ 1129, 1139, contributed
to the underlying fraud.  The 5CAC alleges that PwC helped TelexFree expand to Colombia and
Ecuador, for instance, see *id.* at 1139, but the 5CAC does not provide any indication as to how that
expansion affected promoters in the United States, such as the plaintiffs, *see id.* at ¶¶ 32-33, 1193.
Similarly, the 5CAC alleges that PwC advised TelexFree to establish an overseas entity to which

TelexFree, LLC's contractual rights to overseas promoters and customers could be transferred, *see id.* at ¶ 1130, but again, the 5CAC does not allege how this transfer affected promoters in the United States, such as the plaintiffs.

Finally, the 5CAC does not allege, with the requisite specificity, how PwC's advice on tax matters or regulatory responses constituted or furthered the underlying fraud. The 5CAC does not, for instance, specify what was "inaccurate" about PwC's advice regarding the mailing of 1099 tax forms, nor how the books PwC allegedly participated in preparing for Massachusetts regulators were "cooked." These allegations "fail to cross 'the line between the conclusory and the factual.'" *Penalbert-Rosa*, 631 F.3d at 595 (quoting *Twombly*, 550 U.S. at 557 n.5); *see also* Docket No. 595 at 9.

The 5CAC does not plausibly allege that PwC substantially assisted the underlying fraud; accordingly, the 5CAC fails to state a claim against PwC for tortious aiding and abetting. Thus, PwC's motion to dismiss is ***granted***.

## Conclusion

The motions filed by The Sheffield Group, Inc. (Docket No. 1299),[21] PNC Bank, N.A. (Docket No. 1301), International Payout Systems, Inc. (Docket No. 1305), Garvey Schubert Barer, P.C. (Docket No. 1310), and PricewaterhouseCoopers LLP (Docket No. 1317) are ***granted***. The motion filed by The Estate of Jeffrey A. Babener (Docket No. 1311) is ***granted in part*** and ***denied in part***. The motions filed by Mauricio Cardenas (Docket No. 1287), Bank of America, N.A. (Docket No. 1291), Dustin Sparman and Vantage Payments, LLC (Docket No. 1294), TD Bank,

---

[21] The other motion filed by The Sheffield Group (Docket No. 1297) is ***denied***.

N.A. (Docket No. 1303), Wells Fargo Advisors LLC and Wells Fargo Bank N.A. (Docket No. 1307), and ProPay, Inc. (Docket No. 1316) are ***denied***.

**SO ORDERED**

***/s/ Timothy S. Hillman***
**TIMOTHY S. HILLMAN**
**DISTRICT JUDGE**
