**United States District Court**
**District of Massachusetts**

| | |
|---|---|
| In re: TelexFree Securities Litigation | MDL Action No. 4:14—md-2566-NMG |

**MEMORANDUM & ORDER**

GORTON, J.

This multi-district litigation ("MDL") arises from the meltdown of a sprawling, hybrid Ponzi-pyramid scheme operated by TelexFree, LLC, TelexFree, Inc. and TelexFree Financial, Inc. (collectively, "TelexFree"). Pending before the Court is the motion of named plaintiff Anthony Cellucci ("plaintiff" or "Cellucci") for class certification (Docket No. 2155). For the reasons that follow, the motion will be denied.

I.    **Background**

TelexFree was a billion-dollar fraud scheme that operated from 2012 until April, 2014. Holding itself out as a multi-level marketing company, TelexFree generated revenue by selling packages of Voice over Internet Protocol ("VoIP") calling plans to "promoters," i.e., participants. TelexFree charged promoters $50 for membership, and then $289 for the right to sell 10 VoIP

-1-

plans per month for a year, or $1,375 for the right to sell 50 VoIP plans per month for a year.

TelexFree operated as a Ponzi scheme by guaranteeing lucrative returns to promoters funded by membership fees collected from new participants.  In theory, promoters could make money by selling VoIP plans to consumers.  The plans were, however, impossible to sell.  Nevertheless, TelexFree guaranteed promoters a return on their investments.  So long as a promoter posted TelexFree advertisements on the Internet every day, TelexFree would "buy back" from the promoter any unsold plans for more than three times the amount the promoter paid for them. TelexFree paid promoters in "credits."  Once a promoter's credits reached a certain balance, the promoter could withdraw the credits as cash.

The company also operated as a pyramid scheme in that it did not accrue income from the sale of (worthless) VoIP services but rather from the recruitment of new participants.  Existing participants were incentivized to recruit new participants in return for credits to their accounts.

Participants tendered funds for memberships and "right-to-sell" plans in one of two ways: either by submitting funds directly to TelexFree through their user accounts or by paying their recruiters in so-called "triangular transactions."

The First Circuit Court of Appeals ("the First Circuit") has explained how the triangular transactions operated:

> The [most] common method used [to pay the fee] was that the new participant paid her membership fee directly to the participant who recruited her. TelexFree then would remove from the recruiting participant's account credits of equal value to the membership fee that this recruiting participant retained. TelexFree then considered the new participant's invoice satisfied and, once annually, issued an [IRS] Form 1099 to the recruiting participant for the value of the credits he redeemed. Existing TelexFree participants could monetize their accumulated credits this fast and reliable way.

In re TelexFree, LLC, 941 F.3d 576, 580 (1st Cir. 2019). The vast majority of TelexFree's revenue was attributable to triangular transactions, as is typical of pyramid schemes, and membership payments accounted for nearly all of TelexFree's income (as opposed to the sale of its product). Almost 90% of those membership payments were made as a result of triangular transactions.

In early 2013, TelexFree and its Brazilian counterpart, Ympactus, came under investigation by authorities in Brazil and the United States. In June, 2013, a Brazilian court found Ympactus in violation of laws banning Ponzi schemes and issued an injunction prohibiting the company from recruiting new participants. TelexFree assured U.S.-based participants that, despite the ongoing investigation, there was nothing to worry about.

-3-

In March, 2014, TelexFree announced that participants would actually have to sell VoIP plans in order to be paid, effectively rescinding the guaranteed return on investment. The announcement triggered a "run on the bank," with participants submitting more $150 million worth of cash withdrawal requests over a period of a few weeks. In April, 2014, TelexFree filed for bankruptcy.

## II. **Procedural History**

Immediately after TelexFree filed its bankruptcy petition, the U.S.-based investigation materialized. Both the Massachusetts Securities Division and U.S. Securities and Exchange Commission filed suit and the Department of Justice executed a series of search warrants, including at the Marlborough, Massachusetts headquarters of TelexFree.

Individual civil actions soon followed. Beginning in May, 2014, plaintiffs filed suits in federal district courts nationwide seeking to recover losses against dozens of defendants, including the operators of the scheme, payment processors and banks that provided financial services to TelexFree. In October, 2014, the Judicial Panel on Multidistrict Litigation allowed a motion to centralize the actions for coordinated pretrial proceedings in another session of this Court.

-4-

In March, 2015, plaintiffs filed the first of five amended consolidated complaints and the Court granted the government's request to stay discovery in the MDL pending parallel criminal proceedings against several TelexFree insiders. The stay remained in place until January, 2019.

While discovery in the MDL was stayed, the bankruptcy proceeding continued apace. The Massachusetts Bankruptcy Court ordered that claims were be paid out according to a "net equity" formula, defined as

> the total of the amount the participant paid to TelexFree less the amount participants received from TelexFree, including any amounts from triangular transactions.

In re Iatrou, No. 20-40112-DPW, 2022 WL 220323, at *2 (D. Mass. Jan. 25, 2022). Only participants who paid more into TelexFree than they ultimately received, i.e., "net losers," were entitled to file claims. In 2019, the First Circuit Court affirmed the Bankruptcy Court's decision and allowed the Bankruptcy Trustee to pursue avoidance actions against "net winners." In re TelexFree, LLC, 941 F.3d. More than 130,000 participant-creditors filed claims, which were subjected to a lengthy vetting process before being approved or denied.

The stay of discovery in the MDL was lifted in 2019. In December, 2021, the transferee judge granted, in part, the plaintiffs' motion to amend which resulted in the filing of the

fifth consolidated amended complaint ("5CAC"). The 5CAC
contains eight counts, including, as relevant to this hearing, a
common-law claim of tortious aiding and abetting against all
defendants. The representative of the putative class brings his
claims against three broad categories of defendants:

(1) TelexFree "insiders" who worked for TelexFree either
officially or unofficially;

(2) Professionals (lawyers and accounts) who advised
TelexFree and allegedly helped to hide funds and lie
to investigators; and

(3) Banks and payment processors who allegedly knew
TelexFree was a fraud but provided financial services
regardless.

More than a dozen defendants moved to dismiss the claims
against them. In August, 2022, the transferee judge issued
multiple orders addressing various motions, resulting in the
dismissal of claims against six defendants. The motions of
defendants Mauricio Cardenas, Bank of America, N.A., Dustin
Sparman, Vantage Payments, LLC, TD Bank, N.A., Wells Fargo
Advisors LLC and Wells Fargo Bank N.A. and ProPay, Inc. were
denied.

In December, 2023 the MDL was reassigned to this session of
the Court.

In February, 2024, the newly-assigned transferee judge
approved settlement agreements with several of the remaining
defendants. Subsequently, the Court held a case management

-6-

conference and established a schedule for discovery, class certification and the filing of dispositive motions.

In December, 2024, plaintiff Anthony Cellucci ("Cellucci" or "plaintiff"), the designated representative of the putative class, filed a motion to certify a class. He seeks to bring claims on behalf of himself and a class of similarly situated individuals who invested money in TelexFree and suffered net losses as a result. Cellucci also seeks to have Attorney Robert Bonsignore appointed as class counsel.

Defendants Wells Fargo, N.A., Wells Fargo Advisors, LLC (collectively, "Wells Fargo"), Maurico Cardenas ("Cardenas"), Michael Montalvo ("Montalvo") and ProPay, Inc. ("ProPay") oppose the motion. The Court held a hearing on plaintiff's motion in February, 2025 and took the matter under advisement.

### III. **Plaintiff's Motion for Class Certification**

Plaintiff moves to certify a class of victims of the TelexFree scheme pursuant to Fed. R. Civ. 23(b)(3). Plaintiff defines the class as

> all persons that made a payment to TelexFree and suffered a [n]et loss . . . defined as placing more funds into TelexFree than the total funds withdrawn from TelexFree.[1]

---

[1] Plaintiff later sought to amend the class definition through ex-post filings with this Court suggesting potential exclusions from the class for the Court to "consider" (Docket No. 2216), which the Court has denied but which, for the reasons set forth below, have no bearing on the decision herein.

The essence of the parties' dispute is the reliability of the methods used by plaintiff's expert to ascribe TelexFree user accounts to individual participants and to calculate individual damages. This issue is relevant to several stages in the Rule 23 analysis.

Plaintiff's expert, Karyl Van Tassel ("Van Tassel"), relied upon participant data stored by TelexFree in an internal system called "SIG" to identify class members. Participants would enter their own identifying information (e.g., name, SSN, phone number, email address) to create user accounts with TelexFree. Each account has its own unique identification number and login name. SIG kept a record of invoices, deposits and withdrawals associated with each account, thereby enabling plaintiff's expert to identify accounts that suffered net losses and to calculate damages.

Defendants insist that this data is entirely unreliable because users often input false information, created multiple accounts under different names or established "group" accounts affiliated with multiple participants. Furthermore, SIG does not capture the whole universe of participant transactions because the cash payments made to recruiters as part of the triangular transactions occurred entirely off-the-books. Those "triangular transactions" purportedly cannot be incorporated

into the calculation of participants' net losses because there is no record of them in the SIG database. Defendants argue that these deficiencies in the data affect plaintiff's ability both to identify class members and to evaluate damages.

Plaintiff counters that the "fundamental problems" in the SIG database that defendants highlight (i.e., fake data, under-aggregation and over-aggregation) are not nearly as pervasive as defendants suggest. Furthermore, plaintiff emphasizes that the definition of the proposed class is limited to those suffering proven net losses as reflected in their direct payments made in the SIG database, i.e., triangular transactions are omitted from the calculation entirely. Thus, plaintiff contends, the class definition is intentionally conservative so as to omit victims whose losses lack evidentiary support. Finally, plaintiff lays out a process that he asserts would be administratively feasible both as to associate user accounts with individual participants and to the accuracy of damages calculations.

### a.    Standard

Class actions serve as "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." Comcast Corp. v. Behrend, 569 U.S. 27, 33 (2013) (cleaned up). A court may certify a class only if it finds that the proposed class satisfies all the requirements of Fed R. Civ.

P. 23(a) ("Rule 23(a)") and that class-wide adjudication is appropriate for one of the reasons set forth in Fed. R. Civ. P 23(b). Smilow v. Sw. Bell Mobile Sys., Inc., 323 F.3d 32, 38 (1st Cir. 2003). Plaintiffs have the burden of proving that the Rule 23 prerequisites to class certification are satisfied by a preponderance of the evidence. In re Nexium Antitrust Litig., 777 F.3d 9, 27 (1st Cir. 2015).

A district court must conduct a "rigorous analysis" under Rule 23 before certifying the class. Id. It may look behind the pleadings, predict how specific issues will become relevant to facts in dispute and conduct a merits inquiry to the extent that the merits overlap with the Rule 23 criteria. See In re New Motor Vehicles Canadian Exp. Antitrust Litig., 522 F.3d 6, 20 (1st Cir. 2008).

Rule 23(a) requires that a class meet the following four criteria:

    1) the class is so numerous that joinder of all
       members is impracticable;

    2) there are questions of law or fact common to the
       class;

    3) the claims or defenses of the representative
       parties are typical of the claims or defenses of
       the class; and

    4) the representative parties will fairly and
       adequately protect the interests of the class.

Fed. R. Civ. P. 23(a)(1)-(4).

Plaintiffs must also show that class certification is appropriate under Rule 23(b). Here, plaintiff seeks to certify the proposed classes under Rule 23(b)(3) which requires that common questions of law or fact "predominate" over those affecting individual class members and that a class action be the "superior" method for fair and efficient adjudication. The standard for demonstrating Rule 23(b)(3) predominance is "far more demanding" than that for the related requirement of Rule 23(a)(2) commonality. In re New Motor Vehicles, 522 F.3d at 20.

Furthermore, plaintiff must satisfy the "implicit" Rule 23 requirement of ascertainability.[2] Mantha v. QuoteWizard.com, LLC, 347 F.R.D. 376, 385 (D. Mass. 2024). A class must not just be ascertainable in theory; identifying its members must be "administratively feasible." Shanley v. Cadle, 277 F.R.D. 63, 67-68 (D. Mass. 2011). Plaintiff's burden is not to identify all class members at the outset of the litigation, so long as the

---

[2] The First Circuit, in common with most other circuits, treats ascertainability as an additional requirement distinct from predominance, In re Nexium Antitrust Litig., 777 F.3d 9, 19 (1st Cir. 2015); see, e.g., Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc., 821 F.3d 992, 996 (8th Cir. 2016); Byrd v. Aaron's Inc., 784 F.3d 154, 164 (3d Cir. 2015), but the two inquiries can sometimes overlap. Hayes v. Wal-Mart Stores, Inc., 725 F.3d 349, 359 (3d Cir. 2013); see Simer v. Rios, 661 F.2d 655, 677 (7th Cir. 1981).

"stable and objective factors" provided in the class
definition can be used to identify class members at a later
stage. Donovan v. Philip Morris USA, Inc., 268 F.R.D. 1, 9
(D. Mass. 2010) (quoting Kent v. SunAmerica Life Ins. Co.,
190 F.R.D. 271, 278 (D. Mass. 2000)).

### b.   Ascertainability

Plaintiff asserts that his putative class is
ascertainable because its membership is determined by
objective criteria, specifically by whether a given
participant's

> real money deposits into the TelexFree scheme exceeded that
> participant's withdrawals from the scheme, based on an
> aggregation of account data in TelexFree's SIG system.

In doing so, plaintiff explains that, because class
membership is controlled solely by the delta between a
participant's total gains and total losses as reflected in SIG,
he does not need to present evidence of participants' triangular
transactions.

A proposed class is deemed ascertainable if

> members can be identified through stable and objective
> factors without individualized litigation as to each
> member.

Thrower v. Citizen Disability, LLC, No. 20-10285-GAO, 2022
Wl 3754737, at *2 (D. Mass. Aug. 30, 2022) (internal quotation
marks omitted); see Matamoros v. Starbucks Corp., 699 F.3d 129,

139 (1st Cir. 2012).  Here, the values as reflected in SIG are stable and objective and, purportedly, require no further examination.

Plaintiff's narrow class definition, however, still fails to address the fundamental problem of linking user accounts to participants, i.e., individual plaintiffs, and, as prior sessions of this Court have held, that is no small problem.

Judge Woodlock identified many of the same deficiencies that defendants emphasize in his ruling with respect to the related bankruptcy:

> First, most new participants paid for their TelexFree memberships in triangular transactions, making cash payments to the participants who recruited them. In re TelexFree, LLC, 941 F.3d at 584. Second, participants do not appear to have received receipts or clear documentation of their payments in triangular transactions.  Third, participants often possessed multiple user accounts in the TelexFree database, sometimes under a variety of usernames. Id. at 579 ("Many participants had multiple accounts, as they were encouraged to do by the economic incentives of the scheme."). Fourth, the TelexFree user account database did not link the user accounts belonging to a single participant; as a consequence, a participant's full history of TelexFree transactions could not easily be tracked across his or her user accounts through the TelexFree database. In re TelexFree, LLC, 2021 WL 2562646, at *2.

In re Iatrou, 2022 WL 220323, at *2.  As such, even though the net gains versus net losses of user accounts is ascertainable, the identity of who own those accounts is not.

-13-

Moreover, even though plaintiff's definitional maneuver seeks to preserve ascertainability by omitting the need to prove triangular transactions, he cannot thereby evade the challenges of the Rule 23 analysis presented by them. Specifically, as discussed below, the assessment of damages will overwhelm the common questions. An accurate calculation of damages of each class member must still account for triangular transactions to ensure that actual net winners do not benefit from the limited data in the SIG system. In short, plaintiff's artificial solution to fix ascertainability simply "kicks the can down the road" by delaying the necessity of proving triangular transactions until the predominance analysis. That is problematic because the First Circuit has estimated that almost 90% of new membership fees were paid to recruiters via triangular transactions. In re TelexFree, LLC, 941 F.3d at 580.

This Court is concerned that plaintiffs have not shown that,

> prior to judgment, it will be possible to establish a
> mechanism for distinguishing the injured from uninjured
> class members that is administratively feasible.

777 F.3d 9, 19 (1st Cir. 2015) (cleaned up).

-14-

**c.   Rule 23(b)(3)**

Plaintiff moves the Court to certify the class pursuant to Rule 23(b)(3), and therefore, in addition to the Rule 23(a) requirements, the court must be convinced that

> questions of law or fact common to the members of the class <u>predominate</u> over any questions affecting only individual members, and that a class action is <u>superior</u> to other available methods for the fair and efficient adjudication of the controversy.

Fed. R. Civ. P. 23(b)(3)(emphasis added).

**1.   Predominance**

The First Circuit has explained that the purpose of the predominance inquiry is

> to test whether any dissimilarity among the claims of class members can be dealt with in a manner that is not inefficient or unfair.

In re Asacol Antitrust Litig., 907 F.3d 42, 51 (1st Cir. 2018). While the "predominance" requirement is much more demanding than the Rule 23(a) prerequisite of commonality, it does not require complete uniformity.  See Amchem Products, Inc. v. Windsor, 521 U.S. 591, 623-24 (1997).  The plaintiff need only prove that individualized questions will not "overwhelm" the common ones. In re Nexium, 777 F.3d at 21.  Thus, the "need for some individualized determinations" will not defeat class certification. Id.

Plaintiff concedes that portions of the case will need to be tried separately, damages in particular. However, he insists that more than one key factual and legal issue in the action is

> common to the class and can be said to predominate . . . even though other matters will have to be tried separately, such as damages . . . .

Tyson Foods, Inc. v. Bouaphakeo, 577 U.S. 442, 453 (2016). Plaintiff argues that the critical question of whether a Ponzi or pyramid scheme existed at TelexFree is a common question of fact that predominates over individual issues, citing to the Court several other cases involving Ponzi scheme class actions wherein this question was deemed sufficient to satisfy predominance.

Defendant maintains that several individualized factual and legal issues will overwhelm common questions at every stage of adjudication and thus preclude class certification. Those issues are 1) choice of law, 2) time-barring, 3) reliance, and 4) damages.

The Court agrees with defendant that individualized inquiries of both choice of law and damages will predominate at trial. Each issue is addressed in turn.

<u>Choice of Law and Conflict of Laws</u>:

Plaintiff asks the Court to apply Massachusetts law to all TelexFree participant class members because the scheme was

-16-

largely run out of TelexFree's headquarters in Massachusetts.
Plaintiff contends that this issue has already been decided at
earlier stages in the litigation several times over by Judge
Hillman.

Defendants counter that Judge Hillman's rulings did not
settle this question for all class members and that choice of
law will need to be determined for plaintiffs individually given
the global scope of the class plaintiff seeks to certify.  They
cite one of Judge Hillman's rulings in a related case, Cellucci
v. Foster Garvey, No. 4:23-10304-TSH, 2023 WL 4627982 (D. Mass.
July 19, 2023), as an example where the Court applied the law of
a different state.  Because the case had been transferred from
the State of Washington, the Court conducted its choice of law
analysis as if it were sitting in the transferor state.  The
Court found there was no conflict between the substantive law of
Washington and Massachusetts and therefore did not reach the
question of which state had the most significant relationship to
the cause of action.  The Court applied the law of Washington
State.

Plaintiff apparently misunderstands Judge Hillman's prior
ruling and misconstrues the necessary choice of law inquiry.  In
the 2022 decision cited by plaintiff, Judge Hillman concluded
that Massachusetts has the "most significant relationship" to

-17-

the underlying tort, In re TelexFree, 626 F. Supp. 3d 253, 288 (D. Mass. 2022), but that does not resolve (or even explicate) the choice of law inquiry. For cases centralized as MDLs under 28 U.S.C. § 1407, courts "typically apply the choice of law rules of each of the transferor courts." In re Fresenius Granuflo/Naturalyte Dialysate Prods. Liab. Litig., 76 F. Supp. 3d 294, 300 (D. Mass. 2015) (quoting In re Volkswagen and Audi Warranty Extension Litig., 692 F.3d 4, 17 (1st Cir. 2012)). Thus, Judge Hillman's conclusion is relevant only insofar as the transferor courts apply the "most significant relationship" test for choosing which forum's law to apply. See In re Volkswagen, 629 F.3d at 18-19.

It is necessary, therefore, to undertake a multistep analysis to assess whether, in fact, "variations in state law swamp any common issues and defeat predominance." Mowbray v. Waste Mgmt. Holdings, Inc., 189 F.R.D. 194, 199 (D. Mass. 1999) (quoting Castano v. Am. Tobacco Co., 84 F.3d 734, 741 (5th Cir. 1996)). Specifically, the Court is compelled 1) to identify the states from which the centralized cases were transferred, 2) to determine whether an actual conflict exists between the laws of the interested jurisdictions, 3) if there is a conflict, to apply the choice of law rule of the transferor state and 4) to compare the applicable substantive laws to determine whether "a

-18-

genuine conflict exists . . . that could defeat predominance." Ortiz v. Saba Univ. Sch. of Med., 348 F.R.D. 4, 12 (D. Mass. 2024).

It is not, however, the responsibility of this Court to undertake this analysis sua sponte.  Most circuit courts and other sessions of this Court are in agreement that it is the plaintiff who must conduct this rigorous analysis in the first instance. See, e.g., Henderson v. Bank of New York Mellon, N.A., 332 F. Supp. 3d 419, 428 (D. Mass. 2018) (confirming that it is the plaintiff who "must shoulder the herculean burden of conducting an extensive review of state law variances to demonstrate how the multi-state class will work") (quoting In re Pharm. Indus. Average Wholesale Price Litig., 252 F.R.D. 83, 94 (D. Mass. 2008)); In re M3 Power Razor Sys. Marketing & Sales Practice Litig., 270 F.R.D. 45, 57 (D. Mass. 2010).  The predominance requirement cannot be met "when the various laws have not been identified and compared." Gariety v. Grant Thornton, LLP, 368 F.3d 356, 370 (4th Cir. 2004); see also Grandalski v. Quest Diagnostics Inc., 767 F.3d 175, 180 (3d Cir. 2014); S. States Police Benevolent Ass'n v. First Choice Armor & Equip., Inc., 241 F.R.D. 85, 90 (D. Mass, 2007) (discussing plaintiffs' burden of demonstrating that variations in state law do not defeat predominance).

Plaintiff has entirely failed to satisfy his burden here.

Cases that make up this MDL were initially transferred to a different session of this Court in October, 2014, pursuant to §1407. The six actions then centralized were pending in three districts in Florida, Georgia and Massachusetts (Docket No. 1). Between February, 2017, and February, 2023, several more actions were transferred into the MDL from New York, Arizona, Florida and Washington (Docket Nos. 89, 97, 102, 1425, 1530). The MDL thus centralizes more than a dozen cases from districts in at least six states.

Plaintiff did not identify any one of those states as the potential source of applicable law nor did he compare their substantive laws to determine whether a choice of law analysis was required. The Court declines to perform tasks which the law dictates are the responsibility of the movant.

Damages:

Plaintiff does not disagree that damages will need to be determined on an individualized basis. The issue is whether such questions will overwhelm the common factual and legal questions already identified by plaintiff and discussed supra.

The First Circuit has held that

> [t]he individuation of damages in consumer class actions is rarely determinative under Rule 23(b)(3) [especially when] common questions predominate regarding liability . . . .

-20-

Smilow, 323 F.3d at 40.

Plaintiff seeks to reassure the Court that calculating damages will not predominate over common questions because there is an "administratively feasible" way to calculate damages. The Court is skeptical.

Plaintiff's claims administration expert, Eric Schachter ("Schachter"), proposes that eligible class members must either submit a "claim form" or have previously submitted an eligible claim that was paid in the parallel bankruptcy matter. All known class members are to be sent a summary of their known transactions and given an opportunity to submit claims if they choose to receive payments different than what is reflected in the SIG records. Participants submitting claims are to be required to provide supporting documentation. For class members who previously submitted eligible claims that were paid in the bankruptcy matter, no further action will be needed.

Plaintiff's proposal for determining participants' damages is unworkable.

For example: An early participant in the scheme ("Participant 1") pays TelexFree directly for his initial membership at a cost of $50, plus the right to sell 10 VoIP plans per month for $289. Participant 1's SIG account would

-21-

therefore reflect a net loss of $339. Then Participant 1, over time, recruits 100 new participants, all of whom pay Participant 1 their $50 membership fees in off-the-books "triangular transactions." Participant 1 has now accrued $5,000, for a net gain of $4,661. She will still appear in the SIG database to be a "net loser" as defined by the proposed class, despite suffering no injury.

Now, as per plaintiff's proposed mechanism for calculating damages, the claims administrator contacts Participant 1 and tells her that she has been identified as a "net loser" in the amount of $339, prompting her to submit a claim with supporting documentation if she believes the damages calculation is incorrect. Participant 1 has no incentive to admit willingly to the Court that she actually profited from the scheme and should be excluded from any payout.

Under this illustration, Schachter's proposed method does not identify and eliminate net winners from the putative class.

Plaintiff responds that there are not a significant number of net winners in the proposed class because the nature of a pyramid scheme is that only a few participants at the very top of the organizational structure actually made a profit. Moreover, he insists, the bankruptcy matter already identified

-22-

net winners in the adversary proceedings brought by the Trustee against two classes comprised of nearly 100,000 net winners.

Both arguments are unavailing.

First, the mere fact that TelexFree was a pyramid scheme is not proof that the putative class contains a de minimis number of uninjured members. Not one of the cases cited by plaintiff indicates that the nature of the scheme itself justifies class certification on the assumption that most class members were injured. Rather, in each case, there was reliable data on which the Court could base its damages calculations for each class member. See Camenisch v. Umpqua Bank, No. 20-05905, 2022 WL 17740285, at *8-9 (N.D. Cal. Dec. 16, 2022) (rejecting defendant's challenge to the method for calculating damages because it was based on the defendants' own data); Audet v. Fraser, 332 F.R.D. 53, 72 (D. Conn. 2019) (declining to assess the reliability of defendant's databases at class certification because the parties stipulated that there were "other reasonably uniform records" that could be used to adjudicate claims); Takiguchi v. MRI Int'l, Inc., No. 2:13-cv-01183-HDM-VCF, 2016 WL 1091090, at *2 (D. Nev. Mar. 21, 2016) (certifying a class for an investment Ponzi scheme wherein investors signed and returned agreements and then transferred payments to a specific Wells Fargo account).

-23-

Second, identifying and eliminating net winners from the class does not resolve the damages inquiry. Theoretically, the ability of the claims administrator to build off of the work already completed by the Bankruptcy Trustee would reduce the burden on participants to prove their damages. He identified net winners and losers and vetted the amount of each claim sought by creditor-victims. Unlike plaintiff, however, the Bankruptcy Trustee identified net winners and losers through a "net equity" formula which incorporated triangular transactions. The Bankruptcy Court then engaged in the painstaking process of validating the amount of the claims filed by creditors, i.e., the net loser participants.

That still leaves a substantial amount of work unfinished. Approximately 132,000 claims have been submitted to the bankruptcy court.[3] Yet even after separating net winners from net losers, tens of thousands of net losers' claims were disallowed after a lengthy claims confirmation process that included evidentiary hearings for participants who chose to challenge the claim amount calculated by the court.

As such, the claims administrator would essentially be required to conduct the same lengthy analysis of claims of class

---

[3] As per the website where participants can submit proof of their claims, at http://registry.telexfreeclaims.com.

members (potentially in the hundreds of thousands) who did not submit claims in the bankruptcy matter.

Even though the First Circuit has, on occasion, approved the use of claims adjudication processes similar to that proposed by plaintiff, those cases do not control.

Plaintiff relies heavily on the case In re Nexium, 777 F.3d, in which the First Circuit accepted a proposed method of ascertaining injuries of potential class members that required individuals to submit affidavits affirming their economic injuries.  In that case, however, unrebutted testimony from a class member in the form of an affidavit or declaration was acceptable because that evidence would have been sufficient to establish injury had the class member brought an individual suit. Id. at 21.

That is not the case here.  Class members are alleging that they were defrauded into paying money to TelexFree, either directly or via triangular transactions to recruiters.  "[A]s a general matter, a plaintiff seeking money damages must prove actual harm." Bern Unlimited, Inc. v. Burton Corp., 95 F. Supp. 3d 184, 217 (D. Mass. 2015) (cleaned up).  Class members must be able to prove their damages without violating Seventh Amendment and due process rights of defendants, i.e., defendants must be

able to challenge the testimony of each participant and rebut the claimed loss amount. <u>See</u> <u>In re Nexium</u>, 777 F.3d at 19-20.

Instead, this case more closely parallels <u>In re Asacol Antitrust Litigation</u>, 907 F.3d 42, 51-58 (1st Cir. 2018), wherein the First Circuit rejected class certification because of the difficulties in distinguishing between uninjured and injured class members. There, plaintiffs proposed a mechanism to omit uninjured class members by prompting all potential class members to submit claims along with any supporting documentation and providing them with an opportunity to contest the court's calculation of their net wins and losses:

> [T]his was not a case in which a very small absolute number of class members might be picked off in a manageable, individualized process at or before trial. Rather, this is a case in which any class member may be uninjured, and there are apparently thousands who in fact suffered no injury. The need to identify those individuals will predominate and render an adjudication unmanageable absent evidence such as the unrebutted affidavits assumed in <u>Nexium</u>, or some other mechanism that can manageably remove uninjured persons from the class in a manner that protects the parties' rights.

<u>Id.</u> at 53-54. The similarity here is especially striking because, just as in <u>Asacol</u>, there are potentially thousands of class members who suffered no injury.

In sum:

1) Plaintiff cannot evade the issue of triangular transactions simply by defining the class to exclude those who engaged

in them; that may resolve ascertainability but not
predominance.

2) Inquiries with respect to individual damages will
predominate over common questions because they must
incorporate triangular transactions:

    a. more than 90% of the transactions did not occur
       through the SIG system but rather via triangular
       transactions for which, as plaintiff admits, there are
       few, if any, records;

    b. the process of culling net winners from the class will
       not necessarily identify them because it is
       unrealistic to assume net winners will self-report
       their gains and thereby forfeit their (miscalculated)
       damages;

    c. damages must be calculated for all 500,000 class
       members, not just those identified as net winners; and

    d. working off of the calculations already made by the
       Bankruptcy Court does not reduce the administrative
       burden here because

       i. only approximately 130,000 of what plaintiff's
          expert estimates to be more than 500,000 injured
          class members have submitted claims thus far; and

-27-

ii. tens of thousands of those claims were disallowed after a lengthy claims adjudication process, and the method of confirming claim amounts by plaintiff's other expert is only a less precise version of the process used by the Bankruptcy Court.

## ORDER

For the reasons set forth above, plaintiff's motion to certify a class (Docket No. 2155) is **DENIED**.

**So ordered.**

_____
Nathaniel M. Gorton
United States District Judge

Dated: April 8 , 2025